# Exhibit A

# EQUITY OFFICE PROPERTIES TRUST

TWO NORTH RIVERSIDE PLZ
SUITE 2100
CHICAGO, IL 60606
312. 466.3300

## S–4/A

**AMENDMENT NO. 3 TO FORM S–4**
**Filed on 06/06/2001**
File Number 333–57526



LIVEDGAR Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

Table of Contents

As filed with the Securities and Exchange Commission on June 6, 2001

Registration No. 333−57526

# SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

AMENDMENT NO. 3
TO

# FORM S−4
### REGISTRATION STATEMENT
UNDER
### THE SECURITIES ACT OF 1933

# EQUITY OFFICE PROPERTIES TRUST
(Exact name of registrant as specified in its charter)

| Maryland | 6798 | 36−4151656 |
|---|---|---|
| (State or Other Jurisdiction of Incorporation or Organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification Number) |

Two North Riverside, Suite 2100
Chicago, Illinois 60606
(312) 466−3300
(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)

Stanley M. Stevens, Esq.

Executive Vice President and Chief Legal Counsel
Equity Office Properties Trust
Two North Riverside Plaza, Suite 2100
Chicago, Illinois 60606
(312) 466−3300
(Name, address, including zip code, and telephone number, including area code, of agent for service)

*Copies to:*

| J. Warren Gorrell, Jr., Esq. | Alison S. Ressler, Esq. |
|---|---|
| George P. Barsness, Esq. | Sullivan & Cromwell |
| Hogan & Hartson L.L.P. | 1888 Century Park East |
| 555 Thirteenth Street, N.W. | Suite 2100 |
| Washington, D.C. 20004−1109 | Los Angeles, CA 90067 |
| (202) 637−5600 | (310) 712−6600 |

**Approximate date of commencement of proposed sale of the securities to the public: As soon as practicable after the effective date of this Registration Statement.**

If the securities being registered on this form are being offered in connection with the formation of a holding company and there is compliance with General Instruction G, check the following box. ☐

If this form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this form is a post−effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

**The Registrant hereby amends this Registration Statement on such date or dates as may be necessary to delay its effective date until the Registrant shall file a further amendment which specifically states that this Registration Statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933 or until the Registration Statement shall become effective on such date as the Commission, acting pursuant to said Section 8(a), may determine.**

Table of Contents





## MERGER PROPOSED — YOUR VOTE IS VERY IMPORTANT

Both of our boards have approved a merger of our two companies. The boards of both companies believe that the merger represents a strategic combination of two premier real estate organizations that will be in the best interests of all of their respective shareholders. By increasing the office space owned and operated by Equity Office by approximately 25% based on square footage, the merger also will solidify Equity Office's position as the nation's largest publicly–held owner and operator of office properties with a large portfolio of high quality office buildings in key markets throughout the United States.

In the merger, Spieker common stockholders will receive $13.50 in cash and 1.49586 Equity Office common shares for each outstanding share of Spieker common stock. Cash will be paid instead of issuing fractional shares. Because the portion of the merger consideration to be received in Equity Office common shares is fixed, the value of the consideration to be received by Spieker common stockholders in the merger will depend upon the market price of Equity Office common shares at the time of the merger. Equity Office common shares are traded on the New York Stock Exchange under the symbol "EOP." On June 5, 2001, Equity Office common shares closed at $29.55 per share. We estimate that approximately 24.9% of the outstanding Equity Office common shares immediately following completion of the merger will have been issued to Spieker common stockholders in the merger and approximately 75.1% will be owned by Equity Office common shareholders as of immediately prior to the completion of the merger, in each case considered on a fully diluted and as–converted basis.

In addition, each outstanding share of Spieker series B, C and E preferred stock will be converted into one newly created Equity Office series E, F and H preferred share, respectively.

**After careful consideration, the boards of Equity Office and Spieker have determined that the merger is in the best interests of their respective shareholders and stockholders, and each board recommends that their respective common shareholders or common stockholders vote FOR approval of the merger agreement and the merger.**

We cannot complete the merger unless Equity Office common shareholders and Spieker common stockholders approve the merger agreement and the merger at the special meetings to be held by Equity Office and Spieker and the Equity Office common shareholders approve amendments to the Equity Office declaration of trust being effected as part of the merger. Approval of the merger agreement and the merger, as well as the amendments to the Equity Office declaration of trust, require the affirmative vote of at least a majority of the outstanding Equity Office common shares. The merger agreement and the merger must be approved by holders of at least a majority of the outstanding shares of Spieker common stock. Whether or not you plan to attend your special meeting, please take the time to vote by completing and mailing the enclosed proxy card. Alternatively, you may vote by telephone or, if you are an Equity Office shareholder, through the Internet, in each case as instructed on your proxy card.

This document provides you with detailed information about your special meeting and the proposed merger. You also can get information from publicly available documents filed by both companies with the Securities and Exchange Commission.

**We encourage you to read this entire document carefully, including the section entitled "Risk Factors" beginning on page 22.**

The dates, times and places of the special meetings are as follows:

<table>
<tr><td align="center"><b>For Equity Office:</b><br>Monday, July 9, 2001 at 10:00 a.m., Central Time<br>One North Franklin Street, Third Floor<br>Chicago, Illinois</td><td align="center"><b>For Spieker:</b><br>Monday, July 9, 2001 at 8:00 a.m., Pacific Time<br>Quadrus Conference Center, Room QCC<br>2400 Sand Hill Road<br>Menlo Park, California</td></tr>
<tr><td align="center"><br><br>Samuel Zell<br>Chairman of the Board<br>Equity Office Properties Trust</td><td align="center"><br><br>Warren E. Spieker, Jr.<br>Chairman of the Board<br>Spieker Properties, Inc.</td></tr>
</table>

## EACH VOTE IS IMPORTANT. PLEASE COMPLETE, SIGN, DATE AND RETURN YOUR PROXY.

Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of the securities to be issued in the merger or passed upon the adequacy or accuracy of this joint proxy statement/prospectus. Any representation to the contrary is a criminal offense.

This joint proxy statement/prospectus is dated June 6, 2001

and it is first being mailed on or about June 8, 2001.

---

Table of Contents

This joint proxy statement/prospectus incorporates important business and financial information about our companies that is not included in or delivered with this document. If you are a shareholder of Equity Office or a stockholder of Spieker you can

obtain any of the documents incorporated by reference from Equity Office or Spieker, as the case may be, or through the SEC or the SEC's web site. The address of that site is http://www.sec.gov. Documents incorporated by reference are available from the companies, without charge, excluding all exhibits unless specifically incorporated by reference as an exhibit to this document. Shareholders of Equity Office or stockholders of Spieker may obtain documents incorporated by reference in this document by requesting them in writing or by telephone from the appropriate company at the following addresses:

<table>
<tr><td>EQUITY OFFICE PROPERTIES TRUST<br>Two North Riverside Plaza Suite 2100<br>Chicago, Illinois 60606<br>Attention: Diane M. Morefield<br>Telephone: (312) 466–3300</td><td>SPIEKER PROPERTIES, INC.<br>2180 Sand Hill Road Suite 200<br>Menlo Park, California 94025<br>Attention: Karen Morris<br>Telephone: (650) 854–5600</td></tr>
</table>

**If you would like to request documents, in order to ensure timely delivery you must do so at least five business days before the date of the special meetings.** This means you must request this information no later than June 29, 2001. If you request any incorporated documents, we will mail them to you by first class mail, or another equally prompt means, within one business day after we receive your request.

Table of Contents

**Equity Office Properties Trust**
**Two North Riverside Plaza**
**Suite 2100**
**Chicago, Illinois 60606**

**NOTICE OF SPECIAL MEETING OF SHAREHOLDERS**

**TO BE HELD ON MONDAY, JULY 9, 2001**

A special meeting of shareholders of Equity Office Properties Trust, a Maryland real estate investment trust, will be held at 10:00 a.m., Central Time, on Monday, July 9, 2001, at One North Franklin Street, Third Floor, Chicago, Illinois, for the following purposes:

1. To consider and vote on the approval of the agreement and plan of merger, dated as of February 22, 2001, as amended, by and among Equity Office, EOP Operating Limited Partnership, a Delaware limited partnership, Spieker Properties, Inc., a Maryland corporation, and Spieker Properties, L.P., a California limited partnership, a copy of which is attached as <u>Annex A</u> to the accompanying joint proxy statement/ prospectus, and the merger of Spieker with and into Equity Office under the merger agreement.

2. To consider and vote on the approval of amendments to the Equity Office declaration of trust to be effected as part of the merger that would increase the maximum number of trustees from 15 to 16 and authorize the board of trustees to exempt one or more series of preferred shares issued in connection with a business combination from all or any portion of the ownership limitations and restrictions on transfer set forth in Article VII of the Equity Office declaration of trust.

3. To transact any other business as may properly come before the special meeting or any adjournments or postponements.

The proposal to approve the merger agreement and the merger and the proposal to approve the amendments to the Equity Office declaration of trust to be effected as part of the merger are conditioned upon one another.

Only holders of record of Equity Office common shares at the close of business on May 21, 2001 are entitled to notice of, and to vote at, the special meeting and any adjournments or postponements.

It is important that your common shares be represented and voted at the meeting. If you do not plan to attend the meeting and vote your common shares in person, please vote in one of these ways:

• MARK, SIGN, DATE AND PROMPTLY RETURN your enclosed proxy card in the postage–paid envelope;

• USE THE TOLL–FREE TELEPHONE NUMBER shown on your proxy card (this call is free in the U.S. and Canada); or

• VISIT THE WEBSITE address shown on your proxy card to vote through the Internet.

Any proxy may be revoked at any time before its exercise at the meeting.

By order of the Equity Office board of trustees

Stanley M. Stevens
*Executive Vice President, Chief Legal Counsel and Secretary*

June 8, 2001

**MERGER PROPOSED — YOUR VOTE IS VERY IMPORTANT**

**The Equity Office board of trustees has approved the merger agreement and the merger of Spieker with and into Equity Office and recommends that you vote to approve the merger agreement and the merger and the amendments to the Equity Office declaration of trust to be effected as part of the merger.**

Table of Contents

## EQUITY OFFICE

## VOTING METHODS

**You have the right to vote and, if desired, to revoke your proxy any time before the Equity Office special meeting.**



U.S. Mail

Proxy Card Voting

1. Mark your selections

2. Date and sign your name exactly as it appears on your proxy card

3. Mail to EquiServe in the return envelope



Telephone Voting

1. Within the U.S. and Canada dial 1–877–779–8683 and outside the U.S. and Canada call collect

2. Enter your control number (printed on your proxy card above your name)

3. Follow the recorded instructions

☑
VOTE
EquiServe
Vote
Tabulation



Internet Voting

1. Go to website *http://www.eproxyvote.com/eop*

2. Enter your 14 digit control number (printed on your proxy card above your name)

3. Follow the instructions provided

**If you hold your Equity Office common shares in your name as a holder of record, you may instruct the proxy holders how to vote your Equity Office common shares by using any of the voting methods specified above. *If your Equity Office common shares are held by a broker, bank or other nominee, you will receive instructions from your nominee which you must follow to have your common shares voted.***

Table of Contents

**Spieker Properties, Inc.**

**2180 Sand Hill Road, Suite 200
Menlo Park, California 94025**

### NOTICE OF SPECIAL MEETING OF STOCKHOLDERS

### TO BE HELD ON MONDAY, JULY 9, 2001

A special meeting of stockholders of Spieker Properties, Inc., a Maryland corporation, will be held at 8:00 a.m., Pacific Time, on Monday, July 9, 2001, at Quadrus Conference Center, Room QCC, 2400 Sand Hill Road, Menlo Park, California for the following purposes:

1. To consider and vote on the approval of the agreement and plan of merger, dated as of February 22, 2001, as amended, by and among Equity Office Properties Trust, a Maryland real estate investment trust, EOP Operating Limited Partnership, a Delaware limited partnership, Spieker and Spieker Properties, L.P., a California limited partnership, a copy of which is attached as Annex A to the accompanying joint proxy statement/ prospectus, and the merger of Spieker with and into Equity Office under the merger agreement.

2. To transact any other business as may properly come before the special meeting or any adjournments or postponements.

Only holders of record of Spieker common stock and preferred stock at the close of business on May 21, 2001 are entitled to notice of the special meeting or any adjournments or postponements. Only holders of record of Spieker common stock at the close of business on May 21, 2001 are entitled to vote at the special meeting or any adjournments or postponements.

It is important that your common stock be represented and voted at the meeting. If you do not plan to attend the meeting and vote your common stock in person, please vote in one of these ways:

• MARK, SIGN, DATE AND PROMPTLY RETURN your enclosed proxy card in the postage–paid envelope; or

• USE THE TOLL–FREE TELEPHONE NUMBER shown on your proxy card (this call is free in the U.S. and Canada).

Any proxy may be revoked at any time before its exercise at the meeting.

Sincerely,

Warren E. Spieker, Jr.
Chairman of the Board

June 8, 2001

**MERGER PROPOSED — YOUR VOTE IS VERY IMPORTANT**

The Spieker board of directors has approved the merger agreement and the merger of Spieker with and into Equity Office and recommends that you vote to approve the merger agreement and the merger.

**TABLE OF CONTENTS**

QUESTIONS & ANSWERS ABOUT THE MERGER
SUMMARY
  The Companies
  The Combined Company
  The Equity Office Special Meeting; Vote Required
  The Spieker Special Meeting; Vote Required
  Recommendation of Equity Office Board
  Recommendation of Spieker Board
  Fairness Opinions
  Merger Financing
  Risks Associated with the Merger
  Amendments to Equity Office's Declaration of Trust
  The Merger Agreement
  Regulatory Approvals
  Accounting Treatment
  Conflicts of Interests of Spieker Directors and Executive Officers in the Merger and the Partnership Merger
  Trustees and Executive Officers of Equity Office After the Merger
  Differences in the Rights of Shareholders
  Selected Historical Consolidated and Combined Financial Data
  Summary Unaudited Pro Forma Condensed Combined Financial Data
RISK FACTORS
  Spieker common stockholders may receive Equity Office common shares in the merger with a market value lower than expected
  Equity Office historically has not owned or operated industrial properties
  The operations of Equity Office and Spieker may not be integrated successfully and intended benefits of the merger may not be realized
  The directors and executive officers of Spieker have interests in the completion of the merger and the partnership merger that may conflict with the interests of Spieker's stockholders
  EOP Partnership will need to replace, at or before maturity, a $1.0 billion bridge facility to be used to finance a portion of the cash merger costs
  Equity Office and Spieker may incur substantial expenses and payments if the merger does not occur
  The $160 million termination fee payable by Spieker and Spieker Partnership may discourage some third party proposals to acquire Spieker that Spieker stockholders may otherwise find desirable
  The merger agreement does not require that the financial advisors' fairness opinions be updated as a condition to closing the merger
  Further declines in overall economic activity in Equity Office's and Spieker's markets could adversely affect Equity Office's operating results after the merger
A WARNING ABOUT FORWARD–LOOKING STATEMENTS
THE EQUITY OFFICE SPECIAL MEETING
  Date, Time, Place and Purpose of the Equity Office Special Meeting
  Who Can Vote
  Voting by Proxy Holders
  Vote by Telephone
  Vote by Internet
  Vote by Mail
  Required Vote

