**Termination of the Merger Agreement**

*Right to Terminate*

The merger agreement may be terminated at any time before the completion of the partnership merger, whether before or after approval of the merger agreement and the mergers by the Equity Office shareholders, EOP Partnership limited partners, Spieker stockholders or Spieker Partnership limited partners, as follows:

- by mutual written consent duly authorized by the Equity Office board of trustees and the Spieker board of directors;

- by either Equity Office or Spieker if:

  — any judgment, injunction, order, decree or action by any governmental entity preventing the consummation of either the merger or the partnership merger becomes final and non–appealable;

  — the merger and the partnership merger have not been completed before December 31, 2001; however, neither Equity Office nor Spieker may terminate the merger agreement if its breach is the reason that the mergers have not been completed;

  — the holders of at least a majority of the outstanding shares of Spieker common stock fail to approve the merger and the merger agreement at the Spieker special meeting, or if holders of partnership units of Spieker Partnership fail to approve the principal terms of the partnership merger by the required vote, or if it is determined by Equity Office that the approvals of the Spieker Partnership unitholders and Spieker Partnership preferred unitholders cannot be obtained, but Spieker may not terminate for either of these reasons if it is in breach in any material respect of its obligations contained in the merger agreement relating to obtaining the required shareholder and partner votes; or

  — the holders of Equity Office common shares fail to approve the merger and the merger agreement and the amendments to the Equity Office declaration of trust at the Equity Office special meeting, or holders of a majority of the partner interests in EOP Partnership fail to approve the merger agreement and the partnership merger, but Equity Office may not terminate for either of these reasons if it is in breach in any material respect of its obligations contained in the merger agreement relating to obtaining the required shareholder and partner votes;

- by Equity Office:

  — upon a breach of or failure to perform any covenant, obligation or agreement on the part of Spieker or Spieker Partnership contained in the merger agreement, or upon a breach of any representation or warranty of Spieker or Spieker Partnership or if any representation or warranty of Spieker or Spieker Partnership is or becomes untrue, in either case so that the conditions to the consummation of the merger contained in the merger agreement would be incapable of being satisfied by December 31, 2001, or as otherwise extended by the parties; or

  — if (a) the Spieker board of directors has failed to recommend or has withdrawn, modified, amended or qualified, or proposed publicly not to recommend or to withdraw, modify, amend or qualify, in any manner adverse to Equity Office, its approval or recommendation of the merger, the partnership merger or the merger agreement, or approved or recommended any superior alternative acquisition proposal, (b) following the announcement or receipt of an alternative acquisition proposal, Spieker has failed to call the Spieker special meeting or failed to prepare and mail to its stockholders this joint proxy statement/prospectus or (c) the Spieker board of directors or any committee of the Spieker board of directors has resolved to do any of the foregoing; or

Table of Contents

- by Spieker:

  — upon a breach of any covenant, obligation or agreement on the part of Equity Office or EOP Partnership contained in the merger agreement, or upon a breach of any representation or warranty of Equity Office or EOP Partnership or if any representation or warranty of Equity Office or EOP Partnership is or becomes untrue, in either case so that the conditions to the consummation of the merger contained in the merger agreement would be incapable of being satisfied by December 31, 2001 or as otherwise extended by the parties; or

  — if the Spieker board of directors has withdrawn, modified, amended or qualified in any manner adverse to Equity Office its approval or recommendation of the merger or the merger agreement in connection with, or approved or recommended, any superior alternative acquisition proposal, or to enter into a binding written agreement with respect to a superior alternative acquisition proposal, so long as, in each case, Spieker has complied with the terms of the no solicitation provisions contained in the merger agreement and, before terminating the merger agreement, has paid to EOP Partnership the termination fee.

*Effect of Termination*

Except for provisions in the merger agreement regarding confidentiality of nonpublic information, payment of fees and expenses, the effect of termination and specified miscellaneous provisions, if the merger agreement is terminated as described above, the merger agreement will become void and have no effect. In addition, if the merger agreement is so terminated, there will be no liability on the part of Equity Office, EOP Partnership, Spieker or Spieker Partnership, except to the extent that the termination results from a material breach by any party of any of its representations, warranties, covenants or agreements contained in the merger agreement. The confidentiality agreement, dated January 2, 2001, between Spieker and Equity Office will continue in effect notwithstanding any termination of the merger agreement.

### Termination Fee and Termination Expenses

Except as described below, each party to the merger agreement will bear its own fees and expenses in connection with the transactions contemplated by the merger agreement.

Spieker and Spieker Partnership will pay to EOP Partnership a termination fee if the merger agreement is terminated:

- by Spieker, (a) if the Spieker board of directors has withdrawn, modified, amended or qualified in any manner adverse to Equity Office its approval or recommendation of either of the merger or the merger agreement in connection with, or approved or recommended, any superior alternative acquisition proposal, or (b) to enter into a binding written agreement with respect to a superior alternative acquisition proposal, so long as, in each case, Spieker complied with the terms of the nonsolicitation provisions contained in the merger agreement;

- by Equity Office, if the Spieker board of directors has failed to recommend or has withdrawn, modified, amended or qualified, or proposed publicly not to recommend or to withdraw, modify, amend or qualify, in any manner adverse to Equity Office its approval or recommendation of either of the merger or the merger agreement or approved or recommended any superior alternative acquisition proposal, or has resolved to do any of the foregoing; or

- under the circumstances listed below, but only if (a) Spieker or Spieker Partnership has received a proposal for an alternative acquisition transaction before the termination and (b) before or within 12 months after the termination, Spieker or Spieker Partnership enters into an agreement regarding any alternative acquisition transaction that is later completed:

  — by Equity Office, if Spieker or Spieker Partnership fails to perform in all material respects all its covenants, obligations and agreements in the merger agreement and the failure cannot be rectified by December 31, 2001;

81

**Table of Contents**

  — by Equity Office, if Spieker or Spieker Partnership is in breach of any of its representations or warranties in the merger agreement, and the breach reasonably would be expected to have a material adverse effect on the business, properties, assets, financial condition or results of operations of Equity Office and its subsidiaries taken as a whole and cannot be rectified by December 31, 2001;

  — by Equity Office or Spieker, if following Spieker's receipt or announcement of an alternative acquisition proposal, Spieker fails to call the Spieker special meeting or fails to prepare and mail to its stockholders this joint proxy statement/prospectus;

  — by Equity Office or Spieker, if any judgment, injunction, order, decree or action by any governmental entity of competent authority, which primarily results from any action or inaction of Spieker or its subsidiaries and prevents the consummation of the merger or the partnership merger, becomes final and non–appealable;

  — by Equity Office or Spieker, if the merger and the partnership merger are not completed before December 31, 2001, and the terminating party has not materially breached its obligations under the merger agreement in a way that prevents the merger or the partnership merger from being completed before December 31, 2001; or

  — by Equity Office or Spieker, if the holders of at least a majority of the outstanding shares of Spieker common stock fail to approve the merger and the merger agreement at the Spieker special meeting, or the holders of partnership units of Spieker Partnership fail to approve the principal terms of the partnership merger by the required vote, or it is determined by Equity Office that the approvals of the Spieker Partnership unitholders and Spieker Partnership preferred unitholders cannot be obtained, but Equity Office or Spieker may not terminate for any of these reasons if it is in breach in any material respect of its obligations contained in the merger agreement relating to obtaining the required shareholder and partner votes.

The termination fee that EOP Partnership may be entitled to receive will be an amount equal to the lesser of (1) $160 million less termination expenses, as described below, paid or payable under the merger agreement and (2) the maximum amount that can be paid to EOP Partnership without causing Equity Office to fail to meet the REIT income requirements under the Internal Revenue Code. The unpaid amount, if any, will be placed in escrow and will be paid in subsequent years to the extent the payment would not cause Equity Office to fail to meet the REIT income requirements under the Internal Revenue Code. Spieker's and Spieker Partnership's obligation to pay any unpaid portion of the termination fee will terminate on February 22, 2004.

Spieker and Spieker Partnership will pay to EOP Partnership termination expenses if the merger agreement is terminated:

- by Equity Office, if Spieker or Spieker Partnership fails to perform in all material respects all of its covenants, obligations and agreements in the merger agreement and the failure cannot be rectified by December 31, 2001, or if Spieker or Spieker Partnership is in breach of any of its representations or warranties in the merger agreement, and the breach reasonably would be expected to have a material adverse effect on the business, properties, assets, financial condition or results of operations of Equity Office and its subsidiaries taken as a whole, and the breach cannot be rectified by December 31, 2001, in each case, so long as Spieker was not entitled to terminate the merger agreement because Equity Office or EOP Partnership failed to perform in all material respects all of its covenants, obligations and agreements in the merger agreement, or because Equity Office or EOP Partnership is in breach of any of its representations or warranties in the merger agreement; or

- by Equity Office or Spieker, if the holders of at least a majority of the outstanding shares of Spieker common stock fail to approve the merger and the merger agreement at the Spieker special meeting, or the holders of partnership units of Spieker Partnership fail to approve the principal terms of the partnership merger by the required vote or it is determined by Equity Office that the

82

---

Table of Contents

approvals of the Spieker Partnership unitholders and Spieker Partnership preferred unitholders cannot be obtained, but Equity Office or Spieker may not terminate for any of these reasons if it is in breach in any material respect of its obligations contained in the merger agreement relating to obtaining the required shareholder and partner votes.

Equity Office and EOP Partnership will pay to Spieker Partnership termination expenses if the merger agreement is terminated:

- by Spieker, if Equity Office or EOP Partnership fails to perform in all material respects all of its covenants, obligations and agreements in the merger agreement and the failure cannot be rectified by December 31, 2001, or if Equity Office or EOP Partnership is in breach of any of its representations or warranties in the merger agreement, and the breach reasonably would be expected to have a material adverse effect on the business, properties, assets, financial condition or results of operations of Spieker and its subsidiaries taken as a whole, and the breach cannot be rectified by December 31, 2001, in each case, so long as Equity Office was not entitled to terminate the merger agreement because Spieker or Spieker Partnership failed to perform in all material respects all of its covenants, obligations and agreements in the merger agreement, or because Spieker or Spieker Partnership is in breach of any of its representations or warranties in the merger agreement; or

- by either Spieker or Equity Office, if the holders of a majority of the outstanding Equity Office common shares fail to approve the merger and the merger agreement at the Equity Office special meeting, or if holders of a majority of the EOP Partnership units fail to approve the merger, but neither Equity Office nor Spieker may terminate for either of these reasons if it is in breach in any material respect of its obligations contained in the merger agreement relating to obtaining the required shareholder and partner votes, so long as Equity Office was not entitled to terminate the merger agreement because of a breach of any representation, warranty, covenant, obligation or agreement on the part of Spieker or Spieker Partnership.

The termination expenses that EOP Partnership or Spieker Partnership may be entitled to receive in these cases will be an amount equal to the lesser of (a) $7,500,000 or (b) the applicable party's out–of–pocket expenses incurred in connection with the merger agreement and the transactions contemplated by the merger agreement, including all attorneys', accountants' and investment bankers' fees and expenses. If the termination expenses payable to that party exceed the maximum amount that can be paid to that party without causing that party to fail to meet the REIT income requirements under the Internal Revenue Code, then the amount initially payable to that party will be that maximum amount, and the unpaid amount will be placed in escrow and paid in subsequent years to the extent the payment would not cause Equity Office to fail to meet the REIT income requirements under the Internal Revenue Code. The paying party's obligation to pay any unpaid portion of the termination expenses will terminate on February 22, 2004.

In addition, if Equity Office prevails in a suit for a breach by Spieker and Spieker Partnership of their obligation to pay the termination fee or termination expenses under the merger agreement, Equity Office will be entitled to its costs and expenses in connection with the suit, with interest.

## Waiver and Amendment of the Merger Agreement

The merger agreement may be amended by the parties in writing by action of the Equity Office board of trustees and the Spieker board of directors at any time before the filing of the Maryland articles of merger relating to the merger. However, after the shareholder and partner approvals are obtained, no such amendment may be made which by law requires the further approval of shareholders or partners without obtaining such further approval. However, if the merger agreement is amended after the mailing of this joint proxy statement/prospectus and your vote is required to such amendment, we will resolicit your vote.

83

Table of Contents

At any time before the completion of the merger, the parties may, in writing:

- extend the time for the performance of any of the obligations or other acts of the other party;

- waive any inaccuracies in the representations and warranties of the other party contained in the merger agreement or in any document delivered under the merger agreement; or

- waive compliance with any of the agreements or conditions of the other party contained in the merger agreement, except as specified.

By law, neither Equity Office nor Spieker can waive:

- the requirement that Equity Office common shareholders and Spieker common stockholders and the partners of EOP Partnership approve the merger;

- the requirement that Equity Office common shareholders approve the amendments to the Equity Office declaration of trust;

- the requirement that partners of Spieker Partnership approve the principal terms of the partnership merger; or

- any court order or law preventing the closing of the merger or the partnership merger.

Whether any of the other conditions would be waived would depend on the facts and circumstances as determined by the reasonable business judgment of the board of trustees of Equity Office or the board of directors of Spieker. If Equity Office or Spieker waived compliance with one or more of the other conditions and the condition was deemed material to a vote of Equity Office common shareholders and/or Spieker common stockholders, Equity Office and/or Spieker would have to resolicit shareholder or stockholder approval, as applicable, before closing the merger. Neither Equity Office nor Spieker intends to notify shareholders or stockholders of any waiver that, in the judgment of Equity Office's board of trustees and Spieker's board of directors, does not require resolicitation of shareholder or stockholder approval.

It is a condition to the closing of the merger that Hogan & Hartson L.L.P., counsel to Equity Office, and Sullivan & Cromwell, counsel to Spieker, deliver opinions that the merger qualifies as a reorganization under the provisions of section 368(a) of the Internal Revenue Code. This condition will not be waived.

## Indemnification; Directors' and Officers' Insurance

Under the merger agreement, Equity Office and EOP Partnership will provide exculpation and indemnification for each person who has been at any time on or before February 22, 2001, or who becomes before the completion of the merger, an officer or director of Spieker or any Spieker subsidiary. This exculpation and indemnification will be the same as provided to these persons by Spieker and its subsidiaries immediately before the completion of the merger in each entity's respective charter, bylaws, partnership, operating or similar agreement, as applicable, as in effect on February 22, 2001. This exculpation and indemnification covers actions only on or before the completion of the merger, including all transactions contemplated by the merger agreement.

In addition, Equity Office and EOP Partnership will indemnify and hold harmless, to the full extent permitted by applicable law, each of the persons described above against any losses, claims, liabilities, expenses, judgments, fines and amounts paid in settlement in connection with any threatened or actual claim, action, suit, proceeding or investigation, whether civil, criminal or administrative, including any action by or on behalf of any or all securityholders of Spieker or Equity Office, or any of their subsidiaries, or by or in the right of Spieker or Equity Office, or any of their subsidiaries, in which any of these persons is, or is threatened to be, made a party based in whole or in part on, or arising in whole or in part out of, or pertaining to:

- the fact that he or she is or was an officer, employee or director of Spieker or any of its subsidiaries or any action or omission by that person in his or her capacity as a director; or

84

Table of Contents

- the merger agreement or the transactions contemplated by the merger agreement, whether in any case asserted or arising before or after the completion of the merger.

After the completion of the merger, Equity Office and EOP Partnership will be obligated to promptly pay and advance reasonable expenses and costs incurred by each of these persons as they become due and payable in advance of the final disposition of the claim, action, suit, proceeding or investigation to the full extent and in the manner permitted by law. Equity Office is also obligated to purchase, at or before the completion of the merger, directors' liability insurance policy coverage for Spieker's directors and officers for a period of six years which will provide the directors and officers with coverage on substantially similar terms as currently provided by Spieker to these directors and officers.

**Assumption of Spieker's Obligations Under Registration Rights Agreements**

Under the merger agreement, Equity Office has agreed to assume Spieker's obligations under existing registration rights agreements between Spieker and several holders of Spieker Partnership units and Spieker Partnership preferred units.

**Voting Agreements**

Messrs. Spieker, French, Singleton, Foster, Vought, Russell, Davenport, Rothstein, Schnugg and Eddy and one other executive officer of Spieker have entered into voting agreements with Equity Office and EOP Partnership agreeing to vote all shares of Spieker common stock, and, if applicable, all Spieker Partnership units, owned of record by each of them, or that they otherwise have the power to vote:

- for adoption and approval of the merger agreement, the merger and the partnership merger and the transactions contemplated thereby; and

- against approval or adoption of any action or agreement (other than the merger agreement or the transactions contemplated thereby) made or taken in opposition to or in competition with the merger.

As of the record date for the Spieker special meeting, these persons beneficially owned, excluding stock options and Spieker Partnership units, a total of 494,805 shares of Spieker common stock, representing approximately 0.73% of the outstanding shares of Spieker common stock entitled to vote at the Spieker special meeting and a total of 3,417,752 Spieker Partnership units representing approximately 4.5% of the outstanding Spieker Partnership units entitled to vote on the partnership merger.

The voting agreements prohibit these individuals from, directly or indirectly, selling, transferring, pledging, encumbering, assigning or otherwise disposing of their stock, stock options or Spieker Partnership units or entering into any contract, option or other agreement or understanding related to any of those actions. In addition, the voting agreements require these individuals to tender and sell to EOP Partnership all of their options to purchase Spieker common stock in the tender offer to be made by EOP Partnership as described in "— Treatment of Spieker Stock Options" on page 68.

None of the trustees or executive officers of Equity Office have entered into voting agreements.

**Spieker Partnership Series D Preferred Units**

The merger agreement provides that each Spieker Partnership series D preferred unit outstanding immediately before the partnership merger will be exchanged for one EOP Partnership series G preferred unit. Under a consent and purchase agreement dated May 7, 2001 by and between Spieker Partnership and the holders of the outstanding Spieker Partnership series D preferred units, these holders have agreed to sell, immediately before the partnership merger, their series D preferred units to Spieker Partnership at a purchase price of $46.50 per Spieker Partnership series D preferred unit plus accrued and unpaid dividends, in cash, without interest. Spieker will pay an aggregate purchase price of $69,750,000 plus accrued and unpaid dividends for the series D preferred units. Spieker Partnership intends to utilize borrowings under its credit facilities to finance the purchase price of these units. Under the consent and

85

Table of Contents

purchase agreement, the holders of the Spieker Partnership series D preferred units also have consented to the principal terms of the partnership merger.

**Acquisition of Spieker Northwest**

Messrs. Spieker, French and Singleton and Mr. Bruce E. Hosford own all of the outstanding shares of common stock of Spieker's noncontrolled subsidiary, Spieker Northwest, Inc., representing 100% of the voting power of Spieker Northwest, and 5% of the outstanding shares of preferred stock of Spieker Northwest. Spieker Partnership owns 95% of the outstanding shares of preferred stock of Spieker Northwest. Messrs. Spieker, Singleton, French and Hosford have entered into a stock purchase agreement that provides for the sale of all of their shares of Spieker Northwest stock to Equity Office Properties Management Corp., a Delaware corporation that is wholly owned by EOP Partnership. Each of Messrs. Spieker, Singleton, French and Hosford will receive $50,625 in exchange for his shares of stock of Spieker Northwest.

**Nonsolicitation Agreements**

It is a condition of the merger that each of Messrs. Spieker, Foster and Vought enter into nonsolicitation agreements with Equity Office and EOP Partnership. Under these agreements, each of the named individuals will agree that for a period of 18 months after the closing date of the mergers, they will not:

- solicit any employee of Equity Office, EOP Partnership, Spieker or Spieker Partnership or their respective subsidiaries for the purpose of causing such employee to leave the employment of Equity Office, EOP Partnership, Spieker or Spieker

Partnership or any of their respective subsidiaries; or

• directly or indirectly hire any such employee.

