Inc. is as follows:

| | |
|---|---:|
| Investment in real estate, net (see Note B) | $2,140 |
| Investment in unconsolidated joint ventures | $(1,938) |
| Lines of credit (see Notes A and C) | $(202) |

(F)  Represents an adjustment to write–off Spieker's deferred financing and leasing costs of $73.9 million, which were not assigned any value in the allocation of the merger acquisition cost.

(G)  To adjust Spieker's unsecured notes to fair value.

(H)  To reflect borrowings on existing and additional credit facilities to finance the cash portion of the merger consideration, the redemption of all outstanding Spieker stock options, the redemption of all Spieker Partnership series D preferred units and the merger costs as follows:

| | |
|---|---:|
| Cash portion of merger consideration (see Note A) | $907,072 |
| Payment to Spieker stock option holders to redeem all outstanding Spieker stock options (see Note A) | 135,821 |
| Merger costs (see Note A) | 73,930 |
| Redemption of all Spieker Partnership series D preferred units prior to the merger (see Note A) | 69,750 |
| Borrowings on credit facilities | $1,186,573 |

EOP Partnership has received executed commitments from various lenders for the entire $1.0 billion principal amount of a bridge loan credit facility to be entered into before the closing of the merger, bearing interest at LIBOR plus 80 basis points, subject to EOP Partnership's credit rating, and maturing in 364 days from date of funding of the bridge facility. EOP Partnership will need to refinance the bridge facility prior to its maturity. Equity Office will guarantee any outstanding obligation under the bridge loan credit facility. EOP Partnership and Equity Office have agreed, jointly and severally, to pay a commitment fee of 20 basis points, or $2.0 million, if the bridge facility is not refinanced within 120 days from the date

Table of Contents

## EQUITY OFFICE PROPERTIES TRUST

### NOTES TO PRO FORMA CONDENSED COMBINED FINANCIAL STATEMENTS — (Continued)

of funding. See Note N. The current line of credit bears interest at LIBOR plus 60 basis points plus an annual facility fee of 20 basis points and matures in June 2003.

(I)  To adjust common minority interests in EOP Partnership to reflect the merger as follows:

| | |
|---|---:|
| Equity Office historical common shareholders' equity, minority interests in EOP Partnership and redeemable common stock | $8,496,183 |
| Spieker historical common shareholders' equity and minority interests in Spieker Partnership | 1,898,217 |
| Pro forma adjustments to common shareholders' equity | 1,548,855 |
| Total | 11,943,255 |
| Minority interests ownership percentage of EOP Partnership after the merger as of March 31, 2001 (see below) | 12.45% |
| Minority interest ownership of EOP Partnership after the merger | 1,486,935 |
| Less historical minority interest ownership of EOP Partnership prior to the merger | (995,943) |
| Less historical minority interest ownership of Spieker Partnership prior to the merger | (288,603) |
| Adjustment to minority interest ownership of EOP Partnership to reflect the merger | $202,389 |

The 12.45% minority interest of EOP Partnership as of March 31, 2001 is calculated as follows:

| | Shares | Units | Shares and Units |
|---|---:|---:|---:|
| Shares of Spieker common stock and Spieker Partnership units outstanding at March 31, 2001 | 65,971,027 | 8,825,245 | 74,796,272 |
| Add conversion of Spieker series A preferred stock to Spieker common stock | 1,219,512 | — | 1,219,512 |

| | | | |
|---|---|---|---|
| Total Spieker common stock and Spieker Partnership units outstanding at March 31, 2001 | 67,190,539 | 8,825,245 | 76,015,784 |
| Conversion rate to Equity Office common shares and EOP Partnership units | 1.49586 | 1.94462 | |
| Equity Office common shares and EOP Partnership redeemable units to be issued in the partnership merger on March 31, 2001 | 100,507,640 | 17,161,748 | 117,669,388 |
| Equity Office common shares, redeemable common shares and EOP Partnership redeemable units outstanding at March 31, 2001(1) | 309,016,219 | 41,056,246 | 350,072,465 |
| Equity Office common shares, redeemable common shares and EOP Partnership redeemable units outstanding after the merger on March 31, 2001 | 409,523,859 | 58,217,994 | 467,741,853 |
| Minority interests ownership percentage of EOP Partnership as of March 31, 2001 | 12.45% | | |
| Equity Office ownership percentage of EOP Partnership as of March 31, 2001 | 87.55% | | |

(1)  Equity Office has approximately 1.7 million common shares outstanding that are redeemable at $31.50 per share. Equity Office is not subject to any sinking fund requirements pertaining to these redeemable shares.

F–7

Table of Contents

## EQUITY OFFICE PROPERTIES TRUST

## NOTES TO PRO FORMA CONDENSED COMBINED FINANCIAL STATEMENTS — (Continued)

(J)  To record the issuance of Equity Office preferred shares in exchange for Spieker preferred shares:

| | |
|---|---|
| Issuance of Equity Office series E preferred shares | $106,250 |
| Issuance of Equity Office series F preferred shares | 150,000 |
| Issuance of Equity Office series H preferred shares | 100,000 |
| Total Equity Office preferred shares | 356,250 |
| Spieker series A preferred shares | 23,949 |
| Spieker series B preferred shares | 102,064 |
| Spieker series C preferred shares | 145,959 |
| Spieker series E preferred shares | 96,401 |
| Total Spieker preferred shares outstanding prior to the merger | 368,373 |
| Total adjustment to preferred shares | $(12,123) |

Listed below is a summary of Equity Office's preferred shares that will be outstanding after the merger. The preferred shareholders are entitled to receive, when and as authorized by Equity Office, cumulative preferential cash distributions. Equity Office may redeem the preferred shares at certain dates in whole or in part at a cash redemption price equal to the redemption preference plus all accrued unpaid dividends to the date fixed for redemption.

| Series | Annual Distribution Rate | Liquidation Preference per Share | Current Balance Outstanding | Quarterly Distribution Amount per Share | Distribution Frequency | Equity Office's Voluntary Redemption Date(2) | Maturity Date |
|---|---|---|---|---|---|---|---|
| A | 8.98% | $ 25.00 | $ 199,850 | $ 0.56125 | Quarterly | on or after 6/15/2002 | Perpetual |
| B(1) | 5.25% | $ 50.00 | $ 300,000 | $ 0.65625 | Quarterly | 2/15/2003 through 2/15/08 | 2/15/08 |
| C | 8.625% | $ 25.00 | $ 114,073 | $0.5390625 | Quarterly | on or after 12/8/2003 | Perpetual |
| E | 9.45% | $ 25.00 | $ 106,250 | $ 0.590625 | Quarterly | anytime at Equity Office's option | Perpetual |
| F | 7.875% | $ 25.00 | $ 150,000 | $0.4921875 | Quarterly | on or after 10/10/02 | Perpetual |
| H | 8.0% | $ 25.00 | $ 100,000 | $ 0.50 | Quarterly | on or after 6/4/03 | Perpetual |

(1)  The Series B Preferred Shares are convertible at any time by the holder into Common Shares at a conversion price of $35.70 per share. These shares are non–callable for five years with a mandatory call on February 15, 2008.

(2)  Equity Office is not subject to any sinking fund requirements pertaining to these preferred shares.

(K)  To record the par value of 100.5 million Equity Office common shares issued to Spieker common stockholders.

F–8

Table of Contents

## EQUITY OFFICE PROPERTIES TRUST

### NOTES TO PRO FORMA CONDENSED COMBINED FINANCIAL STATEMENTS — (Continued)

(L)  To reflect the net increase in additional paid in capital associated with the merger as follows:

| | |
|---|---:|
| Issuance of 100.5 million Equity Office common shares based on a 1.49586 conversion ratio in exchange for 67.2 million shares of Spieker common stock (see Note I) | $ 2,944,326 |
| Issuance of 17.2 million EOP Partnership units based on a 1.94462 exchange rate in exchange for 8.8 million units of Spieker Partnership (see Note I) | 502,746 |
| Less par value of Equity Office common shares issued to Spieker common stockholders (see Note K) | (1,005) |
| Adjustment to minority interests in EOP Partnership (see Note I) | (202,389) |
| Less historical minority interests in the ownership of Spieker Partnership | (288,603) |
| Less Spieker's historical additional paid in capital | (1,609,614) |
| Net increase in paid in capital | $ 1,345,461 |

(M)  To reflect the adjustment for the straight–line effect of scheduled rent increases.

(N)  To reflect the additional interest expense incurred from borrowing on a bridge loan credit facility and the current line of credit to finance the cash portion of the merger consideration, the redemption of all outstanding Spieker stock options, the redemption of all Spieker Partnership series D preferred units and the merger costs and amortization of the mark–to–market adjustment for the unsecured notes:

| | |
|---|---:|
| Borrowing from bridge loan credit facility | $1,000,000 |
| Borrowing from current line of credit | 186,573 |
| | |
| Cash portion of merger consideration, the redemption of all outstanding Spieker stock options, the redemption of all Spieker Partnership series D preferred units and the merger costs (see Note H) | 1,186,573 |
| Effective interest rate | 6.31% |
| | |
| Additional annual interest expense | 74,873 |
| Amortization of $18.5 million mark–to–market adjustment (see Note G) | 22 |
| | |
| Adjustment to annual interest expense | $   74,895 |
| | |
| Adjustment to quarterly interest expense | $   18,724 |

The current line of credit bears interest at LIBOR plus 60 basis points plus an annual facility fee of 20 basis points and matures in June 2003. As of March 31, 2001, the available borrowing capacity on this facility was approximately $962 million. EOP Partnership has received executed commitments from various lenders for the entire $1.0 billion principal amount of a bridge loan credit facility to be entered into before the closing of the merger, bearing interest at LIBOR plus 80 basis points, subject to EOP Partnership's credit rating, and maturing in 364 days from date of funding of the bridge facility. The effective interest rate of 6.31% represents the LIBOR rate as of March 31, 2001, plus 80 basis points, which is the effective rate on the current line of credit as well as the bridge loan credit facility. EOP Partnership will need to refinance the bridge facility prior to maturity of the bridge facility. Equity Office will guarantee any outstanding obligation under the bridge loan credit facility. EOP Partnership and Equity Office have agreed, jointly and severally, to pay a commitment fee of 20 basis points, or $2.0 million, if the bridge facility is not refinanced within 120 days from the date of funding. EOP Partnership anticipates incurring higher interest costs on the replacement indebtedness due to higher interest costs of longer–term debt.

Table of Contents

## EQUITY OFFICE PROPERTIES TRUST

### NOTES TO PRO FORMA CONDENSED COMBINED FINANCIAL STATEMENTS — (Continued)

Since the interest rate on the bridge loan credit facility and the current line of credit is based on a spread over LIBOR, the rates will periodically change. If the interest rate on the additional credit facility increases or decreases by 12.5 basis points, the following adjustment would be made to interest expense:

| | |
|---|---:|
| Adjustment to annual interest expense if interest rate increases 12.5 basis points | $  1,483 |

| | |
|---|---|
| Adjustment to annual interest expense if interest rate decreases 12.5 basis points | $(1,483) |
| Adjustment to quarterly interest expense if interest rate increases 12.5 basis points | $   371 |
| Adjustment to quarterly interest expense if interest rate decreases 12.5 basis points | $  (371) |

(O)  To reverse Spieker's historical amortization of deferred financing costs due to the write—off of deferred financing costs as a result of the merger (see Note F).

(P)  To reflect additional depreciation expense related to the adjustment to the investment in real estate as follows:

| | |
|---|---|
| Adjustment to investment in real estate (see Note B) | $2,821,918 |
| Portion allocated to building and improvements | 80% |
| Adjustment to the depreciable basis of Spieker's investment in real estate, net | $2,257,534 |
| Additional annual depreciation expense based on an estimated useful life of 40 years | $56,438 |
| Additional quarterly depreciation expense based on an estimated useful life of 40 years | $14,110 |

(Q)  To reverse Spieker's historical amortization of deferred lease commissions due to the write—off of deferred lease commissions as a result of the merger (see Note F).

(R)  Management has estimated that there will be a reduction of general and administrative expenses as a result of the merger of approximately 50% to 60% on a pro forma basis. The general and administrative expense savings have not been included in the pro forma condensed combined statements of operations. There can be no assurance that Equity Office will be successful in realizing such anticipated cost savings.

(S)  To adjust the minority interest income allocation to EOP Partnership for the three months ended March 31, 2001 to 12.56% and for the year ended December 31, 2000 to 12.89% as if the merger had occurred on January 1, 2000, and the Equity Office common shares and EOP Partnership units to be issued in the merger were issued on January 1, 2000. The minority interest income allocation to EOP Partnership for each period is calculated based on the weighted average number of EOP Partnership units outstanding during the period divided by the sum of the weighted average number of Equity Office common shares and EOP Partnership units outstanding during the period. Issuance of additional common shares and units changes the ownership interests of both the minority interests and Equity Office.

(T)  Adjustment to eliminate the dividend on the Spieker series A preferred stock which was converted into shares of Spieker common stock on April 6, 2001.

F—10

Table of Contents

**EQUITY OFFICE PROPERTIES TRUST**

**NOTES TO PRO FORMA CONDENSED COMBINED FINANCIAL STATEMENTS — (Continued)**

(U)  The following table sets forth the computation of basic earnings per common share and diluted earnings per common share and common share equivalent:

| | For the three months ended March 31, 2001 | | For the year ended December 31, 2000 | |
|---|---|---|---|---|
| | Historical | Pro Forma | Historical | Pro Forma |
| **Numerator** | | | | |
| Net income from continuing operations before gain on sales of real estate | $ 121,998 | $ 160,820 | $392,198 | $457,113 |
| Gain on sales of real estate (excluding allocation to minority interests in partially owned properties of $1,473 for the year ended December 31, 2000) | — | 20,516 | 34,540 | 176,064 |
| | 121,998 | 181,336 | 426,738 | 633,177 |

| | | | | |
|---|---|---|---|---|
| Numerator for basic earnings per share — net income from continuing operations available for common shares | | | | |
| Minority interest in EOP Partnership | 16,282 | 26,038 | 59,376 | 93,686 |
| Numerator for diluted earnings per share — net income from continuing operations available for common shares and common share equivalents | $ 138,280 | $ 207,374 | $486,114 | $ 726,863 |

**Denominator**

| | | | | |
|---|---|---|---|---|
| Denominator for basic earnings per common share — weighted average common shares outstanding | 306,971,084 | 408,581,209 | 277,186,733 | 378,765,944 |
| Denominator for diluted earnings per common share and common share equivalent — weighted average common shares and common share equivalents outstanding | 351,400,853 | 470,172,726 | 318,997,407 | 437,738,366 |

**Basic earnings available for common shares per weighted average common share:**

| | | | | |
|---|---|---|---|---|
| Net income from continuing operations before gain on sales of real estate, net of minority interests | $.40 | $.40 | $1.43 | $1.27 |
| Gain on sales of real estate, net of minority interests | — | .04 | .11 | .40 |
| Net income from continuing operations | $.40 | $.44 | $1.54 | $1.67 |

**Diluted earnings available for common shares and common share equivalents per weighted average common share and common share equivalent:**

| | | | | |
|---|---|---|---|---|
| Net income from continuing operations before gain on sales of real estate | $.39 | $.40 | $1.42 | $1.26 |
| Gain on sales of real estate | — | .04 | .11 | .40 |
| Net income from continuing operations | $.39 | $.44 | $1.53 | $1.66 |

F–11

Table of Contents

ANNEX A

**AGREEMENT AND PLAN OF MERGER**

**DATED AS OF FEBRUARY 22, 2001, AS AMENDED**

Table of Contents

**AGREEMENT AND PLAN OF MERGER**

among

**EQUITY OFFICE PROPERTIES TRUST,**

**EOP OPERATING LIMITED PARTNERSHIP,**

**SPIEKER PROPERTIES, INC.**

and

**SPIEKER PROPERTIES, L.P.**

**Dated as of February 22, 2001**

# TABLE OF CONTENTS

## ARTICLE 1

### THE MERGERS

|      |                                                                         | Page |
|------|-------------------------------------------------------------------------|------|
| 1.1  | The Partnership Merger                                                   | A–2  |
| 1.2  | The Merger                                                               | A–2  |
| 1.3  | Closing                                                                  | A–2  |
| 1.4  | Effective Time                                                          | A–3  |
| 1.5  | Effect of Partnership Merger on Agreement of Limited Partnership        | A–3  |
| 1.6  | Effect of Merger on Declaration of Trust and Bylaws                     | A–3  |
| 1.7  | Trustees of Equity Office                                                | A–3  |
| 1.8  | Effect on Capital Stock                                                  | A–3  |
| 1.9  | Effect on Partnership Interests                                          | A–4  |
| 1.10 | Partnership Merger Consideration; Merger Consideration                  | A–4  |
| 1.11 | Partner Approval                                                        | A–6  |
| 1.12 | Appraisal or Dissenters Rights                                          | A–7  |
| 1.13 | Exchange of Certificates; Pre–Closing Dividends; Fractional Shares      | A–7  |

### ARTICLE 2
#### REPRESENTATIONS AND WARRANTIES OF SPIEKER AND SPIEKER PARTNERSHIP

| 2.1  | Organization, Standing and Power                                        | A–11 |
| 2.2  | Spieker Subsidiaries                                                     | A–11 |
| 2.3  | Capital Structure                                                       | A–12 |
| 2.4  | Other Interests                                                          | A–14 |
| 2.5  | Authority; Noncontravention; Consents                                   | A–14 |
| 2.6  | SEC Documents; Financial Statements; Undisclosed Liabilities            | A–15 |
| 2.7  | Absence of Certain Changes or Events                                    | A–16 |
| 2.8  | Litigation                                                               | A–16 |
| 2.9  | Properties                                                               | A–17 |
| 2.10 | Environmental Matters                                                   | A–18 |
| 2.11 | Related Party Transactions                                             | A–20 |
| 2.12 | Employee Benefits                                                       | A–20 |
| 2.13 | Employee Policies                                                       | A–21 |
| 2.14 | Taxes                                                                    | A–21 |
| 2.15 | No Payments to Employees, Officers or Directors                         | A–22 |
| 2.16 | Broker; Schedule of Fees and Expenses                                   | A–22 |
| 2.17 | Compliance with Laws                                                    | A–23 |
| 2.18 | Contracts; Debt Instruments                                             | A–23 |
| 2.19 | Opinion of Financial Advisor                                            | A–24 |
| 2.20 | State Takeover Statutes                                                 | A–24 |
| 2.21 | Stockholder Rights Plan                                                  | A–24 |
| 2.22 | Investment Company Act of 1940                                          | A–24 |
| 2.23 | Definition of Knowledge of Spieker                                      | A–24 |
| 2.24 | Required Stockholder Approvals and Partner Approvals                    | A–25 |

|      |                                                                         | Page |
|------|-------------------------------------------------------------------------|------|

### ARTICLE 3
#### REPRESENTATIONS AND WARRANTIES OF EQUITY OFFICE AND EOP PARTNERSHIP

| 3.1  | Organization, Standing and Power of Equity Office                       | A–25 |
| 3.2  | Equity Office Subsidiaries                                               | A–25 |
| 3.3  | Capital Structure                                                       | A–26 |
| 3.4  | Other Interests                                                          | A–28 |
| 3.5  | Authority; Noncontravention; Consents                                   | A–28 |
| 3.6  | SEC Documents; Financial Statements; Undisclosed Liabilities            | A–29 |
| 3.7  | Absence of Certain Changes or Events                                    | A–30 |
| 3.8  | Litigation                                                               | A–30 |
| 3.9  | Properties                                                               | A–30 |
| 3.10 | Environmental Matters                                                   | A–32 |
| 3.11 | Taxes                                                                    | A–32 |
| 3.12 | Brokers; Schedule of Fees and Expenses                                  | A–33 |
| 3.13 | Compliance with Laws                                                    | A–33 |
| 3.14 | Contracts; Debt Instruments                                             | A–33 |
| 3.15 | Opinion of Financial Advisor                                            | A–34 |
| 3.16 | State Takeover Statutes                                                 | A–34 |
| 3.17 | Investment Company Act of 1940                                          | A–34 |
| 3.18 | Definition of Knowledge of Equity Office                                | A–34 |
| 3.19 | Required Shareholder Approvals and Partner Approvals                    | A–34 |

### ARTICLE 4

COVENANTS

| | | |
|---|---|---|
| 4.1 | Conduct of Spieker's and Spieker Partnership's Business Pending Merger | A–34 |
| 4.2 | Conduct of Equity Office's and EOP Partnership's Business Pending Merger | A–37 |
| 4.3 | No Solicitation | A–38 |
| 4.4 | Affiliates | A–40 |
| 4.5 | Other Actions | A–40 |

ARTICLE 5
ADDITIONAL COVENANTS

| | | |
|---|---|---|
| 5.1 | Preparation of the Form S–4 and the Proxy Statement; Spieker Stockholders Meeting, Spieker Unitholders Consent Solicitation and Equity Office Shareholders Meeting | A–41 |
| 5.2 | Access to Information; Confidentiality | A–43 |
| 5.3 | Commercially Reasonable Efforts; Notification | A–43 |
| 5.4 | Tax Matters | A–44 |
| 5.5 | Public Announcements | A–44 |
| 5.6 | Listing | A–44 |
| 5.7 | Transfer and Gains Taxes | A–44 |
| 5.8 | Benefit Plans and Other Employee Arrangements | A–45 |
| 5.9 | Indemnification | A–46 |
| 5.10 | Declaration of Dividends and Distributions | A–48 |
| 5.11 | Transfer of Spieker TRS | A–49 |
| 5.12 | Notices | A–49 |
| 5.13 | Resignations | A–49 |
| 5.14 | Assumption of Existing Tax Protection Agreements | A–50 |
| 5.15 | EOP Partnership Agreement | A–50 |
| 5.16 | Registration Rights Agreements | A–50 |

ii

**Table of Contents**

| | | Page |
|---|---|---|

ARTICLE 6
CONDITIONS

| | | |
|---|---|---|
| 6.1 | Conditions to Each Party's Obligation to Effect the Mergers | A–50 |
| 6.2 | Conditions to Obligations of Equity Office and EOP Partnership | A–50 |
| 6.3 | Conditions to Obligations of Spieker and Spieker Partnership | A–52 |

ARTICLE 7
TERMINATION, AMENDMENT AND WAIVER

| | | |
|---|---|---|
| 7.1 | Termination | A–53 |
| 7.2 | Certain Fees and Expenses | A–54 |
| 7.3 | Effect of Termination | A–56 |
| 7.4 | Amendment | A–56 |
| 7.5 | Extension; Waiver | A–56 |

