Table of Contents

ARTICLE 5

ADDITIONAL COVENANTS

5.1 *Preparation of the Form S—4 and the Proxy Statement; Spieker Stockholders Meeting, Spieker Unitholders Consent Solicitation and Equity Office Shareholders Meeting.*

(a) As promptly as practicable after execution of this Agreement, (i) each of Spieker and Equity Office shall prepare and file with the SEC (with appropriate requests for confidential treatment, unless the parties hereto otherwise agree) under the Exchange Act, one or more joint proxy statements/prospectuses, forms of proxies and information statements (such joint proxy statement(s)/prospectus(es) and information statements together with any amendments to supplements thereto, the "Joint Proxy Statement") relating to the stockholder meeting of Spieker and the shareholder meeting of Equity Office, the vote of the stockholders of Spieker with respect to the Merger and the shareholders of Equity Office with respect to the Merger, and the consent, if any, of partners of Spieker Partnership and EOP Partnership in connection with any required Partner Approvals and (ii) in connection with the clearance by the SEC of the Joint Proxy Statement, Equity Office and Spieker, if applicable, shall prepare and file with the SEC under the Securities Act one or more registration statements on Form S—4 (such registration statements, together with any amendments or supplements thereto, the "Form S—4"), in which the Joint Proxy Statement will be included, as one or more prospectuses in connection with the registration under the Securities Act of the Equity Office Common Shares, Equity Office Preferred Shares, Equity Office OP Units and Equity Office Preferred OP Units to be distributed to the holders of Spieker Common Stock, Spieker Preferred Shares, Spieker OP Units and Spieker Preferred OP Units in the Mergers. The respective parties will cause the Proxy Statement and the Form S—4 to comply as to form in all material respects with the applicable provisions of the Securities Act, the Exchange Act and the rules and regulations thereunder. Each of Spieker, Spieker Partnership, Equity Office and EOP Partnership shall furnish all information about itself and its business and operations and all necessary financial information to the other as the other may reasonably request in connection with the preparation of the Joint Proxy Statement and the Form S—4. Each of Equity Office and Spieker, if applicable, shall use its commercially reasonable efforts, and Spieker will cooperate with Equity Office, to have the Form S—4 declared effective by the SEC as promptly as practicable (including clearing the Proxy Statement with the SEC). Each of Spieker and Spieker Partnership, on the one hand, and Equity Office and EOP Partnership, on the other hand, agree promptly to correct any information provided by it for use in the Joint Proxy Statement and the Form S—4 if and to the extent that such information shall have become false or misleading in any material respect, and each of the parties hereto further agrees to take all steps necessary to amend or supplement the Joint Proxy Statement and the Form S—4 and to cause the Joint Proxy Statement and the Form S—4 as amended or supplemented to be filed with the SEC and to be disseminated to their respective stockholders and shareholders and partners, in each case as and to the extent required by applicable federal and state securities laws. Each of Spieker, Spieker Partnership, Equity Office and EOP Partnership agrees that the information provided by it for inclusion in the Joint Proxy Statement or the Form S—4 and each amendment or supplement thereto, at the time of mailing thereof and at the time of the respective meetings of stockholders and shareholders of Spieker and Equity Office and at the time of the respective taking of consents, if any, of partners of Spieker Partnership and EOP Partnership, will not include an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading. Equity Office will advise and deliver copies (if any) to Spieker, promptly after it receives notice thereof, of any request by the SEC for amendment of the Joint Proxy Statement or the Form S—4 or comments thereon and responses thereto or requests by the SEC for additional information (regardless of whether such requests relate to Equity Office or EOP Partnership, on the one hand, and Spieker or Spieker Partnership, on the other hand), and Equity Office shall promptly notify Spieker, and Spieker shall promptly notify Equity Office, if applicable, of (i) the time when the Form S—4 has become effective, (ii) the filing of any supplement or amendment thereto, (iii) the issuance of any stop order, and (iv) the suspension of the qualification and registration

Table of Contents

of the Equity Office Common Shares, Equity Office Preferred Shares, Equity Office OP Units and Equity Office Preferred OP Units issuable in connection with the Mergers.

(b) Each of Spieker, Spieker Partnership, Equity Office and EOP Partnership shall use its commercially reasonable efforts to timely mail the joint proxy statement/prospectus contained in the Form S—4 to its stockholders or shareholders. It shall be a condition to the mailing of the joint proxy statement/prospectus that (i) Equity Office and EOP Partnership shall have received a "comfort" letter from Arthur Andersen LLP, independent public accountants for Spieker and Spieker Partnership, of the kind contemplated by the Statement of Auditing Standards with respect to Letters to Underwriters promulgated by the American Institute of Certified Public Accountants (the "AICPA Statement"), dated as of the date on which the Form S—4 shall become effective and as of the Effective Time, addressed to Equity Office and EOP Partnership, in form and substance reasonably satisfactory to Equity Office and EOP Partnership, concerning the procedures undertaken by Arthur Andersen LLP with respect to the financial statements and information of Spieker, Spieker Partnership and their subsidiaries and Spieker TRS contained in the Form S—4 and the other matters contemplated by the AICPA Statement and otherwise customary in scope and substance for letters delivered by independent public accountants in connection with transactions such as those contemplated by this Agreement and (ii) Spieker shall have received a "comfort" letter from Ernst & Young LLP, independent public accountants for Equity Office and EOP Partnership, of the kind contemplated by the AICPA Statement, dated as of the date on which the Form S—4 shall become effective and as of the Effective Time, addressed to Spieker and Spieker Partnership, in form and substance reasonably satisfactory to Spieker, concerning the procedures undertaken by Ernst &

Young LLP with respect to the financial statements and information of Equity Office, EOP Partnership and their subsidiaries contained in the Form S–4 and the other matters contemplated by the AICPA Statement and otherwise customary in scope and substance for letters delivered by independent public accountants in connection with transactions such as those contemplated by this Agreement. Each of Spieker and Spieker Partnership also shall use commercially reasonable efforts to cause (i) the counsel to render the opinion described in clause (i) of Section 6.2(d) to have delivered an opinion, which opinion shall be filed as an exhibit to the Form S–4, as to the federal income tax matters described in clause (i) of Section 6.2(d), and (ii) Sullivan & Cromwell or other counsel reasonably satisfactory to Equity Office to have delivered an opinion, which opinion shall be filed as an exhibit to the Form S–4, as to the federal income tax matters described in clause (ii) of Section 6.2(d) and Section 6.3(e) and such other federal income tax matters as are required to be addressed in the Form S–4 and the Joint Proxy Statement under the applicable rules of the SEC. Each of Equity Office and EOP Partnership shall use commercially reasonable efforts to cause Hogan & Hartson L.L.P. or other counsel reasonably satisfactory to Spieker to have delivered an opinion, which opinion shall be filed with the SEC as an exhibit to the Form S–4, as to the federal income tax matters described in clause (iii) of Section 6.2(d), Section 6.2(e) and Section 6.3(d). Such opinions shall contain customary exceptions, assumptions and qualifications and be based upon customary representations.

(c) Equity Office will duly call and give notice of and, as soon as practicable following the date of this Agreement (but in no event sooner than 20 business days following the date the Joint Proxy Statement is mailed to the shareholders of Equity Office), convene and hold a meeting of its shareholders (the "Equity Office Shareholders Meeting") for the purpose of obtaining the Equity Office Shareholder Approvals. Equity Office shall, through its Board of Trustees, recommend to its shareholders approval of this Agreement, the Merger and the transactions contemplated by this Agreement.

(d) Spieker will duly call and give notice of and, as soon as practicable following the date of this Agreement (but in no event sooner than 20 business days following the date the Joint Proxy Statement is mailed to the stockholders of Spieker), convene and hold a meeting of its stockholders (the "Spieker Stockholders Meeting") for the purpose of obtaining the Spieker Stockholder Approvals. Spieker shall, through its Board of Directors, recommend to its stockholders approval of this Agreement, the Merger and the transactions contemplated by this Agreement and include such recommendation in the Proxy Statement; *provided, however,* that prior to the Spieker Stockholders Meeting, such recommendation

A–42

Table of Contents

may be withdrawn, modified, amended or qualified if and only to the extent permitted by Section 4.3(c) hereof.

(e) Equity Office and Spieker shall use their commercially reasonable efforts to convene their respective shareholder and stockholder meetings on the same day, which day, subject to the provisions of Sections 5.1(c), 5.1(d) and 5.3, shall be a day not later than 60 days after the date the Joint Proxy Statement is mailed.

(f) If on the date for the Equity Office Shareholders Meeting and Spieker Stockholders Meeting established pursuant to Section 5.1(e) of this Agreement, either Equity Office or Spieker has not received duly executed proxies for a sufficient number of votes to approve the Merger, then both parties shall recommend the adjournment of their respective shareholders and stockholders meetings until one or more dates not later than the date 10 days after the originally scheduled date of the shareholders meetings.

(g) Spieker shall request written consents for approval by the limited partners of Spieker Partnership of each of the matters described in the definition of Spieker Partner Approvals. Spieker shall vote in favor of or consent to, as applicable, each of the matters described in the definition of Spieker Partner Approvals, to the extent approval thereof is required by the Spieker Partnership Agreement. Spieker shall recommend to the limited partners of Spieker Partnership that they approve such matters. Spieker shall execute its written consent to each of the matters described in the definition of Spieker Partner Approvals, on the 20th business day after mailing of the Joint Proxy Statement to holders of the Spieker OP Units and Spieker Preferred OP Units and immediately thereafter Spieker Partnership shall mail to each holder of a Spieker OP Unit and each Spieker Preferred OP Unit a notice of the approval of the Partnership Merger in accordance with Section 15679.3 of the CRULPA. Equity Office shall request written consents, if any is required, by the limited partners of EOP Partnership of each of the matters described in the definition of Equity Office Partner Approvals. Equity Office shall vote, if any is required, in favor of such matters and recommend to the limited partners of EOP Partnership that they approve such matters.

(h) Spieker shall not exercise any dissenters or other similar rights with respect to any of its Spieker OP Units or Spieker Preferred OP Units, including, without limitation, any rights under Section 15679.2 of the CRULPA.

*5.2 Access to Information; Confidentiality.* Subject to the requirements of confidentiality agreements with third parties in existence on the date hereof, each of the parties shall, and shall cause each of its Subsidiaries (and, in the case of Spieker, Spieker TRS) to, afford to the other parties and to the officers, employees, accountants, counsel, financial advisors and other representatives of such other parties, reasonable access during normal business hours prior to the Effective Time to all their respective properties, books, contracts, commitments, personnel and records and, during such period, each of the parties shall, and shall cause each of its Subsidiaries (and, in the case of Spieker, Spieker TRS) to, furnish promptly to the other parties (a) a copy of each report, schedule, registration statement and other document filed by it during such period pursuant to the requirements of federal or state securities laws and (b) all other information concerning its business, properties and personnel as such other party may reasonably request. Each of the parties shall, and shall cause its Subsidiaries (and in the case of Spieker, Spieker TRS) to, use commercially reasonable efforts to cause its officers, employees, accountants, counsel, financial advisors and other representatives and affiliates to, hold any nonpublic information in confidence in accordance with the Confidentiality Agreement, which shall

remain in full force and effect pursuant to the terms thereof, notwithstanding the execution and delivery of this Agreement or the termination hereof.

5.3 *Commercially Reasonable Efforts; Notification.*

(a) Subject to the terms and conditions herein provided, each of the parties shall: (i) use commercially reasonable efforts to cooperate with one another in (A) determining which filings are required to be made prior to the Effective Time with, and which consents, approvals, permits or authorizations are required to be obtained prior to the Effective Time from, governmental or regulatory authorities of the United States, the

A-43

---

several states and foreign jurisdictions and any third parties in connection with the execution and delivery of this Agreement, and the consummation of the transactions contemplated hereby, including, without limitation, any filing under the HSR Act, and (B) timely making all such filings and timely seeking all such consents, approvals, permits and authorizations; (ii) use commercially reasonable efforts (other than the payment of money which is not contractually required to be paid) to obtain in writing any consents required from third parties to effectuate the Mergers, such consents to be in form reasonably satisfactory to each of the parties; and (iii) use commercially reasonable efforts to take, or cause to be taken, all other action and do, or cause to be done, all other things necessary, proper or appropriate to consummate and make effective the transactions contemplated by this Agreement. If at any time after the Effective Time any further action is necessary or desirable to carry out the purpose of this Agreement, each party shall take all such necessary action.

(b) Spieker and Spieker Partnership shall use commercially reasonable efforts to obtain from Arthur Andersen LLP access to all work papers relating to audits of Spieker and Spieker Partnership performed by Arthur Andersen LLP, and the continued cooperation of Arthur Andersen LLP with regard to the preparation of consolidated financial statements for the Surviving Trust.

(c) Spieker and Spieker Partnership shall give prompt notice to Equity Office and EOP Partnership, and Equity Office and EOP Partnership shall give prompt notice to Spieker and Spieker Partnership, (i) if any representation or warranty made by it contained in this Agreement that is qualified as to materiality becomes untrue or inaccurate in any respect or any such representation or warranty that is not so qualified becomes untrue or inaccurate in any material respect or (ii) of the failure by it to comply with or satisfy in any material respect any covenant, condition or agreement to be complied with or satisfied by it under this Agreement; *provided, however,* that no such notification shall affect the representations, warranties, covenants or agreements of the parties or the conditions to the obligations of the parties under this Agreement.

5.4 *Tax Matters.*

(a) Each of Equity Office and Spieker shall use its commercially reasonable efforts before and after the Effective Time to cause the Merger to qualify as a reorganization under the provisions of Sections 368(a) of the Code and to obtain the opinions of counsel referred to in Sections 6.2(e) and 6.3(e).

(b) In connection with the Partnership Merger, EOP Partnership shall adopt an amendment to the EOP Partnership Agreement substantially in the form set forth as *Exhibit K* hereto addressing certain federal income tax matters affecting the holders of Spieker OP Units who will receive Equity Office OP Units in the Partnership Merger.

5.5 *Public Announcements.* The initial press release to be issued with respect to the transactions contemplated by this Agreement will be in the form agreed to by the parties prior to the execution of this Agreement. Spieker will consult with Equity Office before issuing, and provide Equity Office the opportunity to review and comment upon, any material press release or other written public statement, including, without limitation, any press release or other written public statement which addresses in any manner the transactions contemplated by this Agreement, and shall not issue any such press release or make any such written public statement prior to such consultation, except as may be required by applicable law, court process or by obligations pursuant to any listing agreement with any national securities exchange.

