99

WRP Units so assigned and having all of the rights of a Limited Partner under the Agreement and the Third Prior Amendment, subject only to such assignee executing and delivering to the Partnership an acceptance of all of the terms and conditions of the Agreement and such other documents or instruments as the General Partner may reasonably require to effect such admission, in accordance with Section 11.4.B of the Agreement. Each permitted assignee of any of the WRP Units issued to a Contributor pursuant to the Contribution Agreement that is admitted as a Substituted Limited Partner in accordance with this Section 1 or Article XI of the Agreement, for so long as such Person owns any such WRP Units, is referred to herein as a "Contributor Limited Partner." Upon satisfaction of the condition described in the second sentence of this Section 1, the General Partner shall update the Partner Registry in the manner described in Section 11.4.C of the Agreement. For purposes of Section 8.6 of the Agreement, each Contributor Limited Partner which is a permitted assignee of a Contributor shall be entitled to exercise its right to require the Partnership to redeem all or any portion of the WRP Units assigned to it by such Contributor at any time.

2.    Adjustments to Carrying Values.

(a)   Upon the admission of the Contributors and the Principals to the Partnership and upon the distribution by the Partnership of the Cash Amount to either Contributor or to any Principal or any Contributor Limited Partner pursuant to the exercise of the Redemption Right with respect to the WRP Units held by such Contributor, Principal or Contributor Limited Partner, the Carrying Values of the Assets of the Partnership shall be adjusted in accordance with the procedures described in Section 1.D of Exhibit B to the Agreement; provided, however, that in order to minimize the administrative burden associated with the adjustments required by this Section 2(a) in connection with the distribution of the Cash Amount to a Contributor, a Principal or a Contributor Limited Partner, the Partnership shall make the adjustments to the Carrying Values of the Partnership's Assets (and the resulting adjustments to the Capital Accounts of the Partners) only upon the happening of the most material event during the calendar year that is described in Section 1.D(2) of Exhibit B to the Agreement (the "Annual Adjustment"); and provided, further, that upon the distribution of the Cash Amount to a Contributor, a Principal or a Contributor Limited Partner or, at the option of the General Partner, upon the occurrence of any other event described in Section 1.D(2) of Exhibit B to the Agreement, that occurs during any year other than as of the date of the Annual Adjustment, the Partnership shall, at the time of such distribution, make adjustments to the Carrying Values of the Partnership's Assets in accordance with the procedures described in Section 1.D of Exhibit B to the Agreement for purposes of adjusting the Capital Account of such Contributor, such Principal or such Contributor Limited Partner who has exercised his Redemption Right or such other affected Partner, but no such adjustments shall be necessary at such time with respect to the Capital Account balances of Partners who remain Partners through the date of the Annual Adjustment or are otherwise not directly affected by any such other event.

(b)   Any determination of the fair market value of Partnership assets pursuant to Section 1.D of Exhibit B to the Agreement (for purposes of

E-3 - 2

100

calculating Unrealized Gain or Unrealized Loss), with respect to adjusting the Carrying Values of Partnership assets in connection with the exercise of Redemption Rights by a Contributor, any Principal or any Contributor Limited Partner shall be made by assuming that the aggregate fair market value of all Partnership assets is equal to the aggregate Cash Amount that would be distributed by the Partnership if all Partnership Units held by all Partners (including the General Partner) were redeemed in exchange for the Cash Amount with respect to each such Partnership Unit at such time, provided, however, such valuation methodology shall not be utilized for purposes of determining the fair market value of the Partnership's assets with respect to any such exercise of Redemption Rights in contemplation of an assignment by or reorganization of the Partnership for the benefit of creditors and any liquidation of the Partnership related thereto or following the filing by (or in contemplation of a filing) by the Partnership of a case under Title 11 of the U.S. Code.

3.    Allocations. Notwithstanding the provisions of Section 2.C of Exhibit C to the Agreement, for purposes of allocating items of income, gain, loss and deduction with respect to the WRP Property in the manner required by Section 704(c) of the Code, the Partnership shall employ, and shall cause any entity controlled by the Partnership which holds title to any of the WRP Property to employ, the "traditional method" as set forth in Regulation Section 1.704-3(b).

4.    Obligation to Restore Deficit Capital Account.

(a)  For purposes of this Section 4, the following terms shall have the meanings set forth below:

(i)  "DRO Amount" means (A) with respect to WRAM, $10,873,678, (B) with respect to WRH, $63,014,285 and (C) with respect to each Scheduled Assignee, the amount set forth opposite such Scheduled Assignee's name on Schedule 1 hereto.

(ii) "Partner Contribution Agreement" means one or more agreements in favor of that certain partnership or those certain partnerships that are partners in WRH, which were executed concurrently with the Third Prior Amendment and have been assigned by such partnerships to WRH, pursuant to which a Second-Tier Partner has agreed to make certain capital contributions to WRH on the terms and subject to the conditions set forth in such Partner Contribution Agreement.

(iii) "Partner Contribution Amount" means, with respect to each Second-Tier Partner, the amount set forth opposite such Second-Tier Partner's name on Schedule 1 hereto, which amount is the amount of capital contributions agreed to be made by such Second-Tier Partner pursuant to the Partner Contribution Agreement to which he is a party.

E-3 - 3

101

      (iv) "Scheduled Assignee" means each permitted assignee of any of the WRP Units of either WRAM or WRH listed on Schedule 1 hereto and the successors and assigns of such Scheduled Assignee.

      (v) "Second-Tier Partners" means those persons listed on Schedule 1 to the Third Prior Amendment who are partners in certain general partnerships that are partners in WRH and who have executed and delivered one or more Partner Contribution Agreements.

      (b) Notwithstanding any other provisions of the Agreement, upon liquidation of the Partnership or upon the liquidation of the Partnership Interest of a Contributor or a Scheduled Assignee, each Contributor or Scheduled Assignee whose interest is being liquidated shall contribute to the Partnership, in accordance with Section 1.704-1(b)(2)(ii)(b)(2) of the Regulations, the deficit balance, if any, in its Capital Account, calculated after the allocation for such year of all items of Net Income, Net Losses, Gross Income and Unrealized Gain or Unrealized Loss allocated in accordance with Section 1.D of Exhibit B to the Agreement; provided, however, that in no event shall such contribution obligation for any Contributor or Scheduled Assignee exceed such Contributor's or Scheduled Assignee's DRO Amount. In addition, WRH assigned and conveyed to the Partnership, effective upon distribution of the WRP Units by WRH, all of WRH's rights under each Partner Contribution Agreement provided by a Second-Tier Partner; provided that in no event shall the contribution obligation pursuant to such Partner Contribution Agreement exceed such Second-Tier Partner's Partner Contribution Amount. The obligation pursuant to this Section 4(b) shall be for the benefit of the Partnership, the General Partner, the creditors of the Partnership or any other person to whom any debts, liabilities or obligations are owed by (or who otherwise has any claim against) the Partnership or the General Partner in its capacity as the general partner of the Partnership and shall be enforceable by such parties. Each Contributor and Scheduled Assignee unconditionally and irrevocably waives any subrogation, reimbursement or similar rights to which it might otherwise be entitled as the result of its performance with respect to the obligation created pursuant to Section 4(b), whether such rights arise with respect to the Partnership, another Partner, or a third party; provided, however, that the General Partner shall in all events be entitled to enforce the contribution obligation of a Contributor or Scheduled Assignee undertaken pursuant to Section 4(b).

      (c) Notwithstanding the foregoing, in the event that the General Partner, pursuant to Section 8.6.B of the Agreement, elects to assume directly and satisfy a Redemption Right exercised by a Contributor or a Scheduled Assignee (a "Tendering Limited Partner"), the General Partner shall assume the obligation of the Tendering Limited Partner pursuant to Section 4(b) above with respect to the WRP Units transferred to the General Partner by such Tendering Limited Partner; provided, however, that if the adjustment to the Carrying Values of Partnership Assets and the related adjustments to the Capital Accounts of the Partners pursuant to Section 2 hereof and Section 1.D of Exhibit B to the Agreement that would have been undertaken pursuant to Section 2 hereof had the

E-3 - 4

102

Partnership satisfied the Redemption Right exercised by such Tendering Limited Partner would have resulted in the Capital Account of the Tendering Limited Partner having a zero or positive balance, then, with respect to such WRP Units acquired from the Tendering Limited Partner, the General Partner shall have no obligation pursuant to Section 4(b) hereof with respect to a liquidation of the Partnership or a liquidation of the Partnership Interest reflected by such WRP Units that occurs more than twelve months following the acquisition of such WRP Units by the General Partner.

(d)   In the event that the liquidation of the Partnership Interest of a Tendering Limited Partner, other than in connection with the liquidation of the Partnership, would trigger an obligation pursuant to Section 4(b) hereof to contribute an amount to the Partnership, then the Net Income of the Partnership for the portion of such year ending on the Specified Redemption Date with respect to such Tendering Limited Partner shall be specially allocated to such Tendering Limited Partner in the amount necessary to eliminate the deficit balance in its Capital Account remaining after all other adjustments for such year (including any adjustments made pursuant to Section 1.D of Exhibit B to the Agreement).

5.   Maintenance of Recourse Debt. The Partnership shall maintain unsecured liabilities as to which the creditor has recourse to the General Partner, including any such unsecured recourse liabilities (as to which the creditor has recourse to the General Partner in its capacity as General Partner) of any other entity that is allocable to the Partnership, in an aggregate amount not less than the amount necessary such that: (a) prior to the distribution by WRAM and WRH of WRP Units issued to them pursuant to the Contribution Agreement, the amount of Partnership recourse liabilities allocated to each of WRAM and WRH shall be not less than its DRO Amount; and (b) following the distribution by WRAM and WRH of WRP Units issued to them pursuant to the Contribution Agreement, the amount of Partnership recourse liabilities allocated directly or indirectly to all Scheduled Assignees and Second-Tier Partners shall be not less than the sum of their respective DRO Amounts and Partner Contribution Amounts. In making such determination, the Partnership shall take into account any and all allocations of Partnership recourse liabilities to other Partners by reason of any guarantees, indemnities, restoration obligations or other, similar arrangements with respect to any such Partners, and the liability by reason of any such Partner's status as a general partner of the Partnership.

6.   Amendments. Notwithstanding any provision in the Agreement to the contrary, the provisions hereof and of the Third Prior Amendment may be waived or amended or otherwise modified with the prior written consent of holders of more than fifty percent (50%) of the WRP Units at the time outstanding and without the consent of any other Limited Partner.

E-3 - 5

103

SCHEDULE 1

SCHEDULED ASSIGNEES AND SECOND-TIER PARTNERS

| Scheduled Assignees/<br>Second-Tier Partners | DRO Amount/<br>Partner Contribution<br>Amount |
|---|---|
| Runstad, H. Jon | (4,254,441) |
| Grousemount Associates | (1,770,549) |
| Norberg, Douglas E. | (1,551,346) |
| Nordby, Jon F. | (593,282) |
| WRAM Inc. | (2,704,060) |
| Allsop Inc. | (2,608,769) |
| Atkin, Jeffrey | (65,221) |
| Bacon, David L. | (50,842) |
| Blumenthal, Herman | (130,441) |
| Brinsley, John L. | (50,843) |
| Carr, Nancy | (64,912) |
| Cleveland T.E. | (65,222) |
| Crowl, John S. | (130,445) |
| Danz, Fredric A. | (608,394) |
| Dingfield, Barbara J. | (1,329,940) |
| Fischer, Robert W. | (50,845) |
| Flynn, Frank | (260,876) |
| Flynn, Michael T. | (2,420,379) |
| Foster, Thomas B. | (801,449) |
| Ganahl, Timothy H. | (130,446) |
| Green, Mark S. | (130,443) |
| Griffin, J. Michael | (130,444) |
| Grousemount Associates | (7,372,126) |
| Hanson, Peter C. | (65,220) |
| Heeseman, Tex | (50,845) |
| Helsell Partnership | (108,388) |
| Helsell, Robert M. | (280,007) |
| Isham, Martha E. | (183,943) |
| Kosmos, George C. Jr. | (282,280) |
| Leendersten, Howard V. | (738,833) |
| Margulis, Valerie L. | (426,318) |
| Morbeck, John P. | (130,445) |
| Newell, Christopher A. | (295,017) |
| Nolan, James L. | (50,845) |
| Norberg, Douglas E. | (3,518,589) |
| Nordby, Jon F. | (2,720,052) |
| Pappas, Theodore R. | (130,445) |
| Parker, Victor E. | (738,834) |

E-3 - 6

104

```
Penny, John D. Jr.                               (130,442)
Phelps, Margaret P.                              (256,141)
Pigott, James C. Family PS                       (608,393)
Rozner, Evelyne and Griffin, Matthew J.        (2,084,177)
Runstad, H. Jon                               (10,800,978)
Scheumann, Theiline P.                         (2,401,958)
Schuchart Partnership                          (9,286,144)
Schuchart, George S.                             (453,335)
Skinner, Jean Enerson                            (130,443)
Stansbury, M.E.                                   (65,220)
Stearns, Kathlyn                                 (295,017)
Stroum, Cynthia                                  (565,070)
Stuart, E. Hadley Jr.                          (1,825,169)
Stuart, Marian B.                              (1,216,770)
Taber, Andrew J.                                 (225,585)
Taylor, William C.                               (496,317)
Trainer, Stevens U.                            (1,033,889)
Wayte, Alan                                       (50,845)
Whalen, Jerome D.                                (190,605)
Windhover Associates                             (125,384)
Wright Runstad & Company                         (729,314)
Wyckoff, Ann P.                                (1,192,385)
Wyckoff, Paul                                     (54,446)
Wyckoff-Dickey, Sheila                            (43,181)
Wyman, David C.                                  (738,833)
Wyman, Polly R.                                  (434,094)
Ackerman G.N.                                      (3,723)
Ahearne T.                                         (2,241)
Aherne P.L.                                        (5,247)
Anderson D                                         (2,685)
Alston C.                                            (618)
Berg B.J.                                          (4,744)
Blanchard J.T.                                    (54,556)
Bohannon M.                                        (2,051)
Brandeberry M.E.                                  (17,141)
Bristol J.B.                                         (750)
Butler D.V.                                        (4,920)
Chapman F.L.                                      (41,845)
Clark B.                                           (2,716)
Coffey B.                                          (1,069)
Coulson E.R.                                       (4,464)
Cullen J.J.                                        (4,830)
Dean R.                                              (758)
Diercks R.J.                                      (63,006)
DIiJulio P.S.                                      (3,598)
Dixon T.E.                                         (1,736)
Ehrlichman P.S.                                   (21,820)
```

