# Exhibit C

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**
**SCHEDULE 14A**
**PROXY STATEMENT PURSUANT TO SECTION 14(a) OF THE SECURITIES**
**EXCHANGE ACT OF 1934**

Filed by the Registrant ☑
Filed by a Party other than the Registrant ☐

Check the appropriate box:

☐ Preliminary Proxy Statement
☐ Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))
☑ Definitive Proxy Statement
☐ Definitive Additional Materials
☐ Soliciting Material Pursuant to §240.14a-12

EQUITY OFFICE PROPERTIES TRUST
(Name of Registrant as Specified In Its Charter)

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

☐ No fee required.
☐ Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

1) Title of each class of securities to which transaction applies:

2) Aggregate number of securities to which transaction applies:

3) Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11(set forth the amount on which the filing fee is calculated and state how it was determined):

4) Proposed maximum aggregate value of transaction:

5) Total fee paid:

☑ Fee paid previously with preliminary materials.

☐ Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

1) Amount Previously Paid:

2) Form, Schedule or Registration Statement No.:

3) Filing Party:

4) Date Filed:



**EQUITY OFFICE PROPERTIES TRUST**
Two North Riverside Plaza, Suite 2100
Chicago, Illinois 60606

**December 29, 2006**

Dear Shareholder,

You are cordially invited to attend a special meeting of shareholders of Equity Office Properties Trust to be held on Monday, February 5, 2007 at 8:30 a.m., local time. The special meeting will take place at One North Franklin Street, 3rd Floor, Chicago, Illinois. At the special meeting, we will ask you to approve the merger of Equity Office Properties Trust with and into Blackhawk Acquisition Trust, which we refer to as the merger, and the Agreement and Plan of Merger, dated as of November 19, 2006, as amended, among Equity Office Properties Trust, EOP Operating Limited Partnership and affiliates of The Blackstone Group, which we refer to as the merger agreement. If the merger is completed, you, as a holder of our common shares, will be entitled to receive $48.50 in cash, without interest and less any applicable withholding taxes, in exchange for each share you own, as more fully described in the enclosed proxy statement.

Our board of trustees has approved the merger, the merger agreement and the other transactions contemplated by the merger agreement, and has declared the merger, the merger agreement and the other transactions contemplated by the merger agreement advisable and in the best interests of Equity Office Properties Trust and our shareholders. **Our board of trustees recommends that you vote "FOR" the approval of the merger and the merger agreement.**

The merger and the merger agreement must be approved by the affirmative vote of the common shareholders entitled to cast a majority of the votes that are entitled to be cast on the matter. The proxy statement accompanying this letter provides you with more specific information concerning the special meeting, the merger, the merger agreement and the other transactions contemplated by the merger agreement. We encourage you to read carefully the enclosed proxy statement, including the exhibits. You may also obtain more information about Equity Office Properties Trust from us or from documents we have filed with the Securities and Exchange Commission.

**Your vote is very important regardless of the number of common shares that you own. Whether or not you plan to attend the special meeting, we request that you authorize your proxy by either completing and returning the enclosed proxy card as promptly as possible or submitting your proxy or voting instructions by telephone or Internet. The enclosed proxy card contains instructions regarding voting. If you attend the special meeting, you may continue to have your shares voted as instructed in the proxy, or you may withdraw your proxy at the special meeting and vote your shares in person. If you fail to vote by proxy or in person, or fail to instruct your broker on how to vote, it will have the same effect as a vote against approval of the merger and the merger agreement.**

Thank you for your cooperation and continued support.

Very truly yours,

*Richard D. Kincaid*

Richard D. Kincaid
President and Chief Executive Officer

This proxy statement is dated December 29, 2006 and is first being mailed to our shareholders on or about January 2, 2007.



**EQUITY OFFICE PROPERTIES TRUST**
Two North Riverside Plaza, Suite 2100
Chicago, Illinois 60606

**NOTICE OF SPECIAL MEETING OF SHAREHOLDERS
TO BE HELD FEBRUARY 5, 2007**

Dear Shareholder:

You are cordially invited to attend a special meeting of the shareholders of Equity Office Properties Trust, a Maryland real estate investment trust, on Monday, February 5, 2007, beginning at 8:30 a.m., local time, at One North Franklin Street, 3rd Floor, Chicago, Illinois. The special meeting is being held for the purpose of acting on the following matters:

1. to consider and vote on a proposal to approve the merger of Equity Office Properties Trust with and into Blackhawk Acquisition Trust, which we refer to as the merger, and the Agreement and Plan of Merger, dated as of November 19, 2006, as amended, among Equity Office Properties Trust, EOP Operating Limited Partnership, Blackhawk Parent LLC, Blackhawk Acquisition Trust and Blackhawk Acquisition L.P., which we refer to as the merger agreement;

2. to consider and vote on a proposal to approve any adjournments of the special meeting for the purpose of soliciting additional proxies if there are not sufficient votes at the special meeting to approve the merger and the merger agreement; and

3. to consider any other business that properly comes before the special meeting or any adjournments or postponements of the special meeting.

**Our board of trustees has approved the merger, the merger agreement and the other transactions contemplated by the merger agreement, and has declared the merger, the merger agreement and the other transactions contemplated by the merger agreement advisable and in the best interests of Equity Office Properties Trust and our shareholders. Our board of trustees recommends that you vote "FOR" the proposal to approve the merger and the merger agreement and "FOR" the proposal to approve any adjournments of the special meeting for the purpose of soliciting additional proxies.**

All holders of record of our common and preferred shares, as of the record date, which was the close of business on December 28, 2006, are entitled to receive notice of and attend the special meeting or any postponements or adjournments of the special meeting. However, only holders of our common shares on the record date are entitled to vote at the special meeting or any postponements or adjournments of the special meeting. The vote of our preferred shareholders is not required to approve the merger and the merger agreement, or any adjournments of the special meeting for the purpose of soliciting additional proxies, and is not being solicited.

The merger and the merger agreement must be approved by the affirmative vote of the common shareholders entitled to cast a majority of the votes that are entitled to be cast on the matter. **Accordingly, regardless of the number of shares that you own, your vote is important.** Even if you plan to attend the special meeting in person, we request that you authorize your proxy to vote your shares by either marking, signing, dating and promptly returning the enclosed proxy card in the postage-paid envelope or submitting your proxy or voting instructions by telephone or Internet. If you fail to vote in person or by proxy, the effect will be that the common shares that you own will not be counted for purposes of determining whether a quorum is present and will have the same effect as a vote against the proposal to approve the merger and the merger agreement. Any adjournments of the special meeting for the purpose of soliciting additional proxies must be approved by the affirmative vote of a majority of the votes cast by holders of our common shares on the proposal. If you fail to cast a vote, in person or by authorizing your proxy, such failure will have no effect

on the proposal to approve any adjournments of the special meeting for the purpose of soliciting additional proxies.

Any proxy may be revoked at any time prior to its exercise by delivery of a properly executed, later-dated proxy card, by submitting your proxy or voting instructions by telephone or Internet at a later date than your previously authorized proxy, by filing a written revocation of your proxy with our Secretary at our address set forth above or by your voting in person at the special meeting.

We encourage you to read this proxy statement carefully. If you have any questions or need assistance voting your shares, please call our proxy solicitor, MacKenzie Partners, Inc., toll-free at 1-800-322-2885. In addition, you may obtain information about us from certain documents that we have filed with the Securities and Exchange Commission and from our website at www.equityoffice.com.

By Order of the Board of Trustees,

Stanley M. Stevens
Chief Legal Counsel and Secretary

December 29, 2006

## TABLE OF CONTENTS

**Page**

SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
The Parties to the Mergers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
The Special Meeting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
The Mergers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
Recommendation of Our Board of Trustees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
Opinion of Our Financial Advisor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
Debt Tender Offers and Consent Solicitation; Redemption . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
Financing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
Treatment of Shares, Share Options, Restricted Shares, Stock Appreciation Rights and Performance
    Awards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
Treatment of Interests in Our Operating Partnership . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
Interests of Our Trustees and Executive Officers in the Mergers . . . . . . . . . . . . . . . . . . . . . . . . 12
No Solicitation of Transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
Conditions to the Mergers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
Termination of the Merger Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
Termination Fee and Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
Regulatory Matters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
No Dissenters' Rights of Appraisal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
Litigation Relating to the Mergers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
Material United States Federal Income Tax Consequences . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
Delisting and Deregistration of Our Common and Preferred Shares . . . . . . . . . . . . . . . . . . . . . 17
Market Price of Our Common Shares . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
QUESTIONS AND ANSWERS ABOUT THE SPECIAL MEETING AND THE MERGERS . . . . . . . . 18
CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING STATEMENTS . . . . . . . . . . . . . 23
THE PARTIES TO THE MERGERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
Equity Office Properties Trust . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
EOP Operating Limited Partnership . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
Blackhawk Parent LLC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
Blackhawk Acquisition Trust . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
Blackhawk Acquisition L.P. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
THE SPECIAL MEETING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
Date, Time and Purpose of the Special Meeting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
Record Date, Notice and Quorum . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
Required Vote . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
Proxies and Revocation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
Adjournments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
Postponements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
THE MERGERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
General Description of the Mergers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
Background of the Mergers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
Reasons for the Mergers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
Recommendation of Our Board of Trustees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
Opinion of Our Financial Advisor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

|  | Page |
|---|---|
| Financing | 43 |
| Guarantee and Remedies | 44 |
| Interests of Our Trustees and Executive Officers in the Mergers | 45 |
| Indemnification of Our Trustees, Directors and Officers | 49 |
| Regulatory Matters | 49 |
| Litigation Relating to the Mergers | 49 |
| Material United States Federal Income Tax Consequences | 50 |
| Delisting and Deregistration of Our Common and Preferred Shares | 54 |
| THE MERGER AGREEMENT | 55 |
| Structure | 55 |
| Effective Times | 55 |
| Organizational Documents | 56 |
| Trustees and Officers; General Partner | 56 |
| Treatment of Shares, Share Options, Restricted Shares, Stock Appreciation Rights and Performance Awards | 56 |
| Treatment of Interests in Our Operating Partnership | 58 |
| No Further Ownership Rights | 60 |
| Exchange and Payment Procedures | 60 |
| Debt Tender Offers and Consent Solicitation; Redemption | 61 |
| Representations and Warranties | 62 |
| Conduct of Our Business Pending the Mergers | 66 |
| No Solicitation of Transactions | 68 |
| Employee Benefits | 70 |
| Pre-Closing Transactions | 70 |
| Agreement to Take Further Action | 71 |
| Conditions to the Mergers | 71 |
| Termination | 74 |
| Termination Fee and Expenses | 75 |
| Amendment and Waiver | 76 |
| ADJOURNMENTS AND POSTPONEMENTS OF THE SPECIAL MEETING | 76 |
| Proposal for Adjournments | 76 |
| Postponements of the Special Meeting | 76 |
| MARKET PRICE OF OUR COMMON SHARES | 76 |
| SECURITIES OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT | 77 |
| Common Share and Unit Ownership by Trustees and Executive Officers | 77 |
| Beneficial Ownership of More than Five Percent | 79 |
| NO DISSENTERS' RIGHTS OF APPRAISAL | 81 |
| SUBMISSION OF SHAREHOLDER PROPOSALS | 81 |
| OTHER MATTERS | 81 |
| WHERE YOU CAN FIND MORE INFORMATION | 81 |

Exhibit A — Agreement and Plan of Merger, dated as of November 19, 2006, as amended, among Equity Office Properties Trust, EOP Operating Limited Partnership, Blackhawk Parent LLC, Blackhawk Acquisition Trust and Blackhawk Acquisition L.P.

Exhibit B — Opinion of Merrill Lynch, Pierce, Fenner & Smith Incorporated, dated as of November 19, 2006

# SUMMARY

*This summary highlights only selected information from this proxy statement relating to (1) the merger of Equity Office Properties Trust with and into Blackhawk Acquisition Trust, which we refer to as the merger, (2) the merger of Blackhawk Acquisition L.P. with and into EOP Operating Limited Partnership, which we refer to as the partnership merger, and (3) certain related transactions. References to the mergers refer to both the merger and the partnership merger. This summary does not contain all of the information about the mergers and related transactions contemplated by the merger agreement that is important to you. As a result, to understand the mergers and the related transactions fully and for a more complete description of the terms of the mergers and related transactions, you should read carefully this proxy statement in its entirety, including the exhibits and the other documents to which we have referred you, including the merger agreement attached as Exhibit A. Each item in this summary includes a page reference directing you to a more complete description of that item. This proxy statement is first being mailed to our shareholders on or about January 2, 2007.*

## The Parties to the Mergers (page 24)

**Equity Office Properties Trust**
**Two North Riverside Plaza, Suite 2100**
**Chicago, Illinois 60606**
**(312) 466-3300**

Equity Office Properties Trust, which we refer to as "we," "us," "our," "the company," "our company" or "Equity Office," is a Maryland real estate investment trust. Equity Office, operating through its various subsidiaries and affiliates, is the largest publicly traded owner and manager of office properties in the United States by square footage. At September 30, 2006, we had a national office portfolio comprised of whole or partial interests in 585 office buildings located in 16 states and the District of Columbia. As of that date, we had an ownership presence in 24 Metropolitan Statistical Areas (MSAs) and in 100 submarkets, enabling us to provide a wide range of office solutions for local, regional and national customers.

**EOP Operating Limited Partnership**
**Two North Riverside Plaza, Suite 2100**
**Chicago, Illinois 60606**
**(312) 466-3300**

EOP Operating Limited Partnership, which we refer to as our operating partnership, is a Delaware limited partnership through which Equity Office conducts substantially all of its business and owns, either directly or indirectly through subsidiaries, substantially all of its assets. Equity Office serves as the sole general partner of EOP Operating Limited Partnership and owns approximately 90% of the limited partnership interests of EOP Operating Limited Partnership.

