merger agreement. The terms of the merger agreement are detailed below under "The Merger Agreement" beginning on page 55 of this proxy statement.

## Reasons for the Mergers

In reaching its decision to approve the merger, the merger agreement and the other transactions contemplated by the merger agreement and to recommend approval of the merger and the merger agreement to our common shareholders, our board of trustees consulted with our senior management team, as well as our outside legal and financial advisors, and considered a number of factors, including the following material factors which our board of trustees viewed as supporting its decision to approve the merger, the merger agreement and the other transactions contemplated by the merger agreement and to recommend approval of the merger and the merger agreement to our common shareholders:

- the course of negotiations between us and Blackstone resulting in a price per common share that was higher than the original offer price from Blackstone and higher than prior indications of interest received by the company from third parties;

- the belief that the merger was more favorable to our shareholders than other strategic alternatives available to the company after considering indications of interest and conducting comprehensive reviews of strategic alternatives during the past year;

- the high multiples of funds from operations at which shares of REITs, including our common shares, have been trading and the risk that those multiples might not be sustained, which could result in a decline in the trading price of our common shares regardless of our performance;

- favorable conditions for sale transactions in the real estate markets generally and the office sector specifically, including prices for real estate assets being extremely high while capitalization rates are extremely low, the relatively low interest rate environment and the number of large portfolio acquisitions and public real estate mergers in recent years;

- the high probability that the mergers would be completed based on, among other things, Blackstone's proven ability to complete large acquisition transactions on the agreed terms, Blackstone's extensive experience in the real estate industry, the lack of a financing condition, and Blackstone Real Estate Partners V L.P.'s $1.5 billion guarantee of the acquisition entities' obligations under the merger agreement;

- the receipt of executed commitment letters from Blackhawk Parent's sources of debt and equity bridge financing for the merger, including the terms of the commitments and the reputation of the financing sources which in the judgment of our board of trustees, increases in the likelihood of such financings being completed;

- the terms and conditions of the merger agreement, which were reviewed by our board of trustees with our financial and legal advisors and the fact that such terms were the product of arm's-length negotiations between the parties;

- the financial presentation of Merrill Lynch, including its oral opinion, which opinion was subsequently confirmed in writing, to our board of trustees to the effect that as of November 19, 2006 and based upon the assumptions made, matters considered and limits of review set forth therein, the common share merger consideration of $48.50 to be received by the holders of our common shares pursuant to the merger is fair from a financial point of view to the holders of our common shares (other than Blackhawk Parent and its affiliates) and the cash merger consideration of $48.50 to be received by the holders of OP Units pursuant to the partnership merger (assuming such holders of OP Units receive the cash merger consideration), other than us or any of our subsidiaries, is fair from a financial point of view to such holders (see "— Opinion of Our Financial Advisor" on page 38);

- the current and historical trading prices for our common shares, and the fact that over the 52-week period ended November 17, 2006, the last trading day prior to the date of the public announcement of the merger agreement, the low price was $28.78 per share and the high price was $44.90 per share;

- our ability, under the merger agreement, under certain circumstances, to consider and respond to an unsolicited written acquisition proposal, and if, after consultation with our financial advisors, the board of trustees determines in good faith that such acquisition proposal is a superior proposal, and Blackhawk Parent chooses not to make improvements to the merger agreement such that the acquisition proposal continues to be a superior proposal, our ability to terminate the merger agreement upon the payment of a termination fee of $200 million which, according to Merrill Lynch's analysis, was a relatively low termination fee;

- our ability, under the merger agreement, to withdraw, modify or amend our recommendation that shareholders vote to approve the merger agreement and the merger under certain circumstances, subject to payment of a termination fee of $200 million if Blackhawk Parent elects to terminate the merger agreement;

- the fact that the all cash merger consideration will provide our shareholders with immediate fair value, in cash, for all of their shares;

- the limited number of potential purchasers with the financial ability to acquire us;

- the fact that our management team recommended the merger to our board of trustees;

- the fact that Blackhawk Parent did not require a voting agreement from any of our principal shareholders; and

- the fact that the merger is subject to the approval of our common shareholders.

Our board of trustees also considered the following potentially negative factors in its deliberations concerning the merger agreement and the merger:

- the merger would preclude our shareholders from having the opportunity to participate in the future performance of our assets, future earnings growth, future appreciation of the value of our common shares or future dividends that could be expected if our strategic plan were successfully implemented;

- the significant costs involved in connection with entering into and completing the merger and the substantial time and effort of management required to consummate the merger and related disruptions to the operation of our business;

- the restrictions on the conduct of our business prior to the completion of the merger, which could delay or prevent us from undertaking business opportunities that may arise pending completion of the merger;

- the pending merger or failure to complete the merger may cause substantial harm to relationships with our employees and may divert management and employee attention away from the day to day operation of our business;

- our inability to solicit competing acquisition proposals and the possibility that the $200 million termination fee payable by us upon the termination of the merger agreement could discourage other potential bidders from making a competing bid to acquire us;

- the fact that an all cash merger would be taxable to our shareholders for U.S. federal income tax purposes;

- the fact that our shareholders will not be entitled to dissenters' rights under Maryland law;

- our inability to take action to cause specific performance or require Blackhawk Parent, MergerCo and Merger Partnership to complete the mergers, and our exclusive remedy against Blackhawk Parent, MergerCo and Merger Partnership with respect to any breach of the merger agreement being to seek damages up to the amount of $1.5 billion, which amount is guaranteed by Blackstone Real Estate Partners V L.P.; and

- the fact that some of our trustees and executive officers may have interests in the mergers that are different from, or in addition to, our shareholders (see "— Interests of Our Trustees and Executive Officers in the Mergers" on page 45).

The foregoing discussion of the factors considered by our board of trustees is not intended to be exhaustive, but rather includes the material factors considered by our board of trustees. In reaching its decision to approve the merger, the merger agreement and the other transactions contemplated by the merger agreement, our board of trustees did not quantify or assign any relative weights to the factors considered and individual trustees may have given different weights to different factors. In the event the merger is not completed for any reason, we expect to continue to pursue our strategic plan with the intention of delivering further improvement in our financial results and enhanced shareholder value.

## Recommendation of Our Board of Trustees

**Our board of trustees, by unanimous vote, has approved the merger, the merger agreement and the other transactions contemplated by the merger agreement and has declared the merger, the merger agreement and the other transactions contemplated by the merger agreement advisable and in the best interests of Equity Office and our shareholders. Our board of trustees recommends that you vote "FOR" the proposal to approve the merger and the merger agreement and "FOR" the proposal to approve any adjournments of the special meeting for the purpose of soliciting additional proxies.**

## Opinion of Our Financial Advisor

On November 19, 2006, Merrill Lynch delivered its oral opinion, which opinion was subsequently confirmed in writing, to our board of trustees to the effect that, as of such date and based upon the assumptions made, matters considered and limits of review set forth in its written opinion, the common share merger consideration of $48.50 to be received by the holders of our common shares pursuant to the merger is fair from a financial point of view to the holders of our common shares, other than Blackhawk Parent and its affiliates, and the cash merger consideration of $48.50 to be received by the holders of OP Units pursuant to the partnership merger (assuming such holders of OP Units receive the cash merger consideration), other than us or any of our subsidiaries, is fair from a financial point of view to such holders.

**The full text of the written opinion of Merrill Lynch, dated as of November 19, 2006, which sets forth the assumptions made, matters considered and limits on the scope of the review undertaken in connection with the opinion is attached as Exhibit B to this proxy statement. The summary of Merrill Lynch's opinion below is qualified by reference to the full text of the opinion, and you are encouraged to read Merrill Lynch's opinion in its entirety. Merrill Lynch's opinion was intended for the use and benefit of our board of trustees, does not address the merits of the underlying decision by the company to engage in the mergers and does not constitute a recommendation to any holder of common shares as to how such holder should vote on the merger or any related matter.**

Merrill Lynch was not asked to address, nor does its opinion address, the fairness to, or any other consideration of, the holders of any class of securities, creditors or other constituencies of Equity Office, other than the holders of common shares and the holders of OP Units who receive the cash merger consideration. In rendering its opinion, Merrill Lynch did not opine as to (i) the proposed consideration to be received by the holders of OP Units that elect to receive Class H preferred units under the terms and subject to the conditions set forth in the merger agreement or (ii) the consideration to be received by the holders of the company's Series B preferred shares and the holders of the company's Series G preferred shares.

In arriving at its opinion, Merrill Lynch, among other things:

(1) reviewed certain publicly available business and financial information relating to Equity Office that it deemed to be relevant;

(2) reviewed certain information, including financial forecasts, relating to the business, earnings, cash flow, assets, liabilities and prospects of Equity Office furnished to Merrill Lynch by Equity Office;

(3) conducted discussions with members of senior management of Equity Office concerning the matters described in clauses 1 and 2 above;

(4) reviewed the market prices and valuation multiples for Equity Office common shares and compared them with those of certain publicly traded companies that it deemed to be relevant;

(5) reviewed the results of operations of Equity Office and compared them with those of certain publicly traded companies that it deemed to be relevant;

(6) compared the proposed financial terms of the mergers with the financial terms of certain other transactions that it deemed to be relevant;

(7) participated in certain discussions and negotiations among representatives of Equity Office and Blackhawk Parent and their financial and legal advisors;

(8) reviewed a draft dated November 19, 2006 of the merger agreement; and

(9) reviewed such other financial studies and analyses and took into account such other matters as it deemed necessary, including its assessment of general economic, market and monetary conditions.

In preparing its opinion, Merrill Lynch assumed and relied upon the accuracy and completeness of all information supplied or otherwise made available to Merrill Lynch, discussed with or reviewed by or for Merrill Lynch, or publicly available, and did not assume any responsibility for independently verifying such information or undertaking an independent evaluation or appraisal of any of the assets or liabilities of Equity Office and was not furnished with any such evaluation or appraisal, nor did Merrill Lynch evaluate the solvency or fair value of Equity Office under any state or federal laws relating to bankruptcy, insolvency or similar matters. In addition, Merrill Lynch has not assumed any obligation to conduct any physical inspection of the properties or facilities of Equity Office. With respect to the financial forecast information furnished to or discussed with Merrill Lynch by Equity Office, Merrill Lynch assumed that they were reasonably prepared and reflected the best currently available estimates and judgment of our management as to the expected future financial performance of Equity Office. Merrill Lynch also assumed that the final form of the merger agreement would not differ in any material respect from the last draft reviewed by it.

Merrill Lynch's opinion was necessarily based upon market, economic and other conditions as they existed and could be evaluated on, and on the information made available to Merrill Lynch as of, the date of its opinion. In connection with the preparation of Merrill Lynch's opinion, Merrill Lynch did not solicit, nor was it authorized by our board of trustees to solicit, third party indications of interest for the acquisition of Equity Office. Additionally, Merrill Lynch's opinion did not express any opinion as to the prices at which our common shares would trade following the announcement of the mergers.

The following is a summary of the material financial and comparative analyses performed by Merrill Lynch that were presented to our board of trustees in connection with its opinion. The following summary, however, does not purport to be a complete description of its presentations or the financial analyses performed by Merrill Lynch, nor does the order of the analyses described represent relative importance or weight given to those analyses by Merrill Lynch. We provided Merrill Lynch with the following capitalization data, as of November 17, 2006, for purposes of the analyses summarized below: 351,963,875 common shares; 38,531,496 OP units; 14,557,547 in-the-money options; 8,389,256 shares issuable upon conversion of the Series B preferred shares, 41,424,900 shares issuable upon conversion of the Exchangeable Notes, 296,768 Unvested Strategic Long Term Incentive Plan ("STLI") shares, and 76,634 Unvested Deferred Equity Plan ("DEP") Shares. Merrill Lynch observed the publicly available historical trading prices for our common shares, as reported by FactSet, and noted that over the 52-week period ended November 17, 2006, the low price was $28.78 per share and the high price was $44.90 per share.

Except as otherwise noted, the following quantitative information, to the extent that it is based on market data, is based on market data as it existed on or before November 17, 2006, and is not necessarily indicative of current market conditions.

*Comparable Public Companies Analysis*

Using publicly available information, Merrill Lynch reviewed and analyzed certain financial information, ratios and public market multiples, where applicable, for the following publicly traded companies in the REIT industry:

**Public Companies Reviewed**

- Boston Properties, Inc.
- Brandywine Realty Trust
- Brookfield Properties Corporation
- Corporate Office Properties Trust
- Cousins Properties Incorporated
- Crescent Real Estate Equities Company
- Duke Realty Corporation
- Highwoods Properties, Inc.
- HRPT Properties Trust
- Kilroy Realty Corporation
- Lexington Corporate Properties Trust
- Liberty Property Trust
- Mack-Cali Realty Corporation
- Maguire Properties, Inc.
- Parkway Properties, Inc.
- Reckson Associates Realty Corporation
- SL Green Realty Corp.
- Washington Real Estate Investment Trust
- Vornado Realty Trust

Using publicly available information, Merrill Lynch then compared certain financial information, ratios and public market multiples for the following publicly traded companies, which were selected from the list above:

**Public Companies Selected**

- Boston Properties, Inc.
- Brandywine Realty Trust
- Brookfield Properties Corporation
- Mack-Cali Realty Corporation
- SL Green Realty Corp.

Although none of the selected companies is directly comparable to Equity Office, the companies included were selected because they are publicly traded companies with operations that for purposes of analysis may be considered similar to certain operations of Equity Office. Accordingly, a complete analysis of the results of the following calculations cannot be limited to a quantitative review of such results and involves complex considerations and judgments concerning the differences in the financial and operating characteristics of the

40

comparable companies and other factors that could affect the public share prices of the comparable companies, as well as the price of our common shares.

The multiples and ratios for Equity Office and each of the selected companies were calculated using their respective closing prices on November 17, 2006 and were based on the most recent publicly available information, Wall Street research and FirstCall consensus reports.

Merrill Lynch calculated illustrative implied prices of our common shares by multiplying management's forward estimated funds from operations ("FFO") per common share for the year 2007 by a range of multiples from 18.0x to 20.0x. This range of multiples was chosen based upon estimated 2007 FFO multiples per share for the selected comparable companies. This analysis yielded illustrative implied prices for our common shares ranging from $41.04 to $45.60 per diluted share.

In addition, Merrill Lynch calculated illustrative implied prices of our common shares by multiplying management's projected earnings before interest, tax, depreciation, and amortization ("EBITDA") for the year 2007 by a range of multiples from 17.5x to 18.5x. This range of multiples was chosen based upon total enterprise value to estimated 2007 EBITDA multiples as of November 17, 2006 for the selected comparable companies. This analysis yielded illustrative implied prices for our common shares ranging from $44.56 to $48.40 per diluted share.

### Net Asset Value Analysis

Merrill Lynch performed a net asset value ("NAV") analysis on Equity Office using gross real estate asset valuations provided by our management. The NAV methodology is relevant for a business like Equity Office in evaluating its underlying real estate assets. Merrill Lynch calculated estimated implied 2007 nominal capitalization rates, based on estimated net operating income projections for 2007 provided by management, and implied values per square foot of Equity Office's properties. The estimated gross real estate value of our properties plus the value of our other assets net of our liabilities yielded a range of $45.63 to $49.06 per diluted share (assuming approximately $340 million of incremental liabilities associated with marking to market the company's indebtedness and excluding any adjustments for transaction costs). The estimated implied 2007 nominal capitalization rates and values per square foot ranged from 5.4% to 5.7% and $349 to $367, respectively.

