on or before May 19, 2007 and such acquisition proposal has not been withdrawn prior to the termination date of the merger agreement or (b) the requisite shareholder vote to approve the merger upon a vote being taken has not been obtained at a duly convened meeting or (ii) by Blackhawk Parent because we or our operating partnership have breached our obligations in the merger agreement regarding non-solicitation and convening and holding a meeting of our common shareholders and Blackhawk Parent is not in material breach of its obligations under the merger agreement, and in each of the foregoing instances, within twelve months following the termination of the merger agreement we enter into a contract with respect to or consummate any acquisition proposal.

We have agreed that in the event that we fail to pay the termination fee or any termination expenses when due, or Blackhawk Parent fails to pay any termination expenses when due, we or Blackhawk Parent, as the case may be, will reimburse the other party for all reasonable costs and expenses actually incurred or accrued by such party in connection with the collection under and enforcement of relevant provisions of the merger agreement.

The merger agreement also provides that if either party terminates the merger agreement because of the other party's material breach of the merger agreement which would result in the failure of a condition being satisfied by May 19, 2007, the breaching party must reimburse the non-breaching party for its reasonable transaction expenses up to a limit of $7.5 million. To the extent that we reimburse Blackhawk Parent's transaction expenses, the amount we paid would be deducted from any termination fee that may thereafter be payable by us to Blackhawk Parent.

## Amendment and Waiver

The merger agreement may be amended by mutual agreement of the parties in writing, whether before or after our shareholders have approved the merger agreement, provided that after any such shareholder approval, no amendment shall be made which, by law or the rules of the New York Stock Exchange, requires further shareholder approval without first obtaining such shareholder approval. The merger agreement also provides that, at any time prior to the merger effective time, we or Blackhawk Parent may extend the time for the performance of any obligations of the other parties, waive any inaccuracies in the representations and warranties of the other parties or waive compliance with any of the agreements or conditions to its obligations contained in the merger agreement.

## ADJOURNMENTS AND POSTPONEMENTS OF THE SPECIAL MEETING

### Proposal for Adjournments

We are asking our common shareholders to vote on a proposal to approve any adjournments of the special meeting for the purpose of soliciting additional proxies if there are not sufficient votes at the special meeting to approve the merger and the merger agreement.

**Our board of trustees recommends that you vote "FOR" the proposal to approve any adjournments of the special meeting for the purpose of soliciting additional proxies.**

### Postponements of the Special Meeting

At any time prior to convening the special meeting, our board of trustees may postpone the special meeting for any reason without the approval of our shareholders. If postponed, we will provide at least ten days' notice of the new meeting date.

## MARKET PRICE OF OUR COMMON SHARES

Our common shares are traded on the New York Stock Exchange under the ticker symbol "EOP." As of December 28, 2006, there were 2,885 shareholders of record. The following table sets forth the high and low sale prices of our common shares as reported on the New York Stock Exchange (rounded to the nearest cent),

and the dividends paid per common share, for each quarterly period for the past two years and for the first, second, third and fourth quarterly periods (through December 28, 2006) of fiscal year ending December 31, 2006.

| | Market Price Range | | |
| | High | Low | Dividend |
|---|---|---|---|
| **Fiscal Year Ending December 31, 2006:** | | | |
| Fourth Quarter (through December 28, 2006) | $49.10 | $39.39 | $0.33 |
| Third Quarter | 40.32 | 36.02 | 0.33 |
| Second Quarter | 36.87 | 31.78 | 0.33 |
| First Quarter | 35.00 | 29.71 | 0.33 |
| **Fiscal Year Ended December 31, 2005:** | | | |
| Fourth Quarter | $33.17 | $28.20 | $0.50 |
| Third Quarter | 35.79 | 31.31 | 0.50 |
| Second Quarter | 34.39 | 30.00 | 0.50 |
| First Quarter | 31.17 | 27.45 | 0.50 |
| Full Year | 35.79 | 27.45 | 2.00 |
| **Fiscal Year Ended December 31, 2004:** | | | |
| Fourth Quarter | $29.86 | $27.11 | $0.50 |
| Third Quarter | 28.95 | 25.71 | 0.50 |
| Second Quarter | 29.20 | 23.90 | 0.50 |
| First Quarter | 30.39 | 27.81 | 0.50 |
| Full Year | 30.39 | 23.90 | 2.00 |

On November 17, 2006, the last trading day prior to the date of the public announcement of the merger agreement, the closing price of our common shares on the New York Stock Exchange was $44.72 per share. On December 28, 2006, the last trading day before the date of this proxy statement, the closing price of our common shares on the New York Stock Exchange was $48.12 per share. You are encouraged to obtain current market quotations for our common shares.

On December 6, 2006, our board of trustees declared a regular quarterly dividend of $0.33 per common share for the quarterly period ended December 31, 2006 payable on December 29, 2006 to shareholders of record at the close of business on December 15, 2006. However, under the terms of the merger agreement, we may not declare or pay any other dividends to our common shareholders without the prior written consent of Blackhawk Parent.

## SECURITIES OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

### Common Share and Unit Ownership by Trustees and Executive Officers

This table indicates how many common shares and OP Units were beneficially owned as of December 28, 2006 by:

- each current trustee;

- each executive officer named in the Summary Compensation Table from the Equity Office Proxy Statement dated April 20, 2006 not also listed as a trustee; and

- trustees and executive officers as a group.

In general, "beneficial ownership" includes those common shares and OP Units a trustee or executive officer has the power to vote or the power to dispose and share options or warrants that are exercisable currently or become exercisable or redeemable within 60 days. Except as otherwise noted, the persons named in the table below have sole voting and investment power with respect to all securities shown as beneficially owned by them.

77

As additional information, we have provided the number of OP Units and the number of phantom share units held by these individuals and the group as of December 28, 2006.

| Name | Common Shares Beneficially Owned(1) | Options Exercisable Within 60 days | Percentage of All Common Shares(1) | OP Units and Phantom Share Units(2) | Percentage of All Common Shares and OP Units(2)(3) |
|---|---|---|---|---|---|
| Marilyn A. Alexander .......... | 800 | 0 | * | 7,068 | * |
| Thomas E. Dobrowski(6) ......... | 1,433 | 0 | * | 4,915 | * |
| William M. Goodyear............ | 22,230 | 117,890 | * | 24,836 | * |
| James D. Harper, Jr. ............. | 2,166 | 165,140 | * | 24,099 | * |
| Richard D. Kincaid ............. | 186,867 | 768,569 | * | 386,486 | * |
| Sheli Z. Rosenberg............... | 114,559(4) | 197,140 | * | 216,249(5) | * |
| Stephen I. Sadove .............. | 7,315 | 0 | * | 6,217 | * |
| Sally Susman................... | 1,889 | 0 | * | 6,132 | * |
| Jan H.W.R. van der Vlist(6) ....... | 3,092 | 0 | * | 0 | * |
| Samuel Zell.................... | 323,611(7) | 4,180,980 | 1.2% | 1,934,960(8) | 1.8% |
| Jeffrey L. Johnson .............. | 96,289 | 519,091 | * | 42,095 | * |
| Peyton H. Owen, Jr. ............ | 48,550 | 85,582 | * | 16,385 | * |
| Stanley M. Stevens ............. | 59,170(9) | 408,926 | * | 130,666(10) | * |
| Marsha C. Williams ............. | 93,612 | 270,036 | * | 12,698 | * |
| Trustees and executive officers as a group (16 persons including those named above)................. | 1,025,888 | 6,743,416 | 2.1% | 2,818,266(11) | 2.9% |

* Less than 1%.

(1) The number of common shares beneficially owned is based on SEC regulations regarding the beneficial ownership of securities. Percentages are based on a total of 356,504,989 common shares outstanding as of December 28, 2006 plus common shares subject to options held by the individual (or group) exercisable within sixty days after December 28, 2006. The percentage of common shares beneficially owned by a person assumes that all options exercisable within sixty days of December 28, 2006 to acquire common shares held by the person are exercised and that no options to acquire common shares held by other persons are exercised. The number of common shares beneficially owned may include both vested and unvested restricted shares.

(2) OP Units may be exchanged for Equity Office common shares or, at the election of Equity Office, the cash value of the Equity Office common shares on a one-for-one basis. OP Units have distribution rights but no voting rights. Phantom share units correspond to shares held by the trustee of the Fourth Amended and Restated Equity Office Supplemental Retirement Savings Plan ("SRP"). The value of amounts deferred under the SRP will be paid out in cash following the merger based on an assumed investment in Equity Office common shares referred to as phantom share units. Equity Office is not required to but does permit SRP participants to submit their voting instructions with respect to the common shares held by the SRP trustee relating to the phantom share units. The OP Units and the phantom share units do represent an economic equivalent to Equity Office common shares, even though the OP Units and the phantom share units may not represent shares "beneficially owned" by the Equity Office trustees and executive officers in accordance with Rule 13d-3 of the Securities Exchange Act of 1934. Unless indicated otherwise below, the amounts shown in this column of the table reflect only phantom share units.

(3) Percentages are based on the total of: (i) 356,504,989 common shares outstanding as of December 28, 2006; (ii) common shares subject to options held by the individual (or the group) exercisable within 60 days after December 28, 2006; plus (iii) common shares that would be issued if the individual (or group) redeemed his or her OP Units and received common shares. Common shares held by the SRP trustee relating to the phantom share units are included in the common shares outstanding. The

percentage of common shares beneficially owned by a person assumes that: (i) all options exercisable within sixty days of December 28, 2006 to acquire common shares held by the person are exercised and that no options to acquire common shares held by other persons are exercised; and (ii) all OP Units held by the person are converted into common shares and that no OP Units held by other persons are converted into common shares.

(4) Includes 40,244 common shares held by Ms. Rosenberg's spouse.

(5) Includes 191,134 OP Units and 25,115 phantom share units. Ms. Rosenberg's spouse owns 17,318 of these 191,134 OP Units.

(6) Until their termination of employment from their prior respective employers (September 2005 for Mr. Dobrowski and December 2005 for Mr. van der Vlist), their employers prohibited them from owning Equity Office common shares. Amounts shown for Mr. Dobrowski include 562 unvested restricted shares (which he must transfer to his former employer upon vesting under each restricted share's current vesting schedule).

(7) Includes 264,263 common shares held directly by Mr. Zell, 27,348 common shares held by Samstock/ SZRT, L.L.C. and 32,000 common shares held by the Helen Zell Revocable Trust. The number in the table excludes an additional 1,523,321 common shares in which Mr. Zell has a pecuniary interest but does not have voting or dispositive power. If these excluded shares were included in the table, Mr. Zell would beneficially own approximately 1.67% of the common shares.

(8) Includes 1,775,065 OP Units held by Samstock/ SZRT, L.L.C. and 159,895 phantom share units held by Mr. Zell. The number in the table excludes an additional 11,845,754 OP Units in which Mr. Zell has a pecuniary interest but does not have voting or dispositive power. If these excluded OP Units and phantom share units were included in the table, Mr. Zell would beneficially own approximately 5.29% of the combined common shares and OP Units outstanding as of December 28, 2006.

(9) Mr. Stevens' spouse holds 49 of the common shares shown.

(10) Includes 6,927 OP Units and 123,739 phantom share units.

(11) Includes 1,973,126 OP Units and 845,140 phantom share units.

### Beneficial Ownership of More than Five Percent

The following table sets forth information with respect to persons who are believed by us to beneficially own more than 5% of our outstanding common shares. The percentage of common shares with respect to the number of common shares beneficially owned is as of December 28, 2006. The number of common shares beneficially owned is taken from the most recent Schedule 13D or 13G filed with the SEC on behalf of such persons or other information made available to us as of December 28, 2006. Except as otherwise indicated, the

reporting persons have stated that they possess sole voting and sole dispositive power over the entire number of shares reported.

| Name and Address of Beneficial Owner | Number of Shares Beneficially Owned | Percentage of Common Shares |
|---|---|---|
| Dodge & Cox(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .<br>555 California Street<br>40th Floor<br>San Francisco, CA 94104 | 43,477,272 | 12.2% |
| The Vanguard Group, Inc.(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . .<br>100 Vanguard Blvd.<br>Malvern, PA 19355 | 21,085,532 | 5.9% |
| Barclays group entities(3): . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 20,703,938 | 5.8% |
| Barclays Global Investors, NA . . . . . . . . . . . . . . . . . . . . . . . . . . .<br>45 Fremont Street<br>San Francisco, CA 94105 | 12,062,578 | |
| Barclays Global Fund Advisors . . . . . . . . . . . . . . . . . . . . . . . . . . .<br>45 Fremont Street<br>San Francisco, CA 94105 | 7,438,363 | |
| Barclays Global Investors, LTD. . . . . . . . . . . . . . . . . . . . . . . . . . .<br>Murray House<br>1 Royal Mint Court<br>London, EC3N 4HH | 849,444 | |
| Barclays Global Investors Japan Trust and Banking Company . . .<br>Ebisu Prime Square Tower<br>8th floor<br>1-1-39 Hiroo Shibuya-Ku<br>Tokyo 150-0012 Japan | 353,553 | |

(1) Amendment No. 4 to the Schedule 13G of the reporting person filed with the SEC on February 3, 2006, states that Dodge & Cox has sole power to vote or direct the vote of 40,769,972 common shares, shared power to vote or direct the vote of 435,200 common shares and sole power to dispose or direct the disposition of 43,477,272 common shares. Amendment No. 4 to the Schedule 13G of the reporting person also states that the securities are beneficially owned by clients of Dodge & Cox, which clients may include investment companies registered under the Investment Company Act and/or employee benefit plans, pension funds, endowment funds or other institutional clients.

A provision of Equity Office's Restated Declaration of Trust prohibits the ownership of more than 9.9% of Equity Office's outstanding shares by any person unless that person provides to the Board of Trustees information and assurances that the ownership will not cause Equity Office to fail to qualify as a "real estate investment trust" for federal income tax purposes.

At the time Dodge & Cox proposed to acquire Equity Office common shares that would have moved its ownership percentage above 9.9%, Dodge & Cox provided written information, agreements and assurances, satisfactory to the Board of Trustees, that supported the Board's decision to allow Dodge & Cox to own more than 9.9% of our outstanding common shares.

(2) This information is based on a Schedule 13G filed with the SEC on February 13, 2006 in which it was reported that The Vanguard Group, Inc. has sole power to vote or direct the voting of 427,825 common shares and sole power to dispose or to direct the disposition of 21,085,532 common shares. According to this Schedule 13G filing, Vanguard Fiduciary Trust Company, a wholly owned subsidiary of The Vanguard Group, Inc., is the beneficial owner of 427,825 common shares, or 0.11% of the common shares outstanding as of December 31, 2005, as a result of its serving as investment manager of collective trust accounts. The Schedule 13G further states that Vanguard Fiduciary Trust Company directs the voting of these shares.

(3) This information is based on a Schedule 13G filed with the SEC on February 2, 2006 in which it was reported that the various entities noted above have sole power to vote or direct the voting of a combined 18,889,566 common shares, and sole power to dispose or to direct the disposition of a combined 20,703,938 common shares. According to this Schedule 13G filing, these common shares are held in trust accounts for the economic (3) benefit of the beneficiaries of those accounts.

## NO DISSENTERS' RIGHTS OF APPRAISAL

Under the Maryland REIT Law, because our common shares were listed on the New York Stock Exchange on the record date for determining shareholders entitled to vote at the special meeting, our common shareholders who object to the merger do not have any appraisal rights or dissenters' rights in connection with the merger. However, our common shareholders can vote against the merger and the merger agreement. Under the Maryland REIT Law, because the holders of our preferred shares are not entitled to vote on the merger and the merger agreement and because our outstanding preferred shares were listed on the New York Stock Exchange on the record date, they do not have any appraisal rights or dissenters' rights in connection with the merger.

