# EXHIBIT A

133

EXHIBIT E-9

(SPIEKER AGREEMENT)

BACKGROUND

In connection with the closing of the merger of Spieker Properties, L.P. ("Spieker Partnership") with the Partnership on July 2, 2001 pursuant to the Agreement and Plan of Merger, dated as of February 22, 2001, as amended, by and among the General Partner, the Partnership, Spieker Properties, Inc. ("Spieker") and Spieker Partnership (the "Merger Agreement") (the "Spieker Merger"), the Partnership is making certain undertakings to certain former limited partners of Spieker Partnership who became Limited Partners as a result of the Spieker Merger (the "Former Spieker Limited Partners"). The specific agreements between the Partnership and Spieker Partnership with respect to these various matters are described below.

SPECIFIC AGREEMENTS

1. Definitions. All capitalized terms used and not otherwise defined in this Exhibit E-9 shall have the meaning set forth in the Partnership Agreement. As used herein, the following terms have the following meanings:

Guaranteed Amount: Means, as to each Guarantee Partner, the amounts of the Guaranteed Debt guaranteed by such Guarantee Partner, as set forth on Schedule 4 to this Exhibit E-9.

Guaranteed Debt: Means the Qualifying Debt guaranteed by the Guarantee Partners.

Guarantee Opportunity: Shall have the meaning set forth in Paragraph 3(a).

Guarantee Partners: Means the Former Spieker Limited Partners whose names are set forth on Schedule 4 to this Exhibit E-9.

Guarantee Protection Period: Means the period commencing on the date of closing of the Spieker Merger and ending on the tenth (10th) anniversary thereof (or if the Guarantee Partner also is a Sale Restriction Partner, for the Protected Period for such Sale Restriction Partner, if longer).

Guaranty Agreement: With respect to guarantees in existence as of February 17, 2001, the term Guaranty Agreement means the agreement dated as of October 13, 1997, as amended to the date of the Spieker Merger, by and among, inter alia, Spieker, Spieker Partnership, and the Guarantee Partners. With respect to any guarantee entered into pursuant to Section 3(a) hereof, the term Guaranty Agreement refers to a "bottom guarantee" to be entered into by and among Equity Office, EOP Partnership, and the Guarantee Partners substantially in the form of the agreements attached as Schedule 8-1 and Schedule 8-2 to this Exhibit E-9.

Protected Units: Means only those Partnership Units issued to the Sale Restriction Partners in the Spieker Merger, or any Partnership Units thereafter issued by the Partnership to the Sale Restriction Partners in exchange for such Protected Units or solely with respect to such Protected Units. The term Protected Units shall not include any other Units hereafter acquired by a Sale Restriction Partner, whether from the Partnership or otherwise.

E-9 - 1

Protected Properties:  Means those Properties set forth on Schedule 2 to this Exhibit E-9 and any other properties or assets acquired by the Partnership received as "substituted basis property" as defined in Section 7701(a)(42) of the Code with respect to such Protected Properties.(1)

Protected Period:  Means with respect to each Sale Restriction Partner, the period ending on the tenth (10th) anniversary of the closing of the Spieker Merger, provided, however, that the Protected Period with respect to each Sale Restriction Partner who enters into a Restriction Agreement in the form of Schedule 3 to this Exhibit E-9 at or prior to the closing of the Spieker Merger shall be increased by one year for each one year of the term of the Restriction Agreement applicable to such Sale Restriction Partner that has elapsed, provided further that in the event that a Sale Restriction Partner violates the terms of the Restriction Agreement (1) during the first two years of the term of the Restriction Agreement, the Protected Period applicable to such Sale Restriction Partner shall not include any portion of the term of the Restriction Agreement, and (2) at any time after the expiration of the first two years of the term of the Restriction Agreement, no portion of the term of the Restriction Agreement following the date of such violation shall be taken into account in determining the Protected Period applicable to such Sale Restriction Partner.(2)

Qualifying Debt:  Means indebtedness of the Partnership that is described in (i), (ii) or (iii) below:

(i) In the case of indebtedness secured by any property or other asset of the Partnership and not recourse to all of the assets of the Partnership, it is the most senior indebtedness secured by that property or asset, and the property securing the indebtedness must have a fair market value, at the time that the Guarantee Opportunity is offered, at least equal to (a) 400% of the aggregate amount of the guarantees provided by Guarantee Partners hereunder, and (b) 133% of the aggregate amount of all indebtedness secured by such property.

(ii) In the case of indebtedness that is recourse to all of the assets of the Partnership, the indebtedness is at all times the most senior indebtedness of the Partnership (but there shall not be a prohibition against other indebtedness that is pari passu with such indebtedness) and the face amount of the indebtedness outstanding is at all times at least equal to 200% of the aggregate amount of the guarantees provided hereunder.

(iii) The indebtedness is guaranteed as of February 17, 2001, by the Guarantee Partners pursuant to the Guaranty Agreement.

In addition, at no time can there be guarantees with respect to the same indebtedness that are not provided by other Guarantee Partners pursuant hereto that are prior to or pari passu with the guarantees provided by the Guarantee Partners pursuant hereto (but there shall be no prohibition on guarantees of other portions of such indebtedness); provided, however, that such prohibition shall not apply with respect to any other guarantees of such debt that are in effect with respect to any of the Guaranteed Debt described in clause (iii) above at the time of the closing of the Spieker Merger.

Sale Restriction Partners:  Means those Former Spieker Limited Partners set forth on Schedule 1 to this Exhibit E-9, and any Person who holds Protected Units who acquires such Protected Units from a Sale Restriction Partner in a transaction in which gain or loss is not recognized in whole or in part for federal income tax purposes and in which such transferee's adjusted basis, as determined for federal income tax purposes, is determined by reference to the adjusted basis of the Sale Restriction Partner in such Protected Units.(3)

---------------

(1) A property shall be a Protected Property only if such property (i) was acquired by Spieker Partnership in connection with Spieker's IPO in a contribution in which part or all of the gain with respect thereto was deferred pursuant to Section 721 of the Code, or (ii) was acquired by Spieker Partnership as "substituted basis property" as defined in Section 7701(a)(42) of the Code with respect to a property described in clause (i).

(2) As of July 2, 2001 restriction agreements have been entered into by Warren E. Spieker, Jr., Dennis E. Singleton, John K. French, Bruce E. Hosford, Blake Family Trust, John G. Davenport, James C. Eddy, John A. Foster, Donald S. Jefferson, Vincent D. Mulroy, Richard L. Romney, Jill T. Schnugg, Peter H. Schnugg, John B. Souther, Jr., and Craig G. Vought.

(3) To be a Sale Restriction Partner, the Partner (i) cannot have redeemed any of its Spieker Partnership OP Units after February 17, 2001, and (ii) must have tendered all Spieker Options held on February 17, 2001 to Equity Office as contemplated by Section 5.8(c) of the Merger Agreement.

135

Spieker Properties:  Means those Properties owned by Spieker
Partnership at the time of the Spieker Merger, including, without
limitation, the Protected Properties.

2. Restrictions on Dispositions of Protected Properties.

(a) The Partnership agrees for the benefit of each Sale Restriction
Partner, for the term of the Protected Period applicable to such Sale
Restriction Partner, not to directly or indirectly sell, exchange, or
otherwise dispose of any Protected Property.

(b) Notwithstanding the restriction set forth in Paragraph 2(a), the
Partnership may dispose of a Protected Property if such disposition
qualifies as a like-kind exchange under Section 1031 of the Code, or an
involuntary conversion under Section 1033 of the Code, or other transaction
(including, but not limited to, a contribution of property to any entity
that qualifies for the nonrecognition of gain under Section 721 or Section
351 of the Code, or a merger or consolidation of the Partnership with or
into another entity that qualifies for taxation as a "partnership" for
federal income tax purposes (a "Successor Partnership")) that does not
result in the recognition of any taxable income or gain to a Sale
Restriction Partner with respect to Protected Units; provided, however,
that: (1) in the event of a disposition under Section 1031 or Section 1033
of the Code, any property that is acquired in exchange for or as a
replacement for a Protected Property shall thereafter be considered a
Protected Property for purposes of this Paragraph 2; (2) if the Protected
Property is transferred to another entity in a transaction in which gain or
loss is not recognized, the interest of the Partnership in such entity
shall thereafter be considered a Protected Property for Purposes of this
Paragraph 2, and if the acquiring entity's disposition of the Protected
Property would cause a Sale Restriction Partner to recognize gain or loss
as a result thereof, the transferred Protected Property still shall be
considered a Protected Property for purposes of this Paragraph 2 and the
transferee shall have agreed to be jointly and severally liable for any
payments required under Section 2(c) hereof; (3) in the event of a merger
or consolidation involving the Partnership and a Successor Partnership, the
Successor Partnership shall have agreed in writing for the benefit of the
Sale Restriction Partners that all of the restrictions of this Paragraph 2
shall apply with respect to the Protected Properties, and (4) after the end
of the ten (10) year period beginning on the closing date of the Spieker
Merger, the Partnership may dispose of a Protected Property in a
transaction that would have qualified as a like-kind exchange under Section
1031 of the Code or as another transaction that would not have resulted in
the recognition of any taxable income or gain to the Former Spieker Limited
Partner under the federal income tax law in effect on the closing date of
the Spieker Merger and prior to the date of such transaction, even if, as a
result of change in law after the closing date of the Spieker Merger, such
transaction results in the recognition of income or gain to the Former
Spieker Limited Partner at the time of such transaction.

(c) In the event that the Partnership breaches its obligation set
forth in Paragraph 2(a) with respect to a Sale Restriction Partner during
the Protected Period applicable to such Sale Restriction Partner, the Sale
Restriction Partner's sole right shall be to receive from the Partnership
as damages an amount equal to the aggregate federal, state and local income
taxes (computed taking into account any deduction allowed in computing
federal income taxes for state income taxes payable as a result thereof)
incurred by the Sale Restriction Partner as a result of the gain allocated
to such Sale Restriction Partner with respect to Protected Units by reason
of such disposition, plus an amount equal to the aggregate federal, state,
and local income taxes payable by the Sale Restricted Partner as a result
of the receipt of any payment required under this Section 2(c). In the
event that a Sale Restriction Partner shall acquire any additional
Partnership Units subsequent to the Spieker Merger by reason of a
contribution of additional money or property to the Partnership, the gain
that be taken into account for purposes of computing the damages payable
under this Paragraph 2(c) would not exceed the gain that such Sale
Restriction Partner would have recognized by reason of the Partnership's
breach of its obligation set forth in Paragraph 2(a) had such Sale
Restriction Partner not acquired such additional Partnership Units. In
addition, in no event shall the gain taken into account for purposes of
computing the damages payable under this Paragraph 2(c) exceed the amount
of gain that would have been recognized by the Sale Restriction Partner
with respect to the Protected Units if the Partnership had sold the
Protected Property in a fully taxable

E-9 - 3

transaction on the day following the closing of the Spieker Merger for a purchase price equal to the fair market value of such Protected Property at such time.

(d) Notwithstanding any provision of this Exhibit E-9, the sole and exclusive rights and remedies of any Sale Restriction Partner for a breach or violation of the covenants set forth in Paragraph 2(a), shall be a claim for damages against the Partnership, computed as set forth in Paragraph 2(c), and no Sale Restriction Partner shall be entitled to pursue a claim for specific performance of the covenant set forth in Paragraph 2(a) or bring a claim against any Person that acquires a Protected Property from the Partnership in violation of Paragraph 2(a) (other than a Successor Partnership that has agreed in writing to be bound by the terms of this Exhibit E-9 or that has otherwise succeeded to all of the assets and all of the liabilities of the Partnership, but then only for damages computed as set forth in Paragraph 2(c)). If the Partnership has breached or violated the covenant set forth in Paragraph 2(a) (or a Sale Restriction Partner asserts that the Partnership has breached or violated the covenant set forth in Paragraph 2(a)), the General Partner and the Sale Restriction Partner agree to negotiate in good faith to resolve any disagreements regarding any such breach or violation and the amount of damages, if any, payable to such Sale Restriction Partner under Paragraph 2(c). If any such disagreement cannot be resolved by the General Partner and such Sale Restriction Partner within sixty (60) days after such breach, the General Partner and the Sale Restriction Partner shall jointly retain a nationally recognized independent public accounting firm ("an Accounting Firm") to act as an arbitrator to resolve as expeditiously as possible all points of any such disagreement (including, without limitation, whether a breach of the covenant set forth Paragraph 2(a) has occurred and, if so, the amount of damages to which the Sale Restriction Partner is entitled as a result thereof, determined as set forth in Paragraph 2(c)). All determinations made by the Accounting Firm with respect to the resolution of any breach or violation of the covenant set forth in Paragraph 2(a) and the amount of damages payable to the Sale Restriction Partner under Paragraph 2(c) shall be final, conclusive and binding on the Partnership and the Sale Restriction Partner. The fees and expenses of any Accounting Firm incurred in connection with any such determination shall be shared equally by General Partner and the Sale Restriction Partner.

3. Election by Certain Former Spieker Limited Partners to Enter into Bottom Guarantees of Debt of EOP Partnership.

(a) During the Guarantee Protection Period, the Partnership shall make available to each Guarantee Partner the opportunity (a "Guarantee Opportunity") to make a "bottom guarantee" of Qualifying Debt of the Partnership in the form of the Guaranty Agreement and in an amount at least equal with respect to each Guarantee Partner to the amount set forth on Schedule 4 to this Exhibit E-9, determined taking into account all existing guarantees of such Guarantee Partner that are then in effect (treating as "bottom guarantees" for this purpose the guarantees that are in effect with respect to the indebtedness that is guaranteed as of February 17, 2001, by the Guarantee Partners pursuant to the Guaranty Agreement, as set forth on Schedule 4 to this Exhibit E-9). During the Guarantee Protection Period, if Guaranteed Debt is repaid and, immediately after such repayment, (i) the amount remaining outstanding with respect to such Guaranteed Debt would be less than the Guaranteed Amount with respect to such Guaranteed Debt or (ii) the Guaranteed Debt no longer would be treated as Qualifying Debt, the Partnership shall provide to each Guarantee Partner that had a Guaranteed Amount with respect to such Guaranteed Debt a new Guarantee Opportunity in an amount equal to such Partner's Guaranteed Amount with respect to the Guaranteed Debt being repaid or no longer qualifying as Qualifying Debt, provided that if the Guaranteed Debt is not being repaid in full, the new Guaranty Opportunity can be an offer to allow a guarantee of a portion of that remaining debt so long as the remaining portion of such debt, after taking into account the Guaranty Opportunities being offered with respect thereto, would be Qualifying Debt. In the event that the Partnership is required to offer a Guarantee Opportunity pursuant to this Paragraph 3(a), the Partnership will provide the Guarantee Partners notice of the type, amount and other relevant attributes of the Qualifying Debt with respect to which the Guarantee Opportunity is offered at least fifteen (15) business days, to the extent reasonably practicable, but in no event less than ten (10) business days prior to (a) the earlier of the closing of the incurrence of such debt and the scheduled repayment of the existing Guaranteed Debt and (b) any

E-9 - 4

137

subsequent date on which the Partnership makes additional Guarantee
Opportunities by reason of the repayment of any indebtedness then subject
to a Guarantee by the Guarantee Partners. In the event that the Partnership
repurchases outstanding Guaranteed Debt, whether or not such debt is
retired, the repurchase thereof shall be treated as a repayment of the
Guaranteed Debt for purposes of this Paragraph 3.

(b) The Partnership makes no representation or warranty to any
Guarantee Partner that any guarantee currently in effect or any "bottom
guarantee" entered into pursuant to Paragraph 3(a) shall be respected for
federal income tax purposes for purposes of causing the Guarantee Partner
to be considered to bear the "economic risk of loss" with respect to the
indebtedness thereby guaranteed by such Guarantee Partner for purposes of
either Section 752 or Section 465 of the Code.

(c) In the event that the Partnership breaches its obligation set
forth in Paragraph 3(a) with respect to a Guarantee Partner during the
Guarantee Protection Period applicable to such Guarantee Partner, the
Guarantee Partner's sole right shall be to receive from the Partnership as
damages an amount equal to the aggregate federal, state and local income
taxes (computed taking into account any deduction allowed in computing
federal income taxes for state income taxes payable as a result thereof)
incurred by the Guarantee Partner as a result of the gain recognized by
such Guarantee Partner by reason of such failure, plus an amount equal to
the aggregate federal, state, and local income taxes payable by the sale
restricted partner as a result of the receipt of payment required under
this Section 3(c). In no event shall the amount taken into account for
purposes of computing the damages payable under this Paragraph 3(c) exceed
the amount of gain that would have been recognized by the Guarantee Partner
if, at the closing of the Spieker Merger, such Guarantee Partner has
recognized an amount of gain equal to the "negative capital account" that
it had with respect to its interest in the Spieker Partnership at the time
of the Spieker Merger. The Partnership shall be considered to have
satisfied it obligations under Paragraph 3(a), and therefore shall have no
liability under this Paragraph 3(c), if it make an offer to a Guarantee
Partner of an opportunity to guarantee Qualifying Debt within the time
periods specified in Paragraph 3(a); the Partnership shall have no
liability if a Guarantee Partner fails to join in such guarantee of
Qualifying Debt.

