HARRISON J. FRAHN IV (BAR NO. 206822)
SIMPSON THACHER & BARTLETT LLP
2550 Hanover Street
Palo Alto, CA 94304
Telephone: (650) 251-5000
Facsimile: (650) 251-5002
hfrahn@stblaw.com

BRUCE D. ANGIOLILLO (admitted *pro hac vice*)
PAUL C. GLUCKOW (admitted *pro hac vice*)
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY  10017-3954
Telephone: (212) 455-2000
Facsimile:  (212) 455-2502
bangiolillo@stblaw.com
pgluckow@stblaw.com

*Attorneys for Defendants/Respondents*
*Blackhawk Parent LLC and*
*EOP Operating Limited Partnership, L.P.*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| JOEL BENOLIEL, GREGG R. DAUGHERTY, BRUCE E. HOSFORD, and DONALD S. JEFFERSON,<br><br>    Plaintiffs/Petitioners,<br><br>    v.<br><br>BLACKHAWK PARENT LLC, a Delaware limited liability company, and EOP OPERATING LIMITED PARTNERSHIP, a Delaware limited partnership,<br><br>    Defendants/Respondents. | Case No. C 07-03001-RMW<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS/PETITIONERS' FIRST AMENDED PETITION TO COMPEL ARBITRATION**<br><br>**Date:   August 31, 2007**<br>**Time:   9:00 A.M.**<br>**Judge:  Hon. Ronald M. Whyte** |

1

**Table of Contents**

2

**Page**

3    PRELIMINARY STATEMENT .................................................................................................1

4    STATEMENT OF FACTS .....................................................................................................4

5    APPLICABLE LEGAL STANDARDS ......................................................................................9

6    ARGUMENT ...................................................................................................................10

7    I.    THE AMENDED PETITION SHOULD BE DISMISSED FOR LACK OF SUBJECT
           MATTER JURISDICTION ........................................................................................10

8
9    II.   THE AMENDED PETITION SHOULD BE DISMISSED BECAUSE PETITIONERS
           LACK STANDING ..................................................................................................12

10   III.  THIS COURT LACKS PERSONAL JURISDICTION OVER BLACKHAWK
           PARENT ...............................................................................................................15

11
     IV.   VENUE IS NOT PROPER IN THE NORTHERN DISTRICT OF CALIFORNIA.........16
12
     V.    NEITHER THE ISSUE OF INTERPRETING THE TERM "INDEPENDENT" NOR
13         THE ISSUE OF DETERMINING THE LOCATION FOR ANY ARBITRATION IS
           PROPERLY BEFORE THIS COURT ..........................................................................18
14
     VI.   THE AMENDED PETITION ALSO FAILS ON THE MERITS...................................21
15
     CONCLUSION ..................................................................................................................23

16

17

18

19

20

21

22

23

24

25

26

27

28

# Table of Authorities

Page

## CASES

*Abramoff v. Shake Consulting, L.L.C.,*
    288 F. Supp. 2d 1 (D.D.C. 2003) ...................................................................17

*Aerojet-General Corp. v. Am. Arbitration Ass'n,*
    478 F.2d 248 (9th Cir. 1973)........................................................................19

*AHS New Mexico Holdings, Inc. v. Healthsource, Inc.,*
    No. Civ.A. 2120-N, 2007 WL 431051 (Del. Ch. Feb. 2, 2007)....................22 n. 9

*Allstate Ins. Co. v. Hughes,*
    358 F.3d 1089 (9th Cir. 2004)......................................................................12

*American Fiber & Finishing, Inc. v. Tyco Healthcare Group, LP,*
    362 F.3d 136 (1st Cir. 2004) ............................................................10, 11, 12

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) .....................................................................................10

*AT&T Techs., Inc. v. Commc'ns Workers of Am.,*
    475 U.S. 643 (1986) .....................................................................................19

*Barclay Square Props. v. Midwest Fed. Sav. and Loan Ass'n of Minneapolis,*
    893 F.2d 968 (8th Cir. 1990).....................................................................12 n. 4

*Barragan v. Wash. Mut. Bank,*
    No. C 06-01646-CRB, 2006 WL 2479125, (N.D. Cal. Aug. 28, 2006)....................18, 19, 20

*Blake v. Dierdorff,*
    856 F.2d 1365 (9th Cir. 1988)......................................................................22

*Carden v. Arkoma Associates,*
    494 U.S. 185 (1990) ...............................................................................11, 12

*Chiron Corp. v. Ortho Diagnostic Sys., Inc.,*
    207 F.3d 1126 (9th Cir. 2000)..................................................................18, 20

*City of San Jose v. Price Waterhouse,*
    No. 91-16489, 1993 WL 83495 (9th Cir. Mar. 23, 1993) ............................21

*Colt's Mfg. Co. v. Devteck Corp.,*
    961 F. Supp. 382 (D. Conn. 1997) ...............................................................13

*Concat LP v. Unilever, PLC,*
    350 F. Supp. 2d 796 (N.D. Cal. 2004)............................................................9

*Container Recovery, Inc. v. Shasta Northwest, Inc.,*
    No. 05-1749-PK, 2007 WL 1724937 (D. Or. June 11, 2007)........................22

*Doctor's Assocs., Inc. v. Hollingsworth,*
    949 F. Supp. 77 (D. Conn. 1996)...................................................................9

*Friday v. American Oil Corp.*,
   No. Civ.A. 01-1598, 2006 WL 897744 (W.D. Pa. Apr. 6, 2006) ..........................................10

*Gladstone Realtors v. Vill. of Bellwood*,
   441 U.S. 91 (1979) ...............................................................................................................12

*Green Tree Fin. Corp. v. Bazzle*,
   539 U.S. 444 (2003) .............................................................................................................19

*Gulf Ins. Co. v. Glasbrenner*,
   417 F.3d 353 (2d Cir. 2005) .................................................................................................17

*Hartford Accident & Indem. Co. v. Equitas Reins. Ltd.*,
   200 F. Supp. 2d 102 (D. Conn. 2002) .............................................................................13, 14

*Howsam v. Dean Witter Reynolds, Inc.*,
   537 U.S. 79 (2002) ..........................................................................................................19, 20

*In re Ford Motor Co./Citibank (South Dakota), N.A.*,
   264 F.3d 952 (9th Cir. 2003) ..................................................................................................9

*Jenkins Brick Co. v. Bremer*,
   321 F.3d 1366 (11th Cir. 2003) .........................................................................................17, 18

*John Wiley & Sons v. Livingston*,
   376 U.S. 543 (1964) .............................................................................................................20

*Johnson v. Columbia Props. Anchorage, LP*,
   437 F.3d 894 (9th Cir. 2006) ...........................................................................................11, 12

*Kanter v. Warner-Lambert Co.*,
   265 F.3d 853 (9th Cir. 2001)......................................................................... 10, 11, 12 n. 4

*Kantor v. Wellesley Galleries, Ltd.*,
   704 F.2d 1088 (9th Cir. 1983) ...............................................................................................11

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
   511 U.S. 375 (1994) .............................................................................................................10

*Kuntz v. Lamar Corp.*,
   385 F.3d 1177 (9th Cir. 2004) ..........................................................................................11, 12

*Legacy Wireless Services, Inc. v. Human Capital, L.L.C.*,
   314 F. Supp. 2d 1045 (D. Or. 2004) .......................................................................................9

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) .............................................................................................................13

*McCarthy v. Providential Corp.*,
   No. C 94-0627, 1994 WL 387852 (N.D. Cal. Jul. 18, 1994)............................................9–10

*McGann v. Ernst & Young*,
   102 F.3d 390 (9th Cir. 1996) ................................................................................................21

*McNutt v. Gen. Motors Acceptance Corp. of Indiana,*
   298 U.S. 178 (1936) ................................................................................................9

*Moses H. Cone Mem'l. Hosp. v. Mercury Constr. Corp.,*
   460 U.S. 1 (1983) ..........................................................................................19, 20

*PaineWebber, Inc. v. Faragalli,*
   61 F.3d 1063 (3d Cir. 1995)..................................................................................13–14

*Pebble Beach Co. v. Caddy,*
   453 F.3d 1151 (9th Cir. 2006) ...............................................................................15

*Salvadori v. Option One Mortgage Corp.,*
   420 F. Supp. 2d 349 (D.N.J. 2006)........................................................................10

*Schwarzenegger v. Fred Martin Motor Co.,*
   374 F.3d 797 (9th Cir. 2004)............................................................................15, 16

*Sher v. Johnson,*
   911 F.2d 1357 (9th Cir. 1990) ...............................................................................15