Voting on Other Matters
How You May Revoke Your Proxy Instructions
How Votes Are Counted
Cost of this Proxy Solicitation
Attending the Equity Office Special Meeting
List of Equity Office Common Shareholders
THE SPIEKER SPECIAL MEETING
    Date, Time, Place and Purpose of the Spieker Special Meeting
    Who Can Vote
    Voting by Proxy Holders
    Vote by Telephone
    Vote by Mail
    Required Vote
    Voting on Other Matters
    How You May Revoke Your Proxy Instructions
    How Votes Are Counted
    Cost of this Proxy Solicitation
    Attending the Spieker Special Meeting
    List of Spieker Common Stockholders
THE MERGER
    Structure of the Mergers
    Background of the Merger
    Equity Office's Reasons for the Merger; Recommendation of the Equity Office Board
    Opinion of Morgan Stanley
    Spieker's Reasons for the Merger; Recommendation of the Spieker Board
    Opinion of Goldman Sachs
    Trustees and Executive Officers of Equity Office After the Merger
    Conflicts of Interest of Spieker Directors and Executive Officers in the Merger and the Partnership Merger
    The Partnership Merger
    Merger Financing
    Regulatory Approvals
    Accounting Treatment
    Restrictions on Resales by Affiliates
    No Dissenters' Rights
    Spieker Litigation
THE MERGER AGREEMENT
    Closing; Effective Time of the Merger
    Merger Consideration
    Surrender of Spieker Stock Certificates
    Possible Redesignation of Equity Office Preferred Shares and EOP Partnership Preferred Units to be Issued in the
    Merger and the Partnership Merger
    Treatment of Spieker Stock Options
    Severance and Bonus Payments
    Representations and Warranties of Equity Office and Spieker
    Conduct of Business of Equity Office and EOP Partnership Pending the Merger
    Conduct of Business of Spieker and Spieker Partnership Pending the Merger
    Pre–Merger Dividends and Distributions
    Conditions to the Merger and the Partnership Merger
    No Solicitation by Spieker
    Termination of the Merger Agreement
    Waiver and Amendment of the Merger Agreement
    Indemnification; Directors' and Officers' Insurance
    Assumption of Spieker's Obligations Under Registration Rights Agreements
    Voting Agreements
    Spieker Partnership Series D Preferred Units
    Acquisition of Spieker Northwest
    Nonsolicitation Agreements
    Tax Related Undertakings of EOP Partnership
MATERIAL FEDERAL INCOME TAX CONSEQUENCES RELATING TO THE MERGER
APPROVAL OF AMENDMENTS TO EQUITY OFFICE'S DECLARATION OF TRUST
DESCRIPTION OF EQUITY OFFICE SHARES OF BENEFICIAL INTEREST
    General
    Common Shares
    Preferred Shares
    Power to Issue Additional Common Shares and Preferred Shares
    New Series E, F and H Preferred Shares
    REIT Ownership Limitations and Transfer Restrictions Applicable to Equity Office Common Shares and Series
    A, B and C Preferred Shares
    REIT Ownership Limitations and Transfer Restrictions Applicable to Equity Office Series E, F and H Preferred
    Shares
    Possible Redesignation of Equity Office Preferred Shares to be Issued in the Merger
    Transfer Agent and Registrar

Anti—Takeover Considerations
COMPARISON OF SHAREHOLDER RIGHTS
    Authorized Shares
    Voting Rights
    Classification of the Board
    Number of Trustees/Directors; Removal of Trustees/Directors; Vacancies
    Limitation of Trustee/Director and Officer Liability
    Indemnification
    Duties of Trustees and Directors
    Maryland Elective Provisions
    Call of Special Meetings of Shareholders
    Shareholder Action by Written Consent
    Advance Notice Provisions for Shareholder Nominations and Shareholder New Business Proposals
    Amendment of the Equity Office Declaration of Trust and Spieker Charter
    Amendment of the Bylaws
    Mergers, Consolidations and Sales of Assets
    Dissolution of Equity Office or Spieker; Termination of REIT Status
    Business Combinations with Interested Shareholders
    Control Share Acquisitions
    Other Constituencies
    Dissenters' Rights
    Distributions
    Shareholder Rights Plans
    REIT Ownership Limitations
LEGAL MATTERS
EXPERTS
SHAREHOLDER PROPOSALS
OTHER MATTERS
WHERE YOU CAN FIND MORE INFORMATION
WHAT INFORMATION YOU SHOULD RELY ON
PRO FORMA CONDENSED COMBINED FINANCIAL STATEMENTS
ANNEX A —AGREEMENT AND PLAN OF MERGER, AS AMENDED
ANNEX B —OPINION OF MORGAN STANLEY & CO. INCORPORATED, DATED FEBRUARY 22, 2001
ANNEX C —OPINION OF GOLDMAN, SACHS & CO., DATED FEBRUARY 22, 2001
ANNEX D —AMENDMENTS TO EQUITY OFFICE DECLARATION OF TRUST AS PART OF THE MERGER
Ex—5.1 Opinion of Hogan & Hartson L.L.P.
Ex—8.1 Opinion of Hogan & Hartson L.L.P.
Ex—8.2 Opinion of Hogan & Hartson L.L.P.
Ex—8.3 Opinion of Sullivan & Cromwell
Ex—8.4 Opinion of Morrison & Foerster LLP
Ex—10.1 Commitment Letter for Bridge Facility
EX—10.3 First Amendment to Revolving Credit Agmt.
EX—23.1 Consent of Ernst & Young LLP
EX—23.2 Consent of Arthur Andersen LLP
Ex—23.8 Consent of Goldman, Sachs & Co.
Ex—99.1 Equity Office Form of Proxy
Ex—99.2 Spieker — Form of Proxy

## TABLE OF CONTENTS

|  | Page |
|---|---|
| TABLE OF CONTENTS | i |
| QUESTIONS & ANSWERS ABOUT THE MERGER | iv |
| SUMMARY | 1 |
|     The Companies | 1 |
|     The Combined Company | 1 |
|     The Equity Office Special Meeting; Vote Required | 2 |
|     The Spieker Special Meeting; Vote Required | 2 |
|     Recommendation of Equity Office Board | 2 |
|     Recommendation of Spieker Board | 3 |
|     Fairness Opinions | 3 |
|     Merger Financing | 3 |
|     Risks Associated with the Merger | 3 |
|     Amendments to Equity Office's Declaration of Trust | 4 |
|     The Merger Agreement | 4 |
|     Regulatory Approvals | 9 |
|     Accounting Treatment | 9 |
|     Conflicts of Interest of Spieker Directors and Executive Officers in the Merger and the Partnership Merger | 9 |
|     Trustees and Executive Officers of Equity Office After the Merger | 11 |

| | |
|---|---|
| Differences in the Rights of Shareholders | 12 |
| Selected Historical Consolidated and Combined Financial Data | 13 |
| Summary Unaudited Pro Forma Condensed Combined Financial Data | 20 |
| RISK FACTORS | 22 |
| Spieker common stockholders may receive Equity Office common shares in the merger with a market value lower than expected | 22 |
| Equity Office historically has not owned or operated industrial properties and the market price of the Equity Office common shares you receive in the merger may decline if Equity Office fails to operate successfully the industrial properties acquired in the merger | 22 |
| The operations of Equity Office and Spieker may not be integrated successfully and intended benefits of the merger may not be realized, which could have a negative impact on the market price of Equity Office common shares after the merger | 23 |
| The directors and executive officers of Spieker have interests in the completion of the merger and the partnership merger that may conflict with the interests of Spieker's stockholders | 23 |
| EOP Partnership will need to replace, at or before maturity, a $1.0 billion bridge facility to be used to finance a portion of the cash merger costs | 25 |
| Equity Office and Spieker may incur substantial expenses and payments if the merger does not occur | 25 |
| The $160 million termination fee payable by Spieker and Spieker Partnership may discourage some third party proposals to acquire Spieker that Spieker stockholders may otherwise find desirable | 25 |
| The merger agreement does not require that the financial advisors' fairness opinions be updated as a condition to closing the merger | 25 |
| Further declines in overall economic activity in Equity Office's and Spieker's markets could adversely affect Equity Office's operating results after the merger | 26 |
| A WARNING ABOUT FORWARD–LOOKING STATEMENTS | 26 |
| THE EQUITY OFFICE SPECIAL MEETING | 27 |
| Date, Time, Place and Purpose of the Equity Office Special Meeting | 27 |
| Who Can Vote | 27 |
| Voting by Proxy Holders | 27 |
| Vote by Telephone | 27 |
| Vote by Internet | 28 |
| Vote by Mail | 28 |
| Required Vote | 28 |
| Voting on Other Matters | 28 |
| How You May Revoke Your Proxy Instructions | 28 |

i

**Table of Contents**

| | Page |
|---|---|
| How Votes Are Counted | 28 |
| Cost of this Proxy Solicitation | 29 |
| Attending the Equity Office Special Meeting | 29 |
| List of Equity Office Common Shareholders | 29 |
| THE SPIEKER SPECIAL MEETING | 30 |
| Date, Time, Place and Purpose of the Spieker Special Meeting | 30 |
| Who Can Vote | 30 |
| Voting by Proxy Holders | 30 |
| Vote by Telephone | 30 |
| Vote by Mail | 30 |
| Required Vote | 30 |
| Voting Agreements | 31 |
| Voting on Other Matters | 31 |
| How You May Revoke Your Proxy Instructions | 31 |
| How Votes Are Counted | 31 |
| Cost of this Proxy Solicitation | 31 |
| Attending the Spieker Special Meeting | 31 |
| List of Spieker Common Stockholders | 32 |
| THE MERGER | 33 |
| Structure of the Mergers | 33 |
| Background of the Merger | 34 |
| Equity Office's Reasons for the Merger; Recommendation of the Equity Office Board | 39 |
| Opinion of Morgan Stanley | 41 |
| Spieker's Reasons for the Merger; Recommendation of the Spieker Board | 47 |
| Opinion of Goldman Sachs | 51 |
| Trustees and Executive Officers of Equity Office After the Merger | 58 |
| Conflicts of Interest of Spieker Directors and Executive Officers in the Merger and the Partnership Merger | 58 |
| The Partnership Merger | 63 |
| Merger Financing | 64 |
| Regulatory Approvals | 64 |
| Accounting Treatment | 64 |
| Restrictions on Resales by Affiliates | 64 |
| No Dissenters' Rights | 65 |

| | |
|---|---|
| Spieker Litigation | 65 |
| THE MERGER AGREEMENT | 66 |
| Closing; Effective Time of the Merger | 66 |
| Merger Consideration | 66 |
| Surrender of Spieker Stock Certificates | 67 |
| Possible Redesignation of Equity Office Preferred Shares and EOP Partnership Preferred Units to be Issued in the Merger and the Partnership Merger | 67 |
| Treatment of Spieker Stock Options | 68 |
| Severance and Bonus Payments | 68 |
| Representations and Warranties of Equity Office and Spieker | 69 |
| Conduct of Business of Equity Office and EOP Partnership Pending the Merger | 70 |
| Conduct of Business of Spieker and Spieker Partnership Pending the Merger | 71 |
| Pre-Merger Dividends and Distributions | 73 |
| Conditions to the Merger and the Partnership Merger | 75 |
| No Solicitation by Spieker | 77 |
| Termination of the Merger Agreement | 80 |
| Waiver and Amendment of the Merger Agreement | 83 |
| Indemnification; Directors' and Officers' Insurance | 84 |
| Assumption of Spieker's Obligations Under Registration Rights Agreements | 85 |
| Voting Agreements | 85 |
| Spieker Partnership Series D Preferred Units | 85 |
| Acquisition of Spieker Northwest | 86 |
| Nonsolicitation Agreements | 86 |
| Tax Related Undertakings of EOP Partnership | 86 |
| MATERIAL FEDERAL INCOME TAX CONSEQUENCES RELATING TO THE MERGER | 89 |
| APPROVAL OF AMENDMENTS TO EQUITY OFFICE'S DECLARATION OF TRUST | 93 |
| DESCRIPTION OF EQUITY OFFICE SHARES OF BENEFICIAL INTEREST | 94 |
| General | 94 |
| Common Shares | 95 |
| Preferred Shares | 96 |
| Power to Issue Additional Common Shares and Preferred Shares | 98 |
| New Series E, F and H Preferred Shares | 99 |
| REIT Ownership Limitations and Transfer Restrictions Applicable to Equity Office Common Shares and Series A, B and C Preferred Shares | 102 |

ii

## Table of Contents

| | Page |
|---|---|
| REIT Ownership Limitations and Transfer Restrictions Applicable to Equity Office Series E, F and H Preferred Shares | 104 |
| Possible Redesignation of Equity Office Preferred Shares to be Issued in the Merger | 104 |
| Transfer Agent and Registrar | 105 |
| Anti-Takeover Considerations | 105 |
| COMPARISON OF SHAREHOLDER RIGHTS | 106 |
| Authorized Shares | 107 |
| Voting Rights | 108 |
| Classification of the Board | 108 |
| Number of Trustees/ Directors; Removal of Trustees/ Directors; Vacancies | 108 |
| Limitation of Trustee/ Director and Officer Liability | 109 |
| Indemnification | 110 |
| Duties of Trustees and Directors | 111 |
| Maryland Elective Provisions | 112 |
| Call of Special Meetings of Shareholders | 113 |
| Shareholder Action by Written Consent | 113 |
| Advance Notice Provisions for Shareholder Nominations and Shareholder New Business Proposals | 113 |
| Amendment of the Equity Office Declaration of Trust and Spieker Charter | 114 |
| Amendment of the Bylaws | 115 |
| Mergers, Consolidations and Sales of Assets | 115 |
| Dissolution of Equity Office or Spieker; Termination of REIT Status | 117 |
| Business Combinations with Interested Shareholders | 117 |
| Control Share Acquisitions | 117 |
| Other Constituencies | 118 |
| Dissenters' Rights | 118 |
| Distributions | 118 |
| Shareholder Rights Plans | 119 |
| REIT Ownership Limitations | 120 |

| | |
|---|---|
| LEGAL MATTERS | 122 |
| EXPERTS | 123 |
| SHAREHOLDER PROPOSALS | 123 |
| OTHER MATTERS | 123 |
| WHERE YOU CAN FIND MORE INFORMATION | 124 |
| WHAT INFORMATION YOU SHOULD RELY ON | 125 |
| PRO FORMA CONDENSED COMBINED FINANCIAL STATEMENTS | F–1 |
| Annex A — Agreement and Plan of Merger, as amended | A–1 |
| Annex B — Opinion of Morgan Stanley & Co. Incorporated, dated February 22, 2001 | B–1 |
| Annex C — Opinion of Goldman, Sachs & Co., dated February 22, 2001 | C–1 |
| Annex D — Amendments to Equity Office Declaration of Trust as Part of the Merger | D–1 |

iii

Table of Contents

## QUESTIONS & ANSWERS ABOUT THE MERGER

**Q: Why are Equity Office and Spieker proposing the merger?**

A: The boards of both companies believe that the merger represents a strategic combination of two premier real estate organizations that will be in the best interests of all of their respective shareholders. By increasing the office space owned and operated by Equity Office by approximately 25% based on square footage, the merger of Equity Office and Spieker also will solidify Equity Office's position as the nation's largest publicly–held owner and operator of office properties with a large portfolio of high quality office buildings in key markets throughout the United States.

**Q: What will I receive in the merger?**

A: *Spieker Stockholders.* In the merger, Spieker common stockholders will receive $13.50 in cash and 1.49586 Equity Office common shares for each outstanding share of Spieker common stock. Cash will be paid instead of issuing fractional shares. Holders of outstanding Spieker preferred stock will receive one newly created Equity Office series E, F or H preferred share for each outstanding share of Spieker series B, C or E preferred stock, respectively. The Equity Office series E, F and H preferred shares issued in the merger will have preferences, conversion and other rights, voting powers, restrictions, limitations as to dividends, qualifications and terms or conditions of redemption identical to those of the shares of the corresponding series of Spieker preferred stock.

*Equity Office Shareholders.* Each Equity Office common share or preferred share held by Equity Office shareholders will continue to represent one Equity Office common share or preferred share after the merger. We estimate that approximately 24.9% of the outstanding Equity Office common shares immediately following completion of the merger will have been issued to Spieker common stockholders in the merger and approximately 75.1% will be owned by Equity Office common shareholders as of immediately prior to the completion of the merger, in each case considered on a fully diluted and as–converted basis.

**Q: What happens if the price of Equity Office common shares and/or Spieker common stock changes before the closing of the merger?**

A: No change will be made to the 1.49586 exchange ratio or to the $13.50 per share cash amount payable to Spieker common stockholders in the merger. Because the market value of Equity Office common shares will fluctuate before and after the closing of the merger, the value of the consideration that Spieker common stockholders will receive in the merger will fluctuate as well.

**Q: What am I being asked to vote upon?**

A: *Spieker Common Stockholders.* You are being asked to approve the merger agreement and the merger of Spieker with and into Equity Office. Approval of the merger agreement and the merger requires the affirmative vote of at least a majority of the outstanding shares of Spieker common stock.

**The Spieker board has adopted and approved the merger agreement and the merger of Spieker with and into Equity Office and recommends that Spieker common stockholders vote FOR approval of the merger agreement and the merger.**

*Equity Office Common Shareholders.* You are being asked to approve the merger agreement and the merger and the amendments to the Equity Office declaration of trust to be effected as part of the merger. Approval of the merger agreement and the merger and approval of the amendments to the Equity Office declaration of trust require the affirmative vote of at least

a majority of all votes entitled to be cast. The proposals to approve the merger agreement and the merger and to approve the amendments to the Equity Office declaration of trust are conditioned upon one another.

**The Equity Office board has adopted and approved the merger agreement and the merger of Spieker with and into Equity Office and recommends that Equity Office common shareholders vote FOR approval of the merger agreement and the merger and FOR approval of the amendments to the Equity Office declaration of trust.**

iv

---

Table of Contents

**Q: Do Spieker common or preferred stockholders have dissenters' rights?**

A: No. Spieker is incorporated under Maryland law. Under Maryland law, because shares of Spieker common stock and series B, C and E preferred stock are listed on a national securities exchange, Spieker common and series B, C and E preferred stockholders have no rights to dissent and receive the appraised value of their shares in the merger.