However, the named individuals may solicit an employee for the purpose of causing the employee to leave the employment of Equity Office, EOP Partnership, Spieker or Spieker Partnership, or may hire such an employee if:

• Equity Office or EOP Partnership indicates in writing its intention to terminate the employment of any employee with respect to all and not less than all of the employee's positions at Equity Office, EOP Partnership, Spieker or Spieker Partnership;

• Equity Office or EOP Partnership terminates the employment of any employee with respect to all and not less than all of the employee's positions at Equity Office, EOP Partnership, Spieker and Spieker Partnership; or

• an employee terminates his positions at all of Equity Office, EOP Partnership, Spieker and Spieker Partnership voluntarily and not as a result of solicitation by the individual.

**Tax Related Undertakings of EOP Partnership**

*Lock–up Agreements.* Under the merger agreement, EOP Partnership has agreed for the benefit of 17 named Spieker Partnership unitholders to amend its partnership agreement to provide that EOP Partnership will not be allowed to sell, exchange or otherwise dispose of, except in tax–free or tax–deferred transactions, specified office properties comprising approximately 6.5 million square feet, or approximately 26.5% of Spieker Partnership's office portfolio on a square footage basis, and specified industrial properties comprising approximately 5.6 million square feet, or approximately 43.7% of Spieker Partnership's industrial portfolio on a square footage basis. These office and industrial properties comprise approximately 12.1 million square feet, or approximately 32.3% of Spieker Partnership's total portfolio on a square footage basis.

If EOP Partnership sells any of the specified properties, EOP Partnership will be required to pay each protected Spieker Partnership unitholder an amount equal to, on an after–tax basis, any income taxes incurred by the unitholder as a result of the sale, to the extent that any of the built–in gain on the date of

86

---

the partnership merger with respect to these properties is allocated to the unitholder as a result of that sale. Therefore, even if it were in the best interest of EOP Partnership to sell any of the specified properties, it may be prohibitively expensive for EOP Partnership to do so during the applicable restriction period. The named unitholders who have the benefit of this protection include, among others, Messrs. Spieker, French, Vought, Davenport and Schnugg and one other Spieker executive officer.

The lock–ups on these properties will last for a "protection period" of at least 10 years. In addition, each of the 17 named Spieker Partnership unitholders will have the opportunity, but will not be required, to increase the length of the protection period that applies to him by entering into a "restriction agreement," under the terms of which the Spieker Partnership unitholder would agree not to sell specified percentages of his Equity Office common shares and EOP Partnership units during the initial 10 year restriction period. Specifically, under the restriction agreement, the named Spieker Partnership unitholder would agree not to sell 70% of his Equity Office common shares and EOP Partnership units acquired in the mergers for two years following the mergers. For each full year thereafter, the total percentage of the named Spieker Partnership unitholder's Equity Office common shares and EOP Partnership units that he would not be able to sell would be reduced by 5%. All restrictions on disposition by the unitholder would terminate on the 10th anniversary of the mergers. The protection period applicable to a named Spieker Partnership unitholder who enters into a restriction agreement will be extended by one year for each year that the unitholder complies with the terms of the restriction agreement, so long as the unitholder complies with the terms of the restriction agreement for at least two years. None of the 17 named Spieker Partnership unitholders is required to enter into a restriction agreement unless he desires to extend his applicable protection period beyond the initial 10–year period. EOP Partnership's only remedy for breach of a restriction agreement would be to deny the extensions of the protection period that would have been provided in the absence of a breach. Neither Equity Office nor EOP Partnership could bring an action for damages or to enjoin a prohibited transfer.

*Guarantee Opportunities.* Under the amendment to the partnership agreement of EOP Partnership described above, EOP Partnership also will be required to make available to the 17 named Spieker Partnership unitholders the opportunity to guarantee "qualifying debt." Qualifying debt generally is debt that meets specified requirements with respect to loan–to–value or loan–to–guarantee ratios or that is currently outstanding debt of Spieker Partnership. After the partnership merger, if guaranteed debt is repaid or no longer meets the requirements for qualified debt, EOP Partnership must offer the 17 named Spieker Partnership unitholders replacement opportunities for these guarantees. The named unitholders who have the benefit of this protection include, among others, Messrs. Spieker, Foster, French, Vought, Davenport and Schnugg and one other Spieker executive officer.

If EOP Partnership fails to comply with its obligations described above, EOP Partnership will be required to pay each protected Spieker Partnership unitholder an amount equal, on an after–tax basis, to any income taxes incurred by the protected unitholder as a result of that failure.

*Allocations of "Tier 3" Nonrecourse Liabilities Under Regulations Section 1.752–3(a)(3).* Under the amendment to the partnership agreement of EOP Partnership described above, EOP Partnership will be required to use commercially reasonable

efforts to cooperate with the 17 named Spieker Partnership unitholders to determine the method to be used for allocating "excess nonrecourse liabilities" of EOP Partnership pursuant to applicable Treasury regulations. With respect to these Spieker Partnership unitholders, EOP Partnership will be prohibited from using a less favorable method of allocating "excess nonrecourse liabilities" than it currently uses with respect to EOP Partnership unitholders who are not parties to express agreements in effect on February 17, 2001, specifying a particular method to be used for such purposes. EOP Partnership also has agreed not to make available to any other EOP Partnership unitholder a more favorable method of allocating "excess nonrecourse liabilities" without making such method available to the protected Spieker Partnership unitholders. In addition, EOP Partnership has agreed to use the same methods of allocating excess nonrecourse liabilities to those 17 named Spieker Partnership unitholders that had been used by Spieker Partnership with respect to those unitholders prior to the partnership merger. If the method of allocating excess nonrecourse liabilities used by EOP Partnership results in the allocation to these specified former Spieker Partnership unitholders of less excess

87

---

Table of Contents

nonrecourse liabilities than was allocated to them by Spieker Partnership, EOP Partnership has agreed to consider in good faith a request by the former Spieker Partnership unitholder to enter into deficit restoration obligations with respect to its EOP Partnership units or to enter into a guarantee of EOP Partnership debt. The named unitholders who have the benefit of this protection include, among others, Messrs. Spieker, French, Foster, Vought, Davenport and Schnugg and one other Spieker executive officer.

*Assumption of Spieker Tax Protection Agreements.* Under the merger agreement and the amendment to the partnership agreement of EOP Partnership described above, EOP Partnership also has expressly agreed to assume obligations of Spieker Partnership to other specified Spieker Partnership unitholders under existing tax protection agreements between Spieker Partnership and these unitholders. Specifically, EOP Partnership has agreed to assume Spieker Partnership's undertaking not to dispose of 11 properties formerly managed by Transpacific Development Company and acquired by Spieker Partnership in 1998 pursuant to a contribution agreement dated February 4, 1998 (referred to as the TDC Curci Portfolio) in taxable transactions prior to February 4, 2018, and to maintain specified debt obligations guaranteed by the contributors of those properties. Also, EOP Partnership has agreed to assume Spieker Partnership's undertaking not to dispose of Larkspur Landing, which was acquired by Spieker Partnership in early 2000, in a taxable transaction prior to February 28, 2010, to maintain a specified amount of recourse debt and to make deficit restoration obligation opportunities available to the six contributors of that property. EOP Partnership also will assume obligations of Spieker Partnership with respect to properties that are not wholly–owned by Spieker Partnership. These obligations include restrictions on dispositions of the properties and maintenance of debt with respect to these properties.

88

---

Table of Contents

## MATERIAL FEDERAL INCOME TAX

## CONSEQUENCES RELATING TO THE MERGER

The following discussion describes the U.S. federal income tax consequences relating to the merger and the receipt of cash and Equity Office common shares in the merger by holders of Spieker common stock and the receipt of Equity Office preferred shares by holders of Spieker preferred stock. Because this discussion is intended to address only federal income tax consequences of the merger that will apply to all Spieker stockholders, it may not contain all of the information that may be important to you. As you review this discussion, you should keep in mind that:

• the tax consequences to you may vary depending on your particular tax situation;

• you may be subject to special rules that are not discussed below if you are:

— a tax–exempt organization;

— a broker–dealer;

— a trader in securities that elects to mark to market;

— a person who holds Spieker stock as part of a hedge, straddle or conversion transaction;

— a person who acquired shares of Spieker stock pursuant to the exercise of employee stock options or otherwise as compensation;

— a person who does not hold its shares of Spieker stock as a capital asset;

— a non–U.S. corporation, non–U.S. partnership, non–U.S. trust, non–U.S. estate or individual who is not taxed as a citizen or resident of the United States, all of which may be referred to collectively as "non–U.S. persons;"

— a trust;

— an estate;

— a regulated investment company;

— an insurance company;

—  U.S. expatriates who are subject to special rules; or

—  otherwise subject to special tax treatment under the Internal Revenue Code;

• this summary does not address state, local, or foreign tax considerations; and

• this discussion is not intended to be, and should not be construed as, tax advice.

**You are urged both to review the following discussion and to consult with your own tax advisor to determine the effect of the merger on your individual tax situation, including any state, local or non–U.S. tax consequences.**

The information in this section is based on the current Internal Revenue Code, current, temporary and proposed regulations, the legislative history of the Internal Revenue Code, current administrative interpretations and practices of the Internal Revenue Service, including its practices and policies as endorsed in private letter rulings, which are not binding on the Internal Revenue Service, and existing court decisions. Future legislation, regulations, administrative interpretations and court decisions could change current law or adversely affect existing interpretations of current law. Any change could apply retroactively. Neither Equity Office nor Spieker has requested, or plans to request, any rulings from the Internal Revenue Service concerning the tax treatment of the merger. It is possible that the Internal Revenue Service would challenge the statements in this discussion, which do not bind the Internal Revenue Service or the courts, and that a court would agree with the Internal Revenue Service.

89

Table of Contents

Hogan & Hartson L.L.P., counsel to Equity Office, and Sullivan & Cromwell, counsel to Spieker, have reviewed this discussion and the statements as to the material federal income tax consequences of the merger set forth below under the captions "— General," "— Federal Income Tax Consequences of the Merger to Spieker Common Stockholders," "— Federal Income Tax Consequences of the Merger to Spieker Preferred Stockholders," and "— Federal Income Tax Consequences to Spieker, Equity Office and Equity Office Shareholders" are the opinion of Hogan & Hartson L.L.P. and Sullivan & Cromwell. These opinions are subject to the limitations and qualifications described in the captioned sections referenced in the preceding sentence.

*General.* Equity Office and Spieker intend for the merger to qualify as a "reorganization" under section 368(a) of the Internal Revenue Code. Hogan & Hartson L.L.P. and Sullivan & Cromwell each is of the opinion that, based on factual representations by both Equity Office and Spieker regarding the merger, the merger will qualify as a reorganization under Section 368(a) of the Internal Revenue Code. In addition, the obligation of Equity Office and Spieker to consummate the merger is conditioned upon Hogan & Hartson L.L.P., counsel to Equity Office, and Sullivan & Cromwell, counsel to Spieker, delivering opinions to Equity Office and Spieker, respectively, that the merger will qualify as a reorganization under the provisions of section 368(a) of the Internal Revenue Code. The opinions of counsel do rely and will rely on customary representations made by Equity Office and Spieker and applicable factual assumptions. If any of the factual assumptions or representations relied upon in the opinions of counsel are inaccurate, the opinions may not accurately describe the U.S. federal income tax treatment of the merger, and this discussion may not accurately describe the tax consequences of the merger.

*Federal Income Tax Consequences of the Merger to Spieker Common Stockholders.* Spieker common stockholders will receive $13.50 in cash and 1.49586 Equity Office common shares for each share of Spieker common stock exchanged in the merger. The merger will have the following material federal income tax consequences to Spieker common stockholders:

• Receipt of Equity Office Common Shares and Cash. A Spieker common stockholder will recognize gain equal to the lesser of either the cash received, excluding cash received for a fractional Equity Office common share, or the amount by which (A) the cash plus the fair market value of the Equity Office common shares received exceeds (B) the stockholder's adjusted tax basis in its Spieker common stock. A Spieker common stockholder will not recognize any loss on the exchange.

In general, gain recognized by a Spieker common stockholder will be taxable as capital gain. This capital gain will be long–term capital gain if the Spieker stockholder's holding period in the Spieker common stock is more than one year. However, it is possible that the gain recognized by a Spieker common stockholder will be taxable as dividend income if the cash received does not result in a "meaningful reduction" in the Equity Office common shares that the Spieker common stockholder would have received had it received only Equity Office common shares in the merger. In determining whether a meaningful reduction has occurred, section 318 of the Internal Revenue Code requires that the stockholder be treated as actually owning Equity Office common shares that are owned by the stockholder's family members or by entities in which the stockholder owns an interest, or which the stockholder has an option to acquire. The Internal Revenue Service has ruled that a minority stockholder in a publicly traded corporation whose relative stock interest is minimal and who exercises no control with respect to corporate affairs is considered to have a meaningful reduction if that stockholder has any reduction in its percentage stock ownership compared to what the shareholder would have received had all of the merger

consideration been stock. Each Spieker stockholder should consult his or her own tax advisor as to the applicability of these rules to his or her situation.

Gain required to be recognized due to the receipt of cash as part of the merger consideration generally must be calculated separately for each block of Spieker common stock exchanged in the merger. A block of stock is generally considered to be a group of shares acquired at the same cost in a single transaction.

90  ·

Table of Contents

A Spieker common stockholder will have a tax basis in the Equity Office common shares received equal to the stockholder's tax basis in its Spieker common stock exchanged, decreased by the amount of any cash received and increased by the amount of any gain recognized in the exchange.

• <u>Fractional Shares.</u> A Spieker common stockholder that receives cash instead of a fractional Equity Office common share will be treated as if the fractional share was received in the merger and then redeemed by Equity Office. The Spieker common stockholder generally will recognize capital gain or loss equal to the difference between the amount of cash received for the fractional share and the stockholder's tax basis in the fractional share. This capital gain or loss will be long−term capital gain or loss if the Spieker stockholder's holding period in the Spieker common stock is more than one year.

• <u>Holding Period.</u> The holding period of the Equity Office common shares received by a Spieker common stockholder in the merger will include the holding period of the Spieker common stock exchanged.

*Federal Income Tax Consequences of the Merger to Spieker Preferred Stockholders.* Under the merger agreement, each outstanding share of Spieker series B preferred stock will be converted into the right to receive one Equity Office series E preferred share; each outstanding share of Spieker series C preferred stock will be converted into the right to receive one Equity Office series F preferred share; and each outstanding share of Spieker series E preferred stock will be converted into the right to receive one Equity Office Series H preferred share. See "The Merger Agreement — Merger Consideration" beginning on page 66. The merger will have the following material federal income tax consequences to Spieker preferred stockholders:

• <u>Receipt of Equity Office Preferred Shares.</u> A Spieker preferred stockholder that exchanges its Spieker preferred stock for Equity Office preferred shares only will not recognize gain or loss on such exchange. A Spieker preferred stockholder will have a tax basis in the Equity Office preferred shares received equal to the stockholder's adjusted tax basis in the Spieker preferred stock exchanged.

• <u>Holding Period.</u> The holding period of the Equity Office preferred shares received by a Spieker preferred stockholder in the merger will include the holding period of the Spieker preferred stock exchanged, assuming that the Spieker preferred stock was held as a capital asset.

*Backup Withholding.* Backup withholding tax at a rate of 31% may apply to cash paid in the merger to a Spieker common stockholder. Backup withholding will not apply, however, if the Spieker common stockholder:

• furnishes a correct taxpayer identification number and certifies that he or she is not subject to backup withholding on Internal Revenue Service Form W−9, or an appropriate substitute form;

• provides a certificate of foreign status on Internal Revenue Service Form W−8 or W−8 BEN, or an appropriate substitute form; or

• is otherwise exempt from backup withholding.

The Internal Revenue Service may impose a penalty upon any taxpayer that fails to provide the correct taxpayer identification number. Any amount withheld under the backup withholding rules may be allowed as a refund or a credit against the stockholder's federal income tax liability provided that the stockholder furnishes required information to the Internal Revenue Service.

*Federal Income Tax Consequences to Spieker, Equity Office and Equity Office Shareholders.* Equity Office and its shareholders will not recognize any gain or loss as a result of the merger.

Spieker will not recognize any gain or loss as a result of the merger if Spieker qualifies as a "real estate investment trust," or "REIT," at the time of the merger. As described below, in connection with the filing of this joint proxy statement/prospectus, Morrison & Foerster LLP, special tax counsel to Spieker, has delivered to Spieker and Equity Office an opinion that Spieker qualifies as a REIT.

91

Table of Contents

*Federal Income Tax Consequences of the Merger to Spieker and Spieker Stockholders if the Merger Did Not Qualify as a Reorganization or Spieker Did Not Qualify as a REIT.* It is a condition to consummation of the merger that Equity Office and Spieker receive opinions of counsel that the merger will qualify as a reorganization for federal income tax purposes, but these opinions will not be binding upon the Internal Revenue Service or the courts.

If the merger failed to qualify as a reorganization, then, regardless of Spieker's status as a REIT, a Spieker stockholder would recognize gain or loss, as applicable, equal to the difference between:

• the aggregate fair market value of the Equity Office common and preferred shares and the cash received in the merger; and

• the stockholder's adjusted tax basis in its Spieker stock.

If the merger failed to qualify as a reorganization, but Spieker qualified as a REIT at the time of the merger, Spieker would incur a tax liability only to the extent that Spieker's net gain recognized on the deemed transfer of its assets to Equity Office were to exceed the fair market value of the Equity Office common and preferred shares and cash issued in the merger. The liability for the tax attributable to any such gain would transfer to Equity Office.

If the merger failed to qualify as a reorganization and if Spieker did not qualify as a REIT at the time of the merger, Spieker would generally recognize gain or loss on the deemed transfer of its assets to Equity Office and Equity Office, as its successor, would incur a very significant current tax liability. If Spieker were to fail to qualify as a REIT but the merger were to qualify as a reorganization, Equity Office would be subject to tax if during the 10 years following the merger Equity Office were to dispose of any asset that was acquired from Spieker in the merger. In this event, Equity Office would generally be subject to tax at the highest regular corporate rate on the built-in gain, if any, that existed with respect to such asset at the time of the merger.

*REIT Qualification of Spieker and Equity Office.* Morrison & Foerster LLP, special tax counsel to Spieker, is of the opinion that Spieker qualifies as a REIT. In addition, as a condition to the merger, Morrison & Foerster LLP will deliver an opinion to Equity Office that Spieker qualifies as a REIT at the time of the merger. These opinions, however, will not be binding on the Internal Revenue Service or the courts. These opinions rely on customary representations made by Spieker about factual matters relating to the organization and operation of Spieker, Spieker Partnership and its subsidiaries. In addition, these opinions are based on factual representations of Spieker concerning its business and properties as set forth in this joint proxy statement/ prospectus and the other documents incorporated by reference in this joint proxy statement/ prospectus. If Spieker did not qualify as a REIT in any of its prior tax years, Spieker would be liable for (and, as successor to Spieker in the merger, Equity Office would be obligated to pay any) federal income tax on its income earned in any year that it did not qualify as a REIT.

Hogan & Hartson L.L.P., counsel to Equity Office, is of the opinion that Equity Office qualifies as a REIT. In addition, as a condition to the merger, Hogan & Hartson L.L.P., counsel to Equity Office, will deliver an opinion to Equity Office and Spieker that commencing with Equity Office's taxable year ending December 31, 1997, Equity Office was organized and has operated in conformity with the requirements for qualification as a REIT, and that after consummation of the mergers, Equity Office's proposed method of operation will enable it to continue to qualify as a REIT.