ARTICLE 8
GENERAL PROVISIONS

| | | |
|---|---|---|
| 8.1 | Nonsurvival of Representations and Warranties | A–57 |
| 8.2 | Notices | A–57 |
| 8.3 | Interpretation | A–57 |
| 8.4 | Counterparts | A–58 |
| 8.5 | Entire Agreement; No Third–Party Beneficiaries | A–58 |
| 8.6 | Governing Law | A–58 |
| 8.7 | Assignment | A–58 |
| 8.8 | Enforcement | A–58 |
| 8.9 | Severability | A–58 |
| 8.10 | Exculpation | A–58 |
| 8.11 | Joint and Several Obligations | A–58 |

iii

**Table of Contents**

## EXHIBITS

| | | |
|---|---|---|
| Exhibit A | — | Form of Delaware Certificate of Merger |
| Exhibit B | — | Form of California Certificate of Merger |
| Exhibit C | — | Form of Maryland Articles of Merger |
| Exhibit D | — | Form of Articles Supplementary Designating Equity Office Series E Preferred Shares |
| Exhibit E | — | Form of Articles Supplementary Designating Equity Office Series F Preferred Shares |
| Exhibit F | — | Form of Articles Supplementary Designating Equity Office Series G Preferred Shares |
| Exhibit G | — | Form of Articles Supplementary Designating Equity Office Series H Preferred Shares |
| Exhibit H | — | Form of Amendment to EOP Partnership Agreement Creating Equity Office Preferred OP Units |
| Exhibit I | — | Form of Proposed Equity Office Charter Amendments |
| Exhibit J | — | Form of Nonsolicitation Agreement |
| Exhibit K | — | Form of Amendment to EOP Partnership Agreement Addressing Certain Federal Income Tax Matters |

iv

Table of Contents

## Index of Defined Terms

| | |
|---|---|
| Acquisition Proposal | 4.3(a)(i) |
| Additional Corresponding Equity Office Dividends and Distributions | 5.10 |
| Affiliate | 2.11 |
| Agreement | Preamble |
| AICPA Statement | 5.1(b) |
| Articles of Merger | E |
| Base Amount | 7.2 |
| Break–Up Expenses | 7.2 |
| Break–Up Fee | 7.2 |
| Break–Up Fee Tax Opinion | 7.2 |
| California Certificate of Merger | D |
| Cash Amount Per Share | 1.10(b)(i) |
| CERCLA | 2.10(a) |
| Certificate | 1.10(b)(vii) |
| Closing | 1.3 |
| Closing Date | 1.3 |
| Code | F |
| Commitment | 4.1(j) |
| Confidentiality Agreement | 4.3(b) |
| Controlled Group Member | 2.12 |
| Corresponding Equity Office Dividends and Distributions | 1.13(d)(ii) |
| CRULPA | 1.1(a) |
| Delaware Certificate of Merger | C |
| Department | 1.4 |
| DRULPA | 1.1(a) |
| Effective Time | 1.4 |
| Effective Times | 1.4 |
| Employee Plan | 2.12 |
| Encumbrances | 2.9(a) |
| Environmental Law | 2.10(a) |
| Environmental Mitigation | 2.9(d) |
| Environmental Permits | 2.10(b)(iv) |
| EOP Partnership | Preamble |
| EOP Partnership Agreement | 1.5 |
| Equity Office | Preamble |
| Equity Office Bylaws | 1.6 |
| Equity Office Common Shares | 1.10(b)(i) |
| Equity Office Counter Proposal | 4.3(c) |
| Equity Office Declaration of Trust | 1.6 |
| Equity Office Disclosure Letter | Art. 3 |
| Equity Office Exchangeable Notes | 3.3(b) |
| Equity Office Existing Preferred OP Units | 3.3(e) |
| Equity Office Existing Preferred Shares | 3.3(a) |
| Equity Office Financial Statement Date | 3.7 |
| Equity Office Material Adverse Effect | 3.1 |
| Equity Office Non–controlled Subsidiaries | 3.2(a) |
| Equity Office Options | 3.3(b) |
| Equity Office OP Units | 1.10(a)(i) |
| Equity Office Other Interests | 3.4 |
| Equity Office Partner Approvals | 1.11 |
| Equity Office Preferred OP Units | 1.10(a)(vi) |

v

## Table of Contents

| | |
|---|---|
| Equity Office Preferred Shares | 1.10(b)(vi) |
| Equity Office Properties | 3.9(a) |
| Equity Office Rent Roll | 3.9(g) |
| Equity Office SEC Documents | 3.6 |
| Equity Office Series A Preferred OP Unit | 3.3(e) |
| Equity Office Series B Preferred OP Unit | 3.3(e) |
| Equity Office Series C Preferred OP Unit | 3.3(e) |
| Equity Office Series D Preferred OP Unit | 1.10(a)(ii) |
| Equity Office Series E Preferred OP Unit | 1.10(a)(iii) |
| Equity Office Series F Preferred OP Unit | 1.10(a)(iv) |
| Equity Office Series G Preferred OP Unit | 1.10(a)(v) |
| Equity Office Series H Preferred OP Unit | 1.10(a)(vi) |
| Equity Office Series A Preferred Shares | 3.3(a) |
| Equity Office Series B Preferred Shares | 3.3(a) |
| Equity Office Series C Preferred Shares | 3.3(a) |
| Equity Office Series D Preferred Share | 1.10(b)(ii) |
| Equity Office Series E Preferred Share | 1.10(b)(iii) |

Equity Office Series F Preferred Share .................... 1.10(b)(iv)
Equity Office Series G Preferred Share .................... 1.10(b)(v)
Equity Office Series H Preferred Share .................... 1.10(b)(vi)
Equity Office Shareholder Approvals ...................... 3.5(a)
Equity Office Shareholders Meeting ...................... 5.1(c)
Equity Office Space Lease ................................ 3.9(g)
Equity Office Subsidiaries ............................... 3.1
Equity Office TRS ........................................ I
ERISA ................................................... 2.12
Exchange Act ............................................ 2.6
Exchange Agent .......................................... 1.13(a)
Exchange Fund ........................................... 1.13(b)
Final Spieker Dividend .................................. 1.13(d)(i)
Final Spieker Partnership Distribution .................. 1.13(d)(ii)
Form S–4 ................................................ 5.1(a)
Former Spieker Properties ............................... 2.10(b)(ii)
GAAP .................................................... 2.6
Governmental Entity ..................................... 2.5(c)
Hazardous Materials ..................................... 2.10(a)
HSR Act ................................................. 2.5(c)
Indebtedness ............................................ 2.18(b)
Indemnification Parties ................................. 5.9(b)
Indemnified Parties ..................................... 5.9(a)
Indemnifying Parties .................................... 5.9(a)
Joint Proxy Statement ................................... 5.1(a)
Knowledge of Spieker .................................... 2.23
Knowledge of Equity Office .............................. 3.18
Laws .................................................... 2.5(c)
Lease Guidelines ........................................ 4.1(j)
Liens ................................................... 2.2(b)
Maximum Amount .......................................... 7.2
Merger .................................................. A
Merger Consideration .................................... 1.10(b)
Mergers ................................................. B
NYSE .................................................... 5.6
Partner Approvals ....................................... 1.11

vi

Table of Contents

Partnership Merger ...................................... B
Partnership Merger Consideration ........................ 1.10(a)
Payor ................................................... 7.2
Pension Plan ............................................ 2.12
Permitted Title Exceptions .............................. 2.9(a)
Person .................................................. 2.2(a)
Property Restrictions ................................... 2.9(a)
Proposed Equity Office Charter Amendments ............... 4.2(h)
Qualifying Income ....................................... 7.2
Recipient ............................................... 7.2
REIT .................................................... 2.14(b)
REIT Requirements ....................................... 7.2
Release ................................................. 2.10(a)
Rule 145 Affiliates ..................................... 4.4
SEC ..................................................... 2.5(c)
Securities Act .......................................... 2.3(g)
Shareholder Approvals ................................... 3.5(a)
Spieker ................................................. Preamble
Spieker Acquisition Agreement ........................... 7.2
Spieker Articles ........................................ 2.1
Spieker Bylaws .......................................... 2.1
Spieker Class B Common Stock ............................ 2.3(a)
Spieker Class C Common Stock ............................ 2.3(a)
Spieker Common Stock .................................... 1.10(b)(i)
Spieker Disclosure Letter ............................... Art. 2
Spieker Financial Statement Date ........................ 2.7
Spieker Material Adverse Effect ......................... 2.1
Spieker OP Units ........................................ 1.10(a)(i)
Spieker Other Interests ................................. 2.4
Spieker Partner Approvals ............................... 1.11
Spieker Partnership ..................................... Preamble
Spieker Partnership Agreement ........................... 1.5
Spieker Preferred OP Units .............................. 1.10(a)(vi)
Spieker Preferred Stock ................................. 1.10(b)(vi)
Spieker Properties ...................................... 2.9(a)
Spieker Recent SEC Documents ............................ 2.6
Spieker Rent Roll ....................................... 2.9(e)
Spieker Representative .................................. 4.3(a)(ii)
Spieker Rights .......................................... 2.21
Spieker Rights Agreement ................................ 2.21
Spieker SEC Documents ................................... 2.6

| | |
|---|---|
| Spieker Series A Preferred OP Unit | 1.10(a)(ii) |
| Spieker Series B Preferred OP Unit | 1.10(a)(iii) |
| Spieker Series C Preferred OP Unit | 1.10(a)(iv) |
| Spieker Series D Preferred OP Unit | 1.10(a)(v) |
| Spieker Series E Preferred OP Unit | 1.10(a)(vi) |
| Spieker Series A Preferred Share | 1.10(b)(ii) |
| Spieker Series B Preferred Share | 1.10(b)(iii) |
| Spieker Series C Preferred Share | 1.10(b)(iv) |
| Spieker Series D Preferred Share | 1.10(b)(v) |
| Spieker Series E Preferred Share | 1.10(b)(vi) |
| Spieker Space Lease | 2.9(e) |
| Spieker Stockholder Approvals | 2.5(a) |

vii

**Table of Contents**

| | |
|---|---|
| Spieker Stockholders Meeting | 5.1(d) |
| Spieker Stock Options | 2.3(b) |
| Spieker Stock Rights | 2.3(b) |
| Spieker Subsidiaries | 2.2(a) |
| Spieker TRS | I |
| Spieker Voting Agreement | J |
| Stock Amount Per Share | 1.10(b)(i) |
| Stock Purchase Agreement | I |
| Subsidiary | 2.2(a) |
| Substituted Option | 5.8(c) |
| Superior Acquisition Proposal | 4.3(d) |
| Surviving Partnership | 1.1(a) |
| Surviving Trust | 1.2 |
| Takeover Statute | 2.20 |
| Taxes | 2.14(a) |
| Tax Protection Agreements | 2.18(j) |
| Third Party Provisions | 8.5 |
| Title 3 | 1.2 |
| Title 8 | 1.2 |
| Transfer | 4.3(a)(i) |
| Transfer and Gains Taxes | 5.7 |
| Welfare Plan | 2.12 |
| 1940 Act | 2.22 |

viii

**Table of Contents**

# AGREEMENT AND PLAN OF MERGER

THIS AGREEMENT AND PLAN OF MERGER (this "Agreement"), dated as of February 22, 2001, by and among EQUITY OFFICE PROPERTIES TRUST, a Maryland real estate investment trust ("Equity Office"), EOP OPERATING LIMITED PARTNERSHIP, a Delaware limited partnership ("EOP Partnership"), SPIEKER PROPERTIES, INC., a Maryland corporation ("Spieker"), and SPIEKER PROPERTIES, L.P., a California limited partnership ("Spieker Partnership").

*R E C I T A L S :*

A. The Board of Trustees of Equity Office and the Board of Directors of Spieker deem it advisable and in the best interests of their respective shareholders, upon the terms and subject to the conditions contained herein, that Spieker shall merge with and into Equity Office (the "Merger").

B. Equity Office, as the sole general partner of EOP Partnership, and Spieker, as the sole general partner of Spieker Partnership, deem it advisable and in the best interests of their respective limited partners, subject to the conditions and other provisions contained herein, that, immediately prior to the Merger, Spieker Partnership shall merge with and into EOP Partnership (or such other entity as provided in Section 1.1(a)), with the holders of partnership interests in Spieker Partnership at the time of the Partnership Merger receiving in any event units of limited partnership interest in EOP Partnership, as set forth herein (the "Partnership Merger" and, together with the Merger, the "Mergers").

C. Upon the terms and subject to the conditions set forth herein, immediately prior to the Merger, EOP Partnership and Spieker Partnership shall execute a Certificate of Merger (the "Delaware Certificate of Merger") in substantially the form attached hereto as *Exhibit A* and shall file such Delaware Certificate of Merger in accordance with Delaware law to effectuate the Partnership Merger.

D. Upon the terms and subject to the conditions set forth herein, immediately prior to the Merger, EOP Partnership and Spieker Partnership shall execute a Certificate of Merger (the "California Certificate of Merger") in substantially the form attached hereto as *Exhibit B* and shall file such California Certificate of Merger in accordance with California law to effectuate the Partnership Merger.

E. Upon the terms and subject to the conditions set forth herein, immediately following the effectiveness of the Partnership Merger, Equity Office and Spieker shall execute Articles of Merger (the "Articles of Merger") in substantially the form attached hereto as *Exhibit C* and shall file such Articles of Merger in accordance with Maryland law to effectuate the Merger.

F. For federal income tax purposes, it is intended that the Merger shall qualify as a reorganization under Section 368(a) of the Internal Revenue Code of 1986, as amended (the "Code"), and that this Agreement shall constitute a plan of reorganization under Section 368(a) of the Code.

G. For federal income tax purposes, it is intended that the Partnership Merger, regardless of form, be treated as a contribution by Spieker Partnership of all of its assets to EOP Partnership in exchange for partnership interests in EOP Partnership, as provided for herein, under Section 721 of the Code, and a distribution of such partnership interests by Spieker Partnership to its partners under Section 731 of the Code.

H. Equity Office, EOP Partnership, Spieker and Spieker Partnership desire to make certain representations, warranties, covenants and agreements in connection with the Mergers.

I. Concurrently with the execution of this Agreement and as an inducement to Equity Office and EOP Partnership to enter into this Agreement, Messrs. Warren E. Spieker, Jr., John K. French and Dennis E. Singleton, as owners of voting capital stock of Spieker Northwest, Inc., a California corporation ("Spieker TRS"), have entered into a Stock Purchase Agreement, dated as of the date hereof, relating to the voting capital stock of Spieker TRS (the "Stock Purchase Agreement"), providing for the sale of their shares of outstanding voting capital stock of Spieker TRS to Equity Office Properties Management Corp. ("Equity Office TRS") or its assigns.

A–1

**Table of Contents**

J. As an inducement to Equity Office to enter into this Agreement, certain executive officers of Spieker have entered into a voting agreement (each, a "Spieker Voting Agreement"), pursuant to which such person has agreed, among other things, to vote his shares of Spieker Common Stock and Spieker OP Units (as defined herein) to approve this Agreement, the respective Mergers and any other matter which requires his vote in connection with the transactions contemplated by this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual representations, warranties, covenants and agreements contained herein, the parties hereto hereby agree as follows:

ARTICLE 1

THE MERGERS

1.1 *The Partnership Merger.*

(a) Upon the terms and subject to the conditions of this Agreement, and in accordance with Title 6, Chapter 17 of the Delaware Code Annotated, as amended (the "DRULPA"), and Title 2, Chapter 3, Article 7.5 of the California Corporations Code, as amended (the "CRULPA"), immediately prior to the consummation of the Merger, Spieker Partnership shall be merged with and into EOP Partnership with EOP Partnership as the surviving limited partnership (or, at EOP Partnership's option, with a limited liability company owned entirely, directly and/or indirectly, by EOP Partnership, or a limited partnership owned entirely, directly and/or indirectly, by EOP Partnership, as determined by Equity Office and EOP Partnership), with the entity designated by EOP Partnership being the surviving limited partnership or limited liability company, as applicable, provided that the alternative structure does not materially adversely affect any class or series of partnership interests in Spieker Partnership) (the "Surviving Partnership"), and with the holders of partnership interests in Spieker Partnership receiving in any event units of partnership interest in EOP Partnership, as set forth in Section 1.10(a).

(b) Pursuant to Treasury Regulation § 1.708–1(c)(3), EOP Partnership and Spieker Partnership intend that the Partnership Merger be treated as an "assets over" form of merger, with the consequences set forth in Treasury Regulation § 1.708–1(c)(3)(i). In addition, if and to the extent that any transaction entered into pursuant to this Agreement or otherwise deemed undertaken in connection with the transactions contemplated by this Agreement is characterized for federal income tax purposes as a direct or indirect transfer of cash from EOP Partnership to a holder of Spieker OP Units or Spieker Preferred OP Units that would be characterized as a sale for federal income tax purposes, pursuant to Treasury Regulation § 1.708–1(c)(4) such sale shall be treated by all parties as a sale by the former holder of Spieker OP Units or Spieker Preferred OP Units receiving (or deemed to receive) such cash of Spieker OP Units or Spieker Preferred OP Units to EOP Partnership and as a direct purchase by EOP Partnership of such Spieker OP Units or Spieker Preferred OP Units from such former holder of Spieker OP Units or Spieker Preferred OP Units immediately prior to the Partnership Merger (and not as a transfer of cash from EOP Partnership to Spieker Partnership as part of the Partnership Merger). Each holder of Spieker OP Units or Spieker Preferred OP Units who receives, directly or indirectly, any cash in connection with the Partnership Merger shall be deemed, by such holder's act of receiving and accepting such cash, to have agreed to the characterization of such transaction set forth in the immediately preceding sentence for purposes of Treasury Regulation § 1.708–1(c)(4).

1.2 *The Merger.* Upon the terms and subject to the conditions set forth in this Agreement, and in accordance with Title 3 of the Corporations and Associations Article of the Annotated Code of Maryland, as amended ("Title 3"), and Title 8 of the Corporations and Associations Article of the Annotated Code of Maryland, as amended ("Title 8"), Spieker shall be merged with

and into Equity Office, with Equity Office surviving as a real estate investment trust (the "Surviving Trust").

1.3 *Closing.* The closing of the Mergers (the "Closing") will take place commencing at 9:00 a.m., local time, on the date to be specified by the parties, which (subject to satisfaction or waiver of the conditions set forth in Article 6) shall be no later than the third business day after satisfaction or waiver of the conditions set forth in Section 6.1 (the "Closing Date"), at the offices of Hogan & Hartson L.L.P., 885 Third Avenue, New York, NY 10022, unless another date or place is agreed to in writing by the parties.

A-2

---

1.4 *Effective Time.* As soon as practicable on the Closing Date, (i) EOP Partnership and Spieker Partnership shall execute and file the Delaware Certificate of Merger, executed in accordance with the DRULPA, with the Office of the Secretary of State of the State of Delaware, and the California Certificate of Merger, executed in accordance with the CRULPA, with the Office of the Secretary of State of the State of California and (ii) Equity Office and Spieker shall then execute and file the Articles of Merger, executed in accordance with Title 3 and Title 8, with the State Department of Assessments and Taxation of Maryland (the "Department"), and shall make all other filings and recordings required, with respect to the Partnership Merger, under the DRULPA and the CRULPA or, with respect to the Merger, under Title 3 and Title 8. The Mergers shall become effective (each an "Effective Time" and collectively the "Effective Times") at such times as Equity Office and Spieker shall agree should be specified in the Delaware Certificate of Merger, the California Certificate of Merger and the Articles of Merger (not to exceed thirty (30) days after the Articles of Merger are accepted for record by the Department). Unless otherwise agreed, the parties shall cause the Effective Times to occur on the Closing Date, with not less than one hour between the Effective Time of the Partnership Merger and the Effective Time of the Merger.

1.5 *Effect of Partnership Merger on Agreements of Limited Partnership.* The Second Amended and Restated Agreement of Limited Partnership, as amended (including the amendment made pursuant to Section 1.9), of EOP Partnership, as in effect as of the Effective Time of the Partnership Merger (the "EOP Partnership Agreement"), shall continue in full force and effect after the Partnership Merger until further amended in accordance with applicable Delaware law. The Second Amended and Restated Agreement of Limited Partnership, as amended, of Spieker Partnership, as in effect immediately prior to the Effective Time of the Partnership Merger (the "Spieker Partnership Agreement"), shall terminate at the Effective Time of the Partnership Merger.

1.6 *Effect of Merger on Declaration of Trust and Bylaws.* The Articles of Amendment and Restatement of Declaration of Trust, as amended (including the amendments made pursuant to Section 1.8) of Equity Office (the "Equity Office Declaration of Trust") and the Bylaws, as amended, of Equity Office (the "Equity Office Bylaws"), as in effect as of the Effective Time of the Merger, and if approved by the Equity Office shareholders, as amended by the Proposed Equity Office Charter Amendments (as defined herein), shall continue in full force and effect after the Merger until further amended in accordance with applicable Maryland law and the terms thereof.

1.7 *Trustees of Equity Office.* The trustees of Equity Office following the Merger shall consist of the trustees of Equity Office immediately prior to the Effective Time of the Merger, who shall continue to serve for the balance of their unexpired terms or their earlier death, resignation or removal, together with Mr. Warren E. Spieker, Jr., Craig G. Vought and John A. Foster, each of whom shall, no later than the third business day after the Effective Time of the Merger, become a trustee. Mr. Spieker's term shall expire in 2004. Prior to the initial filing of the Form S-4 with the SEC, Spieker shall notify Equity Office in writing as to whether (a) Mr. Vought's term shall expire in 2003 and Mr. Foster's term shall expire in 2002 or (b) Mr. Vought's term shall expire in 2002 and Mr. Foster's term shall expire in 2003. Following their election as trustees, such individuals shall serve for their designated terms, subject to their earlier death, resignation or removal.

1.8 *Effect on Capital Stock.* The effect of the Merger on the shares of capital stock of Spieker shall be as provided in the Articles of Merger and in Section 1.10. The Merger shall not change the shares of beneficial interest of Equity Office outstanding immediately prior to the Merger. Prior to or as of the Effective Time, the Equity Office Declaration of Trust shall be amended, in accordance with Title 8 and the terms of the Equity Office Declaration of Trust, as follows:

(i) by the adoption by the Equity Office Board of Trustees of the articles supplementary substantially in the form set forth on *Exhibit D* to provide for the creation of the Equity Office Series E Preferred Shares (as defined herein) and the Equity Office Series E Preferred Excess Shares (as defined herein);

(ii) by the adoption by the Equity Office Board of Trustees of the articles supplementary substantially in the form set forth on *Exhibit E* to provide for the creation of the Equity Office Series F

A-3

---

Preferred Shares (as defined herein) and the Equity Office Series F Preferred Excess Shares (as defined herein);

(iii) by the adoption by the Equity Office Board of Trustees of the articles supplementary substantially in the form set forth on *Exhibit F* to provide for the creation of the Equity Office Series G Preferred Shares (as defined herein) and the Equity Office Series G Preferred Excess Shares (as defined herein); and

(iv) by the adoption by the Equity Office Board of Trustees of the articles supplementary substantially in the form set forth on *Exhibit G* to provide for the creation of the Equity Office Series H Preferred Shares (as defined herein) and the Equity Office Series H Preferred Excess Shares (as defined herein).

1.9 *Effect on Partnership Interests.* The effect of the Partnership Merger on the partnership interests of Spieker Partnership shall be as provided in the Delaware Certificate of Merger and in Section 1.10. The Partnership Merger shall not change the partnership interests of EOP Partnership outstanding immediately prior to the Merger. Prior to or as of the Effective Time, the EOP Partnership Agreement shall be amended, in accordance with the DRULPA and the terms of the EOP Partnership Agreement, by the adoption by Equity Office, in its capacity as the general partner of EOP Partnership, of an amendment substantially in the form set forth on *Exhibit H* in order to provide for the creation of (i) if necessary, the Equity Office Series D Preferred OP Units (as defined herein), (ii) the Equity Office Series E Preferred OP Units (as defined herein), (iii) the Equity Office Series F Preferred OP Units (as defined herein), (iv) the Equity Office Series G Preferred OP Units (as defined herein) and (v) the Equity Office Series H Preferred OP Units (as defined herein).

1.10 *Partnership Merger Consideration; Merger Consideration.*

(a) *Partnership Merger Consideration.* The consideration to be paid to holders of Partnership Units (as defined in the Spieker Partnership Agreement) and Partnership Interests (as defined in the Spieker Partnership Agreement) of Spieker Partnership in the Partnership Merger (collectively, the "Partnership Merger Consideration") is as follows:

(i) Each Partnership Unit (as defined in the Spieker Partnership Agreement) of Spieker Partnership, excluding all Partnership Units allocated to the Spieker Preferred OP Units (as defined herein) ("Spieker OP Units"), outstanding immediately prior to the Effective Time of the Partnership Merger shall be exchanged for 1.94462 Class A Units (as defined in the EOP Partnership Agreement) of EOP Partnership ("Equity Office OP Units"). The holders of the Equity Office OP Units issued in the Partnership Merger (other than Spieker and Spieker Subsidiaries (as defined herein)) shall be entitled to redeem such Equity Office OP Units immediately following the consummation of the Partnership Merger (and thereafter) pursuant to the terms of the EOP Partnership Agreement, except that for purposes of the exchange provisions thereof such Equity Office OP Units shall be deemed to have been issued as of the date the related Spieker OP Units were issued by Spieker Partnership (or if earlier, one year prior to the Effective Time of the Partnership Merger), and shall be entitled to the same rights and privileges as the holders of Equity Office OP Units outstanding on the date hereof.

(ii) The Series A Preferred Interest (as defined in the Spieker Partnership Agreement) of Spieker Partnership ("Spieker Series A Preferred OP Unit") outstanding immediately prior to the Effective Time of the Partnership Merger, if any, shall be exchanged for 1,000,000 Series D Preferred Units (as defined in the EOP Partnership Agreement), designated a Series D Preferred Unit, of EOP Partnership (each, an "Equity Office Series D Preferred OP Unit").