5.6 *Listing.* Equity Office shall use commercially reasonable efforts to cause the Equity Office Common Shares, Equity Office Series E Preferred Shares, Equity Office Series F Preferred Shares and Equity Office Series H Preferred Shares to be issued in the Merger, the Equity Office Common Shares reserved for issuance upon redemption of Equity Office OP Units issued in the Partnership Merger, the Equity Office Common Shares reserved for issuance upon conversion of Equity Office Series D Preferred Shares (if any), and the Equity Office Series G Preferred Shares reserved for issuance upon conversion of Equity Office Series G Preferred OP Units issued in the Partnership Merger, in each case, to be approved for listing on the New York Stock Exchange (the "NYSE"), subject to official notice of issuance, prior to the Effective Time.

5.7 *Transfer and Gains Taxes.* Each party shall cooperate in the preparation, execution and filing of all returns, questionnaires, applications or other documents regarding any real property transfer or gains, sales,

A-44

Table of Contents

use, transfer, value added stock transfer and stamp taxes, any transfer, recording, registration and other fees and any similar taxes which become payable in connection with the transactions contemplated by this Agreement (together with any related interests, penalties or additions to tax, "Transfer and Gains Taxes"). From and after the Effective Time, Equity Office shall pay or cause EOP Partnership, as appropriate, to pay or cause to be paid, without deduction or withholding from any amounts payable to the holders of Equity Office Common Shares or Equity Office OP Units, as applicable, all Transfer and Gains Taxes (which term shall not in any event be construed to include for these purposes any Tax imposed under the Code).

5.8 *Benefit Plans and Other Employee Arrangements.*

(a) *Benefit Plans.* After the Effective Time, all employees of Spieker who are employed by the Surviving Trust shall be eligible to participate in the same manner as other similarly situated employees of the Surviving Trust who were formerly employees of Equity Office in any "employee benefit plan," as defined in Section 3(3) of ERISA, sponsored or maintained by the Surviving Trust after the Effective Time or, if Equity Office determines it is not practicable for such employees to do so immediately after the Effective Time, then such employees shall continue to be eligible to participate in an "employee benefit plan", as defined in Section 3(3) of ERISA, of Spieker which is continued by the Surviving Trust until such time as Equity Office determines it is practicable to include them in its "employee benefit plans" for similarly situated employees of the Surviving Trust as contemplated above. With respect to each such employee benefit plan, service with Spieker or any Spieker Subsidiary (as applicable) and the predecessor of any of them shall be included for purposes of determining eligibility to participate, vesting (if applicable) and determination of the level of entitlement to, benefits under such employee benefit plan. Equity Office shall, or shall cause the Surviving Trust and its Subsidiaries to, (i) waive all limitations as to preexisting conditions, exclusions and waiting periods with respect to participation and coverage requirements applicable to all employees of Spieker who are employed by the Surviving Trust under any welfare plan that such employees may be eligible to participate in after the Effective Time, other than limitations or waiting periods that are already in effect with respect to such employees and that have not been satisfied as of the Effective Time under any welfare plan maintained for such employees immediately prior to the Effective Time, and (ii) provide each such employee of Spieker who is employed by the Surviving Trust with credit for any co–payments and deductibles paid prior to the Effective Time in satisfying any applicable deductible or out–of–pocket requirements under any welfare plans that such employees are eligible to participate in after the Effective Time.

(b) *Stock Option and Restricted Stock Plans.* The stock option plans or programs of Spieker and the restricted stock plans or programs of Spieker shall be discontinued as of the Effective Time.

(c) *Spieker Stock Options.* Immediately prior to the date on which the Spieker stockholders approve the Merger, each outstanding Spieker Stock Option shall, effective as of such time, become fully vested and exercisable to the extent not already so vested and exercisable and, to the extent not otherwise provided in the applicable option agreement as permitted by applicable law, each such Spieker Stock Option shall be automatically converted at the Effective Time into an option (a "Substituted Option") to purchase a number of shares of Equity Office Common Shares equal to the number of shares of Spieker Common Stock that could have been purchased (assuming full vesting) under such Spieker Stock Option multiplied by 1.94462 (rounded down to the nearest whole number of shares of Spieker Common Stock) at an exercise price per share of Equity Office Common Shares equal to the per–share option exercise price specified in the Spieker Stock Option divided by 1.94462 (rounded up to the nearest whole cent). Such Substituted Option shall otherwise be subject to the same terms and conditions as such Spieker Stock Option. For purposes of expiration and otherwise, the date of grant of the Substituted Option shall be the date on which the corresponding Spieker Stock Option was granted. As soon as practicable after the date hereof and subject to applicable law, Equity Office shall offer to purchase, subject to consummation of the Mergers, all Spieker Stock Options outstanding on the date hereof from the holders thereof for an amount in cash in respect thereof equal to the product of (i) the excess, if any, of (A) $58.50 over (B) the exercise price of such Spieker Stock Option and (ii) the number of shares of Spieker Common Stock subject thereto. If the holder of any such Spieker Stock Option tenders such option prior to 11:59 p.m., Pacific Time, on the 20th business day after the purchase offer is made to the holders thereof, then within three business days after the Effective Time, Equity Office shall, subject to reduction for required withholding taxes, pay to each such tendering former holder of

A–45

Table of Contents

Spieker Stock Options the purchase price thereof. As promptly as reasonably practicable after the Effective Time, Equity Office shall issue to each holder of an outstanding Spieker Stock Option a document evidencing the foregoing assumption by Equity Office. In respect of each Spieker Stock Option assumed by Equity Office, but not tendered for cash, and converted into a Substituted Option, and the Equity Office Common Shares underlying such Substituted Option, Equity Office shall, as soon as practicable after the Effective Time, file and keep current a Registration Statement on Form S–8 or other appropriate registration statement for as long as Substituted Options remain outstanding.

(d) *Restricted Stock.* All unvested shares of restricted stock of Spieker set forth in Schedule 5.8(d) of the Spieker Disclosure Letter shall, by virtue of this Agreement and without further action of Spieker, Equity Office or the holder of such shares of restricted stock, to the extent required in the plan, agreement or instrument pursuant to which such shares of restricted stock were granted, vest and become free of all restrictions immediately prior to the date on which the Spieker shareholders approve the Merger and shall be converted into the Merger Consideration upon the Effective Time pursuant to Section 1.10.

(e) *Withholding.* To the extent required by applicable law, Spieker shall require each employee who exercises a Spieker Stock Option or who receives Spieker Common Stock pursuant to any existing commitment to pay to Spieker in cash or Spieker Common Stock an amount sufficient to satisfy in full Spieker's obligation to withhold Taxes incurred by reason of such exercise

or issuance (unless and to the extent such withholding is satisfied pursuant to the provision regarding withholding in Section 1.13(c)).

(f) *Special Severance Policy.* Equity Office acknowledges that the transactions contemplated by this Agreement shall be deemed a "Change in Control" for purposes of the Special Severance Policy, and that severance payments shall be made in accordance with the Special Severance Policy to any participant who becomes entitled to such payments on account of a termination of employment occurring on or after the Effective Date, unless such termination is for Cause or is a voluntary resignation without Good Reason in accordance with the terms of the Special Severance Policy. As of the Effective Time, there shall not be any additional employees or other service providers thereafter designated for participation in the Special Severance Policy.

(g) *Bonus Plans.* From and after the Effective Time, Equity Office or EOP Partnership shall pay, if earned, development bonuses to employees identified on *Schedule 5.8(g)* of the Spieker Disclosure Letter up to the aggregate amount set forth on *Schedule 5.8(g)* of the Spieker Disclosure Letter. Equity Office or EOP Partnership also shall assume the obligations of Spieker to pay annual bonuses to Spieker employees not covered by the Special Severance Policy and such bonuses shall be payable to such employees who are terminated by Equity Office (unless terminated for inadequate performance) before January 1, 2002. Such bonuses shall be payable to the extent accrued for the year 2001 through the date of termination and shall be calculated based on actual bonuses paid in 2000 (assuming such bonuses reflected a full year of employment).

5.9 *Indemnification.*

(a) From and after the Effective Time, Equity Office and EOP Partnership (collectively, the "Indemnifying Parties") shall provide exculpation and indemnification for each individual who is now or has been at any time prior to the date hereof or who becomes prior to the Effective Time of the Merger, an officer or director of Spieker or any Spieker Subsidiary (the "Indemnified Parties") which is the same as the exculpation and indemnification provided to the Indemnified Parties by Spieker and the Spieker Subsidiaries immediately prior to the Effective Time of the Merger in its charter, Bylaws or in its partnership, operating or similar agreement, as in effect on the date hereof.

(b) In addition to the rights provided in Section 5.9(a) above, in the event of any threatened or actual claim, action, suit, proceeding or investigation, whether civil, criminal or administrative, including, without limitation, any action by or on behalf of any or all security holders of Spieker or Equity Office, or any Spieker Subsidiary or Equity Office Subsidiary, or by or in the right of Spieker or Equity Office, or any Spieker Subsidiary or Equity Office Subsidiary, or any claim, action, suit, proceeding or investigation in which any individual who is now, or has been, at any time prior to the date hereof, or who becomes prior to the Effective Time of the Merger, an officer, employee or director of Spieker or any Spieker Subsidiary (the "Indemnifica-

A–46

**Table of Contents**

tion Parties") is, or is threatened to be, made a party based in whole or in part on, or arising in whole or in part out of, or pertaining to (i) the fact that he is or was an officer, employee or director of Spieker or any of the Spieker Subsidiaries or any action or omission by such individual in his capacity as a director, or (ii) this Agreement or the transactions contemplated by this Agreement, whether in any case asserted or arising before or after the Effective Time of the Merger, the Indemnifying Parties shall, from and after the Effective Time of the Merger, indemnify and hold harmless, as and to the full extent permitted by applicable law, each Indemnification Party against any losses, claims, liabilities, expenses (including reasonable attorneys' fees and expenses), judgments, fines and amounts paid in settlement in accordance herewith in connection with any such threatened or actual claim, action, suit, proceeding or investigation. Any Indemnification Party proposing to assert the right to be indemnified under this Section 5.9(b) shall, promptly after receipt of notice of commencement of any action against such Indemnification Party in respect of which a claim is to be made under this Section 5.9(b) against the Indemnifying Parties, notify the Indemnifying Parties of the commencement of such action, enclosing a copy of all papers served; *provided, however,* that the failure to provide such notice shall not affect the obligations of the Indemnifying Parties except to the extent such failure to notify materially prejudices the Indemnifying Parties' ability to defend such claim, action, suit, proceeding or investigation; and *provided further, however,* that, in the case of any action pending at the Effective Time of the Merger, notification pursuant to this Section 5.9(b) shall be received by Equity Office prior to such Effective Time. If any such action is brought against any of the Indemnification Parties and such Indemnification Parties notify the Indemnifying Parties of its commencement, the Indemnifying Parties will be entitled to participate in and, to the extent that they elect by delivering written notice to such Indemnification Parties promptly after receiving notice of the commencement of the action from the Indemnification Parties, to assume the defense of the action and after notice from the Indemnifying Parties to the Indemnification Parties of their election to assume the defense, the Indemnifying Parties will not be liable to the Indemnification Parties for any legal or other expenses except as provided below. If the Indemnifying Parties assume the defense, the Indemnifying Parties shall have the right to settle such action without the consent of the Indemnification Parties; *provided, however,* that the Indemnifying Parties shall be required to obtain such consent (which consent shall not be unreasonably withheld) if the settlement includes any admission of wrongdoing on the part of the Indemnification Parties or any decree or restriction on the Indemnification Parties; *provided further, however,* that no Indemnifying Parties, in the defense of any such action shall, except with the consent of the Indemnification Parties (which consent shall not be unreasonably withheld), consent to entry of any judgment or enter into any settlement that does not include as an unconditional term thereof the giving by the claimant or plaintiff to such Indemnification Parties of a release from all liability with respect to such action. The Indemnification Parties will have the right to employ their own counsel in any such action, but the fees, expenses and other charges of such counsel will be at the expense of such Indemnification Parties unless (i) the employment of counsel by the Indemnification Parties has been authorized in writing by the Indemnifying Parties, (ii) the Indemnification Parties have reasonably concluded (based on written advice of counsel to the Indemnification Parties) that there may be legal

defenses available to them that are different from or in addition to and inconsistent with those available to the Indemnifying Parties, (iii) a conflict or potential conflict exists (based on written advice of counsel to the Indemnification Parties) between the Indemnification Parties and the Indemnifying Parties (in which case the Indemnifying Parties will not have the right to direct the defense of such action on behalf of the Indemnification Parties) or (iv) the Indemnifying Parties have not in fact employed counsel to assume the defense of such action within a reasonable time after receiving notice of the commencement of the action from the Indemnification Parties, in each of which cases the reasonable fees, disbursements and other charges of counsel will be at the expense of the Indemnifying Parties and shall promptly be paid by each Indemnifying Party as they become due and payable in advance of the final disposition of the claim, action, suit, proceeding or investigation to the fullest extent and in the manner permitted by law; *provided, however*, that in no event shall any contingent fee arrangement be considered reasonable. Notwithstanding the foregoing, the Indemnifying Parties shall not be obligated to advance any expenses or costs prior to receipt of an undertaking by or on behalf of the Indemnification Party to repay any expenses advanced if it shall ultimately be determined that the Indemnification Party is not entitled to be indemnified against such expense. It is understood that the Indemnifying Parties shall not, in connection with any proceeding or related proceedings in the same jurisdiction, be liable for the reasonable fees, disbursements and other charges of more than one separate firm

A–47

Table of Contents

admitted to practice in such jurisdiction at any one time for all such Indemnification Parties unless (a) the employment of more than one counsel has been authorized in writing by the Indemnifying Parties, (b) any of the Indemnification Parties have reasonably concluded (based on written advice of counsel to the Indemnification Parties) that there may be legal defenses available to them that are different from or in addition to and inconsistent with those available to other Indemnification Parties or (c) a conflict or potential conflict exists (based on written advice of counsel to the Indemnification Parties) between any of the Indemnification Parties and the other Indemnification Parties, in each case of which the Indemnifying Parties shall be obligated to pay the reasonable fees and expenses of such additional counsel or counsels. Notwithstanding anything to the contrary set forth in this Agreement, the Indemnifying Parties (i) shall not be liable for any settlement effected without their prior written consent and (ii) shall not have any obligation hereunder to any Indemnification Party to the extent that a court of competent jurisdiction shall determine in a final and non–appealable order that such indemnification is prohibited by applicable law. In the event of a final and non–appealable determination by a court that any payment of expenses is prohibited by applicable law, the Indemnification Parties shall promptly refund to the Indemnifying Parties the amount of all such expenses theretofore advanced pursuant hereto.