E-3 - 7

105

| | |
|---|---|
| Ellis W.H. | (3,525) |
| Erxleben W.C. | (1,755) |
| Filer T.J. | (2,006) |
| Fluhrer G.E. | (49,462) |
| Foreman L.L. | (2,914) |
| Foster T.B. | (139,362) |
| Gaffiney J.M. | (62,317) |
| Galloway J. | (1,129) |
| Gleaves C. | (3,066) |
| Graybeal L.E. | (2,638) |
| Hall, C.M. | (93,138) |
| Hendrickson J. | (3,209) |
| Hill G.R. | (4,135) |
| Howorth D.B. | (2,613) |
| Israel A.D. | (13,854) |
| Jackson D.E. | (3,120) |
| Keefe R.E. | (92,690) |
| Keehnel S.K. | (5,979) |
| Kennedy P.F. | (22,914) |
| Koslow A. | (759) |
| Lee L.N. | (2,365) |
| Loacker L.J. | (5,671) |
| Mack G. | (5,530) |
| Macleod J.W. | (2,749) |
| Magnano M.J. | (43,651) |
| Marcy D.E. | (2,531) |
| Martin L.C. | (3,080) |
| Matson D.D. | (116,291) |
| Mcconaughy B.A. | (4,758) |
| Mc Cullough J.C. | (267) |
| Mellem R. | (2,569) |
| Morrow A.J. | (3,440) |
| Murray M.X. | (14,101) |
| Myklebust R.A. | (1,123) |
| Nielsen M.J. | (180) |
| Noll J.B. | (25,934) |
| Nomellini C.P. | (57,947) |
| Palmer D.S. | (50,680) |
| Pepper L.H. | (42,303) |
| Prince D.R. | (4,289) |
| Redman A.M. | (41,769) |
| Rheaume W.J. | (2,778) |
| Rieke P.V. | (2,881) |
| Roberts K.E. | (6,033) |
| Runstad J.M. | (31,986) |
| Russell B.L. | (5,855) |
| Sandler M.D. | (6,704) |

E-3 - 8

106

```
Schweet L.S.                                    (1,200)
Seidel R.                                       (1,262)
Serkin B.P.                                     (1,794)
Silvey M.                                       (3,025)
Spitzer H.                                      (5,318)
Stansbury M.E.                                  (9,304)
Stone V.R.                                     (44,495)
Sweeney D.B.                                     (3,833)
Thieme D.                                        (2,631)
Tonkin W.G.                                      (4,370)
Utevsky D.                                       (5,089)
Vaska M.                                         (2,240)
Voorhees L.R.                                    (5,427)
Washburn J.T.                                    (2,868)
Whalen J.D.                                     (80,770)
Whiteley K.                                      (8,925)
Whitford J.P.                                   (15,963)
Wilson D.R.                                      (6,527)
Winberry P.B.                                    (2,609)
Winter D.S.                                      (3,114)
Wolfe C.R.                                       (1,417)
Wright C.W.                                      (3,295)
Total                                       (73,887,963)
                                            ==========
```

E-3 - 9

107

EXHIBIT E-4

(GALBREATH AGREEMENT)

BACKGROUND

On April 21, 1998, Galbreath-Denver Limited Partnership, an Ohio limited partnership ("Galbreath") and 1560 Broadway Partnership, a Colorado general partnership ("Broadway") (collectively the "Additional Limited Partners") each was issued 1,684 Class B Units (referred to as the "Galbreath and Broadway Units"). In connection with the issuance of the Galbreath and Broadway Units, a Prior Addendum dated as of April 21, 1998, to the Original Partnership Agreement, which set forth specific agreements regarding certain additional rights and obligations of the Additional Limited Partners, was executed. Such specific agreements are described below.

All capitalized terms used in this Exhibit E-4 and not otherwise defined shall have the meanings assigned in the Agreement.

SPECIFIC AGREEMENTS

Notwithstanding any other provision of the Agreement to the contrary, upon liquidation of the Partnership, each of the Additional Partners shall be required to contribute to the Partnership the deficit balance in such party's Capital Account computed in accordance with Sections 1.752-2(b)(1) and (2) of the Regulations; provided, however, that such contribution obligation shall not exceed the amount by which the recourse obligations of the Partnership exceed the assets of the Partnership available to satisfy such recourse obligations and shall not exceed $4,154,000 with respect to Galbreath and the lesser of the deficit balance in Broadway's Capital Account in "owner" at the date of "closing" reduced by any income allocated to Broadway after the date of Closing or $10,500,000 with respect to Broadway (collectively, the "Deficit Obligation"). Each of the Additional Limited Partners specifically waives any right of contribution or subrogation with respect to such Deficit Obligation and neither the General Partner nor any other Partner or other Person shall be required to reimburse the Additional Limited Partners for such contributions. Upon payment of such Deficit Obligation, each Additional Limited Partner's Capital Account shall be credited with such payment. Amounts paid to the Partnership pursuant to the Deficit Obligation shall be used to satisfy the recourse obligations of the Partnership.

Upon the sale, redemption, conversion or other disposition of the Galbreath and Broadway Units received by any Additional Limited Partner, the Deficit Obligation of such Additional Limited Partner shall be reduced in an amount equal to the percentage of the Galbreath and Broadway Units owned by such Additional Limited Partner which were sold, redeemed, converted or otherwise disposed of by such Additional Limited Partner, and upon the sale, redemption, conversion or other disposition of all the Galbreath and Broadway Units received by any Additional Limited Partner, the Deficit Obligation shall be terminated with respect to such Additional Limited Partner. Nothing in this Exhibit E-4

108

shall in any way effect the sale, exchange or conversion rights of the Additional Limited Partners under the Agreement or this Exhibit E-4.

In the case of Galbreath only, certain partners of Galbreath shall execute and deliver to the Partnership, and the Partnership shall accept, a Guarantee in the form agreed to by such Galbreath partners and the Partnership.

E-4 - 2

109

EXHIBIT E-5

(PALO ALTO SQUARE AGREEMENT)

BACKGROUND

Pursuant to a closing under that certain Contribution Agreement dated September 28, 1999, by and between Palo Alto Square Limited Partnership, an Illinois limited partnership, ("Contributor") and the General Partner (the "Contribution Agreement"), Contributor was issued 1,012,623 Class B Units (referred to as the "Contributor Units") in exchange for certain real property interests described in the Contribution Agreement (the "Property"). Contributor has assigned the Contributor Units to the Equity Holders (as defined below). In connection with the issuance of Contributor Units, the Tenth Prior Amendment to the Original Partnership Agreement, which set forth specific agreements regarding certain additional rights and obligations of the Contributor and its constituent partners as set forth on Schedule 1 to such Tenth Prior Amendment (the "Equity Holders"), was executed. Such specific agreements are described below.

All capitalized terms used in this Exhibit E-5 and not otherwise defined shall have the meanings assigned in the Agreement.

SPECIFIC AGREEMENTS

1. Right to Assign. Notwithstanding any other provision of this Exhibit E-5 or of the Agreement, the Equity Holders shall have the right to assign all or any portion of their Contributor Units, together with any and all other rights of the Equity Holders pursuant to this Exhibit E-5 or the Agreement, to one or more of the constituent partners or shareholders, members, partners or beneficiaries of constituent partners of the Equity Holders as of October 1, 1999, whether direct or indirect, without the need for the consent of the General Partner or Limited Partners and without being subject to the right of first refusal set forth in Section 11.3.A(a) of the Agreement, but in each case subject to the restrictions and conditions set forth in Sections 11.3.C, 11.3.D, 11.3.E, 11.6.E and 11.6.F of the Agreement. Upon the delivery of written notice of such an assignment to the General Partner, each assignee of Contributor Units pursuant to the immediately preceding sentence shall be admitted to the Partnership as a Substituted Limited Partner owning the Contributor Units so assigned and having all of the rights of a Limited Partner under the Agreement and this Exhibit E-5, subject only to such assignee executing and delivering to the Partnership an acceptance of all of the terms and conditions of the Agreement and such other documents or instruments as the General Partner may reasonably require to effect such admission, in accordance with Section 11.4.B of the Agreement. Each permitted assignee of any of the Contributor Units, issued to the Contributor pursuant to the Contribution Agreement and subsequently transferred to the Equity Holders, that is admitted as a Substituted Limited Partner in accordance with this Section 1 or Article XI of the Agreement, for so long as such Person owns any such Contributor Units, is referred to in this Exhibit E-5 as an "Indirect Equity Holder." Upon satisfaction of the condition described in the second sentence of this Section 1, the General Partner shall update the Partner Registry in the manner described in Section 11.4.C of the Agreement. For purposes of Section 8.6 of the Agreement, each Equity Holder and Indirect

110

Equity Holder shall be entitled to exercise its right to require the Partnership to redeem all or any portion of the Contributor Units assigned to it by an Equity Holder at any time on or after October 1, 1999.

2.    Adjustments to Carrying Values. (a) The Carrying Values of the Assets of the Partnership shall be adjusted in accordance with the procedures described in Section 1.D of Exhibit B to the Agreement; provided, however, that in order to minimize the administrative burden associated with the adjustments required by this Section 2(a) in connection with the distribution of the Cash Amount to an Equity Holder or an Indirect Equity Holder, the Partnership shall make the adjustments to the Carrying Values of the Partnership's assets (and the resulting adjustments to the Capital Accounts of the Partners) only upon the happening of the most material event during the calendar year that is described in Section 1.D(2) of Exhibit B to the Agreement (the "Annual Adjustment") and; provided further that upon the distribution of the Cash Amount to an Equity Holder or an Indirect Equity Holder or, at the option of the General Partner, upon the occurrence of any other event described in Section 1.D(2) of Exhibit B to the Agreement, that occurs during any year other than as of the date of the Annual Adjustment, the Partnership shall, at the time of such distribution, make adjustments to the Carrying Values of the Partnership's assets in accordance with the procedures described in Section 1.D of Exhibit B to the Agreement for purposes of adjusting the Capital Account of an Equity Holder, or such Indirect Equity Holder who has exercised his Redemption Right or such other affected Partner, but no such adjustments shall be necessary at such time with respect to the Capital Account balances of Partners who remain Partners through the date of the Annual Adjustment or are otherwise not directly affected by any such other event.

(b)    Any determination of the fair market value of Partnership assets pursuant to Section 1.D of Exhibit B to the Agreement (for purposes of calculating Unrealized Gain or, Unrealized Loss), with respect to adjusting the Carrying Values of Partnership assets in connection with the exercise of Redemption Rights by an Equity Holder or any Indirect Equity Holder shall be made by assuming that the aggregate fair market value of all Partnership assets is equal to the aggregate Cash Amount that would be distributed by the Partnership if all Partnership Units held by all Partners (including the General Partner) were redeemed in exchange for the Cash Amount with respect to each such Partnership Unit at such time, provided, however, such valuation methodology shall not be utilized for purposes of determining the fair market value of the Partnership's assets with respect to any such exercise of Redemption Rights in contemplation of an assignment by or reorganization of the Partnership for the benefit of creditors and any liquidation of the Partnership related thereto or following the filing by (or in contemplation of a filing) by the Partnership of a case under Title 11 of the U.S. Code.

3.    Allocations. Notwithstanding the provisions of Section 2.C of Exhibit C to the Agreement, for purposes of allocating, items of income, gain, loss and deduction with respect to the Property in the manner required by Section 704(c) of the Code, the Partnership shall employ, and shall cause any entity controlled by the Partnership which holds title to any of the Property to employ the "traditional method" as set forth in Regulation Section 1.704-3(b).

E-5 - 2

111

    4.    Obligation to Restore Deficit Capital Accounts. (a) For purposes of this Section 4, the following terms shall have the meanings set forth below:

    (i) "Protected Amount" means, with respect to any Protected Partner, an amount equal to (i) the taxable gain, if any, that would be realized by such Protected Partner if such Partner were to dispose of its Partnership Interests for no consideration other than the release or deemed release of liabilities of the Partnership assumed by or otherwise allocable to such Partner under Code Section 752, as such hypothetical gain is determined from time to time, less (ii) such Partner's share of "qualified nonrecourse financing" as defined in Code Section 465(b)(6) and the Regulations thereunder, as such share is determined from time to time in accordance with Regulations Section 1.752-3(a). The Protected Amount allocable to any Protected Partner may be modified from time to time by an amendment to the Agreement or by execution of a written instrument by and between such Protected Partner and the General Partner, acting on behalf of the Partnership and without the prior written consent of any other Partner (whether or not Protected Partners).

    (ii) "Protected Partner(s)" means that or those Limited Partner(s) designated as Protected Partner(s) on Exhibit A attached to the Tenth Prior Amendment, as such designation may be modified from time to time by the General Partner, whether by express amendment to the Agreement or by execution of a written instrument by and between any Protected Partner(s) and the General Partner, acting on behalf of the Partnership and without the prior consent of other Limited Partners (whether or not Protected Partners). For purposes hereof, any successor, assignee, or transferee of Partnership Interests from a Protected Partner, which successor, assignee or transferee determines its basis in such Units by reference to the basis of the predecessor, assignor or transferor Protected Partner, shall be considered a Protected Partner.