**Blackhawk Parent LLC**
**c/o Blackstone Real Estate Partners V L.P.**
**345 Park Avenue**
**New York, New York 10154**
**(212) 583-5000**

Blackhawk Parent LLC, which we refer to as Blackhawk Parent, is a Delaware limited liability company formed in connection with the mergers by affiliates of Blackstone Real Estate Partners V L.P., a Delaware limited partnership. The principal business of Blackstone Real Estate Partners V L.P. consists of making various real estate related investments. Blackstone Real Estate Partners V L.P. is an affiliate of The Blackstone Group.

The Blackstone Group, a global private investment firm with offices in New York, Atlanta, Boston, Los Angeles, London, Hamburg, Mumbai and Paris, was founded in 1985. Blackstone's real estate group has raised approximately $13 billion for real estate investing and has a long track record of investing in office

3

buildings, hotels and other commercial properties. In addition to real estate, Blackstone's core businesses include private equity, corporate debt investing, marketable alternative asset management, mergers and acquisitions advisory, and restructuring and reorganization advisory.

**Blackhawk Acquisition Trust**
**c/o Blackstone Real Estate Partners V L.P.**
**345 Park Avenue**
**New York, New York 10154**
**(212) 583-5000**

Blackhawk Acquisition Trust, which we refer to as MergerCo, is a Maryland real estate investment trust and a wholly-owned subsidiary of Blackhawk Parent. MergerCo was formed in connection with the mergers by Blackhawk Parent.

**Blackhawk Acquisition L.P.**
**c/o Blackstone Real Estate Partners V L.P.**
**345 Park Avenue**
**New York, New York 10154**
**(212) 583-5000**

Blackhawk Acquisition L.P., which we refer to as Merger Partnership, is a Delaware limited partnership. MergerCo is the sole general partner of Merger Partnership. Merger Partnership was formed in connection with the mergers. Pursuant to the merger agreement, on the closing date, Merger Partnership will merge with and into our operating partnership, which we refer to as the partnership merger. We refer to the surviving limited partnership of the partnership merger as the surviving partnership.

**The Special Meeting (page 25)**

*The Proposals*

The special meeting of our shareholders will be held at 8:30 a.m., local time, on Monday, February 5, 2007 at One North Franklin Street, 3rd Floor, Chicago, Illinois. At the special meeting, holders of our common shares of beneficial interest, par value $.01 per share, will be asked to approve the merger and the merger agreement and to approve any adjournments of the special meeting for the purpose of soliciting additional proxies if there are not sufficient votes at the special meeting to approve the merger and the merger agreement.

The persons named in the accompanying proxy will also have discretionary authority to vote upon other business, if any, that properly comes before the special meeting and any adjournments or postponements of the special meeting.

*Record Date, Notice and Quorum*

All holders of record of our common and preferred shares as of the record date, which was the close of business on December 28, 2006, are entitled to receive notice of and attend the special meeting or any postponements or adjournments of the special meeting. However, only common shareholders on the record date are entitled to vote at the special meeting or any postponements or adjournments of the special meeting.

Each holder of our common shares will be entitled to cast one vote on each matter presented at the special meeting for each common share that such holder owned as of the record date. On the record date, there were 356,504,989 common shares outstanding and entitled to vote at the special meeting.

The presence, in person or by proxy, of holders of common shares entitled to cast a majority of the votes that are entitled to be cast at the meeting will constitute a quorum for purposes of the special meeting.

4

*Required Vote*

Completion of the merger requires approval of the merger and the merger agreement by the affirmative vote of the common shareholders entitled to cast a majority of the votes entitled to be cast on the matter. **Because the required vote for this proposal is based on the number of votes our common shareholders are entitled to cast rather than on the number of votes cast, failure to vote your common shares (including as a result of broker non-votes) and abstentions will have the same effect as voting against the proposal to approve the merger and the merger agreement.**

In addition, the proposal to approve any adjournments of the special meeting for the purpose of soliciting additional proxies requires the affirmative vote of a majority of the votes cast by our common shareholders on the proposal. For the purpose of this proposal, if a holder of our common shares fails to cast a vote on this proposal, in person or by authorizing a proxy, such failure will not have any effect on the outcome of this proposal. Abstentions and broker non-votes are not considered votes cast and therefore will have no effect on the proposal to approve any adjournments of the special meeting for the purpose of soliciting additional proxies. The vote of our preferred shareholders is not required to approve the merger and the merger agreement or any adjournments of the special meeting for the purpose of soliciting additional proxies, and is not being solicited.

As of the record date, our trustees and executive officers owned and are entitled to vote an aggregate of approximately 1,871,028 common shares, entitling them to exercise approximately 0.52% of the voting power of our common shares entitled to vote at the special meeting. Our trustees and executive officers have informed us that they intend to vote the common shares that they own in favor of the proposal to approve the merger and the merger agreement.

*Proxies; Revocation*

Any of our common shareholders of record entitled to vote may authorize a proxy by returning the enclosed proxy, submitting a proxy or voting instructions by telephone or Internet, or by appearing and voting at the special meeting in person. If the common shares that you own are held in "street name" by your broker, you should instruct your broker on how to vote your shares using the instructions provided by your broker.

Any proxy may be revoked at any time prior to its exercise by your delivery of a properly executed, later-dated proxy card, by authorizing your proxy by telephone or Internet at a later date than your previously authorized proxy, by your filing a written revocation of your proxy with our Secretary or by your voting in person at the special meeting.

## The Mergers (page 28)

Pursuant to the merger agreement, on the closing date, we will be merged with and into MergerCo with MergerCo continuing as the surviving real estate investment trust. We sometimes use the term surviving entity in this proxy statement to refer to MergerCo as the surviving real estate investment trust following the merger. In the merger, each of our common shares issued and outstanding immediately prior to the effective time of the merger (other than shares held by us or our subsidiaries or MergerCo, which will be automatically canceled and retired and cease to exist with no payment being made with respect thereto) will be converted into the right to receive $48.50 in cash, without interest and less any applicable withholding taxes. We refer to this consideration to be received for each common share in the merger as the common share merger consideration. In addition, in connection with the merger, each of our 5.25% Series B Convertible, Cumulative Preferred Shares, par value $.01 per share, which we refer to as our Series B preferred shares, and our 7.75% Series G Cumulative Redeemable Preferred Shares of Beneficial Interest, par value $.01 per share, which we refer to as our Series G preferred shares, issued and outstanding immediately prior to the effective time of the merger, other than preferred shares held by our subsidiaries or MergerCo, will be converted automatically into the right to receive one share of 5.25% Series B cumulative preferred stock or one share of 7.75% Series G preferred stock of the surviving entity, as the case may be, which will have substantially the same terms as our Series B and Series G preferred shares, respectively.

5

The merger of Equity Office and MergerCo will become effective at such time as the articles of merger with respect to the merger are accepted for record by the State Department of Assessments and Taxation of Maryland, or the SDAT, or such later time that the parties to the merger agreement may specify in such documents (which will not exceed 30 days after the articles of merger are accepted for record). We sometimes use the term merger effective time in this proxy statement to describe the time the merger becomes effective. As promptly as practicable following the merger effective time, the surviving entity will be liquidated into Blackhawk Parent. Upon the liquidation, the surviving entity's preferred shares will be canceled and holders of the preferred shares of the surviving entity will receive a cash distribution from the surviving entity in accordance with the terms of the articles supplementary classifying the surviving entity's Series B and Series G preferred shares, which will be $50.00 per Series B preferred share and $25.00 per Series G preferred share, plus in each case any accrued and unpaid dividends.

Also on the closing date, immediately prior to the merger effective time, Merger Partnership will be merged with and into our operating partnership with our operating partnership continuing as the surviving limited partnership. The partnership merger will be effective upon the filing of the certificate of merger with respect to the partnership merger with the Secretary of State of the State of Delaware or at such later time which the parties shall have agreed upon and designated in such filing in accordance with the Delaware Revised Uniform Limited Partnership Act.

The following diagram outlines the proposed mergers:



(1) To be liquidated following the merger of Equity Office Properties Trust with and into Blackhawk Acquisition Trust.

Please also see "The Merger Agreement — Treatment of Shares, Share Options, Restricted Shares, Stock Appreciation Rights and Performance Awards" for additional information.

**Recommendation of Our Board of Trustees (page 38)**

Our board of trustees unanimously:

- has determined that it is advisable and in our and our common shareholders' best interests for us to enter into the merger agreement and consummate the merger and the other transactions contemplated by the merger agreement;

- has approved the merger, the merger agreement and the other transactions contemplated by the merger agreement and directed that the merger and the merger agreement be submitted to our common shareholders for approval at a special meeting of shareholders; and

- recommends that you vote **"FOR"** the proposal to approve the merger and the merger agreement.

**Opinion of Our Financial Advisor (page 38)**

On November 19, 2006, Merrill Lynch, Pierce, Fenner & Smith, which we refer to as Merrill Lynch, delivered its oral opinion, which opinion was subsequently confirmed in writing, to our board of trustees to the effect that, as of such date and based upon the assumptions made, matters considered and limits of review set forth in its written opinion, the common share merger consideration of $48.50 to be received by the holders of our common shares pursuant to the merger is fair from a financial point of view to the holders of our common shares, other than Blackhawk Parent and its affiliates, and the cash merger consideration of $48.50 to be received by the holders of OP Units pursuant to the partnership merger (assuming such holders of OP Units receive the cash merger consideration), other than us or any of our subsidiaries, is fair from a financial point of view to such holders.

**The full text of the written opinion of Merrill Lynch, dated as of November 19, 2006, which sets forth the assumptions made, matters considered and limits on the scope of the review undertaken in connection with the opinion is attached as Exhibit B to this proxy statement. The summary of Merrill Lynch's opinion below is qualified by reference to the full text of the opinion, and you are encouraged to read Merrill Lynch's opinion in its entirety. Merrill Lynch's opinion was intended for the use and benefit of our board of trustees, does not address the merits of the underlying decision by the company to engage in the mergers and does not constitute a recommendation to any holder of common shares as to how such holder should vote on the merger or any related matter. Pursuant to a letter agreement dated as of November 13, 2006, between us and Merrill Lynch, we agreed to pay Merrill Lynch a fee of $30 million for its services if the proposed mergers are consummated. Merrill Lynch will also serve as a dealer manager for the debt tender offers and solicitation agent for the exchangeable notes consent solicitation, in each case related to the mergers, for which Merrill Lynch will be paid customary fees.**

**Debt Tender Offers and Consent Solicitation; Redemption (page 61)**

On December 26, 2006, our operating partnership commenced offers to purchase and related consent solicitations with respect to the following securities that our operating partnership has outstanding, on the

terms and subject to the conditions set forth in the related tender offer and consent solicitation documentation that has been distributed to the holders of such securities:

| | |
|---|---|
| 6.763% Notes due June 15, 2007 | 7.000% Notes due July 15, 2011 |
| 7.410% Notes due September 1, 2007 | 6.750% Notes due February 15, 2012 |
| 7.750% Notes due November 15, 2007 | 5.875% Notes due January 15, 2013 |
| 6.750% Notes due January 15, 2008 | 4.750% Notes due March 15, 2014 |
| 6.750% Notes due February 15, 2008 | Floating Rate Notes due May 27, 2014 |
| 6.800% Notes due January 15, 2009 | 7.350% Debentures due December 1, 2017 |
| 7.250% Notes due May 1, 2009 | 7.250% Notes due February 15, 2018 |
| 7.125% Notes due July 1, 2009 | 7.500% Debentures due October 1, 2027 |
| 8.100% Notes due August 1, 2010 | 7.250% Notes due June 15, 2028 |
| 4.650% Notes due October 1, 2010 | 7.500% Notes due April 19, 2029 |
| Floating Rate Notes due October 1, 2010 | 7.875% Notes due July 15, 2031 |
| 7.650% Notes due December 15, 2010 | |

In addition, the tender offers and consent solicitations include our operating partnership's outstanding senior, unsecured series of InterNotes. We refer to the outstanding securities listed above, as well as the InterNotes, collectively as the senior notes. Approximately $8.4 billion aggregate principal amount of senior notes was outstanding as of December 28, 2006. In connection with the offers to purchase the senior notes, our operating partnership is seeking the consents of the holders of the senior notes to amend the indentures governing the senior notes to eliminate substantially all of the restrictive covenants contained in the senior notes and the indentures, eliminate certain events of default, modify covenants regarding mergers, and modify or eliminate certain other provisions contained in the indentures and the senior notes. The proposed terms of the amended senior notes and indentures are described in the tender offer and consent solicitation documents.

The tender offer and consent solicitation documents provide that holders of senior notes will not be able to deliver consents to the amendments to the indentures and the senior notes without also tendering their senior notes. Assuming the requisite consents are received from the holders of the senior notes with respect to such amendments, the amendments will become operative concurrently with the merger effective time, so long as all senior notes validly tendered on or prior to the consent date are accepted for purchase pursuant to the offers to purchase concurrent with the merger effective time. Assuming that all of the conditions to the tender offers and consent solicitations are satisfied or waived, concurrently with the merger effective time, senior notes validly tendered in the tender offers will be accepted for payment. If the amendments become operative, senior notes that are not tendered and purchased in the tender offers are expected to remain outstanding and will be subject to the terms of the applicable indenture as modified by the amendments. In the event the requisite consents are not obtained, we and our operating partnership will issue (subject to certain conditions), immediately prior to the effective time of the partnership merger, an irrevocable notice of optional redemption of senior notes as to which requisite consents have not been obtained and that are redeemable in accordance with their terms and the applicable indenture, which would provide for the satisfaction and discharge of such senior notes and such indenture with respect to such senior notes.

Our operating partnership is also seeking the consents of the holders of $1.5 billion aggregate principal amount of 4.00% Exchangeable Senior Notes due 2026 issued by our operating partnership, which we refer to as the exchangeable notes, to amend the indenture governing the exchangeable notes as it relates to such exchangeable notes so as to eliminate substantially all of the restrictive covenants contained in the exchange-able notes and such indenture, eliminate certain events of default, modify covenants regarding mergers, and modify or eliminate certain other provisions contained in such indenture and the exchangeable notes and the related registration rights agreement. The proposed terms of the amendments to the indenture as they relate to the exchangeable notes, the exchangeable notes and the registration rights agreement are described in the relevant consent solicitation documents. Assuming the requisite consents are received from the holders of the exchangeable notes to amend the indenture as it relates to the exchangeable notes and the exchangeable notes

8

and the registration rights agreement, the amendments will become operative concurrently with the merger effective time.