In addition, Merrill Lynch calculated the NAV range as adjusted by estimated transaction costs, which included severance payments, debt defeasance and repayment costs, transfer taxes and professional fees. Merrill Lynch assumed that these aggregate transaction costs were approximately $940 million. The estimated NAV per common share, adjusted for these transaction costs (but excluding the adjustment associated with marking to market the company's indebtedness referenced in the preceding paragraph), yielded a range of $43.75 to $47.21 per diluted share.

Merrill Lynch also examined recent publicly available equity research NAV estimates from financial institutions that provide research coverage of Equity Office. The estimated NAV indication from equity analysts' reports yielded ranges of $34.00 to $46.50 (based on the mid point of one equity analyst's estimated NAV range) and $34.00 to $50.00 per diluted share (based on the high end of the same equity analyst's estimated NAV range).

### Discounted Cash Flow Analysis

Merrill Lynch performed a discounted cash flow ("DCF") analysis on Equity Office, based on projections provided by our management. The DCF analysis was performed in order to evaluate the fully diluted equity value per common share. Merrill Lynch calculated illustrative implied equity value per share by calculating (a) the sum of (i) the illustrative present value indications of unlevered free cash flows for Equity Office for the years 2007 though 2010 using discount rates ranging from 7.25% to 7.75%, based on the estimated cost of capital of Equity Office, which included consideration of historical rates of return for publicly-traded common stocks, risks inherent in the industry and specific risks associated with the continuing operations of Equity Office on a standalone basis, and (ii) the present value of the illustrative terminal value using estimated 2011

EBITDA based on terminal EBITDA multiples ranging from 17.5x to 18.5x, based upon total enterprise value to estimated 2007 EBITDA multiples as of November 17, 2006 for the selected comparable companies described above, and using discount rates ranging from 7.25% to 7.75% less (iii) management's projection of Equity Office's net debt of $12.9 billion as of December 31, 2006 divided by (b) total outstanding diluted common shares. The DCF analysis yielded an implied equity value per diluted share ranging from $41.34 to $46.11.

### Comparable Transaction Analysis

Using publicly available information, Merrill Lynch examined the following selected transactions in the office real estate industry:

Acquiror / Target / Announcement Date

- SL Green Realty Corporation / Reckson Associates Realty Corporation / August 3, 2006

- Brookfield Properties Corporation — The Blackstone Group / Trizec Properties Inc. / June 5, 2006

- The Blackstone Group / CarrAmerica Realty Corporation / March 6, 2006

- General Electric Capital Corporation / Arden Realty, Inc. / December 21, 2005

Merrill Lynch selected these precedent transactions on the basis of a range of factors, including the industry in which the target companies operate, and the property characteristics and asset quality of the target companies. For each of the selected transactions, Merrill Lynch calculated and compared the implied forward EBITDA multiple and the implied forward nominal capitalization rate. These financial measures are relevant in evaluating the value of companies like Equity Office and the companies selected in this comparable transactions analysis. Merrill Lynch selected a range of forward EBITDA multiples of 18.0x to 19.0x based on the implied forward EBITDA multiples for the selected precedent transactions and a range of forward nominal capitalization rates of 5.25% to 5.75% based on the implied forward nominal capitalization rates for the selected precedent transactions. The range of forward EBITDA multiples, applied to management's estimated 2007 EBITDA, yielded an implied equity value per diluted share range of $45.95 to $49.82. The range of forward nominal capitalization rates, applied to management's estimated 2007 net operating income and excluding any adjustment for transaction costs, yielded an implied equity value per diluted share range of $44.41 to $50.75.

The summary set forth above describes the material analyses performed by Merrill Lynch but does not purport to be a complete description of the analyses performed by Merrill Lynch in arriving at its opinion. The preparation of a financial opinion is a complex process and is not necessarily susceptible to partial or summary description. Accordingly, Merrill Lynch believes that its analyses must be considered as a whole and that selecting portions of its analyses and the factors considered by Merrill Lynch, without considering all analyses and factors, could create an incomplete view of the process underlying the Merrill Lynch opinion. Merrill Lynch did not assign relative weights to any of its analyses in preparing its opinion. The matters considered by Merrill Lynch in its analyses were based on numerous macroeconomic, operating and financial assumptions with respect to industry performance, general business and economic conditions and other matters, many of which are beyond Equity Office's and Merrill Lynch's control, and involve the application of complex methodologies and educated judgments. In addition no company utilized as a comparison in the analyses described above is identical to Equity Office, and none of the transactions utilized as a comparison is identical to the mergers.

Our board of trustees selected Merrill Lynch as its financial advisor because of Merrill Lynch's reputation as an internationally recognized investment banking and advisory firm with substantial experience in transactions similar to the mergers and because Merrill Lynch is familiar with Equity Office and its business. As part of Merrill Lynch's investment banking business, Merrill Lynch is continually engaged in the valuation of businesses and their securities in connection with mergers and acquisitions, leveraged buyouts, negotiated underwritings, competitive biddings, secondary distributions of listed and unlisted securities, private placements and valuations for corporate and other purposes. Pursuant to a letter agreement dated as of November 13,

2006, between us and Merrill Lynch, we agreed to pay Merrill Lynch a fee of $30 million for its services if the proposed mergers are consummated. Additionally, we have agreed to indemnify Merrill Lynch and certain related persons for certain liabilities related to or arising out of its engagement, including liabilities under the federal securities laws.

Merrill Lynch has, in the past, provided financial advisory and financing services to Equity Office and certain affiliates of Blackhawk Parent and may continue to do so and has received, and may receive, fees for rendering such services. In the past two years, we have paid to Merrill Lynch approximately $18.6 million in fees in connection with financial services provided by Merrill Lynch to us. Merrill Lynch will also serve as a dealer manager for the debt tender offers and solicitation agent for the exchangeable notes consent solicitation, in each case related to the mergers, for which Merrill Lynch will be paid customary fees. Merrill Lynch may actively trade or invest in the equity and other securities of Equity Office and affiliates of Blackhawk Parent for its own account and for the accounts of customers, and accordingly, may at any time hold a long or short position in such securities.

## Financing

In connection with the mergers, Blackhawk Parent will cause an aggregate of approximately $19.5 billion to be paid to our common shareholders, the limited partners (other than us or any of our subsidiaries) of our operating partnership (assuming none of the limited partners of our operating partnership elect to receive Class H preferred units in our operating partnership in lieu of cash consideration) and holders of share options, restricted shares, stock appreciation rights and performance awards. Blackhawk Parent will also cause approximately $360 million (plus accrued and unpaid distributions) to be paid to the holders of our Series B preferred shares (assuming none of the Series B preferred shares have been converted into our common shares prior to the merger effective time) and Series G preferred shares in connection with the liquidation of the surviving entity into Blackhawk Parent after the merger. In addition, our operating partnership has commenced tender offers to purchase up to all of the senior notes and it has called for redemption all of the $50 million aggregate principal amount outstanding of its 6.880% Notes due April 30, 2007 and its 7.875% Notes due December 1, 2016. As of December 28, 2006, there were approximately $8.4 billion aggregate principal amount of senior notes, $51.5 million aggregate principal amount of redemption notes ($1.5 million of which will be repaid at maturity on February 1, 2007) and $1.5 billion aggregate principal amount of exchangeable notes outstanding. Our revolving credit facility will also be repaid and our mortgage loan agreements and secured debt will be repaid or remain outstanding. As of December 28, 2006, we had an aggregate principal amount of approximately $4.4 billion of consolidated indebtedness under our revolving credit facility, mortgage loan agreements and secured debt. As of December 28, 2006, our share of unconsolidated joint venture secured debt was approximately $167 million.

In connection with the execution and delivery of the merger agreement, Blackhawk Parent obtained a debt commitment letter from Goldman Sachs Mortgage Company, Bear Stearns Commercial Mortgage, Inc. and Bank of America, N.A. providing for debt financing in an aggregate principal amount of up to the lesser of (a) $29.6 billion and (b) 82.5% of the total consideration payable by Blackhawk Parent for the completion of the mergers and other costs, such as transaction costs relating to the mergers, less the aggregate amount of our existing indebtedness that is not repaid or defeased at the time of the mergers. Goldman Sachs Mortgage Company, Bear Stearns Commercial Mortgage, Inc. and Bank of America, N.A. have been joined in their commitment by Citigroup Global Markets Realty Corp., Column Financial, Inc. (an affiliate of Credit Suisse Group), German American Capital Corporation (an affiliate of Deutsche Bank Securities Inc.), Morgan Stanley Mortgage Capital Inc. and Wachovia Bank, National Association. In addition, Blackhawk Parent obtained an equity bridge commitment letter from Goldman, Sachs & Co., Bear Stearns Commercial Mortgage, Inc. and BAS Capital Funding Corporation (an affiliate of Bank of America, N.A.) providing for an equity investment in an aggregate amount of up to $3.5 billion. Goldman, Sachs & Co., Bear Stearns Commercial Mortgage, Inc. and BAS Capital Funding Corporation have been joined in their commitment by Morgan Stanley Mortgage Capital Inc. and Morgan Stanley Real Estate Special Situations Fund III, L.P. It is expected that in connection with the mergers, affiliates of The Blackstone Group will contribute up to approximately $3.2 billion of equity

to Blackhawk Parent, which amount will be used to fund the remainder of the acquisition costs that are not covered by the debt and equity bridge financing.

In addition to the payment of the merger consideration, the funds to be advanced under the commitment letters will be used for purposes such as reserves, the tenders for, or refinancing of, our existing debt, and for other costs and expenses related to the mergers. Blackstone has informed the company that it currently believes that the funds to be borrowed under the debt commitment letter are to be secured by, among other things, a first priority mortgage lien on certain office buildings which are wholly-owned or ground leased by us, a security interest in our equity interests in certain joint ventures which own office buildings directly or indirectly and escrows, reserves, a cash management account, a first priority pledge of and security interest in any mezzanine borrower's interests and such other pledges and security required by the lenders to secure and perfect their interest in the collateral.

The equity bridge and debt commitment letters terminate on May 31, 2007. Funding under the equity bridge commitment letter is conditioned on the closing of the debt financing and the mergers being completed. The debt financing is conditioned on the mergers being completed and other customary conditions for similar financings. The lenders have the right to terminate the debt commitment letter under certain circumstances, including if Blackhawk Parent is entitled to terminate the merger agreement due to a breach of certain representations and warranties or any other section in the merger agreement relating to a material adverse effect with respect to us.

The merger agreement does not contain a financing condition or a "market MAC" condition to the closing of the mergers. Under the terms of the merger agreement, Blackhawk Parent has agreed to use its reasonable best efforts to arrange its equity bridge and debt financing on the terms and conditions described in the commitment letters. In the event that any portion of Blackhawk Parent's equity bridge or debt financing becomes unavailable on the terms and conditions contemplated in the commitment letters, Blackhawk Parent is obligated to use its reasonable best efforts to arrange to obtain that portion from alternative sources on comparable or more favorable terms. Blackhawk Parent is obligated to keep us informed of the status of its efforts to arrange equity bridge and debt financing and to give us prompt notice of any material breach by any party of the commitment letters or of any termination of the commitment letters. Before it permits any material amendment or modification to be made to, or any waiver of any material provision or remedy under, the commitment letters which would or would be reasonably expected to materially and adversely affect or delay in any material respect Blackhawk Parent's ability to consummate the mergers, Blackhawk Parent must first obtain our written consent (which shall not be unreasonably withheld or delayed). With certain exceptions, we have agreed to provide, and to cause our subsidiaries and our and their representatives to provide, all reasonable cooperation in connection with the arrangement of the equity bridge and debt financing as may be reasonably requested by Blackhawk Parent.

### Guarantee and Remedies

In connection with the merger agreement, Blackstone Real Estate Partners V L.P. has agreed uncondition-ally to guarantee the due and punctual observance, performance and discharge of all of the payment obligations, and the timely performance when required of all indemnification obligations of Blackhawk Parent, MergerCo and Merger Partnership under the merger agreement, up to a maximum amount of $1.5 billion. The guarantee is not subject to an escrow of any funds supporting it and will terminate on the earlier of the merger effective time or November 19, 2008.

We cannot seek specific performance to require Blackhawk Parent, MergerCo and Merger Partnership to complete the mergers, and our exclusive remedy, except with respect to enforcing confidentiality provisions, against Blackhawk Parent, MergerCo and Merger Partnership with respect to any breach of the merger agreement is to seek damages up to the amount of $1.5 billion (which amount is guaranteed by Blackstone Real Estate Partners V L.P.). Blackhawk Parent, MergerCo and Merger Partnership can, however, seek specific performance to require us to complete the mergers.

**Interests of Our Trustees and Executive Officers in the Mergers**

*Share Options, Restricted Shares and Performance Awards*

As of the record date, there were 14,324,013 common shares subject to share options, of which 3,581,092 were unvested, 1,838.830 unvested restricted shares, and performance awards in respect of a maximum number of 373,402 shares, all of which were unvested, in each case granted to our trustees and executive officers under our equity award plans.

Under the terms of the merger agreement, immediately prior to the merger effective time, outstanding share options, restricted shares and performance awards, including those held by our trustees and executive officers, whether or not exercisable or vested, will become fully vested and exercisable or payable, as the case may be, and, in the case of the restricted shares and performance awards, free of any forfeiture restrictions. Specifically, under the merger agreement:

- unvested share options held by our executive officers and Mr. Samuel Zell, Chairman of our board of trustees, will become fully vested and exercisable, and all share options held by our trustees and executive officers and not exercised will be canceled as of the merger effective time in exchange for the right to receive a single lump sum cash payment in respect of each common share underlying their share options equal to the excess, if any, of $48.50 per share over the exercise price per share of their share options, less applicable withholding taxes;

- restricted shares owned by our executive officers and certain of our trustees will become fully vested and free of any forfeiture restrictions immediately prior to the merger effective time and will be considered outstanding common shares for purposes of the merger agreement, including the right to receive the common share merger consideration, less applicable withholding taxes; and

- each outstanding performance award held by our executive officers will become fully vested and free of any forfeiture restrictions immediately prior to the merger effective time and will be paid out, in the case of awards granted under the Strategic Long-Term Incentive Plan, based on performance through the end of the calendar quarter preceding the date of the merger agreement plus accumulated dividends based on awards to be paid out at 200% of target, and, in the case of awards granted under the Deferred Equity Plan, at the maximum level (200% of target) in a lump sum cash payment equal to $48.50 per share subject to the performance award, less applicable withholding taxes.