## SUBMISSION OF SHAREHOLDER PROPOSALS

We intend to hold an annual meeting in 2007 only if the mergers are not completed. If we hold such an annual meeting, in order to be eligible for inclusion in our proxy materials for our 2007 annual meeting, written notice of any shareholder proposal must be received by us a reasonable time before we begin to print and mail our proxy materials for such annual meeting. Shareholder proposals intended to be presented at the 2007 annual meeting of shareholders must have been received by the Secretary of Equity Office no later than December 21, 2006 to be considered for inclusion in our proxy statement relating to the 2007 annual meeting. In addition, any shareholder who wishes to propose a nominee to the Board of Trustees or submit any other matter to a vote at the 2007 annual meeting of shareholders (other than a shareholder proposal included in our proxy materials pursuant to SEC Rule 14a-8) must deliver such information to our Secretary no earlier than February 23, 2007 and not later than March 25, 2007 and must comply with the other provisions and requirements of Article II, Section 13 of our Third Amended and Restated Bylaws, which are on file with the SEC and may be obtained from our Secretary upon request. Our Bylaws are also available in the Investor Relations — Trust Governance section of our website at www.equityoffice.com.

## OTHER MATTERS

We currently know of no other business that will be presented for consideration at the special meeting. Nevertheless, the enclosed proxy confers discretionary authority to vote with respect to matters described in Rule 14a-4(c) under the Securities Exchange Act of 1934, as amended, including matters that the board of trustees does not know, a reasonable time before proxy solicitation, are to be presented at the meeting. If any of these matters are presented at the meeting, then the proxy agents named in the enclosed proxy card will vote in accordance with their judgment.

## WHERE YOU CAN FIND MORE INFORMATION

We file certain reports and information with the SEC under the Exchange Act. You may obtain copies of this information in person or by mail from the public reference room of the SEC, 100 F Street, N.E., Room 1580, Washington, DC 20549, at prescribed rates. You may obtain information on the operation of the public reference room by calling the SEC at 1-800-SEC-0330 or 202-942-8090. The SEC also maintains an Internet website that contains reports, proxy statements and other information about issuers like Equity Office, which file electronically with the SEC. The address of that website is www.sec.gov. The information contained on the SEC's website is expressly not incorporated by reference into this proxy statement.

We file annual, quarterly and current reports and proxy statements with the SEC. You may read and copy any reports, proxy statements or other information that we file with the SEC at the following location of the SEC:

Public Reference Room
100 F Street, N.E., Room 1580
Washington, D.C. 20549

Please call the SEC at 1-800-SEC-0330 for further information on the public reference rooms. You may also obtain copies of this information by mail from the Public Reference Section of the SEC, 100 F Street, N.E., Room 1580, Washington, D.C. 20549, at prescribed rates. Our public filings are also available to the public from document retrieval services and the Internet website maintained by the SEC at www.sec.gov and on our website at www.equityoffice.com under Investor Relations — Financial Reports — SEC Filings.

Reports, proxy statements or other information concerning us may also be inspected at the offices of the New York Stock Exchange at 20 Broad Street, New York, New York 10005.

Any person, including any beneficial owner, to whom this proxy statement is delivered may request copies of reports, proxy statements or other information concerning us, without charge, by written or telephonic request directed to us at Equity Office Properties Trust, Two North Riverside Plaza, Suite 2100, Chicago, Illinois 60606-2703, Attention: Elizabeth P. Coronelli. If you would like to request documents, please do so by January 24, 2007, in order to receive them before the special meeting.

We are "incorporating by reference" information into this proxy statement, meaning that we are disclosing important information to you by referring you to another document filed separately with the SEC. The information incorporated by reference is considered to be part of this proxy statement, except to the extent that the information is superseded by information in this proxy statement.

The following documents contain important information about us and our financial condition and operating results, and are hereby incorporated by reference:

- Annual Report on Form 10-K for the year ended December 31, 2005, filed with the SEC on March 15, 2006;

- Quarterly Reports on Form 10-Q filed with the SEC on May 10, 2006, August 8, 2006 and November 7, 2006; and

- Current Reports on Form 8-K filed with the SEC on December 27, 2006, December 11, 2006, December 7, 2006, November 21, 2006, November 20, 2006, September 28, 2006, August 24, 2006, August 23, 2006, August 1, 2006 (reporting on Item 2.05), July 13, 2006, June 28, 2006, May 31, 2006, May 23, 2006 and March 9, 2006.

We also incorporate by reference any documents filed by us pursuant to Section 13(a), 13(c), 14 or 15(d) of the Exchange Act after the date of this proxy statement and prior to the date of the special meeting. The information contained in any of these documents will be considered part of this proxy statement from the date these documents are filed. The information we file later with the SEC will automatically update and supersede the information contained in this proxy statement.

No persons have been authorized to give any information or to make any representations other than those contained in this proxy statement and, if given or made, such information or representations must not be relied upon as having been authorized by us or any other person. This proxy statement is dated December 29, 2006. You should not assume that the information contained in this proxy statement is accurate as of any date other than that date, and the mailing of this proxy statement to shareholders shall not create any implication to the contrary.

Exhibit A

AGREEMENT AND PLAN OF MERGER

Among

EQUITY OFFICE PROPERTIES TRUST,

EOP OPERATING LIMITED PARTNERSHIP,

BLACKHAWK PARENT LLC,

BLACKHAWK ACQUISITION TRUST

and

BLACKHAWK ACQUISITION L.P.

Dated as of November 19, 2006

and amended by

Amendment No. 1

dated as of December 14, 2006

## TABLE OF CONTENTS

| | Page |
|---|---|
| ARTICLE I DEFINITIONS | A-2 |
| Section 1.01 Definitions | A-2 |
| Section 1.02 Interpretation and Rules of Construction | A-7 |
| ARTICLE II THE MERGERS | A-8 |
| Section 2.01 Mergers | A-8 |
| Section 2.02 Charter and Bylaws; Partnership Agreements | A-8 |
| Section 2.03 Effective Times | A-8 |
| Section 2.04 Closing | A-9 |
| Section 2.05 Trustees and Officers; General Partner | A-9 |
| Section 2.06 Other Transactions | A-9 |
| Section 2.07 Dissolution and Liquidation of the Surviving Entity | A-10 |
| ARTICLE III EFFECTS OF THE MERGERS | A-10 |
| Section 3.01 Effects on Shares | A-10 |
| Section 3.02 Effect on Partnership Units | A-12 |
| Section 3.03 Exchange of Certificates and Uncertificated Units; Paying Agent | A-13 |
| Section 3.04 Withholding Rights | A-15 |
| Section 3.05 Dissenters' or Appraisal Rights | A-15 |
| Section 3.06 Termination of DRIP | A-15 |
| Section 3.07 Debt Offers | A-15 |
| Section 3.08 Redemption and Satisfaction and Discharge | A-17 |
| ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE COMPANY AND THE OPERATING PARTNERSHIP | A-17 |
| Section 4.01 Organization and Qualification; Subsidiaries; Authority | A-17 |
| Section 4.02 Organizational Documents | A-18 |
| Section 4.03 Capitalization | A-19 |
| Section 4.04 Authority Relative to this Agreement, Takeover Laws, Validity and Effect of Agreements | A-20 |
| Section 4.05 No Conflict; Required Filings and Consents | A-21 |
| Section 4.06 Permits; Compliance with Laws | A-22 |
| Section 4.07 SEC Filings; Financial Statements; No Unknown Liabilities | A-23 |
| Section 4.08 Absence of Certain Changes or Events | A-23 |
| Section 4.09 Absence of Litigation | A-23 |
| Section 4.10 Employee Benefit Plans | A-24 |
| Section 4.11 Labor Matters | A-25 |
| Section 4.12 Information Supplied | A-25 |
| Section 4.13 Property and Leases | A-26 |
| Section 4.14 Intellectual Property | A-28 |
| Section 4.15 Taxes | A-28 |
| Section 4.16 Environmental Matters | A-30 |
| Section 4.17 Material Contracts | A-31 |
| Section 4.18 Brokers | A-32 |

|  | Page |
|---|---|
| SECTION 4.19 Opinion of Financial Advisor | A-32 |
| SECTION 4.20 Insurance | A-32 |
| SECTION 4.21 Investment Company Act of 1940 | A-32 |
| ARTICLE V REPRESENTATIONS AND WARRANTIES OF BUYER PARTIES | A-33 |
| SECTION 5.01 Corporate Organization | A-33 |
| SECTION 5.02 Ownership of MergerCo and Merger Partnership; No Prior Activities | A-33 |
| SECTION 5.03 Corporate Authority | A-34 |
| SECTION 5.04 No Conflict; Required Filings and Consents | A-34 |
| SECTION 5.05 Information Supplied | A-35 |
| SECTION 5.06 Absence of Litigation | A-35 |
| SECTION 5.07 Required Financing; Guarantee | A-35 |
| SECTION 5.08 No Ownership of Company Shares | A-36 |
| SECTION 5.09 Brokers | A-36 |
| ARTICLE VI CONDUCT OF BUSINESS PENDING THE MERGERS | A-36 |
| SECTION 6.01 Conduct of Business by Company Parties Pending the Mergers | A-36 |
| SECTION 6.02 Other Actions | A-40 |
| ARTICLE VII ADDITIONAL AGREEMENTS | A-40 |
| SECTION 7.01 Proxy Statement; Other Filings | A-40 |
| SECTION 7.02 Company Shareholders' Meeting | A-41 |
| SECTION 7.03 Access to Information; Confidentiality | A-41 |
| SECTION 7.04 No Solicitation of Transactions | A-42 |
| SECTION 7.05 Employee Benefits Matters | A-43 |
| SECTION 7.06 Directors' and Officers' Indemnification and Insurance | A-44 |
| SECTION 7.07 Further Action; Reasonable Efforts | A-46 |
| SECTION 7.08 Certain Tax Matters | A-47 |
| SECTION 7.09 Public Announcements | A-48 |
| SECTION 7.10 Cooperation with Financing | A-48 |
| SECTION 7.11 Resignations | A-49 |
| SECTION 7.12 Takeover Statutes | A-49 |
| SECTION 7.13 Delisting and Deregistering of Securities | A-49 |
| SECTION 7.14 Tax Matters | A-49 |
| SECTION 7.15 Notices of Certain Events | A-49 |
| ARTICLE VIII CONDITIONS TO THE MERGERS | A-50 |
| SECTION 8.01 Conditions to the Obligations of Each Party | A-50 |
| SECTION 8.02 Conditions to the Obligations of the Buyer Parties | A-50 |
| SECTION 8.03 Conditions to the Obligations of the Company Parties | A-52 |
| ARTICLE IX TERMINATION, AMENDMENT AND WAIVER | A-52 |
| SECTION 9.01 Termination | A-52 |
| SECTION 9.02 Effect of Termination | A-54 |
| SECTION 9.03 Fees and Expenses | A-54 |
| SECTION 9.04 Escrow | A-55 |
| SECTION 9.05 Waiver | A-55 |

| | Page |
|---|---|
| ARTICLE X GENERAL PROVISIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | A-56 |
| SECTION 10.01 Non-Survival of Representations and Warranties . . . . . . . . . . . . . . . . . . . . . . . . . . | A-56 |
| SECTION 10.02 Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | A-56 |
| SECTION 10.03 Severability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | A-56 |
| SECTION 10.04 Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | A-57 |
| SECTION 10.05 Entire Agreement; Assignment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | A-57 |
| SECTION 10.06 Remedies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | A-57 |
| SECTION 10.07 Specific Performance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | A-57 |
| SECTION 10.08 Parties in Interest. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | A-57 |
| SECTION 10.09 Governing Law; Forum . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | A-57 |
| SECTION 10.10 Headings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | A-58 |
| SECTION 10.11 Counterparts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | A-58 |
| SECTION 10.12 Waiver . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | A-58 |
| SECTION 10.13 Waiver of Jury Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | A-58 |

## INDEX OF DEFINED TERMS

Acquisition Proposal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-2
Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-2
Affiliate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-2
Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1
Amended Partnership Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-8
Articles of Merger . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-8
beneficial owner . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-2
Blue Sky Laws . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-22
Business Day . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-2
Buyer Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1
Bylaws . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-8
Capital Expenditures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-39
CERCLA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-30
Certificate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-2
Change in Recommendation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-42
Charter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-8
Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-45
Class A Units . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-2
Class H Preferred Units . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-3
Closing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-9
Closing Date . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-9
Code . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1
Commitment Letters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-36
Company . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1
Company Board . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1
Company Bylaws . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-2
Company Charter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-2
Company Common Share Merger Consideration . . . . . . . . . . . . . . . . . . . . . . . A-10
Company Common Shares . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-3
Company Employees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-43
Company ESPP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-44
Company Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-54
Company Financial Advisor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-32
Company Intellectual Property . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-28
Company Leases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-26
Company Material Adverse Effect . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-3
Company Merger . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1
Company Merger Effective Time . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-8
Company Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1
Company Preferred Share Merger Consideration . . . . . . . . . . . . . . . . . . . . . . A-11
Company Preferred Shares . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-3
Company Properties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-3
Company Recommendation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-41
Company Restricted Shares . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-11

*Company SEC Reports* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-23
*Company Series B Preferred Shares* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-3
*Company Series C Preferred Shares* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-19
*Company Series G Preferred Shares* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-3
*Company Shareholder Approval* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-21
*Company Shareholders' Meeting* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-41
*Company Termination Fee* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-54
*Company Title Insurance Policy* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-26
*Confidentiality Agreement* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-42
*Continuing Employees* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-43
*Contracts* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-3
*control* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-4
*Credit Agreement* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-4
*Damages Amount* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-55
*Debt Commitment Letter* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-35
*Debt Financing* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-36
*Debt Offers* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-16
*Delaware Courts* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-58
*Disclosure Schedule* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-4
*DRULPA* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1
*DSOS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-9
*End Date* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-52
*Environmental Laws* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-4
*Environmental Permits* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-30
*Equity Bridge Commitment Letter* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-35
*Equity Bridge Financing* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-35
*Equity Bridge Providers* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-35
*Equity Funding Letter* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-35
*ERISA* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-24
*ERISA Affiliate* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-25
*Exchange Act* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-22
*Exchange Fund* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-13
*Exchangeable Notes* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-4
*Expenses* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-54
*Financing* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-36
*Financing Commitments* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-36
*Form of Election* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-12
*Former Equityholder* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-14
*GAAP* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-4
*Governmental Authority* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-4
*Governmental Order* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-52
*Ground Lease* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-27
*Ground Leases* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-27
*Guarantee* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-36
*Guarantor* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-36

*Hazardous Substances* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-4
*HSR Act* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-22
*Incentive Plan* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-11
*Indebtedness* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-4
*Indemnified Parties* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-45
*Intellectual Property* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-4
*IRS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-24
*JV Entities* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-18
*knowledge of Parent* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-5
*knowledge of the Company* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-4
*Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-5
*Lenders* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-36
*Liens* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-5
*Liquidation Payment Date* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-10
*Material Company Leases* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-26
*Material Contract* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-31
*Maximum Premium* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-46
*Merger Consideration* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-12
*Merger Partnership* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1
*MergerCo* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1
*MergerCo Preferred Shares* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-11
*MergerCo Series B Preferred Shares* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-10
*MergerCo Series G Preferred Shares* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-10
*Mergers* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1
*MRL* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1
*Non-Qualified Account Plans* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-44
*NYSE* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-22
*Offer Documents* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-16
*Operating Partnership* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1
*Operating Partnership Agreement* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-5
*Operating Partnership Cash Merger Consideration* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-12
*Operating Partnership Merger Consideration* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-12
*Option Merger Consideration* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-11
*Organizational Documents* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-18
*Other Filings* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-25
*Parent* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1
*Parent Expenses* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-54
*Parent Financing* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-36
*Parent Material Adverse Effect* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-5
*Participation Agreements* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-27
*Partnership Merger* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1
*Partnership Merger Certificate* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-9
*Partnership Merger Effective Time* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-9
*Partnership SEC Reports* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-31
*Paying Agent* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-13

*Performance Award Merger Consideration* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-11
*Performance Awards* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-11
*Permits* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-20
*Permitted Liens* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-5
*person* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-6
*Plans* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-24
*Post-Signing Returns* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-49
*Property Restrictions* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-26
*Proxy Statement* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-22
*Qualifying Income* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-55
*Redemption Notes* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-16
*REIT* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-9
*Representative* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-6
*SAR Merger Consideration* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-11
*SARs* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-11
*SDAT* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-8
*SEC* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-22
*Section 16* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-44
*Securities Act* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-22
*Senior Notes* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-6
*Series B Preferred Share Merger Consideration* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-10
*Series B Preferred Units* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-6
*Series G Preferred Share Merger Consideration* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-11
*Series G Preferred Units* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-6
*Share Options* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-11
*Subsidiaries* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-18
*subsidiary* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-7
*Superior Proposal* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-7
*Surviving Entity* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-8
*Surviving Partnership* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-8
*Tax Protection Agreements* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-30
*Tax Returns* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-28
*Taxes* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-7
*Termination Date* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-52
*Third Party* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-27
*Transfer Taxes* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-47
*Unit Election* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-12
*WARN* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-25

## AGREEMENT AND PLAN OF MERGER

THIS AGREEMENT AND PLAN OF MERGER, dated as of November 19, 2006 (this "Agreement"), is made and entered into by and among EQUITY OFFICE PROPERTIES TRUST, a Maryland real estate investment trust (the "Company"), EOP OPERATING LIMITED PARTNERSHIP, a Delaware limited partnership (the "Operating Partnership", and together with the Company, the "Company Parties"), BLACKHAWK PARENT LLC, a Delaware limited liability company ("Parent"), BLACKHAWK ACQUISITION TRUST, a Maryland real estate investment trust and a wholly-owned subsidiary of Parent ("MergerCo"), and BLACK-HAWK ACQUISITION L.P., a Delaware limited partnership whose general partner is MergerCo ("Merger Partnership" and together with Parent and MergerCo, the "Buyer Parties").