(d) Notwithstanding any provision of this Exhibit E-9, the sole and
exclusive rights and remedies of any Guarantee Partner for a breach or
violation of the covenants set forth in Paragraph 3(a), shall be a claim
for damages against the Partnership, computed as set forth in Paragraph
3(c), and no Guarantee Partner shall be entitled to pursue a claim for
specific performance of the covenant set forth in Paragraph 3(a). If the
Partnership has breached or violated the covenant set forth in Paragraph
3(a) (or a Guarantee Partner asserts that the Partnership has breached or
violated the covenant set forth in Paragraph 3(a)), the General Partner and
the Guarantee Partner agree to negotiate in good faith to resolve any
disagreements regarding any such breach or violation and the amount of
damages, if any, payable to such Guarantee Partner under Paragraph 3(c). If
any such disagreement cannot be resolved by the General Partner and such
Guarantee Partner within sixty (60) days after such breach, the General
Partner and the Guarantee Partner shall jointly retain an Accounting Firm
to act as an arbitrator to resolve as expeditiously as possible all points
of any such disagreement (including, without limitation, whether a breach
of the covenant set forth Paragraph 3(a) has occurred and, if so, the
amount of damages to which the Sale Restriction Partner is entitled as a
result thereof, determined as set forth in Paragraph 3(c)). All
determinations made by the Accounting Firm with respect to the resolution
of any breach or violation of the covenant set forth in Paragraph 3(a) and
the amount of damages payable to the Guarantee Partner under Paragraph 3(c)
shall be final, conclusive and binding on the Partnership and the Guarantee
Partner. The fees and expenses of any Accounting Firm incurred in
connection with any such determination shall be shared equally by General
Partner and the Guarantee Partner.

(e) In addition to the other rights set forth in this Paragraph 3,
each Guarantee Partner shall have the right, but not the obligation, upon
fifteen (15) business days prior written notice to the Partnership, to
enter into an additional "bottom guarantee" of the Spieker Partnership
7.125% Notes due December 1, 2006 (the "2006 Notes"), in an amount up to
the Available Additional Debt specified for such Guarantee Partner on
Schedule 4 to this Exhibit 9. In the event that a Guarantee Partner shall
exercise

E-9 - 5

138

such right, the Guaranteed Amount of such Guarantee Partner shall be
increased by the amount of such additional guarantee, and the provisions of
Paragraphs 3(a), 3(b), 3(c), and 3(d) shall thereafter apply with respect
to such guarantee as though it were in effect at the closing of the Spieker
Merger. The rights of the Guarantee Partners pursuant hereto, if not
exercised, shall expire upon the earlier of the maturity or the prior
prepayment of the 2006 Notes, provided that the Partnership shall give the
Guarantee Partners thirty (30) days prior notice of the prepayment of the
2006 Notes.

4. No Obligation of the Partnership to Maintain Debt.  Notwithstanding any
obligations of the Partnership referred to in this Exhibit E-9, the Partnership
shall not be obligated to maintain any level of indebtedness in excess of the
amounts specifically required to meet the obligations set forth in Paragraph 3
above or otherwise specifically required to be maintained under the Spieker Tax
Protection Agreements assumed by the Partnership pursuant to the Merger
Agreement.

5. Section 704(c) Method.  Notwithstanding Paragraph 2.C. of Exhibit C, the
Partnership shall use the "traditional method" under Regulations Section
1.704-3(b) for purposes of making allocations under Section 704(c) of the Code
with respect to each Spieker Property to take into account the Book-Tax
Disparities as of the effective time of the Spieker Merger with respect to the
Spieker Properties, with no "curative allocations" to offset the effect of the
"ceiling rule," except to the extent that the Partnership expressly would be
required to use a different method under a Spieker Tax Protection Agreement
assumed by the Partnership pursuant to the Merger Agreement. The 704(c) Values
of the Spieker Properties shall be as determined by agreement between Spieker
Partnership and the Partnership prior to the effective time of the Spieker
Merger, or in the absence of such agreement, as determined by the General
Partner for purposes of preparing the financial statements of the Partnership
and the General Partner reflecting the results of the Spieker Merger so long as
the outside accountants of the General Partner and the Partnership have approved
such financial statements as being in accordance with generally accepted
accounting procedures.

6. Allocations of "Tier 3" Nonrecourse Liabilities Pursuant to Regulations
Section 1.752-3(a)(3).

(a) The Partnership shall use commercially reasonable efforts to
cooperate with the Former Spieker Limited Partners set forth on Schedule 5
to this Exhibit 9 to determine the method to be used for allocating "excess
nonrecourse liabilities" of the Partnership pursuant to Regulations Section
1.752-3(a)(3) following the Spieker Merger. The Partnership shall not use
with respect to such Former Spieker Limited Partners a method that is less
favorable than the method used by the Partnership with respect to the other
Limited Partners of the Partnership who are not parties to the express
agreements in effect on February 17, 2001, specifying a particular method
to be used for such purposes, which are set forth on Schedule 5 to this
Exhibit E-9. In addition, the Partnership shall not make available after
the date of the Spieker Merger, whether pursuant to an agreement entered
into after such date or otherwise, to any other Limited Partner a method of
allocating "excess nonrecourse liabilities" of the Partnership that is more
favorable than that made available to such Former Spieker Limited Partners
without making such method available to the Former Spieker Limited Partners
on a pro rata basis with such other Limited Partners (except as, and only
to the extent, required pursuant to an agreement in effect on February 17,
2001, identified on Schedule 5 to this Exhibit E-9). In the case of a
Former Spieker Limited Partner who, prior to the Spieker Merger, had been
specially allocated a portion of a Spieker Partnership nonrecourse
liability secured by a property with respect to which such Spieker Partner
has a built-in gain under Section 704(c) of the Code to take into account
such Former Spieker Limited Partner's share of such built-in gain that was
not taken into account in making the allocation of such liability by
Spieker Partnership under Regulations Section 1.752-3(a)(2), the
Partnership shall continue such method of allocating such liability
following the Spieker Merger.

(b) If the amount of debt allocated to a Former Spieker Limited
Partner under Section 1.752-3(a)(3) of the Code is reduced following the
Spieker Merger from the amount allocated to such Former Spieker Limited
Partner immediately before the Spieker Merger and such reduction could
reasonably be expected to cause the Former Spieker Limited Partner to
recognize gain by reason of a deemed distribution of cash to it in excess
of its adjusted basis in its Partnership Interest, the Partnership shall
consider in good faith a request from such Former Spieker Limited Partner
to become a Protected

E-9 - 6

139

Partner and/or to increase its Protected Amount, as applicable, from time to time after the Spieker Merger and/or to enter into a guarantee of Qualifying Debt on terms substantially similar to those set forth in the Guaranty Agreement if such Former Spieker Limited Partner shall provide information from its professional tax advisor satisfactory to the Partnership showing that, in the absence of such increased Protected Amount or guarantee, such Limited Partner likely would not be allocated from the Partnership sufficient indebtedness under Section 752 of the Code and the at-risk provisions under Section 465 of the Code to avoid the recognition of gain (other than gain required to be recognized by reason of actual cash distributions from the Partnership). The Partnership and its professional tax advisors shall cooperate in good faith with such Former Spieker Limited Partner and its professional tax advisor to provide such information regarding the allocation of the Partnership liabilities and the nature of such liabilities as is reasonably necessary in order to determine the Former Spieker Limited Partner's adjusted tax basis in its Partnership Interest and at-risk amount. In deciding whether or not to grant such a request, the Partnership shall be entitled to take into account all factors related to the Partnership, including, without limitation, the existing and anticipated debt structure of the Partnership, the tax situations of all other Partners, including the General Partner (individually and as a group), and the effect that granting such a request might have on their tax situation, and the anticipated long-term business needs of the Partnership. The Partnership's only obligation with respect to any such request from a Former Spieker Limited Partner pursuant to this Paragraph 6(b) shall be to act in good faith. In the event the Partnership fails to act in good faith with respect to any such request, the exclusive remedy of the Former Spieker Limited Partner who made such request shall be an action for specific performance, with no entitlement to monetary damages.

7. **Effect of Other Agreements With Former Spieker Limited Partners.** Pursuant to the Merger Agreement, the General Partner, the Partnership, Spieker, and Spieker Partnership entered into an Assignment and Assumption Agreement, dated as of July 2, 2001, pursuant to which the Partnership assumed certain obligations of Spieker Partnership made pursuant to certain tax protection agreements (the "Spieker Tax Protection Agreements") set forth on Schedule 6 to this Exhibit E-9.

8. **Election by Certain Former Spieker Limited Partners to Undertake Deficit Restoration Obligation.** Each Former Spieker Limited Partner who, prior to February 18, 2001, had entered into an agreement with Spieker Partnership to bear the economic risk of loss as to a portion of Spieker Partnership's recourse indebtedness by undertaking the obligation to restore a portion of its negative capital account balance upon liquidation of such Former Spieker Limited Partner's interest in Spieker Partnership was given the opportunity to become a Protected Partner with a Protected Amount in an amount equal to the maximum amount such Former Spieker Limited Partner was obligated to restore to Spieker Partnership on February 17, 2001; provided, however, that no Former Spieker Limited Partner has the right to increase its Protected Amount following the Spieker Merger. The Former Spieker Limited Partners who have elected to become Protected Partners under such provision of the Merger Agreement, along with their specified Protected Amounts as of the closing of the Spieker Merger, are set forth on Schedule 6 to this Exhibit E-9. Each such election by a Former Spieker Limited Partner shall become effective upon the later of receipt thereof by the General Partner or the "effective time" of the merger of Spieker Partnership into the Partnership. Upon becoming effective, each such election by a Former Spieker Limited Partner pursuant to this Section 8 or any other provision of this Exhibit E-9 shall be irrevocable, cannot be reduced, and shall be binding upon successive transferees of the Former Spieker Limited Partners, except as provided in Section 13.3.D of the Agreement.

E-9 - 7

SCHEDULE 1 TO EXHIBIT E-9

SALE RESTRICTION PARTNERS

Warren E. Spieker, Jr.
Dennis E. Singleton
John K. French
Bruce E. Hosford
Blake Family Trust
Gregg R. Daugherty
John G. Davenport
James C. Eddy
John A. Foster
Donald S. Jefferson
Vincent D. Mulroy
Richard L. Romney
Jill T. Schnugg
Peter H. Schnugg
John B. Souther, Jr.
Craig G. Vought
Joel Benoliel

E-9 - 8

141

PROTECTED PROPERTIES 1/

| TYPE | NAME | PROPERTY # |
|------|------|------------|
| O | Santa Clara Office Center I | 10001 |
| O | Stender Way II (3001 Stender Way) | 10011 |
| O | Santa Clara Office Center II | 10021/10022 |
| O | Gateway Office Phase I | 10031 |
| I | Scott Boulevard (3281-3285 Scott Blvd.) | 10041 |
| O | Santa Clara Office Center III | 10051 |
| I | Airport Commerce Center | 10071 |
| O | Gateway Office Phase II (IIA, IIB and IIC) | 10081, 10082, 10083 |
| I | Stender Way - 3045 | 10101 |
| I | 2727 Augustine (Applied Materials Inc.) | 10111 |
| O | 384 Santa Trinita (Sunnyvale Business Centre) | 10121 |
| O | The Alameda (1871) | 10131 |
| O | Creekside Phase I | 10141 |
| O | Creekside Phase II | 10142 |
| O | North First Street Office Center in San Jose | 10151 |
| I | Cupertino Business Center | 10161 |
| O | 455 University Avenue | 10181 |
| I | North American Van Lines | 10191 |
| O | 8880 Cal Center Drive | 10211 |
| I | 2685 Augustine (Applied Materials II) | 10241 |
| O | Denny's | 10251 |
| I | Aspect Telecommunications in San Jose | 10271 |
| O | Gateway Oaks II | 10281 |
| O | Gateway Oaks I | 10291 |
| I | Cadillac Court | 10301 |

---

(1/) Notwithstanding the contents of this Schedule 3 to Exhibit E-9, Protected Properties include only those properties that meet the definition of "Protected Properties" as set forth in Exhibit E-9 to the Partnership Agreement, which provides that a property shall be a Protected Property only if such property (i) was acquired by Spieker Partnership in connection with Spieker's IPO in a contribution in which part or all of the gain with respect thereto was deferred pursuant to Section 721 of the Code, or (ii) was acquired by Spieker Partnership as "substituted basis property" as defined in Section 7701(a)(42) of the Code with respect to a property described in clause (i).

| TYPE | NAME | PROPERTY # |
|------|------|-----------|
| O | 701 University Avenue | 10311 |
| O | The Orchard | 10341 |
| O | 575 University Avenue | 10361 |
| O | 601 University Avenue | 10362 |
| I | Patrick Henry Drive | 10421 |
| I | COG Warehouse | 10431 |
| I | Okidata Distribution Center | 10451 |
| I | Montague Industrial Center | 10571 |
| O | Redwood Shores | 10711 |
| O | Santa Monica Business Park (aka) The American Golf Building | 12375 |
| I | Fremont Bayside (Bayview Business Center) | 10371 |
| I | Huntwood Business Park | 10481 |
| I | Independent Road Warehouse | 10491 |
| I | Bay Center II Business Park | 10511 |
| I | 3875 Bay Center Place (Keebler Warehouse) | 10521 |
| I | Dubuque Business Center | 10591 |
| I | 21001 Cabot Boulevard (21001-21005) | 10601 |
| I | Eden Landing Business Center | 10631 |
| I | 30750 Wiegman Road (Good Guys Distribution Center) | 10641 |
| I | Industrial Drive Warehouse | 10661 |
| O | 2180 Sand Hill Road | 10671 |
| O | Federal Way Office Building | 20021 |
| O | Bellevue Gateway I | 20041 |
| O | Bellevue Gateway II | 20051 |
| O | Station Oaks (aka Amerisuites/ Prime Hospitality) | 12692 |
| O | 10040 Main Street Building | 20061 |
| O | San Mateo BayCenter I | 11831 |
| O | Pacific View Plaza | 11351 |
| I | Ravendale @ Central | 11361 |
| O | Pasadena Financial Center | 11571 |
| O | Point West Corporate Centre | 11621 |
| I | Huntwood Business Center | 11761 |
| O | Century Square | 11581 |
| O | San Mateo BayCenter II | 12121 |
| O | San Mateo BayCenter III | 12531 |
| O | Ontario Gateway II | 12551 |
| I | Hayward Business Park | 12381 |

| TYPE | NAME | PROPERTY # |
|------|------|-----------|
| O | Governor Executive Centre | 12591 |
| O | Lincoln Executive Center A | 20394 |
| O | Lincoln Executive Center B | 20395 |
| O | Lincoln Executive Center I | 20391 |
| O | Lincoln Executive Center II | 20392 |
| O | Lincoln Executive Center III | 20393 |
| O | Tower Seventeen | 11791 |
| O | Benjamin Franklin Plaza | 30301 |
| O | Eastgate Office Park | 20381 |
| O | Empire Corporate Center | 12611 |
| O | Santa Monica Gateway | 12661 |
| O | Plaza East (Quadrant Plaza) | 20401 |
| O | Station Oaks (Homestead) | 12691 |
| O | Bellevue I (I-90) | 20411 |
| O | Bellevue II (I-90) | 20412 |
| O | Drake's Landing Office Park | 12701 |
| O | Lincoln Center One | 30321 |
| O | Lincoln Center Two | 30322 |
| O | Lincoln Center Three | 30323 |
| O | Lincoln Center Five | 30325 |
| O | Lincoln Building | 30326 |
| O | Lincoln Plaza | 30327 |
| O | Lincoln Tower | 30324 |
| O | The Tower (The Tower at Westwood) | 12721 |
| O | N.E. 8th Street Tower (Griffin Site) | 20431 |
| O | Emeryville Tower IV (aka Watergate Tower IV) | 11479 |

SCHEDULE 3 TO EXHIBIT E-9

FORM OF RESTRICTION AGREEMENT

[Individual's Name] Restriction Agreement

, 2001

Equity Office Properties Trust
EOP Limited Partnership
Two North Riverside Plaza
Suite 2100
Chicago, Illinois 60606

Ladies and Gentlemen:

The undersigned understands that Equity Office Properties Trust, a Maryland real estate investment trust ("EQUITY OFFICE"), EOP Limited Partnership, a Delaware limited partnership ("EOP PARTNERSHIP"), Spieker, Inc., a Maryland corporation ("SPIEKER"), and Spieker, L.P., a California limited partnership ("SPIEKER PARTNERSHIP"), have entered into an Agreement and Plan of Merger, dated as of February 22, 2001 (the "MERGER AGREEMENT"), pursuant to which (i) Spieker Partnership will be merged with and into EOP Partnership or with a subsidiary of EOP Partnership (the "PARTNERSHIP MERGER") and (ii) Spieker will be merged with and into Equity Office (the "MERGER" and, together with the Partnership Merger, the "MERGERS").

The Merger Agreement contemplates that, in connection with the closing of the Partnership Merger, EOP Partnership will make certain undertakings related to federal income tax matters to certain limited partners of Spieker Partnership, including the undersigned, who contributed assets to Spieker Partnership in connection with its formation in 1993 and will become EOP Limited Partners as a result of the Partnership Merger. The specific undertakings and agreements with respect to these matters will be set forth on Exhibit E-9 to the EOP Partnership Agreement pursuant to the [          ] Amendment to the EOP Partnership Agreement, which will be effective as of the Effective Time.

Under the terms of Exhibit E-9, the term during which certain of these "tax protection" undertakings by EOP Partnership will apply can be extended from ten years to up to twenty years for those Spieker limited partners who agree to and comply with the restrictions set forth in this Restriction Agreement. In order to obtain the benefit of the extended term of the "tax protection" undertakings of EOP Partnership available under Exhibit E-9, and for other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the undersigned hereby agrees as follows:

1. DEFINITIONS

All capitalized terms used but not defined herein shall have the meanings set forth in the Merger Agreement. As used in herein:

"DISPOSITION" shall include any sale (including a grant of any option, contract to sell and any sale of a contract to purchase), assignment, pledge, encumbrance, hypothecation, mortgage, exchange, or any swap agreement or other arrangement that transfers all or a portion of the economic consequences associated with the ownership (regardless of whether any of the transactions described above is to be settled by the delivery of Partnership Units, Shares, or such other securities, in cash or otherwise), provided that a pledge of Partnership Units or Shares to secure bona fide indebtedness that does not exceed sixty percent (60%) of the Value (as defined in the EOP Partnership Agreement) of the Partnership Units or Shares pledged to secure such indebtedness at the time such indebtedness is incurred shall not constitute a Disposition (but a disposition of the Partnership Units or Shares securing such indebtedness pursuant to a foreclosure or in lieu of foreclosure shall constitute a Disposition at the time of such foreclosure or delivery in lieu thereof). "DISPOSE" shall have the correlative meaning.