*Strawbridge v. Curtiss,*
   7 U.S. (3 Cranch) 267 (1806)...........................................................................11, 12

*Sutter Home Winery, Inc. v. Vintage Selections, Ltd.,*
   971 F.2d 401 (9th Cir. 1992)..................................................................................21

*Trustmark Ins. Co. v. Fire & Casualty Ins. Co. of Conn.,*
   No. 02 C 0934, 2002 WL 832567 (N.D. Ill. May 2, 2002) ..........................19, 20, 22

*Ultimate Creations, Inc. v. Wright,*
   No. CV 05-3713-PHX-MHM, 2006 WL 2547324 (D. Ariz. Aug. 28, 2006) ............17

*Vesta Fire Ins. Corp. v. Insurance Ventures, Inc.,*
   No. 6204CV0296GEBPAN, 2006 WL 314488 (E.D. Cal. Feb. 9, 2006) ................22

*Woodke v. Dahm,*
   70 F.3d 983 (8th Cir. 1995) ...................................................................................17

*Ytuarte v. Gruner & Jahr Printing and Pub'g Co.,*
   935 F.2d 971 (8th Cir. 1991)..................................................................................15

## STATUTES

28 U.S.C. § 1332....................................................................................................2, 11

28 U.S.C. § 1391(a)(1) ................................................................................................16

9 U.S.C. § 4.................................................................................................................12

## RULES

Civil L.R. 3-2(c) ...............................................................................................16 n. 5

Civil L.R. 3-5(b) ...............................................................................................16 n. 5

## <u>OTHER AUTHORITIES</u>

*Largest Firms Grow*, 12-98 J. Accountancy 16 (Dec. 1998) ........................................................21

Restatement (Second) of Contracts § 202(3)(a) (1981) ............................................................21

Securities Exchanges Audit Requirements, 15 U.S.C.A. § 78j-1(l) (2002) ................................21

William W. Schwarzer, et al., California Practice Guide: Federal Civil Procedure
    Before Trial § 4:315 (2007) ..................................................................................................17

Defendants/Respondents Blackhawk Parent LLC ("Blackhawk Parent") and EOP Operating Limited Partnership ("EOP") (collectively "Respondents") respectfully submit this Memorandum of Points and Authorities in opposition to the First Amended Petition to Compel Arbitration ("Amended Petition" or "Am. Pet.") of Plaintiffs/Petitioners Joel Benoliel, Gregg R. Daugherty, Bruce E. Hosford, and Donald S. Jefferson (collectively "Petitioners").

**PRELIMINARY STATEMENT**

As will be demonstrated at the arbitration that Petitioners seem determined to delay and manipulate, Petitioners' underlying claim is entirely without merit because Petitioners' alleged tax liabilities were self-inflicted and do not trigger any indemnification obligation by Respondents. Like Petitioners' underlying claim, the Amended Petition itself is fatally flawed and should be dismissed with dispatch.

In 2001, EOP acquired Petitioners' Spieker Properties, L.P. for in excess of $7 billion (the "Spieker Transaction") and Petitioners became limited partners of EOP. In a tax protection agreement ("TPA") entered into in connection with that transaction, EOP agreed not to "directly or indirectly sell, exchange, or otherwise dispose of" certain identified properties (the "Protected Properties") and further agreed to pay certain taxes incurred as a result of any such disposition.

In November 2006, affiliates of The Blackstone Group ("Blackstone") and Equity Office Properties Trust ("EOPT"), the general partner of EOP, announced that they had entered into an agreement whereby Blackstone would acquire EOPT (the "Blackstone Transaction"). In early January 2007, Respondents provided Petitioners with a Confidential Election Memorandum explaining that Petitioners, as limited partners in EOP, could exchange their limited partnership units for cash consideration or remain limited partners in EOP. In late January 2007, Petitioners wrote to Respondents claiming that if they chose to receive cash consideration in connection with the Blackstone Transaction, then Respondents would have to indemnify them under the TPA for taxes incurred as a result of such cash payments. Respondents explained in a letter dated January 30, 2007 that no such indemnification obligations existed because the Blackstone Transaction did not involve the direct or indirect sale, exchange or disposition of any of the Protected Properties

1  under the TPA.  The transaction closed on February 9, 2007.  It is undisputed that EOP owned all

2  of the Protected Properties before and after the closing.

3          In connection with the closing, Petitioners, along with certain other former partners

4  of Spieker Properties, L.P. (collectively, the "Original Petitioners"), chose to receive cash

5  consideration of more than $400 million rather than partnership units in the surviving entity.

6  Thus, any tax liability owed by Petitioners is the direct result of Petitioners' decision to redeem

7  their interests for cash consideration rather than rolling over their partnership interests, which

8  would not have resulted in any tax liabilities.  Put differently, any taxes incurred by Petitioners are

9  a result of gain realized on the sale of their interests in EOP as distinguished from a sale of the

10  Protected Properties.  In short, Petitioners decided to cash out, but do not want to pay their taxes.

11          In the months that followed the closing, Petitioners persisted in their disingenuous

12  interpretation of the TPA.  Because the TPA calls for arbitration of all claims, without regard to

13  their merits or lack thereof, the parties began communicating concerning the selection of an

14  arbitrator and other procedural issues associated with the anticipated arbitration.  Those

15  discussions were active and ongoing when the Original Petitioners violated the agreement to

16  arbitrate set forth in the TPA and filed their preemptive and premature original Petition to Compel

17  Arbitration (the "Original Petition") on June 8, 2007, seeking to litigate issues related to the

18  arbitrator selection process and the place of arbitration in order to gain some perceived strategic

19  advantage regarding certain aspects of the arbitration.

20          The Original Petition suffered from fundamental defects that were highlighted by

21  Respondents in their Memorandum of Points and Authorities in Opposition to the Petition to

22  Compel Arbitration ("Resp'ts Original Opposition").  Apparently recognizing some of the fatal

23  jurisdictional flaws in their Original Petition, Petitioners filed this Amended Petition, with only

24  four of the seventeen Original Petitioners.  However, Petitioners' latest effort to subvert the

25  arbitration envisioned by the TPA is equally deficient.

26          *First*, the Amended Petition should be dismissed for lack of subject matter

27  jurisdiction.  Petitioners' only claimed basis for invoking the jurisdiction of this Court is diversity

28  jurisdiction under 28 U.S.C. § 1332.  Petitioners allege that they are domiciliaries and citizens of

1   Washington.  The Court lacks diversity jurisdiction because at least one limited partner of EOP,

2   and thus EOP itself, is also a citizen of Washington. (*See infra* Point I.)

3          *Second*, the Amended Petition should be dismissed for lack of standing because

4   Respondents have never refused to arbitrate and, in fact, have consistently acknowledged that the

5   parties' dispute concerning the proper interpretation of the TPA must be resolved through

6   arbitration.  (*See infra* Point II.)  Ironically, it is *Petitioners* who have breached the agreement to

7   arbitrate by filing the Original Petition and now this Amended Petition, and by walking away from

8   the ongoing discussions concerning the proper composition of the arbitral tribunal and the

9   procedures that would govern the arbitration.  The TPA specifically provides that the parties "shall

10  jointly retain" the arbitrator.  The parties were engaged in that process when Petitioners breached

11  the parties' agreement by filing the Original Petition.  If Petitioners had continued in good-faith

12  discussions concerning the selection of a mutually acceptable arbitrator, rather than filing two

13  meritless petitions, the parties could have selected an arbitrator by now and, if necessary, the

14  arbitrator could have determined the location of the arbitration.  Instead, Petitioners have

15  manufactured a dispute and made successive court filings in a transparent procedural ploy to gain

16  some perceived strategic advantage.

17         Even if Petitioners could overcome these deficiencies, which they cannot, the

18  Amended Petition should still be denied because the Court lacks personal jurisdiction over

19  Blackhawk Parent (*see infra* Point III) and venue is not proper in the Northern District of

20  California.  (*See infra* Point IV.)

21         Finally, any issues concerning the meaning of the phrase "nationally recognized

22  independent public accounting firm," or the location of the arbitration, are not properly before this

23  Court.  (*See infra* Point V.)  And in any event, Petitioners' arguments fail on the merits.  (*See infra*

24  Point VI.)

25

26

27

28

### STATEMENT OF FACTS[1]

**A.      The Spieker Transaction**

In December 2000, Original Petitioner Craig Vought, then the Chief Executive Officer of Spieker Properties, Inc. ("Spieker Properties"), met in Chicago with Timothy Callahan, then the Chief Executive Officer of EOPT, to discuss a possible merger of their companies.  (*See* June 6, 2001 EOPT S-4A, as amended, at 36, (Ex. A)[2] ("Spieker Proxy").)