**Q: Do Equity Office common shareholders have dissenters' rights?**

A: No. Following the merger, Equity Office shareholders will continue to own their Equity Office shares and, accordingly, will have no rights to dissent and receive the appraised value of their shares under Maryland law.

**Q: How soon after the special meetings will the merger occur?**

A: If the merger agreement and the merger are approved at both the Equity Office and the Spieker special meetings and if Equity Office common shareholders approve the amendments to Equity Office's declaration of trust, we anticipate that the merger will occur as soon as practicable after the special meetings.

**Q: Will I recognize taxable gain or loss as a result of the merger?**

A: We expect the following tax consequences generally to apply:

*Spieker Stockholders.* For U.S. federal income tax purposes, each Spieker common stockholder will recognize any gain realized on the exchange up to an amount equal to the lesser of:

• the cash received by that Spieker common stockholder, excluding cash received for fractional shares of Equity Office; and

• the amount by which the cash plus the fair market value of the Equity Office common shares received by that Spieker common stockholder exceeds that Spieker common stockholder's adjusted basis in its shares of Spieker common stock.

A Spieker common stockholder will not recognize any loss on the receipt of cash and Equity Office common shares in exchange for Spieker common stock. A Spieker common stockholder will have a tax basis in the Equity Office common shares received equal to the stockholder's basis in its Spieker common stock exchanged, decreased by the amount of any cash received and increased by the amount of gain recognized in the exchange. A Spieker preferred stockholder will not recognize any gain or loss on the exchange of its Spieker preferred stock for Equity Office preferred shares received in the merger. A Spieker preferred stockholder will have a tax basis in the Equity Office preferred shares equal to the stockholder's basis in its Spieker preferred stock exchanged. For a description of the tax treatment of cash received for fractional shares of Equity Office and other material tax consequences of the merger, see "Material Federal Income Tax Consequences Relating to the Merger" beginning on page 89.

*Equity Office Common Shareholders.* Equity Office common shareholders will not recognize either gain or loss for U.S. federal income tax purposes as a result of the merger.

**If you hold shares of Spieker common stock, the tax consequences to you will depend on your personal situation, including your basis in your shares of Spieker common stock. You should consult your tax advisor for a full understanding of the tax consequences of the merger to you.**

**Q: What will my dividends be before and after the merger?**

A: Until the merger is completed, Spieker common and preferred stockholders will continue to receive regular dividends as authorized by Spieker's board of directors. Assuming the merger closes on or before July 13, 2001, Spieker currently does not intend to pay any further dividends during the pre−merger period, other than the quarterly dividends declared on March 7, 2001. If the merger closes after July 13, 2001, Spieker currently intends to continue to pay regular quarterly dividends for any additional quarterly periods ending before the closing of the merger, including the quarter ending June 30, 2001, and, if necessary, a final dividend in an amount equal to the minimum amount necessary to maintain Spieker's REIT status under the Internal Revenue Code and to avoid the payment of any corporate level tax

v

Table of Contents

with respect to undistributed income or gain, as required by the merger agreement.

After the completion of the merger, former holders of Spieker common stock will receive the distributions payable to all holders of Equity Office common shares with a record date after the closing, and former Spieker preferred stockholders will be entitled to receive the same cumulative distributions on their Equity Office preferred shares that they were entitled to as holders of Spieker preferred stock, including for the quarter ending June 30, 2001 if the merger is completed on or before July 13, 2001. Based on the merger consideration payable to Spieker common stockholders in the merger and Equity Office's current quarterly distribution of $0.45 per common share, a Spieker common stockholder would receive quarterly Equity Office distributions on a pro forma combined equivalent basis of $0.88 per share for each share of Spieker common stock exchanged, assuming Equity Office's current quarterly distribution of $0.45 per common share. The current quarterly dividend paid by Spieker on its common stock is $0.70 per share. Upon completion of the merger, you will cease receiving any distributions or dividends on all shares of Spieker common stock and Spieker preferred stock you held before the merger other than any dividends declared before completion of the merger but not yet paid.

**Q: What should I do now?**

A:  If you are an Equity Office common shareholder or a Spieker common stockholder, just indicate on your proxy card how you want to vote, and sign and mail it in the enclosed postage–paid envelope as soon as possible so that your shares will be represented at your special meeting or vote your shares by telephone or, if you are an Equity Office shareholder, through the Internet, in each case, by following the instructions on your proxy card.

If you sign and send in your proxy and do not indicate how you want to vote, your proxy will be voted in favor of the proposal to approve the merger agreement and the merger and, if you are an Equity Office common shareholder, in favor of the proposal to approve the amendments to the Equity Office declaration of trust to be effected as part of the merger. If you do not sign and send in your proxy, vote by telephone, through the internet, or at your special meeting, or if you abstain, it will have the effect of a vote against approval of the merger agreement and the merger and, in the case of Equity Office common shareholders, against the amendments to the Equity Office declaration of trust.

You can choose to attend your special meeting and vote your shares in person instead of completing and returning a proxy card. You also may vote by telephone or, if you are an Equity Office shareholder, through the Internet, in each case, by following the instructions on your proxy card. If you do complete and return a proxy card, you may change your vote at any time up to and including the time of the vote on the day of your special meeting by following the directions beginning on page 27 for Equity Office shareholders and beginning on page 30 for Spieker stockholders.

**Q: If my shares are held in "street name" by my broker, will my broker vote my shares for me?**

A:  Your broker will vote your Equity Office common shares or shares of Spieker common stock only if you instruct your broker how to vote by following the directions your broker provides. If you do not instruct your broker how to vote, your shares will not be voted and this will have the effect of voting against approval of the merger agreement and the merger and, in the case of Equity Office common shareholders, against approval of the amendments to the Equity Office declaration of trust.

**Q: Should I send in my stock certificates now?**

A:  No. After the merger, Equity Office's exchange agent will send to former Spieker common and preferred stockholders a letter of transmittal explaining what you must do to exchange your Spieker common or preferred stock certificates for the merger consideration payable to you.

If you are an Equity Office shareholder, you are not required to take any action regarding your Equity Office common share certificates.

Table of Contents

**Q: Who can answer my questions?**

A:  *Equity Office Common Shareholders.* Equity Office common shareholders who have more questions about the merger or desire additional copies of this joint proxy statement/ prospectus or additional proxy cards should contact:

Equity Office Properties Trust

Two North Riverside Plaza
Suite 2100
Chicago, Illinois 60606
Attention: Diane Morefield
Telephone: (312) 466–3300

*Spieker Common and Preferred Stockholders.* Spieker common and preferred stockholders who have more questions about the merger or desire additional copies of this joint proxy statement/ prospectus or, with respect to Spieker common stockholders, who

desire additional proxy cards should contact:

Spieker Properties, Inc.

2180 Sand Hill Road
Suite 200
Menlo Park, California 94025
Attention: Karen Morris
Telephone: (650) 854–5600

vii

**Table of Contents**

# SUMMARY

*This summary highlights selected information from this joint proxy statement/ prospectus. It may not contain all of the detailed information that may be important to you. To understand the merger fully and for a more complete description of the legal terms of the merger, you should read carefully this entire document and the other documents to which we refer, including the merger agreement, as amended. For more information about Equity Office and Spieker, see "Where You Can Find More Information" beginning on page 124. Each item in this summary refers to the pages where that subject is discussed more fully.*

## The Companies

### Equity Office Properties Trust

Two North Riverside Plaza
Suite 2100
Chicago, Illinois 60606
(312) 466–3300

Equity Office Properties Trust, a Maryland real estate investment trust, is the nation's largest publicly–held owner and operator of office properties, based upon equity market capitalization and square footage. At March 31, 2001, Equity Office had a portfolio of 380 office buildings comprising 99.0 million square feet in 24 states and the District of Columbia. Equity Office, which has elected to be taxed as REIT for federal income tax purposes, is an independent real estate company that manages all aspects of its operations internally.

Equity Office is the sole general partner of, and owns approximately an 88.5% interest in, EOP Operating Limited Partnership, a Delaware limited partnership. Equity Office owns substantially all of its assets and conducts all of its operations through EOP Partnership, which principally is engaged in acquiring, owning, operating and leasing office properties. Equity Office was organized in 1996 and began operations in 1997 to continue and expand the national office property business of Mr. Samuel Zell, Chairman of the Board of Trustees of Equity Office, and his affiliates.

### Spieker Properties, Inc.

2180 Sand Hill Road
Suite 200
Menlo Park, California 94025
(650) 854–5600

Spieker Properties, Inc., a Maryland corporation, is the second largest publicly–held owner and operator of office and industrial properties, based upon equity market capitalization. Spieker's properties are located primarily in greater Seattle, Washington; greater Portland, Oregon; Northern California and Southern California. As of March 31, 2001, Spieker owned 37.4 million square feet of commercial real estate. As of that date, Spieker's portfolio mix consisted of 24.7 million square feet of office property and 12.7 million square feet of industrial property. Spieker, which has elected to be taxed as a REIT for federal income tax purposes, is an independent real estate company that manages all aspects of its operations internally.

Substantially all of the business activities of Spieker are conducted through its operating partnership, Spieker Properties, L.P., a California limited partnership, of which Spieker is the sole general partner. Spieker was formed to continue and expand the real estate activities, including the acquisition, development, management and leasing of the properties of its predecessor firm, Spieker Partners, which commenced operations in 1987. Spieker commenced operations in November 1993 with the acquisition of properties of Spieker Partners and with the completion of its initial public offering.

## The Combined Company

### Equity Office Properties Trust

Two North Riverside Plaza
Suite 2100
Chicago, Illinois 60606
(312) 466–3300

Upon completion of the merger, Equity Office will remain the sole general partner of, and own approximately an 87.8% interest in, EOP Partnership, assuming that (1) none of the unitholders of EOP Partnership or Spieker Partnership redeem their units for cash or exchange their units for Equity Office common shares or Spieker common stock, as applicable, and (2) no

1

---

Table of Contents

holder of convertible securities of Equity Office, EOP Partnership or Spieker, including share options of Equity Office and Spieker, converts or exercises those securities for Equity Office common shares or shares of Spieker common stock prior to the merger.

Equity Office will own a portfolio comprising approximately 136.4 million square feet of commercial real estate in 24 states and the District of Columbia, and have 4.3 million square feet of properties under development with an expected investment in properties under development of approximately $1.1 billion, upon completion of the merger. Based on per share closing price of Equity Office common shares on the New York Stock Exchange on June 5, 2001, the latest practicable date before mailing this joint proxy statement/prospectus, the debt and equity market capitalization of the combined company is estimated to be approximately $26.7 billion.

## The Equity Office Special Meeting; Vote

### Required (see page 27)

The Equity Office special meeting will be held at One North Franklin Street, Third Floor, Chicago, Illinois on Monday, July 9, 2001 at 10:00 a.m., Central Time. At the special meeting, holders of Equity Office common shares will be asked to consider and vote upon a proposal to approve the merger agreement and the merger of Spieker with and into Equity Office and a proposal to approve the amendments to the Equity Office declaration of trust described under "— Amendments to Equity Office's Declaration of Trust" on page 4. Approval of the merger agreement and the merger, as well as the amendments to Equity Office's declaration of trust, requires the affirmative vote of the holders of at least a majority of the outstanding Equity Office common shares as of the record date for the special meeting. As of the record date for the Equity Office special meeting, the trustees, executive officers and their affiliates beneficially owned, excluding share options and EOP Partnership units held by them, 4,170,306 Equity Office common shares representing 1.35% of the outstanding Equity Office common shares entitled to be voted at the Equity Office special meeting. The vote of Equity Office preferred shareholders is not required for approval of the merger agreement and the merger or approval of the amendments to the Equity Office declaration of trust.

You can vote at the Equity Office special meeting if you owned Equity Office common shares at the close of business on May 21, 2001.

## The Spieker Special Meeting; Vote Required (see page 30)

The Spieker special meeting will be held at Quadrus Conference Center, Room QCC, 2400 Sand Hill Road, Menlo Park, California, on Monday, July 9, 2001 at 8:00 a.m., Pacific Time. At the special meeting, holders of Spieker common stock will be asked to consider and vote upon a proposal to approve the merger agreement and the merger of Spieker with and into Equity Office. Approval of the merger agreement and the merger requires the affirmative vote of the holders of a majority of the outstanding shares of Spieker common stock as of the record date for the special meeting. The vote of Spieker preferred stockholders is not required for approval of the merger agreement and the merger. Less than 1% of the shares of Spieker common stock entitled to vote at the Spieker special meeting were held as of the record date by Spieker directors, executive officers and their affiliates. Eleven Spieker directors and executive officers holding 494,805 shares of Spieker common stock, or approximately 0.73% of the outstanding shares of Spieker common stock as of the record date, have entered into voting agreements agreeing to vote these shares in favor of the merger agreement and the merger at the Spieker special meeting.

You can vote at the Spieker special meeting if you owned Spieker common stock at the close of business on May 21, 2001.

## Recommendation of Equity Office Board (see page 39)

The Equity Office board of trustees has adopted and approved the merger agreement and the merger, has determined that the merger agreement and the merger are in the best interests of Equity Office and its shareholders and recommends that Equity Office common shareholders vote FOR approval of the merger agreement and the merger and FOR approval of the amendments to the Equity Office declaration of trust described under "— Amendments to Equity Office's Declaration of Trust" on page 4. Equity Office common shareholders also should refer to the reasons the Equity Office board considered in determining

2

Table of Contents

whether to adopt and approve the merger agreement and the merger beginning on page 39.

**Recommendation of Spieker Board (see page 47)**

The Spieker board of directors has adopted and approved the merger agreement and the merger, has determined that the merger agreement and the merger are in the best interests of Spieker and its stockholders and recommends that Spieker common stockholders vote FOR approval of the merger agreement and the merger. Spieker common stockholders also should refer to the reasons the Spieker board considered in determining whether to adopt and approve the merger agreement and the merger beginning on page 47.

**Fairness Opinions**

*Equity Office (see page 41)*

In deciding to adopt and approve the merger agreement and the merger, the Equity Office board considered the oral opinion, delivered February 22, 2001, of its financial advisor, Morgan Stanley & Co. Incorporated, that, as of that date, the consideration to be paid by Equity Office under the merger agreement was fair, from a financial point of view, to Equity Office. This opinion was confirmed in writing on February 22, 2001. The Morgan Stanley opinion, which sets forth the assumptions made, procedures followed, matters considered and limitations on the review undertaken by Morgan Stanley in connection with its opinion, is attached as Annex B to this document. Morgan Stanley did not make any independent valuation or appraisal of the assets or liabilities of Spieker and was not furnished with any such appraisals in connection with preparing its fairness opinion. Equity Office has agreed to pay Morgan Stanley a financial advisory fee of $9.0 million contingent upon completion of the merger. **We encourage Equity Office shareholders to read this opinion carefully. This opinion does not, however, constitute a recommendation to any Equity Office shareholder with respect to any matters relating to the proposed merger.**

*Spieker (see page 51)*

In deciding to adopt and approve the merger agreement and the merger, the Spieker board considered the opinion, delivered February 22, 2001, of its financial advisor, Goldman, Sachs & Co., that, as of that date and based upon and subject to the matters set forth in that opinion, the consideration to be received by Spieker common stockholders in the merger was fair, from a financial point of view, to the Spieker common stockholders. The Goldman Sachs opinion, which sets forth the assumptions made, procedures followed, matters considered and limitations on the review undertaken by Goldman Sachs in connection with its opinion, is attached as Annex C to this document. Goldman Sachs did not make an independent evaluation or appraisal of the assets and liabilities of Spieker or Equity Office or any of their subsidiaries and was not furnished with an evaluation or appraisal of any of these assets or liabilities in connection with preparing its fairness opinion. Spieker has agreed to pay Goldman Sachs a financial advisory fee of $6.0 million contingent upon completion of the merger. **We encourage Spieker stockholders to read this opinion carefully. This opinion does not, however, constitute a recommendation to any Spieker stockholder with respect to any matters relating to the proposed merger.**

**Merger Financing (see page 64)**

Equity Office intends to finance the estimated $1.187 billion of merger costs, including the approximately $907 million cash portion of the consideration to be paid to Spieker common stockholders, under a new $1.0 billion unsecured bridge facility, to be entered into before the closing of the merger, and by EOP Partnership borrowing the remaining $187 million of merger costs under EOP Partnership's existing $1.0 billion credit facility. EOP Partnership has received executed commitments from various lenders for the entire $1.0 billion principal amount of the new bridge facility, which will have a term of 364 days from funding and an interest rate of LIBOR plus 80 basis points, subject to EOP Partnership's credit rating. Equity Office will guarantee any outstanding obligation under the new bridge facility. EOP Partnership and Equity Office have agreed, jointly and severally, to pay a commitment fee of 20 basis points, or $2.0 million, if the new bridge facility is not refinanced within 120 days from the date of funding. At March 31, 2001, EOP Partnership had available borrowing capacity under its existing $1.0 billion credit facility of $962 million.