The opinions of Hogan & Hartson L.L.P. rely upon customary representations made by Equity Office about factual matters relating to the organization and operation of Equity Office, EOP Partnership and its subsidiaries. In addition, these opinions are based upon factual representations of Equity Office concerning its business and properties as set forth in this joint proxy statement/prospectus and the other documents incorporated by reference in this joint proxy statement/prospectus. Finally, the portion of each Hogan & Hartson L.L.P. opinion that addresses the qualification of Equity Office as a REIT following the merger is based in part upon the respective opinion of Morrison & Foerster LLP described above relating to the qualification of Spieker as a REIT currently and at the closing of the merger and the representations made

92

Table of Contents

by Spieker in connection with each Morrison & Foerster opinion. If Spieker did not qualify as a REIT at the time of the merger, Equity Office could fail to qualify as a REIT after the merger.

Equity Office intends to continue to operate in a manner to qualify as a REIT following the merger, but there is no guarantee that Equity Office will qualify or remain qualified as a REIT. Qualification and taxation as a REIT depend upon Equity Office's ability to meet, through actual annual (or, in some cases, quarterly) operating results, requirements relating to income, asset ownership, distribution levels and diversity of share ownership, and the various REIT qualification requirements imposed under the Internal Revenue Code. Hogan & Hartson L.L.P. will not review Equity Office's compliance with these tests on a continuing basis. Given the complex nature of the REIT qualification requirements, the ongoing importance of factual determinations and the possibility of future changes in the circumstances of Equity Office, Equity Office cannot guarantee that its actual operating results will satisfy the requirements for taxation as a REIT under the Internal Revenue Code for any particular tax year.

## APPROVAL OF AMENDMENTS TO EQUITY OFFICE'S DECLARATION OF TRUST

As provided in the merger agreement, Equity Office is proposing to its common shareholders two amendments to its declaration of trust. These amendments would:

- Amend Section 5.2 of the Equity Office declaration of trust to increase the maximum number of trustees from 15 to 16; and

- Add a new Section 7.2.10 to the Equity Office declaration of trust that would authorize the Equity Office board of trustees to exempt under specified circumstances one or more series of preferred shares issued in connection with a business combination from all or any portion of the ownership limitations and restrictions on transfer set forth in Article VII of the Equity Office declaration of trust.

The text of these amendments is attached to this joint proxy statement/prospectus as <u>Annex D</u>.

### *Increase in Maximum Number of Trustees*

The purpose of the amendment to the Equity Office declaration of trust to increase the maximum number of trustees from 15 to 16 is to allow Messrs. Spieker, Foster and Vought to be appointed as trustees of Equity Office following the merger. Equity Office currently has 13 incumbent trustees and will add these three trustees under the merger agreement.

### *Authority of Board of Trustees to Exempt One or More Series of Preferred Shares Issued in Connection with a Business Combination from All or a Portion of the Existing Share Ownership Limitations and Restrictions on Transfer in the Declaration of Trust*

The purpose of the amendment to the Equity Office declaration of trust to authorize the Equity Office board of trustees to exempt one or more series of preferred shares issued in connection with a business combination from all or any portion of the ownership limitations and restrictions on transfer set forth in Article VII of the Equity Office declaration of trust is to provide the board flexibility in business combination transactions, including the merger, to vary the terms of the ownership limitations and restrictions on transfer applicable to any such preferred shares. This amendment allows, in a business combination transaction, the Equity Office board of trustees to issue one or more series of preferred shares that are exempt from all or part of the ownership limitations and transfer restrictions contained in Article VII of the Equity Office declaration of trust, if either:

- the Equity Office board determines that, assuming that all the shares of the exempted series of preferred shares are held by one non–U.S. person, it is not reasonably likely that:

    (1)  five persons would own directly or indirectly more than 49.5% of the fair market value of the outstanding Equity Office shares;

    (2)  the outstanding Equity Office shares would be owned by less than 100 persons; and

93

Table of Contents

    (3)  non–U.S. persons would own directly or indirectly 43% or more of the fair market value of the issued and outstanding Equity Office shares; or

- the Equity Office board establishes restrictions on the direct and indirect ownership and transfer of the exempted series of preferred shares and remedies for invalid transfers to make it reasonably likely that:

    (1)  no five individuals directly or indirectly own more than 50% of the value of the outstanding Equity Office shares;

    (2)  the outstanding Equity Office shares will be owned by at least 100 persons; and

    (3)  the fair market value of the outstanding Equity Office shares directly and indirectly owned by non–U.S. persons is less than 43% of the fair market value of all of the outstanding Equity Office shares; or

- a combination of the criteria in the two alternatives above so that each of item (1), (2) or (3) is satisfied under one of the two alternatives.

### *Required Vote and Equity Office Board Recommendation*

The affirmative vote of a majority of the outstanding Equity Office common shares is required to approve the amendments to the Equity Office declaration of trust. The proposal to approve the merger agreement and the merger and the proposal to approve the amendments to the Equity Office declaration of trust are conditioned on one another. If the merger agreement and the merger and the proposed amendments to the Equity Office declaration of trust are approved by Equity Office common shareholders, the amendments to the Equity Office declaration of trust will become effective at the closing of the merger when articles of merger are filed by Equity Office with the State Department of Assessments and Taxation of Maryland.

**The Equity Office board of trustees recommends that Equity Office common shareholders vote "FOR" approval of the amendments to the Equity Office declaration of trust.**

## DESCRIPTION OF EQUITY OFFICE SHARES OF BENEFICIAL INTEREST

*The following summary of the material terms of Equity Office's shares of beneficial interest does not include all of the terms of the shares and should be read together with the declaration of trust and bylaws of Equity Office and applicable Maryland law and, in the case of the Equity Office series E, F and H preferred shares, the forms of the articles supplementary for each of these series. The Equity Office declaration of trust and bylaws are incorporated by reference in this joint proxy statement/prospectus. See "Where You Can Find More Information" beginning on page 124. Forms of the articles supplementary for the Equity Office series E, F and H preferred shares to be established as part of the merger are included as exhibits to the registration statement, of which this document is a part.*

### General

The authorized shares of beneficial interest of Equity Office consist of 750,000,000 common shares, par value $.01 per share, and 100,000,000 preferred shares, par value $.01 per share, of which 8,000,000 shares are designated as 8.98% series A cumulative redeemable preferred shares, 7,000,000 shares are designated as 5.25% series B convertible, cumulative preferred shares and 4,600,000 shares are designated as 8 5/8% series C cumulative redeemable preferred shares of beneficial interest. The following

94

Table of Contents

table sets forth the issued and outstanding Equity Office common shares and series A, B and C preferred shares as of May 21, 2001:

| Class or Series of Shares | Issued and Outstanding |
|---|---|
| Common shares | 309,815,068 |
| Series A preferred shares | 7,994,000 |
| Series B preferred shares | 5,990,000 |
| Series C preferred shares | 4,562,000 |

Under the Equity Office declaration of trust, the Equity Office board of trustees has the authority to issue authorized but unissued common shares and, subject to the rights of holders of any class or series of preferred shares, preferred shares in one or more classes or series, without shareholder approval. The Equity Office board of trustees also is authorized to reclassify authorized but unissued common shares into preferred shares, and authorized but unissued preferred shares into common shares, without shareholder approval, subject to the rights of holders of any class or series of preferred shares. Absent an express provision to the contrary in the terms of any class or series of authorized shares, under the Equity Office declaration of trust, the Equity Office board of trustees also has the power to divide or combine the outstanding shares of any class or series, without shareholder approval.

Under Maryland law applicable to Maryland REITs, a shareholder is not personally liable for the obligations of Equity Office solely as a result of his or her status as a shareholder. The Equity Office declaration of trust provides that no shareholder will be liable for any debt or obligation of Equity Office by reason of being a shareholder nor will any shareholder face any personal liability in tort, contract or otherwise to any person that relates to the property or affairs of Equity Office by reason of being a shareholder.

The Equity Office bylaws further provide that Equity Office will indemnify each present or former shareholder against any claim or liability to which the shareholder may become subject by reason of being or having been a shareholder and that Equity Office will reimburse each shareholder for all reasonable expenses incurred by him or her relating to any such claim or liability. However, with respect to tort claims, contractual claims where shareholder liability is not so negated, claims for taxes and certain statutory liability, the shareholders may, in some jurisdictions, be personally liable to the extent that such claims are not satisfied by Equity Office.

Inasmuch as Equity Office carries public liability insurance which it considers adequate, any risk of personal liability to shareholders is limited to situations in which Equity Office's assets plus its insurance coverage would be insufficient to satisfy the claims against Equity Office and its shareholders.

### Common Shares

All Equity Office common shares outstanding are duly authorized, validly issued, fully paid and nonassessable.

Subject to the preferential rights of any other shares of beneficial interest and to the provisions of the Equity Office declaration of trust regarding ownership limitations and restrictions on transfers of shares of beneficial interest, holders of Equity Office common shares are entitled to receive distributions if, as and when authorized and declared by the Equity Office board of trustees out of assets legally available therefor and to share ratably in the assets of Equity Office legally available for distribution to its shareholders in the event of its liquidation, dissolution or winding–up after payment of, or adequate provision for, all known debts and liability of Equity Office.

Subject to the provisions of the Equity Office declaration of trust regarding ownership limitations and restrictions on transfer of shares of beneficial interest, each outstanding Equity Office common share entitles the holder to one vote on all matters submitted to a vote of shareholders, including the election of trustees. Except as provided with respect to any other class or series of shares of beneficial interest, the holders of the Equity Office common shares possess the exclusive voting power.

Table of Contents

There is no cumulative voting in the election of trustees, which means that the holders of a majority of the outstanding common shares can elect all of the trustees then standing for election and the holders of the remaining shares of beneficial interest, except as provided with respect to any other class or series of shares of beneficial interest, will not be able to elect any trustees.

Holders of Equity Office common shares have no preferences, conversion, sinking fund, redemption rights or preemptive rights to subscribe for any securities of Equity Office. Subject to the exchange provisions of the declaration of trust regarding ownership limitations and restrictions on transfer, Equity Office common shares have equal distribution, liquidation, voting and other rights.

The Equity Office declaration of trust permits the termination of the existence of Equity Office if approved by the affirmative vote of the holders of not less two−thirds of the votes entitled to be cast on the matter. In addition, the Equity Office board of trustees may terminate the status of Equity Office as a REIT under the Internal Revenue Code at any time, without a vote of the holders of Equity Office common or preferred shares.

## Preferred Shares

The Equity Office declaration of trust authorizes the Equity Office board of trustees to issue 100,000,000 preferred shares, to classify any unissued preferred shares and to reclassify any previously classified but unissued preferred shares of any series from time to time, in one or more series, as authorized by the Equity Office board of trustees. The Equity Office board of trustees also is authorized to reclassify authorized but unissued common shares into preferred shares, and authorized but unissued preferred shares into common shares, without shareholder approval.

### Series A Preferred Shares

The Equity Office series A preferred shares rank senior to the Equity Office common shares and on a parity with the Equity Office series B and series C preferred shares with respect to payment of distributions and distributions of assets upon liquidation, dissolution or winding up of Equity Office.

Holders of the Equity Office series A preferred shares are entitled to receive, when and as authorized by Equity Office, cumulative cash distributions at the rate of 8.98% of the $25.00 liquidation preference per annum, which is equivalent to a fixed annual amount of $2.245 per share. These distributions are cumulative and are payable quarterly in arrears on or before March 15, June 15, September 15 and December 15 of each year.

The Equity Office series A preferred shares are not convertible and are not entitled to the benefit of any sinking fund.

On and after June 15, 2002, Equity Office, at its option, may redeem the series A preferred shares, in whole or from time to time in part, for cash at a redemption price of $25.00 per share, plus all accumulated and unpaid distributions to the date fixed for redemption. However, the redemption price, other than the portion consisting of accrued and unpaid distributions, is payable only out of the sale proceeds of other shares of beneficial interest of Equity Office. In addition, Equity Office may acquire any series A preferred shares that have been transferred to a charitable beneficiary under Article VII of the declaration of trust of Equity Office because they were owned or acquired by a shareholder in violation of the applicable ownership limits.

### Series B Preferred Shares

The Equity Office series B preferred shares rank senior to the Equity Office common shares and on a parity with the Equity Office series A preferred shares and the Equity Office series C preferred shares with respect to the payment of distributions and amounts upon liquidation, dissolution or winding up of Equity Office.

Table of Contents

Distributions on the Equity Office series B preferred shares are cumulative and are payable quarterly, when, as and if declared by the Equity Office board of trustees, on or about February 15, May 15, August 15 and November 15 of each year, at the rate of 5.25% of the $50.00 liquidation preference per annum, which is equivalent to $2.625 per annum per share.

The Equity Office series B preferred shares are convertible at any time, at the option of the holder, unless previously redeemed, into Equity Office common shares at a conversion price of $35.70 per Equity Office common share, which is equivalent to a conversion rate of 1.40056 common shares for each Equity Office series B preferred share, and which may be adjusted in specified circumstances.

The Equity Office series B preferred shares are not entitled to the benefit of any sinking fund.

On and after February 15, 2003, the Equity Office series B preferred shares will be redeemable by Equity Office, in whole or from time to time in part, at the option of Equity Office, for that number of Equity Office common shares as are issuable at the conversion price. Equity Office may exercise the redemption right only if for 20 trading days within any period of 30 consecutive trading days, the closing price of the Equity Office common shares on the NYSE exceeds $41.055 per share, which may be adjusted in specified circumstances.

On and after February 15, 2003, the Equity Office series B preferred shares may be redeemed at the option of Equity Office for cash, in whole or from time to time in part, initially at $51.1667 per Equity Office series B preferred share and thereafter at prices declining to $50.00 per Equity Office series B preferred share on and after February 15, 2007, plus in each case accumulated and unpaid distributions, if any, to the redemption date. Equity Office may not exercise its cash redemption right unless the redemption price, other than the portion consisting of accumulated and unpaid distributions, for the exercise of the cash redemption right is paid solely out of the sale proceeds of other shares of beneficial interest of Equity Office. In addition, Equity Office may acquire any series B preferred shares that have been transferred to a charitable beneficiary under Article VII of the declaration of trust of Equity Office because they were owned or acquired by a shareholder in violation of the applicable ownership limits.

The Equity Office series B preferred shares are subject to mandatory redemption on February 15, 2008 at a price of $50.00 per Equity Office series B preferred share, plus accumulated and unpaid distributions to the redemption date.

### Series C Preferred Shares

The Equity Office series C preferred shares rank senior to the common shares and on a parity with the Equity Office series A preferred shares and the Equity Office series B preferred shares with respect to payment of distributions and distributions of assets upon liquidation, dissolution or winding up of Equity Office.

Holders of the Equity Office series C preferred shares are entitled to receive, when and as authorized by Equity Office, cumulative cash distributions at the rate of 8 5/8% of the liquidation preference per annum, which is equivalent to $2.15625 per Equity Office series C preferred share per year. These distributions are cumulative and are payable quarterly in arrears on March 15, June 15, September 15 and December 15 of each year.

The Equity Office series C preferred shares are not convertible and are not entitled to the benefit of any sinking fund.

On or after December 8, 2003, Equity Office, at its option, may redeem the Equity Office series C preferred shares, in whole or in part, at any time or from time to time, at a redemption price of $25.00 per share, plus all accumulated and unpaid distributions to the date of redemption. However, the redemption price of the Equity Office series C preferred shares, other than any portion thereof consisting of accumulated and unpaid distributions, may be paid only from sale proceeds of other equity securities of Equity Office. In addition, Equity Office may acquire any series C preferred shares that have been

97

Table of Contents

transferred to a charitable beneficiary under Article VII of the declaration of trust of Equity Office because they were owned or acquired by a shareholder in violation of the applicable ownership limits.

### Liquidation Rights of Series A, B and C Preferred Shares

Upon any voluntary or involuntary liquidation, dissolution or winding up of Equity Office, the Equity Office series A and C preferred shares are entitled to a liquidation preference of $25.00 per share and the series B preferred shares are entitled to a liquidation preference of $50.00 per share plus, in each case, any accumulated and unpaid distributions to the date of payment, before any distribution of assets is made to holders of common shares and any other class or series of shares of Equity Office ranking junior to the Equity Office series A, B and C preferred shares as to liquidation rights. If upon any voluntary or involuntary liquidation, dissolution or winding up of Equity Office, the assets of Equity Office are insufficient to make such full payments to holders of Equity Office series A, B and C preferred shares and other preferred shares ranking on a parity with the Equity Office series A, B and C preferred shares, then holders of Equity Office series A, B and C preferred shares and parity preferred shares will share ratably in any distribution of assets in proportion to the full liquidating distributions to which they would otherwise be respectively entitled. After payment of the full amount of the liquidating distributions to which they are entitled, the holders of Equity Office series A, B and C preferred shares will not be entitled to any further participation in any distribution of assets by Equity Office.

### Voting Rights of Series A, B and C Preferred Shares

Holders of Equity Office series A, B and C preferred shares do not have any voting rights, except as set forth below or as otherwise required by law.

Under the articles supplementary establishing the Equity Office series A, B and C preferred shares, the Equity Office board of trustees may not authorize, create or increase the authorized amount of any class or series of shares ranking before the outstanding Equity Office series A, B and C preferred shares with respect to the payment of distributions or upon liquidation, dissolution or

winding up of Equity Office, or reclassify any authorized shares into any such shares or create, authorize or issue any obligation or security convertible into or evidencing the right to purchase any such shares, without the approval of holders of at least two–thirds of the outstanding Equity Office series A, B and C preferred shares voting separately as classes. A two–thirds separate class vote also would be required for any amendment, alteration or repeal of provisions of the declaration of trust, whether by merger, consolidation or otherwise, that would materially and adversely affect any right, preference, privilege or voting power of the Equity Office series A, B and C preferred shares, with several specified exceptions set forth in the declaration of trust.

The holders of the outstanding Equity Office series A, B and C preferred shares also are entitled, voting together as a single class with all other equity securities with like voting rights, to elect a total of two trustees to the Equity Office board of trustees at any time distributions on the preferred shares are in arrears for six or more quarterly periods.

### Power to Issue Additional Common Shares and Preferred Shares

Equity Office believes that the power of its board of trustees to issue additional authorized but unissued common shares or preferred shares and to classify or reclassify unissued common shares or preferred shares and thereafter to cause Equity Office to issue such classified or reclassified shares of beneficial interest provides Equity Office with increased flexibility in structuring possible future financings and acquisitions and in meeting other needs which may arise. The additional classes or series, as well as the common shares, generally will be available for future issuance without further action by Equity Office's shareholders, unless such action is required by applicable law or the rules of the NYSE. Although the Equity Office board of trustees has no present intention of doing so, it could authorize Equity Office to issue a class or series that could, depending upon the terms of such class or series, delay, defer or prevent

98

---

Table of Contents

a transaction or a change in control of Equity Office that might involve a premium price for holders of common shares or otherwise be in their best interest.

### New Series E, F and H Preferred Shares

The Equity Office series E, F and H preferred shares to be established before or simultaneously with the merger will have preferences, conversion and other rights, voting powers, restrictions, limitations as to dividends, qualifications and terms or conditions of redemption identical to those of the shares of the corresponding series of Spieker preferred stock.

The following table sets forth the authorized, issued and outstanding Equity Office series E, F and H preferred shares upon completion of the merger:

| Class or Series of Shares | Authorized | Issued and Outstanding |
|---|---|---|
| Series E preferred shares | 4,250,000 | 4,250,000 |
| Series F preferred shares | 6,000,000 | 6,000,000 |
| Series H preferred shares | 4,000,000 | 4,000,000 |

#### Series E Preferred Shares to be Issued in the Merger

The Equity Office series E preferred shares to be issued in the merger will rank senior to the Equity Office common shares and on a parity with the Equity Office series A, B, C, F and H preferred shares with respect to the payment of distributions and amounts upon liquidation, dissolution or winding up of Equity Office.