(iii) The Series B Cumulative Redeemable Preferred Interest (as defined in the Spieker Partnership Agreement) of Spieker Partnership ("Spieker Series B Preferred OP Unit") outstanding immediately prior to the Effective Time of the Partnership Merger shall be exchanged for 4,250,000 Series E Preferred Units (as defined in the EOP Partnership Agreement), designated a Series E Preferred Unit, of EOP Partnership (each, an "Equity Office Series E Preferred OP Unit").

A–4

Table of Contents

(iv) The Series C Cumulative Redeemable Preferred Interest (as defined in the Spieker Partnership Agreement) of Spieker Partnership ("Spieker Series C Preferred OP Unit") outstanding immediately prior to the Effective Time of the Partnership Merger shall be exchanged for 6,000,000 Series F Preferred Units (as defined in the EOP Partnership Agreement), designated a Series F Preferred Unit, of EOP Partnership (each, an "Equity Office Series F Preferred OP Unit").

(v) Each Series D Preferred Unit (as defined in the Spieker Partnership Agreement) of Spieker Partnership ("Spieker Series D Preferred OP Unit") outstanding immediately prior to the Effective Time of the Partnership Merger shall be exchanged for one Series G Preferred Unit (as defined in the EOP Partnership Agreement), designated a Series G Preferred Unit, of EOP Partnership ("Equity Office Series G Preferred OP Unit").

(vi) The Series E Cumulative Redeemable Preferred Interest (as defined in the Spieker Partnership Agreement) of Spieker Partnership ("Spieker Series E Preferred OP Unit") outstanding immediately prior to the Effective Time of the Partnership Merger shall be exchanged for 4,000,000 Series H Preferred Units (as defined in the EOP Partnership Agreement), designated a Series H Preferred Unit, of EOP Partnership (each, an "Equity Office Series H Preferred OP Unit").

As used herein, (i) "Spieker Preferred OP Units" means, collectively, Spieker Series A Preferred OP Units, Spieker Series B Preferred OP Units, Spieker Series C Preferred OP Units, Spieker Series D Preferred OP Units and Spieker Series E Preferred OP Units and (ii) "Equity Office Preferred OP Units" means, collectively, Equity Office Series D Preferred OP Units, Equity Office Series E Preferred OP Units, Equity Office Series F Preferred OP Units, Equity Office Series G Preferred OP Units and Equity Office Series H Preferred OP Units.

(b) *Merger Consideration.* The consideration to be paid to holders of capital stock of Spieker in the Merger (collectively, the "Merger Consideration") is as follows:

(i) Each share of Common Stock, par value $.0001 per share, of Spieker ("Spieker Common Stock") issued and outstanding immediately prior to the Effective Time of the Merger, together with the associated Spieker Right (as defined herein), shall be converted into the right to receive (a) an amount of cash computed as set forth in subparagraph (A) below (the "Cash Amount Per Share"), without interest, and (b) a number of validly issued, fully paid and nonassessable common shares of beneficial interest, $.01 par value per share, of Equity Office ("Equity Office Common Shares") computed as set forth in subparagraph (B) below (the "Stock Amount Per Share"), as follows:

(A) The Cash Amount Per Share shall be an amount of cash, without interest, equal to $13.50.

(B) The Stock Amount Per Share shall be 1.49586 Equity Office Common Shares.

(ii) Each share of Series A Preferred Stock (par value $.0001 per share), liquidation preference $25.00 per share, of Spieker ("Spieker Series A Preferred Share") issued and outstanding immediately prior to the Effective Time of the Merger, if any, shall be converted into the right to receive one Series D preferred share of beneficial interest, $0.01 par value per share, liquidation preference $25.00 per share, of Equity Office ("Equity Office Series D Preferred Share");

(iii) Each share of Series B Cumulative Redeemable Preferred Stock (par value $.0001 per share), liquidation preference $25.00 per share, of Spieker ("Spieker Series B Preferred Share") issued and outstanding immediately prior to the Effective Time of the Merger shall be converted into the right to receive one Series E preferred share of beneficial interest, $0.01 par value per share, liquidation preference $25.00 per share, of Equity Office ("Equity Office Series E Preferred Share"). The Equity Office Series E Preferred Shares shall have preferences, conversion and other rights, voting powers, restrictions, limitations as to dividends, qualifications and terms or conditions of redemption thereof identical to that of the Spieker Series B Preferred Shares outstanding on the date hereof;

(iv) Each share of Series C Cumulative Redeemable Preferred Stock (par value $.0001 per share), liquidation preference $25.00 per share, of Spieker ("Spieker Series C Preferred Share") issued and outstanding immediately prior to the Effective Time of the Merger shall be converted into the right to

A–5

Table of Contents

receive one Series F preferred share of beneficial interest, $0.01 par value per share, liquidation preference $25.00 per share, of Equity Office ("Equity Office Series F Preferred Share"). The Equity Office Series F Preferred Shares shall have preferences, conversion and other rights, voting powers, restrictions, limitations as to dividends, qualifications and terms or conditions of redemption thereof identical to that of the Spieker Series C Preferred Shares outstanding on the date hereof;

(v) Each share of Series D Cumulative Redeemable Preferred Stock (par value $.0001 per share), liquidation preference $50.00 per share, of Spieker ("Spieker Series D Preferred Shares") issued and outstanding immediately prior to the Effective Time of the Merger shall be converted into the right to receive one Series G preferred share of beneficial interest, $0.01 par value per share, liquidation preference $50.00 per share, of Equity Office ("Equity Office Series G Preferred Share"). The Equity Office Series G Preferred Shares shall have preferences, conversion and other rights, voting powers, restrictions, limitations as to dividends, qualifications and terms or conditions of redemption thereof identical to that of the Spieker Series D Preferred Shares outstanding on the date hereof;

(vi) Each share of Series E Cumulative Redeemable Preferred Stock (par value $.0001 per share), liquidation preference $25.00 per share, of Spieker ("Spieker Series E Preferred Share") issued and outstanding immediately prior to the Effective Time of the Merger shall be converted into the right to receive one Series H preferred share of beneficial interest, $0.01 par value per share, liquidation preference $25.00 per share, of Equity Office ("Equity Office Series H Preferred Share"). The Equity Office Series H Preferred Shares shall have preferences, conversion and other rights, voting powers, restrictions, limitations as to dividends, qualifications and terms or conditions of redemption thereof identical to that of the Spieker Series E Preferred Shares outstanding on the date hereof. As used herein, (i) "Spieker Preferred Stock" means, collectively, Spieker Series A Preferred Shares, Spieker Series B Preferred Shares, Spieker Series C Preferred Shares, Spieker Series D Preferred Shares and Spieker Series E Preferred Shares and (ii) "Equity Office Preferred Shares" means, collectively, Equity Office Series D Preferred Shares, Equity Office Series E Preferred Shares, Equity Office Series F Preferred Shares, Equity Office Series G Preferred Shares and Equity Office Series H Preferred Shares;

(vii) All shares of Spieker Common Stock, together with the associated Spieker Right, when so converted as provided in Section 1.10(b)(i), and all shares of Spieker Preferred Stock, when so converted as provided in Sections 1.10(b)(ii)–(vi), shall no longer be outstanding and shall automatically be cancelled and retired and shall cease to exist, and each holder of a certificate (a "Certificate") theretofore representing any such shares shall cease to have any rights with respect thereto, except the right to receive, upon the surrender of such Certificate in accordance with Section 1.13(c), as applicable, (A) any dividends and other distributions in accordance with Section 1.13(d), (B) certificates representing the Equity Office Common Shares into which such shares of Spieker Common Stock are converted pursuant to Section 1.10(b)(i), (C) cash, without interest, into which such shares of Spieker Common Stock are converted pursuant to Section 1.10(b)(i), (D) certificates representing the Equity Office Series D Preferred Shares into which Spieker Series A Preferred Shares are converted pursuant to Section 1.10(b)(ii), if any, (E) certificates representing the Equity Office Series E Preferred Shares into which Spieker Series B Preferred Shares are converted pursuant to Section 1.10(b)(iii), (F) certificates representing the Equity Office Series F Preferred Shares into which Spieker Series C Preferred Shares are converted pursuant to Section 1.10(b)(iv), (G) certificates representing the Equity Office Series G Preferred Shares into which Spieker Series D Preferred Shares are

converted pursuant to Section 1.10(b)(v), (H) certificates representing the Equity Office Series H Preferred Shares into which Spieker Series E Preferred Shares are converted pursuant to Section 1.10(b)(vi), and (I) any cash, without interest, in lieu of fractional Equity Office Common Shares to be issued or paid in consideration for Spieker Common Stock upon the surrender of such Certificate in accordance with Sections 1.13(c) and 1.13(g).

1.11 *Partner Approval.* Spieker shall seek the requisite approval of the partners of Spieker Partnership of this Agreement, the Merger, the withdrawal of Spieker as general partner and the Partnership Merger to the extent required by the Spieker Partnership Agreement or applicable law to effectuate the transactions contemplated by this Agreement (collectively, the "Spieker Partner Approvals"). Equity Office shall seek the

A–6

**Table of Contents**

requisite approval of the partners of EOP Partnership of the Merger and the Partnership Merger to the extent required by the EOP Partnership Agreement or applicable law to effectuate the transactions contemplated by this Agreement (collectively, the "Equity Office Partner Approvals," and together with the Spieker Partner Approvals, the "Partner Approvals").

1.12 *Appraisal or Dissenters Rights.* The holders of Spieker Common Stock, Spieker Preferred Stock (other than the Spieker Series A Preferred Shares), Equity Office Common Shares, Equity Office Existing Preferred Shares, Equity Office OP Units or Equity Office Existing Preferred Shares are not entitled under applicable law to appraisal, dissenters or similar rights as a result of the Mergers. Pursuant to Section 3–202 of the Maryland General Corporation Law, the holders of Spieker Series A Preferred Shares are entitled to dissenter's rights in accordance with the Maryland General Corporation Law. Pursuant to Section 15679.2 of the CRULPA, the holders of Spieker OP Units and Spieker Preferred OP Units are entitled to dissenters rights in accordance with the CRULPA but not otherwise.

1.13 *Exchange of Certificates; Pre–Closing Dividends; Fractional Shares.*

(a) *Exchange Agent.* Prior to the Effective Time, Equity Office shall appoint Equiserve LLC as the exchange agent, or another bank or trust company reasonably acceptable to Spieker, to act as exchange agent (the "Exchange Agent") for the exchange of the Merger Consideration upon surrender of certificates representing issued and outstanding shares of Spieker Common Stock and each series of Spieker Preferred Stock.

(b) *Equity Office to Provide Merger Consideration; Spieker to Provide Funds for Final Spieker Dividend.* Equity Office shall provide to the Exchange Agent on or before the Effective Time of the Merger, for the benefit of the holders of Spieker Common Stock and each series of Spieker Preferred Stock, the Merger Consideration issuable in exchange for the issued and outstanding Spieker Common Stock and each series of Spieker Preferred Stock pursuant to Section 1.10, together with any cash required to make payments in lieu of any fractional shares pursuant to Section 1.13(g) (the "Exchange Fund"). The Exchange Agent (or other depository acting for the benefit of the Exchange Agent) shall invest any cash included in the Exchange Fund as directed by Equity Office, on a daily basis. Any interest or other income resulting from such investments shall be paid to Equity Office. Spieker shall provide to the Exchange Agent not later than one business day prior to the Effective Time of the Merger, for the benefit of the holders of Spieker Common Stock and each series of Spieker Preferred Stock, cash payable in respect of any dividends required pursuant to Section 1.13(d)(i). Such cash shall be invested in accordance with written directions delivered by Spieker to the Exchange Agent or other depository not later than one business day prior to the Effective Time of the Merger, with any interest or other income earned on such investments to be paid to Equity Office as the successor to Spieker in the Merger.

(c) *Exchange Procedure.* Equity Office shall use commercially reasonable efforts to cause the Exchange Agent, no later than the fifth business day after the Closing Date, to mail to each holder of record of a Certificate or Certificates which immediately prior to the Effective Time represented outstanding shares of Spieker Common Stock or any series of Spieker Preferred Stock whose shares were converted into the right to receive the Merger Consideration pursuant to Section 1.10(b), (i) a letter of transmittal (which shall specify that delivery shall be effected, and risk of loss and title to the Certificates shall pass, only upon delivery of the Certificates to the Exchange Agent and shall be in a form and have such other provisions as Equity Office may reasonably specify) and (ii) instructions for use in effecting the surrender of the Certificates in exchange for the Merger Consideration together with any dividends or distributions to which such holder is entitled pursuant to Section 1.13(d) and cash, if any, payable in lieu of fractional shares pursuant to Section 1.13(g). Upon surrender of a Certificate for cancellation to the Exchange Agent, together with such letter of transmittal, duly executed, and such other documents as may reasonably be required by the Exchange Agent, (i) the holder of such Certificate shall be entitled to receive in exchange therefor the Merger Consideration into which the shares of Spieker Common Stock or a series of Spieker Preferred Stock, as applicable, theretofore represented by such Certificate shall have been converted pursuant to Section 1.10(b), together with any dividends or other distributions to which such holder is entitled pursuant to Section 1.13(d) and cash, if any, payable in lieu of fractional shares pursuant to Section 1.13(g), (ii) Equity Office shall use

A–7

**Table of Contents**

commercially reasonable efforts to cause the Exchange Agent to mail (or make available for collection by hand if so elected by the surrendering holder) such amount to such holder within five business days after receipt thereof, and (iii) the Certificate so surrendered shall forthwith be canceled. In the event of a transfer of ownership of shares of Spieker Common Stock or any series

of Spieker Preferred Stock which is not registered in the transfer records of Spieker, payment may be made to a Person other than the Person in whose name the Certificate so surrendered is registered if such Certificate shall be properly endorsed or otherwise be in proper form for transfer and the Person requesting such payment either shall pay any transfer or other taxes required by reason of such payment being made to a Person other than the registered holder of such Certificate or establish to the satisfaction of Equity Office that such tax or taxes have been paid or are not applicable. Until surrendered as contemplated by this Section 1.13, each Certificate shall be deemed at any time after the Effective Time to represent only the right to receive upon such surrender the Merger Consideration, without interest, into which the shares of Spieker Common Stock or any series of Spieker Preferred Stock heretofore represented by such Certificate shall have been converted pursuant to Section 1.10, and any dividends or other distributions to which such holder is entitled pursuant to Section 1.13(d) and any cash payable in lieu of fractional shares pursuant to Section 1.13(g). No interest will be paid or will accrue on the Merger Consideration upon the surrender of any Certificate or on any cash payable pursuant to Section 1.13(d) or Section 1.13(g). Equity Office or the Exchange Agent, as applicable, shall be entitled, in its sole and absolute discretion, to deduct and withhold from the cash, Equity Office Common Shares or Equity Office Preferred Shares (as defined herein), or any combination thereof, that otherwise is payable pursuant to this Agreement to any holder of shares of Spieker Common Stock or any series of Spieker Preferred Stock such amounts as Equity Office or the Exchange Agent is required to deduct and withhold with respect to the making of such payment under the Code or under any provision of state, local or foreign tax law. For this purpose, any Equity Office Common Shares or Equity Office Preferred Shares deducted and withheld by Equity Office shall be valued at the last trading price of the Equity Office Common Shares or the Equity Office Preferred Shares, as applicable, on the New York Stock Exchange on the Effective Date of the Merger (or in the event that a series of Equity Office Preferred Shares does not trade on the New York Stock Exchange, at the liquidation preference (excluding unpaid dividends) per Equity Office Preferred Share). To the extent that amounts are so withheld by Equity Office or the Exchange Agent, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the holder of the shares of Spieker Common Stock or a series of Spieker Preferred Stock, as applicable, in respect of which such deduction and withholding was made by Equity Office or the Exchange Agent.

(d) *Record Dates for Final Dividends; Distributions with Respect to Unexchanged Shares.*

(i) If and to the extent necessary for Spieker to satisfy the requirements of Section 857(a)(1) of the Code for the taxable year of Spieker ending at the Effective Time of the Merger (and to avoid the payment of any tax with respect to undistributed income or gain), Spieker shall declare a dividend (the "Final Spieker Dividend") to holders of shares of Spieker Common Stock and each series of Spieker Preferred Stock, if and to the extent required by the terms thereof, the record date for which shall be the close of business on the last business day prior to the Effective Time of the Merger, in an amount equal to the minimum dividend sufficient to permit Spieker to satisfy such requirements. Any dividends payable hereunder to holders of Spieker Common Stock and, if applicable, each series of Spieker Preferred Stock shall be paid on the last business day immediately preceding the Closing Date. In the event that Spieker is required to declare a Final Spieker Dividend with respect to the Spieker Common Stock, Spieker Partnership shall simultaneously declare a distribution (the "Final Spieker Partnership Distribution") to holders of Spieker OP Units in an amount per unit equal to the Final Spieker Dividend payable per share of Spieker Common Stock, together with any distributions required to be paid to holders of Spieker Preferred OP Units by reason of the payment of either the Final Spieker Dividend or the Final Spieker Partnership Distribution with respect to Spieker OP Units, the record date for which shall be the close of business on the last business day prior to the Effective Time of the Partnership Merger. The distribution payable hereunder to holders of Spieker OP Units and, if applicable, Spieker Preferred OP Units, shall be paid on the last business day immediately preceding the Closing Date.

A-8

Table of Contents

(ii) If Spieker determines that it is necessary to declare the Final Spieker Dividend, Spieker shall notify Equity Office at least 20 days prior to the date for the Spieker Stockholders Meeting, and Equity Office shall be entitled to declare a dividend per share payable to holders of shares of Equity Office Common Shares (in which event EOP Partnership shall declare a distribution per unit payable to holders of Equity Office OP Units if a distribution has been declared on the Equity Office Common Shares), the record dates for which shall be the close of business on the last business day prior to the Effective Time, in an amount per Equity Office Common Share (and Equity Office OP Unit) equal to the quotient obtained by dividing (x) the Final Spieker Dividend paid by Spieker with respect to each share of Spieker Common Stock by (y) 1.94462 (the "Corresponding Equity Office Dividends and Distributions"). If, and to the extent, the terms of any series of Equity Office Preferred Shares or Equity Office Preferred OP Units require the payment of a dividend or distribution by reason of the payment of the Corresponding Equity Office Dividends and Distributions, Equity Office and EOP Partnership shall declare and pay any such required dividends and distributions. The Corresponding Equity Office Dividends and Distributions (and any dividends payable to holders of Equity Office Preferred Shares and distributions payable to holders of Equity Office Preferred OP Units) shall be in addition to any Additional Corresponding Equity Office Dividends and Distributions (and any dividends payable to holders of Equity Office Preferred Shares and distributions payable to holders of Equity Office Preferred OP Units) payable pursuant to Section 5.10.

(iii) No dividends or other distributions with respect to Equity Office Common Shares or any series of Equity Office Preferred Shares with a record date after the Effective Time shall be paid to the holder of any unsurrendered Certificate with respect to the Equity Office Common Shares or such series of Equity Office Preferred Shares represented thereby, and no cash payment in lieu of fractional shares shall be paid to any such holder pursuant to Section 1.13(g), in each case until the surrender of such Certificate in accordance with this Section 1.13. Subject to the effect of applicable escheat laws, following surrender of any such Certificate (A) with respect to Certificates that represent the right to receive Equity Office Common Shares, there shall be paid to the holder of such Certificate, without interest, (i) at the time of such surrender, the amount of any cash payable pursuant to Section 1.10 and/or in lieu of any fractional Equity Office Common Shares to which such holder

is entitled pursuant to Section 1.13(g) and (ii) (x) at the time of such surrender the amount of dividends or other distributions with a record date after the Effective Time theretofore paid with respect to such whole Equity Office Common Shares, without interest, and (y) at the appropriate payment date, the amount of dividends or other distributions with a record date after the Effective Time but prior to such surrender and with a payment date subsequent to such surrender payable with respect to such whole Equity Office Common Shares and (B) with respect to Certificates that represent the right to receive any series of Equity Office Preferred Shares, there shall be paid to the holder of such Certificate, without interest, (x) at the time of such surrender the amount of dividends or other distributions with a record date after the Effective Time theretofore paid with respect to such Equity Office Preferred Shares and (y) at the appropriate payment date, the amount of dividends or other distributions with a record date after the Effective Time but prior to such surrender and with a payment date subsequent to such surrender payable with respect to such Equity Office Preferred Shares.

(e) *No Further Ownership Rights in Spieker Common Stock and Spieker Preferred Stock.* All Merger Consideration paid upon the surrender of Certificates in accordance with the terms of this Section 1.13 (including any cash paid pursuant to Section 1.13(g)) shall be deemed to have been paid in full satisfaction of all rights pertaining to the Spieker Common Stock and each series of Spieker Preferred Stock, as applicable, theretofore represented by such Certificates; *provided, however,* that Spieker shall transfer to the Exchange Agent cash sufficient to pay any dividends or make any other distributions with a record date prior to the Effective Time which may have been declared or made by Spieker on such Spieker Common Stock or any such series of Spieker Preferred Stock in accordance with the terms of this Agreement or prior to the date of this Agreement and which remain unpaid at the Effective Time and have not been paid prior to such surrender, and there shall be no further registration of transfers on the stock transfer books of Spieker of the Spieker Common Stock or any series of Spieker Preferred Stock which were outstanding immediately prior to

A–9

---

**Table of Contents**

the Effective Time. If, after the Effective Time, Certificates are presented to Equity Office for any reason, they shall be canceled and exchanged as provided in this Section 1.13.

(f) *No Liability.* None of Spieker, Equity Office or the Exchange Agent shall be liable to any Person in respect of any Merger Consideration or dividends delivered to a public official pursuant to any applicable abandoned property, escheat or similar law. Any portion of the Exchange Fund delivered to the Exchange Agent pursuant to this Agreement that remains unclaimed for 12 months after the Effective Time shall be redelivered by the Exchange Agent to Equity Office, upon demand, and any holders of Certificates who have not theretofore complied with Section 1.13(c) shall thereafter look only to Equity Office for delivery of the Merger Consideration, any cash payable in lieu of fractional shares pursuant to Section 1.13(g) and any unpaid dividends, subject to applicable escheat and other similar laws.

(g) *No Fractional Shares; No Fractional Equity Office OP Units*

(i) No certificates or scrip representing fractional Equity Office Common Shares shall be issued upon the surrender for exchange of Certificates, and such fractional share interests will not entitle the owner thereof to vote, to receive dividends or to any other rights of a shareholder of Equity Office.

(ii) No fractional Equity Office Common Shares shall be issued pursuant to this Agreement. In lieu of the issuance of any fractional Equity Office Common Shares pursuant to this Agreement, each holder of Spieker Common Stock shall be paid an amount in cash (without interest), rounded to the nearest cent (with .5 of a cent rounded up), determined by multiplying (i) the average closing price of one Equity Office Common Share on the New York Stock Exchange on the five trading days immediately preceding the Closing Date by (ii) the fraction of an Equity Office Common Share which such holder would otherwise be entitled to receive under this Section 1.13.

(iii) No fractional Equity Office OP Units shall be issued pursuant to this Agreement. In lieu of the issuance of any fractional Equity Office OP Units pursuant to this Agreement, each holder of Spieker OP Units who would receive, based on the exchange ratio specified in Section 1.10(a)(i), a number of Equity Office OP Units that is not a whole number shall receive instead a number of Equity Office OP Units that is equal to the whole number that is nearest to the number of Equity Office OP Units that otherwise would be paid to such holder of Spieker OP Units based on Section 1.10(a)(i) (with .5 of a Spieker OP Unit rounded up).

(h) *Lost Certificates.* If any Certificate shall have been lost, stolen or destroyed, upon the making of an affidavit of that fact by the Person claiming such Certificate to be lost, stolen or destroyed and, if required by Equity Office or the Exchange Agent, the posting by such Person of a bond in such reasonable amount as Equity Office or the Exchange Agent reasonably may direct (but consistent with the practices Equity Office applies to its own shareholders) as indemnity against any claim that may be made against them with respect to such Certificate, the Exchange Agent will issue in exchange for such lost, stolen or destroyed Certificate the cash, Equity Office Common Shares or Equity Office Preferred Shares to which the holders thereof are entitled pursuant to Section 1.10, any cash payable pursuant to Section 1.13(g) to which the holders thereof are entitled and any dividends or other distributions to which the holders thereof are entitled pursuant to Section 1.13(d).