(c) At or prior to the Effective Time of the Merger, Equity Office shall purchase directors' and officers' liability insurance covering acts or omissions occurring prior to the Effective Time of the Merger for a period of six years with respect to those individuals who are currently covered by Spieker's directors' and officers' liability insurance policy on terms with respect to such coverage and amount no less favorable to Spieker's directors and officers currently covered by such insurance than those of such policy in effect on the date hereof.

(d) This Section 5.9 is intended for the irrevocable benefit of, and to grant third–party rights to, the Indemnified Parties, the Indemnification Parties and their successors, assigns and heirs and shall be binding on all successors and assigns of Equity Office and EOP Partnership. Each of the Indemnified Parties and the Indemnification Parties shall be entitled to enforce the covenants contained in this Section 5.9 and Equity Office and EOP Partnership acknowledge and agree that each Indemnified Party and Indemnification Party would suffer irreparable harm and that no adequate remedy at law exists for a breach of such covenants and such Indemnified Party or such Indemnification Party shall be entitled to injunctive relief and specific performance in the event of any breach of any provision in this Section 5.9.

(e) If Equity Office or EOP Partnership or any of its respective successors or assigns (i) consolidates with or merges into any other Person and shall not be the continuing or surviving corporation or entity of such consolidation or merger or (ii) transfers all or substantially all of its properties and assets to any Person, then, and in each such case the successors and assigns of such entity shall assume the obligations set forth in this Section 5.9, which obligations are expressly intended to be for the irrevocable benefit of, and shall be enforceable by, each director and officer covered hereby.

5.10 *Declaration of Dividends and Distributions*. From and after the date of this Agreement, neither Spieker nor Equity Office shall make any dividend or distribution to its respective stockholders or shareholders without the prior written consent of the other party; *provided, however*, the written consent of the other party shall not be required for the authorization and payment of (a) distributions at their respective stated dividend or distribution rates with respect to Equity Office Existing Preferred Shares or any series of Spieker Preferred Stock, (b) quarterly distributions with respect to the Spieker Common Stock of $0.70 per share for the quarter ending March 31, 2001 and each quarter thereafter, subject to increase as set forth below and (c) quarterly distributions with respect to the Equity Office Common Shares of up to $0.45 per share for the quarter ending March 31, 2001 and for each quarter thereafter; *provided, however*, the record date for each distribution with respect to the Spieker Common Stock shall be the same date as the record date for the quarterly distribution for the Equity Office Common Shares, as provided to Spieker by notice not less than twenty (20) business days prior to the record date for any quarterly Equity Office distribution. Within 30 days of the date of this Agreement, Spieker shall prepare and present to Equity Office a financial plan showing in reasonable detail the expected management of its operations, including any asset dispositions, and its estimated taxable income (including allowable deductions attributable to payments required to be made by Spieker prior to the Effective Time under the Spieker special severance policy and allowable deductions

A–48

Table of Contents

attributable to the vesting of restricted stock of Spieker set forth on *Schedule 5.8(d)* prior to the Effective Time) in a manner that results in no required Final Spieker Dividend in order for Spieker, at the Effective Time of the Merger, to satisfy the requirement of the Section 857(a)(1) for the short taxable year of Spieker ending at such time (and to avoid the payment of any tax with respect to any undistributed income or gain for such year). Such plan shall include the projected required quarterly dividends per share of Spieker Common Stock necessary to ensure that no Final Spieker Dividend is required to be paid, which quarterly dividends shall be not less than $0.70 per share nor result in a "return of capital" per share of Spieker Common Stock that exceeds one percent (1%) of the projected dividends per share. Upon the approval by Equity Office of such plan, which approval shall not be unreasonably withheld, Spieker shall be entitled to increase the quarterly dividend per share of Spieker Common Stock to the amount shown in such plan, as approved by Equity Office. From and after the date of this Agreement, Spieker Partnership shall not make any distribution to the holders of Spieker OP Units except a distribution per Spieker OP Unit in the same amount as a dividend per share of Spieker Common Stock permitted pursuant to this Section 5.10, with the same record and payment dates as such dividend on the Spieker Common Stock. If Spieker increases any quarterly dividend per share of Spieker Common Stock to an amount in excess of $0.70 per share in accordance with this Section 5.10, Equity Office shall be entitled to declare a dividend per share payable to holders of Equity Office Common Shares (and EOP Partnership shall declare a distribution per unit payable to holders of Equity Office OP Units if a dividend has been declared on the Equity Office Common Shares), the record dates for which shall be the close of the business on the last business day prior to the Effective Time, in an amount per Equity Office Common Share and Equity Office OP Unit equal to the quotient obtained by dividing (x) the aggregate amount of quarterly dividends per share of Spieker Common Stock declared or paid by Spieker in excess of $0.70 per share per quarter in accordance with this Section 5.10 by (y) 1.94462 (the "Additional Corresponding Equity Office Dividends and Distributions"). If, and to the extent, the terms of any series of Equity Office Preferred Shares or Equity Office Preferred OP Units require the payment of a dividend or distribution by reason of the payment of the Additional Corresponding Equity Office Dividends and Distributions, Equity Office and EOP Partnership shall declare and pay any such required dividends and distributions. The Additional Corresponding Equity Office Dividends and Distributions (and any dividends payable to holders of Equity Office Preferred Shares and distributions payable to holders of Equity Office Preferred OP Units) shall be paid on the last business day immediately preceding the Closing Date. The foregoing restrictions shall not apply, however, (i) to Equity Office to the extent a distribution (or an increase in a distribution) by Equity Office is necessary for Equity Office to maintain REIT status, avoid the incurrence of any taxes under Section 857 of the Code, avoid the imposition of any excise taxes under Section 4981 of the Code, or avoid the need to make one or more extraordinary or disproportionately larger distributions to meet any of the three preceding objectives (or to any corresponding distributions or increases in distributions paid by EOP Partnership), (ii) to Equity Office and EOP Partnership with respect to any Corresponding Equity Office Dividends and Distributions, or (iii) to Spieker and Spieker Partnership with respect to any Final Spieker Dividends and Final Spieker Partnership Distributions.

5.11 *Transfer of Spieker TRS*. At the Closing and pursuant to the Stock Purchase Agreement, each of the holders of voting capital stock of Spieker TRS (other than Spieker Partnership, to the extent it owns any such voting capital stock) shall transfer to Equity Office TRS Sub or such Person or Persons as Equity Office TRS Sub shall designate by written notice delivered to them prior to the Closing, or shall authorize a merger that will result in such a transfer of all of the shares of Spieker TRS which are not owned by Spieker Partnership, for an aggregate consideration in an amount equal to the purchase price per share set forth in the Stock Purchase Agreement multiplied by the number of outstanding shares of voting capital stock of Spieker TRS. Equity Office shall use commercially reasonable efforts to cause Equity Office TRS Sub to perform its obligations under the Stock Purchase Agreement.

5.12 *Notices*. Equity Office shall provide such notice to its preferred shareholders of the Merger as is required under Maryland law or the Equity Office Declaration of Trust.

5.13 *Resignations*. On the Closing Date, Spieker shall cause the directors and officers of Spieker and of each of the Spieker Subsidiaries to submit their resignations from such positions, effective as of the Effective Time of the Merger.

Table of Contents

5.14 *Assumption of Existing Tax Protection Agreements*. Effective as of the Effective Time of the Partnership Merger, Equity Office and EOP Partnership shall assume the obligations of Spieker, Spieker Partnership and/or the applicable Spieker Subsidiary, as the case may be, under the Tax Protection Agreements as described in *Schedule 2.18(j)* to the Spieker Disclosure Letter. Immediately prior to the Effective Time of the Partnership Merger, Equity Office and EOP Partnership shall enter into agreements with Spieker and Spieker Partnership, for the benefit of and enforceable by the individuals and entities who are intended to be protected by the provisions of the Tax Protection Agreements, confirming such assumption effective as of the Effective Time of the Partnership Merger.

5.15 *EOP Partnership Agreement*. At the Closing, EOP Partnership shall assume and perform any obligations that Spieker Partnership or any Spieker Subsidiary has immediately prior to the Effective Time to issue securities in accordance with the terms of any partnership or other agreement to which Spieker Partnership or such Spieker Subsidiary is a party and that are described on *Schedule 5.15*, in the same manner and to the same extent that Spieker Partnership or such Spieker Subsidiary would be required to perform such obligation if no Merger had been consummated.

5.16 *Registration Rights Agreements*. At the Closing, Spieker shall assign and Equity Office shall assume by appropriate instrument the Registration Rights Agreements described on *Schedule 5.16* to the Spieker Disclosure Letter.

ARTICLE 6

CONDITIONS

6.1 *Conditions to Each Party's Obligation to Effect the Mergers.* The obligations of each party to effect the Mergers and to consummate the other transactions contemplated by this Agreement to occur on the Closing Date shall be subject to the fulfillment at or prior to the Closing Date of the following conditions:

(a) *Shareholder and Partner Approvals.* The Spieker Stockholder Approvals, the Equity Office Shareholder Approvals and the Partner Approvals shall have been obtained.

(b) *HSR Act.* The waiting period (and any extension thereof) applicable to the Partnership Merger, the Merger or the transactions contemplated by the Stock Purchase Agreement under the HSR Act, if applicable to the Partnership Merger, the Merger or the transactions contemplated by the Stock Purchase Agreement, shall have expired or been terminated.

(c) *Listing of Shares.* The NYSE shall have approved for listing the Equity Office Common Shares, Equity Office Series E Preferred Shares, Equity Office Series F Preferred Shares and Equity Office Series H Preferred Shares to be issued in the Merger, the Equity Office Common Shares reserved for issuance upon redemption of Equity Office OP Units issued in the Partnership Merger, the Equity Office Common Shares reserved for issuance upon conversion of Equity Office Series D Preferred Shares (if any), and the Equity Office Series G Preferred Shares reserved for issuance upon conversion of Equity Office Series G Preferred OP Units issued in the Partnership Merger, in each case, to be approved for listing on the NYSE, subject to official notice of issuance, prior to the Effective Time.

(d) *Form S–4.* The Form S–4 shall have become effective under the Securities Act and shall not be the subject of any stop order or proceedings by the SEC seeking a stop order.

(e) *No Injunctions or Restraints.* No temporary restraining order, preliminary or permanent injunction or other order issued by any court of competent jurisdiction or other legal restraint or prohibition preventing the consummation of the Mergers or any of the other transactions contemplated hereby shall be in effect.

(f) *Blue Sky Laws.* Equity Office and EOP Partnership shall have received all state securities or "blue sky" permits and other authorizations necessary to issue the Equity Office Common Shares and Equity Office OP Units issuable in the Mergers.

6.2 *Conditions to Obligations of Equity Office and EOP Partnership.* The obligations of Equity Office and EOP Partnership to effect the Mergers and to consummate the other transactions contemplated to occur

A–50

**Table of Contents**

on the Closing Date are further subject to the following conditions, any one or more of which may be waived by Equity Office:

(a) *Representations and Warranties.* Each of the representations and warranties of Spieker and Spieker Partnership set forth in this Agreement, disregarding all qualifications and exceptions contained therein relating to materiality or Spieker Material Adverse Effect, shall be true and correct as of the date of this Agreement and as of the Closing Date as though made on and as of the Closing Date (except to the extent that such representations and warranties are expressly limited by their terms to another date, in which case such representations and warranties shall be true and correct as of such other date), except where the failure of such representations and warranties to be true and correct would not, individually or in the aggregate, reasonably be expected to have a Spieker Material Adverse Effect; and Equity Office shall have received a certificate (which certificate may be qualified by "knowledge" to the same extent as the representations and warranties of Spieker and Spieker Partnership contained herein are so qualified) signed on behalf of Spieker by the chief executive officer or the chief financial officer of Spieker, in such capacity, to such effect.

(b) *Performance of Obligations of Spieker and Spieker Partnership.* Spieker and Spieker Partnership shall have performed in all material respects all obligations required to be performed by them under this Agreement at or prior to the Effective Time, and Equity Office shall have received a certificate signed on behalf of Spieker by the chief executive officer or the chief operating officer of Spieker, in such capacity, to such effect.

(c) *Material Adverse Effect.* Since the date of this Agreement, there shall have been no Spieker Material Adverse Effect and Equity Office shall have received a certificate of the chief executive officer or chief operating officer of Spieker, in such capacity, certifying to such effect.

(d) *Tax Opinions Relating to REIT Status and Partnership Status.* Equity Office shall have received (i) an opinion of counsel to Spieker reasonably satisfactory to Equity Office, dated as of the Closing Date, to the effect that, commencing with its taxable year ended December 31, 1993 through and including the end of its taxable year ended December 31, 1999, (x) Spieker was organized and operated in conformity with the requirements for qualification as a REIT under the Code, and (y) Spieker Partnership was during and since October 15, 1993, through the end of its taxable year ended December 31, 1999, treated for federal income tax purposes as a partnership and not as a corporation or association taxable as a corporation (with customary exceptions, assumptions and qualifications and based upon customary representations); (ii) an opinion of Sullivan & Cromwell or other counsel to Spieker reasonably satisfactory to Equity Office, dated as of the Closing Date, to the effect that, commencing with its taxable year ended December 31, 2000, (x) Spieker was organized and has operated in conformity with the requirements for qualification as a REIT under the Code, and (y) Spieker Partnership has been during and since January 1, 2000, and continues

to be, treated for federal income tax purposes as a partnership and not as a corporation or association taxable as a corporation (with customary exceptions, assumptions and qualifications and based upon customary representations and upon the opinion of counsel rendering the opinion described in clause (i) if such counsel is not the same counsel), and (iii) an opinion of Hogan & Hartson L.L.P. or other counsel to Equity Office reasonably satisfactory to Spieker, dated as of the Closing Date, to the effect that, commencing with its taxable year ended December 31, 1997, Equity Office was organized and has operated in conformity with the requirements for qualification as a REIT under the Code and that, after giving effect to the Merger, Equity Office's proposed method of operation will enable it to continue to meet the requirements for qualification and taxation as a REIT under the Code (with customary exceptions, assumptions and qualifications and based upon customary representations and based upon and subject to the opinions of counsel to Spieker described in clauses (i) and (ii) above).