    (b)    Notwithstanding any provision of the Partnership Agreement to the contrary (including, without limitation, the second sentence of Section 13.3 of the Partnership Agreement), upon liquidation of the Partnership or upon the liquidation of the Partnership Interest of a Protected Partner, such Protected Partner whose interest is being liquidated shall contribute to the Partnership in accordance with Treasury Regulation Section 1.704-1(b)(2)(ii)(b)(2), the deficit balance, if any, in its Capital Account, calculated after the allocation for such year of all items of Net Income, Net Losses, Gross Income and Unrealized Gain or Unrealized Loss allocated in accordance with Section 6.1 of the Agreement, Section 1.D of Exhibit B to the Agreement, provided, however, that in no event shall such contribution obligation for any Protected Partner exceed such Protected Partner's Protected Amount. The obligation created pursuant to this Section 4(b) shall be for the benefit of the Partnership, the General Partner, the creditors of the Partnership or any other person to whom any debts, liabilities or obligations are owed by (or who otherwise has any claim against) the Partnership or the General Partner in its capacity as

E-5 - 3

112

general partner of the Partnership and shall be enforceable by such parties. Each Protected Partner unconditionally and irrevocably waives any subrogation, reimbursement or similar rights to which it might otherwise be entitled as the result of its performance with respect to the obligation pursuant to this Section 4(b), whether such rights arise with respect to the Partnership, another Partner of the Partnership or a third party; provided, however, that the General Partner shall in all events be entitled to enforce the contribution obligation of a Protected Partner undertaken pursuant to Section 4(b). Notwithstanding anything herein to the contrary, the obligation of a Protected Partner to contribute amounts pursuant to this paragraph shall continue in full force and effect in accordance with the terms hereof until one year following the transfer or other disposition by such Protected Partner of its Partnership Interests unless the Partnership and such Protected Partner agree otherwise. Unless expressly agreed by the Partnership and the affected holders of Contributor Units or any other holder of Contributor Units who is not a Protected Partner shall have any obligation to contribute amounts to the Partnership.

5.    Amendments. Notwithstanding any provision in the Agreement to the contrary, the provisions of the Tenth Prior Amendment may be waived or amended or otherwise modified with the prior written consent of holders (being either the Equity Holders and/or the Indirect Equity Holders) of more than seventy-five percent (75%) of the Contributor Units at the time outstanding and without the consent of any other Limited Partner.

E-5 - 4

113

EXHIBIT E-6

(CORNERSTONE AGREEMENT)

BACKGROUND

In connection with the closing of the merger of Cornerstone Properties Limited Partnership ("Cornerstone Partnership") with and into the Partnership on June 19, 2000, (the "Cornerstone Merger") pursuant to the Agreement and Plan of Merger, dated as of February 11, 2000, as amended, among the General Partner, the Partnership, Cornerstone Properties Inc. and Cornerstone Partnership (the "Merger Agreement"), certain former limited partners of Cornerstone Partnership who became Limited Partners as a result of the Cornerstone Merger (referred to as "Former Cornerstone Limited Partners") have elected to become Protected Partners and, as a group, the Former Cornerstone Limited Partners have been given the right to increase their Protected Amount after the closing of the Cornerstone Merger, subject to a specified aggregate dollar limitation. In addition, the Partnership and Cornerstone Partnership entered into certain other agreements with respect to tax matters that affect the Former Cornerstone Limited Partners. The specific agreements between the Partnership and Cornerstone Partnership with respect to these various matters are described below.

All capitalized terms used and not otherwise defined in this Exhibit E-6 shall have the meanings assigned in the Agreement.

SPECIFIC AGREEMENTS

1. Election by Certain Former Cornerstone Limited Partners to Undertake Deficit Restoration Obligation. Each Former Cornerstone Limited Partner who, prior to the closing of the Cornerstone Merger, had entered into an agreement with Cornerstone Partnership to bear the economic risk of loss as to a portion of Cornerstone Partnership's recourse indebtedness by undertaking the obligation to restore a portion of its negative capital account balance upon liquidation of such Former Cornerstone Limited Partner's interest in Cornerstone Partnership was given the opportunity to become a Protected Partner with a Protected Amount in an amount equal to the maximum amount such Former Cornerstone Limited Partner was obligated to restore to Cornerstone Partnership immediately prior to the closing of the Cornerstone Merger; provided, however, that except as set forth in Paragraphs 2 and 3, below, no Former Cornerstone Limited Partner has the right to increase its Protected Amount following the Cornerstone Merger. The Former Cornerstone Limited Partners who have elected to become Protected Partners under such provision of the Merger Agreement, along with their specified Protected Amounts as of the closing of the Cornerstone Merger, are set forth on Schedule 1 to this Exhibit E-6. Each such election by a Former Cornerstone Limited Partner shall become effective upon the later of receipt thereof by the General Partner or the "effective time" of the merger of Cornerstone Partnership into the Partnership. Upon becoming effective, each such election by a Former Cornerstone Limited Partner pursuant to this Section 1 or any other provision of this Exhibit E-6 shall be irrevocable, cannot be reduced, and shall be binding upon successive transferees of the Former Cornerstone Limited Partners, except as provided in Section 13.3.D of the Agreement.

114

2. Election by Former Cornerstone Limited Partners to Increase Protected Amount. Notwithstanding the proviso in Paragraph 1, above, Former Cornerstone Limited Partners may, at any time following the Cornerstone Merger, elect to become Protected Partners and/or increase their Protected Amounts (as determined immediately prior to the Cornerstone Merger), as a group, by an aggregate amount of up to $50 million, reduced by the amount of any increases to the amounts that such former limited partners of Cornerstone Partnership were obligated to restore to Cornerstone Partnership that occurred during the period commencing on February 11, 2000, and ending at the closing of the Cornerstone Merger.

3. Effect of Other Agreements With Former Cornerstone Limited Partners. Pursuant to the Merger Agreement, the General Partner, the Partnership, Cornerstone Properties Inc. and Cornerstone Partnership entered into an Assignment and Assumption Agreement, dated as of June 19, 2000, pursuant to which the Partnership assumed certain obligations of Cornerstone Partnership made pursuant to certain tax protection agreements (the "Cornerstone Tax Protection Agreements") described on Schedule A to such Assignment and Assumption Agreement, a copy of which is attached as Schedule 2 to this Exhibit E-6. To the extent that the Cornerstone Tax Protection Agreements included a right to enter into deficit restoration obligations with respect to Cornerstone Partnership, such Former Cornerstone Limited Partners who are beneficiaries of such Cornerstone Tax Protection Agreements are Protected Partners and have Protected Amounts as provided in the Cornerstone Tax Protection Agreements. Notwithstanding the limitations in Paragraphs 1 and 2 above, the Protected Partners who are beneficiaries of the Cornerstone Tax Protection Agreements shall have the right to increase their Protected Amounts if and to the extent provided in the applicable Cornerstone Tax Protection Agreement and the amount of any such increase shall not be taken into account in applying the limitation in Paragraph 2. The Cornerstone Tax Protection Agreements pursuant to which certain Former Cornerstone Limited Partners have the right to become Protected Partners or to increase their specified Protected Amounts (subject to the limitations noted therein) are listed on Schedule 3 to this Exhibit E-6.

4. Request to Increase Amount of Deficit Restoration Obligation. The Partnership shall consider in good faith a request from a Former Cornerstone Limited Partner to become a Protected Partner and/or to increase its Protected Amount, as applicable, from time to time after the Cornerstone Merger if such Former Cornerstone Limited Partner shall provide information from its professional tax advisor satisfactory to the Partnership showing that, in the absence of such increased Protected Amount, such Limited Partner likely would not be allocated from the Partnership sufficient indebtedness under Section 752 of the Code and the at-risk provisions under Section 465 of the Code to avoid the recognition of gain (other than gain required to be recognized by reason of actual cash distributions from the Partnership). The Partnership and its professional tax advisors shall cooperate in good faith with such Former Cornerstone Limited Partner and its professional tax advisor to provide such information regarding the allocation of the Partnership liabilities and the nature of such liabilities as is reasonably necessary in order to determine the Former Cornerstone Limited Partner's adjusted tax basis in its Partnership Interest and at-risk amount. In deciding whether or not to grant such a request, the Partnership shall be entitled to take into account all factors related to the Partnership, including, without limitation, the existing and anticipated debt structure of

E-6 - 2

115

the Partnership, the tax situations of all other Partners, including the General Partner (individually and as a group), and the effect that granting such a request might have on their tax situation, and the anticipated long-term business needs of the Partnership. The Partnership's only obligation with respect to any such request from a Former Cornerstone Limited Partner pursuant to this Paragraph 4 shall be to act in good faith. In the event the Partnership fails to act in good faith with respect to any such request, the exclusive remedy of the Former Cornerstone Limited Partner who made such request shall be an action for specific performance, with no entitlement to monetary damages.

5. Manner of Electing to Become a Protected Partner or To Increase Protected Amount. A Former Cornerstone Limited Partner who pursuant to the rights set forth under the other Paragraphs of this Exhibit E-6, wishes to become a Protected Partner or, if already a Protected Partner, to increase its Protected Amount, shall provide a written notice to the General Partner specifying the desired Protected Amount. If such election is made pursuant to Paragraph 2, such election shall become effective upon the receipt thereof by the General Partner unless (i) the General Partner determines that the limitation set forth in Paragraph 2 would be exceeded by reason of such election, or (ii) the General Partner reasonably determines, based on the advice of its tax advisors and after consulting with the Former Cornerstone Limited Partner and its tax advisors, that the amount specified in such Former Cornerstone Limited Partner's election substantially exceeds the amount necessary to cause such Former Cornerstone Limited Partner to be allocated sufficient Partnership liabilities under Section 752 of the Code (taking into account the effect of anticipated reductions in Partnership debt on such Former Cornerstone Limited Partner's allocable share of Partnership liabilities) to cover such Former Cornerstone Limited Partner's "negative tax capital account" and reasonably projected changes therein. If such election is pursuant to a Cornerstone Tax Protection Agreement, such election shall become effective upon the receipt thereof by the General Partner unless the General Partner reasonably determines, based on the advice of its tax advisors and after consulting with the Former Cornerstone Limited Partner and its tax advisor, that such Former Cornerstone Limited Partner does not have the right to undertake such election without the consent of the General Partner. If such election is not pursuant to Paragraph 2 or a Cornerstone Tax Protection Agreement (or such is election does not become effective pursuant to the provisions of one of the two preceding sentences), such election shall be deemed to be a request pursuant to Paragraph 4 of this Exhibit E-6 and shall become effective only upon approval by the General Partner in accordance with the provisions of Paragraph 4. Upon becoming effective, such election shall be irrevocable, cannot be reduced, and shall be binding upon successive transferees of the Former Cornerstone Limited Partner except as provided in Section 13.3.D of the Agreement.

6. No Obligation of the Partnership to Maintain Recourse Debt. Notwithstanding any obligations of the Partnership referred to in this Exhibit E-6, the Partnership shall not be obligated to maintain any level of indebtedness that qualifies as a Recourse Liability or Partner Nonrecourse Debt in excess of the amounts otherwise specifically required to be maintained under the Cornerstone Tax Protection Agreements assumed by the Partnership pursuant to the Merger Agreement.

7. Amendments of Exhibit E; Designation as Part II Protected Partners. All Protected Partners and their respective Protected Amounts as provided in this Exhibit

E-6 - 3

116

E-6 shall be reflected on Exhibit E, which shall be amended from time to time as necessary to reflect any additional Protected Partners and/or increases in Protected Amounts made pursuant to paragraphs 2, 3, or 4, above. Former Cornerstone Partnership Limited Partners who are or become Protected Partners pursuant to the provisions of this Exhibit E-6 shall be designated on Exhibit E as Part II Protected Partners; provided, however, that any Former Cornerstone Limited Partner who is only obligated to restore a deficit in its capital account upon liquidation of the Partnership pursuant to a Cornerstone Tax Protection Agreement shall be designated on Exhibit E as a Part I Protected Partner.

       8. Section 704(c) Method. Notwithstanding Paragraph 2.C. of Exhibit C, the Partnership shall use the "traditional method" under Regulations Section 1.704-3(b) for purposes of making allocations under Section 704(c) of the Code with respect to each property in which Cornerstone Partnership owns a direct or indirect interest at the time of the Cornerstone Merger (the "Cornerstone Properties") to take into account the Book-Tax Disparities as of the effective time of the Cornerstone Merger with respect to the Cornerstone Properties, with no "curative allocations" to offset the effect of the "ceiling rule," except to the extent that the Partnership expressly would be required to use a different method under a Cornerstone Tax Protection Agreement assumed by the Partnership pursuant to the Merger Agreement. The 704(c) Values of the Cornerstone Properties shall be as determined by agreement between Cornerstone Partnership and the Partnership prior to the effective time of the Cornerstone Merger, or in the absence of such agreement, as determined by the General Partner using such reasonable method of valuation as it shall adopt.

       9. Allocations of "Tier 3" Nonrecourse Liabilities Pursuant to Regulations Section 1.752-3(a)(3). Unless, and only to the extent, expressly provided otherwise in the Cornerstone Tax Protection Agreements assumed by the Partnership pursuant to the Merger Agreement, and notwithstanding Section 6.1.C. of the Agreement, the Partnership shall determine in its reasonable discretion the method to be used for allocating "excess nonrecourse liabilities" of the Partnership pursuant to Regulations Section 1.752-3(a)(3) following the Cornerstone Merger, provided that (i) the Partnership shall not use with respect to the Former Cornerstone Limited Partners a method that is less favorable than the method used by the Partnership with respect to the other Limited Partners of the Partnership who are not parties to an express agreement specifying a particular method to be used for such purposes, and (ii) in the case of a Former Cornerstone Limited Partner who, prior to the Cornerstone Merger, had been specially allocated a portion of a Cornerstone Partnership nonrecourse liability secured by a property with respect to which such Cornerstone Partner has a built-in gain under Section 704(c) of the Code to take into account such Former Cornerstone Limited Partner's share of such built-in gain that was not taken into account in making the allocation of such liability by Cornerstone Partnership under Regulations Section 1.752-3(a)(2), the Partnership shall continue such method of allocating such liability following the Cornerstone Merger.