In addition, our operating partnership has agreed to use its reasonable best efforts to redeem its 7.000% Notes due February 1, 2007, its 6.880% Notes due April 30, 2007 and its 7.875% Notes due December 1, 2016. We refer to these three series of notes as the redemption notes. On December 28, 2006, our operating partnership called for redemption on February 1, 2007 all of the $50 million aggregate principal amount outstanding of its 6.880% Notes due April 30, 2007 and its 7.875% Notes due December 1, 2016. The operating partnership will repay at maturity the $1.5 million aggregate principal amount outstanding of its 7.00% Notes due February 1, 2007.

## Financing (page 43)

In connection with the mergers, Blackhawk Parent will cause an aggregate of approximately $19.5 billion to be paid to our common shareholders, the limited partners (other than us or any of our subsidiaries) of our operating partnership (assuming none of the limited partners of our operating partnership elect to receive Class H preferred units in our operating partnership in lieu of cash consideration) and holders of share options, restricted shares, stock appreciation rights and performance awards. Blackhawk Parent will also cause approximately $360 million (plus accrued and unpaid distributions) to be paid to the holders of our Series B preferred shares (assuming none of the Series B preferred shares have been converted into our common shares prior to the merger effective time) and Series G preferred shares in connection with the liquidation of the surviving entity into Blackhawk Parent after the merger. In addition, our operating partnership has commenced tender offers to purchase up to all of the senior notes and it has called for redemption all of the $50 million aggregate principal amount outstanding of its 6.880% Notes due April 30, 2007 and its 7.875% Notes due December 1, 2016. As of December 28, 2006, there were approximately $8.4 billion aggregate principal amount of senior notes, $51.5 million aggregate principal amount of redemption notes ($1.5 million of which will be repaid at maturity on February 1, 2007) and $1.5 billion aggregate principal amount of exchangeable notes outstanding. Our revolving credit facility will also be repaid and our mortgage loan agreements and secured debt will be repaid or remain outstanding. As of December 28, 2006, we had an aggregate principal amount of approximately $4.4 billion of consolidated indebtedness under our revolving credit facility, mortgage loan agreements and secured debt. As of December 28, 2006, our share of unconsolidated joint venture secured debt was approximately $167 million.

In connection with the execution and delivery of the merger agreement, Blackhawk Parent obtained a debt commitment letter from Goldman Sachs Mortgage Company, Bear Stearns Commercial Mortgage, Inc. and Bank of America, N.A. providing for debt financing in an aggregate principal amount of up to the lesser of (a) $29.6 billion and (b) 82.5% of the total consideration payable by Blackhawk Parent for the completion of the mergers and other costs, such as transaction costs relating to the mergers, less the aggregate amount of our existing indebtedness that is not repaid or defeased at the time of the mergers. Goldman Sachs Mortgage Company, Bear Stearns Commercial Mortgage, Inc. and Bank of America, N.A. have been joined in their commitment by Citigroup Global Markets Realty Corp., Column Financial, Inc. (an affiliate of Credit Suisse Group), German American Capital Corporation (an affiliate of Deutsche Bank Securities Inc.), Morgan Stanley Mortgage Capital Inc. and Wachovia Bank, National Association. In addition, Blackhawk Parent obtained an equity bridge commitment letter from Goldman, Sachs & Co., Bear Stearns Commercial Mortgage, Inc. and BAS Capital Funding Corporation (an affiliate of Bank of America, N.A.) providing for an equity investment in an aggregate amount of up to $3.5 billion. Goldman, Sachs & Co., Bear Stearns Commercial Mortgage, Inc. and BAS Capital Funding Corporation have been joined in their commitment by Morgan Stanley Mortgage Capital Inc. and Morgan Stanley Real Estate Special Situations Fund III, L.P. It is expected that in connection with the mergers, affiliates of The Blackstone Group will contribute up to approximately $3.2 billion of equity to Blackhawk Parent, which amount will be used to fund the remainder of the acquisition costs that are not covered by the debt and equity bridge financing.

The merger agreement does not contain a financing condition or a "market MAC" condition to the closing of the mergers. Under the terms of the merger agreement, Blackhawk Parent has agreed to use its

reasonable best efforts to arrange the equity bridge and debt financing on the terms and conditions described in the commitment letters.

**Treatment of Shares, Share Options, Restricted Shares, Stock Appreciation Rights and Performance Awards (page 56)**

*Common Shares*

The merger agreement provides that, at the merger effective time, each common share issued and outstanding immediately prior to the merger effective time (other than shares held by our subsidiaries or MergerCo, which will be automatically canceled and retired and cease to exist with no payment being made with respect thereto) will be automatically converted into, and will be canceled in exchange for, the right to receive $48.50 in cash, without interest and less any applicable withholding taxes.

*Preferred Shares*

The merger agreement provides that, upon completion of the merger, (i) each of our Series B preferred shares issued and outstanding immediately prior to the merger effective time (other than Series B preferred shares held by our subsidiaries or MergerCo, which will be automatically canceled and retired and cease to exist with no payment being made with respect thereto) will be automatically converted into, and will be canceled in exchange for, the right to receive one share of 5.25% Series B cumulative preferred stock, par value $.01 per share, of the surviving entity and (ii) each of our Series G preferred shares issued and outstanding immediately prior to the merger effective time (other than Series G preferred shares held by our subsidiaries or MergerCo, which will be automatically canceled and retired and cease to exist with no payment being made with respect thereto) will be automatically converted into, and will be canceled in exchange for, the right to receive one share of 7.75% Series G cumulative redeemable preferred stock, par value $.01 per share, of the surviving entity. The Series B and Series G preferred shares of the surviving entity will not be listed on any securities exchange.

Pursuant to the terms of the merger agreement, as promptly as practicable after the merger effective time, the surviving entity will be liquidated into Blackhawk Parent, and Blackhawk Parent has agreed to assume and discharge in accordance with their terms all liabilities and obligations of the surviving entity effective on such liquidation. Upon the liquidation, (i) the surviving entity's Series B preferred shares will be canceled and holders of the surviving entity's Series B preferred shares will receive a cash distribution from the liquidation of the surviving entity in accordance with the terms of the articles supplementary classifying the surviving entity's Series B preferred shares, which will be $50.00 per share plus any accrued and unpaid dividends thereon and (ii) the surviving entity's Series G preferred shares will be canceled and holders of the surviving entity's Series G preferred shares will receive a cash distribution from the liquidation of the surviving entity in accordance with the terms of the articles supplementary classifying the surviving entity's Series G preferred shares, which will be $25.00 per share plus any accrued and unpaid dividends thereon. Holders of our preferred shares are not entitled to vote on the merger and the merger agreement, or any adjournments of the special meeting for the purpose of soliciting additional proxies at the special meeting.

Holders of our Series B preferred shares have the right at any time to convert their Series B preferred shares into our common shares. As of December 28, 2006, the conversion price was $35.70 per common share or the equivalent of a conversion rate of 1.40056 common shares per Series B preferred share ($50.00 per Series B preferred share liquidation preference divided by the $35.70 conversion price). Based on the current conversion price for the Series B preferred shares and assuming the merger is consummated in accordance with the merger agreement, holders of each Series B preferred share converted prior to the merger who hold the common shares issued upon conversion at the merger effective time would be entitled to receive approximately $67.93 (1.40056 common shares issuable upon conversion times $48.50) for such common shares, less any applicable withholding taxes. Any Series B preferred shares not converted prior to the merger will be automatically converted into the right to receive one Series B preferred share of the surviving entity and, upon the liquidation of MergerCo as promptly as practicable following the merger, would only be entitled

10

to receive the liquidation preference of $50.00 per share, plus accrued and unpaid dividends to the date of payment.

### *Share Options, Restricted Shares, Stock Appreciation Rights and Performance Awards*

The merger agreement provides that, immediately prior to the merger effective time, all of our outstanding share options, restricted shares, stock appreciation rights and performance awards, whether or not exercisable or vested, as the case may be, will become fully vested and exercisable or payable, as the case may be, and, in the case of the restricted shares and performance awards, free of forfeiture restrictions.

Immediately prior to the merger effective time, each outstanding restricted share will be considered an outstanding common share for the purposes of the merger agreement and at the merger effective time will be automatically converted into, and will be cancelled in exchange for, the right to receive $48.50 in cash, without interest and less any applicable withholding taxes.

In connection with the merger:

- all unexercised share options held immediately prior to the merger will be canceled in exchange for payment to the holder of each such share option of an amount in cash, less applicable withholding taxes, equal to the product of:

  - the aggregate number of common shares underlying such share option immediately prior to the merger effective time, multiplied by;

  - the excess, if any, of $48.50 over the exercise price per share of our common shares subject to such share option;

- the holder of each stock appreciation right will receive an amount in cash, less applicable withholding taxes, equal to the product of:

  - the aggregate number of common shares underlying such stock appreciation right immediately prior to the merger effective time, multiplied by;

  - the excess, if any, of $48.50 over the exercise price per share of such stock appreciation right; and

- the holder of each performance award will receive an amount in cash, less applicable withholding taxes, equal to the product of:

  - 200% of the aggregate target number of common shares subject to such performance award, as applicable, immediately prior to the merger effective time, multiplied by;

  - $48.50.

Accumulated dividends on performance awards paid out under the Strategic Long-Term Incentive Plan, also based on 200% of the target number of common shares underlying such awards, will also be paid in cash, less applicable withholding taxes.

### Treatment of Interests in Our Operating Partnership (page 58)

In connection with the partnership merger, each Class A unit of partnership interest in our operating partnership issued and outstanding immediately prior to the effectiveness of the partnership merger (other than Class A units we or any of our subsidiaries own which will remain outstanding and unchanged as Class A units of partnership interest in the surviving partnership), will be automatically converted into the right to receive $48.50 in cash, without interest and less applicable withholding taxes. We refer to the Class A units of partnership interest in our operating partnership as OP Units. Alternatively, in lieu of this cash consideration, each limited partner of our operating partnership that is an "accredited investor" as defined under the U.S. securities laws and that has satisfied certain other conditions will be offered the opportunity, subject to certain conditions, to elect to convert all, but not less than all, of the OP Units that such partner owns into Class H preferred units in the surviving partnership on a one-for-one basis. Separate materials will be sent to the limited partners of our operating partnership regarding this election. **This proxy statement does not**

constitute any solicitation of consents in respect of the partnership merger, and does not constitute an offer to exchange or convert the OP Units that you may own for or into Class H preferred units in the surviving partnership.

### Interests of Our Trustees and Executive Officers in the Mergers (page 45)

Our trustees and executive officers may have interests in the mergers that are different from, or in addition to, yours, including the following:

- unvested share options held by our executive officers and Mr. Samuel Zell, Chairman of our board of trustees, will become fully vested and exercisable, and all share options held by our trustees and executive officers and not exercised will be canceled as of the merger effective time in exchange for the right to receive a single lump sum cash payment in respect of each common share underlying their share options equal to the excess, if any, of $48.50 per share over the exercise price per share of their share options, less applicable withholding taxes;

- restricted shares owned by our executive officers and certain of our trustees will become fully vested and free of any forfeiture restrictions immediately prior to the merger effective time and will be considered outstanding common shares for purposes of the merger agreement, including the right to receive the common share merger consideration, less applicable withholding taxes;

- each outstanding performance award held by our executive officers will become fully vested and free of any forfeiture restrictions immediately prior to the merger effective time and will be paid out, in the case of awards granted under the Strategic Long-Term Incentive Plan, based on performance through the end of the calendar quarter preceding the date of the merger agreement plus accumulated dividends based on awards to be paid out at 200% of target, and, in the case of awards granted under the Deferred Equity Plan, at the maximum level (200% of target), in a lump sum cash payment equal to $48.50 per share subject to the performance award, less applicable withholding taxes; and

- each of our executive officers will be entitled to severance benefits, comprised of (a) a lump sum cash payment of a pro rata portion of their annual bonus through the date of termination, (b) a lump sum payment equal to two and one-half (two and one-quarter in the case of Mr. Winter and three in the case of Mr. Kincaid) years annual salary and bonus and (c) continued eligibility for the executive officer and his or her dependents for two and one-half (two and one-quarter in the case of Mr. Winter and three in the case of Mr. Kincaid) years in our medical benefits plan and certain other benefit plans, under his or her respective change in control agreement if his or her employment is terminated without "cause" by us or he or she resigns for "good reason" (each as defined in their change in control agreement, which, in the case of Mr. Kincaid, includes the occurrence of the merger) within two years after shareholder approval of the merger.

Our trustees and executive officers also will be entitled to receive merger consideration as a result of their ownership of common shares and OP Units. As of the record date, Sheli Rosenberg, Samuel Zell and Stanley Stevens, each of whom is one of our trustees or executive officers, beneficially owned 191,134 OP Units, 1,775,065 OP Units and 6,927 OP Units, respectively. In addition, Mr. Zell has a pecuniary interest but does not have voting or dispositive power in an additional 11,845,754 OP Units. Each of Ms. Rosenberg, Mr. Zell and Mr. Stevens will receive a cash payment of $48.50 per OP Unit or, alternatively, if such person satisfies certain requirements applicable to all holders of OP Units, such person will be offered the opportunity to elect to convert all, but not less than all, of his or her OP Units into Class H preferred units in the surviving partnership on a one-for-one basis (for a more complete discussion of the treatment of the OP Units and the terms of the Class H preferred units, see "The Merger Agreement — Treatment of Interests in Our Operating Partnership"). It is intended that our trustees and executive officers, as holders of OP Units who convert their OP Units into Class H preferred units in the surviving partnership, will generally be permitted to defer potential taxable gain they would otherwise recognize if they were to receive a cash payment in exchange for their OP Units (although the Internal Revenue Service could assert that such conversion constitutes a taxable transaction).