The following table summarizes (a) the unvested share options with exercise prices of less than $48.50 per share (all of our share options outstanding as of the date of this proxy statement had exercise prices of less than $48.50), (b) the unvested restricted shares, and (c) the unvested performance awards, in each case held by each of our executive officers and trustees as of December 28, 2006, and the aggregate consideration that each of them will receive under the merger agreement with respect to their unvested share options, restricted shares and performance awards.

| Name | No. of Shares Underlying Unvested Options | Weighted Average Exercise Price Unvested Options(1) | Number of Outstanding Unvested Restricted Shares | Dollar Amount of Cash Payable in Respect of Unvested Performance Awards(2) | Aggregate Resulting Consideration |
|---|---|---|---|---|---|
| **Executive Officers:** | | | | | |
| Richard D. Kincaid | 427,727 | $29.68 | 185,738 | $3,618,327 | $20,675,587 |
| Debra L. Ferruzzi | 60,386 | 29.87 | 25,395 | 651,247 | 3,008,055 |
| Jeffrey L. Johnson | 262,392 | 29.76 | 90,689 | 1,873,232 | 11,187,616 |
| Peyton H. Owen, Jr. | 145,730 | 29.88 | 48,550 | 1,388,583 | 6,456,023 |
| Stanley M. Stevens | 108,080 | 29.68 | 50,936 | 796,522 | 5,300,486 |
| Marsha C. Williams | 184,229 | 29.67 | 70,740 | 1,532,264 | 8,432,850 |
| Robert J. Winter | 63,279 | 29.32 | 31,052 | 1,062,110 | 3,781,794 |
| **Trustees:** | | | | | |
| Marilyn A. Alexander | — | — | — | — | — |
| Thomas E. Dobrowski | — | — | 1,254 | — | 60,819 |
| William M. Goodyear | — | — | 1,254 | — | 60,819 |
| James D. Harper, Jr. | — | — | 1,254 | — | 60,819 |
| Sheli Z. Rosenberg | — | — | 1,254 | — | 60,819 |
| Stephen I. Sadove | — | — | — | — | — |
| Sally Susman | — | — | — | — | — |
| Jan H.W.R. van der Vlist | — | — | — | — | — |
| Samuel Zell | 552,911 | 29.83 | 232,350 | — | 21,592,797 |

(1) The weighted average exercise prices have been rounded to the nearest one-hundredth.

(2) Calculated as unvested target shares multiplied by 200% (which will result in the maximum payment in respect of such performance awards, as provided for in the merger agreement) plus accrued dividend equivalents.

For a more complete discussion of the beneficial ownership of our securities by our trustees and executive officers, please see "Securities Ownership of Certain Beneficial Owners and Management — Common Share and Unit Ownership by Trustees and Executive Officers" on page 77 of this proxy statement.

*OP Units*

Pursuant to the merger agreement, in the partnership merger, each OP Unit issued and outstanding immediately prior to the effectiveness of the partnership merger (other than units we or any of our subsidiaries own) will be converted into the right to receive $48.50 in cash, without interest and less applicable withholding taxes. Alternatively, in lieu of this cash consideration, each limited partner of our operating partnership that is an "accredited investor" as defined under the U.S. securities laws will be offered the opportunity to elect to convert all, but not less than all, of the OP Units that such limited partner owns into Class H preferred units in the surviving partnership on a one-for-one basis. It is intended that our trustees and executive officers, as holders of OP Units who convert their OP Units into Class H preferred units in the surviving partnership, will generally be permitted to defer potential taxable gain they would otherwise recognize if they were to receive a cash payment in exchange for their OP Units (although the Internal Revenue Service could assert that such conversion constitutes a taxable transaction). For a more complete discussion of the treatment of OP Units and

46

the terms of the Class H preferred units, please see "The Merger Agreement — Treatment of Interests in Our Operating Partnership — OP Units" on page 58 of this proxy statement.

None of our trustees and executive officers beneficially owned OP Units as of December 28, 2006 other than Ms. Sheli Z. Rosenberg, Mr. Samuel Zell and Mr. Stanley M. Stevens. As of the record date, Ms. Rosenberg beneficially owned 191,134 OP Units, Mr. Zell beneficially owned 1,775,065 OP Units and Mr. Stevens beneficially owned 6,927 OP Units. If Ms. Rosenberg, Mr. Zell and Mr. Stevens do not elect to convert the OP Units that they beneficially own into Class H preferred units in the surviving partnership, they will receive aggregate consideration of approximately $9,269,999, $86,090,653 and $335,960, respectively, with respect to such units in connection with the partnership merger. Instead, if Ms. Rosenberg, Mr. Zell or Mr. Stevens elects to convert all of his or her OP Units into Class H preferred units in the surviving partnership and if he or she satisfies certain requirements applicable to all holders of OP Units, he or she will receive 191,134 Class H preferred units, 1,775,065 Class H preferred units and 6,927 Class H preferred units, respectively, in the surviving partnership in connection with the partnership merger. In addition, Mr. Zell has a pecuniary interest but does not have voting or dispositive power in an additional 11,845,754 OP Units. If such OP Units are not converted into Class H preferred units, they will be converted into aggregate consideration of approximately $574,519,069, and, instead, if an election is made to convert such OP Units into Class H preferred units they will be converted into 11,845,754 Class H preferred units. Mr. Zell is also a party to a tax protection agreement relating to one property for which the company estimates its maximum exposure to Mr. Zell is approximately $3 million.

### Change in Control Agreements

The approval of the merger by our shareholders will represent a "change in control" under our change in control agreements that we have entered into with each of our executive officers. Under these change in control agreements, in the event that the executive officer is dismissed within two years following the approval of the merger by our shareholders "without cause" (as defined in the change in control agreements) or resigns for "good reason" (as defined below), the executive officer would be entitled to the following:

- all accrued but unpaid compensation and paid time off in a lump sum cash payment consisting of the executive officer's base salary and pro-rated bonus through the date of termination; and

- a severance payment equal to a multiple of 2.5 (a multiple of 2.25 for Mr. Winter and a multiple of 3 for Mr. Kincaid) times the sum of:

  - the executive officer's annual base salary, at the greater of the rate in effect immediately before the approval of the merger by our shareholders and the rate in effect immediately before his or her termination of employment, and

  - the average of the executive officer's annual bonus for the three previous fiscal years;

- continued eligibility for the executive and his or her dependants to participate for a period of 2.5 years (2.25 years for Mr. Winter and 3 years for Mr. Kincaid) in our medical and specified other benefit plans; and

- immediate vesting of all share options and restricted shares held by the executive officer to the extent not previously accelerated.

In addition, under the change in control agreements, regardless of whether the executive officer's employment is terminated, if any payments made to the executive officer would result in an excise tax imposed by Section 4999 of the Internal Revenue Code, the executive officer would become entitled to receive a tax reimbursement payment that would put the executive officer in the same financial position after-tax that he would have been in if the excise tax did not apply to such amounts.

As defined in the change in control agreements "good reason" includes the occurrence of the merger for Mr. Kincaid, meaning that he can resign following the merger and collect the severance benefits described above. For other executive officers, "good reason" includes any of the following events:

- change in the executive officer's status, position or responsibilities (including reporting responsibilities) which, in the executive officer's reasonable judgment, represents an adverse change;

- the executive officer ceases to report to the surviving entity's chief executive officer;

- the assignment to the executive officer of any duties or responsibilities which, in the executive officer's reasonable judgment, are inconsistent with his or her status, title, position or responsibilities;

- removal of the executive officer from any offices or positions held prior to the merger;

- reduction in the executive officer's base salary or any failure to timely pay any compensation or benefits;

- relocation of the executive officer's principal place of employment by more than 25 miles;

- failure to provide the executive officer with compensation and benefits, in the aggregate, at least equal to those provided prior to the merger;

- the surviving entity's insolvency; and

- a material breach by us of the change in control agreement.

The following table sets forth an estimate of the potential cash severance payments that could be payable as described above in the event the executive officer becomes entitled to such severance amount pursuant to their change-in-control agreements (described above) following the merger (assuming for illustrative purposes that the executive officer's employment is terminated on March 1, 2007 but utilizing current base salaries and the bonus compensation amounts provided for in the agreements without regard to additional payments resulting from anticipated base pay increases in 2007). The table does not include an amount referable to the value of the continued health and welfare benefits to be received by the executive officer, or the value of the tax reimbursement payment (described above), if applicable.

| Executive Officers | Amount of Potential Cash Severance Payment |
|---|---|
| Richard D. Kincaid | $4,584,066 |
| Debra L. Ferruzzi | 1,155,009 |
| Jeffrey L. Johnson | 2,067,770 |
| Peyton H. Owen, Jr. | 1,697,217 |
| Stanley M. Stevens | 1,652,337 |
| Marsha C. Williams | 1,806,591 |
| Robert J. Winter | 1,206,102 |

*Equity Office Supplemental Retirement Savings Plan*

Under the Equity Office Supplemental Retirement Savings Plan ("SRP"), executives and trustees have deferred various types of compensation that would otherwise have been payable upon termination of employment or in future years. In connection with the merger, our board of trustees amended the SRP to comply with recent changes in tax laws and to provide for the payment of all benefits under the SRP and the termination of the SRP immediately following the merger. As a result, amounts payable to our executive officers and trustees that were otherwise deferred into future years will now be made promptly following the merger. All of these amounts were fully vested, such that our executive officers and trustees would have been entitled to receive the payments whether or not they continued to be our employees or trustees and whether or not the merger occurred. The amendment only accelerated the timing of the payment.

48

**Indemnification of Our Trustees, Directors and Officers**

The merger agreement provides that for a period of at least six years after the merger effective time, the charter and bylaws or other organizational documents of the surviving entity and its subsidiaries will contain indemnification provisions that are no less favorable than the indemnification provisions in our existing charter and bylaws or the applicable organizational documents of our subsidiaries, and that those provisions will not be amended, repealed or modified during that period in any manner that would affect adversely the rights of any individuals who at or prior to the merger effective time were our or our subsidiaries' trustees, directors, officers, employees, agents, or fiduciaries, except as required by law and then only to the minimum extent required by law.

Blackhawk Parent, the surviving entity and our operating partnership have agreed to indemnify, to the fullest extent permitted by applicable laws, persons who were at the date of the merger agreement or during the period between the signing of the merger agreement and the merger effective time our and our subsidiaries' trustees, directors and officers with respect to any legal actions or judgments arising out of or relating to their duties or services as our or our subsidiaries', trustees, directors or officers, including any actions or omissions taken with respect to the merger agreement or the mergers, occurring at or prior to the merger effective time and, subject to certain conditions, shall pay related legal fees, costs and expenses incurred by them in connection therewith.

The merger agreement requires that we, in consultation with Blackhawk Parent, purchase a non-cancelable extended reporting period endorsement under our existing directors', trustees' and officers' liability insurance policies in the same form as we presently maintain which will provide our directors, trustees and officers with coverage for six years following the closing date of the mergers of not less than the existing coverage under, and with terms not less favorable in the aggregate to, the insured persons, than the coverage we maintained as of November 19, 2006. This requirement is subject to a maximum cost of 300% of our 2007 annual premium to be paid for such insurance. Blackhawk Parent or the surviving entity have agreed to maintain such policies in effect.

The parties have agreed not to terminate or modify to the detriment of any indemnitee the obligations described above regarding trustees', directors' and officers' indemnification, and trustees', directors' and officers' liability insurance, and such obligations must be assumed by any successor entity to the surviving entity as a result of any consolidation, merger, liquidation, dissolution or transfer of all or substantially all of its properties and assets.

**Regulatory Matters**

We are unaware of any material federal, state or foreign regulatory requirements or approvals that are required for the execution of the merger agreement or the completion of either the merger or the partnership merger, other than the filing of the articles of merger with respect to the merger with, and the acceptance of such articles of merger for record by, the SDAT, and the filing of a certificate of merger with respect to the partnership merger by our operating partnership with the Secretary of State of the State of Delaware.

**Litigation Relating to the Mergers**

On November 20, 2006, a purported shareholder class action related to the merger agreement, *Engel v. Equity Office Properties Trust, et al.* (Case No. 24-C-06-010525), was filed in the Circuit Court for Baltimore City, Maryland, naming us and each of our trustees as defendants. The lawsuit alleges that defendants have breached their fiduciary duties in connection with approval of the merger agreement, which is claimed to provide unfair and inadequate consideration. Seven other lawsuits raising similar purported class claims have also been filed, including two other such suits in the Circuit Court for Baltimore City (*Lefari v. Equity Office Properties Trust, et al.* (Case No. 24-C-06-010716) and *Casden v. Equity Office Properties Trust, et al.* (Case No. 24-C-06-010969)), four in the Circuit Court of Cook County, Illinois (*Blaz v. Equity Office Properties Trust, et al.* (Case No. 06-CH-25190), *Phillips v. Zell, et al.* (Case No. 06-CH-25196), *Kaiman v. Zell, et al.* (Case No. 06-CH-25278) and *Staehr v. Equity Office Properties Trust, et al.* (Case No. 06-CH-25402)), and one in the United States District Court for the

Northern District of Illinois (*Beck v. Dobrowski, et al.* (Case No. 06-CV-6411)) (the "federal court lawsuit"). The federal court lawsuit purports to be brought not only as a class action but also as a shareholder derivative case on behalf of Equity Office (which is named only nominally as a defendant). These lawsuits generally allege breaches of fiduciary duties by our trustees in connection with the merger agreement (including, but not limited to, various alleged breaches of duties of loyalty, due care, candor, independence and good faith), claim that defendants have failed to take appropriate steps to maximize shareholder value (including by failing to conduct an auction or negotiate with all interested parties), and allege that various terms of the merger agreement are preclusive and/or unfair. Certain of the lawsuits also include claims that the defendants have improperly favored themselves in connection with the proposed transaction, engaged in self-dealing and/or have improperly provided for disparate treatment among Equity Office security holders. The federal court lawsuit also includes purported derivative claims for abuse of control, gross mismanagement, and corporate waste. In addition to Equity Office and its trustees, The Blackstone Group is named as a defendant in certain of the lawsuits, and is alleged to have aided and abetted the other defendants' alleged fiduciary breaches. The lawsuits seek a variety of equitable and injunctive relief, including enjoining defendants from completing the proposed merger transaction, disgorgement of alleged benefits improperly received and/or unspecified damages and other relief. We intend to vigorously defend the actions.

**Material United States Federal Income Tax Consequences**

The following is a summary of the material United States federal income tax consequences of the merger to holders of our common and preferred shares whose shares are surrendered in the merger in exchange for the right to receive the merger consideration as described below. This summary is based on current law, is for general information only and is not tax advice. This summary is based on the Code, applicable Treasury Regulations, and administrative and judicial interpretations thereof, each as in effect as of the date hereof, all of which are subject to change or different interpretations, possibly with retroactive effect. We have not requested, and do not plan to request, any rulings from the Internal Revenue Service (the "IRS") concerning our tax treatment or the tax treatment of the merger, and the statements in this proxy are not binding on the IRS or any court. We can provide no assurance that the tax consequences contained in this discussion will not be challenged by the IRS, or if challenged, will be sustained by a court.

This summary assumes that our common and preferred shares are held as capital assets within the meaning of Section 1221 of the Code and does not address all aspects of taxation that may be relevant to particular holders in light of their personal investment or tax circumstances or to persons that are subject to special tax rules and does not address the tax consequences of the merger to holders of share options, restricted shares, stock appreciation rights, performance awards or OP Units. In addition, this summary does not address the tax treatment of special classes of holders of our common or preferred shares, including, for example:

- banks and other financial institutions;
- insurance companies;
- regulated investment companies;
- real estate investment trusts;
- tax-exempt entities or persons holding our stock in a tax-deferred or tax advantaged account;
- mutual funds;
- subchapter S corporations;
- dealers in securities or currencies;
- traders in securities that elect to use a mark-to-market method of accounting for their securities holdings;
- persons whose functional currency is not the United States dollar;
- persons holding our common or preferred shares as part of a hedging or conversion transaction or as part of a "straddle" or a constructive sale;
- U.S. expatriates;
- persons subject to the alternative minimum tax;

- holders who acquired our common or preferred shares through the exercise of employee share options or warrants or otherwise as compensation;
- holders that are properly classified as a partnership or otherwise as a pass-through entity under the Code;
- holders that hold 5% or more of any class of our shares; and
- non-U.S. holders, as defined below, except to the extent discussed below.