WHEREAS, the parties wish to effect a business combination through a merger of the Company with and into MergerCo (the "Company Merger") on the terms and subject to the conditions set forth in this Agreement and in accordance with Title 8 of the Corporations and Associations Article of the Annotated Code of Maryland (the "MRL");

WHEREAS, the parties also wish to effect a merger of Merger Partnership with and into the Operating Partnership (the "Partnership Merger" and together with the Company Merger, the "Mergers"), on the terms and subject to the conditions set forth in this Agreement and in accordance with Section 17-211 of the Delaware Revised Uniform Limited Partnership Act, as amended ("DRULPA");

WHEREAS, the Board of Trustees of the Company (the "Company Board") has (i) approved this Agreement, the Company Merger and the other transactions contemplated by this Agreement and declared that the Company Merger and the other transactions contemplated by this Agreement are advisable and in the best interests of the Company and its shareholders on the terms and subject to the conditions set forth herein, (ii) directed that this Agreement, the Company Merger and the other transactions contemplated hereby be submitted for consideration at a meeting of the Company's shareholders and (iii) recommended the approval of this Agreement and the Company Merger by the Company's shareholders;

WHEREAS, the Company, as the sole general partner of the Operating Partnership, has approved this Agreement and the Partnership Merger and deemed it advisable and in the best interests of the Operating Partnership and the limited partners of the Operating Partnership to enter into this Agreement and to consummate the Partnership Merger on the terms and conditions set forth herein;

WHEREAS, the Board of Trustees of MergerCo has approved this Agreement and the Company Merger and declared that this Agreement and the Company Merger are advisable and in the best interests of MergerCo and its shareholder on the terms and subject to the conditions set forth herein;

WHEREAS, MergerCo, as the sole general partner of Merger Partnership, has approved this Agreement and the Partnership Merger and deemed it advisable and in the best interests of Merger Partnership and its limited partner to enter into this Agreement and to consummate the Partnership Merger on the terms and subject to the conditions set forth herein;

WHEREAS, the parties intend that for federal, and applicable state, income tax purposes the Company Merger will be treated as a taxable sale by the Company of all of the Company's assets to MergerCo in exchange for the Company Common Share Merger Consideration and the Company Preferred Share Merger Consideration provided for herein to be provided to the shareholders of the Company and the assumption of all of the Company's liabilities, followed by a distribution of such Merger Consideration to the shareholders of the Company in liquidation pursuant to Section 331 and Section 562 of the Internal Revenue Code of 1986, as amended (the "Code"), and that this Agreement shall constitute a "plan of liquidation" of the Company for federal income tax purposes; and

WHEREAS, the parties hereto desire to make certain representations, warranties, covenants and agreements in connection with the Mergers, and also to prescribe various conditions to such transactions.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and agreements herein contained, and intending to be legally bound hereby, the parties hereto hereby agree as follows:

ARTICLE I

DEFINITIONS

SECTION 1.01  *Definitions.*  For purposes of this Agreement:

"*Acquisition Proposal*" means any proposal or offer for, whether in one transaction or a series of related transactions, any (a) merger, consolidation, share exchange, business combination or similar transaction involving the Company, the Operating Partnership or any other Subsidiary that would constitute a "significant subsidiary" (as defined in Rule 1-02 of Regulation S-X, but substituting 20% for references to 10% therein), (b) sale or other disposition, directly or indirectly, by merger, consolidation, share exchange, business combination or any similar transaction, of any assets of the Company or the Subsidiaries representing 20% or more of the consolidated assets of the Company and the Subsidiaries taken as a whole, (c) issue, sale or other disposition by the Company or any Subsidiary of (including by way of merger, consolidation, share exchange, business combination or any similar transaction) securities (or options, rights or warrants to purchase, or securities convertible into, such securities) representing 20% or more of the votes associated with the outstanding voting equity securities of the Company or 20% or more of the equity interests or general partner interests in the Operating Partnership, (d) tender offer or exchange offer in which any Person or "group" (as such term is defined under the Exchange Act) shall acquire beneficial ownership (as such term is defined in Rule 13d-3 under the Exchange Act), or the right to acquire beneficial ownership, of 20% or more of the votes associated with the outstanding Company Common Shares or 20% or more of the equity interests or general partner interests in the Operating Partnership, (e) recapitalization, restructuring, liquidation, dissolution or other similar type of transaction with respect to the Company or the Operating Partnership, or (f) transaction which is similar in form, substance or purpose to any of the foregoing transactions; provided, however, that the term "Acquisition Proposal" shall not include (i) the Mergers or any of the other transactions contemplated by this Agreement or (ii) any merger, consolidation, business combination, reorganization, recapitalization or similar transaction solely among the Company and one or more Subsidiaries or among Subsidiaries.

"*Action*" means any claim, action, suit, proceeding, arbitration, mediation or investigation.

"*Affiliate*" or "*affiliate*" of a specified person means a person who, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified person.

"*beneficial owner*" has the meaning ascribed to such term under Rule 13d-3(a) of the Exchange Act.

"*Business Day*" or "*business day*" means any day on which the principal offices of the SEC in Washington, D.C. are open to accept filings, or, in the case of determining a date when any payment is due, any day (other than a Saturday or Sunday) on which banks are not required or authorized to close in the City of New York.

"*Certificate*" or "*Certificates*" means, unless otherwise specified, any certificate evidencing Company Common Shares.

"*Class A Units*" means the Class A Units of the Operating Partnership.

"*Class H Preferred Unit*" means a Class H Preferred Unit of the Surviving Partnership as defined in the form of Annex A attached as Exhibit A hereto, which shall be annexed to and made part of the Operating Partnership Agreement immediately prior to the Partnership Merger Effective Time.

"*Company Bylaws*" means the Third Amended and Restated By-Laws of the Company as filed with the SEC as Exhibit 3.1 to the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2003.

A-2

"*Company Charter*" means the Restated Declaration of Trust of the Company as filed with the SEC as Exhibit 3.2 to the Company's Quarterly Report on Form 10-Q for the quarter ended September 30, 2003.

"*Company Common Shares*" means the common shares of beneficial interest, par value $.01 per share, of the Company.

"*Company Material Adverse Effect*" means, with respect to the Company, an effect, event, development or change that is materially adverse to the assets, business, results of operations or financial condition of the Company, the Subsidiaries and the JV Entities, taken as a whole, other than any effect, event, development or change arising out of or resulting from (a) changes in conditions in the U.S. or global economy or capital or financial markets generally, including changes in interest or exchange rates, (b) changes in Law or tax, regulatory, political or business conditions that, in each case, generally affect the geographic regions or industries in which the Company, the Subsidiaries and the JV Entities conduct their business (unless, and only to the extent, such effect, event, development or change affects the Company, the Subsidiaries and the JV Entities in a disproportionate manner as compared to other persons or participants in the industries in which the Company, the Subsidiaries and the JV Entities conduct their business and that operate in the geographic regions affected by such effect, event, development or change), (c) changes in GAAP, (d) the negotiation, execution, announcement or performance of this Agreement or the transactions contemplated hereby or the consummation of the transactions contemplated by this Agreement, including the impact thereof on relationships, contractual or otherwise, with tenants, suppliers, lenders, investors, venture partners or employees, (e) acts of war, armed hostilities, sabotage or terrorism, or any escalation or worsening of any such acts of war, armed hostilities, sabotage or terrorism threatened or underway as of the date of this Agreement (unless, and only to the extent, such effect, event, development or change affects the Company, the Subsidiaries and the JV Entities in a dispropor-tionate manner as compared to other persons or participants in the industries in which the Company, the Subsidiaries and the JV Entities conduct their business and that operate in the geographic regions affected by such effect, event, development or change), (f) earthquakes, hurricanes or other natural disasters (unless, and only to the extent, such effect, event, development or change affects the Company, the Subsidiaries and the JV Entities, in a disproportionate manner as compared to other persons or participants in the industries in which the Company, the Subsidiaries and the JV Entities conduct their business and that operate in the geographic regions affected by such effect, event, development or change), (g) any action taken by the Company or the Subsidiaries at the request or with the consent of any of the Buyer Parties or (h) any Action brought or threatened by or on behalf of any holder of equity interests in the Company or any of its Subsidiaries arising out of or relating to the transactions contemplated by this Agreement; provided, however, that with respect to references to Company Material Adverse Effect in the representations and warranties set forth in Section 4.05, the exceptions set forth in clause (d) will not apply. The parties agree that the mere fact of a decrease in the market price of the Company Common Shares shall not, in and of itself, constitute a Company Material Adverse Effect, but any effect, event, development or change underlying such decrease (other than any such effects, events, developments or changes set forth in clauses (a) through (h) above) shall be considered in determining whether there has been a Company Material Adverse Effect.

"*Company Preferred Shares*" means the Company Series B Preferred Shares and the Company Series G Preferred Shares, collectively.

"*Company Properties*" means all real property interests, excluding space leases, together with all buildings, structures and other improvements and fixtures located on or under such real property interests and all easements, rights and other appurtenances to such real property, owned or held by the Company, the Subsidiaries or the JV Entities, including fee interests, ground leasehold interests and mortgage loans held as lender.

"*Company Series B Preferred Shares*" means the 5.25% Series B Convertible, Cumulative Preferred Shares, par value $.01 per share, of the Company.

A-3

"*Company Series G Preferred Shares*" means the 7.75% Series G Cumulative Redeemable Preferred Shares of Beneficial Interest, par value $.01 per share, of the Company.

"*Contracts*" means any contracts, agreements, licenses, notes, bonds, mortgages, indentures, commitments or other instruments or obligations, other than Company Leases and Ground Leases.

"*control*" (including the terms "*controlled by*" and "*under common control with*") means the possession, directly or indirectly of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, as trustee or executor, by contract or credit arrangement or otherwise.

"*Credit Agreement*" means the Revolving Credit Agreement dated as of September 22, 2006 among the Operating Partnership, as borrower, the banks listed on the signature pages thereof, Banc of America Securities LLC, as Joint Lead Arranger and Joint Bookrunner, J.P. Morgan Securities Inc., as Joint Lead Arranger and Joint Bookrunner, Bank of America, N.A., as Administrative Agent, JPMorgan Chase Bank, N.A., as Syndication Agent, and the Documentation Agents, Senior Managing Agents and Managing Agents named therein.

"*Disclosure Schedule*" means the disclosure schedule delivered by the Company to Parent concurrently with the execution of this Agreement for which the disclosure of any fact or item in any Section of such disclosure schedule shall, should the existence of such fact or item be relevant to any other section, be deemed to be disclosed with respect to that other Section so long as the relevance of such disclosure to such other Section is reasonably apparent from the nature of such disclosure. Nothing in the Disclosure Schedule is intended to broaden the scope of any representation or warranty of the Company or the Operating Partnership made herein.

"*Environmental Laws*" means any Law relating to (i) releases or threatened releases of Hazardous Substances; (ii) the manufacture, handling, transport, use, treatment, storage or disposal of Hazardous Substances; or (iii) pollution or protection of the environment, health, safety or natural resources.

"*Exchangeable Notes*" means the 4.00% Exchangeable Senior Notes due 2026 of the Operating Partnership and the Company.

"*GAAP*" means generally accepted accounting principles as applied in the United States.

"*Governmental Authority*" means any United States national, federal, state, provincial, municipal or local government, governmental, regulatory or administrative authority, agency, instrumentality or commission or any court, tribunal, or judicial or arbitral body or self-regulated entity.

"*Hazardous Substances*" means (i) those substances defined in or regulated under the following United States federal statutes and their state counterparts, as each has been amended as of the date of this Agreement, and all regulations thereunder including the Resource Conservation and Recovery Act, the Comprehensive Environmental Response, Compensation and Liability Act, the Clean Water Act, the Safe Drinking Water Act, the Atomic Energy Act, and the Clean Air Act; (ii) petroleum and petroleum products, including crude oil and any fractions thereof; (iii) polychlorinated biphenyls, asbestos, asbestos containing materials, toxic molds, ureaformaldehyde insulation and radon; and (iv) any other contaminant, substance, material or waste regulated pursuant to any Environmental Law.

"*Indebtedness*" means, without duplication, (i) indebtedness for borrowed money (excluding any interest thereon), secured or unsecured, (ii) reimbursement obligations under any letters of credit or similar instruments, (iii) capitalized lease obligations, (iv) obligations under interest rate cap, swap, collar or similar transactions or currency hedging transactions (valued at the termination value thereof), and (v) guarantees of any Indebtedness of the foregoing of any other person; provided that, for clarification, Indebtedness shall not include "trade debt" or "trade payables."

"*Intellectual Property*" means all United States, foreign and international intellectual property, including all (i) patents, patent applications and invention registrations of any type, (ii) trademarks, service marks, trade dress, logos, trade names, corporate names and other source identifiers, and

registrations and applications for registration thereof, (iii) copyrightable works, copyrights, and registrations and applications for registration thereof, and (iv) confidential and proprietary information, including trade secrets and know-how.

"*knowledge of the Company*" means the actual knowledge of those individuals listed on <u>Exhibit B</u> hereto, without investigation.

"*knowledge of Parent*" means the actual knowledge of those individuals listed on <u>Exhibit C</u> hereto, without investigation.

"*Law*" means any United States national, federal, state, provincial, municipal or local statute, law, ordinance, regulation, rule, code, executive order, injunction, judgment, decree or other order.

"*Liens*" means with respect to any asset (including any security), any mortgage, claim, lien, pledge, charge, option, right of first refusal or offer, security interest or encumbrance of any kind in respect to such asset.

"*Operating Partnership Agreement*" means that certain Third Amended and Restated Agreement of Limited Partnership of the Operating Partnership, dated as of July 2, 2001, as amended by the First Amendment thereto, dated as of July 29, 2002, the Second Amendment thereto, dated as of June 27, 2003, the Third Amendment thereto, dated as of December 8, 2003, the Fourth Amendment thereto, dated as of May 25, 2004, and the Fifth Amendment thereto, dated as of June 9, 2005.