E-9 - 12

145

"EQUITY INTEREST" means the total number of Shares and Partnership Units in which the undersigned will acquire a beneficial interest at the Effective Time, computed assuming that the undersigned had not disposed of any Spieker OP Units or shares of Spieker Common Stock after February 17, 2001 and assuming that each share of Spieker Common Stock would be converted into 1.94462 Equity Office Common Shares (that is, that the undersigned would receive only Equity Office Common Shares (and no cash) in the Merger). The undersigned's Equity Interest is set forth on Schedule 1 hereto.

"EXTENDED RESTRICTION PERIOD" means the period commencing on the day following the second (2nd) anniversary of the Effective Time and ending on the tenth (10th) anniversary of the Effective Time.

"IMMEDIATE FAMILY" shall have the meaning assigned to such term in Article I of the EOP Partnership Agreement.

"INITIAL RESTRICTION PERIOD" means the period commencing on the date hereof and continuing to and including the second (2nd) anniversary of the Effective Time.

"PARTNERSHIP UNITS" means (a) the EOP "Partnership Units" (as such term is defined in Article I of the EOP Partnership Agreement) in which the undersigned will acquire a beneficial interest in connection with the Partnership Merger at the Effective Time and (b) any securities convertible into or exercisable or exchangeable for such Partnership Units in which the undersigned will acquire a beneficial interest in connection with the Partnership Merger at the Effective Time.

"PERMITTED DISPOSITION" means a Disposition to (i) a member of the Immediate Family of the undersigned, (ii) a charitable organization a contribution to which would be deductible pursuant to Section 170 of the Code, or (iii) any partnership or trust, the partners or beneficiaries, as applicable, of which are exclusively the undersigned or members of the Immediate Family of the undersigned and/or a charitable organization a contribution to which would be deductible pursuant to Section 170 of the Code, provided that any such transfer shall not involve a disposition for value; provided that the transferee in any such Disposition described in clause (i), clause (ii) or clause (iii), as applicable, agrees in writing to be bound by the restrictions set forth herein for the term hereof. Any Disposition by a permitted transferee shall be treated as a Disposition by undersigned for purposes of this agreement.

"REDEMPTION RIGHTS" means, as applicable, any Redemption Rights pursuant to Section 8.6 of the EOP Partnership Agreement.

"SHARES" means (a) the Equity Office "Shares" (as such term is defined in Article VI of the Equity Office Declaration of Trust) in which the undersigned would acquire a beneficial interest in connection with the Merger at the Effective Time, assuming that the undersigned were to receive only Equity Office Shares (and no cash) in the Merger and (b) any securities convertible into or exercisable or exchangeable for Shares in which the undersigned will acquire a beneficial interest in connection with the Merger at the Effective Time.

2. INITIAL RESTRICTION PERIOD

During the Initial Restriction Period, the undersigned shall not Dispose of Partnership Units and/or Shares if such Disposition, taken together with all prior Dispositions (excluding Permitted Dispositions) since February 17, 2000 of any Shares, Partnership Units, shares of Spieker Common Stock and/or Spieker OP Units, would result in a decrease in the undersigned's Equity Interest on the date hereof by thirty percent (30%) or more; provided that nothing herein shall prevent the undersigned from making a Permitted Disposition pursuant to which the transferee becomes subject to the terms and restrictions of this Restriction Agreement.

3. EXTENDED RESTRICTION PERIODS

During the Extended Restriction Period, the undersigned shall not Dispose of Partnership Units and/or Shares if such Disposition, taken together with all prior Dispositions (excluding Permitted Dispositions) since February 17, 2000 of any Shares, Partnership Units, shares of Spieker Common Stock and/or Spieker OP

E-9 - 13

146

Units, would result in a decrease in the undersigned's Equity Interest on the date hereof by an amount equal to or greater than the sum of (x) thirty five percent (35%) and (y) the product of (a) five percent (5%), multiplied by (b) number of full years of the Extended Restriction Period that have expired on the date of such Disposition; provided that nothing herein shall prevent the undersigned from making a Permitted Disposition pursuant to which the transferee becomes subject to the terms and restrictions of this Restriction Agreement.

### 4. REPRESENTATION AND ACKNOWLEDGEMENTS

The undersigned now has good and marketable title to the undersigned's units of limited partner interest in Spieker Partnership and shares of capital stock of Spieker, free and clear of all liens, encumbrances, and claims whatsoever. The undersigned acknowledges that (a) in the event of a breach of the restriction set forth in Section 2 hereof, the Protected Period for purposes of Section 2 of Exhibit E-9 to the EOP Partnership Agreement with respect to the undersigned will be limited to ten (10) years from the Effective Time and (b) in the event of a breach of the restrictions set forth in Section 3, the Protected Period for purposes of Section 2 of Exhibit E-9 to the EOP Partnership Agreement with respect to the undersigned will not include any period attributable to the year of the Extended Restriction Period in which the breach occurs or any year thereafter. The undersigned further understands that this Restriction Agreement is irrevocable and shall be binding upon the undersigned's heirs, legal representatives, successors, and assigns.

### 5. LIMITATION ON REMEDIES.

In entering into this agreement, the undersigned is doing so with the understanding the exclusive remedy of EOP Partnership and Equity Office in the event of a breach hereof will be to limit the Protected Period as set forth in Exhibit E-9, and that in no event shall either Equity Office or EOP Partnership have the right to seek specific performance of this agreement or to bring an action for damages hereunder.

### 6. MISCELLANEOUS

This agreement shall be governed by and construed in accordance with the laws of the State of Delaware. This agreement is irrevocable and will be binding on the undersigned and the respective successors, heirs, personal representatives, and assigns of the undersigned. The undersigned has carefully read this agreement and discussed its requirements, to the extent the undersigned believed necessary, with his counsel.

Very truly yours,

------------------------------------
[name]

Accepted:

EOP Operating Limited Partnership

By: Equity Office Properties Trust, its general partner

By: ---------------------------------------------------------

E-9 - 14

147

SCHEDULE 1

EQUITY INTEREST

(COMPUTED AS OF FEBRUARY 17, 2001)


Spieker Shares                                           ---------------

Spieker Partnership Units                                ---------------

Equity Office Shares                                     ---------------
(computed using an exchange ratio of 1.49586)

EOP Partnership Units                                    ---------------
(computed using an exchange ratio of 1.94462)

Equity Interest                                          ---------------


E-9 - 15

SCHEDULE 4 TO EXHIBIT E-9

FORMER SPIEKER LIMITED PARTNERS
WHO HAVE ENTERED INTO GUARANTEES

| GUARANTEE PARTNER | SPIEKER PARTNERSHIP 6.80% NOTES DUE 12/15/01 | SPIEKER PARTNERSHIP 6.95% NOTES DUE 12/15/02 | SPIEKER PARTNERSHIP 7.125% NOTES DUE 12/01/06 | TOTAL GUARANTEE AMOUNT | AVAILABLE ADDITIONAL DEBT(4) |
|---|---|---|---|---|---|
| Warren E. Spieker, Jr | $ 0 | $ 31,000,000 | $ 5,000,000 | $ 36,000,000 | $11,454,156 |
| Dennis E. Singleton | $ 0 | $ 13,000,000 | $ 1,000,000 | $ 14,000,000 | $ 3,233,146 |
| John K. French | $ 0 | $ 12,000,000 | $ 1,000,000 | $ 13,000,000 | $ 2,483,599 |
| Bruce E. Hosford | $ 0 | $ 12,500,000 | $ 500,000 | $ 13,000,000 | $ 2,207,584 |
| Blake Family Trust | $ 0 | $ 500,000 | $ 150,000 | $ 650,000 | $ 505,596 |
| Gregg R. Daugherty | $ 0 | $ 92,000 | $ 0 | $ 92,000 | $ 0 |
| John G. Davenport | $ 0 | $ 1,700,000 | $ 200,000 | $ 1,900,000 | $ 735,845 |
| James C. Eddy | $ 289,500 | $ 2,110,500 | $ 700,000 | $ 3,100,000 | $ 704,881 |
| John A. Foster | $ 0 | $ 1,000,000 | $ 150,000 | $ 1,150,000 | $ 693,300 |
| Donald S. Jefferson | $ 0 | $ 2,400,000 | $ 200,000 | $ 2,600,000 | $ 872,223 |
| Vincent D. Mulroy | $ 0 | $ 1,600,000 | $ 200,000 | $ 1,800,000 | $ 545,743 |
| Richard L. Romney | $ 0 | $ 1,600,000 | $ 150,000 | $ 1,750,000 | $ 586,521 |
| Jill T. Schnugg | $ 578,000 | $ 728,000 | $ 1,450,000 | $ 2,756,000 | $ 490,293 |
| Peter H. Schnugg | $ 578,000 | $ 728,000 | $ 1,450,000 | $ 2,756,000 | $ 490,292 |
| John B. Souther, Jr | $ 0 | $ 1,000,000 | $ 150,000 | $ 1,150,000 | $ 413,178 |
| Craig G. Vought | $ 130,000 | $ 370,000 | $ 200,000 | $ 700,000 | $ 506,109 |
| Joel Benoliel | $ 0 | $ 2,200,000 | $ 150,000 | $ 2,350,000 | $ 323,534 |
| Total | $ 1,575,500 | $ 84,528,500 | $ 12,650,000 | $ 98,754,000 | |
| Total Amount of the Notes | $50,000,000 | $110,000,000 | $100,000,000 | $260,000,000 | $26,246,000 |

---------------
(4) The Guarantee Partners will be entitled to additional guarantees in the aggregate amount of $31,096,000 (reduced by any additional guarantee amounts guaranteed by the Guarantee Partners prior to July 2, 2001) to be allocated among the Guarantee Partners in the manner specified by Spieker at or prior to the closing. In this regard, Warren E. Spieker, Jr., Dennis E. Singleton, James C. Eddy, John A. Foster, Jill T. Schnugg, Peter H. Schnugg and Craig G. Vought entered into additional guarantees with Spieker Partnership prior to the closing of the Spieker Merger in the aggregate amount of $4,850,000, which amount shall be applied against the $31,096,000 described above and the aggregate Available Additional Debt amount as of July 2, 2001, shall be $26,246,000.

E-9 - 16

149

SECTION 752 ALLOCATION AGREEMENTS BETWEEN EOP PARTNERSHIP AND EXISTING EOP
LIMITED PARTNERS AS OF THE CLOSING DATE OF THE SPIEKER MERGER

1. Tax Reporting Agreement, dated September 2, 1997, by and among Columbus American Properties LLC, Columbus Southeast Properties, Inc., Joseph C Canizaro-901 Limited Partnership, Joseph C Canizaro-400 Limited Partnership and EOP Partnership.

2. Exhibit E-6 (Cornerstone Agreement) to the Second Amended and Restated Agreement of Limited Partnership of EOP Partnership, effective as of June 19, 2000.

3. Oral understanding between Beacon Properties L.P. and EOP Partnership to allocate "Tier 3" Liabilities in accordance with the method now described in Treas. Reg. sec. 1.752-3(a)(3), as amended in October 2000.

E-9 - 17

150

SPIEKER TAX PROTECTION AGREEMENTS ASSUMED PURSUANT TO THE MERGER AGREEMENT(5)

1. Contribution Agreement dated as of November 19, 1999 by and among Spieker Properties, L.P., Spieker Properties, Inc. and Lincoln Larkspur Office One Associates, Ltd., Lincoln Larkspur Office Three Associates, Ltd. and Larkspur One OP, LLC, Larkspur Two OP, LLC and Larkspur Three OP, LLC.

2. Contribution Agreement dated as of January 7, 1998 among Spieker Properties, L.P., Spieker Properties, Inc. and the contributors identified on the signature page attached thereto in connection with certain properties managed by Transpacific Development Company.

3. Third Amended and Restated Limited Partnership Agreement of Brea Place Associates, L.P. dated as of June   , 1997, as amended.

4. Limited Partnership Agreement of Spieker Brea, L.P., a Delaware Limited Partnership dated as of April   , 1997.

5. Agreement of Limited Partnership of Freemont Bayside Associates, L.P. dated as of June 7, 1989, as amended.

6. Limited Liability Company Agreement of Spieker Griffin/W9 Associates, L.L.C., dated as of April 6, 1998, as amended.

---------------
(5) Must be the same as those listed on Schedule 2.18(j) to the Merger Agreement, excluding the Guaranty Agreement, dated October 13, 1997, which is governed only by the provisions of Paragraph 3 of Exhibit E-9 and, to the extent applicable, the agreements on this Schedule 6.

E-9 - 18

151

SCHEDULE 7 TO EXHIBIT E-9

FORMER SPIEKER LIMITED PARTNERS
WHO HAVE ELECTED TO BECOME PROTECTED PARTNERS
PURSUANT TO SECTION 8 OF EXHIBIT E-9

| NAME OF FORMER SPIEKER LIMITED PARTNER: | 2/22/01 RESTORATION AMOUNT: | 7/02/01 PROTECTED AMOUNT: |
|---|---|---|
| Preston Butcher............................................. | $10,850,000 | $10,850,000* |
| Daniel C. Ross............................................. | $   250,000 | $   250,000* |
| Paul Z. Rose............................................... | $   600,000 | $   600,000* |
| Denny McLarry 1998 Trust................................... | $   900,000 | $   900,000* |
| Otilia C. McLarry 1998 Trust............................... | $   900,000 | $   900,000* |
| Burch Boone............................................... | $   500,000 | $   500,000* |
| TOTAL..................................................... | $14,000,000 | $14,000,000* |

* Represents the maximum available protected amount.

E-9 - 19

SCHEDULE 8-1 TO EXHIBIT E-9

FORM OF GUARANTY AGREEMENT -- FOR UNSECURED INDEBTEDNESS -- BETWEEN GUARANTEE
PARTNERS, EQUITY OFFICE AND EOP PARTNERSHIP PURSUANT TO SECTION 3(a) OF EXHIBIT
E-9(6)

GUARANTY AGREEMENT

THIS GUARANTY AGREEMENT ("Agreement"), dated as of [date] is made and
entered into by and among EOP Operating Limited Partnership, a Delaware limited
partnership (the "Partnership"), Equity Office Properties Trust, a Maryland real
estate investment trust (the "General Partner"), and those certain undersigned
Persons identified on Schedule 1 attached hereto (as such Schedule 1 may be
amended, modified, supplemented or restated from time to time, the "EOP Limited
Partners").

WHEREAS, the General Partner is the general partner of the Partnership and
each of the EOP Limited Partners is a limited partner in the Partnership.

WHEREAS, the Partnership has issued certain unsecured notes (each of those
unsecured notes identified on Schedule 2 attached hereto and referred to herein
individually as a "Note" and collectively as the "Notes");

WHEREAS, it is in the best interests of each of the EOP Limited Partners
that the Partnership and the General Partner provide to the EOP Limited Partners
an opportunity to guaranty the payment and performance of a portion of the
Partnership's present and future indebtedness and obligations under the Notes;

NOW, THEREFORE, in consideration of the covenants and conditions set forth
herein, as well as other valuable consideration, the parties hereto hereby agree
as follows:

1. Capitalized Terms.  Capitalized terms used herein and not otherwise
defined herein shall have the same meanings as set forth in the partnership
agreement of the EOP Operating Limited Partnership, as such partnership
agreement may be amended, modified, supplemented or restated from time to time
(the "Partnership Agreement").