On January 2, 2001, Spieker Properties and EOPT entered into a confidentiality agreement and the companies began due diligence.  (*Id.*)  On January 25, 2001, members of the senior management of Spieker Properties met with members of the senior management of EOPT to exchange information on the structure of their respective organizations and discuss management and personnel issues.  (*Id.*)

On February 7, 2001, Vought met with Callahan and other EOPT executives in Chicago.  (*Id.*)  At that meeting, Callahan presented a proposal for a merger of Spieker Properties with EOPT.  (*Id.*)  On February 9, 2001, Callahan telephoned Vought to discuss EOPT's proposal.  (*Id.* at 37.)  Between February 9 and 12, 2001, the companies continued to discuss by telephone the structure of a merger.  (*Id.*)

Beginning on February 20, 2001, representatives from Spieker Properties, EOPT, Goldman Sachs (financial advisor to Spieker Properties), Morgan Stanley (financial advisor to EOPT), Sullivan & Cromwell (legal counsel to Spieker Properties) and Hogan & Hartson LLP (legal counsel to EOPT) met in Hogan & Hartson's New York offices to negotiate a merger agreement and other related agreements, including the TPA.  (*Id.* at 38; *see also* Declaration of Stanley M. Stevens ("Stevens Decl.") ¶ 4.)  On February 22, 2001, Spieker Properties and EOPT executed the merger agreement (the "Spieker Merger Agreement").  (Spieker Proxy at 38.)

On July 2, 2001, pursuant to the Spieker Merger Agreement, Spieker Properties merged into EOPT.  Each company's operating partnership — Spieker Properties L.P. and EOP —

---

[1]      The facts set forth herein, many of which are taken directly from the proxy statement filed in connection with the Spieker Transaction, are not in dispute.

[2]      All exhibits referenced as Exs. A-N are exhibits to the Declaration of Timothy J. Cornell.

1  also merged, with EOP surviving the merger.  After the merger, EOP owned the properties

2  previously held by Spieker Properties L.P., and Petitioners became limited partners of EOP.

3  **B.    The EOP Partnership Agreement And The TPA**

4  On July 2, 2001, in connection with the consummation of the Spieker Transaction,

5  the partners of EOP, including Petitioners, entered a Third Amended and Restated Agreement of

6  Limited Partnership of EOP Operating Limited Partnership (the "EOP Partnership Agreement").

7  (*See* EOP Partnership Agreement (Ex. B).)  The EOP Partnership Agreement was executed in

8  Chicago, Illinois, and is governed by Delaware law.  (Stevens Decl. ¶ 7; EOP Partnership

9  Agreement § 15.9 (Ex. B).)

10  As part of the EOP Partnership Agreement, EOP agreed not to "directly or

11  indirectly sell, exchange, or otherwise dispose of" the Protected Properties formerly owned by

12  Spieker Properties and further agreed to pay certain taxes incurred as a result of any such

13  disposition.  This agreement was set forth in the TPA, which was included as part of a separate

14  exhibit to the EOP Partnership Agreement.  (*See* Exhibit E-9 to the EOP Partnership Agreement

15  (TPA) (Ex. B at 135–36) § 2(a)-2(c).)  The terms of the TPA were negotiated in New York during

16  February 2001.  (Stevens Decl. ¶ 6.)  The Protected Properties were specifically listed in Schedule

17  2 to Exhibit E-9 of the EOP Partnership Agreement.  (TPA Sched. 2 (Ex. B at 141–43).)

18  The TPA requires that if Petitioners and EOP disagree over whether Petitioners are

19  entitled to any reimbursement for any alleged tax liability, Petitioners and Respondents are "to

20  negotiate in good faith to resolve any disagreements regarding any such breach or violation and

21  the amount of damages, if any . . . " (TPA § 2(d).)  The TPA further provides that, if, after 60

22  days, the parties' disagreement cannot be resolved, Petitioners and Respondents "shall jointly

23  retain a nationally recognized independent public accounting firm to act as an arbitrator to resolve

24  as expeditiously as possible all points of any such disagreement . . . ." (*Id.*)

25  **C.    The Blackstone Transaction**

26  On November 19, 2006, affiliates of Blackstone and EOPT entered into an

27  agreement (the "Blackstone Merger Agreement") whereby Blackstone agreed to acquire all of the

28

RESPONDENTS' MEMORANDUM OF POINTS AND AUTHORITIES    Case No. C 07-03001-RMW
IN OPPOSITION TO FIRST AMENDED PETITION TO COMPEL ARBITRATION

1    common shares of EOPT.  (*See* December 29, 2006 EOPT Proxy, as amended, at 35 (Ex. C)

2    ("EOPT Proxy").)

3              The Blackstone Merger Agreement contemplated that immediately prior to the

4    merger of EOPT and Blackstone: (i) Blackhawk Acquisition, L.P., an affiliate of Blackstone,

5    would merge into EOP; (ii) Blackhawk Parent, also an affiliate of Blackstone, would become

6    EOP's general partner; and (iii) EOP would survive the transaction.  (*Id.* at 55.)  The Blackstone

7    Merger Agreement also provided that, upon the holder's election, each outstanding unit of

8    partnership interest in EOP would be rolled over as units in the surviving partnership on a one-for-

9    one basis.  (*Id.* at 58.)  Accordingly, the Blackstone Merger Agreement was specifically structured

10   to offer EOP limited partners such as Petitioners the opportunity to avoid incurring taxes through

11   the election to take units in the surviving entity, *i.e.*, the merger itself was not a taxable event for

12   Petitioners.  Instead, any taxes incurred by Petitioners are a result of their unilateral decision to

13   redeem their interests for cash.

14             While EOP and Blackstone understood that certain limited partners might choose to

15   take cash as part of the merger, EOP had no indemnification obligation to EOP limited partners

16   under the TPA because the Blackstone Transaction did not constitute a direct or indirect sale,

17   exchange or other disposition of any of the Protected Properties.  (*Id.* at 55.)  Instead, Blackhawk

18   Acquisition L.P. would be merged into EOP, and EOP would survive the merger and would

19   continue to own the Protected Properties after the merger.  (*Id.* at 55, 58-60.)  Respondents

20   advised the Petitioners of this before the Blackstone Transaction closed and even before the

21   shareholders voted in favor of the Blackstone Transaction.  (*See* January 30, 2007 letters from

22   Blackhawk Parent to Original Petitioners (Ex. D).)

23        **D.     Petitioners' Election To Take Cash Consideration**

24             On February 9, 2007, the transaction closed as contemplated by the Blackstone

25   Merger Agreement and the EOP limited partners, who made the requisite election, continued to be

26   limited partners in EOP.  Original Petitioners, including Petitioners in this action, elected not to

27   remain limited partners in EOP, but rather chose to receive cash for their EOP partnership units.

28

RESPONDENTS' MEMORANDUM OF POINTS AND AUTHORITIES          Case No. C 07-03001-RMW
IN OPPOSITION TO FIRST AMENDED PETITION TO COMPEL ARBITRATION

1  (Am. Pet. ¶ 32.)  After deciding to liquidate their interests in EOP, Petitioners decided they did not

2  want to pay the tax obligations that arose from that decision.

3          **E.        The Continuing Arbitration Discussions**

4                  When Petitioners persisted in asserting their unmeritorious claim that they were

5  entitled to indemnification notwithstanding their decision to take cash rather than remain limited

6  partners in EOP, the parties recognized that this dispute was subject to arbitration under the TPA.