**Risks Associated with the Merger (see page 22)**

The board of trustees of Equity Office and the board of directors of Spieker believe that the

Table of Contents

merger is in the best interests of their respective shareholders and stockholders. There are, however, risks associated with the merger that you should consider in deciding how to vote. These risks include, among others:

- the fact that the value of the Equity Office shares Spieker stockholders will receive in the merger will fluctuate during the period before the merger;

- the potential inability of Equity Office to integrate successfully Spieker's portfolio and to realize the cost savings expected from the merger;

- the fact that the directors and officers of Spieker may have interests in, and will receive benefits from, the merger that are different from, or in addition to, and, therefore, may conflict with the interests of Spieker stockholders in the merger;

- the fact that EOP Partnership will need to refinance the new $1.0 billion bridge facility being obtained to finance $1.0 billion of the estimated $1.187 billion of merger costs within 364 days from date of funding, and anticipates incurring increased interest costs on the replacement indebtedness due to higher interest costs of longer–term debt;

- the fact that Spieker and Spieker Partnership may be required to pay a termination fee of up to $160 million under specified circumstances;

- the fact that Equity Office and Spieker have already incurred substantial expenses in connection with the merger, and may incur additional expenses in the event that the merger is not completed; and

- the risk that further declines in overall economic activity in Equity Office's and Spieker's markets could adversely affect Equity Office's results after the merger.

**Amendments to Equity Office's Declaration of Trust (see page 93)**

As part of the merger, Equity Office common shareholders will be asked to vote upon a proposal to amend the Equity Office declaration of trust, to:

- increase the maximum number of trustees from 15 to 16; and

- authorize the Equity Office board of trustees to exempt one or more series of preferred shares issued in connection with a business combination from all or any portion of the ownership limitations and restrictions on transfer set forth in Article VII of the Equity Office declaration of trust.

The Equity Office board of trustees has declared advisable the amendments to be effected as part of the merger and recommends that Equity Office shareholders approve these amendments.

The proposal to approve the merger agreement and the merger and the proposal to approve the amendments to the Equity Office declaration of trust are conditioned upon one another. If both proposals are not approved, Equity Office and Spieker cannot complete the merger.

**The Merger Agreement (see page 66)**

*The merger agreement, as amended, is attached at the back of this document as* <u>Annex A</u>. *We urge you to read the merger agreement because it is the legal document that governs the merger.*

The merger agreement contemplates the following two–step transaction:

- the partnership merger, in which Spieker Partnership will merge with and into EOP Partnership, and Spieker Partnership will cease to exist, which we refer to as the partnership merger, followed by

- the merger, in which Spieker will merge with and into Equity Office and Spieker will cease to exist.

The merger will be completed as soon as practicable following the partnership merger.

*The Vote of Partners of EOP Partnership and Spieker Partnership (see page 63)*

Under authority granted Equity Office, as general partner of EOP Partnership, Equity Office has approved the partnership merger. No vote or consent of unitholders of EOP Partnership is

Table of Contents

required for approval of the partnership merger. The partnership agreement of EOP Partnership requires the approval of the merger by the consent of unitholders holding at least a majority of the outstanding EOP Partnership units, including any EOP Partnership units held by Equity Office. Equity Office owns more than a majority of the outstanding EOP Partnership class A units and all of the outstanding EOP Partnership preferred units, and intends to take action by written consent, as permitted under the partnership agreement of EOP Partnership, to approve the merger on or about 10:00 a.m., Central Time, on Monday, July 9, 2001.

California law requires the approval of the principal terms of the partnership merger by at least a majority in interest of each class of the outstanding Spieker Partnership units, including any preferred Spieker Partnership units held by Spieker. Spieker owns more than a majority of the outstanding Spieker Partnership units, including all outstanding classes of preferred units other than the series D preferred units of Spieker Partnership, and intends to take action by written consent, as permitted under California law, to approve the principal terms of the partnership merger on or about 8:00 a.m., Pacific Time, on Monday, July 9, 2001. The holders of Spieker Partnership series D preferred units have already consented to the principal terms of the partnership merger.

The required partner approvals of the partnership merger and the merger are, therefore, assured. Neither the merger nor the partnership merger will be completed, however, if the partners of EOP Partnership and Spieker Partnership approve the merger and the partnership merger, as applicable, but the Equity Office common shareholders or the Spieker common stockholders do not approve the merger.

5

---

Table of Contents

### Structure Diagrams

The following diagrams depict in summary form the structure of Equity Office and Spieker before and after the partnership merger and the merger, assuming that (1) none of the unitholders of EOP Partnership or Spieker Partnership redeem their units for cash or exchange their units for Equity Office common shares or Spieker common stock, as applicable, and (2) no holder of convertible securities of Equity Office, EOP Partnership or Spieker, including share options of Equity Office and Spieker, converts or exercises those securities for Equity Office common shares or shares of Spieker common stock. The percentages in the diagrams reflect ownership of partnership interests of EOP Partnership and Spieker Partnership, other than preferred interests as of May 21, 2001 and as of immediately after the partnership merger and the merger. All outstanding preferred units of EOP Partnership are owned by Equity Office. All outstanding preferred interests of Spieker Partnership are owned by Spieker, except for the Spieker Partnership series D preferred units, which are owned by two institutional investors and will be purchased by Spieker Partnership immediately before the partnership merger. As a result of the merger, Equity Office will succeed to the EOP Partnership units issued to Spieker Partnership in the partnership merger.

Current Structure:



After the Partnership Merger and the Merger:



6

Table of Contents

*Conditions to the Merger and the Partnership Merger (see page 75)*

Before we can complete the partnership merger and the merger, a number of conditions must be satisfied. These include:

- the approval of the merger agreement and the merger, as well as the amendments to the Equity Office declaration of trust described under "Approval of Amendments to Equity Office's Declaration of Trust" beginning on page 93 by Equity Office common shareholders;

- the approval of the merger agreement and the merger by Spieker common stockholders;

- the approval of the merger by the partners of EOP Partnership;

- the approval of the principal terms of the partnership merger by the partners of Spieker Partnership;

- the absence of a court order or law preventing the completion of either the merger or the partnership merger; and

- other customary closing conditions.

Where the law permits, Equity Office or Spieker could decide to complete the merger even though one or more conditions were not satisfied. By law, neither Equity Office nor Spieker can waive:

- the requirement that Equity Office common shareholders, Spieker common stockholders and partners of EOP Partnership approve the merger and that Equity Office common shareholders approve the amendments to Equity Office's declaration of trust to be effected as part of the merger;

- the requirement that partners of Spieker Partnership approve the principal terms of the partnership merger; or

- any court order or law preventing the closing of the merger or the partnership merger.

Whether any of the other conditions would be waived would depend on the facts and circumstances as determined by the reasonable business judgment of the board of trustees of Equity Office or the board of directors of Spieker. If Equity Office or Spieker waived compliance with one or more of the other conditions and the condition was deemed material to a vote of Equity Office common shareholders and/or Spieker common stockholders, Equity Office and/or Spieker would have to resolicit shareholder or stockholder approval, as applicable, before closing the merger. Neither Equity Office nor Spieker intends to notify shareholders or stockholders of any waiver that, in the judgment of Equity Office's board of trustees and Spieker's board of directors, does not require resolicitation of shareholder or stockholder approval.

It is a condition to the closing of the merger that Hogan & Hartson L.L.P., counsel to Equity Office, and Sullivan & Cromwell, counsel to Spieker, deliver opinions that the merger qualifies as a reorganization under the provisions of section 368(a) of the Internal Revenue Code. This condition will not be waived.

*Termination of the Merger Agreement (see page 80)*

Equity Office or Spieker may terminate the merger agreement, whether before or after the required shareholder and partner approvals are obtained, if:

- the merger and the partnership merger are not completed by December 31, 2001, unless extended by the parties; however, neither Equity Office nor Spieker may terminate the merger agreement if its breach is the reason that the merger or the partnership merger is not completed by that date;

- a final, non–appealable judgment or governmental order is issued preventing completion of the merger or the partnership merger;

- the Spieker common stockholders do not approve the merger agreement and the merger, the partners of Spieker Partnership do not approve the principal terms of the partnership merger, or Equity Office determines that either such approval cannot be obtained, but Spieker may not terminate the merger agreement for either of these reasons if it is in breach in any material respect of its obligations contained in the merger agreement relating to obtaining these approvals; or

Table of Contents

- Equity Office common shareholders do not approve the merger agreement and the merger, and the amendments to the Equity Office declaration of trust, or the partners of EOP Partnership do not approve the merger, but Equity Office may not terminate the merger agreement for either of these reasons if it is in breach in any material respect of its obligations contained in the merger agreement relating to obtaining these approvals.

Equity Office also may terminate the merger agreement if:

- Spieker or Spieker Partnership breaches or does not perform any of its covenants, obligations or agreements in the merger agreement, or breaches any of its representations or warranties or if any of its representations and warranties is or becomes untrue, in either case so that the conditions to completion of the merger and the partnership merger would be incapable of being satisfied by December 31, 2001, unless extended by the parties; or

- the Spieker board of directors does not recommend or withdraws, modifies, amends or qualifies, in any manner adverse to Equity Office, its approval or recommendation of either the merger or the merger agreement, or approves or recommends any superior alternative acquisition proposal, or the Spieker board or any committee of the Spieker board resolves to do any of the foregoing; or

- following the announcement or receipt of an alternative acquisition proposal, Spieker does not call the Spieker special meeting or does not prepare and mail to its stockholders this joint proxy statement/ prospectus or the Spieker board or any committee of the Spieker board resolves to do any of the foregoing.

Spieker also may terminate the merger agreement if:

- Equity Office or EOP Partnership breaches or fails to perform any of its covenants, obligations or agreements in the merger agreement, or breaches any of its representations or warranties or if any of its representations and warranties is or becomes untrue, in either case so that the conditions to completion of the merger and the partnership merger would be incapable of being satisfied by December 31, 2001, unless extended by the parties; or

- the Spieker board withdraws, modifies, amends or qualifies, in any manner adverse to Equity Office, its approval or recommendation of either of the merger or the merger agreement in connection with, or approves or recommends, any superior alternative acquisition proposal, or in order to enter into a binding written agreement with respect to a superior acquisition proposal, so long as, in each case, Spieker has complied with the terms of the no solicitation provisions contained in the merger agreement and, before terminating the merger agreement, pays to EOP Partnership the termination fee.

Equity Office and Spieker also may mutually agree to terminate the merger agreement.

### Termination Fee and Termination Expenses (see page 81)

Spieker and Spieker Partnership have agreed to pay to EOP Partnership a termination fee of up to $160 million, if the merger agreement is terminated:

- by Spieker under the circumstances described above where it is permitted to terminate the merger agreement because its board of directors has withdrawn, modified or qualified, in any manner adverse to Equity Office, its recommendation of either the merger or the merger agreement in connection with, or has approved or recommended, any superior acquisition proposal, or in order to enter into a binding agreement with respect to a superior acquisition proposal; or

- by Equity Office because the Spieker board does not recommend or withdraws, modifies, amends or qualifies, in any manner adverse to Equity Office, its approval or recommendation of the merger, the partnership merger or the merger agreement, or approves or recommends any superior alternative acquisition proposal, or resolves to do any of the foregoing.

8

Table of Contents

The termination fee of up to $160 million also would be payable by Spieker and Spieker Partnership if:

- Spieker or Spieker Partnership has received a proposal for an alternative acquisition transaction before the termination;

- before or within 12 months after the termination, Spieker or Spieker Partnership enters into an agreement regarding any alternative acquisition transaction that is later completed; and

- the merger agreement was terminated by Equity Office because a final, non-appealable judgment or governmental order resulting primarily from action or inaction of Spieker or Spieker Partnership was issued or the merger agreement was terminated by Equity Office or Spieker for any other reason other than by mutual agreement, a breach by Equity Office or EOP Partnership of its representations and warranties, covenants, obligations or agreements, the failure of Equity Office common shareholders to approve the merger agreement and the merger and the amendments to the Equity Office declaration of trust or the failure of partners of EOP Partnership to approve the merger.

Under the merger agreement, Spieker and Spieker Partnership, on the one hand, and Equity Office and EOP Partnership, on the other, also may become obligated under specified circumstances to reimburse up to $7.5 million of the other parties' expenses if the merger agreement is terminated. The amount of any termination fee paid by Spieker and Spieker Partnership would be reduced by any expense reimbursement paid by them.

**Regulatory Approvals (see page 64)**

No material federal or state regulatory requirements must be complied with or approvals must be obtained by Equity Office, EOP Partnership, Spieker or Spieker Partnership in connection with either the merger or the partnership merger.

**Accounting Treatment (see page 64)**

The merger will be treated as a purchase for financial accounting purposes.

**Conflicts of Interest of Spieker Directors and Executive Officers in the Merger and the Partnership Merger (see page 58)**

In considering the recommendation of the Spieker board with respect to the merger agreement and the merger, Spieker stockholders should be aware that, as described below, some Spieker directors and executive officers have interests in, and will receive benefits from, the merger and the partnership merger that differ from, or are in addition to, and, therefore, may conflict with the interests of Spieker stockholders generally.

*Trustees of Equity Office After the Merger.* Under the merger agreement, Warren E. Spieker, Jr., Spieker's Chairman of the Board, and John A. Foster and Craig G. Vought, Spieker's Co–Chief Executive Officers, will become members of the Equity Office board of trustees following the merger. Mr. Spieker's term will expire in 2004, Mr. Vought's term in 2003 and Mr. Foster's term in 2002. See "— Trustees and Executive Officers of Equity Office After the Merger" beginning on page 11.

*Indemnification and Insurance.* The merger agreement provides that Equity Office and EOP Partnership will provide exculpation and indemnification for directors and officers of Spieker and Spieker Partnership, including for actions taken in connection with the merger, which is the same as the exculpation and indemnification provided by Spieker and Spieker Partnership as of the date of the merger agreement. The merger agreement also provides that Equity Office and EOP Partnership will indemnify and hold harmless former directors and officers of Spieker and Spieker Partnership after the merger to the fullest extent permitted by law. In addition, Equity Office has agreed to provide directors' and officers' insurance for the benefit of those individuals currently covered by Spieker's insurance for a period of six years after the merger.

*Equity–Based Awards.* Unvested options to purchase an aggregate of 1,075,247 shares of Spieker common stock at an average exercise price of $38.33 per share previously awarded to 17 Spieker directors and executive officers will vest in connection with the merger pursuant to the plans under which they were issued and in any event no later than the day before the merger closes. These 17 Spieker directors and executive officers also currently hold vested options to

9

---

Table of Contents

purchase an aggregate of an additional 2,577,505 shares of Spieker common stock at an average exercise price of $30.48. All Spieker stock options will be converted in the merger into options to purchase Equity Office common shares under the terms of the merger agreement.

Under the merger agreement, holders of Spieker stock options will be entitled to tender the Equity Office options that they will receive in the merger to EOP Partnership for a cash payment per option converted in the merger equal to the excess, if any, of $58.50 over the exercise price of the Spieker option, which acquisition and payment will be made within three business days of the closing of the merger. Options to purchase Equity Office common shares that are not tendered to EOP Partnership as described above would remain outstanding as options to purchase Equity Office common shares.

Eleven Spieker directors and executive officers holding vested options to purchase an aggregate of 2,471,505 shares of Spieker common stock at an average exercise price of $30.27, and unvested options to purchase an additional 946,247 shares of Spieker common stock at an average exercise price of $38.00 that will vest in connection with the merger, have agreed to tender their options to EOP Partnership. The aggregate value of these vested and unvested options, calculated using the average exercise prices of the options and the $58.50 cash option tender price, is approximately $89.2 million. The remaining six Spieker directors and executive officers who have not indicated whether or not they intend to tender their options hold vested options to purchase an aggregate of 106,000 shares of Spieker common stock at an average exercise price of $35.57, and unvested options to purchase an additional 129,000 shares of Spieker common stock at an average exercise price of $40.74 that will vest in the merger. At the $58.50 cash tender offer price, these vested and unvested options have an aggregate value of approximately $4.7 million.

In addition, 205,182 unvested shares of Spieker restricted stock previously awarded to Spieker directors and executive officers will vest on the day immediately before the date on which the Spieker common stockholders approve the merger. Using a $57.70 pro forma equivalent value for Spieker common stock, the aggregate value of the unvested Spieker restricted stock previously awarded to Spieker directors and executive officers is approximately $11.8 million.