Distributions on the Equity Office series E preferred shares, when issued, will cumulate and will be payable quarterly, when, as and if declared by the Equity Office board of trustees, on the last day of March, June, September and December of each year. The rate of distributions for the series E preferred shares will be $2.3625 per annum per share.

The Equity Office series E preferred shares will not be convertible into Equity Office common shares and will not be entitled to the benefit of any sinking fund.

The Equity Office series E preferred shares will be redeemable by Equity Office at a price of $25.00 per Equity Office series E preferred share, plus accumulated and unpaid distributions to the redemption date. The redemption price of series E preferred shares, other than the portion consisting of accrued and unpaid distributions, will be payable solely out of proceeds from the sale of other shares of beneficial interest of Equity Office, including any rights, warrants or options to purchase any shares of beneficial interest but excluding debt securities convertible into or exchangeable for shares of beneficial interest. In addition, Equity Office may acquire any excess series E preferred shares that are transferred to it under the articles supplementary for the series E preferred shares because they were owned or acquired by a shareholder in violation of applicable ownership limits.

If any series E preferred shares are outstanding, no distributions may be declared or paid or set apart for payment on any class or series of shares of beneficial interest of Equity Office ranking, as to distributions, on a parity with or junior to series E preferred shares for any period unless full cumulative distributions have been or contemporaneously are declared and paid or declared and a

sum sufficient for the payment thereof set apart for such payments on series E preferred shares for all past distribution periods and the then current distribution period.

In addition, unless full cumulative distributions on series E preferred shares have been or contemporaneously are declared and paid or declared and a sum sufficient for the payment thereof set apart for payment for all past dividend periods and the then current dividend period:

• no distributions other than in Equity Office common shares or other shares of beneficial interest ranking junior to series E preferred shares as to distributions and amounts upon liquidation may be declared or paid or set aside for payment or other distribution may be declared or made upon the

99

**Table of Contents**

Equity Office common shares, series A preferred shares, series B preferred shares, series C preferred shares, series F preferred shares and series H preferred shares or any other shares of beneficial interest of Equity Office ranking junior to or on a parity with series E preferred shares as to distributions or upon liquidation; and

• no Equity Office common shares, series A preferred shares, series B preferred shares, series C preferred shares, series F preferred shares and series H preferred shares or any other shares of beneficial interest of Equity Office ranking junior to or on a parity with series E preferred shares as to distributions or amounts upon liquidation may be redeemed, purchased or otherwise acquired for any consideration (or any moneys be paid to or made available for a sinking fund for the redemption of any such shares of beneficial interest) by Equity Office, except by conversion into or exchange for other shares of beneficial interest of Equity Office ranking junior to series E preferred shares as to distributions and amounts upon liquidation.

Upon any voluntary or involuntary liquidation, dissolution or winding up of Equity Office, the Equity Office series E preferred shares, when issued, will be entitled to a liquidation preference of $25.00 per share, plus accrued and unpaid distributions to the date of payment, before any distribution or payment to the Equity Office common shares or any other class or series of shares of beneficial interest of Equity Office ranking junior to the Equity Office series E preferred shares as to liquidation rights.

If upon any voluntary or involuntary liquidation, dissolution or winding up of Equity Office, the assets of Equity Office are insufficient to make full payments to holders of Equity Office series E preferred shares and other preferred shares ranking on a parity with the Equity Office series E preferred shares, then holders of Equity Office series E preferred shares and such other preferred shares will share ratably in any distribution of assets in proportion to the full liquidating distributions to which they would otherwise be respectively entitled. After payment of the full amount of the liquidating distributions to which they are entitled, the holders of Equity Office series E preferred shares will not be entitled to any further participation in any distribution of assets by Equity Office.

*Series F Preferred Shares to be Issued in the Merger*

The Equity Office series F preferred shares to be issued in the merger will rank senior to the Equity Office common shares and on a parity with the Equity Office series A, B, C, E and H preferred shares with respect to the payment of distributions and amounts upon liquidation, dissolution or winding up of Equity Office.

Distributions on the Equity Office series F preferred shares, when issued, will cumulate and will be payable quarterly, when, as and if declared by the Equity Office board of trustees, on the last day of January, April, July and October of each year. The rate of distributions for the series F preferred shares will be $1.96875 per annum per share.

The Equity Office series F preferred shares will not be convertible into Equity Office common shares and will not be entitled to the benefit of any sinking fund.

The Equity Office series F preferred shares, when issued, will be redeemable by Equity Office after October 10, 2002 at a price of $25.00 per Equity Office series F preferred share, plus accumulated and unpaid distributions to the redemption date. The redemption price of series F preferred shares, other than the portion consisting of accrued and unpaid distributions, will be payable solely out of proceeds from the sale of other shares of beneficial interest of Equity Office, including any rights, warrants or options to purchase any shares of beneficial interest but excluding debt securities convertible into or exchangeable for shares of beneficial interest. In addition, Equity Office may acquire any excess series F preferred shares that are transferred to it under the articles supplementary for the series F preferred shares because they were owned or acquired by a shareholder in violation of applicable ownership limits.

The Equity Office series F preferred shares will have the same limitations on the payment of distributions on junior and parity shares and the same liquidation rights as the Equity Office series E preferred shares.

100

Table of Contents

### *Series H Preferred Shares to be Issued in the Merger*

The new Equity Office series H preferred shares to be issued in the merger will rank senior to the Equity Office common shares and on a parity with the Equity Office series A, B, C, E and F preferred shares with respect to the payment of distributions and amounts upon liquidation, dissolution or winding up of Equity Office. Distributions on the Equity Office series H preferred shares will cumulate and will be payable quarterly, when, as and if declared by the Equity Office board of trustees, on the last day of March, June, September and December of each year. The rate of distributions for the series H preferred shares will be $2.00 per annum per share.

The Equity Office series H preferred shares will not be convertible into Equity Office common shares and will not be entitled to the benefit of any sinking fund.

The Equity Office series H preferred shares will be redeemable by Equity Office after June 4, 2003 at a price of $25.00 per Equity Office series H preferred share, plus accumulated and unpaid distributions to the redemption date. The redemption price of series H preferred shares, other than the portion consisting of accrued and unpaid distributions, will be payable solely out of proceeds from the sale of other shares of beneficial interest of Equity Office, including any rights, warrants or options to purchase any shares of beneficial interest but excluding debt securities convertible into or exchangeable for shares of beneficial interest. In addition, Equity Office may acquire any excess series H preferred shares that are transferred to it under the articles supplementary for the series H preferred shares because they were owned or acquired by a shareholder in violation of applicable ownership limits.

The Equity Office series H preferred shares will have the same limitations on the payment of distributions on junior and parity preferred shares and the same liquidation rights as the Equity Office series E and F preferred shares.

### *Voting Rights of Equity Office Series E, F and H Preferred Shares*

Holders of Equity Office series E, F and H preferred shares will not have any voting rights, except as set forth below or as otherwise required by law.

Under the articles supplementary establishing these series of preferred shares, if six quarterly distributions, whether or not consecutive, payable on any of these series of preferred shares or other parity preferred shares are in arrears, the number of trustees on the Equity Office board of trustees will be increased by two, and the holders of the series E, F and H preferred shares, voting together as a class, with the holders of other series of parity preferred shares entitled to such voting rights, which are referred to as "voting preferred shares," will have the right to elect two additional trustees to serve on the Equity Office board of trustees until the distributions have been paid in full or set aside for payment. The term of office of all trustees so elected will terminate with the termination of such voting rights.

The approval of a majority of the outstanding series E, F and H preferred shares and all other series of voting preferred shares similarly affected and having such voting rights, voting as a single class is required to:

- enter into a share exchange that affects series E, F or H preferred shares, or consolidate with or merge Equity Office with or into any other entity, unless in each such case each series E, F or H preferred share remains outstanding without a material adverse change to its terms and rights or is converted into or exchanged for preferred shares of the surviving entity having preferences, conversion and other rights, voting powers, restrictions, limitations as to distributions, qualifications and terms or conditions of redemption thereof identical to those of the series E, F or H preferred shares, as applicable, or

- authorize, reclassify, create, or increase the authorized amount of any class of shares of beneficial interest having rights senior to series E, F or H preferred shares with respect to the payment of distributions or amounts upon liquidation, dissolution or winding up of the affairs of Equity Office.

However, Equity Office may create additional classes of parity preferred shares and shares of beneficial interest ranking junior to series E, F and H preferred shares as to distributions or amounts upon liquidation, dissolution or winding up of the affairs of Equity Office, increase the authorized number of

101

Table of Contents

parity preferred shares and junior shares and issue additional series of parity preferred shares and junior shares without the consent of any holder of series E, F or H preferred shares.

The approval of two–thirds of the outstanding series E, F and H preferred shares and all other series of voting preferred shares similarly affected and having such voting rights, voting as a single class, is required in order to amend the articles supplementary for the series E, F or H preferred shares or Equity Office's declaration of trust to affect materially and adversely the rights, preferences or voting power of the holders of series E, F or H preferred shares or any voting preferred shares.

**REIT Ownership Limitations and Transfer Restrictions Applicable to Equity Office Common Shares and Series A, B and C Preferred Shares**

For Equity Office to qualify as a REIT under the Internal Revenue Code, no more than 50% in value of its outstanding shares of beneficial interest may be owned, actually or constructively, by five or fewer "individuals," which, as defined in the Internal Revenue Code for this purpose, includes certain entities. In addition, if Equity Office, or an actual or constructive owner of 10% or more of the shares of Equity Office, owns, actually or constructively, 10% or more of a tenant of Equity Office, then the rent received by Equity Office from that "related party tenant" will not be qualifying income for purposes of determining whether Equity Office meets the requirements for qualification as a REIT under the Internal Revenue Code unless the tenant is a taxable REIT subsidiary and specified requirements are met. A REIT's shares also must be beneficially owned by 100 or more persons.

As a means of addressing these requirements, Article VII of the Equity Office declaration of trust provides that, with several exceptions, no person may own, or be deemed to own directly and/or by virtue of the attribution provisions of the Internal Revenue Code, more than 9.9%, in value or number of shares, whichever is more restrictive, of the issued and outstanding shares of any class or series of shares. Under the Equity Office declaration of trust, the Equity Office board of trustees may increase the ownership limit with respect to any class or series of shares. After giving effect to this increase, however, five beneficial owners of common shares may not beneficially own in the aggregate more than 49.5% of the outstanding common shares. In addition, the Equity Office board of trustees is required to waive or modify the ownership limit with respect to one or more persons who would not be treated as "individuals" under the Internal Revenue Code if such person submits to the Equity Office board of trustees specified information that demonstrates, to the reasonable satisfaction of the Equity Office board of trustees, that such ownership would not jeopardize Equity Office's status as a REIT under the Internal Revenue Code. The Equity Office declaration of trust further prohibits any person from transferring any Equity Office common or preferred shares if the transfer would result in shares of beneficial interest of Equity Office being owned by fewer than 100 persons or otherwise would cause Equity Office not to qualify as a REIT.

With respect to the Equity Office series B preferred shares, the ownership limit in the declaration of trust means the greater of (a) 9.9% of the series B preferred shares, in value or number, whichever is more restrictive, or (b) such number of series B preferred shares such that five persons who are considered individuals pursuant to Section 542 of the Internal Revenue Code, as modified by Section 856(h)(3) of the Internal Revenue Code, taking into account all excepted holders within the meaning of the declaration of trust, could not beneficially own, in the aggregate, more than 49.5% of the value of the outstanding shares of beneficial interest of Equity Office.

If any transfer of shares or any other event would otherwise result in any person violating the ownership limits, then the declaration of trust provides that (a) the transfer will be void and of no force or effect with respect to the prohibited transferee with respect to that number of shares that exceeds the ownership limits and (b) the prohibited transferee would not acquire any right or interest in the shares. The shares transferred in violation of the ownership limit instead would be transferred automatically to a charitable trust, the beneficiary of which would be a qualified charitable organization selected by Equity Office.

The trustee of the charitable trust would be required to sell the shares transferred in violation of the ownership limit to a person or entity who could own the shares without violating the ownership limit, and to distribute to the prohibited transferee an amount equal to the lesser of the price paid by such person for the shares transferred in violation of the ownership limit or the sales proceeds received by the charitable

102

---

Table of Contents

trust for the shares. In the case of a transfer for no consideration, such as a gift, the charitable trustee would be required to sell the shares to a qualified person or entity and distribute to the prohibited transferee an amount equal to the lesser of the fair market value of the shares as of the date of the prohibited transfer or the sales proceeds received by the charitable trust.

Under its declaration of trust, Equity Office, or its designee, would have the right to purchase the shares from the charitable trust at a price per share equal to the lesser of (a) the price per share in the transaction that resulted in the transfer of the shares to the charitable trust, or, in the case of a devise or gift, the market price at the time of such devise or gift, and (b) the market price of such shares on the date Equity Office, or its designee, were to agree to purchase the shares. Any proceeds derived from the sale of the shares in excess of the amount distributed to the prohibited transferee under these provisions would be distributed to the beneficiary of the charitable trust.

The charitable trustee will have the sole right to vote the shares that it holds, and any distributions paid on shares held by the charitable trustee would be paid to the beneficiary of the charitable trust.

If the transfer to the charitable trust of the shares that were transferred in violation of the ownership limit is not automatically effective for any reason, then the transfer that resulted in the violation of the ownership limit would be void.

All persons or entities who own, directly or by virtue of the attribution provisions of the Internal Revenue Code, more than 5%, or such other percentage between 1/2 of 1% and 5% as provided in applicable rules and regulations under the Internal Revenue Code, of the lesser of the number or value of the outstanding Equity Office shares must give a written notice to Equity Office by January 30 of each year stating the name and address of such owner, the number of Equity Office shares owned and a description of the manner in which such Equity Office shares are held. In addition, a holder of record of Equity Office shares to whom the foregoing requirement applies who holds his Equity Office shares as nominee for another person or entity which is

required to include in gross income the dividends received on such shares must also give notice of the name and address of such person or entity and the number of Equity Office shares of such person or entity with respect to which such holder of record is nominee. In addition, each record, beneficial and constructive holder of Equity Office shares is required, upon demand of Equity Office, to disclose to Equity Office in writing any information with respect to the direct, indirect and constructive ownership of Equity Office shares as the Equity Office board of trustees deems necessary to comply with the provisions of the Internal Revenue Code applicable to REITs, to comply with the requirements of any taxing authority or governmental agency or to determine any such compliance.

The Equity Office declaration of trust contains an additional limitation on the ownership by non–U.S. persons of Equity Office common and preferred shares, other than preferred shares issued and outstanding as of June 19, 2000, and common shares into which such preferred shares may be converted. This limitation restricts the direct or indirect acquisition or ownership of Equity Office shares if, as a result of the acquisition or ownership, non–U.S. persons would own directly or indirectly 43% or more of the fair market value of the issued and outstanding Equity Office shares. If any transfers of Equity Office shares occur that would result in non–U.S. persons owning directly or indirectly 43% or more of the fair market value of the issued and outstanding Equity Office shares as described above, then the number of shares that would cause a non–U.S. person to violate this restriction are automatically transferred to a charitable trust, or if transfer to a charitable trust would not be effective to prevent violation of this restriction, then the transfer of shares will be void.

As part of the merger, the Equity Office declaration of trust will be amended to allow for the exemption of series of preferred shares issued in any merger from ownership limitations or restrictions on transfer under specified circumstances. See "Approval of Amendments to Equity Office's Declaration of Trust" beginning on page 93.

The foregoing restrictions on ownership and transferability would not apply if the Equity Office board of trustees were to determine that it is no longer in the best interests of Equity Office to attempt to qualify, or to continue to qualify, as a REIT under the Internal Revenue Code.

103

---

**Table of Contents**

**REIT Ownership Limitations and Transfer Restrictions Applicable to Equity Office Series E, F and H Preferred Shares**

Instead of being governed by the foregoing restrictions, the Equity Office series E, F and H preferred shares will have ownership limitations and transfer restrictions identical to those contained in the articles supplementary for the corresponding Spieker series B, C and E preferred stock.

Under the articles supplementary for the Equity Office series E, F and H preferred shares, no holder of series E, F and H preferred shares may own more than 9.9% of the value of the outstanding Equity Office common shares and preferred shares. If the issuance or transfer of series E, F and H preferred shares to any person would cause that person to exceed the ownership limit (unless a waiver of the Equity Office board of trustees has been obtained), would cause Equity Office to be beneficially owned by fewer than 100 persons or would cause Equity Office to become "closely held" under Section 856(h) of the Internal Revenue Code, the issuance or transfer will be null and void and the intended transferee will acquire no rights to the shares.

Series E, F and H preferred shares involved in a transfer or change in capital structure that results in a person owning in excess of the ownership limit (unless a waiver of the Equity Office board of trustees has been obtained) or would cause Equity Office to become "closely held" within the meaning of Section 856(h) of the Internal Revenue Code will automatically be exchanged for excess preferred shares of the same series as the shares intended to be transferred. All excess preferred shares will be transferred, without action by the shareholder, to Equity Office as trustee of a trust for the exclusive benefit of the transferee or transferees to whom the excess preferred shares are ultimately transferred.

While the excess preferred shares are held in trust, they will not be entitled to vote, they will not be considered for purposes of any shareholder vote or the determination of a quorum for a shareholder vote and they will not be entitled to participate in any distributions made by Equity Office or upon liquidation. Equity Office has the right, for a period of 90 days during the time the excess preferred shares are held by Equity Office in trust, to purchase all or any portion of the excess preferred shares from the intended transferee at the lesser of the price paid for the shares by the intended transferee and the closing market price for the shares on the date Equity Office exercises its option to purchase.

All certificates representing series E, F and H preferred shares will bear a legend referring to the restrictions described above.

All holders of series E, F and H preferred shares who own of record more than 5% of the outstanding Equity Office common shares and preferred shares, or 1% if there are more than 200 but fewer than 2,000 shareholders or one–half of 1% if there are 200 or less shareholders of record, must file an affidavit with Equity Office containing the information specified in the articles supplementary for the class or series of shares owned by the filing holder within 30 days after January 1 of each year. In addition, each series E, F and H preferred shareholder will upon demand be required to disclose to Equity Office in writing information with respect to the direct, indirect and constructive ownership of shares as the Equity Office board of trustees deems necessary to determine Equity Office's status as a REIT and to ensure compliance with the ownership limit.

**Possible Redesignation of Equity Office Preferred Shares to be Issued in the Merger**

The merger agreement, as amended, permits Equity Office to redesignate the series of preferred shares to be issued in the merger and the partnership merger to enable Equity Office to issue consecutively–numbered series of preferred shares. For example, the amended merger agreement permits Equity Office:

- to redesignate as "series D preferred shares" its series E preferred shares to be issued in the merger in exchange for issued and outstanding Spieker series B preferred shares;

- to redesignate as "series E preferred shares" its series F preferred shares to be issued in the merger in exchange for issued and outstanding Spieker series C preferred shares; and

104

Table of Contents

- to redesignate as "series F preferred shares" its series H preferred shares to be issued in the merger in exchange for issued and outstanding Spieker series E preferred shares.

The redesignation of preferred shares under the amended merger agreement is subject to the repurchase of the Spieker series D preferred units immediately prior to the partnership merger. Apart from redesignating the Equity Office preferred shares to be issued in the merger and eliminating references within the articles supplementary for each series of Equity Office preferred shares to be issued in the merger to series of Equity Office preferred shares that will not be issued in the merger, the articles supplementary for the redesignated Equity Office series D, E and F preferred shares will otherwise be substantially in the form set forth as exhibits to the registration statement of which this document is a part.