(i) *Applicability to Partnership Merger.* Except for the provisions relating to the Exchange Agent, certificates, the exchange procedure and fractional Equity Office Common Shares, (which shall not be applicable), all other provisions of this Section 1.13 shall apply to Spieker Partnership, EOP Partnership, the Spieker OP Units and the Spieker OP Preferred Units with respect to the Partnership Merger.

## ARTICLE 2

### REPRESENTATIONS AND WARRANTIES OF SPIEKER AND SPIEKER PARTNERSHIP

Except as specifically set forth in the Spieker SEC Documents (as defined herein) or in the schedule delivered to Equity Office prior to the execution hereof and identified by either co−Chief Executive Officer of

A−10

Spieker as the disclosure letter to this Agreement (the "Spieker Disclosure Letter"), Spieker and Spieker Partnership represent and warrant to Equity Office and EOP Partnership as follows:

2.1 *Organization, Standing and Power.* Spieker is a corporation duly incorporated, validly existing and in good standing under the laws of Maryland. Spieker has all requisite corporate power and authority to own, operate, lease and encumber its properties and carry on its business as now being conducted. The Articles of Incorporation, as amended and supplemented, of Spieker (the "Spieker Articles") are in effect, and no dissolution, revocation or forfeiture proceedings regarding Spieker have been commenced. Spieker is duly qualified or licensed to do business as a foreign corporation and is in good standing in each jurisdiction in which the nature of its business or the ownership or leasing of its properties makes such qualification or licensing necessary, other than in such jurisdictions where the failure to be so qualified or licensed, individually or in the aggregate, would not reasonably be expected to have a Spieker Material Adverse Effect (as defined herein). As used in this Agreement, a "Spieker Material Adverse Effect" means any circumstance, event, occurrence, change or effect that is materially adverse to the business, properties, assets (tangible or intangible), financial condition or results of operations of Spieker, Spieker Partnership and the Spieker Subsidiaries (as defined herein), taken as a whole, except, in each case, as a result of (i) changes in general economic conditions nationally or regionally, (ii) changes affecting the real estate industry generally which do not affect Spieker or Spieker Partnership, as the case may be, materially disproportionately relative to other participants in the real estate industry similarly situated, or (iii) in and of itself and without the occurrence of any other Spieker Material Adverse Effect, changes in the trading prices of Spieker Common Stock or any series of Spieker Preferred Stock. Spieker has delivered to Equity Office complete and correct copies of the Spieker Articles and the Amended and Restated Bylaws of Spieker (the "Spieker Bylaws"), in each case, as amended or supplemented to the date of this Agreement.

2.2 *Spieker Subsidiaries.*

(a) *Schedule 2.2* to the Spieker Disclosure Letter sets forth (i) each Subsidiary (as defined herein) of Spieker (the "Spieker Subsidiaries") and Spieker TRS (which Spieker TRS constitutes the only entity in which Spieker owns a non−voting equity interest and has no right to control except as set forth in Schedule 2.4 of the Spieker Disclosure Letter), (ii) the ownership interest therein of Spieker, (iii) if not directly or indirectly wholly owned by Spieker, the identity and ownership interest of each of the other owners of such Spieker Subsidiary or Spieker TRS, as applicable, (iv) each office property and other commercial property owned by such Spieker Subsidiary or Spieker TRS, as applicable, and (v) if not wholly owned by such Spieker Subsidiary or Spieker TRS, as applicable, the identity and ownership interest of each of the other owners of such property. As used in this Agreement, "Subsidiary" of any Person (as defined herein) means any corporation, partnership, limited liability company, joint venture, trust or other legal entity of which such Person owns (either directly or through or together with another Subsidiary of such Person) either (i) a general partner, managing member or other similar interest, or (ii)(A) 10% or more of the voting power of the voting capital stock or other voting equity interests, or (B) 10% or more of the outstanding voting capital stock or other voting equity interests of such corporation, partnership, limited liability company, joint venture or other legal entity. As used herein, "Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization or other entity. *Schedule 2.2* of the Spieker Disclosure Letter sets forth a true and complete list of the equity securities owned by Spieker, any Spieker Subsidiary or Spieker TRS, in any corporation, partnership, limited liability company, joint venture or other legal entity, excluding Spieker Subsidiaries and Spieker TRS.

(b) Except as set forth in *Schedule 2.2* to the Spieker Disclosure Letter, (i) all of the outstanding shares of capital stock owned by Spieker, or Spieker Subsidiary or Spieker TRS of each Spieker Subsidiary and Spieker TRS that is a corporation have been duly authorized, validly issued and are (A) fully paid and nonassessable and not subject to preemptive or similar rights, and (B) owned free and clear of all pledges, claims, liens, charges, encumbrances and security interests of any kind or nature whatsoever (collectively, "Liens") and (ii) all equity interests in each Spieker Subsidiary that is a partnership, joint venture, limited liability company or trust which are owned by Spieker, by another Spieker Subsidiary or Spieker TRS or by Spieker and another Spieker Subsidiary or Spieker TRS are owned free and clear of all Liens other than pledges, if any, contained in organizational documents of such Spieker Subsidiary and given to secure

A−11

performance thereunder. Each Spieker Subsidiary and Spieker TRS that is a corporation is duly incorporated, validly existing and in good standing under the laws of its jurisdiction of incorporation and has the requisite corporate power and authority to own, operate, lease and encumber its properties and carry on its business as now being conducted, and each Spieker Subsidiary that is a partnership, limited liability company or trust is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization and has the requisite power and authority to own, operate, lease and encumber its properties and carry

on its business as now being conducted. Each Spieker Subsidiary and Spieker TRS is duly qualified or licensed to do business and is in good standing in each jurisdiction in which the nature of its business or the ownership or leasing of its properties makes such qualification or licensing necessary, other than in such jurisdictions where the failure to be so qualified or licensed, individually or in the aggregate, would not reasonably be expected to have a Spieker Material Adverse Effect. Complete and correct copies of the articles of incorporation, bylaws, organization documents and partnership, joint venture and operating agreements of each Spieker Subsidiary and Spieker TRS, as amended to the date of this Agreement, have been previously delivered or made available to Equity Office. No effective amendment has been made to the Spieker Partnership Agreement since February 28, 2000.

2.3  *Capital Structure.*

(a)  The authorized shares of capital stock of Spieker consist of 1,000,000,000 shares of capital stock, par value $.0001 per share, 649,000,000 of which are classified as Spieker Common Stock, 2,000,000 of which are classified as Class B Common Stock (par value $.0001 per share) of Spieker ("Spieker Class B Common Stock"), 1,500,000 of which are classified as Class C Common Stock (par value $.0001 per share) of Spieker ("Spieker Class C Common Stock"), 1,000,000 of which are classified as Series A Preferred Shares, 5,000,000 of which are classified as Series B Preferred Shares, 6,000,000 of which are classified as Series C Preferred Shares, 1,500,000 of which are classified as Series D Preferred Shares, 4,000,000 of which are classified as Series E Preferred Shares and 330,000,000 of which are classified as Excess Stock. 65,923,946 shares of Spieker Common Stock are issued and outstanding on the date of this Agreement; no shares of Spieker Class B Common Stock are issued and outstanding on the date of this Agreement; no shares of Spieker Class C Common Stock are issued and outstanding on the date of this Agreement; 1,000,000 Spieker Series A Preferred Shares are issued and outstanding on the date of this Agreement; 4,250,000 Spieker Series B Preferred Shares are issued and outstanding on the date of this Agreement; 6,000,000 Spieker Series C Preferred Shares are issued and outstanding on the date of this Agreement; no shares of Spieker Series D Preferred Shares are issued and outstanding on the date of this Agreement; 4,000,000 Spieker Series E Preferred Shares are issued and outstanding on the date of this Agreement. 6,500,000 shares of Spieker Participating Preferred Stock (par value $.0001 per share) have been reserved for issuance pursuant to the Spieker Rights Plan and none are outstanding.

(b)  Set forth in *Schedule 2.3(b)* to the Spieker Disclosure Letter is a true and complete list of the following: (i) each qualified or nonqualified option to purchase shares of Spieker Common Stock or Spieker OP Units granted under Spieker's Amended and Restated 1993 Directors' Stock Option Plan, Spieker's Amended and Restated 1993 Stock Incentive Plan, Spieker Partnership's Employee Stock Incentive Pool or any other formal or informal arrangement (collectively, the "Spieker Stock Options"); and (ii) except for the Spieker Rights, the Spieker Series A Preferred Shares and the Spieker OP Units, all other warrants or other rights to acquire Spieker Common Stock, all stock appreciation rights, restricted stock, dividend equivalents, deferred compensation accounts, restricted stock unit awards and other awards which are outstanding on the date of this Agreement ("Spieker Stock Rights"). *Schedule 2.3(b)* to the Spieker Disclosure Letter sets forth for each Spieker Stock Option and Spieker Stock Right (other than Spieker OP Units and Spieker Series A Preferred Shares) the name of the grantee, the date of the grant, the type of grant, the status of the option grants as qualified or nonqualified under Section 422 of the Code, the number of shares of Spieker Common Stock subject to each option or other award, the number and type of shares subject to options or awards that are currently exercisable, the exercise price per share, and the number and type of such shares subject to stock appreciation rights. On the date of this Agreement, except as set forth in this Section 2.3 or excepted therefrom or as set forth in *Schedule 2.3(b)* to the Spieker Disclosure Letter, no shares of Spieker Common Stock were outstanding or reserved for issuance.

A-12

Table of Contents

(c)  All outstanding shares of Spieker Common Stock are duly authorized, validly issued, fully paid and nonassessable and not subject to preemptive or similar rights under law or the Spieker Articles or Spieker Bylaws, or any contract or instrument to which Spieker is a party or by which it is bound. There are no bonds, debentures, notes or other indebtedness of Spieker having the right to vote (or convertible into, or exchangeable or exercisable for, securities having the right to vote) on any matters on which shareholders of Spieker may vote.

(d)  Other than (i) as set forth in this Section 2.3 or in *Schedule 2.3(b)* to the Spieker Disclosure Letter, (ii) Spieker OP Units, which may be converted into shares of Spieker Common Stock at a rate of one share of Spieker Common Stock for each Spieker OP Unit or, under the circumstances described in Article XI and Exhibit C of the Spieker Partnership Agreement, into cash, shares of Spieker Common Stock or a combination of cash and shares of Spieker Common Stock, (iii) 1,500,000 Spieker Series D Preferred Shares issuable, and reserved for issuance, upon the conversion of Spieker Series D Preferred OP Units, and (iv) 1,219,512 shares of Spieker Common Stock issuable, and reserved for issuance, upon the conversion of the Spieker Series A Preferred Shares, as of the date of this Agreement, there are no outstanding securities, options, warrants, calls, rights, commitments, agreements, arrangements or undertakings of any kind to which Spieker or any Spieker Subsidiary or Spieker TRS is a party or by which such entity is bound, obligating Spieker or any Spieker Subsidiary or Spieker TRS to issue, deliver or sell, or cause to be issued, delivered or sold, additional shares of capital stock, voting securities or other ownership interests of Spieker or any Spieker Subsidiary or Spieker TRS or obligating Spieker or any Spieker Subsidiary or Spieker TRS to issue, grant, extend or enter into any such security, option, warrant, call, right, commitment, agreement, arrangement or undertaking (other than to Spieker or a Spieker Subsidiary or Spieker TRS).

(e)  As of the date of this Agreement, (i) 75,749,191 Spieker OP Units (including for purposes of this Section 2.3(e) the Spieker Series A Preferred Unit representing 1,000,000 Spieker OP Units) are validly issued and outstanding, fully paid and nonassessable and not subject to preemptive or similar rights under law or the Spieker Partnership Agreement, or any contract or instrument to which Spieker or Spieker Partnership is a party or by which either is bound, of which 66,923,946 Spieker OP Units

(including for purposes of this Section 2.3(e) the Spieker Series A Preferred Unit representing 1,000,000 Spieker OP Units) are owned by Spieker, (ii) the Spieker Series A Preferred OP Unit (which represents 1,000,000 Spieker OP Units) is validly issued and outstanding, fully paid and nonassessable and not subject to preemptive or similar rights, and is owned by Spieker, (iii) the Spieker Series B Preferred OP Unit is validly issued and outstanding, fully paid and nonassessable and not subject to preemptive or similar rights and is owned by Spieker, (iv) the Spieker Series C Preferred OP Unit is validly issued and outstanding, fully paid and nonassessable and not subject to preemptive or similar rights, and is owned by Spieker, (v) 1,500,000 Spieker Series D Preferred OP Units are validly issued and outstanding, fully paid and nonassessable and not subject to preemptive or similar rights, none of which are owned by Spieker and (vi) the Spieker Series E Preferred OP Unit is validly issued and outstanding, fully paid and nonassessable and not subject to preemptive or similar rights, and is owned by Spieker. *Schedule 2.3(e)* to the Spieker Disclosure Letter sets forth the name of each holder of Spieker OP Units and the number of Spieker OP Units owned by each such holder as of the date of this Agreement. Except as provided in the Spieker Partnership Agreement or as contemplated by this Agreement, the Spieker OP Units are not subject to any restrictions imposed by Spieker Partnership on the transfer, assignment, pledge, distribution, encumbrance or other disposition thereof (either voluntarily or involuntarily and with or without consideration) or on the exercise of the voting rights thereof provided in the Spieker Partnership Agreement. Except as provided in the Spieker Partnership Agreement, Spieker Partnership has not issued or granted and is not a party to any outstanding commitments of any kind relating to, or any presently effective agreements or understandings with respect to, the issuance or sale of interests in Spieker Partnership, whether issued or unissued, or securities convertible into or exchangeable or exercisable for interests in Spieker Partnership.

(f) All dividends on Spieker Common Stock and each series of Spieker Preferred Stock and all distributions on Spieker OP Units and Spieker Preferred OP Units, which have been declared prior to the date of this Agreement, have been paid in full.

A–13

---

Table of Contents

(g) Set forth on *Schedule 2.3(g)* to the Spieker Disclosure Letter is a list of each registration rights agreement or other agreement between Spieker and/or Spieker Partnership, on the one hand, and one or more other parties, on the other hand, which sets forth the rights of any such other party or parties to cause the registration of any securities of Spieker and/or Spieker Partnership pursuant to the Securities Act of 1933, as amended (the "Securities Act").

2.4 *Other Interests.* Except for interests in the Spieker Subsidiaries, Spieker TRS and certain other entities as set forth in *Schedule 2.4* to the Spieker Disclosure Letter (the "Spieker Other Interests"), none of Spieker, Spieker Partnership, any Spieker Subsidiary or Spieker TRS owns directly or indirectly any interest or investment (whether equity or debt) in any corporation, partnership, joint venture, business, trust, limited liability company or other entity (other than investments in short–term investment securities). With respect to the Spieker Other Interests, Spieker Partnership is a partner, member or shareholder in good standing, and owns such interests free and clear of all Liens. None of Spieker, Spieker Partnership, any Spieker Subsidiary or Spieker TRS is in material breach of any agreement, document or contract which is of a material nature governing its rights in or to the Spieker Other Interests, all of which agreements, documents and contracts are (a) listed in Schedule 2.4 to the Spieker Disclosure Letter, (b) unmodified except as described therein and (c) to the Knowledge of Spieker (as defined herein), in full force and effect. To the Knowledge of Spieker, the other parties to any such agreement, document or contract which is of a material nature are not in material breach of any of their respective obligations under such agreements, documents or contracts.

2.5 *Authority; Noncontravention; Consents.*

(a) Spieker has the requisite corporate power and authority to enter into this Agreement and, subject to the requisite Spieker stockholder approval of the Merger and any other matters reasonably and timely requested by any other party to effectuate the transactions contemplated by this Agreement (collectively, the "Spieker Stockholder Approvals") and the Spieker Partner Approvals (as defined herein), to consummate the transactions contemplated by this Agreement to which Spieker is a party. The execution and delivery of this Agreement by Spieker and the consummation by Spieker of the transactions contemplated by this Agreement to which Spieker is a party have been duly authorized by all necessary action on the part of Spieker, except for and subject to the Spieker Stockholder Approvals and the Spieker Partner Approvals. This Agreement has been duly executed and delivered by Spieker and constitutes a valid and binding obligation of Spieker, enforceable against Spieker in accordance with and subject to its terms, subject to applicable bankruptcy, insolvency, moratorium or other similar laws relating to creditors' rights and general principles of equity.

(b) Spieker Partnership has the requisite partnership power and authority to enter into this Agreement and, subject to the requisite Spieker Partner Approvals, to consummate the transactions contemplated by this Agreement to which Spieker Partnership is a party. The execution and delivery of this Agreement by Spieker Partnership and the consummation by Spieker Partnership of the transactions contemplated by this Agreement to which Spieker Partnership is a party have been duly authorized by all necessary action on the part of Spieker Partnership, except for and subject to the Spieker Stockholder Approvals and the Spieker Partner Approvals. This Agreement has been duly executed and delivered by Spieker Partnership and constitutes a valid and binding obligation of Spieker Partnership, enforceable against Spieker Partnership in accordance with and subject to its terms, subject to applicable bankruptcy, insolvency, moratorium or other similar laws relating to creditors' rights and general principles of equity.

(c) Except as set forth in *Schedule 2.5(c)(1)* to the Spieker Disclosure Letter and subject to receipt of the Spieker Stockholder Approvals and the Spieker Partner Approvals, the execution and delivery of this Agreement by Spieker do not, and the consummation of the transactions contemplated by this Agreement to which Spieker is a party and compliance by Spieker with the provisions of this Agreement will not, conflict with, or result in any violation of, or default (with or without notice or lapse of

time, or both) under, or give rise to a right of termination, cancellation or acceleration of any material obligation or to material loss of a benefit under, or result in the creation of any Lien upon any of the properties or assets of Spieker or any Spieker Subsidiary under, (i) the Spieker Articles or Spieker Bylaws or the comparable charter or organizational documents or partnership, operating, or similar agreement (as the case may be) of any Spieker Subsidiary or Spieker TRS, each as amended or supplemented, (ii) any loan or credit agreement, note, bond,

A–14

---

Table of Contents

mortgage, indenture, merger or other acquisition agreement, reciprocal easement agreement, lease or other agreement, instrument, permit, concession, franchise or license applicable to Spieker or any Spieker Subsidiary or Spieker TRS or their respective properties or assets or (iii) subject to the governmental filings and other matters referred to in the following sentence, any judgment, order, decree, statute, law, ordinance, rule or regulation (collectively, "Laws") applicable to Spieker or any Spieker Subsidiary or Spieker TRS, or their respective properties or assets, other than, in the case of clause (ii) or (iii), any such conflicts, violations, defaults, rights, loss or Liens that individually or in the aggregate would not reasonably be expected to (x) have a Spieker Material Adverse Effect or (y) prevent or materially impair the ability of Spieker to perform any of its obligations hereunder or prevent or materially threaten or impede the consummation of the transactions contemplated by this Agreement. No consent, approval, order or authorization of, or registration, declaration or filing with, any federal, state or local government or any court, administrative or regulatory agency or commission or other governmental authority or agency, domestic or foreign (a "Governmental Entity"), is required by or with respect to Spieker or any Spieker Subsidiary or Spieker TRS in connection with the execution and delivery of this Agreement by Spieker and Spieker Partnership or the consummation by Spieker or any Spieker Subsidiary of the transactions contemplated by this Agreement, except for (i) the filing with the Securities and Exchange Commission (the "SEC") of (x) the Joint Proxy Statement (as defined herein), and (y) such reports and filings under the Securities Act and Section 13(a) of the Exchange Act as may be required in connection with this Agreement and the transactions contemplated by this Agreement, (ii) the filing and acceptance for record of the Articles of Merger by the Department, (iii) the filing of the Delaware Certificate of Merger with the Office of the Secretary of State of the State of Delaware, (iv) the filing of the California Certificate of Merger with the Secretary of State of the State of California and (v) such other consents, approvals, orders, authorizations, registrations, declarations and filings (A) as are set forth in *Schedule 2.5(c)(2)* to the Spieker Disclosure Letter, (B) as may be required under (w) the Hart–Scott–Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act"), (x) laws requiring transfer, recordation or gains tax filings, (y) federal, state or local environmental laws or (z) the "blue sky" laws of various states, to the extent applicable, or (C) which, if not obtained or made, would not prevent or delay in any material respect the consummation of any of the transactions contemplated by this Agreement or otherwise prevent Spieker from performing its obligations under this Agreement in any material respect or reasonably be expected to have, individually or in the aggregate, a Spieker Material Adverse Effect.

2.6 *SEC Documents; Financial Statements; Undisclosed Liabilities.* Spieker and Spieker Partnership have filed all reports, schedules, forms, statements and other documents required to be filed with the SEC since December 31, 1997 through the date hereof (collectively, including all exhibits thereto and any registration statement filed since such date, the "Spieker SEC Documents"). All of the Spieker SEC Documents (other than preliminary material), as of their respective filing dates, complied in all material respects with all applicable requirements of the Securities Act and the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and, in each case, the rules and regulations promulgated thereunder applicable to such Spieker SEC Documents. None of the Spieker SEC Documents at the time of filing contained, nor will any report, schedule, form, statement or other document filed by Spieker or Spieker Partnership after the date hereof and prior to the Effective Time contain, any untrue statement of a material fact or omitted to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading. The consolidated financial statements of Spieker included in the Spieker SEC Documents or of Spieker Partnership included in the Spieker SEC Documents complied, or will comply, as to form in all material respects with applicable accounting requirements and the published rules and regulations of the SEC with respect thereto, have been or will be prepared in accordance with generally accepted accounting principles ("GAAP") (except, in the case of unaudited statements, as permitted by the applicable rules and regulations of the SEC) applied on a consistent basis during the periods involved (except as may be indicated in the notes thereto) and fairly presented, or will fairly present, in all material respects in accordance with the applicable requirements of GAAP and the applicable rules and regulations of the SEC, the consolidated financial position of Spieker and its Subsidiaries or Spieker Partnership and its Subsidiaries, as the case may be, in each case, taken as a whole, as of the dates thereof and the consolidated results of operations and cash flows for the periods then ended (except, in the case of unaudited statements, as permitted by Form 10–Q under the

A–15

---

Table of Contents

Exchange Act). Except as set forth in *Schedule 2.6(b)* to the Spieker Disclosure Letter, Spieker has no Subsidiaries which are not consolidated for accounting purposes. Except for liabilities and obligations set forth in the Spieker SEC Documents or in *Schedule 2.6(c)* to the Spieker Disclosure Letter, none of Spieker, any Spieker Subsidiary or Spieker TRS has any liabilities or obligations of any nature (whether accrued, absolute, contingent or otherwise) required by GAAP to be set forth on a consolidated balance sheet of Spieker or in the notes thereto and which, individually or in the aggregate, would reasonably be expected to have a Spieker Material Adverse Effect.

2.7 *Absence of Certain Changes or Events.* Except as disclosed in the Spieker SEC Documents or in *Schedule 2.7* to the Spieker Disclosure Letter, since December 31, 1999 (the "Spieker Financial Statement Date"), Spieker, its Subsidiaries and

Spieker TRS have conducted their business only in the ordinary course (taking into account prior practices, including the acquisition and disposition of properties and issuance of securities) and there has not been (a) any circumstance, event, occurrence, change or effect that has had a Spieker Material Adverse Effect, nor has there been any circumstance, event, occurrence, change or effect that with the passage of time would reasonably be expected to result in a Spieker Material Adverse Effect, (b) except for regular quarterly distributions not in excess of $0.70 per share of Spieker Common Stock or Spieker OP Unit (subject to changes pursuant to Section 5.10 and to any Final Spieker Dividend payable pursuant to Section 1.13(d)(i)), $0.8536584 per share of Spieker Series A Preferred Shares, of $0.590625 per share of Spieker Series B Preferred Shares, $0.4921875 per share of Spieker Series C Preferred Shares or of $0.50 per share of Spieker Series E Preferred Shares (or, in each case, with respect to the period commencing on the date hereof and ending on the Closing Date, distributions as necessary to maintain REIT (as defined herein) status), in each case with customary record and payment dates, any authorization, declaration, setting aside or payment of any dividend or other distribution (whether in cash, stock or property) with respect to the Spieker Common Stock, the Spieker OP Units or any series of the Spieker Preferred OP Units or the Spieker Preferred Stock, (c) any split, combination or reclassification of the Spieker Common Stock, the Spieker OP Units or any series of the Spieker Preferred OP Units or the Spieker Preferred Stock or any issuance or the authorization of any issuance of any other securities in respect of, in lieu of or in substitution for, or giving the right to acquire by exchange or exercise, shares of stock of Spieker or partnership interests in Spieker Partnership or any issuance of an ownership interest in, any Spieker Subsidiary or Spieker TRS, (d) any damage, destruction or loss, whether or not covered by insurance, that has had or would reasonably be expected to have a Spieker Material Adverse Effect, (e) any change in accounting methods, principles or practices by Spieker or any of its Subsidiaries, Spieker Partnership or any of its Subsidiaries or Spieker TRS materially affecting its assets, liabilities or business, except insofar as may have been disclosed in Spieker SEC Documents or required by a change in GAAP, or (f) any amendment in any material respect of any employment, consulting, severance, retention or any other agreement between Spieker and any officer or director of Spieker.