(e) *Tax Opinion Relating to the Mergers.* Equity Office shall have received an opinion dated the Closing Date from Hogan & Hartson L.L.P. or other counsel reasonably satisfactory to Equity Office, based upon customary certificates and letters, which letters and certificates are to be in a form to be agreed upon by the parties and dated the Closing Date, to the effect that (i) the Merger will qualify as a reorganization under the provisions of Section 368(a) of the Code and (ii) the Partnership Merger will not result in the recognition

A–51

---

Table of Contents

of taxable gain or loss at the time of the Partnership Merger to a holder of Spieker OP Units or Spieker Preferred OP Units, as applicable, (A) who is a "U.S. person" (as defined for purposes of Sections 897 and 1445 of the Code; (B) who does not exercise its redemption right with respect to Equity Office OP Units or Equity Office Preferred OP Units, as applicable, under the EOP Partnership Agreement on a date sooner than the date two years after the Effective Date for the Partnership Merger; (C) who does not receive a cash distribution in connection with the Partnership Merger (or a deemed cash distribution resulting from relief or a deemed relief from liabilities, including as a result of the prepayment of indebtedness of Spieker Partnership in connection with or following the Partnership Merger) in excess of such holder's adjusted basis in its Spieker OP Units or its Spieker Preferred OP Units, as applicable, at the time of the Partnership Merger; (D) who is not required to recognize gain by reason of the application of Section 707(a) of the Code and the Treasury Regulations thereunder to the Partnership Merger, with the result that the Partnership Merger is treated as part of a "disguised sale" by reason of any transactions undertaken by Spieker Partnership prior to or in connection with the Partnership Merger or any debt of Spieker Partnership that is assumed or repaid in connection with the Partnership Merger; and (E) whose "at risk" amount does not fall below zero as a result of the Mergers.

(f) *Opinion Relating to Roll–Up Rules.* Equity Office shall have received an opinion of Sullivan & Cromwell or other counsel to Spieker reasonably satisfactory to Equity Office, dated as of the Closing Date, to the effect that the Partnership Merger is not subject to the requirements of (a) Subpart 900 of Regulation S–K, as amended, as promulgated by the SEC, (b) Rule 2810(a)(10) promulgated by the National Association of Securities Dealers or (c) Sections 25014.5 through 25014.7 of Title 4, Division 1 of the California Corporate Securities Law, as amended.

(g) *"Comfort" Letter.* Equity Office and EOP Partnership shall have received a "comfort" letter from Arthur Andersen LLP, as described in Section 5.1(b).

(h) *Shares of Spieker TRS.* All of the voting shares of Spieker TRS (other than any such shares owned by Spieker Partnership) shall have been transferred to Equity Office TRS Sub, or its designees or assigns, in accordance with the Stock Purchase Agreement.

(i) *Nonsolicitation Agreements.* Each of Warren E. Spieker, Jr., John A. Foster and Craig G. Vought shall have entered into nonsolicitation agreements substantially in the forms set forth on *Exhibit J.*

6.3 *Conditions to Obligations of Spieker and Spieker Partnership.* The obligations of Spieker and Spieker Partnership to effect the Mergers and to consummate the other transactions contemplated to occur on the Closing Date is further subject to the following conditions, any one or more of which may be waived by Spieker:

(a) *Representations and Warranties.* Each of the representations and warranties of Equity Office and EOP Partnership set forth in this Agreement, disregarding all qualifications and exceptions contained therein relating to materiality or Equity Office Material Adverse Effect, shall be true and correct as of the date of this Agreement and as of the Closing Date as though made on and as of the Closing Date (except to the extent that such representations and warranties are expressly limited by their terms to another date, in which case such representations and warranties shall be true and correct as of such other date), except where the failure of such representations and warranties to be true and correct would not, individually or in the aggregate, reasonably be expected to have a Equity Office Material Adverse Effect; and Spieker shall have received a certificate (which certificate may be qualified by "knowledge" to the same extent as the representations and warranties of Equity Office and EOP Partnership contained herein are so qualified) signed on behalf of Equity Office by the chief executive officer or the chief financial officer of Equity Office, in such capacity, to such effect.

(b) *Performance of Obligations of Equity Office and EOP Partnership.* Equity Office and EOP Partnership shall have performed in all material respects all obligations required to be performed by it under this Agreement at or prior to the Effective Time, and Spieker shall have received a certificate of Equity Office signed on behalf of Equity Office by a duly authorized executive officer of Equity Office, in such capacity, to such effect.

A–52

Table of Contents

(c) *Material Adverse Effect.* Since the date of this Agreement, there shall have been no Equity Office Material Adverse Effect and Spieker shall have received a certificate of a duly authorized executive officer of Equity Office, in such capacity, certifying to such effect.

(d) *Tax Opinions Relating to REIT Status and Partnership Status.* Spieker shall have received the opinion of Hogan & Hartson L.L.P. or other counsel to Equity Office reasonably satisfactory to Spieker, dated as of the Closing Date, that, commencing with its taxable year ended December 31, 1997, (i) Equity Office was organized and has operated in conformity with the requirements for qualification as a REIT under the Code and that, after giving effect to the Merger, Equity Office's proposed method of operation will enable it to continue to meet the requirements for qualification and taxation as a REIT under the Code (with customary exceptions, assumptions and qualifications and based upon customary representations and based upon and subject to the opinions of counsel to Spieker described in Section 6.2(d) of this Agreement), and (ii) EOP Partnership has been during and since 1997, and continues to be, treated for federal income tax purposes as a partnership and not as a corporation or association taxable as a corporation (with customary exceptions, assumptions and qualifications and based upon customary representations).

(e) *Tax Opinion Relating to the Mergers.* Spieker shall have received an opinion dated the Closing Date from Sullivan & Cromwell or other counsel reasonably satisfactory to Spieker, based upon customary certificates and letters, which letters and certificates are to be in a form to be agreed upon by the parties and dated the Closing Date, to the effect that (i) the Merger will qualify as a reorganization under the provisions of Section 368(a) of the Code and (ii) the Partnership Merger will not result in the recognition of taxable gain or loss at the time of the Partnership Merger to a holder of Spieker OP Units or Spieker Preferred OP Units, as applicable, (A) who is a "U.S. person" (as defined for purposes of Sections 897 and 1445 of the Code; (B) who does not exercise its redemption right with respect to Equity Office OP Units or Equity Office Preferred OP Units, as applicable, under the EOP Partnership Agreement on a date sooner than the date two years after the Effective Date for the Partnership Merger; (C) who does not receive a cash distribution in connection with the Partnership Merger (or a deemed cash distribution resulting from relief or a deemed relief from liabilities, including as a result of the prepayment of indebtedness of Spieker Partnership in connection with or following the Partnership Merger) in excess of such holder's adjusted basis in its Spieker OP Units or its Spieker Preferred OP Units, as applicable, at the time of the Partnership Merger; (D) who is not required to recognize gain by reason of the application of Section 707(a) of the Code and the Treasury Regulations thereunder to the Partnership Merger, with the result that the Partnership Merger is treated as part of a "disguised sale" by reason of any transactions undertaken by Spieker Partnership prior to or in connection with the Partnership Merger or any debt of Spieker Partnership that is assumed or repaid in connection with the Partnership Merger; and (E) whose "at risk" amount does not fall below zero as a result of the Mergers.

(f) *"Comfort" Letter.* Spieker and Spieker Partnership shall have received a "comfort" letter from Ernst & Young LLP, as described in Section 5.1(b).

ARTICLE 7

TERMINATION, AMENDMENT AND WAIVER

7.1 *Termination.* This Agreement may be terminated at any time prior to the Effective Time of the Partnership Merger, whether such action occurs before or after any of the Spieker Stockholder Approvals, the Equity Office Shareholder Approvals or either of the Spieker Partner Approvals are obtained:

(a) by mutual written consent duly authorized by the Board of Trustees of Equity Office and the Board of Directors of Spieker;

(b) by Equity Office, (i) upon a breach of or failure to perform any covenant, obligation or agreement on the part of Spieker or Spieker Partnership set forth in this Agreement, or (ii) upon a breach of or in the event that any representation or warranty of Spieker or Spieker Partnership is or shall have become untrue, in either case such that the conditions set forth in Section 6.2(a) or Section 6.2(b),

A–53

Table of Contents

as the case may be, would be incapable of being satisfied by December 31, 2001 (or as otherwise extended);

(c) by Spieker, (i) upon a breach of or failure to perform any covenant, obligation or agreement on the part of Equity Office or EOP Partnership set forth in this Agreement, or (ii) upon a breach of or in the event that any representation or warranty of Equity Office or EOP Partnership is or shall have become untrue, in either case such that the conditions set forth in Section 6.3(a) or Section 6.3(b), as the case may be, would be incapable of being satisfied by December 31, 2001 (or as otherwise extended);

(d) by either Equity Office or Spieker, if any judgment, injunction, order, decree or action by any Governmental Entity of competent authority preventing the consummation of either of the Mergers shall have become final and non-appealable;

(e) by either Equity Office or Spieker, if the Mergers shall not have been consummated before December 31, 2001; *provided, however,* that a party may not terminate pursuant to this clause (e) if the terminating party shall have breached in any material respect its obligations under this Agreement in any manner that shall have caused either of the Mergers not to have been consummated by such date;

(f) by either Equity Office or Spieker (unless Spieker or Spieker Partnership is in breach in any material respect of its obligations under Section 5.1) if, upon a vote at a duly held Spieker Stockholders Meeting or any adjournment thereof, the Spieker Stockholder Approvals shall not have been obtained as contemplated by Section 5.1, if the Spieker Partner Approvals have not been obtained as contemplated by Section 5.1 or if it is determined by Equity Office that the Spieker Partner Approvals cannot be obtained;

(g) by either Spieker or Equity Office (unless Equity Office or EOP Partnership is in breach in any material respect of its obligations under Section 5.1) if, upon a vote at a duly held Equity Office Shareholders Meeting or any adjournment thereof, the Equity Office Shareholder Approvals shall not have been obtained as contemplated by Section 5.1 or if the Equity Office Partner Approvals have not been obtained as contemplated by Section 5.1;

(h) by Spieker (i) if the Board of Directors of Spieker shall have withdrawn, modified, amended or qualified in any manner adverse to Equity Office its approval or recommendation of either of the Merger or this Agreement in connection with, or approved or recommended, any Superior Acquisition Proposal, or, (ii) in order to enter into a binding written agreement with respect to a Superior Acquisition Proposal, provided that, in each case, Spieker shall have complied with the terms of Section 4.3 and, prior to terminating pursuant to this Section 7.1(h), has paid to EOP Partnership the Break–Up Fee (as defined herein) as provided by Section 7.2 hereof; and

(i) by Equity Office, if (1) the Board of Directors of Spieker shall have failed to recommend or withdrawn, modified, amended or qualified, or proposed publicly not to recommend or to withdraw, modify, amend or qualify, in any manner adverse to Equity Office its approval or recommendation of either of the Mergers or this Agreement or approved or recommended any Superior Acquisition Proposal, (2) following the announcement or receipt of an Acquisition Proposal, Spieker shall have failed to call the Spieker Stockholders Meeting in accordance with Section 5.1(a) or failed to prepare and mail to its stockholders the Joint Proxy Statement in accordance with Section 5.1(a) or 5.1(b), or (3) the Board of Directors of Spieker or any committee thereof shall have resolved to do any of the foregoing.

7.2 *Certain Fees and Expenses.* If this Agreement shall be terminated (i) pursuant to Section 7.1(h), 7.1(i)(1) or 7.1(i)(3), then Spieker and Spieker Partnership theretofore or thereupon shall pay to EOP Partnership a fee equal to the Break–Up Fee (as defined herein), and (ii) pursuant to Section 7.1(b) or 7.1(f), then Spieker and Spieker Partnership shall pay to EOP Partnership (provided that Spieker was not entitled to terminate this Agreement pursuant to Section 7.1(c) at the time of such termination) an amount equal to the Break–Up Expenses (as defined herein). If this Agreement shall be terminated pursuant to Section 7.1(c) or 7.1(g), then Equity Office and EOP Partnership shall pay to Spieker Partnership (provided that Equity Office was not entitled to terminate this Agreement pursuant to Section 7.1(b) at the time of such termination) an amount equal to the Break–Up Expenses. If this Agreement shall be terminated pursuant to

---

Table of Contents

Section 7.1(b), 7.1(d) (if primarily resulting from any action or inaction of Spieker, Spieker Partnership or any Spieker Subsidiary or Spieker TRS), 7.1(e), 7.1(f), 7.1(i)(2) and prior to the time of such termination an Acquisition Proposal has been received by Spieker or Spieker Partnership, and either prior to the termination of this Agreement or within twelve (12) months thereafter, Spieker or Spieker Partnership enters into any written agreement to consummate a transaction or series of transactions which, had such agreement been proposed or negotiated during the term of this Agreement, would have constituted an Acquisition Proposal pursuant to Section 4.3 (each, a "Spieker Acquisition Agreement"), which is subsequently consummated (whether or not any Spieker Acquisition Agreement relates to the same Acquisition Proposal which had been received at the time of the termination of this Agreement), then Spieker and Spieker Partnership shall pay the Break–Up Fee to EOP Partnership.

The payment of the Break–Up Fee shall be compensation for the loss suffered by Equity Office and EOP Partnership as a result of the failure of the Mergers to be consummated (including, without limitation, opportunity costs and out–of–pocket costs and expenses) and to avoid the difficulty of determining damages under the circumstances. The Break–Up Fee shall be paid by Spieker and Spieker Partnership to EOP Partnership, or the Break–Up Expenses shall be paid by Spieker and Spieker Partnership to EOP Partnership or EOP Partnership to Spieker Partnership (as applicable), in immediately available funds within two (2) business days after the date the event giving rise to the obligation to make such payment occurred (except as otherwise provided in Section 7.1(h) or 7.1(i)). Spieker acknowledges that the agreements contained in this Section 7.2 are integral parts of this Agreement; accordingly, if Spieker and Spieker Partnership fail to promptly pay the Break–Up Fee or Break–Up Expenses due pursuant to this Section 7.2 and, in order to obtain payment, Equity Office commences a suit which results in a judgment against Spieker or Spieker Partnership for any amounts owed pursuant to this Section 7.2, Spieker and Spieker Partnership shall pay to Equity Office its costs and expenses (including attorneys' fees and expenses) in connection with such suit, together with interest on the amount owed at the rate on six–month U.S. Treasury obligations in effect on the date such payment was required to be made plus 300 basis points.