E-6 - 4

117

FORMER CORNERSTONE LIMITED PARTNERS
WHO HAVE ELECTED TO BECOME PROTECTED PARTNERS
PURSUANT TO SECTION 1 OF EXHIBIT E-6

| NAME OF FORMER CORNERSTONE LIMITED PARTNER: | 2/11/00 RECOURSE DEBT AMOUNT: | 6/19/00 PROTECTED AMOUNT: |
|---|---|---|
| The Jean Johnson Trust | $11,910.00 | - |
| Gilbert E. Bovet | - | $240,000.00 |
| Webcor Investment Company | - | $250,000.00 |
| Nora E. Wagner Declaration of Trust dated July 27, 1989 | - | $6,500.00 |
| Jill Benitez | $2,800.00 | $2,800.00 |
| Michael D. and Jean C. Couch | $25,000.00 | $25,000.00 |
| Howard E. Wolf | $58,023.00 | $60,000.00 |
| The McMichael Living Trust u/a dated 12/88 | $35,000.00 | $65,000.00 |
| The Rosser Brophy Edwards & Gloria Sedelmeyer Edwards Revocable Trust UTA dated 12/18/91 | $1,185,000.00 | $1,100,000.00 |
| The Boyd Revocable Trust UTA dated 11/6/91 | $1,185,000.00 | $1,100,000.00 |
| The Peggy H. Wheatcroft Trust UTA dated 3/22/84 | $575,000.00 | $575,000.00 |
| Ronald G. Wheatcroft | $625,000.00 | $600,000.00 |
| The Mark T. & Elizabeth W. Gates Living Trust u/a dated 9/10/93 | $6,800,000.00 | $6,200,000.00 |
| James M. Pollock 1977 Revocable Trust | $55,000.00 | $17,000.00 |
| The Lennon J. and Annie Farrell McAdams Trust | $25,000.00 | $9,000.00 |
| Webcor Builders, Inc. | $1,750,000.00 | $1,950,000.00 |
| The Jeffrey A. Morris Property Trust | $780,000.00 | $725,000.00 |
| The Diane L. Morris Property Trust | $780,000.00 | $725,000.00 |
| The James B. Morris Property Trust | $780,000.00 | $725,000.00 |
| The John G. Morris Property Trust | $780,000.00 | $725,000.00 |

E-6 - 5

118

| NAME OF FORMER CORNERSTONE LIMITED PARTNER: | 2/11/00 RECOURSE DEBT AMOUNT: | 6/19/00 PROTECTED AMOUNT: |
|---|---|---|
| Ira Michael Heyman | $25,000.00 | $57,000.00 |
| The Spiegel Family Trust FBO Marilyn J. Spiegel | $13,491.00 | $5,000.00 |
| Hugh Banks | $103,000.00 | $100,000.00 |
| The Gypsy Hershey Horsted Trust u/t/a dated 1/4/89 | $103,000.00 | $103,000.00 |
| The Reed and Margaret Punsten Primary Trust u/a 8/23/94 | - | $72,000.00 |
| Timothy S. Mayotte | $75,000.00 | - |
| The Lavenstein Family Trust | - | $160,000.00 |
| Paul Denison, Trustee u/t/a dated 4/6/76 | - | $1,000,000.00 |
| Roland E. Brandel | - | $57,000.00 |
| David E. Nelson | - | $60,000.00 |
| Miller Ream | - | $1,500,000.00 |
| Robinson Family LLC | - | $500,000.00 |
| The Meagan McNeill Wilson Trust u/t/a 2/1/84 | - | $76,000.00 |
| The Eric Stanley Wilson Trust u/t/a 2/1/84 | - | $76,000.00 |
| The Peter Metcalf Wilson Trust u/t/a 2/1/84 | - | $76,000.00 |
| Bonnie W. Leyerzaph | - | $55,000.00 |
| John W. Leyerzaph | - | $55,000.00 |
| The Villano Family Trust u/t/a 1/4/86 | - | $50,000.00 |
| The Wales Family Trust | - | $25,000.00 |
| David R. Word | - | $2,750,000.00 |
| Roger C. and Carmen Stuhlmuller | - | $104,000.00 |
| Jim Arce | - | $4,500.00 |
| William Wilson III | $3,000,00.00 | $9,000,000.00 |
| TOTAL | $18,697,224.00 | $30,985,800.00 |

E-6 - 6

119

## ASSIGNMENT AND ASSUMPTION AGREEMENT

(Tax Protection Agreements)

This ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement") is made and entered into on June 19, 2000, between Cornerstone Properties Inc., a Nevada corporation ("Cornerstone"), Cornerstone Properties Limited Partnership, a Delaware limited partnership ("Cornerstone Partnership"), Equity Office Properties Trust, a Maryland real estate investment trust ("EOP"), and EOP Operating Limited Partnership, a Delaware limited partnership ("EOP Partnership").

RECITALS

WHEREAS, Cornerstone, Cornerstone Partnership, EOP and EOP Partnership are parties to the Agreement and Plan of Merger dated as of February 11, 2000, as amended (the "Merger Agreement"), pursuant to which (i) Cornerstone will merge with and into EOP and (ii) Cornerstone Partnership will merge with and into EOP Partnership;

WHEREAS, Cornerstone Partnership and/or Cornerstone is a party to each of the agreements described on Schedule A attached hereto (collectively, the "Cornerstone Tax Protection Agreements");

WHEREAS, in connection with the transactions contemplated by the Merger Agreement and as required by Section 5.14 of the Merger Agreement, Cornerstone Partnership and Cornerstone desire to assign to EOP Partnership and EOP any and all of Cornerstone Partnership's and Cornerstone's rights and interests under the Cornerstone Tax Protection Agreements (such rights and interests hereinafter referred to as the "Cornerstone Rights") in exchange for EOP Partnership's and EOP's assumption of any and all of Cornerstone Partnership's and Cornerstone's remaining obligations under the Cornerstone Tax Protection Agreements (such obligations hereinafter referred to as the "Cornerstone Obligations"); and

WHEREAS, EOP Partnership and EOP desire to accept the Cornerstone Rights and to assume the Cornerstone Obligations;

NOW, THEREFORE, in consideration of the mutual agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

AGREEMENT

1.    Assignment of Cornerstone Rights and Assumption of Cornerstone Obligations. Cornerstone Partnership and Cornerstone hereby assign to EOP Partnership

E-6 - 7



120

and EOP the Cornerstone Rights, and EOP Partnership and EOP hereby accept the foregoing assignment and assume and agree to perform any and all of the Cornerstone Obligations.

       2.      Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute only one instrument.

    [Remainder of Page Intentionally Left Blank]

E-6 - 8

121

        IN WITNESS WHEREOF, the parties hereto have executed this
Agreement as of the date first above written.


                              CORNERSTONE PROPERTIES INC.


                              By:
                                 -------------------------------------
                              Name:       Kevin P. Mahoney
                              Title:   Senior Vice President and
                                       Chief Financial Officer

                              CORNERSTONE PROPERTIES
                              LIMITED PARTNERSHIP

                              By:      Cornerstone Properties Inc.,
                                       its general partner

                              By:
                                 -------------------------------------
                              Name:       Kevin P. Mahoney
                              Title:   Senior Vice President and
                                       Chief Financial Officer


                         E-6 - 9

122

EQUITY OFFICE PROPERTIES TRUST

By:
    --------------------------------------
Name:       Stanley M. Stevens
Title:      Executive Vice President,
Chief       Legal Counsel and Secretary

EOP OPERATING LIMITED PARTNERSHIP

By:  Equity Office Properties Trust,
     its general partner

    By:
        --------------------------------
    Name:       Stanley M. Stevens
    Title:  Executive Vice President,
    Chief       Legal Counsel and Secretary

E-6 - 10

123

Schedule A

CORNERSTONE TAX PROTECTION AGREEMENTS

1.    First Amendment to Agreement of Limited Partnership of Cornerstone Properties Limited Partnership, dated as of January 29, 1997 (related to Corporate 500, Phase I, and Corporate 500, Phase II).

2.    Second Amendment to Agreement of Limited Partnership of Cornerstone Properties Limited Partnership, dated as of April 28, 1998.

3.    Third Amendment to Agreement of Limited Partnership of Cornerstone Properties Limited Partnership, dated as of June 3, 1998 (related to 1299 Ocean Avenue, Santa Monica, California and 201 California Street, San Francisco, California), and related Tax Reimbursement Agreement, dated as of June 3, 1998, by and among Cornerstone Properties Limited Partnership, the New Partners named therein and William L. Tooley.

4.    Fifth Amendment to Agreement of Limited Partnership of Cornerstone Properties Limited Partnership, dated as of January 21, 2000 (related to 400 Capital Mall, Sacramento, California).

5.    Contribution Agreement and Agreement and Plan of Merger, dated as of June 22, 1998, as amended, by and among Cornerstone Properties Inc., Cornerstone Properties Limited Partnership, William Wilson & Associates and the entities listed on Schedule I thereto.

6.    Letter, dated September 21, 1998, from Cornerstone Properties Inc. and Cornerstone Properties Limited Partnership to O'Brien-Kreitzberg & Associates.

7.    Letter, dated September 11, 1998, from Cornerstone Properties Inc. and Cornerstone Properties Limited Partnership to Bixby Ranch Company.

8.    Agreement to Contribute, dated as of April 28, 1998, by and between One Memorial Drive Limited Partnership, The Prudential Insurance Company of America, Cornerstone Properties Limited Partnership and One Memorial Cornerstone LLC.

E-6 - 11

124

CORNERSTONE TAX PROTECTION AGREEMENTS PURSUANT TO WHICH
CERTAIN FORMER CORNERSTONE LIMITED PARTNERS
HAVE THE RIGHT TO BECOME PROTECTED PARTNERS
SECTION 3 OF EXHIBIT E-6

1.      Third Amendment to Agreement of Limited Partnership of Cornerstone
        Properties Limited Partnership, dated as of June 3, 1998 (related to
        1299 Ocean Avenue, Santa Monica, California and 201 California Street,
        San Francisco, California), and related Tax Reimbursement Agreement,
        dated as of June 3, 1998, by and among Cornerstone Properties Limited
        Partnership, the New Partners named therein and William L. Tooley.

2.      Contribution Agreement and Agreement and Plan of Merger, dated as of
        June 22, 1998, as amended, by and among Cornerstone Properties Inc.,
        Cornerstone Properties Limited Partnership, William Wilson & Associates
        and the entities listed on Schedule I thereto.

E-6 - 12

125

EXHIBIT E-7

(ECH-NORTH LOOP/THEATER DISTRICT PARKING AGREEMENT)

BACKGROUND

On August 21, 2000, in connection with the closing of the Contribution Agreement by and between North Loop-Tremont Partnership, an Illinois partnership, ("Contributor"), the Partnership, ECH-Chicago Parking Limited Partnership ("ECH"), and the Constituent partners of Contributor (the "Constituent Partners"), dated November 6, 1997 and the Settlement Agreement and Release of Claims by and between the Partnership, ECH, Contributor and the Constituent Partners, Contributor received 91,406 Class B units of limited Partnership Interest in the Partnership (the "ECHNLT Units") in exchange for its limited partnership interest in ECH-North Loop/Theater District Parking Limited Partnership. In connection with the issuance of the ECHNLT Units, the First Amendment to the Agreement (the "FIRST AMENDMENT") was executed adding this Exhibit E-7 to the Agreement, setting forth specific agreements regarding additional rights and obligations of the Contributor with respect to the ECHNLT Units. Such specific agreements are set forth below.

All Capitalized terms used and not otherwise defined in this Exhibit E-7 have the meanings assigned in the Agreement.

SPECIFIC AGREEMENTS

1.      ADMISSION TO PARTNERSHIP. Contributor is hereby admitted to the Partnership as an Additional Limited Partner in accordance with Section 12.2 of the Agreement and hereby agrees to become a party to the Agreement and to be bound by all of the terms, conditions and other provisions of the Agreement, including, but not limited to, the power of attorney set forth in Section 15.11 of the Agreement.

2.      RIGHT TO ASSIGN. Notwithstanding any other provision of this Exhibit E-7, the Agreement or the First Amendment, Contributor shall have the right to assign at any time and from time to time all or any portion of its ECHNLT Units, together with any and all other rights of Contributor pursuant to this Exhibit E-7 or the Agreement, to one or more of the constituent partners or shareholders, members, partners or beneficiaries of constituent partners of Contributor on the date hereof, whether direct or indirect, without the need for the consent of the General Partner or any other General Partner or Limited Partner and without being subject to the right of first refusal set forth in Section 11.3.A(a) of the Agreement, but in each case subject to the restrictions and conditions set forth in Sections 11.3.C, 11.3.D, 11.3.E, 11.6.E and 11.6.F of the Agreement. Upon the delivery of written notice of such an assignment to the General Partner, each assignee of ECHNLT Units pursuant to the immediately preceding sentence shall be admitted to the Partnership as a Substituted Limited Partner owning the ECHNLT Units so assigned and having all of the rights of a Limited Partner under the Agreement, the First Amendment

126

thereto and this Exhibit E-7, subject only to such assignee executing and delivering to the Partnership an acceptance of all of the terms and conditions of the Agreement and such other documents or instruments as the General Partner may reasonably require to effect such admission, in accordance with Section 11.4.B of the Agreement. Each permitted assignee of any of the ECHNLT Units issued to the Contributor pursuant to the Contribution Agreement that is admitted as a Substituted Limited Partner in accordance with this Section 2 or Article XI of the Agreement, for so long as such Person owns any such ECHNLT Units, is referred to in this Exhibit E-7 as an "INDIRECT EQUITY HOLDER." Upon satisfaction of the condition described in the second sentence of this Section 2, the General Partner shall update the Partner Registry in the manner described in Section 11.4.C of the Agreement. For purposes of Section 8.6 of the Agreement, Contributor and each Indirect Equity Holder shall be entitled to exercise its right to require the Partnership to redeem all or any portion of the ECHNLT Units at any time on or after the first anniversary date of the issuance of the ECHNLT Units to Contributor.

3.      PRE-CONTRIBUTION GAIN. Contributor shall be allocated gain in accordance with Section 704(c) of the Code upon the sale, transfer, conveyance or disposition, directly or indirectly, of either or both Properties (as such term is defined in the First Amendment) (such gain being hereinafter referred to as "PRE-CONTRIBUTION GAIN"). Notwithstanding anything contained in the Agreement to the contrary, the Pre-Contribution Gain allocable to Contributor pursuant to Section 704(c) of the Code in connection with any sale, transfer, conveyance or disposition, directly or indirectly, of the Properties shall be, in aggregate and as of the date hereof, $12,424,927 in respect of the TD Self Park (as such term is defined in the First Amendment) and $35,127,926 in respect of NLTC (as such term is defined in the First Amendment), as each such amount is hereafter reduced in accordance with the provisions of Section 704(c) of the Code and Exhibit C, Paragraph 2 of the Agreement. The provisions of Exhibit C, Paragraph 2 to the Agreement shall be applicable with respect to the allocation of income, gain, loss and deduction pursuant to Section 704(c) of the Code to Contributor.