All of our trustees were fully aware of the foregoing interests of our trustees and executive officers in the merger and considered them prior to approving the merger and the merger agreement.

**No Solicitation of Transactions (page 68)**

The merger agreement contains restrictions on our ability to solicit or engage in discussions or negotiations with a third party regarding specified transactions involving the company or our subsidiaries. Notwithstanding these restrictions, under certain circumstances and subject to certain conditions, our board of trustees may respond to an unsolicited written acquisition proposal or terminate the merger agreement and enter into an acquisition agreement with respect to a superior proposal.

**Conditions to the Mergers (page 71)**

Completion of the mergers depends upon the satisfaction or waiver of a number of conditions, including, among others:

- approval of the merger and the merger agreement by the requisite shareholder vote;

- no action by any governmental authority that would prohibit the consummation of the merger or the partnership merger;

- our and our operating partnership's representations and warranties being true and correct, except where the failure of such representations and warranties to be true and correct in all respects without regard to any materiality or material adverse effect qualifications (other than the representation relating to any material adverse effect to us) does not and would not have, individually or in the aggregate, a material adverse effect;

- the performance, in all material respects, by us and our operating partnership of our and our operating partnership's obligations under the merger agreement and compliance, in all material respects, with the agreements and covenants to be performed or complied with under the merger agreement;

- since November 19, 2006, there shall not have been an effect, event, development or change that, individually or in the aggregate, has resulted or would result in a material adverse effect;

- the receipt of a tax opinion of our counsel, Sidley Austin LLP, opining that we have been organized and have operated in conformity with the requirements for qualification as a REIT under the Internal Revenue Code of 1986, as amended, which we refer to as the Code, commencing with our taxable year ended December 31, 1997;

- receipt from the administrative agent under our revolving credit facility of a "payoff" letter acknowledging that, subject to repayment of the aggregate principal amount outstanding under the credit facility, together with all accrued and unpaid interest and any other fees or expenses payable, the credit facility will be terminated, any and all related liens held by the administrative agent, or any other collateral agent under the revolving credit facility, will be released, and we and our subsidiaries will be released from any and all material liabilities and obligations under the credit facility and any related guaranties (other than any obligations under any indemnification or similar provision that survive such termination); and

- either (a) receipt of requisite consents with respect to the senior notes (pursuant to the tender offers and consent solicitations) and the exchangeable notes (pursuant to the consent solicitation therefor) and the execution of supplemental indentures to the indentures governing these notes, which will be effective promptly following the receipt of the required consents with the amendments described in the applicable tender offer or consent solicitation documents to become operative upon the acceptance of these notes for payment pursuant to the tender offers (in the case of the senior notes) and concurrently with the merger effective time or (b) we and our operating partnership shall have complied with our obligation under the merger agreement, which provides that, to the extent that, as of the closing date, the requisite consents have not been obtained, we and our operating partnership will issue immediately prior to the effective time of the partnership merger, an irrevocable notice of optional redemption for

13

notes the holders of which have not delivered the requisite consents and that are redeemable in accordance with their terms and the applicable indenture governing such notes, which shall provide for the satisfaction and discharge of such notes and such indenture with respect to such notes, so long as Blackhawk Parent, MergerCo and Merger Partnership shall have, among other things, irrevocably deposited with the applicable trustee under each such indenture sufficient funds to effect such satisfaction and discharge.

**Termination of the Merger Agreement (page 74)**

The merger agreement may be terminated and the mergers may be abandoned at any time prior to the effective time of the partnership merger, as follows:

- by mutual written consent of Blackhawk Parent and Equity Office;

- by either Blackhawk Parent or us if:

  - the partnership merger has not occurred on or before May 19, 2007, provided that this right will not be available to a party whose failure to fulfill any obligation under the merger agreement materially contributed to the failure of the partnership merger to occur on or before May 19, 2007;

  - any governmental authority shall have enacted, issued, promulgated, enforced or entered any final and non-appealable injunction, order, decree or ruling or taken any other action which has the effect of making consummation of either of the mergers illegal or otherwise prevents or prohibits the consummation of either of the mergers; provided, however, that the right to terminate will not be available to any party unless such party shall have used its reasonable best efforts to oppose any such governmental order or to have such governmental order vacated or made inapplicable to such merger; or

  - the requisite vote of our common shareholders to approve the merger upon a vote being taken at a duly convened shareholders meeting is not obtained; or

- by Blackhawk Parent if:

  - none of Blackhawk Parent, MergerCo and Merger Partnership is in material breach of its obligations under the merger agreement, and (a) any of our or our operating partnership's representations and warranties are or become untrue or incorrect such that the closing condition pertaining to our or our operating partnership's representations and warranties would be incapable of being satisfied by May 19, 2007, or (b) there has been a breach of any of our or our operating partnership's covenants or agreements such that the closing condition pertaining to our or our operating partnership's performance and compliance with covenants or agreements would be incapable of being satisfied by May 19, 2007;

  - our board of trustees withdraws, modifies or amends its recommendation that shareholders vote to approve the merger agreement and the merger in any manner adverse to Blackhawk Parent, MergerCo or Merger Partnership;

  - our board of trustees approves, endorses or recommends an acquisition proposal; we enter into a contract or agreement relating to an acquisition proposal (other than a confidentiality agreement permitted by the merger agreement); a tender offer or exchange offer for any of our outstanding stock that constitutes an acquisition proposal is commenced before the requisite shareholder vote is obtained and our board of trustees fails to recommend against acceptance of such tender offer or exchange offer within ten business days after it is commenced; or we or our board of trustees publicly announces the intention to do any of the foregoing; or

  - our board of trustees exempts, or is required to exempt, any person other than Blackhawk Parent or its affiliates from the ownership restrictions in Article VII of our declaration of trust, which we refer to as our charter; or

14

- by us if:

  - neither we nor our operating partnership is in material breach of our or its respective obligations under the merger agreement, and (a) any of Blackhawk Parent's, MergerCo's or Merger Partnership's representations and warranties are or become untrue or incorrect such that the closing condition pertaining to their representations and warranties would be incapable of being satisfied by May 19, 2007, or (b) there has been a breach of any of Blackhawk Parent's, MergerCo's or Merger Partnership's covenants or agreements such that the closing condition pertaining to their performance and compliance with covenants and agreements would be incapable of being satisfied by May 19, 2007; or

  - our board of trustees approves and authorizes us to enter into a definitive agreement to implement a superior proposal in accordance with the terms of the merger agreement, so long as:

    - the requisite shareholder vote has not been obtained;

    - we are not in or have not been in breach of our obligations under the merger agreement with regard to prohibitions on soliciting acquisition proposals in any material respect;

    - our board of trustees has determined in good faith, after consulting with its financial advisor, that such definitive agreement constitutes a superior proposal;

    - we have notified Blackhawk Parent in writing that we intend to enter into such agreement (attaching the most current version of such agreement);

    - during the three business days following the receipt by Blackhawk Parent of our notice, we have offered to negotiate with, and, if accepted by Blackhawk Parent, have negotiated in good faith with, Blackhawk Parent to make adjustments to the terms and conditions of the merger agreement to enable us to proceed with the mergers and the other transactions contemplated by the merger agreement;

    - our board of trustees has determined in good faith, after the end of such three business day period, after considering the results of any such negotiations and any revised proposals made by Blackhawk Parent, that the superior proposal giving rise to such notice continues to be a superior proposal; and

    - we pay to Blackhawk Parent the termination fee in accordance with the merger agreement simultaneously with the termination of the merger agreement.

## Termination Fee and Expenses (page 75)

We have agreed to pay to Blackhawk Parent a termination fee of $200 million if:

- we terminate the merger agreement because our board approves and authorizes us to enter into an agreement to implement a superior proposal in accordance with the terms of the merger agreement;

- Blackhawk Parent has terminated the merger agreement because our board has withdrawn, modified or amended its recommendation that shareholders vote to approve the merger agreement and the merger in any manner adverse to Blackhawk Parent, MergerCo or Merger Partnership;

- Blackhawk Parent has terminated the merger agreement because our board has approved, endorsed or recommended, or we have entered into a contract or agreement relating to, an acquisition proposal, or a tender offer or exchange offer for any of our outstanding stock has been commenced prior to the requisite shareholder vote being obtained and our board has failed to recommend against such tender or exchange offer within ten business days of its commencement, or we or our board has publicly announced its intention to do any of the foregoing;

- Blackhawk Parent has terminated the merger agreement because our board has exempted, or is required to exempt, any person other than Blackhawk Parent or its affiliates from the ownership restrictions in Article VII of our charter; or

- an acquisition proposal has been made to us or our operating partnership, or otherwise publicly announced, prior to the termination date of the merger agreement and the merger agreement has been terminated (i) by either Blackhawk Parent or us because (a) the mergers have not been consummated on or before May 19, 2007 and such acquisition proposal has not been withdrawn prior to the termination date of the merger agreement or (b) the requisite shareholder vote to approve the merger upon a vote being taken has not been obtained at a duly convened meeting or (ii) by Blackhawk Parent because we or our operating partnership have breached our obligations in the merger agreement regarding non-solicitation and convening and holding a meeting of our common shareholders and Blackhawk Parent is not in material breach of its obligations under the merger agreement, and in each of the foregoing instances, within twelve months following the termination of the merger agreement we enter into a contract with respect to or consummate any acquisition proposal.

The merger agreement also provides that if either party terminates the merger agreement because of the other party's material breach of the merger agreement which would result in the failure of a condition being satisfied by May 19, 2007, the breaching party must reimburse the non-breaching party for its reasonable transaction expenses up to a limit of $7.5 million.

## Regulatory Matters (page 49)

We are unaware of any material federal, state or foreign regulatory requirements or approvals that are required for the execution of the merger agreement or the completion of either the merger or the partnership merger, other than the filing of the articles of merger with respect to the merger with, and the acceptance of such articles of merger for record by, the SDAT, and the filing of a certificate of merger with respect to the partnership merger by our operating partnership with the Secretary of State of the State of Delaware.

## No Dissenters' Rights of Appraisal (page 81)

We are organized as a real estate investment trust under Maryland law. Under the Maryland REIT Law, because our common shares were listed on the New York Stock Exchange on the record date for determining shareholders entitled to vote at the special meeting, our common shareholders who object to the merger do not have any appraisal rights or dissenters' rights in connection with the merger. However, our common shareholders can vote against the merger and the merger agreement. Under the Maryland REIT Law, because the holders of our preferred shares are not entitled to vote on the merger and the merger agreement and because our outstanding preferred shares were listed on the New York Stock Exchange on the record date, they do not have any appraisal rights or dissenters' rights in connection with the merger.

## Litigation Relating to the Mergers (page 49)

On November 20, 2006, a purported shareholder class action related to the merger agreement, *Engel v. Equity Office Properties Trust, et al.* (Case No. 24-C-06-010525), was filed in the Circuit Court for Baltimore City, Maryland, naming us and each of our trustees as defendants. Seven other lawsuits raising similar purported class claims have also been filed, including two other such suits in the Circuit Court for Baltimore City (*Lefari v. Equity Office Properties Trust, et al.* (Case No. 24-C-06-010716) and *Casden v. Equity Office Properties Trust, et al.* (Case No. 24-C-06-010969)), four in the Circuit Court of Cook County, Illinois (*Blaz v. Equity Office Properties Trust, et al.* (Case No. 06-CH-25190), *Phillips v. Zell, et al.* (Case No. 06-CH-25196), *Kaiman v. Zell, et al.* (Case No. 06-CH-25278) and *Staehr v. Equity Office Properties Trust, et al.* (Case No. 06-CH-25402)), and one in the United States District Court for the Northern District of Illinois (*Beck v. Dobrowski, et al.* (Case No. 06-CV-6411)), the last of which also includes shareholder derivative claims. These lawsuits generally allege breaches of fiduciary duties by our trustees in connection with the merger agreement (including, but not limited to, various alleged breaches of duties of loyalty, due care, candor, independence and good faith), claim that defendants have failed to take appropriate steps to maximize shareholder value (including by failing to conduct an auction or negotiate with all interested parties), and allege that various terms of the merger agreement are preclusive and/or unfair. Certain of the lawsuits also include claims that the defendants have improperly favored themselves in connection with the proposed transaction, engaged in self-dealing and/or have improperly provided for disparate treatment among Equity Office security holders. The

federal court lawsuit also includes purported derivative claims for abuse of control, gross mismanagement, and corporate waste. In addition to Equity Office and its trustees, The Blackstone Group is named as a defendant in certain of the lawsuits, and is alleged to have aided and abetted the other defendants' alleged fiduciary breaches. The lawsuits seek a variety of equitable and injunctive relief, including enjoining defendants from completing the proposed merger transaction, disgorgement of alleged benefits improperly received and/or unspecified damages and other relief. We intend to vigorously defend the actions.

### Material United States Federal Income Tax Consequences (page 50)

The receipt of the merger consideration for each of our shares pursuant to the merger will be a taxable transaction for United States federal income tax purposes. Generally for United States federal income tax purposes, you will recognize gain or loss as a result of the merger measured by the difference, if any, between the merger consideration per share and your adjusted tax basis in that share. In addition, under certain circumstances, we may be required to withhold a portion of your merger consideration under applicable tax laws. Tax matters can be complicated, and the tax consequences of the merger to you will depend on your particular tax situation. We encourage you to consult your tax advisor regarding the tax consequences of the merger to you.

### Delisting and Deregistration of Our Common and Preferred Shares (page 54)

If the merger is completed, our common and preferred shares will no longer be traded on the New York Stock Exchange and will be deregistered under the Securities Exchange Act of 1934, as amended, which we refer to as the Exchange Act. If the partnership merger is completed, the OP Units will be deregistered under the Exchange Act.