This summary also does not discuss any state, local, foreign or other tax considerations.

If any entity that is treated as a partnership for United States federal income tax purposes holds our common or preferred shares, the tax treatment of its partners or members generally will depend upon the status of the partner or member and the activities of the entity. If you are a partner of a partnership or a member of a limited liability company or other entity classified as a partnership for United States federal income tax purposes and that entity is holding our common or preferred shares, you should consult your tax advisor. Moreover, each holder should consult its own tax advisor regarding the United States federal income tax consequences to it of the merger in light of its own particular situation, as well as any consequences of the merger to such holder arising under the laws of any other taxing jurisdiction.

For purposes of this section, a "U.S. holder" means a beneficial owner of our common or preferred shares that is for United States federal income tax purposes one of the following:

- a citizen or resident of the United States;
- a corporation, or other entity treated as a corporation for United States federal income tax purposes created or organized in or under the laws of the United States or any state thereof, or the District of Columbia;
- a trust (a) the administration of which is subject to the primary supervision of a United States court and which has one or more United States persons who have the authority to control all substantial decisions of the trust, or (b) that was in existence on August 20, 1996, was treated as a United States person on the previous day, and elected to continue to be so treated; or
- an estate the income of which is subject to United States federal income taxation regardless of its source.

As used in this section, a "non-U.S. holder" means a beneficial owner of our common or preferred shares that is an individual, corporation, estate or trust that is not a U.S. holder as described in the bullets above.

### Consequences to Us of the Merger

For United States federal income tax purposes, we will treat the merger as if we had sold all of our assets to MergerCo in exchange for the merger consideration and then made a liquidating distribution of the merger consideration to our shareholders in exchange for our shares.

### Consequences of the Merger to U.S. Holders of Our Common Shares

*General.* The receipt of cash by U.S. holders in exchange for their common shares pursuant to the merger will be a taxable transaction for United States federal income tax purposes (and also may be a taxable transaction under applicable state, local and foreign income and other tax laws). In general, a U.S. holder of our common shares will recognize gain or loss for United States federal income tax purposes equal to the difference between:

- the amount of cash received in exchange for our common shares; and
- the U.S. holder's adjusted tax basis in our common shares.

Gain or loss will be calculated separately for each block of common shares, with a block consisting of common shares acquired at the same cost in a single transaction. Assuming that the common shares constitute capital assets in the hands of the U.S. holder, this gain or loss will be capital gain or loss and will be long-

51

term capital gain or loss if at the time of the merger the common shares have been held for more than one year. An individual U.S. holder will be subject to tax on net capital gain at a maximum federal income tax rate of 15%. Capital gains of corporate U.S. holders generally are taxable at the regular tax rates applicable to corporations. The deductibility of a capital loss recognized in the exchange is subject to limitations under the Code. In addition, the IRS has the authority to prescribe, but has not yet prescribed, regulations that would apply a tax rate of 25% to a portion of capital gain realized by a noncorporate shareholder on the sale of REIT shares that would correspond to the REIT's "unrecaptured Section 1250 gain."

*Special Rule for U.S. Holders Who Have Held Common Shares Less than Six Months.* A U.S. holder who has held our common shares for less than six months at the time of the merger, taking into account the holding period rules of Section 246(c)(3) and (4) of the Code, and who recognizes a loss on the exchange of our common shares in the merger, will be treated as recognizing a long-term capital loss to the extent of any capital gain dividends received from us, or such holder's share of any designated retained capital gains, with respect to such common shares.

### Consequences of the Merger to Non-U.S. Holders of Our Common Shares

Generally, a non-U.S. holder's gain or loss from the merger will be determined in the same manner as that of a U.S. holder. The United States federal income tax consequences of the merger to a non-U.S. holder will depend on various factors, including whether the receipt of the common share merger consideration is treated under provisions added to the Code by the Foreign Investment in Real Property Tax Act of 1980, or FIRPTA, as sales of our common shares or instead as distributions from us. The provisions governing distributions from REITs could apply because, for United States federal income tax purposes, the merger will be treated as a sale of our assets followed by a liquidating distribution from us to our shareholders of the proceeds from the asset sale. Current law is unclear as to which provisions should apply, and both sets of provisions are discussed below. In general, the provisions governing the taxation of distributions by REITs may be less favorable to certain non-U.S. holders, and non-U.S. holders should consult their tax advisors regarding the possible application of those provisions.

*Taxable Sale of Common Shares.* Subject to the discussion of backup withholding and of distribution of gain from the disposition of U.S. real property interests below, if the merger is treated as a taxable sale of our common shares, a non-U.S. holder should not be subject to United States federal income taxation on any gain or loss from the merger unless: (i) the gain is effectively connected with the non-U.S. holder's conduct of a trade or business in the United States, or, if an applicable income tax treaty applies, the gain is attributable to a permanent establishment maintained by the non-U.S. holder in the United States; (ii) the non-U.S. holder is an individual present in the United States for 183 days or more in the taxable year of the merger and certain other requirements are met; or (iii) such common shares constitute a "U.S. real property interest" under FIRPTA.

A non-U.S. holder whose gain is effectively connected with the conduct of a trade or business in the United States will generally be subject to United States federal income tax on such gain on a net basis in the same manner as a U.S. holder. In addition, a non-U.S. holder that is a corporation may be subject to the 30% branch profits tax on such effectively connected gain described in clause (i) above.

A non-U.S. holder who is an individual present in the United States for 183 days or more in the taxable year of the merger and who meets certain other requirements will be subject to a flat 30% tax on the gain derived from the merger, which may be offset by United States source capital losses. In addition, the non-U.S. holder may be subject to applicable alternative minimum taxes.

If a non-U.S. holder's common shares constitute a "U.S. real property interest" under FIRPTA, such holder will be subject to United States federal income tax on the gain recognized in the merger on a net basis in the same manner as a U.S. holder. A non-U.S. holder's common shares generally will not constitute a U.S. real property interest if (i) we are a "domestically controlled qualified investment entity" at the merger effective time, or (ii) the non-U.S. holder holds 5% or less of the total fair market value of our common shares at all times during the shorter of (a) the five-year period ending with the effective date of the merger and (b) the non-U.S. holder's holding period for the shares. A "qualified investment entity" includes a REIT. Assuming we qualify as a REIT, we will be a "domestically controlled qualified investment entity" at the

merger effective time if non-U.S. holders held directly or indirectly less than 50% in value of our stock at all times during the five-year period ending with the merger effective time. While we believe that we currently are a domestically controlled REIT, no assurances can be given that the actual ownership of our stock has been or will be sufficient for us to qualify as a "domestically controlled qualified investment entity" at the merger effective time.

In addition, our common shares will not constitute a U.S. real property interest if (i) as of the effective date of the merger, we did not hold any U.S. real property interests, and (ii) all of the U.S. real property interests held by us during the five-year period ending with the effective date of the merger were disposed of in transactions in which the full amount of the gain (if any) was recognized. The application of this rule in a transaction such as the merger is not entirely clear. You should consult your tax advisor regarding the possible FIRPTA tax consequences to you of the merger.

*Distribution of Gain from the Disposition of U.S. Real Property Interests.*   The tax treatment described above assumes that the receipt of the common share merger consideration will be treated as a sale or exchange of our common shares for purposes of FIRPTA. It is possible, however, that the IRS may assert that the common share merger consideration received by a non-U.S. holder is subject to tax under Section 897(h)(1) of the Code as a distribution from us that is attributable to gain from the deemed sale of our U.S. real estate assets in the merger and not as a sale of our common shares. If the IRS were successful in making this assertion, then such distribution would be taxed under FIRPTA, unless a special exception applies (the "5% Exception," discussed below). If the distribution were taxed under FIRPTA, the gain recognized by a non-U.S. holder generally would be subject to United States federal income tax on a net basis to the extent the distribution is attributable to gain from the sale of our real estate assets, and a corporate non-U.S. holder could also be subject to the branch profits tax on such FIRPTA gain. On the other hand, the 5% Exception generally would apply to a non-U.S. holder of our shares if the non-U.S. holder does not own more than 5% of our common shares at any time during the one-year period ending on the date of the distribution. If the 5% Exception were to apply to a non-U.S. Holder, the FIRPTA tax would not apply, but there is some risk that the common share merger consideration could be treated as an ordinary dividend distribution from us, in which case the common share merger consideration you receive would be subject to United States federal income tax (and withholding) at a 30% rate.

*Income Tax Treaties.*   If a non-U.S. holder is eligible for treaty benefits under an income tax treaty with the United States, the non-U.S. holder may be able to reduce or eliminate certain of the United States federal income tax consequences discussed above, such as the branch profits tax. Non-U.S. holders should consult their tax advisor regarding possible relief under an applicable income tax treaty.

*U.S. Withholding Tax.*   As described above, it is unclear whether the receipt of the common share merger consideration will be treated as a sale or exchange of our common shares or as a distribution from us that is attributable to gain from the deemed sale of our U.S. real estate assets in the merger. Accordingly, we intend to withhold U.S. federal income tax at a rate of 35% from the portion of the common share merger consideration that is, or is treated as, attributable to gain from the sale of U.S. real property interests and paid to a non-U.S. holder unless such holder qualifies for the 5% Exception. If a non-U.S. holder holds its shares through a nominee, that nominee may take a contrary position and conclude that withholding applies to the merger consideration payable to such non-U.S. holder.

A non-U.S. holder may be entitled to a refund or credit against the holder's United States federal income tax liability, if any, with respect to any amount withheld pursuant to FIRPTA, provided that the required information is furnished to the IRS on a timely basis. Non-U.S. holders should consult their tax advisor regarding withholding tax considerations.

### Consequences to Holders of Series B and Series G Preferred Shares

The merger will be treated as a taxable transaction to holders of our Series B and Series G preferred shares. Subject to the qualifications discussed above with respect to our common shareholders, including the assumption that our Series B and Series G preferred shares are a capital asset in the hands of our Series B and Series G preferred shareholders, the federal income tax consequences to holders of our Series B and Series G

preferred shares generally will be the same as the consequences to holders of our common shares described above, except that the capital gain or loss recognized by a holder of our Series B and Series G preferred shares will be measured by the difference between the holder's adjusted tax basis in the preferred shares exchanged and the fair market value of the MergerCo Series B and MergerCo Series G preferred stock of the surviving entity received by such holder, which should equal the amount of cash (subject to any withholding taxes) that such holder will receive upon the liquidation of the surviving entity into Blackhawk Parent following the merger. Each holder's basis in the MergerCo Series B and MergerCo Series G preferred stock of the surviving entity will equal the fair market value of those shares and, thus, such holder should not recognize additional gain or loss upon the liquidation of the surviving entity into Blackhawk Parent. With respect to non-U.S. holders of our Series B and Series G preferred shares, it is not entirely clear whether the receipt of the MergerCo Series B and MergerCo Series G preferred stock will be treated as a sale or exchange of our preferred shares or as a distribution from us that is attributable to gain from the deemed sale of our U.S. real estate assets in the merger. Accordingly, we intend to withhold U.S. federal income tax at a rate of 35% from the portion of the Series B or Series G preferred share merger consideration that is, or is treated as, attributable to gain from the sale of U.S. real property interests and paid to a non-U.S. holder, unless such non-U.S. holder of our Series B or Series G preferred shares, respectively, does not own at any time during the one-year period ending on the date of the distribution more than 5% of the preferred class of stock (*i.e.*, either the Series B or Series G preferred shares) held by such non-U.S. holder. Non-U.S. holders of our Series B or Series G preferred shares should consult their tax advisor regarding withholding tax considerations.

### *Information Reporting and Backup Withholding*

Backup withholding, currently at a rate of 28%, and information reporting may apply to the cash received pursuant to the exchange of our common shares in the merger. Backup withholding will not apply, however, to a holder who

- in the case of a U.S. holder, furnishes a correct taxpayer identification number and certifies that it is not subject to backup withholding on the substitute IRS Form W-9 or successor form,
- in the case of a non-U.S. holder, furnishes an applicable IRS Form W-8 or successor form, or
- is otherwise exempt from backup withholding and complies with other applicable rules and certification requirements.

Backup withholding is not an additional tax and any amount withheld under these rules may be credited against the holder's United States federal income tax liability and may entitle the holder to a refund if required information is timely furnished to the IRS.

**THE FOREGOING DOES NOT PURPORT TO BE A COMPLETE ANALYSIS OF THE POTEN-TIAL TAX CONSIDERATIONS RELATING TO THE MERGER AND IS NOT TAX ADVICE. THEREFORE, HOLDERS OF OUR COMMON AND PREFERRED SHARES ARE STRONGLY URGED TO CONSULT THEIR TAX ADVISORS AS TO THE SPECIFIC TAX CONSEQUENCES TO THEM OF THE MERGER, INCLUDING THE APPLICABILITY AND EFFECT OF UNITED STATES FEDERAL, STATE, LOCAL, FOREIGN AND OTHER TAX LAWS IN THEIR PARTICULAR CIRCUMSTANCES.**

**NOTHING IN THIS PROXY STATEMENT IS INTENDED TO BE, OR SHOULD BE CON-STRUED AS, TAX ADVICE WITH RESPECT TO THE OP UNIT HOLDERS. OP UNIT HOLDERS, WHO WILL SEPARATELY RECEIVE MATERIALS DESCRIBING THE PARTNERSHIP MERGER, TERMS OF THE ELECTION AND THE CLASS H PREFERRED UNITS, ALSO SHOULD CONSULT THEIR TAX ADVISORS AS TO THE SPECIFIC TAX CONSEQUENCES TO THEM OF THEIR ELECTION.**

### Delisting and Deregistration of Our Common and Preferred Shares

If the merger is completed, our common and preferred shares will no longer be traded on the New York Stock Exchange and will be deregistered under the Exchange Act. If the partnership merger is completed, the OP Units will be deregistered under the Exchange Act.

## THE MERGER AGREEMENT

*The following summarizes material provisions of the merger agreement (as amended), a copy of which is attached to this proxy statement as Exhibit A and which we incorporate by reference into this document. This summary may not contain all of the information about the merger agreement that is important to you. Therefore, we recommend that you read carefully the copy of the merger agreement attached to this proxy statement as Exhibit A in its entirety, as the rights and obligations of the parties are governed by the express terms of the merger agreement and not by this summary or any other information contained in this proxy statement.*

*The merger agreement contains representations and warranties made by, and to, us, the operating partnership, Blackhawk Parent, MergerCo and Merger Partnership. These representations and warranties, which are set forth in the copy of the merger agreement attached to this proxy statement as Exhibit A, were made for the purposes of negotiating and entering into the merger agreement between the parties. In addition, these representations and warranties were made as of specified dates, may be subject to standards of materiality different from what may be viewed as material to shareholders, or may have been used for the purpose of allocating risk between the parties instead of establishing such matters as facts. Moreover, information concerning the subject matter of the representations and warranties, which do not purport to be accurate as of the date of this proxy statement, may have changed since the date of the merger agreement and subsequent developments or new information qualifying a representation or warranty may have been included in this proxy statement.*

*As used in the summary of the material terms of the merger agreement below and elsewhere in this proxy statement, unless the context requires otherwise, references to our "subsidiaries" do not include certain joint venture entities in which we, directly or indirectly, through our subsidiaries own interests.*

## Structure

### *The Partnership Merger*

At the effective time of the partnership merger, Merger Partnership, which was formed in connection with the mergers and has no assets or liabilities, will merge with and into our operating partnership, Merger Partnership's separate existence will cease, and our operating partnership will survive the partnership merger. At the effective time of the partnership merger, all of our operating partnership's and Merger Partnership's property, whether real, personal or mixed, will be vested in the surviving partnership and all of our operating partnership's and Merger Partnership's liabilities will attach to the surviving partnership.