"*Parent Material Adverse Effect*" means, with respect to Parent, an effect, event, development or change that, individually or in the aggregate with all other effects, events, developments or changes, is materially adverse to the assets, business, results of operations or financial condition of Parent and its subsidiaries, taken as a whole, other than any effect, event, development or change arising out of or resulting from (a) changes in conditions in the U.S. or global economy or capital or financial markets generally, including changes in interest or exchange rates, (b) changes in Law or tax, regulatory, political or business conditions that, in each case, generally affect the geographic regions or industries in which Parent and its subsidiaries conduct their business (unless, and only to the extent, such effect, event, development or change affects Parent and its subsidiaries in a disproportionate manner as compared to other persons or participants in the industries in which Parent and its subsidiaries conduct their business and that operate in the geographic regions affected by such effect, event, development or change), (c) changes in GAAP, (d) the negotiation, execution, announcement or performance of this Agreement or the transactions contemplated hereby or the consummation of the transactions contemplated by this Agreement, including the impact thereof on relationships, contractual or otherwise, with tenants, suppliers, lenders, investors, venture partners or employees, (e) acts of war, armed hostilities, sabotage or terrorism, or any escalation or worsening of any such acts of war, armed hostilities, sabotage or terrorism threatened or underway as of the date of this Agreement (unless, and only to the extent, such effect, event, development or change affects Parent and its subsidiaries in a disproportionate manner as compared to other persons or participants in the industries in which Parent and its subsidiaries conduct their business and that operate in the geographic regions affected by such effect, event, development or change), (f) earthquakes, hurricanes or other natural disasters (unless, and only to the extent, such effect, event, development or change affects Parent and its subsidiaries, in a disproportionate manner as compared to other persons or participants in the industries in which Parent and its subsidiaries conduct their business and that operate in the geographic regions affected by such effect, event, development or change), (g) any action taken by Parent and its subsidiaries at the request or with the consent of any of the Buyer Parties or (h) any Action brought or threatened by or on behalf of any holder of equity interests in the Company or any of its Subsidiaries arising out of or relating to the transactions contemplated by this Agreement; provided, however, that with respect to references to Parent Material Adverse Effect in the representations and warranties set forth in Section 5.04, the exceptions set forth in clause (d) will not apply.

"*Permitted Liens*" means (i) Liens for Taxes not yet delinquent and Liens for Taxes being contested in good faith and for which there are adequate reserves on the financial statements of the Company (if such reserves are required pursuant to GAAP); (ii) inchoate mechanics' and materialmen's Liens for

construction in progress; (iii) inchoate materialmen's, workmen's, repairmen's, warehousemen's and carriers' Liens arising in the ordinary course of business of the Company or any Subsidiary; (iv) with respect to real property, zoning restrictions, survey exceptions, utility easements, rights of way and similar Liens that are imposed by any Governmental Authority having jurisdiction thereon or otherwise are typical for the applicable property type and locality and that do not interfere materially with the current use of such property (assuming its continued use in the manner in which it is currently used) or, with respect to unimproved or vacant real property, interfere materially with the intended use of such property; (v) with respect to real property, any title exception disclosed in any Company Title Insurance Policy provided or made available to Parent (whether material or immaterial), Liens and obligations arising under the Material Contracts (including but not limited to any Lien securing mortgage debt disclosed in the Disclosure Schedule), the Company Leases and any other Lien that does not interfere materially with the current use of such property (assuming its continued use in the manner in which it is currently used) or materially adversely affect the value or marketability of such property; (vi) any Liens securing Indebtedness permitted or required by this Agreement and/or (vii) other Liens being contested in the ordinary course of business in good faith; _provided_ an appropriate reserve has been established therefor on the Company's consolidated balance sheet as of September 30, 2006.

"_person_" or "_Person_" means an individual, corporation, partnership, limited partnership, limited liability company, syndicate, person (including a "person" as defined in Section 13(d)(3) of the Exchange Act), joint venture, trust, association, unincorporated organization or other entity or government, political subdivision, agency or instrumentality of a government.

"_Representative_" of a Person means any officer, trustee, director, Affiliate, employee, investment banker, financial advisor, financing source, attorney, accountant, consultant, broker, finder or other agent or representative of such Person.

"_Senior Notes_" means the following securities issued by the Operating Partnership or Spieker Properties, L.P., as the case may be: (a) 7.00% Notes due 2007 ($1,500,000 principal amount outstanding), (b) 6.88% Notes due 2007 ($25,000,000 principal amount outstanding), (c) 6.75% Notes due 2008 ($150,000,000 principal amount outstanding), (d) 7.25% Notes due 2009 ($200,000,000 principal amount outstanding), (e) 7.125% Notes due 2009 ($150,000,000 principal amount outstanding), (f) 7.65% Notes due 2010 ($200,000,000 principal amount outstanding), (g) 7.875% Notes due 2016 ($25,000,000 principal amount outstanding), (h) 7.35% Debentures due 2017 ($200,000,000 principal amount outstanding), (i) 7.50% Debentures due 2027 ($150,000,000 principal amount outstanding), (j) 6.763% Notes due 2007 ($300,000,000 principal amount outstanding), (k) 7.41% Senior Notes due 2007 ($50,000,000 principal amount outstanding), (l) 7.75% Note due 2007 ($600,000,000 principal amount outstanding), (m) 6.75% Notes due 2008 ($300,000,000 principal amount outstanding), (n) 6.80% Note due 2009 ($500,000,000 principal amount outstanding), (o) 8.10% Notes due 2010 ($360,000,000 principal amount outstanding), (p) Floating Rate Notes due 2010 ($200,000,000 principal amount outstanding), (q) 4.65% Fixed Rate Notes due 2010 ($800,000,000 principal amount outstanding), (r) 7.00% Notes due 2011 ($1,100,000,000 principal amount outstanding), (s) 6.75% Note due 2012 ($500,000,000 principal amount outstanding), (t) 5.875% Notes due 2013 ($500,000,000 principal amount outstanding), (u) 4.75% Notes due 2014 ($1,000,000,000 principal amount outstanding), (v) Floating Rate Notes due 2014 ($45,000,000 principal amount outstanding), (w) 7.25% Notes due 2018 ($250,000,000 principal amount outstanding), (x) 4.00% Exchangeable Senior Notes due 2026 ($1,500,000,000 principal amount outstanding), (y) 7.25% Notes due 2028 ($225,000,000 principal amount outstanding), (z) 7.50% Notes due 2029 ($200,000,000 principal amount outstanding), (aa) 7.875% Notes due 2031 ($300,000,000 principal amount outstanding), (bb) 7.125% Notes due 2006 ($100,000,000 principal amount outstanding) and (cc) the InterNotes ($74,898,000 total principal amount outstanding).

"_Series B Preferred Units_" means the 5.25% Series B Convertible, Cumulative Redeemable Preferred Units of the Operating Partnership.

"_Series G Preferred Units_" means the 7.75% Series G Cumulative Redeemable Preferred Units of the Operating Partnership.

A-6

"*subsidiary*" or "*subsidiaries*" of the Company, Parent or any other person means a corporation, limited liability company, partnership, joint venture or other organization of which at least 50% of the equity interests is owned, directly or indirectly, by such party.

"*Superior Proposal*" means a written Acquisition Proposal (on its most recently amended and modified terms, if amended and modified) made by a Third Party (i) that relates to more than 50% of the voting power of the capital stock of the Company or all or substantially all of the assets of the Company and the Subsidiaries taken as a whole, (ii) which the Company Board determines in its good faith judgment (after consultation with its financial advisor and after taking into account all of the terms and conditions of the Acquisition Proposal) to be more favorable from a financial point of view to the Company's shareholders (in their capacities as shareholders) than the Company Merger (including any alterations to this Agreement agreed to in writing by Parent in response thereto), (iii) the material conditions to the consummation of which are all reasonably capable of being satisfied in the judgment of the Company Board, and (iv) for which financing, to the extent required, is then committed or, in the judgment of the Company Board, is reasonably likely to be available.

"*Taxes*" means any and all taxes, charges, fees, levies and other assessments, including income, gross receipts, excise, property, sales, withholding (including dividend withholding and withholding required pursuant to Sections 1445 and 1446 of the Code), social security, occupation, use, service, license, payroll, franchise, transfer and recording taxes, windfall or other profits, capital stock, employment, worker's compensation, unemployment or compensation taxes, fees and charges, including estimated excise, ad valorem, stamp, value added, capital gains, duty or custom taxes, imposed by the United States or any taxing authority (domestic or foreign), whether computed on a separate, consolidated, unitary, combined or any other basis, and similar charges of any kind (together with any and all interest, penalties, additions to tax and additional amounts imposed with respect thereto) imposed by any government or taxing authority.

SECTION 1.02    *Interpretation and Rules of Construction.*

In this Agreement, except to the extent otherwise provided or that the context otherwise requires:

(a) when a reference is made in this Agreement to an Article, Section, Exhibit or Schedule, such reference is to an Article or Section of, or an Exhibit or Schedule to, this Agreement unless otherwise indicated;

(b) the table of contents and headings for this Agreement are for reference purposes only and do not affect in any way the meaning or interpretation of this Agreement;

(c) whenever the words "include," "includes" or "including" are used in this Agreement, they are deemed to be followed by the words "without limitation";

(d) the words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement;

(e) references to any statute, rule or regulation are to the statute, rule or regulation as amended, modified, supplemented or replaced from time to time (and, in the case of statutes, include any rules and regulations promulgated under the statute) and to any section of any statute, rule or regulation include any successor to the section;

(f) all terms defined in this Agreement have the defined meanings when used in any certificate or other document made or delivered pursuant hereto, unless otherwise defined therein;

(g) the definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms;

(h) references to a person are also to its successors and permitted assigns; and

(i) the use of "or" is not intended to be exclusive unless expressly indicated otherwise.

## ARTICLE II

## THE MERGERS

SECTION 2.01  *Mergers.*

(a) Subject to the terms and conditions of this Agreement, and in accordance with Section 17-211 of the DRULPA, at the Partnership Merger Effective Time, Merger Partnership and the Operating Partnership shall consummate the Partnership Merger pursuant to which (i) Merger Partnership shall be merged with and into the Operating Partnership and the separate existence of Merger Partnership shall thereupon cease and (ii) the Operating Partnership shall be the surviving limited partnership in the Partnership Merger (the "Surviving Partnership"). The Partnership Merger shall have the effects specified in Section 17-211 of the DRULPA.

(b) Subject to the terms and conditions of this Agreement, and in accordance with Section 8-501.1 of the MRL, at the Company Merger Effective Time, MergerCo and the Company shall consummate the Company Merger pursuant to which (i) the Company shall be merged with and into MergerCo and the separate existence of the Company shall thereupon cease and (ii) MergerCo shall be the surviving real estate investment trust in the Company Merger (the "Surviving Entity"). The Company Merger shall have the effects specified in Section 8-501.1 of the MRL.

SECTION 2.02  *Charter and Bylaws; Partnership Agreements.*

(a) The declaration of trust of MergerCo as in effect immediately prior to the Company Merger Effective Time, shall be the declaration of trust of the Surviving Entity until thereafter amended as provided therein or by Law (including the articles supplementary classifying the MergerCo Preferred Shares, the "Charter").

(b) The bylaws of MergerCo, as in effect immediately prior to the Company Merger Effective Time, shall be the bylaws of the Surviving Entity until thereafter amended as provided by Law, by the Charter or by such bylaws (the "Bylaws").

(c) Prior to the Partnership Merger Effective Time, the Company, as the general partner of the Operating Partnership, shall cause the Operating Partnership Agreement to be amended to annex to such agreement Annex A in the form of Exhibit A hereto (as so amended, the "Amended Partnership Agreement"). From and after the Partnership Merger Effective Time, the certificate of limited partnership of the Operating Partnership, as in effect immediately prior to the Partnership Merger Effective Time, shall be the certificate of limited partnership of the Surviving Partnership until thereafter amended as provided below or by Law. From and after the Partnership Merger Effective Time, the Amended Partnership Agreement shall be the partnership agreement of the Surviving Partnership until thereafter amended as provided therein or by Law.

SECTION 2.03  *Effective Times.*

(a) At the Closing, the Operating Partnership shall file a certificate of merger in a form that complies with the DRULPA (the "Partnership Merger Certificate") with the Secretary of State of the State of Delaware (the "DSOS"), executed in accordance with the applicable provisions of the DRULPA and shall make all other filings or recordings required under the DRULPA to effect the Partnership Merger. The Partnership Merger shall become effective upon such time as the Partnership Merger Certificate has been filed with the DSOS, or such later time which the parties hereto shall have agreed upon and designated in such filing in accordance with the DRULPA as the effective time of the Partnership Merger (the "Partnership Merger Effective Time").

(b) At the Closing and immediately after the Partnership Merger Effective Time, MergerCo and the Company shall duly execute and file articles of merger with respect to the Company Merger in a form that complies with the MRL (the "Articles of Merger") with the State Department of Assessments and Taxation of the State of Maryland (the "SDAT") in accordance with the MRL. The Company Merger shall become effective upon such time as the Articles of Merger have been accepted for record by the SDAT, or such later time which the parties hereto shall have agreed upon and designated in such filing in accordance with the MRL as the effective time of the Company Merger but not to exceed thirty (30) days after the Articles of Merger are accepted for record by the SDAT (the "Company Merger Effective Time").

A-8

Section 2.04  *Closing.*   Unless this Agreement shall have been terminated in accordance with Section 9.01, the closing of the Mergers (the "Closing") shall occur as promptly as practicable (but in no event later than the third (3rd) Business Day) after all of the conditions set forth in Article VIII (other than conditions which by their terms are required to be satisfied or waived at the Closing) shall have been satisfied or waived by the party entitled to the benefit of the same, or at such other time and on a date as agreed to by the parties (the "Closing Date"). The Closing shall take place at the offices of Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York 10017, or at such other place as agreed to by the parties hereto.

Section 2.05  *Trustees and Officers; General Partner.*

(a)  The trustees of MergerCo immediately prior to the Company Merger Effective Time shall be the trustees of the Surviving Entity and the officers of MergerCo immediately prior to the Company Merger Effective Time shall be the officers of the Surviving Entity, each to hold office in accordance with the Charter and Bylaws.

(b)  The general partner of the Surviving Partnership immediately after the Partnership Merger Effective Time shall be the Company. At the Company Merger Effective Time, the Surviving Entity shall execute and deliver to the Surviving Partnership an acceptance of all of the terms and conditions of the Amended Partnership Agreement and shall thereafter be admitted to the Surviving Partnership as the substitute general partner and a substitute limited partner of the Surviving Partnership and shall carry on the business of the Surviving Partnership without dissolution as provided in the Amended Partnership Agreement. Following the Company Merger Effective Time, MergerCo, as the new general partner of the Surviving Partnership, shall file a certificate of amendment to the certificate of limited partnership of the Surviving Partnership to reflect its admission to the Surviving Partnership as the new general partner of the Surviving Partnership.