2. Partner Assumption of Indebtedness.

a. The EOP Limited Partners unconditionally guarantee to the
Partnership (and, as third party beneficiaries, the holders of the Notes)
the payment and performance of the Partnership's present and future
indebtedness and obligations under the Notes of at least an amount equal to
[TOTAL GUARANTY AMOUNT] (the "Total Guaranty Amount") (i.e., that the
aggregate principal amounts paid under the Notes by the Partnership will at
least equal the Total Guaranty Amount). In addition, the EOP Limited
Partners unconditionally indemnify the General Partner (and any other
partner of the Partnership that otherwise may have liability directly or
indirectly with respect thereof) from and against all liabilities in
respect of the Notes except to the extent such liability exceeds an amount
equal to the excess, if any, of (i) the Total Guaranty Amount over (ii)
payments of principal made by the Partnership on the Notes. The Partnership
and the General Partner shall sometimes hereinafter be referred to
collectively as the "Debtor". The amounts payable by each EOP Limited
Partner in respect of the guarantee and indemnification obligations
hereunder shall be in the same proportion as the amounts listed next to
such EOP Limited Partner's name on Schedule 3 attached hereto bears to the
Total Guaranty Amount provided that, notwithstanding anything to the
contrary contained in this Paragraph 2, each EOP Limited Partner's
obligation shall be limited to the amount(s) set forth on Schedule 3 next
to such EOP Limited Partner's name (with respect to each EOP Limited
Partner, a "EOP Limited Partner's Share") and shall be limited to
guaranteeing the payment and performance of, and indemnifying the General
Partner with respect to, only the Notes set forth on Schedule 3. For the
purposes of this Paragraph 2,

153

Notes that are repurchased by the Partnership but not retired shall not be treated as having been repaid except to the extent that, if the repurchased Notes were treated as having been repaid, the remaining outstanding balance of the Notes would be less than 200% of the Total Guaranty Amount with respect to such Notes.

b. Notwithstanding anything to the contrary contained in the Partnership Agreement or the Bylaws or Declaration of Trust of the General Partner, as each may be amended, modified, supplemented or restated from time to time, any decision by Debtor hereunder, including a decision to make a demand on the EOP Limited Partners under this Paragraph 2, shall require the majority vote of the independent directors of the General Partner. Each EOP Limited Partner authorizes Debtor at any time in its discretion to alter any of the terms of the Notes and to make such modifications to the Notes that have the effect of releasing Debtor from liability for all or any part of the Notes; provided, however, that the Partnership shall have complied with its obligations under Exhibit E-9 of the Partnership Agreement to offer the EOP Limited Partners the opportunity to guarantee other Qualifying Debt or shall have agreed to make the payments required under Exhibit E-9 of the Partnership Agreement. Debtor and the holders of the Notes or any other parties authorized pursuant to the documents executed in connection with such Notes, and under all modifications, renewals and extensions of those instruments (collectively, the "Loan Documents") to enforce collection thereof (collectively, the "Note Holders") may take any of the foregoing actions upon any terms and conditions as Debtor and the Note Holders may elect, without giving notice to any EOP Limited Partner or obtaining the consent of any EOP Limited Partner and without affecting the liability of any EOP Limited Partner under this Paragraph 2.

c. It is understood and agreed by each EOP Limited Partner that until an amount with respect to the principal amount of the Notes equal to the Total Guaranty Amount is fully paid and until each and every term, covenant and condition of this Paragraph 2 is fully performed, no EOP Limited Partner shall be released by any act or event which might, but for this provision of this Paragraph 2, be deemed a legal or equitable discharge of a surety, or by reason of any waiver, extension, modification, forbearance or delay or other act or omission of any Note Holder or the Partnership's failure to proceed promptly or otherwise as against the General Partner or Debtor's failure to proceed promptly or otherwise as against any EOP Limited Partner or any Note Holder's failure to proceed promptly or otherwise against Debtor, or by any reason of any action taken or omitted or circumstance which may or might vary the risk or affect the rights or remedies of any EOP Limited Partner as against Debtor or any Note Holder, or by reason of any further dealings between Debtor and any Note Holder, whether relating to the Notes or otherwise, and each EOP Limited Partner hereby expressly waives and surrenders any defense to its liability hereunder based upon any of the foregoing acts, omissions, things, agreements, waivers or any of them; it being the purpose and intent of this Paragraph 2 that the obligations of each EOP Limited Partner hereunder are absolute and unconditional under any and all circumstances. Each EOP Limited Partner's obligations under this Paragraph 2 are independent of those of Debtor. Debtor's rights under this Paragraph 2 will not be exhausted by any action by it until an amount equal to the Total Guaranty Amount has been fully paid and performed with respect to the Notes and the period of time has expired during which any payment made to the Note Holders by Debtor under the Notes or to Debtor by each EOP Limited Partner under this Paragraph 2 may be determined to be a Preferential Payment (as defined below) without such determination, in fact, being made. Each EOP Limited Partner further agrees that to the extent all or any part of any payment made to the Note Holders under the Notes or by a EOP Limited Partner under this Paragraph 2 is subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid by the recipient thereof or paid over to a trustee, receiver or any other entity, whether under any bankruptcy act or otherwise (any such payment is hereinafter referred to as a "Preferential Payment"), then this Paragraph 2 shall continue to be effective or shall be reinstated, as the case may be, and, to the extent of such payment or repayment, the obligations of the EOP Limited Partner shall be revived and continued in full force and effect as if said Preferential Payment had not been made. Each EOP Limited Partner waives: (a) all statutes of limitations as a defense to any action brought against any Limited Partner pursuant to this Paragraph 2, to the fullest extent permitted by law; (b) any defense based upon any legal disability of Debtor or any discharge or limitation of the liability of Debtor to the Note Holders, whether consensual or arising by operation or law

E-9 - 21

154

or any bankruptcy, reorganization, receivership, insolvency, or debtor-relief proceeding, or from any other cause; (c) presentment, demand, protest and notice of any kind, provided that the foregoing waiver shall not be construed to waive any demand or notice to the EOP Limited Partners expressly provided for in this Paragraph 2; and (d) any defense upon or arising out of any defense which Debtor may have to the payment or performance of any part of the Notes.

d. Notwithstanding any other provision of this Paragraph 2 to the contrary, each EOP Limited Partner hereby waives any claim or other rights which such EOP Limited Partner may now have or hereafter acquire against the General Partner, or each of them, or any other EOP Limited Partner, or any other Person (including, without limitation, any other partner in the Partnership), of all or any of the Notes that arise from the existence or performance of such EOP Limited Partner's obligations under this Paragraph 2, the Notes or any of the Loan Documents (all such claims and rights are referred to as the "EOP Limited Partner's Conditional Rights"), including, without limitation, any right of subrogation, reimbursement, exoneration, contribution, or indemnification, any right to participate in any claim or remedy of the Partnership or the Note Holders against the General Partner, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, by any payment made hereunder or otherwise, including, without limitation, the right to take or receive from Debtor, directly or indirectly, in cash or other property or by setoff or in any other manner, payment or security on account of such claim or other rights. If, notwithstanding the foregoing provisions, any amount shall be paid to any EOP Limited Partner on account of any such EOP Limited Partner's Conditional Rights and either (i) such amount is paid to such EOP Limited Partner at any time when the Notes shall not have been paid or performed in a principal amount equal to the Total Guaranty Amount, or (ii) regardless of when such amount is paid to such EOP Limited Partner, any payment made by Debtor to the Note Holders or by a EOP Limited Partner under this Paragraph 2 is at any time determined to be a Preferential Payment such that the total principal amount received by Note Holders, less the Preferential Payment, is less than the Total Guaranty Amount, then a portion of the amount paid to such EOP Limited Partner equal to the such EOP Limited Partner's proportionate share of the excess of the Total Guaranty Amount over the principal amount received by Note Holders (net of the Preferential Payment) shall be held in trust for the benefit of Debtor and the Note Holders, as their interests may appear, and shall forthwith be paid to the Partnership as a Capital Contribution to be credited and applied upon the Notes, whether matured or unmatured, in such order as Debtor, in its sole and absolute discretion, shall determine. To the extent that any of the provisions of this Paragraph 2 shall not be enforceable, each EOP Limited Partner agrees that until such time as the Notes have been paid and performed in a principal amount equal to the Total Guaranty Amount and the period of time has expired during which any payment made by Debtor to the Note Holders or by a EOP Limited Partner under this Paragraph 2 may be determined to be a Preferential Payment, the EOP Limited Partner's Conditional Rights to the extent not validly waived shall be subordinate to the Note Holder's right to payment and performance of the Notes up to the Total Guaranty Amount, and such EOP Limited Partner shall not enforce such EOP Limited Partner's Conditional Rights during such period. Each EOP Limited Partner assumes full responsibility for keeping fully informed of the financial condition of Debtor and all other circumstances affecting Debtor's ability to perform its obligations under the Loan Documents and agrees that neither Debtor nor the Note Holders will have any duty to report to any EOP Limited Partner any information which Debtor or the Note Holders receive about Debtor's financial condition or any circumstances being on Debtor's ability to perform.

e. Upon a default of the Partnership under the Loan Documents, the Note Holders may elect to compromise, or adjust any part of the Notes, or make any other accommodation with Debtor, or exercise any other remedy against Debtor. Except as expressly provided herein, no such action by the Note Holders will release or limit the liability of any EOP Limited Partner. In addition to all rights of setoff or lien against any moneys, securities or other property of any EOP Limited Partner given to the Partnership by law, the Partnership shall have a right of setoff against all distributions to which a EOP Limited Partner may be entitled from the Partnership, and every such right of setoff may be exercised without demand upon or notice to any EOP Limited Partner (except the notice expressly provided for above). No right of setoff shall be deemed to have been waived by any act or conduct on the part of the Partnership or

E-9 - 22

155

by any neglect to exercise such right of setoff, or by any delay in doing so; and every right of setoff shall continue in full force and effect until specifically waived or released by an instrument in writing executed by the Partnership or until a EOP Limited Partner has satisfied in full all of such EOP Limited Partner's obligations under this Paragraph 2. In the event that any EOP Limited Partner shall advance or become obligated to pay any sums toward the Notes, or in the event that for any reason whatsoever Debtor is now, or shall hereafter become, indebted to any EOP Limited Partner, each EOP Limited Partner agrees that the amount of such sums and such indebtedness and all interest thereon shall at all times be subordinate as to lien, time of payment and in all other respects to the prior repayment to Note Holders of a principal amount equal to the Total Guaranty Amount, and no EOP Limited Partner shall be entitled to enforce or receive payment thereof until a principal amount equal to the Total Guaranty Amount owing to the Note Holders has been paid in full and the period of time has expired during which any payment made by Debtor to the Note Holders or the EOP Limited Partners pursuant to this Paragraph 2 may be determined to be a Preferential Payment. Any payment made by any EOP Limited Partner under this Paragraph 2 shall be deemed to be a Capital Contribution by said EOP Limited Partner to the Partnership.

f. This Paragraph 2 shall be governed by Delaware law, and, except to the extent otherwise provided in this Paragraph 2, may be amended only by a written instrument executed by the EOP Limited Partners listed from time to time on Schedule 1 hereto and Debtor. Notwithstanding anything to the contrary provided herein, in no event shall any EOP Limited Partner be entitled to the issuance of any additional Partnership Units as a result of any contribution made by such EOP Limited Partner pursuant to this Paragraph 2, nor shall the Percentage Interests or Partnership Interests of the Partners be adjusted as a result thereof. Without limiting any other similar provision in this Agreement, the provisions of this Paragraph 2 shall bind and benefit the heirs' executors, administrators, legal representatives, successors and assigns of each EOP Limited Partner and Debtor.

g. Notwithstanding the foregoing, the obligations of the EOP Limited Partners to make any payments under this Paragraph 2 shall terminate as of the earliest date (the "Termination Date") that, as a result of a repayment, compromise or adjustment of a principal amount of the Notes, the total principal amount outstanding under the Notes is reduced by an amount equal to or greater than the Total Guaranty Amount, or if the Partnership incurs indebtedness senior to the Notes, provided that the obligations of the EOP Limited Partners hereunder shall continue after the Termination Date to the extent of any claims that are attributable fully and solely to an event or action that occurred before the Termination Date, and provided further that the Partnership shall offer the EOP Limited Partners a Guarantee Opportunity in replacement of the guarantee provided under this Guaranty Agreement to the extent required pursuant to Exhibit E-9 of the Partnership Agreement.

3. Non-Discrimination.  The Partnership and the General Partner agree to exercise all of their rights under Paragraph 2 above in a non-discriminatory manner with respect to the EOP Limited Partners and in a manner that is not disproportionate to any of the EOP Limited Partner's Shares of the Indebtedness, provided that the foregoing shall not impair or limit either the Partnership's or the General Partner's right to exercise all of their rights under Paragraph 2 above to the fullest extent permitted under this Agreement.

4. Notices.  All notices, offers or other communications required or permitted to be given pursuant to this Agreement shall be given in the manner and to the addresses set forth in the Partnership Agreement and shall be deemed at such time as is set forth in the Partnership Agreement.

5. Effect and Interpretation.  This Agreement shall be governed by and construed in conformity with the laws of the State of Delaware.

6. Counterparts.  This Agreement may be executed in counterparts, each of which shall be an original, but all of which shall constitute one and the same instrument.

7. Third Party Beneficiaries.  The Notes Holders shall be third party beneficiaries of this Agreement.

8. Entire Understanding; Etc.  This Agreement, together with the Partnership Agreement, constitutes the entire agreement and understanding among the parties hereto with respect to the matters set forth in this

E-9 - 23

156

Agreement, and supersedes all prior agreements, oral and written, among the parties hereto with respect to the subject matter hereof.

9. Amendments. Except to the extent expressly otherwise provided herein, this Agreement may not be amended except by a written instrument signed by the General Partner (and approved on behalf of the General Partner by at least a majority of its directors who are not Affiliates of any of the Limited Partners) and a Majority-In-Interest of the EOP Limited Partners.

10. Severability. If any provision of this Agreement, or the application of such provision to any person or circumstance, shall be held invalid by a court of competent jurisdiction, the remainder of this Agreement, or the application of such provision to persons or circumstances other than those to which it is held invalid by such court, shall not be affected thereby.

11. Pronouns and Headings. As used herein, all pronouns shall include the masculine, feminine and neuter, and all defined terms shall include the singular and plural thereof wherever the context and facts require such construction. The headings, titles and subtitles herein are inserted for convenience of reference only and are to be ignored in any construction of the provisions hereof. Any references in this Agreement to "including" shall be deemed to mean "including without limitation."

12. Assurances. Each of the EOP Limited Partners shall hereafter execute and deliver such further instruments and do such further acts and things as may be required or useful to carry out the intent and purpose of this Agreement and as are not inconsistent with the terms hereof.

13. Tax Consequences. Each EOP Limited Partner acknowledges that he or she has relied fully upon the advice of its own legal counsel and/or accountant in determining the tax consequences of this Agreement and the transactions contemplated hereby and not upon any representations or advice by the General Partner, the Partnership or any other partner in the Partnership.

14. Disputes. Notwithstanding anything to the contrary contained in this Agreement, all claims, disputes and controversies between or among any of the parties hereto (including, without limitation, any claims, disputes and controversies between the Partnership or the General Partner and any one or more of the EOP Limited Partners) arising out of or in connection with this Agreement or the subject matter hereof, relating to the validity, construction, performance, breach, enforcement or termination thereof, or otherwise, shall be resolved by binding arbitration pursuant to the applicable law of the State of Delaware, this Section 14 and, to the extent not inconsistent with this Section 14, the Expedited Procedures and Commercial Arbitration Rules of the American Arbitration Association (the "Arbitration Rules"). In the event of any direct conflict, the terms of this Agreement shall control over any conflicting provisions of Delaware law and the Arbitration Rules.

(a) Procedures. Any arbitration called for by this Section 14 shall be conducted in accordance with the following procedures:

(i) The Partnership, the General Partner or any EOP Limited Partner (the "Requesting Party") may demand arbitration pursuant to Section 14(a) at any time by giving written notice of such demand (the "Demand Notice") to any other EOP Limited Partner with respect to which a claim, dispute or controversy exists hereunder and (if the Requesting Party is not the Partnership or the General Partner) to the Partnership and the General Partner, which Demand Notice shall describe in reasonable detail the nature of the claim, dispute or controversy.

(ii) Within fifteen (15) days after the giving of a Demand Notice, the Requesting Party, on the one hand, and each of the other EOP Limited Partners and/or the Partnership and/or the General Partners against whom the claim has been made or with respect to which a dispute has arisen (collectively, the "Responding Party"), on the other hand, shall select and designate in writing to the other party one reputable, disinterested individual (a "Qualified Individual") willing to act as an arbitrator of the claim, dispute or controversy in question. Each of the Requesting Party and the Responding Party shall use its best efforts to select a present or former partner of a national accounting firm that is not then currently employed by such party as its respective Qualified

E-9 - 24

157

Individual. Within fifteen (15) days after the foregoing selections have been made, the arbitrators so selected shall jointly select a present or former partner of a national accounting firm that is not then currently employed by any of the parties as the third Qualified Individual willing to act as an arbitrator of the claim, dispute or controversy in question (the "Third Arbitrator"). In the event that the two arbitrators initially selected are unable to agree on the Third Arbitrator within the second fifteen (15) day period referred to above, then, on the application of either party, the American Arbitration Association shall promptly select and appoint a present or former partner of a national accounting firm that is not currently employed by any of the parties as the Qualified Individual to act as the Third Arbitrator in accordance with the terms of the Arbitration Rules. The three arbitrators selected pursuant to this subsection (a) shall constitute the arbitration panel for the arbitration in question.

(iii) The presentations of the EOP Limited Partners in the arbitration proceeding shall be commenced and completed within sixty (60) days after the selection of the arbitration panel pursuant to subsection (b) above, and the arbitration panel shall render its decision in writing within thirty (30) days after the completion of such presentations. Any decision concurred in by any two (2) of the arbitrators shall constitute the decision of the arbitration panel, and unanimity shall not be required. If a decision concurred in by at least two (2) of the arbitrators is not rendered within such thirty (30) day period, then each of the parties shall select a new Qualified Individual willing to act as an arbitrator and a new arbitration proceeding shall commence in accordance with this Section 13.

(iv) The arbitration panel shall have the discretion to include in its decision a direction that all or part of the attorneys' fees and costs of the prevailing party or parties and/or the costs of such arbitration be paid by any other party or parties. On the application of a party before or after the initial decision of the arbitration panel, and proof of its attorneys' fees and costs, the arbitration panel shall order the other party to make any payments directed pursuant to the preceding sentence.

(v) The Third Arbitrator shall have the right in its discretion to authorize the obtaining of discovery, including the taking of depositions of witnesses for the purpose of discovery.

(vi) At the request of any party, the arbitrators shall make and provide to the parties written findings of fact and conclusions of law.

(vii) Notwithstanding anything to the contrary provided herein, the arbitrators shall have no authority to award punitive damages.

(b) Binding Character.  Any decision rendered by the arbitration panel pursuant to this Section 14 shall be final and binding on the parties thereto, and judgment thereon may be entered by any state or federal court of competent jurisdiction sitting in the State of Delaware.

(c) Exclusivity.  Arbitration shall be the exclusive method available for resolution of claims, disputes and controversies described in this Section 13 and the Partnership, the General Partner and the EOP Limited Partners stipulate that the provisions hereof shall be a complete defense to any suit, action, or proceeding in any court or before any administrative or arbitration tribunal within respect to any such claim, controversy or dispute. The provisions of this Section 14 shall survive the dissolution of the Partnership. The General Partner and each EOP Limited Partner consents to the jurisdiction of any state or federal court of competent jurisdiction sitting in the State of Delaware to compel arbitration in accordance with the provisions of this Section 13.