7  On May 10, 2007, counsel for Respondents wrote to counsel for Petitioners stating that the parties

8  should begin to discuss the procedures for the anticipated arbitration and identifying certain issues

9  to be addressed in connection with the arbitration, including:  selecting an arbitrator, including

10  exchanging lists of nationally recognized independent public accounting firms that could act as

11  arbitrator; discussing the procedures to be employed if the parties could not agree on a nationally

12  recognized independent public accounting firm; deciding the arbitration rules and procedures that

13  would govern the arbitration; and deciding the place of the arbitration.  (*See* May 10, 2007 Letter

14  from Angiolillo to Steinberg (Ex. E).)  Counsel for Respondents proposed that the parties

15  exchange lists of potential arbitrators early the following week; that if the parties could not agree

16  on an arbitrator, then the International Institute for Conflict Prevention and Resolution ("CPR")

17  could choose the arbitrator;[3] that the arbitration proceeding be governed by the CPR Rules; and

18  that the place of arbitration be New York, New York (where the TPA was negotiated).  (*Id.*)

19                  By letter dated May 14, 2007, Petitioners' counsel indicated that they would be

20  ready to exchange lists of nationally recognized independent public accounting firms by early the

21  following week (though, as of the filing of the Original Petition, Petitioners had not provided such

22  list).  (*See* May 14, 2007 Letter from Steinberg to Angiolillo (Ex. F).)  Petitioners' counsel also

23  stated that they believed it was "premature" to discuss the question of which organization might

24  assist the parties in selecting an arbitrator (but then filed the Original Petition in this Court less

25

---

26  [3]        It should be noted that two lawyers from Petitioners' counsel's firm serve on CPR
        Committees, and the firm itself is a CPR Sponsor.  *See* http://www.cpradr.org/arb-
27      advcomm.asp?M=9.2.2.3; http://www.cpradr.org/commMembers.asp?filnm=ARBN;
        http://www.cpradr.org/commMembers.asp?filnm=EDSC;
28      http://www.cpradr.org/CPR_CorpDin07.asp.

RESPONDENTS' MEMORANDUM OF POINTS AND AUTHORITIES        Case No. C 07-03001-RMW
IN OPPOSITION TO FIRST AMENDED PETITION TO COMPEL ARBITRATION

1   than a month later).  (*Id.*)  Petitioners' counsel also stated that they were considering the

2   suggestion of Respondents' counsel to use the CPR Rules, but never provided any further response

3   on this topic.  (*Id.*)  Petitioners' counsel said that they thought California would be a more

4   appropriate forum for arbitration, but also stated that they would "consider any reasons you may

5   offer for preferring New York."  (*Id.*)

6           On May 23, 2007, Petitioners' counsel spoke with Respondents' counsel by

7   telephone.  Respondents' counsel advised Petitioners' counsel that Respondents were amenable to

8   using any of the "big four" accounting firms — Deloitte Touche Tohmatsu, Ernst & Young,

9   KPMG, and PricewaterhouseCoopers — to arbitrate Petitioners' claims.  (May 31, 2007 Letter

10  from Gluckow to Edgar (Ex. H).)  Petitioners' counsel was not prepared to provide Petitioners' list

11  at that time.

12          On May 25, 2007, Petitioners' counsel wrote to Respondents' counsel proposing

13  that the parties exchange information concerning "which nationally recognized public accounting

14  firms meet the definition of 'independent' under" Respondents' interpretation of the TPA.  (May

15  25, 2007 Letter from Edgar to Gluckow (Ex. G).)

16          On May 31, 2007, Respondents' counsel wrote to Petitioners' counsel noting that

17  Respondents had already proposed four potential arbitrators and that Petitioners had not provided

18  their list to Respondents.  (Ex. H.)  Respondents' counsel also explained that once Petitioners

19  provided Respondents with their list, the parties would be in a position to "discuss which of the

20  proposed candidates might be mutually acceptable to the parties" so as to avoid getting bogged

21  down in endless debates about definitions.  (*Id.*)

22          Respondents were awaiting a response to their May 31, 2007 letter when

23  Petitioners filed their Original Petition to Compel Arbitration on June 8, 2007, breaching the

24  parties' agreement to arbitrate and inappropriately seeking to involve this Court in issues related to

25  the selection of the arbitrator and the place of arbitration.

26          Respondents filed their Original Opposition on July 20, 2007.  At this point,

27  Petitioners had: (1) declined to negotiate in good faith to mutually retain an arbitrator; (2) failed to

28  propose any potential arbitrators; and (3) sought to obtain some perceived strategic advantage by

1   filing a lawsuit rather than proceeding with arbitration.  In defense against these tactics,

2   Respondents filed their own Petition for an Order Compelling Arbitration in Illinois state court

3   seeking an order requiring Petitioners to meet and confer in good faith with Respondents to

4   resolve their disagreements and, failing that, referring the parties to an arbitration institution

5   (Petition for an Order Compelling Arbitration, *EOP Operating Ltd. P'ship v. Spieker*, 07CH

6   19272 (Ill. Cir. Ct. Cook Cty. Jul. 20, 2007) (Ex. I).)

7           In response to Respondents' Original Opposition, which highlighted significant

8   jurisdictional problems in the Original Petition (*see* Resp'ts Original Opposition at 9–12),

9   Petitioners eliminated thirteen of the seventeen Original Petitioners in a futile effort to secure

10  diversity jurisdiction.

11          The thirteen former Original Petitioners no longer named in this Amended Petition

12  have now filed suit against Respondents in California State Superior Court, further multiplying the

13  unnecessary court proceedings instigated by Petitioners. (Petition to Compel Arbitration and for

14  Appointment of Arbitrator, *Spieker v. Blackhawk Parent LLC*, Civ 464823 (Cal. Sup. Ct. San

15  Mateo Cty. Jul. 30, 2007) (Ex. L).)

16                          **<u>APPLICABLE LEGAL STANDARDS</u>**

17          When a petition to compel arbitration is challenged for lack of jurisdiction, the

18  "jurisdictional dispute[] . . . must be resolved before the court considers the merits." *See Legacy*

19  *Wireless Services, Inc. v. Human Capital, L.L.C.*, 314 F. Supp. 2d 1045, 1048 (D. Or. 2004).

20  Once challenged, the burden of establishing the court's jurisdiction by a preponderance of the

21  evidence lies with the party invoking the court's jurisdiction. *McNutt v. Gen. Motors Acceptance*

22  *Corp. of Indiana*, 298 U.S. 178, 189 (1936); *In re Ford Motor Co./Citibank (South Dakota), N.A.*,

23  264 F.3d 952, 957 (9th Cir. 2003); *Doctor's Assocs., Inc. v. Hollingsworth*, 949 F. Supp. 77, 81

24  (D. Conn. 1996) (holding that on a motion to compel arbitration, movants have the burden of

25  establishing subject matter jurisdiction).  As set forth below, Petitioners cannot meet this burden.

26          If a court has jurisdiction over the subject matter of a petition, it applies "a standard

27  similar to the summary judgment standard of Fed. R. Civ. P. 56" to the merits of the petition.

28  *Concat LP v. Unilever, PLC*, 350 F. Supp. 2d 796, 804 (N.D. Cal. 2004) (quoting *McCarthy v.*

RESPONDENTS' MEMORANDUM OF POINTS AND AUTHORITIES          Case No. C 07-03001-RMW
IN OPPOSITION TO FIRST AMENDED PETITION TO COMPEL ARBITRATION

1   *Providential Corp.*, No. C 94-0627, 1994 WL 387852, at *2 (N.D. Cal. Jul. 18, 1994)).

2   Accordingly, the petitioner must prove that there is no genuine issue of material fact and that the

3   petitioner is entitled to judgment as a matter of law. *Salvadori v. Option One Mortgage Corp.*,

4   420 F. Supp. 2d 349, 353 (D.N.J. 2006) (applying the summary judgment standard to a motion to

5   compel arbitration) (citing Fed. R. Civ. P. 56(c)); *Friday v. American Oil Corp.*, No. Civ.A. 01-

6   1598, 2006 WL 897744, at *1 (W.D. Pa. Apr. 6, 2006) (same).  Similarly, the Court must consider

7   all of the non-moving party's evidence and construe all reasonable inferences in the light most

8   favorable to the non-moving party.  *Friday*, 2006 WL 897744, at *1 (citing *Anderson v. Liberty*

9   *Lobby, Inc.*, 477 U.S. 242, 255 (1986)); *Salvadori*, 420 F. Supp. 2d at 353.