*Special Severance Policy.* Spieker has a "special severance policy" applicable to executive officers that provides for severance compensation under specified circumstances in the event of a change in control. Equity Office has acknowledged that the merger will be a change in control for purposes of the Spieker special severance policy and that severance payments will be made as provided in the Spieker special severance policy to any participant who becomes entitled to these payments because of a termination of employment occurring on or after the closing of the merger, unless the termination is for cause or is a voluntary

resignation without good reason under the terms of the Spieker special severance policy. No executive officer eligible for the benefits of the Spieker special severance policy will become an executive officer of Equity Office following the merger.

If any payments made to an executive officer by Spieker under the Spieker special severance policy would result in an excise tax imposed by section 4999 of the Internal Revenue Code, the executive officer will receive a tax reimbursement payment that would put the executive officer in the same financial position after–tax that he would have been in if the excise tax did not apply to such amounts. However, if reducing the total payments under the special severance policy by 10% or less would avoid triggering the excise tax, the payments under the Spieker special severance policy will be reduced by the amount necessary to avoid triggering the excise tax rather than making the tax reimbursement payment.

Under the severance policy, the thirteen executive officers of Spieker will be entitled to receive estimated cash payments ranging from approximately $1.1 million to $5.0 million as a base amount, or approximately $33.9 million in the aggregate. In the event these executive officers become entitled to tax reimbursement as described above, the tax reimbursement amounts could range from $0 to $3.4 million per individual, or approximately $19.9 million in the aggregate. The calculation of the estimated cash payments under the special severance policy assumes that Equity Office's obligations under the policy are triggered immediately upon the closing of the merger and that the merger will close on July 9, 2001. The amounts shown include estimated 2001

10

---

## Table of Contents

bonuses through the closing date. Neither Spieker nor Equity Office has yet determined that any tax reimbursement payments would be required.

In addition, under the Spieker special severance policy, the executive officer and his or her eligible dependents will continue to be eligible to participate in the medical, dental, disability and life insurance plans and arrangements applicable to him or her immediately before his or her termination of employment, on substantially the same terms and conditions in effect immediately before the termination. If such participation is prohibited, equivalent coverage will be purchased for the executive officer and his or her eligible dependents with no greater after–tax cost to the executive officer than he or she paid for coverage prior to being terminated. Coverage will continue for three years from the date of termination in the case of Messrs. Spieker, Foster and Vought, and John K. French and Dennis E. Singleton, each of whom is a Vice–Chairman of Spieker's board, Stuart A. Rothstein, Spieker's Chief Financial Officer, and one other executive officer and for two years from the date of termination in the case of Joseph D. Russell, Jr., Peter H. Schnugg and James C. Eddy and all other eligible executive officers.

*Tax Related Undertakings of EOP Partnership.* Under the merger agreement, EOP Partnership has agreed, for the benefit of 17 named unitholders, not to sell, exchange or otherwise dispose of, except in tax–free or tax–deferred transactions, specified office properties comprising approximately 6.5 million square feet, or approximately 26.5% of Spieker Partnership's office portfolio on a square footage basis, and specified industrial properties comprising approximately 5.6 million square feet, or approximately 43.7% of Spieker Partnership's industrial portfolio on a square footage basis. These office and industrial properties comprise approximately 12.1 million square feet, or approximately 32.3% of Spieker Partnership's total portfolio on a square footage basis. These restrictions, which benefit Messrs. Spieker, Foster, Vought, French, Singleton, Schnugg and Eddy and one other Spieker executive officer, among others, last for at least 10 years and, depending on whether the unitholder enters into, and complies with the terms of, an agreement not to sell specified percentages of their Equity Office common shares and EOP Partnership units during the initial 10 year restriction period, up to 20 years after closing of the partnership merger. In addition, EOP Partnership has agreed for tax purposes to make available to these same named unitholders the opportunity to guarantee specified debt of EOP Partnership for the same period and has made specified other undertakings. These provisions are intended to ensure that these unitholders, who originally contributed properties to Spieker Partnership in exchange for Spieker Partnership units, will be able to continue to defer the otherwise substantial gain that would be recognized by them for tax purposes as EOP Partnership unitholders upon a sale of any one or more of these properties.

*Loan Forgiveness.* According to its terms, a $400,000 loan made in April 2000 by Spieker to Mr. Rothstein, together with accrued interest, will be forgiven upon completion of the merger. The loan was extended to Mr. Rothstein for the purchase of a personal residence and has an outstanding balance of $360,000. If the merger were not to occur, 10% of the original loan amount would be forgiven in each of the next four years under the terms of the loan, subject to his continued employment.

*Acquisition of Spieker Northwest.* In connection with the merger, a subsidiary of Equity Office will purchase 100% of the voting and 5% of the non–voting capital stock of Spieker Northwest, Inc., a noncontrolled third–party service subsidiary of Spieker, for an aggregate of $202,500 in cash from the holders of that stock, who include Messrs. Spieker, French and Singleton and one other individual, each of whom owns 25% of the voting capital stock of Spieker Northwest, Inc. and 1.25% of the non–voting capital stock.

*BroadBand Restricted Stock Agreements.* Spieker has entered into restricted stock agreements with its executive officers, among others, under which those executive officers have been awarded shares of common stock of BroadBand Office, Inc. In connection with the merger, the restrictions with respect to those shares will lapse. BroadBand Office, Inc. filed for Chapter 11 bankruptcy protection under the U.S. Bankruptcy Code on May 9, 2001. Therefore, such awards are not expected to have any value.

**Trustees and Executive Officers of Equity Office After the Merger (see page 58)**

Following the merger, the current trustees of Equity Office will remain as trustees of Equity Office. In addition, the merger agreement provides that Messrs. Spieker, Foster and Vought will become members of the Equity Office board of

11

Table of Contents

trustees as described above. Following the merger, the current executive officers of Equity Office will remain as executive officers of Equity Office. No current executive officers of Spieker will become executive officers of Equity Office following the merger.

**Differences in the Rights of Shareholders**
**(see page 106)**

The rights of holders of Spieker common and preferred stock currently are governed by the Maryland General Corporation Law and Spieker's charter and bylaws. Following the closing of the merger, the rights of former holders of Spieker common and preferred stock who receive Equity Office common or preferred shares in the merger will be governed by the Maryland REIT Law and Equity Office's declaration of trust and bylaws. The Maryland REIT Law contains trust governance provisions that generally are comparable to or the same as many corporate governance provisions in the Maryland General Corporation Law.

12

Table of Contents

**Selected Historical Consolidated and Combined Financial Data**

*Equity Office*

The following tables set forth selected consolidated and combined financial and operating information on a historical basis for Equity Office and its predecessors. The selected operating data and certain other data set forth below for the years ended December 31, 2000, 1999 and 1998, for the period from July 11, 1997 through December 31, 1997, for the period from January 1, 1997 through July 10, 1997 and for the year ended December 31, 1996, and the balance sheet data as of December 31, 2000, 1999, 1998, 1997 and 1996 and July 10, 1997, have been derived from the historical audited consolidated and combined financial statements of Equity Office and its predecessors, audited by Ernst & Young LLP, independent auditors. The selected operating and other data at and for the three months ended March 31, 2001 and 2000 have been derived from the unaudited financial statements of Equity Office. The following information should be read together with the consolidated financial statements and financial statement notes of Equity Office incorporated by reference in this joint proxy statement/ prospectus. See "Where You Can Find More Information" beginning on page 124.

| | Equity Office | | | | | |
|---|---|---|---|---|---|---|
| | For the three months ended March 31, | | For the years ended December 31, | | | For the period from July 11, 1997 through December 31, 1997(2) |
| | 2001 | 2000 | 2000(1) | 1999 | 1998 | |
| | (Dollars in thousands, except per share data) | | | | | |
| **Operating Data:** | | | | | | |
| Revenues: | | | | | | |
| Rental, parking and other | $ 650,209 | $ 460,936 | $2,217,146 | $1,919,056 | $1,658,420 | $ 406,713 |
| Total revenues | 663,216 | 468,875 | 2,264,243 | 1,942,243 | 1,679,699 | 412,968 |
| **Expenses:** | | | | | | |
| Interest | 157,940 | 100,532 | 525,787 | 413,995 | 338,611 | 76,675 |
| Depreciation and amortization | 124,974 | 89,652 | 436,417 | 358,989 | 305,982 | 70,346 |
| Property operating and ground rent(3) | 217,672 | 157,361 | 764,007 | 669,763 | 600,367 | 155,679 |
| General and administrative | 25,639 | 19,651 | 91,415 | 80,927 | 63,564 | 17,690 |
| Total expenses | 526,225 | 367,196 | 1,817,626 | 1,523,674 | 1,308,524 | 320,390 |
| Income before allocation to minority interests, income from investment in unconsolidated joint ventures, net gain (loss) on sales of real estate, | 136,991 | 101,679 | 446,617 | 418,569 | 371,175 | 92,578 |

|  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|
| extraordinary items and cumulative effect of a change in accounting principle |  |  |  |  |  |  |
| Minority interests | (19,535) | (12,969) | (66,219) | (50,153) | (38,340) | (7,799) |
| Income from investment in unconsolidated joint ventures | 15,426 | 11,374 | 56,251 | 13,824 | 11,267 | 3,173 |
| Net gain (loss) on sales of real estate and extraordinary items | — | 3,251 | 34,211 | 49,113 | 4,927 | (16,240) |
| Cumulative effect of a change in accounting principle | (1,142) | — | — | — | — | — |
| Net income | 131,740 | 103,335 | 470,860 | 431,353 | 349,029 | 71,712 |
| Put option settlement | — | (1,030) | (2,576) | (5,658) | — | — |
| Preferred distributions, net | (10,884) | (10,697) | (43,348) | (43,603) | (32,202) | (649) |
| Net income available for common shares | $ 120,856 | $ 91,608 | $ 424,936 | $ 382,092 | $ 316,827 | $ 71,063 |
| Net income available per weighted average common share outstanding — basic | $ 0.39 | $ 0.37 | $ 1.53 | $ 1.49 | $ 1.25 | $ 0.44 |
| Net income available per weighted average common share and common share equivalent outstanding — diluted | $ 0.39 | $ 0.37 | $ 1.52 | $ 1.48 | $ 1.24 | $ 0.43 |

[Additional columns below]

[Continued from above table, first column(s) repeated]

| | Equity Office Predecessors | |
|---|---|---|
| | For the period from January 1, 1997 through July 10, 1997 | For the year ended December 31, 1996 |
| | (Dollars in thousands, except per share data) | |
| **Operating Data:** | | |
| Revenues: | | |
| Rental, parking and other | $ 327,017 | $ 493,396 |
| Total revenues | 339,104 | 508,124 |
| Expenses: | | |
| Interest | 80,481 | 119,595 |
| Depreciation and amortization | 66,034 | 96,237 |
| Property operating and ground rent(3) | 127,285 | 201,067 |
| General and administrative | 17,201 | 23,145 |
| Total expenses | 291,001 | 440,044 |
| Income before allocation to minority interests, income from investment in unconsolidated joint ventures, net gain (loss) on sales of real estate, extraordinary items and cumulative effect of a change in accounting principle | 48,103 | 68,080 |
| Minority interests | (912) | (2,086) |
| Income from investment in unconsolidated joint ventures | 1,982 | 2,093 |
| Net gain (loss) on sales of real estate and extraordinary items | 12,236 | 5,338 |
| Cumulative effect of a change in accounting principle | — | — |
| Net income | 61,409 | 73,425 |
| Put option settlement | — | — |
| Preferred distributions, net | — | — |
| Net income available for common shares | $ 61,409 | $ 73,425 |

Net income available per weighted average common share outstanding — basic

Net income available per weighted average common share and common share equivalent outstanding — diluted

13

**Table of Contents**

|  | Equity Office | | | | | |
|---|---|---|---|---|---|---|
|  | For the three months ended March 31, | | For the years ended December 31, | | | For the period from July 11, 1997 through December 31, 1997(2) |
|  | 2001 | 2000 | 2000(1) | 1999 | 1998 | |
|  | (Dollars in thousands, except per share data) | | | | | |
| Weighted average common shares outstanding — basic | 306,971,084 | 247,695,287 | 277,186,733 | 256,045,895 | 253,167,037 | 162,591,477 |
| Weighted average common shares and common share equivalents outstanding — diluted | 351,400,853 | 283,568,648 | 318,997,407 | 291,157,204 | 283,974,532 | 180,014,027 |
| Cash distributions declared per common share | $ .45 | $ .42 | $ 1.74 | $ 1.58 | $ 1.38 | $ 0.56 |
| **Balance Sheet Data** (at end of period): | | | | | | |
| Investment in real estate, net of accumulated depreciation | $ 16,612,557 | $ 12,497,425 | $ 16,641,325 | $ 12,572,153 | $ 13,331,560 | $ 10,976,319 |
| Total assets | $ 18,723,298 | $ 14,089,833 | $ 18,794,253 | $ 14,046,058 | $ 14,261,291 | $ 11,751,672 |
| Mortgage debt, unsecured notes and lines of credit | $ 8,658,159 | $ 5,962,784 | $ 8,802,994 | $ 5,851,918 | $ 6,025,405 | $ 4,284,317 |
| Total liabilities | $ 9,415,412 | $ 6,484,776 | $ 9,504,662 | $ 6,334,985 | $ 6,472,613 | $ 4,591,697 |
| Minority interests | $ 1,194,223 | $ 858,634 | $ 1,218,396 | $ 883,454 | $ 737,715 | $ 754,818 |
| Redeemable common shares | $ 54,122 | $ 52,576 | $ 54,122 | $ 51,546 | $ 100,000 | $ 100,000 |
| Preferred shares | $ 613,423 | $ 613,923 | $ 613,923 | $ 615,000 | $ 615,000 | $ 200,000 |
| Shareholders' equity/owners' equity | $ 7,446,118 | $ 6,079,924 | $ 7,403,150 | $ 6,161,073 | $ 6,335,963 | $ 6,105,157 |
| **Other Data:** | | | | | | |
| General and administrative expenses as a percentage of total revenues | 3.9% | 4.2% | 4.0% | 4.2% | 3.8% | 4.3% |
| Number of office properties | 380 | 294 | 381 | 294 | 284 | 258 |
| Net rentable square feet of office properties (in millions) | 99.0 | 77.0 | 99.0 | 77.0 | 75.1 | 65.3 |
| Occupancy of office properties | 94% | 94% | 95% | 94% | 95% | 94% |
| Funds from operations(4) | $ 272,591 | $ 195,559 | $ 910,959 | $ 749,641 | $ 661,645 | $ 160,929 |
| Property net operating income(5) | $ 435,618 | $ 305,599 | $ 1,463,151 | $ 1,256,180 | $ 1,065,714 | $ 253,418 |
| Earnings before interest, taxes, depreciation and amortization(6) | $ 461,483 | $ 314,588 | $ 1,535,943 | $ 1,226,053 | $ 1,046,626 | $ 241,477 |
| Cash flow provided by operating activities | $ 192,801 | $ 109,489 | $ 907,343 | $ 720,711 | $ 759,151 | $ 190,754 |

| | | | | | |
|---|---|---|---|---|---|
| Cash flow (used for) investing activities | $ (63,672) | $ (65,929) | $ (1,311,778) | $ (67,138) | $ (2,231,712) | $ (1,592,272) |
| Cash flow (used for) provided by financing activities | $ (144,775) | $ (29,522) | $ 455,353 | $ (718,315) | $ 1,310,788 | $ 1,630,346 |
| Ratio of earnings to combined fixed charges and preferred share dividends | 1.8 | 1.8 | 1.8 | 1.8 | 1.9 | 2.1 |

[Additional columns below]

[Continued from above table, first column(s) repeated]

| | Equity Office Predecessors | |
|---|---|---|
| | For the period from January 1, 1997 through July 10, 1997 | For the year ended December 31, 1996 |
| | (Dollars in thousands, except per share data) | |
| Weighted average common shares outstanding — basic | | |
| Weighted average common shares and common share equivalents outstanding — diluted | | |
| Cash distributions declared per common share | | |
| **Balance Sheet Data** (at end of period): | | |
| Investment in real estate, net of accumulated depreciation | — | $ 3,291,815 |
| Total assets | — | $ 3,912,565 |
| Mortgage debt, unsecured notes and lines of credit | — | $ 1,964,892 |
| Total liabilities | — | $ 2,174,483 |
| Minority interests | — | $ 11,080 |
| Redeemable common shares | — | — |
| Preferred shares | — | — |
| Shareholders' equity/owners' equity | — | $ 1,727,002 |
| **Other Data:** | | |
| General and administrative expenses as a percentage of total revenues | 5.1% | 4.6% |
| Number of office properties | — | 84 |
| Net rentable square feet of office properties (in millions) | — | 29.2 |
| Occupancy of office properties | — | 90% |
| Funds from operations(4) | $ 113,022 | $ 160,460 |
| Property net operating income(5) | $ 202,108 | $ 294,556 |
| Earnings before interest, taxes, depreciation and amortization(6) | $ 196,134 | $ 283,490 |
| Cash flow provided by operating activities | $ 95,960 | $ 165,975 |
| Cash flow (used for) investing activities | $ (571,068) | $ (924,227) |
| Cash flow (used for) provided by financing activities | $ 245,851 | $ 1,057,551 |
| Ratio of earnings to combined fixed charges and preferred | 1.6 | 1.5 |

share dividends

(1) On June 19, 2000, Equity Office completed its acquisition of Cornerstone Properties Inc. See note 3 to Equity Office's consolidated financial statements incorporated by reference in this joint proxy statement/ prospectus.