**Transfer Agent and Registrar**

The transfer agent and registrar for the Equity Office common and preferred shares is EquiServe LP.

**Anti–Takeover Considerations**

Maryland law and the Equity Office declaration of trust and bylaws contain a number of provisions that may have the effect of discouraging transactions that involve an actual or threatened change of control of Equity Office. See "Comparison of Shareholder Rights" beginning on page 106. These provisions include:

- *Classified board of trustees and size of board fixed with range* — The board of trustees of Equity Office is divided into three classes with staggered terms of office. The total number of trustees is fixed by a majority vote of the board of trustees within a range of a minimum of nine and a maximum of 15 (to be increased to 16 as part of the merger). These provisions may make it more difficult for a third party to gain control of the board of trustees of Equity Office. At least two annual meetings of Equity Office, instead of one, generally would be required to effect a change in a majority of the board of trustees, and the number of trustees cannot be increased above the maximum number of trustees specified in the declaration of trust without board and shareholder approvals.

- *Removal of trustees* — Under the Equity Office declaration of trust, subject to the rights of one or more classes or series of preferred shares to elect one or more trustees, a trustee may be removed at any time, but only with cause, at a meeting of the shareholders by the affirmative vote of the holders of not less than a majority of the shares then outstanding and entitled to vote generally in the election of trustees.

- *Unsolicited Takeover Provisions of Maryland Law* — Maryland law provides protection for Maryland real estate investment trusts against unsolicited takeovers by protecting the board of trustees with regard to actions taken in a takeover context. Maryland law also allows publicly held Maryland real estate investment trusts to elect to be governed by all or any part of Maryland law provisions relating to extraordinary actions and unsolicited takeovers.

- *Call of Special Meetings of Shareholders* — The Equity Office bylaws provide that special meetings of shareholders may be called only by the chairman of the board, the president, one–third of the trustees or by the holders of shares entitled to cast not less than a majority of all the votes entitled to be cast at the meeting. This provision limits the ability of shareholders to call special meetings.

- *Advance Notice Provisions for Shareholder Nominations and Shareholder New Business Proposals* — The Equity Office bylaws require advance written notice for shareholders to nominate a trustee or bring other business before a meeting of shareholders. This provision limits the ability of shareholders to make nominations for trustees or introduce other proposals that are not timely received for consideration at a meeting.

105

Table of Contents

- *Two–thirds Shareholder Vote Required to Approve Some Amendments to the Declaration of Trust* — Some amendments to the declaration of trust must first be declared advisable by the board of trustees and thereafter must be approved by shareholders by the affirmative vote of not less than two–thirds of all votes entitled to be cast. These vote requirements may make amendments to the Equity Office declaration of trust that shareholders believe desirable more difficult to effect.

- *Exclusive Authority of Board to Amend Bylaws, Except for Specified Amendments* — The Equity Office bylaws provide that the power to amend, repeal or adopt new bylaws is vested exclusively with the board of trustees, except that any amendments by the board of trustees to the bylaw provisions relating to meetings of shareholders, the minimum and maximum number of trustees, and the requirement that at least two–thirds of the trustees must be persons who are not executive officers of Equity Office or persons affiliated with Mr. Zell or his affiliates are subject to the approval of shareholders by vote of a majority of the votes cast. These provisions may make more difficult bylaw amendments that shareholders may believe are desirable.

- *Business Combination with Interested Shareholders* — The Maryland Business Combination Act provides that, unless exempted, a Maryland real estate investment trust may not engage in business combinations, including mergers, dispositions of 10% or more of its assets, issuances of shares and other specified transactions, with an "interested shareholder" or its affiliates, for five years after the most recent date on which the interested shareholder became an interested shareholder and thereafter unless specified criteria are met. The Equity Office board of trustees has elected by resolution to exempt from the provisions of the Maryland Business Combination Act any business combination with any person. However, this resolution, by its terms, may be altered or repealed at any time, in whole or in part, by the board of trustees.

- *Other Constituencies* — Maryland law expressly codifies the authority of a Maryland real estate investment trust to include in its charter a provision that allows the board of trustees to consider the effect of a potential acquisition of control on shareholders, employees, suppliers, customers, creditors and communities in which offices or other establishments of the trust are located. The Equity Office declaration of trust does not include a provision of this type. Maryland law also provides, however, that the inclusion or omission of this type of provision in the declaration of trust of a Maryland real estate investment trust does not create an inference concerning factors that may be considered by the board of trustees regarding a potential acquisition of control. This law may allow the board of trustees to reject an acquisition proposal even though the proposal was in the best interests of Equity Office shareholders.

## COMPARISON OF SHAREHOLDER RIGHTS

The following comparison of the rights of Equity Office shareholders and Spieker stockholders summarizes the material differences but is not intended to list all of the differences. As a Maryland real estate investment trust, Equity Office is subject to the Maryland REIT Law. The Maryland REIT Law covers many of the same matters covered by the Maryland General Corporation Law, including limitation of liabilities of trustees and officers, indemnification of trustees and officers, classification of the board, classification of shares, amendment of the declaration of trust, mergers of a Maryland real estate investment trust with other entities and dissenters' rights. There are some corporate governance matters that are addressed in the Maryland General Corporation Law, however, that are not dealt with in the Maryland REIT Law. It is the general practice of Maryland real estate investment trusts to address some of these matters through provisions in the declaration of trust or bylaws. As a Maryland corporation, Spieker is subject to the Maryland General Corporation Law.

The following discussion should be read together with the declaration of trust and bylaws of Equity Office, the charter and bylaws of Spieker and applicable Maryland law. The declaration of trust and bylaws of Equity Office and the charter and bylaws of Spieker are incorporated by reference in this joint proxy statement/prospectus, and will be sent to holders of Equity Office common shares and Spieker common and preferred stock upon request. See "Where You Can Find More Information" beginning on page 124.

106

Table of Contents

## Authorized Shares

*Equity Office.* The authorized shares of beneficial interest of Equity Office consist of 750,000,000 common shares, $.01 par value per share, and 100,000,000 preferred shares, $.01 par value per share, of which 8,000,000 shares are designated as 8.98% series A cumulative redeemable preferred shares, 7,000,000 shares are designated as 5.25% series B convertible cumulative preferred shares and 4,600,000 shares are designated as 8 5/8% series C cumulative redeemable preferred shares.

Under the Equity Office declaration of trust, the Equity Office board of trustees has the authority to issue authorized but unissued common shares or preferred shares in one or more classes or series without shareholder approval. The Equity Office board of trustees also is authorized to reclassify authorized but unissued common shares into preferred shares, and authorized but unissued preferred shares into common shares, without shareholder approval.

Subject to an express provision to the contrary in the terms of any class or series of authorized shares, under the Equity Office declaration of trust the board of trustees also has the power to divide or combine the outstanding shares of any class or series, without shareholder approval.

Notwithstanding the foregoing, under the articles supplementary establishing the outstanding series A, B and C preferred shares of Equity Office, the board of trustees may not authorize, create or increase the authorized amount of any class or series of shares ranking before the outstanding series A, B and C preferred shares with respect to the payment of distributions or upon liquidation, without the approval of holders of two–thirds of the outstanding shares of these series of preferred shares voting together as a single class.

At May 21, 2001, there were issued and outstanding 309,815,068 Equity Office common shares, 7,994,000 Equity Office series A preferred shares, 5,990,000 Equity Office series B preferred shares and 4,562,900 Equity Office series C preferred shares.

Before completion of the merger, Equity Office will file articles supplementary to its declaration of trust to provide for the designation of the preferred shares to be issued in the merger, of which 4,250,000 will be classified as series E preferred shares, 6,000,000 will be classified as series F preferred shares and 4,000,000 will be classified as series H preferred shares. Equity Office also will provide for the designation of a corresponding number of excess preferred shares for each newly established series of preferred shares. The Equity Office series E, F and H preferred shares issued in the merger will have preferences, conversion and other rights, voting powers, restrictions, limitations as to dividends, qualifications and terms or conditions of redemption identical to those of the shares of the corresponding series of Spieker preferred stock.

*Spieker.* The authorized shares of capital stock of Spieker consist of 1,000,000,000 shares of capital stock, par value $.0001 per share, of which 649,000,000 are classified as Spieker common stock, 2,000,000 are classified as class B common stock, par value $.0001 per share, 1,500,000 are classified as class C common stock, par value $.0001 per share, 1,000,000 are classified as series A preferred stock, par value $.0001 per share, 5,000,000 are classified as series B preferred stock, par value $.0001 per share, 6,000,000 are classified as series C preferred stock, par value $.0001 per share, 1,500,000 are classified as series D preferred stock, par value $.0001 per share, 4,000,000 are classified as series E preferred stock, par value $.0001 per share, and 330,000,000 are classified as excess stock.

Subject to limitations prescribed by Maryland law and the Spieker charter, the Spieker board of directors is authorized to reclassify any unissued portion of the authorized shares of capital stock into other classes or series of common stock or preferred stock. The Spieker board may also establish the number of shares in each class or series, fix the designation and any preferences, conversion and other rights, voting powers, restrictions, limitations as to dividends, qualifications and terms and conditions of redemption.

Except as described above, the articles supplementary establishing the outstanding series B, C and E preferred stock of Spieker do not permit the Spieker board of directors to authorize, reclassify, create or increase the authorized amount of any class of stock having rights senior to those series of preferred stock

107

Table of Contents

with respect to the payment of dividends or amounts upon liquidation, dissolution or winding up of the affairs of Spieker without the approval of holders of a majority of the outstanding shares of those series of preferred stock, each voting together as a single class.

At May 21, 2001, there were issued and outstanding 67,395,001 shares of Spieker common stock, 4,250,000 shares of series B preferred stock, 6,000,000 shares of series C preferred stock, 4,000,000 shares of series E preferred stock, no shares of class B common stock, no shares of series A preferred stock and no shares of excess stock.

## Voting Rights

*Equity Office.* Each holder of Equity Office common shares is entitled to one vote per share and to the same and identical voting rights as other holders of Equity Office common shares. Holders of Equity Office common shares do not have cumulative voting rights. Except as provided in articles supplementary establishing a series of Equity Office preferred shares or required by law, holders of Equity Office preferred shares do not have any voting rights. For a description of the voting rights of holders of outstanding series A, B and C preferred shares, see "Description of Equity Office Shares of Beneficial Interest — Preferred Shares — Voting Rights of Series A, B and C Preferred Shares" on page 98.

*Spieker.* Each holder of Spieker common stock is entitled to one vote per share and to the same and identical voting rights as other holders of Spieker common stock. Holders of Spieker common stock do not have cumulative voting rights. Except as provided by law or in the articles supplementary establishing the series of Spieker preferred stock, holders of Spieker series B, C and E preferred stock do not have voting rights.

## Classification of the Board

*Equity Office.* The Maryland REIT Law permits a Maryland real estate investment trust's board of trustees to be divided into up to three classes with staggered terms of office. The Equity Office declaration of trust divides the Equity Office board of trustees into three classes, with classes being elected to three–year terms on a rotating basis.

*Spieker.* The Maryland General Corporation Law permits a Maryland corporation to divide its board of directors into classes with staggered terms of office so long as the term of office of at least one class expires each year. Spieker's board of directors is divided into three classes, with classes being elected to three–year terms on a rotating basis.

### Number of Trustees/ Directors; Removal of Trustees/ Directors; Vacancies

*Equity Office.* The Equity Office declaration of trust currently provides for a minimum of nine and a maximum of 15 trustees, with the number of trustees within this range established by a majority vote of the board of trustees as provided in the Equity Office bylaws. As part of the merger, the Equity Office declaration of trust will be amended to, among other things, increase the maximum number of trustees from 15 to 16. Under the Equity Office bylaws, except during the period in which a vacancy exists, at least two–thirds of the Equity Office trustees must be persons who are not executive officers of Equity Office or persons affiliated with Samuel Zell or his affiliates.

Under the Equity Office declaration of trust, subject to the rights of one or more classes or series of preferred shares to elect one or more trustees, a trustee may be removed at any time, but only with cause, at a meeting of the shareholders by the affirmative vote of the holders of not less than a majority of the shares then outstanding and entitled to vote generally in the election of trustees.

Under the Equity Office declaration of trust, subject to the rights of holders of any class or series of preferred shares, each vacancy on the board of trustees, including a vacancy resulting from an increase in the number of trustees, may be filled only by the affirmative vote of a majority of the remaining trustees in office, even if the remaining trustees do not constitute a quorum. Any trustee elected to fill a vacancy will

108

---

Table of Contents

hold office for the remainder of the full term of the class of trustees in which the vacancy occurred and until a successor is elected and qualifies.

The holders of the outstanding shares of series A, B and C preferred shares of Equity Office are entitled, voting together as a single class, to elect a total of two trustees to the Equity Office board of trustees at any time distributions on the preferred shares were in arrears for six or more quarterly periods, whether or not consecutive.

*Spieker.* Spieker's charter provides that the number of directors shall be three members which may be increased or decreased by at least a majority of the board of directors pursuant to Spieker's bylaws. Spieker's bylaws provide that two–thirds of the entire board of directors may alter the number of directors set by Spieker's charter. The minimum number of directors permitted under Spieker's charter and bylaws is three and the maximum is 25. The current size of Spieker's board of directors is seven. Spieker's charter provides that directors may be removed from office at any time, but only for cause and then only by the affirmative vote of 80% of the combined voting power of all classes of shares of capital stock entitled to vote in the election for directors. Spieker's bylaws provide that cause, for these purposes, is defined as:

• Conviction of a felony;

• Declaration of unsound mind by order of a court;

• Gross dereliction of duty;

• Conviction of any act involving moral turpitude; or

• Commission of an act that constitutes intentional misconduct or a knowing violation of law if the action in either event results both in an improper substantial personal benefit to the director and in a material injury to Spieker.

Subject to the rights of the holders of any series of stock separately entitled to elect one or more directors, vacancies on Spieker's board which result from the removal of a director may be filled by the vote of Spieker stockholders. Subject to the rights of the holders of any series of stock separately entitled to elect one or more directors, a majority of remaining directors, whether or not constituting a quorum, may fill a vacancy on the Spieker board of directors resulting from any cause except an increase in the number of directors. A majority of the entire board of directors may fill a vacancy on the Spieker board resulting from an increase in the number of directors. A director elected by the stockholders to fill a vacancy which results from the removal of a director serves for the balance of the term of the removed director and a director elected by the board of directors to fill a vacancy serves until the next annual meeting of stockholders and until a successor is elected and qualifies.

If six quarterly dividends, whether or not consecutive, payable on shares of series B, C, D and E preferred stock are in arrears, whether or not earned or declared, the number of directors then constituting the board of directors will be increased by two, and the holders of shares of series B, C, D and E preferred stock, voting together as a class, will have the right to elect two additional directors at any annual meeting of the stockholders or a properly called meeting of the holders of series B, C, D and E preferred stock until all of the dividends have been declared and paid or set aside for payment. The term of office of all directors so elected shall be terminated with the termination of such voting rights.

**Limitation of Trustee/ Director and Officer Liability**

*Equity Office.* Under Maryland law, the declaration of trust of a Maryland real estate investment trust may include a provision expanding or limiting the liability of its trustees and officers to the trust or its shareholders for money damages but may not include a provision which restricts or limits the liability of its trustees or officers to the trust or its shareholders to the extent that:

- it is proved that the person actually received an improper benefit or profit in money, property or services, for the amount of the benefit or profit in money, property or services actually received; or

109

Table of Contents

- a judgment or other final adjudication adverse to the person is entered in a proceeding based on a finding that the person's action, or failure to act, was the result of active and deliberate dishonesty and was material to the cause of action adjudicated in the proceeding.

The Equity Office declaration of trust provides that, to the maximum extent that Maryland law permits, no trustee or officer of Equity Office shall be liable to Equity Office or to any shareholder for money damages.

*Spieker.* Maryland law permits a corporation to include in its charter any provision expanding or limiting the liability of its directors and officers to the corporation or its stockholders for money damages, subject to the same limitations described above for a Maryland real estate investment trust. Spieker's charter provides that to the fullest extent permitted by Maryland law, no director or officer shall be personally liable to Spieker or its stockholders for money damages.

**Indemnification**

*Equity Office.* Maryland law generally permits a Maryland real estate investment trust to indemnify any person made a party to any threatened, pending or completed action, suit or proceeding by reason of the fact that the person is or was a trustee, officer, employee or agent of the trust or any predecessor entity, or is or was serving at the request of the trust or predecessor entity as a director, officer, partner, trustee, employee or agent of another corporation, partnership, joint venture, trust, other enterprise or employee benefit plan, unless it is established that:

- the act or omission was material to the matter giving rise to the proceeding and either was committed in bad faith or was the result of active and deliberate dishonesty;

- the person actually received an improper personal benefit in money, property or services; or

- in the case of any criminal proceeding, the person had reasonable cause to believe that the act or omission was unlawful.

Under Maryland law, indemnity may be provided against judgments, penalties, fines, settlements and reasonable expenses actually incurred by the person in connection with the proceeding. The indemnification may be provided, however, only if authorized for a specific proceeding after a determination has been made that indemnification is permissible in the circumstances because the person met the applicable standard of conduct. This determination is required to be made:

- by the board of trustees by a majority vote of a quorum consisting of trustees not, at the time, parties to the proceeding;

- if a quorum cannot be obtained, then by a majority vote of a committee of the board consisting solely of two or more trustees not, at the time, parties to the proceeding;

- by special legal counsel; or

- by the shareholders.

If the proceeding is one by or in the right of the trust, indemnification may not be provided as to any proceeding in which the person is found liable to the trust.

A Maryland real estate investment trust may pay, before final disposition, the expenses, including attorneys' fees, incurred by a trustee, officer, employee or agent in defending a proceeding. Under Maryland law, expenses may be advanced to a trustee or officer when the trustee or officer gives an undertaking to the trust to repay the amounts advanced if it is ultimately determined that he or she is not entitled to indemnification. Maryland law does not require that the undertaking be secured and the undertaking may be accepted without reference to the financial ability of the trustee or officer to repay the advance. A Maryland trust is required to indemnify any trustee who has been successful, on the merits or otherwise, in defense of a proceeding for reasonable expenses. The determination as to reasonableness of expenses is required to be made in the same manner as required for indemnification.

110

Table of Contents

Under the Maryland REIT Law, the indemnification and advancement of expenses provided by statute are not exclusive of any other rights to which a person seeking indemnification or advancement of expenses may be entitled under any bylaw, agreement, vote of shareholders, vote of trustees or otherwise.

Under the Equity Office bylaws, Equity Office is required to indemnify and advance expenses to present and former trustees and officers, and may indemnify employees and agents, of Equity Office and its predecessors. The Equity Office bylaws also provide for mandatory indemnification and advancement of expenses to present and former shareholders of Equity Office or its predecessors made a party to a proceeding by reason of their status.

The limited partnership agreement of EOP Partnership also provides for indemnification of Equity Office and its officers and trustees to the same extent that indemnification is provided to officers and trustees of Equity Office in its declaration of trust, and limits the liability of Equity Office and its officers and trustees to EOP Partnership and its respective partners to the same extent that the Equity Office declaration of trust limits the liability of the officers and trustees of Equity Office to Equity Office and its shareholders.

*Spieker.* The Maryland General Corporation Law allows corporations such as Spieker to indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit or proceeding, whether civil, criminal, administrative or investigative, by reason of the fact that he or she is or was a director, officer, employee or agent of the corporation or is or was serving at the request of the corporation as a director, officer, employee, partner, trustee, or agent of another foreign or domestic corporation, partnership, joint venture, trust, other enterprise, on the same terms and subject to the same limitations as described above for a Maryland real estate investment trust.