2.8  *Litigation.* Except as disclosed in the Spieker SEC Documents or in *Schedule 2.8* to the Spieker Disclosure Letter, and other than personal injury and other routine tort litigation arising from the ordinary course of operations of Spieker, the Spieker Subsidiaries and Spieker TRS (a) which are covered by insurance, subject to a reasonable deductible or retention limit or (b) for which all material costs and liabilities arising therefrom are reimbursable pursuant to common area maintenance or similar agreements, there is no suit, action or proceeding pending (in which service of process has been received by an employee of Spieker, a Spieker Subsidiary or the Spieker TRS) or, to the Knowledge of Spieker (as hereinafter defined), threatened in writing against or affecting Spieker, or any Spieker Subsidiary or Spieker TRS that, individually or in the aggregate, would reasonably be expected to (i) have a Spieker Material Adverse Effect or (ii) prevent or materially impair the ability of Spieker to perform any of its obligations hereunder or prevent or materially threaten or impair the consummation of any of the transactions contemplated by this Agreement, nor is there any judgment, decree, injunction, rule or order of any court or Governmental Entity or arbitrator outstanding against Spieker, any Spieker Subsidiary or Spieker TRS having, or which, insofar as reasonably can be foreseen, in the future would have, any such effect. Notwithstanding the foregoing, (y) *Schedule 2.8* to the Spieker Disclosure Letter sets forth each and every material uninsured claim, equal employment opportunity claim and claim relating to sexual harassment and/or discrimination pending or, to the Knowledge of Spieker, threatened as of the date hereof, in each case with a brief summary of such claim or threatened

A–16

**Table of Contents**

claim, and (z) no claim has been made under any directors' and officers' liability insurance policy maintained at any time by Spieker, any of the Spieker Subsidiaries or Spieker TRS.

2.9  *Properties.*

(a) Except as provided in *Schedule 2.2* or *Schedule 2.9(a)* to the Spieker Disclosure Letter, Spieker or the Spieker Subsidiary or Spieker TRS set forth on *Schedule 2.2* to the Spieker Disclosure Letter owns fee simple title to or holds a leasehold interest in each of the real estate properties identified in *Schedule 2.2* to the Spieker Disclosure Letter (the "Spieker Properties"), which are all of the real estate properties owned or leased by them, in each case (except for the Permitted Title Exceptions (as defined herein)) free and clear of liens, mortgages or deeds of trust, claims against title, charges which are liens, security interests or other encumbrances on title ("Encumbrances"). *Schedule 2.2* to the Spieker Disclosure Letter further identifies which of the Spieker Properties are owned in fee simple by Spieker or the Spieker Subsidiary or Spieker TRS and which of the Spieker Properties are subject to a ground lease. Except as set forth in *Schedule 2.2* to the Spieker Disclosure Letter, no other Person has any ownership interest in any of the Spieker Properties and any such ownership interest so scheduled does not materially interfere with the present use of, any of the Spieker Properties subject thereto or affected thereby. Except as set forth in *Schedule 2.9(a)* to the Spieker Disclosure Letter, none of the Spieker Properties is subject to any restriction on the sale or other disposition thereof or on the financing or release of financing thereon. The Spieker Properties are not subject to any rights of way, agreements, laws, ordinances and regulations affecting building use or occupancy, or reservations of an interest in title (collectively, "Property Restrictions") or Encumbrances, except for the following (collectively, the "Permitted Title Exceptions") (i) Property Restrictions and Encumbrances set forth in the Spieker Disclosure Letter, (ii) Property Restrictions imposed or promulgated by law or any governmental body or authority with respect to real property, including zoning regulations, which do not materially adversely affect the current use of any Spieker Property, (iii) Property Restrictions and Encumbrances disclosed on existing title reports or policies or existing surveys or subsequently granted by Spieker or the Spieker Subsidiary or Spieker TRS, which Property Restrictions and Encumbrances, in any event, do not materially interfere with the present use of any of the Spieker Properties subject thereto or affected thereby and (iv) liens for real estate taxes not yet due and payable, mechanics', carriers', workmen's, repairmen's liens and other Encumbrances and Property Restrictions, if any, which, individually or in the aggregate, do not materially detract from the value of or materially interfere with the present use of any of the Spieker Properties subject thereto or

affected thereby. *Schedule 2.9(a)* to the Spieker Disclosure Letter lists each of the Spieker Properties which are under development as of the date of this Agreement and describes the status of such development as of the date hereof.

(b) Except as provided in *Schedule 2.2* or *Schedule 2.9(b)* to the Spieker Disclosure Letter, valid policies of title insurance (or fully paid and enforceable commitments therefor) have been issued insuring the applicable Spieker Subsidiary's or Spieker TRS's (as the case may be) fee simple title or leasehold estate, as the case may be, to the Spieker Properties owned by it in amounts approximately equal to the purchase price therefor paid by such Spieker Subsidiary or Spieker TRS, subject only to the Permitted Title Exceptions and the matters disclosed in the Spieker Disclosure Letter. Such policies are, at the date hereof, in full force and effect. No material claim has been made against any such policy.

(c) Except as provided in *Schedule 2.9(c)* to the Spieker Disclosure Letter, Spieker has no Knowledge (i) that, any certificate, permit or license from any governmental authority having jurisdiction over any of the Spieker Properties or any agreement, easement or other right which is necessary to permit the lawful use and operation of the buildings and improvements on any of the Spieker Properties or which is necessary to permit the lawful use and operation of all driveways, roads and other means of egress and ingress to and from any of the Spieker Properties has not been obtained and is not in full force and effect, or of any pending threat of modification or cancellation of any of the same, the absence of which would reasonably be expected to have a material adverse effect on such Spieker Property, (ii) of any written notice of any violation of any federal, state or municipal law, ordinance, order, regulation or requirement affecting any of the Spieker Properties issued by any governmental authority which would reasonably be expected to have a material adverse effect on such Spieker Property, (iii) of any structural defects relating to any Spieker Property which would reasonably be expected to have a material adverse effect on such Spieker Property, (iv) of any Spieker Property whose

A-17

---

Table of Contents

building systems are not in working order so as to have a material adverse effect on such Spieker Property, or (v) of any physical damage to any Spieker Property which would reasonably be expected to have a material adverse effect on such Spieker Property for which there is not insurance in effect covering the cost of the restoration and the loss of revenue (subject to a reasonable deduction or retention limit).

(d) Except as set forth in *Schedule 2.9(d)* to the Spieker Disclosure Letter, none of Spieker, any Spieker Subsidiary or Spieker TRS has received any written or published notice to the effect that (i) any condemnation or involuntary rezoning proceedings are pending or threatened with respect to any of the Spieker Properties or (ii) any zoning, building or similar law, code, ordinance, order or regulation is or will be violated by the continued maintenance, operation or use of any buildings or other improvements on any of the Spieker Properties or by the continued maintenance, operation or use of the parking areas which would reasonably be expected to have a material adverse effect on such Spieker Property. Except as set forth in *Schedule 2.9(d)* to the Spieker Disclosure Letter, (i) all work required to be performed, payments required to be made and actions required to be taken prior to the date hereof pursuant to any agreement entered into with a governmental body or authority in connection with a site approval, zoning reclassification or other similar action relating to any Spieker Properties (*e.g.*, Local Improvement District, Road Improvement District, Environmental Mitigation (as defined herein)) have been performed, paid or taken, as the case may be, and (ii) Spieker has no Knowledge of any planned or proposed work, payments or actions that may be required after the date hereof pursuant to such agreements, in each of case (i) and (ii) except as set forth in development or operating budgets for such Spieker Properties delivered to Equity Office and EOP Partnership prior to the date hereof and other than those which would not reasonably be expected to have a Spieker Material Adverse Effect. As used in this Agreement, "Environmental Mitigation" means investigation, clean-up, removal action, remedial action, restoration, repair, response action, corrective action, monitoring, sampling and analysis, installation, reclamation, closure or post-closure in response to any actual or suspected environmental condition or Hazardous Materials.

(e) The rent rolls previously provided by Spieker to Equity Office (the "Spieker Rent Roll") list each Spieker Space Lease (as defined herein) in effect as of the dates set forth therein, none of which are earlier than December 31, 2000, and, except for omissions or discrepancies that, either individually or in the aggregate, would not reasonably be expected to have a Spieker Material Adverse Effect, all information set forth in the Spieker Rent Roll is true, correct and complete as of the date thereof. "Spieker Space Lease" means each lease or other right of occupancy affecting or relating to a property in which Spieker Partnership (or an entity in which it directly or indirectly has an interest) is the landlord, either pursuant to the terms of the lease agreement or as successor to any prior landlord, but excluding any ground lease. Spieker has made available to Equity Office true, correct and complete copies of all Spieker Space Leases, including all amendments, modifications, supplements, renewals, extensions and guarantees related thereto, as of the date hereof. Except as set forth in a delinquency report made available to Equity Office, none of Spieker, any Spieker Subsidiary or Spieker TRS, on the one hand, nor, to the knowledge of Spieker or Spieker Partnership, any other party, on the other hand, is in monetary default under any Spieker Space Lease, except for such defaults that would not reasonably be expected to have a Spieker Material Adverse Effect.

(f) *Schedule 2.9(f)* contains a true and complete list, by type of insurance, carrier, coverages (including limits) and term, of all material policies of casualty, liability and other types of insurance (except title insurance) carried by Spieker or any Spieker Subsidiary. All such policies are in full force and effect and neither Spieker nor any Spieker Subsidiary has received from any insurance company notice of any material defects or deficiencies affecting the insurability of Spieker or any Spieker Subsidiary or any of their respective assets thereunder.

2.10 *Environmental Matters.*

(a)  "Environmental Law" shall mean all applicable Laws, including any plans, other criteria, or guidelines promulgated pursuant to such Laws, relating to noise control, or the protection of human health, safety and natural resources, animal health or welfare or the environment, including, without limitation, Laws relating to the use, manufacturing, production, generation, installation, recycling, reuse, sale, storage, handling, transport, treatment, release, threatened release or disposal of any Hazardous Materials (including

A–18

Table of Contents

the Comprehensive Environmental Response, Compensation, and Liability Act, as amended, 42 U.S.C. ss 9601 et seq. ("CERCLA")). "Hazardous Materials" shall mean substances, wastes, radiation or materials (whether solids, liquids or gases) (i) which are hazardous, toxic, infectious, explosive, radioactive, carcinogenic, or mutagenic, (ii) which are listed, regulated or defined under any Environmental Law, and shall include "hazardous wastes," "hazardous substances," "hazardous materials," "pollutants," "contaminants," "toxic substances," "radioactive materials" or "solid wastes," (iii) the presence of which on property cause or threaten to cause a nuisance pursuant to applicable statutory or common law upon the property or to adjacent properties, (iv) which contain without limitation polychlorinated biphenyls (PCBs), asbestos or asbestos–containing materials, lead–based paints, urea–formaldehyde foam insulation, or petroleum or petroleum products (including, without limitation, crude oil or any fraction thereof) or (v) which pose a hazard to human health, safety, natural resources, industrial hygiene, or the environment, or an impediment to working conditions. "Release" shall have the meaning set forth in Section 101 of CERCLA, without regard to the exclusions set forth therein.

(b)  Except as disclosed in the Spieker SEC Documents,

(i)  none of Spieker, any of the Spieker Subsidiaries or Spieker TRS or, to Spieker's Knowledge, any other Person has caused or permitted the presence of any Hazardous Materials at, on or under any of the Spieker Properties and none of Spieker, any of the Spieker Subsidiaries or Spieker TRS has any Knowledge of the presence of any Hazardous Materials at, on or under any of the Spieker Properties, in each of the foregoing cases, such that the presence of such Hazardous Materials (including the presence of asbestos in any buildings or improvements at the Spieker Properties) would, individually or in the aggregate, reasonably be expected to have a Spieker Material Adverse Effect;

(ii)  (y) there have been no Releases of Hazardous Materials at, on, under or from (A) the Spieker Properties or (B) any real property previously owned, operated or leased by Spieker, the Spieker Subsidiaries, or Spieker TRS (the "Former Spieker Properties") during the period of such ownership, operation or tenancy, and (z) none of Spieker, any of the Spieker Subsidiaries or Spieker TRS has any Knowledge of any Releases of Hazardous Materials having occurred or presently occurring at, on, under or from the Spieker Properties or the Former Spieker Properties, which Releases described in changes (y) and (z) would, individually or in the aggregate, reasonably be expected to have a Spieker Material Adverse Effect;

(iii)  (y) Spieker, the Spieker Subsidiaries and Spieker TRS have not failed to comply with any Environmental Law, and (z) none of Spieker, any of the Spieker Subsidiaries or Spieker TRS has any liability under the Environmental Laws, except in each of cases (y) and (z) to the extent that any such failure to comply or any such liability, individually or in the aggregate, would not reasonably be expected to have a Spieker Material Adverse Effect; and

(iv)  Spieker, the Spieker Subsidiaries and Spieker TRS have been duly issued, and currently have and will maintain through the Closing Date, all permits, licenses, certificates and approvals required under any Environmental Law (collectively, the "Environmental Permits") necessary to operate their businesses as currently operated except where the failure to obtain and maintain such Environmental Permit would not, individually or in the aggregate, reasonably be expected to have a Spieker Material Adverse Effect. Spieker, the Spieker Subsidiaries and Spieker TRS have timely filed applications for all Environmental Permits. All of the Environmental Permits are transferable and none require consent, notification or other action to remain in full force and effect following consummation of the transactions contemplated hereby.

(c)  Spieker has previously delivered or made available to Equity Office complete copies of all material information, documents and reports including, without limitation, environmental investigations and testing or analysis that are in the possession or control of any of Spieker, the Spieker Subsidiaries and Spieker TRS and which relate to compliance with Environmental Laws by any of them or to the past or current environmental condition of the Spieker Properties.

A–19

Table of Contents

2.11  *Related Party Transactions.* Set forth in *Schedule 2.11* to the Spieker Disclosure Letter is a list of all material arrangements, agreements and contracts entered into by Spieker, any Spieker Subsidiary and Spieker TRS which are in effect and which are with (a) any investment banker or financial advisor, in each case, relating to any obligation to make, or which could result in the making of, any payment (except pursuant to indemnification obligations), (b) any Person who is an officer, director or Affiliate (as defined herein) of Spieker or any Spieker Subsidiary or Spieker TRS, any relative of any of the foregoing or any entity of which any of the foregoing is an Affiliate or (c) any Person who acquired Spieker Common Stock, Spieker OP Units or any series of Spieker Preferred OP Units or Spieker Preferred Stock in a private placement. Such documents, copies of all of which have previously been delivered or made available to Equity Office, are listed in *Schedule 2.11* to the Spieker Disclosure Letter. As used in this Agreement, the term "Affiliate" shall have the same meaning as such term is defined in Rule 405

promulgated under the Securities Act.

2.12 *Employee Benefits.* As used herein, the term "Employee Plan" includes any pension, retirement, savings, disability, medical, dental, health, life, death benefit, group insurance, profit sharing, deferred compensation, stock option, bonus, incentive, vacation pay, tuition reimbursement, severance pay, or other employee benefit plan, trust, agreement, contract, agreement, policy or commitment (including, without limitation, any pension plan, as defined in Section 3(2) of the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder ("ERISA") ("Pension Plan"), and any welfare plan as defined in Section 3(1) of ERISA ("Welfare Plan")), whether any of the foregoing is funded, insured or self-funded, written or oral, (i) sponsored or maintained by Spieker, any Spieker Subsidiary or Spieker TRS (each, a "Controlled Group Member") and covering any Controlled Group Member's active or former employees (or their beneficiaries), (ii) to which any Controlled Group Member is a party or by which any Controlled Group Member (or any of the rights, properties or assets thereof) is bound or (iii) with respect to which any current Controlled Group Member may otherwise have any material liability (whether or not such Controlled Group Member still maintains such Employee Plan). Each Employee Plan is listed on *Schedule 2.12* to the Spieker Disclosure Letter. Except as disclosed in *Schedule 2.12* to the Spieker Disclosure Letter, with respect to the Employee Plans:

(a)  No Controlled Group Member has any continuing liability under any Welfare Plan which provides for continuing benefits or coverage for any participant or any beneficiary of a participant after such participant's termination of employment, except as may be required by Section 4980B of the Code or Section 601 (et seq.) of ERISA, or under any applicable state law, and at the expense of the participant or the beneficiary of the participant.

(b)  Each Employee Plan complies in all material respects with the applicable requirements of ERISA and any other applicable law governing such Employee Plan, and, to the Knowledge of Spieker, each Employee Plan has at all times been properly administered in all material respects in accordance with all such requirements of law, and in accordance with its terms and the terms of any applicable collective bargaining agreement to the extent consistent with all such requirements of law. Each Pension Plan which is intended to be qualified under Section 401(a) of the Code, has received a favorable determination letter from the IRS stating that such Plan meets the requirements of Section 401(a) of the Code and that the trust associated with such Plan is tax-exempt under Section 501(a) of the Code and, to the Knowledge of Spieker, no event has occurred which would jeopardize the qualified status of any such plan or the tax exempt status of any such trust under Sections 401(a) and Section 501(a) of the Code, respectively. No lawsuits, claims (other than routine claims for benefits) or formal complaints to, or by, any Person or governmental entity have been filed, are pending or, to the Knowledge of Spieker, threatened with respect to any Employee Plan and, to the Knowledge of Spieker, there is no fact or contemplated event which would reasonably be expected to give rise to any such lawsuit, claim (other than routine claims for benefits) or complaint with respect to any Pension Plan. Without limiting the foregoing, the following are true with respect to each Employee Plan:

(i)  all Controlled Group Members have complied in all material respects with the reporting and disclosure requirements of ERISA, the Code, or both, with respect to each Employee Plan and no Controlled Group Member has incurred any material liability in connection with such reporting or disclosure;

A-20

---

Table of Contents

(ii)  all contributions and payments with respect to Employee Plans that are required to be made by a Controlled Group Member with respect to periods ending on or before the Closing Date (including periods from the first day of the current plan or policy year to the Closing Date) have been, or will be, made or accrued before the Closing Date in accordance with the appropriate plan document, actuarial report, collective bargaining agreements or insurance contracts or arrangements or as otherwise required by ERISA or the Code; and

(iii)  with respect to each such Employee Plan, to the extent applicable, Spieker has delivered to or has made available to Equity Office true and complete copies of (A) plan documents, or any and all other documents that establish the existence of the plan, trust, arrangement, contract, policy or commitment and all amendments thereto, (B) the most recent determination letter, if any, received from the IRS, (C) the three most recent Form 5500 Annual Reports (and all schedules and reports relating thereto) and actuarial reports and (D) all related trust agreements, insurance contract or other funding agreements that implement each such Employee Plan.

(c)  With respect to each Employee Plan, to the Knowledge of Spieker, there has not occurred, and no Person is contractually bound to enter into, any "prohibited transaction" within the meaning of Section 4975(c) of the Code or Section 406 of ERISA, which transaction is not exempt under Section 4975(d) of the Code or Section 408 of ERISA and which could subject Spieker or any Controlled Group Member to material liability.

(d)  No Controlled Group Member has maintained or been obligated to contribute to any Employee Plan subject to Code Section 412 or Title IV of ERISA. No Employee Plan subject to Code Section 412 or Title IV of ERISA has been terminated.

(e)  With respect to each Pension Plan maintained by any Controlled Group Member, such Plan provides the Plan Sponsor the authority to amend or terminate the Plan at any time, subject to applicable requirements of ERISA and the Code.

2.13 *Employee Policies.* The employee handbooks of Spieker, the Spieker Subsidiaries and Spieker TRS currently in effect have been delivered to Equity Office and fairly and accurately summarize in all material respects all material employee policies, vacation policies and payroll policies.

2.14 *Taxes.*

(a) Each of Spieker, the Spieker Subsidiaries and Spieker TRS (A) has filed all Tax returns and reports required to be filed by it (after giving effect to any filing extension properly granted by a Governmental Entity having authority to do so) and all such returns and reports are accurate and complete in all material respects, (B) has paid (or Spieker has paid on its behalf) all Taxes (as defined herein) shown on such returns and reports as required to be paid by it, and (C) has complied in all material respects with all applicable laws, rules and regulations relating to the payment and withholding of Taxes (including, without limitation, withholding of Taxes pursuant to Sections 1441, 1442, 1445, 1446, 3121, and 3402 of the Code or similar provisions under any foreign laws) and has, within the time period prescribed by law, withheld and paid over to the proper governmental entities all amounts required to be so withheld and paid over under applicable laws and regulations, except, with respect to all of the foregoing, where the failure to file such tax returns and reports or failure to pay such Taxes or failure to comply with such withholding requirements would not reasonably be expected to have a Spieker Material Adverse Effect. The most recent audited financial statements contained in the Spieker SEC Documents reflect an adequate reserve for all material Taxes payable by Spieker, the Spieker Subsidiaries and Spieker TRS for all taxable periods and portions thereof through the date of such financial statements. Since the Spieker Financial Statement Date, Spieker has incurred no liability for Taxes under Sections 857(b), 860(c) or 4981 of the Code, including without limitation any Tax arising from a prohibited transaction described in Section 857(b)(6) of the Code, and none of Spieker, any Spieker Subsidiary or Spieker TRS has incurred any material liability for Taxes other than in the ordinary course of business. No event has occurred, and no condition or circumstance exists, which presents a material risk that any material Tax described in the preceding sentences will be imposed upon Spieker, any Spieker Subsidiary, or Spieker TRS. None of Spieker, any Spieker Subsidiary or Spieker TRS is

A–21

---

the subject of any audit, examination, or other proceeding in respect of federal income Taxes, and to Spieker's Knowledge, no audit, examination or other proceeding in respect of federal income Taxes involving any of Spieker, any Spieker Subsidiary, or Spieker TRS is being considered by any Tax authority. To the Knowledge of Spieker, no deficiencies for any Taxes have been proposed, asserted or assessed against Spieker, any Spieker Subsidiary or Spieker TRS, and no requests for waivers of the time to assess any such Taxes are pending. As used in this Agreement, "Taxes" shall include all taxes, charges, fees, levies and other assessments, including, without limitation, income, gross receipts, excise, property, sales, withholding (including, without limitation, dividend withholding and withholding required pursuant to Sections 1445 and 1446 of the Code), social security, occupation, use, service, license, payroll, franchise, transfer and recording taxes, fees and charges, including estimated taxes, imposed by the United States or any taxing authority (domestic or foreign), whether computed on a separate, consolidated, unitary, combined or any other basis, and any interest, fines, penalties or additional amounts attributable to, or imposed upon, or with respect to any such taxes, charges, fees, levies or other assessments.

(b) Spieker (i) for all taxable years for which the Internal Revenue Service could assert a tax liability, has been subject to taxation as a real estate investment trust (a "REIT") within the meaning of Section 856 of the Code and has satisfied all requirements to qualify as a REIT for all such years, (ii) has operated since December 31, 2000 to the date of this representation, and intends to continue to operate, in such a manner as to qualify as a REIT for the taxable year ending on the earlier of December 31, 2001 or the Closing Date and, if later, for the taxable year of Spieker ending on the Closing Date, and (iii) has not taken or omitted to take any action which would reasonably be expected to result in a challenge to its status as a REIT and, to Spieker's Knowledge, no such challenge is pending or threatened. Each Spieker Subsidiary which is a partnership, joint venture or limited liability company (i) has been since its formation and continues to be treated for federal income tax purposes as a partnership or as an entity that is disregarded for federal income tax purposes and not as a corporation or an association taxable as a corporation and (ii) has not since the later of its formation or the acquisition by Spieker of a direct or indirect interest therein, owned any assets (including, without limitation, securities) that would cause Spieker to violate Section 856(c)(4) of the Code. Spieker Partnership is not a publicly traded partnership within the meaning of Section 7704(b) of the Code that is taxable as a corporation pursuant to Section 7704(a) of the Code. Each Spieker Subsidiary which is a corporation has been since its formation a qualified REIT subsidiary under Section 856(i) of the Code. Neither Spieker nor any Spieker Subsidiary holds any asset (x) the disposition of which would be subject to rules similar to Section 1374 of the Code as a result of an election under IRS Notice 88–19 or Temporary Treas. Reg. §1.337(d)–5T or (y) which is subject to a consent filed pursuant to Section 341(f) of the Code and the regulations thereunder.