As used in this Agreement, "Break–Up Fee" shall be an amount equal to the lesser of (i) $160,000,000 less Break–Up Expenses paid or payable under this Section 7.2 (the "Base Amount") and (ii) the sum of (A) the maximum amount that can be

paid to EOP Partnership without causing Equity Office to fail to meet the requirements of Sections 856(c)(2) and (3) of the Code determined as if the payment of such amount did not constitute income described in Sections 856(c)(2)(A)–(H) and 856(c)(3)(A)–(I) of the Code ("Qualifying Income"), as determined by independent accountants to Equity Office, and (B) in the event Equity Office receives a letter from outside counsel (the "Break–Up Fee Tax Opinion") indicating that Equity Office has received a ruling from the IRS holding that EOP Partnership's receipt of the Base Amount would either constitute Qualifying Income or would be excluded from gross income of Equity Office within the meaning of Sections 856(c)(2) and (3) of the Code (the "REIT Requirements") or that the receipt by EOP Partnership of the remaining balance of the Base Amount following the receipt of and pursuant to such ruling would not be deemed constructively received prior thereto, the Base Amount less the amount payable under clause (A) above. Spieker's and Spieker Partnership's obligation to pay any unpaid portion of the Break–Up Fee shall terminate three years from the date of this Agreement. In the event that EOP Partnership is not able to receive the full Base Amount, Spieker and Spieker Partnership shall place the unpaid amount in escrow and shall not release any portion thereof to EOP Partnership unless and until Spieker receives one or both of the following: (i) a letter from Equity Office's independent accountants indicating the maximum amount that can be paid at that time to EOP Partnership without causing Equity Office to fail to meet the REIT Requirements or (ii) a Break–Up Fee Tax Opinion, in either of which events Spieker and Spieker Partnership shall pay to EOP Partnership the unpaid Base Amount or, if less and either there is no Break–up Fee Tax Opinion or the ruling described in the Break–Up Fee Tax Opinion does not hold that the Base Amount either would constitute Qualifying Income or would be excluded from gross income for purposes of the REIT Requirements, the maximum amount stated in the letter referred to in (i) above. Subject to satisfaction of the conditions set forth in the immediately preceding sentence, there is no limitation on the number of distributions that can be made from the escrow prior to the third anniversary of the date of this Agreement.

A–55

Table of Contents

The "Break–Up Expenses" payable to EOP Partnership or Spieker Partnership, as the case may be (the "Recipient"), shall be an amount equal to the lesser of (i) $7,500,000 or (ii) the Recipient's out–of–pocket expenses incurred in connection with this Agreement and the transactions contemplated hereby (including, without limitation, all attorneys', accountants' and investment bankers' fees and expenses). If the Break–Up Expenses payable to the Recipient exceed the maximum amount that can be paid to the Recipient without causing the Recipient to fail to meet the requirements of Sections 856(c)(2) and (3) of the Code determined as if the payment of such amount did not constitute Qualifying Income, as determined by independent accountants to the Recipient (the "Maximum Amount"), the amount initially payable to the Recipient shall be limited to the Maximum Amount. If, however, within the three–year period commencing on the date of this Agreement, the Recipient receives a Break–Up Fee Tax Opinion indicating that it has received a ruling from the IRS holding that the Recipient's receipt of the Break–Up Expenses would either constitute Qualifying Income or would be excluded from gross income of the Recipient within the meaning of the REIT Requirements or that receipt by the Recipient of the balance of the Break–Up Expenses above the Maximum Amount following the receipt of and pursuant to such ruling would not be deemed constructively received prior thereto, the Recipient shall be entitled to a letter payable to it the full amount of the Break–Up Expenses. The obligation of Equity Office and EOP Partnership or Spieker and Spieker Partnership, as applicable ("Payor"), to pay any unpaid portion of the Break–Up Expenses shall terminate three years from the date of this Agreement. In the event that the Recipient is not able to receive the full Break–Up Expenses, the Payor shall place the unpaid amount in escrow and shall not release any portion thereof to the Recipient unless and until the Payor receives either one or both of the following: (i) a letter from the independent accountants of Equity Office or Spieker, as the case may be, indicating the maximum amount that can be paid at that time to the Recipient without causing it to fail to meet the REIT Requirements or (ii) a Break–Up Expense Tax Opinion, in either of which events the Payor shall pay to the Recipient the unpaid Break–Up Expenses or, if less and there is no Break–Up Expense Tax Opinion or the ruling described in the Break–Up Expense Tax Opinion does not hold that the Base Amount either would constitute Qualifying Income or would be excluded from gross income for purposes of the REIT Requirements, the maximum amount stated in the letter referred to in (i) above. Subject to satisfaction of the conditions set forth in the immediately preceding sentence, there is no limitation on the number of distributions that can be made from the escrow prior to the third anniversary of the date of this Agreement.

7.3 *Effect of Termination.* In the event of termination of this Agreement by either Spieker or Equity Office as provided in Section 7.1, this Agreement shall forthwith become void and have no effect, without any liability or obligation on the part of Equity Office, EOP Partnership, Spieker or Spieker Partnership, other than the last sentence of Section 5.2, Section 7.2, this Section 7.3 and Article 8, and except to the extent that such termination results from a material breach by any party of any of its representations, warranties, covenants or agreements set forth in this Agreement.

7.4 *Amendment.* This Agreement may be amended by the parties in writing by action of the respective Board of Trustees or Board of Directors of Equity Office and Spieker at any time before or after any Shareholder Approvals are obtained and prior to the filing of the Articles of Merger with the Department; *provided, however,* that, after the Shareholder Approvals and Partner Approvals are obtained, no such amendment, modification or supplement shall be made which by law requires the further approval of shareholders or partners without obtaining such further approval. The parties agree to amend this Agreement in the manner provided in the immediately preceding sentence to the extent required to (a) continue the status of each party as a REIT or (b) preserve the Merger as a reorganization under Section 368(a) of the Code.

7.5 *Extension; Waiver.* At any time prior to the Effective Time, the parties may (a) extend the time for the performance of any of the obligations or other acts of the other party, (b) waive any inaccuracies in the representations and warranties of the other party contained in this Agreement or in any document delivered pursuant to this Agreement or (c) subject to the proviso of Section 7.4, waive compliance with any of the agreements or conditions of the other party contained in this Agreement. Any agreement on the part of a party to any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of

**Table of Contents**

such party. The failure of any party to this Agreement to assert any of its rights under this Agreement or otherwise shall not constitute a waiver of those rights.

ARTICLE 8

GENERAL PROVISIONS

8.1 *Nonsurvival of Representations and Warranties.* None of the representations and warranties in this Agreement or in any instrument delivered pursuant to this Agreement confirming the representations and warranties in this Agreement shall survive the Effective Time. This Section 8.1 shall not limit any covenant or agreement of the parties which by its terms contemplates performance after the Effective Time.

8.2 *Notices.* All notices, requests, claims, demands and other communications under this Agreement shall be in writing and shall be delivered personally, sent by overnight courier (providing proof of delivery) to the parties or sent by telecopy (providing confirmation of transmission) at the following addresses or telecopy numbers (or at such other address or telecopy number for a party as shall be specified by like notice):

   (a)  if to Equity Office or EOP Partnership, to:

        Equity Office Properties Trust
        Two North Riverside Plaza
        Suite 2100
        Chicago, IL 60606
        Attention:  Timothy H. Callahan, President
                Stanley M. Stevens, Chief Legal Counsel
        Fax No.:  (312) 466−4020

   with a copy (which shall not constitute notice) to:

        Hogan & Hartson L.L.P.
        555 Thirteenth Street, N.W.
        Washington, D.C. 20004−1109
        Attention:  J. Warren Gorrell, Jr.
                George P. Barsness
        Fax No.:  (202) 637−5910

   (b)  if to Spieker or Spieker Partnership, to:

        Spieker Properties, Inc.
        2180 Sand Hill Road
        Suite 200
        Menlo Park, CA 94025
        Attention:  Craig Vought, Co−Chief Executive Officer
                Sara Reynolds Steppe, Senior Vice
                President, General Counsel
        Fax No.:  (650) 233−3838

   with a copy (which shall not constitute notice) to:

        Sullivan & Cromwell
        1888 Century Park East
        Los Angeles, CA 90067−1725
        Attention: Alison S. Ressler
        Fax No.: (310) 712−8800

All notices shall be deemed given only when actually received.

8.3 *Interpretation.* When a reference is made in this Agreement to a Section, such reference shall be to a Section of this Agreement unless otherwise indicated. The table of contents and headings contained in this

Table of Contents

Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation."

8.4 *Counterparts.* This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other party.

8.5 *Entire Agreement; No Third–Party Beneficiaries.* This Agreement, the Spieker Disclosure Letter, the Equity Office Disclosure Letter, the Confidentiality Agreement, the Voting Agreements and the other agreements entered into in connection with the Mergers (a) constitute the entire agreement and supersede all prior agreements and understandings, both written and oral between the parties with respect to the subject matter of this Agreement and (b) except as provided in Section 5.9 ("Third Party Provisions"), are not intended to confer upon any Person other than the parties hereto any rights or remedies.

8.6 *Governing Law.* THE PARTNERSHIP MERGER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATES OF DELAWARE AND CALIFORNIA, AS APPLICABLE, REGARDLESS OF THE LAWS THAT MIGHT OTHERWISE GOVERN UNDER APPLICABLE PRINCIPLES OF CONFLICT OF LAWS THEREOF. EXCEPT AS PROVIDED IN THE IMMEDIATELY PRECEDING SENTENCE, THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF MARYLAND, REGARDLESS OF THE LAWS THAT MIGHT OTHERWISE GOVERN UNDER APPLICABLE PRINCIPLES OF CONFLICT OF LAWS THEREOF.

8.7 *Assignment.* Neither this Agreement nor any of the rights, interests or obligations under this Agreement shall be assigned or delegated, in whole or in part, by operation of law or otherwise by any of the parties without the prior written consent of the other parties. Subject to the preceding sentence, this Agreement will be binding upon, inure to the benefit of, and be enforceable by, the parties and their respective successors and assigns.

8.8 *Enforcement.* The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in any federal court located in Maryland or in any state court located in Maryland this being in addition to any other remedy to which they are entitled at law or in equity. In addition, each of the parties hereto (a) consents to submit itself (without making such submission exclusive) to the personal jurisdiction of any federal court located in Maryland or any state court located in Maryland in the event any dispute arises out of this Agreement or any of the transactions contemplated by this Agreement and (b) agrees that it will not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court.

8.9 *Severability.* Any term or provision of this Agreement which is invalid or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Agreement or affecting the validity or enforceability of any of the terms or provisions of this Agreement in any other jurisdiction. If any provision of this Agreement is so broad as to be unenforceable, the provision shall be interpreted to be only so broad as is enforceable.

8.10 *Exculpation.* This Agreement shall not impose any personal liability on any shareholder, trustee, trust manager, officer, employee or agent of Equity Office or Spieker, and all Persons shall look solely to the property of Equity Office or Spieker for the payment of any claim hereunder or for the performance of this Agreement.

8.11 *Joint and Several Obligations.* In each case where both Spieker and Spicker Partnership, on the one hand, or Equity Office and EOP Partnership, on the other hand, are obligated to perform the same obligation hereunder, such obligation shall be joint and several.

A–58

Table of Contents

IN WITNESS WHEREOF, Equity Office, EOP Partnership, Spieker and Spieker Partnership have caused this Agreement to be signed by their respective officers (or general partners) thereunto duly authorized all as of the date first written above.

EQUITY OFFICE PROPERTIES TRUST

By: _____ /s/ TIMOTHY H. CALLAHAN

Name:  Timothy H. Callahan
Title:   President and Chief Executive Officer

EOP OPERATING LIMITED PARTNERSHIP

By:  Equity Office Properties Trust,
its sole general partner

By: _____ /s/ TIMOTHY H. CALLAHAN

Name: Timothy H. Callahan
Title:    President and Chief Executive Officer

SPIEKER PROPERTIES, INC.

By: _____ /s/ WARREN E. SPIEKER, JR.

Name: Warren E. Spieker, Jr.
Title:    Chairman of the Board

SPIEKER PROPERTIES, L.P.

By: Spieker Properties, Inc.,
its sole general partner

By: _____ /s/ WARREN E. SPIEKER, JR.

Name: Warren E. Spieker, Jr.
Title:    Chairman of the Board

A–59

Table of Contents

## FIRST AMENDMENT TO AGREEMENT AND PLAN OF MERGER

THIS FIRST AMENDMENT TO AGREEMENT AND PLAN OF MERGER (this "First Amendment") is entered into as of May 25, 2001 by and among EQUITY OFFICE PROPERTIES TRUST, a Maryland real estate investment trust ("Equity Office"), EOP OPERATING LIMITED PARTNERSHIP, a Delaware limited partnership ("EOP Partnership"), SPIEKER PROPERTIES, INC., a Maryland corporation ("Spieker"), and SPIEKER PROPERTIES, L.P., a California limited partnership ("Spieker Partnership"), for the purpose of amending the Agreement and Plan of Merger, dated as of February 22, 2001, entered into by and among Equity Office, EOP Partnership, Spieker and Spieker Partnership (the "Merger Agreement"). All capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Merger Agreement.

WHEREAS, the parties hereto desire to amend certain provisions of the Merger Agreement as provided herein;

NOW, THEREFORE, in consideration of the premises and the mutual covenants set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

### Section 1.  Clarification of NYSE Listing Requirements.

(a) Section 5.6 of the Merger Agreement is deleted and replaced with the following:

5.6 *Listing.* Equity Office shall use commercially reasonable efforts to cause the Equity Office Common Shares, Equity Office Series E Preferred Shares, Equity Office Series F Preferred Shares and Equity Office Series H Preferred Shares to be issued in the Merger and the Equity Office Common Shares reserved for issuance upon redemption of Equity Office OP Units issued in the Partnership Merger, in each case, to be approved for listing on the New York Stock Exchange (the "NYSE"), subject to official notice of issuance, prior to the Effective Time.

(b) Section 6.1(c) of the Merger Agreement is deleted and replaced with the following:

(c) *Listing of Shares.* The NYSE shall have approved for listing the Equity Office Common Shares, Equity Office Series E Preferred Shares, Equity Office Series F Preferred Shares and Equity Office Series H Preferred Shares to be issued in the Merger and the Equity Office Common Shares reserved for issuance upon redemption of Equity Office OP Units issued in the Partnership Merger, in each case, subject to official notice of issuance, prior to the Effective Time.