4.      ALLOCATIONS. Notwithstanding any contrary provision in the Agreement, for purposes of allocating items of income, gain, loss and deduction with respect to the Properties in the manner required by Section 704(c) of the Code, the Partnership shall employ, and shall cause any entity controlled by the Partnership which holds title to any of the Properties to employ, the "traditional method" as set forth in Regulation Section 1.704-3(b).

5.      OBLIGATION TO RESTORE DEFICIT CAPITAL ACCOUNTS. Contributor shall be a Part II Protected Partner pursuant to the Agreement for all relevant purposes. The Protected Amount allocable to Contributor pursuant to the Agreement shall be the amount designated on Schedule 1 to this Exhibit E-7 as the Protected Amount for Contributor. Notwithstanding anything contained in the Agreement to the contrary, any Indirect Equity Holder that is admitted as a Substitute Limited Partner pursuant to, and in accordance with, Section 2 to this Exhibit E-7 above

E-7 - 2

127

shall be admitted as a Part II Protected Partner if and only if all of the following conditions are satisfied: (i) such Indirect Equity Holder shall expressly assume, in writing, all of the liabilities and obligations of a Part II Protected Partner pursuant to the Agreement for the benefit of the General Partner and the Partnership (such written assumption agreement, an "ASSUMPTION AGREEMENT"); (ii) such Indirect Equity Holder shall designate its Protected Amount in the Assumption Agreement, which Protected Amount shall be approved by Contributor (or the applicable immediate predecessor-in-interest to such Indirect Equity Holder) in writing; and (iii) the aggregate Protected Amount, at any time, allocated to Contributor and any and all Indirect Equity Holders allocated a Protected Amount pursuant to this sentence shall not exceed the Protected Amount presently allocated to Contributor on Schedule 1 to this Exhibit E-7.

E-7 - 3

128

SCHEDULE 1 TO EXHIBIT E-7

| PART II PROTECTED PARTNER | PROTECTED AMOUNT |
|---|---|
| North Loop-Tremont Partnership | $32,341,926 |

E-7 - 4

129

EXHIBIT E-8

(SEATTLE WORLD TRADE CENTER -- EAST BUILDING AGREEMENT)


BACKGROUND

On September 8, 2000, in connection with the closing of the Contribution Agreement by and between WRC Trade Center LLC, a Washington limited liability company, ("Contributor") and EOP-WTC LLC, a Delaware limited liability company, ("Acquiror") dated July 7, 1998, Contributor received 227,011 Class B Units of limited Partnership Interest in the Partnership (the "WTC Units"), based on a price per Unit of $30.3688, in exchange for its interest in the "Project," as defined in the Contribution Agreement. In connection with the issuance of the WTC Units, the Second Amendment to the Agreement was executed adding this Exhibit E-8 to the Agreement, setting forth specific agreements regarding additional rights and obligations of the Equity Holders, who were assigned the WTC Units by the Contributor and the Intermediate Equity Holders as described more fully in the Second Amendment to the Agreement, with respect to the WTC Units. Such specific agreements are set forth below.

All Capitalized terms used and not otherwise defined in this Exhibit E-8 have the meanings assigned in the Agreement or the Second Amendment, as applicable.

SPECIFIC AGREEMENTS

1.      ADMISSION TO PARTNERSHIP. The Contributor is admitted to the Partnership as an Additional Limited Partner in accordance with Section 12.2 of the Agreement and agrees to become a party to the Agreement and to be bound by all of the terms, conditions and other provisions of the Agreement, including, but not limited to, the power of attorney set forth in Section 15.11 of the Agreement. The General Partner has consented to the transfer of a portion of the WTC Units from the Contributor to the Intermediate Equity Holders, who have agreed to become parties to the Agreement and to be bound by all of the terms, conditions and other provisions of the Agreement, including, but not limited to, the power of attorney set forth in Section 15.11 of the Agreement. The General Partner has consented to the transfer the WTC Units from the Contributor and the Intermediate Equity Holders, as applicable, to the Equity Holders as reflected on Schedule 1 to the Second Amendment to the Agreement. Accordingly, the Equity Holders are admitted to the Partnership as Substituted Limited Partners in accordance with Section 11.4 of the Agreement and agree to become parties to the Agreement and to be bound by all of the terms, conditions and other provisions of the Agreement, including, but not limited to, the power of attorney set forth in Section 15.11 of the Agreement. The Contributor and the Intermediate Equity Holders are no longer Limited Partners of the Partnership.

2.      LOCK-UP PERIOD. For a period equal to one year following the Closing Date (the "Lock-Up Period"), none of the Equity Holders shall, in any way or to any extent, redeem (pursuant to the Agreement or otherwise), sell, transfer, assign, pledge or encumber or otherwise convey any or all of the WTC Units delivered to Contributor

130

pursuant to the Contribution Agreement and subsequently assigned to such Equity Holders. Notwithstanding the foregoing, during and after the Lock-Up Period, an Equity Holder shall have the right to (i) pledge or encumber the WTC Units (or Conversion Shares, if applicable) to a financial institution or other commercial lender for the purpose of securing an extension of credit to such Equity Holder by such financial institution or other commercial lender and (ii) assign all or any portion of its WTC Units, together with any and all other rights and obligations of such Equity Holder pursuant to this Exhibit E-8 and the Agreement, to one or more of the constituent partners or shareholders, members, partners or beneficiaries the such Equity Holder on the date hereof, whether direct or indirect, without the need for the consent of the General Partner or any other Limited Partner and without being subject to the right of first refusal set forth in Section 11.3.A(a) of the Agreement, but in each case subject to the restrictions and conditions set forth in Sections 11.3.C, 11.3.D, 11.3.E, 11.6.E and 11.6.F of the Agreement and subject to the requirement that each such assignee receiving any of such WTC Units and/or Conversion Shares is an "Accredited Investor," as such term is defined in Regulation D promulgated under the Securities Act of 1933, as amended. Upon the delivery of written notice of such an assignment to the General Partner, each assignee of WTC Units pursuant to the immediately preceding sentence shall be admitted to the Partnership as a Substituted Limited Partner owning the WTC Units so assigned and having all of the rights of a Limited Partner under the Agreement, the Second Amendment thereto and this Exhibit E-8, subject only to such assignee executing and delivering to the Partnership an acceptance of all of the terms and conditions of the Agreement and such other documents or instruments as the General Partner may reasonably require to effect such admission, in accordance with Section 11.4.B of the Agreement. Each permitted assignee of any of the WTC Units, issued to the Contributor pursuant to the Contribution Agreement, that is admitted as a Substituted Limited Partner in accordance with this Section 2 or Article XI of the Agreement, for so long as such Person owns any such WTC Units, is referred to in this Exhibit E-8 as an "INDIRECT EQUITY HOLDER." Upon satisfaction of the condition described in the second sentence of this Section 2, the General Partner shall update the Partner Registry in the manner described in Section 11.4.C of the Agreement. For purposes of Section 8.6 of the Agreement, each Indirect Equity Holder shall be entitled to exercise its right to require the Partnership to redeem all or any portion of the WTC Units assigned to it by the Contributor at any time on or after the first anniversary of the issuance of the WTC Units to Contributor pursuant to the closing under the Contribution Agreement.

3.     SALE OF THE PROJECT. For a period of two years following the Closing Date, the Partnership and the General Partner shall not, without the prior written consent of the affected Equity Holder(s): (a) sell or otherwise dispose of the Project (other than through a deed in lieu of foreclosure, a foreclosure action, or an act of eminent domain) unless such sale or disposition qualifies for non-recognition of gain under the Code (for example, by means of exchanges contemplated under Code sections 351, 354, 355, 368, 721, 1031, or 1033), in such manner as the Code provides from time to time and the Equity Holders recognize no gain as a result thereof or (b) cause a voluntary distribution of property that would cause the Equity Holders to recognize

E-8 - 2

131

income or gain pursuant to the provisions of either or both of sections 704(c)(1)(B) and 737 of the Code.

4.    ALLOCATIONS. Notwithstanding any contrary provision in the Agreement, for a period of two years following the Closing Date, for purposes of allocating items of income, gain, loss and deduction with respect to the Property in the manner required by Section 704(c) of the Code, the Partnership shall employ, and shall cause any entity controlled by the Partnership which holds title to any of the Property to employ, the "traditional method" without curative allocations as set forth in Regulation Section 1.704-3(b).

5.    EQUITY HOLDERS TO PROVIDE INFORMATION. Each Equity Holder agrees that it shall deliver (or shall cause each of its partners, shareholders and members, as applicable, to deliver) to the General Partner or to any other party designated by the General Partner, any documentation that may be required under the Agreement or the Declaration of Trust of the General Partner and such other information as may reasonably be requested by the General Partner at such time as any WTC Units are exchanged for Shares of the General Partner (the "CONVERSION SHARES") pursuant to Section 8.6 of the Agreement.

6.    OBLIGATION TO RESTORE DEFICIT CAPITAL ACCOUNTS. Each Equity Holder whose name appears on Schedule 1 to this Exhibit E-8 shall be a Part II Protected Partner pursuant to the Agreement for all relevant purposes. The Protected Amount allocable to each such Equity Holder pursuant to the Agreement shall be the amount so designated on Schedule 1 to this Exhibit E-8. The Protected Amount designated on Schedule 1 to this Exhibit E-8 reflects the aggregate Protected Amount allocable to each Equity Holder and, in the case of H. Jon Runstad, Douglas E. Norberg, and Jon F. Nordby, the prior Protected Amounts of each such Equity Holder set forth in Exhibit E-3 to the Agreement are replaced and superceded hereby.

E-8 - 3

132

SCHEDULE 1 TO EXHIBIT E-8

| PART II PROTECTED PARTNER | PROTECTED AMOUNT |
|---|---|
| H. Jon Runstad | $15,905,389i |
| Douglas E. Norberg | $5,419,935ii |
| Jon F. Nordby | $3,538,334iii |
| Walter R. Ingram | $400,000 |

----------------------

i Includes $15,055,389 Protected Amount previously set forth in Exhibit E-3.

ii Includes $5,069,935 Protected Amount previously set forth in Exhibit E-3.

iii Includes $3,313,334 Protected Amount previously set forth in Exhibit E-3.

E-8 - 4

133

EXHIBIT E-9

(SPIEKER AGREEMENT)

BACKGROUND

In connection with the closing of the merger of Spieker Properties, L.P. ("Spieker Partnership") with the Partnership on July 2, 2001 pursuant to the Agreement and Plan of Merger, dated as of February 22, 2001, as amended, by and among the General Partner, the Partnership, Spieker Properties, Inc. ("Spieker") and Spieker Partnership (the "Merger Agreement") (the "Spieker Merger"), the Partnership is making certain undertakings to certain former limited partners of Spieker Partnership who became Limited Partners as a result of the Spieker Merger (the "Former Spieker Limited Partners"). The specific agreements between the Partnership and Spieker Partnership with respect to these various matters are described below.

SPECIFIC AGREEMENTS

1. Definitions.  All capitalized terms used and not otherwise defined in this Exhibit E-9 shall have the meaning set forth in the Partnership Agreement. As used herein, the following terms have the following meanings:

Guaranteed Amount:  Means, as to each Guarantee Partner, the amounts of the Guaranteed Debt guaranteed by such Guarantee Partner, as set forth on Schedule 4 to this Exhibit E-9.

Guaranteed Debt:  Means the Qualifying Debt guaranteed by the Guarantee Partners.

Guarantee Opportunity:  Shall have the meaning set forth in Paragraph 3(a).

Guarantee Partners:  Means the Former Spieker Limited Partners whose names are set forth on Schedule 4 to this Exhibit E-9.

Guarantee Protection Period:  Means the period commencing on the date of closing of the Spieker Merger and ending on the tenth (10th) anniversary thereof (or if the Guarantee Partner also is a Sale Restriction Partner, for the Protected Period for such Sale Restriction Partner, if longer).

Guaranty Agreement:  With respect to guarantees in existence as of February 17, 2001, the term Guaranty Agreement means the agreement dated as of October 13, 1997, as amended to the date of the Spieker Merger, by and among, inter alia, Spieker, Spieker Partnership, and the Guarantee Partners. With respect to any guarantee entered into pursuant to Section 3(a) hereof, the term Guaranty Agreement refers to a "bottom guarantee" to be entered into by and among Equity Office, EOP Partnership, and the Guarantee Partners substantially in the form of the agreements attached as Schedule 8-1 and Schedule 8-2 to this Exhibit E-9.

Protected Units:  Means only those Partnership Units issued to the Sale Restriction Partners in the Spieker Merger, or any Partnership Units thereafter issued by the Partnership to the Sale Restriction Partners in exchange for such Protected Units or solely with respect to such Protected Units. The term Protected Units shall not include any other Units hereafter acquired by a Sale Restriction Partner, whether from the Partnership or otherwise.

E-9 - 1

134

Protected Properties:  Means those Properties set forth on Schedule 2 to this Exhibit E-9 and any other properties or assets acquired by the Partnership received as "substituted basis property" as defined in Section 7701(a)(42) of the Code with respect to such Protected Properties.(1)

Protected Period:  Means with respect to each Sale Restriction Partner, the period ending on the tenth (10th) anniversary of the closing of the Spieker Merger, provided, however, that the Protected Period with respect to each Sale Restriction Partner who enters into a Restriction Agreement in the form of Schedule 3 to this Exhibit E-9 at or prior to the closing of the Spieker Merger shall be increased by one year for each one year of the term of the Restriction Agreement applicable to such Sale Restriction Partner that has elapsed, provided further that in the event that a Sale Restriction Partner violates the terms of the Restriction Agreement (1) during the first two years of the term of the Restriction Agreement, the Protected Period applicable to such Sale Restriction Partner shall not include any portion of the term of the Restriction Agreement, and (2) at any time after the expiration of the first two years of the term of the Restriction Agreement, no portion of the term of the Restriction Agreement following the date of such violation shall be taken into account in determining the Protected Period applicable to such Sale Restriction Partner.(2)

Qualifying Debt:  Means indebtedness of the Partnership that is described in (i), (ii) or (iii) below:

(i) In the case of indebtedness secured by any property or asset of the Partnership and not recourse to all of the assets of the Partnership, it is the most senior indebtedness secured by that property or asset, and the property securing the indebtedness must have a fair market value, at the time that the Guarantee Opportunity is offered, at least equal to (a) 400% of the aggregate amount of the guarantees provided by Guarantee Partners hereunder, and (b) 133% of the aggregate amount of all indebtedness secured by such property.