### Market Price of Our Common Shares (page 76)

Our common shares are traded on the New York Stock Exchange under the ticker symbol "EOP." On November 17, 2006, the last trading day prior to the date of the public announcement of the merger agreement, the closing price of our common shares on the New York Stock Exchange was $44.72 per share. On December 28, 2006, the last trading day before the date of this proxy statement, the closing price of our common shares on the New York Stock Exchange was $48.12 per share. You are encouraged to obtain current market quotations for our common shares.

## QUESTIONS AND ANSWERS ABOUT THE SPECIAL MEETING AND THE MERGERS

*The following questions and answers address briefly some questions you may have regarding the special meeting and the proposed mergers. These questions and answers may not address all questions that may be important to you as a shareholder. Please refer to the more detailed information contained elsewhere in this proxy statement, as well as the additional documents to which it refers or which it incorporates by reference, including the merger agreement (as amended), a copy of which is attached to this proxy statement as Exhibit A.*

**Q:** *What is the proposed transaction?*

**A:** The proposed transaction is the acquisition of the company and its subsidiaries, including our operating partnership, by affiliates of The Blackstone Group pursuant to the merger agreement. Once the merger and the merger agreement have been approved by our shareholders and the other closing conditions under the merger agreement have been satisfied or waived, Equity Office will merge with and into MergerCo with MergerCo continuing as the surviving entity. Immediately prior to the merger effective time, Merger Partnership will be merged with and into our operating partnership with our operating partnership continuing as the surviving limited partnership. For additional information about the merger and the partnership merger, please review the merger agreement attached to this proxy statement as Exhibit A and incorporated by reference into this proxy statement. We encourage you to read the merger agreement carefully and in its entirety, as it is the principal document governing the merger.

**Q:** *As a common shareholder, what will I receive in the merger?*

**A:** For each outstanding common share of beneficial interest that you own immediately prior to the merger effective time, you will receive $48.50 in cash, without interest and less any applicable withholding taxes.

**Q:** *Will I receive any regular quarterly dividends with respect to the common shares that I own?*

**A:** On December 6, 2006, we declared a regular quarterly dividend of $0.33 per common share for the quarterly period ended December 31, 2006 payable on December 29, 2006 to shareholders of record at the close of business on December 15, 2006. However, under the terms of the merger agreement, we may not declare or pay any other dividends to you without the prior written consent of Blackhawk Parent.

**Q:** *When do you expect the mergers to be completed?*

**A:** We are working toward completing the mergers as quickly as possible. If our shareholders vote to approve the merger and the merger agreement, and assuming that the other conditions to the mergers are satisfied or waived, it is anticipated that the mergers will become effective as soon as practicable following the special meeting.

**Q:** *If the merger is completed, when can I expect to receive the common share merger consideration for my common shares?*

**A:** Promptly after the completion of the merger, you will receive a letter of transmittal describing how you may exchange your common shares for the common share merger consideration. You should not send your common share certificates to us or anyone else until you receive these instructions.

**Q:** *When and where is the special meeting?*

**A:** The special meeting of shareholders will take place on Monday, February 5, 2007 at 8:30 a.m., local time, at One North Franklin Street, 3rd Floor, Chicago, Illinois.

**Q:** *Who can vote and attend the special meeting?*

**A:** All of our common and preferred shareholders of record as of the close of business on December 28, 2006, the record date for the special meeting, are entitled to receive notice of and attend the special meeting or any adjournments or postponements of the special meeting. However, only our common shareholders on the record date are entitled to vote at the special meeting or any postponements or adjournments of the special meeting. Each holder of our common shares is entitled to cast one vote on each matter properly brought before the special meeting for each common share that such holder owned as of the record date. The vote of our preferred shareholders is not required to approve the merger and the merger agreement,

18

or any adjournments of the special meeting for the purpose of soliciting additional proxies, and is not being solicited.

**Q:** *What vote of common shareholders is required to approve the merger and the merger agreement?*

**A:** Approval of the merger and the merger agreement requires the affirmative vote of the common shareholders entitled to cast a majority of the votes entitled to be cast on the matter. Because the required vote is based on the number of votes entitled to be cast rather than on the number of votes cast, failure to cast a vote (including as a result of broker non-votes and abstentions) will have the same effect as voting against the proposal to approve the merger and the merger agreement.

**Q:** *What vote of our common shareholders is required to approve an adjournment of the special meeting?*

**A:** Approval of any adjournments of the special meeting to solicit additional proxies requires the affirmative vote of a majority of the votes cast by our common shareholders, in person or by proxy, on the proposal. For the purpose of this proposal, if you fail to cast a vote on this proposal, in person or by proxy, such failure will not have any effect on the outcome of this proposal. Abstentions and broker non-votes are not considered votes cast and therefore will have no effect on the proposal to approve any adjournments of the special meeting for the purpose of soliciting additional proxies.

**Q:** *How does the common share merger consideration compare to the market price of the common shares?*

**A:** The common share merger consideration of $48.50 per common share represents an approximate 8.5% premium over the closing price of our common shares of $44.72 on November 17, 2006, the last trading day prior to the public announcement of the merger agreement, an approximate 20.5% premium over the average closing price of our common shares of $40.26 for the three-month period ended November 17, 2006, and an approximate 37.7% premium over the average closing price of our common shares of $35.22 for the one-year period ended November 17, 2006. Over the one-year period ended November 17, 2006, the low trading price was $28.78 per share and the high trading price was $44.90 per share.

**Q:** *How does our board of trustees recommend that I vote?*

**A:** Our board of trustees unanimously recommends that our common shareholders vote to approve the merger and the merger agreement and to approve any adjournments of the special meeting for the purpose of soliciting additional proxies if there are not sufficient votes at the special meeting to approve the merger and the merger agreement.

**Q:** *Do any of the company's trustees and executive officers have any interest in the merger that is different than mine?*

**A:** Our trustees and executive officers may have interests in the merger that are different from, or in addition to, yours, including the consideration that they would receive with respect to their share options, restricted shares and performance awards in connection with the merger. Additionally, our trustees and executive officers who beneficially own OP Units will receive consideration with respect to their OP Units in connection with the partnership merger. Further, our executive officers may be entitled to certain severance payments and benefits following the closing of the merger. Please see "The Mergers — Interests of Our Trustees and Executive Officers in the Mergers" on page 45 for additional information about possible interests that our trustees and executive officers may have in the merger that are different than yours.

**Q:** *How do I cast my vote?*

**A:** If you are a common shareholder of record on the record date, you may vote in person at the special meeting or authorize a proxy for the special meeting. You can authorize your proxy by completing, signing, dating and returning the enclosed proxy card in the accompanying pre-addressed, postage-paid envelope, or, if you prefer, by following the instructions on your proxy card for telephonic or Internet proxy authorization. If the telephone or Internet option is available to you, we strongly encourage you to use it because it is faster and less costly. Registered shareholders can transmit their voting instructions by telephone by calling **1-800-652-VOTE (1-800-652-8683)** or on the Internet at **www.computershare.com/ expressvote**. Telephone and Internet voting are available 24 hours a day until 1:00 a.m. (Chicago time)

19

immediately prior to the special meeting. Have your proxy card with you if you are going to authorize your proxy by telephone or the Internet. To authorize your proxy by mail, please sign, date and mail your proxy card in the envelope provided. If you attend the special meeting in person, you may request a ballot when you arrive.

For participants in the Equity Office Dividend Reinvestment and Share Purchase Plan or the Non-Qualified Employee Share Purchase Plan, your plan shares will be voted as you specify on your proxy card and will not be voted if the proxy card is not returned or if you do not vote in person or authorize your proxy by telephone or the Internet. For employees holding restricted shares acquired through the 1997 Share Option and Share Award Plan or the 2003 Share Option and Share Incentive Plan, your shares will be voted as you specify on your proxy card and will not be voted if the proxy card is not returned or if you do not vote in person or authorize your proxy by telephone or the Internet. Employees and trustees who hold phantom share units in the Equity Office Fourth Amended and Restated Supplemental Retirement Savings Plan ("SRP") are permitted to direct the voting of the shares held by the SRP trustee, Merrill Lynch Trust Company, corresponding to the number of phantom share units credited to the SRP participant's plan account(s). The shares corresponding to your phantom share units will not be voted if you do not direct the SRP trustee how to vote such shares.

*Q:*   ***How do I cast my vote if my common shares are held of record in "street name"?***

A:   If you hold your common shares in "street name" through a broker or other nominee, your broker or nominee will not vote your shares unless you provide instructions on how to vote. You must obtain a proxy form from the broker, bank or other nominee that is the record holder of your shares and provide the record holder of your shares with instructions on how to vote your shares, in accordance with the voting directions provided by your broker, bank or nominee. The inability of your record holder to vote your shares, often referred to as a "broker non-vote", will have the same effect as a vote against the proposal to approve the merger and the merger agreement and will have no effect on the proposal to approve any adjournments of the special meeting for the purpose of soliciting additional proxies. If your shares are held in "street name", please refer to the voting instruction card used by your broker, bank or other nominee, or contact them directly, to see if you may submit voting instructions using the Internet or telephone.

*Q:*   ***What will happen if I abstain from voting or fail to vote?***

A:   With respect to the proposal to approve the merger and the merger agreement, if you abstain from voting, fail to cast your vote in person or by proxy or if you hold your shares in "street name" and fail to give voting instructions to the record holder of your shares, it will have the same effect as a vote against the merger.

With respect to the proposal to approve any adjournments of the special meeting for the purpose of soliciting additional proxies, if you abstain from voting, fail to cast your vote in person or by proxy or, if you hold your shares in "street name," fail to give voting instructions to the record holder of your shares, it will not have any effect on the outcome of that proposal.

*Q:*   ***How will proxy holders vote my common shares?***

A:   If you properly authorize a proxy prior to the special meeting, your common shares will be voted as you direct. If you authorize a proxy but no direction is otherwise made, your common shares will be voted **"FOR"** the proposal to approve the merger and the merger agreement and **"FOR"** the proposal to approve any adjournments of the special meeting for the purpose of soliciting additional proxies. The proxy holders will vote in their discretion upon such other matters as may properly come before the special meeting or any adjournment or postponement of the special meeting.

*Q:*   ***What happens if I sell my common shares before the special meeting?***

A:   If you held your common shares on the record date but transfer them prior to the merger effective time, you will retain your right to vote at the special meeting, but not the right to receive the common share merger consideration for the common shares. The right to receive such consideration when the merger becomes effective will pass to the person who owns the shares you previously owned.

*Q:*   *Can I change my vote after I have mailed my proxy card?*

A:   Yes. If you own common shares as a record holder on the record date, you may revoke a previously authorized proxy at any time before it is exercised by filing with our Secretary a notice of revocation or a duly authorized proxy bearing a later date or by attending the meeting and voting in person. Attendance at the meeting will not, in itself, constitute revocation of a previously authorized proxy. If you have instructed a broker to vote your shares, the foregoing options for changing your vote do not apply and instead you must follow the instructions received from your broker to change your vote.

*Q:*   *Is the merger expected to be taxable to me?*

A:   Yes. The receipt of the merger consideration for each of our shares pursuant to the merger will be a taxable transaction for United States federal income tax purposes. Generally, for United States federal income tax purposes, you will recognize gain or loss as a result of the merger measured by the difference, if any, between the common share merger consideration and your adjusted tax basis in that share. In addition, under certain circumstances, we may be required to withhold a portion of your merger consideration under applicable tax laws. You should read "The Mergers — Material United States Federal Income Tax Consequences" on page 50 for a more complete discussion of the United States federal income tax consequences of the merger. Tax matters can be complicated, and the tax consequences of the merger to you will depend on your particular tax situation. We encourage you to consult your tax advisor regarding the tax consequences of the merger to you.

*Q:*   *Should I send in my certificates representing common shares now?*

A:   No. Shortly after the merger is completed, you will receive a letter of transmittal with instructions informing you how to send your common share certificates to the paying agent in order to receive the common share merger consideration. You should use the letter of transmittal to exchange share certificates for the common share merger consideration to which you are entitled as a result of the merger. **DO NOT SEND ANY SHARE CERTIFICATES WITH YOUR PROXY.**

*Q:*   *Should I send in my certificates representing Series B or Series G preferred shares now?*

A:   No. The preferred shares of the surviving entity (MergerCo) will be uncertificated and any certificates that, prior to the merger effective time, evidenced our preferred shares will be treated by the surviving entity as if such certificates evidenced the preferred shares of the surviving entity constituting the applicable merger consideration.

*Q:*   *What rights do I have if I oppose the merger?*

A:   If you are a common shareholder of record on the record date, you can vote against the proposal to approve the merger and the merger agreement. You are not, however, entitled to dissenters' or appraisal rights under Maryland law because our common shares are listed on the New York Stock Exchange. Please see "No Dissenters' Rights of Appraisal" on page 81.

*Q:*   *What will happen to common shares that I currently own after completion of the merger?*

A:   Following the completion of the merger, your common shares will be canceled and will represent only the right to receive your portion of the common share merger consideration. Trading in our common shares on the New York Stock Exchange will cease. Price quotations for our common shares will no longer be available and we will cease filing periodic reports with the Securities and Exchange Commission, which we refer to as the SEC.

*Q:*   *Have any shareholders already agreed to approve the merger?*

A:   No. There are no agreements between Blackhawk Parent or other affiliates of Blackstone and any of our common shareholders in which a shareholder has agreed to vote in favor of approval of the merger and the merger agreement.

*Q:*   *Where can I find more information about the company?*

A:   We file certain information with the SEC. You may read and copy this information at the SEC's public reference facilities. You may call the SEC at 1-800-SEC-0330 for information about these facilities. This

information is also available on the SEC's website at www.sec.gov and on our website at www.equityoffice.com. Information contained on our website is not part of, or incorporated in, this proxy statement. You can also request copies of these documents from us. See "Where You Can Find More Information" on page 81.