### *The Merger*

Immediately after the effective time of the partnership merger, at the merger effective time, Equity Office will merge with and into MergerCo, Equity Office's separate corporate existence will cease, and MergerCo will survive the merger and continue to exist as a wholly-owned subsidiary of Blackhawk Parent. All of our and MergerCo's properties, assets, rights, privileges, immunities, powers and purposes, and all of our and MergerCo's liabilities, will become those of the surviving real estate investment trust. Following the completion of the merger, our common and preferred shares will be de-listed from the New York Stock Exchange and deregistered under the Exchange Act and will no longer be publicly traded.

## Effective Times

The effective time of the partnership merger will occur at (1) the time that our operating partnership files a certificate of merger with respect to the partnership merger with the Secretary of State of the State of Delaware or (2) a later time agreed to by the parties and designated in such filing in accordance with the Delaware Revised Uniform Limited Partnership Act.

The merger effective time will occur at (1) the time the articles of merger with respect to the merger are accepted for record by the SDAT, or (2) such later time agreed by the parties to the merger agreement and designated in the articles of merger (which will not exceed 30 days after such articles have been accepted for

55

record). The closing will occur as promptly as practicable, but in no event later than the third business day after all of the conditions set forth in the merger agreement have been satisfied or waived (other than those conditions which by their terms are required to be satisfied or waived at the closing), unless the parties otherwise agree.

## Organizational Documents

The declaration of trust, including the articles supplementary thereto, and the bylaws of MergerCo, each as in effect immediately prior to the merger effective time, will be the declaration of trust and bylaws of the surviving entity. The certificate of limited partnership of our operating partnership, as amended, will be the certificate of limited partnership of the surviving partnership until amended following the effective time of the partnership merger as provided in the merger agreement and in accordance with applicable law. The third amended and restated limited partnership agreement of our operating partnership, as further amended prior to the effective time of the partnership merger as required by the merger agreement and in effect immediately prior to the effective time of the partnership merger, will be the limited partnership agreement of the surviving partnership until further amended in accordance with its terms or by applicable law.

## Trustees and Officers; General Partner

The trustees and officers of MergerCo immediately prior to the merger effective time will be the trustees and officers of the surviving entity. The officers will hold their office in accordance with the charter and bylaws of the surviving entity. Immediately after the effective time of the partnership merger, we will remain the general partner of the surviving partnership, and after the merger effective time, MergerCo shall be the general partner of the surviving partnership.

## Treatment of Shares, Share Options, Restricted Shares, Stock Appreciation Rights and Performance Awards

### Common Shares

At the merger effective time, each common share issued and outstanding immediately prior to the merger effective time (other than shares held by our subsidiaries or MergerCo, which will be automatically canceled and retired and cease to exist with no payment being made with respect thereto) will be automatically converted into, and will be canceled in exchange for, the right to receive $48.50 in cash, without interest and less any applicable withholding taxes.

We have also agreed to take all actions necessary to suspend our dividend reinvestment and share purchase plan effective as soon as possible after November 19, 2006 and to terminate such plan effective as of the merger effective time.

### Preferred Shares

At the merger effective time, (i) each Series B preferred share of the company issued and outstanding immediately prior to the merger effective time (other than Series B preferred shares held by our subsidiaries or MergerCo, which will be automatically canceled and retired and cease to exist with no payment being made with respect thereto) will be automatically converted into, and will be canceled in exchange for, the right to receive one share of Series B cumulative preferred stock of the surviving entity and (ii) each Series G preferred share of the company issued and outstanding immediately prior to the merger effective time (other than Series G preferred shares held by our subsidiaries or MergerCo, which will be automatically canceled and retired and cease to exist with no payment being made with respect thereto) will be automatically converted into, and will be canceled in exchange for, the right to receive one share of Series G cumulative redeemable preferred stock of the surviving entity. The Series B and G preferred shares of the surviving entity will not be listed on any securities exchange.

Pursuant to the terms of the merger agreement, as promptly as practicable after the merger effective time, the surviving entity will be liquidated into Blackhawk Parent, and Blackhawk Parent has agreed to assume and

56

discharge in accordance with their terms all liabilities and obligations of the surviving entity effective on such liquidation. Upon the liquidation, (i) the surviving entity's Series B preferred shares will be canceled and holders of the surviving entity's Series B preferred shares will receive a cash distribution from the liquidation of the surviving entity in accordance with the terms of the articles supplementary classifying the surviving entity's Series B preferred shares, which will be $50.00 per share plus any accrued and unpaid dividends thereon and (ii) the surviving entity's Series G preferred shares will be canceled and holders of the surviving entity's Series G preferred shares will receive a cash distribution from the liquidation of the surviving entity in accordance with the terms of the articles supplementary classifying the surviving entity's Series G preferred shares, which will be $25.00 per share plus any accrued and unpaid dividends thereon. While holders of our preferred shares are entitled to receive notice of and attend the special meeting or any postponements or adjournments of the special meeting, they are not entitled to vote upon the merger and the merger agreement or any adjournments of the special meeting for the purpose of soliciting additional proxies, at the special meeting.

Holders of our Series B preferred shares have the right at any time to convert their Series B preferred shares into our common shares. As of December 28, 2006, the conversion price was $35.70 per common share or the equivalent of a conversion rate of 1.40056 common shares per Series B preferred share ($50.00 per Series B preferred share liquidation preference divided by the $35.70 conversion price). Based on the current conversion price for the Series B preferred shares and assuming the merger is consummated in accordance with the merger agreement, holders of each Series B preferred share converted prior to the merger who hold the common shares issued upon conversion at the merger effective time would be entitled to receive approximately $67.93 (1.40056 common shares issuable upon conversion times $48.50) for such common shares, less any applicable withholding taxes. Any Series B preferred shares not converted prior to the merger will be automatically converted into the right to receive one Series B preferred share of the surviving entity and, upon the liquidation of MergerCo as promptly as practicable following the merger, would only be entitled to receive the liquidation preference of $50.00 per share, plus accrued and unpaid dividends to the date of payment.

### Share Options, Restricted Shares, Stock Appreciation Rights and Performance Awards

Immediately prior to the merger effective time, all outstanding share options, restricted shares, stock appreciation rights and performance awards, whether or not exercisable or vested, as the case may be, will become fully vested and exercisable or payable, as the case may be and, in the case of the restricted shares and performance awards, free of forfeiture restrictions.

Immediately prior to the merger effective time, each outstanding restricted share will be considered an outstanding common share for the purposes of the merger agreement and at the merger effective time will be automatically converted into, and will be cancelled in exchange for, the right to receive $48.50 in cash, without interest and less any applicable withholding taxes.

Each share option to purchase our common shares that remains outstanding immediately prior to the merger effective time, whether vested or unvested, will be canceled and converted into the right to receive promptly after the merger effective time (and in any event within five business days) a single lump sum cash payment, less applicable withholding taxes, equal to the product of:

- the aggregate number of common shares underlying such share option immediately prior to the merger effective time, multiplied by;

- the excess, if any, of $48.50 over the exercise price per share of our common shares subject to such share option.

If the exercise price of any share option is equal to or greater than $48.50 per share, such option will be canceled without any cash payment being made in respect thereof. As of the date of this proxy statement, none of our outstanding share options had an exercise price equal to, or greater than, $48.50 per share.

Additionally, under the terms of the merger agreement, immediately prior to the merger effective time, each stock appreciation right in respect of common shares will become fully vested and exercisable. Each

unexercised stock appreciation right will be canceled in exchange for the right to receive, promptly after the merger effective time (and in any event within five business days), a cash payment, less applicable withholding taxes, equal to the product of:

- the aggregate number of common shares underlying such stock appreciation right immediately prior to the merger effective time, multiplied by;

- the excess, if any, of $48.50 over the exercise price per share of such stock appreciation right.

If the exercise price of any stock appreciation right is equal to or greater than $48.50 per share, such stock appreciation right will be canceled without any cash payment being made in respect thereof. As of the date of this proxy statement, none of our outstanding stock appreciation rights had an exercise price equal to, or greater than, $48.50 per share.

Additionally, under the terms of the merger agreement, immediately prior to the merger effective time, each performance award in respect of common shares will become fully vested and free of all forfeiture restrictions and will entitle the holder of such performance award to the right to receive, promptly after the merger effective time (and in any event within five business days), a cash payment, less applicable withholding taxes, equal to the product of:

- 200% of the aggregate target number of common shares subject to such performance award, as applicable, immediately prior to the merger effective time, multiplied by;

- $48.50.

Accumulated dividends on performance awards paid out under the Strategic Long-Term Incentive Plan, also based on 200% of the target number of common shares underlying such awards, will also be paid in cash, less applicable withholding taxes.

The amount of cash payable with respect to share options, restricted shares, stock appreciation rights and performance awards will be reduced by the amount of any applicable taxes required to be withheld. All share options, restricted shares, stock appreciation rights and performance awards will be canceled and all of our employee stock purchase plans will terminate at the merger effective time.

### Treatment of Interests in Our Operating Partnership

#### OP Units

In connection with the partnership merger, each OP Unit issued and outstanding immediately prior to the effectiveness of the partnership merger (other than units we or any of our subsidiaries own which will remain outstanding and unchanged as Class A units in the surviving partnership) will be automatically converted into the right to receive $48.50 in cash, without interest and less applicable withholding taxes. Alternatively, in lieu of this cash consideration, each limited partner (other than us or any of our subsidiaries) of our operating partnership will be offered the opportunity to elect to convert all, but not less than all, of the OP Units that such limited partner owns into Class H preferred units in the surviving partnership on a one-for-one basis, provided that such limited partner meets the conditions described below. As described above under the section captioned "The Mergers — Interests of Our Trustees and Executive Officers in the Mergers — OP Units" on page 46, certain of our trustees and executive officers beneficially own OP Units and will be offered the opportunity to participate in this election.

Limited partners will only be entitled to elect to convert their OP Units into Class H preferred units in the surviving partnership if they (a) are "accredited investors" as defined under the U.S. securities laws, (b) agree to be bound by a new limited partnership agreement of the surviving partnership, and (c) make a valid and timely election to receive the Class H preferred units pursuant to election materials that will be separately sent to limited partners. **This proxy statement does not constitute any solicitation of consents in respect of the partnership merger, and does not constitute an offer to exchange or convert the OP Units that you may own for or into Class H preferred units in the surviving partnership.**

58

In general, Class H preferred units in the surviving partnership will have the following terms:

- each Class H preferred unit will have a stated liquidation preference of $48.50; distributions of available cash when, as and if made by the surviving partnership will be payable on a quarterly basis, in preference to all holders of other classes of partnership interests in the surviving partnership, until each holder has received a cumulative return of 6% per annum on the stated liquidation preference, which we refer to as the preferred return; and the preferred return will compound annually to the extent unpaid;

- upon liquidation of the surviving partnership, holders of Class H preferred units will be entitled to the liquidation preference of $48.50 plus any accrued but unpaid preferred return prior to any distributions being made on any other partnership interests;

- commencing on the third anniversary of the partnership merger (or, if earlier, upon the surviving partnership becoming a subsidiary of any public real estate investment trust), any holder of Class H preferred units may cause the surviving partnership to redeem all, but not less than all, of such holder's Class H preferred units for cash equal to the liquidation preference plus any accrued and unpaid preferred return, provided that:

  - such redemption right shall be exercisable only once per year during the 30-day period following each anniversary of the partnership merger (starting with the third anniversary of the partnership merger);

  - upon the death of a holder of Class H preferred units prior to the third anniversary of the partnership merger, the estate of that holder will have the right to require the surviving partnership to redeem all of the deceased holder's Class H preferred units for cash during the 120-day period following the deceased holder's death;

  - on the date of the partnership merger, the fair market value of the surviving partnership's assets is expected to exceed their tax basis, and if in any year the surviving partnership allocates additional taxable income or gain to a holder of Class H preferred units that is attributable to that excess, a holder will have the right to require the surviving partnership to redeem for cash a whole number of Class H preferred units having a liquidation preference approximately equal to such income or gain (and to receive any accrued and unpaid preferred return on the redeemed preferred units), which redemption right is exercisable during the 120-day period after the holder receives such holder's Schedule K-1 to IRS Form 1065 or other written information statement, identifying the amount of such additional income or gain, for the related taxable period; and

  - if the surviving partnership becomes a subsidiary of any public real estate investment trust, the public real estate investment trust shall have the right to amend such redemption provisions to provide the public real estate investment trust the option to issue publicly traded stock in such public real estate investment trust to any redeeming holder in lieu of cash;

- commencing on the seventh anniversary of the partnership merger, the surviving partnership may, at its option, redeem the Class H preferred units for cash equal to the liquidation preference plus any accrued and unpaid preferred return;

- except as otherwise required by law, holders of Class H preferred units will have no voting rights or other consent rights in the surviving partnership, provided that so long as there are at least $35 million of Class H preferred units outstanding, holders of two-thirds of the outstanding Class H preferred units must approve any material and adverse amendments to the preference, distribution, tax protection and redemption provisions applicable to the Class H preferred units; and

- the surviving partnership will provide holders of Class H preferred units with unaudited quarterly and audited annual financial statements.

Certain limited partners of our operating partnership currently are entitled to the benefit of certain tax protection agreements, which, among other things, require our operating partnership to: (i) retain or not

dispose of certain assets, except pursuant to certain nonrecognition transactions, for a specified period of time; (ii) maintain a minimum level of debt and permit certain limited partners to guarantee debt of the operating partnership; and (iii) employ certain Code Section 704(c) methods. The surviving partnership will continue to be subject to the existing tax protection agreements to which the operating partnership is a party.

### Series B and G Preferred Units

Each Series B preferred unit and each Series G preferred unit in our operating partnership issued and outstanding immediately prior to the effective time of the partnership merger, all of which are held by Equity Office, shall remain as one issued and outstanding Series B preferred unit and Series G preferred unit, as the case may be, of the surviving partnership.

### General Partnership Interests

The general partner interests of our operating partnership shall remain outstanding and unchanged as general partner interests in the surviving partnership. Immediately after the effective time of the partnership merger, we will remain the general partner of the surviving partnership and, after the merger effective time, MergerCo will be the general partner of the surviving partnership and shall have such rights, duties and obligations as are more fully set forth in the partnership agreement, as amended and as further amended in accordance with the terms of the merger agreement.

## No Further Ownership Rights

At the merger effective time and the effective time of the partnership merger, as applicable, holders of our common shares and preferred shares and holders of OP Units that are converted into the right to receive cash consideration in the partnership merger will cease to be, and will have no rights solely as, shareholders or as limited partners, as applicable, other than the right to receive the applicable merger consideration. The merger consideration paid to the holders of our common shares and preferred shares and holders of OP Units in accordance with the exchange and payment procedures contained in the merger agreement will be deemed to have been paid in full satisfaction of all rights and privileges pertaining to our common shares, preferred shares and OP Units exchanged (and, if applicable, represented by certificates exchanged therefor).