Section 2.06  *Other Transactions.*   Parent shall have the option, in its sole discretion and without requiring the further consent of any of the Company Parties or the board of trustees, board of directors, stockholders or partners of any Company Parties, upon reasonable notice to the Company, to request that the Company, immediately prior to the Closing, (a) convert or cause the conversion of one or more wholly owned Subsidiaries that are organized as corporations into limited liability companies and one or more Subsidiaries that are organized as limited partnerships into limited liability companies, on the basis of organizational documents as reasonably requested by Parent, (b) sell or cause to be sold all of the stock, partnership interests or limited liability interests owned, directly or indirectly, by the Company in one or more wholly owned Subsidiaries at a price designated by Parent, and (c) sell or cause to be sold any of the assets of the Company or one or more wholly owned Subsidiaries at a price designated by Parent; provided, however, that (i) neither the Company nor any Subsidiary shall be required to take any action in contravention of any Organizational Document or other Contract, (ii) any such actions or transactions shall be contingent upon all of the conditions set forth in Article VIII having been satisfied (or, with respect to Section 8.02, waived) and receipt by the Company of a written notice from Parent to such effect and that the Buyer Parties are prepared to proceed immediately with the Closing and any other evidence reasonably requested by the Company that the Closing will occur (it being understood that in any event the transactions described in clauses (a), (b) and (c) will be deemed to have occurred prior to the Closing), (iii) such actions (or the inability to complete such actions) shall not affect or modify in any respect the obligations of the Buyer Parties under this Agreement, including payment of the Merger Consideration, (iv) neither the Company nor any Subsidiary shall be required to take any such action that could adversely affect the classification of the Company as a "real estate investment trust" (a "REIT") within the meaning of Section 856 of the Code or could subject the Company to any "prohibited transactions" taxes or other material Taxes under Code Sections 857(b), 860(c) or 4981 and (v) neither the Company nor any Subsidiary shall be required to take any such action that could result in any United States federal, state or local income Tax being imposed on the limited partners of the Operating Partnership. Parent shall upon request by the Company advance to the Company all reasonable out-of-pocket costs to be incurred by the Company or, promptly upon request by the Company, reimburse the Company for all reasonable out-of-pocket costs incurred by the Company in connection with any actions taken by the Company in accordance with this Section 2.06 (including reasonable fees and expenses of its Representatives). The Buyer Parties shall, on a joint and several basis, indemnify and hold harmless the Company, the Subsidiaries and

their Representatives from and against any and all liabilities, losses, damages, claims, costs, expenses, interest, awards, judgments and penalties suffered or incurred by them in connection with or as a result of taking such actions. Without limiting the foregoing, none of the representations, warranties or covenants of the Company Parties shall be deemed to apply to, or deemed breached or violated by, any of the transactions contemplated by this Section 2.06 or required by Parent pursuant to this Section 2.06.

SECTION 2.07  *Dissolution and Liquidation of the Surviving Entity*.  As promptly as practicable following the Company Merger Effective Time, the Surviving Entity shall deliver written notice of its election to liquidate and terminate its existence to the holders of the MergerCo Preferred Shares, stating the date and place of payment of the amount distributable to such holders of the MergerCo Preferred Shares in accordance with the terms of the Charter relating to the MergerCo Preferred Shares, which notice will be delivered prior to the payment date stated in the notice (the "Liquidation Payment Date") in accordance with the terms of the Charter relating to the MergerCo Preferred Shares. On the Liquidation Payment Date, the holders of the MergerCo Preferred Shares will receive distributions from the Surviving Entity equal to the amounts payable to them upon a liquidation of the Surviving Entity in accordance with the terms of the Charter relating to the MergerCo Preferred Shares. The Surviving Entity will undertake dissolution in accordance with the provisions of Section 8-502 of the MRL and will file articles of dissolution with the SDAT. Parent agrees to assume and discharge in accordance with the terms, all of the liabilities and obligations of the Surviving Entity effective on such liquidation.

## ARTICLE III

## EFFECTS OF THE MERGERS

SECTION 3.01  *Effects on Shares*.  At the Company Merger Effective Time, by virtue of the Company Merger and without any action on the part of the holder of Company Common Shares or holders of any shares in MergerCo:

(a) Each common share of beneficial interest, par value $0.01 per share, of MergerCo issued and outstanding immediately prior to the Company Merger Effective Time shall remain as one issued and outstanding common share of beneficial interest of the Surviving Entity.

(b) Each Company Common Share that is owned by any Subsidiary or by MergerCo immediately prior to the Company Merger Effective Time shall automatically be canceled and retired and shall cease to exist, and no payment shall be made with respect thereto.

(c) Each Company Common Share issued and outstanding (including any Company Common Shares held in any Rabbi Trust for the SERP) immediately prior to the Company Merger Effective Time (other than shares to be canceled in accordance with Section 3.01(b)) shall automatically be converted into, and canceled in exchange for, the right to receive an amount in cash to be paid by Parent equal to $48.50, without interest (the "Company Common Share Merger Consideration").

(d) (i) Each Company Series B Preferred Share issued and outstanding immediately prior to the Company Merger Effective Time (other than the Company Series B Preferred Shares owned by any Subsidiary or by MergerCo, which shall be automatically cancelled and retired and cease to exist) shall automatically be converted into, and shall be cancelled in exchange for, the right to receive one share of 5.25% Series B Cumulative Preferred Stock, par value $.01 per share (the "MergerCo Series B Preferred Shares") of the Surviving Entity (the "Series B Preferred Share Merger Consideration"), and (ii) each Company Series G Preferred Share issued and outstanding immediately prior to the Company Merger Effective Time (other than the Company Series G Preferred Shares owned by any Subsidiary or by MergerCo, which shall be automatically cancelled and retired and cease to exist) shall automatically be converted into, and shall be cancelled in exchange for, the right to receive one share of 7.75% Series G Cumulative Redeemable Preferred Stock, par value $.01 per share (the "MergerCo Series G Preferred Shares" and, together with the MergerCo Series B Preferred Shares, the "MergerCo Preferred Shares") of the Surviving Entity (the "Series G Preferred Share Merger Consideration" and, together with the Series B Preferred Share Merger Consideration, the "Company Preferred Share Merger Consideration").

Immediately prior to the Company Merger Effective Time, the terms of the MergerCo Series B Preferred Shares shall be set forth in the articles supplementary of MergerCo, substantially in the form set forth in Exhibit D hereto, and the terms of the MergerCo Series G Preferred Shares shall be set forth in the articles supplementary of MergerCo, substantially in the form set forth in Exhibit E hereto.

(e) Immediately prior to the Company Merger Effective Time, each outstanding qualified or nonqualified option to purchase Company Common Shares ("Company Share Options") under any employee or trustee share option or compensation plan or arrangement of the Company shall become fully vested and exercisable (whether or not then vested or subject to any performance condition that has not been satisfied, and regardless of the exercise price thereof). At the Company Merger Effective Time, each Company Share Option not theretofore exercised shall be canceled in exchange for the right to receive a single lump sum cash payment, equal to the product of (i) the number of Company Common Shares subject to such Company Share Option immediately prior to the Company Merger Effective Time, whether or not vested or exercisable, and (ii) the excess, if any, of the Company Common Share Merger Consideration over the exercise price per share of such Company Share Option (the "Option Merger Consideration"), less any applicable Taxes required to be withheld in accordance with Section 3.04 with respect to such payment. If the exercise price per share of any such Company Share Option is equal to or greater than the Company Common Share Merger Consideration, such Company Share Option shall be canceled without any cash payment being made in respect thereof.

(f) Immediately prior to the Company Merger Effective Time, all restricted share awards ("Company Restricted Shares") granted pursuant to the 1997 Share Option and Share Award Plan and the 2003 Share Option and Share Incentive Plan (collectively, as amended, modified or supplemented, the "Incentive Plan") or otherwise that remain unvested automatically shall become fully vested and free of any forfeiture restrictions and each Company Restricted Share shall be considered an outstanding Company Common Share for all purposes of this Agreement, including the right to receive the Company Common Share Merger Consideration.

(g) Immediately prior to the Company Merger Effective Time, each outstanding stock appreciation right in respect of Company Common Shares ("SARs") outstanding under the Incentive Plan shall become fully vested and exercisable (whether or not then vested or subject to any performance condition that has not been satisfied, and regardless of the exercise price thereof). At the Company Merger Effective Time, each SAR not theretofore exercised shall be canceled in exchange for the right to receive a single lump sum cash payment, equal to the product of (i) the number of Company Common Shares subject to such SAR immediately prior to the Company Merger Effective Time, whether or not vested or exercisable, and (ii) the excess, if any, of the Company Common Share Merger Consideration over the exercise price per share of such SAR (the "SAR Merger Consideration"), less any applicable Taxes required to be withheld in accordance with Section 3.04 with respect to such payment. If the exercise price per share of any such SAR is equal to or greater than the Company Common Share Merger Consideration, such SAR shall be canceled without any cash payment being made in respect thereof.

(h) Immediately prior to the Company Merger Effective Time, all performance awards ("Performance Awards") granted under the Strategic Long-Term Incentive Plan and the Deferred Equity Plan pursuant to the Incentive Plan that remain unvested automatically shall become fully vested and free of any forfeiture restrictions and, at the Company Merger Effective Time, shall be paid out, in the case of the Strategic Long-Term Incentive Plan, based on performance through the end of the calendar quarter preceding the date of this Agreement (which would result in maximum payment), and, in the case of the Deferred Equity Plan, at the maximum level, except in a lump sum cash payment equal to the product of (x) the number of Company Common Shares subject to each such Performance Award times (y) the Company Common Share Merger Consideration (the "Performance Award Merger Consideration"), less any applicable Taxes required to be withheld in accordance with Section 3.04 with respect to such payment.

SECTION 3.02  *Effect on Partnership Units.*

(a)  At the Partnership Merger Effective Time, by virtue of the Partnership Merger and without any action on the part of the holder of any partnership interest of the Operating Partnership or Merger Partnership:

(i)  Each Class A Unit issued and outstanding immediately prior to the Partnership Merger Effective Time (other than any Class A Units held by the Company or any of its Subsidiaries, which Class A Units shall remain outstanding and unchanged as units of limited partner interest in the Surviving Partnership), subject to the terms and conditions set forth herein, shall be converted, without any action on the part of the holder, into the right to receive cash in an amount equal to the Company Common Share Merger Consideration, without interest (the "Operating Partnership Cash Merger Consideration"); provided, however, that in lieu of the Operating Partnership Cash Merger Consideration, if but only if (x) the holder of such Class A Unit has effectively made and not revoked a valid election pursuant to Section 3.02(b) to receive a Class H Preferred Unit in respect thereof, and (y) the issuance of such Class H Preferred Units would be exempt from registration under the Securities Act and applicable state securities laws, then each of such holder's Class A Units shall be converted into one fully paid Class H Preferred Unit, without interest (such Class H Preferred Unit and/or Operating Partnership Cash Merger Consideration, the "Operating Partnership Merger Consideration", and together with the Company Common Share Merger Consideration, the Company Preferred Share Merger Consideration, the Option Merger Consideration, the SAR Merger Consideration and the Performance Award Merger Consideration, the "Merger Consideration").

(ii)  Each Series B Preferred Unit and each Series G Preferred Unit issued and outstanding immediately prior to the Partnership Merger Effective Time shall remain as one issued and outstanding Series B Preferred Unit or Series G Preferred Unit, as the case may be, of the Surviving Partnership.

(iii)  The general partner interests of the Operating Partnership shall remain outstanding and unchanged as general partner interests in the Surviving Partnership, and the holder thereof shall have such rights, duties and obligations as are more fully set forth in the Amended Partnership Agreement.

(iv)  Each partnership interest in Merger Partnership shall automatically be cancelled and cease to exist, the holders thereof shall cease to have any rights with respect thereto, and no payment shall be made with respect thereto.

(b)  Subject to Section 3.02(b)(iv) and in accordance with Section 3.02(a)(i), each eligible holder of Class A Units shall be entitled, with respect to all, but not less than all, of such holder's Class A Units, to make an unconditional election, on or prior to the Election Date, to receive in the Partnership Merger in lieu of the Operating Partnership Cash Merger Consideration to which such holder would otherwise be entitled, Class H Preferred Units (a "Unit Election") as follows:

(i)  Merger Partnership shall prepare and deliver to the Operating Partnership, as promptly as practicable following the date of this Agreement and, in any event, not later than five (5) Business Days after the date on which the Proxy Statement is mailed to the shareholders of the Company, and the Operating Partnership shall mail to the holders of Class A Units, a form of election, which form shall be subject to the reasonable approval of the Company (the "Form of Election"). The Form of Election may be used by each holder of Class A Units to designate such holder's election to convert all, but not less than all, of the Class A Units held by such holder into Class H Preferred Units. Any such holder's election to receive Class H Preferred Units shall be deemed to have been properly made only if Parent shall have received at its principal executive office, not later than 5:00 p.m., New York City time on that date that is five Business Days before the scheduled date of the Company Shareholders' Meeting (the "Election Date"), a Form of Election specifying that such holder elects to receive Class H Preferred Units and otherwise properly completed and signed. The Form of Election shall state therein the date that constitutes the Election Date.

(ii)  A Form of Election may be revoked by any holder of a Class A Unit only by written notice received by Parent prior to 5:00 p.m., New York City time, on the Election Date. In addition, all Forms of Election shall automatically be revoked if the Partnership Merger has been abandoned.

(iii) The reasonable determination of Parent shall be binding as to whether or not elections to receive Class H Preferred Units have been properly made or revoked. If Parent determines that any election to receive Class H Preferred Units was not properly made, the Class A Units with respect to which such election was not properly made shall be converted into Operating Partnership Cash Merger Consideration in accordance with Section 3.02(a). Parent may, with the agreement of the Company, make such rules as are consistent with this Section 3.02(b) for the implementation of elections provided for herein as shall be necessary or desirable to fully effect such elections.

(iv) Each holder of Class A Units, as a condition to making a Unit Election with respect to such holder's Class A Units, shall (x) represent to Parent that such holder is an Accredited Investor (as such term is defined under Rule 501 promulgated under the Securities Act) and (y) agree to be bound by the terms of the limited partnership agreement of the Surviving Partnership as it will be in effect immediately following the Partnership Merger Effective Time (which agreement shall incorporate the terms of the Class H Preferred Units set forth in Annex A attached as Exhibit A hereto and any other terms determined by Parent that are not inconsistent with the terms of the Class H Preferred Units (including terms of the Amended Partnership Agreement that are subject to the voting rights specified in I(ii) of Annex A) and such matters).

(v) The Company Parties agree to reasonably cooperate with Parent in preparing any disclosure statement or other disclosure information to accompany the Form of Election, including information applicable to an offering of securities exempt from registration under the Securities Act pursuant to Rule 506 thereunder, each of which shall be subject to the reasonable approval of the Company.

(vi) Promptly after the Partnership Merger Effective Time (but in any event within five (5) Business Days), Parent shall deliver to each holder of Class A Units entitled to receive Class H Preferred Units pursuant to the terms of this Section 3.02, a notice confirming such holder's record ownership of the Class H Preferred Unit issuable pursuant hereto in respect of such Class A Units.

SECTION 3.03  *Exchange of Certificates and Uncertificated Units; Paying Agent.*

(a) *Paying Agent.*  Prior to the Partnership Merger Effective Time, Parent shall appoint a bank or trust company reasonably satisfactory to the Company to act as Exchange and Paying Agent (the "Paying Agent") for the payment or exchange, as applicable, in accordance with this Article III of the Merger Consideration (collectively, such cash and securities being referred to as the "Exchange Fund"). On or before the Partnership Merger Effective Time, Parent shall deposit with the Paying Agent the Merger Consideration, for the benefit of the holders of Company Common Shares, Company Share Options and Class A Units, as applicable. Parent shall cause the Paying Agent to make, and the Paying Agent shall make, payments of the Merger Consideration out of the Exchange Fund in accordance with this Agreement. The Exchange Fund shall not be used for any other purpose. Any and all interest earned on cash deposited in the Exchange Fund shall be paid to the Surviving Entity.

(b) *Company Preferred Shares.*  The MergerCo Preferred Shares will be uncertificated and any certificates that, prior to the Company Merger Effective Time, evidenced Company Series B Preferred Shares or Company Series G Preferred Shares will thereafter be treated by MergerCo as if such certificates evidenced the MergerCo Series B Preferred Shares or MergerCo Series G Preferred Shares, as the case may be, constituting the applicable Merger Consideration.