(d) No Alteration of Agreement.  Nothing contained herein shall be deemed to give the arbitrators any authority, power or right to alter, change, amend, modify, add to, or subtract from any of the provisions of this Partnership Agreement.

E-9 - 25

158

    IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of
the date first written above.

                                    EOP Operating Limited Partnership,
                                    a Delaware limited partnership

                                    By: Equity Office Properties Trust,
                                      a Maryland real estate
                                      investment trust

                                    Its: General Partner

                                        By:
                                        -----------------------------------
                                        -----------------------------------
                                        Its:
                                        -----------------------------------
                                        [Title]

                        E-9 - 26

159

COUNTERPART EOP LIMITED PARTNER SIGNATURE PAGE
ATTACHED TO AND MADE A PART OF
THAT CERTAIN GUARANTY AGREEMENT
DATED AS OF

----------------------------------------
Print Name of EOP Limited Partner

----------------------------------------
Signature of EOP Limited Partner

E-9 - 27

160

SCHEDULE 1

List of EOP Limited Partners

E-9 - 28

161

SCHEDULE 2

List of Notes

E-9 – 29

SCHEDULE 3

List of EOP Limited Partners' Guaranteed Amounts

E-9 - 30

163

FORM OF GUARANTY AGREEMENT -- FOR SECURED NONRECOURSE INDEBTEDNESS -- BETWEEN
GUARANTEE PARTNERS, EQUITY OFFICE AND EOP PARTNERSHIP PURSUANT TO SECTION 3(a)
OF EXHIBIT E-9

GUARANTY AGREEMENT

THIS GUARANTY AGREEMENT ("Guarantee"), dated as of
2001, is made by those certain undersigned Persons identified on Schedule 1
attached hereto ("Guarantors"), in favor of [LENDER] ("Guaranteed Party").

WHEREAS, [BORROWER] ("Maker"), is indebted to the Guaranteed Party in the
sum of [LOAN], as evidenced by a certain Promissory Note dated [DATE] (the
"Note"), which is secured by a Mortgage (the "Mortgage") on certain property of
the Maker(the "Properties" and individually, a "Property").

WHEREAS, the Guarantors desire to guarantee collection of a portion of the
principal amount of the Note not in excess of [Guaranteed Amount] (the
"Guaranteed Amount").

NOW, THEREFORE, for good and valuable consideration, the receipt and
sufficiency of which is hereby acknowledged, and intending to be legally bound
hereby, Guarantors agree as follows:

1. Guarantee

A. The Guarantors hereby irrevocably and unconditionally guarantee the
collection by the Guaranteed Party of, and hereby agree to pay to the Guaranteed
Party upon demand (following (1) foreclosure of the Mortgage, exercise of the
powers of sale thereunder and/or acceptance by the Guaranteed Party of a deed to
a Property in lieu of foreclosures, and (2) the exhaustion of the exercise of
any and all remedies available to the Guaranteed Party against Maker, including,
without limitation, realizing upon the assets of Maker other than the
Properties), an amount equal to the excess, if any, of the Guaranteed Amount
over the Maker Proceeds (as hereinafter defined). The amounts payable by each
Guarantor in respect of the guarantee obligations hereunder shall be in the same
proportion as the amounts listed next to such Guarantor's name on Schedule 2
attached hereto bears to the Guaranteed Amount provided that, notwithstanding
anything to the contrary contained in this Agreement, each Guarantor's
obligation shall be limited to the amount(s) set forth on Schedule 2 next to
such Guarantor's name. The Guarantors' obligations as set forth in this
Paragraph 1.A. are hereinafter referred to as the "Guaranteed Obligations."

B. For the purposes of this Guarantee, the term "Maker Proceeds" shall mean
the aggregate of the Foreclosure Proceeds (as hereinafter defined) plus all
amounts collected from the Maker or realized from the sale of assets of the
Maker other than the Properties.

C. For the purposes of this Guarantee, the term "Foreclosure Proceeds"
shall have the applicable meaning set forth below with respect to a Property:

1. If at least one bona fide third party unrelated to the Guaranteed
Party (and including, without limitation, any of the Guarantors) bids for
such Property at a sale thereof, conducted upon foreclosure of the related
Mortgage or exercise of the power of sale thereunder, Foreclosure Proceeds
shall mean the highest amount bid for such Property by the party that
acquires title thereto (directly or through a nominee) at or pursuant to
such sale. For the purposes of determining such highest bid, amounts bid
for the Property by the Guaranteed Party shall be taken into account
notwithstanding the fact that such bids may constitute credit bids which
offset against the amount due to the Guaranteed Party under the Note.

2. If there is no such unrelated third-party at such sale of the
Property so that only bidder at such sale is the Guaranteed Party or its
designee, the Foreclosure Proceeds shall be deemed to be fair market value
(the "Fair Market Value") of the Property as of the date of the foreclosure
sale, as such Fair Market Value shall be mutually agreed upon by the
Guaranteed Party and the Guarantor or determined pursuant to subparagraph
1.D.

3. If the Guaranteed Party receives and accepts a deed to the Property
in lieu of foreclosure in partial satisfaction of Maker's obligations under
the Note, the Foreclosure Proceeds shall be deemed to

E-9 - 31

be the Fair Market Value of such Property as of the date of delivery of the deed-in-lieu of foreclosure, as such Fair Market Value shall be mutually agreed upon by the Guaranteed Party and the Guarantor or determined pursuant to subparagraph 1.D.

D. Fair Market Value of a Property shall be the price at which a willing seller not compelled to sell would sell such Property, and a willing buyer not compelled to buy would purchase the Property, free and clear of all mortgages but subject to all leases and reciprocal easement and operating agreements. If the Guaranteed Party and Guarantor are unable to agree upon the Fair Market Value of a Property in accordance with subparagraphs 1.C.2. or 3. above, as applicable, within twenty (20) days after the date of the foreclosure sale or the delivery of the deed-in-lieu of foreclosure, as applicable, relating to a Property, either party may have the Fair Market Value of a Property determined by appraisal by appointing an appraiser having the qualifications set forth below to determine the same and by notifying the other party of such appointment within twenty (20 days after the expiration of such twenty (20) day period. If the other party shall fail to notify the first party, within twenty (20) days after its receipt of notice of the appointment by the first party, of the appointment by the other party of an appraiser having the qualifications set forth below, the appraiser appointed by the first party shall alone make the determination of such Fair Market Value. Appraisers appointed by the parties shall be members of the Appraisal Institute (MAI) and shall have at least ten years' experience in the valuation of properties similar to the Property being valued in the greater metropolitan area in which such Property is located. If each party shall appoint an appraiser having the aforesaid qualifications and is such tow appraiser cannot, within thirty (30) days after the appointment of the second appraiser, agree upon the determination hereinabove required, then they shall select a third appraiser which third appraiser shall have the aforesaid qualifications, and if they fail so to do within forty (40) days after the appointment of the second appraiser they shall notify the parties hereto, and either party shall thereafter have the right, on notice to the other, to apply, for the appointment of a third appraiser to the chapter of the American Arbitration Association or its successor organization located in the metropolitan area in which the Property is located or to which the Property is proximate or if no such chapter is located in such metropolitan area, in the metropolitan area closest to the Property in which such a chapter is located. Each appraiser shall render its decision as to the Fair Market Value of the Property in question within thirty (30) days after the appointment of the third appraiser and shall furnish a copy thereof to the Guaranteed Party and Guarantor. The Fair Market Value of the Property shall then be calculated as the average of (i) the Fair Market Value determined by the third appraiser and (ii) whichever of the Fair Market Values determined by the first two appraisers is closer to the Fair Market Value determined by the third appraiser; provided, however, that if the Fair Market Value determined by the third appraiser is higher or lower than both Fair Market Values determined by the first two appraiser, such Fair Market Value determined by the third appraiser shall be disregarded and the Fair Market Value of the Property shall then be calculated as the average of the Fair Market Value determined by the first two appraisers. The Fair Market Value of a Property as so determined shall be binding and conclusive upon the Guaranteed Party and Guarantor. Each party shall bear the cost of its own appraiser and the cost of appointing, and the expenses of, the third appraiser shall be shared equally by the Guaranteed Party and Guarantor.

2. Waivers: Other Agreements.

The Guaranteed Party is hereby authorized, without notice to demand upon Guarantors, which notice or demand is expressly waived hereby, and without discharging or otherwise affecting the enforceability of the obligations of the Guarantors hereunder (which shall remain absolute and unconditional notwithstanding any such action or omission to act), from time to time to:

(i) waive or otherwise consent to noncompliance with any provision of the Note or Mortgage, or any part thereof, or any other instrument or agreement in respect of the Guaranteed Obligations now or hereafter executed by Maker or any other person and delivered to the Guaranteed Party, except that Maker shall not extend the time for payment of the Guaranteed Obligations by Maker;

(ii) accept partial payments on the Guaranteed Obligations by Maker;

165

(iii) receive, take and hold additional security or collateral for the payment of the Guaranteed Obligations or for the payment of this Guarantee, or for the payment of any other guarantees of the Guaranteed Obligations, and exchange, enforce, waive, substitute, liquidate, terminate, abandon, fail to perfect, subordinate, transfer, or otherwise alter or release any such additional security or collateral;

(iv) apply any and all such security or collateral and direct the order or manner of sale thereof as the Guaranteed Party may determine in its sole discretion;

(v) settle, release, compromise, collect or otherwise liquidate the Guaranteed Obligations or accept, substitute, release, exchange or otherwise alter, affect or impair any Mortgage or any other security or collateral for the Guaranteed Obligations or any other guarantee therefore, in any manner;

(vi) add, release or substitute any one or more other guarantors, makers or endorsers of the Guaranteed Obligations and otherwise deal with Maker or any other guarantor as the Guaranteed Party may elect in its sole discretion; and

(vii) apply any and all payments or recoveries from Maker, Guarantors or from any other guarantor of the Guaranteed Obligations, to such of the Guaranteed Obligations as the Guaranteed Party in its sole discretion may determine, whether such Guaranteed Obligations are secured or unsecured or guaranteed or not guaranteed by others.

3. Miscellaneous.

A. This Guarantee is irrevocable as to any and all of the Guaranteed Obligations until the earliest date (the "Termination Date") that, as a result of a repayment, compromise or adjustment of a principal amount of the Note, the total principal amount outstanding under the Note is reduced by an amount equal to or greater than the Total Guaranty Amount, or if the Borrower incurs indebtedness senior to, or pari passu with the Note, provided that the obligations of the Guarantors hereunder shall continue after the Termination Date to the extent of any claims that are attributable fully and solely to an event or action that occurred before the Termination Date, and provided further that the EOP Operating Limited Partnership shall offer the Borrower a Guarantee Opportunity, (as defined in Exhibit E-9 of the Partnership Agreement) in replacement of the guarantee provided under this Guaranty Agreement to the extent required pursuant to Exhibit E-9.

B. This Guarantee is binding on the Guarantors and their successors and assigns, and insures to the benefit of the Guaranteed Party.

C. No delay on the part of the Guaranteed Party in the exercise of any right or remedy shall operate as a waiver thereof, and no single or partial exercise or waiver by the Guaranteed Party of any right or remedy shall preclude any further exercise thereof, nor shall any modification or waiver of any of the provisions of this Guarantee be binding upon the Guaranteed Party, except as expressly set forth in a writing duly signed or delivered by the Guaranteed Party or on the Guaranteed Party's behalf by an authorized officer or agent of the Guaranteed Party. The Guaranteed Party's failure at any time or times hereafter to require strict performance by Maker, Guarantors or any other person of any of the provisions, warranties, terms and conditions contained in any security agreement, agreements, guarantee, instrument or document now or at any time or times hereafter executed by Maker or Guarantors or delivered to the Guaranteed Party shall not waive, affect or diminish any right of the Guaranteed Party at any time or times hereafter to demand strict performance thereof and such right shall not be deemed to have been waived by any act or knowledge of the Guaranteed Party, its agents, officers, or employees, unless such waiver is contained in an instrument in writing signed by an officer or agent of the Guaranteed Party and directed to Maker or Guarantors, or either of them (as the case may be) specifying such waiver. No waiver by the Guaranteed Party of any default shall operate as a waiver of any other default or the same default on a future occasion, and no action by the Guaranteed Party permitted hereunder shall in any way affect or impair the Guaranteed Party's rights or the obligations of Guarantors under this Guarantee.

D. This Guarantee shall be interpreted and the rights and liabilities of the parties hereto determined in accordance with the laws (other than the conflicts of law provisions) of the State of [New York].

E-9 - 33

E. This Guarantee contains all the terms and conditions of the agreement between the Guaranteed Party and Guarantors. The terms and provisions of this Guarantee may not be waived, altered, modified or amended except in writing duly executed by the party to be charged thereby.

F. Any notice shall be directed to the parties at the following addresses:

If to Guarantors:

If to the Guaranteed Party:

G. Capitalized terms used herein and not otherwise defined herein shall have the same meanings as set forth in the partnership agreement of the EOP Operating Limited Partnership, as such partnership agreement may be amended, modified, supplemented or restated from time to time (the "Partnership Agreement").

E-9 - 34

167

COUNTERPART GUARANTOR SIGNATURE PAGE
ATTACHED TO AND MADE A PART OF
THAT CERTAIN GUARANTY AGREEMENT
DATED AS OF

    IN WITNESS WHEREOF, the undersigned has duly executed this Guarantee as of the date first above written.

```
                              ----------------------------------------
                                    Print Name of Guarantor

                              ----------------------------------------
                                    Signature of Guarantor
```

E-9 - 35

ATTACHMENT A

(SERIES A PREFERRED UNITS)

In accordance with Sections 4.2.A and 4.2.D of the Partnership Agreement, set forth below are the terms and conditions of the Series A Preferred Units established and issued by the Partnership to the General Partner on December 19, 1997, in connection with the merger of Beacon Properties L.P. ("Beacon Partnership") with and into the Partnership (the "Beacon Partnership Merger"), in exchange for the then outstanding Series A Preferred Units of Beacon Partnership (all of which had been acquired by the General Partner as a result of the merger of Beacon Properties Corporation with and into the General Partner). All capitalized terms used in this Attachment and not otherwise defined shall have the meanings assigned in the Partnership Agreement.

A.    Designation and Number. A series of Partnership Units, designated as Series A Preferred Units, was established on December 19, 1997, on which date 8,000,0000 Series A Preferred Units were issued to the General Partner in the Beacon Partnership Merger.

B.    Rank. The Series A Preferred Units shall, with respect to distribution rights and rights upon liquidation, dissolution or winding up of the Partnership, rank (a) senior to the Class A Units, Class B Units and all Partnership Interests ranking junior to the Series A Preferred Units; (b) on a parity with the Series B Preferred Units, the Series C Preferred Units, the Series D Preferred Units, the Series E Preferred Units, the Series F Preferred Units and all Partnership Interests issued by the Partnership the terms of which specifically provide that such Partnership Interests rank on a parity with the Series A Preferred Units; and (c) junior to all Partnership Interests issued by the Partnership the terms of which specifically provide that such Partnership Interests rank senior to the Series A Preferred Units.

C.    Distributions.

(i)    Pursuant to Section 5.1 of the Partnership Agreement, holders of Series A Preferred Units shall be entitled to receive, out of Available Cash, cumulative preferential distributions of Available Cash at the rate of 8.98% of the $25.00 liquidation preference per annum (equivalent to a fixed annual amount of $2.245 per unit). Such distributions shall be cumulative from the last date on which any distributions were paid with respect to the Series A Preferred Units of Beacon Partnership for which the Series A Preferred Units were exchanged in connection with the Beacon Partnership Merger and shall be payable quarterly in arrears on or before March 15, June 15, September 15 and December 15 of each year or, if not a business day, the next succeeding business day (each a "Series A Preferred Unit

169

Distribution Payment Date"). Any distribution payable on the Series A Preferred Units for any partial distribution period shall be computed on the basis of a 360-day year consisting of twelve 30-day months.

     (ii)    No distributions on Series A Preferred Units shall be authorized or paid or set apart for payment at such time as the terms and provisions of any agreement of the Partnership, including any agreement relating to its indebtedness, prohibits such authorization, payment or setting apart for payment or provides that such authorization, payment or setting apart for payment would constitute a breach thereof, or a default thereunder, or if such authorization or payment shall be restricted or prohibited by law.

     (iii)    Notwithstanding the foregoing, distributions with respect to the Series A Preferred Units will accrue whether or not the terms and provisions set forth in Section C.(ii) of this Attachment A at any time prohibit the current payment of distributions, whether or not there is sufficient Available Cash for such distributions and whether or not such distributions are authorized. Accrued but unpaid distributions on the Series A Preferred Units will accumulate as of the Series A Preferred Unit Distribution Payment Date on which they first become payable.

     (iv)    When distributions are not paid in full (or a sum sufficient for such full payment is not so set apart) upon the Series A Preferred Units and any other Partnership Interests ranking on a parity as to distributions with the Series A Preferred Units, all distributions authorized upon the Series A Preferred Units and any other Partnership Interests ranking on a parity as to distributions with the Series A Preferred Units shall be authorized pro rata so that the amount of distributions authorized per Partnership Unit of Series A Preferred Units and such other Partnership Interests shall in all cases bear to each other the same ratio that accrued distributions per Partnership Unit on the Series A Preferred Units and such other Partnership Interests (which shall not include any accrual in respect of unpaid distributions for prior distribution periods if such other Partnership Interests do not have a cumulative distribution) bear to each other. No interest, or sum of money in lieu of interest, shall be payable in respect of any distribution payment or payments on Series A Preferred Units which may be in arrears.