10                                **ARGUMENT**

11  **I.      THE AMENDED PETITION SHOULD BE DISMISSED FOR LACK OF SUBJECT
            MATTER JURISDICTION**

12

13                Since federal district courts are courts of limited jurisdiction, it is axiomatic that

14  "[i]n the absence of jurisdiction, a court is powerless to act." *American Fiber & Finishing, Inc. v.*

    *Tyco Healthcare Group, LP*, 362 F.3d 136, 138 (1st Cir. 2004).  Moreover, "[i]t is to be presumed
15
    that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests
16
    upon the party asserting jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375,
17
    377 (1994) (citations omitted); *see also Kanter v. Warner-Lambert Co.*, 265 F.3d 853, 857–58 (9th
18
    Cir. 2001) (declaring that "the party asserting diversity jurisdiction bears the burden of proof").
19
                Petitioners concede there is no federal question presented by the Amended Petition,
20
    that the Federal Arbitration Act ("FAA") does not provide a basis for subject matter jurisdiction,
21
    and that their sole claimed basis for subject matter jurisdiction in this Court is diversity
22
    jurisdiction.  (*See* Am. Pet. ¶ 20; Petitioners' Memorandum of Points and Authorities ("Mem.") at
23
    7 n. 2.)  Recognizing that their Original Petition to Compel Arbitration was devoid of any factual
24
    allegations relevant to diversity jurisdiction and that at least thirteen of the Original Petitioners
25
    were not diverse from Respondents (*see* Resp'ts Original Opposition at 9–12), those petitioners
26
    have been excluded from the Amended Petition.  But this effort is to no avail.
27

28

RESPONDENTS' MEMORANDUM OF POINTS AND AUTHORITIES          Case No. C 07-03001-RMW
IN OPPOSITION TO FIRST AMENDED PETITION TO COMPEL ARBITRATION

1        The Amended Petition alleges that "[t]he Court has subject matter jurisdiction over

2    this controversy under 28 U.S.C. § 1332 because Petitioners and Respondents are of diverse

3    citizenship . . . ." (Am. Pet. ¶ 20.)  However, in order to establish a basis for diversity jurisdiction,

4    "there must be complete diversity of citizenship between the parties opposed in interest." *Kuntz v.*

5    *Lamar Corp.*, 385 F.3d 1177, 1181 (9th Cir. 2004) (citing *Strawbridge v. Curtiss*, 7 U.S. (3

6    Cranch) 267, 267 (1806)).  Therefore, if any of the four Petitioners is not of diverse citizenship

7    from any of the two Respondents, this Court lacks subject matter jurisdiction over the Amended

8    Petition.

9        For purposes of diversity jurisdiction, a natural person is a citizen of the state in

10   which he or she is domiciled.  *Kanter*, 265 F.3d at 857; *Kantor v. Wellesley Galleries, Ltd.*, 704

11   F.2d 1088, 1090 (9th Cir. 1983).  "A person's domicile is her permanent home, where she resides

12   with the intention to remain or to which she intends to return." *Kanter*, 265 F.3d at 857.  The

13   Amended Petition alleges that all four Petitioners are domiciled in and citizens of Washington.

14   (Am. Pet. ¶¶ 9–12.)

15       In *Carden v. Arkoma Associates*, 494 U.S. 185 (1990), the Supreme Court

16   unequivocally established that "diversity jurisdiction in a suit by or against [an artificial] entity

17   depends on the citizenship of all the members." *Id.* at 195–96; *see also American Fiber*, 362 F.3d

18   at 137 ("a limited partnership is deemed to be a citizen of every state of which any of its general or

19   limited partners are citizens"); *Johnson v. Columbia Props. Anchorage, LP*, 437 F.3d 894, 899

20   (9th Cir. 2006).  Similarly, a limited liability company is treated "like a partnership," having

21   citizenship "in every state of which its owners/members are citizens." *Johnson*, 437 F.3d at 899.

22   Therefore, EOP is a citizen of every state of which any of EOP's general or limited partners are

23   citizens, and, similarly, Blackhawk Parent is a citizen of every state of which its members are

24   citizens.

25       Respondent EOP's limited partners are citizens of multiple states, including

26   Washington.[4]  (Declaration of Matthew Koritz ("Koritz Decl.") ¶ 3.)  Because EOP has a limited

27

28       [4]    Petitioners allege that it was "made clear in Respondents' Memorandum of Points and
     Authorities in Opposition to Plaintiffs/Petitioners' Petition to Compel Arbitration" that no
     EOP partners are citizens of Washington.  (Am. Pet. ¶ 16.)  Petitioners apparently arrive at

1   partner who is a citizen of Washington, EOP is a citizen of Washington.  *See Carden*, 494 U.S. at

2   195–96; *Johnson*, 437 F.3d at 899; *American Fiber*, 362 F.3d at 137.  Accordingly, there is no

3   complete diversity and no basis for diversity jurisdiction.  *See Kuntz*, 385 F.3d at 1181 (citing

4   *Strawbridge*, 7 U.S. (3 Cranch) at 267).  Therefore, since subject matter jurisdiction is allegedly

5   premised upon diversity and complete diversity of citizenship cannot be established, this Court

6   must dismiss the Amended Petition for lack of subject matter jurisdiction.  *See Allstate Ins. Co. v.*

7   *Hughes*, 358 F.3d 1089, 1095 (9th Cir. 2004).

8   **II.    THE AMENDED PETITION SHOULD BE DISMISSED BECAUSE PETITIONERS**
    **        LACK STANDING**

9

10          This Court should also dismiss the Amended Petition for lack of standing because

11  there has been no refusal to arbitrate as required under § 4 of the Federal Arbitration Act.  *See* 9

12  U.S.C. § 4; (*see also* Am. Pet. ¶ 50.)  To the contrary, when the Original Petition was filed, the

13  parties were in the midst of deciding how the arbitration would proceed, a process that is

14  continuing.  Petitioners have not suffered an injury in fact and there is no actual justiciable

15  controversy.

16          Whether a petitioner has standing to bring suit is a threshold question in every case;

17  courts must dismiss outright petitions that fail to make out an actual case or controversy.  *See*

18  *Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91, 100 (1979).  There are three constitutional

19  requirements of standing: (1) the petitioner must have suffered an "injury in fact;" (2) there must

20  be a causal connection between the injury and the conduct complained of; and (3) it must be

21  _____

22  this faulty conclusion because "Defendants' Memorandum alleged only that certain [EOP
    partners] were citizens of California and Oregon, and did not state that any [EOP partners]
    were citizens of Washington." (*Id.*)  Respondents were under no obligation to allege the

23  citizenship of any EOP partners.  It was the Petitioners' obligation to allege facts
    supporting diversity jurisdiction including citizenship of the parties, an obligation

24  Petitioners completely ignored.  *Barclay Square Props. v. Midwest Fed. Sav. and Loan*
    *Ass'n of Minneapolis*, 893 F.2d 968, 969 (8th Cir. 1990) ("When jurisdiction is based on
    diversity of citizenship, the pleadings, to establish diversity, must set forth with specificity

25  the citizenship of the parties."); *see also Kanter*, 265 F.3d at 857–58 (holding that
    Defendants' "failure to specify Plaintiffs' state citizenship was fatal to Defendants'

26  assertion of diversity jurisdiction").  In any event, Respondents explicitly indicated that
    they were not listing all the EOP partners and were only listing some to demonstrate that

27  there was no diversity jurisdiction.  (Resp'ts Original Opposition at 12 ("Respondent
    EOP's limited partners are citizens of multiple states, including California and Oregon.").)

28

1  likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

2  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  An "injury in fact" is "an invasion

3  of a legally protected interest which is . . . concrete and particularized, and . . . actual or imminent,

4  not conjectural or hypothetical."  *Id.* (internal citations omitted).

5           To meet this standing requirement, at a minimum a "petition to compel arbitration

6  must allege that the adverse party has failed, neglected or refused to arbitrate."  *Hartford Accident*

7  *& Indem. Co. v. Equitas Reins. Ltd.*, 200 F. Supp. 2d 102, 104 (D. Conn. 2002).  Failure to do so

8  results in dismissal of the petition.  *Id.* at 110.  The decision in *Hartford* is illustrative of why

9  Petitioners lack standing.  In *Hartford*, the petitioners sent a demand to the respondents requesting

10 that the respondents name their arbitrator.  *Id.* at 105-06.  Before the respondents responded to the

11 demand, the *Hartford* petitioners filed a petition to compel arbitration in which they speculatively

12 alleged that respondents "do not intend to arbitrate, and will refuse to arbitrate."  *Id.* at 106.  The

13 *Hartford* court held that under Section 4 of the FAA, the party seeking to compel arbitration must

14 be "aggrieved" before the court can direct arbitration.  *Id.* at 108 ("Absent a refusal by the other

15 party to arbitrate, arbitration cannot be compelled under Section 4.") (internal quotations omitted);

16 *see also Colt's Mfg. Co. v. Devteck Corp.*, 961 F. Supp. 382, 384-85 (D. Conn. 1997) ("Canada

17 has not refused to arbitrate, but instead, has gone forward with arbitration . . . . Since Colt is not an

18 'aggrieved party' it is not entitled to an order compelling arbitration under Section 4 of the FAA

19 with Canada.") (internal quotations omitted).  That is, to meet the standing requirement, the

20 petitioner must allege facts that demonstrate that there has been an actual refusal to arbitrate:

21           Requiring a petitioner to allege that the adverse party has actually failed,
          neglected, or refused to arbitrate assures the court that there is, in fact, a
22        dispute concerning whether the parties should arbitrate. If the adverse party
          has not refused to arbitrate, or will agree to arbitrate, there is no reason for
23        court involvement in the first place . . .  'It is doubtful that a petition to
          compel filed before the "adverse" party has refused arbitration would present
24        an Article III court with a justiciable case or controversy in the first
          instance.'
25

26 *Hartford*, 200 F. Supp. 2d at 108, n.8 (quoting *PaineWebber, Inc. v. Faragalli*, 61 F.3d 1063, 1067

27 (3d Cir. 1995)).  The refusal must be "clear," "express" and "unequivocal."  *PaineWebber*, 61

28

RESPONDENTS' MEMORANDUM OF POINTS AND AUTHORITIES        Case No. C 07-03001-RMW
IN OPPOSITION TO FIRST AMENDED PETITION TO COMPEL ARBITRATION

1  F.3d at 1067.  The petitioners in *Hartford*, like Petitioners here, failed to meet this pleading

2  standard and their petition was dismissed.  *Hartford*, 200 F. Supp. 2d at 108.