(2) On December 19, 1997, Equity Office completed its acquisition of Beacon Properties Corporation at a cost of approximately $4.3 billion. As a result of this transaction, Equity Office acquired an interest in 130 properties containing approximately 20.9 million square feet.

(3) Property operating expenses include real estate taxes, insurance, repairs and maintenance and other property operating expenses.

14

---

**Table of Contents**

(4) The White Paper on Funds from Operations approved by the Board of Governors of the National Association of Real Estate Investment Trusts, or NAREIT, in March 1995 defines funds from operations as net income (loss), computed in accordance with generally accepted accounting principles, excluding gains (or losses) from debt restructuring and sales of properties, plus real estate related depreciation and amortization and after adjustments for unconsolidated partnerships and joint ventures. In November 1999, NAREIT issued a National Policy Bulletin effective January 1, 2000 clarifying the definition of funds from operations to include all operating results, both recurring and non−recurring, except those defined as extraordinary under generally accepted accounting principles. In accordance with this NAREIT Bulletin, Equity Office no longer adjusts for the amortization of discounts and premiums on mortgages when calculating funds from operations. Accordingly, Equity Office restated the prior period data for comparative purposes. Equity Office believes that funds from operations is helpful to investors as a measure of the performance of an equity REIT because, along with cash flow from operating activities, financing activities and investing activities, it provides investors with an indication of the ability of Equity Office to incur and service debt, to make capital expenditures and to fund other cash needs. Equity Office computes funds from operations in accordance with standards established by NAREIT, which may not be comparable to funds from operations reported by other REITs that do not define the term in accordance with the current NAREIT definition or that interpret the current NAREIT definition differently than Equity Office. Equity Office computes funds from operations in accordance with the standards established by NAREIT, and, therefore, includes straight−line rents in its funds from operations. Spieker excludes straight−line rents in calculating its funds from operations. Note 3 to Spieker's selected data table on page 18 shows under the caption "Funds from operations before straight−line rent" funds from operations of Spieker calculated on a comparable basis to how Equity Office calculates its funds from operations. Funds from operations does not represent cash generated from operating activities in accordance with generally accepted accounting principles, nor does it represent cash available to pay distributions and should not be considered as an alternative to net income, determined in accordance with generally accepted accounting principles, as an indication of Equity Office's financial performance or to cash flow from operating activities, determined in accordance with generally accepted accounting principles, as a measure of Equity Office's liquidity, nor is it indicative of funds available to fund Equity Office's cash needs, including its ability to make cash distributions. Equity Office calculates funds from operations as follows:

| | Equity Office | | | | |
| --- | --- | --- | --- | --- | --- |
| | For the three months ended March 31, | | For the years ended December 31, | | |
| | 2001 | 2000 | 2000(1) | 1999 | 1998 |
| Income before allocation to minority interests, income from investment in unconsolidated joint ventures, net gain on sales of real estate, extraordinary items and cumulative effect of a change in accounting principle | $136,991 | $101,679 | $446,617 | $418,569 | $371,175 |
| Add (deduct): | | | | | |
| Income allocated to minority interests for partially owned properties | (3,253) | (553) | (5,370) | (1,981) | (2,114) |
| Income from investment in unconsolidated joint ventures | 15,426 | 11,374 | 56,251 | 13,824 | 11,267 |
| Depreciation and amortization (real estate related) (including share of unconsolidated joint ventures) | 134,311 | 94,786 | 459,385 | 368,490 | 313,519 |
| Put option settlement | — | (1,030) | (2,576) | (5,658) | — |
| Preferred distributions, net | (10,884) | (10,697) | (43,348) | (43,603) | (32,202) |
| Funds from operations | $272,591 | $195,559 | $910,959 | $749,641 | $661,645 |

[Additional columns below]

[Continued from above table, first column(s) repeated]

| | Equity Office | Equity Office Predecessors |
| --- | --- | --- |

| | For the period from July 11, 1997 through December 31, 1997(2) | For the period from January 1, 1997 through July 10, 1997 | For the year ended December 31, 1996 |
|---|---|---|---|
| Income before allocation to minority interests, income from investment in unconsolidated joint ventures, net gain on sales of real estate, extraordinary items and cumulative effect of a change in accounting principle | $ 92,578 | $ 48,103 | $ 68,080 |
| Add (deduct): | | | |
| Income allocated to minority interests for partially owned properties | (789) | (912) | (2,086) |
| Income from investment in unconsolidated joint ventures | 3,173 | 1,982 | 2,093 |
| Depreciation and amortization (real estate related) (including share of unconsolidated joint ventures) | 66,616 | 63,849 | 92,373 |
| Put option settlement | — | — | — |
| Preferred distributions, net | (649) | — | — |
| Funds from operations | $ 160,929 | $ 113,022 | $ 160,460 |

(5) Property net operating income is defined as rental income, including tenant reimbursements, parking and other income less property operating expenses, including real estate taxes, insurance, repairs and maintenance and other property operating expenses.

(6) Earnings before interest, taxes, depreciation and amortization is presented because Equity Office believes this data is used by some investors to evaluate Equity Office's ability to meet debt service

15

Table of Contents

requirements. Equity Office considers earnings before interest, taxes, depreciation and amortization to be an indicative measure of its operating performance due to the significance of Equity Office's long–lived assets and because this data can be used to measure Equity Office's ability to service debt, fund capital expenditures and expand its business. However, this data should not be considered as an alternative to net income, operating profit, cash flows from operations or any other operating or liquidity performance measure prescribed by generally accepted accounting principles. In addition, earnings before interest, taxes, depreciation and amortization as calculated by Equity Office may not be comparable to similarly titled measures reported by other companies. Interest expense, taxes, depreciation and amortization, which are not reflected in the presentation of earnings before interest, taxes, depreciation and amortization, have been, and will be, incurred by Equity Office. Investors are cautioned that these excluded items are significant components in understanding and assessing Equity Office's financial performance. Equity Office calculates earnings before interest, taxes, depreciation and amortization as follows:

| | Equity Office | | | | | |
|---|---|---|---|---|---|---|
| | For the three months ended March 31, | | For the years ended December 31, | | | For the period from July 11, 1997 through December 31, 1997(2) |
| | 2001 | 2000 | 2000(1) | 1999 | 1998 | |
| Earnings before interest, taxes, depreciation and amortization: | | | | | | |
| Net income available for common shares | $ 120,856 | $ 91,608 | $ 424,936 | $ 382,092 | $ 316,825 | $ 71,063 |
| Plus minority interest — EOP Partnership | 16,282 | 12,416 | 59,376 | 48,172 | 36,226 | 7,010 |
| Plus depreciation and lease amortization | 123,648 | 88,275 | 426,671 | 354,296 | 299,578 | 66,168 |
| Plus preferred distributions, net | 10,884 | 10,697 | 43,348 | 43,603 | 32,202 | 649 |
| Plus put option settlement | — | 1,030 | 2,576 | 5,658 | — | — |
| Plus interest expense and loan amortization | 159,266 | 101,909 | 535,533 | 418,688 | 345,015 | 80,853 |
| Plus taxes | 1,517 | 47 | 2,719 | 656 | 1,666 | 239 |
| Less income from investment in unconsolidated joint ventures, net of income allocated to minority interest in partially owned properties | (12,173) | (10,821) | (49,408) | (11,843) | (9,153) | (2,384) |
| Plus Equity Office's share of earnings (losses) before interest, | 40,061 | 22,678 | 122,930 | 33,844 | 29,194 | 1,638 |

| | | | | | |
|---|---:|---:|---:|---:|---:|---:|
| taxes, depreciation and amortization from its investment in unconsolidated joint ventures, net of earnings before interest, taxes, depreciation and amortization allocated to minority interests in partially owned properties | | | | | | |
| Less net (gain) loss on sales of real estate, extraordinary items and cumulative effect of a change in accounting principle | 1,142 | (3,251) | (32,738) | (49,113) | (4,927) | 16,241 |
| **Earnings before interest, taxes, depreciation and amortization** | $461,483 | $314,588 | $1,535,943 | $1,226,053 | $1,046,626 | $ 241,477 |

[Additional columns below]

[Continued from above table, first column(s) repeated]

| | Equity Office Predecessors | |
|---|---:|---:|
| | **For the period from January 1, 1997 through July 10, 1997** | **For the year ended December 31, 1996** |
| **Earnings before interest, taxes, depreciation and amortization:** | | |
| Net income available for common shares | $ 61,409 | $ 73,425 |
| Plus minority interest — EOP Partnership | — | — |
| Plus depreciation and lease amortization | 63,263 | 91,962 |
| Plus preferred distributions, net | — | — |
| Plus put option settlement | — | — |
| Plus interest expense and loan amortization | 83,252 | 123,870 |
| Plus taxes | 868 | 1,375 |
| Less income from investment in unconsolidated joint ventures, net of income allocated to minority interest in partially owned properties | (1,070) | (7) |
| Plus Equity Office's share of earnings (losses) before interest, taxes, depreciation and amortization from its investment in unconsolidated joint ventures, net of earnings before interest, taxes, depreciation and amortization allocated to minority interests in partially owned properties | 648 | (1,797) |
| Less net (gain) loss on sales of real estate, extraordinary items and cumulative effect of a change in accounting principle | (12,236) | (5,338) |
| **Earnings before interest, taxes, depreciation and amortization** | $ 196,134 | $ 283,490 |

16

---

**Table of Contents**

*Spieker*

The following table sets forth selected consolidated financial and operating information on a historical basis for Spieker. The selected operating and certain other data set forth below for the years ended December 31, 2000, 1999, 1998, 1997 and 1996, and the balance sheet data as of December 31, 2000, 1999, 1998, 1997 and 1996, have been derived from the historical consolidated financial statements of Spieker, audited by Arthur Andersen LLP, independent auditors. The selected operating data and certain other data for the three months ended March 31, 2001 and 2000, and the balance sheet data as of March 31, 2001 and March 31, 2000 have been derived from Spieker's unaudited financial statements. The following information should be read together with the consolidated financial statements and financial statement notes of Spieker incorporated by reference in this joint proxy statement/ prospectus. See "Where You Can Find More Information" beginning on page 124.

| For the three months ended March 31, | | Year ended December 31, | | | | |
|---|---|---|---|---|---|---|
| **2001** | **2000** | **2000** | **1999** | **1998** | **1997** | **1996** |

**(amounts in thousands, except per share amounts)**

| | | | | | | | |
|---|---:|---:|---:|---:|---:|---:|---:|
| **Operating Data:** | | | | | | | |
| Revenues | 210,398 | 169,512 | $ 753,836 | $ 643,829 | $ 561,097 | $ 331,313 | $ 200,699 |
| Income from operations before disposition of real estate and minority interests | 79,671 | 53,257 | 239,863 | 195,516 | 163,924 | 110,134 | 65,764 |
| Net income | 88,071 | 66,124 | 333,464 | 220,151 | 159,665 | 115,004 | 64,190 |
| Net income available to common stockholders | 79,754 | 57,807 | 300,195 | 187,322 | 130,431 | 99,890 | 52,051 |
| Net income per share of common stock(1) — basic | 1.21 | 0.89 | 4.59 | 2.93 | 2.10 | 2.07 | 1.51 |
| Net income per share of common stock(1) — diluted | 1.17 | 0.87 | 4.45 | 2.89 | 2.07 | 2.04 | 1.50 |
| Dividends and distributions per share: | | | | | | | |
| Series A preferred stock(2) | 0.85 | 0.85 | 3.41 | 2.98 | 2.80 | 2.41 | 2.10 |
| Series B preferred stock | 0.59 | 0.59 | 2.36 | 2.36 | 2.36 | 2.36 | 2.36 |
| Series C preferred stock | 0.49 | 0.49 | 1.97 | 1.97 | 1.97 | 0.44 | — |
| Series E preferred stock | 0.50 | 0.50 | 2.00 | 2.00 | 1.15 | — | — |
| Common stock | 0.70 | 0.70 | 2.80 | 2.44 | 2.29 | 2.09 | 1.77 |
| Class B common stock(2) | — | — | — | — | 2.10 | 2.50 | 2.23 |
| Class C common stock(2) | — | — | — | — | 2.32 | 2.02 | 1.77 |
| **Balance Sheet Data:** | | | | | | | |
| Investments in real estate (before accumulated depreciation) | 4,755,314 | 4,504,477 | $4,704,358 | $4,404,274 | $4,182,806 | $ 3,252,572 | $1,447,173 |
| Net investments in real estate | 4,354,363 | 4,173,363 | 4,328,597 | 4,088,034 | 3,942,028 | 3,083,521 | 1,319,472 |
| Total assets | 4,614,786 | 4,323,832 | 4,528,288 | 4,268,485 | 4,056,870 | 3,242,934 | 1,390,314 |
| Mortgage loans | 51,785 | 93,289 | 56,738 | 97,331 | 110,698 | 96,502 | 45,997 |
| Unsecured debt | 2,031,132 | 1,909,500 | 1,998,119 | 1,899,512 | 1,736,500 | 1,335,000 | 674,000 |
| Total debt | 2,082,917 | 2,002,789 | 2,054,857 | 1,996,843 | 1,847,198 | 1,431,502 | 719,997 |
| Stockholders' equity | 1,977,987 | 1,812,487 | 1,940,057 | 1,793,445 | 1,723,462 | 1,493,828 | 563,928 |
| **Other Data:** | | | | | | | |
| Funds from operations(3) | 99,867 | 72,419 | $ 329,259 | $ 258,828 | $ 215,064 | $ 147,912 | $ 93,293 |
| Cash flow provided by (used by) | | | | | | | |
| Operating activities | 124,375 | 96,415 | 377,132 | 321,005 | 287,860 | 191,450 | 112,581 |
| Investing activities | (70,267) | (56,259) | (209,979) | (211,495) | (780,373) | (1,697,885) | (387,567) |
| Financing activities | (30,094) | (45,695) | (171,247) | (97,312) | 474,801 | 1,499,727 | 296,749 |
| Ratio of earnings to combined fixed charges and preferred distributions | 2.34 | 1.83 | 1.97 | 1.74 | 1.65 | 2.05 | 1.97 |
| Total rentable square footage of properties at end of period | 37,395 | 40,391 | 37,715 | 40,659 | 40,843 | 34,543 | 21,430 |
| Occupancy rate at end of period | 97.4% | 96.3% | 97.4% | 96.3% | 96.4% | 94.5% | 96.6% |

(1) Per share amounts based upon the basic weighted average shares outstanding for the quarterly periods ended March 31, 2001 and March 31, 2000 were 65,937,390 and 65,071,321, respectively, and the diluted weighted average shares outstanding were 69,111,093 and 67,247,908, respectively. Per share amounts based upon the basic weighted average shares outstanding for the years ended December 31, 2000 through 1996 were as follows: 65,401,668 for 2000, 63,984,711 for 1999, 62,113,172 for 1998, 48,207,141 for 1997, and 34,438,317 for 1996, and the diluted weighted average shares outstanding were 68,166,326 for 2000, 64,983,415 for 1999, 62,877,995 for 1998, 48,968,905 for 1997, and 34,691,140 for 1996. Diluted weighted average shares outstanding include the dilutive effect of stock options using the treasury method.

(2) As of December 31, 1999, all class B and class C shares were converted into Spieker common stock. The series A preferred stock was converted to Spieker common stock in April 2001.