The Spieker charter provides that Spieker shall provide any indemnification permitted by Maryland law and shall indemnify:

- Directors and officers, whether serving Spieker or at its request any other entity, to the full extent required or permitted by Maryland law, including the advance of expenses under the procedures and to the full extent permitted by law; and

- Employees and agents, whether serving Spieker or at its request any other entity, to the extent authorized by the Spieker board of directors or the bylaws and permitted by law.

**Duties of Trustees and Directors**

*Equity Office and Spieker.* Maryland law provides protection for Maryland corporations and Maryland real estate investment trusts against unsolicited takeovers by protecting the board of directors or board of trustees with regard to actions taken in a takeover context. Maryland law provides that the duties of directors and trustees will not require them to:

- accept, recommend, or respond to any proposal by a person seeking to acquire control;

- authorize the real estate investment trust to redeem any rights under, modify, or render inapplicable a shareholder rights plan;

- make a determination under the Maryland Business Combination Statute or the Control Share Acquisition Statute, as described below;

- elect to be subject to any or all of the "elective provisions" described below; or

- act or fail to act solely because of:

— the effect the act or failure to act may have on an acquisition or potential acquisition of control; or

— the amount or type of consideration that may be offered or paid to shareholders in an acquisition.

111

Table of Contents

Maryland law also establishes a presumption that the act of a director or trustee satisfies the required standard of care. In the case of a Maryland corporation, a director must perform his or her duties in good faith, in a manner that is in the best interests of the corporation and with the care of an ordinarily prudent person under similar circumstances. In the case of a Maryland real estate investment trust, the standard of care is not explicitly addressed in the statute. In addition, an act of a director or trustee relating to or affecting an acquisition or a potential acquisition of control is not subject under Maryland law to a higher duty or greater scrutiny than is applied to any other act of a director or trustee. This provision creates a Maryland rule which is less exacting than case law in many other jurisdictions which (a) imposes an enhanced level of scrutiny when a board implements anti-takeover measures in a change of control context, and (b) shifts the burden of proof to directors to show that the defensive mechanism adopted by a board is reasonable in relation to the threat posed.

Maryland law also provides that the duty of a trustee is only enforceable by the trust or in the right of the trust. A shareholder suit to enforce the duty of a trustee, therefore, can only be brought derivatively.

**Maryland Elective Provisions**

*Equity Office and Spieker.* Maryland legislation enacted in 1999 allows publicly held Maryland corporations and Maryland real estate investment trusts to elect to be governed by all or any part of Maryland law provisions relating to extraordinary actions and unsolicited takeovers. The election to be governed by one or more of these provisions can be made by a Maryland real estate investment trust in its declaration of trust or bylaws or by resolution adopted by the board of trustees so long as the trust or corporation has at least three trustees or directors, as applicable, who, at the time of electing to be subject to the provisions are not:

- officers or employees of the trust or corporation;

- persons seeking to acquire control of the trust or corporation;

- directors, officers, affiliates or associates of any person seeking to acquire control; or

- nominated or designated as trustees or directors by a person seeking to acquire control.

Articles supplementary must be filed with the Maryland State Department of Assessments and Taxation if a Maryland corporation or real estate investment trust elects to be subject to any or all of the provisions by board resolution or bylaw amendment. Shareholder approval is not required for the filing of articles supplementary.

The Maryland legislation provides that a corporation or real estate investment trust can elect to be subject to all or any portion of the following provisions, notwithstanding any contrary provisions contained in the trust's existing declaration of trust or bylaws:

- Classified Board: The corporation or real estate investment trust may divide its board into three classes which, to the extent possible, will have the same number of directors or trustees, as applicable, the terms of which will expire at the third annual meeting of shareholders after the election of each such class;

- Two—Thirds Shareholder Vote to Remove Trustees or Directors Only for Cause: The shareholders may remove any trustee or director, as applicable, only by the affirmative vote of at least two—thirds of all the votes entitled to be cast by the shareholders generally in the election of directors, but a trustee or director may not be removed without cause;

- Size of Board Fixed by Vote of Board: The number of directors or trustees, as applicable, will be fixed only by resolution of the board;

- Board Vacancies Filled by the Board for the Remaining Term: Vacancies that result from an increase in the size of the board, or the death, resignation, or removal of a trustee or director, may be filled only by the affirmative vote of a majority of the remaining trustees or directors even if they do not constitute a quorum. Trustees or directors elected to fill vacancies shall hold office for the

112

---

Table of Contents

remainder of the full term of the class of trustees or directors in which the vacancy occurred, as opposed to until the next annual meeting of shareholders, and until a successor is elected and qualifies; and

- Shareholder Calls of Special Meetings: Special meetings of shareholders shall be called by the secretary of the corporation or real estate investment trust only upon the written request of shareholders entitled to cast at least a majority of all votes entitled to be cast at the meeting.

In response to the 1999 legislation, Equity Office elected to be governed by the provisions of the Maryland code relating to the filling of board vacancies for the remainder of the term as described above. However, even before the 1999 legislation, the Equity Office declaration of trust and/or bylaws, as applicable, already provided for a classified board, that the number of trustees was to be determined by a resolution of the board, subject to a minimum and maximum number, and that the secretary of Equity Office must call a special meeting of shareholders only upon the written request of the holders of a majority of the outstanding securities entitled to vote.

Spieker has not elected to be governed by the specific provisions of the 1999 legislation. However, Spieker's charter and/or bylaws, as applicable, already provide for a classified board, that the number of directors is to be determined by a resolution of the board, subject to a minimum and maximum number, and that the secretary of Spieker must call a special meeting of stockholders only upon the written request of the holders of a majority of the outstanding securities entitled to vote.

**Call of Special Meetings of Shareholders**

*Equity Office.* The Equity Office bylaws provide that special meetings of shareholders may be called by the chairman of the board, the president or one—third of the trustees. Special meetings of shareholders also may be called by the holders of shares entitled to cast not less than a majority of all the votes entitled to be cast at a special meeting of shareholders.

*Spieker.* Spieker's bylaws provide that special meetings of the stockholders may be called by the chairman of the board, the president or a majority of the board and by the secretary upon the written request of stockholders holding at least a majority of all votes entitled to be cast at the meeting.

**Shareholder Action by Written Consent**

*Equity Office.* The Equity Office bylaws permit any action required or permitted to be taken at a meeting of shareholders to be taken without a meeting if a consent in writing, setting forth the action to be taken, is signed by shareholders entitled to cast a sufficient number of votes to approve the matter.

*Spieker.* Spieker's bylaws also allow any action required or allowed to be taken at a stockholder's meeting to be taken without a meeting if there is a unanimous written consent which sets forth the action and is signed by each stockholder entitled to vote on the matter and a written waiver of any right to dissent is signed by each stockholder entitled to notice of the meeting but not entitled to vote at it.

**Advance Notice Provisions for Shareholder Nominations and Shareholder New Business Proposals**

*Equity Office.* The Equity Office bylaws require advance written notice for shareholders to nominate a trustee or bring other business before a meeting of shareholders.

For an annual meeting, a shareholder must deliver notice to the secretary of Equity Office not later than the close of business on the 60th day nor earlier than the close of business on the 90th day before the first anniversary of the preceding year's annual meeting. However, if the date of the annual meeting is advanced by more than 30 days or delayed by more than 60 days from the applicable anniversary date of the prior year's annual meeting, or the meeting is a special meeting of shareholders at which trustees will be elected, notice by the shareholder must be given not earlier than the close of business on the 90th day before the meeting and not later than the close of business on the later of the 60th day before the meeting

113

---

Table of Contents

or the tenth day following the day on which public announcement of the date of the meeting is first made by Equity Office.

The Equity Office bylaws contain detailed requirements for the contents of shareholder notices of trustee nominations and new business.

*Spieker.* The Spieker bylaws require advance written notice for shareholders to nominate a director or bring other business before a meeting of stockholders.

For an annual meeting, a shareholder must deliver notice to the secretary of Spieker not less than 60 days nor more than 90 days before the first anniversary of the preceding year's annual meting. However, if the date of the annual meeting is advanced by more than 30 days or delayed by more than 60 days from the anniversary date, notice by the stockholder must be delivered not earlier than the 90th day before the annual meeting and not later than the close of business on the later of the 60th day before the annual meeting or the tenth day following the day on which public announcement of the date of the annual meeting is first made. In the case of a special meeting of stockholders called for the purpose of electing directors, notice must be given not later than the close of business on the 10th day following the day on which notice of the date of the special meeting was mailed or public disclosure of the date of the special meeting was made, whichever occurs first.

The Spieker bylaws contain detailed requirements for the contents of stockholder notices of director nominations and new business.

**Amendment of the Equity Office Declaration of Trust and Spieker Charter**

*Equity Office.* Under Maryland law and the Equity Office declaration of trust, the trustees, by a two-thirds vote, may at any time amend the declaration of trust solely to enable Equity Office to qualify as a REIT under the Internal Revenue Code or as a real estate investment trust under Maryland law, without action by Equity Office shareholders. The Equity Office board of trustees also may amend the declaration of trust to set the terms of one or more series of preferred shares without action by holders of Equity Office common shares. Other amendments to the declaration of trust must first be declared advisable by the board of trustees and thereafter must be approved by shareholders by the affirmative vote of not less than two-thirds of all votes entitled to be cast, or, in the case of amendments to the declaration of trust in connection with mergers and other specified business combinations or that involve an increase or decrease in the number of authorized common shares or preferred shares, not less than a majority of all votes entitled to be cast.

Under the articles supplementary for the series A, B and C preferred shares of Equity Office, the approval of holders of each preferred series by a two-thirds class vote would be required for:

•

the authorization, creation or increase in the authorized or issued amount of any class or series of Equity Office shares ranking before the outstanding preferred series as to distributions or upon liquidation; or

• any amendment, alteration or repeal of provisions of the declaration of trust, whether by merger, consolidation, or otherwise, so as to materially and adversely affect any right, preferences, privileges or voting power of the outstanding series of preferred shares.

*Spieker.* General amendments to Spieker's charter are governed by the provisions of the Maryland General Corporation Law. Spieker's charter expressly provides, however, that Spieker's board of directors may determine the rights, preferences, privileges, designations and other characteristics of classes and series of Spieker's stock. Under the Maryland General Corporation Law, general amendments to Spieker's charter require Spieker's board of directors to adopt a resolution which sets forth the proposed amendment, declare that it is advisable and direct that the proposed amendment be submitted for consideration at either an annual or special meeting of the stockholders entitled to vote to approve the amendment.

114

Table of Contents

Spieker's charter requires that any proposed amendment to the charter will become effective only upon the affirmative vote of the holders of not less than a majority of all votes entitled to be cast on the matter. However, any amendment to, repeal of or adoption of any provision inconsistent with those provisions of the charter relating to:

• the number, the selection and the removal of members of the board of directors;

• the board's review of business combination transactions;

• shareholder proposals; or

• the amendment of the charter,

will be effective only if it is adopted upon the affirmative vote of not less than 80% of the aggregate votes entitled to be cast on the proposed amendment.

The Maryland General Corporation Law provides holders of classes or series of Spieker's preferred stock a right to vote as a class or series on amendments to Spieker's charter, regardless of limitations on the voting rights of the class or series, if the amendment would alter or change any preference or relative or other right given to the class or series.

## Amendment of the Bylaws

*Equity Office.* The Equity Office bylaws provide that the power to amend, repeal or adopt new bylaws is vested exclusively with the board of trustees, except that any amendments by the board of trustees to the bylaw provisions relating to meetings of shareholders, the minimum and maximum number of trustees, and the requirement that at least two–thirds of the trustees must be persons who are not executive officers of Equity Office or persons affiliated with Mr. Zell or his affiliates are subject to the approval of shareholders by vote of a majority of the votes cast.

*Spieker.* The bylaws provide that amendments to the bylaws may be adopted either by holders of record of not less than 80% of votes entitled to be cast by the outstanding shares of Spieker capital stock generally in the election of directors or by a vote of two–thirds of Spieker's board.

## Mergers, Consolidations and Sales of Assets

*Equity Office.* Under the Maryland REIT Law, a merger involving a Maryland real estate investment trust generally requires approval by the affirmative vote of not less than two–thirds of all votes entitled to be cast on the matter, unless the declaration of trust specifies a greater or lesser percentage, but not less than a majority of all votes entitled to be cast. No shareholder approval is required for 90% owned subsidiary mergers or by shareholders of a Maryland successor trust if the merger does not reclassify or change the outstanding shares or otherwise amend the declaration of trust and the number of shares to be issued in the merger is not more than 20% of the number of its shares of the same class or series outstanding immediately before the merger is completed. The Equity Office declaration of trust specifies that the affirmative vote of shareholders of not less than a majority of all votes entitled to be cast is required to approve mergers for which a shareholder vote is required under Maryland law.

The Maryland REIT Law does not address the requirements for the approval by shareholders of a consolidation or sale of all or substantially all of the assets of a real estate investment trust. However, the Equity Office declaration of trust requires that a majority of the Equity Office shares entitled to vote on the matter must approve a consolidation of Equity Office into one or more other entities or the sale of all or substantially all of the assets of Equity Office outside the ordinary course of business. Under the Equity Office declaration of trust, the mortgage, pledge or other creation of a security interest in any or all of the assets of Equity Office, whether or not in the ordinary course of business, as well as the sale of all or substantially all of the assets of Equity Office to a majority owned subsidiary or as a distribution to shareholders, is not deemed to be a sale requiring shareholder approval.

Table of Contents

*Spieker.* Under the Maryland General Corporation Law, Spieker may approve a consolidation, merger, share exchange or transfer of assets by adopting a resolution that declares the proposed transaction is advisable on substantially the terms and conditions set forth in the resolution and directing that the proposed transaction be submitted for consideration at either an annual or special meeting of the stockholders. Notice which states that a purpose of the meeting will be to act on the proposed consolidation, merger, share exchange or transfer of assets must be provided to each stockholder entitled to vote on the proposed transaction and to each stockholder not entitled to vote on the proposed transaction, except the stockholders of a successor in a merger if the merger does not alter the contract rights of their stock as expressly provided in the charter.

Under the Maryland General Corporation Law, a proposed merger ordinarily requires the approval of stockholders by the affirmative vote of two–thirds of all the votes entitled to vote on the proposed merger. However, as permitted by the Maryland General Corporation Law, Spieker's charter provides that any proposed action requiring, under Maryland law, the affirmative vote of more than a majority of all the votes entitled to vote on the proposed action shall be valid and effective if authorized under the charter by the affirmative vote of a majority of the total number of votes entitled to vote on the proposed action, except as otherwise provided in the charter. Spieker's charter does not contain a provision requiring the affirmative vote of more than a majority of all votes entitled to vote on any proposed merger.

Approval of a merger by Spieker's stockholder's is not required if: (a) the merger does not reclassify or change the terms of any class or series of stock that is outstanding immediately before the merger becomes effective or otherwise amend its charter and (b) the number of shares of its stock of such class or series outstanding immediately after the effective time of the merger does not increase by more than 20% of the number of its shares of the class or series of stock that is outstanding immediately before the merger becomes effective, or there is no stock outstanding or subscribed for and entitled to be voted on the merger.

Spieker's charter provides that the board of directors will, in connection with the exercise of its business judgement involving a business combination or any actual or proposed transaction which would or may involve a change in control of Spieker, in determining what is in the best interests of the Spieker stockholders, give due consideration to all relevant factors, including, but not limited to:

- all economic effect, both immediate and long–term, upon the Spieker stockholders including the effect of not participating in the transaction;

- the social and economic effect on the employees, customers of, and others dealing with Spieker and on the communities in which Spieker operates or is located;

- whether the proposal is acceptable based on the historical and current operating results or financial condition of Spieker;

- the reputation and business practices of the offeror and its management and affiliates as they would affect the employees of Spieker;

- the future value of the stock or any other securities of Spieker;

- any antitrust or other legal and regulatory issues that are raised by the proposed transaction; and

- the business and financial condition and earnings prospects of the acquiring person or entity, including, but not limited to, debt service and other existing financial obligations, financial obligations to be incurred in connection with the acquisition, and other likely financial obligations of the acquiring person or entity.

If, after considering all the relevant factors, the board determines that the proposed business combination or actual or proposed transaction which may involve a change in control of Spieker should be rejected by the Spieker stockholders, the board may take any lawful action to defeat the transaction, including but not limited to advising shareholders not to approve the proposed transaction, instituting

Table of Contents

litigation against the party making the proposal and obtaining a more favorable offer from another individual or entity.

**Dissolution of Equity Office or Spieker; Termination of REIT Status**

*Equity Office.* The Equity Office declaration of trust permits the termination of the existence of Equity Office if approved by the affirmative vote of the holders of not less two–thirds of the outstanding Equity Office shares entitled to vote on the matter. In addition, the board of trustees may terminate the status of Equity Office as a REIT under the Internal Revenue Code for any taxable year without a vote of the holders of Equity Office common or preferred shares.

*Spieker.* Under the Maryland General Corporation Law, Spieker may be dissolved if its board of directors adopts a resolution which declares that dissolution is advisable and directs that the proposed dissolution be submitted for consideration at either an annual or special meeting of the stockholders. Notice which states that a purpose of the meeting will be to act on the proposed dissolution must be given to each stockholder entitled to vote on the proposed dissolution. To be effective, the proposed dissolution must be approved by the stockholders by the affirmative vote of two–thirds of all the votes entitled to be cast.

## Business Combinations with Interested Shareholders

*Equity Office and Spieker.* The Maryland Business Combination Act provides that, unless exempted, a Maryland real estate investment trust or corporation may not engage in business combinations, including mergers, dispositions of 10% or more of its assets, issuances of shares and other specified transactions, with an "interested shareholder" or its affiliates, for five years after the most recent date on which the interested shareholder became an interested shareholder. Thereafter, unless specified "price criteria" and other standards are met or an exemption is available, a business combination with an interested shareholder or its affiliates must be recommended by the board of trustees and approved by (a) at least 80% of the outstanding voting shares and (b) at least two–thirds of the outstanding voting shares, other than voting shares held by the interested shareholder or any of its affiliates. Under the statute, an "interested shareholder" generally is defined to mean a person or group which owns beneficially, directly or indirectly, 10% or more of the outstanding voting shares of the real estate investment trust. These requirements do not apply to a business combination with an interested shareholder or its affiliates if approved by the board of trustees before the time the interested shareholder first became an interested shareholder.

The Equity Office board of trustees has elected by resolution to exempt from the provisions of the Maryland Business Combination Act any business combination with any person. However, this resolution, by its terms, may be altered or repealed at any time, in whole or in part, by the board of trustees. The Spieker board of directors has elected by resolution to exempt from the provisions of the Maryland Business Combination Act the proposed merger.

## Control Share Acquisitions

*Equity Office and Spieker.* The Maryland Control Share Acquisition Act provides that shares of a Maryland real estate investment trust or corporation that are acquired in a "control share acquisition," which is defined as the acquisition of shares comprising one–fifth, one–third or a majority of all voting shares, have no voting rights except:

- if approved by shareholders by the affirmative vote of two–thirds of all the votes entitled to be cast on the matter, excluding all "interested shares;" or

- if the acquisition of the shares has been approved or exempted at any time before the acquisition of the shares.

The Maryland Control Share Acquisition Act is applicable to a publicly traded Maryland real estate investment trust or corporation unless its charter or bylaws specifically provides that it shall be inapplicable.

117

---

Table of Contents

The Equity Office bylaws provide that the Maryland Control Share Act shall not apply to any acquisition by any person of shares of Equity Office. Any amendment to this provision by the board of trustees would require the approval of shareholders by a vote of a majority of the votes cast. See "— Amendment of the Bylaws" on page 115. Neither Spieker's bylaws nor its charter contain such an opt–out provision.