(c) To Spieker's knowledge, as of the date hereof, Spieker is a "domestically–controlled" REIT within the meaning of Section 897(h) of the Code.

2.15 *No Payments to Employees, Officers or Directors.* Schedule 2.15 to the Spieker Disclosure Letter contains a true and complete list of all arrangements, agreements or plans pursuant to which cash and non–cash payments which will become payable to each employee, officer or director of Spieker, any Spieker Subsidiary or Spieker TRS as a result of the Merger or a termination of service subsequent to the consummation of the Merger. Except as described in *Schedule 2.15* to the Spieker Disclosure Letter, or as otherwise provided for in this Agreement, there is no employment or severance contract, or other agreement requiring payments, cancellation of indebtedness or other obligation to be made on a change of control or otherwise as a result of the consummation of any of the transactions contemplated by this Agreement or as a result of a termination of service subsequent to the consummation of any of the transactions contemplated by this Agreement, with respect to any employee, officer or director of Spieker, any Spieker Subsidiary or Spieker TRS. Except as described in *Schedule 2.15* of the Spieker Disclosure Letter, there is no agreement or arrangement with any employee, officer or other service provider under which Spieker, any Spieker Subsidiary or any Spieker TRS has agreed to pay any tax that might be owed under Section 4999 of the Code with respect to payments to such individuals.

2.16 *Broker; Schedule of Fees and Expenses.* No broker, investment banker, financial advisor or other Person, other than Goldman, Sachs & Co. the fees and expenses of which are described in the engagement

A–22

Table of Contents

letter dated February 16, 2001, between Goldman, Sachs & Co. and Spieker, a true, correct and complete copy of which has previously been given to Equity Office, is entitled to any broker's, finder's, financial advisor's or other similar fee or commission in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of Spieker or any Spieker Subsidiary.

2.17 *Compliance with Laws.* None of Spieker, any Spieker Subsidiary or Spieker TRS has violated or failed to comply with any statute, law, ordinance, regulation, rule, judgment, decree or order of any Governmental Entity applicable to its business, properties or operations, except in each case to the extent that such violation or failure would not reasonably be expected to have a Spieker Material Adverse Effect.

2.18 *Contracts; Debt Instruments.*

(a)  None of Spieker, any Spieker Subsidiary or Spieker TRS has received a written notice that it is in violation of or in default under (nor to the Knowledge of Spieker does there exist any condition which upon the passage of time or the giving of notice or both would cause such a violation of or default under) any material loan or credit agreement, note, bond, mortgage, indenture, lease, permit, concession, franchise, license or any other material contract, agreement, arrangement or understanding, to which it is a party or by which it or any of its properties or assets is bound, nor to the Knowledge of Spieker does such a violation or default exist, except in each case to the extent that such violation or default, individually or in the aggregate, would not reasonably be expected to have a Spieker Material Adverse Effect.

(b)  Except for any of the following expressly identified in the Spieker SEC Documents, *Schedule 2.18(b)* to the Spieker Disclosure Letter sets forth a list of each material loan or credit agreement, note, bond, mortgage, indenture and any other agreement or instrument pursuant to which any Indebtedness (as defined herein) of Spieker, the Spieker Subsidiaries and Spieker TRS, other than Indebtedness payable to Spieker, a Spieker Subsidiary or the Spieker TRS, is outstanding or may be incurred. For purposes of this Section 2.18, "Indebtedness" shall mean (i) indebtedness for borrowed money, whether secured or unsecured, (ii) obligations under conditional sale or other title retention agreements relating to property purchased by such Person, (iii) capitalized lease obligations, (iv) obligations under interest rate cap, swap, collar or similar transaction or currency hedging transactions (valued at the termination value thereof) and (v) guarantees of any such indebtedness of any other Person.

(c)  To the extent not set forth in response to the requirements of Section 2.18(b), *Schedule 2.18(c)* to the Spieker Disclosure Letter sets forth each interest rate cap, interest rate collar, interest rate swap, currency hedging transaction, and any other agreement relating to a similar transaction to which Spieker, any Spieker Subsidiary or Spieker TRS is a party or an obligor with respect thereto.

(d)  Except as set forth in *Schedule 2.18(d)* of the Spieker Disclosure Letter, none of Spieker, any Spieker Subsidiary or Spieker TRS is a party to any agreement which would restrict any of them from prepaying any of their Indebtedness without penalty or premium at any time or which requires any of them to maintain any amount of Indebtedness with respect to any of the Spieker Properties.

(e)  None of Spieker, any Spieker Subsidiary or Spieker TRS is a party to any agreement relating to the management of any Spieker Property by any Person other than Spieker, a Spieker Subsidiary or Spieker TRS.

(f)  None of Spieker, any Spieker Subsidiary or Spieker TRS is a party to any agreement pursuant to which Spieker, any Spieker Subsidiary or Spieker TRS manages or provides services with respect to any real properties other than Spieker Properties, except for the agreements listed in *Schedule 2.18(f)* to the Spieker Disclosure Letter.

(g)  Spieker has delivered to Equity Office prior to the date of this Agreement a true and complete capital budget for the year 2001 relating to budgeted capital improvements and development. *Schedule 2.18(g)* to the Spieker Disclosure Letter lists all material agreements entered into by Spieker, each of the Spieker Subsidiaries and Spieker TRS relating to the development or construction of, or additions or expansions to, any Spieker Real Properties (or any properties with respect to which Spieker has executed as of the date of this Agreement a purchase agreement or other similar agreement) which are currently in effect and under which Spieker or any of the Spieker Subsidiaries or Spieker TRS currently has, or expects to incur,

A–23

Table of Contents

an obligation in excess of $250,000 in the aggregate in the future. True, correct and complete copies of such agreements have previously been delivered or made available to Equity Office.

(h)  *Schedule 2.18(h)* to the Spieker Disclosure Letter lists all agreements entered into by Spieker, any Spieker Subsidiary or Spieker TRS providing for the sale of, or option to sell, any Spieker Properties or the purchase of, or option to purchase, by

Spieker, any Spieker Subsidiary or Spieker TRS, on the one hand, or the other party thereto, on the other hand, any real estate not yet consummated as of the date hereof.

(i) Except as set forth in *Schedule 2.18(i)* to the Spieker Disclosure Letter, none of Spieker, any Spieker Subsidiary or Spieker TRS has any material continuing contractual liability (A) for indemnification or otherwise under any agreement relating to the sale of real estate previously owned, whether directly or indirectly, by Spieker, any Spieker Subsidiary or Spieker TRS or (B) to pay any additional purchase price for any of the Spieker Properties.

(j) Except as set forth in *Schedule 2.18(j)* to the Spieker Disclosure Letter, none of Spieker, any Spieker Subsidiary or Spieker TRS has entered into or is subject, directly or indirectly, to any "Tax Protection Agreements." As used herein, a Tax Protection Agreement is an agreement, oral or written, (A) that has as one of its purposes to permit a Person to take the position that such Person could defer federal taxable income that otherwise might have been recognized upon a transfer of property to the Spieker Partnership or any other Spieker Subsidiary that is treated as a partnership for federal income tax purposes, and that (i) prohibits or restricts in any manner the disposition of any assets of Spieker, any Spieker Subsidiary or Spieker TRS, (ii) requires that Spieker, any Spieker Subsidiary or Spieker TRS maintain, put in place, or replace, indebtedness, whether or not secured by one or more of the Spieker Properties, or (iii) requires that Spieker, any Spieker Subsidiary or Spieker TRS offer to any Person at any time the opportunity to guarantee or otherwise assume, directly or indirectly (including, without limitation, through a "deficit restoration obligation," guarantee (including, without limitation, a "bottom" guarantee), indemnification agreement or other similar arrangement), the risk of loss for federal income tax purposes for indebtedness or other liabilities of Spieker, any Spieker Subsidiary or Spieker TRS, (B) that specifies or relates to a method of taking into account book–tax disparities under Section 704(c) of the Code with respect to one or more assets of Spieker or a Spieker Subsidiary, or (C) that requires a particular method for allocating one or more liabilities of Spieker or any Spieker Subsidiary under Section 752 of the Code. None of Spieker, any Spieker Subsidiary or Spieker TRS is in violation of or in default under any Tax Protection Agreement.

2.19 *Opinion of Financial Advisor.* Spieker has received the written opinion of Goldman, Sachs & Co., Spieker's financial advisor, to the effect that the proposed consideration to be received by the holders of Spieker Common Stock pursuant to the Merger is fair to such holders from a financial point of view.

2.20 *State Takeover Statutes.* Spieker has taken all action necessary to exempt the transactions contemplated by this Agreement between Equity Office and Spieker and its Affiliates from the operation of any "fair price," "moratorium," "control share acquisition" or any other anti–takeover statute or similar statute enacted under the laws of the state or federal laws of the United States or similar statute or regulation (a "Takeover Statute").

2.21 *Stockholder Rights Plan.* The Board of Directors of Spieker has resolved to, and Spieker promptly after execution of this Agreement shall, take all action necessary to render the rights (the "Spieker Rights") issued pursuant to the terms of that certain Stockholder Protection Rights Agreement, dated as of September 10, 1998, between Spieker and The Bank of New York, as rights agent (the "Spieker Rights Agreement"), inapplicable to the Mergers, this Agreement, and the other transactions contemplated hereby.

2.22 *Investment Company Act of 1940.* None of Spieker, any Spieker Subsidiary or Spieker TRS is, or at the Effective Time will be, required to be registered under the Investment Company Act of 1940, as amended (the "1940 Act").

2.23 *Definition of "Knowledge of Spieker".* As used in this Agreement, the phrase "Knowledge of Spieker" (or words of similar import) means the actual knowledge of those individuals identified in *Schedule 2.23* to the Spieker Disclosure Letter.

A–24

---

**Table of Contents**

2.24 *Required Stockholder Approvals and Partner Approvals.* The affirmative vote of the holders of at least a majority of the Spieker Common Stock and the Spieker Series A Preferred Stock outstanding and entitled to vote and voting together as a single class are the only votes of the holders of any class or series of Spieker capital stock necessary or required under this Agreement or under applicable law to approve the Merger and this Agreement. The approval of Spieker and the affirmative vote of at least a majority of each class of Spieker limited partner interests, voting in accordance with the Spieker Partnership Agreement, and the affirmative vote of the outstanding Spieker Series D Preferred OP Units, as set forth in *Schedule 2.24* to the Spieker Disclosure Letter, are the only vote of the holders of any class or series of Spieker Partnership's partnership interests necessary or required under this Agreement or under applicable law to approve this Agreement, the Merger, the withdrawal of Spieker as general partner and the Partnership Merger (including, without limitation, termination of the Spieker Partnership Agreement).

ARTICLE 3

REPRESENTATIONS AND WARRANTIES OF EQUITY OFFICE AND

EOP PARTNERSHIP

Except as specifically set forth in the Equity Office SEC Documents (as defined herein) or in the schedule delivered to Spieker prior to the execution hereof and identified by the President or an Executive Vice President of Equity Office as the disclosure letter to this Agreement (the "Equity Office Disclosure Letter"), Equity Office and EOP Partnership represent and warrant to Spieker and Spieker Partnership as follows:

3.1 *Organization, Standing and Power of Equity Office.* Equity Office is a real estate investment trust duly organized, validly existing and in good standing under the laws of Maryland. Equity Office has all requisite power and authority to own, operate, lease and encumber its properties and carry on its business as now being conducted. Equity Office is duly qualified or licensed to do business as a foreign trust and is in good standing in each jurisdiction in which the nature of its business or the ownership or leasing of its properties makes such qualification or licensing necessary, other than in such jurisdictions where the failure to be so qualified or licensed, individually or in the aggregate, would not reasonably be expected to have an Equity Office Material Adverse Effect (as defined herein). As used in this Agreement, an "Equity Office Material Adverse Effect" means any circumstance, event, occurrence, change or effect that is materially adverse to the business, properties, assets (tangible or intangible), financial condition or results of operations of Equity Office, EOP Partnership and the Subsidiaries of Equity Office (collectively, "Equity Office Subsidiaries"), taken as a whole, except, in each case, as a result of (i) changes in general economic conditions nationally or regionally, (ii) changes affecting the real estate industry generally which do not affect Equity Office or EOP Partnership, as the case may be, materially disproportionately relative to other participants in the real estate industry similarly situated, or (iii) in and of itself and without the occurrence of any other Equity Office Material Adverse Effect, changes in the trading prices of Equity Office Common Shares or any series of Equity Office Preferred Shares. Equity Office has delivered to Spieker complete and correct copies of the Equity Office Declaration of Trust and the Equity Office Bylaws, as amended or supplemented to the date of this Agreement.

3.2 *Equity Office Subsidiaries.*

(a) *Schedule 3.2(a)* to the Equity Office Disclosure Letter sets forth (i) each Equity Office Subsidiary and each entity in which Equity Office or EOP Partnership holds non–voting equity securities (but no voting equity securities) (collectively, the "Equity Office Non–controlled Subsidiaries"), (ii) the ownership interest therein of Equity Office, (iii) if not directly or indirectly wholly owned by Equity Office, the identity and ownership interest of each of the other owners of such Equity Office Subsidiary, (iv) each office property and other commercial property owned by such Equity Office Subsidiary, and (v) if not wholly owned by such Equity Office Subsidiary, the identity and ownership interest of each of the other owners of such property.

(b) Except as set forth in *Schedule 3.2(b)* to the Equity Office Disclosure Letter, (i) all the outstanding shares of capital stock owned by Equity Office, an Equity Office Subsidiary or Equity Office TRS of each

A–25

Equity Office Subsidiary and each Equity Office Non–controlled Subsidiary that is a corporation have been duly authorized, validly issued and are (A) fully paid and nonassessable and not subject to preemptive or similar rights and (B) owned free and clear of all Liens and (ii) all equity interests in each Equity Office Subsidiary that is a partnership, joint venture, limited liability company or trust which are owned by Equity Office, by another Equity Office Subsidiary or by Equity Office and another Equity Office Subsidiary are owned free and clear of all Liens. Each Equity Office Subsidiary that is a corporation is duly incorporated, validly existing and in good standing under the laws of its jurisdiction of incorporation and has the requisite corporate power and authority to own, operate, lease and encumber its properties and carry on its business as now being conducted, and each Equity Office Subsidiary that is a partnership, limited liability company or trust is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization and has the requisite power and authority to own, operate, lease and encumber its properties and carry on its business as now being conducted. Each Equity Office Subsidiary is duly qualified or licensed to do business and is in good standing in each jurisdiction in which the nature of its business or the ownership or leasing of its properties makes such qualification or licensing necessary, other than in such jurisdictions where the failure to be so qualified or licensed, individually or in the aggregate, would not reasonably be expected to have an Equity Office Material Adverse Effect. Complete and correct copies of the Articles of Incorporation, Bylaws, organization documents and partnership, joint venture and operating agreements of each Equity Office Subsidiary, as amended to the date of this Agreement, have been previously delivered or made available to Spieker. No effective amendment has been made to the EOP Partnership Agreement since December 22, 2000 (except to admit substituted limited partners following transfers of Equity Office OP Units).

3.3 *Capital Structure.*

(a) The authorized shares of beneficial interest of Equity Office consist of 750,000,000 Equity Office Common Shares, 307,728,060 of which were issued and outstanding as of January 31, 2001, and 100,000,000 preferred shares of beneficial interest, 8,000,000 of which are designated as 8.98% Series A Cumulative Redeemable Preferred Shares ("Equity Office Series A Preferred Shares"), 7,000,000 of which are designated as 5.25% Series B Convertible, Cumulative Preferred Shares ("Equity Office Series B Preferred Shares") and 4,600,000 of which are designated as 8?% Series C Cumulative Redeemable Preferred Shares ("Equity Office Series C Preferred Shares," and, together with the Equity Office Series A Preferred Shares and the Equity Office Series B Preferred Shares, the "Equity Office Existing Preferred Shares"). As of January 31, 2001, 7,994,000 Equity Office Series A Preferred Shares were issued and outstanding, 6,000,000 Equity Office Series B Preferred Shares were issued and outstanding and 4,562,900 Equity Office Series C Preferred Shares were issued and outstanding.

(b) Set forth in *Schedule 3.3(b)* to the Equity Office Disclosure Letter is a true and complete list of the following: (i) each qualified or nonqualified option to purchase Equity Office's shares of beneficial interest granted under the Employee Share Option and Restricted Share Plan or any other formal or informal arrangement (collectively, the "Equity Office Options"); and (ii) except for the Equity Office Series B Preferred Shares and the Senior Exchangeable Notes due November 15, 2008 of EOP Partnership (the "Equity Office Exchangeable Notes"), all other warrants or other rights to acquire Equity Office's shares of beneficial interest, all share appreciation rights, phantom shares, dividend equivalents, performance units and performance shares which are outstanding on the date of this Agreement. *Schedule 3.3(b)* to the Equity Office Disclosure Letter sets forth the Equity

Office Options granted to Equity Office's Chief Executive Officer and four other most highly compensated officers, the date of each grant, the status of each Equity Office Option as qualified or nonqualified under Section 422 of the Code, the number of Equity Office Common Shares subject to each Equity Office Option, the number and type of Equity Office's Common Shares subject to Equity Office Options that are currently exercisable, the exercise price per share, and the number and type of such shares subject to share appreciation rights. On the date of this Agreement, except as set forth in this Section 3.3 or excepted therefrom or as set forth in *Schedule 3.3(b)* or *3.3(d)* to the Equity Office Disclosure Letter, no shares of beneficial interest of Equity Office were outstanding or reserved for issuance (except for Equity Office Common Shares reserved for issuance upon redemption of Equity Office OP Units and upon exchange of the Equity Office Exchangeable Notes).

A–26

**Table of Contents**

(c) All outstanding shares of beneficial interest of Equity Office are duly authorized, validly issued, fully paid and nonassessable and not subject to preemptive or similar rights under law or the Equity Office Declaration of Trust or Equity Office Bylaws, or any contract or instrument to which Equity Office is a party or by which it is bound. Except for the Equity Office Exchangeable Notes, there are no bonds, debentures, notes or other indebtedness of Equity Office having the right to vote (or convertible into, or exchangeable for, securities having the right to vote) on any matters on which shareholders of Equity Office may vote.

(d) Except (i) as set forth in this Section 3.3 or in *Schedule 3.3(b)* or *3.3(d)* to the Equity Office Disclosure Letter, (ii) Equity Office Common Shares issuable, and reserved for issuance, upon conversion of the Equity Office Series B Preferred Shares, (iii) 9,558,824 Equity Office Common Shares issuable, and reserved for issuance, upon exchange of the Equity Office Exchangeable Notes and (iv) Equity Office OP Units, which may be redeemed for Equity Office Common Shares, as of the date of this Agreement, there are no outstanding securities, options, warrants, calls, rights, commitments, agreements, arrangements or undertakings of any kind to which Equity Office or any Equity Office Subsidiary is a party or by which such entity is bound, obligating Equity Office or any Equity Office Subsidiary to issue, deliver or sell, or cause to be issued, delivered or sold, additional shares of beneficial interest, voting securities or other ownership interests of Equity Office or any Equity Office Subsidiary or obligating Equity Office or any Equity Office Subsidiary to issue, grant, extend or enter into any such security, option, warrant, call, right, commitment, agreement, arrangement or undertaking (other than to Equity Office or an Equity Office Subsidiary).

(e) As of January 31, 2001, 349,245,178 Equity Office OP Units, 7,994,000 8.98% Series A Cumulative Redeemable Preferred Units ("Equity Office Series A Preferred OP Units"), 6,000,000 5.25% Series B Convertible, Cumulative Preferred Units ("Equity Office Series B Preferred OP Units") and 4,562,900 8 5/8% Series C Cumulative Redeemable Preferred Units ("Equity Office Series C Preferred OP Units," and, together with the Equity Office Series A Preferred OP Units and the Equity Office Series B Preferred OP Units, the "Equity Office Existing Preferred OP Units") are validly issued and outstanding, fully paid and nonassessable and not subject to preemptive or similar rights under law or the EOP Partnership Agreement, or any contract or instrument to which Equity Office or EOP Partnership is a party or by which either is bound, of which 307,728,060 Equity Office OP Units and all of the Equity Office Existing Preferred OP Units are owned by Equity Office and Equity Office Subsidiaries. *Schedule 3.3(e)* to the Equity Office Disclosure Letter sets forth the name of each holder of Equity Office OP Units and the number of Equity Office OP Units owned by each such holder as of January 31, 2001. Except as set forth in the EOP Partnership Agreement or as contemplated by this Agreement, the Equity Office OP Units and Equity Office Existing Preferred OP Units are not subject to any restrictions imposed by EOP Partnership on the transfer, assignment, pledge, distribution, encumbrance or other disposition thereof (either voluntarily or involuntarily and with or without consideration) or on the exercise of the voting rights thereof provided in the EOP Partnership Agreement. Except as set forth in this Section 3.3 or in *Schedule 3.3(d)* to the Equity Office Disclosure Letter, EOP Partnership has not issued or granted and is not a party to any outstanding commitments of any kind relating to, or any presently effective agreements or understandings with respect to, interests in EOP Partnership, whether issued or unissued, or securities convertible or exchangeable into interests in EOP Partnership.

(f) All dividends on Equity Office Common Shares and Equity Office Existing Preferred Shares and all distributions on Equity Office OP Units and Equity Office Existing Preferred OP Units, which have been declared prior to the date of this Agreement have been paid in full, except that (i) the dividends payable on Equity Office Common Shares (along with the corresponding distributions payable on Equity Office OP Units) which were declared on February 13, 2001 and are payable on April 16, 2001 have not yet been paid, (ii) the dividends payable on Equity Office Series A Preferred Shares (along with the corresponding distributions payable on Equity Office Series A Preferred OP Units) which were declared on November 1, 2000 and are payable on March 15, 2001 have not yet been paid, and (iii) the dividends payable on Equity Office Series C Preferred Shares (along with the corresponding distributions payable on Equity Office Series C Preferred OP Units) which were declared on November 1, 2000 and are payable on March 15, 2001 have not yet been paid.

(g) The Equity Office Common Shares and the Equity Office Preferred Shares to be issued by Equity Office, and the Equity Office OP Units to be issued by the EOP Partnership, pursuant to this Agreement have

A–27

Table of Contents

been duly authorized for issuance, and upon issuance will be duly and validly issued, fully paid and nonassessable. The Equity Office Preferred OP Units to be issued by EOP Partnership pursuant to this Agreement will be different series of the same class of limited partnership interests as the Equity Office Existing Preferred OP Units and will represent units of Limited Partnership Interest (as defined in the EOP Partnership Agreement) in EOP Partnership.

3.4 *Other Interests.* Except for interests in the Equity Office Subsidiaries, Equity Office Non–Controlled Subsidiaries and certain other entities as set forth in *Schedule 3.2(a), 3.2(b)* or *3.4* to the Equity Office Disclosure Letter (the "Equity Office Other Interests"), neither Equity Office nor any of its Subsidiaries owns directly or indirectly any interest or investment (whether equity or debt) in any corporation, partnership, joint venture, business, trust or other entity (other than investments in short–term investment securities). With respect to the Equity Office Other Interests, Equity Office, EOP Partnership, an Equity Office Subsidiary or an Equity Office Non–Controlled Subsidiary is a partner or shareholder in good standing, and owns such interests free and clear of all Liens. Neither Equity Office nor any of the Equity Office Subsidiaries is in material breach of any agreement, document or contract which is of a material nature governing its rights in or to the Equity Office Other Interests, all of which agreements, documents and contracts are (a) listed in *Schedule 3.4* to the Equity Office Disclosure Letter (or disclosed in the Equity Office SEC Documents (as defined herein)), (b) unmodified except as described therein and (c) to the Knowledge of Equity Office (as defined herein), in full force and effect. To the Knowledge of Equity Office and except as set forth in *Schedule 3.4* to the Equity Office Disclosure Letter, the other parties to any such agreement, document or contract which is of a material nature are not in breach of any of their respective obligations under such agreements, documents or contracts.