### Section 2.  Spieker Stock Options.

The fourth and fifth sentences of Section 5.8(c) of the Merger Agreement hereby are amended in their entirety to read as set forth below:

As soon as practicable after Spieker mails the Joint Proxy Statement to its shareholders and subject to applicable law, EOP Partnership shall offer to purchase, subject to consummation of the Mergers, each Spieker Stock Option outstanding on the date hereof from the holders thereof for an amount in cash in respect thereof equal to the product of (i) the excess, if any, of (A) $58.50 over (B) the exercise price of such Spieker Stock Option and (ii) the number of shares of Spieker Common Stock subject to such Spieker Stock Option at such exercise price. Subject to the terms and conditions of the offer to purchase, if the holder of any such Spieker Stock Option tenders such option prior to 5:00 p.m., New York City time, on the later of (x) the 20th business day after the mailing of the offer to purchase and (y) the 2nd business day after the Effective Time, then promptly after the expiration of the

offer period, EOP Partnership shall, subject to reduction for required withholding taxes, pay to each such tendering former holder of Spieker Stock Options the purchase price thereof.

Table of Contents

**Section 3.  Possible Redesignation of Equity Office Preferred Shares and EOP Partnership Preferred Units to be issued in the Mergers.**

A new Section 8.12 is added to the Merger Agreement as follows:

8.12  *Redesignation of Equity Office Preferred Shares and EOP Partnership Preferred Units to be issued in the Mergers.* On April 6, 2001, all of the issued and outstanding Spieker Series A Preferred Shares were converted, at the election of the holders thereof, into 1,219,512 shares of Spieker Common Stock and all of the issued and outstanding Spieker Series A Preferred OP Units were converted into 1,219,512 Spieker OP Units. Pursuant to the terms of a Consent and Purchase Agreement, dated as of May 7, 2001 (the "Consent and Purchase Agreement"), by and among Spieker Partnership, Belair Real Estate Corporation ("Belair") and Belcrest Realty Corporation ("Belcrest", and together with Belair, the "Series D Holders"), the Series D Holders (a) consented to the principal terms of the Partnership Merger and (b) agreed to the repurchase by Spieker Partnership of all Spieker Series D Preferred OP Units held by the Series D Holders on the Closing Date immediately prior to the Partnership Merger, at a purchase price of $46.50 per Spieker Partnership Series D Preferred OP Unit plus any accrued but unpaid distributions, without interest. Therefore, (a) no Equity Office Series D Preferred Shares will be issued in the Merger in exchange for Spieker Series A Preferred Shares and no Equity Office Series D Preferred OP Units will be issued in the Partnership Merger in exchange for Spieker Series A Preferred Units, and (b) subject to completion of such repurchase, no Equity Office Series G Preferred Shares will be issued or reserved for issuance in the Merger in exchange for Spieker Series D Preferred Shares and no Equity Office Series G Preferred OP Units will be issued in the Partnership Merger in exchange for Spieker Series D Preferred OP Units. In order to enable Equity Office and EOP Partnership to issue Equity Office preferred shares and EOP Partnership preferred units of limited partnership interest in consecutively–lettered series and subject to completion of the repurchase of the Series D Preferred OP Units by Spieker Partnership as contemplated by the Consent and Purchase Agreement, notwithstanding any provision of this Agreement to the contrary (a) Equity Office shall have the authority to redesignate as (i) Equity Office "Series D Cumulative Redeemable Preferred Shares (par value $.01 per share)," the Equity Office Series E Preferred Shares to be issued in the Merger in exchange for issued and outstanding Spieker Series B Preferred Shares, (ii) Equity Office "Series E Cumulative Redeemable Preferred Shares (par value $.01 per share)," the Equity Office Series F Preferred Shares to be issued in the Merger in exchange for issued and outstanding Spieker Series C Preferred Shares and (iii) Equity Office "Series F Cumulative Redeemable Preferred Shares (par value $.01 per share)," the Equity Office Series H Preferred Shares to be issued in the Merger in exchange for issued and outstanding Spieker Series E Preferred Shares; and (b) EOP Partnership shall have the authority to redesignate as (i) EOP Partnership "Series D Cumulative Redeemable Preferred Units," the EOP Partnership Series E Preferred OP Units to be issued in the Partnership Merger in exchange for issued and outstanding Spieker Series B Preferred OP Units, (ii) EOP Partnership "Series E Cumulative Preferred Units," the EOP Partnership Series F Preferred OP Units to be issued in the Partnership Merger in exchange for issued and outstanding Spieker Series C Preferred OP Units and (iii) EOP Partnership "Series F Cumulative Preferred Units," the EOP Partnership Series H Preferred OP Units to be issued in the Partnership Merger in exchange for issued and outstanding Spieker Series E Preferred OP Units. Apart from redesignating the Equity Office preferred shares and EOP Partnership preferred units to be issued in the Merger and the Partnership Merger as indicated above and eliminating references within the articles supplementary for each series of Equity Office preferred shares and in each newly created series of EOP Partnership preferred units to be issued in the Merger and the Partnership Merger, as the case may be, to series of Equity Office preferred shares or EOP Partnership preferred units that will not be issued in the Merger and the Partnership Merger, respectively, the articles supplementary for the redesignated Equity Office series D, E and F preferred shares shall otherwise be substantially in the form set forth on *Exhibits D, E and G,* respectively, and the amendments to the EOP Partnership Agreement to provide for the creation of the redesignated EOP Partnership series D, E and F preferred units shall otherwise be substantially in the form set forth on *Exhibit H.*

A–2

Table of Contents

**Section 4.  Index of Defined Terms.**

The Index of Defined Terms contained in the Merger Agreement is amended by adding the following entries:

| | |
|---|---|
| Belair | Section 8.12 |
| Belcrest | Section 8.12 |
| Consent and Purchase Agreement | Section 8.12 |
| Series D Holders | Section 8.12 |

**Section 5.  Construction of Merger Agreement.**

The Merger Agreement shall be read together and shall have the same force and effect as if the provisions of the Merger Agreement and this First Amendment were contained in one document; and, in the event of conflict, this First Amendment shall control without regard to whether any provision of the Merger Agreement is specifically named in this First Amendment. Except

as expressly amended by this First Amendment, the Merger Agreement shall remain in full force and effect in accordance with its terms.

**Section 6. Counterparts.**

This First Amendment may be executed in any number of counterparts and by the parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

A−3

Table of Contents

IN WITNESS WHEREOF, Equity Office, EOP Partnership, Spieker and Spieker Partnership have caused this First Amendment to be signed by their respective officers (or general partners) thereunto duly authorized all as of the date first written above.

**EQUITY OFFICE PROPERTIES TRUST**

By: /s/ STANLEY M. STEVENS

Name:  Stanley M. Stevens
Title:      Executive Vice President, Chief Legal Counsel and Secretary

**EOP OPERATING LIMITED PARTNERSHIP**

By:  Equity Office Properties Trust, its sole general partner

By:      /s/ STANLEY M. STEVENS

Name:  Stanley M. Stevens
Title:          Executive Vice President, Chief Legal Counsel and Secretary

**SPIEKER PROPERTIES, INC.**

By: /s/ CRAIG G. VOUGHT

Name:  Craig G. Vought
Title:  Co−Chief Executive Officer

**SPIEKER PROPERTIES, L.P.**

By:  Spieker Properties, Inc., its sole general partner

By:      /s/ CRAIG G. VOUGHT

Name:  Craig G. Vought
Title:  Co−Chief Executive Officer

A−4

Table of Contents

**ANNEX B**

*MORGAN STANLEY DEAN WITTER*

1585 BROADWAY
NEW YORK, NEW YORK 10036
(212) 761-4000

February 22, 2001

Board of Trustees

Equity Office Properties Trust
Two North Riverside Plaza, Suite 2100
Chicago, IL 60606

Members of the Board:

    We understand that Spieker Properties, Inc. (the "Target" or the "Company"), Spieker Properties, L.P. (the "Target Partnership"), Equity Office Properties Trust (the "Buyer") and Equity Office Properties Limited Partnership (the "Buyer Partnership") propose to enter into the Agreement and Plan of Merger, dated as of February 22, 2001 (the "Merger Agreement"), which provides, among other things, for the merger (the "Merger") of Target with and into Buyer, and immediately prior to the Merger, the merger of Target Partnership with and into Buyer Partnership. Pursuant to the Merger, as set forth in the Merger Agreement, (i) each outstanding share of common stock, par value $.0001 per share (the "Company Common Stock") of Target, together with the associated rights issued pursuant to the terms of that certain Stockholder Protection Rights Agreement, dated as of September 10, 1998, between Target and the Bank of New York, as rights agent, other than shares held in treasury or held by the Buyer or any affiliate of the Buyer, will be converted into the right to receive $13.50 per share in cash and 1.49586 common shares of beneficial interest, $.01 par value per share, of Equity Office Properties Trust (the "Buyer's Common Shares"), and (ii) Spieker Properties Preferred Stock (as defined in the Merger Agreement) will be converted into Equity Office Properties Preferred Shares (as defined in the Merger Agreement). The terms and conditions of the Merger are more fully set forth in the Merger Agreement.

    You have asked for our opinion as to whether the consideration to be paid by the Buyer pursuant to the Merger Agreement is fair from a financial point of view to the Buyer.

    For purposes of the opinion set forth herein, we have:

(i)    reviewed certain publicly available financial statements and other business and financial information of the Company and the Buyer, respectively;

(ii)    reviewed certain internal financial statements and other financial and operating data concerning the Company and the Buyer, respectively;

(iii)    analyzed certain internal financial forecasts prepared by the managements of the Company and the Buyer, respectively;

(iv)    reviewed information relating to certain strategic, financial and operational benefits anticipated from the Merger, prepared by the managements of the Company and the Buyer, respectively;

(v)    discussed the past and current operations and financial condition and the prospects of the Buyer, including information relating to certain strategic, financial and operational benefits anticipated from the Merger, with senior executives of the Buyer;

(vi)    reviewed the pro forma impact of the Merger on the Buyer's funds from operations per share, cash flow, consolidated capitalization and financial ratios;

(vii)    reviewed the reported prices and trading activity for the Company Common Stock and the Buyer's Common Shares, respectively;

B-1

---

Table of Contents

*MORGAN STANLEY DEAN WITTER*

Board of Trustees
Equity Office Properties Trust
February 22, 2001
Page 2

(viii)    compared the financial performance of the Company and the Buyer and the prices and trading activity of the Company Common Stock and the Buyer's Common Shares with that of certain other publicly– traded companies comparable with the Company and the Buyer, respectively, and their securities;

(ix)    reviewed the financial terms, to the extent publicly available, of certain comparable acquisition transactions;

(x)    participated in discussions and negotiations among representatives of the Company and the Buyer and their financial and legal advisors;

(xi)    reviewed the Merger Agreement and certain related documents; and

(xii)  considered such other factors and performed such other analyses as we have deemed appropriate.

We have assumed and relied upon without independent verification the accuracy and completeness in all material respects of the information supplied or otherwise made available to us by the Company and the Buyer for the purposes of this opinion. With respect to the internal financial forecasts, including information relating to certain strategic, financial and operational benefits anticipated from the Merger, we have assumed that they have been reasonably prepared on bases reflecting the best currently available estimates and judgments of the future financial performance of the Company and the Buyer. In addition, we have assumed that the Merger will be consummated in accordance with the terms set forth in the Merger Agreement. We have not made any independent valuation or appraisal of the assets or liabilities of the Company, nor have we been furnished with any such appraisals. Our opinion is necessarily based on financial, economic, market and other conditions as in effect on, and the information made available to us as of, the date hereof.

We have acted as financial advisor to the Board of Trustees of the Buyer in connection with this transaction and will receive a fee for our services, including a transaction fee that is contingent upon the consummation of the Merger. In the past, Morgan Stanley & Co. Incorporated and its affiliates have provided financial advisory and financing services for the Buyer and the Company and have received fees for the rendering of these services. In the ordinary course of business, Morgan Stanley may from time to time trade in the debt and equity securities or senior loans of the Buyer. In addition, asset management affiliates of Morgan Stanley beneficially own, in the aggregate, approximately 2.0% of the Buyer's Common Shares. Furthermore, Morgan Stanley is financial advisor to and affiliates of Morgan Stanley are shareholders of Constellation Real Technologies LLC, a private company in which both the Buyer and the Company are shareholders.

It is understood that this letter is for the information of the Board of Trustees of the Buyer and may not be used for any other purpose without our prior written consent, except that a copy of our written opinion may be included in its entirety in any filing that the Buyer is required to file with the Securities and Exchange Commission in connection with the Merger. In addition, this opinion does not in any manner address the prices at which the Buyer's Common Shares will trade following the consummation of the Merger, and Morgan Stanley expresses no opinion or recommendation as to how the shareholders of the Company and the Buyer should vote at the shareholders' meetings held in connection with the Merger.

B–2

Table of Contents

*MORGAN STANLEY DEAN WITTER*

Board of Trustees
Equity Office Properties Trust
February 22, 2001
Page 3

Based upon and subject to the foregoing, we are of the opinion on the date hereof that the consideration to be paid by the Buyer pursuant to the Merger Agreement is fair from a financial point of view to the Buyer.

Very truly yours,

MORGAN STANLEY & CO. INCORPORATED

By:

J.E. Hoke Slaughter
Managing Director

B–3

Table of Contents

Goldman, Sachs & Co.  85 Broad Street  New York, New York 10004
Tel: 212–902–1000

**ANNEX C**

Goldman, Sachs & Co.  85 Broad Street  New York, New York 10004
Tel: 212–902–1000

**PERSONAL AND CONFIDENTIAL**

February 22, 2001

Board of Directors

Spieker Properties, Inc.
2180 Sand Hill Road
Menlo Park, CA 94025

Gentlemen:

You have requested our opinion as to the fairness from a financial point of view to the holders of the outstanding shares of Common Stock, par value $0.0001 per share (the "Spieker Common Stock"), of Spieker Properties, Inc. ("Spieker" or the "Company") of the Consideration (as defined below) to be received for each share of Spieker Common Stock pursuant to the Agreement and Plan of Merger, dated as of February 22, 2001 (the "Agreement"), by and among the Company, Spieker Properties, L.P., an affiliate of the Company ("Spieker Partnership"), Equity Office Properties Trust ("EOP"), and EOP Operating Limited Partnership, an affiliate of EOP ("EOP Partnership"). Pursuant to the Agreement, the Company will be merged with and into EOP (the "Merger") and each outstanding share of Spieker Common Stock will be converted into the right to receive (a) $13.50 in cash (the "Cash Consideration") and (b) 1.49586 common shares of beneficial interest, par value $0.01 per share (the "EOP Common Stock"), of EOP (the "Stock Consideration" and, together with the Cash Consideration, the "Consideration") as more fully set forth in the Agreement.