(ii) In the case of indebtedness that is recourse to all of the assets of the Partnership, the indebtedness is at all times the most senior indebtedness of the Partnership (but there shall not be a prohibition against other indebtedness that is pari passu with such indebtedness) and the face amount of the indebtedness outstanding is at all times at least equal to 200% of the aggregate amount of the guarantees provided hereunder.

(iii) The indebtedness is guaranteed as of February 17, 2001, by the Guarantee Partners pursuant to the Guaranty Agreement.

In addition, at no time can there be guarantees with respect to the same indebtedness that are not provided by other Guarantee Partners pursuant hereto that are prior to or pari passu with the guarantees provided by the Guarantee Partners pursuant hereto (but there shall be no prohibition on guarantees of other portions of such indebtedness); provided, however, that such prohibition shall not apply with respect to any other guarantees of such debt that are in effect with respect to any of the Guaranteed Debt described in clause (iii) above at the time of the closing of the Spieker Merger.

Sale Restriction Partners:  Means those Former Spieker Limited Partners set forth on Schedule 1 to this Exhibit E-9, and any Person who holds Protected Units who acquires such Protected Units from a Sale Restriction Partner in a transaction in which gain or loss is not recognized in whole or in part for federal income tax purposes and in which such transferee's adjusted basis, as determined for federal income tax purposes, is determined by reference to the adjusted basis of the Sale Restriction Partner in such Protected Units.(3)

---------------
(1) A property shall be a Protected Property only if such property (i) was acquired by Spieker Partnership in connection with Spieker's IPO in a contribution in which part or all of the gain with respect thereto was deferred pursuant to Section 721 of the Code, or (ii) was acquired by Spieker Partnership as "substituted basis property" as defined in Section 7701(a)(42) of the Code with respect to a property described in clause (i).

(2) As of July 2, 2001 restriction agreements have been entered into by Warren E. Spieker, Jr., Dennis E. Singleton, John K. French, Bruce E. Hosford, Blake Family Trust, John G. Davenport, James C. Eddy, John A. Foster, Donald S. Jefferson, Vincent D. Mulroy, Richard L. Romney, Jill T. Schnugg, Peter H. Schnugg, John B. Souther, Jr., and Craig G. Vought.

(3) To be a Sale Restriction Partner, the Partner (i) cannot have redeemed any of its Spieker Partnership OP Units after February 17, 2001, and (ii) must have tendered all Spieker Options held on February 17, 2001 to Equity Office as contemplated by Section 5.8(c) of the Merger Agreement.

E-9 - 2

135

Spieker Properties:  Means those Properties owned by Spieker
Partnership at the time of the Spieker Merger, including, without
limitation, the Protected Properties.

2. Restrictions on Dispositions of Protected Properties.

    (a) The Partnership agrees for the benefit of each Sale Restriction
Partner, for the term of the Protected Period applicable to such Sale
Restriction Partner, not to directly or indirectly sell, exchange, or
otherwise dispose of any Protected Property.

    (b) Notwithstanding the restriction set forth in Paragraph 2(a), the
Partnership may dispose of a Protected Property if such disposition
qualifies as a like-kind exchange under Section 1031 of the Code, or an
involuntary conversion under Section 1033 of the Code, or other transaction
(including, but not limited to, a contribution of property to any entity
that qualifies for the nonrecognition of gain under Section 721 or Section
351 of the Code, or a merger or consolidation of the Partnership with or
into another entity that qualifies for taxation as a "partnership" for
federal income tax purposes (a "Successor Partnership")) that does not
result in the recognition of any taxable income or gain to a Sale
Restriction Partner with respect to Protected Units; provided, however,
that: (1) in the event of a disposition under Section 1031 or Section 1033
of the Code, any property that is acquired in exchange for or as a
replacement for a Protected Property shall thereafter be considered a
Protected Property for purposes of this Paragraph 2; (2) if the Protected
Property is transferred to another entity in a transaction in which gain or
loss is not recognized, the interest of the Partnership in such entity
shall thereafter be considered a Protected Property for Purposes of this
Paragraph 2, and if the acquiring entity's disposition of the Protected
Property would cause a Sale Restriction Partner to recognize gain or loss
as a result thereof, the transferred Protected Property still shall be
considered a Protected Property for purposes of this Paragraph 2 and the
transferee shall have agreed to be jointly and severally liable for any
payments required under Section 2(c) hereof; (3) in the event of a merger
or consolidation involving the Partnership and a Successor Partnership, the
Successor Partnership shall have agreed in writing for the benefit of the
Sale Restriction Partners that all of the restrictions of this Paragraph 2
shall apply with respect to the Protected Properties, and (4) after the end
of the ten (10) year period beginning on the closing date of the Spieker
Merger, the Partnership may dispose of a Protected Property in a
transaction that would have qualified as a like-kind exchange under Section
1031 of the Code or as another transaction that would not have resulted in
the recognition of any taxable income or gain to the Former Spieker Limited
Partner under the federal income tax law in effect on the closing date of
the Spieker Merger and prior to the date of such transaction, even if, as a
result of change in law after the closing date of the Spieker Merger, such
transaction results in the recognition of income or gain to the Former
Spieker Limited Partner at the time of such transaction.

    (c) In the event that the Partnership breaches its obligation set
forth in Paragraph 2(a) with respect to a Sale Restriction Partner during
the Protected Period applicable to such Sale Restriction Partner, the Sale
Restriction Partner's sole right shall be to receive from the Partnership
as damages an amount equal to the aggregate federal, state and local income
taxes (computed taking into account any deduction allowed in computing
federal income taxes for state income taxes payable as a result thereof)
incurred by the Sale Restriction Partner as a result of the gain allocated
to such Sale Restriction Partner with respect to Protected Units by reason
of such disposition, plus an amount equal to the aggregate federal, state,
and local income taxes payable by the Sale Restricted Partner as a result
of the receipt of any payment required under this Section 2(c). In the
event that a Sale Restriction Partner shall acquire any additional
Partnership Units subsequent to the Spieker Merger by reason of a
contribution of additional money or property to the Partnership, the gain
that be taken into account for purposes of computing the damages payable
under this Paragraph 2(c) would not exceed the gain that such Sale
Restriction Partner would have recognized by reason of the Partnership's
breach of its obligation set forth in Paragraph 2(a) had such Sale
Restriction Partner not acquired such additional Partnership Units. In
addition, in no event shall the gain taken into account for purposes of
computing the damages payable under this Paragraph 2(c) exceed the amount
of gain that would have been recognized by the Sale Restriction Partner
with respect to the Protected Units if the Partnership had sold the
Protected Property in a fully taxable

E-9 - 3

136

transaction on the day following the closing of the Spieker Merger for a purchase price equal to the fair market value of such Protected Property at such time.

(d) Notwithstanding any provision of this Exhibit E-9, the sole and exclusive rights and remedies of any Sale Restriction Partner for a breach or violation of the covenants set forth in Paragraph 2(a), shall be a claim for damages against the Partnership, computed as set forth in Paragraph 2(c), and no Sale Restriction Partner shall be entitled to pursue a claim for specific performance of the covenant set forth in Paragraph 2(a) or bring a claim against any Person that acquires a Protected Property from the Partnership in violation of Paragraph 2(a) (other than a Successor Partnership that has agreed in writing to be bound by the terms of this Exhibit E-9 or that has otherwise succeeded to all of the assets and all of the liabilities of the Partnership, but then only for damages computed as set forth in Paragraph 2(c)). If the Partnership has breached or violated the covenant set forth in Paragraph 2(a) (or a Sale Restriction Partner asserts that the Partnership has breached or violated the covenant set forth in Paragraph 2(a)), the General Partner and the Sale Restriction Partner agree to negotiate in good faith to resolve any disagreements regarding any such breach or violation and the amount of damages, if any, payable to such Sale Restriction Partner under Paragraph 2(c). If any such disagreement cannot be resolved by the General Partner and such Sale Restriction Partner within sixty (60) days after such breach, the General Partner and the Sale Restriction Partner shall jointly retain a nationally recognized independent public accounting firm ("an Accounting Firm") to act as an arbitrator to resolve as expeditiously as possible all points of any such disagreement (including, without limitation, whether a breach of the covenant set forth Paragraph 2(a) has occurred and, if so, the amount of damages to which the Sale Restriction Partner is entitled as a result thereof, determined as set forth in Paragraph 2(c)). All determinations made by the Accounting Firm with respect to the resolution of any breach or violation of the covenant set forth in Paragraph 2(a) and the amount of damages payable to the Sale Restriction Partner under Paragraph 2(c) shall be final, conclusive and binding on the Partnership and the Sale Restriction Partner. The fees and expenses of any Accounting Firm incurred in connection with any such determination shall be shared equally by General Partner and the Sale Restriction Partner.

3. Election by Certain Former Spieker Limited Partners to Enter into Bottom Guarantees of Debt of EOP Partnership.

(a) During the Guarantee Protection Period, the Partnership shall make available to each Guarantee Partner the opportunity (a "Guarantee Opportunity") to make a "bottom guarantee" of Qualifying Debt of the Partnership in the form of the Guaranty Agreement and in an amount at least equal with respect to each Guarantee Partner to the amount set forth on Schedule 4 to this Exhibit E-9, determined taking into account all existing guarantees of such Guarantee Partner that are then in effect (treating as "bottom guarantees" for this purpose the guarantees that are in effect with respect to the indebtedness that is guaranteed as of February 17, 2001, by the Guarantee Partners pursuant to the Guaranty Agreement, as set forth on Schedule 4 to this Exhibit E-9). During the Guarantee Protection Period, if Guaranteed Debt is repaid and, immediately after such repayment, (i) the amount remaining outstanding with respect to such Guaranteed Debt would be less than the Guaranteed Amount with respect to such Guaranteed Debt or (ii) the Guaranteed Debt no longer would be treated as Qualifying Debt, the Partnership shall provide to each Guarantee Partner that had a Guaranteed Amount with respect to such Guaranteed Debt a new Guarantee Opportunity in an amount equal to such Partner's Guaranteed Amount with respect to the Guaranteed Debt being repaid or no longer qualifying as Qualifying Debt, provided that if the Guaranteed Debt is not being repaid in full, the new Guaranty Opportunity can be an offer to allow a guarantee of a portion of that remaining debt so long as the remaining portion of such debt, after taking into account the Guaranty Opportunities being offered with respect thereto, would be Qualifying Debt. In the event that the Partnership is required to offer a Guarantee Opportunity pursuant to this Paragraph 3(a), the Partnership will provide the Guarantee Partners notice of the type, amount and other relevant attributes of the Qualifying Debt with respect to which the Guarantee Opportunity is offered at least fifteen (15) business days, to the extent reasonably practicable, but in no event less than ten (10) business days prior to (a) the earlier of the closing of the incurrence of such debt and the scheduled repayment of the existing Guaranteed Debt and (b) any

E-9 - 4

137

subsequent date on which the Partnership makes additional Guarantee
Opportunities by reason of the repayment of any indebtedness then subject
to a Guarantee by the Guarantee Partners. In the event that the Partnership
repurchases outstanding Guaranteed Debt, whether or not such debt is
retired, the repurchase thereof shall be treated as a repayment of the
Guaranteed Debt for purposes of this Paragraph 3.

(b) The Partnership makes no representation or warranty to any
Guarantee Partner that any guarantee currently in effect or any "bottom
guarantee" entered into pursuant to Paragraph 3(a) shall be respected for
federal income tax purposes for purposes of causing the Guarantee Partner
to be considered to bear the "economic risk of loss" with respect to the
indebtedness thereby guaranteed by such Guarantee Partner for purposes of
either Section 752 or Section 465 of the Code.

(c) In the event that the Partnership breaches its obligation set
forth in Paragraph 3(a) with respect to a Guarantee Partner during the
Guarantee Protection Period applicable to such Guarantee Partner, the
Guarantee Partner's sole right shall be to receive from the Partnership as
damages an amount equal to the aggregate federal, state and local income
taxes (computed taking into account any deduction allowed in computing
federal income taxes for state income taxes payable as a result thereof)
incurred by the Guarantee Partner as a result of the gain recognized by
such Guarantee Partner by reason of such failure, plus an amount equal to
the aggregate federal, state, and local income taxes payable by the sale
restricted partner as a result of the receipt of payment required under
this Section 3(c). In no event shall the amount taken into account for
purposes of computing the damages payable under this Paragraph 3(c) exceed
the amount of gain that would have been recognized by the Guarantee Partner
if, at the closing of the Spieker Merger, such Guarantee Partner has
recognized an amount of gain equal to the "negative capital account" that
it had with respect to its interest in the Spieker Partnership at the time
of the Spieker Merger. The Partnership shall be considered to have
satisfied it obligations under Paragraph 3(a), and therefore shall have no
liability under this Paragraph 3(c), if it make an offer to a Guarantee
Partner of an opportunity to guarantee Qualifying Debt within the time
periods specified in Paragraph 3(a); the Partnership shall have no
liability if a Guarantee Partner fails to join in such guarantee of
Qualifying Debt.

(d) Notwithstanding any provision of this Exhibit E-9, the sole and
exclusive rights and remedies of any Guarantee Partner for a breach or
violation of the covenants set forth in Paragraph 3(a), shall be a claim
for damages against the Partnership, computed as set forth in Paragraph
3(c), and no Guarantee Partner shall be entitled to pursue a claim for
specific performance of the covenant set forth in Paragraph 3(a). If the
Partnership has breached or violated the covenant set forth in Paragraph
3(a) (or a Guarantee Partner asserts that the Partnership has breached or
violated the covenant set forth in Paragraph 3(a)), the General Partner and
the Guarantee Partner agree to negotiate in good faith to resolve any
disagreements regarding any such breach or violation and the amount of
damages, if any, payable to such Guarantee Partner under Paragraph 3(c). If
any such disagreement cannot be resolved by the General Partner and such
Guarantee Partner within sixty (60) days after such breach, the General
Partner and the Guarantee Partner shall jointly retain an Accounting Firm
to act as an arbitrator to resolve as expeditiously as possible all points
of any such disagreement (including, without limitation, whether a breach
of the covenant set forth Paragraph 3(a) has occurred and, if so, the
amount of damages to which the Sale Restriction Partner is entitled as a
result thereof, determined as set forth in Paragraph 3(c). All
determinations made by the Accounting Firm with respect to the resolution
of any breach or violation of the covenant set forth in Paragraph 3(a) and
the amount of damages payable to the Guarantee Partner under Paragraph 3(c)
shall be final, conclusive and binding on the Partnership and the Guarantee
Partner. The fees and expenses of any Accounting Firm incurred in
connection with any such determination shall be shared equally by General
Partner and the Guarantee Partner.