*Q:*   *Who will solicit and pay the cost of soliciting proxies?*

A:   We will bear the cost of soliciting proxies for the special meeting. Our board of trustees is soliciting your proxy on our behalf. Our trustees, officers and employees may solicit proxies by telephone and facsimile, by mail, on the Internet or in person. They will not be paid any additional amounts for soliciting proxies. We have retained MacKenzie Partners, Inc. to assist us in the solicitation of proxies, and will pay approximately $10,000, plus reimbursement of out-of-pocket expenses, to MacKenzie Partners, Inc. for its services. We will also request that banking institutions, brokerage firms, custodians, trustees, nominees, fiduciaries and other like parties forward the solicitation materials to the beneficial owners of common shares held of record by such person, and we will, upon request of such record holders, reimburse forwarding charges and out-of-pocket expenses.

*Q:*   *Who can help answer my other questions?*

A:   If you have more questions about the special meeting or the mergers, you should contact our proxy solicitation agent, MacKenzie Partners, Inc., as follows:

MacKenzie Partners, Inc.
105 Madison Avenue
New York, NY 10016
1-800-322-2885 or call collect to 212-929-5500

If your broker holds your shares, you should also call your broker for additional information.

## CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING STATEMENTS

Information both included and incorporated by reference in this proxy statement may contain forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. Forward-looking statements, which are based on various assumptions and describe our future plans, strategies, and expectations, are generally identified by our use of words such as "intend," "plan," "may," "should," "will," "project," "estimate," "anticipate," "believe," "expect," "continue," "potential," "opportunity," and similar expressions, whether in the negative or affirmative. We cannot guarantee that we actually will achieve these plans, intentions or expectations, including completing the mergers on the terms summarized in this proxy statement. All statements regarding our expected financial position, business and financing plans are forward-looking statements.

Except for historical information, matters discussed in this proxy statement are subject to known and unknown risks, uncertainties and other factors which may cause our actual results, performance or achievements to be materially different from future results, performance or achievements expressed or implied by such forward-looking statements. These risks and other factors include, but are not limited to:

- the failure to satisfy conditions to completion of the mergers, including receipt of shareholder approval;

- the failure to obtain the necessary financing arrangements set forth in commitment letters received by Blackhawk Parent in connection with the proposed transaction;

- the failure of the mergers to close for any other reason;

- the occurrence of any effect, event, development or change that could give rise to the termination of the merger agreement;

- the outcome of the legal proceedings that have been, or may be, instituted against us and others following announcement of our entering into the merger agreement;

- risks that the proposed transaction disrupts current plans and operations including potential difficulties in employee retention;

- the amount of the costs, fees, expenses and charges related to the mergers and the actual terms of certain financings that will need to be obtained for the mergers;

- the impact of substantial indebtedness that will need to be incurred to finance the consummation of the mergers;

- our exclusive remedy against Blackhawk Parent, MergerCo and Merger Partnership with respect to any breach of the merger agreement is to seek damages up to the amount of $1.5 billion (which amount is guaranteed by Blackstone Real Estate Partners V L.P.), which may not be adequate to cover our damages;

- while our occupancy and market rents are increasing, we continue to experience rent roll down in certain markets (although at levels that are significantly less than recent years) as leases expire and are renewed at current rates; our operations also may continue to be negatively impacted by the effect of increased expenses (including energy, real estate taxes, insurance and repairs and maintenance expense) and significant tenant improvement and leasing costs;

- although new construction in our principal markets is not high relative to historic levels, we may face increased competition in certain of our markets as buildings currently planned or under development are completed and begin to lease up;

- our long-term leases cause our operating results to lag improving market conditions;

- our geographic market diversity may cause our overall operating results to be less favorable than operating results in the strongest markets;

- in order to continue to pay distributions to our common shareholders and unitholders at anticipated levels, we must borrow funds or sell assets;

23

- future disposition activity may reduce our income from continuing operations and funds from operations and may also result in gains or losses on sale of real estate, earnings dilution and impairment charges;

- our performance and share value are subject to risks associated with the real estate industry; new acquisitions may fail to perform as expected;

- our ability to dispose of assets on terms we find acceptable will be subject to market conditions we do not control;

- our ability to maintain our status as a REIT for federal and state income tax purposes;

- our properties face significant leasing competition;

- competition for acquisitions or an oversupply of properties for sale could adversely affect us;

- we face potential adverse effects from tenant bankruptcies or insolvencies; and

- a hurricane, earthquake or terrorist act could adversely affect our business and, as a result of our self-insurance levels, such losses, or other potential losses, will not be fully covered by third-party insurance.

These risks and uncertainties, along with the risks that are set forth in the "Risk Factors," "Legal Proceedings" and "Management Discussion and Analysis of Results of Operations and Financial Condition" sections of our or our operating partnership's SEC filings, including our and our partnership's most recent filings on Forms 10-Q and 10-K and our operating partnership's Form 10-K, as amended, should be considered in evaluating any forward-looking statements contained in this proxy statement. All forward-looking statements speak only as of the date of this proxy statement. All subsequent written and oral forward-looking statements attributable to us or any person acting on our behalf are qualified by the cautionary statements in this section.

All information contained in this proxy statement concerning Blackhawk Parent and its subsidiaries or the financing arrangements related to the mergers has been supplied by Blackhawk Parent, MergerCo and Merger Partnership and has not been independently verified by us.

## THE PARTIES TO THE MERGERS

**Equity Office Properties Trust**
**Two North Riverside Plaza, Suite 2100**
**Chicago, Illinois 60606**
**(312) 466-3300**

We are a Maryland real estate investment trust. Operating through our various subsidiaries and affiliates, we are the largest publicly traded owner and manager of office properties in the United States by square footage. At September 30, 2006, we had a national office portfolio comprised of whole or partial interests in 585 office buildings located in 16 states and the District of Columbia. As of that date, we had an ownership presence in 24 Metropolitan Statistical Areas (MSAs) and in 100 submarkets, enabling us to provide a wide range of office solutions for local, regional and national customers. Additional information about us is available on our website at www.equityoffice.com. The information contained on our website is not incorporated into, and does not form a part of, this proxy statement or any other report or document on file with or furnished to the SEC. Our common shares are listed on the New York Stock Exchange under the symbol "EOP." For additional information about us and our business, please refer to "Where You Can Find More Information" on page 81.

**EOP Operating Limited Partnership**
**Two North Riverside Plaza, Suite 2100**
**Chicago, Illinois 60606**
**(312) 466-3300**

Our operating partnership is a Delaware limited partnership through which we conduct substantially all of our business and own, either directly or indirectly through subsidiaries, substantially all of our assets. We serve as the sole general partner of our operating partnership and own approximately 90% of the limited partnership interests of our operating partnership.

**Blackhawk Parent LLC**
**c/o Blackstone Real Estate Partners V L.P.**
**345 Park Avenue**
**New York, New York 10154**
**(212) 583-5000**

Blackhawk Parent is a Delaware limited liability company formed in connection with the mergers by affiliates of Blackstone Real Estate Partners V L.P., a Delaware limited partnership. The principal business of Blackstone Real Estate Partners V L.P. consists of making various real estate related investments. Blackstone Real Estate Partners V L.P. is an affiliate of The Blackstone Group.

The Blackstone Group, a global private investment firm with offices in New York, Atlanta, Boston, Los Angeles, London, Hamburg, Mumbai and Paris, was founded in 1985. Blackstone's real estate group has raised approximately $13 billion for real estate investing and has a long track record of investing in office buildings, hotels and other commercial properties. In addition to real estate, Blackstone's core businesses include private equity, corporate debt investing, marketable alternative asset management, mergers and acquisitions advisory and restructuring and reorganization advisory.

**Blackhawk Acquisition Trust**
**c/o Blackstone Real Estate Partners V L.P.**
**345 Park Avenue**
**New York, New York 10154**
**(212) 583-5000**

MergerCo is a Maryland real estate investment trust and a wholly-owned subsidiary of Blackhawk Parent. MergerCo was formed in connection with the mergers by Blackhawk Parent.

**Blackhawk Acquisition L.P.**
**c/o Blackstone Real Estate Partners V L.P.**
**345 Park Avenue**
**New York, New York 10154**
**(212) 583-5000**

Merger Partnership is a Delaware limited partnership, whose sole general partner is MergerCo. Merger Partnership was formed in connection with the mergers.

## THE SPECIAL MEETING

### Date, Time and Purpose of the Special Meeting

This proxy statement is being furnished to our shareholders in connection with the solicitation of proxies from our common shareholders by our board of trustees to be exercised at a special meeting to be held on Monday, February 5, 2007 at 8:30 a.m., local time. The special meeting will take place at One North Franklin Street, 3rd Floor, Chicago, Illinois. The purpose of the special meeting is for you to consider and vote upon a proposal to approve the merger of Equity Office with and into MergerCo, with MergerCo surviving the

merger, and the merger agreement, to consider and vote on a proposal to approve any adjournments of the special meeting for the purpose of soliciting additional proxies, and to transact any other business that may properly come before the special meeting or any adjournments or postponements of the special meeting. Our common shareholders must approve the merger and the merger agreement for the merger to occur. A copy of the merger agreement is attached as Exhibit A to this proxy statement, which we encourage you to read carefully in its entirety.

## Record Date, Notice and Quorum

All holders of record of our common and preferred shares as of the record date, which was the close of business on December 28, 2006, are entitled to receive notice of and attend the special meeting or any postponements or adjournments of the special meeting. However, only our common shareholders on the record date are entitled to vote at the special meeting or any postponements or adjournments of the special meeting. On the record date, there were 356,504,989 common shares outstanding.

The presence of common shareholders entitled to cast a majority of the votes that are entitled to be cast at the meeting, in person or by proxy, will constitute a quorum for purposes of the special meeting. A quorum is necessary to hold the special meeting. We are not entitled to cast any votes with respect to common shares held by us or any of our subsidiaries (other than in a fiduciary capacity) and any such votes will not be considered to be votes entitled to be cast for purposes of determining a quorum. Abstentions and properly executed broker non-votes will be counted in determining the presence of a quorum. A broker non-vote results as to a particular matter when a broker properly executes and returns a proxy without specific voting instructions from the beneficial owner. Under the rules of the New York Stock Exchange, brokers are precluded from exercising their voting discretion with respect to the approval of non-routine matters, such as the merger or the merger agreement.

## Required Vote

Completion of the merger requires the approval of the merger and the merger agreement by the affirmative vote of common shareholders entitled to cast a majority of the votes entitled to be cast on the matter. Each common shareholder is entitled to cast one vote on each matter presented at the special meeting for each common share owned by such shareholder on the record date. **Because the required vote for this proposal is based on the number of votes our common shareholders are entitled to cast rather than on the number of votes cast, failure to vote common shares that you own (including as a result of broker non-votes) and abstentions will have the same effect as voting against the proposal to approve the merger and the merger agreement.**

In addition, the proposal to approve any adjournments of the special meeting for the purpose of soliciting additional proxies requires the affirmative vote of a majority of the votes cast by our common shareholders on the proposal. For the purpose of this proposal, if any common shareholder fails to cast a vote, in person or by proxy, such failure will not have any effect on the outcome of this proposal. Abstentions and broker non-votes are not considered votes cast and therefore will have no effect on the proposal to approve any adjournments of the special meeting for the purpose of soliciting additional proxies.

Accordingly, in order for your common shares to be included in the vote, if you are a shareholder of record, you must either have your common shares voted by returning the enclosed proxy card or by authorizing your proxy or voting instructions by telephone or Internet or voting in person at the special meeting. The vote of our preferred shareholders is not required to approve the merger and the merger agreement or any adjournments of the special meeting for the purpose of soliciting additional proxies, and is not being solicited.

Record holders may vote or cause their common shares to be voted by proxy using one of the following methods:

- mark, sign, date and return the enclosed proxy card by mail; or

- authorize your proxy or voting instructions by telephone or by Internet by following the instructions included with your proxy card; or

- appear and vote in person by ballot at the special meeting.

Regardless of whether you plan to attend the special meeting, we request that you authorize a proxy for your common shares as described above as promptly as possible. If you own common shares through a bank, brokerage firm or nominee (*i.e.*, in "street name"), you must provide voting instructions in accordance with the instructions on the voting instruction card that your bank, brokerage firm or nominee provides to you. You should instruct your bank, brokerage firm or nominee as to how to vote your common shares, following the directions contained in such voting instruction card. If you have not received such voting instructions or require further information regarding such voting instructions, contact your broker who can give you directions on how to vote your common shares.

If you are a participant in the Equity Office Dividend Reinvestment and Share Purchase Plan or the Non-Qualified Employee Share Purchase Plan or an employee holding restricted shares acquired through the 1997 Share Option and Share Award Plan or the 2003 Share Option and Share Incentive Plan, your shares will be voted as you specify on your proxy card and will not be voted if the proxy card is not returned or if you do not vote in person or authorize a proxy by telephone or the Internet. Employees and trustees who hold phantom share units in the SRP are permitted to direct the voting of the shares held by the SRP trustee, Merrill Lynch Trust Company, corresponding to the number of phantom share units credited to the SRP participant's plan account(s). The shares corresponding to your phantom share units will not be voted if you do not direct the SRP trustee how to vote such shares.

As of the record date, our trustees and executive officers owned and are entitled to vote an aggregate of approximately 1,871,028 common shares, entitling them to exercise approximately 0.52% of the voting power of our common shares entitled to vote at the special meeting. Our trustees and executive officers have informed us that they intend to vote the common shares that they own in favor of approval of the proposal to approve the merger and the merger agreement and in favor of the proposal to approve any adjournments of the special meeting for the purpose of soliciting additional proxies.

**Proxies and Revocation**

If you authorize a proxy, your common shares will be voted at the special meeting as you indicate on your proxy. If no instructions are indicated when you authorize your proxy, your common shares will be voted "FOR" the proposal to approve the merger and the merger agreement and "FOR" the proposal to approve any adjournments of the special meeting for the purpose of soliciting additional proxies.

You may revoke your proxy at any time, but only before the proxy is voted at the special meeting, in any of three ways:

- by delivering, prior to the date of the special meeting, a written revocation of your proxy dated after the date of the proxy that is being revoked to our Secretary at Two North Riverside Plaza, Suite 2100, Chicago, Illinois 60606; or

- by delivering to our Secretary a later-dated, duly executed proxy or by authorizing your proxy by telephone or by Internet at a date after the date of the previously authorized proxy relating to the same shares; or

- by attending the special meeting and voting in person by ballot.