## Exchange and Payment Procedures

On or before the effective time of the partnership merger, Blackhawk Parent will deposit, or cause to be deposited, the merger consideration for the benefit of the holders of our common shares, share options, stock appreciation rights or performance awards and OP Units, respectively, with a paying agent reasonably satisfactory to us. Promptly after the merger effective time (but in any event within five business days), Blackhawk Parent will cause the paying agent to mail a customary letter of transmittal subject to our prior approval and, if applicable, instructions for surrendering certificates for our common shares and OP Units to each holder thereof. The letter of transmittal and instructions will tell you how to surrender your common share certificates and any interest in OP Units, as applicable, in exchange for the applicable merger consideration.

The preferred shares of the surviving entity (MergerCo) will be uncertificated and any certificates that, prior to the merger effective time, evidenced our preferred shares will be treated by the surviving entity as if such certificates evidenced the preferred shares of the surviving entity constituting the applicable merger consideration.

*You should not return your share certificates with the enclosed proxy card, and you should not forward your share certificates to the paying agent without a letter of transmittal.*

A holder of common shares will not be entitled to receive the merger consideration until such holder surrenders such holder's common share certificate or certificates to the paying agent, together with a duly completed and executed letter of transmittal and any other documents as the paying agent may reasonably require. The merger consideration may be paid to a person other than the person in whose name the

corresponding common share certificate is registered if the certificate is properly endorsed or is otherwise in the proper form for transfer. In addition, the person requesting payment must either pay any applicable stock transfer taxes or establish to the satisfaction of Blackhawk Parent that such stock transfer taxes have been paid or are not applicable.

No interest will be paid or will accrue on the cash payable upon surrender of the certificates. Each of the paying agent, the surviving entity and Blackhawk Parent will be entitled to deduct and withhold any applicable taxes from the merger consideration.

At the merger effective time and the effective time of the partnership merger, our share transfer books and the unit transfer books of our operating partnership will be closed, and there will be no further registration of transfers of our common shares, preferred shares or restricted shares or limited partner interests in the operating partnership, as applicable.

None of the paying agent, Blackhawk Parent, MergerCo, Merger Partnership, us, our operating partnership or any of their respective employees, officers, directors, trustees, shareholders, partners, agents or affiliates will be liable to any person for any cash merger consideration delivered to a public official pursuant to any applicable abandoned property, escheat or similar law. Any portion of the merger consideration deposited with the paying agent that remains undistributed to the holders of common shares, share options, stock appreciation rights or performance awards or holders of OP Units for twelve months after the merger effective time will be delivered to the surviving entity. Holders of our common shares, share options, stock appreciation rights and performance awards or holders of OP Units prior to the applicable merger who have not complied with the exchange and payment procedures contained in the merger agreement within twelve months after the merger effective time may only look to the surviving entity and Blackhawk Parent for payment of the merger consideration.

If you have lost a certificate, or if it has been stolen or destroyed, then before you are entitled to receive the merger consideration, you will be required to deliver an affidavit stating that fact and, if required by Blackhawk Parent or paying agent, to post a bond in the form and amount reasonably required by Blackhawk Parent or the paying agent as indemnity against any claim that may be made against Blackhawk Parent and the paying agent on account of the alleged loss, theft or destruction of such certificate.

**Debt Tender Offers and Consent Solicitation; Redemption**

On December 26, 2006, our operating partnership commenced offers to purchase and related consent solicitations with respect to the following securities that our operating partnership has outstanding, on the terms and subject to the conditions set forth in the related tender offer and consent solicitation documentation that has been distributed to the holders of such securities:

| | |
|---|---|
| 6.763% Notes due June 15, 2007 | 7.000% Notes due July 15, 2011 |
| 7.410% Notes due September 1, 2007 | 6.750% Notes due February 15, 2012 |
| 7.750% Notes due November 15, 2007 | 5.875% Notes due January 15, 2013 |
| 6.750% Notes due January 15, 2008 | 4.750% Notes due March 15, 2014 |
| 6.750% Notes due February 15, 2008 | Floating Rate Notes due May 27, 2014 |
| 6.800% Notes due January 15, 2009 | 7.350% Debentures due December 1, 2017 |
| 7.250% Notes due May 1, 2009 | 7.250% Notes due February 15, 2018 |
| 7.125% Notes due July 1, 2009 | 7.500% Debentures due October 1, 2027 |
| 8.100% Notes due August 1, 2010 | 7.250% Notes due June 15, 2028 |
| 4.650% Notes due October 1, 2010 | 7.500% Notes due April 19, 2029 |
| Floating Rate Notes due October 1, 2010 | 7.875% Notes due July 15, 2031 |
| 7.650% Notes due December 15, 2010 | |

In addition, the tender offers and consent solicitations include our operating partnership's outstanding senior, unsecured InterNotes. We refer to the outstanding securities listed above, as well as the InterNotes, collectively as our senior notes. Approximately $8.4 billion aggregate principal amount of senior notes were

outstanding as of December 28, 2006. In connection with the offers to purchase the senior notes, our operating partnership is seeking the consents of the holders of the senior notes to amend the indentures governing the senior notes to eliminate substantially all of the restrictive covenants contained in the senior notes and the related indentures, eliminate certain events of default, modify covenants regarding mergers, and modify or eliminate certain other provisions contained in the indentures and the senior notes. The proposed terms of the amended senior notes and indentures are described in the tender offer and consent solicitation documents.

The tender offer and consent solicitation documents provide that holders of senior notes will not be able to deliver consents to the amendments to the indentures and the senior notes without also tendering their senior notes. Assuming the requisite consents are received from the holders of the senior notes with respect to such amendments, the amendments will become operative concurrently with the merger effective time, so long as all senior notes validly tendered on or prior to the consent date are accepted for purchase pursuant to the offers to purchase concurrent with the merger effective time. Assuming that all of the conditions to the tender offers and consent solicitations are satisfied or waived, concurrently with the merger effective time, senior notes validly tendered in the tender offers will be accepted for payment. If the amendments become operative, senior notes that are not tendered and purchased in the tender offers are expected to remain outstanding and will be subject to the terms of the applicable indenture as modified by the amendments. In the event the requisite consents are not obtained, we and our operating partnership will issue (subject to the conditions set forth below), immediately prior to the effective time of the partnership merger, an irrevocable notice of optional redemption of senior notes as to which requisite consents have not been obtained and that are redeemable in accordance with their terms and the applicable indenture, which would provide for the satisfaction and discharge of such senior notes and such indenture with respect to such senior notes. It is a condition to our and our operating partnership's obligation to issue any such irrevocable notice of optional redemption that Blackhawk Parent shall have provided written notice to us confirming that all of Blackhawk Parent's conditions set forth in the merger agreement have been satisfied or waived (except for the condition relating to the consent solicitations and the senior notes redemption) and that Blackhawk Parent, MergerCo and Merger Partnership are prepared to proceed immediately with the closing, and Blackhawk Parent, MergerCo and Merger Partnership also shall have irrevocably deposited with the applicable trustee under each indenture sufficient funds to effect such satisfaction and discharge.

Our operating partnership is also seeking the consents of the holders of $1.5 billion aggregate principal amount of 4.00% Exchangeable Senior Notes due 2026 issued by our operating partnership, which we refer to as the exchangeable notes, to amend the indenture governing the exchangeable notes as it relates to such exchangeable notes so as to eliminate substantially all of the restrictive covenants contained in the exchange-able notes and such indenture, eliminate certain events of default, modify covenants regarding mergers, and modify or eliminate certain other provisions contained in such indenture and the exchangeable notes and the related registration rights agreement. The proposed terms of the amendments to the indenture as they relate to the exchangeable notes, the exchangeable notes and the registration rights agreement are described in the relevant consent solicitation documents. Assuming the requisite consents are received from the holders of the exchangeable notes to amend the indenture as it relates to the exchangeable notes and the exchangeable notes and the registration rights agreement, the amendments will become operative concurrently with the merger effective time.

In addition, our operating partnership has agreed to use its reasonable best efforts to redeem its 7.000% Notes due February 1, 2007, its 6.880% Notes due April 30, 2007 and its 7.875% Notes due December 1, 2016. We refer to these three series of notes as the redemption notes. On December 28, 2006, our operating partnership called for redemption on February 1, 2007 all of the $50 million aggregate principal amount outstanding of its 6.880% Notes due April 30, 2007 and its 7.875% Notes due December 1, 2016. The operating partnership will repay at maturity the $1.5 million aggregate principal amount outstanding of its 7.00% Notes due February 1, 2007.

## Representations and Warranties

We and our operating partnership, jointly and severally, made customary representations and warranties in the merger agreement that are subject, in some cases, to specified exceptions and qualifications contained in

the merger agreement or in the disclosure schedules delivered in connection therewith. These representations and warranties relate to, among other things:

- due organization, valid existence, good standing and power and authority to carry on the businesses of each of us, our operating partnership, our other subsidiaries and other entities in which we own certain equity interests (which we refer to as our joint ventures);

- our charter and bylaws and the similar organizational documents of our operating partnership, our other subsidiaries and certain of our joint ventures;

- our capitalization and the capitalization of our operating partnership, and our ownership in our other subsidiaries and joint ventures and the absence of any encumbrances on our ownership of the equity interests of our subsidiaries and our joint ventures;

- our and our operating partnership's power and authority to execute and deliver, and to perform our and our operating partnership's obligations under, the merger agreement and to consummate the transactions contemplated by the merger agreement;

- the enforceability of the merger agreement against us and our operating partnership;

- the vote of our shareholders required in connection with the approval of the merger and the merger agreement and the approval of us as the general partner of our operating partnership;

- the exemption of the merger agreement and the mergers from the requirements of any business combination, control share acquisition or other takeover laws contained in Title 8 of the Corporations and Associations Article of the Annotated Code of Maryland, the Maryland General Corporation Law or the Delaware Revised Uniform Limited Partnership Act;

- the absence of conflicts with, or breaches or violations of, our, our operating partnership's, or certain of our joint ventures' organizational documents, and laws, permits and certain contracts applicable to us, our operating partnership, our other subsidiaries and our joint ventures as a result of entering into the merger agreement or performing our or their respective obligations under the merger agreement;

- consents and approvals of governmental entities required as a result of executing and delivering the merger agreement and performing our and our operating partnership's obligations under the merger agreement;

- possession of all permits necessary to operate our, our subsidiaries' and our joint ventures' properties and carry on our, our subsidiaries' and our joint ventures' business and the absence of any conflict with, or default, breach or violation of, applicable laws or such permits;

- our and our operating partnership's SEC filings since January 1, 2004, and the financial statements contained therein;

- the absence of liabilities required to be recorded on a balance sheet under generally accepted accounting principles as applied in the United States, or GAAP, since September 30, 2006;

- the absence of any material adverse effect (as discussed below) and certain other changes and events since December 31, 2005;

- the absence of litigation or orders against us or our subsidiaries;

- our and our subsidiaries' employee benefit plans;

- labor matters affecting us and our subsidiaries;

- the accuracy and completeness of information we and our operating partnership have supplied for inclusion or incorporation by reference in this proxy statement or any other document to be filed with the SEC or provided to holders of OP Units in connection with the transactions contemplated by the merger agreement;

- real property owned and leased by us, our subsidiaries and our joint ventures; our, our subsidiaries' and our joint ventures' leases, ground leases, development agreements, and participation agreements;

- personal property owned by us and our subsidiaries;

- intellectual property used by, owned by or licensed by us and our subsidiaries;

- tax matters affecting us and our subsidiaries;

- environmental matters affecting us, our subsidiaries and our joint ventures;

- our, our subsidiaries' and our joint ventures' material contracts and the absence of any breach or violation of, or default under, any material contract;

- the absence of any undisclosed broker's or finder's fees;

- the receipt by us of a fairness opinion from Merrill Lynch to the effect that, as of the date of the merger agreement, (i) the cash merger consideration to be received by holders of our common shares is fair from a financial point of view to such holders, and (ii) the cash merger consideration to be received by holders of OP Units (excluding the general partner and any officers and trustees, in their individual capacity, of us or any of our subsidiaries) in the partnership merger, is fair from a financial point of view to the holders of such OP Units;

- our and our subsidiaries' insurance policies; and

- our and our subsidiaries' status as an investment company under the Investment Company Act of 1940, as amended.

For the purposes of the merger agreement, "material adverse effect" means any effect, event, development or change that is materially adverse to our, our subsidiaries' and our joint ventures' assets, business, results of operations or financial condition taken as a whole. A "material adverse effect" will not have been deemed to occur for purposes of the merger agreement, however, as a result of effects, events, developments or changes arising out of or resulting from:

- changes in conditions in the U.S. or global economy or capital or financial markets generally, including changes in interest or exchange rates;

- changes in law or tax, regulatory, political or business conditions that, in each case, generally affect the geographic regions or industries in which we, our subsidiaries and our joint ventures conduct business (unless and only to the extent such effect, event, development or change affects us and our subsidiaries in a disproportionate manner as compared to other persons or participants in the industries in which we, our subsidiaries and our joint ventures conduct business and that operate in the geographic regions affected by such effect, event, development or change);

- changes in GAAP;

- the negotiation, execution, announcement or performance of the merger agreement or the transactions contemplated by the merger agreement or the consummation of the transactions contemplated by the merger agreement, including the impact thereof on relationships, contractual or otherwise, with tenants, suppliers, lenders, investors, venture partners or employees;

- acts of war, armed hostilities, sabotage or terrorism, or any escalation or worsening of any such acts of war, armed hostilities, sabotage or terrorism threatened or underway as of November 19, 2006 (unless and only to the extent such effect, event, development or change affects us, our subsidiaries and our joint ventures in a disproportionate manner as compared to other persons or participants in the industries in which we, our subsidiaries and our joint ventures conduct business and that operate in the geographic regions affected by such effect, event, development or change);

- earthquakes, hurricanes or other natural disasters (unless and only to the extent such effect, event, development or change affects us, our subsidiaries and our joint ventures in a disproportionate manner as compared to other persons or participants in the industries in which we, our subsidiaries and our

joint ventures conduct business and that operate in the geographic regions affected by such effect, event, development or change);

- any action taken by us or our subsidiaries at the request or with the consent of Blackhawk Parent, MergerCo or Merger Partnership; or

- any action brought or threatened by or on behalf of any holder of equity interests in us or our subsidiaries arising out of or relating to the transactions contemplated by the merger agreement.

The exceptions set forth in the fourth bullet above do not apply to the references to material adverse effect in certain representations and warranties. Under the merger agreement, the mere fact that there has been a decrease in the market price of our common shares will not itself constitute a material adverse effect. However, any effect, event, development or change underlying such price decrease (other than those set forth in the bullets above) will be considered in determining whether there has been a material adverse effect.

The merger agreement also contains customary representations and warranties made, jointly and severally, by Blackhawk Parent, MergerCo and Merger Partnership that are subject, in some cases, to specified exceptions and qualifications. The representations and warranties relate to, among other things:

- their due organization, valid existence, good standing and power and authority to carry on their businesses;

- the ownership of MergerCo and Merger Partnership and absence of prior conduct of activities or business of MergerCo and Merger Partnership;

- their power and authority to execute and deliver, and to perform their obligations under, the merger agreement and to consummate the transactions contemplated by the merger agreement;

- the enforceability of the merger agreement against them;

- the absence of conflicts with, or breaches or violations of, their organizational documents, laws, or certain contracts as a result of entering into the merger agreement or consummating the mergers;

- consents and approvals of governmental entities required as a result of executing and delivering the merger agreement and performing their obligations under the merger agreement;

- the accuracy and completeness of information they have supplied for inclusion in this proxy statement or any other document to be filed with the SEC in connection with the transactions contemplated by the merger agreement;

- the absence of litigation or orders against them;

- their capital resources, including in particular the equity funding and the debt financing which will provide Blackhawk Parent with acquisition financing at the effective time of the mergers sufficient to consummate the mergers and the other transactions contemplated by the merger agreement, including the debt tender offers, redemption of senior notes, if any, the consent solicitation with respect to the exchangeable notes and refinancings of certain other indebtedness, if required;

- the guarantee executed by Blackstone Real Estate Partners V L.P.;

- their ownership of common shares, preferred shares, preferred units, OP Units or any other securities of ours and our subsidiaries; and

- clarification that neither we nor our operating partnership will pay for any broker's or finder's fees based upon arrangements made by or on behalf of Blackhawk Parent, MergerCo or Merger Partnership.