(c) *Share Transfer Books.*  At the Company Merger Effective Time or the Partnership Merger Effective Time, as applicable, the share and unit transfer books of the Company and the Operating Partnership shall be closed and thereafter there shall be no further registration of transfers of the Company Common Shares, Company Restricted Shares, Company Preferred Shares, or Class A Units, as applicable. From and after the Company Merger Effective Time or the Partnership Merger Effective Time, as applicable, persons who held Company Common Shares, Company Restricted Shares, Company Preferred Shares, or Class A Units immediately prior to the Company Merger Effective Time or the Partnership Merger Effective Time, as applicable, shall cease to have rights with respect to such shares or units, except as otherwise provided for herein. On or after the Company Merger Effective Time, any Certificates presented to the Paying Agent, the

A-13

Surviving Entity or the transfer agent for any reason shall be exchanged for the applicable Merger Consideration with respect to the Company Common Shares formerly represented thereby.

(d) *Exchange Procedures for Certificates and Uncertificated Class A Units.*  Promptly after the Company Merger Effective Time (but in any event within five (5) Business Days), Parent shall cause the Paying Agent to mail to each person who immediately prior to the Company Merger Effective Time or the Partnership Merger Effective Time, as applicable, held Company Common Shares or Class A Units entitled to receive Class H Preferred Units pursuant to the terms of Section 3.02 (each, a "Former Equityholder"), pursuant to Section 3.01: (i) a customary letter of transmittal which shall be subject to the prior approval of the Company (which shall specify that, if applicable, delivery of Certificates shall be effected, and risk of loss and title to the Certificates shall pass to the Paying Agent, only upon delivery of the Certificates to the Paying Agent, and which letter shall be in such form and have such other provisions as Parent may reasonably specify) and (ii) if applicable, instructions for use in effecting the surrender of the Former Equityholder's Certificates in exchange for the applicable Merger Consideration to which the holder thereof is entitled. Upon (i) if applicable, surrender by a Former Equityholder of a Certificate for cancellation to the Paying Agent or to such other agent or agents reasonably satisfactory to the Company as may be appointed by Parent, and (ii) delivery by such Former Equityholder of such letter of transmittal (together with such Certificate, if applicable), duly executed and completed in accordance with the instructions thereto, and such other documents as may reasonably be required by the Paying Agent, such Former Equityholder shall receive in exchange therefor the applicable Merger Consideration payable in respect of the Company Common Shares or Class A Units, pursuant to the provisions of this Article III, and the Certificate (if any) so surrendered shall forthwith be canceled. In the event of a transfer of ownership of Company Common Shares or Class A Units that is not registered in the transfer records of the Company or the Operating Partnership, if applicable, payment may be made to a person other than the person in whose name the Certificate so surrendered is registered, if such Certificate shall be properly endorsed or otherwise be in proper form for transfer and the person requesting such payment shall pay any transfer or other Taxes required by reason of the payment to a person other than the registered holder of such Certificate or establish to the satisfaction of Parent that such Tax has been paid or is not applicable. Until surrendered as contemplated by this Section 3.03, each Certificate shall be deemed at any time after the Company Merger Effective Time or Partnership Merger Effective Time, as applicable, to represent only the right to receive, upon such surrender, the applicable Merger Consideration as contemplated by this Section 3.03. No interest shall be paid or accrue on any Merger Consideration. Promptly after the Company Merger Effective Time (but in any event within five (5) Business Days), Parent shall pay to each holder of a Company Share Option, SAR or Performance Award cancelled in accordance with this Article III the Option Merger Consideration, the SAR Merger Consideration or the Performance Award Merger Consideration, as applicable.

(e) *No Further Ownership Rights in Company Common Shares, Company Preferred Shares, Class A Units or Company Share Options.*  At the Company Merger Effective Time or Partnership Merger Effective Time, as applicable, holders of Company Common Shares, Company Preferred Shares, or Class A Units (that are converted into the right to receive cash in the Partnership Merger pursuant to Section 3.02(a)) shall cease to be, and shall have no rights as, shareholders of the Company or limited partners of the Operating Partnership other than the right to receive the applicable Merger Consideration provided under this Article III. The applicable Merger Consideration paid in accordance with the terms of this Article III shall be deemed to have been paid in full satisfaction of all rights and privileges pertaining to the Company Common Shares, Company Preferred Shares, and Class A Units exchanged therefor and, if applicable, represented by Certificates exchanged therefor. The Option Merger Consideration, SAR Merger Consideration or Performance Award Merger Consideration paid with respect to Company Share Options, SARs and Performance Awards, respectively, in accordance with the terms of this Article III shall be deemed to have been paid in full satisfaction of all rights and privileges pertaining to the canceled Company Share Options, SARs and Performance Awards, as applicable, and on and after the Company Merger Effective Time the holder of a Company Share Option, SAR or Performance Award shall have no further rights with respect thereto, other than the right to receive the Option Merger Consideration, SAR Merger Consideration or Performance Award Merger Consideration as provided in Section 3.01(e).

A-14

(f) *Termination of Exchange Fund*.    Any portion of the Exchange Fund which remains undistributed to the holders of Company Common Shares, Class A Units, Company Share Options, SARs or Performance Awards for twelve (12) months after the Company Merger Effective Time shall be delivered to the Surviving Entity, and any holders of Company Common Shares, Class A Units, Company Share Options, SARs or Performance Awards prior to the applicable Merger who have not theretofore complied with this Article III shall thereafter look only to the Surviving Entity and Parent for payment of the applicable Merger Consideration.

(g) *No Liability*.    None of the Buyer Parties, Company Parties or the Paying Agent, or any employee, officer, director, shareholder, partner, agent or Affiliate thereof, shall be liable to any person in respect of any Merger Consideration, if the Exchange Fund has been delivered to a public official pursuant to any applicable abandoned property, escheat or similar Law.

(h) *Investment of Exchange Fund*.    The Paying Agent shall invest the cash included in the Exchange Fund, as directed by Parent, on a daily basis. Any net profit resulting from, or interest or income produced by, such investments shall be placed in the Exchange Fund. To the extent that there are losses with respect to such investments, or the Exchange Fund diminishes for other reasons below the level required to make prompt payments of the Merger Consideration as contemplated hereby, Parent shall promptly replace or restore the portion of the Exchange Fund lost through investments or other events so as to ensure that the Exchange Fund is, at all times, maintained at a level sufficient to make all such payments in full.

(i) *Lost Certificates*.    If any Certificate shall have been lost, stolen or destroyed, upon the making of an affidavit of that fact by the person claiming such Certificate to be lost, stolen or destroyed and, if required by Parent or the Paying Agent, the posting by such person of a bond in such amount as Parent or the Paying Agent reasonably may direct, the Paying Agent will issue in exchange for such lost, stolen or destroyed Certificate the applicable Merger Consideration payable in respect thereof pursuant to this Agreement.

SECTION 3.04    *Withholding Rights*.    The Surviving Entity, Parent or the Paying Agent, as applicable, shall be entitled to deduct and withhold from the consideration otherwise payable pursuant to this Agreement to any holder of Company Common Shares, Company Share Options, Company Restricted Shares, SARs, Performance Awards, Company Preferred Shares or Class A Units such amounts as it is required to deduct and withhold with respect to the making of such payment under the Code, and the rules and regulations promulgated thereunder, or any provision of state, local or foreign Tax law. To the extent that amounts are so withheld by the Surviving Entity, Parent or the Paying Agent, as applicable, such withheld amounts (i) shall be remitted by the Surviving Entity, Parent or the Paying Agent, as the case may be, to the applicable Governmental Authority, and (ii) shall be treated for all purposes of this Agreement as having been paid to the holder of Company Common Shares, Company Share Options, Company Restricted Shares, SARs, Performance Awards, Company Preferred Shares or Class A Units in respect of which such deduction and withholding was made by the Surviving Entity, Parent or the Paying Agent, as applicable.

SECTION 3.05    *Dissenters' or Appraisal Rights*.    No dissenters' or appraisal rights shall be available with respect to the Mergers or the other transactions contemplated hereby.

SECTION 3.06    *Termination of DRIP*.    The Company shall take all actions necessary to terminate its Dividend Reinvestment and Share Purchase Plan (the "DRIP"), effective as soon as possible after the date of this Agreement, and ensure that no purchase or other rights under the DRIP enable the holder of such rights to acquire any interest in the Surviving Entity or any other Company Party or Buyer Party as a result of such purchase or the exercise of such rights at or after such date.

SECTION 3.07    *Debt Offers*.

(a) The Company and the Operating Partnership shall use their respective commercially reasonable efforts to commence as promptly as practicable following the date of receipt of the Offer Documents from Parent pursuant to subparagraph (ii) below and written instructions from Parent to commence the Debt Offers, offers to purchase, and related consent solicitations (or, in the case of the Exchangeable Notes, a consent solicitation which is not related to a concurrent tender offer) with respect to Senior Notes on the terms and conditions set forth in Section 3.07(a) of the Disclosure Schedule prepared by Parent (or as may otherwise be agreed

between the Company and Parent) and such other customary terms and conditions as are reasonably acceptable to Parent and the Company (including the related or stand-alone consent solicitations, collectively, the "Debt Offers"); provided that (i) this Agreement shall have not been terminated in accordance with Section 9.01, (ii) the Company shall have received from Parent the completed Offer Documents which shall be in form and substance reasonably satisfactory to the Company, and (iii) at the time of such commencement, the Buyer Parties shall have otherwise performed or complied with all of their agreements and covenants required by this Agreement to be performed on or prior to the time that the Debt Offers are to be commenced. The Company and the Operating Partnership shall waive any of the conditions to the Debt Offers (other than that the Mergers shall have been consummated and that there shall be no order prohibiting consummation of the Debt Offers) as may be reasonably requested by Parent in writing and shall not, without the written consent of Parent, waive any condition to the Debt Offers or make any changes to the Debt Offers other than as agreed between Parent and the Company. Neither the Company nor the Operating Partnership need make any change to the terms and conditions of the Debt Offers without their prior written consent, which shall not be unreasonably withheld, provided that such consent shall not be required for an increase in any consideration payable in the Debt Offers or for any change that is not material.

(b) The Company and the Operating Partnership agree that, promptly following the consent expiration date, assuming the requisite consents are received, each of the Company, the Operating Partnership and the Subsidiaries as is necessary shall execute supplemental indentures to the indentures governing the Senior Notes, which supplemental indentures shall implement the amendments set forth in the Offer Documents and shall become operative upon acceptance of the Senior Notes for payment pursuant to the Debt Offers and concurrently with the Company Merger Effective Time, subject to the terms and conditions of this Agreement (including the conditions to the Debt Offers). Concurrent with the Company Merger Effective Time, Parent shall cause the Company or the Operating Partnership to accept for payment and after the Company Merger Effective Time, Parent shall cause the Surviving Entity or the Operating Partnership to promptly pay for the Senior Notes that have been properly tendered and not properly withdrawn pursuant to the Debt Offers and, subject to receipt of the requisite consents, pay for consents validly delivered and not revoked in accordance with the Debt Offers.

(c) Promptly after the date of this Agreement, Parent, at its own expense, shall prepare all necessary and appropriate documentation in connection with the Debt Offers, including the offers to purchase, related consents and letters of transmittal and other related documents (collectively, the "Offer Documents"). Parent, the Company and the Operating Partnership shall, and shall cause their respective subsidiaries to, reasonably cooperate with each other in the preparation of the Offer Documents. The Offer Documents (including all amendments or supplements thereto) and all mailings to the holders of the Senior Notes in connection with the Debt Offers shall be subject to the prior review of, and comment by, the Company and Parent and shall be reasonably acceptable in form and substance to each of them. If at any time prior to the completion of the Debt Offers any information in the Offer Documents should be discovered by the Company and the Subsidiaries, on the one hand, or Parent, on the other, which should be set forth in an amendment or supplement to the Offer Documents, so that the Offer Documents shall not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of circumstances under which they are made, not misleading, the party that discovers such information shall promptly notify the other party in writing, and an appropriate amendment or supplement describing such information shall be disseminated by or on behalf of the Company and the Operating Partnership to the holders of the applicable Senior Notes. Notwithstanding anything to the contrary in this Section 3.07, the Company and the Operating Partnership shall comply with the requirements of Rule 14e-1 under the Exchange Act and any other applicable Law to the extent such Laws are applicable in connection with the Debt Offers. To the extent that the provisions of any applicable Law conflict with this Section 3.07, the Company and the Operating Partnership shall comply with the applicable Law and shall not be deemed to have breached their obligations hereunder by such compliance.

(d) In connection with the Debt Offers, Parent may select one or more dealer managers or solicitation agents (of which one such dealer manager or solicitation agent shall be the Company Financial Advisor and which others will be reasonably acceptable to the Company), information agents, depositaries and other agents

to provide assistance in connection therewith and the Company and the Operating Partnership shall, and shall cause the Subsidiaries to, enter into customary agreements (including indemnities) with such parties so selected and on terms and conditions acceptable to Parent. Parent shall pay the fees and expenses of any dealer manager, solicitation agent, information agent, depositary or other agent retained in connection with the Debt Offers, and Parent further agrees to reimburse the Company and the Operating Partnership and the Subsidiaries for all of their reasonable out-of-pocket costs (including reasonable fees and expenses of their Representatives) in connection with the Debt Offers promptly following incurrence and delivery of reasonable documentation of such costs. The Buyer Parties shall, on a joint and several basis, indemnify and hold harmless the Company and its Subsidiaries, their Representatives (other than any direct indemnification of any dealer manager or solicitation agent, which shall be indemnified under the applicable dealer manager or solicitation agent agreement; provided, however, that the Buyer Parties shall indemnify the Company and its Subsidiaries from and against any and all liabilities, losses, damages, claims, costs, expenses, interest, awards, judgments and penalties suffered or incurred by them in connection with any dealer manager or solicitation agent agreement) from and against any and all liabilities, losses, damages, claims, costs, expenses, interest, awards, judgments and penalties suffered or incurred by them in connection with the Debt Offers and the Offer Documents; provided, however, that none of the Buyer Parties shall have any obligation to indemnify and hold harmless any such party or person to the extent that such liabilities, losses, damages, claims, costs, expenses, interest, awards, judgments and penalties suffered or incurred arises from disclosure regarding the Company and its Subsidiaries supplied by such party or person or included in any Company SEC Report that is determined to have contained a material misstatement or omission.

SECTION 3.08  *Redemption and Satisfaction and Discharge*.

(a) (i) The Operating Partnership shall pay at maturity the $100,000,000 7.125% Notes due December 1, 2006 and shall use its reasonable best efforts to redeem the $1,500,000 7.0% Notes due February 1, 2007, $25,000,000 6.88% Notes due April 30, 2007 and $25,000,000 7.875% Notes due December 1, 2016 (collectively, the "Redemption Notes") as soon as practicable but in any event within 85 days of the date of this Agreement in accordance with the terms of such Redemption Notes and related indentures.

(b) To the extent that, as of the Closing Date, the requisite consents specified in Section 3.07(a) of the Disclosure Schedule have not been validly delivered (without having been properly withdrawn) in accordance with the Debt Offers with respect to any series of Senior Notes by the holders thereof, the Company and the Operating Partnership shall, immediately prior to the Partnership Merger Effective Time, issue an irrevocable notice of optional redemption for all of the then outstanding Senior Notes of such series as have not delivered the requisite consents and which are redeemable in accordance with the terms of such series of Senior Notes and the applicable indenture governing such series of the Senior Notes and which shall provide for the satisfaction and discharge of such Senior Notes and such indentures with respect to such series of Senior Notes; provided, Parent shall have provided written notice to the Company confirming that all conditions set forth in Sections 8.01 and 8.02 have been satisfied (or with respect to Section 8.02, except for Section 8.02(g), waived) and that the Buyer Parties are prepared to proceed immediately with the Closing; and provided further that, the Buyer Parties shall have irrevocably deposited with the applicable trustee under each indenture sufficient funds to effect such satisfaction and discharge.