     (v)    Except as provided in Section C.(iv) of this Attachment A, unless full cumulative distributions on the Series A Preferred Units have been or contemporaneously are authorized and paid or authorized and a sum sufficient for the payment thereof is set apart for payment for all past distribution periods and the then current distribution period, no distributions (other than in Partnership Interests ranking junior to the Series A Preferred Units as to distributions and upon liquidation) shall be authorized or paid or set aside for payment nor shall any other distribution be authorized or made upon the Class A Units, the Class B Units, or any other Partnership Interests ranking junior to or on a parity with the Series A Preferred Units as to distributions or upon liquidation, nor shall any Class A Units,

Attachment A-2

Class B Units, or any other Partnership Interests ranking junior to or on a parity with the Series A Preferred Units as to distributions or upon liquidation be redeemed, purchased or otherwise acquired for any consideration (or any moneys be paid to or made available for a sinking fund for the redemption of any such units or other Partnership Interests) by the Partnership (except by conversion into or exchange for Partnership Interests ranking junior to the Series A Preferred Units as to distributions and upon liquidation).

(vi)    Holders of the Series A Preferred Units shall not be entitled to any distribution, whether payable in cash, property or Partnership Units in excess of full cumulative distributions on the Series A Preferred Units as described above. Any distribution payment made on the Series A Preferred Units shall first be credited against the earliest accrued but unpaid distribution due with respect to such Series A Preferred Units which remains payable.

D.    Allocations.

Allocations of the Partnership's items of income, gain, loss and deduction shall be allocated among holders of Series A Preferred Units in accordance with Article VI of the Agreement.

E.    Liquidation Preference.

(i)    Upon any voluntary or involuntary liquidation, dissolution or winding up of the affairs of the Partnership, the holders of Series A Preferred Units then outstanding are entitled to be paid out of the assets of the Partnership available for distribution to the Partners pursuant to Section 13.2.A of the Agreement a liquidation preference of $25.00 per Series A Preferred Unit, plus an amount equal to any accrued and unpaid distributions to the date of payment, before any distribution of assets is made to holders of Class A Units, Class B Units or any other Partnership Interests that rank junior to the Series A Preferred Units as to liquidation rights.

(ii)    In the event that, upon any such voluntary or involuntary liquidation, dissolution or winding up, the available assets of the Partnership are insufficient to pay the amount of the liquidating distributions on all outstanding Series A Preferred Units and the corresponding amounts payable on all other Partnership Interests ranking on a parity with the Series A Preferred Units in the distribution of assets, then such assets shall be allocated among the Series A Preferred Units, as a class, and each class or series of such other such Partnership Interests, as a class, in proportion to the full liquidating distributions to which they would otherwise be respectively entitled.

(iii)    After payment of the full amount of the liquidating distributions to which they are entitled, the holders of Series A Preferred Units will have no right or claim to any of the remaining assets of the Partnership.

Attachment A-3

171

   (iv)  The consolidation or merger of the Partnership with or into any other partnership, corporation, trust or entity or of any other partnership, corporation, trust or other entity with or into the Partnership or the sale, lease or conveyance of all or substantially all of, the property or business of the Partnership, shall not be deemed to constitute a liquidation, dissolution or winding up of the Partnership for purposes of this Section E.

   F.   Redemption.

   In connection with a redemption by the General Partner of any or all of the Series A Preferred Shares of the General Partner, the Partnership shall provide cash to the General Partner for such purpose which shall be equal to redemption price of the Series A Preferred Shares to be redeemed and one Series A Preferred Unit shall be canceled with respect to each Series A Preferred Share so redeemed. From and after the date in which the Series A Preferred Shares are redeemed, any Series A Preferred Units so canceled shall no longer be outstanding and all rights hereunder, to distributions or otherwise, with respect to such Series A Preferred Units shall cease.

Attachment A-4

ATTACHMENT B

(SERIES B PREFERRED UNITS)

In accordance with Sections 4.2.A and 4.2.D of the Agreement, set forth below are the terms and conditions of the Series B Preferred Units established and issued by the Partnership on February 19, 1998, in connection with the issuance of Series B Preferred Shares by the General Partner. Capitalized terms used herein and not otherwise defined shall have the meanings given to them in the Agreement.

A.    Designation and Number. A series of Partnership Units, designated as Series B Preferred Units was established on February 19, 1998, on which date 6,000,000 Series B Preferred Units were issued to the General Partner.

B.    Rank. The Series B Preferred Units shall, with respect to distribution rights and rights upon voluntary or involuntary liquidation, dissolution or winding up of the affairs of the Partnership, rank (a) senior to the Class A Units, Class B Units and all Partnership Interests ranking junior to the Series B Preferred Units; (b) on a parity with the Series A Preferred Units, the Series C Preferred Units, the Series D Preferred Units, the Series E Preferred Units, the Series F Preferred Units, and all other Partnership Interests issued by the Partnership the terms of which specifically provide that such Partnership Interests rank on a parity with the Series B Preferred Units; and (c) junior to all Partnership Interests issued by the Partnership the terms of which specifically provide that such Partnership Interests rank senior to the Series B Preferred Units.

C.    Distributions.

(i)    Pursuant to Section 5.1 of the Agreement, holders of Series B Preferred Units shall be entitled to receive, out of Available Cash, cumulative preferential cash distributions at the rate of 5.25% of the $50.00 liquidation preference per annum (equivalent to a fixed annual amount of $2.625 per unit). Distributions (which term as used herein shall include liquidated damages, if any, payable pursuant to Section C.(vi) of this Attachment B) on the Series B Preferred Units shall be payable quarterly and be cumulative from the fifteenth day of each February, May, August and November or, if not a business day, the next succeeding business day (each, a "Series B Preferred Unit Distribution Payment Date"). Any distribution (including the initial distribution) payable on the Series B Preferred Units for any partial distribution period shall be prorated and computed on the basis of a 360-day year consisting of twelve 30-day months.

(ii)    No distribution on the Series B Preferred Units shall be authorized by the General Partner or paid or set apart for payment by the

173

Partnership at such time as the terms and provisions of any agreement of the Partnership, including any agreement relating to its indebtedness, prohibits such authorization, payment or setting apart for payment or provides that such authorization, payment or setting apart for payment would constitute a breach thereof, or a default thereunder, or if such authorization or payment shall be restricted or prohibited by law. No interest, or sum of money in lieu of interest, shall be payable in respect of any distribution payment or payments on the Series B Preferred Units which may be in arrears.

Notwithstanding the foregoing, distributions with respect to the Series B Preferred Units shall accumulate whether or not any of the foregoing restrictions exist, whether or not there is sufficient Available Cash for the payment thereof and whether or not such distributions are authorized. Accumulated but unpaid distributions on the Series B Preferred Units shall not bear interest and holders of the Series B Preferred Units shall not be entitled to any distributions in excess of full cumulative distributions. Any distribution payment made on the Series B Preferred Units shall first be credited against the earliest accumulated but unpaid distribution due with respect to such units which remains payable.

(iii)    Except as provided in Section C.(iv) of this Attachment B, if any Series B Preferred Units are outstanding, no distributions (other than in Partnership Interests ranking junior to the Series B Preferred Units as to distributions and upon liquidation, dissolution or winding up of the affairs of the Partnership) shall be declared or paid or set apart for payment nor shall any other distribution be declared or made upon the Class A Units, the Class B Units, or any other Partnership Interests ranking junior to or on a parity with the Series B Preferred Units as to distributions or upon liquidation, dissolution or winding up of the affairs of the Partnership for any period unless full cumulative distributions have been or contemporaneously are declared and paid or declared and a sum sufficient for the payment thereof set apart for such payment on the Series B Preferred Units for all past distribution periods and the then current distribution period, nor shall any Class A Units, Class B Units, or any other Partnership Interests ranking junior to or on a parity with the Series B Preferred Units as to distributions or upon liquidation, dissolution or winding up of the affairs of the Partnership, be redeemed, purchased or otherwise acquired for any consideration (or any moneys be paid to or made available for a sinking fund for the redemption of any such Partnership Interests) by the Partnership (except by conversion into or exchange for Partnership Interests ranking junior to the Series B Preferred Units as to distributions and upon liquidation, dissolution or winding up of the affairs of the Partnership).

(iv)    When distributions are not paid in full (or a sum sufficient for such full payment is not so set apart) upon the Series B Preferred Units and any other Partnership Interests ranking on a parity as to distributions with the Series B Preferred Units, all distributions declared upon the Series B Preferred Units and any other Partnership Interests ranking on a parity as to distributions with the Series B Preferred Units shall be declared pro rata so that the amount of

Attachment B-2

distributions declared per unit of Series B Preferred Units and such other Partnership Interests shall in all cases bear to each other the same ratio that accumulated distributions per unit on the Series B Preferred Units and such other Partnership Interests (which shall not include any accumulation in respect of unpaid distributions for prior distribution periods if such other Partnership Interests do not have a cumulative distribution) bear to each other.

(v)     Holders of Series B Preferred Units shall not be entitled to any distribution, whether payable in cash, property or Partnership Interests, in excess of full cumulative distributions on the Series B Preferred Units as described above. Accumulated but unpaid distributions on the Series B Preferred Units will accumulate as of the Series B Preferred Unit Distribution Payment Date on which they first become payable.

(vi)     If the General Partner fails to maintain the effectiveness of the registration statement as required by the Registration Rights Agreement dated February 19, 1998 between the General Partner and Lehman Brothers Inc. (the "Registration Rights Agreement"), liquidated damages shall accumulate on the $50.00 liquidation preference of the Series B Preferred Units at a rate of 0.25% per annum (equivalent to a fixed annual amount of $0.125 per unit) with respect to the first quarter immediately following such failure and at a rate of 0.50% per annum (equivalent to a fixed annual amount of $0.25 per unit) with respect to the second quarter and all subsequent quarters following such failure ("Liquidated Damages").

D.     Allocations.

Allocations of the Partnership's items of income, gain, loss and deduction shall be allocated among holders of Series B Preferred Units in accordance with Article VI of the Agreement.

E.     Liquidation Preference.

(i)     In the event of any voluntary or involuntary liquidation, dissolution or winding up of the affairs of the Partnership, the holders of the Series B Preferred Units shall be entitled to receive out of the assets of the Partnership available for distribution to the Partners pursuant to Section 13.2.A of the Agreement a liquidation preference of $50.00 per Series B Preferred Unit, plus an amount equal to any accumulated and unpaid distributions to the date of payment, before any distribution of assets is made to holders of Class A Units, Class B Units or any other Partnership Interests that rank junior to the Series B Preferred Units as to liquidation rights.

(ii)     If upon any such voluntary or involuntary liquidation, dissolution or winding up of the affairs of the Partnership, the assets of the Partnership are insufficient to make such full payment to holders of the Series B Preferred Units and the corresponding amounts payable on all other Partnership Interests ranking on a parity with the Series B Preferred Units in the distribution

Attachment B-3

175

of assets, then the holders of such Partnership Interests shall share ratably in any such distribution of assets in proportion to the full liquidating distributions to which they would otherwise be respectively entitled.

(iii)    After payment of the full amount of the liquidating distributions to which they are entitled, the holders of Series B Preferred Units shall have no right or claim to any of the remaining assets of the Partnership.

(iv)    None of a consolidation or merger of the Partnership with or into another entity, merger of another entity with or into the Partnership, a statutory unit exchange by the Partnership or a sale, lease or conveyance of all or substantially all of the Partnership's property or business shall be considered a liquidation, dissolution or winding up of the affairs of the Partnership.

F.    Redemption.

In connection with redemption by the General Partner of any of its Series B Preferred Shares in accordance with the provisions of the Articles Supplementary to the Declaration of Trust filed with the State Department of Assessments and Taxation of Maryland on February 19, 1998, establishing the Series B Preferred Shares (the "Articles Supplementary"), the Partnership shall provide cash to the General Partner for such purpose which shall be equal to the redemption price (as set forth in the Articles Supplementary) and one Series B Preferred Unit shall be canceled with respect to each Series B Preferred Share so redeemed by the General Partner. From and after the Series B Preferred Share Redemption Date (as defined in the Articles Supplementary), any Series B Preferred Units so canceled shall no longer be outstanding and all rights hereunder, to distributions or otherwise, with respect to such Series B Preferred Units shall cease.

G.    Conversion.

In connection with conversion into Shares of any Series B Preferred Shares in accordance with the provisions of the Articles Supplementary, the Partnership shall (i) issue to the General Partner a number of Class A Units equal to the number of Shares issued by the General Partner upon such conversion; and (ii) provide cash to the General Partner, if necessary, in an amount equal to the amount of cash paid by the General Partner upon conversion of any Series B Preferred Shares which would otherwise result in the issuance of fractional Shares. One Series B Preferred Unit, or any fraction thereof, shall be canceled with respect to each Series B Preferred Share, or any fraction thereof, so converted, and from and after such conversion, any Series B Preferred Units so canceled shall no longer be outstanding and all rights hereunder, to distributions or otherwise, with respect to such Series B Preferred Units shall cease.

Attachment B-4

176

ATTACHMENT C

(SERIES C PREFERRED UNITS)

In accordance with Sections 4.2.A and 4.2.D of the Agreement, set forth below are the terms and conditions of the Series C Preferred Units established and issued by the Partnership on December 14, 1998, in connection with issuance of Series C Preferred Shares by the General Partner. Capitalized terms used herein and not otherwise defined shall have the meanings given to them in the Agreement.

A.    Designation and Number. A series of Partnership Units, designated as Series C Preferred Units was established on December 14, 1998, on which date 4,600,000 Series C Preferred Units were issued to the General Partner.

B.    Rank. The Series C Preferred Units shall, with respect to distribution rights and rights upon liquidation, dissolution or winding up of the Partnership, rank (a) senior to the Class A, Units, Class B Units and all Partnership Interests ranking junior to the Series C Preferred Units; (b) on a parity with the Series A Preferred Units, the Series B Preferred Units, the Series D Preferred Units, the Series E Preferred Units, the Series F Preferred Units, and all other Partnership Interests issued by the Partnership the terms of which specifically provide that such Partnership Interests rank on a parity with the Series C Preferred Units; and (c) junior to all Partnership Interests issued by the Partnership the terms of which specifically provide that such Partnership Interests rank senior to the Series C Preferred Units.

C.    Distributions.

(i)    Pursuant to Section 5.1 of the Agreement, holders of Series C Preferred Units shall be entitled to receive, out of Available Cash, cumulative preferential distributions of Available Cash at the rate of 8 5/8% of the $25.00 liquidation preference per annum (equivalent to a fixed annual amount of $2.15625 per unit). Such distributions shall accumulate on a daily basis and be cumulative from the date of original issuance (December 8, 1998) and shall be payable quarterly in arrears on March 15, June 15, September 15 and December 15 of each year or, if not a business day, the next succeeding business day (each a "Series C Preferred Unit Distribution Payment Date"), commencing March 15, 1999. Any distribution payable on the Series C Preferred Units for any partial distribution period shall be computed on the basis of a 360-day year consisting of twelve 30-day months.

(ii)    No distributions on Series C Preferred Units shall be authorized or paid or set apart for payment at such time as the terms and provisions of any agreement of the Partnership, including any agreement relating to its indebtedness, prohibits such authorization, payment or setting apart for

payment or provides that such authorization, payment or setting apart for payment would constitute a breach thereof, or a default thereunder, or if such authorization or payment shall be restricted or prohibited by law.

(iii)    Notwithstanding the foregoing, distributions with respect to the Series C Preferred Units will accumulate whether or not the terms and provisions set forth in Section C.(ii) of this Attachment C at any time prohibit the current payment of distributions, whether or not there is sufficient Available Cash for such distributions and whether or not such distributions are authorized. Accumulated but unpaid distributions on the Series C Preferred Units will accumulate as of the Series C Preferred Unit Distribution Payment Date on which they first become payable.

(iv)    When distributions are not paid in full (or a sum sufficient for such full payment is not so set apart) upon the Series C Preferred Units and any other Partnership Interests ranking on a parity as to distributions with the Series C Preferred Units, all distributions authorized upon the Series C Preferred Units and any other Partnership Interests ranking on a parity as to distributions with the Series C Preferred Units shall be authorized pro rata so that the amount of distributions authorized per Partnership Unit of Series C Preferred Units and such other Partnership Interests shall in all cases bear to each other the same ratio that accumulated distributions per Partnership Unit on the Series C Preferred Units and such other Partnership Interests (which shall not include any accumulation in respect of unpaid distributions for prior distribution periods if such other Partnership Interests do not have a cumulative distribution) bear to each other. No interest, or sum of money in lieu of interest, shall be payable in respect of any distribution payment or payments on Series C Preferred Units which may be in arrears.

(v)    Except as provided in Section C.(iv) of this Attachment C, unless full cumulative distributions on the Series C Preferred Units have been or contemporaneously are authorized and paid or authorized and a sum sufficient for the payment thereof is set apart for payment for all past distribution periods and the then current distribution period, no distributions (other than in Partnership Interests ranking junior to the Series C Preferred Units as to distributions and upon liquidation) shall be authorized or paid or set aside for payment nor shall any other distribution be authorized or made upon the Class A Units, the Class B Units, or any other Partnership Interests ranking junior to or on a parity with the Series C Preferred Units as to distributions or upon liquidation, nor shall any Class A Units, Class B Units, or any other Partnership Interests ranking junior to or on a parity with the Series C Preferred Shares as to distributions or upon liquidation be redeemed, purchased or otherwise acquired for any consideration (or any moneys be paid to or made available for a sinking fund for the redemption of any such units or other Partnership Interests) by the Partnership (except by conversion into or exchange for Partnership Interests ranking junior to the Series C Preferred Units as to distributions and upon liquidation).