3          Petitioners do not — and cannot — allege that Respondents made a clear, express

4  and unequivocal refusal to arbitrate.  In fact, there has been no refusal to arbitrate.  It is undisputed

5  that both Petitioners and Respondents have agreed to arbitrate this dispute.  (*See, e.g.,* Exs. B, E,

6  F.)  The parties were in the midst of discussing the procedures for the anticipated arbitration,

7  including who would act as arbitrator, what rules would govern, and where the arbitration would

8  occur, when Petitioners filed their premature Original Petition.  (*See, e.g.,* Exs. G, H; Am. Pet. ¶¶

9  38-48.)

10          Early on in the negotiations, Respondents provided Petitioners with a list of

11  accounting firms that they believe can act as arbitrator and were awaiting a similar list from

12  Petitioners when the Original Petition was filed.  (Ex. H.; *see also* August 7, 2007 Letter from

13  Gluckow to Steinberg (Ex. J).)  Petitioners finally proposed two potential arbitrators on July 27,

14  2007, well after initiating this litigation.  (July 27, 2007 Letter from Steinberg to Angiolillo (Ex.

15  K).)

16          Petitioners cannot create standing by refusing to negotiate the procedures for

17  arbitration or refusing to appoint a mutually agreeable arbitrator.  The Amended Petition itself

18  demonstrates that Respondents have consistently been willing to arbitrate, engaging in

19  conscientious back-and-forth communications with Petitioners to first determine the need for

20  arbitration (Am. Pet. ¶¶ 35, 38, 40) and to then work towards selecting an arbitrator and arbitration

21  location.  (Am. Pet. ¶¶ 43, 45, 48.)

22          Indeed, Petitioners' decision to run into court to gain some strategic advantage,

23  while the parties were engaged in negotiations, demonstrates Petitioners' — not Respondents' —

24  unwillingness to resolve disputes according to the terms of the TPA's arbitration provision.

25  However, despite this premature attempt to derail the parties' negotiations, Respondents are

26  continuing to discuss the selection of an arbitrator and related issues with Petitioners.  (*See, e.g.,*

27  Ex. J ("[O]ur clients would prefer to move forward with the merits of the arbitration . . . and work

28

1   out any conflict issues without involving the courts."); July 31, 2007 Letter from Steinberg to

2   Angiolillo (Ex. M); August 8, 2007 Letter from Steinberg to Gluckow (Ex. N).)

3            Because there is no case or controversy presented by the Amended Petition, the

4   Amended Petition should be dismissed.

5   **III.    THIS COURT LACKS PERSONAL JURISDICTION OVER BLACKHAWK
         PARENT**

6

7            Petitioners fail to allege any adequate basis for the assertion of personal jurisdiction

8   over Blackhawk Parent, EOP's general partner.  Petitioners recognize that Blackhawk Parent is a

    limited liability company organized under the laws of Delaware and is an affiliate of Blackstone,

9   headquartered in New York, New York.  (Am. Pet. ¶ 14.)   However, Petitioners do not allege any

10  relevant connection between Blackhawk Parent and California.

11           Importantly, jurisdiction over a partnership does not confer jurisdiction over its

12  partners.  *Sher v. Johnson*, 911 F.2d 1357, 1365 (9th Cir. 1990); *see also Ytuarte v. Gruner & Jahr

13  Printing and Pub'g Co.*, 935 F.2d 971, 972-973 (8th Cir. 1991) (declining to find jurisdiction over

14  the partners even though there was jurisdiction over the partnership and the managing partners

15  were responsible for managing partnership property in the forum).  Simply because Blackhawk

16  Parent is the general partner of EOP does not mean that this Court has personal jurisdiction over

17  Blackhawk Parent.  Rather, for this Court to assert personal jurisdiction over Blackhawk Parent,

18  Petitioners must demonstrate that Blackhawk Parent, independent of its relationship to EOP, has

19  "minimum contacts" with California.  *See Sher*, 911 F.2d at 1361, 1365; *Schwarzenegger v. Fred

20  Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004) (holding that the "plaintiff bears the burden

21  of demonstrating that jurisdiction is appropriate").

22           Petitioners have the burden of establishing that Blackhawk Parent has "performed

23  some act or consummated some transaction within the forum or otherwise purposefully availed

24  [itself] of the privileges of conducting activities in the forum" and that "the claim arises out of or

25  results from" those forum related-activities.  *See Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1155

26  (9th Cir. 2006).  Moreover, the exercise of jurisdiction by this Court must be "reasonable."  *Id.*

27  Petitioners fail to meet this burden.

28

1    Petitioners have not demonstrated, as they must, that Blackhawk Parent has

2    engaged in any transaction in California relevant to the Petition.  The Amended Petition alleges a

3    disagreement about the interpretation of an arbitration clause in the TPA.  Blackhawk Parent did

4    not even exist when the TPA was negotiated or executed.

5    Petitioners do not allege any facts that otherwise tie Blackhawk Parent to

6    California.  Petitioners do not allege — let alone allege facts — that Blackhawk Parent has

7    purposefully availed itself of, or directed its activities to, this forum, nor do Petitioners allege a

8    claim arising from conduct of Blackhawk Parent in this forum.  *See Schwarzenegger*, 374 F.3d at

9    802–03 (declaring that if a plaintiff fails to demonstrate both purposeful availment of the forum

10   and a claim arising from such purposeful availment, personal jurisdiction cannot be established).

11   Petitioners' failure to plead such requisite facts warrants dismissal of the Amended Petition as to

12   Blackhawk Parent for lack of personal jurisdiction.

13   **IV.    VENUE IS NOT PROPER IN THE NORTHERN DISTRICT OF CALIFORNIA[5]**

14   Petitioners allege that venue is proper in this District pursuant to 28 U.S.C. §

15   1391(a)(1) because Respondents are subject to personal jurisdiction and therefore reside in this

16   District.  (Am. Pet. ¶ 22.)  Under 28 U.S.C. § 1391(a)(1), venue is proper in "a judicial district

17   where any defendant resides, if all defendants reside in the same State."  28 U.S.C. § 1391(a)(1).

18   But neither Respondent resides in California.  Indeed, Petitioners themselves allege that

19   Respondent EOP is a Delaware limited partnership with its headquarters in Chicago, Illinois and

20   Respondent Blackhawk Parent is a Delaware LLC with its headquarters in New York, New York.

21   (Am. Pet. ¶¶ 13, 14.)  Furthermore, Respondent Blackhawk Parent is not subject to personal

22   jurisdiction in California.  (*See supra* Point III.)

23   Alternatively, Petitioners allege that a "substantial part of the property that is the

24   subject of the action" is located in California.  (Am. Pet. ¶ 22.)  But property in the Northern

25   District of California is not the subject of this action.  This action is about the interpretation of an

26   arbitration clause.  (*See* Am. Pet. ¶ 8.)  Thus, the fact that property owned by EOP, either at the

27   _____

[5]    Inexplicably, Petitioners have completely ignored their obligation to address Intradistrict
      Assignment.  *See* Civil L.R. 3-2(c), 3-5(b).

28

RESPONDENTS' MEMORANDUM OF POINTS AND AUTHORITIES          Case No. C 07-03001-RMW
IN OPPOSITION TO FIRST AMENDED PETITION TO COMPEL ARBITRATION

1   time the Petitioners were limited partners or afterward, is located in this venue is irrelevant both to

2   the dispute before the Court and the underlying dispute to be arbitrated by the parties.