17

**Table of Contents**

(3) The White Paper on Funds from Operations approved by the Board of Governors of NAREIT in March 1995 defines funds from operations as net income, computed in accordance with GAAP, excluding gains (or losses) from debt restructuring and sales of properties, plus real estate related depreciation and amortization and after adjustments for unconsolidated partnerships and joint ventures. In accordance with this NAREIT Bulletin, Spieker restated the 1996 data to reflect the new NAREIT definition except that Spieker eliminates straight-line rent from the calculation. In November 1999, NAREIT issued a National Policy Bulletin effective January 1, 2000 clarifying the definition of funds from operations to include all operating results, both recurring and non-recurring, except those defined as extraordinary under GAAP. Spieker believes that funds from operations is helpful to investors as a measure of the performance of an equity REIT because, along with cash flow from operating activities, financing activities and investing activities, it provides investors with an indication of Spieker's ability to incur and service debt, to make capital expenditures and to fund other cash needs. Spieker computes funds from operations in accordance with standards established by NAREIT except that Spieker eliminates straight-line rent from the calculation, which may not be comparable to funds from operations reported by other REITs that interpret the current

NAREIT definition differently than Spieker does. Equity Office computes funds from operations in accordance with the standards established by NAREIT, and, therefore, includes straight-line rents in its funds from operations calculations. Amounts shown in the table below under the caption "Funds from operations before straight-line rent" are presented for Spieker showing funds from operations calculated on a comparable basis to how Equity Office calculates its funds from operations. Funds from operations does not represent cash generated from operating activities in accordance with GAAP, nor does it represent cash available to pay distributions and should not be considered as an alternative to net income, determined in accordance with GAAP, as an indication of Spieker's financial performance or to cash flow from operating activities, determined in accordance with GAAP, as a measure of Spieker's liquidity, nor is it indicative of funds available to fund Spieker's cash needs, including Spieker's ability to make cash distributions.

| | For the three months ended March 31, | | Year ended December 31, | | | | |
|---|---|---|---|---|---|---|---|
| | 2001 | 2000 | 2000 | 1999 | 1998 | 1997 | 1996 |
| Income from operations before disposition of real estate and minority interests: | $ 79,671 | $53,257 | $239,863 | $195,516 | $163,924 | $110,134 | $ 65,764 |
| Less: | | | | | | | |
| Dividends on series B preferred stock | (2,510) | (2,510) | (10,041) | (10,041) | (10,041) | (10,041) | (10,041) |
| Dividends on series C preferred stock | (2,953) | (2,953) | (11,813) | (11,813) | (11,813) | (2,658) | — |
| Dividends on series E preferred stock | (2,000) | (2,000) | (8,000) | (8,000) | (4,600) | — | — |
| Distributions on preferred operating partnership units | (1,441) | (1,441) | (5,766) | (7,904) | (8,542) | (402) | — |
| Income from operations after preferred dividends and distributions | 70,767 | 44,353 | 204,243 | 157,758 | 128,928 | 97,033 | 55,723 |
| Add: | | | | | | | |
| Depreciation and amortization | 33,797 | 30,064 | 136,360 | 110,003 | 93,512 | 52,172 | 37,040 |
| Other, net[a] | 581 | 422 | 1,866 | 1,262 | 112 | 747 | 303 |
| Funds from operations before straight-line rent[b] | 105,145 | 74,839 | 342,469 | 269,023 | 222,552 | 149,952 | 93,066 |
| Straight-line rent | (5,278) | (2,420) | (13,210) | (10,195) | (7,488) | (2,040) | 227 |
| Funds from operations | $ 99,867 | $72,419 | $329,259 | $258,828 | $215,064 | $147,912 | $ 93,293 |

[a] Primarily includes our share of funds from operations from Spieker Griffin/W9 Associates, L.L.C., an unconsolidated joint venture. Further discussion of this joint venture can be found under "Investments in Affiliates" in our notes to consolidated financial statements.

[b] Amounts shown in this line correspond to Equity Office's calculation of funds from operations.

18

---

Table of Contents

*Equivalent Per Share Data*

We have summarized below specified per common share information for our respective companies on a historical basis, pro forma combined basis and pro forma combined equivalent basis. The pro forma combined amounts are based on the purchase method of accounting. The Spieker per common share pro forma combined equivalents are calculated by multiplying the pro forma combined per common share amounts by the common stock exchange ratio of 1.49586 and by adding to that the $13.50 cash amount to be paid per share of Spieker common stock in the merger.

The following information should be read together with the historical and pro forma financial statements included or incorporated by reference in this document. See "Where You Can Find More Information" beginning on page 124.

| | For the three months ended March 31, 2001 | | For the year ended December 31, 2000 | |
|---|---|---|---|---|
| | Basic | Diluted | Basic | Diluted |
| Net income per common share before extraordinary items and cumulative effect of a change in accounting principle: | | | | |
| Equity Office | $0.40 | $0.39 | $1.54 | $1.53 |
| Spieker | $1.21 | $1.17 | $4.59 | $4.45 |
| Equity Office and Spieker pro forma combined before extraordinary items and cumulative effect of a change in accounting principle | $0.44 | $0.44 | $1.67 | $1.66 |
| Spieker pro forma combined equivalent | $0.86 | $0.86 | $3.27 | $3.25 |

For the three

| | months ended<br>March 31, 2001 | For the year ended<br>December 31, 2000 |
|---|---|---|
| **Cash distributions declared per common share:** | | |
| Equity Office | $  0.45 | $  1.74 |
| Spieker | $  0.70 | $  2.80 |
| Equity Office and Spieker pro forma combined | $  0.45 | $  1.74 |
| Spieker pro forma combined equivalent | $  0.88 | $  3.38 |
| **Shareholders' equity (book value) per common share (end  of period):** | | |
| Equity Office | $ 24.26 | $ 24.28 |
| Spieker | $ 24.40 | $ 23.89 |
| Equity Office and Spieker pro forma combined | $ 25.52 | $ 25.55 |
| Spieker pro forma combined equivalent | $ 51.68 | $ 51.73 |

*Market Prices of Equity Office Common Shares and Spieker Common Stock*

The following table sets forth the price per share of Equity Office common shares and Spieker common stock based on the last reported sale prices per share on the NYSE on February 22, 2001, the last trading day before the public announcement of the execution of the merger agreement, and on June 5, 2001, the latest practicable date before mailing this joint proxy statement/ prospectus.

| | Price per share | | |
|---|---|---|---|
| | **Equity Office** | **Spieker** | **Spieker pro<br>forma equivalent(1)** |
| February 22, 2001 | $ 29.43 | $ 52.10 | $ 57.52 |
| June 5, 2001 | $ 29.55 | $ 57.37 | $ 57.70(2) |

(1) Computed by multiplying the Equity Office common share closing price by the 1.49586 exchange ratio and adding the $13.50 cash amount per share.

(2) The average last reported sale price per Equity Office common share for the ten trading days preceding June 6, 2001 was $29.18. The Spieker pro forma equivalent, based on such ten trading days, would be $57.15.

19

**Table of Contents**

**Summary Unaudited Pro Forma Condensed Combined Financial Data**

The following table sets forth the summary unaudited pro forma condensed combined financial data for Equity Office and Spieker as a combined entity, giving effect to the merger as if it had occurred on the dates indicated and after giving effect to the pro forma adjustments. The unaudited pro forma condensed combined operating data are presented as if the merger had been consummated on January 1, 2000. The unaudited pro forma condensed combined balance sheet data at March 31, 2001 are presented as if the merger had occurred on March 31, 2001. In the opinion of management of Equity Office, all adjustments necessary to reflect the effects of these transactions have been made. The merger will be accounted for under the purchase method of accounting as provided by Accounting Principles Board Opinion No. 16.

The pro forma financial information should be read together with the respective historical audited consolidated financial statements and financial statement notes of Equity Office and of Spieker incorporated by reference into this joint proxy statement/prospectus. See "Where You Can Find More Information" on page 124. The unaudited pro forma operating data are presented for comparative purposes only and are not necessarily indicative of what the actual combined results of operations of Equity Office and Spieker would have been for the period presented, nor do these data purport to represent the results of future periods. See "Equity Office Properties Trust Pro Forma Condensed Combined Financial Statements" beginning on page F-1.

| | Pro forma<br>for the three months ended<br>March 31, 2001 | Pro forma<br>for the year ended<br>December 31, 2000 |
|---|---|---|
| | (Dollars in thousands, except per share data) | |
| **Operating Data:** | | |
| **Revenues:** | | |
| Rental | $ 672,084 | $ 2,294,095 |
| Tenant reimbursements | 146,299 | 512,362 |
| Parking | 30,590 | 112,107 |
| Other | 14,955 | 51,886 |
| Fee income | 2,494 | 12,466 |
| Interest/dividends | 11,793 | 40,129 |

| | | |
|---|--:|--:|
| Total revenues | 878,215 | 3,023,045 |
| **Expenses:** | | |
| Interest: | | |
|     Expense incurred | 210,059 | 731,455 |
|     Amortization of deferred financing costs | 1,326 | 9,746 |
| Depreciation | 159,009 | 579,233 |
| Amortization | 9,082 | 26,903 |
| Real estate taxes | 89,551 | 319,838 |
| Insurance | 5,091 | 17,880 |
| Repairs and maintenance | 82,694 | 300,604 |
| Property operating | 92,012 | 329,968 |
| Ground rent | 3,081 | 10,012 |
| General and administrative | 33,278 | 120,237 |
| Total expenses | 685,183 | 2,445,876 |

20

---

**Table of Contents**

| | Pro forma for the three months ended March 31, 2001 | Pro forma for the year ended December 31, 2000 |
|---|--:|--:|
| | **(Dollars in thousands, except per share data)** | |
| Income before allocation to minority interests, income from investment in unconsolidated joint ventures, net gain on sales of real estate, extraordinary items and cumulative effect of a change in accounting principle | 193,032 | 577,169 |
| Minority interests: | | |
|     EOP Partnership | (26,038) | (93,686) |
|     Partially owned properties | (3,253) | (6,843) |
| Income from investment in unconsolidated joint ventures | 15,426 | 56,251 |
| Net gain on sales of real estate | 20,516 | 176,064 |
| Net income from continuing operations | 199,683 | 708,955 |
| Put option settlement | — | (2,576) |
| Preferred distributions, net | (18,347) | (73,202) |
| Net income from continuing operations before extraordinary items and cumulative effect of a change in accounting principle available for common shares | $ 181,336 | $ 633,177 |
| Net income from continuing operations before extraordinary items and cumulative effect of a change in accounting principle per weighted average common share outstanding — basic | $ 0.44 | $ 1.67 |
| Weighted average common shares outstanding — basic | 408,581,209 | 378,765,944 |
| Net income from continuing operations before extraordinary items and cumulative effect of a change in accounting principle per weighted average common share and common share equivalent outstanding — diluted | $ 0.44 | $ 1.66 |
| Weighted average common shares and common share equivalents outstanding — diluted | 470,172,726 | 437,738,366 |
| **Balance Sheet Data (at end of period):** | | |
|     Investment in real estate net of accumulated depreciation | $ 23,794,833 | |
| Total assets | $ 26,042,889 | |
| Total debt | $ 11,909,149 | |
| Total liabilities | $ 12,931,681 | |
| Minority interests | $ 1,685,215 | |
| Redeemable common shares | $ 54,122 | |
| Shareholders' equity | $ 11,371,871 | |

Table of Contents

# RISK FACTORS

*In addition to the risks relating to the businesses of Equity Office and Spieker, which are incorporated by reference in this joint proxy statement/prospectus from Equity Office's Current Report on Form 8–K filed with the SEC on March 23, 2001 and Spieker's Amendment to Form 10–K on Form 10–K/A for the year ended December 31, 2000 as filed with the SEC on June 6, 2001 and the other information included in this document, including the matters addressed in "A Warning About Forward–Looking Statements" on page 26, you should carefully consider the following material risk factors to the merger in determining whether or not to vote in favor of the approval of the merger agreement and the merger.*

**Spieker common stockholders may receive Equity Office common shares in the merger with a market value lower than expected**

Spieker common stockholders will receive $13.50 in cash and 1.49586 Equity Office common shares in the merger for each share of Spieker common stock at the time of the closing of the merger. The market price of Equity Office common shares at the time of the merger may vary significantly from the price on the date of execution of the merger agreement or from the price on either the date of this joint proxy statement/prospectus or the date of the Equity Office and Spieker special meetings. These variances may arise due to, among other things:

- changes in the business, operations and prospects of Equity Office;

- market assessments of the likelihood that the merger will be completed;

- demand for office space in California and other West Coast markets or nationwide;

- the financial condition of current or prospective tenants; and

- interest rates, general market and economic conditions and other factors.

Substantially all of these factors are beyond the control of Equity Office and Spieker. It should be noted that during the 12–month period ending on June 5, 2001, the most recent date practicable before the mailing of this joint proxy statement/prospectus, the closing per share price of Equity Office common shares varied from a low of $26.69 to a high of $33.19 and ended that period at $29.55. Historical trading prices are not necessarily indicative of future performance.

The exchange ratio for shares of Spieker common stock to be exchanged for Equity Office common shares in the merger was fixed at the time of the signing of the merger agreement and is not subject to adjustment based on changes in the trading price of Equity Office common shares or Spieker common stock before the closing of the merger. Accordingly, the market price of any Equity Office common shares that Spieker common stockholders receive in the merger will depend on the market price of Equity Office common shares at the time of closing of the merger.

**Equity Office historically has not owned or operated industrial properties and the market price of the Equity Office common shares you receive in the merger may decline if Equity Office fails to operate successfully the industrial properties acquired in the merger**

In the merger, a subsidiary of Equity Office will acquire Spieker's portfolio of industrial properties totaling approximately 12.7 million rentable square feet, including industrial properties totaling approximately 6.7 million rentable square feet under contract for sale. The industrial properties will represent approximately 9% of the combined portfolio based on square footage and approximately 5% based on net operating income. Equity Office historically has not owned or operated industrial properties. If Equity Office fails to operate successfully these industrial properties, the market price of Equity Office common shares could decline. In addition, if Equity Office determines to liquidate these industrial properties over time, it may not be successful in doing so or may not do so at attractive prices, which could adversely affect the market price of Equity Office common shares.

22

Table of Contents

**The operations of Equity Office and Spieker may not be integrated successfully and intended benefits of the merger may not be realized, which could have a negative impact on the market price of Equity Office common shares after the merger**

The completion of the merger poses risks for the ongoing operations of Equity Office, including that:

- following the merger, Equity Office may not achieve expected cost savings and operating efficiencies, such as the elimination of redundant administrative costs and property management costs;

- the diversion of management attention to the integration of the operations of Spieker could have an adverse effect on the revenues, expenses and operating results of Equity Office;

- the Spieker portfolio may not perform as well as Equity Office anticipates due to various factors, including changes in macro–economic conditions and the demand for office space in California and other West Coast markets in which Spieker has a substantial presence;

- Equity Office may experience difficulties and incur expenses related to the assimilation and retention of Spieker non–executive employees; and

- Equity Office may not effectively integrate Spieker's operations.

If Equity Office fails to integrate successfully Spieker and/or to realize the intended benefits of the merger, the market price of Equity Office common shares could decline from their market price at the time of completion of the merger.

**The directors and executive officers of Spieker have interests in the completion of the merger and the partnership merger that may conflict with the interests of Spieker's stockholders**

In considering the recommendation of the Spieker board with respect to the merger agreement and the merger, Spieker stockholders should be aware that some Spieker directors and executive officers have interests in, and will receive benefits from, the merger and the partnership merger that differ from, or are in addition to, and, therefore, may conflict with the interests of Spieker stockholders generally, including the following:

- Three current directors or executive officers of Spieker, Messrs. Spieker, Foster and Vought, will become trustees of Equity Office;

- Equity Office and EOP Partnership will provide exculpation and indemnification for directors and officers of Spieker and Spieker Partnership, including for actions taken in connection with the merger, which is the same as the exculpation and indemnification provided by Spieker and Spieker Partnership as on the date of the merger agreement;

- Equity Office and EOP Partnership will indemnify and hold harmless former directors and officers of Spieker and Spieker Partnership after the merger to the fullest extent permitted by law;

- Equity Office has agreed to provide directors' and officers' insurance for the benefit of those individuals currently covered by Spieker's insurance for a period of six years after the merger;

- Unvested options to purchase an aggregate of 1,075,247 shares of Spieker common stock at an average exercise price of $38.33 per share previously awarded to 17 Spieker directors and executive officers will vest in connection with the merger pursuant to the plans under which they were issued and in any event no later than the day before the merger closes. These 17 Spieker directors and executive officers also currently hold vested options to purchase an aggregate of an additional 2,577,505 shares of Spieker common stock at an average exercise price of $30.48. All Spieker stock options will be converted in the merger into options to purchase Equity Office common shares under the terms of the merger agreement. Under the merger agreement, holders of Spieker stock options will be entitled to tender their options to EOP Partnership for a cash payment equal to the excess, if any, of $58.50 per Spieker share option over the exercise price of the Spieker options multiplied by the number of their Spieker options converted in the merger, which acquisition and payment will be made within three business days of the closing of the merger. Options to purchase

23

---

Table of Contents

Equity Office common shares that are not tendered to EOP Partnership as described above would remain outstanding as options to purchase Equity Office common shares. Under agreements entered into with Equity Office, eleven Spieker directors and executive officers holding vested options to purchase an aggregate of 2,471,505 shares of Spieker common stock at an average exercise price of $30.27, and unvested options to purchase an additional 946,247 shares of Spieker common stock at an average exercise price of $38.00 that will vest in the merger, have agreed to tender their options to EOP Partnership. The aggregate value of these vested and unvested options, calculated using the average exercise prices of the options and the $58.50 cash option tender price, is approximately $89.2 million. The remaining six Spieker directors and executive officers who have not indicated whether or not they intend to tender their options hold vested options to purchase an aggregate of 106,000 shares of Spieker common stock at an average exercise price of $35.57, and unvested options to purchase an additional 129,000 shares of Spieker common stock at an average exercise price of $40.74 that will vest in the merger. At the $58.50 cash tender offer price, these vested and unvested options have an aggregate value of approximately $4.7 million.