## Other Constituencies

*Equity Office and Spieker.* Maryland law expressly codifies the authority of Maryland real estate investment trusts and Maryland corporations to include in their charters a provision that allows the board of trustees or board of directors to consider the effect of a potential acquisition of control on shareholders, employees, suppliers, customers, creditors and communities in which offices or other establishments of the trust are located. The Equity Office declaration of trust does not include a provision of this type. Maryland law also provides, however, that the inclusion or omission of this type of provision in the declaration of trust of a Maryland real estate investment trust allowing the board of trustees to consider the effect of a potential acquisition of control on the foregoing constituencies does not create an inference concerning factors that may be considered by the board of trustees regarding a potential acquisition of control. As described above in "— Mergers, Consolidations and Sales of Assets — Spieker" beginning on page 116, Spieker's charter includes a provision allowing the board of directors to consider other constituencies in their consideration of a merger proposal.

## Dissenters' Rights

*Equity Office and Spieker.* Maryland law applicable to Maryland real estate investment trusts provides dissenters' rights for any shareholder who objects to a merger to the same extent as a Maryland corporation's stockholders would enjoy dissenters' rights. Therefore, shareholders of both Equity Office and Spieker have the same statutory dissenters' rights. A shareholder has the

right to demand and receive payment of the fair value of his or her shares, unless:

- the shares are listed on a national securities exchange or are designated as a national market security on the interdealer quotation system of the National Association of Securities Dealers, Inc. on the record date for determining shareholders entitled to vote on the merger; or

- the shares are those of a successor entity, as long as the merger does not alter the contract rights of the shares as expressly provided by the declaration of trust and the shares are converted in whole or in part in the merger into stock, including preferred stock, of the successor entity or cash, scrip, or other rights or interests arising out of the treatment of fractional shares.

**Distributions**

*Equity Office.* The Equity Office declaration of trust provides that the trustees will endeavor to declare and pay distributions as necessary for Equity Office to qualify as a REIT under the Internal Revenue Code. However, shareholders do not have any right to a distribution unless and until authorized and declared by the Equity Office board of trustees. Distributions may not be paid on the Equity Office common shares unless all accrued but unpaid distributions on each outstanding series of preferred shares of Equity Office have been declared and paid or set apart for payment. Payments of distributions by Equity Office are not limited by any rules concerning the capital or surplus of Equity Office or the par value of the Equity Office shares.

*Spieker.* The Maryland General Corporation Law provides that the board of directors may not make a distribution of money or property to its stockholders if the distribution would prevent the corporation from paying its debts as they became due in the ordinary course of business or, unless and to the extent specifically allowed by the corporation's charter, if after the distribution, the corporation's total assets would be less than the sum of its total liabilities plus the amount that would be needed, if the corporation were to be dissolved at the time of the distribution, to satisfy the preferential rights to distributions upon

118

---

Table of Contents

dissolution of the corporation's shareholders whose rights upon dissolution are superior to those receiving the distribution.

**Shareholder Rights Plans**

*Equity Office.* Equity Office has not adopted a shareholder rights plan.

*Spieker.* On September 9, 1998, Spieker adopted a shareholder rights plan. On that date, the Spieker board of directors declared a dividend payable on September 30, 1998 of one right for each outstanding share of Spieker common stock held of record at the close of business on September 30, 1998. Shares of Spieker common stock issued thereafter and prior to the separation time, as described below, will have an attached right. The Spieker board of directors adopted the Rights Agreement for the purpose of protecting stockholders against attempts to acquire control of Spieker by means of a hostile tender offer made at less than a full and fair price and other takeover tactics that can be used to deprive stockholders of the ability to get a full and fair price for all of their shares.

The separation time will occur upon the earlier of:

- 10 days following the date any entity commences a tender or exchange offer which, if completed, would result in that entity becoming an acquiring person, as described below.

- 10 days following a public announcement that an entity has become an acquiring person.

An acquiring person is any person or entity which beneficially owns 15% or more of the Spieker common stock, with some exceptions. The Spieker board of directors may shorten or lengthen the 10–day time period by resolution before the expiration of the 10–day period, in which case the separation time will be the date determined by the Spieker board of directors. If a tender offer or exchange offer is cancelled or terminated before the separation time without the purchase or exchange of any shares of Spieker common stock, the offer will be deemed not to have been made.

Until the separation time, Spieker common stock certificates will evidence the rights, and the rights will be transferred with and only with the Spieker common stock. After the separation time, the rights agent will mail separate rights certificates to holders of Spieker common stock, and the rights may trade separately.

The rights will become exercisable one business day following the separation time. In that event, each right, other than rights beneficially owned by the acquiring person, shall entitle the holder to purchase for an exercise price of $140 a number of shares of Spieker common stock having a market value of $280.

The Spieker board of directors may also elect, at any time after the separation time and before the acquiring person becomes the beneficial owner of 50% of the Spieker common stock, to exchange each outstanding right for one share of Spieker common stock or one one–hundredth of a share of Spieker participating preferred stock. The Spieker board of directors may, at its option, at any time before the separation time, redeem all of the outstanding rights at a price of $.01 per right. Immediately upon the action of the Spieker board of directors electing to redeem the rights, without any further action and without any notice, the right to exercise the rights will terminate and each right will thereafter represent only the right to receive the redemption price in cash.

The rights will expire on the earliest of (1) the close of business on September 30, 2008, (2) the date on which the rights are redeemed, (3) the date the Spieker board of directors elects to exchange the rights for Spieker common stock or Spieker participating preferred stock or (4) the date of Spieker's merger into another corporation pursuant to an agreement entered into before the public announcement that a person has become an acquiring person.

The exercise price and the number of rights outstanding, or in some circumstances the securities purchasable upon exercise of the rights, are subject to adjustment from time to time to prevent dilution in the event of a stock split or the distribution of any securities or assets in respect of, instead of or in exchange for Spieker common stock.

119

---

Table of Contents

If at any time following the date of the public announcement that a person has become an acquiring person, either Spieker is acquired in a merger or other business combination in which it is not the surviving corporation or 50% or more of Spieker's assets, cash flow or earning power is sold or transferred, then each holder of a right would be entitled to receive, upon exercise, common stock of the acquiring company having a value equal to two times the exercise price of the right.

The Spieker shareholder rights plan will terminate immediately before the merger but will otherwise remain in full force and effect until such time.

## REIT Ownership Limitations

*Equity Office.* For Equity Office to qualify as a REIT under the Internal Revenue Code, no more than 50% in value of its outstanding shares of beneficial interest may be owned, actually or constructively, by five or fewer "individuals," which, as defined in the Internal Revenue Code for this purpose, includes some entities. In addition, if Equity Office, or an actual or constructive owner of 10% or more of the shares of Equity Office, owns, actually or constructively, 10% or more of a tenant of Equity Office, then the rent received by Equity Office from that "related party tenant" will not be qualifying income for purposes of determining whether Equity Office meets the requirements for qualification as a REIT under the Internal Revenue Code unless the tenant is a taxable REIT subsidiary and specified requirements are met. A REIT's shares also must be beneficially owned by 100 or more persons.

As a means of addressing these requirements, Article VII of the Equity Office declaration of trust provides that, subject to exceptions, no person may own, or be deemed to own directly and/or by virtue of the attribution provisions of the Internal Revenue Code, more than 9.9%, in value or number of shares, whichever is more restrictive, of the issued and outstanding shares of any class or series of shares. Under the Equity Office declaration of trust, the board of trustees may increase the ownership limit with respect to any class or series of shares. After giving effect to this increase, however, five beneficial owners of common shares may not beneficially own in the aggregate more than 49.5% of the outstanding common shares. In addition, the Equity Office board of trustees is required to waive or modify the ownership limit with respect to one or more persons who would not be treated as "individuals" under the Internal Revenue Code if such person submits to the Equity Office board of trustees specified information that demonstrates, to the reasonable satisfaction of the board of trustees, that such ownership would not jeopardize Equity Office's status as a REIT under the Internal Revenue Code. The Equity Office declaration of trust further prohibits any person from transferring any Equity Office common or preferred shares if the transfer would result in shares of beneficial interest of Equity Office being owned by fewer than 100 persons or otherwise would cause Equity Office not to qualify as a REIT.

If any transfer of shares or any other event would otherwise result in any person violating the ownership limits, then the declaration of trust provides that (a) the transfer will be void and of no force or effect with respect to the prohibited transferee with respect to that number of shares that exceeds the ownership limits and (b) the prohibited transferee would not acquire any right or interest in the shares. The shares transferred in violation of the ownership limit instead would be transferred automatically to a charitable trust, the beneficiary of which would be a qualified charitable organization selected by Equity Office.

The trustee of the charitable trust would be required to sell the shares transferred in violation of the ownership limit to a person or entity who could own the shares without violating the ownership limit, and to distribute to the prohibited transferee an amount equal to the lesser of the price paid by such person for the shares transferred in violation of the ownership limit or the sales proceeds received by the charitable trust for the shares. In the case of a transfer for no consideration, such as a gift, the charitable trustee would be required to sell the shares to a qualified person or entity and distribute to the prohibited transferee an amount equal to the lesser of the fair market value of the shares as of the date of the prohibited transfer or the sales proceeds received by the charitable trust.

Under its declaration of trust, Equity Office, or its designee, would have the right to purchase the shares from the charitable trust at a price per share equal to the lesser of (a) the price per share in the

120

---

Table of Contents

transaction that resulted in the transfer of the shares to the charitable trust, or, in the case of a devise or gift, the market price at the time of such devise or gift, and (b) the market price of such shares on the date Equity Office, or its designee, were to agree to

purchase the shares. Any proceeds derived from the sale of the shares in excess of the amount distributed to the prohibited transferee under these provisions would be distributed to the beneficiary of the charitable trust.

The charitable trustee will have the sole right to vote the shares that it holds, and any distributions paid on shares held by the charitable trustee would be paid to the beneficiary of the charitable trust.

If the transfer to the charitable trust of the shares that were transferred in violation of the ownership limit is not automatically effective for any reason, then the transfer that resulted in the violation of the ownership limit would be void.

All persons or entities who own, directly or by virtue of the attribution provisions of the Internal Revenue Code, more than 5%, or such other percentage between 1/2 of 1% and 5% as provided in applicable rules and regulations under the Internal Revenue Code, of the lesser of the number or value of the outstanding Equity Office shares must give a written notice to Equity Office by January 30 of each year stating the name and address of such owner, the number of Equity Office shares owned and a description of the manner in which such Equity Office shares are held. In addition, a holder of record of Equity Office shares subject to the foregoing requirement who holds its Equity Office shares as nominee for another person or entity which is required to include in gross income the dividends received on such shares must also give notice of the name and address of such person or entity and the number of Equity Office shares of such person or entity with respect to which such holder of record is nominee. In addition, each record, beneficial and constructive holder of Equity Office shares is required, upon demand of Equity Office, to disclose to Equity Office in writing any information with respect to the direct, indirect and constructive ownership of Equity Office shares as the Equity Office board of trustees deems necessary to comply with the provisions of the Internal Revenue Code applicable to REITs, to comply with the requirements of any taxing authority or governmental agency or to determine any such compliance.

The Equity Office declaration of trust contains an additional limitation on the ownership by non–U.S. persons of Equity Office common and preferred shares, other than preferred shares issued and outstanding as of June 19, 2000, and the common shares into which such preferred shares may be converted. This limitation restricts the direct or indirect acquisition or ownership of Equity Office shares if, as a result of the acquisition or ownership, non–U.S. persons would own directly or indirectly 43% or more of the fair market value of the issued and outstanding Equity Office shares. If any transfers of Equity Office shares occur that would result in non–U.S. persons owning directly or indirectly 43% or more of the fair market value of the issued and outstanding Equity Office shares as described above, then the number of shares that would cause a non–U.S. person to violate this restriction are automatically transferred to a charitable trust, or if transfer to a charitable trust would not be effective to prevent violation of this restriction, then the transfer of shares will be void.

As part of the merger, the Equity Office declaration of trust will be amended to allow for the board to exempt one or more series of preferred stock issued in connection with their issuance in a business combination from these ownership limitations and restrictions on transfer under specified circumstances. See "Approval of Amendments to Equity Office's Declaration of Trust" beginning on page 93.

The foregoing restrictions on ownership and transferability would not apply if the Equity Office board of trustees were to determine that it is no longer in the best interests of Equity Office to attempt to qualify, or to continue to qualify, as a REIT under the Internal Revenue Code.

For a description of the ownership limitations and transfer restrictions that will apply to the Equity Office series E, F and H preferred shares, see "Description of Equity Office Shares of Beneficial Interest — REIT Ownership Limitations and Transfer Restrictions Applicable to Equity Office Series E, F and H Preferred Shares" on page 104.

*Spieker.* To enable Spieker to continue to qualify as a REIT, Spieker's charter restricts the ownership of shares of common stock and preferred stock. Spieker's charter provides that, subject to

121

Table of Contents

exceptions specified in the charter, no stockholder may own more than 9.9% of the value of the outstanding common stock and preferred stock. Spieker's board may waive this ownership limit in some limited situations if the Board receives a ruling of the Internal Revenue Service or an opinion of counsel to the effect that such ownership will not jeopardize Spieker's status as a REIT for federal income tax purposes. As a condition to such waiver, the board may require representations and undertakings from the applicant with respect to preserving the REIT status of Spieker. The ownership limit will not apply if the board and the stockholders of Spieker determine that it is no longer in the best interests of Spieker to attempt to qualify, or to continue to qualify, as a REIT. If the issuance or transfer of shares of common stock or preferred stock to any person would cause such person to exceed the ownership limit (unless a waiver of the board has been obtained) would cause Spieker to be beneficially owned by fewer than 100 persons or cause Spieker to become "closely held" under Section 856(h) of the Internal Revenue Code, such issuance or transfer shall be null and void and the intended transferee will acquire no rights to such shares.

Spieker's charter also provides that shares involved in a transfer or change in capital structure that results in a person owning in excess of the ownership limit, unless a waiver of the board has been obtained, or would cause Spieker to become "closely held" within the meaning of Section 856(h) of the Internal Revenue Code will automatically be exchanged for excess stock. All excess stock will be transferred, without action by the stockholder, to Spieker as trustee of a trust for the exclusive benefit of the transferee or transferees to whom the excess stock is ultimately transferred. While the excess stock is held in trust, it will not be entitled to vote, it will not be considered for purposes of any stockholder vote or the determination of a quorum for such vote and

it will not be entitled to participate in any distributions made by Spieker, except upon liquidation. Spieker would have the right, for a period of 90 days during the time the excess stock is held by Spieker in trust, to purchase all or any portion of the excess stock from the intended transferee at the lesser of the price paid for the stock by the intended transferee and the closing market price for the stock on the date Spieker exercises its option to purchase.

The ownership limit provision in Spieker's charter will not be automatically removed even if the REIT provisions of the Internal Revenue Code are changed so as to no longer contain any ownership concentration limitation or if the ownership concentration limitation is increased. Except as otherwise described above, any change in the ownership limit would require an amendment to the charter. An amendment to the charter increasing the ownership limit requires the affirmative vote of holders owning a majority of the total number of shares of all classes of stock outstanding and entitled to vote on the amendment.

All certificates representing shares of common stock and preferred stock bear a legend referring to the restrictions described above.

All persons who own of record more than 5% of the outstanding common stock and preferred stock (or 1% if there are more than 200 but fewer than 2,000 shareholders or one–half of 1% if there are 200 or less shareholders of record) must file an affidavit with Spieker containing the information specified in Spieker's charter within 30 days after January 1 of each year. In addition, each shareholder will upon demand be required to disclose to Spieker in writing such information with respect to the direct, indirect and constructive ownership of shares as the Spieker board deems necessary to determine Spieker's status as a REIT and to ensure compliance with the ownership limit.

## LEGAL MATTERS

The validity of the Equity Office common and preferred shares offered by this joint proxy statement/ prospectus will be passed upon for Equity Office by Hogan & Hartson L.L.P., Washington, D.C. and New York, New York.

The qualification of the merger as a reorganization under section 368(a) of the Internal Revenue Code and the qualification of Equity Office as a REIT for federal income tax purposes will be passed upon for Equity Office by Hogan & Hartson L.L.P., Washington, D.C. and New York, New York.

122

---

Table of Contents

The qualification of the merger as a reorganization under section 368(a) of the Internal Revenue Code will be passed upon for Spieker by Sullivan & Cromwell, New York, New York. The qualification of Spieker as a REIT for federal income tax purposes will be passed upon for Spieker by Morrison & Foerster LLP, San Francisco, California, special tax counsel for Spieker.

## EXPERTS

Ernst & Young LLP, independent auditors, have audited the Equity Office consolidated financial statements and schedule included in its Annual Report on Form 10–K, as amended, for the year ended December 31, 2000, as set forth in their report, which is incorporated by reference in this joint proxy statement/ prospectus and elsewhere in the registration statement. The Equity Office financial statements and schedule are incorporated by reference in reliance on Ernst & Young LLP's report, given on their authority as experts in accounting and auditing.

The audited financial statements and schedule of Spieker incorporated by reference in this prospectus and elsewhere in the registration statement to the extent and for the periods indicated in their report have been audited by Arthur Andersen LLP, independent public accountants, and are included herein in reliance upon the authority of said firm as experts in accounting and auditing in giving said report.

## SHAREHOLDER PROPOSALS

Shareholder proposals intended to be presented at the 2002 annual meeting of Equity Office shareholders must have been received by the Secretary of Equity Office no later than December 17, 2001, to be considered for inclusion in its proxy statement relating to the 2002 meeting.

To be considered for inclusion in the proxy statement relating to the Equity Office 2002 meeting, shareholder proposals submitted outside the Rule 14a–8 processes must have been received by the Secretary of Equity Office no earlier than February 21, 2002 and no later than March 25, 2002 to be presented at the 2002 annual meeting of shareholders, and discretionary authority may be used if untimely submitted.

Due to the proposed merger, Spieker does not currently expect to hold a 2001 annual meeting of stockholders because Spieker will be merged with and into Equity Office and it will cease to exist as a separate legal entity. If the merger is not completed and an annual meeting is held, to be eligible for inclusion in Spieker's proxy statement and form of proxy relating to that meeting, proposals of stockholders intended to be presented at the meeting must be received by Spieker within a reasonable period of time after Spieker announces publicly the date of the meeting and before Spieker mails its proxy statement to stockholders in

connection with the meeting.

## OTHER MATTERS

As of the date of this joint proxy statement/ prospectus, neither the board of trustees of Equity Office nor the board of directors of Spieker knows of any matters that will be presented for consideration at either special meeting other than those described in this joint proxy statement/ prospectus. If any other matters properly come before either of the special meetings or any adjournments or postponements of either of the special meetings, and are voted upon, the enclosed proxies will confer discretionary authority on the individuals named as proxies to vote the shares represented by those proxies as to any other matters. Those individuals named in the Equity Office proxies intend to vote or not vote consistent with the recommendation of the management of Equity Office. Those individuals named as proxies in the Spieker proxies intend to vote or not vote consistent with the recommendation of the management of Spieker.

123

---

**Table of Contents**

## WHERE YOU CAN FIND MORE INFORMATION

Equity Office has filed with the SEC a registration statement on Form S-4, as amended (333-57526), of which this joint proxy statement/ prospectus forms a part. The registration statement registers the distribution to Spieker common stockholders of the Equity Office common shares to be issued in connection with the merger. The registration statement, including the attached exhibits and schedules, contains additional relevant information about Equity Office common shares. The rules and regulations of the SEC allow us to omit some information included in the registration statement from this joint proxy statement/ prospectus. In addition, Equity Office and Spieker file reports, proxy statements and other information with the SEC under the Securities Exchange Act of 1934. You may read and copy any of this information at the following locations of the SEC:

| | | |
|---|---|---|
| Public Reference Room<br>450 Fifth Street, N.W.<br>Room 1024<br>Washington, D.C. 20549 | New York Regional Office<br>7 World Trade Center<br>Suite 1300<br>New York, NY 10048 | Chicago Regional Office<br>Citicorp Center<br>500 West Madison Street<br>Suite 1400<br>Chicago, IL 60661-2511 |

You may obtain information on the operation of the SEC's Public Reference Room by calling the SEC at 1-800-SEC-0330.