3.5 *Authority; Noncontravention; Consents.*

(a) Equity Office has the requisite power and authority to enter into this Agreement and, subject to the requisite shareholder approval of the Merger and the Proposed Equity Office Charter Amendments (as defined herein) (the "Equity Office Shareholder Approvals" and, together with the Spieker Stockholder Approvals, the "Shareholder Approvals"), to consummate the transactions contemplated by this Agreement to which Equity Office is a party. The execution and delivery of this Agreement by Equity Office and the consummation by Equity Office of the transactions contemplated by this Agreement to which Equity Office is a party have been duly authorized by all necessary action on the part of Equity Office, except for and subject to the Equity Office Shareholder Approvals and the requisite approval, if any is required, of the partners of EOP Partnership. This Agreement has been duly executed and delivered by Equity Office and constitutes a valid and binding obligation of Equity Office, enforceable against Equity Office in accordance with and subject to its terms, subject to applicable bankruptcy, insolvency, moratorium or other similar laws relating to creditors' rights and general principles of equity.

(b) EOP Partnership has the requisite partnership power and, subject to the requisite partner approval of the Partnership Merger (if any), authority to enter into this Agreement and to consummate the transactions contemplated by this Agreement to which EOP Partnership is a party. The execution and delivery of this Agreement by EOP Partnership and the consummation by EOP Partnership of the transactions contemplated by this Agreement to which EOP Partnership is a party have been duly authorized by all necessary action on the part of EOP Partnership, except for and subject to the Equity Office Partner Approvals. This Agreement has been duly executed and delivered by EOP Partnership and constitutes a valid and binding obligation of EOP Partnership, enforceable against EOP Partnership in accordance with and subject to its terms, subject to applicable bankruptcy, insolvency, moratorium or other similar laws relating to creditors' rights and general principles of equity.

(c) Except as set forth in *Schedule 3.5(c)(1)* to the Equity Office Disclosure Letter and subject to receipt of the Equity Office Shareholder Approvals and the Equity Office Partner Approvals, the execution and delivery of this Agreement by Equity Office and EOP Partnership do not, and the consummation of the transactions contemplated by this Agreement to which Equity Office or EOP Partnership is a party and compliance by Equity Office or EOP Partnership with the provisions of this Agreement will not, conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a

A–28

Table of Contents

right of termination, cancellation or acceleration of any material obligation or to loss of a material benefit under, or result in the creation of any Lien upon any of the properties or assets of Equity Office or any Equity Office Subsidiary under, (i) the Equity Office Declaration of Trust or the Equity Office Bylaws or the comparable charter or organizational documents or partnership, operating or similar agreement (as the case may be) of any other Equity Office Subsidiary, each as amended or supplemented to the date of this Agreement, (ii) any loan or credit agreement, note, bond, mortgage, indenture, reciprocal easement agreement, lease or other agreement, instrument, permit, concession, franchise or license applicable to Equity Office or any Equity Office Subsidiary or their respective properties or assets or (iii) subject to the governmental filings and other matters referred to in the following sentence, any Laws applicable to Equity Office or any Equity Office Subsidiary or their respective properties or assets, other than, in the case of clause (ii) or (iii), any such conflicts, violations, defaults, rights, loss or Liens that individually or in the aggregate would not reasonably be expected to (x) have an Equity Office Material Adverse Effect or (y) prevent or materially impair the ability of Equity Office to perform any of its obligations hereunder or prevent or materially threaten or impede the consummation of the transactions contemplated by this Agreement. No consent, approval, order or authorization of, or registration, declaration or filing with, any Governmental Entity is required by or with respect to Equity Office or any Equity Office Subsidiary in connection with the execution and delivery of this Agreement by Equity Office and EOP Partnership or the consummation by Equity Office or any Equity Office Subsidiary of any of the transactions contemplated by this Agreement, except for (i) the filing with the SEC of (x) the Form S–4 (as defined herein) and (y) such reports and filings under the Securities Act and under Sections 13(a) and 13(d) of the Exchange Act as may be required in connection with this Agreement and the transactions contemplated by this Agreement, (ii) the filing and acceptance for record of the Articles of Merger by the

Department, (iii) the filing of the Delaware Certificate of Merger with the Office of the Secretary of State of the State of Delaware, (iv) the filing of the California Certificate of Merger with the Secretary of State of the State of California, (v) such filings as may be required in connection with the payment of any transfer and gains taxes and (vi) such other consents, approvals, orders, authorizations, registrations, declarations and filings (A) as are set forth in *Schedule 3.5(c)(2)* to the Equity Office Disclosure Letter or (B) as may be required under the (w) the HSR Act, (x) federal, state or local environmental laws or (y) the "blue sky" laws of various states, to the extent applicable, or (C) which, if not obtained or made, would not prevent or delay in any material respect the consummation of any of the transactions contemplated by this Agreement or otherwise prevent Equity Office from performing its obligations under this Agreement in any material respect or reasonably be expected to have, individually or in the aggregate, an Equity Office Material Adverse Effect.

3.6 *SEC Documents; Financial Statements; Undisclosed Liabilities.* Equity Office and EOP Partnership have filed all reports, schedules, forms, statements and other documents required to be filed with the SEC since December 31, 1997 through the date hereof (the "Equity Office SEC Documents"). All of the Equity Office SEC Documents (other than preliminary material), as of their respective filing dates, complied in all material respects with all applicable requirements of the Securities Act and the Exchange Act and, in each case, the rules and regulations promulgated thereunder applicable to such Equity Office SEC Documents. None of the Equity Office SEC Documents at the time of filing contained, nor will any report, schedule, form, statement or other document filed by Equity Office or EOP Partnership after the date hereof and prior to the Effective Time contain, any untrue statement of a material fact or omitted to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading. The consolidated financial statements of Equity Office and the Equity Office Subsidiaries included in the Equity Office SEC Documents complied, or will comply, as to form in all material respects with applicable accounting requirements and the published rules and regulations of the SEC with respect thereto, have been or will be prepared in accordance with GAAP (except, in the case of unaudited statements, as permitted by the applicable rules and regulations of the SEC) applied on a consistent basis during the periods involved (except as may be indicated in the notes thereto) and fairly presented, or will fairly present, in all material respects in accordance with the applicable requirements of GAAP and the applicable rules and regulations of the SEC, the consolidated financial position of Equity Office and the Equity Office Subsidiaries, taken as a whole, as of the dates thereof and the consolidated results of operations and cash flows for the periods then ended (except, in the case of unaudited statements, as permitted by Form 10–Q

A–29

Table of Contents

under the Exchange Act). Except for liabilities and obligations set forth in the Equity Office SEC Documents or in *Schedule 3.6* to the Equity Office Disclosure Letter, neither Equity Office nor any Equity Office Subsidiary has any liabilities or obligations of any nature (whether accrued, absolute, contingent or otherwise) required by GAAP to be set forth on a consolidated balance sheet of Equity Office or in the notes thereto and which, individually or in the aggregate, would reasonably be expected to have an Equity Office Material Adverse Effect.

3.7 *Absence of Certain Changes or Events.* Except as disclosed in the Equity Office SEC Documents or in *Schedule 3.7* to the Equity Office Disclosure Letter, since December 31, 1999 (the "Equity Office Financial Statement Date"), Equity Office and the Equity Office Subsidiaries have conducted their business only in the ordinary course (taking into account prior practices, including the acquisition of properties and issuance of securities) and there has not been (a) any circumstance, event, occurrence, change or effect that has had an Equity Office Material Adverse Effect, nor has there been any circumstance, event, occurrence, change or effect that with the passage of time would reasonably be expected to result in an Equity Office Material Adverse Effect, (b) except for regular quarterly distributions not in excess of $0.45 per Equity Office Common Share or Equity Office OP Unit or the stated distribution rate for each Equity Office Existing Preferred Share or Equity Office Existing Preferred OP Unit, subject to changes pursuant to Section 5.10 and to any Corresponding Equity Office Dividends and Distributions paid pursuant to Section 1.13(d)(ii) or to rounding adjustments as necessary and with customary record and payment dates, any authorization, declaration, setting aside or payment of any dividend or other distribution (whether in cash, shares or property) with respect to Equity Office Common Shares, Equity Office OP Units, Equity Office Existing Preferred Shares or Equity Office Existing Preferred OP Units, (c) any split, combination or reclassification of any of Equity Office's shares of beneficial interest, (d) any damage, destruction or loss, whether or not covered by insurance, that has had or would reasonably be expected to have an Equity Office Material Adverse Effect or (e) any change made prior to the date of this Agreement in accounting methods, principles or practices by Equity Office or any Equity Office Subsidiary materially affecting its assets, liabilities or business, except insofar as may have been disclosed in the Equity Office SEC Documents or required by a change in GAAP.

3.8 *Litigation.* Except as disclosed in the Equity Office SEC Documents or in *Schedule 3.8* to the Equity Office Disclosure Letter, and other than personal injury and other routine tort litigation arising from the ordinary course of operations of Equity Office and the Equity Office Subsidiaries (a) which are covered by insurance, subject to a reasonable deductible or retention limit or (b) for which all material costs and liabilities arising therefrom are reimbursable pursuant to common area maintenance or similar agreements, there is no suit, action or proceeding pending (in which service of process has been received by an employee of Equity Office or an Equity Office Subsidiary) or, to the Knowledge of Equity Office (as defined herein), threatened in writing against or affecting Equity Office or any Equity Office Subsidiary that, individually or in the aggregate, would reasonably be expected to (i) have an Equity Office Material Adverse Effect or (ii) prevent or materially impair the ability of Equity Office to perform any of its obligations hereunder or prevent or materially threaten or impair the consummation of any of the transactions contemplated by this Agreement, nor is there any judgment, decree, injunction, rule or order of any Governmental Entity or arbitrator outstanding against Equity Office or any Equity Office Subsidiary having, or which, insofar as reasonably can be foreseen, in the future would have, any such effect.

*3.9  Properties.*

(a)  Except as set forth in *Schedule 3.9(a)* to the Equity Office Disclosure Letter, Equity Office or one of the Equity Office Subsidiaries owns fee simple title to each of the real properties listed in the Equity Office SEC Filings as owned by it (the "Equity Office Properties"), except where the failure to own such title would not have an Equity Office Material Adverse Effect.

(b)  The Equity Office Properties are not subject to any Encumbrances or Property Restrictions which reasonably could be expected to cause an Equity Office Material Adverse Effect.

(c)  Valid policies of title insurance (or fully paid and enforceable commitments therefor) have been issued insuring Equity Office's or the applicable Equity Office Subsidiary's fee simple title or leasehold estate, as the case may be, to the Equity Office Properties in amounts which are, except in the case of San Felipe

A–30

---

Plaza, approximately equal to the purchase price thereof paid by Equity Office or the applicable Equity Office Subsidiaries therefor, except where the failure to obtain such title insurance would not reasonably be expected to have an Equity Office Material Adverse Effect.

(d)  Equity Office has no Knowledge (i) that it has failed to obtain a certificate, permit or license from any governmental authority having jurisdiction over any of the Equity Office Properties where such failure would reasonably be expected to have an Equity Office Material Adverse Effect or of any pending threat of modification or cancellation of any of the same which would reasonably be expected to have an Equity Office Material Adverse Effect, (ii) of any written notice of any violation of any federal, state or municipal law, ordinance, order, rule, regulation or requirement affecting any of the Equity Office Properties issued by any governmental authorities which would reasonably be expected to have an Equity Office Material Adverse Effect or (iii) of any structural defects relating to Equity Office Properties, Equity Office Properties whose building systems are not in working order, physical damage to any Equity Office Property for which there is not insurance in effect covering the cost of the restoration and the lost revenue (subject to a reasonable deduction or retention limit), except such structural defects, building systems not in working order and physical damage, which, in the aggregate, would not reasonably be expected to have an Equity Office Material Adverse Effect.

(e)  Except as set forth in *Schedule 3.9(e)* to the Equity Office Disclosure Letter, neither Equity Office nor any of the Equity Office Subsidiaries has received any written or published notice to the effect that (i) any condemnation or involuntary rezoning proceedings are pending or threatened with respect to any of the Equity Office Properties or (ii) any zoning, building or similar law, code, ordinance, order or regulation is or will be violated by the continued maintenance, operation or use of any buildings or other improvements on any of the Equity Office Properties or by the continued maintenance, operation or use of the parking areas, other than such notices which, in the aggregate, would not reasonably be expected to have an Equity Office Material Adverse Effect.

(f)  Except as set forth in *Schedule 3.9(f)* to the Equity Office Disclosure Letter, (i) all work to be performed, payments to be made and actions to be taken by Equity Office or the Equity Office Subsidiaries prior to the date hereof pursuant to any agreement entered into with a governmental body or authority in connection with a site approval, zoning reclassification or similar action relating to any Equity Office Properties (*e.g.*, Local Improvement District, Road Improvement District, Environmental Mitigation), have been performed, paid or taken, as the case may be, and (ii) Equity Office has no Knowledge of any planned or proposed work, payments or actions that may be required after the date hereof pursuant to such agreements, in each of cases (i) and (ii) except where the failure to do so would, in the aggregate, not reasonably be expected to have an Equity Office Material Adverse Effect.

(g)  The rent roll previously provided by Equity Office to Spieker (the "Equity Office Rent Roll") lists each Equity Office Space Lease (as defined herein) in effect as of the respective dates indicated in the Equity Office Rent Roll and, except for omissions or discrepancies that, either individually or in the aggregate, would not reasonably be expected to have an Equity Office Material Adverse Effect, all information set forth in the Equity Office Rent Roll is true, correct, and complete as of the date thereof. "Equity Office Space Lease" means each lease or other right of occupancy affecting or relating to a property in which EOP Partnership (or an entity in which it directly or indirectly has an interest) is the landlord, either pursuant to the terms of the lease agreement or as successor to any prior landlord, but excluding any ground lease. Equity Office has made available to Spieker true, correct and complete copies of all Equity Office Space Leases, including all amendments, modifications, supplements, renewals, extensions and guarantees related thereto, as of the date hereof. Except as set forth in a delinquency report made available to Spieker, neither Equity Office nor any Equity Office Subsidiary, on the one hand, nor, to the Knowledge of Equity Office or EOP Partnership, any other party, on the other hand, is in monetary default under any Equity Office Space Lease, except for such defaults that would not reasonably be expected to have an Equity Office Material Adverse Effect.

(h)  *Schedule 3.9(h)* contains a true and complete list, by type of insurance, carrier, coverages (including limits) and term, of all material policies of casualty, liability and other types of insurance (except title insurance) carried by Equity Office or any Equity Office Subsidiary. All such policies are in full force and

A–31

Table of Contents

effect and neither Equity Office nor any Equity Office Subsidiary has received from any insurance company notice of any material defects or deficiencies affecting the insurability of Equity Office or any Equity Office Subsidiary or any of their respective assets thereunder.

3.10 *Environmental Matters.*

Except as disclosed in the Equity Office SEC Documents,

(i) none of Equity Office, any of the Equity Office Subsidiaries or, to Equity Office's Knowledge, any other Person has caused or permitted the presence of any Hazardous Materials at, on or under any of the Equity Office Properties, such that the presence of such Hazardous Materials (including the presence of asbestos in any buildings or improvements at the Equity Office Properties) would, individually or in the aggregate, reasonably be expected to have an Equity Office Material Adverse Effect;

(ii) except in accordance with the Environmental Permits, there have been no Releases of Hazardous Materials at, on, under or from (A) the Equity Office Properties, or (B) any real property formerly owned, operated or leased by Equity Office or the Equity Office Subsidiaries during the period of such ownership, operation or tenancy, which would, individually or in the aggregate, reasonably be expected to have an Equity Office Material Adverse Effect;

(iii) (y) Equity Office and the Equity Office Subsidiaries have not failed to comply in any material respect with all Environmental Laws, and (z) neither Equity Office nor any of the Equity Office Subsidiaries has any liability under the Environmental Laws, except in each of cases (y) and (z) to the extent such failure to comply or any such liability, individually or in the aggregate, would not reasonably be expected to have an Equity Office Material Adverse Effect; and

(iv) Equity Office and the Equity Office Subsidiaries have been duly issued, and currently have and will maintain through the Closing Date, all Environmental Permits except where the failure to obtain and maintain such Environmental Permits would not, individually or in the aggregate, reasonably be expected to have an Equity Office Material Adverse Effect. Equity Office and the Equity Office Subsidiaries have timely filed applications for all Environmental Permits.

3.11 *Taxes.*

(a) Each of Equity Office and the Equity Office Subsidiaries (i) has filed all Tax returns and reports required to be filed by it (after giving effect to any filing extension properly granted by a Governmental Entity having authority to do so), and all such returns and reports are accurate and complete in all material respects, (ii) has paid (or Equity Office has paid on its behalf) all Taxes shown on such returns and reports as required to be paid by it and (iii) has complied in all material respects with all applicable laws, rules and regulations relating to the payment and withholding of Taxes (including, without limitation, withholding of Taxes pursuant to Sections 1441, 1442, 1445, 1446, 3121, and 3402 of the Code or similar provisions under any foreign laws) and has, within the time period prescribed by law, withheld and paid over to the proper governmental entities all amounts required to be so withheld and paid over under applicable laws and regulations, except, with respect to all of the foregoing, where the failure to file such tax returns or reports or failure to pay such Taxes or failure to comply with such requirements would not reasonably be expected to have an Equity Office Material Adverse Effect. The most recent audited financial statements contained in the Equity Office SEC Documents reflect an adequate reserve for all material Taxes payable by Equity Office and the Equity Office Subsidiaries for all taxable periods and portions thereof through the date of such financial statements. Since the Equity Office Financial Statement Date, Equity Office has incurred no liability for Taxes under Sections 857(b), 860(c) or 4981 of the Code, including without limitation any Tax arising from a prohibited transaction described in Section 857(b)(6) of the Code, and neither Equity Office nor any Equity Office Subsidiary has incurred any material liability for Taxes other than in the ordinary course of business. No event has occurred, and no condition or circumstance exists, which presents a material risk that any material Tax described in the preceding sentence will be imposed upon Equity Office or any Equity Office Subsidiary. Neither Equity Office nor any Equity Office Subsidiary is the subject of any audit, examination, or other proceeding in respect of federal income Taxes, and to Equity Office's Knowledge, no audit, examination or other proceeding in respect of federal income Taxes involving any of Equity Office or any Equity Office

Table of Contents

Subsidiary is being considered by any Tax authority. To the Knowledge of Equity Office, no deficiencies for any Taxes have been proposed, asserted or assessed against Equity Office or any of the Equity Office Subsidiaries, and no requests for waivers of the time to assess any such Taxes are pending.

(b) Equity Office (i) for all taxable years commencing with 1997, which was the first year of its operations, through December 31, 2000, has been subject to taxation as a REIT within the meaning of Section 856 of the Code and has qualified as a REIT for all such years, (ii) has operated since December 31, 2000 to the date of this representation, and intends to continue to operate, in such a manner as to qualify as a REIT for the taxable year that includes the Closing Date and (iii) has not taken or omitted to take any action which would reasonably be expected to result in a challenge to its status as a REIT and, to Equity Office's Knowledge, no such challenge is pending or threatened. Each Equity Office Subsidiary which is a partnership, joint venture or limited liability company either (A)(i) has been treated since its formation and continues to be treated for federal income tax purposes either as a partnership or as an entity that is disregarded for federal income tax purposes and not as a corporation or as an association taxable as a corporation and (ii) has not since the later of its formation or the acquisition by Equity Office of a direct or indirect interest therein, owned any assets (including, without limitation, securities) that would cause

Equity Office to violate Section 856(c)(4) of the Code or (B)(i) met the conditions set forth in clause (A)(i) and (A)(ii) as of December 31, 2000 and (ii) as of March 31, 2001, will be treated for federal income tax purposes as a corporation and will qualify as a taxable REIT Subsidiary under Section 856(l) of the Code. EOP Partnership is not a publicly traded partnership within the meaning of Section 7704(b) of the Code that is taxable as a corporation pursuant to Section 7704(a) of the Code. Each Equity Office Subsidiary which is a corporation (1) has been since its formation a qualified REIT subsidiary under Section 856(i) of the Code or (2) as of March 31, 2001 will qualify as a taxable REIT subsidiary under Section 856(l) of the Code. Except as set forth in *Schedule 3.11* to the Equity Office Disclosure Letter, neither Equity Office nor any Equity Office Subsidiary holds any asset (x) the disposition of which would be subject to rules similar to Section 1374 of the Code as a result of an election under IRS Notice 88–19 or Temporary Treas. Reg. §1.337(d)–5T or (y) which is subject to a consent filed pursuant to Section 341(f) of the Code and the regulations thereunder.

(c) To Equity Office's knowledge, as of the date hereof, Equity Office is a "domestically–controlled REIT" within the meaning of Section 897(h)(4)(B) of the Code.

3.12 *Brokers; Schedule of Fees and Expenses.* No broker, investment banker, financial advisor or other Person, other than Morgan Stanley & Co. Incorporated, the fees and expenses of which will be paid by Equity Office and are described in the engagement letter dated February 16, 2001, between Morgan Stanley & Co. Incorporated and Equity Office, a true, correct and complete copy of which has previously been given to Spieker, is entitled to any broker's, finder's, financial advisor's or other similar fee or commission in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of Equity Office or any Equity Office Subsidiary.

3.13 *Compliance with Laws.* Neither Equity Office nor any of the Equity Office Subsidiaries has violated or failed to comply with any statute, law, ordinance, regulation, rule, judgment, decree or order of any Governmental Entity applicable to its business, properties or operations, except in each case to the extent that such violation or failure would not reasonably be expected to have an Equity Office Material Adverse Effect.

3.14 *Contracts; Debt Instruments.* Neither Equity Office nor any Equity Office Subsidiary has received a written notice that Equity Office or any Equity Office Subsidiary is in violation of or in default under (nor to the Knowledge of Equity Office does there exist any condition which upon the passage of time or the giving of notice or both would cause such a violation of or default under) any material loan or credit agreement, note, bond, mortgage, indenture, lease, permit, concession, franchise, license or any other material contract, agreement, arrangement or understanding, to which it is a party or by which it or any of its properties or assets is bound, nor to the Knowledge of Equity Office does such a violation or default exist, except to the extent such violation or default, individually or in the aggregate, would not reasonably be expected to have an Equity Office Material Adverse Effect, except as set forth in the Equity Office SEC Documents or in *Schedule 3.14* to the Equity Office Disclosure Letter.

A–33

---

**Table of Contents**

3.15 *Opinion of Financial Advisor.* Equity Office has received the opinion of Morgan Stanley & Co. Incorporated, Equity Office's financial advisor, to the effect that the consideration to be paid by Equity Office in connection with the Merger is fair, from a financial point of view, to Equity Office.

3.16 *State Takeover Statutes.* Equity Office has taken all action necessary to exempt the transactions contemplated by this Agreement between Equity Office and Spieker and its Affiliates from the operation of Takeover Statutes.

3.17 *Investment Company Act of 1940.* Neither Equity Office nor any of the Equity Office Subsidiaries is, or at the Effective Time will be, required to be registered under the 1940 Act.

3.18 *Definition of "Knowledge of Equity Office".* As used in this Agreement, the phrase "Knowledge of Equity Office" (or words of similar import) means the actual knowledge of those individuals identified in *Schedule 3.18* to the Equity Office Disclosure Letter.

3.19 *Required Shareholder Approvals and Partner Approvals.* The affirmative vote of the holders of not less than a majority of all votes entitled to be cast by holders of Equity Office Common Shares, and the affirmative vote of the partners of EOP Partnership holding at least a majority of the outstanding Partnership Units (as defined in the EOP Partnership Agreement) (including Partnership Units held by Equity Office), are the only votes of the holders of any class or series of Equity Office capital shares or EOP Partnership limited partners necessary or required under this Agreement or under applicable law to approve the Merger, this Agreement and the Proposed Equity Office Charter Amendments. The approval of the Partnership Merger by Equity Office is the only vote necessary or required under this Agreement or under applicable law to approve the Partnership Merger under the EOP Partnership Agreement.