We note that also pursuant to the Agreement, Spieker Partnership will be merged with and into EOP Partnership (the "Partnership Merger") and each partnership unit (other than preferred partnership units) of Spieker Partnership ("Spieker OP Unit") will be exchanged for 1.94462 Class A units of EOP Partnership. We further note that, pursuant to the Limited Partnership Agreement of Spieker Partnership, holders of Spieker OP Units have the right, exercisable prior to the Partnership Merger, to convert their Spieker OP Units into shares of Spieker Common Stock and thereby receive the Consideration provided for in the Merger for shares of Spieker Common Stock. In rendering this opinion, we are not opining on the consideration to be received by holders of Spieker OP Units in the Partnership Merger or to the differential treatment afforded to the holders of Spieker OP Units in comparison to the Consideration to be received by the holders of shares of Spieker Common Stock in the Merger.

Goldman, Sachs & Co., as part of its investment banking business, is continually engaged in the valuation of businesses and their securities in connection with mergers and acquisitions, negotiated underwritings, competitive biddings, secondary distributions of listed and unlisted securities, private placements and valuations for estate, corporate and other purposes. We are familiar with the Company having provided certain investment banking services to the Company from time to time, including having acted as (i) lead–managing underwriter of a public offering of $150 million aggregate principal amount of 6.75% Notes due 2008 of Spieker Partnership in January 1998, (ii) lead–managing underwriter of a public offering of four million Series D Cumulative Redeemable Preferred Shares of Spieker in June 1998, (iii) lead–managing underwriter of a public offering of $200 million aggregate principal amount of 7.25% Notes due 2009 of Spieker Partnership in May 1999, (iv) lead–managing underwriter of a public offering of $200 million aggregate principal amount of 6.80% Notes due 2004 of Spieker Partnership in May 1999, (v) lead–managing underwriter of a public offering of $200 million aggregate principal amount of 7.65% Notes due 2010 of Spieker Partnership in December 2000, and (vi) its financial advisor in connection with the Agreement. We also have provided certain investment banking services to EOP from time to time, including having acted as (i) co–managing underwriter of a public offering of $300 million aggregate principal amount of 6.763% Notes due 2007 of EOP Partnership in June 1998, (ii) lead–managing underwriter of a public offering of 4,765,423 shares of EOP Common Stock in October 1998, (iii) co–managing underwriter of a public offering of

C–1

Table of Contents

Board of Directors
Spieker Properties, Inc.
February 22, 2001
Page Three

$500 million aggregate principal amount of 6.8% Notes due 2009 of EOP Partnership in January 1999, (iv) co–managing underwriter of a public offering of $300 million aggregate principal amount of 6.5% Notes due 2004 of EOP Partnership in January 1999, (v) co–managing underwriter of a public offering of $200 million aggregate principal amount of 6.375% Notes due 2002 of EOP Partnership in January 1999, (vi) co–managing underwriter of a public offering of $500 million aggregate principal amount of 8.375% Notes due 2006 of EOP Partnership in March 2000, and (vii) co–lead–managing underwriter of a public offering of $400 million aggregate principal amount of 7.375% Notes due 2003 of EOP Partnership in November 2000. Goldman, Sachs & Co. provides a full range of financial advisory and securities services and, in the course of its normal trading activities, may from time to time effect transactions and hold positions in securities, including derivative securities, of the Company or EOP for its own account and for the accounts of customers. As of the date hereof, Goldman, Sachs & Co. holds a net long position of 2,661,085 shares of EOP Common Stock. Goldman, Sachs & Co. may provide investment banking services to EOP and its subsidiaries in the future.

In connection with this opinion, we have reviewed, among other things, the Agreement; Annual Reports to Stockholders and Annual Reports on Form 10–K of the Company and EOP for the three years ended December 31, 1999; a draft of the audited financial statements for the Company for the year ended December 31, 2000; certain interim reports to stockholders and Quarterly Reports on Form 10–Q of the Company and EOP; certain other communications from the Company and EOP to their respective stockholders; certain internal financial analyses and forecasts for the Company prepared by its management (the "Company Forecasts"); certain internal financial analyses and forecasts for EOP prepared by its management; and certain cost savings and operating synergies projected by the managements of the Company and EOP to result from the transactions contemplated by the

Agreement. We also have held discussions with members of the senior managements of the Company and EOP regarding their assessment of the strategic rationale for, and the potential benefits of, the transactions contemplated by the Agreement and the past and current business operations, financial condition and future prospects of their respective companies. In addition, we have reviewed the reported price and trading activity for the Spieker Common Stock and the EOP Common Stock, compared certain financial and stock market information for the Company and EOP with similar information for certain other companies the securities of which are publicly traded, reviewed the financial terms of certain recent business combinations in the real estate industry specifically and other industries generally and performed such other studies and analyses as we considered appropriate.

We have relied upon the accuracy and completeness of all of the financial and other information discussed with or reviewed by us and have assumed such accuracy and completeness for purposes of rendering this opinion. In addition, we have not made an independent evaluation or appraisal of the assets and liabilities of the Company or EOP or any of their subsidiaries and we have not been furnished with any such evaluation or appraisal. With your consent, we have taken into account the views of the Company's management of the risks and uncertainties relating to the Company's ability to achieve the Company Forecasts in the amounts and time periods contemplated thereby. We were not requested to solicit, and did not solicit, interest from other parties with respect to an acquisition of, or other business combination with, the Company. Our advisory services and the opinion expressed herein are provided for the information and assistance of the Board of Directors of the Company in connection with its consideration of the transactions contemplated by the Agreement and such opinion does not constitute a recommendation as to how any holder of Spieker Common Stock should vote with respect to such transactions.

Based upon and subject to the foregoing and based upon such other matters as we consider relevant, it is our opinion that, as of the date hereof, the Consideration to be received by the holders of Spieker Common Stock is fair from a financial point of view to such holders.

Very truly yours,

C–2

---

Table of Contents

Board of Directors
Spieker Properties, Inc.
February 22, 2001
Page Three

*Goldman, Sachs & Co*

GOLDMAN, SACHS & CO.

C–3

---

Table of Contents

**ANNEX D**

**AMENDMENTS TO EQUITY OFFICE DECLARATION OF TRUST AS PART OF THE MERGER**

**1. Amendment to Section 5.2**

The first sentence of Section 5.2 of the Declaration of Trust of Equity Office, as amended, is amended in its entirety to read as follows:

The number of Trustees (hereinafter the "Trustees") shall initially be three, shall be increased to nine within 90 days following closing of the Trust's initial public offering of Shares (as hereinafter defined), and shall not thereafter be decreased, but may be increased to a maximum of sixteen pursuant to the Bylaws of the Trust.

**2. Amendment to Add New Section 7.2.10**

A new Section 7.2.10 is added to Article VII of the Declaration of Trust of Equity Office, as amended, to read in its entirety as follows:

Section 7.2.10. *Exemption for Certain Preferred Shares.* Notwithstanding any provision of this Article VII (or any successor provision), in connection with the issuance of Preferred Shares by the Trust in connection with a Business Combination (as defined in Section 8.4), the Board may exempt by Board resolution one or more series of Preferred Shares (an "Exempted Preferred Series") from all or any portion of the provisions of this Article VII, including, without limitation, the restrictions or limitations on ownership and transfer contained in Section 7.2.1(a) and Section 7.3, *provided* that either condition (a), (b) or (c) below has been met:

    (a) the Board, in its sole and absolute discretion, shall have determined that assuming that all shares of such Exempted Preferred Series are Beneficially Owned by one Non–U.S. Person who is considered an individual pursuant to Section 542 of the Code as modified by Section 856(h)(3) of the Code, it is not reasonably likely that:

        (1) five Persons who are considered individuals pursuant to Section 542 of the Code as modified by Section 856(h)(3) of the Code (taking into account all of the Excepted Holders) would Beneficially Own more than 49.5% of the value of the outstanding Shares;

        (2) the Shares would be beneficially owned by less than 100 Persons; and

        (3) the fair market value of the Shares owned directly and indirectly by Non–U.S. Persons for purposes of Section 897(h)(4)(B) of the Code would comprise forty–three (43%) percent or more of the fair market value of the issued and outstanding Shares; or

    (b) the Board shall have established restrictions or limitations on Beneficial Ownership and transfer of the Exempted Preferred Series and remedies for breach thereof that vary from those contained in this Article VII and that, in the sole and absolute discretion of the Board, ensure that it is reasonably likely that:

        (1) no five Persons who are considered individuals pursuant to Section 542 of the Code as modified by Section 856(h)(3) of the Code (taking into account all of the Excepted Holders) would Beneficially Own more than 50% of the value of the outstanding Shares;

        (2) the Shares would be beneficially owned by at least 100 Persons; and

        (3) the fair market value of the Shares owned directly and indirectly by Non–U.S. Persons for purposes of Section 897(h)(4)(B) of the Code would comprise less than forty–three percent (43%) of the fair market value of the issued and outstanding Shares; or

    (c) a combination of conditions (a) or (b) above shall have been met, provided that (1) at least one of condition (a)(1) or condition (b)(1) shall have been met; (2) at least one of condition (a)(2) or condition (b)(2) shall have been met; and (3) at least one of condition (a)(3) or condition (b)(3) shall have been met.

D–1

---

Table of Contents

## PART II

### INFORMATION NOT REQUIRED IN PROSPECTUS

**Item 20.** *Indemnification of Trustees and Officers*

    The Maryland REIT Law permits a Maryland REIT to include in its declaration of trust a provision limiting the liability of its trustees and officers to the REIT and its shareholders for money damages, except with respect to liability resulting from (1) an actual receipt of an improper benefit or profit in money, property or services, to the extent of the amount of the benefit or profit in money, property or services actually received or (2) a judgment or other final adjudication adverse to the trustee or officer entered in a proceeding based on a finding that the trustee's or officer's action or failure to act was material to the cause of action adjudicated in the proceeding and was the result of active and deliberate dishonesty. The Equity Office declaration of trust contains such a provision.

    The Maryland REIT Law permits a Maryland REIT to indemnify and advance expenses to its trustees and officers to the same extent as permitted for directors and officers of a Maryland corporation under the Maryland General Corporation Law. In the case of directors and officers of a Maryland corporation, the Maryland General Corporation Law permits a Maryland corporation to indemnify present and former directors and officers (including any such person who, while serving in that capacity, is or was serving at the request of the corporation as a director, officer, partner, trustee, employee or agent of a foreign or domestic corporation, partnership, joint venture, trust, other enterprise or employee benefit plan) against judgments, penalties, fines, settlements and reasonable expenses actually incurred by them in connection with any proceeding to which they may be made a party by reason of such service, unless it is established that either: (1) the act or omission of the director or officer was material to the matter giving rise to the proceeding and either (x) was committed in bad faith or (y) was the result of active and deliberate dishonesty; (2) the director or officer actually received an improper personal benefit in money, property or services; or (3) in the case of any criminal proceeding, the director or officer had reasonable cause to believe that the act or omission was unlawful.

    Under the Maryland General Corporation Law, a Maryland corporation may not, however, indemnify a director or advance expenses for a proceeding brought by the direct or against the corporation, except (x) for a proceeding to enforce indemnification under the Maryland General Corporation Law or (y) if the charter or bylaws of the corporation, a resolution of the board of directors of the corporation or an agreement approved by the board of directors of the corporation to which the corporation is a party expressly so provide. Also, in the case of a proceeding by or in the right of the corporation, the corporation may not indemnify in the case of a judgment of liability on the basis that a personal benefit was improperly received. In either situation described in this paragraph, a court may order indemnification only for expenses.

As a condition to advancing expenses, a Maryland corporation must first receive (1) a written affirmation by the director or officer of his or her good faith belief that he or she has met the standard of conduct necessary for indemnification and (2) a written undertaking by the director or officer or on his or her behalf to repay the amount paid or reimbursed by the Maryland corporation if it shall ultimately be determined that the standard of conduct was not met.

Under the Maryland General Corporation Law, a determination of entitlement to indemnification must by made by (1) the board of directors by a majority vote of a quorum consisting of directors not, at the time, parties to the proceeding, or, if such a quorum cannot be obtained, then by a majority vote of a committee of the board consisting solely of two or more directors not, at the time, parties to such proceeding and who were fully designated to act in the matter by a majority vote of the full board in which the designated directors who are parties may participate; (2) special legal counsel selected by the board for a committee of the board by vote, or, if the requisite quorum of the full board cannot be obtained and the committee cannot be established, by a majority vote of the full board in which directors who are parties may participate; or (3) stockholders.

II–1

**Table of Contents**

The Equity Office declaration of trust provides that Equity Office has the power, to the maximum extent permitted by Maryland law, to obligate itself to indemnify, and to pay or reimburse reasonable expenses in advance of final disposition of a proceeding to, (1) any individual who is a present or former trustee or officer of Equity Office or (2) any individual who, while a trustee or officer of Equity Office and at the request of Equity Office, serves or has served as a director, officer, partner, trustee, employee or agent of another corporation, partnership, joint venture, trust, employee benefit plan or any other enterprise and who is made a party to the proceeding by reason of his or her status as a present or former trustee or officer of Equity Office. The Equity Office bylaws provide that, to the maximum extent permitted by Maryland law, Equity Office shall indemnify such persons. In addition, under the Equity Office bylaws, Equity Office is obligated to, without requiring a preliminary determination of the ultimate entitlement to indemnification, pay or reimburse, in advance of final disposition of a proceeding, reasonable expenses incurred by such persons under circumstances permitted by Maryland law. Under the Equity Office declaration of trust and bylaws, Equity Office also may, with the approval of its board of trustees, provide indemnification or payment or reimbursement of expenses to any present or former trustee or officer who served a predecessor of Equity Office.

In addition, Mr. Dobrowski, a trustee of Equity Office, is indemnified by General Motors Investment Management Corporation and is covered by an insurance policy maintained by General Motors Corporation, of which General Motors Investment Management Corporation is a subsidiary, in connection with serving on the Equity Office board of trustees.

The partnership agreement of EOP Partnership also provides for indemnification of Equity Office and its trustees and officers to the same extent that indemnification is provided to trustees and officers of Equity Office in its declaration of trust and bylaws, and limits the liability of Equity Office and its trustees and officers to EOP Partnership and its respective partners to the same extent that the Equity Office declaration of trust limits the liability of trustees and officers of Equity Office to Equity Office and its shareholders.