(e) In addition to the other rights set forth in this Paragraph 3,
each Guarantee Partner shall have the right, but not the obligation, upon
fifteen (15) business days prior written notice to the Partnership, to
enter into an additional "bottom guarantee" of the Spieker Partnership
7.125% Notes due December 1, 2006 (the "2006 Notes"), in an amount up to
the Available Additional Debt specified for such Guarantee Partner on
Schedule 4 to this Exhibit 9. In the event that a Guarantee Partner shall
exercise

E-9 - 5

138

such right, the Guaranteed Amount of such Guarantee Partner shall be increased by the amount of such additional guarantee, and the provisions of Paragraphs 3(a), 3(b), 3(c), and 3(d) shall thereafter apply with respect to such guarantee as though it were in effect at the closing of the Spieker Merger. The rights of the Guarantee Partners pursuant hereto, if not exercised, shall expire upon the earlier of the maturity or the prior prepayment of the 2006 Notes, provided that the Partnership shall give the Guarantee Partners thirty (30) days prior notice of the prepayment of the 2006 Notes.

4. No Obligation of the Partnership to Maintain Debt. Notwithstanding any obligations of the Partnership referred to in this Exhibit E-9, the Partnership shall not be obligated to maintain any level of indebtedness in excess of the amounts specifically required to meet the obligations set forth in Paragraph 3 above or otherwise specifically required to be maintained under the Spieker Tax Protection Agreements assumed by the Partnership pursuant to the Merger Agreement.

5. Section 704(c) Method. Notwithstanding Paragraph 2.C. of Exhibit C, the Partnership shall use the "traditional method" under Regulations Section 1.704-3(b) for purposes of making allocations under Section 704(c) of the Code with respect to each Spieker Property to take into account the Book-Tax Disparities as of the effective time of the Spieker Merger with respect to the Spieker Properties, with no "curative allocations" to offset the effect of the "ceiling rule," except to the extent that the Partnership expressly would be required to use a different method under a Spieker Tax Protection Agreement assumed by the Partnership pursuant to the Merger Agreement. The 704(c) Values of the Spieker Properties shall be as determined by agreement between Spieker Partnership and the Partnership prior to the effective time of the Spieker Merger, or in the absence of such agreement, as determined by the General Partner for purposes of preparing the financial statements of the Partnership and the General Partner reflecting the results of the Spieker Merger so long as the outside accountants of the General Partner and the Partnership have approved such financial statements as being in accordance with generally accepted accounting procedures.

6. Allocations of "Tier 3" Nonrecourse Liabilities Pursuant to Regulations Section 1.752-3(a)(3).

(a) The Partnership shall use commercially reasonable efforts to cooperate with the Former Spieker Limited Partners set forth on Schedule 1 to this Exhibit 9 to determine the method to be used for allocating "excess nonrecourse liabilities" of the Partnership pursuant to Regulations Section 1.752-3(a)(3) following the Spieker Merger. The Partnership shall not use with respect to such Former Spieker Limited Partners a method that is less favorable than the method used by the Partnership with respect to the other Limited Partners of the Partnership who are not parties to the express agreements in effect on February 17, 2001, specifying a particular method to be used for such purposes, which are set forth on Schedule 5 to this Exhibit E-9. In addition, the Partnership shall not make available after the date of the Spieker Merger, whether pursuant to an agreement entered into after such date or otherwise, to any other Limited Partner a method of allocating "excess nonrecourse liabilities" of the Partnership that is more favorable than that made available to such Former Spieker Limited Partners without making such method available to the Former Spieker Limited Partners on a pro rata basis with such other Limited Partners (except as, and only to the extent, required pursuant to an agreement in effect on February 17, 2001, identified on Schedule 5 to this Exhibit E-9). In the case of a Former Spieker Limited Partner who, prior to the Spieker Merger, had been specially allocated a portion of a Spieker Partnership nonrecourse liability secured by a property with respect to which such Spieker Partner has a built-in gain under Section 704(c) of the Code to take into account such Former Spieker Limited Partner's share of such built-in gain that was not taken into account in making the allocation of such liability by Spieker Partnership under Regulations Section 1.752-3(a)(2), the Partnership shall continue such method of allocating such liability following the Spieker Merger.

(b) If the amount of debt allocated to a Former Spieker Limited Partner under Section 1.752-3(a)(3) of the Code is reduced following the Spieker Merger from the amount allocated to such Former Spieker Limited Partner immediately before the Spieker Merger and such reduction could reasonably be expected to cause the Former Spieker Limited Partner to recognize gain by reason of a deemed distribution of cash to it in excess of its adjusted basis in its Partnership Interest, the Partnership shall consider in good faith a request from such Former Spieker Limited Partner to become a Protected

E-9 - 6

139

Partner and/or to increase its Protected Amount, as applicable, from time to time after the Spieker Merger and/or to enter into a guarantee of Qualifying Debt on terms substantially similar to those set forth in the Guaranty Agreement if such Former Spieker Limited Partner shall provide information from its professional tax advisor satisfactory to the Partnership showing that, in the absence of such increased Protected Amount or guarantee, such Limited Partner likely would not be allocated from the Partnership sufficient indebtedness under Section 752 of the Code and the at-risk provisions under Section 465 of the Code to avoid the recognition of gain (other than gain required to be recognized by reason of actual cash distributions from the Partnership). The Partnership and its professional tax advisors shall cooperate in good faith with such Former Spieker Limited Partner and its professional tax advisor to provide such information regarding the allocation of the Partnership liabilities and the nature of such liabilities as is reasonably necessary in order to determine the Former Spieker Limited Partner's adjusted tax basis in its Partnership Interest and at-risk amount. In deciding whether or not to grant such a request, the Partnership shall be entitled to take into account all factors related to the Partnership, including, without limitation, the existing and anticipated debt structure of the Partnership, the tax situations of all other Partners, including the General Partner (individually and as a group), and the effect that granting such a request might have on their tax situation, and the anticipated long-term business needs of the Partnership. The Partnership's only obligation with respect to any such request from a Former Spieker Limited Partner pursuant to this Paragraph 6(b) shall be to act in good faith. In the event the Partnership fails to act in good faith with respect to any such request, the exclusive remedy of the Former Spieker Limited Partner who made such request shall be an action for specific performance, with no entitlement to monetary damages.

7. Effect of Other Agreements With Former Spieker Limited Partners. Pursuant to the Merger Agreement, the General Partner, the Partnership, Spieker, and Spieker Partnership entered into an Assignment and Assumption Agreement, dated as of July 2, 2001, pursuant to which the Partnership assumed certain obligations of Spieker Partnership made pursuant to certain tax protection agreements (the "Spieker Tax Protection Agreements") set forth on Schedule 6 to this Exhibit E-9.

8. Election by Certain Former Spieker Limited Partners to Undertake Deficit Restoration Obligation. Each Former Spieker Limited Partner who, prior to February 18, 2001, had entered into an agreement with Spieker Partnership to bear the economic risk of loss as to a portion of Spieker Partnership's recourse indebtedness by undertaking the obligation to restore a portion of its negative capital account balance upon liquidation of such Former Spieker Limited Partner's interest in Spieker Partnership was given the opportunity to become a Protected Partner with a Protected Amount in an amount equal to the maximum amount such Former Spieker Limited Partner was obligated to restore to Spieker Partnership on February 17, 2001; provided, however, that no Former Spieker Limited Partner has the right to increase its Protected Amount following the Spieker Merger. The Former Spieker Limited Partners who have elected to become Protected Partners under such provision of the Merger Agreement, along with their specified Protected Amounts as of the closing of the Spieker Merger, are set forth on Schedule 6 to this Exhibit E-9. Each such election by a Former Spieker Limited Partner shall become effective upon the later of receipt thereof by the General Partner or the "effective time" of the merger of Spieker Partnership into the Partnership. Upon becoming effective, each such election by a Former Spieker Limited Partner pursuant to this Section 8 or any other provision of this Exhibit E-9 shall be irrevocable, cannot be reduced, and shall be binding upon successive transferees of the Former Spieker Limited Partners, except as provided in Section 13.3.D of the Agreement.

E-9 - 7

140

SCHEDULE 1 TO EXHIBIT E-9

SALE RESTRICTION PARTNERS

Warren E. Spieker, Jr.
Dennis E. Singleton
John K. French
Bruce E. Hosford
Blake Family Trust
Gregg R. Daugherty
John G. Davenport
James C. Eddy
John A. Foster
Donald S. Jefferson
Vincent D. Mulroy
Richard L. Romney
Jill T. Schnugg
Peter H. Schnugg
John B. Souther, Jr.
Craig G. Vought
Joel Benoliel

E-9 - 8

141

SCHEDULE 2 TO EXHIBIT E-9

PROTECTED PROPERTIES 1/

| TYPE | NAME | PROPERTY # |
|------|------|------------|
| O | Santa Clara Office Center I | 10001 |
| O | Stender Way II (3001 Stender Way) | 10011 |
| O | Santa Clara Office Center II | 10021/10022 |
| O | Gateway Office Phase I | 10031 |
| I | Scott Boulevard (3281-3285 Scott Blvd.) | 10041 |
| O | Santa Clara Office Center III | 10051 |
| I | Airport Commerce Center | 10071 |
| O | Gateway Office Phase II (IIA, IIB and IIC) | 10081, 10082, 10083 |
| I | Stender Way - 3045 | 10101 |
| I | 2727 Augustine (Applied Materials Inc.) | 10111 |
| O | 384 Santa Trinita (Sunnyvale Business Centre) | 10121 |
| O | The Alameda (1871) | 10131 |
| O | Creekside Phase I | 10141 |
| O | Creekside Phase II | 10142 |
| O | North First Street Office Center in San Jose | 10151 |
| I | Cupertino Business Center | 10161 |
| O | 455 University Avenue | 10181 |
| I | North American Van Lines | 10191 |
| O | 8880 Cal Center Drive | 10211 |
| I | 2685 Augustine (Applied Materials II) | 10241 |
| O | Denny's | 10251 |
| I | Aspect Telecommunications in San Jose | 10271 |
| O | Gateway Oaks II | 10281 |
| O | Gateway Oaks I | 10291 |
| I | Cadillac Court | 10301 |

------------

(1/) Notwithstanding the contents of this Schedule 3 to Exhibit E-9, Protected Properties include only those properties that meet the definition of "Protected Properties" as set forth in Exhibit E-9 to the Partnership Agreement, which provides that a property shall be a Protected Property only if such property (i) was acquired by Spieker Partnership in connection with Spieker's IPO in a contribution in which part or all of the gain with respect thereto was deferred pursuant to Section 721 of the Code, or (ii) was acquired by Spieker Partnership as "substituted basis property" as defined in Section 7701(a)(42) of the Code with respect to a property described in clause (i).

| TYPE | NAME | PROPERTY # |
|------|------|-----------|
| O | 701 University Avenue | 10311 |
| O | The Orchard | 10341 |
| O | 575 University Avenue | 10361 |
| O | 601 University Avenue | 10362 |
| I | Patrick Henry Drive | 10421 |
| I | COG Warehouse | 10431 |
| I | Okidata Distribution Center | 10451 |
| I | Montague Industrial Center | 10571 |
| O | Redwood Shores | 10711 |
| O | Santa Monica Business Park (aka) The American Golf Building | 12375 |
| I | Fremont Bayside (Bayview Business Center) | 10371 |
| I | Huntwood Business Park | 10481 |
| I | Independent Road Warehouse | 10491 |
| I | Bay Center II Business Park | 10511 |
| I | 3075 Bay Center Place (Keebler Warehouse) | 10521 |
| I | Dubuque Business Center | 10591 |
| I | 21001 Cabot Boulevard (21001-21005) | 10601 |
| I | Eden Landing Business Center | 10631 |
| I | 30750 Wiegman Road (Good Guys Distribution Center) | 10641 |
| I | Industrial Drive Warehouse | 10661 |
| O | 2180 Sand Hill Road | 10671 |
| O | Federal Way Office Building | 20021 |
| O | Bellevue Gateway I | 20041 |
| O | Bellevue Gateway II | 20051 |
| O | Station Oaks (aka Amerisuites/ Prime Hospitality) | 12692 |
| O | 10040 Main Street Building | 20061 |
| O | San Mateo BayCenter I | 11831 |
| O | Pacific View Plaza | 11351 |
| I | Ravendale @ Central | 11361 |
| O | Pasadena Financial Center | 11571 |
| O | Point West Corporate Centre | 11621 |
| I | Huntwood Business Center | 11761 |
| O | Century Square | 11581 |
| O | San Mateo BayCenter II | 12121 |
| O | San Mateo BayCenter III | 12531 |
| O | Ontario Gateway II | 12551 |
| I | Hayward Business Park | 12381 |