Attendance at the special meeting will not, in itself, constitute revocation of a previously granted proxy. If you own common shares in "street name," you may revoke or change previously granted voting instructions by following the instructions provided by the bank, brokerage firm, nominee or other party that is the registered owner of the common shares.

We do not expect that any matters other than the proposal to approve the merger and the merger agreement and, if necessary, the proposal to approve any adjournments of the special meeting for the purpose

of soliciting additional proxies will be brought before the special meeting. If, however, such a matter is properly presented at the special meeting or any adjournments or postponements of the special meeting, the persons appointed as proxies will have discretionary authority to vote the shares represented by duly executed proxies in accordance with their discretion.

We will pay the costs of soliciting proxies for the special meeting. Our trustees, officers and employees may solicit proxies by telephone and facsimile, by mail, on the Internet or in person. They will not be paid any additional amounts for soliciting proxies. We will also request that individuals and entities holding our common shares in their names, or in the names of their nominees, that are beneficially owned by others, send proxy materials to and obtain proxies from those beneficial owners, and, upon request, will reimburse those holders for their reasonable expenses in performing those services. We have retained MacKenzie Partners, Inc. to assist us in the solicitation of proxies, and will pay fees of approximately $10,000, plus reimbursement of out-of-pocket expenses, to MacKenzie Partners, Inc. for their services. Our arrangement with MacKenzie Partners, Inc. includes provisions obligating us to indemnify it for certain liabilities that could arise in connection with its solicitation of proxies on our behalf.

## Adjournments

Although it is not currently expected, the special meeting may be adjourned for the purpose of soliciting additional proxies if sufficient common shareholders are not present at the special meeting, in person or by proxy, to constitute a quorum or if we believe it is reasonably likely that the merger and the merger agreement will not be approved at the special meeting of shareholders when convened on February 5, 2007, or when reconvened following any adjournment. Any adjournments may be made to a date not more than 120 days after the original record date without notice, other than by an announcement at the special meeting, by the affirmative vote of a majority of the votes cast on the proposal, whether or not a quorum exists, or by the chairperson of the meeting for any reason. Any adjournment of the special meeting for the purpose of soliciting additional proxies will allow shareholders who have already sent in their proxies to revoke them at any time prior to their exercise.

## Postponements

At any time prior to convening the special meeting, our board of trustees may postpone the special meeting for any reason without the approval of our shareholders. If postponed, we will provide at least ten days' notice of the new meeting date. Although it is not currently expected, our board of trustees may postpone the special meeting for the purpose of soliciting additional proxies if it concludes that by the meeting date it is reasonably likely that we will not have received sufficient proxies to constitute a quorum or sufficient votes for the proposal to approve the merger and the merger agreement. Similar to adjournments, any postponement of the special meeting for the purpose of soliciting additional proxies will allow shareholders who have already sent in their proxies to revoke them at any time prior to their use.

## THE MERGERS

### General Description of the Mergers

Under the terms of the merger agreement, affiliates of The Blackstone Group will acquire us and our subsidiaries, including our operating partnership, through their ownership of Blackhawk Parent, the merger of us with and into MergerCo, and the merger of Merger Partnership with and into our operating partnership. Under the merger agreement, we will merge with and into MergerCo with MergerCo continuing as the surviving entity. Immediately prior to the merger effective time, Merger Partnership will merge with and into our operating partnership with our operating partnership continuing as the surviving limited partnership.

**This proxy statement does not constitute any solicitation of consents in respect of the partnership merger, and does not constitute an offer to exchange or convert OP Units that you may own for or into Class H preferred units in the surviving partnership.**

28

**Background of the Mergers**

Over the years, our senior management and board of trustees have periodically reviewed our business strategy and prospects with the goal of maximizing shareholder value in light of changing real estate capital market conditions and, in particular, those affecting the business of office property ownership.

Since 2004, there has been a significant appreciation in the private market value of office properties across the United States, but more particularly in Southern California and in the Washington, DC and New York City metropolitan areas. Our portfolio is located in a large number of markets and is not concentrated just in those three markets. Despite the increasing market value of our portfolio, our board of trustees observed that neither our cash flow nor our stock price increased commensurately.

Our senior management and board of trustees have devoted considerable time and effort in analyzing how best to take advantage of the appreciation in the private market valuation of our portfolio. Over time, our senior management developed and recommended, and our board of trustees approved, a strategy designed to take advantage of higher prices for office properties as an opportunity to refocus the company's capital in markets and properties most likely to deliver long-term growth. As part of this strategy, we have sold strategically less desirable properties and markets and deployed a portion of the proceeds to investment in our strategically more desirable core markets and properties. We have also used some of the proceeds of dispositions to repurchase our common shares. Senior management periodically updated the board of trustees on the status of this strategic program, changing market conditions and management's estimates of the increasing market value of the company's portfolio.

As part of their periodic review of our strategic program, during September 7, 2005 meetings of our board of trustees and its committee of independent trustees, senior management and trustees again discussed the company's strategic plan, including how best to position the company for future success. During the meetings, senior management reported that there were then $2.6 billion of pending or completed company dispositions since the beginning of 2005.

In early November, 2005, the company received an unsolicited, informal inquiry from an investment advisor, which we refer to as Company A and which had in the past partnered in transactions with an institutional client of Company A that has significant financial resources. We refer to this client as Company B. Representatives of Company A expressed an interest, together with Company B in acquiring the company. Mr. Richard D. Kincaid, our President and Chief Executive Officer, informed the representatives of Company A that, while the company was not pursuing a sale, he would inquire of the board of trustees whether it was interested in further conversations with Company A on the subject.

At a November 15, 2005 meeting of our board of trustees, following a management presentation, our board of trustees discussed the company's strategy, including asset dispositions, and factors affecting the company's performance and investment opportunities, such as the increasingly large amount of capital available to buyers pursuing real estate acquisitions or investments in the office sector. The trustees then met in an executive session without the presence of management, other than Mr. Kincaid, who advised them of the unsolicited informal inquiry from Company A. Following discussion, our board of trustees directed senior management to advise Company A that it was not interested in then pursuing a sale of the company and directed senior management to focus its efforts on the company's ongoing strategic initiatives. Senior management of the company informed representatives of Company A accordingly.

On December 13, 2005, our board of trustees met to continue discussion of the company's strategic program. The discussion included the company's dividend policy, the effect of potentially increasing the company's leverage and the possibility of increasing repurchases of the company's common shares. Following discussion, the board authorized increasing the company's open market share repurchase program to approximately $1.5 billion.

During the first week of January, 2006, representatives of Company A, after having been informed that the board was not pursuing a sale of the company, contacted senior management of the company and indicated that Company A was still very interested in pursuing a transaction with the company and that Company B had the financial resources to pay the purchase price without the addition of third party equity partners.

29

Representatives of Company A requested a meeting with senior management and Mr. Samuel Zell, Chairman of our board of trustees. On January 23, 2006, senior management of the company met with representatives of Company A. During the meeting, the possibility of a transaction was discussed, including Company A and Company B acquiring a 20% to 40% interest in the company. On January 24, 2006, Messrs. Zell and Kincaid and Mr. Jeffrey L. Johnson, our Executive Vice President — Chief Investment Officer, also met with representatives of Company A and discussed the possibility of an acquisition of all or a portion of the company. In the course of the meeting, Mr. Zell indicated that he would not be supportive of an acquisition for all of the company if the price was less than $45 a share, at a minimum. On January 23, 2006, trading in our common shares closed at $31.23 per share.

On January 27, 2006, representatives of Company A informed Mr. Kincaid that it was not interested in acquiring a 20% to 40% interest in the company but that it, together with Company B, would consider acquiring 100% of the company for approximately $40 per share in cash. Mr. Kincaid consulted with Mr. Zell and other directors regarding this discussion and then informed Company A that he believed that the price would not be sufficient from the board of trustees' perspective but that the company would allow Company A to review non-public information, subject to the execution of a confidentiality and standstill agreement, in the hopes that reviewing such information would lead Company A to propose a higher per share price. On February 13, 2006, we entered into a confidentiality and standstill agreement with Company A and provided Company A's representatives with non-public due diligence information to assist them in evaluating the company. During this time, senior management then began to consult with Merrill Lynch as financial advisor with respect to a possible transaction with Company A and with respect to a possible leveraged recapitalization.

On February 15, 2006, Messrs. Kincaid and Johnson made presentations to representatives of Company A regarding our business, markets and properties.

On February 19, 2006, Mr. Kincaid participated in a telephone conference with a representative of Company A during which Mr. Kincaid suggested, in response to an inquiry from the representative of Company A, that if Company A were interested in making an offer to acquire the company, it should submit a written offer to our board of trustees specifying Company A's offer price per share and remaining due diligence requirements.

On February 21, 2006, a representative of Company A informed Mr. Kincaid of Company A's continued interest in an acquisition of the company and asked for additional time to submit a written proposal until after Company B's scheduled board meeting on March 13, 2006. Mr. Kincaid indicated that this timing was unacceptably long in view of alternative courses of action relating to its strategic program which the company was actively considering.

On February 22, 2006, Mr. Kincaid was contacted by a representative of Company A who requested an additional week to provide a written offer and indicated that he expected the offer price to be approximately $37-$38 per share, which was lower than Company A's previous preliminary indication of a price of approximately $40 per share. In response, Mr. Kincaid indicated that if Company A wished to pursue a transaction, it needed to submit a written proposal for the board of trustees to consider at its meeting on the following day. Later that day, representatives of Company A informed Mr. Kincaid that Company A was not prepared to submit a written acquisition proposal at that time. On February 22, 2006, trading in our common shares closed at $31.22 per share.

At our board of trustees meeting on February 23, 2006, Mr. Kincaid updated our board of trustees on the status of discussions with Company A. Our senior management expressed concern regarding the price indicated by Company A, the credibility of the indication given the past course of dealing with Company A, the seeming inability of Company A to make a timely decision, and Company A's ability to execute a transaction which would be complex and would represent the largest acquisition of any public real estate company ever undertaken as well as the largest acquisition of any type of public company by a private buyer. In light of the foregoing, our board of trustees directed senior management to terminate discussions with the representatives of Company A. Mr. Johnson informed Company A accordingly.

At the same meeting, and in light of the conversations with Company A, our board of trustees considered the advisability of engaging in a process for soliciting potential purchasers of the company. Mr. Kincaid expressed concern that it would not be possible to preserve the confidentiality of such a process and that if it became publicly known that the company was for sale, the Company would suffer material harm to its strategic disposition program and there could be material disruption within the company and damage to its value, including adverse impacts on our relations with employees and tenants. Concern was also expressed that given the size of the company and the fact that a cash buyout of the company would be the largest such transaction ever undertaken, such a process could ultimately result in the company being sold for less than its true value or not being sold at all. After discussion, the board of trustees affirmed that the company was not pursuing a sale but that it would consider an offer if it was at a price that reflected the company's full value.

At the same meeting, the board of trustees discussed management's continuing view that the public markets were still not reflecting improvements in the underlying value of the company's portfolio, particularly relative to certain other public office REITs with less diversified market concentrations. The board also discussed a number of related topics, including the company's focused strategic asset sales, the ideal size of the company, the company's capital structure, the level and nature of the company's leverage and the desirability of increasing the company's common share repurchase program. The board of trustees directed senior management to study in depth various strategic alternatives and to report back with its findings.

On March 8, 2006, a senior officer of Company B called Mr. Kincaid and indicated that Company B was still interested in acquiring the company. Mr. Kincaid informed him that our board of trustees was skeptical of Company B's ability to consummate a transaction. In response, the senior officer of Company B indicated that he was committed to getting a transaction completed in a timely manner.

On March 16, 2006, representatives of Company A informed Mr. Johnson that they, along with Company B, were still interested in pursuing a transaction with the company, that the board of Company B had met on March 13, 2006 and allocated additional funds for real estate investments sufficient to acquire the company and discussed a value for the company in the $40.75 per share range and that Company A was bringing in a leading investment bank to assist with completing the transaction. Company A's representative did not indicate that final approval of the board of Company B for such a transaction had been obtained. Senior management of the company responded that, while the company was not pursuing a sale, if Company A wished to make a specific proposal in writing, the board of trustees would consider it. Representatives of Company A informed our senior management that they would submit a written offer within a week, which they failed to do. On March 16, 2006, trading in our common shares closed at $34.45 per share.

On April 3, 2006, a representative of Company A contacted Mr. Johnson and informed him that the senior officer of Company B who had contacted Mr. Kincaid on March 8, 2006 had resigned. As a result, our senior management believed that a transaction involving Company A or Company B was unlikely to go forward.

On April 10, 2006, a widely read industry publication reported that a party had recently approached the company regarding buying it. The industry publication also reported that in an interview it held with Mr. Zell, he "described the contact as 'a flirtation.'" The industry publication also stated that Mr. Zell "stressed, as he has in previous discussion with us over nearly 10 years, that EOP has a fiduciary duty to consider any serious bids."

Over the course of April and May, Mr. Johnson and Merrill Lynch had a number of conversations with an investment bank brought in by Company A to assist with a potential transaction. The representative of the investment bank indicated that it and Company B were still interested in pursuing a transaction and were evaluating it.

On May 5, 2006 senior management of the company met with representatives of the investment bank working with Company A to discuss a potential transaction. Our senior management indicated that before the company would consider pursuing a transaction, it would need assurances that Company B was fully committed to executing a transaction in a timely manner.

Subsequently, Mr. Kincaid indicated to representatives of Company A that there would be a meeting of the board on May 23, 2006, and that Company A should submit any proposal it wished to make in advance so

31

that it would be considered at that meeting. On May 19, 2006, representatives of Company A and the investment bank with which it was working informed our senior management that they would not be in a position to make a written offer and that their valuation of the company was in the $37-$38 per share range. On that date, trading in our common shares closed at $32.23 per share.