The representations and warranties of each of the parties to the merger agreement will expire upon the closing of the mergers.

**Conduct of Our Business Pending the Mergers**

Under the merger agreement, we have agreed that, subject to certain exceptions in the merger agreement and the disclosure schedules delivered in connection therewith, between November 19, 2006 and the effective time of the partnership merger, we and our operating partnership will:

- use commercially reasonable efforts to conduct our and our subsidiaries' businesses in all material respects in the ordinary course of business consistent with past practice; and

- use commercially reasonable efforts to conduct operations in compliance, in all material respects, with applicable laws and to maintain and preserve substantially intact our and our subsidiaries' business organization, to retain the services of our and our subsidiaries' current officers and key employees, to preserve our and our subsidiaries' assets and properties in good repair and condition and to preserve the goodwill and current relationships with our and our subsidiaries' lessees and other persons with whom we or any of our subsidiaries have significant business relations.

We have also agreed that during the same time period, subject to certain exceptions set forth in the merger agreement and the disclosure schedules delivered in connection therewith or unless Blackhawk Parent either gives its prior written consent or does not object within five business days from the date we request such a consent, we and our subsidiaries will not, among other things:

- amend our, our operating partnership's, or our other subsidiaries' organizational documents;

- authorize for issuance, issue or sell, pledge, dispose of or subject to any lien (except in connection with a financing permitted by the merger agreement) or agree or commit to any of the foregoing in respect of, any shares of beneficial interest or shares of any class of capital stock or other equity interest of us or any of our subsidiaries or any options, warrants, convertible securities or other rights of any kind to acquire any such shares, or any other equity interest, of us or any of our subsidiaries; repurchase, redeem or otherwise acquire any securities or equity equivalent except in the ordinary course of business; or reclassify, combine, split or subdivide any shares of beneficial interest or shares of any class of capital stock or other equity interest of us or any of our subsidiaries;

- declare, set aside, make or pay dividends or other distributions, other than (a) cash dividends paid by our wholly-owned subsidiaries in the ordinary course of business consistent with past practice, (b) the quarterly dividend payment on our common shares for the quarter ended December 31, 2006 not to exceed $0.33 per share, (c) the corresponding quarterly distribution on existing OP Units, (d) cash dividends on our preferred shares, and (e) dividends or distributions required under the applicable organizational documents;

- acquire (by merger, consolidation, acquisition of equity interests or assets, or any other business combination) any corporation, partnership, limited liability company, joint venture or other business organization or any individual item of property (other than real property and related assets) or individual asset for consideration in excess of $5 million, or, subject to Blackhawk Parent's consent in its sole discretion, acquire, or enter into any option, commitment or agreement to acquire, any real property or commence any development activity on any of our, our subsidiaries' or our joint ventures' properties;

- incur any indebtedness or issue any debt securities or assume, guarantee or endorse, or otherwise as an accommodation become responsible for, the obligations of any person (other than a subsidiary) for indebtedness;

- modify, amend or terminate any material contract or enter into any new material contract (other than in the ordinary course of business) or any non-compete contract;

- increase compensation or benefits payable to directors, officers or non-executive employees except for increases in the ordinary course of business consistent with past practice, or grant to any of our or our subsidiaries' directors, officers, employees or independent contractors any new employment, retention, bonus, severance, change of control or termination pay equity-based cash awards;

- grant any increase in, or alter or amend, any right to receive any severance, change of control, retention or termination pay or benefits or establish, adopt, enter into or amend any collective bargaining, bonus, profit-sharing, thrift, compensation, stock option, restricted stock, stock unit, dividend equivalent, pension, retirement, deferred compensation, employment, loan, retention, indemnification, consulting, termination, severance or other similar plan, agreement, trust, fund, policy or arrangement with any trustee, officer or employee or, other than consulting agreements, with any independent contractor;

- repurchase, repay or prepay any of our indebtedness, or pay, discharge or satisfy any material claims, liabilities or obligations except in the ordinary course consistent with past practice;

- change in any material respect GAAP financial accounting principles or policies;

- enter into a new lease or terminate, materially modify or amend any lease that relates to in excess of 50,000 square feet of net rentable area at any of our, our subsidiaries' and our joint ventures' properties, or enter into, terminate or materially modify or amend any ground lease;

- make any loans, advances or capital contributions to, or investments in, any person (other than our subsidiaries, joint ventures or as required by any material contract in effect as of November 19, 2006), or authorize or enter into any commitment for any new material capital expenditure other than certain permitted expenditures;

- waive, release, assign, settle or compromise any material legal actions or material liabilities other than in the ordinary course of business or certain securities-related legal actions;

- make, change or rescind any material tax election, amend any material tax return, settle or compromise any material tax liability, audit, claim or assessment, or enter into any material closing agreement related to taxes, or knowingly surrender any right to claim a material tax refund, other than as required by applicable law or necessary to preserve our status as a REIT under the Code, or to qualify or preserve the status of any subsidiary as a partnership for federal income tax purposes or as a qualified REIT subsidiary or a taxable REIT subsidiary under the Code, as the case may be (provided that in such events we shall notify Blackhawk Parent of such election and shall not fail to make such election in a timely manner);

- enter into, amend or modify any material tax protection agreement, or take any action that would violate any tax protection agreement or otherwise give rise to any material liability of us or any of our subsidiaries with respect to tax protection agreements;

- amend any term of any outstanding equity security or equity interest of us or any of our subsidiaries;

- subject to Blackhawk Parent's consent in its sole discretion, sell or otherwise dispose of, or consent to any lien other than permitted liens on, any of our, our subsidiaries' or our joint ventures' properties or other material assets other than pending sales pursuant to definitive agreements executed prior to November 19, 2006 or specified agreements to sell additional such properties for not less than specified target sales prices;

- adopt a plan of complete or partial liquidation or dissolution except with respect to subsidiaries that sell all or substantially all of their assets, or taxable REIT subsidiaries whose activities are related solely to such assets, and which sales are otherwise permitted pursuant to the merger agreement;

- fail to use our best commercial efforts to maintain in full force and effect all existing insurance policies or to replace such insurance policies with comparable insurance policies covering us, our, our subsidiaries' and our joint ventures' properties, and our subsidiaries' properties, assets and businesses or substantially equivalent policies;

- initiate or consent to any material zoning reclassification of any our, our subsidiaries' or our joint ventures' owned or material leased properties or any material change to any approved site plan, special use permit, planned unit development approval or other land use entitlement affecting any such properties except to the extent such action would not materially adversely affect the value of the affected properties;

- effectuate a "plant closing" or "mass layoff" each as defined in the Worker Adjustment and Retraining Notification Act or any similar state or local law; and

- announce an intention, enter into an agreement or otherwise make a commitment, to do any of the foregoing.

We have also agreed with Blackhawk Parent and the other parties to the merger agreement that, except as contemplated by the merger agreement, such party shall not, directly or indirectly, without the prior written consent of the other parties, take or cause to be taken any action that would reasonably be expected to materially delay consummation of the transactions contemplated by the merger agreement, or enter into any agreement or otherwise make a commitment, to take any such action.

## No Solicitation of Transactions

We have agreed that, from November 19, 2006 to the merger effective time and subject to specified exceptions described below, neither we nor any of our subsidiaries will, nor will we authorize any of our representatives to, directly or indirectly:

- solicit or knowingly facilitate (including by way of furnishing nonpublic information or assistance) any inquiries with respect to or the making of any acquisition proposal (as defined below);

- enter into discussions or negotiate with any person in furtherance of those inquiries or to obtain an acquisition proposal or release any person from any standstill agreement or similar obligation to us or any of our subsidiaries, other than the automatic termination of standstill obligations pursuant to the terms of agreements as in effect as of November 19, 2006, by virtue of the execution and announcement of the merger agreement or otherwise;

- withdraw, modify or amend our board's recommendation that shareholders approve the merger agreement and the merger in any manner adverse to Blackhawk Parent, MergerCo or Merger Partnership or fail to recommend that shareholders approve the merger agreement and the merger; provided, however, at any time prior to obtaining approval of our shareholders of the merger and other than in response to an acquisition proposal, our board may withdraw, modify or amend its recommendation that shareholders approve the merger agreement and the merger in the event that the board has determined in good faith that the failure to take such action would be inconsistent with its duties to our shareholders under applicable law;

- approve, endorse or recommend any acquisition proposal; or

- enter into any agreement in principle, arrangement, understanding, contract or agreement relating to an acquisition proposal.

For purposes of the merger agreement, "acquisition proposal" means any proposal or offer (other than the mergers or any of the other transactions contemplated by the merger agreement) for any:

- merger, consolidation, share exchange, business combination or similar transaction involving us, our operating partnership or any of our significant subsidiaries;

- sale or other disposition, directly or indirectly, by merger, consolidation, share exchange, business combination, or any similar transaction, of 20% or more of our and our subsidiaries' assets, taken as a whole;

- issue, sale or other disposition by us or any of our subsidiaries of shares of our capital stock or other securities representing 20% or more of the voting power of our voting securities or 20% or more of the equity interests or general partner interests in our operating partnership;

- tender offer or exchange offer in which any person or group acquires beneficial ownership, or the right to acquire beneficial ownership, of 20% or more of the voting power of our common shares or 20% or more of the outstanding equity interests or general partner interests in our operating partnership;

- recapitalization, restructuring, liquidation, dissolution or other similar type of transaction with respect to us or our operating partnership; or

- other transaction which is similar in form, substance or purpose to any of the foregoing transactions.

Prior to the approval of the merger by our shareholders, following the receipt of an unsolicited written acquisition proposal, we may contact such person and its advisors solely for the purpose of clarifying the proposal and any material terms thereof and the conditions to consummation, to determine whether such acquisition proposal is reasonably likely to result in a superior proposal and, if our board of trustees determines in good faith, after consultation with its legal and financial advisors, that such acquisition proposal is reasonably likely to result in a superior proposal, our board of trustees may:

- furnish non-public information with respect to us and our subsidiaries to such person who made such proposal, provided that we have caused such person to enter into a confidentiality agreement with us containing terms that are at least as favorable to us as those contained in the confidentiality agreement we signed with an affiliate of Blackhawk Parent and we concurrently disclose the same non-public information to Blackhawk Parent if not previously disclosed;

- participate in negotiations regarding such proposal;

- following receipt of a written acquisition proposal that constitutes a superior proposal, recommend to our shareholders that they approve such superior proposal and, in connection therewith, withdraw or modify in a manner adverse to Blackhawk Parent, or fail to make, our board of trustees' recommendation that our shareholders approve the merger agreement and the merger; and

- authorize us to enter into a definitive agreement providing for the implementation of such superior proposal.

For purposes of the merger agreement, "superior proposal" means a written acquisition proposal:

- that relates to more than 50% of the voting power of our capital stock or all or substantially all of our and our subsidiaries' assets, taken as a whole;

- which our board of trustees determines in its good faith judgment, after consultation with its financial advisor and after taking into account all the terms and conditions of the acquisition proposal, to be more favorable from a financial point of view to our shareholders than the merger (including any alterations to the merger agreement agreed to in writing by Blackhawk Parent in response to such an acquisition proposal);

- whose material conditions to consummation are reasonably capable of being satisfied in the judgment of the board of trustees; and

- for which financing, to the extent required, is then committed or, in the judgment of our board of trustees, is reasonably likely to be available.

We and our operating partnership have agreed to promptly notify Blackhawk Parent (in any event within 48 hours after receipt) of our receipt of any acquisition proposal, any request for information relating to us or our subsidiaries or any inquiry or request for discussions or negotiations regarding any acquisition proposal. In our notice to Blackhawk Parent, we have agreed to provide the identity of parties making the proposal and a copy of such acquisition proposal, inquiry or request. We and our operating partnership have also agreed to keep Blackhawk Parent reasonably informed on a prompt basis as to any material developments regarding any such acquisition proposal, indication, inquiry or request. Under the merger agreement, we may not, and may not permit any of our subsidiaries to, terminate, waive, amend or modify any provision of any existing standstill or confidentiality agreement to which we or our subsidiaries are a party in each case relating to an acquisition proposal. We also agreed to cease any existing discussions, negotiations or communications with any parties with respect to any acquisition proposal.

We also agreed not to take any action to exempt any person from the ownership restrictions in Article VII of our charter or otherwise cause such restrictions not to apply.

**Employee Benefits**

For a period of not less than twenty-four months following the closing date, Blackhawk Parent has agreed that it will cause the surviving entity to provide all employees employed by us or our subsidiaries as of the merger effective time and who continue to be employed by the surviving entity or its successors or assigns or any of their subsidiaries ("continuing employees") with base salary and cash incentive compensation (excluding any cash bonuses related to equity or equity-based awards) in an amount at least equal to the same level that was provided to each continuing employee, or to which such continuing employee was entitled immediately prior to the merger effective time and benefits (other than equity-based benefits) that are no less favorable in the aggregate as those provided to such continuing employees immediately prior to the merger effective time.

Blackhawk Parent has agreed to honor, and to cause the surviving entity to honor, all severance, change of control and similar obligations, as well as certain other employment related contracts, agreements, arrangements and commitments of Equity Office and its subsidiaries, in accordance with their terms as in effect immediately prior to the merger effective time.

Prior to the merger effective time, our board of trustees will take such actions as are necessary to terminate all share or investment-based non-qualified deferred compensation account-based arrangements and cash payment will be made in single lump sum to the participants in such plans.

All restrictions on the disposition of our common shares purchased under our 1997 Non-Qualified Employee Share Purchase Program will terminate at the merger effective time.

In addition, Blackhawk Parent has agreed to:

- provide each of our continuing employees with credit for service with us and our subsidiaries with respect to any employee benefit plans established by Blackhawk Parent or its subsidiaries under which our continuing employees may be eligible to participate after the merger effective time ("new plans"), to the same extent as such continuing employee was entitled to credit for such service under our respective benefit plans, provided that such crediting of service will not operate to duplicate any benefits and will not be counted for the purpose of crediting benefit accrual under any defined benefit plan; and

- for purposes of each new plan providing health benefits to any continuing employee, cause such continuing employee to receive credit for all amounts paid by such continuing employee for purposes of satisfying all deductible, co-payments and out-of-pocket maximums as though such amounts had been paid in accordance with the terms and conditions of the parallel plan, program or arrangement of Blackhawk Parent or the surviving entity.