ARTICLE IV

REPRESENTATIONS AND WARRANTIES OF THE COMPANY AND THE OPERATING PARTNERSHIP

Except as set forth in the Disclosure Schedule, the Company and the Operating Partnership hereby jointly and severally represent and warrant to the Buyer Parties as follows:

SECTION 4.01  *Organization and Qualification; Subsidiaries; Authority*.

(a) Each Company Party is a real estate investment trust or limited partnership duly organized, validly existing and in good standing under the laws of the State of Maryland or the State of Delaware, as applicable. Each Company Party is duly qualified or licensed to do business as a foreign trust or limited partnership and is in good standing under the laws of any other jurisdiction in which the character of the properties owned,

A-17

leased or operated by it therein or in which the transaction of its business makes such qualification or licensing necessary, except where the failure to be so qualified, licensed or in good standing would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect. Each Company Party has all requisite real estate investment trust or partnership power and authority to own, operate, lease and encumber its properties and carry on its business as now conducted in all material respects.

(b) The outstanding equity of each of the Company's subsidiaries, including the Operating Partnership (the "Subsidiaries"), is owned by the Company or a wholly owned Subsidiary except as set forth in Section 4.01(b) or 4.03(g) of the Disclosure Schedule (which Section of the Disclosure Schedule sets forth in respect of such Subsidiaries the outstanding equity of each such Subsidiary owned by Persons other than the Company or a wholly owned Subsidiary, together with the names of such other Persons). Except as set forth in Sections 4.01(b) and 4.01(c) of the Disclosure Schedule and except for any buy/sell rights, rights of first offer or refusal or similar contractual rights under any Contracts set forth in Sections 4.13 and 4.17 of the Disclosure Schedule and in the Company Leases, the Company does not own, directly or indirectly, any shares of stock of, or other equity interest in, or any other securities convertible or exchangeable into or exercisable for stock of or other equity interest in, any Person with an aggregate fair market value with respect to such Person in excess of $5,000,000. Except as set forth in Section 4.01(b) and 4.01(c) of the Disclosure Schedule, all issued and outstanding shares or other equity interests of each Subsidiary and JV Entity are owned directly or indirectly by the Company or a wholly owned Subsidiary, free and clear of all Liens other than Liens specified in the organizational documents of JV Entities, or in loan documents that are Material Contracts or, in the case of a JV Entity, other loan documents applicable to such JV Entity. Each Subsidiary and, to the knowledge of the Company, each JV Entity, is a corporation, partnership or limited liability company duly incorporated or formed, validly existing and in good standing under the laws of the jurisdiction of its incorporation or formation, except where the failure to be so incorporated, formed, validly existing or in good standing would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect. Each of the Subsidiaries and, to the knowledge of the Company, the JV Entities, has the requisite corporate, limited partnership, limited liability company or similar power and authority to own, lease and operate its properties and to carry on its business as it is now being conducted, except where the failure to have such power and authority would not, individually or in the aggregate, be reasonably expected to have a Company Material Adverse Effect. Each of the Operating Partnership, the other Subsidiaries and, to the knowledge of the Company, each JV Entity, is duly qualified or licensed to do business, and is in good standing (to the extent applicable), in each jurisdiction where the character of the properties owned, leased or operated by it or the conduct or nature of its business makes such qualification or licensing necessary, except for jurisdictions in which the failure to be so qualified, licensed or in good standing would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect.

(c) A correct and complete list of Persons, other than the Subsidiaries, in which the Company or any Subsidiary has a direct or indirect equity interest having a fair market value in excess of $5,000,000 (the "JV Entities"), together with the names of the other members and partners in each JV Entity and the respective percentage stated interests of each such member or partner in each JV Entity is set forth in Section 4.01(c) of the Disclosure Schedule.

SECTION 4.02  *Organizational Documents.*  The Company has previously provided or made available complete copies of the Company Charter, which constitutes the declaration of trust of the Company as in effect on the date hereof, and the Company Bylaws, the Operating Partnership Agreement, and the certificate of limited partnership of the Operating Partnership (and in each case, all amendments thereto) and the material organizational documents of each of the JV Entities in its possession (collectively, the "Organizational Documents"). Except as would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect, (i) all Organizational Documents are in full force and effect and no dissolution, revocation or forfeiture proceedings regarding the Company or any of the Subsidiaries or, to the knowledge of the Company, the JV Entities have been commenced and (ii) neither the Company nor any Subsidiary is in violation of any of the Organizational Documents.

SECTION 4.03  *Capitalization.*

(a)  The authorized shares of beneficial interest of the Company consist of 750,000,000 Company Common Shares and 100,000,000 preferred shares of beneficial interest, par value $0.01 per share, of the Company, of which (i) 7,000,000 shares have been designated as Company Series B Preferred Shares, (ii) 4,600,000 shares have been designated as 85/8% Series C Cumulative Redeemable Preferred Shares of Beneficial Interest (the "Company Series C Preferred Shares") and (iii) 9,200,000 shares have been designated as Company Series G Preferred Shares. As of November 17, 2006, (i) 351,963,875 Company Common Shares (which includes 1,853,739 Company Restricted Shares), (ii) 5,989,930 Company Series B Preferred Shares, (iii) no Company Series C Preferred Shares and (iv) 8,500,000 Company Series G Preferred Shares were issued and outstanding. As of November 17, 2006, 14,557,547 Company Common Shares have been reserved for issuance pursuant to the Company Share Options and no Company Common Shares have been reserved for issuance pursuant to the SARs. As of November 17, 2006, 14,557,547 Company Share Options to purchase 14,557,547 Company Common Shares were outstanding under the Incentive Plan and 1,254 SARs in respect of 1,254 Company Common Shares were outstanding under the Incentive Plan. As of November 17, 2006, 186,701 Performance Awards in respect of a maximum number of 373,402 Company Common Shares were outstanding. As of November 17, 2006, 38,531,496 Company Common Shares have been reserved for issuance upon the redemption of Class A Units outstanding on the date hereof, 8,389,256 Company Common Shares have been reserved for issuance upon the conversion of the Company Series B Preferred Shares, 41,424,900 Company Common Shares have been reserved for issuance upon the conversion of the Exchangeable Notes, 296,768 Company Common Shares have been reserved for issuance pursuant to the Strategic Long-Term Incentive Plan, 76,634 Company Common Shares have been reserved for issuance pursuant to the Deferred Equity Plan and 2,000,000 Company Common Shares have previously been reserved for issuance pursuant to the Company ESPP. As of November 17, 2006, the Company had no Company Common Shares reserved for issuance or required to be reserved for issuance other than as described above. Since November 17, 2006 and through the date of this Agreement, other than in connection with the issuance of Company Common Shares pursuant to the exercise of Company Share Options or SARs or redemption or conversion of Class A Units, in each case outstanding as of November 17, 2006, there has been no change in the number of shares of outstanding capital stock of the Company or Company Share Options or the number of outstanding Performance Awards. All issued and outstanding shares of the Company and the Subsidiaries are, and all shares subject to issuance as specified above, upon issuance on the terms and conditions specified in the instruments pursuant to which they are issuable will be, when issued, duly authorized, validly issued, fully paid, nonassessable and free of preemptive rights under any provision of Law or the applicable Organizational Documents.

(b)  Except for the Company Share Options, SARs, Performance Awards, Class A Units, the Exchangeable Notes, the Company Series B Preferred Shares or as set forth in Section 4.03(b) of the Disclosure Schedule, there are no options, warrants, calls, subscription rights, exercisable, convertible or exchangeable securities or other rights, agreements or commitments (contingent or otherwise) that obligate the Company to issue, transfer or sell any shares of capital stock of the Company or other equity interest in the Company, or any investment that is convertible into or exercisable or exchangeable for any such shares. Section 4.03(b) of the Disclosure Schedule sets forth a true, complete and correct list of the Company Share Options as of the date of this Agreement, including the name of the Person to whom such Company Share Options have been granted, the number of shares subject to each Company Share Option, the per share exercise price or purchase price for each Company Share Option.

(c)  Section 4.03(c) of the Disclosure Schedule sets forth a true, complete and correct list of the unvested Company Restricted Shares as of November 17, 2006, including the name of the Person to whom such Company Restricted Shares have been granted for each such award. As of November 17, 2006, there were 1,853,739 Company Restricted Shares issued and outstanding.

(d)  Section 4.03(d) of the Disclosure Schedule sets forth a true, complete and correct list of the cash payable (or formula for determining) in connection with the Company's stock value unit awards outstanding as of the date of this Agreement, including the name of the Person to whom such cash awards have been granted for each such award. Except as set forth in Sections 4.03(c) or (d) of the Disclosure Schedule, the Company

does not have outstanding any share appreciation rights, dividend equivalent rights, stock-based performance awards, restricted stock unit awards or "phantom" shares.

(e) Except as set forth in the Company Charter, the Company Bylaws or Section 4.03(e) of the Disclosure Schedule, there are no agreements or understandings to which the Company is a party with respect to the voting of any Company Common Shares or which restrict the transfer of any such shares, nor as of the date of this Agreement does the Company have knowledge of any third party agreements or understandings with respect to the voting of any such shares. Except for the Exchangeable Notes and the Company Preferred Shares, none of the Company or any Subsidiary has any outstanding bonds, debentures, notes or other obligations the holders of which have the right to vote (or which are convertible into, exchangeable into or exercisable for securities having the right to vote) on any matter that the shareholders of the Company or partners of the Operating Partnership may vote.

(f) Except as set forth in the Section 4.03(f)(ii) of the Disclosure Schedule or the Organizational Documents, there are no outstanding contractual obligations of the Company or any of the Subsidiaries to repurchase, redeem or otherwise acquire any Company Common Shares or capital stock of any Subsidiary.

(g) The Company is the sole general partner of the Operating Partnership. As of the date hereof, the Company held 351,963,875 Class A Units, 5,989,930 Series B Preferred Units and 8,500,000 Series G Preferred Units. In addition to the Class A Units held by the Company, as of November 17, 2006, 38,531,496 Class A Units, no Series B Preferred Units and no Series G Preferred Units were issued and outstanding and no other units or equity interests in the Operating Partnership were issued and outstanding. Since November 17, 2006 and through the date of this Agreement, other than in connection with the redemption or conversion of Class A Units in accordance with the Operating Partnership Agreement, there have been no changes in the number of outstanding units of the Operating Partnership. Section 4.03(g) of the Disclosure Schedule sets forth a list of all holders of Class A Units of partnership interest in the Operating Partnership other than the Company as of November 17, 2006, including the name of the Person holding each such unit, and the number and type (*e.g.*, general, limited, etc.). Except as set forth in the Operating Partnership Agreement, there are no options, warrants, calls, subscriptions, convertible securities, or other rights, agreements or commitments that obligate the Company, the Operating Partnership or any other Subsidiary to issue, repurchase, redeem, transfer or sell any partnership interests of the Operating Partnership. Except as set forth in Section 4.03(g) of the Disclosure Schedule, the partnership interests in the Operating Partnership that are owned by the Company are owned free and clear of any Liens and are subject only to the restrictions on transfer set forth in the Operating Partnership Agreement and those imposed by applicable Law.

(h) As of the date of this Agreement, there is no outstanding indebtedness for borrowed money of the Company and the Subsidiaries in excess of $10,000,000 in principal amount, other than indebtedness in the amounts identified by instrument in Section 4.03(h) of the Disclosure Schedule and excluding inter-company Indebtedness among the Company and the Subsidiaries.

(i) The Company does not have a "poison pill" or similar stockholder rights plan.

SECTION 4.04    *Authority Relative to this Agreement, Takeover Laws, Validity and Effect of Agreements.*

(a) The Company has all necessary real estate investment trust power and authority to execute and deliver this Agreement, to perform its obligations hereunder and, subject to the approvals described in the penultimate sentence of this Section 4.04(a), to consummate the transactions contemplated by this Agreement to which the Company is a party, including the Company Merger. The Company Board has (i) approved this Agreement, the Company Merger and the other transactions contemplated by this Agreement and declared that the Company Merger and the other transactions contemplated by this Agreement are advisable and in the best interests of the Company and its shareholders on the terms and subject to the conditions set forth herein, (ii) directed that this Agreement and the Company Merger be submitted for consideration at a meeting of the Company's shareholders and (iii) recommended the approval of this Agreement and the Company Merger by the Company's shareholders. Except for the approvals described in the following sentence, the execution, delivery and performance by the Company of this Agreement and the consummation of the transactions contemplated by this Agreement, including the Company Merger, have been duly and validly authorized by all

A-20

necessary real estate investment trust action on behalf of the Company. No other real estate investment trust proceedings on the part of the Company are necessary to authorize this Agreement or to consummate the transactions contemplated by this Agreement, including the Company Merger, other than (i) the affirmative approval of the Company Merger by at least a majority of all the votes entitled to be cast on the matter by the holders of all outstanding Company Common Shares (the "Company Shareholder Approval"), and (ii) the execution, filing with, and the acceptance for record by, the SDAT of the Articles of Merger as required by the MRL. This Agreement has been duly and validly executed and delivered by the Company and, assuming the due authorization, execution and delivery by each of the Buyer Parties, constitutes a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer and similar Laws of general applicability relating to or affecting creditors' rights or by general equity principles.

(b) The Operating Partnership (through the Company as its general partner) has all necessary partnership power and authority to execute and deliver this Agreement, to perform its obligations hereunder and to consummate the transactions contemplated by this Agreement to which the Operating Partnership is a party, including the Partnership Merger. The execution, delivery and performance by the Operating Partnership of this Agreement and the consummation by the Operating Partnership of the transactions contemplated by this Agreement, including the Partnership Merger, have been duly and validly authorized by all necessary partnership action on behalf of the Operating Partnership, including by all necessary action of the partners of the Operating Partnership, and no other partnership proceedings are necessary to authorize this Agreement or to consummate the transactions contemplated by this Agreement, including the Partnership Merger, other than the filing of the Partnership Merger Certificate as required by the DRULPA. Other than the approvals of the partners of the Operating Partnership, which approval has been obtained, and the Company Shareholder Approval, no other vote or approval of the holders of any class or series of the capital stock, partnership interests or other equity interest of the Company or any of the Subsidiaries is necessary to approve the Company Merger, the Partnership Merger and the transactions contemplated by this Agreement. This Agreement has been duly and validly executed and delivered by the Operating Partnership (and by the Company on behalf of the Operating Partnership) and, assuming the due authorization, execution and delivery by each of the Buyer Parties, constitutes a legal, valid and binding obligation of the Operating Partnership, enforceable against it in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer and similar Laws of general applicability relating to or affecting creditors' rights or by general equity principles.

(c) The Company Parties have taken all action required to be taken by them in order to exempt this Agreement, the Company Merger and the Partnership Merger, and this Agreement, the Company Merger and the Partnership Merger are exempt, from the requirements of any "fair price," "moratorium," "control share acquisition," "affiliate transaction," "business combination" or other takeover Laws of the MRL, the Maryland General Corporation Law or the DRULPA.