Attachment C-2

(vi)     Holders of the Series C Preferred Units shall not be entitled to any distribution, whether payable in cash, property or Partnership Units in excess of full cumulative distributions on the Series C Preferred Units as described above. Any distribution payment made on the Series C Preferred Units shall first be credited against the earliest accumulated but unpaid distribution due with respect to such Series C Preferred Units which remains payable.

D.     Allocations.

Allocations of the Partnership's items of income, gain, loss and deduction shall be allocated among holders of Series C Preferred Units in accordance with Article VI of the Agreement.

E.     Liquidation Preference.

(i)     Upon any voluntary or involuntary liquidation, dissolution or winding up of the affairs of the Partnership, the holders of Series C Preferred Units then outstanding are entitled to be paid out of the assets of the Partnership available for distribution to the Partners pursuant to Section 13.2.A of the Agreement a liquidation preference of $25.00 per Series C Preferred Unit, plus an amount equal to any accumulated and unpaid distributions to the date of payment, before any distribution of assets is made to holders of Class A Units, Class B Units or any other Partnership Interests that rank junior to the Series C Preferred Units as to liquidation rights.

(ii)     In the event that, upon any such voluntary or involuntary liquidation, dissolution or winding up, the available assets of the Partnership are insufficient to pay the amount of the liquidating distributions on all outstanding Series C Preferred Units and the corresponding amounts payable on all other Partnership Interests ranking on a parity with the Series C Preferred Units in the distribution of assets, then such assets shall be allocated among the Series C Preferred Units, as a class, and each class or series of such other such Partnership Interests, as a class, in proportion to the full liquidating distributions to which they would otherwise be respectively entitled.

(iii)     After payment of the full amount of the liquidating distributions to which they are entitled, the holders of Series C Preferred Units will have no right or claim to any of the remaining assets of the Partnership.

(iv)     The consolidation or merger of the Partnership with or into any other partnership, corporation, trust or entity or of any other partnership, corporation, trust or other entity with or into the Partnership or the sale, lease or conveyance of all or substantially all of, the property or business of the Partnership, shall not be deemed to constitute a liquidation, dissolution or winding up of the Partnership for purposes of this Section E.

Attachment C-3

179

F.      Redemption.

In connection with a redemption by the General Partner of any or all of the Series C Preferred Shares, the Partnership shall provide cash to the General Partner for such purpose which shall be equal to redemption price of the Series C Preferred Shares to be redeemed and one Series C Preferred Unit shall be canceled with respect to each Series C Preferred Share so redeemed. From and after the date in which the Series C Preferred Shares are redeemed, the Series C Preferred Units so canceled shall no longer be outstanding and all rights hereunder, to distributions or otherwise, with respect to such Series C Preferred Units shall cease.

Attachment C-4

ATTACHMENT D

(SERIES D PREFERRED UNITS)

In accordance with Sections 4.2.A and 4.2.D of the Agreement, set forth below are the terms and conditions of the Series D Preferred Units hereby established that will be issued by the Partnership to Spieker on July 2, 2001, in connection with the merger of Spieker Properties, L.P. ("Spieker Partnership") with and into the Partnership (the "Spieker Partnership Merger"), in exchange for the then outstanding Series B Preferred Interest of Spieker Partnership (all of which will be acquired by the General Partner in the merger of Spieker Properties, Inc. with and into General Partner (the "REIT Merger") immediately following the Spieker Partnership Merger). All capitalized terms used in this Attachment D and not otherwise defined shall have the meanings assigned in the Agreement.

A.      Designation and Number. A series of Partnership Units, designated as Series D Cumulative Redeemable Preferred Units (the "Series D Preferred Units"), is hereby established. The number of Series D Preferred Units shall be 4,250,000.

B.      Rank. The Series D Preferred Units shall, with respect to distribution rights and rights upon voluntary or involuntary liquidation, dissolution or winding up of the Partnership, rank (a) senior to the Class A Units, Class B Units and all Partnership Interests ranking junior to the Series D Preferred Units; (b) on a parity with the Series A Preferred Units, the Series B Preferred Units, the Series C Preferred Units, Series E Preferred Units, Series F Preferred Units, and all Partnership Interests issued by the Partnership the terms of which specifically provide that such Partnership Interests rank on a parity with the Series D Preferred Units (each referred to as "Parity Preferred Units"); and (c) junior to all Partnership Interests issued by the Partnership the terms of which specifically provide that such Partnership Interests rank senior to the Series D Preferred Units.

C.      Distributions.

(a)      Subject to the rights of series of Preferred Units which may from time to time come into existence, the holders of Series D Preferred Units shall be entitled to receive distributions, when, as and if required pursuant to the Agreement, of Available Cash, prior and in preference to any distribution with respect to Class A Units or Class B Units, at the rate of $2.3625 per Series D Preferred Unit per annum. Such distributions shall be cumulative from the last date on which any distributions were paid with respect to Series B Cumulative Redeemable Preferred Interest of Spieker Partnership for which Series D Preferred Units were exchanged in connection with the merger of Spieker Partnership with

and into the Partnership and shall be payable quarterly in arrears on the last day of March, June, September and December or, if not a business day, the next succeeding business day (each, a "Distribution Payment Date"). Any distribution payable on Series D Preferred Units for any partial distribution period will be computed on the basis of a 360-day year consisting of twelve 30-day months. Distributions will be payable to Series D Preferred Unitholders at the close of business on the Partnership Record Date, which shall be on such date designated by the General Partner for the payment of distributions (each, a "Distribution Record Date").

       (b)     Distributions on Series D Preferred Units will accrue whether or not the Partnership has Available Cash, whether or not there are funds legally available for the payment of such distributions and whether or not such distributions are declared. No interest, or sum of money in lieu of interest, shall be payable in respect of any distribution payment or payments on Series D Preferred Units which may be in arrears. Holders of the Series D Preferred Units will not be entitled to distributions in excess of the full cumulative distributions as described above.

       (c)     If any Series D Preferred Units are outstanding, no distributions shall be declared or paid or set apart for payment on any Partnership Unit, as to distributions, on a parity with or junior to Series D Preferred Units for any period unless full cumulative distributions have been or contemporaneously are paid or declared and a sum sufficient for the payment thereof set apart for such payments on Series D Preferred Units for all past distribution periods and the then current distribution period. When distributions are not paid in full (or a sum sufficient for such full payment is not set apart) upon the Series D Preferred Units and the Partnership Units ranking on parity as to distributions with Series D Preferred Units, all distributions declared upon Series D Preferred Units and any other series of Partnership Units having parity as to distributions with Series D Preferred Units shall be declared pro rata so that the amount of distributions declared per Series D Preferred Units and such other Partnership Units shall in all cases bear to each other the same ratio that accrued distributions per share on Series D Preferred Units and such other Partnership Units bear to each other.

       (d)     Except as provided in Section 3(c), unless full cumulative distributions on Series D Preferred Units have been or contemporaneously are declared and paid or declared and a sum sufficient for the payment thereof set apart for payment for all past distribution periods and the then current distribution period, no distributions (other than in Class A Units or other Partnership Units ranking junior to Series D Preferred Units as to distributions and amounts upon liquidation) shall be declared or paid or set aside for payment or other distribution shall be declared or made upon the Class A Units, Class B Units, Series A Preferred Units, Series B Preferred Units, Series C Preferred Units, Series E Preferred Units and Series F Preferred Units or any other Partnership Units ranking junior to or on a parity with Series D Preferred Units as to distributions or upon liquidation, nor shall any Class A Units, Class B Units, Series A Preferred Units, Series B Preferred

Attachment D-2

Units, Series C Preferred Units, Series E Preferred Units and Series F Preferred Units, or any other Partnership Units ranking junior to or on a parity with Series D Preferred Units as to distributions or amounts upon liquidation be redeemed by the Partnership (except by conversion into or exchange for other Partnership Units ranking junior to Series D Preferred Units as to distributions and amounts upon liquidation).

(e)    Any distribution payment made on Series D Preferred Units shall first be credited against the earliest accrued but unpaid distribution due with respect to Series D Preferred Units which remains payable.

D.    Allocations.

Allocations of the Partnership's items of income, gain, loss and deduction shall be allocated among the holders of Series D Preferred Units in accordance with Article VI of the Agreement.

E.    Liquidation Preference.

(a)    Subject to the rights of series of Preferred Units which may from time to time come into existence, upon any voluntary or involuntary liquidation, dissolution or winding up of the affairs of the Partnership, then, before any distribution or payment shall be made to the holders of any Class A Units, Class B Units, or any other class or series of Partnership ranking junior to Series D Preferred Units in the distribution of assets upon any liquidation, dissolution or winding up of the affairs of the Partnership, the holders of Series D Preferred Units shall be entitled to receive out of assets of the Partnership legally available for distribution to limited partners, liquidation distributions in the amount of the liquidation preference of $25.00 per share, plus an amount equal to all distributions accrued and unpaid thereon. After payment of the full amount of the liquidating distributions to which they are entitled, the holders of Series D Preferred Units will have no right or claim to any of the remaining assets of the Partnership. In the event that, upon any such voluntary or involuntary liquidation, dissolution or winding up of the affairs of the Partnership, the available assets of the Partnership are insufficient to pay the amount of the liquidation distributions on all outstanding Series D Preferred Units and the corresponding amounts payable on all Partnership Units ranking on a parity with Series D Preferred Units in the distribution of assets upon any liquidation, dissolution or winding up of the affairs of the Partnership ("Parity Units"), then the holders of Series D Preferred Units and Parity Units shall share ratably in any such distribution of assets in proportion to the full liquidating distributions to which they would otherwise be respectively entitled.

(b)    For the purposes hereof, neither a consolidation or merger of the Partnership with or into any other partnership, limited liability company, corporation or any other entity, nor a merger of any other partnership, limited liability company, corporation or any other entity with or into the Partnership, nor a

Attachment D-3

183

sale or transfer of all or any part of the Partnership assets for cash or securities shall be considered a liquidation, dissolution or winding up of the Partnership.

F.    Redemption

(a)    Series D Preferred Units are not redeemable prior to December 11, 2000. On and after December 11, 2000, the General Partner may redeem outstanding Series D Preferred Units, in whole or in part, at any time or from time to time, for cash at a redemption price of $25.00 per unit, plus an amount equal to all distributions accrued and unpaid thereon to the date fixed for redemption, without interest. The redemption price of Series D Preferred Units (other than the portion thereof consisting of accrued and unpaid distributions) is payable solely out of proceeds (without giving effect to any temporary use of such proceeds) from the contributions with respect to other Partnership Units, which may include Class A Units, Class B Units, Preferred Units, or other ownership interests in the Partnership however designated (other than debt securities converted into or exchangeable for Partnership Units), and any rights, warrants or options to purchase any thereof. If fewer than all of the outstanding Series D Preferred Units are to be redeemed, the number of units to be redeemed will be determined by the General Partner and such units may be redeemed pro rata from the holders of such units in proportion to the number of such units held by such holders (with adjustments to avoid redemption of fractional units) or by lot in a manner determined by the General Partner.

(b)    Unless full cumulative distributions on all Series D Preferred Units and Parity Units shall have been or contemporaneously are paid or declared and a sum sufficient for the payment thereof set apart for payment for all past distribution periods and the then current distribution period, no Series D Preferred Units or Parity Units shall be redeemed unless all outstanding Series D Preferred Units and Parity Units are simultaneously redeemed; provided, however, that the foregoing shall not prevent the purchase or acquisition of Series D Preferred Units or Parity Units pursuant to a purchase or exchange offer made on the same terms to holders of all outstanding Series D Preferred Units or Parity Units, as the case may be. Furthermore, unless full cumulative distributions on all outstanding Series D Preferred Units and Parity Units have been or contemporaneously are paid or declared and a sum sufficient for the payment thereof set apart for payment for all past distribution periods and the then current distribution period, the Partnership shall not purchase or otherwise acquire directly or indirectly any Series D Preferred Units or Parity Units (except by conversion into or exchange for Partnership Units ranking junior to Series D Preferred Units and Parity Units as to distributions and amounts upon liquidation).

(c)    The General Partner shall, in its sole discretion, determine the form and content of a notice of redemption. If notice of redemption of any Series D Preferred Units has been given and if the funds necessary for such redemption have been set aside by the Partnership in trust for the benefit of the holders of Series D Preferred Units so called for redemption, then from and after the redemption date,

Attachment D-4

distributions will cease to accrue on such Series D Preferred Units, such Series D Preferred Units shall no longer be deemed outstanding and all rights of the holders of such units will terminate, except the right to receive the redemption price.

(d)    The holders of Series D Preferred Units at the close of business on a Distribution Record Date will be entitled to receive the distribution payable with respect to such Series D Preferred Units on the corresponding Distribution Payment Date notwithstanding the redemption thereof between such Distribution Record Date and the corresponding Distribution Payment Date or the Partnership's default in the payment of the distribution due. Except as provided above, the Partnership will make no payment or allowance for unpaid distributions, whether or not in arrears, on Series D Preferred Units which have been called for redemption.

F.    Status of Redeemed Series D Preferred Units.

In the event any Series D Preferred Units shall be redeemed pursuant hereto, the units so redeemed shall revert to the status of authorized but unissued Preferred Units available for future issuance and reclassification by the General Partner.

G.    Value.

For purposes of the definition of Deemed Value of Partnership Interest, the Value on any date of the Series D Preferred Units shall be the Liquidation Preference of such Series D Preferred Unit.

H.    Voting Rights.

The holders of Series D Preferred Units shall have no voting rights whatsoever, except for any voting rights to which they may be entitled under the laws of the State of Delaware.

Attachment D-5

185

ATTACHMENT E

(SERIES E PREFERRED UNITS)

In accordance with Sections 4.2.A and 4.2.D of the Agreement, set forth below are the terms and conditions of the Series E Preferred Units hereby established that will be issued by the Partnership to Spieker on July 2, 2001, in connection with the merger of Spieker Properties, L.P. ("Spieker Partnership") with and into the Partnership (the "Spieker Partnership Merger"), in exchange for the then outstanding Series C Preferred Interest of Spieker Partnership (all of which will be acquired by the General Partner in the merger of Spieker Properties, Inc. with and into General Partner (the "REIT Merger") immediately following the Spieker Partnership Merger). All capitalized terms used in this Attachment E and not otherwise defined shall have the meanings assigned in the Agreement.

A.      Designation and Number. A series of Partnership Units, designated as Series E Cumulative Redeemable Preferred Units (the "Series E Preferred Units"), is hereby established. The number of Series E Preferred Units shall be 6,000,000.

B.      Rank. The Series E Preferred Units shall, with respect to distribution rights and rights upon voluntary or involuntary liquidation, dissolution or winding up of the Partnership, rank (a) senior to the Class A Units, Class B Units and all Partnership Interests ranking junior to the Series E Preferred Units; (b) on a parity with the Series A Preferred Units, the Series B Preferred Units, the Series C Preferred Units, Series D Preferred Units, Series F Preferred Units, and all Partnership Interests issued by the Partnership the terms of which specifically provide that such Partnership Interests rank on a parity with the Series E Preferred Units (each referred to as "Parity Preferred Units"); and (c) junior to all Partnership Interests issued by the Partnership the terms of which specifically provide that such Partnership Interests rank senior to the Series E Preferred Units:

C.      Distributions.

(a)      Subject to the rights of series of Preferred Units which may from time to time come into existence, the holders of Series E Preferred Units shall be entitled to receive distributions, when, as and if required pursuant to the Agreement, of Available Cash, prior and in preference to any distribution with respect to Class A Units or Class B Units, at the rate of $1.96875 per Series E Preferred Unit per annum. Such distributions shall be cumulative from the last date on which any distributions were paid with respect to Series C Cumulative Redeemable Preferred Interest of Spieker Partnership for which Series E Preferred Units were exchanged in connection with the merger of Spieker Partnership with

and into the Partnership and shall be payable quarterly in arrears on the last day of January, April, July and October or, if not a business day, the next succeeding business day (each, a "Distribution Payment Date"). Any distribution payable on Series E Preferred Units for any partial distribution period will be computed on the basis of a 360-day year consisting of twelve 30-day months. Distributions will be payable to Series E Preferred Unitholders at the close of business on the Partnership Record Date, which shall be on such date designated by the General Partner for the payment of distributions (each, a "Distribution Record Date").

(b)      Distributions on Series E Preferred Units will accrue whether or not the Partnership has Available Cash, whether or not there are funds legally available for the payment of such distributions and whether or not such distributions are declared. No interest, or sum of money in lieu of interest, shall be payable in respect of any distribution payment or payments on Series E Preferred Units which may be in arrears. Holders of the Series E Preferred Units will not be entitled to distributions in excess of the full cumulative distributions as described above.

(c)      If any Series E Preferred Units are outstanding, no distributions shall be declared or paid or set apart for payment on any Partnership Unit, as to distributions, on a parity with or junior to Series E Preferred Units for any period unless full cumulative distributions have been or contemporaneously are paid or declared and a sum sufficient for the payment thereof set apart for such payments on Series E Preferred Units for all past distribution periods and the then current distribution period. When distributions are not paid in full (or a sum sufficient for such full payment is not set apart) upon the Series E Preferred Units and the Partnership Units ranking on parity as to distributions with Series E Preferred Units, all distributions declared upon Series E Preferred Units and any other series of Partnership Units parity as to distributions with Series E Preferred Units shall be declared pro rata so that the amount of distributions declared per Series E Preferred Units and such other Partnership Units shall in all cases bear to each other the same ratio that accrued distributions per share on Series E Preferred Units and such other Partnership Units bear to each other.