3         Petitioners also allege that "a substantial part of the events and omissions on which

4   Petitioners' claims are based occurred in this District."  (Am. Pet. ¶ 22).  But "[o]nly the events

5   that directly give rise to a claim are relevant."  *Jenkins Brick Co. v. Bremer*, 321 F.3d 1366, 1371

6   (11th Cir. 2003); *see also* William W. Schwarzer, et al., California Practice Guide: Federal Civil

7   Procedure Before Trial § 4:315 (2007) (same).  Moreover, "of the places where the events have

8   taken place, only those locations hosting a 'substantial part' of the events are to be considered."

9   *Jenkins Brick*, 321 F.3d at 1371; *see also Ultimate Creations, Inc. v. Wright*, No. CV 05-3713-

10  PHX-MHM, 2006 WL 2547324, at *4 (D. Ariz. Aug. 28, 2006) ("[F]or venue to be proper,

11  significant events or omissions material to the plaintiff's claim must have occurred in the district

12  in question . . . .  It would be error, for instance, to treat the venue statute's 'substantial part' test as

13  mirroring the minimum contacts test employed in personal jurisdiction inquiries.") (quoting *Gulf*

14  *Ins. Co. v. Glasbrenner*, 417 F.3d 353, 357 (2d Cir. 2005)).

15        The TPA •   the sole document upon which Petitioners' claims are based •   was

16  negotiated in New York, New York and executed in Chicago, Illinois.  (Spieker Proxy at 37–38;

17  Stevens Decl. ¶¶ 6–7.)  Indeed, the Spieker Proxy filed with the SEC puts the lie to Petitioners'

18  disingenuous claim concerning "the absence of any nexus between the Protection Agreement and

19  New York."  (Am. Pet. ¶ 6; *see also* Mem. at 6.)

20        Respondents, allegedly located in Delaware, New York, and Illinois (*see* Am. Pet.

21  ¶¶ 13, 14), stand accused of failing to meet their obligations under the arbitration clause because

22  they have not provided a list of their relationships with accounting firms.  (Am. Pet. ¶ 6.)  That

23  alleged omission has occurred where Respondents are located.  *See Woodke v. Dahm*, 70 F.3d 983,

24  985 (8th Cir. 1995) ("Congress meant to require courts to focus on relevant activities of the

25  defendant, not of the plaintiff"); *Abramoff v. Shake Consulting, L.L.C.*, 288 F. Supp. 2d 1, 4

26  (D.D.C. 2003) (stating that because "the general-venue statute protects the defendant, courts often

27  focus on the relevant activities of the defendant, rather than the plaintiff, in determining where a

28  substantial part of the underlying events occurred").  Accordingly, if, as Petitioners allege,

1    Respondents failed to meet their obligations — which they did not — they did so in either

2    Chicago or New York.

3          Moreover, Petitioners do not allege that any of the parties are located in California.

4    Indeed, Petitioners are all alleged to be domiciliaries and citizens of Washington.  (Am. Pet. ¶¶ 9–

5    12.)  Thus none of the named parties to this suit has any significant connection to California.

6          Furthermore, Petitioners allege that they are entitled to indemnification for tax

7    liabilities incurred as a result of the Blackstone Transaction.  (Am. Pet. ¶¶ 3–4.)  That transaction

8    was negotiated and executed in New York and Chicago, not the Northern District of California.

9    (EOPT Proxy at 35.)

10          Petitioners do not and cannot demonstrate that a substantial part of the relevant

11    events or omissions occurred in the Northern District of California, and therefore, venue here is

12    improper.  *Jenkins Brick*, 321 F.3d at 1371.

13   **V.    NEITHER THE ISSUE OF INTERPRETING THE TERM "INDEPENDENT" NOR
           THE ISSUE OF DETERMINING THE LOCATION FOR ANY ARBITRATION IS**
14   **     PROPERLY BEFORE THIS COURT**

15          The Amended Petition violates the unambiguous terms of the TPA, in which the

16    parties agreed to arbitrate "all points" of any disagreement related to the sale, exchange, or other

17    disposition of a Protected Property, and nowhere carved out an exception for the issues that

18    Petitioners ask this Court to decide.  (*See* TPA §§ 2(a), 2(d).)  Petitioners' decision to run into

19    court, halting the process they were engaged in with Respondents, should not be tolerated in the

20    face of the valid and sweeping arbitration provision in the TPA.

21          A court's role in enforcing arbitration is very limited.  A party may not litigate

22    claims in federal court that are properly referable to an arbitration proceeding.  *Chiron Corp. v.*

23    *Ortho Diagnostic Sys., Inc.,* 207 F.3d 1126, 1130 (9th Cir. 2000).  "The court's role under the

24    [Federal Arbitration] Act is [ ] limited to determining (1) whether a valid agreement to arbitrate

25    exists and, if it does, (2) whether the agreement encompasses the dispute at issue."  *Id.* (citations

26    omitted); *Barragan v. Wash. Mut. Bank*, No. C 06-01646-CRB, 2006 WL 2479125, at *3 (N.D.

27    Cal. Aug. 28, 2006) (stating that "the Supreme Court has preserved a 'limited role for the federal

28    courts to play in interpreting arbitration agreements.  Specifically, . . . whether the parties have

1  submitted a particular dispute to arbitration.'") (citing *Howsam v. Dean Witter Reynolds, Inc.*, 537

2  U.S. 79, 83-84 (2002)).

3         "By contrast, other types of disputes about arbitration clauses are generally beyond

4  the purview of the judiciary." *Barragan*, 2006 WL 2479125, at *3; *see also Green Tree Fin.*

5  *Corp. v. Bazzle*, 539 U.S. 444, 453 (2003) (finding that the question of whether a contract forbid

6  class arbitration was a question of contract interpretation and arbitration procedures, and as such

7  was rightly for the arbitrator, not the court, to decide); *Howsam*, 537 U.S. at 79 (stating that the

8  "question of arbitrability" is "an issue for judicial determination") (citations and internal quotation

9  marks omitted) (emphasis in original); *Trustmark Ins. Co. v. Fire & Casualty Ins. Co. of Conn.*,

10  No. 02 C 0934, 2002 WL 832567, at *2 (N.D. Ill. May 2, 2002) ("The parties' disagreement about

11  the location of the arbitration, instead of being a refusal to arbitrate, is merely a dispute about a

12  contract requirement.").

13         Moreover, "as a matter of federal law, any doubts concerning the scope of

14  arbitrable issues should be resolved in favor of arbitration . . . ." *Moses H. Cone Mem'l. Hosp. v.*

15  *Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983); *Aerojet-General Corp. v. Am. Arbitration*

16  *Ass'n*, 478 F.2d 248, 251 (9th Cir. 1973) ("The use of arbitration as a means of settling disputes

17  has been accorded specific Congressional endorsement in the Federal Arbitration Act, . . . and

18  should be encouraged by the federal courts.") (citation omitted).  Where, as here, the parties

19  included a broad arbitration clause in their contract, courts are required to allow disputes related to

20  the contract to be resolved through arbitration unless "it may be said with positive assurance that

21  the arbitration clause is not susceptible of any interpretation that covers the asserted dispute.

22  Doubts should be resolved in favor of coverage." *AT&T Techs., Inc. v. Commc'ns Workers of*

23  *Am.,* 475 U.S. 643, 650 (1986) (internal citation and quotations omitted).

24         The questions Petitioners attempt to bring before this Court, regarding the meaning

25  of "nationally recognized independent public accounting firm" and the location of the arbitration,

26  undoubtedly do not fall within the narrow category of "questions of arbitrability" that federal

27  courts are tasked with deciding.  Rather, in line with the parties' intent that all disputes be

28

1    arbitrated, such a determination should be made outside of court.[6]  *See Moses Hosp.*, 460 U.S. at

2    24-25 ("[A]s a matter of federal law, any doubts concerning the scope of arbitrable issues should

3    be resolved in favor of arbitration . . . ."); *Chiron Corp.*, 207 F.3d at 1130 ("The court's role under

4    the [Federal Arbitration] Act is [ ] limited . . . .").  As the court stated in *Trustmark*:  "[O]ne of the

5    parties cannot . . . insist on a forum it chooses by filing a petition to compel arbitration . . . .

6    Because the broad language of paragraph A provides 'any dispute or difference of opinion

7    hereafter arising with respect to this Contract shall be submitted to arbitration,' the court

8    concludes that the issue of a mutually agreeable location for the underlying dispute is itself an

9    arbitrable issue."  *Trustmark*, No. 02 C 0934, 2002 WL 832567, at *2-3.