- 205,182 unvested shares of Spieker restricted stock previously awarded to Spieker directors and executive officers will vest on the day immediately before the date on which the Spieker common stockholders approve the merger. Using a $57.70 pro forma equivalent value for Spieker common stock, the aggregate value of the unvested Spieker restricted stock previously awarded to Spieker directors and executive officers is approximately $11.8 million;

- Under the Spieker special severance policy, the thirteen executive officers of Spieker will be entitled to receive estimated cash payments ranging from approximately $1.1 million to $5.0 million as a base amount, or approximately $33.9 million in the aggregate. If the tax reimbursements described under "The Merger — Conflicts of Interest of Spieker Directors and Executive Officers in the Merger and the Partnership Merger — Special Severance Policy" beginning on page 60 were payable, the tax reimbursement amounts could range from $0 to $3.4 million per individual, or approximately $19.9 million in the aggregate. The calculation of the estimated cash payments under the special severance policy assumes that Equity Office's obligations under the policy are triggered immediately upon the closing of the merger and that the merger will close on July 9, 2001. The amounts shown include estimated 2001 bonuses through the closing date. Neither Spieker nor Equity Office has yet determined that any tax reimbursement payments would be required;

- Under the Spieker special severance policy the executive officer and his or her eligible dependents will continue to be eligible to participate in the medical, dental, disability and life insurance plans and arrangements applicable to him or her immediately before his or her termination of employment, on substantially the same terms and conditions in effect immediately before the termination. If such participation is prohibited, equivalent coverage will be purchased for the executive officer and his or her eligible dependents with no greater after-tax cost to the executive officer than he or she paid for coverage prior to being terminated;

- Under the merger agreement, EOP Partnership has agreed, for the benefit of 17 named unitholders, not to sell, exchange or otherwise dispose of, except in tax-free or tax-deferred transactions, specified office properties comprising approximately 6.5 million square feet, or approximately 26.5% of Spieker Partnership's office portfolio on a square footage basis, and specified industrial properties comprising approximately 5.6 million square feet, or approximately 43.7% of Spieker Partnership's industrial portfolio on a square footage basis. These office and industrial properties comprise approximately 12.1 million square feet, or approximately 32.3% of Spieker Partnership's total portfolio on a square footage basis;

- According to its terms, a $400,000 loan made in April 2000 by Spieker to Mr. Rothstein, together with accrued interest, will be forgiven upon completion of the merger. The loan was extended to Mr. Rothstein for the purchase of a personal residence and has an outstanding principal balance of $360,000;

24

**Table of Contents**

- A subsidiary of Equity Office will purchase 100% of the voting and 5% of the non-voting capital stock of Spieker Northwest, Inc., a noncontrolled third-party service subsidiary of Spieker, for an aggregate of $202,500 in cash from the holders of that stock, who include Messrs. Spieker, French and Singleton and one other individual, each of whom owns 25% of the voting capital stock of Spieker Northwest, Inc. and 1.25% of the non-voting; and

- Spieker has entered into restricted stock agreements with its executive officers, among others, under which those executive officers have been awarded shares of common stock of BroadBand Office, Inc. In connection with the merger, the restrictions with respect to those shares will lapse. BroadBand Office, Inc. filed for Chapter 11 bankruptcy protection under the U.S. Bankruptcy Code on May 9, 2001. Therefore, such awards are not expected to have any value.

**EOP Partnership will need to replace, at or before maturity, a $1.0 billion bridge facility to be used to finance a portion of the cash merger costs**

EOP Partnership has received $1.0 billion of executed commitments from various lenders for an unsecured $1.0 billion bridge facility expected to be entered into by EOP Partnership by the closing of the merger. The bridge facility is expected to be used to fund $1.0 billion of the $1.187 billion of cash merger costs. The balance of the cash merger costs is expected to be funded under EOP Partnership's existing line of credit. The commitments provide for a bridge facility having a term of 364 days from the funding of the bridge facility, and an interest rate of LIBOR plus 80 basis points, subject to EOP Partnership's credit rating. Equity Office will guarantee any outstanding obligation under the bridge facility. EOP Partnership and Equity Office have agreed, jointly and severally, to pay a commitment fee of 20 basis points, or $2.0 million, if the bridge facility is not refinanced within 120 days from the date of funding. EOP Partnership expects to replace the bridge facility with longer-term financing within 120 days of the funding of the bridge facility. However, it also anticipates incurring increased interest costs on the replacement indebtedness due to higher interest costs of longer-term debt. The interest rate on the replacement indebtedness will depend on prevailing market conditions at the time. Each $1/8^{th}$ of 1% increase in the annual interest rate on the replacement indebtedness as compared to the interest rate on the bridge facility will increase Equity Office's annual consolidated interest expense by approximately $1.5 million.

**Equity Office and Spieker may incur substantial expenses and payments if the merger does not occur**

It is possible that the merger may not be completed. If the merger is not completed, Equity Office and Spieker will have incurred substantial expenses. In addition, Spieker and Spieker Partnership may incur a termination fee of up to $160 million if the merger agreement is terminated under specified circumstances. Further, the parties also may become obligated to reimburse up to $7.5 million of the other parties' expenses if the merger agreement is terminated for certain reasons. The amount of any termination fee paid by Spieker and Spieker Partnership would be reduced by any expense reimbursement paid by them.

**The $160 million termination fee payable by Spieker and Spieker Partnership may discourage some third party proposals to acquire Spieker that Spieker stockholders may otherwise find desirable**

The $160 million termination fee payable by Spieker and Spieker Partnership if the merger agreement is terminated under specified circumstances represents approximately 2.5% of the approximate $6.5 billion debt and equity market capitalization of Spieker at the time the merger agreement was entered into. This $160 million termination fee may discourage some third party proposals to acquire Spieker in the 12 months following termination of the merger agreement that Spieker stockholders may otherwise find desirable to the extent that a potential acquiror would not be willing to assume the $160 million termination fee.

**The merger agreement does not require that the financial advisors' fairness opinions be updated as a condition to closing the merger**

The merger agreement does not require that the financial advisors' fairness opinions be updated as a condition to closing the merger and neither Equity Office nor Spieker currently intends to request that those opinions be updated. As such, the fairness opinions do not reflect any changes in the relative values of Equity Office or Spieker subsequent to the date of the merger agreement. The market price of the Equity Office common shares and Spieker common stock at the completion of the merger may vary

25

---

Table of Contents

significantly from the market price as of the date of the merger agreement, which is the same date as the fairness opinions of the financial advisors.

**Further declines in overall economic activity in Equity Office's and Spieker's markets could adversely affect Equity Office's operating results after the merger**

As a result of the current slowdown in economic activity, there has been an increase in vacancy rates for office properties in substantially all major markets in which Equity Office and Spieker own properties. In particular, the San Francisco, San Jose, Seattle, Oakland, Washington, D.C., Denver and Boston metropolitan statistical areas, in which approximately 42% of the combined entity's properties based on square footage will be located, experienced an increase in vacancy rates between December 31, 2000 and March 31, 2001 ranging from 2% in Boston to 3.5% in San Francisco based on published industry data. At March 31, 2001, vacancy rates in these markets ranged from 4.6% in San Jose to 11.2% in Denver. During the same period, there also was an increase in sublease space in most of the other major markets in which Equity Office or Spieker have office properties, ranging up to an estimated high of 3.3% of all leasable office space in Chicago, 3.1% in Dallas and Seattle and 3.0% in San Francisco. While market conditions within a particular metropolitan statistical area may vary within various submarkets and property classes, Equity Office and Spieker believe the foregoing data are illustrative of current market trends. Reflective of current economic conditions, during the three months ended March 31, 2001, both Equity Office and Spieker experienced a reduction in the number of broker inquiries and tours at many of their properties suggesting a reduced tenant demand for space. Although a reduction in tenant demand ultimately may result in decreased market rents, Equity Office and Spieker believe that it is too soon to draw any conclusions about where market rents ultimately will stabilize. Increases in overall vacancy rates and sublease space and/or declines in market rents could adversely affect Equity Office's occupancy rates subsequent to the merger, the rents it can charge on expiring leases as well as its revenues and operating results in subsequent periods.

A WARNING ABOUT FORWARD–LOOKING STATEMENTS

Equity Office and Spieker have each made forward–looking statements in this document, and in documents that are incorporated by reference in this document, that are subject to risks and uncertainties. Forward–looking statements include information concerning possible or assumed future results of operations of Equity Office and Spieker. Also, statements including words such as "believes," "expects," "anticipates," "intends," "plans," "estimates," or similar expressions are forward–looking statements. Many factors, some of which are discussed elsewhere in this document and in the documents incorporated by reference in this document, could affect the future financial results of Equity Office and could cause actual results to differ materially from those expressed in forward–looking statements contained or incorporated by reference in this document. Important factors that could cause actual results to differ materially from current expectations reflected in these forward–looking statements include, among others, the factors discussed under the caption "Risk Factors" beginning on page 22 and the filings made by Equity Office and Spieker with the SEC that are identified on pages 124 and 125 and incorporated in this document.

Forward–looking statements are not guarantees of performance. They involve risks, uncertainties and assumptions. The future results and shareholder values of Equity Office following completion of the merger may differ materially from those expressed in these forward–looking statements. Many of the factors that will determine these results and values are beyond the ability of Equity Office and Spieker to control or predict. For these forward–looking statements, Equity Office and Spieker claim the protection of the safe harbor for forward–looking statements contained in the Private Securities Litigation Reform Act of 1995.

26

Table of Contents

# THE EQUITY OFFICE SPECIAL MEETING

## Date, Time, Place and Purpose of the Equity Office Special Meeting

The special meeting of the Equity Office common shareholders is scheduled to be held on Monday, July 9, 2001 at 10:00 a.m., Central Time, at One North Franklin Street, Third Floor, Chicago, Illinois. It may be adjourned or postponed to another date and/or place for proper purposes. The purpose of the meeting is to consider and vote upon (1) a proposal to approve the merger agreement and the merger of Spieker with and into Equity Office and (2) a proposal to amend the Equity Office declaration of trust as discussed below. The Equity Office common shareholders also might be asked to vote upon a proposal to adjourn the Equity Office special meeting for the purpose, among others, of allowing additional time for the solicitation of additional votes to approve the merger agreement and the merger.

At the meeting, in addition to the vote on the merger agreement and the merger, Equity Office common shareholders will be asked to vote upon a proposal to amend the Equity Office declaration of trust as part of the merger to increase the maximum number of trustees from 15 to 16 and to authorize the board of trustees to exempt one or more series of preferred shares issued in connection with a business combination from all or any portion of the ownership limitations and restrictions on transfer set forth in Article VII of the Equity Office declaration of trust. The proposal to approve the merger agreement and the merger and the proposal to approve the amendments to the Equity Office declaration of trust are conditioned upon one another.

## Who Can Vote

You are entitled to vote your Equity Office common shares if our shareholder records showed that you held your Equity Office common shares as of the close of business on May 21, 2001. At the close of business on that date, a total of 309,815,068 Equity Office common shares were outstanding and entitled to vote. Each Equity Office common share has one vote. The enclosed proxy card shows the number of Equity Office common shares that you are entitled to vote. Your individual vote is confidential and will not be disclosed to third parties.

## Voting by Proxy Holders

If you hold your Equity Office common shares in your name as a holder of record, you may instruct the proxy holders how to vote your Equity Office common shares by using the toll–free telephone number, the Internet website listed on the proxy card or by signing, dating and mailing the proxy card in the postage–paid envelope that we have provided to you. Whichever of these methods you select to transmit your instructions, the proxy holders will vote your Equity Office common shares as provided by those instructions. If you give us a signed proxy without giving specific voting instructions, your Equity Office common shares will be voted by the proxy holders in favor of the merger agreement and the merger and in favor of the amendments to the Equity Office declaration of trust. *If your Equity Office common shares are held by a broker, bank or other nominee, you will receive instructions from your nominee which you must follow to have your common shares voted.*

## Vote by Telephone

You can vote your Equity Office common shares by telephone by dialing the toll–free telephone number, at no cost to you, printed on your proxy card. Telephone voting is available 24 hours a day until 3:00 p.m. Eastern Time, on Friday, July 6, 2001. Easy–to–follow voice prompts allow you to vote your Equity Office common shares and confirm that your instructions have been properly recorded. Our telephone voting procedures are designed to authenticate shareholders by using individual control numbers. *If you vote by telephone, you do not need to return your proxy card.* If you are located outside the U.S. and Canada, you should use the collect calling option printed on your proxy card.

27

Table of Contents

## Vote by Internet

You can also choose to vote through the Internet. The website for Internet voting is printed on your proxy card. Internet voting is available 24 hours a day until 3:00 p.m. Eastern Time, on Friday, July 6, 2001. As with telephone voting, you will be given the opportunity to confirm that your instructions have been properly recorded. *If you vote through the Internet, you do not need to return your proxy card.*

**Vote by Mail**

If you choose to vote by mail, simply mark your proxy card, sign and date it, and return it to EquiServe LP in the postage–paid envelope provided.

**Required Vote**

Approval of the merger agreement and the merger, as well as the amendments to the Equity Office declaration of trust, requires the affirmative vote of the holders of at least a majority of the Equity Office common shares entitled to vote at the Equity Office special meeting and outstanding on the record date, May 21, 2001. The vote of the holders of Equity Office's preferred shares is not required for approval of the merger agreement, the merger or the amendments to the Equity Office declaration of trust. As of the record date for the Equity Office special meeting, trustees, executive officers and their affiliates beneficially owned, excluding share options and EOP Partnership units held by them, 4,170,306 Equity Office common shares representing 1.35% of the outstanding Equity Office common shares entitled to vote at the Equity Office special meeting.

**Voting on Other Matters**

We are not now aware of any matters to be presented at the Equity Office special meeting except for those described in this joint proxy statement/prospectus. If any other matters not described in this joint proxy statement/prospectus are properly presented at the meeting, the proxy holders will use their own judgment to determine how to vote your Equity Office common shares. If the meeting is adjourned or postponed, your Equity Office common shares may be voted by the proxy holders on the new meeting date as well, unless you have revoked your proxy instructions before that date.

**How You May Revoke Your Proxy Instructions**

To revoke your proxy instructions, you must (1) so advise Equity Office's Secretary, Stanley M. Stevens, c/o Equity Office Properties Trust, Two North Riverside Plaza, Suite 2100, Chicago, Illinois 60606, in writing or by facsimile before your Equity Office common shares have been voted by the proxy holders at the meeting, (2) re–vote your shares on the Internet, (3) deliver to Equity Office's Secretary before the date of the meeting your revised proxy instructions, or (4) attend the meeting and vote your Equity Office common shares in person.

**How Votes Are Counted**

A quorum of shares entitled to vote must be present in person or by proxy at the special meeting in order to hold the vote on the proposal to approve the merger agreement and the merger and the amendments to the Equity Office declaration of trust. A majority of the outstanding Equity Office common shares entitled to vote constitutes a quorum. If you have returned valid proxy instructions or attend the meeting in person, your Equity Office common shares will be counted for the purpose of determining whether there is a quorum, even if you wish to abstain from voting on some or all matters introduced at the meeting. If you hold your Equity Office common shares through a broker, bank or other nominee, the nominee may only vote the Equity Office common shares which it holds for you as provided by your instructions. If it has not received your instructions by the 10th day before the meeting, the nominee may not vote on the merger agreement, the merger or the amendments to the Equity Office declaration of trust, which would result in a "broker non–vote" on the merger agreement and the merger as well as on the amendments to the Equity Office declaration of trust. Abstentions and broker non–votes will

28

**Table of Contents**

have the same effect as a vote against the proposals to approve the merger agreement, the merger and the amendments to the Equity Office declaration of trust.

**Cost of this Proxy Solicitation**

Equity Office will pay the cost of its proxy solicitation. In addition to soliciting proxies by mail, we have engaged MacKenzie Partners, Inc., a proxy solicitation firm, to assist in obtaining proxies from our common shareholders on a timely basis. We will pay MacKenzie Partners, Inc.'s reasonable out of pocket expenses plus a $7,500 fee for these services. We will, upon request, reimburse brokers, banks and other nominees for their reasonable expenses in sending proxy material to their principals and obtaining their proxies.

We also expect that several of our employees will solicit Equity Office common shareholders personally and by telephone. None of these employees will receive any additional or special compensation for doing this.