The SEC also maintains an Internet web site that contains reports, proxy statements and other information regarding issuers, including Equity Office and Spieker, who file electronically with the SEC. The address of that site is http://www.sec.gov. Reports, proxy statements and other information concerning Equity Office and Spieker may also be inspected at the offices of the New York Stock Exchange, which are located at 20 Broad Street, New York, New York 10005.

The SEC allows Equity Office and Spieker to "incorporate by reference" information in this document, which means that the companies can disclose important information to you by referring you to another document filed separately with the SEC. The information incorporated by reference is considered to be a part of this joint proxy statement/ prospectus, except for any information that is superseded by information included directly in this document.

The documents listed below that Equity Office and Spieker have previously filed with the SEC are considered to be a part of this joint proxy statement/ prospectus. They contain important business and financial information about the companies that is not included in or delivered with this document.

**Equity Office SEC Filings (File No. 1-13115):**

| | |
|---|---|
| 2000 Annual Report on Form 10-K | Filed on March 23, 2001 |
| Amendment to Form 10-K on Form 10-K/A | Filed on June 6, 2001 |
| Quarterly Report on Form 10-Q for the quarter ended March 31, 2001 | Filed on May 15, 2001 |
| Amendment to Quarterly Report on Form 10-Q for the quarter ended March 31, 2001 on Form 10-Q/A | Filed on June 6, 2001 |
| Current Reports on Form 8-K | Filed on March 23, 2001 and March 9, 2001 |
| Registration Statement on Form 8-A | Filed on June 19, 1997, setting forth the description of Equity Office common shares, including any amendments or reports filed for the purpose of updating such description |

124

Table of Contents

Spieker SEC Filings (File No. 1–12528):

| | |
|---|---|
| 2000 Annual Report on Form 10–K | Filed on March 23, 2001 |
| Amendment to Form 10–K on Form 10–K/A | Filed on June 6, 2001 |
| Quarterly Report on Form 10–Q for the quarter ended March 31, 2001 | Filed on May 15, 2001 |
| Current Reports on Form 8–K | Filed on March 9, 2001 and June 4, 2001 |
| Registration Statement on Form 8–A | Filed on November 3, 1993, setting forth the description of the Spieker common stock, including any amendments or reports filed for the purpose of updating such description |

Equity Office and Spieker incorporate by reference additional documents that either company may file with the SEC between the date of this joint proxy statement/ prospectus and the date of each company's special meeting. These include periodic reports, such as Annual Reports on Form 10–K, Quarterly Reports on Form 10–Q and Current Reports on Form 8–K, as well as proxy materials.

Equity Office has supplied all information contained or incorporated by reference in this joint proxy statement/prospectus relating to Equity Office, as well as all pro forma financial information, and Spieker has supplied all information contained or incorporated by reference in this joint proxy statement/ prospectus relating to Spieker. This document constitutes the prospectus of Equity Office and a joint proxy statement of Spieker and Equity Office.

## WHAT INFORMATION YOU SHOULD RELY ON

**No person has been authorized to give any information or to make any representation that differs from, or adds to, the information discussed in this joint proxy statement/ prospectus or in the annexes attached hereto which are specifically incorporated by reference. Therefore, if anyone gives you different or additional information, you should not rely on it.**

**This document is dated June 6, 2001. The information contained in this joint proxy statement/ prospectus speaks only as of its date unless the information specifically indicates that another date applies. This joint proxy statement/ prospectus does not constitute an offer to exchange or sell, or a solicitation of an offer to exchange or purchase, Equity Office common shares or Spieker common stock or to ask for proxies, to or from any person to whom it is unlawful to direct these activities.**

125

---

Table of Contents

## EQUITY OFFICE PROPERTIES TRUST

## PRO FORMA CONDENSED COMBINED FINANCIAL STATEMENTS

### As of and for the three months ended March 31, 2001
### and for the year ended December 31, 2000
### (Unaudited)

The accompanying Unaudited Pro Forma Condensed Combined Balance Sheet as of March 31, 2001 is presented as if the proposed merger of Equity Office Properties Trust and Spieker Properties, Inc. had occurred on March 31, 2001. The accompanying Unaudited Pro Forma Condensed Combined Statements of Operations for the three months ended March 31, 2001 and for the year ended December 31, 2000 reflect the proposed merger of Equity Office Properties Trust and Spieker Properties, Inc. as if the merger had occurred on January 1, 2000.

In the opinion of management, all significant adjustments necessary to reflect the effects of the merger have been made.

F–1

---

Table of Contents

## EQUITY OFFICE PROPERTIES TRUST

## PRO FORMA CONDENSED COMBINED BALANCE SHEET

### MARCH 31, 2001 (Unaudited)
### (Dollars in thousands)

| | Equity Office Properties Trust Historical | Spieker Properties, Inc. Historical | Merger Adjustments(A) | Equity Office Properties Trust Pro Forma |
|---|---|---|---|---|
| **ASSETS:** | | | | |
| Investment in real estate, net | $ 16,612,557 | $ 4,360,358 | $2,821,918 (B) | $ 23,794,833 |
| Cash and cash equivalents | 37,610 | 37,034 | — (C) | 74,644 |
| Rent and other receivables | 306,835 | 51,425 | (41,245)(D) | 317,015 |
| Escrow deposits and restricted cash | 45,131 | | | 45,131 |
| Investment in unconsolidated joint ventures | 1,135,205 | 18,098 | (1,938)(E) | 1,151,365 |
| Prepaid expenses and other assets, net | 585,960 | 147,871 | (73,930)(F) | 659,901 |
| **Total Assets** | $ 18,723,298 | $ 4,614,786 | $2,704,805 | $ 26,042,889 |
| **LIABILITIES, MINORITY INTERESTS, REDEEMABLE COMMON SHARES AND SHAREHOLDERS' EQUITY:** | | | | |
| Mortgage debt, net | $ 2,784,255 | $ 51,785 | $ — | $ 2,836,040 |
| Unsecured notes, net | 5,836,404 | 1,936,500 | (18,500)(G) | 7,754,404 |
| Lines of credit | 37,500 | 94,632 | 1,186,573 (H) | 1,318,705 |
| Distribution payable | 160,679 | 55,178 | — | 215,857 |
| Other liabilities | 596,574 | 210,101 | — | 806,675 |
| **Total Liabilities** | 9,415,412 | 2,348,196 | 1,168,073 | 12,931,681 |
| Commitments and contingencies | | | | |
| Minority Interests | | | | |
| EOP Partnership | 995,943 | 288,603 | 202,389 (I) | 1,486,935 |
| Partially owned properties | 198,280 | — | — | 198,280 |
| **Total Minority Interests** | 1,194,223 | 288,603 | 202,389 | 1,685,215 |
| **Redeemable Common Shares** | 54,122 | — | | 54,122 |
| Shareholders' Equity: | | | | |
| Preferred shares | 613,423 | 368,373 | (12,123)(J) | 969,673(J) |
| Common shares | 3,073 | 6 | 1,005 (K) | 4,084 |
| Additional paid in capital | 7,443,045 | 1,609,608 | 1,345,461 (L) | 10,398,114 |
| **Total Shareholders' Equity** | 8,059,541 | 1,977,987 | 1,334,343 | 11,371,871 |
| **Total Liabilities, Minority Interests, Redeemable Common Shares and Shareholders' Equity** | $ 18,723,298 | $ 4,614,786 | $2,704,805 | $ 26,042,889 |

F–2

**Table of Contents**

## EQUITY OFFICE PROPERTIES TRUST

## PRO FORMA CONDENSED COMBINED STATEMENT OF OPERATIONS

### FOR THE THREE MONTHS ENDED MARCH 31, 2001 (Unaudited)
#### (Dollars in thousands, except per share data)

| | Equity Office Properties Trust Historical | Spieker Properties, Inc. Historical | Merger Adjustments(A) | Equity Office Properties Trust Pro Forma |
|---|---|---|---|---|
| **Revenues:** | | | | |
| Rental | $ 509,135 | $ 158,348 | $ 4,601 (M) | $ 672,084 |
| Tenant reimbursements | 97,321 | 48,978 | — | 146,299 |
| Parking | 30,590 | — | — | 30,590 |
| Other | 13,163 | 1,792 | — | 14,955 |
| Fee income | 2,172 | 322 | — | 2,494 |
| Interest/dividends | 10,835 | 958 | — | 11,793 |
| Total revenues | 663,216 | 210,398 | 4,601 | 878,215 |
| **Expenses:** | | | | |
| Interest: | | | | |
| Expense incurred | 157,940 | 33,395 | 18,724 (N) | 210,059 |

|  |  |  |  |  |
|---|---|---|---|---|
| Amortization of deferred financing costs | 1,326 | 746 | (746)(O) | 1,326 |
| Depreciation | 114,566 | 30,333 | 14,110 (P) | 159,009 |
| Amortization | 9,082 | 3,857 | (3,857)(Q) | 9,082 |
| Real estate taxes | 76,662 | 12,889 | — | 89,551 |
| Insurance | 3,307 | 1,784 | — | 5,091 |
| Repairs and maintenance | 65,600 | 17,094 | — | 82,694 |
| Property operating | 69,022 | 22,990 | — | 92,012 |
| Ground rent | 3,081 | — | — | 3,081 |
| General and administrative | 25,639 | 7,639 | —  (R) | 33,278 |
| Total expenses | 526,225 | 130,727 | 28,231 | 685,183 |
| Income before allocation to minority interests, income from investment in unconsolidated joint ventures, net gain on sales of real estate and cumulative effect of a change in accounting principle | 136,991 | 79,671 | (23,630) | 193,032 |
| Minority Interests: |  |  |  |  |
| EOP Partnership | (16,282) | (12,116) | 2,360 (S) | (26,038) |
| Partially owned properties | (3,253) | — | — | (3,253) |
| Income from investment in unconsolidated joint ventures | 15,426 | — | — | 15,426 |
| Net gain on sales of real estate | — | 20,516 | — | 20,516 |
| Net income from continuing operations | 132,882 | 88,071 | (21,270) | 199,683 |
| Preferred distributions | (10,884) | (8,317) | 854 (T) | (18,347) |
| Net income from continuing operations before cumulative effect of a change in accounting principle available for common shares | $    121,998 | $    79,754 | $ (20,416) | $    181,336 |
| Net income from continuing operations before cumulative effect of a change in accounting principle per weighted average common share outstanding — basic | $    0.40 |  |  | $    0.44 (U) |
| Weighted average common shares outstanding — basic | 306,971,084 |  |  | 408,581,209 |
| Net income from continuing operations before cumulative effect of a change in accounting principle per weighted average common share and common share equivalent outstanding — diluted | $    0.39 |  |  | $    0.44 (U) |
| Weighted average common shares and common share equivalents outstanding — diluted | 351,400,853 |  |  | 470,172,726 |

F–3

Table of Contents

## EQUITY OFFICE PROPERTIES TRUST

## PRO FORMA CONDENSED COMBINED STATEMENT OF OPERATIONS

### FOR THE YEAR ENDED DECEMBER 31, 2000 (Unaudited)
(Dollars in thousands, except per share data)

|  | Equity Office Properties Trust Historical | Spieker Properties, Inc. Historical | Merger Adjustments(A) | Equity Office Properties Trust Pro Forma |
|---|---|---|---|---|
| **Revenues:** |  |  |  |  |
| Rental | $    1,732,799 | $ 556,330 | $    4,966 (M) | $    2,294,095 |
| Tenant reimbursements | 324,193 | 188,169 | — | 512,362 |
| Parking | 112,107 | — | — | 112,107 |
| Other | 48,047 | 3,839 | — | 51,886 |
| Fee income | 10,931 | 1,535 | — | 12,466 |
| Interest/dividends | 36,166 | 3,963 | — | 40,129 |
| Total revenues | 2,264,243 | 753,836 | 4,966 | 3,023,045 |
| **Expenses:** |  |  |  |  |

| | | | | |
|---|---:|---:|---:|---:|
| Interest: | | | | |
| Expense incurred | 525,787 | 130,773 | 74,895 (N) | 731,455 |
| Amortization of deferred financing costs | 9,746 | 2,267 | (2,267)(O) | 9,746 |
| Depreciation | 399,768 | 123,027 | 56,438 (P) | 579,233 |
| Amortization | 26,903 | 14,789 | (14,789)(Q) | 26,903 |
| Real estate taxes | 268,305 | 51,533 | — | 319,838 |
| Insurance | 12,214 | 5,666 | — | 17,880 |
| Repairs and maintenance | 234,986 | 65,618 | — | 300,604 |
| Property operating | 238,490 | 91,478 | — | 329,968 |
| Ground rent | 10,012 | — | — | 10,012 |
| General and administrative | 91,415 | 28,822 | — (R) | 120,237 |
| Total expenses | 1,817,626 | 513,973 | 114,277 | 2,445,876 |
| Income before allocation to minority interests, income from investment in unconsolidated joint ventures, net gain on sale of real estate and extraordinary items | 446,617 | 239,863 | (109,311) | 577,169 |
| Minority Interests: | | | | |
| EOP Partnership | (59,376) | (46,450) | 12,140 (S) | (93,686) |
| Partially owned properties | (6,843) | — | — | (6,843) |
| Income from investment in unconsolidated joint ventures | 56,251 | — | — | 56,251 |
| Net gain on sales of real estate | 36,013 | 140,051 | — | 176,064 |
| Net income from continuing operations | 472,662 | 333,464 | (97,171) | 708,955 |
| Put option settlement | (2,576) | — | — | (2,576) |
| Preferred distributions, net | (43,348) | (33,269) | 3,415 (T) | (73,202) |
| Net income from continuing operations before extraordinary items available for common shares | $ 426,738 | $ 300,195 | $ (93,756) | $ 633,177 |
| Net income from continuing operations before extraordinary items per weighted average common share outstanding — basic | $ 1.54 | | | $ 1.67 (U) |
| Weighted average common shares outstanding — basic | 277,186,733 | | | 378,765,944 |
| Net income from continuing operations before extraordinary items per weighted average common share and common share equivalent outstanding — diluted | $ 1.53 | | | $ 1.66 (U) |
| Weighted average common shares and common share equivalents outstanding — diluted | 318,997,407 | | | 437,738,366 |

F–4

---

Table of Contents

## EQUITY OFFICE PROPERTIES TRUST

### NOTES TO PRO FORMA CONDENSED COMBINED FINANCIAL STATEMENTS

#### MARCH 31, 2001 (Unaudited)
#### (Dollars in thousands, except per share data)

(A)  Represents adjustments to record the merger between Equity Office and Spieker based upon the assumed purchase price of $7.3 billion assuming a market value of $29.2945 per share of Equity Office's common shares. The calculation of the merger acquisition cost is as follows:

| | |
|---|---:|
| Issuance of 100.5 million Equity Office common shares based on a 1.49586 exchange ratio in exchange for 67.2 million shares of Spieker common stock (see Note I) | $2,944,326 |
| Issuance of 17.2 million EOP Partnership redeemable units based on a 1.94462 exchange ratio in exchange for 8.8 million units of Spieker Partnership (see Note I) | 502,746 |
| Payment of $13.50 per share of Spieker common stock outstanding | 907,072 |
| Issuance of 4,250,000 9.45% series E preferred shares of Equity Office in exchange for 4,250,000 shares of 9.45% series B preferred stock of Spieker | 106,250 |
| Issuance of 6,000,000 7.875% series F preferred shares of Equity Office in exchange for 6,000,000 shares of 7.875% series C preferred stock of Spieker | 150,000 |
| Issuance of 4,000,000 8.0% series H preferred shares of Equity Office in exchange for 4,000,000 shares of 8.00% series E preferred stock of Spieker | 100,000 |

| | |
|---|---|
| Assumption of Spieker's total liabilities | 2,348,196 |
| Adjustment to Spieker's unsecured notes to reflect fair value (see Note G) | (18,500) |
| Assumed borrowing by Spieker to redeem the Spieker Partnership series D preferred units prior to the merger | 69,750 |
| Payment to Spieker stock option holders to redeem 5,630,879 stock options at $58.50 each less the weighted average exercise price of $34.78 per option plus an additional $2.2 million for employer's share of social security tax on the redemption amounts (assumes all option holders accept the cash tender offer) | 135,821 |
| Merger costs (see calculation below) | 73,930 |
| Total merger acquisition cost | $7,319,591 |

The following is a calculation of estimated merger costs:

| | |
|---|---|
| Employee termination costs | $40,955 |
| Investment advisory fees | 15,000 |
| Transfer taxes | 5,000 |
| Legal, accounting and other fees | 12,975 |
| Total merger costs | $73,930 |

(B) Represents the estimated increase over Spieker's investment in real estate based upon the merger acquisition cost to reflect the allocation to other tangible assets of Spieker being acquired:

| | |
|---|---|
| Merger acquisition cost (see Note A) | $7,319,591 |
| Less basis of Spieker's net assets acquired: | |
| Investment in real estate, net | 4,360,358 |
| Cash and cash equivalents | 37,034 |
| Rents and other receivables (excluding $41.2 million of deferred rents receivable) | 10,180 |
| Investment in unconsolidated joint ventures (excluding $1.9 million relating to Spieker Northwest, Inc. (see Note E)) | 16,160 |
| Prepaid expenses and other assets (excluding $73.9 million of deferred leasing and financing costs (see Note F)) | 73,941 |
| Subtotal | 4,497,673 |
| Adjustment to record fair value of Spieker's investment in real estate, net | $2,821,918 |

F—5

Table of Contents

**EQUITY OFFICE PROPERTIES TRUST**

**NOTES TO PRO FORMA CONDENSED COMBINED FINANCIAL STATEMENTS — (Continued)**

(C) There was no change in cash and cash equivalents as a result of the following transactions:

| | |
|---|---|
| Anticipated borrowings on a bridge loan credit facility and the current line of credit to finance the cash portion of the merger consideration, the redemption of all outstanding Spieker stock options, the redemption of all Spieker Partnership series D preferred units and the merger costs (see Note H) | $1,186,573 |
| Less cash portion of merger consideration, the redemption of all outstanding Spieker stock options, the redemption of all Spieker Partnership series D preferred units and the merger costs (see Note A) | (1,186,573) |
| Net adjustment to cash and cash equivalents | $ — |

(D) Represents the elimination of Spieker's deferred rent receivable of $41.2 million, which arose from the historical straight lining of rental revenue.

(E) Adjustment to consolidate Spieker Northwest, Inc. as a result of the acquisition of 100% of its voting stock and 5% of its non–voting capital stock by Equity Office Properties Management Corp., a wholly owned subsidiary of EOP Partnership, for approximately $0.2 million. In addition to third party management contracts, which are expected to terminate at the closing of the mergers, Spieker Northwest, Inc. owns 85,114 square feet of office and industrial property, which had total revenues of $0.9 million for the year ended December 31, 2000 and $0.3 million for the three months ended March 31, 2001. The $0.2 million purchase price for Spieker Northwest, Inc. is included in the total merger cost of $73.9 million and has been allocated to investment in real estate, net (See Note A). The $1.9 million adjustment represents Spieker's historical equity investment in Spieker Northwest, Inc. The adjustment to the pro forma balance sheet as a result of the acquisition of Spieker Northwest,