ARTICLE 4

COVENANTS

4.1 *Conduct of Spieker's and Spieker Partnership's Business Pending Merger.* During the period from the date of this Agreement to the Effective Times, except as consented to in writing by Equity Office or as contemplated in this Agreement, Spieker and Spieker Partnership shall, and shall cause (or, in the case of Spieker Subsidiaries and Spieker TRS that Spieker or Spieker Partnership do not control, shall use commercially reasonable efforts to cause) each of the Spieker Subsidiaries and

Spieker TRS to:

(a) conduct its business only in the usual, regular and ordinary course and in substantially the same manner as heretofore conducted, except for such changes as are expressly required by this Agreement;

(b) use commercially reasonable efforts to preserve intact its business organizations and goodwill and, provided it does not require additional compensation, keep available the services of its officers and employees;

(c) confer on a regular basis with one or more representatives of Equity Office to report operational matters of materiality and, subject to Section 4.3, any proposals to engage in material transactions;

(d) promptly notify Equity Office of the occurrence or existence of any circumstance, event, occurrence, change or effect that has had or would reasonably be expected to have a Spieker Material Adverse Effect;

(e) promptly deliver to Equity Office true and correct copies of any report, statement, schedule or other document filed with the SEC subsequent to the date of this Agreement;

(f) maintain its books and records in accordance with GAAP consistently applied and not change in any material manner any of its methods, principles or practices of accounting in effect at the Spieker Financial Statement Date, except as may be required by the SEC, applicable law or GAAP;

(g) duly and timely file all reports, tax returns and other documents required to be filed with federal, state, local and other authorities, subject to extensions permitted by law, provided Spieker notifies Equity Office that it is availing itself of such extensions and provided such extensions do not adversely affect Spieker's status as a qualified REIT under the Code;

A–34

Table of Contents

(h) maintain in full force and effect insurance coverage substantially similar to insurance coverage maintained on the date hereof;

(i) not make or rescind any express or deemed election relative to Taxes (unless such election or rescission is required by law or necessary (1) to preserve Spieker's status as a REIT, or (2) to qualify or preserve the status of any Spieker Subsidiary as a partnership for federal income tax purposes, as a qualified REIT subsidiary under Section 856(i) of the Code, or as a taxable REIT subsidiary under Section 856(l) of the Code, as the case may be (in which event Spieker or the applicable Spieker Subsidiary shall not fail to make such election in a timely manner);

(j) not (A) acquire, enter into any option to acquire, or exercise an option or other right or election or enter into any other commitment or contractual obligation (each, a "Commitment") for the acquisition of any real property or, except as permitted in a property capital budget approved in writing by Equity Office, other transaction (other than Commitments referred to in *Schedule 4.1(j)* to the Spieker Disclosure Letter) involving in excess of $100,000, encumber assets or commence construction of, or enter into any Commitment to develop or construct other real estate projects, except in the ordinary course of its office property business, including leasing activities pursuant to Equity Office–approved guidelines identified as the guidelines by Equity Office and Spieker as of the date hereof (the "Lease Guidelines"), (B) incur or enter into any Commitment to incur additional indebtedness (secured or unsecured) except for working capital under its revolving line(s) of credit and Commitments for indebtedness for the purposes and not in excess of the amounts described on *Schedule 4.1(j)* to the Spieker Disclosure Letter or (C) modify, amend or terminate, or enter into any Commitment to modify, amend or terminate, any indebtedness (secured or unsecured) in existence as of the date hereof;

(k) not amend the Spieker Articles or the Spieker Bylaws, or the articles or certificate of incorporation, bylaws, code of regulations, partnership agreement, operating agreement or joint venture agreement or comparable charter or organization document of any Spieker Subsidiary or Spieker TRS;

(l) not classify or re–classify any unissued shares of capital stock; make no change in the number of shares of capital stock, membership interests or units of limited partnership interest issued and outstanding, other than pursuant to (i) the exercise of options disclosed in *Schedule 2.3* to the Spieker Disclosure Letter, (ii) the conversion of the Spieker Class A Preferred Shares if required by their terms, (iii) the redemption of Spieker OP Units under the Spieker Partnership Agreement solely for shares of Spieker Common Stock unless, and only to the extent that, such redemption solely for shares of Spieker Common Stock would reasonably be expected to cause Spieker not to qualify as a REIT for federal income tax purposes, or (v) the conversion of Spieker Series D OP Units under the Spieker Partnership Agreement solely into Spieker Series D Preferred Shares;

(m) grant no options or other right or commitment relating to its shares of capital stock, membership interests or units of limited partnership interest or any security convertible into its shares of capital stock, membership interests or units of limited partnership interest, or any security the value of which is measured by shares of beneficial interest, or any security subordinated to the claim of its general creditors and not amend or waive any rights under any of the Spieker Stock Options or Spieker Stock Rights;

(n) except as provided in Section 5.10 and in connection with the use of Spieker Common Stock to pay the exercise price or tax withholding in connection with equity−based employee benefit plans by the participants therein, not (i) authorize, declare, set aside or pay any dividend or make any other distribution or payment with respect to any Spieker Common Stock, Spieker Preferred Stock, Spieker OP Unit or Spieker Preferred OP Unit or (ii) directly or indirectly redeem, purchase or otherwise acquire any shares of capital stock, membership interests or units of partnership interest or any option, warrant or right to acquire, or security convertible into, shares of capital stock, membership interests or units of partnership interest of Spieker or any Spieker Subsidiary, except for (A) deemed transfers of Spieker excess shares required under Article Ninth of the Spieker Articles in order to preserve the status of Spieker as a REIT under the Code, (B) redemptions of Spieker OP Units, whether or not outstanding on the date of this Agreement, under the Spieker Partnership Agreement in which solely Spieker Common

A−35

Table of Contents

Stock is utilized, and (C) redemption of the Spieker Series A Preferred Stock, which Spieker shall call for redemption and (except to the extent converted into Spieker Common Stock pursuant to the terms thereof) redeem promptly after the date hereof;

(o) not sell, lease, mortgage, subject to Lien (or, in the case of an involuntary Lien, fail to have such Lien removed within 30 days of the creation thereof) or otherwise dispose of any of the Spieker Properties, except in connection with a transaction that is permitted by Section 4.1(j), that is made in the ordinary course of business and is the subject of a binding contract in existence on the date of this Agreement and disclosed in *Schedule 2.18* to the Spieker Disclosure Letter or in connection with a transaction that is permitted by the Lease Guidelines;

(p) not sell, lease, mortgage, subject to Lien or otherwise dispose of any of its personal property or intangible property, except in the ordinary course of business and is not material, individually or in the aggregate;

(q) not make any loans, advances or capital contributions to, or investments in, any other Person, other than loans, advances and capital contributions to Spieker Subsidiaries or Spieker TRS in existence on the date hereof and ordinary course expense advances to employees and except in connection with a transaction permitted by Section 4.1(j), and not enter into any new, or amend or supplement any existing, contract, lease or other agreement with Spieker TRS;

(r) not pay, discharge or satisfy any claims, liabilities or obligations (absolute, accrued, asserted or unasserted, contingent or otherwise), other than the payment, discharge or satisfaction, in the ordinary course of business consistent with past practice or in accordance with their terms, of liabilities reflected or reserved against in, or contemplated by, the most recent consolidated financial statements (or the notes thereto) furnished to Equity Office or incurred in the ordinary course of business consistent with past practice;

(s) not guarantee the indebtedness of another Person, enter into any "keep well" or other agreement to maintain any financial statement condition of another Person or enter into any arrangement having the economic effect of any of the foregoing;

(t) not enter into any Commitment with any officer, director or Affiliate of Spieker or any of the Spieker Subsidiaries or Spieker TRS or any material Commitment with any consultant;

(u) not increase any compensation or enter into or amend any employment, severance or other arrangement with any of its officers, directors or employees earning more than $50,000 per annum, other than as required by any contract or Plan or in accordance with waivers by employees of benefits under such agreements or in accordance with Section 5.8(f);

(v) not adopt any new employee benefit plan or amend any existing plans or rights;

(w) not settle any stockholder derivative or class action claims arising out of or in connection with any of the transactions contemplated by this Agreement;

(x) not change the ownership of any of its Subsidiaries or Spieker TRS, except changes which arise as a result of the acquisition of Spieker OP Units in exchange for Spieker Common Stock pursuant to exercise of the Spieker OP Unit redemption right under Section 8.6 of the Spieker Partnership Agreement;

(y) not accept a promissory note in payment of the exercise price payable under any option to purchase shares of Spieker Common Stock;

(z) not enter into any Tax Protection Agreement;

(aa) not settle or compromise any material federal, state, local or foreign tax liability; and

(bb) not authorize, recommend, propose or announce an intention to do any of the foregoing prohibited actions, or enter into any contract, agreement, commitment or arrangement to do any of the foregoing prohibited actions.

A−36

Table of Contents

4.2 *Conduct of Equity Office's and EOP Partnership's Business Pending Merger.* During the period from the date of this Agreement to the Effective Times, except as consented to in writing by Spieker or as expressly contemplated in this Agreement, Equity Office and EOP Partnership shall, and shall cause (or, in the case of Spieker Subsidiaries that Spieker or Spieker Partnership do not control, shall use commercially reasonable efforts to cause) each of the Equity Office Subsidiaries to:

(a) use commercially reasonable efforts to preserve intact its business organizations and goodwill and keep available the services of its officers and employees;

(b) confer on a regular basis with one or more representatives of Spieker to report operational matters of materiality which would reasonably be expected to have an Equity Office Material Adverse Effect;

(c) promptly notify Spieker of the occurrence or existence of any circumstance, event, occurrence, change or effect that has had or would reasonably be expected to have an Equity Office Material Adverse Effect;

(d) promptly deliver to Spieker true and correct copies of any report, statement, schedule or other document filed with the SEC subsequent to the date of this Agreement;

(e) maintain its books and records in accordance with GAAP consistently applied and not change in any material manner any of its methods, principles or practices of accounting in effect at the Equity Office Financial Statement Date, except as may be required by the SEC, applicable law or GAAP;

(f) duly and timely file all reports, tax returns and other documents required to be filed with federal, state, local and other authorities, subject to extensions permitted by law, provided such extensions do not adversely affect Equity Office's status as a qualified REIT under the Code;

(g) not make or rescind any express or deemed election relative to Taxes (unless such election or rescission is required by law or necessary (1) to preserve Equity Office's status as a REIT, or (2) to qualify or preserve the status of any Equity Office Subsidiary as a partnership for federal income tax purposes, as a qualified REIT subsidiary under Section 856(i) of the Code, or as a taxable REIT subsidiary under Section 856(l) of the Code, as the case may be, in which event Equity Office or the applicable Equity Office Subsidiary shall not fail to make such election in a timely manner);

(h) not amend the Equity Office Declaration of Trust, the Equity Office Bylaws or the EOP Partnership Agreement (except for the Proposed Equity Office Charter Amendments (as defined herein) and the amendment to the EOP Partnership Agreement described in Section 5.4), except to the extent necessary to reflect the admission of additional limited partners and other amendments in connection therewith that can be made by Equity Office without a vote of limited partners and that will not, individually or in the aggregate, materially adversely affect the rights or obligations of holders of Equity Office OP Units; as used herein, "Proposed Equity Office Charter Amendments" means the proposed amendments to the Equity Office Declaration of Trust, substantially in the form attached hereto as *Exhibits I*, which has been approved by the Board of Trustees of Equity Office and will be submitted to a vote of the shareholders of Equity Office;

(i) not (A) enter into or agree to effect any merger, acquisition, consolidation, reorganization, or other business combination with any third party in which Equity Office is not the surviving party thereto or (B) enter into or agree to effect any merger, acquisition, exchange offer or other business combination with a third party in which Equity Office is the surviving party that would result in the issuance of equity securities representing in excess of 25% of the outstanding Equity Office Common Shares on the date any such business combination is entered into or agreed to unless, in either such case, such business combination is approved by Spieker, which approval shall not be unreasonably withheld or delayed, or the business combination agreement provides that the required vote of Equity Office shareholders for approval of such business combination is no less than the affirmative vote of holders of Equity Office Common Shares representing more than 50% of the sum (x) the number of Equity Office Common Shares outstanding at the time of each approval plus (y) 50,000,000;

A–37

Table of Contents

(j) except as provided in Section 5.10 hereof and in connection with the use of Equity Office Common Shares to pay the exercise price or tax withholding in connection with equity–based employee benefit plans by the participants therein, not (i) authorize, declare, set aside or pay any dividend or make any other distribution or payment with respect to any Equity Office Common Shares or Equity Office OP Units or (ii) directly or indirectly redeem, purchase or otherwise acquire any shares of capital stock, membership interests or units of partnership interest or any option, warrant or right to acquire, or security convertible into, shares of capital stock, membership interests, or units of partnership interest of Equity Office or any Equity Office Subsidiary, except for (A) redemptions of Equity Office Common Shares required under 7.3.6 of the Equity Office Declaration of Trust in order to preserve the status of Equity Office as a REIT under the Code, and (B) redemptions of Equity Office OP Units, whether or not outstanding on the date of this Agreement, under the EOP Partnership Agreement in which Equity Office Common Shares are utilized; and

(k) not authorize, recommend, propose or announce an intention to do any of the foregoing prohibited actions, or enter into any contract, agreement, commitment or arrangement to do any of the foregoing prohibited actions.

4.3　*No Solicitation.*

(a) On and after the date hereof and prior to the Effective Time of the Merger, Spieker agrees, for itself and in its capacity as the sole general partner of the Spieker Partnership, that:

(i) none of it, Spieker Partnership, any Spieker Subsidiary or Spieker TRS shall invite, initiate, solicit or encourage, directly or indirectly, any inquiries, proposals, discussions or negotiations or the making or implementation of any proposal or offer (including, without limitation, any proposal or offer to its stockholders) with respect to any direct or indirect (A) merger, consolidation, business combination, reorganization, recapitalization, liquidation, dissolution or similar transaction, (B) sale, acquisition, tender offer, exchange offer (or the filing of a registration statement under the Securities Act in connection with such an exchange offer), share exchange or other transaction or series of related transactions that, if consummated, would result in the issuance of securities representing, or the sale, exchange or transfer of, 15% or more of the outstanding voting equity securities of Spieker or outstanding partnership interests of Spieker Partnership (including, without limitation, partnership interests and units), except an underwritten public offering of Spieker Common Stock for cash, or (C) sale, lease, exchange, mortgage, pledge, transfer or other disposition ("Transfer") of any assets of Spieker or Spieker Partnership in one or a series of related transactions that, if consummated, would result in the Transfer of more than 30% of the assets of Spieker or Spieker Partnership, other than the Mergers (any such proposal or offer being hereinafter referred to as an "Acquisition Proposal"), or engage in any discussions or negotiations with or provide any confidential or non–public information or data to, or afford access to properties, books or records to, any Person relating to, or that may reasonably be expected to lead to, an Acquisition Proposal, or enter into any letter of intent, agreement in principle or agreement relating to an Acquisition Proposal, or propose publicly to agree to do any of the foregoing, or otherwise facilitate any effort or attempt to make or implement an Acquisition Proposal (including, without limitation, by amending or granting any waiver under, the Spieker Rights Agreement);

(ii) none of it, Spieker Partnership, any Spieker Subsidiary or Spieker TRS will permit any officer, director, employee, affiliate, agent, investment banker, financial advisor, attorney, accountant, broker, finder, consultant or other agent or representative of Spieker, Spieker Partnership, any Spieker Subsidiary or Spieker TRS (each, a "Spieker Representative") to engage in any of the activities described in Section 4.3(a)(i);

(iii) (A) it, Spieker Partnership, the Spieker Subsidiaries and Spieker TRS will immediately cease and cause to be terminated any existing activities, discussions or negotiations with any Persons conducted heretofore with respect to any of the foregoing (including, without limitation, any Acquisition Proposal) and will take commercially reasonable actions to inform each Spieker Representative, and each of the Persons referred to in Section 4.3(b), of the obligations undertaken in this Section 4.3 and to cause each Spieker Representative to comply with such obligations, and (B) it shall promptly request each Person, if any, that has executed a confidentiality agreement within the twenty–four months prior to the date hereof

A–38

**Table of Contents**

in connection with its consideration of any Acquisition Proposal to return or destroy all confidential information heretofore furnished to such Person by or on behalf of it, Spieker Partnership, the Spieker Subsidiaries and Spieker TRS; and

(iv) it will (A) notify Equity Office promptly (but in any event within 24 hours), orally and in writing, if Spieker, Spieker Partnership, any Spieker Subsidiary, Spieker TRS or any Spieker Representative after receipt of (1) an Acquisition Proposal or any amendment or change in any previously received Acquisition Proposal, (2) any request for confidential or nonpublic information or data relating to, or for access to the properties, books or records of, Spieker, Spieker Partnership, any Spieker Subsidiary or Spieker TRS by any Person that has made, or to such party's knowledge may be considering making, an Acquisition Proposal, or (3) any oral or written expression that any such activities, discussions or negotiations are sought to be initiated or continued with it, and, as applicable, include in such notice the identity of the Person making such Acquisition Proposal, indication or request, the material terms of such Acquisition Proposal, indication or request and, if in writing, shall promptly deliver to Equity Office copies of any proposals, indications of interest, indication or request along with all other related documentation and correspondence; and (B) will keep Equity Office informed of the status and material terms of (including all changes to the status or material terms of) any such Acquisition Proposal, indication or request.

(b) Notwithstanding Section 4.3(a), the Board of Directors of Spieker (including with respect to Spieker's capacity as the sole general partner of Spieker Partnership) shall not be prohibited from furnishing information to or entering into discussions or negotiations with, any Person that makes a bona fide written Acquisition Proposal to the Board of Directors of Spieker after the date hereof which was not invited, initiated, solicited or encouraged, directly or indirectly, by Spieker, Spieker Partnership, any Spieker Subsidiary, Spieker TRS or any Spieker Representative on or after the date hereof, if, and only to the extent that (i) a majority of the Board of Directors of Spieker determines in good faith, after consultation with its financial advisors of nationally recognized reputation and outside legal counsel, that such Acquisition Proposal is reasonably likely to result in a Superior Acquisition Proposal, (ii) each of Spieker and Spieker Partnership complies with all of its obligations under this Agreement, (iii) prior to furnishing such information to, or entering into discussions or negotiations with, such Person, Spieker provides written notice to Equity Office to the effect that it is furnishing information to, or entering into discussions with such Person and (iv) Spieker enters into a confidentiality agreement with such Person the material terms of which are (without regard to the terms of such Acquisition Proposal) in all material respects no less favorable to Spieker, and no less restrictive to the Person making

such Acquisition Proposal, than those contained in the Confidentiality Agreement, dated January 2, 2001, between Spieker and Equity Office (the "Confidentiality Agreement").

(c)  Notwithstanding anything to the contrary set forth in Section 4.3(a) or 4.3(b), in the event that an Acquisition Proposal constitutes a Superior Acquisition Proposal (as defined herein), nothing contained in this Section 4.3 shall prohibit the Board of Directors of Spieker from withdrawing, modifying, amending or qualifying its recommendation of this Agreement and the Merger as required under Section 5.1(d) hereof and recommending such Superior Acquisition Proposal to its stockholders: (i) if but only if, Spieker: (A) complies fully with this Section 4.3 and (B) provides Equity Office with at least three (3) business days' prior written notice of its intent to withdraw, modify, amend or qualify its recommendation of this Agreement or the Merger, (ii) if, in the event that during such three (3) business days Equity Office makes a counter proposal to such Superior Acquisition Proposal (any such counter proposal being referred to in this Agreement as the "Equity Office Counter Proposal"), Spieker's Board of Directors in good faith, taking into account the advice of its outside financial advisors of nationally recognized reputation, determines (A) that the Equity Office Counter Proposal is not at least as favorable to Spieker's stockholders as the Superior Acquisition Proposal, from a financial point of view, and (B) the Equity Office Counter Proposal is not at least as favorable generally to Spieker's stockholders (taking into account all financial and strategic considerations and other relevant factors, including relevant legal, financial, regulatory and other aspects of such proposals, and the conditions, prospects and time required for completion of such proposal), and (iii) Spieker shall have terminated this Agreement in accordance with Section 7.1(h).

A–39

---

**Table of Contents**

(d)  For all purposes of this Agreement, "Superior Acquisition Proposal" means a bona fide written proposal made by a third party to acquire, directly or indirectly, Spieker and/or Spieker Partnership pursuant to a tender or exchange offer, merger, share exchange, consolidation or sale of all or substantially all of the assets of Spieker, Spieker Partnership, and the Spieker Subsidiaries or otherwise (i) on terms which a majority of the Board of Directors of Spieker determines in good faith, (A) after consultation with Spieker's financial advisors of nationally recognized reputation, are superior, from a financial point of view, to Spieker's stockholders to those provided for in the Merger and (B) to be more favorable generally to Spieker's stockholders (taking into account all financial and strategic considerations and other relevant factors, including relevant legal, financial, regulatory and other aspects of such proposals, and the conditions, prospects and time required for completion of such proposal), (ii) for which financing, to the extent required, in the reasonable judgment of the Board of Directors is capable of being obtained and (iii) which the Board of Directors of Spieker determines in good faith is reasonably capable of being consummated.

(e)  Any disclosure that the Board of Directors of Spieker may be compelled to make with respect to the receipt of an Acquisition Proposal in order to comply with its duties to shareholders imposed by applicable law or Rule 14d–9 or 14e–2 of the Exchange Act will not constitute a violation of this Section 4.3.

(f)  Nothing in this Section 4.3 shall (i) permit Spieker to terminate this Agreement (except as expressly provided in Article 7) or (ii) affect any other obligations of Spieker under this Agreement.

4.4  *Affiliates.* Prior to the Effective Time of the Merger, Spieker shall cause to be prepared and delivered to Equity Office a list (reasonably satisfactory to counsel for Equity Office) identifying all Persons who, at the time of the Spieker Stockholders Meeting and the Equity Office Shareholders Meeting, may be deemed to be "affiliates" of Spieker or Spieker Partnership as that term is used in paragraphs (c) and (d) of Rule 145 under the Securities Act (the "Rule 145 Affiliates"). Spieker shall use its commercially reasonable efforts to cause each Person who is identified as a Rule 145 Affiliate in such list to deliver to Equity Office on or prior to the Effective Time a written agreement, in the form previously approved by the parties hereto, that such Rule 145 Affiliate will not sell, pledge, transfer or otherwise dispose of any Equity Office Common Shares, Equity Office OP Units or Equity Office Preferred OP Units issued to such Rule 145 Affiliate pursuant to the Merger, except pursuant to an effective registration statement under the Securities Act or in compliance with paragraph (d) of Rule 145 or as otherwise permitted by the Securities Act. Equity Office shall be entitled to place legends as specified in such written agreements on the certificates representing any Equity Office Common Shares to be received pursuant to the terms of this Agreement by such Rule 145 Affiliates who have executed such agreements and to issue appropriate stop transfer instructions to the transfer agent for the Equity Office Common Shares, Equity Office OP Units and Equity Office Preferred OP Units issued to such Rule 145 Affiliates, consistent with the terms of such agreements. Each of Equity Office and EOP Partnership shall timely file the reports required to be filed by it under the Exchange Act and the rules and regulations adopted by the SEC thereunder, and it will take such further action as any Rule 145 Affiliate of Spieker or Equity Office may reasonably request, all to the extent required from time to time to enable such Rule 145 Affiliate to sell shares of beneficial interest of Equity Office received by such Rule 145 Affiliate in the Merger without registration under the Securities Act pursuant to (i) Rule 145(d)(1) under the Securities Act, as such rule may be amended from to time, or (ii) any successor rule or regulation hereafter adopted by the SEC.

4.5  *Other Actions.* Each of Spieker and Spieker Partnership, on the one hand, and Equity Office and EOP Partnership, on the other hand, shall not take, and shall use commercially reasonable efforts to cause their respective Subsidiaries not to take, any action that would result in (i) any of the representations and warranties of such party (without giving effect to any "knowledge" qualification) set forth in this Agreement that are qualified as to materiality becoming untrue, (ii) any of such representations and warranties (without giving effect to any "knowledge" qualification) that are not so qualified becoming untrue in any material respect or (iii) except as expressly required by Section 4.3, any of the conditions to the Merger set forth in Article 6 not being satisfied.

A–40