Equity Office has entered into indemnification agreements with some of its trustees and executive officers to provide them with indemnification to the full extent permitted by Maryland law and the declaration of trust and bylaws of Equity Office.

Equity Office has obtained an insurance policy to provide liability coverage for its trustees and officers.

Insofar as indemnification for liabilities arising under the Securities Act may be permitted to trustees, officers or persons controlling Equity Office under the foregoing provisions, Equity Office has been informed that in the opinion of the SEC such indemnification is against public policy as expressed in the Act and is therefore unenforceable.

**Item 21.** *Exhibits and Financial Statement Schedules*

**(a) Exhibits**

| Exhibit No. | Exhibit Description |
| --- | --- |
| 2.1 | Agreement and Plan of Merger, dated as of February 22, 2001, as amended, by and among Equity Office, EOP Partnership, Spieker and Spieker Partnership, which is included in this Registration Statement as Annex A to the joint proxy statement/prospectus. The Form of Proposed Equity Office Charter Amendments, which is Exhibit I to the Merger Agreement, is included in this Registration Statement as Annex D to the joint proxy statement/prospectus. Exhibits D–H and K to the Merger Agreement are incorporated herein by reference to Exhibit 2.1 to Equity Office's Current Report on Form 8–K, as filed with the SEC on March 9, 2001. The registrant agrees to furnish supplementally a copy of Exhibits A–C and J to the Merger Agreement to the SEC upon request. |

II–2

**Table of Contents**

| Exhibit No. | Exhibit Description |
| --- | --- |

| 4.1 | Form of Articles Supplementary Designating Equity Office Series E Preferred Shares (attached as Exhibit D to the Merger Agreement, which is incorporated herein by reference to Exhibit 2.1 to Equity Office's Current Report on Form 8–K, as filed with the SEC on March 9, 2001) |
|---|---|
| 4.2 | Form of Articles Supplementary Designating Equity Office Series F Preferred Shares (attached as Exhibit E to the Merger Agreement, which is incorporated herein by reference to Exhibit 2.1 to Equity Office's Current Report on Form 8–K, as filed with the SEC on March 9, 2001) |
| 4.3 | Form of Articles Supplementary Designating Equity Office Series H Preferred Shares (attached as Exhibit G to the Merger Agreement, which is incorporated herein by reference to Exhibit 2.1 to Equity Office's Current Report on Form 8–K, as filed with the SEC on March 9, 2001) |
| 5.1 | Opinion of Hogan & Hartson L.L.P. regarding the legality of common shares and preferred shares being registered |
| 8.1 | Opinion of Hogan & Hartson L.L.P. regarding the qualification of the merger as a reorganization for federal income tax purposes and related federal income tax consequences |
| 8.2 | Opinion of Hogan & Hartson L.L.P. regarding the qualification of Equity Office as a real estate investment trust and EOP Partnership as a partnership for federal income tax purposes |
| 8.3 | Opinion of Sullivan & Cromwell regarding the qualification of the merger as a reorganization for federal income tax purposes and related federal income tax consequences |
| 8.4 | Opinion of Morrison & Foerster LLP regarding the qualification of Spieker as a real estate investment trust and Spieker Partnership as a partnership for federal income tax purposes |
| 10.1 | Commitment Letter for Bridge Facility, dated May 11, 2001 |
| 10.2† | Fee Letter for Bridge Facility, dated May 11, 2001 |
| 10.3 | First Amendment to Revolving Credit Agreement, dated as of May 18, 2001 |
| 12.1† | Ratio of earnings to combined fixed charges and preferred share dividends of Equity Office |
| 12.2† | Ratio of earnings to combined fixed charges and preferred share dividends of Spieker |
| 23.1 | Consent of Ernst & Young LLP (Equity Office) |
| 23.2 | Consent of Arthur Andersen LLP (Spieker) |
| 23.3 | Consent of Hogan & Hartson L.L.P. (included in Exhibit 5.1) |
| 23.4 | Consent of Hogan & Hartson L.L.P. (included in Exhibits 8.1 and Exhibit 8.2) |
| 23.5 | Consent of Sullivan & Cromwell (included in Exhibit 8.3) |
| 23.6 | Consent of Morrison & Foerster LLP (included in Exhibit 8.4) |
| 23.7† | Consent of Morgan Stanley & Co. Incorporated |
| 23.8 | Consent of Goldman, Sachs & Co. |
| 24.1† | Power of attorney (included on signature page) |
| 99.1 | Equity Office — Form of Proxy |
| 99.2 | Spieker — Form of Proxy |
| 99.3† | Consent of Warren E. Spieker, Jr. to be named as a trustee |
| 99.4† | Consent of Craig G. Vought to be named as a trustee |
| 99.5† | Consent of John A. Foster to be named as a trustee |

† Previously filed.

II–3

Table of Contents

**(b) Financial Statement Schedule**

The following financial statement schedule was filed with the Equity Office Annual Report on Form 10–K/A for the year ended December 31, 2000 (File no. 1–13115), filed with the SEC on June 6, 2001, and is incorporated herein by reference:

**Schedule III — Real Estate and Accumulated Depreciation**

Schedules not listed above have been omitted because they are inapplicable or the information required to be set forth therein is contained, or incorporated by reference, in the consolidated final statements of Equity Office or notes thereto.

**(c) Reports, Opinions or Appraisals**

The opinion of Morgan Stanley & Co. Incorporated is attached as Annex B to this joint proxy statement/prospectus. The opinion of Goldman, Sachs & Co. is attached as Annex C to this joint proxy statement/prospectus.

**Item 22. *Undertakings***

The Registrant hereby undertakes:

(1) To file, during any period in which offers or sales are being made, a post–effective amendment to this registration statement:

(i) to include any prospectus required by Section 10(a)(3) of the Securities Act of 1933;

(ii) to reflect in the prospectus any facts or events arising after the effective date of the registration statement (or the most recent post–effective amendment thereof) which, individually or in the aggregate, represent a fundamental change in the information set forth in the registration statement. Notwithstanding the foregoing, any increase or decrease in volume of securities offered (if the total dollar value of securities offered would not exceed that which was registered) and any deviation from the low or high end of the estimated maximum offering range may be reflected in the form of prospectus filed with the Commission pursuant to rule 424(b) if, in the aggregate, the changes in volume and price represent no more than a 20 percent change in the maximum aggregate offering price set forth in the "Calculation of Registration Fee" table in the effective registration statement; and

(iii) to include any material information with respect to the plan of distribution not previously disclosed in the registration statement or any material change to such information in the registration statement.

(2) That, for the purpose of determining any liability under the Securities Act of 1933, each such post–effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial *bona fide* offering thereof.

(3) To remove from registration by means of a post–effective amendment any of the securities being registered which remain unsold at the termination of the offering.

(4) That, for the purpose of determining any liability under the Securities Act of 1933, each filing of the registrant's annual report pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (and, where applicable, each filing of an employee benefit plan's annual report pursuant to Section 15(d) of the Securities Exchange Act of 1934) that is incorporated by reference in the registration statement shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial *bona fide* offering thereof.

II–4

Table of Contents

(5) That prior to any public reoffering of the securities registered hereunder through use of a prospectus which is a part of this registration statement, by any person or party who is deemed to be an underwriter within the meaning of Rule 145(c), the issuer undertakes that such reoffering prospectus will contain the information called for by the applicable registration form with respect to reofferings by persons who may be deemed underwriters, in addition to the information called for by the other items of the applicable form.

(6) That every prospectus: (i) that is filed pursuant to paragraph (5) immediately preceding, or (ii) that purports to meet the requirements of Section 10(a)(3) of the Act and is used in connection with an offering of securities subject to Rule 415, will be filed as a part of an amendment to the registration statement and will not be used until such amendment is effective, and that, for purposes of determining any liability under the Securities Act of 1933, each such post–effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial *bona fide* offering thereof.

(7) Insofar as indemnification for liabilities arising under the Securities Act of 1933 may be permitted to trustees, officers and controlling persons of the registrant pursuant to the foregoing provisions, or otherwise, the registrant has been advised that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the registrant of expenses incurred or paid by a trustee, officer or controlling person of the registrant in the successful defense of any action, suit or proceeding) is asserted by such trustee, officer or controlling person in connection with the securities being registered, the registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Act and will be governed by the final adjudication of such issue.

(8) To respond to requests for information that is incorporated by reference into the prospectus pursuant to Item 4, 10(b), 11, or 13 of this form, within one business day of receipt of such request, and to send the incorporated documents by first class mail or other equally prompt means. This includes information contained in documents filed subsequent to the effective date of the registration statement through the date of responding to the request.

(9) To supply by means of a post–effective amendment all information concerning a transaction, and the company being acquired involved therein, that was not the subject of and included in the registration statement when it became effective.

II–5

Table of Contents

## SIGNATURES

Pursuant to the requirements of the Securities Act, the registrant has duly caused this registration statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Chicago, State of Illinois on June 6, 2001.

EQUITY OFFICE PROPERTIES TRUST

By:                    /s/ STANLEY M. STEVENS

Stanley M. Stevens
Executive Vice President,
Chief Legal Counsel and Secretary

Pursuant to the requirements of the Securities Act of 1933, this registration statement has been signed by the following persons in the capacities indicated as of the 6th day of June, 2001.

| Signature | Title |
|---|---|
| *<br>Timothy H. Callahan | President, Chief Executive Officer and Trustee (principal executive officer) |
| *<br>Richard D. Kincaid | Executive Vice President — Chief Financial Officer (principal financial officer) |
| *<br>Stephen M. Briggs | Senior Vice President — Chief Accounting Officer (principal accounting officer) |
| *<br>Samuel Zell | Chairman of the Board of Trustees |
| *<br>Sheli Z. Rosenberg | Trustee |
| *<br>Thomas E. Dobrowski | Trustee |
| *<br>James D. Harper, Jr. | Trustee |
| *<br>Jerry M. Reinsdorf | Trustee |
| *<br>William M. Goodyear | Trustee |
| *<br>David K. McKown | Trustee |
| *<br>Edwin N. Sidman | Trustee |

II–6

Table of Contents

| Signature | Title |
|---|---|
| *<br>D. J. André de Bock | Trustee |
| *<br>William Wilson III | Trustee |
| *<br>John S. Moody | Trustee |
| *<br>Jan H.W.R. van der Vlist | Trustee |

* Pursuant to Power of Attorney
By: /s/ STANLEY M. STEVENS

Stanley M. Stevens
Attorney–in–Fact

II–7

Table of Contents

## EXHIBIT INDEX

| Exhibit No. | Exhibit Description |
|---|---|
| | |

| | |
|---|---|
| 2.1 | Agreement and Plan of Merger, dated as of February 22, 2001, as amended, by and among Equity Office, EOP Partnership, Spieker and Spieker Partnership, which is included in this Registration Statement as Annex A to the joint proxy statement/ prospectus. The Form of Proposed Equity Office Charter Amendments, which is Exhibit I to the Merger Agreement, is included in this Registration Statement as Annex D to the joint proxy statement/prospectus. Exhibits D–H and K to the Merger Agreement are incorporated herein by reference to Exhibit 2.1 to Equity Office's Current Report on Form 8–K, as filed with the SEC on March 9, 2001. The registrant agrees to furnish supplementally a copy of Exhibits A–C and J to the Merger Agreement to the SEC upon request. |
| 4.1 | Form of Articles Supplementary Designating Equity Office Series E Preferred Shares (attached as Exhibit D to the Merger Agreement, which is incorporated herein by reference to Exhibit 2.1 to Equity Office's Current Report on Form 8–K, as filed with the SEC on March 9, 2001) |
| 4.2 | Form of Articles Supplementary Designating Equity Office Series F Preferred Shares (attached as Exhibit E to the Merger Agreement, which is incorporated herein by reference to Exhibit 2.1 to Equity Office's Current Report on Form 8–K, as filed with the SEC on March 9, 2001) |
| 4.3 | Form of Articles Supplementary Designating Equity Office Series H Preferred Shares (attached as Exhibit G to the Merger Agreement, which is incorporated herein by reference to Exhibit 2.1 to Equity Office's Current Report on Form 8–K, as filed with the SEC on March 9, 2001) |
| 5.1 | Opinion of Hogan & Hartson L.L.P. regarding the legality of common shares and preferred shares being registered |
| 8.1 | Opinion of Hogan & Hartson L.L.P. regarding the qualification of the merger as a reorganization for federal income tax purposes and related federal income tax consequences |
| 8.2 | Opinion of Hogan & Hartson L.L.P. regarding the qualification of Equity Office as a real estate investment trust and EOP Partnership as a partnership for federal income tax purposes |
| 8.3 | Opinion of Sullivan & Cromwell regarding the qualification of the merger as a reorganization for federal income tax purposes and related federal income tax consequences |
| 8.4 | Opinion of Morrison & Foerster LLP regarding the qualification of Spieker as a real estate investment trust and Spieker Partnership as a partnership for federal income tax purposes |
| 10.1 | Commitment Letter for Bridge Facility, dated May 11, 2001 |
| 10.2† | Fee Letter for Bridge Facility, dated May 11, 2001 |
| 10.3 | First Amendment to Revolving Credit Agreement, dated as of May 18, 2001 |
| 12.1† | Ratio of earnings to combined fixed charges and preferred distributions of Equity Office |

## Table of Contents

| Exhibit No. | Exhibit Description |
|---|---|
| 12.2† | Computation of ratio of earnings to combined fixed charges and preferred dividends of Spieker |
| 23.1 | Consent of Ernst & Young LLP (Equity Office) |
| 23.2 | Consent of Arthur Andersen LLP (Spieker) |
| 23.3 | Consent of Hogan & Hartson L.L.P. (included in Exhibit 5.1) |
| 23.4 | Consent of Hogan & Hartson L.L.P. (included in Exhibits 8.1 and Exhibit 8.2) |
| 23.5 | Consent of Sullivan & Cromwell (included in Exhibit 8.3) |
| 23.6 | Consent of Morrison & Foerster LLP (included in Exhibit 8.4) |
| 23.7† | Consent of Morgan Stanley & Co. Incorporated |
| 23.8 | Consent of Goldman, Sachs & Co. |
| 24.1† | Power of attorney |
| 99.1 | Equity Office — Form of Proxy |
| 99.2 | Spieker — Form of Proxy |
| 99.3† | Consent of Warren E. Spieker, Jr. to be named as a trustee |
| 99.4† | Consent of Craig G. Vought to be named as a trustee |
| 99.5† | Consent of John A. Foster to be named as a trustee |

† Previously filed.