143

```
-------------------------------------------------------------
TYPE         NAME                          PROPERTY #
-------------------------------------------------------------
O            Governor Executive Centre     12591
-------------------------------------------------------------
O            Lincoln Executive Center A    20394
-------------------------------------------------------------
O            Lincoln Executive Center B    20395
-------------------------------------------------------------
O            Lincoln Executive Center I    20391
-------------------------------------------------------------
O            Lincoln Executive Center II   20392
-------------------------------------------------------------
O            Lincoln Executive Center III  20393
-------------------------------------------------------------
O            Tower Seventeen               11791
-------------------------------------------------------------
O            Benjamin Franklin Plaza       30301
-------------------------------------------------------------
O            Eastgate Office Park          20381
-------------------------------------------------------------
O            Empire Corporate Center       12611
-------------------------------------------------------------
O            Santa Monica Gateway          12661
-------------------------------------------------------------
O            Plaza East (Quadrant Plaza)   20401
-------------------------------------------------------------
O            Station Oaks (Homestead)      12691
-------------------------------------------------------------
O            Bellevue I (I-90)             20411
-------------------------------------------------------------
O            Bellevue II (I-90)            20412
-------------------------------------------------------------
O            Drake's Landing Office Park   12701
-------------------------------------------------------------
O            Lincoln Center One            30321
O            Lincoln Center Two            30322
O            Lincoln Center Three          30323
O            Lincoln Center Five           30325
O            Lincoln Building              30326
O            Lincoln Plaza                 30327
O            Lincoln Tower                 30324
-------------------------------------------------------------
O            The Tower (The Tower at
             Westwood)                     12721
-------------------------------------------------------------
O            N.E. 8th Street Tower (Griffin
             Site)                         20431
-------------------------------------------------------------
O            Emeryville Tower IV (aka
             Watergate Tower IV)           11479
-------------------------------------------------------------
```

144

SCHEDULE 3 TO EXHIBIT E-9

FORM OF RESTRICTION AGREEMENT

[Individual's Name] Restriction Agreement

, 2001

Equity Office Properties Trust
EOP Limited Partnership
Two North Riverside Plaza
Suite 2100
Chicago, Illinois 60606

Ladies and Gentlemen:

The undersigned understands that Equity Office Properties Trust, a Maryland real estate investment trust ("EQUITY OFFICE"), EOP Limited Partnership, a Delaware limited partnership ("EOP PARTNERSHIP"), Spieker, Inc., a Maryland corporation ("SPIEKER"), and Spieker, L.P., a California limited partnership ("SPIEKER PARTNERSHIP"), have entered into an Agreement and Plan of Merger, dated as of February 22, 2001 (the "MERGER AGREEMENT"), pursuant to which (i) Spieker Partnership will be merged with and into EOP Partnership or with a subsidiary of EOP Partnership (the "PARTNERSHIP MERGER") and (ii) Spieker will be merged with and into Equity Office (the "MERGER" and, together with the Partnership Merger, the "MERGERS").

The Merger Agreement contemplates that, in connection with the closing of the Partnership Merger, EOP Partnership will make certain undertakings related to federal income tax matters to certain limited partners of Spieker Partnership, including the undersigned, who contributed assets to Spieker Partnership in connection with its formation in 1993 and will become EOP Limited Partners as a result of the Partnership Merger. The specific undertakings and agreements with respect to these matters will be set forth on Exhibit E-9 to the EOP Partnership Agreement pursuant to the [        ] Amendment to the EOP Partnership Agreement, which will be effective as of the Effective Time.

Under the terms of Exhibit E-9, the term during which certain of these "tax protection" undertakings by EOP Partnership will apply can be extended from ten years to up to twenty years for those Spieker limited partners who agree to and comply with the restrictions set forth in this Restriction Agreement. In order to obtain the benefit of the extended term of the "tax protection" undertakings of EOP Partnership available under Exhibit E-9, and for other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the undersigned hereby agrees as follows:

1. DEFINITIONS

All capitalized terms used but not defined herein shall have the meanings set forth in the Merger Agreement. As used in herein:

"DISPOSITION" shall include any sale (including a grant of any option, contract to sell and any sale of a contract to purchase), assignment, pledge, encumbrance, hypothecation, mortgage, exchange, or any swap agreement or other arrangement that transfers all or a portion of the economic consequences associated with the ownership (regardless of whether any of the transactions described above is to be settled by the delivery of Partnership Units, Shares, or such other securities, in cash or otherwise), provided that a pledge of Partnership Units or Shares to secure bona fide indebtedness that does not exceed sixty percent (60%) of the Value (as defined in the EOP Partnership Agreement) of the Partnership Units or Shares pledged to secure such indebtedness at the time such indebtedness is incurred shall not constitute a Disposition (but a disposition of the Partnership Units or Shares securing such indebtedness pursuant to a foreclosure or in lieu of foreclosure shall constitute a Disposition at the time of such foreclosure or delivery in lieu thereof). "DISPOSE" shall have the correlative meaning.

E-9 - 12

145

"EQUITY INTEREST" means the total number of Shares and Partnership Units in which the undersigned will acquire a beneficial interest at the Effective Time, computed assuming that the undersigned had not disposed of any Spieker OP Units or shares of Spieker Common Stock after February 17, 2001 and assuming that each share of Spieker Common Stock would be converted into 1.94462 Equity Office Common Shares (that is, that the undersigned would receive only Equity Office Common Shares (and no cash) in the Merger). The undersigned's Equity Interest is set forth on Schedule 1 hereto.

"EXTENDED RESTRICTION PERIOD" means the period commencing on the day following the second (2nd) anniversary of the Effective Time and ending on the tenth (10th) anniversary of the Effective Time.

"IMMEDIATE FAMILY" shall have the meaning assigned to such term in Article I of the EOP Partnership Agreement.

"INITIAL RESTRICTION PERIOD" means the period commencing on the date hereof and continuing to and including the second (2nd) anniversary of the Effective Time.

"PARTNERSHIP UNITS" means (a) the EOP "Partnership Units" (as such term is defined in Article I of the EOP Partnership Agreement) in which the undersigned will acquire a beneficial interest in connection with the Partnership Merger at the Effective Time and (b) any securities convertible into or exercisable or exchangeable for such Partnership Units in which the undersigned will acquire a beneficial interest in connection with the Partnership Merger at the Effective Time.

"PERMITTED DISPOSITION" means a Disposition to (i) a member of the Immediate Family of the undersigned, (ii) a charitable organization a contribution to which would be deductible pursuant to Section 170 of the Code, or (iii) any partnership or trust, the partners or beneficiaries, as applicable, of which are exclusively the undersigned or members of the Immediate Family of the undersigned and/or a charitable organization a contribution to which would be deductible pursuant to Section 170 of the Code, provided that any such transfer shall not involve a disposition for value, provided that the transferee in any such Disposition described in clause (i), clause (ii) or clause (iii), as applicable, agrees in writing to be bound by the restrictions set forth herein for the term hereof. Any Disposition by a permitted transferee shall be treated as a Disposition by undersigned for purposes of this agreement.

"REDEMPTION RIGHTS" means, as applicable, any Redemption Rights pursuant to Section 8.6 of the EOP Partnership Agreement.

"SHARES" means (a) the Equity Office "Shares" (as such term is defined in Article VI of the Equity Office Declaration of Trust) in which the undersigned would acquire a beneficial interest in connection with the Merger at the Effective Time, assuming that the undersigned were to receive only Equity Office Shares (and no cash) in the Merger and (b) any securities convertible into or exercisable or exchangeable for Shares in which the undersigned will acquire a beneficial interest in connection with the Merger at the Effective Time.

2. INITIAL RESTRICTION PERIOD

During the Initial Restriction Period, the undersigned shall not Dispose of Partnership Units and/or Shares if such Disposition, taken together with all prior Dispositions (excluding Permitted Dispositions) since February 17, 2000 of any Shares, Partnership Units, shares of Spieker Common Stock and/or Spieker OP Units, would result in a decrease in the undersigned's Equity Interest on the date hereof by thirty percent (30%) or more; provided that nothing herein shall prevent the undersigned from making a Permitted Disposition pursuant to which the transferee becomes subject to the terms and restrictions of this Restriction Agreement.

3. EXTENDED RESTRICTION PERIODS

During the Extended Restriction Period, the undersigned shall not Dispose of Partnership Units and/or Shares if such Disposition, taken together with all prior Dispositions (excluding Permitted Dispositions) since February 17, 2000 of any Shares, Partnership Units, shares of Spieker Common Stock and/or Spieker OP

E-9 - 13

146

Units, would result in a decrease in the undersigned's Equity Interest on the date hereof by an amount equal to or greater than the sum of (x) thirty five percent (35%) and (y) the product of (a) five percent (5%), multiplied by (b) number of full years of the Extended Restriction Period that have expired on the date of such Disposition; provided that nothing herein shall prevent the undersigned from making a Permitted Disposition pursuant to which the transferee becomes subject to the terms and restrictions of this Restriction Agreement.

### 4. REPRESENTATION AND ACKNOWLEDGEMENTS

The undersigned now has good and marketable title to the undersigned's units of limited partner interest in Spieker Partnership and shares of capital stock of Spieker, free and clear of all liens, encumbrances, and claims whatsoever. The undersigned acknowledges that (a) in the event of a breach of the restriction set forth in Section 2 hereof, the Protected Period for purposes of Section 2 of Exhibit E-9 to the EOP Partnership Agreement with respect to the undersigned will be limited to ten (10) years from the Effective Time and (b) in the event of a breach of the restrictions set forth in Section 3, the Protected Period for purposes of Section 2 of Exhibit E-9 to the EOP Partnership Agreement with respect to the undersigned will not include any period attributable to the year of the Extended Restriction Period in which the breach occurs or any year thereafter. The undersigned further understands that this Restriction Agreement is irrevocable and shall be binding upon the undersigned's heirs, legal representatives, successors, and assigns.

### 5. LIMITATION ON REMEDIES.

In entering into this agreement, the undersigned is doing so with the understanding the exclusive remedy of EOP Partnership and Equity Office in the event of a breach hereof will be to limit the Protected Period as set forth in Exhibit E-9, and that in no event shall either Equity Office or EOP Partnership have the right to seek specific performance of this agreement or to bring an action for damages hereunder.

### 6. MISCELLANEOUS

This agreement shall be governed by and construed in accordance with the laws of the State of Delaware. This agreement is irrevocable and will be binding on the undersigned and the respective successors, heirs, personal representatives, and assigns of the undersigned. The undersigned has carefully read this agreement and discussed its requirements, to the extent the undersigned believed necessary, with his counsel.

Very truly yours,

----------------------------------------
[name]

Accepted:

EOP Operating Limited Partnership

By: Equity Office Properties Trust, its general partner

By:
-----------------------------------------------------------

E-9 - 14

147

SCHEDULE 1

EQUITY INTEREST

(COMPUTED AS OF FEBRUARY 17, 2001)


Spieker Shares                                          ---------------

Spieker Partnership Units                              ---------------

Equity Office Shares                                  ---------------
(computed using an exchange ratio of 1.49586)

EOP Partnership Units                                 ---------------
(computed using an exchange ratio of 1.94462)

Equity Interest                                        ---------------


E-9 - 15

148

SCHEDULE 4 TO EXHIBIT E-9

FORMER SPIEKER LIMITED PARTNERS
WHO HAVE ENTERED INTO GUARANTEES

| GUARANTEE PARTNER | SPIEKER PARTNERSHIP 6.80% NOTES DUE 12/15/01 | SPIEKER PARTNERSHIP 6.95% NOTES DUE 12/15/02 | SPIEKER PARTNERSHIP 7.125% NOTES DUE 12/01/06 | TOTAL GUARANTEE AMOUNT | AVAILABLE ADDITIONAL DEBT(4) |
|---|---|---|---|---|---|
| Warren E. Spieker, Jr...... | $        0 | $ 31,000,000 | $  5,000,000 | $ 36,000,000 | $11,454,156 |
| Dennis E. Singleton........ | $        0 | $ 13,000,000 | $  1,000,000 | $ 14,000,000 | $ 3,233,146 |
| John K. French............. | $        0 | $ 12,000,000 | $  1,000,000 | $ 13,000,000 | $ 2,483,599 |
| Bruce E. Hosford........... | $        0 | $ 12,500,000 | $    500,000 | $ 13,000,000 | $ 2,207,584 |
| Blake Family Trust......... | $        0 | $    500,000 | $    150,000 | $    650,000 | $   505,596 |
| Gregg R. Daugherty........ | $        0 | $     92,000 | $        0 | $     92,000 | $        0 |
| John G. Davenport.......... | $        0 | $  1,700,000 | $    200,000 | $  1,900,000 | $   735,845 |
| James C. Eddy.............. | $  289,500 | $  2,110,500 | $    700,000 | $  3,100,000 | $   704,881 |
| John A. Foster............. | $        0 | $  1,000,000 | $    150,000 | $  1,150,000 | $   693,300 |
| Donald S. Jefferson........ | $        0 | $  2,400,000 | $    200,000 | $  2,600,000 | $   872,223 |
| Vincent D. Mulroy......... | $        0 | $  1,600,000 | $    200,000 | $  1,800,000 | $   545,743 |
| Richard L. Romney......... | $        0 | $  1,600,000 | $    150,000 | $  1,750,000 | $   586,521 |
| Jill T. Schnugg........... | $  578,000 | $    728,000 | $  1,450,000 | $  2,756,000 | $   490,293 |
| Peter H. Schnugg.......... | $  578,000 | $    728,000 | $  1,450,000 | $  2,756,000 | $   490,292 |
| John B. Souther, Jr........ | $        0 | $  1,000,000 | $    150,000 | $  1,150,000 | $   413,178 |
| Craig G. Vought........... | $  130,000 | $    370,000 | $    200,000 | $    700,000 | $   506,109 |
| Joel Benoliel.............. | $        0 | $  2,200,000 | $    150,000 | $  2,350,000 | $   323,534 |
| Total..................... | $ 1,575,500 | $ 84,528,500 | $ 12,650,000 | $ 98,754,000 | |
| Total Amount of the Notes.................. | $50,000,000 | $110,000,000 | $100,000,000 | $260,000,000 | $26,246,000 |

---------------
(4) The Guarantee Partners will be entitled to additional guarantees in the
aggregate amount of $31,096,000 (reduced by any additional guarantee amounts
guaranteed by the Guarantee Partners prior to July 2, 2001) to be allocated
among the Guarantee Partners in the manner specified by Spieker at or prior to
the closing. In this regard, Warren E. Spieker, Jr., Dennis E. Singleton, James
C. Eddy, John A. Foster, Jill T. Schnugg, Peter H. Schnugg and Craig G. Vought
entered into additional guarantees with Spieker Partnership prior to the
closing of the Spieker Merger in the aggregate amount of $4,850,000, which
amount shall be applied against the $31,096,000 described above and the
aggregate Available Additional Debt amount as of July 2, 2001, shall
be $26,246,000.

E-9 - 16