Pursuant to the direction of the board of trustees at its February 23, 2006 meeting, between board meetings in February 2006 and May 2006, with the assistance of its financial advisor, Merrill Lynch, senior management analyzed and considered various strategic alternatives, including: (1) maintaining the status quo which included executing the company's existing strategic plan of selling assets, engaging in share repurchases, and streamlining operations; (2) implementing a large partial monetization strategy by accelerating asset sales via a joint venture program or outright sale program, the proceeds of which would be used to pay a special dividend, retire debt, repurchase stock and pay transaction costs; (3) executing a leveraged recapitalization with secured debt, the proceeds of which would be used to tender for all outstanding unsecured bonds, repurchase stock and pay tender and other transaction costs; and (4) selling the company through a process for soliciting potential purchasers of the company.

On May 23, 2006, senior management of the company and representatives of Merrill Lynch presented to the board's committee of independent trustees their analysis of the various strategic alternatives. In doing so, they also discussed the company's past and expected future performance, the large number of recent REIT going private transactions, the significant increase in the valuation of public REITs generally, and the spread in value attributed to office real estate properties by the private markets as compared to the public markets. The trustees also discussed their concerns with engaging in a process to solicit potential purchasers of the company, which concerns had previously been discussed at the board meeting held on February 23, 2006. Also participating in the meeting were representatives from Sidley Austin LLP who discussed the trustees' fiduciary duties. The non-management trustees then met in an executive session, without advisors and after discussion, determined to direct management to continue to focus on reallocating capital to key core markets (as distinguished from the company's prior strategy of owning properties in all major markets) instead of pursuing the other strategic alternatives analyzed by Merrill Lynch and senior management. The board of trustees affirmed these conclusions during an executive session without advisors at its meeting the following day and directed senior management to proceed with efforts to re-align the company's portfolio accordingly so long as favorable market conditions continued.

On May 24, 2006, Green Street Advisors, an independent research firm, publicly assigned a 20% takeover probability to our valuation. On that date, trading in our common shares closed at $32.93 per share. They had not previously assigned to the company any takeover probability.

During the first half of 2006, we continued our program to take advantage of extraordinary market conditions to dispose of assets at high valuations, to exit or reduce our presence in certain markets, to acquire additional assets in certain core markets and to repurchase our common shares. During the six months ended June 30, 2006, we sold approximately $417.4 million of assets and acquired assets for approximately $165.1 million.

In the first week of July 2006, Mr. Zell met with the Chairman of the Board of a large public office company, which we refer to as Company C. The Chairman of the Board of Company C had requested the meeting, and at the meeting, unsolicited, raised with Mr. Zell the possibility that the two companies explore structuring a transaction to enhance the value of their assets. Following the meeting, Mr. Zell informed senior management of Company C's interest.

On July 10, 2006, we entered into a confidentiality and standstill agreement with Company C. During July and August, we exchanged with Company C non-public due diligence information and our senior management met with their representatives and exchanged ideas and information about a possible transaction, including the possibility of engaging in asset swaps or our acquiring certain of their assets. Our senior management and Company C's representatives also discussed the possibility of combining the two companies in a stock for stock merger. The discussions were high level and preliminary in nature.

32

On July 24, 2006, our board of trustees held a meeting called primarily for the purpose of considering a reorganization of the company's field operations in view of the diminished size of its portfolio. Responding to a request made at our board of trustees' May 24, 2006 meeting, senior management reported on plans to decrease the company's G&A costs commensurate with the decrease in its portfolio size and to move from a regional to a functional structure with enhanced asset management and pricing functions. Senior management indicated that these plans included elimination of certain positions of current or prospective employees. The board of trustees approved the proposal and the restructuring and the elimination of various positions were announced on July 25, 2006. Senior management also discussed with the board plans for additional dispositions of assets.

In mid August, 2006, Mr. Jonathan D. Gray, Senior Managing Director, of The Blackstone Group, on an unsolicited basis, contacted a representative of Merrill Lynch and indicated a desire to make an offer to acquire the company at a price between $40 and $42 per share as part of a transaction where a large public office company, which we refer to as Company D, would acquire approximately one third of the assets. In response, at the direction of the company, a representative of Merrill Lynch indicated to Mr. Gray that the company was not pursuing a sale of the company and that Mr. Kincaid believed that our board would not deem the price indicated by Mr. Gray to be sufficient. However, he suggested that the parties meet to get acquainted, particularly since the company was actively disposing of assets that Blackstone might find of interest. Based on the company's response, Blackstone did not submit a written offer. On August 18, 2006, trading in our common shares closed at $36.98 per share.

On August 24, 2006, we announced plans to dispose of all of our properties in Atlanta, to reduce the size of our portfolio in Chicago, Denver and Northern California, and to selectively sell assets in our other core markets. These plans involved additional sales totaling $3.0 billion to $3.5 billion in the aggregate.

Subsequently, Blackstone indicated that they were no longer acting together with Company D because that party attributed a lower value than Blackstone to the company's assets in which they had been interested.

On August 28, 2006, a representative of a large private equity fund, which we refer to as Company E, contacted Mr. Johnson, on an unsolicited basis, to inform him about Company E and to suggest that representatives of the parties meet to discuss a possible acquisition of the Company with senior management participating as part of the buying group.

On September 11, 2006, Mr. Kincaid, Mr. Johnson and a representative of Merrill Lynch met with Mr. Gray. At that meeting, Mr. Gray expressed Blackstone's general interest in acquiring the company. Mr. Kincaid reiterated that our board of trustees had indicated that the company was not then pursuing a sale and was primarily focused on its asset sale and capital reallocation program. He noted, however, that if Blackstone was prepared to make a compelling offer, the board of trustees would consider it. On September 11, 2006, trading in our common shares closed at $37.75 per share.

On September 14, 2006, during a meeting of the board of trustees' committee of independent trustees, and on September 15, 2006, during a meeting of our board of trustees, senior management updated our trustees on discussions with Blackstone and Company C as well as that no further discussions were taking place with Company A or Company B. Mr. Kincaid informed the trustees that these parties had been informed that while the company was not then pursuing a sale, senior management would submit to the board of trustees for its consideration any credible offer that reflected the full value of the company. He also informed the trustees that Company E had approached senior management to determine if there was interest in senior management participating in a buyout of the company and that senior management had responded that there was none. Senior management also reported to the board on progress in implementing the company's reorganization of its operations as well as on property disposition and acquisition activities and recommended that the company pursue an aggressive disposition strategy at least through the end of 2006 to continue taking advantage of market conditions.

On October 11, 2006, Messrs. Kincaid and Johnson met with representatives of Company E. Mr. Kincaid informed the representatives that senior management was not interested in participating as members of a buying group of the company.

On October 11, 2006, Mr. Zell met with the Chairman of the Board of Company C and indicated that in light of the conversations between the two companies and potential transactions discussed in the process, he was highly skeptical that the two companies could agree on a transaction that would be beneficial to the company's shareholders. Notwithstanding Mr. Zell's comments, the Chairman of the Board of Company C asked to have a further meeting with Mr. Zell, Mr. Kincaid and the President of Company C to continue exploring the possibility of a transaction.

On October 25, 2006, Messrs. Kincaid and Zell met with the Chairman of the Board and with the President of Company C and further discussed the possibility of the two companies entering into a transaction. On November 3, 2006, Mr. Kincaid met with the President of Company C. The discussions were high level and preliminary in nature.

In the last week of October 2006, Mr. Gray contacted a representative of Merrill Lynch, on an unsolicited basis, to inquire what price the company would consider to be a compelling offer. At the direction of the company, Merrill Lynch's representative declined to provide a price, and with the knowledge of the company, informally indicated that such an offer would have to exceed $45, would probably have to be closer to $50 per share and would have to have a low termination fee. Merrill Lynch informed Blackstone that if it wished to proceed, Blackstone should provide a written proposal to our board of trustees for its consideration.

On November 2, 2006, Blackstone contacted Merrill Lynch and expressed its interest in making a written proposal to acquire the company for $47.50 per share in cash. On that day, trading in our common shares closed at $42.36 per share. Blackstone also requested access to confidential due diligence information regarding the company, and on November 7, 2006, the company entered into a confidentiality and standstill agreement with Blackstone and began providing Blackstone with due diligence information.

On November 13, 2006, Blackstone delivered a written proposal to acquire the company's outstanding common shares and operating partnership units for a cash price of $47.50 per share or unit. The proposal stated that Blackstone anticipated obtaining firm commitments to finance the transaction by November 19, 2006 and that Blackstone would proceed without any financing contingency in the definitive merger agreement. The proposal expressed Blackstone's willingness to accept a termination fee of $275 million (1.3% of the equity value at the indicated offer price). Blackstone indicated that it would be prepared to sign a definitive merger agreement before the opening of trading on November 20, 2006, less than one week from the date of the proposal. On November 13, 2006, trading in our common shares closed at $43.06 per share.

At a meeting of our board of trustees on November 13, 2006 held after receipt of the Blackstone written proposal, Mr. Kincaid discussed the status and course of discussions with each of Company A, Company B, Company C and Company E. He also outlined the history of Blackstone's interest in the company. Mr. Kincaid then discussed the written proposal from Blackstone, including the $47.50 per share price, the $275 million termination fee, and Blackstone's readiness to enter into a definitive merger agreement in less than one week. Representatives of Merrill Lynch described Blackstone and its transactional experience, including its recent series of acquisitions of large public real estate companies. They also reported on the status of Blackstone's financing commitments and conveyed Merrill Lynch's belief that Blackstone would be able to secure the financing needed for the transaction. Representatives from Sidley Austin LLP explained the trustees' duties in the context of a potential sale of the company. Following the discussion, representatives of Merrill Lynch made a presentation to the board with respect to its preliminary financial analysis of the company, the current market for office REITs generally, and a preliminary evaluation of the financial terms of Blackstone's written proposal. Following the presentation and after discussion, our board of trustees determined to authorize senior management to continue to explore a sale transaction with Blackstone. Following discussion among the board members and their advisors, the board determined not to solicit other potential purchasers, taking into account the relatively low proposed termination fee, the history of unsuccessful discussions with other potential purchasers during the prior year and the risks associated with soliciting other purchasers that had been discussed at prior board meetings. The board of trustees directed senior management and Merrill Lynch to continue negotiations with Blackstone toward a transaction with a lower termination fee not to exceed $200 million and a higher price.

Between November 13, 2006 and November 19, 2006, the parties, assisted by their respective advisors, negotiated the terms of the transaction, including the price, amount of the termination fee and the guarantee to be provided by Blackstone Real Estate Partners V L.P. in connection with the transaction. On November 15, 2006, Simpson Thacher & Bartlett LLP, Blackstone's legal counsel, sent an initial draft of the merger agreement to Sidley Austin LLP. In the course of the negotiations, Blackstone agreed to increase its offer price to $48.50 per share, to decrease the proposed termination fee to $200 million and to increase the guarantee of Blackstone Real Estate Partners V L.P. to $1.5 billion from its original proposal of $500 million. Blackstone also indicated that it expected the transaction costs to be in excess of $2 billion, an increase from its prior estimate of $1.3 billion as a result of its due diligence.

During the period from November 15, 2006 through November 19, 2006, representatives of the company, assisted by our financial and legal advisors negotiated with Blackstone and its representatives the provisions of the merger agreement and related documents, including the terms of the Class H preferred units which holders of OP units may elect to receive in lieu of cash if they meet certain conditions, the representations and warranties to be made by each party and the covenants applicable to each party and exchanged multiple drafts of the transaction documents.

At a meeting of our board of trustees convened on November 17, 2006, Mr. Kincaid reported on the negotiations that had taken place since the previous board meeting. Representatives of Sidley Austin LLP summarized the material terms of the draft merger agreement. A summary of the key terms of the merger agreement and the material terms of the proposed Class H preferred units had been previously provided to the board. The board also received an oral report from Merrill Lynch regarding the status of the equity and debt financing commitments being obtained by Blackstone in connection with the proposed transaction.

Our board of trustees held another meeting on November 19, 2006. In advance of the meeting, all members of the board received copies of a Merrill Lynch presentation and a draft of the merger agreement. Mr. Kincaid described the status of the negotiations with Blackstone, informed the trustees that Blackstone Real Estate Partners V L.P. had agreed to provide a $1.5 billion guarantee of Blackstone's obligations under the merger agreement and updated them on financing commitments obtained by Blackstone for the transaction. He also reported on the change of control consequences of the proposed transaction under existing compensation arrangements for senior officers as well as existing severance arrangements for non-executives of the company. Representatives of Sidley Austin LLP again briefed the trustees on their duties and the terms and conditions of the merger agreement. Representatives of Merrill Lynch provided a presentation explaining financial details of the proposed transaction and the underlying basis for their fairness analysis. They also discussed the equity and debt financing commitments submitted by Blackstone and responded to questions from the trustees. At the conclusion of the discussion, representatives from Merrill Lynch rendered an oral opinion to the board, subsequently confirmed in writing, that, as of November 19, 2006 and based upon and subject to the assumptions, qualifications and limitations to be set forth in its written opinion, the proposed cash merger consideration of $48.50 per share to be received by the holders of our common shares, other than Blackhawk Parent and its affiliates, and the proposed cash merger consideration of $48.50 to be received by the holders of OP Units pursuant to the partnership merger (assuming such holders of OP Units receive the proposed cash merger consideration), other than the company or any of its subsidiaries, was fair from a financial point of view to such shareholders and unit holders. Mr. Kincaid then delivered the formal recommendation of senior management that the board approve the merger agreement. The non-management members of the board then met in executive session, without advisors.

After discussion, and taking into account the fairness opinion delivered orally by representatives of Merrill Lynch and other factors described below in greater detail under the heading "Reasons for the Mergers," our board of trustees unanimously adopted resolutions which, among other things, approved the mergers, the merger agreement and the other transactions contemplated by the merger agreement and resolved to recommend that our common shareholders vote for the approval of the merger of the company and the merger agreement.

Following the board meeting, the company and Blackhawk Parent executed the merger agreement. During the late evening on November 19, 2006, the company issued a press release announcing the execution of the