**Pre-Closing Transactions**

In addition, Blackhawk Parent may request that, in its sole discretion and immediately prior to the closing, we (1) convert any of our wholly-owned subsidiaries organized as a corporation or limited partnership into a limited liability company, (2) sell the stock, partnership interests or limited liability interests owned by us in any wholly-owned subsidiary at a price designated by Blackhawk Parent, or (3) sell any of our or our wholly-owned subsidiaries' assets at a price designated by Blackhawk Parent. These rights of Blackhawk Parent are limited, however, in that (a) Blackhawk Parent may not require us to take any action that contravenes any organizational document or contract, (b) any such actions or transactions would be contingent upon all conditions to the obligations of us, Blackhawk Parent, MergerCo and Merger Partnership under the merger agreement having been satisfied or waived and our receipt of a written notice from Blackhawk Parent to such effect and that Blackhawk Parent, MergerCo and Merger Partnership are prepared to proceed immediately with the closing and any other evidence reasonably requested by us that the closing will occur, (c) these actions (or the inability to complete them) will not affect or modify the obligations of Blackhawk Parent, MergerCo and Merger Partnership under the merger agreement, and (d) we and our subsidiaries will not be required to take any action that could adversely affect our classification as a REIT within the meaning of the Code, that could subject us to any prohibited transactions taxes or certain other material taxes under the

Code, or that could result in any United States federal, state or local income tax being imposed on the limited partners of our operating partnership.

**Agreement to Take Further Action**

Subject to the terms and conditions of the merger agreement and in accordance with applicable laws, each party to the merger agreement has agreed to use its reasonable efforts to take, or to cause to be taken, all appropriate action and to do, or to cause to be done, all things necessary, proper or advisable under applicable laws to consummate and make effective the mergers and the transactions contemplated by the merger agreement, including using its reasonable efforts to obtain all permits, consents, approvals, authorizations, qualifications and orders of governmental authorities with us and our subsidiaries as are necessary for the consummation of the transactions contemplated by the merger agreement and to fulfill the conditions to the mergers and the other transactions contemplated by the merger agreement.

Each party to the merger agreement has agreed to cooperate and use its reasonable best efforts to defend through litigation on the merits any legal action, including administrative or judicial action, asserted by any party in order to avoid the entry of, or to have vacated, lifted, reversed, terminated or overturned any decree, judgment, injunction or other order that in whole or in part restricts, delays, prevents or prohibits consumma- tion of the mergers, including by vigorously pursuing all available avenues of administrative and judicial appeal.

Furthermore, the parties have agreed to use their respective commercially reasonable efforts to obtain any third-party consents:

- necessary, proper or advisable to consummate the transactions contemplated by the merger agreement; or

- required to prevent a material adverse effect from occurring prior to the merger effective time.

In addition, we and our operating partnership have agreed that, in the event that we or our operating partnership fail to obtain any of the third-party consents mentioned above, each of us will use our commercially reasonable efforts and take all such actions reasonably requested by Blackhawk Parent to minimize any adverse effect on us, our operating partnership, Blackhawk Parent, MergerCo or Merger Partnership or their respective businesses as a result of the failure to obtain such consent.

Neither we nor our subsidiaries will be permitted to pay or commit to pay any cash or other consideration, make any commitment or incur any liability or other obligation in connection with obtaining any approval or consent from any non-governmental third party unless Blackhawk Parent has provided its prior written consent, which Blackhawk Parent cannot unreasonably withhold or delay. In addition, none of Blackhawk Parent, MergerCo, Merger Partnership or their respective affiliates will be required to pay any cash or other consideration, make any commitment or incur any liability or other obligation in connection with obtaining any approval or consent from any non-governmental third party.

**Conditions to the Mergers**

The obligations of the parties to complete the mergers are subject to the following mutual conditions:

- approval of the merger and the merger agreement by the requisite shareholder vote; and

- no governmental authority shall have enacted, issued, promulgated, enforced or entered any injunction, order, decree or ruling that would make the consummation of either merger illegal or otherwise prohibit the consummation of either merger, provided that a party asserting this condition will, in the case of an injunction or order, have used its reasonable best efforts to prevent the entry of any such injunction or other order and to appeal as promptly as possible any such injunction or other order that may be entered.

The obligations of Blackhawk Parent, MergerCo and Merger Partnership to complete the mergers are subject to the following additional conditions:

- our and our operating partnership's representations and warranties that (a) are not made as of a specific date shall be true and correct as of the date of the closing, as though made on and as of the closing, and (b) are made as of a specific date shall be true and correct as of such date, except where the failure of our and our operating partnership's representations and warranties to be true and correct in all respects without regard to any materiality or material adverse effect qualifications (other than the representation relating to any material adverse effect to us) does not and would not have, individually or in the aggregate, a material adverse effect, provided that certain representations and warranties pertaining to our capitalization must be true and correct in all material respects as of the closing;

- the performance, in all material respects, by us and our operating partnership of our and our operating partnership's obligations under the merger agreement and compliance, in all material respects, with the agreements and covenants to be performed or complied with under the merger agreement;

- the receipt by Blackhawk Parent of a certificate signed by one of our officers with respect to the truth and correctness of our and our operating partnership's representations and warranties, the performance, in all material respects, of our and our operating partnership's obligations under the merger agreement and compliance with the agreements and covenants to be performed or complied with under the merger agreement;

- since November 19, 2006, there shall not have been an effect, event, development or change that, individually or in the aggregate, has resulted or would result in a material adverse effect;

- the receipt of a tax opinion of our counsel, Sidley Austin LLP, opining that we have been organized and have operated in conformity with the requirements for qualification as a REIT under the Code, commencing with our taxable year ended December 31, 1997;

- receipt from the administrative agent under our revolving credit facility of a "payoff" letter acknowledging that, subject to repayment of the aggregate principal amount outstanding under the credit facility, together with all accrued and unpaid interest and any other fees or expenses payable, the credit facility will be terminated, any and all related liens held by the administrative agent, or any other collateral agent under the revolving credit facility, will be released, and we and our subsidiaries will be released from any and all material liabilities and obligations under the credit facility and any related guaranties (other than any obligations under any indemnification or similar provision that survive such termination); and

- either (a) receipt of requisite consents with respect to the senior notes (pursuant to the tender offers and consent solicitations) and the exchangeable notes (pursuant to the consent solicitation therefor) and the execution of supplemental indentures to the indentures governing these notes, which will be effective promptly following the receipt of the required consents with the amendments described in the applicable tender offer or consent solicitation documents to become operative upon the acceptance of these notes for payment pursuant to the tender offers (in the case of the senior notes) and concurrently with the merger effective time or (b) we and our operating partnership shall have complied with our obligation under the merger agreement, which provides that, to the extent that, as of the closing date, the requisite consents have not been obtained, we and our operating partnership will issue, immediately prior to the effective time of the partnership merger, an irrevocable notice of optional redemption for notes the holders of which have not delivered the requisite consents and that are redeemable in accordance with their terms and the applicable indenture governing such notes, which shall provide for the satisfaction and discharge of such notes and such indenture with respect to such notes, so long as Blackhawk Parent, MergerCo and Merger Partnership shall have, among other things, irrevocably deposited with the applicable trustee under each such indenture sufficient funds to effect such satisfaction and discharge.

The obligations of us and our operating partnership to complete the mergers are subject to the following additional conditions:

- the representations and warranties of Blackhawk Parent, MergerCo and Merger Partnership, that (a) are not made as of a specific date shall be true and correct as of the date of the closing, as though made on and as of the closing, and (b) are made as of a specific date shall be true and correct as of such date, except where the failure of their representations and warranties to be true and correct in all respects without regard to any materiality or Blackhawk Parent material adverse effect qualifications does not have and would not reasonably be expected to have, individually or in the aggregate, a Blackhawk Parent material adverse effect;

- the performance, in all material respects, by Blackhawk Parent, MergerCo and Merger Partnership of their obligations under the merger agreement and compliance, in all material respects, with the agreements and covenants to be performed or complied with under the merger agreement; and

- the receipt by us of an officer's certificate with respect to the truth and correctness of the representations and warranties of Blackhawk Parent, MergerCo and Merger Partnership and the performance of their obligations under the merger agreement and compliance, in all material respects, with the agreements and covenants to be performed or complied with under the merger agreement.

For the purposes of the merger agreement, "Blackhawk Parent material adverse effect" means any effect, event, development or change that, individually or in the aggregate with all other effects, events, developments or changes, is materially adverse to Blackhawk Parent's and its subsidiaries' assets, business, results of operations or financial condition taken as a whole. A "Blackhawk Parent material adverse effect" will not have occurred, however, as a result of effects, events, developments or changes arising out of or resulting from:

- changes in conditions in the U.S. or global economy or capital or financial markets generally, including changes in interest or exchange rates;

- changes in law or tax, regulatory, political or business conditions that, in each case, generally affect the geographic regions or industries in which Blackhawk Parent and its subsidiaries conduct their business (unless and only to the extent such effect, event, development or change affects Blackhawk Parent and its subsidiaries in a disproportionate manner as compared to other persons or participants in the industries in which Blackhawk Parent and its subsidiaries conduct their business and that operate in the geographic regions affected by such effect, event, development or change);

- changes in GAAP;

- the negotiation, execution, announcement or performance of the merger agreement or the transactions contemplated by the merger agreement or the consummation of the transactions contemplated by the merger agreement, including the impact thereof on relationships, contractual or otherwise, with tenants, suppliers, lenders, investors, venture partners or employees;

- acts of war, armed hostilities, sabotage or terrorism, or any escalation or worsening of any such acts of war, armed hostilities, sabotage or terrorism threatened or underway as of November 19, 2006 (unless and only to the extent such effect, event, development or change affects Blackhawk Parent and its subsidiaries in a disproportionate manner as compared to other persons or participants in the industries in which Blackhawk Parent and its subsidiaries conduct their business and that operate in the geographic regions affected by such effect, event, development or change);

- earthquakes, hurricanes or other natural disasters (unless and only to the extent such effect, event, development or change affects Blackhawk Parent and its subsidiaries in a disproportionate manner as compared to other persons or participants in the industries in which Blackhawk Parent and its subsidiaries conduct their business and that operate in the geographic regions affected by such effect, event, development or change);

- any action taken by Blackhawk Parent and its subsidiaries at the request or with the consent of us or our operating partnership; or

73

- any action brought or threatened by or on behalf of any holder of equity interests in us or our subsidiaries arising our of or relating to the transactions contemplated by the merger agreement.

The exceptions set forth in the fourth bullet above do not apply to the references to material adverse effect in certain representations and warranties.

## Termination

The merger agreement may be terminated and the mergers may be abandoned at any time prior to the effective time of the partnership merger, as follows:

- by mutual written consent of Blackhawk Parent and Equity Office;

- by either Blackhawk Parent or us if:

  - the partnership merger has not occurred on or before May 19, 2007, provided that this right will not be available to a party whose failure to fulfill any obligation under the merger agreement materially contributed to the failure of the partnership merger to occur on or before May 19, 2007;

  - any governmental authority shall have enacted, issued, promulgated, enforced or entered any final and non-appealable injunction, order, decree or ruling or taken any other action which has the effect of making consummation of either of the mergers illegal or otherwise prevents or prohibits the consummation of either of the mergers; provided, however, that the right to terminate will not be available to any party unless such party shall have used its reasonable best efforts to oppose any such governmental order or to have such governmental order vacated or made inapplicable to the merger; or

  - the requisite vote of our common shareholders to approve the merger upon a vote being taken at a duly convened shareholders meeting is not obtained; or

- by Blackhawk Parent if:

  - none of Blackhawk Parent, MergerCo and Merger Partnership is in material breach of its obligations under the merger agreement, and (a) any of our or our operating partnership's representations and warranties are or become untrue or incorrect such that the closing condition pertaining to our or our operating partnership's representations and warranties would be incapable of being satisfied by May 19, 2007, or (b) there has been a breach of any of our or our operating partnership's covenants or agreements such that the closing condition pertaining to our or our operating partnership's performance and compliance with covenants or agreements would be incapable of being satisfied by May 19, 2007;

  - our board of trustees withdraws, modifies or amends its recommendation that shareholders vote to approve the merger agreement and the merger in any manner adverse to Blackhawk Parent, MergerCo or Merger Partnership;

  - our board of trustees approves, endorses or recommends an acquisition proposal; we enter into a contract or agreement relating to an acquisition proposal (other than a confidentiality agreement permitted by the merger agreement); a tender offer or exchange offer for any of our outstanding stock that constitutes an acquisition proposal is commenced before the requisite shareholder vote is obtained and our board of trustees fails to recommend against acceptance of such tender offer or exchange offer within ten business days after it is commenced; or we or our board of trustees publicly announces the intention to do any of the foregoing; or

  - our board of trustees exempts, or is required to exempt, any person other than Blackhawk Parent or its affiliates from the ownership restrictions in Article VII of our charter; or

- by us if:

  - neither we nor our operating partnership is in material breach of our or its respective obligations under the merger agreement, and (a) any of Blackhawk Parent's, MergerCo's or Merger Partnership's

representations and warranties are or become untrue or incorrect such that the closing condition pertaining to their representations and warranties would be incapable of being satisfied by May 19, 2007, or (b) there has been a breach of any of Blackhawk Parent's, MergerCo's or Merger Partnership's covenants or agreements such that the closing condition pertaining to their performance and compliance with covenants and agreements would be incapable of being satisfied by May 19, 2007; or

- our board of trustees approves and authorizes us to enter into a definitive agreement to implement a superior proposal in accordance with the terms of the merger agreement, so long as:

  - the requisite shareholder vote has not been obtained;

  - we are not in or have not been in breach of our obligations under the merger agreement with regard to prohibitions on soliciting acquisition proposals in any material respect;

  - our board of trustees has determined in good faith, after consulting with its financial advisor, that such definitive agreement constitutes a superior proposal;

  - we have notified Blackhawk Parent in writing that we intend to enter into such agreement (attaching the most current version of such agreement);

  - during the three business days following the receipt by Blackhawk Parent of our notice, we have offered to negotiate with, and, if accepted by Blackhawk Parent, have negotiated in good faith with, Blackhawk Parent to make adjustments to the terms and conditions of the merger agreement to enable us to proceed with the mergers and the other transactions contemplated by the merger agreement;

  - our board of trustees has determined in good faith, after the end of such three business day period, after considering the results of any such negotiations and any revised proposals made by Blackhawk Parent, that the superior proposal giving rise to such notice continues to be a superior proposal; and

  - we pay to Blackhawk Parent the termination fee in accordance with the merger agreement simultaneously with the termination of the merger agreement.

## Termination Fee and Expenses

We have agreed to pay to Blackhawk Parent a termination fee of $200 million if:

- we terminate the merger agreement because our board approves and authorizes us to enter into an agreement to implement a superior proposal in accordance with the terms of the merger agreement;

- Blackhawk Parent has terminated the merger agreement because our board has withdrawn, modified or amended its recommendation that shareholders vote to approve the merger agreement and the merger in any manner adverse to Blackhawk Parent, MergerCo or Merger Partnership;

- Blackhawk Parent has terminated the merger agreement because our board has approved, endorsed or recommended, or we have entered into a contract or agreement relating to, an acquisition proposal, or a tender offer or exchange offer for any of our outstanding stock has been commenced prior to the requisite shareholder vote being obtained and our board has failed to recommend against such tender or exchange offer within ten business days of its commencement, or we or our board has publicly announced its intention to do any of the foregoing;

- Blackhawk Parent has terminated the merger agreement because our board has exempted, or is required to exempt, any person other than Blackhawk Parent or its affiliates from the ownership restrictions in Article VII of our charter; or

- an acquisition proposal has been made to us or our operating partnership, or otherwise publicly announced, prior to the termination date of the merger agreement and the merger agreement has been terminated (i) by either Blackhawk Parent or us because (a) the mergers have not been consummated