SECTION 4.05  *No Conflict; Required Filings and Consents.*

(a) Except as set forth in Section 4.05(a) of the Disclosure Schedule and except as set forth in the Organizational Documents, Ground Leases, loan documents evidencing or securing Indebtedness, all of which have been made available to Parent, subject to the receipt of the Company Shareholder Approval, the execution and delivery of this Agreement by any of the Company Parties do not, and the performance of their respective obligations hereunder will not, (i) conflict with or violate (1) the Company Charter or the Company Bylaws, (2) the Operating Partnership Agreement or the certificate of limited partnership of the Operating Partnership or (3) the organizational documents of any Subsidiary or, to the knowledge of the Company, the organizational documents of any JV Entity, as amended or supplemented, (ii) assuming that all consents, approvals, authorizations and other actions described in subsection (b) of this Section 4.05 have been obtained and all filings and obligations described in subsection (b) of this Section 4.05 have been made, conflict with or violate any Law applicable to the Company, the Operating Partnership or any Subsidiary or, to the knowledge of the Company, any JV Entity, or by which any property or asset of the Company, the Operating Partnership or any Subsidiary or, to the knowledge of the Company, any JV Entity, is bound, or (iii) require

A-21

any consent or result in any violation or breach of or constitute (with or without notice or lapse of time or both) a default (or give to others any right of termination, amendment, acceleration or cancellation or any right to purchase or sell assets or equity) under, result in the loss of any material right or benefit under, or result in the triggering of any payments or result in the creation of a Lien or other encumbrance on any property or asset of the Company, the Operating Partnership or any Subsidiary or, to the knowledge of the Company, any JV Entity, pursuant to, any of the terms, conditions or provisions of any material Permit, Material Company Lease or Material Contract to which the Company or any Subsidiary is a party or by which it or any of its respective properties or assets may be bound, except, with respect to clauses (i)(3), (ii) and (iii), any matter, event or consequence described herein that would not, individually or in the aggregate, (A) prevent or materially delay consummation of the Mergers and the other transactions contemplated by this Agreement or (B) reasonably be expected to have a Company Material Adverse Effect.

(b) The execution and delivery by the Company Parties of this Agreement does not, and the performance of their respective obligations hereunder will not, require any consent, approval, order, authorization or permit of, or filing with or notification to, any Governmental Authority, except (i) for (A) applicable requirements, if any, of the Securities Act of 1933, as amended (the "Securities Act"), the Securities Exchange Act of 1934, as amended (the "Exchange Act"), state securities or "blue sky" laws ("Blue Sky Laws"), (B) the pre-merger notification requirements of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act"), (C) the filing with the Securities and Exchange Commission (the "SEC") of a proxy statement relating to the Company Merger to be sent to the Company's shareholders (as amended or supplemented from time to time, the "Proxy Statement") and other written communications that may be deemed "soliciting materials" under Rule 14a-12 promulgated under the Exchange Act, (D) any filings required under the rules and regulations of the New York Stock Exchange (the "NYSE"), (E) the filing of the Articles of Merger with, and the acceptance for record thereof by, the SDAT, and (F) the filing of the Partnership Merger Certificate with, and the acceptance for record thereof by, the DSOS, (G) such filings as may be required in connection with the payment of any transfer and gain taxes, and (H) filings required by federal, state or local Environmental Laws, or and (ii) where the failure to obtain such consents, approvals, authorizations or permits, or to make such filings or notifications, would not, individually or in the aggregate, (A) prevent or materially delay consummation of the Mergers and the other transactions contemplated by this Agreement or (B) reasonably be expected to have a Company Material Adverse Effect.

SECTION 4.06  *Permits; Compliance with Laws.*

(a) Except as set forth in Section 4.06(a) of the Disclosure Schedule, each of the Company, the Operating Partnership and the other Subsidiaries and, to the knowledge of the Company, the JV Entities, is in possession of all franchises, grants, authorizations, licenses, permits, consents, certificates, approvals and orders of any Governmental Authority necessary for it to own, lease and operate its properties or to carry on its business as it is now being conducted (collectively, the "Permits"), and all such Permits are valid and in full force and effect, except where the failure to possess the Permits, or the suspension or cancellation of, any of the Permits would not, individually or in the aggregate, be reasonably expected to have a Company Material Adverse Effect. No suspension or cancellation of any Permits is pending or, to the knowledge of the Company, threatened, and no such suspension or cancellation will result from the transactions contemplated by this Agreement, except, in each case, as would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect.

(b) Except as set forth in Section 4.06(b) of the Disclosure Schedule, none of the Company, the Operating Partnership, any other Subsidiary nor, to the knowledge of the Company, any JV Entity is in conflict with, or in default, breach or violation of, (i) any Laws applicable to the Company, the Operating Partnership, any other Subsidiary or, to the knowledge of the Company, any JV Entity, or by which any property or asset of the Company, the Operating Partnership, any other Subsidiary or, to the knowledge of the Company, any JV Entity is bound or (ii) any Permit, in each case except for any such conflicts, defaults, breaches or violations which would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect.

SECTION 4.07  *SEC Filings; Financial Statements; No Unknown Liabilities.*

(a) Each of the Company and the Operating Partnership has filed all forms, reports and documents (including all exhibits) required to be filed by it with the SEC since January 1, 2004 (the "Company SEC Reports"). The Company SEC Reports (other than preliminary material), each as amended prior to the date hereof, (i) have been prepared in all material respects in accordance with the requirements of the Securities Act or the Exchange Act, as the case may be, and the rules and regulations promulgated thereunder, and (ii) did not, when filed as amended prior to the date hereof, contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements made therein, in the light of the circumstances under which they were made, not misleading. The Company has made available to Parent copies of all material correspondence between the SEC, on the one hand, and the Company and any of its Subsidiaries on the other hand since January 1, 2004. Except as set forth in Section 4.07(a) of the Disclosure Schedule, no Subsidiary other than the Operating Partnership is or has been required to file any form, report or other document with the SEC or any securities exchange or quotation service.

(b) Each of the consolidated financial statements (including, in each case, any notes thereto) contained in or incorporated by reference into the Company SEC Reports was prepared in accordance with GAAP (except, in the case of unaudited statements, as permitted by the applicable rules and regulations of the SEC) applied on a consistent basis throughout the periods indicated (except as may be indicated in the notes thereto), complied in all material respects with applicable accounting requirements and the rules and regulations of the SEC and each fairly presented, in all material respects, the consolidated financial position, results of operations and cash flows of the Company and its consolidated Subsidiaries or the Operating Partnership and its consolidated subsidiaries, as the case may be, as of the respective dates thereof and for the respective periods indicated therein except as otherwise noted therein (subject, in the case of unaudited statements, to normal and recurring year end adjustments).

(c) Except (i) as set forth in Section 4.07(c) of the Disclosure Schedule, (ii) to the extent set forth on the consolidated balance sheet of the Company as of September 30, 2006 (including the notes thereto) included in the Company's Form 10-Q for the quarter ended September 30, 2006, (iii) liabilities incurred on behalf of the Company or any Subsidiary in connection with this Agreement, and (iv) liabilities incurred in the ordinary course of business consistent with past practice since September 30, 2006, none of the Company or its Subsidiaries had any liabilities or obligations of any nature (whether accrued, absolute, contingent or otherwise) required by GAAP to be set forth in a consolidated balance sheet of the Company or in the notes thereto, except for any such liabilities or obligations which would not, individually or in the aggregate, have a Company Material Adverse Effect.

SECTION 4.08  *Absence of Certain Changes or Events.*  Except as disclosed in the Company SEC Reports filed prior to the date hereof, since December 31, 2005 through the date hereof, (a) each of the Company, the Operating Partnership and the other Subsidiaries has conducted its business substantially in the ordinary course consistent with past practice, (b) there has not been an effect, event, development or circumstance that, individually or in the aggregate with all other effects, events, developments and changes, has resulted or would reasonably be expected to result in a Company Material Adverse Effect, (c) there has not been any declaration, setting aside for payment or payment of any dividend or other distribution (whether in cash, stock or property) with respect to any of the Company Preferred Shares, Company Common Shares or the Class A Units other than (i) regular quarterly cash dividends at a rate equal to $0.33 per Company Common Share, (ii) dividends paid to holders of the Company Preferred Shares in accordance with the terms of such securities, and (iii) distributions paid to holders of Class A Units in accordance with the terms of the Operating Partnership Agreement, and (d) there has not been any material change in any tax method or election by the Company or any Subsidiary.

SECTION 4.09  *Absence of Litigation.*  Except (i) as listed in Section 4.09 of the Disclosure Schedule or (ii) as set forth in the Company SEC Reports filed prior to the date of this Agreement, there is no Action pending (in which service of process has been received by an employee of the Company or any Subsidiary) or, to the knowledge of the Company, threatened in writing against the Company or any of its Subsidiaries or any

of its or their respective properties or assets or any director, officer or employee of the Company or any Subsidiaries or other Person, in each case, for whom the Company or any Subsidiaries may be liable, except as would not, individually or in the aggregate, (x) prevent or materially impair or delay the ability of any Company Party to perform its obligations under this Agreement, the consummation of the Mergers or any other transaction contemplated by this Agreement or (y) have a Company Material Adverse Effect. None of the Company and its Subsidiaries is subject to any order, judgment, writ, injunction or decree, except as would not, individually or in the aggregate, (x) prevent or materially impair or delay the ability of any Company Party to perform its obligations under this Agreement, the consummation of the Mergers or any other transaction contemplated by this Agreement or (y) have a Company Material Adverse Effect.

SECTION 4.10  *Employee Benefit Plans.*

(a) Section 4.10(a) of the Disclosure Schedule lists all employee benefit plans (as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA")) and material bonus, stock option, stock purchase, restricted stock, incentive, deferred compensation, retiree medical or life insurance, supplemental retirement, severance or other benefit plans, programs or arrangements, and all retention, bonus, employment, termination, severance or other contracts or agreements to which the Company or any "ERISA Affiliate" (as defined in Section 4.10(g)) is a party, with respect to which the Company or any ERISA Affiliate has any current or future obligation or which are maintained, contributed to or sponsored by the Company or any Subsidiary for the benefit of any current or former employee, officer, director or independent contractor of the Company or any ERISA Affiliate (all such plans, programs, arrangements, contracts or agreements, whether or not listed in Section 4.10(a) of the Disclosure Schedule, and without qualification for materiality as provided above, collectively, the "Plans"). The Company has made available to Parent copies of the following: (i) the Plans set forth on Section 4.10(a) of the Disclosure Schedule, (ii) the annual report (Form 5500), if any, filed with the Internal Revenue Service ("IRS") for the last three plan years, (iii) the most recently received IRS determination letter, if any, relating to a Plan set forth on Section 4.10(a) of the Disclosure Schedule, (iv) the most recently prepared actuarial report or financial statement, if any, relating to a Plan set forth on Section 4.10(a) of the Disclosure Schedule, (v) the most recent summary plan description, if any, for such Plan set forth on Section 4.10(a) of the Disclosure Schedule (or other descriptions of such Plan provided to employees) and all modifications thereto, and (vi) all material correspondence with the Department of Labor or the IRS.

(b) Each Plan has been established and operated in accordance with its terms and the requirements of all applicable Laws, including ERISA and the Code, except for such noncompliance that would not, individually or in the aggregate, have a Company Material Adverse Effect. Each Plan that is a "nonqualified deferred compensation plan" (as defined in Section 409A(d)(1) of the Code) has been operated since January 1, 2005 in good faith compliance with Section 409A of the Code and IRS Notice 2005-1. No Action is pending or, to the knowledge of the Company, threatened, with respect to any Plan (other than claims for benefits in the ordinary course) that would, individually or in the aggregate, have a Company Material Adverse Effect.

(c) Each Plan that is intended to be qualified under Section 401(a) of the Code or Section 401(k) of the Code has received a favorable determination letter from the IRS, or is entitled to rely on a favorable opinion issued by the IRS, and to the knowledge of the Company no fact or event has occurred since the date of such determination letter or letters from the IRS that would reasonably be expected to adversely affect the qualified status of any such Plan or the exempt status of any such trust.

(d) Except as set forth in Section 4.10(d)(i) of the Disclosure Schedule, neither the Company nor any ERISA Affiliate, sponsors, has sponsored or has any obligation with respect to any employee benefit plan that is subject to the provisions of Title IV of ERISA, is an employee stock ownership plan within the meaning of Section 4975(e)(7) of the Code, a voluntary employee beneficiary association or is a multiemployer plan within the meaning of Section 3(37) of ERISA. Except as set forth in Section 4.10(d)(ii) of the Disclosure Schedule, neither the Company nor any ERISA Affiliate sponsors, has sponsored or has any obligation with respect to any employee benefit plan that provides for any post-employment or post-retirement health or medical or life insurance benefits for retired, former or current employees of the Company or any ERISA Affiliate, except as required by Section 4980B of the Code.

(e) Full payment has been made, or otherwise properly accrued on the books and records of the Company and any ERISA Affiliate, of all amounts that the Company and any ERISA Affiliate are required under the terms of the Plans to have paid as contributions to such Plans on or prior to the date hereof (excluding any amounts not yet due) and the contribution requirements, on a prorated basis, for the current year have been made or otherwise properly accrued on the books and records of the Company through the Closing Date.

(f) Except as contemplated by Section 3.01(e), (f), (g) and (h), or as set forth in Section 4.10(f)(i) of the Disclosure Schedule, neither the execution and delivery of this Agreement nor the consummation of the Mergers and the transactions contemplated hereby will (either alone or in conjunction with any other event) result in, cause the vesting, exercisability or delivery of, or increase in the amount or value of, any payment, right or other benefit to any employee, officer, director or other service provider of the Company or any ERISA Affiliate. Except as set forth in Section 4.10(f)(ii) of the Disclosure Schedule, no Plan, either individually or collectively, provides for any payment by the Company or any ERISA Affiliate that would constitute a "parachute payment" within the meaning of Section 280G of the Code after giving effect to the transactions contemplated by this Agreement (either alone or in conjunction with any other event).

(g) For purposes of this Section 4.10, an entity is an "ERISA Affiliate" of the Company if it is considered a single employer with the Company under 4001(b) of ERISA or part of the same controlled group as the Company for purposes of Section 302(d)(8)(C) of ERISA.

SECTION 4.11 *Labor Matters*.

(a) Except as set forth in Section 4.11 of the Disclosure Schedule, neither the Company nor any Subsidiary is a party to any collective bargaining agreement or other labor union contract applicable to persons employed by the Company or any Subsidiary. Except as set forth in Section 4.11 of the Disclosure Schedule or as would not, individually or the aggregate, have a Company Material Adverse Effect, (i) neither the Company nor any Subsidiary has breached or otherwise failed to comply with any provision of any such agreement or contract, and there are no grievances outstanding against the Company or any Subsidiary under such agreement or contract, (ii) none of the employees of the Company or its Subsidiaries is represented by a union, (iii) to the knowledge of the Company no union organizing efforts have been conducted within the last three years or are now being conducted, and (iv) to the knowledge of the Company, there is no and has not been a, strike, slowdown, work stoppage or lockout by or with respect to any employees of the Company or any Subsidiary.

(b) Except as would not, individually or the aggregate, have a Company Material Adverse Effect, the Company and each of its Subsidiaries is in compliance with all applicable Laws relating to the employment of labor, including all applicable Laws relating to wages, hours, collective bargaining, employment discrimination, civil rights, safety and health, workers' compensation, pay equity and the collection and payment of withholding and/or social security taxes. Neither the Company nor any of its Subsidiaries has incurred any liability or obligation under the Worker Adjustment and Retraining Notification Act ("WARN") or any similar state or local Law within the last six months which remains unsatisfied.

SECTION 4.12 *Information Supplied.*  The information supplied by the Company Parties for inclusion or incorporation by reference in the Proxy Statement or any other document to be filed with the SEC or provided to holders of Class A Units in connection with the transactions contemplated by this Agreement (the "Other Filings") will not, in the case of the Proxy Statement, at the date it is first mailed to the Company's shareholders or at the time of the Company Shareholders' Meeting or at the time of any amendment or supplement thereof, or, in the case of any Other Filing at the date it is first mailed to the Company's shareholders or at the date it is first filed with the SEC, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading. No representation is made (or omitted to be made) by the Company Parties with respect to statements made or incorporated by reference therein based on information supplied by Buyer Parties in connection with the preparation of the Proxy Statement or the Other Filings for inclusion or incorporation by reference therein. All documents that the Company is responsible for filing with the SEC in connection with the Mergers, or the other transactions contemplated by this Agreement, will comply as to form and substance in all material respects with the applicable requirements