(d)      Except as provided in Section 3(c), unless full cumulative distributions on Series E Preferred Units have been or contemporaneously are declared and paid or declared and a sum sufficient for the payment thereof set apart for payment for all past distribution periods and the then current distribution period, no distributions (other than in Class A Units or other Partnership Units ranking junior to Series E Preferred Units as to distributions and amounts upon liquidation) shall be declared or paid or set aside for payment or other distribution shall be declared or made upon the Class A Units, Class B Units, Series A Preferred Units, Series B Preferred Units, Series C Preferred Units, Series D Preferred Units and Series F Preferred Units or any other Partnership Units ranking junior to or on a parity with Series E Preferred Units as to distributions or upon liquidation, nor shall any Class A Units, Class B Units, Series A Preferred Units, Series B Preferred Units, Series C Preferred Units, Series D Preferred Units and Series F Preferred

Attachment E-2

137

Units, or any other Partnership Units ranking junior to or on a parity with Series E Preferred Units as to distributions or amounts upon liquidation be redeemed by the Partnership (except by conversion into or exchange for other Partnership Units ranking junior to Series E Preferred Units as to distributions and amounts upon liquidation).

(e)    Any distribution payment made on Series E Preferred Units shall first be credited against the earliest accrued but unpaid distribution due with respect to Series E Preferred Units which remains payable.

F.    Allocations.

Allocations of the Partnership's items of income, gain, loss and deduction shall be allocated among the holders of Series E Preferred Units in accordance with Article VI of the Agreement.

G.    Liquidation Preference.

(a)    Subject to the rights of series of Preferred Units which may from time to time come into existence, upon any voluntary or involuntary liquidation, dissolution or winding up of the affairs of the Partnership, then, before any distribution or payment shall be made to the holders of any Class A Units, Class B Units, or any other class or series of Partnership ranking junior to Series E Preferred Units in the distribution of assets upon any liquidation, dissolution or winding up of the affairs of the Partnership, the holders of Series E Preferred Units shall be entitled to receive out of assets of the Partnership legally available for distribution to limited partners, liquidation distributions in the amount of the liquidation preference of $25.00 per share, plus an amount equal to all distributions accrued and unpaid thereon. After payment of the full amount of the liquidating distributions to which they are entitled, the holders of Series E Preferred Units will have no right or claim to any of the remaining assets of the Partnership. In the event that, upon any such voluntary or involuntary liquidation, dissolution or winding up of the affairs of the Partnership, the available assets of the Partnership are insufficient to pay the amount of the liquidation distributions on all outstanding Series E Preferred Units and the corresponding amounts payable on all Partnership Units ranking on a parity with Series E Preferred Units in the distribution of assets upon any liquidation, dissolution or winding up of the affairs of the Partnership ("Parity Units"), then the holders of Series E Preferred Units and Parity Units shall share ratably in any such distribution of assets in proportion to the full liquidating distributions to which they would otherwise be respectively entitled.

(b)    For the purposes hereof, neither a consolidation or merger of the Partnership with or into any other partnership, limited liability company, corporation or any other entity, nor a merger of any other partnership, limited liability company, corporation or any other entity with or into the Partnership, nor a sale or transfer of all or any part of the Partnership assets for cash or securities shall be considered a liquidation, dissolution or winding up of the Partnership.

Attachment E-3

F.        Redemption

(a)        Series E Preferred Units are not redeemable prior to October 10, 2002. On and after October 10, 2002, the General Partner may redeem outstanding Series E Preferred Units, in whole or in part, at any time or from time to time, for cash at a redemption price of $25.00 per unit, plus an amount equal to all distributions accrued and unpaid thereon to the date fixed for redemption, without interest. The redemption price of Series E Preferred Units (other than the portion thereof consisting of accrued and unpaid distributions) is payable solely out of proceeds (without giving effect to any temporary use of such proceeds) from the contributions with respect to other Partnership Units, which may include Class A Units, Class B Units, Preferred Units, or other ownership interests in the Partnership however designated (other than debt securities converted into or exchangeable for Partnership Units), and any rights, warrants or options to purchase any thereof. If fewer than all of the outstanding Series E Preferred Units are to be redeemed, the number of units to be redeemed will be determined by the General Partner and such units may be redeemed pro rata from the holders of such units in proportion to the number of such units held by such holders (with adjustments to avoid redemption of fractional units) or by lot in a manner determined by the General Partner.

(b)        Unless full cumulative distributions on all Series E Preferred Units and Parity Units shall have been or contemporaneously are paid or declared and a sum sufficient for the payment thereof set apart for payment for all past distribution periods and the then current distribution period, no Series E Preferred Units or Parity Units shall be redeemed unless all outstanding Series E Preferred Units and Parity Units are simultaneously redeemed; provided, however, that the foregoing shall not prevent the purchase or acquisition of Series E Preferred Units or Parity Units pursuant to a purchase or exchange offer made on the same terms to holders of all outstanding Series E Preferred Units or Parity Units, as the case may be. Furthermore, unless full cumulative distributions on all outstanding Series E Preferred Units and Parity Units have been or contemporaneously are paid or declared and a sum sufficient for the payment thereof set apart for payment for all past distribution periods and the then current distribution period, the Partnership shall not purchase or otherwise acquire directly or indirectly any Series E Preferred Units or Parity Units (except by conversion into or exchange for Partnership Units ranking junior to Series E Preferred Units and Parity Units as to distributions and amounts upon liquidation).

(c)        The General Partner shall, in its sole discretion, determine the form and content of a notice of redemption. If notice of redemption of any Series E Preferred Units has been given and if the funds necessary for such redemption have been set aside by the Partnership in trust for the benefit of the holders of Series E Preferred Units so called for redemption, then from and after the redemption date, distributions will cease to accrue on such Series E Preferred Units, such Series E Preferred Units shall no longer be deemed outstanding and all rights of the holders of such units will terminate, except the right to receive the redemption price.

Attachment E-4

189

(d)    The holders of Series E Preferred Units at the close of business on a Distribution Record Date will be entitled to receive the distribution payable with respect to such Series E Preferred Units on the corresponding Distribution Payment Date notwithstanding the redemption thereof between such Distribution Record Date and the corresponding Distribution Payment Date or the Partnership's default in the payment of the distribution due. Except as provided above, the Partnership will make no payment or allowance for unpaid distributions, whether or not in arrears, on Series E Preferred Units which have been called for redemption.

F.    Status of Redeemed Series E Preferred Units.

In the event any Series E Preferred Units shall be redeemed pursuant hereto, the units so redeemed shall revert to the status of authorized but unissued Preferred Units available for future issuance and reclassification by the General Partner.

G.    Value.

For purposes of the definition of Deemed Value of Partnership Interest, the Value on any date of the Series E Preferred Units shall be the Liquidation Preference of such Series E Preferred Unit.

H.    Voting Rights.

The holders of Series E Preferred Units shall have no voting rights whatsoever, except for any voting rights to which they may be entitled under the laws of the State of Delaware.

Attachment E-5

ATTACHMENT F

(SERIES F PREFERRED UNITS)

          In accordance with Sections 4.2.A and 4.2.D of the Agreement,
set forth below are the terms and conditions of the Series F Preferred Units
hereby established that will be issued by the Partnership to Spieker on July 2,
2001, in connection with the merger of Spieker Properties, L.P. ("Spieker
Partnership") with and into the Partnership (the "Spieker Partnership Merger"),
in exchange for the then outstanding Series E Preferred Interest of Spieker
Partnership (all of which will be acquired by the General Partner in the merger
of Spieker Properties, Inc. with and into General Partner (the "REIT Merger")
immediately following the Spieker Partnership Merger). All capitalized terms
used in this Attachment F and not otherwise defined shall have the meanings
assigned in the Agreement.

          A.          Designation and Number. A series of Partnership Units,
designated as Series F Cumulative Redeemable Preferred Units (the "Series F
Preferred Units"), is hereby established. The number of Series F Preferred Units
shall be 4,000,000.

          B.          Rank. The Series F Preferred Units shall, with respect
to distribution rights and rights upon voluntary or involuntary liquidation,
dissolution or winding up of the Partnership, rank (a) senior to the Class A
Units, Class B Units and all Partnership Interests ranking junior to the Series
F Preferred Units; (b) on a parity with the Series A Preferred Units, the Series
B Preferred Units, the Series C Preferred Units, Series D Preferred Units,
Series E Preferred Units, and all Partnership Interests issued by the
Partnership the terms of which specifically provide that such Partnership
Interests rank on a parity with the Series F Preferred Units (each referred to
as "Parity Preferred Units"); and (c) junior to all Partnership Interests issued
by the Partnership the terms of which specifically provide that such Partnership
Interests rank senior to the Series F Preferred Units.

          C.          Distributions.

          (a)          Subject to the rights of series of Preferred Units which
may from time to time come into existence, the holders of Series F Preferred
Units shall be entitled to receive distributions, when, as and if required
pursuant to the Agreement, of Available Cash, prior and in preference to any
distribution with respect to Class A Units or Class B Units, at the rate of
$2.00 per Series F Preferred Unit per annum. Such distributions shall be
cumulative from the last date on which any distributions were paid with respect
to Series E Cumulative Redeemable Preferred Interest of Spieker Partnership for
which Series F Preferred Units were exchanged in connection with the merger of
Spieker Partnership with and into the

191

Partnership and shall be payable quarterly in arrears on the last day of March, June, September, and December or, if not a business day, the next succeeding business day (each, a "Distribution Payment Date"). Any distribution payable on Series F Preferred Units for any partial distribution period will be computed on the basis of a 360-day year consisting of twelve 30-day months. Distributions will be payable to Series F Preferred Unitholders at the close of business on the Partnership Record Date, which shall be on such date designated by the General Partner for the payment of distributions (each, a "Distribution Record Date").

(b)     Distributions on Series F Preferred Units will accrue whether or not the Partnership has Available Cash, whether or not there are funds legally available for the payment of such distributions and whether or not such distributions are declared. No interest, or sum of money in lieu of interest, shall be payable in respect of any distribution payment or payments on Series F Preferred Units which may be in arrears. Holders of the Series F Preferred Units will not be entitled to distributions in excess of the full cumulative distributions as described above.

(c)     If any Series F Preferred Units are outstanding, no distributions shall be declared or paid or set apart for payment on any Partnership Unit, as to distributions, on a parity with or junior to Series F Preferred Units for any period unless full cumulative distributions have been or contemporaneously are paid or declared and a sum sufficient for the payment thereof set apart for such payments on Series F Preferred Units for all past distribution periods and the then current distribution period. When distributions are not paid in full (or a sum sufficient for such full payment is not set apart) upon the Series F Preferred Units and the Partnership Units ranking on parity as to distributions with Series F Preferred Units, all distributions declared upon Series F Preferred Units and any other series of Partnership Units parity as to distributions with Series F Preferred Units shall be declared pro rata so that the amount of distributions declared per Series F Preferred Units and such other Partnership Units shall in all cases bear to each other the same ratio that accrued distributions per share on Series F Preferred Units and such other Partnership Units bear to each other.

(d)     Except as provided in Section 3(c), unless full cumulative distributions on Series F Preferred Units have been or contemporaneously are declared and paid or declared and a sum sufficient for the payment thereof set apart for payment for all past distribution periods and the then current distribution period, no distributions (other than in Class A Units or other Partnership Units ranking junior to Series F Preferred Units as to distributions and amounts upon liquidation) shall be declared or paid or set aside for payment or other distribution shall be declared or made upon the Class A Units, Class B Units, Series A Preferred Units, Series B Preferred Units, Series C Preferred Units, Series D Preferred Units and Series E Preferred Units or any other Partnership Units ranking junior to or on a parity with Series F Preferred Units as to distributions or upon liquidation, nor shall any Class A Units, Class B Units, Series A Preferred Units, Series B Preferred Units, Series C Preferred Units, Series D Preferred Units and Series E Preferred

Attachment F-2

Units, or any other Partnership Units ranking junior to or on a parity with Series F Preferred Units as to distributions or amounts upon liquidation be redeemed by the Partnership (except by conversion into or exchange for other Partnership Units ranking junior to Series F Preferred Units as to distributions and amounts upon liquidation).

(e)     Any distribution payment made on Series F Preferred Units shall first be credited against the earliest accrued but unpaid distribution due with respect to Series F Preferred Units which remains payable.

H.     Allocations.

Allocations of the Partnership's items of income, gain, loss and deduction shall be allocated among the holders of Series F Preferred Units in accordance with Article VI of the Agreement.

I.     Liquidation Preference.

(a)     Subject to the rights of series of Preferred Units which may from time to time come into existence, upon any voluntary or involuntary liquidation, dissolution or winding up of the affairs of the Partnership, then, before any distribution or payment shall be made to the holders of any Class A Units, Class B Units, or any other class or series of Partnership ranking junior to Series F Preferred Units in the distribution of assets upon any liquidation, dissolution or winding up of the affairs of the Partnership, the holders of Series F Preferred Units shall be entitled to receive out of assets of the Partnership legally available for distribution to limited partners, liquidation distributions in the amount of the liquidation preference of $25.00 per share, plus an amount equal to all distributions accrued and unpaid thereon. After payment of the full amount of the liquidating distributions to which they are entitled, the holders of Series F Preferred Units will have no right or claim to any of the remaining assets of the Partnership. In the event that, upon any such voluntary or involuntary liquidation, dissolution or winding up of the affairs of the Partnership, the available assets of the Partnership are insufficient to pay the amount of the liquidation distributions on all outstanding Series F Preferred Units and the corresponding amounts payable on all Partnership Units ranking on a parity with Series F Preferred Units in the distribution of assets upon any liquidation, dissolution or winding up of the affairs of the Partnership ("Parity Units"), then the holders of Series F Preferred Units and Parity Units shall share ratably in any such distribution of assets in proportion to the full liquidating distributions to which they would otherwise be respectively entitled.

(b)     For the purposes hereof, neither a consolidation or merger of the Partnership with or into any other partnership, limited liability company, corporation or any other entity, nor a merger of any other partnership, limited liability company, corporation or any other entity with or into the Partnership, nor a sale or transfer of all or any part of the Partnership assets for cash or securities shall be considered a liquidation, dissolution or winding up of the Partnership.

Attachment F-3

193

F.        Redemption

(a)        Series F Preferred Units are not redeemable prior to
June 4, 2003. On and after June 4, 2003, the General Partner may redeem
outstanding Series F Preferred Units, in whole or in part, at any time or from
time to time, for cash at a redemption price of $25.00 per unit, plus an amount
equal to all distributions accrued and unpaid thereon to the date fixed for
redemption, without interest. The redemption price of Series F Preferred Units
(other than the portion thereof consisting of accrued and unpaid distributions)
is payable solely out of proceeds (without giving effect to any temporary use of
such proceeds) from the contributions with respect to other Partnership Units,
which may include Class A Units, Class B Units, Preferred Units, or other
ownership interests in the Partnership however designated (other than debt
securities converted into or exchangeable for Partnership Units), and any
rights, warrants or options to purchase any thereof. If fewer than all of the
outstanding Series F Preferred Units are to be redeemed, the number of units to
be redeemed will be determined by the General Partner and such units may be
redeemed pro rata from the holders of such units in proportion to the number of
such units held by such holders (with adjustments to avoid redemption of
fractional units) or by lot in a manner determined by the General Partner.

(b)        Unless full cumulative distributions on all Series F
Preferred Units and Parity Units shall have been or contemporaneously are paid
or declared and a sum sufficient for the payment thereof set apart for payment
for all past distribution periods and the then current distribution period, no
Series F Preferred Units or Parity Units shall be redeemed unless all
outstanding Series F Preferred Units and Parity Units are simultaneously
redeemed; provided, however, that the foregoing shall not prevent the purchase
or acquisition of Series F Preferred Units or Parity Units pursuant to a
purchase or exchange offer made on the same terms to holders of all outstanding
Series F Preferred Units or Parity Units, as the case may be. Furthermore,
unless full cumulative distributions on all outstanding Series F Preferred Units
and Parity Units have been or contemporaneously are paid or declared and a sum
sufficient for the payment thereof set apart for payment for all past
distribution periods and the then current distribution period, the Partnership
shall not purchase or otherwise acquire directly or indirectly any Series F
Preferred Units or Parity Units (except by conversion into or exchange for
Partnership Units ranking junior to Series F Preferred Units and Parity Units as
to distributions and amounts upon liquidation).

(c)        The General Partner shall, in its sole discretion,
determine the form and content of a notice of redemption. If notice of
redemption of any Series F Preferred Units has been given and if the funds
necessary for such redemption have been set aside by the Partnership in trust
for the benefit of the holders of Series F Preferred Units so called for
redemption, then from and after the redemption date, distributions will cease to
accrue on such Series F Preferred Units, such Series F Preferred Units shall no
longer be deemed outstanding and all rights of the holders of such units will
terminate, except the right to receive the redemption price.

Attachment F-4

        (d)      The holders of Series F Preferred Units at the close of business on a Distribution Record Date will be entitled to receive the distribution payable with respect to such Series F Preferred Units on the corresponding Distribution Payment Date notwithstanding the redemption thereof between such Distribution Record Date and the corresponding Distribution Payment Date or the Partnership's default in the payment of the distribution due. Except as provided above, the Partnership will make no payment or allowance for unpaid distributions, whether or not in arrears, on Series F Preferred Units which have been called for redemption.

        F.      Status of Redeemed Series F Preferred Units.

        In the event any Series F Preferred Units shall be redeemed pursuant hereto, the units so redeemed shall revert to the status of authorized but unissued Preferred Units available for future issuance and reclassification by the General Partner.

        G.      Value.

        For purposes of the definition of Deemed Value of Partnership Interest, the Value on any date of the Series F Preferred Units shall be the Liquidation Preference of such Series F Preferred Unit.

        H.      Voting Rights.

        The holders of Series F Preferred Units shall have no voting rights whatsoever, except for any voting rights to which they may be entitled under the laws of the State of Delaware.

Attachment F-5