10              By dismissing the Amended Petition and forcing the parties to continue discussions

11    (and, failing that, allowing the parties to follow the procedures of an arbitration organization), this

12    Court would uphold the intentions and contractual agreement of the parties to arbitrate "all points"

13    of their dispute.  *See also Howsam*, 537 U.S. at 84 (citing *John Wiley & Sons v. Livingston*, 376

14    U.S. 543, 557 (1964) (holding that an arbitrator should decide whether the first two steps of a

15    grievance procedure were completed, where these steps are prerequisites to arbitration));

16    *Barragan*, 2006 WL 2479125, at *3 ("[T]here is a presumption that courts should not decide

17    'procedural questions' relating to an arbitration agreement.").  As such, this Court should refrain

18    from deciding these matters in favor of allowing the parties to fulfill their obligations to honor

19    their agreed-upon arbitration clause.[7]

---

20    [6]    Arbitration organizations such as the International Institute for Conflict Prevention and
       Resolution ("CPR") and the American Arbitration Association ("AAA") have devised
21    widely-recognized procedures for selection of an arbitrator where parties have agreed to
       arbitrate all disputes.  *See* CPR Rules for Non-Administered Arbitration, Rule 5 (providing
22    for selection of an arbitrator by the parties), Rule 6 (providing for selection of an arbitrator
       by CPR in the event that the parties fail in any number of ways to appoint an arbitrator),
23    *available at* http://www.cpradr.org/pdfs/arb-rules2005.pdf; AAA Commercial Arbitration
       Rules and Mediation (2005), Rule R-11 (providing for appointment of an arbitrator in the
24    event that parties have not selected one), Rule R-12 (providing for appointment of an
       arbitrator by the parties), *available at* http://www.adr.org/sp.asp?id=22440.

25
       [7]    Respondents' Petition for an Order Compelling Arbitration in Illinois state court seeks an
26    order requiring Petitioners to meet and confer in good faith with Respondents to resolve
       their disagreements and, failing that, referring the parties to an arbitration institution such
27    as the CPR or the AAA.  (Ex. I.)  Respondents were forced to file their Petition to protect
       their interests given Petitioners' recourse to the courts in contravention of the parties'
28    arbitration agreement and discussions.

1    **VI.     THE AMENDED PETITION ALSO FAILS ON THE MERITS**

2           For the reasons discussed above, the Court should dismiss the Amended Petition

3    without reaching the merits of the Amended Petition, but the Amended Petition fails on the merits

4    as well.

5           The word "independent" as used in the TPA cannot be isolated and divorced from

6    the term of which it is a part • "nationally recognized independent public accounting firm."  The

7    TPA requires the selection of a "nationally recognized independent public accounting firm."

8    (TPA § 2(d)).

9           It is well-settled that contract terms are given their ordinary meaning unless such

10   terms are specifically defined by the parties to the contract.  *Sutter Home Winery, Inc. v. Vintage*

11   *Selections, Ltd.*, 971 F.2d 401, 410 (9th Cir. 1992) ("No agreement is ever entirely free of

12   ambiguity.  There is always the possibility that the parties actually intended a contract term to

13   have an unconventional meaning.  However, unless this intention is manifested in some way, the

14   term will be given its generally accepted meaning.") (citing Restatement (Second) of Contracts §

15   202(3)(a) (1981) ("Unless a different intention is manifested . . . where language has a generally

16   prevailing meaning, it is interpreted in accordance with that meaning.")).

17          The term "nationally recognized independent public accounting firm" is a common

18   term of art used to refer to a category of stand-alone (*i.e.* not captive), reputable, widely used and

19   recognized accounting firms.[8]  *See e.g.,* Securities Exchanges Audit Requirements, 15 U.S.C.A. §

20   78j-1(l) (2002) (referring to "independent public accounting firm" as a type of accounting firm

21   without reference to the firm's relationships with third parties); American Institute of Certified

22   Public Accountants, *Largest Firms Grow*, 12-98 J. Accountancy 16 (Dec. 1998) ("As a group, the

23   100 largest independent public accounting firms experienced revenue growth for the third straight

24   year."); *McGann v. Ernst & Young*, 102 F.3d 390, 391 (9th Cir. 1996) (using "independent

25   accounting firm" as a term of art to describe a category of accounting firms); *City of San Jose v.*

26   ───────────────
     [8]      Indeed, in the Amended Petition, Petitioners actually use the term "independent accounting
27   firm" as the common term of art that it is.  (Am. Pet. ¶ 54 ("Simply put, Respondents
     refuse to identify who is conflicted by virtue of their extensive relationships with
28   *independent accounting firms.*") (emphasis added).)

RESPONDENTS' MEMORANDUM OF POINTS AND AUTHORITIES          Case No. C 07-03001-RMW
IN OPPOSITION TO FIRST AMENDED PETITION TO COMPEL ARBITRATION

*Price Waterhouse*, No. 91-16489, 1993 WL 83495, at *1 (9th Cir. Mar. 23, 1993) (same); *Blake v. Dierdorff*, 856 F.2d 1365, 1371 (9th Cir. 1988) (same); *see also Container Recovery, Inc. v. Shasta Northwest, Inc.*, No. 05-1749-PK, 2007 WL 1724937, at *4 (D. Or. June 11, 2007) (same); *Vesta Fire Ins. Corp. v. Insurance Ventures, Inc.*, No. 6204CV0296GEBPAN, 2006 WL 314488, at *1 (E.D. Cal. Feb. 9, 2006) (same).[9]

Respondents proposed to address issues concerning the impartiality of the proposed arbitrators after receiving Petitioners' candidates. However, Petitioners refused to provide any such list until two months after Respondents provided their list. Nevertheless, Respondents remain prepared to address such issues and are doing so with Petitioners. (*See*, *e.g.*, Exs. J, M, N.)

In addition, entry of an order that the parties conduct the arbitration in this District, as requested by Petitioners, would be inappropriate for the same reasons that venue is not proper in this District — the key events (including the negotiation and execution of the TPA) occurred outside this District and none of the named parties are located in this District. (*See supra* Point IV.) And, as discussed, this is an issue that should be decided by the arbitrator. (*See supra* Point V.) *See also Trustmark*, No. 02 C 0934, 2002 WL 832567, at *2–3. If the Court is inclined to order any relief, it should order Petitioners to meet and confer in good faith with Respondents to resolve their disagreements and, failing that, to proceed before an arbitration institution such as the CPR or the AAA.

---

[9] The authorities cited by Petitioners to support their current interpretation of "independent accounting firm" are inapposite. (*See* Petitioners' Memorandum, at 8). For example, in *AHS New Mexico Holdings, Inc. v. Healthsource, Inc.*, No. Civ.A. 2120-N, 2007 WL 431051 (Del. Ch. Feb. 2, 2007), the parties decided voluntarily to not use a particular accounting firm if such firm had worked for one of the parties during the three years prior. "Section 2.8 [of the parties' agreement] stated that Deloitte & Touche LLP would determine the Adjusted Net Worth, unless the firm had been engaged by either party in the preceding three years. In fact, Deloitte & Touche LLP did work for one of the parties in the three years preceding the commencement of this dispute. Consequently, the parties agreed to retain Crowe Chizek and Company LLC ("Crowe Chizek") instead in March, 2006." *Id.* at *3, n. 11. Even the Black's Law Dictionary definition cited by Petitioners does not provide support for their interpretation of "independent"; rather, it suggests only that the auditor must be an "outside person or firm," *i.e.* a non-employee.

1

## CONCLUSION

2          For all the reasons set forth herein, the Amended Petition should be dismissed.

3    Dated:  August 10, 2007                    SIMPSON THACHER & BARTLETT LLP

4                                          By   /s/ Harrison J. Frahn IV
5                                               Harrison J. Frahn IV (Bar No. 206822)
                                                SIMPSON THACHER & BARTLETT LLP
6                                               2550 Hanover Street
                                                Palo Alto, CA 94304
7                                               Telephone: (650) 251-5000
                                                Facsimile: (650) 251-5002

8                                               Bruce D. Angiolillo (admitted *pro hac vice*)
                                                Paul C. Gluckow (admitted *pro hac vice*)
9                                               SIMPSON THACHER & BARTLETT LLP
                                                425 Lexington Avenue
10                                              New York, NY  10017-3954
                                                Telephone: (212) 455-2000
11                                              Facsimile:  (212) 455-2502
                                                Attorneys for Defendants/Respondents
12                                              BLACKHAWK PARENT LLC and
                                                EOP OPERATING LIMITED PARTNERSHIP
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28