Set forth below is a discussion of all material positive and negative factors considered by the Equity Office board of trustees in making its determination to adopt and approve the merger agreement and the merger. As used in this discussion, (1) references to the assets and business activities of Equity Office mean the assets and business activities of EOP Partnership, through which Equity Office conducts substantially all of its operations and (2) references to the assets and business activities of Spieker mean the assets and business activities of Spieker Partnership, through which Spieker conducts substantially all of its operations. Neither Equity Office nor Spieker has material assets other than their respective interests in EOP Partnership and Spieker Partnership and they conduct all of their business activities through those partnerships.

*Positive Factors Considered by the Equity Office Board*

In making its determination with respect to the merger agreement and the merger, the Equity Office board discussed with Equity Office senior management, as well as its financial and legal advisors, and considered a number of factors, including the following material positive factors:

- the uniqueness of the opportunity presented by the merger for Equity Office to acquire a significant portfolio of well-located, high-quality office properties in key California and other West Coast office markets, consisting of ownership or interests in approximately 25 million rentable square feet of predominantly Class A office properties, and the view of Equity Office senior management that this portfolio likely could not be replicated through acquisitions of individual assets;

- the potential for Spieker's office portfolio to significantly enhance Equity Office's existing presence in these West Coast office markets, including Seattle, San Francisco, San Jose, Orange County and Los Angeles, many submarkets of which have significant impediments to new office supply;

- the potential for the merger, by increasing the number of office properties operated by Equity Office by approximately 25% based on square footage, to further solidify Equity Office's position as the largest publicly-held owner and operator of office properties in the United States. Were the merger to occur, Equity Office would be the largest or second largest owner and operator of office properties in nine of Equity Office's ten largest office markets in the United States, based on square footage;

- the significant potential rent growth in Spieker's portfolio as a result of prevailing market rents in excess of rental amounts under Spieker's current leases. In the next three years, a total of 52% of the leases in the Spieker portfolio are scheduled to expire and rental rates in effect as of February 22, 2001 under most of those leases were significantly below current rental rates;

- estimated cost savings and reductions in expenses of approximately $25–30 million following the merger through reductions in corporate and executive staff and reductions in office space requirements;

39

**Table of Contents**

- the potential for Equity Office to manage Spieker's office properties efficiently following the merger as a result of the significant geographic overlap of Equity Office's and Spieker's office portfolios;

- the opportunity presented by the merger for Equity Office to expand its existing development pipeline in California and other West Coast markets;

- the number of Equity Office common shares and EOP Partnership units required to be issued in the merger and the partnership merger was fixed and would not be adjusted in the event of a decline in the trading price of Equity Office common shares;

- the due diligence review of Spieker and its assets conducted by Equity Office management and its advisors, including, among other things, site tours of a significant number of Spieker's properties, and Equity Office management's favorable assessment of the quality of Spieker's assets and the significant barriers to additional supply in many of Spieker's markets;

- the estimated post-merger incremental accretion of $0.02 and $0.10 to Equity Office's First Call consensus 2001 and 2002 funds from operations per share estimates of $3.18 and $3.51, respectively, as described under "— Opinion of Morgan Stanley" below;

- the likelihood that Equity Office's leverage, on a pro forma basis after giving effect to the assumption of Spieker's debt in the merger and the debt to be incurred by Equity Office to finance the cash portion of the merger consideration, would improve modestly due to Spieker's lower leverage, as described under "Opinion of Morgan Stanley" below;

- management's belief that the increased size of Equity Office following the merger would provide greater financial flexibility to the merged company and that its increased equity market capitalization would result in greater liquidity for Equity Office's shareholders;

- the report by Equity Office management based on conversations with the rating agencies to the effect that the rating agencies viewed the transaction favorably and confirmed that Equity Office's ratings would likely be affirmed, giving effect to the merger; and

- the opinion, analyses and presentations of Morgan Stanley described under "—Opinion of Morgan Stanley" beginning on page 41, including the opinion of Morgan Stanley that, as of the date of that opinion, and based upon and limited by the matters stated in that opinion, the consideration to be paid by Equity Office under the merger agreement is fair, from a financial point of view, to Equity Office.

*Negative Factors Considered by the Equity Office Board*

The Equity Office board of trustees also considered the following potentially negative factors in its deliberations concerning the merger and the merger agreement:

- management's view that market rents in some of Spieker's markets were declining as a result of an economic slowdown in the broader economy;

- the need to finance the cash portion of the consideration of approximately $900 million payable to Spieker common stockholders in the merger;

- the risk that the anticipated benefits of the merger to Equity Office and its shareholders might not be realized as a result of possible changes in the real estate market in California and other West Coast markets;

- the risk that the anticipated benefits of the merger to Equity Office and its shareholders might not be realized as a result of an inability to operate or dispose of the Spieker portfolio of industrial properties;

- the risk that the anticipated benefits of the merger to Equity Office and its shareholders might not be fully realized as a result of any inability to achieve the anticipated cost savings and reduction in

40

---

Table of Contents

expenses and other potential difficulties in integrating the two companies and their respective operations;

- the limitations on Equity Office's ability to sell a substantial number of Spieker properties resulting from the tax protection agreements to be entered into or assumed in connection with the merger;

- that the shares to be issued as part of the merger consideration were being issued at less than what management believed to be their inherent, long-term value;

- the significant cost involved in connection with completing the merger and the substantial management time and effort required to effect the merger and integrate the businesses of Equity Office and Spieker; and

- the risk that the merger might not be completed based upon the failure to satisfy covenants or closing conditions and the resulting interruption to the business of Equity Office.

The above discussion is not intended to be exhaustive of all factors considered by the Equity Office board, but does set forth all material positive and negative factors considered by the Equity Office board of trustees. The Equity Office trustees present at the February 22, 2001 special meeting of the board unanimously adopted and approved the merger agreement and the merger and recommended approval of the merger agreement and the merger in light of the various factors described above and other factors that each such member of the Equity Office board of trustees felt were appropriate. In view of the wide variety of factors considered by the Equity Office board in connection with its evaluation of the merger and the complexity of these matters, the Equity Office board did not consider it practical, and did not attempt, to quantify, rank or otherwise assign relative weights to the specific factors it considered in reaching its decision. Rather, the Equity Office board made its determination based on the totality of information presented to and the investigation conducted by it. In considering the factors discussed above, individual trustees may have given different weights to different factors.

**Opinion of Morgan Stanley**

Equity Office retained Morgan Stanley to provide it with financial advisory services and a financial fairness opinion in connection with the merger. The Equity Office board of trustees selected Morgan Stanley to act as Equity Office's financial advisor based on Morgan Stanley's qualifications, expertise and reputation and its knowledge of the business and affairs of Equity Office. At the meeting of the Equity Office board on February 22, 2001, Morgan Stanley rendered its oral opinion, subsequently confirmed in writing, that as of February 22, 2001, and subject to and based on the considerations in its opinion, the consideration to be paid by Equity Office pursuant to the merger agreement is fair from a financial point of view to Equity Office.

**The full text of Morgan Stanley's opinion, dated as of February 22, 2001, which sets forth, among other things, the assumptions made, procedures followed, matters considered and limitations on the review undertaken by Morgan Stanley, is attached as <u>Annex B</u> to this joint proxy statement/prospectus. We urge you to read this opinion carefully and in its entirety. Morgan Stanley's opinion is directed to the board of trustees of Equity Office, addresses only the fairness from a financial point of view of the consideration to be paid by Equity Office pursuant to the merger agreement, and does not**

**address any other aspect of the merger or constitute a recommendation with respect to the merger. This summary should be read together with the full text of the opinion.**

In connection with rendering its opinion, Morgan Stanley, among other things:

- reviewed certain publicly available financial statements and other business and financial information of Spieker and Equity Office, respectively;

- reviewed certain internal financial statements and other financial and operating data concerning Spieker and Equity Office, respectively;

41

---

**Table of Contents**

- analyzed certain financial forecasts prepared by the managements of Spieker and Equity Office, respectively;

- reviewed information relating to certain strategic, financial and operational benefits anticipated from the merger, prepared by the managements of Spieker and Equity Office, respectively;

- discussed the past and current operations and financial condition and the prospects of Equity Office, including information relating to certain strategic, financial and operational benefits anticipated from the merger, with senior executives of Equity Office;

- reviewed the pro forma impact of the merger on Equity Office's funds from operations per share, cash flow, consolidated capitalization and financial ratios;

- reviewed the reported prices and trading activity for Spieker common stock and Equity Office common shares, respectively;

- compared the financial performance of Spieker and Equity Office and the prices and trading activity of Spieker common stock and Equity Office common shares with that of certain other publicly–traded companies comparable with Spieker and Equity Office, respectively, and their securities;

- reviewed the financial terms, to the extent publicly available, of certain comparable acquisition transactions;

- participated in discussions and negotiations among representatives of Spieker and Equity Office and their financial and legal advisors;

- reviewed the merger agreement and certain related documents; and

- considered such other factors and performed such other analyses as Morgan Stanley deemed appropriate.

Morgan Stanley assumed and relied upon without independent verification the accuracy and completeness in all material respects of the information supplied or otherwise made available to Morgan Stanley for the purposes of this opinion. With respect to the internal financial forecasts, including information relating to certain strategic, financial and operational benefits anticipated from the merger, Morgan Stanley assumed that they have been reasonably prepared on bases reflecting the best currently available estimates and judgments of the future financial performance of Spieker and Equity Office. In addition, Morgan Stanley assumed that the merger would be consummated in accordance with the terms set forth in the merger agreement. Morgan Stanley did not make any independent valuation or appraisal of the assets or liabilities of Spieker, nor was Morgan Stanley furnished with any such appraisals. The opinion of Morgan Stanley is necessarily based on financial, economic, market and other conditions as in effect on, and the information made available to Morgan Stanley as of, February 22, 2001.

The following is a summary of the material financial analyses performed by Morgan Stanley in connection with its oral opinion and the preparation of its written opinion. These summaries of financial analyses include information presented in tabular format. In order to fully understand the financial analyses used by Morgan Stanley, the tables must be read together with the text of each summary. The tables alone do not constitute a complete description of the financial analyses.

*Historical Share Price Performance.* Morgan Stanley reviewed the historical trading prices for the common stock of Spieker from February 16, 2000 through February 16, 2001. The table below presents the share prices based on specified parameters during the period and presents the premium to such prices implied by the acquisition price. The acquisition price was determined to be $58.50 per share for Spieker, which is based on the $13.50 per share in cash and 1.49586 common shares of Equity Office being offered for each share of Spieker common stock, and assuming a value of $30.083 per share of Equity Office, which was the average closing price of Equity Office for the ten trading days before February 16, 2001.

42

Table of Contents

| Metric | Period Date | Spieker Share Price | Proposal % Premium |
|--------|-------------|---------------------|--------------------|
| Price on February 16, 2001 | 2/16/01 | $ 52.00 | 12.5% |
| Average Price | Last 2 weeks | 52.90 | 10.6 |
| Average Price | Last 6 months | 53.95 | 8.4 |
| Average Price | 2001 | 51.25 | 14.2 |
| Price on February 16, 2000 | 2/16/00 | 40.56 | 44.2 |
| All–Time High | 9/15/00 | 58.88 | (0.6) |

*Net Asset Valuation Analysis.* Using Equity Office's projections of Spieker's performance results for the year 2001 and projected asset and liability balances as of the estimated closing date of June 30, 2001, Morgan Stanley calculated the net asset value per share for Spieker. In so doing, Morgan Stanley applied a range of capitalization rates from 8.25% to 8.75% to Equity Office's projections of Spieker's 2001 net operating income for the office properties, assuming no additional net operating income from future acquisitions or developments, and applied a range of capitalization rates and per square foot values to Spieker's projected, stabilized 2001 net operating income and square footage, respectively, for the industrial properties. The resulting gross real estate value was added to the gross value of Spieker's other assets, including developments in progress, land, cash and marketable securities, certain other assets and fee income (valued at a 5.0x multiple of earnings before interest, taxes, depreciation and amortization), less Spieker's outstanding debt and certain other liabilities, to arrive at an equity net asset value. The equity net asset value per share was then calculated by dividing the equity net asset value by the number of shares of Spieker common stock and Spieker Partnership units outstanding on a fully diluted basis. This analysis indicated a net asset value range of between $55.92 and $62.78 per share. The acquisition price of $58.50 per share for Spieker falls within this range.

*Discounted Cash Flow Analysis.* Morgan Stanley performed discounted cash flow analyses, that is, analyses of the present value, calculated as of June 30, 2001, of both the projected unlevered free cash flows and cash flows to equity of Spieker.

Free Cash Flow Model. Morgan Stanley performed a discounted cash flow analysis, calculated as of June 30, 2001, of the projected free cash flows for the period from 2001 to 2005 of Spieker based upon projections provided by Equity Office. In addition, Morgan Stanley assumed recurring capital expenditures that equal ten percent of net operating income and valued fee income at a 5.0x multiple. Morgan Stanley employed discount rates reflecting an unlevered cost of capital ranging from 12.0% to 13.5% and terminal forward 12–month capitalization rates applied to 2005 net operating income ranging from 9.00% to 10.00%. Based upon Equity Office's projections of Spieker cash flows for the years 2001 through 2005, the range of present values per share of Spieker common stock was as follows:

| | Terminal Forward 12–Month Capitalization Rates | | | | |
|---------------|---------|---------|---------|---------|---------|
| Discount Rates | 9.00% | 9.25% | 9.50% | 9.75% | 10.00% |
| 12.0% | $ 69.91 | $ 67.84 | $ 65.88 | $ 64.01 | $ 62.25 |
| 12.5% | 68.55 | 66.51 | 64.57 | 62.74 | 61.00 |
| 13.0% | 67.21 | 65.20 | 63.30 | 61.50 | 59.78 |
| 13.5% | 65.90 | 63.92 | 62.05 | 60.27 | 58.58 |

This range of present values implied by the free cash flow model exceeds the acquisition price of $58.50 per share for Spieker.

Dividend Discount Model. Morgan Stanley performed a discounted cash flow analysis, calculated as of June 30, 2001, of the projected cash flows to equity for the period from 2001 to 2005 of Spieker based upon projections provided by Equity Office. For the purposes of this analysis, Morgan Stanley grew dividends per share by applying 90.0% of the previous years' funds from operations per share growth rate to the previous year's dividend per share. Morgan Stanley employed discount rates reflecting an equity cost of capital ranging from 14.5% to 16.5% and employed terminal forward 12–month funds from operations multiples applied to 2005 funds from operations per share ranging from

43

Table of Contents

9.0x to 11.0x. Based upon Equity Office's projections of Spieker cash flows to equity for the years 2001 through 2005, the range of present values per share of Spieker common stock was as follows:

| | Terminal Forward 12–Month Funds From Operations Multiples | | | | |
|---------------|---------|---------|---------|---------|---------|
| Discount Rates | 9.0x | 9.5x | 10.0x | 10.5x | 11.0x |
| 14.5% | $57.66 | $60.17 | $ 62.68 | $65.19 | $67.70 |
| 15.0% | 56.88 | 59.35 | 61.82 | 64.30 | 66.77 |
| 15.5% | 56.11 | 58.55 | 60.98 | 63.42 | 65.85 |
| 16.0% | 55.63 | 57.76 | 60.16 | 62.56 | 64.96 |
| 16.5% | 54.62 | 56.98 | 59.35 | 61.71 | 64.07 |

The acquisition price of $58.50 per share for Spieker falls within the above range of present values implied by the dividends discount model.

*Comparable Companies Analysis.* Morgan Stanley compared various publicly available information of Spieker with publicly traded companies that share similar characteristics with Spieker. These companies include:

• Arden Realty Inc.;

• Boston Properties, Inc.;

• CarrAmerica Realty Corporation;

• Equity Office;

• Kilroy Realty Corporation;

• Mack–Cali Realty Corporation;

• Reckson Associates Realty Corp.; and

• SL Green Realty Corp.

Morgan Stanley arrived at a range of comparable company multiples by (1) dividing the share prices (using closing share prices as of February 16, 2001) by consensus 2001 and 2002 funds from operations per share and adjusted funds from operations per share estimates from First Call and Realty Stock Review, respectively, and (2) dividing estimated price/2001 funds from operations multiples by total returns (the sum of existing indicated dividend yield and First Call 5–year growth estimates). Morgan Stanley's calculations resulted in a selected range of price/2001 funds from operations multiples, price/2002 funds from operations multiples, price/2001 adjusted funds from operations multiples, price/2002 adjusted funds from operations multiples and 2001 funds from operations multiple/total return as follows:

|  | Price/2001 Funds From Operations Multiples | Price/2002 Funds From Operations Multiples | Price/2001 Adjusted Funds From Operations Multiples | Price/2002 Adjusted Funds From Operations Multiples | 2001 Funds From Operations Multiples/ Total Return |
|---|---|---|---|---|---|
| High | 11.0x | 9.5x | 14.0x | 12.5x | 60.0% |
| Low | 9.0 | 7.5 | 11.0 | 10.5 | 45.0 |

All multiples were applied to Equity Office's projections for Spieker, and maintenance capital expenditures (for the purposes of calculating adjusted funds from operations) were assumed to be 10% of

Table of Contents

net operating income. Applying a 20% control premium to the above–mentioned selected range of multiples, Morgan Stanley determined an implied value per share of Spieker common stock as follows:

|  | 20% Premium to | | | | |
|---|---|---|---|---|---|
|  | Price/2001 Funds From Operations Multiples | Price/2002 Funds From Operations Multiples | Price/2001 Adjusted Funds From Operations Multiples | Price/2002 Adjusted Funds From Operations Multiples | 2001 Funds From Operations Multiples/ Total Return |
| High | $ 71.54 | $ 75.35 | $ 77.68 | $ 85.19 | $ 73.93 |
| Low | 58.54 | 59.49 | 61.04 | 71.56 | 58.85 |

This range of values implied by the comparable companies analysis exceeds the acquisition price of $58.50 per share for Spieker.

*Premiums Paid in Selected Precedent Transactions Analysis.* Morgan Stanley used publicly available information from several precedent transactions and analyzed the premiums/discounts paid in these transactions over prevailing market prices, 52–week high closing prices and net asset value per share estimates from Green Street Advisors before the announcement of these transactions. Morgan Stanley selected these transactions because they were acquisitions of large, publicly–traded real estate investment trusts in the broader real estate industry.

The transactions reviewed include:

• the Rodamco North America NV acquisition of Urban Shopping Centers, Inc.;

• the Equity Office acquisition of Cornerstone Properties Inc.;

- the Olympus Real Estate Corporation acquisition of Walden Residential Properties, Inc.;

- the Duke Realty Investments, Inc. acquisition of Weeks Corporation;

- The Irvine Company acquisition of Irvine Apartment Communities;

- the ProLogis Trust acquisition of Meridian Industrial Trust;

- the Equity Residential Properties Trust acquisition of Merry Land & Investment Company;

- the New Plan Realty Trust acquisition of Excel Realty Trust;

- the Equity Office acquisition of Beacon Properties Corporation; and

- the Simon Property Group, Inc. acquisition of DeBartolo Realty Corporation.

The table below provides the selected high and low premiums to the unaffected price (average stock price for the 10 trading days ending 5 trading days before the announcement of the transaction), the 52-week high closing price and the Green Street Advisors' net asset value per share estimate (before the announcement of the merger) for the precedent transactions:

| | Premium to | | |
| --- | --- | --- | --- |
| | Unaffected Price | 52-Week High | Green Street Net Asset Value |
| High | 37.7% | 10.6% | 25.6% |
| Low | 12.0% | (1.3%) | 5.9% |

Based on an unaffected share price of $52.00, a 52-week high closing price of $58.88 and Green Street Advisors' net asset value per share estimate of $55.21, these premiums imply a valuation range as follows:

| | Premium to | | |
| --- | --- | --- | --- |
| | Unaffected Price | 52-Week High | Green Street Net Asset Value |
| High | $ 71.60 | $ 65.12 | $ 69.34 |
| Low | 58.24 | 58.11 | 58.46 |

45

---

Table of Contents

The acquisition price of $58.50 per share for Spieker falls within the above range of values implied by the premiums paid in selected precedent transactions analysis.

*Securities Research Analysts' Future Price Targets and Net Asset Value Estimates Analysis.* Morgan Stanley reviewed the net asset value per share and price target estimates for shares of Spieker common stock as estimated by analysts from various financial institutions in recent reports. These financial institutions included: Morgan Stanley, Merrill Lynch, Goldman Sachs, Credit Suisse First Boston and Salomon Smith Barney. Net asset value per share estimates ranged from $56.00 to $62.75 and target price per share estimates ranged from $57.00 to $68.00. The acquisition price of $58.50 per share for Spieker falls within these ranges.

*Pro Forma Merger Analysis.* Morgan Stanley analyzed the effect of the merger on, among other things, the estimated First Call consensus funds from operations per fully diluted Equity Office common share, including EOP Partnership units, for the years ended December 31, 2001–2005. The First Call consensus funds from operations are the funds from operations estimates, and those implied by the long-term growth rate estimates, compiled by First Call Corporation from contributing equity research analysts. In doing so, Morgan Stanley combined the projected operating results for Equity Office and Spieker and assumed a 50% savings in Spieker's general and administrative expenses as well as additional costs related to the transaction of approximately $90 million, all in accordance with estimates provided by the management of Equity Office. Morgan Stanley observed a total projected post-merger incremental accretion of $0.02 and $0.10 to Equity Office's First Call consensus 2001 and 2002 funds from operations per share estimates of $3.18 and $3.51, respectively. The analysis assumed a transaction closing date of June 30, 2001. In calculating the purchase price for Spieker common stock and Spieker Partnership units, a $30.083 share price for Equity Office common shares was assumed, which equals Equity Office's average closing share price for the ten trading days prior to February 16, 2001.

Morgan Stanley also analyzed the effect of the merger on Equity Office's pro forma equity market capitalization, total market capitalization and leverage ratios. In this regard, Morgan Stanley noted that:

- the pro forma equity market capitalization for Equity Office would be approximately $14.2 billion, assuming a share price of $30.083 and assuming approximately 470.6 million Equity Office common shares and EOP Partnership units outstanding after completion of the merger, and the pro forma total market capitalization would be approximately $28.0 billion; and

• Equity Office's debt to total market capitalization ratio would decrease, upon completion of the merger, from 46.2% before the merger to 45.8% after the assumption of Spieker's outstanding debt plus the incremental debt incurred for the cash portion of the transaction consideration and for the payment of the transaction costs.

In connection with the review of the merger by Equity Office's board of trustees, Morgan Stanley performed a variety of financial and comparative analyses for purposes of rendering its opinion. The preparation of a fairness opinion is a complex process and is not necessarily susceptible to a partial analysis or summary description. In arriving at its opinion, Morgan Stanley considered the results of all of its analyses as a whole and did not attribute any particular weight to any analysis or factor considered by it. Morgan Stanley believes that the summary provided and the analyses described above must be considered as a whole and that selecting portions of these analyses, without considering all of them, would create an incomplete view of the process underlying its analyses and opinion. In addition, Morgan Stanley may have given various analyses and factors more or less weight than other analyses and factors and may have deemed various assumptions more or less probable than other assumptions, so that the range of valuations resulting from any particular analysis described above should therefore not be taken to be Morgan Stanley's view of the actual value of Spieker or Equity Office.

In performing its analyses, Morgan Stanley made numerous assumptions with respect to industry performance, general business and economic conditions and other matters, many of which are beyond the control of Equity Office or Spieker. Any estimates contained in Morgan Stanley's analysis are not necessarily indicative of future results or actual values, which may be significantly more or less favorable

46

Table of Contents

than those suggested by these estimates. The analyses performed were prepared solely as a part of Morgan Stanley's analysis of the fairness from a financial point of view of the consideration to be paid by Equity Office pursuant to the merger agreement and were conducted in connection with the delivery by Morgan Stanley of its opinion dated February 22, 2001 to the board of trustees of Equity Office. Morgan Stanley's analyses do not purport to be appraisals or to reflect the prices at which shares of common stock of Spieker or Equity Office might actually trade. The consideration to be paid by Equity Office in the merger was determined through negotiations between Equity Office and Spieker and was approved by Equity Office's board of trustees. Morgan Stanley did not recommend any specific consideration to Equity Office or that any given consideration constituted the only appropriate consideration for the merger.

Morgan Stanley's opinion was one of the many factors taken into consideration by the Equity Office board of trustees in making its determination to approve the merger. Morgan Stanley's analyses summarized above should not be viewed as determinative of the opinion of the Equity Office board of trustees with respect to the value of Spieker or of whether the Equity Office board of trustees would have been willing to agree to a different form of consideration.

Morgan Stanley is an internationally recognized investment banking and advisory firm. Morgan Stanley, as part of its investment banking and financial advisory business, is continuously engaged in the valuation of businesses and their securities in connection with mergers and acquisitions, negotiated underwritings, competitive biddings, secondary distributions of listed and unlisted securities, private placements and valuations for corporate and other purposes. In the past, Morgan Stanley and its affiliates have provided financial advisory and financing services to Equity Office and Spieker and have received customary fees for the rendering of these services. In the ordinary course of business, Morgan Stanley may from time to time trade in the securities of or indebtedness of Equity Office and Spieker for its own account, the accounts of investment funds and other clients under the management of Morgan Stanley and for the accounts of its customers and, accordingly, may at any time hold a long or short position in these securities or indebtedness. Furthermore, Morgan Stanley is financial advisor to, and affiliates of Morgan Stanley are, participants in Constellation Real Technologies LLC, a joint venture in which both Equity Office and Spieker are participants.

Equity Office has agreed to pay Morgan Stanley a financial advisory fee of $9 million upon completion of the transaction. Equity Office has also agreed to reimburse Morgan Stanley for its expenses incurred in performing its services and to indemnify Morgan Stanley and its affiliates, their respective directors, officers, agents and employees and each person, if any, controlling Morgan Stanley or any of its affiliates against certain liabilities and expenses, including certain liabilities under federal securities laws, related to or arising out of Morgan Stanley's engagement and any related transactions.

The merger agreement does not contemplate or provide for Morgan Stanley to update its opinion dated February 22, 2001. Equity Office does not currently intend to request an updated opinion from Morgan Stanley. If there were a material amendment to the merger agreement before the completion of the merger that results in a resolicitation of proxies for the Equity Office and Spieker shareholder votes on the merger agreement and the merger, Equity Office would consider at that time whether it was appropriate to obtain an updated opinion from Morgan Stanley.

### Spieker's Reasons for the Merger; Recommendation of the Spieker Board

The Spieker board of directors approved the merger and approved and adopted the merger agreement at a meeting held on February 22, 2001. The Spieker board believes that the merger agreement, the merger and the other transactions contemplated by the merger agreement are advisable and in the best interests of Spieker and its stockholders. Accordingly, after careful consideration, the Spieker board recommends that Spieker common stockholders vote FOR approval of the merger agreement and

the merger.

In considering the recommendation of the Spieker board with respect to the merger, Spieker stockholders should be aware that some members of the Spieker board as well as some Spieker executive officers have interests in the merger and the partnership merger that differ from, or are in addition to, the

47

**Table of Contents**

interests of Spieker stockholders generally. See "— Conflicts of Interest of Spieker Directors and Executive Officers in the Merger and the Partnership Merger" beginning on page 58.

In determining whether to adopt and approve the merger agreement and the merger and to recommend approval of the merger agreement and the merger by the Spieker stockholders, the Spieker board of directors considered the following matters as specified by the Spieker charter as part of its consideration of the positive and negative factors discussed below:

- the economic effect, both immediate and long–term, upon Spieker's stockholders;

- the social and economic effect on the employees of, customers of, and others dealing with, Spieker and its subsidiaries and on the communities in which Spieker and its subsidiaries operate or are located;

- the acceptability of the proposed merger based on the historical and current operating results or financial condition of Spieker;

- whether a more favorable price could be obtained for Spieker's stock or other securities in the future;

- the reputation and business practices of Equity Office and its management and affiliates as they would affect the employees of Spieker and its subsidiaries;

- the future value of the stock or any other securities of Spieker;

- any antitrust or other legal and regulatory issues that are raised by the proposed merger; and

- the business and financial condition and earnings prospects of Equity Office, including, but not limited to, debt service and other existing financial obligations, financial obligations to be incurred in connection with the proposed merger and other likely financial obligations of Equity Office.

Set forth below is a discussion of all material positive and negative factors considered by the Spieker board of directors in making its determination to adopt and approve the merger agreement and the merger. As used in this discussion, (1) references to the assets and business activities of Spieker mean the assets and business activities of Spieker Partnership, through which Spieker conducts substantially all of its operations and (2) references to the assets and business activities of Equity Office mean the assets and business activities of EOP Partnership, through which Equity Office conducts substantially all of its operations. Neither Equity Office nor Spieker has material assets other than their respective interests in EOP Partnership and Spieker Partnership and they conduct all of their business activities through those partnerships.

*Positive Factors Considered by the Spieker Board*

In addition, in making the determination described above, the Spieker board of directors discussed with Spieker senior management, as well as its financial and legal advisors, and considered a number of factors, including the following material positive factors:

- the terms of the merger agreement, including that each share of Spieker common stock will be converted into $13.50 in cash and 1.49586 common shares of Equity Office, representing based on the implied $58.50 per share price (1) a premium of 10% over the average closing price for Spieker common stock for the 10 day trading period ending February 14, 2001, which was the 10 day trading period over which the exchange ratio was determined, (2) a premium of 12% over the Spieker common stock price based on the closing stock price for Spieker on February 22, 2001 and (3) 97.6% of the 52–week high closing price for Spieker common stock;

- management's assessment that a merger of Spieker with another entity with broader geographic markets and a more diverse property portfolio was Spieker's most attractive strategic alternative, and that a combination of Spieker and Equity Office would be expected to produce a combined company with better than average risk–adjusted returns due to, among other things:

48

Table of Contents

    — the overlap of Equity Office's properties in the markets where Spieker operates that would result in a strong concentration of ownership in those markets;

    — the fact that the combined company to result from the merger would be focused on the type of markets that Spieker had traditionally focused on — that is, markets with high barriers to entry due to the fact that those markets are already substantially built out; and

    — Equity Office's strong market position in the top ten office real estate markets in the nation;

• the belief that Equity Office's common shares trade below the net asset value of its property portfolio, indicating the potential for future appreciation in the trading prices for Equity Office common shares;

• the reputation and strength of Equity Office's management team;

• the fact that a merger with Equity Office would result in a larger, more diverse and more liquid stockholder base for the Spieker stockholders, including any Spieker Partnership unitholders who receive shares of Spieker common stock by converting their units into those shares before the partnership merger or who receive Equity Office common shares by redeeming EOP Partnership units after the partnership merger, and the likelihood that the larger, more diverse stockholder base of the combined company would result in a lower cost of capital for the combined company;

• the fact that two to three representatives of Spieker were to be elected to the Equity Office board of trustees for a period of time, so that Spieker stockholders' interests will continue to be represented following the merger;

• the due diligence review of Equity Office and its assets conducted by or on behalf of Spieker management by its advisors, including, among other things, site tours of a significant number of Equity Office's properties, and Spieker management's assessment of the high quality of Equity Office's assets;

• historical and prospective information concerning Equity Office's and Spieker's respective businesses, operations and financial performance, including, among other things, the earnings prospects of Equity Office and its debt service and financial obligations, both before and after the merger;

• Spieker management's assessment of the high quality of the tenant base of Equity Office, and correspondingly its low delinquency rate;

• the financial presentation of Goldman Sachs on February 22, 2001 and the opinion of Goldman Sachs rendered to the Spieker board on that date to the effect that, as of such date and based upon and subject to the matters set forth in that opinion, the consideration to be received by the holders of Spieker common stock pursuant to the merger agreement was fair from a financial point of view to those holders;

• the social and economic effect on the employees of Spieker and its subsidiaries, including, among other things, (1) that Equity Office had been recognized in *Fortune* magazine as the most admired real estate company, (2) that Equity Office's benefit plans were at least as favorable as those of Spieker and (3) that the merger agreement required Equity Office to allow Spieker employees to participate in Equity Office plans in the same manner as similarly situated Equity Office employees or, if not practicable in the determination of Equity Office, to allow Spieker employees to continue to be eligible to participate in Spieker employee benefit plans;

• the expected benefits of the proposed merger on Spieker's customers that would result from the merger as a result of Equity Office's national presence, including, among other things, the fact that Spieker customers would only have to deal with one landlord for many of their office space needs nationwide and would be able to use conference facilities or excess space in markets where the customer does not have a permanent office;

49

Table of Contents

• the report by Spieker management based on conversations of Equity Office with the rating agencies to the effect that the rating agencies had viewed the transaction favorably and confirmed that Equity Office's ratings would not be reduced as a result of the merger; and

• the fact that the stock component of the consideration to Spieker common stockholders generally will be a tax–free transaction to those stockholders.

*Negative Factors Considered by the Spieker Board*

    The Spieker board of directors also considered the following potentially negative factors, among others, in determining whether to adopt and approve the merger agreement and the merger and to recommend approval of the merger agreement and the merger by the Spieker stockholders:

•

the fact that a significant portion of the consideration to be received by Spieker common stockholders consists of Equity Office common shares the exact number of which will be determined pursuant to a fixed exchange ratio. As a result, a decrease in the trading price of Equity Office common shares before the closing of the merger will reduce the value of the per share and aggregate consideration that will be received by the Spieker stockholders;

• the risk that the anticipated benefits of the merger to Spieker stockholders discussed above under "— Positive Factors Considered by the Spieker Board" may not be realized as a result of possible changes in the real estate market, or as a result of potential difficulties in integrating the two companies and their respective operations;

• the likelihood that in the short term the combined company would grow more slowly than First Call consensus estimates indicated that Spieker would on a stand–alone basis;

• the possibility that the public announcement of the merger would make it more difficult for Spieker to retain employees because of the likelihood that some Spieker employees would anticipate that they did not have a position with the combined company and would begin to search for new employment even before the merger closed;

• the possibility that the public announcement of the merger would lead to a decrease in the trading price of Equity Office's common shares which, due to the fact that a substantial portion of the consideration to be received by Spieker common stockholders in the merger is based on the value of Equity Office's common shares, would reduce the overall value of the merger consideration;

• the significant cost involved in connection with completing the merger, the substantial management time and effort required to effectuate the merger and integrate the businesses of the companies and the related disruption to Spieker's operations; and

• the $160 million termination fee payable by Spieker and Spieker Partnership to EOP Partnership under some circumstances and the specific circumstances under which that fee is payable, which might discourage some proposals to acquire Spieker in the 12 months following termination of the merger agreement because of the increased price that the acquiror would have to pay.

The above discussion is not intended to be exhaustive of all factors considered by the Spieker board, but does set forth all material positive and negative factors considered by the Spieker board of directors. The Spieker directors present at the February 22, 2001 special meeting of the board unanimously approved the merger and recommended approval of the merger in light of the various factors described above and other factors that each such member of the Spieker board of directors felt were appropriate. In view of the wide variety of factors considered by the Spieker board in connection with its evaluation of the merger and the complexity of these matters, the Spieker board did not consider it practical, and did not attempt, to quantify, rank or otherwise assign relative weights to the specific factors it considered in reaching its decision. Rather, the Spieker board made its recommendation based on the totality of information presented to and the investigation conducted by it. In considering the factors discussed above, individual directors may have given different weights to different factors.

50

---

Table of Contents

**Opinion of Goldman Sachs**

On February 22, 2001, Goldman, Sachs & Co. delivered an oral opinion to the board of directors of Spieker, subsequently confirmed by delivery of a written opinion, dated as of February 22, 2001, that, as of that date and subject to the matters and assumptions set forth in the opinion, the consideration, consisting of $13.50 in cash and 1.49586 Equity Office common shares per share of Spieker common stock, to be received in connection with the merger was fair from a financial point of view to the holders of shares of Spieker common stock.

**The full text of the written opinion of Goldman Sachs, dated as of February 22, 2001, which sets forth the assumptions made, procedures followed, matters considered and limitations on the review undertaken by Goldman Sachs in connection with the opinion, is attached as <u>Annex C</u> and is incorporated by reference in this proxy statement/ prospectus. Spieker stockholders are urged to, and should, read the opinion in its entirety.**

In connection with its opinion, Goldman Sachs reviewed, among other things:

• the merger agreement;

• annual reports to shareholders and annual reports on Form 10–K of Spieker and Equity Office, respectively, for the three years ended December 31, 1999;

• a draft of the audited financial statements for Spieker for the year ended December 31, 2000;

• various interim reports to shareholders and quarterly reports on Form 10–Q of Spieker and Equity Office, respectively;

• various other communications from Spieker and Equity Office to their respective shareholders; and

- various internal financial analyses and forecasts for Spieker and Equity Office prepared by their respective managements, including various cost savings and operating synergies projected by the managements of Spieker and Equity Office to result from the merger.

Goldman Sachs also held discussions with members of the senior managements of Spieker and Equity Office regarding their assessment of the strategic rationale for, and the potential benefits of, the transactions contemplated by the merger agreement and the past and current business operations, financial condition and future prospects of Spieker and Equity Office. In addition, Goldman Sachs:

- reviewed the reported price and trading activity for the common stock of Spieker and the Equity Office common shares;

- compared financial and stock market information for Spieker and Equity Office with similar information for the securities of other publicly traded companies;

- reviewed the financial terms of recent business combinations in the real estate industry specifically, and in other industries generally; and

- performed other studies and analyses that Goldman Sachs considered appropriate.

Goldman Sachs relied upon the accuracy and completeness of all of the financial and other information that was discussed with or reviewed by it. Goldman Sachs assumed the accuracy and completeness of this information for purposes of rendering its opinion. Goldman Sachs did not make an independent evaluation or appraisal of the assets and liabilities of Spieker or Equity Office or any of their subsidiaries and was not furnished with an evaluation or appraisal of any of these assets or liabilities. With the consent of the Spieker board of directors, Goldman Sachs took into account the views of Spieker's management regarding the risks and uncertainties relating to Spieker's ability to achieve the forecasts prepared by Spieker's management in the amounts and time periods contemplated by those forecasts. Goldman Sachs was not requested to solicit, and did not solicit, interest from other parties with respect to an acquisition of, or other business combination with, Spieker. Goldman Sachs provided its advisory services and opinion for the information and assistance of the board of directors of Spieker in connection

51

---

Table of Contents

with its consideration of the merger. **Goldman Sachs' opinion does not constitute a recommendation as to how any holder of common stock of Spieker should vote with respect to the merger.**

In connection with its opinion, Goldman Sachs noted that pursuant to the merger agreement, Spieker Partnership, an affiliate of Spieker, will be merged with and into EOP Partnership, an affiliate of Equity Office, and each partnership unit of Spieker Partnership, other than preferred partnership interests, will be exchanged for 1.94462 partnership units of EOP Partnership. Goldman Sachs also noted that, pursuant to the partnership agreement of Spieker Partnership, holders of partnership units of Spieker Partnership, other than preferred partnership interests, have the right, exercisable prior to the completion of the transactions contemplated by the merger agreement, to convert their partnership units into shares of Spieker common stock and thereby receive the consideration provided for in the merger for shares of Spieker common stock. In rendering its opinion, Goldman Sachs did not opine on the consideration to be received by holders of partnership units of Spieker Partnership in the transactions contemplated by the merger agreement or the differential treatment afforded to the holders of those partnership units in comparison to the consideration to be received by the holders of shares of Spieker common stock in the merger.

The following is a summary of the material financial analyses utilized by Goldman Sachs and furnished to the Spieker board of directors in connection with the rendering of the Goldman Sachs opinion. This summary does not purport to be a complete description of the analyses performed by Goldman Sachs. The order of the analyses described, and the results of those analyses, do not represent the relative importance or weight given to the analyses by Goldman Sachs.

**The following summaries of financial analyses include information presented in tabular format. You should read these tables together with the text of each summary.**

*Analysis of Consideration.* Goldman Sachs reviewed the consideration to be received by holders of shares of Spieker common stock in the merger. This consideration consists of (1) $13.50 in cash and (2) 1.49586 common shares of Equity Office per share of Spieker common stock. Based on the average closing price of Equity Office common shares on the NYSE over the 10 trading days ended February 15, 2001, Goldman Sachs noted that the consideration in connection with the merger would be equivalent to $58.50 per share. Goldman Sachs also noted that, based on the closing price of Equity Office common shares on the NYSE on February 21, 2001, two days prior to announcement of the merger, the consideration in connection with the merger would be equivalent to $57.73 per share.

*Accretion/ Dilution Summary.* Goldman Sachs analyzed the financial impact of the merger on the funds from operations of Equity Office common shares. These analyses were based on consensus estimates of the Institutional Brokers Estimate System, or IBES, for Spieker and Equity Office. For each of the years 2001 and 2002, Goldman Sachs analyzed the estimated funds from operations per share of Spieker common stock and Equity Office common shares, interest expense and the projected synergies to result from the merger to calculate the estimated accretion/ dilution on Equity Office's common shares. Assuming the completion of the merger by June 30, 2001 and assuming synergies of $10 million in 2001 and $25 million in 2002, Goldman Sachs' analysis indicated the merger would be dilutive by $0.06 per share in 2001 and add $0.02 per share in 2002. Goldman Sachs also

performed the same analysis using internal projections prepared by Spieker management for Spieker, which resulted in less dilution in 2001 and more accretion in 2002.

*Comparison of Office Real Estate Companies.* Using Spieker management projections and IBES consensus estimates, Goldman Sachs reviewed and compared selected financial information and multiples

52

**Table of Contents**

for Spieker to corresponding financial information and multiples for the following office real estate companies:

- Boston Properties, Inc.;
- Vornado Realty Trust;
- SL Green Realty Corp.;
- Equity Office;
- CarrAmerica Realty Corporation;
- Kilroy Realty Corporation;
- TrizecHahn Corporation;
- Reckson Associates Realty Corp.;
- Arden Realty Inc.; and
- Mack-Cali Realty Corporation.

Goldman Sachs calculated the funds from operations multiples and other financial information for Spieker at (1) the implied transaction price, based on the closing price for shares of Spieker common stock on the NYSE on February 21, 2001 and the exchange ratio, (2) the implied transaction price, based on the closing price for shares of Spieker common stock on the NYSE on February 21, 2001 and the exchange ratio and an adjustment to funds from operations to include the effect of straight-lined rents, and (3) the current market price, based on the closing price for shares of Spieker common stock on the NYSE on February 21, 2001. The multiples and other financial information calculated by Goldman Sachs are based on the closing prices on February 21, 2001 for shares of Spieker and the selected companies' common stock and the most recent publicly available information for Spieker and the selected companies. The funds from operations and five year growth estimates for Spieker and the selected companies were based on IBES estimates. The five-year growth estimates for Spieker were based on IBES estimates. Goldman Sachs' analysis of the selected companies compared the following to the results for Spieker:

- the February 21, 2001 closing share price as a percentage of the 52-week high share price;

- total market capitalization;

- net debt as a percentage of total market capitalization;

- the 2001 and 2002 estimated funds from operations multiples;

- the estimated funds from operations growth rate for 2001 to 2002;

- five-year estimated growth rate; and

- the multiple of the 2002 estimated funds from operations multiple to the five-year growth rate.

The results of these analyses with respect to Spieker are summarized as follows:

| | Transaction price | Transaction price— adjusted | Current market price |
|---|---|---|---|
| February 21, 2001 closing share price as a percentage of the 52-week high share price | 97.6% | 97.6% | 89.0% |
| Common equity market capitalization (in millions) | $4,377.7 | $4,377.7 | $3,990.8 |
| Net debt (in millions) | $2,041.8 | $2,041.8 | $2,041.8 |
| Preferred equity market capitalization (in millions) | $ 431.3 | $ 431.3 | $ 431.3 |
| Total market capitalization (in millions) | $6,850.9 | $6,850.9 | $6,463.9 |
| Net debt as a percentage of total market capitalization | 29.8% | 29.8% | 31.6% |
| Estimated funds from operations multiples for 2001 | 11.5x | 11.0x | 10.5x |
| Estimated funds from operations multiples for 2002 | 10.0x | 9.6x | 9.1x |
| Estimated funds from operations growth rate for 2001 to 2002 | 15.8% | 15.1% | 15.8% |
| Five-year estimated growth rate | 13.0% | 13.0% | 13.0% |
| Multiple of the 2002 estimated funds from operations multiple to the five-year growth rate | 0.8x | 0.7x | 0.7x |

53

Table of Contents

Goldman Sachs also performed the same analyses using projections prepared by Spieker management for Spieker, which yielded lower funds from operations multiples and higher growth rates.

The results of these analyses with respect to the selected office real estate companies are as follows:

| | Selected Office Real Estate Companies | | | |
| | High | Median | Mean | Low |
|---|---|---|---|---|
| February 21, 2001 closing share price as a percentage of the 52–week high share price | 93.0% | 88.5% | 89.0% | 85.1% |
| Total market capitalization (in millions) | $19,684.4 | $3,551.7 | $5,751.9 | $1,314.4 |
| Net debt as a percentage of total market capitalization | 60.9% | 40.7% | 41.5% | 31.8% |
| Estimated funds from operations multiples for 2001 | 11.1x | 8.9x | 8.9x | 7.3x |
| Estimated funds from operations multiples for 2002 | 9.5x | 8.1x | 8.1x | 6.8x |
| Estimated funds from operations growth rate for 2001 to 2002 | 16.7% | 9.9% | 10.3% | 6.8% |
| Five–year estimated growth rate | 15.0% | 9.8% | 10.1% | 7.5% |
| Multiple of the 2002 estimated funds from operations multiple to the five–year growth rate | 0.9x | 0.8x | 0.8x | 0.5x |

*Net Asset Value Analyses.* Using information provided by Spieker management, Goldman Sachs calculated the net asset value, or NAV, per share for Spieker common stock by subtracting debt and other liabilities from gross assets. Goldman Sachs calculated gross assets by applying capitalization rates ranging from 8.25% to 9.00% to Spieker's annualized net operating income of $584.9 million. Spieker's annualized net operating income was based on cash net operating income for its stabilized properties for the fourth quarter of 2000. In calculating Spieker's cash net operating income, Goldman Sachs did not utilize straight–lined accounting methodologies. Goldman Sachs added the value of Spieker's other assets to Spieker's gross assets. These other assets included developments in progress, valued at 110% of book value to account for developer's profit, land held for development, valued at book value, and management fees, valued, by Spieker's management, at a multiple of 5.0x earnings before interest, taxes, depreciation and amortization, or EBITDA. This analysis indicated Spieker's NAV per share as follows:

| Capitalization rate | NAV per share of Spieker common stock |
|---|---|
| 8.25% | $ 60.30 |
| 8.50% | $ 57.64 |
| 8.75% | $ 55.12 |
| 9.00% | $ 52.75 |

Based on publicly disclosed information, Goldman Sachs also calculated the NAV per Equity Office common share by subtracting debt and other liabilities from gross assets. Goldman Sachs calculated gross assets by applying capitalization rates ranging from 8.50% to 9.00% to Equity Office's annualized net operating income of $1,629.7 million. Equity Office's annualized net operating income was based on net operating income for its stabilized properties for the fourth quarter of 2000. In calculating Equity Office's net operating income, Goldman Sachs did not utilize straight–lined accounting methodologies. Goldman Sachs added the value of Equity Office's other assets to Equity Office's gross assets. These other assets included developments in progress, valued at 110% of book value to account for developer's profit, land held for development, valued at book value, management fees, valued, by Equity Office's management, at

Table of Contents

a multiple of 5.0x EBITDA, and investments in unconsolidated subsidiaries, valued using the equity method. This analysis indicated Equity Office's NAV per share as follows:

| Capitalization rate | NAV per Equity Office common share |
|---|---|
| 8.50% | $ 32.40 |
| 8.75% | $ 30.90 |
| 9.00% | $ 29.43 |

*Exchange Ratio Analysis.* Goldman Sachs reviewed the exchange ratio history for various periods ending February 21, 2001. Goldman Sachs calculated the implied historical exchange ratios of shares of Spieker common stock to Equity Office common shares for the average and high of the periods set forth below and for February 21, 2001 as follows:

| Period | Implied Exchange Ratio |
|---|---|

|  |  |
|---|---|
| February 21, 2001 | 1.78x |
| Three months average for the period ended February 21, 2001 | 1.68x |
| Six months average for the period ended February 21, 2001 | 1.76x |
| One year average for the period ended February 21, 2001 | 1.74x |
| One year high for the period ended February 21, 2001 | 1.90x |
| Three year high for the period ended February 21, 2001 | 1.90x |

Goldman Sachs also noted that, based on the average closing price of Equity Office common shares on the NYSE over the 10 trading days ended February 15, 2001 and hypothetically converting the cash consideration payable in the merger into Equity Office common shares at that average value, the exchange ratio for an all–stock merger would be 1.94462.

*Discounted Cash Flow Analysis.* Goldman Sachs performed a discounted cash flow analysis by calculating the present value of estimated annual dividends for Spieker for 2001 through 2005 based upon Spieker's management projections. Goldman Sachs calculated the terminal values based on funds from operations multiples ranging from 7.0x to 9.0x applied to the projected 2006 funds from operations per share. Goldman Sachs discounted the dividends and the terminal values to present value based on discount rates ranging from 12.0% to 15.0%. The results of this analysis were as follows:

| Terminal funds from operations multiple | Equity discount rate | | | |
|---|---|---|---|---|
|  | 12.0% | 13.0% | 14.0% | 15.0% |
| 7.0x | $54.03 | $51.96 | $50.00 | $48.14 |
| 7.5x | $56.65 | $54.48 | $52.41 | $50.44 |
| 8.0x | $59.28 | $56.99 | $54.81 | $52.74 |
| 8.5x | $61.90 | $59.50 | $57.21 | $55.04 |
| 9.0x | $64.53 | $62.01 | $59.61 | $57.34 |

55

**Table of Contents**

*Selected Public REIT Mergers.* Goldman Sachs analyzed information relating to the following eight comparable transactions in the real estate investment trust industry since 1997:

| Acquirer | Target |
|---|---|
| Equity Office Properties Trust | Cornerstone Properties Inc. |
| Duke Realty Investments, Inc. | Weeks Corporation |
| ProLogis Trust | Meridian Industrial Trust, Inc. |
| Equity Residential Properties Trust | Merry Land & Investment Company, Inc. |
| Equity Office Properties Trust | Beacon Properties Corporation |
| Rodamco North America | Urban Shopping Centers Inc. |
| Olympus Real Estate Fund II, L.P. | Walden Residential Properties, Inc. |
| Berkshire Realty Holdings, L.P. | Berkshire Realty Company, Inc. |

Goldman Sachs compared the following information relating to the selected transactions to the proposed merger:

- the premium of the implied offer price to the target stock price on the day prior to announcement of the particular transaction;

- the target's funds from operations multiple (based on the closing price of the target's shares on the day prior to announcement of the particular transaction and IBES funds from operations estimates for the forward year);

- the acquirer's funds from operations (based on the closing price of the acquirer's shares on the day prior to announcement of the particular transaction and IBES funds from operations estimates for the forward year);

- the transaction funds from operations multiple (based on the implied offer price and IBES funds from operations estimates for the forward year); and

- the transaction funds from operations multiple as a percentage of the acquirer's funds from operations.

The results of this analysis were as follows:

|  | Selected REIT Mergers | | | | Proposed merger |
|---|---|---|---|---|---|
|  | High | Median | Mean | Low |  |
| Premium of implied offer price to target stock price on day prior to announcement | 39.4% | 22.2% | 21.8% | 11.5% | 10.4% |
| Target's funds from operations multiple | 12.1x | 8.9x | 9.2x | 7.1x | 10.4x |
| Acquirer's funds from operations multiple | 16.8x | 10.5x | 11.4x | 9.2x | 9.3x |
| Transaction funds from operations multiple | 15.6x | 10.9x | 11.2x | 8.7x | 11.5x |

| Transaction funds from operations multiple as a percentage of acquirer's funds from operations multiple | 116.8% | 98.4% | 102.0% | 92.7% | 124.1% |
| --- | --- | --- | --- | --- | --- |

The preparation of a fairness opinion is a complex process and is not necessarily susceptible to partial analysis or summary description. Selecting portions of the analyses or of the summary set forth above, without considering the analyses as a whole, could create an incomplete view of the processes underlying Goldman Sachs' opinion. In arriving at its fairness determination, Goldman Sachs considered the results of all these analyses and did not attribute any particular weight to any factor or analysis considered by it; rather, Goldman Sachs made its determination as to fairness on the basis of its experience and professional judgment after considering the results of all of these analyses. No company or transaction used in the above analyses is directly comparable to Spieker or Equity Office or the transactions contemplated by the merger agreement.

Goldman Sachs prepared these analyses solely for purposes of providing an opinion to the Spieker board of directors. The analyses do not purport to be appraisals or necessarily reflect the prices at which businesses or securities actually may be sold. Analyses based upon forecasts of future results are not

56

---

**Table of Contents**

necessarily indicative of actual future results, which may be significantly more or less favorable than those suggested by these analyses. Because these analyses are inherently subject to uncertainty, being based upon numerous factors or events beyond the control of the parties or their respective advisors, none of Spieker, Equity Office, Goldman Sachs or any other person assumes responsibility if future results are materially different from those forecast. As described above, the financial analyses presented by Goldman Sachs to the Spieker board of directors was one of many factors taken into consideration by the Spieker board of directors in making its determination to approve the transactions contemplated by the merger agreement.

Goldman Sachs, as part of its investment banking business, is continually engaged in the valuation of businesses and their securities in connection with mergers and acquisitions, negotiated underwritings, competitive biddings, secondary distributions of listed and unlisted securities, private placements and valuations for estate, corporate and other purposes. Goldman Sachs is familiar with Spieker having provided investment banking services to Spieker from time to time, for which it received customary compensation, including having acted as:

- lead–managing underwriter of a public offering of $150 million aggregate principal amount of 6.75% notes due January 15, 2008 of Spieker Partnership, an affiliate of Spieker, in January 1998;

- lead–managing underwriter of a private placement of 4,000,000 series D cumulative redeemable preferred units of Spieker Partnership in June 1998;

- lead–managing underwriter of a public offering of $200 million aggregate principal amount of 7.25% notes due May 1, 2009 of Spieker Partnership in May 1999;

- lead–managing underwriter of a public offering of $200 million aggregate principal amount of 6.80% notes due May 1, 2004 of Spieker Partnership in May 1999;

- lead–managing underwriter of a public offering of $200 million aggregate principal amount of 7.65% notes due December 15, 2010 of Spieker Partnership in December 2000; and

- its financial advisor in connection with the merger agreement.

Goldman Sachs also has provided investment banking services to Equity Office from time to time, for which it received customary compensation, including having acted as:

- co–managing underwriter of a public offering of $300 million aggregate principal amount of 6.763% notes due 2007 of EOP Partnership in June 1998;

- lead–managing underwriter of a public offering of 4,765,423 common shares of Equity Office in October 1998;

- co–managing underwriter of an offering of $500 million aggregate principal amount of 6.8% notes due January 15, 2009 of EOP Partnership in January 1999;

- co–managing underwriter of an offering of $300 million aggregate principal amount of 6.5% notes due January 15, 2004 of EOP Partnership in January 1999;

- co–managing underwriter of an offering of $200 million aggregate principal amount of 6.375% notes due January 15, 2002 of EOP Partnership in January 1999;

- co–managing underwriter of a public offering of $500 million aggregate principal amount of 8.375% notes due March 15, 2006 of EOP Partnership in March 2000; and

- co–lead–managing underwriter of a public offering of $400 million aggregate principal amount of 7 3/8% notes due 2003 of EOP Partnership in November 2000.

Goldman Sachs provides a full range of financial advisory and securities services and, in the course of its normal trading activities, may from time to time effect transactions and hold positions in securities, including derivative securities, of Spieker or Equity Office for its own account and for the accounts of customers. As of February 22, 2001, Goldman Sachs held a net long position of 2,661,085 Equity Office

57

Table of Contents

common shares. Goldman Sachs may provide investment banking services to Equity Office and its subsidiaries in the future.

Pursuant to a letter agreement dated February 16, 2001, Spieker engaged Goldman Sachs to render general financial advisory services in connection with the sale of all or a portion of Spieker to Equity Office. Under the terms of this letter agreement, Spieker has agreed to pay Goldman Sachs a fee of $6 million payable upon the closing of the merger. Spieker also has agreed to reimburse Goldman Sachs for its reasonable out–of–pocket expenses, including attorneys' fees, and to indemnify Goldman Sachs against various liabilities, including liabilities under the federal securities laws.

The merger agreement does not contemplate or provide for Goldman Sachs to update its opinion dated February 22, 2001. Spieker does not currently intend to request an updated opinion from Goldman Sachs. If there were a material amendment to the merger agreement before the completion of the merger that results in a resolicitation of proxies for the Spieker and Equity Office shareholder votes on the merger agreement and the merger, Spieker would consider at that time whether it was appropriate to obtain an updated opinion from Goldman Sachs.

## Trustees and Executive Officers of Equity Office After the Merger

Following the merger, the 13 current trustees of Equity Office will remain as trustees of the combined entity. In addition, three current directors or executive officers of Spieker, Messrs. Spieker, Foster and Vought will become trustees of the combined entity. Mr. Spieker's term will expire in 2004, Mr. Vought's in 2003 and Mr. Foster's in 2002.

Following the merger, the current executive officers of Equity Office will remain as executive officers of Equity Office. No current executive officers of Spieker will become executive officers of Equity Office following the merger.

## Conflicts of Interest of Spieker Directors and Executive Officers in the Merger and the Partnership Merger

In considering the recommendation of the Spieker board with respect to the merger, Spieker stockholders should be aware that, as described below, some Spieker directors and executive officers have interests in, and will receive benefits from, the merger and the partnership merger that differ from, or are in addition to, and, therefore, may conflict with the interests of Spieker stockholders generally.

*Trustees of Equity Office After the Merger.* Following the merger, the 13 current trustees of Equity Office will remain as trustees of the combined entity. In addition, Messrs. Spieker, Foster and Vought will become trustees of the combined entity. See "— Trustees and Executive Officers of Equity Office After the Merger" above.

*Indemnification and Insurance.* The merger agreement provides that Equity Office and EOP Partnership will provide exculpation and indemnification for each person who has been at any time on or before February 22, 2001, or who becomes before the completion of the merger, a director or officer of Spieker or any Spieker subsidiary which is the same as the exculpation and indemnification provided by Spieker and Spieker Partnership as of the date of the merger agreement. In addition, Equity Office and EOP Partnership will indemnify and hold harmless those persons against any losses, claims, liabilities, expenses, judgments, fines and amounts paid in settlement arising out of the fact that the person is or was an officer, employee or director of Spieker or any of Spieker's subsidiaries or out of the merger agreement or the transactions contemplated by the merger agreement to the fullest extent permitted by law. Further, Equity Office has agreed to purchase directors' and officers' liability insurance coverage for the benefit of those individuals currently covered by Spieker's insurance for a period of six years following the merger. For a more complete discussion of these provisions of the merger agreement, see "The Merger Agreement — Indemnification; Directors' and Officers' Insurance" beginning on page 84.

*Equity–Based Awards.* Unvested options to purchase an aggregate of 1,075,247 shares of Spieker common stock at an average exercise price of $38.33 per share previously awarded to 17 Spieker directors

58

Table of Contents

and executive officers will vest in connection with the merger pursuant to the plans under which they were issued and in any event no later than the day before the merger closes. These 17 Spieker directors and executive officers currently hold vested options to purchase an aggregate of an additional 2,577,505 shares of Spieker common stock at an average exercise price of $30.48. All Spieker stock options will be converted in the merger into options to purchase Equity Office common shares under the terms of the merger agreement. Under the merger agreement, holders of Spieker stock options will be entitled to tender the Equity Office

options that they will receive in the merger to EOP Partnership for a cash payment per option converted in the merger equal to the excess, if any, of $58.50 per Spieker option over the exercise price of the Spieker option, which acquisition and payment will be made within three business days of the closing of the merger. Options to purchase Equity Office common shares that are not tendered to EOP Partnership as described above would remain outstanding under their terms.

The following table sets forth the unvested Spieker stock options held by Spieker directors and executive officers the vesting of which will accelerate in connection with the merger, the total outstanding Spieker stock options held by such persons, the average exercise price of the outstanding Spieker stock options and the cash value of the tender of all outstanding options held by such persons at the $58.50 per option tender price.

| Name | Unvested Spieker Stock Options | Total Outstanding Spieker Stock Options | Average Exercise Price of Outstanding Spieker Stock Options | Cash Value of Tender of Outstanding Stock Options |
|---|---|---|---|---|
| Warren E. Spieker, Jr. | 116,000 | 722,500 | $29.73 | $20,786,325 |
| John K. French | 82,000 | 432,000 | $31.04 | 11,862,720 |
| Dennis E. Singleton | 48,000 | 342,500 | $28.20 | 10,377,750 |
| Richard J. Bertero | 10,000 | 23,500 | $37.04 | 504,310 |
| Harold M. Messmer, Jr. | 10,000 | 10,000 | $42.19 | 163,100 |
| David M. Petrone | 10,000 | 14,000 | $40.85 | 247,100 |
| William S. Thompson, Jr. | 10,000 | 23,500 | $37.04 | 504,310 |
| John A. Foster | 128,400 | 354,500 | $34.31 | 8,575,355 |
| Craig G. Vought | 162,000 | 542,500 | $32.68 | 14,007,350 |
| Joseph D. Russell, Jr. | 71,400 | 132,200 | $38.99 | 2,579,222 |
| Peter H. Schnugg | 72,247 | 193,552 | $35.67 | 4,418,792 |
| Stuart A. Rothstein | 53,000 | 120,000 | $37.07 | 2,571,600 |
| James C. Eddy | 69,200 | 203,500 | $32.80 | 5,229,950 |
| All other executive officers as a group (4 persons) | 233,000 | 538,500 | $36.08 | 12,073,170 |
| All directors and executive officers as a group who have agreed to tender their options (11 persons)(1) | 946,247 | 3,417,752 | $32.41 | $89,169,150 |
| All directors and executive officers as a group (17 persons) | 1,075,247 | 3,652,752 | $32.79 | $93,912,254 |

(1) These directors and executive officers are: Messrs. Spieker, French, Singleton, Foster, Vought, Russell, Davenport and Schnugg and three other executive officers.

In addition, 205,182 unvested shares of Spieker restricted stock previously awarded to Spieker directors and executive officers will vest on the day immediately before the date on which the Spieker common stockholders approve the merger. The following table sets forth the unvested shares of restricted

59

Table of Contents

stock previously awarded to directors and executive officers and the value of such restricted stock at an assumed $57.70 pro forma equivalent value for Spieker common stock.

| Name | Unvested Restricted Stock | Assumed Value |
|---|---|---|
| Warren E. Spieker, Jr. | 33,589 | $1,938,085 |
| John K. French | 16,362 | 944,087 |
| Dennis E. Singleton | 12,138 | 700,363 |
| John A. Foster | 29,591 | 1,707,401 |
| Craig G. Vought | 28,384 | 1,637,757 |
| Joseph D. Russell, Jr. | 19,937 | 1,150,365 |
| Peter H. Schnugg | 9,272 | 534,994 |
| Stuart A. Rothstein | 8,103 | 467,543 |
| James C. Eddy | 3,896 | 224,799 |
| All other executive officers as a group (3 persons) | 43,910 | 2,533,607 |

*Special Severance Policy.* Spieker has a special severance policy applicable to specified executive officers, which provides for severance compensation under specified circumstances in the event of a change in control. A change in control occurs for purposes of the Spieker special severance policy when:

• any person becomes the owner of 20% or more of Spieker's voting securities;

• individuals who constitute the Spieker board on the effective date of the Spieker special severance policy and any new directors whose election or nomination for election was approved by a vote of at least three quarters of the directors then in office who either were directors at the beginning of that period or whose election or nomination for election was previously so approved, cease to constitute a majority; or

- the Spieker stockholders approve a merger, consolidation, share exchange or similar transaction in which Spieker's voting securities do not continue to represent at least 60% of the total voting power of the surviving entity.

In the event of termination of employment by Spieker without cause, or by the executive officer for good reason, within two years following a change in control, Spieker or its successor will make a lump sum payment of the following amount, which we refer to in this description as the base amount:

- three times, in the case of Messrs. Spieker, Vought, Foster, French, Singleton and Rothstein and one other Spieker executive officer, and two times, in the case of Messrs. Russell, Schnugg and Eddy and all other eligible executive officers, the sum of (a) the executive officer's highest annual rate of base salary during the 12 months immediately preceding termination, (b) the average of the annual bonus earned by the executive officer during the two completed fiscal years before termination, and (c) the average fair market value of the shares of Spieker restricted common stock granted to the executive officer during the two completed fiscal years before the change in control; and

- the pro rata portion of the annual bonus for the fiscal year in which termination occurred, calculated on the basis of the target bonus and on the assumption that all performance goals were achieved at target level.

An executive officer is considered terminated for cause if he or she willfully and continually fails to substantially perform his or her duties after a written demand for substantial performance is delivered, or if he or she willfully engages in illegal conduct or misconduct which is materially and demonstrably injurious to Spieker.

60

Table of Contents

Good reason will exist for purposes of the special severance policy if any of the following events occur without the executive officer's consent:

- reduction in his or her base salary;

- required relocation of his or her principal place of employment by more than 20 miles;

- substantial adverse change in his or her duties or responsibilities; or

- failure to continue any employee benefit plan, compensation plan, welfare plan or material fringe benefit plan, or reduction in any benefit under any such plan unless the executive officer is permitted to participate in other plans providing substantially equivalent benefits in the aggregate.

If any payments made to an executive officer by Spieker under the Spieker special severance policy or otherwise would result in an excise tax imposed by section 4999 of the Internal Revenue Code, the executive officer will receive a tax reimbursement payment that would put the executive officer in the same financial position after–tax that he would have been in if the excise tax did not apply to such amounts. However, if reducing the payments to be made under the special severance policy by 10% or less would avoid triggering the excise tax, the payments will be reduced by the amount necessary to avoid triggering the excise tax rather than making the tax reimbursement payment.

Equity Office has acknowledged that the merger will be a change in control for purposes of the Spieker special severance policy and that severance payments will be made as provided by the Spieker special severance policy to any participant who becomes entitled to these payments because of a termination of employment occurring on or after the effective date of the merger, unless the termination is for cause or is a voluntary resignation without good reason under the terms of the Spieker special severance policy. No executive officer eligible for the benefits of the Spieker special severance policy will become an executive officer of Equity Office following the merger.

Under the special severance policy, Mr. Spieker will be eligible to receive an estimated cash payment of approximately $5.0 million as his base amount. In the event Mr. Spieker is entitled to tax reimbursement as described above, this amount could be as much as $3.3 million. Mr. Foster will be eligible to receive an estimated cash payment of approximately $5.0 million as his base amount. In the event Mr. Foster is entitled to tax reimbursement as described above, this amount could be as much as $3.4 million. Mr. Vought will be eligible to receive an estimated cash payment of approximately $5.0 million as his base amount. In the event Mr. Vought is entitled to tax reimbursement as described above, this amount could be as much as $3.4 million. The four other most highly compensated Spieker executive officers, Messrs. Russell, Schnugg, Rothstein and Eddy, will be eligible to receive estimated cash payments of approximately $2.5 million, $2.0 million, $2.8 million and $1.6 million, respectively, as their base amounts. If these four other most highly compensated Spieker executive officers were entitled to tax reimbursements as described above, these amounts could be as much as $1.6 million, $1.1 million, $1.8 million and $1.0 million, respectively. In addition, four other Spieker executive officers will be eligible to receive cash payments in the aggregate of approximately $7.2 million as their base amounts. If these four other Spieker executive officers were entitled to tax reimbursements as described above, this aggregate amount could be as much as $3.7 million. Messrs. French and Singleton also will be eligible to receive cash payments of approximately $1.9 million and $1.1 million, respectively, as their base amounts. Based on Mr. French's estimated base amount, it is unlikely that he would be entitled to a tax reimbursement amount. If Mr. Singleton was entitled to tax reimbursement as described above, this amount could be as much as $642,000. The calculation of the estimated cash payments under the special severance policy assumes that Equity Office's obligations under the policy are triggered immediately upon the

closing of the merger and that the merger will close on July 9, 2001. The amounts shown include estimated 2001 bonuses through the closing date. Neither Spieker nor Equity Office has yet determined that any tax reimbursement payments would be required.

In addition, under the special severance policy the executive officer and his or her eligible dependents will continue to be eligible to participate in the medical, dental, disability and life insurance plans and arrangements applicable to him or her immediately before his or her termination of employment, on substantially the same terms and conditions in effect immediately before the termination. If such

61

Table of Contents

participation is prohibited, equivalent coverage will be purchased for the executive officer and his or her eligible dependents with no greater after–tax cost to the executive officer than he or she paid for coverage prior to being terminated. Coverage will continue for three years from the date of termination in the case of Messrs. Spieker, Foster, Vought, French, Singleton and Rothstein and one other Spieker executive officer and for two years from the date of termination in the case of Messrs. Russell, Schnugg and Eddy and all other eligible executive officers.

*Tax Related Undertakings of EOP Partnership.* Under the merger agreement, EOP Partnership has agreed, for the benefit of 17 named individuals, not to sell, exchange or otherwise dispose of, except in tax–free or tax–deferred transactions, specified office properties comprising approximately 6.5 million square feet, or approximately 26.5% of Spieker Partnership's office portfolio on a square footage basis, and specified industrial properties comprising approximately 5.6 million square feet, or approximately 43.7% of Spieker Partnership's industrial portfolio on a square footage basis. These office and industrial properties comprise approximately 12.1 million square feet, or approximately 32.3% of Spieker Partnership's total portfolio on a square footage basis. These restrictions, which benefit Messrs. Spieker, Foster, Vought, French, Singleton, Schnugg and Eddy and one other Spieker executive officer, among others, last for at least 10 years and, depending on whether the unitholder enters into, and complies with the terms of, an agreement not to sell specified percentages of their Equity Office common shares and EOP Partnership units during the initial 10 year restriction period, up to 20 years after closing of the partnership merger. In addition, EOP Partnership has agreed for tax purposes to make available to these same named unitholders the opportunity to guarantee specified debt of EOP Partnership for the same period and has made specified other undertakings. These provisions are intended to ensure that these unitholders, who originally contributed properties to Spieker Partnership in exchange for Spieker Partnership units, will be able to continue to defer the otherwise substantial gain that would be recognized by them for tax purposes as EOP Partnership unitholders upon a sale of any one or more of these properties. See "The Merger Agreement — Tax Related Undertakings of EOP Partnership" beginning on page 86.

*Loan Forgiveness.* On April 20, 2000, Mr. Rothstein borrowed $400,000 from Spieker for the purpose of buying a personal residence. One–half of the loan principal is interest bearing at an annual rate of 6.31%, and the other half is non–interest bearing. The terms of the loan provide that one–fifth of the non–interest bearing portion of the loan will be forgiven each year, as long as Mr. Rothstein continues to be employed by Spieker. The terms of the loan also provide that upon a change in control of Spieker, the outstanding principal balance of $360,000 and all accrued interest on the loan will be forgiven. The accrued interest to be forgiven assuming a June 30, 2001 closing date for the merger is approximately $7,900. The merger will constitute a change in control of Spieker for this purpose.

*Acquisition of Spieker Northwest.* In connection with the merger, a subsidiary of Equity Office will purchase 100% of the voting and 5% of the non–voting capital stock of Spieker Northwest, Inc., a noncontrolled third–party service subsidiary of Spieker, for an aggregate of $202,500 in cash from the holders of that voting stock, who include Messrs. Spieker, French and Singleton and one other individual, each of whom owns 25% of the voting capital stock of Spieker Northwest, Inc. and 1.25% of the non–voting.

*BroadBand Restricted Stock Agreements.* Spieker has entered into restricted stock agreements with its executive officers, among others, pursuant to which those executive officers have been awarded shares of common stock of BroadBand Office, Inc. In connection with the merger, the restrictions with respect to those shares will lapse.

The following table sets forth the unvested BroadBand Office, Inc. restricted shares held by Spieker directors and executive officers, the vesting of which will be accelerated in connection with the merger. The value of the unvested restricted shares at the time of the awards was approximately $122,400 in the aggregate.

62

Table of Contents

| Name | Unvested Shares |
|---|---|
| Warren E. Spieker, Jr. | 104,000 |
| John K. French | 56,000 |
| Dennis E. Singleton | 16,000 |
| John A. Foster | 104,000 |
| Craig G. Vought | 232,000 |
| Joseph D. Russell, Jr. | 56,000 |

| | |
|---|---|
| Peter H. Schnugg | 32,000 |
| Stuart A. Rothstein | 40,000 |
| James C. Eddy | 32,000 |
| All other executive officers as a group (4 persons) | 144,000 |

BroadBand Office, Inc. filed for Chapter 11 bankruptcy protection under the U.S. Bankruptcy Code on May 9, 2001. Therefore, such awards are not expected to have any value.

## The Partnership Merger

In the partnership merger, EOP Partnership will acquire all outstanding interests in Spieker Partnership through the merger of Spieker Partnership with and into EOP Partnership and Spieker Partnership will cease to exist. Holders of Spieker Partnership units, other than Spieker Partnership preferred units, including Spieker, will receive, for each Spieker Partnership unit issued and outstanding immediately before the partnership merger 1.94462 EOP Partnership class A units, with fractional units rounded to the whole number that is nearest to the number of EOP Partnership class A units that otherwise would be paid to a holder of Spieker Partnership units. The Spieker Partnership preferred interests and units will be exchanged as follows:

- the series B cumulative redeemable preferred interest in Spieker Partnership will be exchanged for 4,250,000 EOP Partnership series E preferred units;

- the series C cumulative redeemable preferred interest in Spieker Partnership will be exchanged for 6,000,000 EOP Partnership series F preferred units; and

- the series E cumulative redeemable preferred interest in Spieker Partnership will be exchanged for 4,000,000 EOP Partnership series H preferred units.

In connection with the partnership merger, EOP Partnership and Equity Office will file a registration statement on Form S–4 to register the class A units of EOP Partnership to be issued to Spieker Partnership unitholders and the Equity Office common shares issuable to holders (other than Equity Office) of units issued in the partnership merger if Equity Office elects to assume, and make a payment in common shares with respect to, EOP Partnership's obligation to redeem the unitholder's units under the partnership agreement of EOP Partnership. That registration statement will contain a consent solicitation/information statement/prospectus soliciting the approval of Spieker Partnership unitholders to the principal terms of the merger agreement and the partnership merger.

Under authority granted Equity Office, as general partner of EOP Partnership, Equity Office has approved the partnership merger. No vote or consent of unitholders of EOP Partnership is required for approval of the partnership merger. The partnership agreement of EOP Partnership requires the approval of the merger by the consent of unitholders holding at least a majority of the outstanding EOP Partnership units, including any EOP Partnership units held by Equity Office. Equity Office owns more than a majority of the outstanding EOP Partnership class A units and all of the outstanding EOP Partnership preferred units, and intends to take action by written consent, as permitted under the partnership agreement of EOP Partnership, to approve the merger on or about 10:00 a.m., Central Time, on Monday, July 9, 2001.

63

---

**Table of Contents**

California law requires the approval of the principal terms of the partnership merger by at least a majority in interest of each class of the outstanding Spieker Partnership units, including any preferred Spieker Partnership units held by Spieker. Spieker owns more than a majority of the outstanding Spieker Partnership units, including all outstanding classes of preferred units other than the series D preferred units of Spieker Partnership, and intends to take action by written consent, as permitted under California law, to approve the principal terms of the partnership merger on or about 8:00 a.m., Pacific Time, on Monday, July 9, 2001. The holders of Spieker Partnership series D preferred units have already consented to the principal terms of the partnership merger as described under "The Merger Agreement — Spieker Partnership Series D Preferred Units beginning on page 85.

The required partnership level approvals of the partnership merger and the merger are, therefore, assured. Neither the merger nor the partnership merger will be completed if the partners of EOP Partnership and Spieker Partnership approve the partnership merger and the merger, as applicable, but the Equity Office common shareholders or the Spieker common stockholders do not approve the merger.

The merger will be completed as soon as practicable following the partnership merger.

The merger agreement also provides that the former Spieker Partnership unitholders, other than Spieker and its subsidiaries, will have the right, beginning immediately after the partnership merger, to redeem the EOP Partnership class A units issued to them in the partnership merger in accordance with the terms and limitations of the partnership agreement of EOP Partnership. Upon redemption of these units, these unitholders would receive cash from EOP Partnership or, if Equity Office, as general partner, elects to assume the obligation of EOP Partnership to redeem the units, Equity Office common shares on a one–for–one basis or their cash equivalent, at the election of Equity Office.

**Merger Financing**

Equity Office intends to finance the estimated $1.187 billion in merger costs, including the approximately $907 million cash portion of the consideration payable to Spieker common stockholders under a new $1.0 billion bridge facility to be entered into by EOP Partnership before the closing of the partnership merger by EOP Partnership and by EOP Partnership borrowing the remaining $187 million of merger costs under its existing $1.0 billion credit facility. EOP Partnership has received executed commitments from various lenders for the entire $1.0 billion principal amount of the new bridge financing. At March 31, 2001, EOP Partnership had approximately $962 million of available borrowing capacity under its existing credit facility. The bridge facility commitments provide for a bridge facility with a term of 364 days and an interest rate of LIBOR plus 80 basis points, subject to EOP Partnership's credit rating. Equity Office will guarantee any outstanding obligation under the bridge facility. EOP Partnership and Equity Office have agreed, jointly and severally, to pay a commitment fee of 20 basis points, or $2.0 million, if the bridge facility is not refinanced within 120 days from the date of funding. Equity Office currently anticipates that EOP Partnership will refinance the bridge facility within 120 days from the date of funding of the bridge facility.

**Regulatory Approvals**

No material federal or state regulatory requirements must be complied with or approvals must be obtained by Equity Office, EOP Partnership, Spieker or Spieker Partnership in connection with either the merger or the partnership merger.

**Accounting Treatment**

Equity Office will treat the merger as a purchase for financial accounting purposes. This means that Equity Office will record the assets acquired and the liabilities assumed at their estimated fair values at the time the merger is completed.

**Restrictions on Resales by Affiliates**

The Equity Office common and preferred shares to be issued to Spieker stockholders in the merger will be freely transferable under the Securities Act, except for shares issued to any person who may be deemed to be an "affiliate" of Spieker within the meaning of Rule 145 under the Securities Act or who

64

---

Table of Contents

will become an "affiliate" of Equity Office within the meaning of Rule 144 under the Securities Act after the merger. Equity Office common shares received by persons who are deemed to be Spieker affiliates or who become Equity Office affiliates may be resold by these persons only in transactions permitted by the limited resale provisions of Rule 145 or as otherwise permitted under the Securities Act. Persons who may be deemed to be affiliates of Spieker generally include individuals or entities that, directly or indirectly through one or more intermediaries, control, are controlled by or are under common control with Spieker and may include officers, directors and principal stockholders of Spieker. All Spieker stockholders who may be deemed to be affiliates of Spieker will be so advised before the completion of the merger.

Under the merger agreement, Spieker will use commercially reasonable efforts to obtain an affiliate agreement from each affiliate of Spieker before the completion of the merger by which each Spieker affiliate will agree not to sell, transfer, pledge or otherwise dispose of any of the Equity Office common shares, Equity Office preferred shares, EOP Partnership units and EOP Partnership preferred units received in the merger in violation of the Securities Act or the rules and regulations promulgated under the Securities Act. Generally, this will require that all sales be made in accordance with Rule 145 under the Securities Act, which in turn requires that, for specified periods, sales be made in compliance with the volume limitations, manner of sale provisions and current information requirements of Rule 144 under the Securities Act.

Equity Office has the right to place legends on the certificates evidencing Equity Office common or preferred shares issued to Spieker affiliates in the merger summarizing the foregoing restrictions until a sale, transfer, pledge or other disposition of the Equity Office common shares represented by these certificates has been registered under the Securities Act or is made in compliance with Rule 145 under the Securities Act.

Persons who are not affiliates of Spieker generally may sell their Equity Office common or preferred shares without restrictions and without delivering this joint proxy statement/prospectus.

**No Dissenters' Rights**

Spieker and Equity Office are organized under Maryland law. Under the Maryland General Corporation Law, because shares of Spieker common stock and series B, C and E preferred stock were listed on a national securities exchange on the record date for the Spieker special meeting, Spieker common and series B, C and E preferred stockholders have no rights to dissent and receive the appraised value of their shares in the merger. The Spieker series A preferred stock was called for redemption and was converted into Spieker common stock on April 6, 2001. No shares of Spieker series D preferred stock were outstanding on the record date for the Spieker special meeting. Following the merger, Equity Office shareholders will continue to own their Equity

Office shares and, accordingly, will have no rights to an appraisal of their shares under Maryland law.

**Spieker Litigation**

On March 8, 2001, a purported class action complaint was filed in the Superior Court of the State of California, County of San Mateo, by an alleged Spieker stockholder. This complaint names as defendants Spieker and each member of its board of directors and principally alleges that the directors breached duties assertedly owed to Spieker's stockholders in connection with entering into the merger agreement. The plaintiffs in the lawsuit seek an injunction (1) against the defendants' agreement to the termination fee provisions of the merger agreement and (2) requiring an unspecified "fair and objective process to sell the company." On April 20, 2001, the defendants jointly moved to dismiss the complaint or, in the alternative, strike portions of the complaint. On May 7, 2001, plaintiff advised that it will withdraw its original complaint and file an amended complaint. Spieker intends to continue vigorously defending the lawsuit.

65

Table of Contents

## THE MERGER AGREEMENT

*The following is a summary of the material terms of the merger agreement, as amended, but does not describe all the terms of the merger agreement. The full text of the merger agreement is attached at the back of this joint proxy statement/prospectus as Annex A. You are urged to read the merger agreement in its entirety because it is the legal document that governs the merger.*

**Closing; Effective Time of the Merger**

The completion of the merger will occur no later than the third business day after the satisfaction or waiver of the conditions set forth in the merger agreement or at such other date or time as may be agreed in writing by Equity Office and Spieker. If the merger agreement and the merger are approved at the special meetings, Equity Office and Spieker currently expect to complete the merger promptly following receipt of shareholder approval.

As soon as practicable after all conditions to the completion of the merger and the partnership merger are satisfied, and after the filing of articles of merger for the partnership merger, Equity Office and Spieker will execute and file articles of merger with the State Department of Assessments and Taxation of Maryland relating to the merger. The effective time of the merger will be the time specified in the articles of merger.

**Merger Consideration**

In the merger:

- holders of Spieker common stock will receive, for each share of Spieker common stock issued and outstanding immediately before the merger, $13.50 in cash and 1.49586 Equity Office common shares;

- holders of Spieker series B preferred stock will receive, for each share of Spieker series B preferred stock issued and outstanding immediately before the merger, one Equity Office series E preferred share;

- holders of Spieker series C preferred stock will receive, for each share of Spieker series C preferred stock issued and outstanding immediately before the merger, one Equity Office series F preferred share; and

- holders of Spieker series E preferred stock will receive, for each share of Spieker series E preferred stock issued and outstanding immediately before the merger, one Equity Office series H preferred share.

The Equity Office series E, F and H preferred shares issued in the merger will have preferences, conversion and other rights, voting powers, restrictions, limitations as to dividends, qualifications and terms or conditions of redemption identical to those of the shares of the corresponding series of Spieker preferred stock.

Holders of Spieker common stock will not receive certificates or scrip representing fractional Equity Office common shares. Instead, each holder of Spieker common stock otherwise entitled to a fractional share interest in Equity Office will be paid an amount in cash, without interest, rounded to the nearest cent, determined by multiplying:

- the average closing price of an Equity Office common share on the NYSE on the five trading days immediately preceding the closing date of the merger by

- the fraction of an Equity Office common share which such holder of Spieker common stock would otherwise be entitled to receive.

Except as otherwise agreed, the merger will be completed on the closing date of the partnership merger with at least one hour between the partnership merger and the merger. Upon conversion of the

66

Table of Contents

outstanding shares of Spieker common stock and preferred stock into the merger consideration, the Spieker common stock and preferred stock will be cancelled and retired and will cease to exist.

Because the exchange ratio is fixed at 1.49586 for the portion of the aggregate merger consideration that is payable in Equity Office common shares, the market value of any Equity Office common shares you will receive in the merger may differ from the market value of the Equity Office common shares if the merger occurred today. On June 5, 2001, the most recent date practicable for obtaining pricing information for Equity Office common shares prior to mailing this joint proxy statement/prospectus, the closing price of Equity Office common shares was $29.55 per share, which, based on the 1.49586 exchange ratio and the $13.50 cash amount per share, would equal a market value equivalent per share of Spieker common stock of $57.70 had the merger been completed on that date, as adjusted to give effect to the portion of the aggregate merger consideration payable in cash and to the portion of the aggregate merger consideration payable in Equity Office common shares.

## Surrender of Spieker Stock Certificates

Equity Office has appointed EquiServe L.P. to act as exchange agent for the purpose of paying the merger consideration. Equity Office will make available to the exchange agent, on or before the effective time of the merger, the cash and securities certificates for that purpose.

Equity Office will use commercially reasonable efforts to cause the exchange agent within five days after the closing of the merger to send to each holder of Spieker common or preferred stock, a letter of transmittal for use in the exchange and instructions explaining how to surrender certificates to the exchange agent. Holders of Spieker common or preferred stock whose shares are converted into the right to receive the merger consideration and who surrender their certificates to the exchange agent, together with a properly completed and signed letter of transmittal, as the case may be, will receive the merger consideration.

Holders of unexchanged shares of Spieker common or preferred stock will not be entitled to receive any dividends, interest payments or other distributions payable by Equity Office on the Equity Office common or preferred shares until surrender of their common or preferred stock. Upon surrender, those holders will receive accumulated dividends and distributions, without interest, payable on Equity Office common or preferred shares, as applicable, after and in respect of a record date following the closing of the merger, together with cash instead of fractional shares.

## Possible Redesignation of Equity Office Preferred Shares and EOP Partnership Preferred Units to be Issued in the Merger and the Partnership Merger

The merger agreement, as amended, permits Equity Office and EOP Partnership to redesignate the series of preferred shares and preferred units to be issued in the merger and the partnership merger to enable Equity Office and EOP Partnership to issue consecutively–numbered series of preferred shares and preferred units. For example, the amended merger agreement permits Equity Office:

- to redesignate as "series D preferred shares" its series E preferred shares to be issued in the merger in exchange for issued and outstanding Spieker series B preferred shares;

- to redesignate as "series E preferred shares" its series F preferred shares to be issued in the merger in exchange for issued and outstanding Spieker series C preferred shares; and

- to redesignate as "series F preferred shares" its series H preferred shares to be issued in the merger in exchange for issued and outstanding Spieker series E preferred shares.

In addition, the amended merger agreement would permit EOP Partnership:

- to redesignate as "series D preferred units" its series E preferred units to be issued in the partnership merger in exchange for issued and outstanding Spieker series B preferred units;

67

Table of Contents

- to redesignate as "series E preferred units" its series F preferred units to be issued in the partnership merger in exchange for issued and outstanding Spieker series C preferred units; and

-

to redesignate as "series F preferred units" its series H preferred units to be issued in the partnership merger in exchange for issued and outstanding Spieker series E preferred units.

The redesignation of preferred shares or preferred units under the amended merger agreement is subject to the repurchase of the Spieker series D preferred units immediately prior to the partnership merger. See "Spieker Partnership Series D Preferred Units" beginning on page 84. Apart from redesignating the Equity Office preferred shares and EOP Partnership preferred units to be issued in the merger and the partnership merger and eliminating references within the articles supplementary for each series of Equity Office preferred shares and in each newly created series of EOP Partnership preferred units to be issued in the merger and the partnership merger to series of Equity Office preferred shares or EOP Partnership preferred units that will not be issued in the merger and the partnership merger,

- the articles supplementary for the redesignated Equity Office series D, E and F preferred shares will otherwise be substantially in the form set forth as exhibits to the registration statement of which this document is a part, and

- the amendments to the EOP Partnership agreement to provide for the creation of the redesignated EOP Partnership series D, E and F preferred units will otherwise be substantially in the form set forth as an exhibit to the registration statement of which this document is a part.

## Treatment of Spieker Stock Options

Each Spieker stock option outstanding under Spieker's Amended and Restated 1993 Directors' Stock Option Plan and Spieker's Amended and Restated 1993 Stock Incentive Plan, whether or not then vested or exercisable, will become fully vested in connection with the merger pursuant to the plan under which it was issued and in any event no later than the day before the merger closes. Each outstanding Spieker stock option will be automatically converted upon the completion of the merger into an option to purchase Equity Office common shares. The substituted Equity Office option will permit its holder to purchase a number of Equity Office common shares equal to the number of shares of Spieker common stock that could have been purchased, under the corresponding Spieker stock option, multiplied by 1.94462 (rounded down to the nearest whole number of shares). The exercise price per Equity Office common share of the substituted option will be equal to the per-share option exercise price specified in the Spieker stock option divided by 1.94462 (rounded up to the nearest whole cent). Each substituted option otherwise will be subject to the same terms and conditions as the corresponding Spieker stock option.

All Spieker stock options will be converted in the merger into options to purchase Equity Office common shares under the terms of the merger agreement. Under the merger agreement, EOP Partnership will offer to purchase all Spieker stock options converted into Equity Office options for an amount in cash equal to:

- the excess, if any, of $58.50 over the exercise price of the Spieker stock option; multiplied by

- the number of shares of Spieker common stock subject to that Spieker stock option.

Options to purchase Equity Office common shares that are not tendered to EOP Partnership as described above would remain outstanding under their terms. Under voting agreements entered into with Equity Office, directors and executive officers of Spieker holding a total of 3,417,752 Spieker stock options with an average exercise price of $32.41 per Spieker share have agreed to tender their options to EOP Partnership.

## Severance and Bonus Payments

Equity Office will make severance payments under the Spieker special severance policy to any participant who becomes entitled to payments under the policy because of a termination of employment occurring on or after the closing of the merger, unless the participant is terminated for cause or resigns

68

Table of Contents

voluntarily with good reason, as further described in the special severance policy. See "The Merger — Conflicts of Interest of Spieker Directors and Executive Officers in the Merger and the Partnership Merger" beginning on page 58. Equity Office also will pay development bonuses to specified Spieker employees, if earned, and will assume Spieker's obligations to pay annual bonuses to employees not covered by the special severance policy and these bonuses will be payable to such employees who are terminated by Equity Office, unless terminated for inadequate performance, before January 1, 2002. These bonuses will be payable to the extent accrued for the year 2001 through the date of termination and will be calculated based on actual bonuses paid in 2000, assuming such bonuses reflected a full year of employment.

## Representations and Warranties of Equity Office and Spieker

The merger agreement contains customary representations and warranties by each of Spieker, Spieker Partnership, Equity Office and EOP Partnership relating to, among other things:

- due organization and good standing;

- capital structure;

- authorization to enter into the merger agreement and to consummate the merger or the partnership merger, as applicable;

- enforceability of the merger agreement;

- no breach of organizational documents or material agreements as a result of the merger agreement or the consummation of the merger or the partnership merger, as applicable;

- required governmental and third–party consents;

- compliance with SEC reporting requirements;

- no material undisclosed liabilities;

- no changes since December 31, 1999 that would have a material adverse effect;

- no material legal proceedings;

- real property;

- environmental matters;

- tax matters, including qualification as a REIT;

- finders' fees;

- compliance with laws;

- contracts and debt instruments;

- receipt of opinion of financial advisor;

- exemption from anti–takeover statutes;

- inapplicability of the Investment Company Act of 1940; and

- required stockholder and partner approvals.

In addition to the representations and warranties made by both Equity Office and Spieker, the merger agreement contains additional representations and warranties made by each of Spieker and Spieker Partnership relating to, among other things:

- disclosure of all related party transactions;

- appropriate funding of employee benefit plans and compliance with applicable regulations;

- disclosure of all payments to employees, officers and directors as a result of the merger or the partnership merger or a termination of service after the merger or the partnership merger; and

- action by the board of directors to render the stockholder rights plan inapplicable to the merger and the partnership merger.

69

Table of Contents

## Conduct of Business of Equity Office and EOP Partnership Pending the Merger

Until the completion of the merger, each of Equity Office and EOP Partnership has agreed that, unless permitted by obtaining Spieker's prior written consent or except as contemplated by the merger agreement, it will, and will cause its subsidiaries to, among other things:

- preserve intact its business organizations and goodwill;

- use commercially reasonable efforts to keep available the services of its officers and employees;

- confer on a regular basis with Spieker to report material operational matters that would reasonably be expected to have a material adverse effect on the business, properties, assets, financial condition or results of operations of Equity Office and its subsidiaries taken as a whole;

- promptly notify Spieker of the occurrence or existence of any change or circumstance that would reasonably be expected to have a material adverse effect on the business, properties, assets, financial condition or results of operations of Equity Office

and its subsidiaries taken as a whole;

- promptly deliver to Spieker true and correct copies of any report, statement, schedule or other document filed with the SEC;

- maintain its books and records in accordance with generally accepted accounting principles consistently applied, and not change any of its methods, principles or practices of accounting in any material manner, except as required by the SEC, applicable law or generally accepted accounting principles; and

- duly and timely file all reports, tax returns and other documents required to be filed with federal, state, local and other authorities, subject to extensions permitted by law, provided the extensions do not adversely affect Equity Office's status as a qualified REIT under the Internal Revenue Code.

In addition, pending the merger, each of Equity Office and EOP Partnership has agreed that, without Spieker's prior written consent or except as otherwise expressly contemplated by the merger agreement, it will not, and will cause its subsidiaries not to, among other things:

- make or rescind any express or deemed election relating to taxes unless required by law or necessary to qualify or preserve Equity Office's status as a REIT or the status of any subsidiary of Equity Office as a partnership for federal income tax purposes, as a qualified REIT subsidiary, or as a taxable REIT subsidiary as defined under the Internal Revenue Code, as the case may be;

- amend its organizational documents, except in specified instances, including the proposed amendments to Equity Office's declaration of trust described in this joint proxy statement/prospectus;

- authorize, declare, set aside or pay any dividend, other than regular quarterly dividends, or regular distributions under the partnership agreement of EOP Partnership, or redemptions of EOP Partnership units under the partnership agreement of EOP Partnership where solely Equity Office common shares are used, or redemptions of Equity Office common shares under its declaration of trust to maintain REIT status;

- enter into or agree to effect

  — any merger, acquisition, consolidation, reorganization or other business combination with any third party in which Equity Office is not the surviving party to the transaction; or

  — any merger, acquisition, exchange offer or other business combination with a third party in which Equity Office is the surviving party that would result in the issuance of equity securities representing in excess of 25% of the outstanding Equity Office common shares on the date any business combination is entered into or agreed to;

unless, in either case,

  — the business combination is approved by Spieker, which approval will not be unreasonably withheld or delayed; or

Table of Contents

  — the business combination agreement provides that the required vote of Equity Office shareholders for approval of the business combination is no less than the affirmative vote of holders of Equity Office common shares representing more than 50% of the sum of the number of Equity Office common shares outstanding at the time of the approval plus 50,000,000; or

- authorize, recommend, propose or announce an intention to do any of the foregoing prohibited actions, or enter into any contract, agreement, commitment or arrangement to do any of the foregoing prohibited actions.

**Conduct of Business of Spieker and Spieker Partnership Pending the Merger**

Until the completion of the merger, each of Spieker and Spieker Partnership has agreed that, unless permitted by obtaining Equity Office's prior written consent or except as contemplated by the merger agreement, it will, and will cause its subsidiaries to, among other things:

- conduct its business, and cause its subsidiaries to conduct their respective businesses, only in the ordinary course and in a manner which is substantially consistent with past practice;

- use commercially reasonable efforts to preserve intact its business organizations and goodwill;

- use commercially reasonable efforts, provided it does not require additional compensation, to keep available the services of its officers and employees;

- confer on a regular basis with Equity Office to report material operational matters and, except in specified instances, any proposals to engage in material transactions;

-

promptly notify Equity Office of the occurrence or existence of any circumstance that would reasonably be expected to have a material adverse effect on the business, properties, assets, financial condition or results of operations of Spieker and its subsidiaries taken as a whole;

• promptly deliver to Equity Office true and correct copies of any report, statement, schedule or other document filed with the SEC;

• maintain its books and records in accordance with generally accepted accounting principles consistently applied, and not change any of its methods, principles or practices of accounting in any material manner, except as required by the SEC, applicable law or generally accepted accounting principles;

• duly and timely file all reports, tax returns and other documents required to be filed with federal, state, local and other authorities, subject to extensions permitted by law, provided that Spieker notifies Equity Office of any extensions and provided that the extensions do not adversely affect Spieker's status as a qualified REIT under the Internal Revenue Code; and

• maintain in full force and effect insurance coverage substantially similar to insurance coverage maintained on the date of the merger agreement.

In addition, pending the merger, each of Spieker and Spieker Partnership has agreed that, without Equity Office's prior written consent or except as contemplated by the merger agreement, it will not, and will cause its subsidiaries not to, among other things:

• make or rescind any express or deemed election relating to taxes unless required by law or necessary to qualify or preserve Spieker's status as a REIT or the status of any subsidiary of Spieker as a partnership for federal income tax purposes, as a qualified REIT subsidiary, or as a taxable REIT subsidiary as defined under the Internal Revenue Code, as the case may be;

• acquire, enter into any option to acquire, or exercise an option or other right or election or enter into any commitment for the acquisition of any real property or, except as permitted in a property capital budget approved in writing by Equity Office, other transaction, other than specified transactions, involving in excess of $100,000, encumber assets, commence construction of or enter into any commitment to develop or construct real estate projects, except in the ordinary course of

Table of Contents

its office property business, including leasing activities permitted by Equity Office approved guidelines;

• incur or enter into any commitment to incur additional debt, except for working capital under its revolving line(s) of credit and commitments for debt for specified purposes and not in excess of specified amounts;

• modify, amend or terminate, or enter into any commitment to modify, amend or terminate, any debt in existence on the date of the merger agreement;

• amend its organizational documents;

• classify or re−classify any unissued shares of stock;

• make any change in the number of shares of capital stock, membership interests or units of limited partnership interest issued and outstanding, except in specified instances;

• grant options or any other rights or commitments relating to its shares of capital stock, membership interests or units of limited partnership interest, or any security convertible into its shares of capital stock, membership interests or units of limited partnership interest, or any security the value of which is measured by shares of beneficial interest, or any security subordinated to the claim of its general creditors;

• amend or waive any rights under any options or other stock rights;

• authorize, declare, set aside or pay any dividend or make any other distribution or payment with respect to the Spieker common or preferred stock or the units of limited partnership interest in Spieker Partnership, other than regular quarterly dividends, or regular distributions under the partnership agreement of Spieker Partnership, or redemptions of Spieker Partnership units under the partnership agreement of Spieker Partnership where solely Spieker common stock is used, or as necessary to maintain REIT status;

• directly or indirectly redeem, purchase or acquire any shares of capital stock, membership interests or units of partnership interest or any option, warrant or right to acquire, or security convertible into, shares of capital stock, membership interests or units of partnership interest of Spieker or any Spieker subsidiary, other than redemptions of Spieker Partnership units under the partnership agreement of Spieker Partnership where solely Spieker common stock is used, and the use of Spieker common stock in connection with equity−based employee benefit plans or as necessary to maintain REIT status;

• sell, lease, mortgage, subject to lien or otherwise dispose of any real property, except in specified instances;

- sell, lease, mortgage, subject to lien or otherwise dispose of any personal property or intangible property, except in the ordinary course of business and as is not material, individually or in the aggregate;

- make any loans, advances or capital contributions to, or investments in, any other person, except in specified instances;

- enter into any new, or amend or supplement any existing, contract, lease or other agreement with Spieker Northwest, Inc.;

- pay, discharge or satisfy any claims, liabilities or obligations whether absolute, accrued, asserted or unasserted, contingent or otherwise, except in specified instances;

- guarantee the debt of another person, enter into any "keep well" or other agreement to maintain any financial statement condition of another person or enter into any arrangement having the same economic effect;

72

Table of Contents

- enter into any commitment with any officer, director or affiliate of Spieker, any of its subsidiaries or Spieker Northwest, Inc. or any material commitment with any consultant;

- increase any compensation or enter into or amend any employment, severance or other arrangement with any of its officers, directors or employees earning more than $50,000 per year, other than as required by any contract or plan or as provided by waivers by employees of benefits under these agreements;

- adopt any new employee benefit plan or amend any existing plans or rights;

- settle any stockholder derivative or class action claims arising out of or in connection with any of the transactions contemplated by the merger agreement;

- change the ownership of any of its subsidiaries or Spieker Northwest, Inc., except in specified instances;

- accept a promissory note in payment of the exercise price payable under any option to purchase shares of Spieker common stock;

- enter into any oral or written "tax protection agreement" that:

— prohibits or restricts in any manner the disposition of any assets of Spieker or any Spieker subsidiary, including Spieker Northwest, Inc.;

— requires that Spieker, any Spieker subsidiary or Spieker Northwest, Inc. maintain, or put in place, or replace, debt, whether or not secured by one or more of Spieker's properties;

— requires that Spieker, any Spieker subsidiary or Spieker Northwest, Inc. offer to any person at any time the opportunity to guarantee or otherwise assume, directly or indirectly, including through a "deficit restoration obligation" guarantee, indemnification agreement or other similar arrangement, the risk of loss for federal income tax purposes for debt or other liabilities of Spieker, any Spieker subsidiary or Spieker Northwest, Inc.;

— specifies or relates to a method of taking into account book–tax disparities under section 704(c) of the Internal Revenue Code with respect to one or more assets of Spieker or a Spieker subsidiary; or

— requires a particular method for allocating one or more liabilities of Spieker or any Spieker subsidiary under section 752 of the Internal Revenue Code;

- settle or compromise any material federal, state, local or foreign tax liability; or

- authorize, recommend, propose or announce an intention to do any of the foregoing prohibited actions, or enter into any contract, agreement, commitment or arrangement to do any of the foregoing prohibited actions.

**Pre–Merger Dividends and Distributions**

*Regular Dividends*

Under the merger agreement, Spieker is permitted to continue to pay regular quarterly dividends on its common stock of $0.70 per share and on the preferred stock at the stated rate. On March 7, 2001, Spieker declared a dividend of $0.70 per share payable on April 20, 2001 to holders of record of its common stock on March 30, 2001. Spieker does not plan to declare and pay any further regular quarterly dividends if the merger closes on or before July 13, 2001. If the merger closes after July 13, 2001, Spieker currently intends to continue to pay regular quarterly dividends for the quarter ending June 30, 2001 and for any additional quarterly periods ending before the closing of the merger.

The merger agreement contemplates that Spieker will have presented to Equity Office, by March 24, 2001, a financial plan showing the expected management of its operations in a manner that will avoid the need to pay a final pre–merger dividend, as described below. The Spieker financial plan will include

73

Table of Contents

projected required quarterly dividends per share of Spieker common stock necessary to ensure that no final pre–merger dividend will be required to be paid with respect to the Spieker common stock, which quarterly dividends will be not less than $0.70 per share of Spieker common stock or result in a "return of capital" per share of Spieker common stock that exceeds one percent of the projected dividends per share.

Upon the approval of the plan by Equity Office, not to be unreasonably withheld, Spieker will be entitled to increase the quarterly dividend per share of Spieker common stock to the amount shown in the plan. If Spieker increases any quarterly dividend per share of Spieker common stock to an amount greater than $0.70 per share, Equity Office will be entitled to declare a special dividend per Equity Office common share in an amount per Equity Office common share equal to the aggregate amount of quarterly dividends per share of Spieker common stock declared or paid by Spieker in excess of $0.70 per share per quarter, divided by 1.94462. If Equity Office declares this dividend, EOP Partnership will simultaneously declare a distribution to the holders of class A units of limited partnership interest in EOP Partnership in an amount per unit equal to the dividend per share to be paid to the holders of Equity Office common shares. The record date for each of the Equity Office dividend and the EOP Partnership distribution will be the last business day before the closing of the merger.

Because Spieker will not pay any additional quarterly dividends if the merger closes on or before July 13, 2001, the provisions described in the preceding two paragraphs would not be operative unless the merger closes after July 13, 2001.

*Final Dividend*

In addition to regular quarterly distributions, as described above, the merger agreement provides that Spieker will declare a final dividend to holders of shares of Spieker common stock, and each series of Spieker preferred stock, if and to the extent required by the terms of the preferred stock, in an amount equal to the minimum amount necessary for Spieker to satisfy the REIT distribution requirements under section 857(a)(1) of the Internal Revenue Code and to avoid the payment of corporate level tax with respect to any undistributed income or gain for Spieker's short taxable year ending at the time of the merger. Section 857(a)(1) requires a REIT to distribute to its stockholders each taxable year an amount equal to 90% of its "REIT taxable income." In addition, a REIT is required to pay tax on any income or gain that it does not distribute to its shareholders, even if it satisfies the 90% distribution requirement.

If Spieker pays a pre–merger dividend to satisfy the distribution requirements described above, Equity Office will be entitled to declare a dividend to holders of Equity Office common shares in an amount per share equal to the amount per share of the pre–merger dividend paid by Spieker to holders of Spieker common stock, divided by 1.94462.

If Spieker declares a pre–merger dividend as described above, Spieker Partnership will simultaneously declare a distribution to the unitholders in Spieker Partnership, other than to the preferred unitholders, in an amount per unit equal to the dividend per share to be paid to the holders of Spieker common stock, together with any distributions required to be paid to holders of preferred units of limited partnership interest in Spieker Partnership because of any of the dividends described above. If Equity Office declares a pre–merger dividend as described above, EOP Partnership will simultaneously declare a distribution to the holders of class A units of limited partnership interest in EOP Partnership in an amount per unit equal to the dividend per share to be paid to the holders of Equity Office common shares. If the terms of any Equity Office preferred shares or EOP Partnership preferred units of limited partnership interest require the payment of a dividend because of the corresponding dividends to holders of Equity Office common shares or EOP Partnership common units of limited partnership interests, Equity Office and EOP Partnership will declare the required dividends and distributions.

If Spieker and Equity Office declare pre–merger dividends as described above, the Spieker dividend will be paid on the last business day before the closing of the merger. The record date for the Equity Office and Spieker dividends also will be on the last business day before the closing of the merger.

74

Table of Contents

## Conditions to the Merger and the Partnership Merger

### *Conditions to Each Party's Obligations to Effect the Merger and the Partnership Merger*

The obligations of Spieker, Spieker Partnership, Equity Office and EOP Partnership to complete the merger and the partnership merger are subject to the satisfaction or, where permissible, waiver of the following conditions:

•

the approval of the merger, the partnership merger and the merger agreement, as applicable, by the affirmative vote of the holders of:

— at least a majority of the outstanding Equity Office common shares;

— at least a majority of the outstanding shares of Spieker common stock;

— that percentage of limited partner interests and classes of those interests in Spieker Partnership, including partner interests held by Spieker, as provided by the partnership agreement of Spieker Partnership and California law; and

— at least a majority of all class A units of limited partnership interest in EOP Partnership, including class A units of limited partnership interest held by Equity Office;

• the approval of the amendments to the Equity Office declaration of trust to be effected as part of the merger by the affirmative vote of the holders of at least a majority of the outstanding Equity Office common shares;

• the waiting period, if any, under the Hart–Scott–Rodino Antitrust Improvements Act of 1976 will have expired or been terminated;

• the NYSE will have approved for listing the Equity Office common shares, the Equity Office series E preferred shares, the Equity Office series F preferred shares and the Equity Office series H preferred shares to be issued in the merger and the Equity Office common shares reserved for issuance upon redemption of the EOP Partnership class A units to be issued in the partnership merger, subject to official notice of issuance, before the closing of the merger;

• the registration statement on Form S–4 of which this proxy statement/ prospectus forms a part will have become effective and will not be the subject of any stop order or proceedings by the SEC seeking a stop order;

• the registration statement on Form S–4 relating to the partnership merger of which the consent solicitation/information statement/ prospectus forms a part will have become effective and will not be the subject of any stop order or proceedings by the SEC seeking a stop order;

• no temporary restraining order, preliminary or permanent injunction or other order issued by any court of competent jurisdiction or other legal restraint or prohibition preventing the completion of the mergers or any of the other transactions contemplated by the merger agreement will be in effect; and

• Equity Office and EOP Partnership will have received all state securities or "blue sky" permits and other authorizations necessary to issue the Equity Office common shares issuable in the merger and the EOP Partnership units issuable in the partnership merger.

***Conditions to the Obligations of Equity Office and EOP Partnership to Effect the Merger and the Partnership Merger***

The obligations of Equity Office and EOP Partnership to complete the mergers are subject to the satisfaction or, where permissible, waiver of the following conditions:

• each of the representations and warranties of Spieker and Spieker Partnership contained in the merger agreement, disregarding exceptions for no "material adverse effect," will be true and correct as of the date of the merger agreement and as of the closing of the merger:

75

Table of Contents

— except to the extent that these representations and warranties are expressly limited by their terms to another date, in which case these representations and warranties will be true and correct as of that other date; and

— except where the failure of these representations and warranties to be true and correct would not, individually or in the aggregate, reasonably be expected to have a Spieker material adverse effect, as described below;

• Spieker and Spieker Partnership will have performed in all material respects all obligations required to be performed by them under the merger agreement at or before the completion of the merger;

• since February 22, 2001, there will have been no Spieker material adverse effect, as described below;

• Equity Office will have received a certificate of an officer of Spieker certifying to each of the above;

• Equity Office will have received an opinion, dated as of the closing date of the merger:

— from counsel to Spieker relating to the REIT status of Spieker and the partnership status of Spieker Partnership;

— from counsel to Equity Office relating to the REIT status of Equity Office;

— from counsel to Equity Office relating to the federal income tax treatment of the merger; and

— from counsel to Spieker relating to the inapplicability of specified "roll–up" rules to the partnership merger;

• all of the voting shares of Spieker Northwest, Inc. will have been transferred to an Equity Office subsidiary designated by Equity Office; and

• each of Messrs. Spieker, Foster and Vought will have entered into a nonsolicitation agreement with Equity Office.

As used in the merger agreement, a "Spieker material adverse effect" means any circumstance, event, occurrence, change or effect that is materially adverse to the business, properties, assets (tangible or intangible), financial condition or results of operations of Spieker, Spieker Partnership and the Spieker subsidiaries, taken as a whole, except, in each case, as a result of:

• changes in general economic conditions nationally or regionally;

• changes affecting the real estate industry generally which do not affect Spieker or Spieker Partnership, as the case may be, materially disproportionately relative to other participants in the real estate industry similarly situated; or

• in and of itself and without the occurrence of any other Spieker material adverse effect, changes in the trading prices of Spieker common stock or any series of Spieker preferred stock.

### Conditions to the Obligations of Spieker and Spieker Partnership to Effect the Merger and the Partnership Merger

The obligations of Spieker and Spieker Partnership to complete the merger and the partnership merger are subject to the satisfaction or, where permissible, waiver of the following conditions:

• each of the representations and warranties of Equity Office and EOP Partnership contained in the merger agreement, disregarding exceptions for no "material adverse effect," will be true and correct as of the date of the merger agreement and as of the closing of the merger:

— except to the extent that these representations and warranties are expressly limited by their terms to another date, in which case these representations and warranties will be true and correct as of that other date; and

76

---

Table of Contents

— except where the failure of these representations and warranties to be true and correct would not reasonably be expected to have an Equity Office material adverse effect, as described below;

• Equity Office and EOP Partnership will have performed in all material respects all obligations required to be performed by them under the merger agreement at or before the completion of the merger;

• since February 22, 2001, there will have been no Equity Office material adverse effect, as described below;

• Spieker will have received a certificate of an officer of Equity Office certifying to each of the foregoing; and

• Spieker will have received an opinion, dated as of the closing date of the merger:

— from counsel to Equity Office relating to the REIT status of Equity Office and the partnership status of EOP Partnership; and

— from counsel to Spieker relating to the federal income tax treatment of the merger.

As used in the merger agreement, an "Equity Office material adverse effect" means any circumstance, event, occurrence, change or effect that is materially adverse to the business, properties, assets (tangible or intangible), financial condition or results of operations of Equity Office, EOP Partnership and the Equity Office subsidiaries, taken as a whole, except, in each case, as a result of:

• changes in general economic conditions nationally or regionally;

• changes affecting the real estate industry generally which do not affect Equity Office or EOP Partnership, as the case may be, materially disproportionately relative to other participants in the real estate industry similarly situated; or

• in and of itself and without the occurrence of any other Equity Office material adverse effect, changes in the trading prices of Equity Office common shares or any series of Equity Office preferred shares.

**No Solicitation by Spieker**

Spieker has agreed, for itself and for Spieker Partnership, that neither Spieker nor any Spieker subsidiary will, or will permit any officer, director, employee, affiliate, agent, investment banker, financial advisor, attorney, accountant, broker, finder, consultant or other agent or representative, which we collectively refer to as "Spieker's representatives," to:

- invite, initiate, solicit or encourage, directly or indirectly, any inquiries, proposals, discussions or negotiations or the making or implementation of any proposal or offer, including any proposal or offer to its stockholders, with respect to an "alternative acquisition proposal," as defined below;

- engage in any discussions or negotiations with or provide any confidential or non–public information or data to, or afford access to properties, books or records to, any person relating to, or that may reasonably be expected to lead to, an alternative acquisition proposal;

- enter into any letter of intent, agreement in principle or agreement relating to an alternative acquisition proposal;

- propose publicly to agree to do any of the foregoing; or

- otherwise facilitate any effort or attempt to make or implement an alternative acquisition proposal, including by amending or granting any waiver under the Spieker stockholder rights plan.

Spieker has agreed, for itself and for Spieker Partnership, that it will:

- immediately cease and cause to be terminated any existing activities, discussions or negotiations with any persons or entities conducted before the merger agreement with respect to any alternative

77

---

Table of Contents

acquisition proposal, and inform each Spieker representative and cause each of them to comply with this obligation;

- request that each person, if any, that has executed a confidentiality agreement in the twenty–four months before the date of the merger agreement in connection with the consideration by the person of any alternative acquisition proposal to return or destroy all confidential information furnished to that person by or on behalf of Spieker and its subsidiaries; and

- notify Equity Office promptly if Spieker or any of its subsidiaries or any Spieker representative receives:

  — an alternative acquisition proposal or any amendment or change in any previously received alternative acquisition proposal;

  — any request for confidential or nonpublic information or data relating to, or for access to the properties, books or records of, Spieker or any of its subsidiaries by any person that has made or to its knowledge may be considering making an alternative acquisition proposal;

  — any oral or written expression that any activities, discussions or negotiations described above are sought to be initiated or continued with it;

  and include in that notice the identity of the person making the alternative acquisition proposal, indication or request, the material terms of that alternative acquisition proposal, indication or request and, if in writing, promptly deliver to Equity Office copies of any proposal, indication or request along with all other related documentation and correspondence and keep Equity Office informed of the status and material terms, including all changes to the status or material terms, of any alternative acquisition proposal, indication or request.

However, under certain circumstances, Spieker, including in its capacity as the sole general partner of Spieker Partnership, may furnish information to, or enter into discussions or negotiations with, any person that makes a *bona fide* written alternative acquisition proposal which was not invited, initiated, solicited or encouraged, directly or indirectly, by Spieker or any of its subsidiaries, provided that:

- a majority of the board of directors of Spieker determines in good faith, after consultation with its financial advisors of nationally recognized reputation and outside legal counsel, that the alternative acquisition proposal is reasonably likely to result in a "superior acquisition proposal," as defined below;

- each of Spieker and Spieker Partnership complies with all its obligations under the merger agreement;

- before furnishing that information to, or entering into discussions or negotiations with, that person, Spieker provides written notice to Equity Office which states that it is furnishing information to, or entering into discussions with, that person; and

- Spieker enters into a confidentiality agreement with that person the terms of which are in all material respects no less favorable to Spieker and no less restrictive to the person making the alternative acquisition proposal, than the terms of the

confidentiality agreement entered into with Equity Office.

For purposes of the merger agreement, an "alternative acquisition proposal" means any direct or indirect:

• merger, consolidation, business combination, reorganization, recapitalization, liquidation, dissolution or similar transaction;

• sale, acquisition, tender offer, exchange offer, the filing of a registration statement under the Securities Act in connection with an exchange offer, share exchange or other transaction or series of related transactions that, if completed, would result in the issuance of securities representing, or the sale, exchange or transfer of, 15% or more of the outstanding voting equity securities of Spieker

78

---

**Table of Contents**

or outstanding partnership interests of Spieker Partnership, except an underwritten public offering of Spieker common stock for cash; or

• sale, lease, exchange, mortgage, pledge, transfer or other disposition of any assets of Spieker or Spieker Partnership in one or a series of related transactions that, if completed, would result in the transfer of more than 30% of the assets of Spieker or Spieker Partnership, other than the mergers.

If an alternative acquisition proposal constitutes a superior alternative acquisition proposal, as described below, the board of directors of Spieker may withdraw, modify, amend or qualify its recommendation of the merger agreement and the merger and recommend the superior alternative acquisition proposal to its stockholders provided that:

• Spieker complies fully with the nonsolicitation provisions and provides Equity Office with at least three business days' prior written notice of its intent to withdraw, modify, amend or qualify its recommendation of the merger agreement or the merger;

• if during those three business days Equity Office makes a counter proposal to the superior alternative acquisition proposal, Spieker's board of directors in good faith, taking into account the advice of its outside financial advisors of nationally recognized reputation, determines that the Equity Office counter proposal is:

— not at least as favorable to Spieker's stockholders as the superior alternative acquisition proposal, from a financial point of view; and

— not at least as favorable generally to Spieker's stockholders, taking into account all financial and strategic considerations and other relevant factors, including relevant legal, financial, regulatory and other aspects of the proposals, and the conditions, prospects and time required for completion of that proposal; and

• Spieker terminates the merger agreement under the terms of the merger agreement and pays to EOP Partnership the termination fee.

For purposes of the merger agreement, a "superior alternative acquisition proposal" means a *bona fide* written proposal made by a third party to acquire, directly or indirectly, Spieker and/or Spieker Partnership in a tender or exchange offer, merger, share exchange, consolidation or sale of all or substantially all of the assets of Spieker, Spieker Partnership, and their subsidiaries or otherwise:

• on terms which a majority of the board of directors of Spieker determines in good faith, after consultation with Spieker's financial advisors of nationally recognized reputation, are superior, from a financial point of view, to Spieker's stockholders to those provided for in the merger;

• on terms which a majority of the board of directors of Spieker determines in good faith to be more favorable generally to Spieker's stockholders, taking into account all financial and strategic considerations and other relevant factors, including relevant legal, financial, regulatory and other aspects of the proposals, and the conditions, prospects and time required for completion of the proposal;

• for which financing, to the extent required, in the reasonable judgment of the board of directors of Spieker is capable of being obtained; and

• which the board of directors of Spieker determines in good faith is reasonably capable of being consummated.

79

---

**Table of Contents**

**Termination of the Merger Agreement**

*Right to Terminate*

The merger agreement may be terminated at any time before the completion of the partnership merger, whether before or after approval of the merger agreement and the mergers by the Equity Office shareholders, EOP Partnership limited partners, Spieker stockholders or Spieker Partnership limited partners, as follows:

• by mutual written consent duly authorized by the Equity Office board of trustees and the Spieker board of directors;

• by either Equity Office or Spieker if:

— any judgment, injunction, order, decree or action by any governmental entity preventing the consummation of either the merger or the partnership merger becomes final and non–appealable;

— the merger and the partnership merger have not been completed before December 31, 2001; however, neither Equity Office nor Spieker may terminate the merger agreement if its breach is the reason that the mergers have not been completed;

— the holders of at least a majority of the outstanding shares of Spieker common stock fail to approve the merger and the merger agreement at the Spieker special meeting, or if holders of partnership units of Spieker Partnership fail to approve the principal terms of the partnership merger by the required vote, or if it is determined by Equity Office that the approvals of the Spieker Partnership unitholders and Spieker Partnership preferred unitholders cannot be obtained, but Spieker may not terminate for either of these reasons if it is in breach in any material respect of its obligations contained in the merger agreement relating to obtaining the required shareholder and partner votes; or

— the holders of Equity Office common shares fail to approve the merger and the merger agreement and the amendments to the Equity Office declaration of trust at the Equity Office special meeting, or holders of a majority of the partner interests in EOP Partnership fail to approve the merger agreement and the partnership merger, but Equity Office may not terminate for either of these reasons if it is in breach in any material respect of its obligations contained in the merger agreement relating to obtaining the required shareholder and partner votes;

• by Equity Office:

— upon a breach of or failure to perform any covenant, obligation or agreement on the part of Spieker or Spieker Partnership contained in the merger agreement, or upon a breach of any representation or warranty of Spieker or Spieker Partnership or if any representation or warranty of Spieker or Spieker Partnership is or becomes untrue, in either case so that the conditions to the consummation of the merger contained in the merger agreement would be incapable of being satisfied by December 31, 2001, or as otherwise extended by the parties; or

— if (a) the Spieker board of directors has failed to recommend or has withdrawn, modified, amended or qualified, or proposed publicly not to recommend or to withdraw, modify, amend or qualify, in any manner adverse to Equity Office, its approval or recommendation of the merger, the partnership merger or the merger agreement, or approved or recommended any superior alternative acquisition proposal, (b) following the announcement or receipt of an alternative acquisition proposal, Spieker has failed to call the Spieker special meeting or failed to prepare and mail to its stockholders this joint proxy statement/prospectus or (c) the Spieker board of directors or any committee of the Spieker board of directors has resolved to do any of the foregoing; or

80

**Table of Contents**

• by Spieker:

— upon a breach of any covenant, obligation or agreement on the part of Equity Office or EOP Partnership contained in the merger agreement, or upon a breach of any representation or warranty of Equity Office or EOP Partnership or if any representation or warranty of Equity Office or EOP Partnership is or becomes untrue, in either case so that the conditions to the consummation of the merger contained in the merger agreement would be incapable of being satisfied by December 31, 2001 or as otherwise extended by the parties; or

— if the Spieker board of directors has withdrawn, modified, amended or qualified in any manner adverse to Equity Office its approval or recommendation of the merger or the merger agreement in connection with, or approved or recommended, any superior alternative acquisition proposal, or to enter into a binding written agreement with respect to a superior alternative acquisition proposal, so long as, in each case, Spieker has complied with the terms of the no solicitation provisions contained in the merger agreement and, before terminating the merger agreement, has paid to EOP Partnership the termination fee.

*Effect of Termination*

Except for provisions in the merger agreement regarding confidentiality of nonpublic information, payment of fees and expenses, the effect of termination and specified miscellaneous provisions, if the merger agreement is terminated as described above, the merger agreement will become void and have no effect. In addition, if the merger agreement is so terminated, there will be no liability on the part of Equity Office, EOP Partnership, Spieker or Spieker Partnership, except to the extent that the termination results from a material breach by any party of any of its representations, warranties, covenants or agreements contained in the merger agreement. The confidentiality agreement, dated January 2, 2001, between Spieker and Equity Office will continue in effect notwithstanding any termination of the merger agreement.

### Termination Fee and Termination Expenses

Except as described below, each party to the merger agreement will bear its own fees and expenses in connection with the transactions contemplated by the merger agreement.

Spieker and Spieker Partnership will pay to EOP Partnership a termination fee if the merger agreement is terminated:

• by Spieker, (a) if the Spieker board of directors has withdrawn, modified, amended or qualified in any manner adverse to Equity Office its approval or recommendation of either of the merger or the merger agreement in connection with, or approved or recommended, any superior alternative acquisition proposal, or (b) to enter into a binding written agreement with respect to a superior alternative acquisition proposal, so long as, in each case, Spieker complied with the terms of the nonsolicitation provisions contained in the merger agreement;

• by Equity Office, if the Spieker board of directors has failed to recommend or has withdrawn, modified, amended or qualified, or proposed publicly not to recommend or to withdraw, modify, amend or qualify, in any manner adverse to Equity Office its approval or recommendation of either of the merger or the merger agreement or approved or recommended any superior alternative acquisition proposal, or has resolved to do any of the foregoing; or

• under the circumstances listed below, but only if (a) Spieker or Spieker Partnership has received a proposal for an alternative acquisition transaction before the termination and (b) before or within 12 months after the termination, Spieker or Spieker Partnership enters into an agreement regarding any alternative acquisition transaction that is later completed:

— by Equity Office, if Spieker or Spieker Partnership fails to perform in all material respects all its covenants, obligations and agreements in the merger agreement and the failure cannot be rectified by December 31, 2001;

81

**Table of Contents**

— by Equity Office, if Spieker or Spieker Partnership is in breach of any of its representations or warranties in the merger agreement, and the breach reasonably would be expected to have a material adverse effect on the business, properties, assets, financial condition or results of operations of Equity Office and its subsidiaries taken as a whole and cannot be rectified by December 31, 2001;

— by Equity Office or Spieker, if following Spieker's receipt or announcement of an alternative acquisition proposal, Spieker fails to call the Spieker special meeting or fails to prepare and mail to its stockholders this joint proxy statement/prospectus;

— by Equity Office or Spieker, if any judgment, injunction, order, decree or action by any governmental entity of competent authority, which primarily results from any action or inaction of Spieker or its subsidiaries and prevents the consummation of the merger or the partnership merger, becomes final and non–appealable;

— by Equity Office or Spieker, if the merger and the partnership merger are not completed before December 31, 2001, and the terminating party has not materially breached its obligations under the merger agreement in a way that prevents the merger or the partnership merger from being completed before December 31, 2001; or

— by Equity Office or Spieker, if the holders of at least a majority of the outstanding shares of Spieker common stock fail to approve the merger and the merger agreement at the Spieker special meeting, or the holders of partnership units of Spieker Partnership fail to approve the principal terms of the partnership merger by the required vote, or it is determined by Equity Office that the approvals of the Spieker Partnership unitholders and Spieker Partnership preferred unitholders cannot be obtained, but Equity Office or Spieker may not terminate for any of these reasons if it is in breach in any material respect of its obligations contained in the merger agreement relating to obtaining the required shareholder and partner votes.

The termination fee that EOP Partnership may be entitled to receive will be an amount equal to the lesser of (1) $160 million less termination expenses, as described below, paid or payable under the merger agreement and (2) the maximum amount that can be paid to EOP Partnership without causing Equity Office to fail to meet the REIT income requirements under the Internal Revenue Code. The unpaid amount, if any, will be placed in escrow and will be paid in subsequent years to the extent the payment would not cause Equity Office to fail to meet the REIT income requirements under the Internal Revenue Code. Spieker's and Spieker Partnership's obligation to pay any unpaid portion of the termination fee will terminate on February 22, 2004.

Spieker and Spieker Partnership will pay to EOP Partnership termination expenses if the merger agreement is terminated:

- by Equity Office, if Spieker or Spieker Partnership fails to perform in all material respects all of its covenants, obligations and agreements in the merger agreement and the failure cannot be rectified by December 31, 2001, or if Spieker or Spieker Partnership is in breach of any of its representations or warranties in the merger agreement, and the breach reasonably would be expected to have a material adverse effect on the business, properties, assets, financial condition or results of operations of Equity Office and its subsidiaries taken as a whole, and the breach cannot be rectified by December 31, 2001, in each case, so long as Spieker was not entitled to terminate the merger agreement because Equity Office or EOP Partnership failed to perform in all material respects all of its covenants, obligations and agreements in the merger agreement, or because Equity Office or EOP Partnership is in breach of any of its representations or warranties in the merger agreement; or

- by Equity Office or Spieker, if the holders of at least a majority of the outstanding shares of Spieker common stock fail to approve the merger and the merger agreement at the Spieker special meeting, or the holders of partnership units of Spieker Partnership fail to approve the principal terms of the partnership merger by the required vote or it is determined by Equity Office that the

82

Table of Contents

approvals of the Spieker Partnership unitholders and Spieker Partnership preferred unitholders cannot be obtained, but Equity Office or Spieker may not terminate for any of these reasons if it is in breach in any material respect of its obligations contained in the merger agreement relating to obtaining the required shareholder and partner votes.

Equity Office and EOP Partnership will pay to Spieker Partnership termination expenses if the merger agreement is terminated:

- by Spieker, if Equity Office or EOP Partnership fails to perform in all material respects all of its covenants, obligations and agreements in the merger agreement and the failure cannot be rectified by December 31, 2001, or if Equity Office or EOP Partnership is in breach of any of its representations or warranties in the merger agreement, and the breach reasonably would be expected to have a material adverse effect on the business, properties, assets, financial condition or results of operations of Spieker and its subsidiaries taken as a whole, and the breach cannot be rectified by December 31, 2001, in each case, so long as Equity Office was not entitled to terminate the merger agreement because Spieker or Spieker Partnership failed to perform in all material respects all of its covenants, obligations and agreements in the merger agreement, or because Spieker or Spieker Partnership is in breach of any of its representations or warranties in the merger agreement; or

- by either Spieker or Equity Office, if the holders of a majority of the outstanding Equity Office common shares fail to approve the merger and the merger agreement at the Equity Office special meeting, or if holders of a majority of the EOP Partnership units fail to approve the merger, but neither Equity Office nor Spieker may terminate for either of these reasons if it is in breach in any material respect of its obligations contained in the merger agreement relating to obtaining the required shareholder and partner votes, so long as Equity Office was not entitled to terminate the merger agreement because of a breach of any representation, warranty, covenant, obligation or agreement on the part of Spieker or Spieker Partnership.

The termination expenses that EOP Partnership or Spieker Partnership may be entitled to receive in these cases will be an amount equal to the lesser of (a) $7,500,000 or (b) the applicable party's out-of-pocket expenses incurred in connection with the merger agreement and the transactions contemplated by the merger agreement, including all attorneys', accountants' and investment bankers' fees and expenses. If the termination expenses payable to that party exceed the maximum amount that can be paid to that party without causing that party to fail to meet the REIT income requirements under the Internal Revenue Code, then the amount initially payable to that party will be that maximum amount, and the unpaid amount will be placed in escrow and paid in subsequent years to the extent the payment would not cause Equity Office to fail to meet the REIT income requirements under the Internal Revenue Code. The paying party's obligation to pay any unpaid portion of the termination expenses will terminate on February 22, 2004.

In addition, if Equity Office prevails in a suit for a breach by Spieker and Spieker Partnership of their obligation to pay the termination fee or termination expenses under the merger agreement, Equity Office will be entitled to its costs and expenses in connection with the suit, with interest.

## Waiver and Amendment of the Merger Agreement

The merger agreement may be amended by the parties in writing by action of the Equity Office board of trustees and the Spieker board of directors at any time before the filing of the Maryland articles of merger relating to the merger. However, after the shareholder and partner approvals are obtained, no such amendment may be made which by law requires the further approval of shareholders or partners without obtaining such further approval. However, if the merger agreement is amended after the mailing of this joint proxy statement/prospectus and your vote is required to such amendment, we will resolicit your vote.

83

Table of Contents

At any time before the completion of the merger, the parties may, in writing:

• extend the time for the performance of any of the obligations or other acts of the other party;

• waive any inaccuracies in the representations and warranties of the other party contained in the merger agreement or in any document delivered under the merger agreement; or

• waive compliance with any of the agreements or conditions of the other party contained in the merger agreement, except as specified.

By law, neither Equity Office nor Spieker can waive:

• the requirement that Equity Office common shareholders and Spieker common stockholders and the partners of EOP Partnership approve the merger;

• the requirement that Equity Office common shareholders approve the amendments to the Equity Office declaration of trust;

• the requirement that partners of Spieker Partnership approve the principal terms of the partnership merger; or

• any court order or law preventing the closing of the merger or the partnership merger.

Whether any of the other conditions would be waived would depend on the facts and circumstances as determined by the reasonable business judgment of the board of trustees of Equity Office or the board of directors of Spieker. If Equity Office or Spieker waived compliance with one or more of the other conditions and the condition was deemed material to a vote of Equity Office common shareholders and/or Spieker common stockholders, Equity Office and/or Spieker would have to resolicit shareholder or stockholder approval, as applicable, before closing the merger. Neither Equity Office nor Spieker intends to notify shareholders or stockholders of any waiver that, in the judgment of Equity Office's board of trustees and Spieker's board of directors, does not require resolicitation of shareholder or stockholder approval.

It is a condition to the closing of the merger that Hogan & Hartson L.L.P., counsel to Equity Office, and Sullivan & Cromwell, counsel to Spieker, deliver opinions that the merger qualifies as a reorganization under the provisions of section 368(a) of the Internal Revenue Code. This condition will not be waived.

## Indemnification; Directors' and Officers' Insurance

Under the merger agreement, Equity Office and EOP Partnership will provide exculpation and indemnification for each person who has been at any time on or before February 22, 2001, or who becomes before the completion of the merger, an officer or director of Spieker or any Spieker subsidiary. This exculpation and indemnification will be the same as provided to these persons by Spieker and its subsidiaries immediately before the completion of the merger in each entity's respective charter, bylaws, partnership, operating or similar agreement, as applicable, as in effect on February 22, 2001. This exculpation and indemnification covers actions only on or before the completion of the merger, including all transactions contemplated by the merger agreement.

In addition, Equity Office and EOP Partnership will indemnify and hold harmless, to the full extent permitted by applicable law, each of the persons described above against any losses, claims, liabilities, expenses, judgments, fines and amounts paid in settlement in connection with any threatened or actual claim, action, suit, proceeding or investigation, whether civil, criminal or administrative, including any action by or on behalf of any or all securityholders of Spieker or Equity Office, or any of their subsidiaries, or by or in the right of Spieker or Equity Office, or any of their subsidiaries, in which any of these persons is, or is threatened to be, made a party based in whole or in part on, or arising in whole or in part out of, or pertaining to:

• the fact that he or she is or was an officer, employee or director of Spieker or any of its subsidiaries or any action or omission by that person in his or her capacity as a director; or

84

Table of Contents

• the merger agreement or the transactions contemplated by the merger agreement, whether in any case asserted or arising before or after the completion of the merger.

After the completion of the merger, Equity Office and EOP Partnership will be obligated to promptly pay and advance reasonable expenses and costs incurred by each of these persons as they become due and payable in advance of the final disposition of the claim, action, suit, proceeding or investigation to the full extent and in the manner permitted by law. Equity Office is also obligated to purchase, at or before the completion of the merger, directors' liability insurance policy coverage for Spieker's directors and officers for a period of six years which will provide the directors and officers with coverage on substantially similar terms as currently provided by Spieker to these directors and officers.

**Assumption of Spieker's Obligations Under Registration Rights Agreements**

Under the merger agreement, Equity Office has agreed to assume Spieker's obligations under existing registration rights agreements between Spieker and several holders of Spieker Partnership units and Spieker Partnership preferred units.

**Voting Agreements**

Messrs. Spieker, French, Singleton, Foster, Vought, Russell, Davenport, Rothstein, Schnugg and Eddy and one other executive officer of Spieker have entered into voting agreements with Equity Office and EOP Partnership agreeing to vote all shares of Spieker common stock, and, if applicable, all Spieker Partnership units, owned of record by each of them, or that they otherwise have the power to vote:

- for adoption and approval of the merger agreement, the merger and the partnership merger and the transactions contemplated thereby; and

- against approval or adoption of any action or agreement (other than the merger agreement or the transactions contemplated thereby) made or taken in opposition to or in competition with the merger.

As of the record date for the Spieker special meeting, these persons beneficially owned, excluding stock options and Spieker Partnership units, a total of 494,805 shares of Spieker common stock, representing approximately 0.73% of the outstanding shares of Spieker common stock entitled to vote at the Spieker special meeting and a total of 3,417,752 Spieker Partnership units representing approximately 4.5% of the outstanding Spieker Partnership units entitled to vote on the partnership merger.

The voting agreements prohibit these individuals from, directly or indirectly, selling, transferring, pledging, encumbering, assigning or otherwise disposing of their stock, stock options or Spieker Partnership units or entering into any contract, option or other agreement or understanding related to any of those actions. In addition, the voting agreements require these individuals to tender and sell to EOP Partnership all of their options to purchase Spieker common stock in the tender offer to be made by EOP Partnership as described in "— Treatment of Spieker Stock Options" on page 68.

None of the trustees or executive officers of Equity Office have entered into voting agreements.

**Spieker Partnership Series D Preferred Units**

The merger agreement provides that each Spieker Partnership series D preferred unit outstanding immediately before the partnership merger will be exchanged for one EOP Partnership series G preferred unit. Under a consent and purchase agreement dated May 7, 2001 by and between Spieker Partnership and the holders of the outstanding Spieker Partnership series D preferred units, these holders have agreed to sell, immediately before the partnership merger, their series D preferred units to Spieker Partnership at a purchase price of $46.50 per Spieker Partnership series D preferred unit plus accrued and unpaid dividends, in cash, without interest. Spieker will pay an aggregate purchase price of $69,750,000 plus accrued and unpaid dividends for the series D preferred units. Spieker Partnership intends to utilize borrowings under its credit facilities to finance the purchase price of these units. Under the consent and

85

---

Table of Contents

purchase agreement, the holders of the Spieker Partnership series D preferred units also have consented to the principal terms of the partnership merger.

**Acquisition of Spieker Northwest**

Messrs. Spieker, French and Singleton and Mr. Bruce E. Hosford own all of the outstanding shares of common stock of Spieker's noncontrolled subsidiary, Spieker Northwest, Inc., representing 100% of the voting power of Spieker Northwest, and 5% of the outstanding shares of preferred stock of Spieker Northwest. Spieker Partnership owns 95% of the outstanding shares of preferred stock of Spieker Northwest. Messrs. Spieker, Singleton, French and Hosford have entered into a stock purchase agreement that provides for the sale of all of their shares of Spieker Northwest stock to Equity Office Properties Management Corp., a Delaware corporation that is wholly owned by EOP Partnership. Each of Messrs. Spieker, Singleton, French and Hosford will receive $50,625 in exchange for his shares of stock of Spieker Northwest.

**Nonsolicitation Agreements**

It is a condition of the merger that each of Messrs. Spieker, Foster and Vought enter into nonsolicitation agreements with Equity Office and EOP Partnership. Under these agreements, each of the named individuals will agree that for a period of 18 months after the closing date of the mergers, they will not:

- solicit any employee of Equity Office, EOP Partnership, Spieker or Spieker Partnership or their respective subsidiaries for the purpose of causing such employee to leave the employment of Equity Office, EOP Partnership, Spieker or Spieker

Partnership or any of their respective subsidiaries; or

• directly or indirectly hire any such employee.

However, the named individuals may solicit an employee for the purpose of causing the employee to leave the employment of Equity Office, EOP Partnership, Spieker or Spieker Partnership, or may hire such an employee if:

• Equity Office or EOP Partnership indicates in writing its intention to terminate the employment of any employee with respect to all and not less than all of the employee's positions at Equity Office, EOP Partnership, Spieker or Spieker Partnership;

• Equity Office or EOP Partnership terminates the employment of any employee with respect to all and not less than all of the employee's positions at Equity Office, EOP Partnership, Spieker and Spieker Partnership; or

• an employee terminates his positions at all of Equity Office, EOP Partnership, Spieker and Spieker Partnership voluntarily and not as a result of solicitation by the individual.

**Tax Related Undertakings of EOP Partnership**

*Lock-up Agreements.* Under the merger agreement, EOP Partnership has agreed for the benefit of 17 named Spieker Partnership unitholders to amend its partnership agreement to provide that EOP Partnership will not be allowed to sell, exchange or otherwise dispose of, except in tax-free or tax-deferred transactions, specified office properties comprising approximately 6.5 million square feet, or approximately 26.5% of Spieker Partnership's office portfolio on a square footage basis, and specified industrial properties comprising approximately 5.6 million square feet, or approximately 43.7% of Spieker Partnership's industrial portfolio on a square footage basis. These office and industrial properties comprise approximately 12.1 million square feet, or approximately 32.3% of Spieker Partnership's total portfolio on a square footage basis.

If EOP Partnership sells any of the specified properties, EOP Partnership will be required to pay each protected Spieker Partnership unitholder an amount equal to, on an after-tax basis, any income taxes incurred by the unitholder as a result of the sale, to the extent that any of the built-in gain on the date of

86

---

the partnership merger with respect to these properties is allocated to the unitholder as a result of that sale. Therefore, even if it were in the best interest of EOP Partnership to sell any of the specified properties, it may be prohibitively expensive for EOP Partnership to do so during the applicable restriction period. The named unitholders who have the benefit of this protection include, among others, Messrs. Spieker, French, Vought, Davenport and Schnugg and one other Spieker executive officer.

The lock-ups on these properties will last for a "protection period" of at least 10 years. In addition, each of the 17 named Spieker Partnership unitholders will have the opportunity, but will not be required, to increase the length of the protection period that applies to him by entering into a "restriction agreement," under the terms of which the Spieker Partnership unitholder would agree not to sell specified percentages of his Equity Office common shares and EOP Partnership units during the initial 10 year restriction period. Specifically, under the restriction agreement, the named Spieker Partnership unitholder would agree not to sell 70% of his Equity Office common shares and EOP Partnership units acquired in the mergers for two years following the mergers. For each full year thereafter, the total percentage of the named Spieker Partnership unitholder's Equity Office common shares and EOP Partnership units that he would not be able to sell would be reduced by 5%. All restrictions on disposition by the unitholder would terminate on the 10th anniversary of the mergers. The protection period applicable to a named Spieker Partnership unitholder who enters into a restriction agreement will be extended by one year for each year that the unitholder complies with the terms of the restriction agreement, so long as the unitholder complies with the terms of the restriction agreement for at least two years. None of the 17 named Spieker Partnership unitholders is required to enter into a restriction agreement unless he desires to extend his applicable protection period beyond the initial 10-year period. EOP Partnership's only remedy for breach of a restriction agreement would be to deny the extensions of the protection period that would have been provided in the absence of a breach. Neither Equity Office nor EOP Partnership could bring an action for damages or to enjoin a prohibited transfer.

*Guarantee Opportunities.* Under the amendment to the partnership agreement of EOP Partnership described above, EOP Partnership also will be required to make available to the 17 named Spieker Partnership unitholders the opportunity to guarantee "qualifying debt." Qualifying debt generally is debt that meets specified requirements with respect to loan-to-value or loan-to-guarantee ratios or that is currently outstanding debt of Spieker Partnership. After the partnership merger, if guaranteed debt is repaid or no longer meets the requirements for qualified debt, EOP Partnership must offer the 17 named Spieker Partnership unitholders replacement opportunities for these guarantees. The named unitholders who have the benefit of this protection include, among others, Messrs. Spieker, Foster, French, Vought, Davenport and Schnugg and one other Spieker executive officer.

If EOP Partnership fails to comply with its obligations described above, EOP Partnership will be required to pay each protected Spieker Partnership unitholder an amount equal, on an after-tax basis, to any income taxes incurred by the protected unitholder as a result of that failure.

*Allocations of "Tier 3" Nonrecourse Liabilities Under Regulations Section 1.752-3(a)(3).* Under the amendment to the partnership agreement of EOP Partnership described above, EOP Partnership will be required to use commercially reasonable

efforts to cooperate with the 17 named Spieker Partnership unitholders to determine the method to be used for allocating "excess nonrecourse liabilities" of EOP Partnership pursuant to applicable Treasury regulations. With respect to these Spieker Partnership unitholders, EOP Partnership will be prohibited from using a less favorable method of allocating "excess nonrecourse liabilities" than it currently uses with respect to EOP Partnership unitholders who are not parties to express agreements in effect on February 17, 2001, specifying a particular method to be used for such purposes. EOP Partnership also has agreed not to make available to any other EOP Partnership unitholder a more favorable method of allocating "excess nonrecourse liabilities" without making such method available to the protected Spieker Partnership unitholders. In addition, EOP Partnership has agreed to use the same methods of allocating excess nonrecourse liabilities to those 17 named Spieker Partnership unitholders that had been used by Spieker Partnership with respect to those unitholders prior to the partnership merger. If the method of allocating excess nonrecourse liabilities used by EOP Partnership results in the allocation to these specified former Spieker Partnership unitholders of less excess

87

---

Table of Contents

nonrecourse liabilities than was allocated to them by Spieker Partnership, EOP Partnership has agreed to consider in good faith a request by the former Spieker Partnership unitholder to enter into deficit restoration obligations with respect to its EOP Partnership units or to enter into a guarantee of EOP Partnership debt. The named unitholders who have the benefit of this protection include, among others, Messrs. Spieker, French, Foster, Vought, Davenport and Schnugg and one other Spieker executive officer.

*Assumption of Spieker Tax Protection Agreements.* Under the merger agreement and the amendment to the partnership agreement of EOP Partnership described above, EOP Partnership also has expressly agreed to assume obligations of Spieker Partnership to other specified Spieker Partnership unitholders under existing tax protection agreements between Spieker Partnership and these unitholders. Specifically, EOP Partnership has agreed to assume Spieker Partnership's undertaking not to dispose of 11 properties formerly managed by Transpacific Development Company and acquired by Spieker Partnership in 1998 pursuant to a contribution agreement dated February 4, 1998 (referred to as the TDC Curci Portfolio) in taxable transactions prior to February 4, 2018, and to maintain specified debt obligations guaranteed by the contributors of those properties. Also, EOP Partnership has agreed to assume Spieker Partnership's undertaking not to dispose of Larkspur Landing, which was acquired by Spieker Partnership in early 2000, in a taxable transaction prior to February 28, 2010, to maintain a specified amount of recourse debt and to make deficit restoration obligation opportunities available to the six contributors of that property. EOP Partnership also will assume obligations of Spieker Partnership with respect to properties that are not wholly-owned by Spieker Partnership. These obligations include restrictions on dispositions of the properties and maintenance of debt with respect to these properties.

88

---

Table of Contents

## MATERIAL FEDERAL INCOME TAX

## CONSEQUENCES RELATING TO THE MERGER

The following discussion describes the U.S. federal income tax consequences relating to the merger and the receipt of cash and Equity Office common shares in the merger by holders of Spieker common stock and the receipt of Equity Office preferred shares by holders of Spieker preferred stock. Because this discussion is intended to address only federal income tax consequences of the merger that will apply to all Spieker stockholders, it may not contain all of the information that may be important to you. As you review this discussion, you should keep in mind that:

• the tax consequences to you may vary depending on your particular tax situation;

• you may be subject to special rules that are not discussed below if you are:

— a tax-exempt organization;

— a broker-dealer;

— a trader in securities that elects to mark to market;

— a person who holds Spieker stock as part of a hedge, straddle or conversion transaction;

— a person who acquired shares of Spieker stock pursuant to the exercise of employee stock options or otherwise as compensation;

— a person who does not hold its shares of Spieker stock as a capital asset;

— a non-U.S. corporation, non-U.S. partnership, non-U.S. trust, non-U.S. estate or individual who is not taxed as a citizen or resident of the United States, all of which may be referred to collectively as "non-U.S. persons;"

— a trust;

— an estate;

— a regulated investment company;

— an insurance company;

—  U.S. expatriates who are subject to special rules; or

—  otherwise subject to special tax treatment under the Internal Revenue Code;

• this summary does not address state, local, or foreign tax considerations; and

• this discussion is not intended to be, and should not be construed as, tax advice.

**You are urged both to review the following discussion and to consult with your own tax advisor to determine the effect of the merger on your individual tax situation, including any state, local or non–U.S. tax consequences.**

The information in this section is based on the current Internal Revenue Code, current, temporary and proposed regulations, the legislative history of the Internal Revenue Code, current administrative interpretations and practices of the Internal Revenue Service, including its practices and policies as endorsed in private letter rulings, which are not binding on the Internal Revenue Service, and existing court decisions. Future legislation, regulations, administrative interpretations and court decisions could change current law or adversely affect existing interpretations of current law. Any change could apply retroactively. Neither Equity Office nor Spieker has requested, or plans to request, any rulings from the Internal Revenue Service concerning the tax treatment of the merger. It is possible that the Internal Revenue Service would challenge the statements in this discussion, which do not bind the Internal Revenue Service or the courts, and that a court would agree with the Internal Revenue Service.

89

Table of Contents

Hogan & Hartson L.L.P., counsel to Equity Office, and Sullivan & Cromwell, counsel to Spieker, have reviewed this discussion and the statements as to the material federal income tax consequences of the merger set forth below under the captions "— General," "— Federal Income Tax Consequences of the Merger to Spieker Common Stockholders," "— Federal Income Tax Consequences of the Merger to Spieker Preferred Stockholders," and "— Federal Income Tax Consequences to Spieker, Equity Office and Equity Office Shareholders" are the opinion of Hogan & Hartson L.L.P. and Sullivan & Cromwell. These opinions are subject to the limitations and qualifications described in the captioned sections referenced in the preceding sentence.

*General.* Equity Office and Spieker intend for the merger to qualify as a "reorganization" under section 368(a) of the Internal Revenue Code. Hogan & Hartson L.L.P. and Sullivan & Cromwell each is of the opinion that, based on factual representations by both Equity Office and Spieker regarding the merger, the merger will qualify as a reorganization under Section 368(a) of the Internal Revenue Code. In addition, the obligation of Equity Office and Spieker to consummate the merger is conditioned upon Hogan & Hartson L.L.P., counsel to Equity Office, and Sullivan & Cromwell, counsel to Spieker, delivering opinions to Equity Office and Spieker, respectively, that the merger will qualify as a reorganization under the provisions of section 368(a) of the Internal Revenue Code. The opinions of counsel do rely and will rely on customary representations made by Equity Office and Spieker and applicable factual assumptions. If any of the factual assumptions or representations relied upon in the opinions of counsel are inaccurate, the opinions may not accurately describe the U.S. federal income tax treatment of the merger, and this discussion may not accurately describe the tax consequences of the merger.

*Federal Income Tax Consequences of the Merger to Spieker Common Stockholders.* Spieker common stockholders will receive $13.50 in cash and 1.49586 Equity Office common shares for each share of Spieker common stock exchanged in the merger. The merger will have the following material federal income tax consequences to Spieker common stockholders:

• Receipt of Equity Office Common Shares and Cash. A Spieker common stockholder will recognize gain equal to the lesser of either the cash received, excluding cash received for a fractional Equity Office common share, or the amount by which (A) the cash plus the fair market value of the Equity Office common shares received exceeds (B) the stockholder's adjusted tax basis in its Spieker common stock. A Spieker common stockholder will not recognize any loss on the exchange.

In general, gain recognized by a Spieker common stockholder will be taxable as capital gain. This capital gain will be long–term capital gain if the Spieker stockholder's holding period in the Spieker common stock is more than one year. However, it is possible that the gain recognized by a Spieker common stockholder will be taxable as dividend income if the cash received does not result in a "meaningful reduction" in the Equity Office common shares that the Spieker common stockholder would have received had it received only Equity Office common shares in the merger. In determining whether a meaningful reduction has occurred, section 318 of the Internal Revenue Code requires that the stockholder be treated as actually owning Equity Office common shares that are owned by the stockholder's family members or by entities in which the stockholder owns an interest, or which the stockholder has an option to acquire. The Internal Revenue Service has ruled that a minority stockholder in a publicly traded corporation whose relative stock interest is minimal and who exercises no control with respect to corporate affairs is considered to have a meaningful reduction if that stockholder has any reduction in its percentage stock ownership compared to what the shareholder would have received had all of the merger

consideration been stock. Each Spieker stockholder should consult his or her own tax advisor as to the applicability of these rules to his or her situation.

Gain required to be recognized due to the receipt of cash as part of the merger consideration generally must be calculated separately for each block of Spieker common stock exchanged in the merger. A block of stock is generally considered to be a group of shares acquired at the same cost in a single transaction.

90

---

Table of Contents

A Spieker common stockholder will have a tax basis in the Equity Office common shares received equal to the stockholder's tax basis in its Spieker common stock exchanged, decreased by the amount of any cash received and increased by the amount of any gain recognized in the exchange.

• <u>Fractional Shares.</u> A Spieker common stockholder that receives cash instead of a fractional Equity Office common share will be treated as if the fractional share was received in the merger and then redeemed by Equity Office. The Spieker common stockholder generally will recognize capital gain or loss equal to the difference between the amount of cash received for the fractional share and the stockholder's tax basis in the fractional share. This capital gain or loss will be long−term capital gain or loss if the Spieker stockholder's holding period in the Spieker common stock is more than one year.

• <u>Holding Period.</u> The holding period of the Equity Office common shares received by a Spieker common stockholder in the merger will include the holding period of the Spieker common stock exchanged.

*Federal Income Tax Consequences of the Merger to Spieker Preferred Stockholders.* Under the merger agreement, each outstanding share of Spieker series B preferred stock will be converted into the right to receive one Equity Office series E preferred share; each outstanding share of Spieker series C preferred stock will be converted into the right to receive one Equity Office series F preferred share; and each outstanding share of Spieker series E preferred stock will be converted into the right to receive one Equity Office Series H preferred share. See "The Merger Agreement — Merger Consideration" beginning on page 66. The merger will have the following material federal income tax consequences to Spieker preferred stockholders:

• <u>Receipt of Equity Office Preferred Shares.</u> A Spieker preferred stockholder that exchanges its Spieker preferred stock for Equity Office preferred shares only will not recognize gain or loss on such exchange. A Spieker preferred stockholder will have a tax basis in the Equity Office preferred shares received equal to the stockholder's adjusted tax basis in the Spieker preferred stock exchanged.

• <u>Holding Period.</u> The holding period of the Equity Office preferred shares received by a Spieker preferred stockholder in the merger will include the holding period of the Spieker preferred stock exchanged, assuming that the Spieker preferred stock was held as a capital asset.

*Backup Withholding.* Backup withholding tax at a rate of 31% may apply to cash paid in the merger to a Spieker common stockholder. Backup withholding will not apply, however, if the Spieker common stockholder:

• furnishes a correct taxpayer identification number and certifies that he or she is not subject to backup withholding on Internal Revenue Service Form W−9, or an appropriate substitute form;

• provides a certificate of foreign status on Internal Revenue Service Form W−8 or W−8 BEN, or an appropriate substitute form; or

• is otherwise exempt from backup withholding.

The Internal Revenue Service may impose a penalty upon any taxpayer that fails to provide the correct taxpayer identification number. Any amount withheld under the backup withholding rules may be allowed as a refund or a credit against the stockholder's federal income tax liability provided that the stockholder furnishes required information to the Internal Revenue Service.

*Federal Income Tax Consequences to Spieker, Equity Office and Equity Office Shareholders.* Equity Office and its shareholders will not recognize any gain or loss as a result of the merger.

Spieker will not recognize any gain or loss as a result of the merger if Spieker qualifies as a "real estate investment trust," or "REIT," at the time of the merger. As described below, in connection with the filing of this joint proxy statement/prospectus, Morrison & Foerster LLP, special tax counsel to Spieker, has delivered to Spieker and Equity Office an opinion that Spieker qualifies as a REIT.

91

Table of Contents

*Federal Income Tax Consequences of the Merger to Spieker and Spieker Stockholders if the Merger Did Not Qualify as a Reorganization or Spieker Did Not Qualify as a REIT.* It is a condition to consummation of the merger that Equity Office and Spieker receive opinions of counsel that the merger will qualify as a reorganization for federal income tax purposes, but these opinions will not be binding upon the Internal Revenue Service or the courts.

If the merger failed to qualify as a reorganization, then, regardless of Spieker's status as a REIT, a Spieker stockholder would recognize gain or loss, as applicable, equal to the difference between:

• the aggregate fair market value of the Equity Office common and preferred shares and the cash received in the merger; and

• the stockholder's adjusted tax basis in its Spieker stock.

If the merger failed to qualify as a reorganization, but Spieker qualified as a REIT at the time of the merger, Spieker would incur a tax liability only to the extent that Spieker's net gain recognized on the deemed transfer of its assets to Equity Office were to exceed the fair market value of the Equity Office common and preferred shares and cash issued in the merger. The liability for the tax attributable to any such gain would transfer to Equity Office.

If the merger failed to qualify as a reorganization and if Spieker did not qualify as a REIT at the time of the merger, Spieker would generally recognize gain or loss on the deemed transfer of its assets to Equity Office and Equity Office, as its successor, would incur a very significant current tax liability. If Spieker were to fail to qualify as a REIT but the merger were to qualify as a reorganization, Equity Office would be subject to tax if during the 10 years following the merger Equity Office were to dispose of any asset that was acquired from Spieker in the merger. In this event, Equity Office would generally be subject to tax at the highest regular corporate rate on the built-in gain, if any, that existed with respect to such asset at the time of the merger.

*REIT Qualification of Spieker and Equity Office.* Morrison & Foerster LLP, special tax counsel to Spieker, is of the opinion that Spieker qualifies as a REIT. In addition, as a condition to the merger, Morrison & Foerster LLP will deliver an opinion to Equity Office that Spieker qualifies as a REIT at the time of the merger. These opinions, however, will not be binding on the Internal Revenue Service or the courts. These opinions rely on customary representations made by Spieker about factual matters relating to the organization and operation of Spieker, Spieker Partnership and its subsidiaries. In addition, these opinions are based on factual representations of Spieker concerning its business and properties as set forth in this joint proxy statement/ prospectus and the other documents incorporated by reference in this joint proxy statement/ prospectus. If Spieker did not qualify as a REIT in any of its prior tax years, Spieker would be liable for (and, as successor to Spieker in the merger, Equity Office would be obligated to pay any) federal income tax on its income earned in any year that it did not qualify as a REIT.

Hogan & Hartson L.L.P., counsel to Equity Office, is of the opinion that Equity Office qualifies as a REIT. In addition, as a condition to the merger, Hogan & Hartson L.L.P., counsel to Equity Office, will deliver an opinion to Equity Office and Spieker that commencing with Equity Office's taxable year ending December 31, 1997, Equity Office was organized and has operated in conformity with the requirements for qualification as a REIT, and that after consummation of the mergers, Equity Office's proposed method of operation will enable it to continue to qualify as a REIT.

The opinions of Hogan & Hartson L.L.P. rely upon customary representations made by Equity Office about factual matters relating to the organization and operation of Equity Office, EOP Partnership and its subsidiaries. In addition, these opinions are based upon factual representations of Equity Office concerning its business and properties as set forth in this joint proxy statement/prospectus and the other documents incorporated by reference in this joint proxy statement/prospectus. Finally, the portion of each Hogan & Hartson L.L.P. opinion that addresses the qualification of Equity Office as a REIT following the merger is based in part upon the respective opinion of Morrison & Foerster LLP described above relating to the qualification of Spieker as a REIT currently and at the closing of the merger and the representations made

92

---

Table of Contents

by Spieker in connection with each Morrison & Foerster opinion. If Spieker did not qualify as a REIT at the time of the merger, Equity Office could fail to qualify as a REIT after the merger.

Equity Office intends to continue to operate in a manner to qualify as a REIT following the merger, but there is no guarantee that Equity Office will qualify or remain qualified as a REIT. Qualification and taxation as a REIT depend upon Equity Office's ability to meet, through actual annual (or, in some cases, quarterly) operating results, requirements relating to income, asset ownership, distribution levels and diversity of share ownership, and the various REIT qualification requirements imposed under the Internal Revenue Code. Hogan & Hartson L.L.P. will not review Equity Office's compliance with these tests on a continuing basis. Given the complex nature of the REIT qualification requirements, the ongoing importance of factual determinations and the possibility of future changes in the circumstances of Equity Office, Equity Office cannot guarantee that its actual operating results will satisfy the requirements for taxation as a REIT under the Internal Revenue Code for any particular tax year.

## APPROVAL OF AMENDMENTS TO EQUITY OFFICE'S DECLARATION OF TRUST

As provided in the merger agreement, Equity Office is proposing to its common shareholders two amendments to its declaration of trust. These amendments would:

- Amend Section 5.2 of the Equity Office declaration of trust to increase the maximum number of trustees from 15 to 16; and

- Add a new Section 7.2.10 to the Equity Office declaration of trust that would authorize the Equity Office board of trustees to exempt under specified circumstances one or more series of preferred shares issued in connection with a business combination from all or any portion of the ownership limitations and restrictions on transfer set forth in Article VII of the Equity Office declaration of trust.

The text of these amendments is attached to this joint proxy statement/prospectus as <u>Annex D</u>.

### *Increase in Maximum Number of Trustees*

The purpose of the amendment to the Equity Office declaration of trust to increase the maximum number of trustees from 15 to 16 is to allow Messrs. Spieker, Foster and Vought to be appointed as trustees of Equity Office following the merger. Equity Office currently has 13 incumbent trustees and will add these three trustees under the merger agreement.

### *Authority of Board of Trustees to Exempt One or More Series of Preferred Shares Issued in Connection with a Business Combination from All or a Portion of the Existing Share Ownership Limitations and Restrictions on Transfer in the Declaration of Trust*

The purpose of the amendment to the Equity Office declaration of trust to authorize the Equity Office board of trustees to exempt one or more series of preferred shares issued in connection with a business combination from all or any portion of the ownership limitations and restrictions on transfer set forth in Article VII of the Equity Office declaration of trust is to provide the board flexibility in business combination transactions, including the merger, to vary the terms of the ownership limitations and restrictions on transfer applicable to any such preferred shares. This amendment allows, in a business combination transaction, the Equity Office board of trustees to issue one or more series of preferred shares that are exempt from all or part of the ownership limitations and transfer restrictions contained in Article VII of the Equity Office declaration of trust, if either:

- the Equity Office board determines that, assuming that all the shares of the exempted series of preferred shares are held by one non–U.S. person, it is not reasonably likely that:

  (1) five persons would own directly or indirectly more than 49.5% of the fair market value of the outstanding Equity Office shares;

  (2) the outstanding Equity Office shares would be owned by less than 100 persons; and

93

---

Table of Contents

  (3) non–U.S. persons would own directly or indirectly 43% or more of the fair market value of the issued and outstanding Equity Office shares; or

- the Equity Office board establishes restrictions on the direct and indirect ownership and transfer of the exempted series of preferred shares and remedies for invalid transfers to make it reasonably likely that:

  (1) no five individuals directly or indirectly own more than 50% of the value of the outstanding Equity Office shares;

  (2) the outstanding Equity Office shares will be owned by at least 100 persons; and

  (3) the fair market value of the outstanding Equity Office shares directly and indirectly owned by non–U.S. persons is less than 43% of the fair market value of all of the outstanding Equity Office shares; or

- a combination of the criteria in the two alternatives above so that each of item (1), (2) or (3) is satisfied under one of the two alternatives.

### *Required Vote and Equity Office Board Recommendation*

The affirmative vote of a majority of the outstanding Equity Office common shares is required to approve the amendments to the Equity Office declaration of trust. The proposal to approve the merger agreement and the merger and the proposal to approve the amendments to the Equity Office declaration of trust are conditioned on one another. If the merger agreement and the merger and the proposed amendments to the Equity Office declaration of trust are approved by Equity Office common shareholders, the amendments to the Equity Office declaration of trust will become effective at the closing of the merger when articles of merger are filed by Equity Office with the State Department of Assessments and Taxation of Maryland.

**The Equity Office board of trustees recommends that Equity Office common shareholders vote "FOR" approval of the amendments to the Equity Office declaration of trust.**

## DESCRIPTION OF EQUITY OFFICE SHARES OF BENEFICIAL INTEREST

*The following summary of the material terms of Equity Office's shares of beneficial interest does not include all of the terms of the shares and should be read together with the declaration of trust and bylaws of Equity Office and applicable Maryland law and, in the case of the Equity Office series E, F and H preferred shares, the forms of the articles supplementary for each of these series. The Equity Office declaration of trust and bylaws are incorporated by reference in this joint proxy statement/prospectus. See "Where You Can Find More Information" beginning on page 124. Forms of the articles supplementary for the Equity Office series E, F and H preferred shares to be established as part of the merger are included as exhibits to the registration statement, of which this document is a part.*

### General

The authorized shares of beneficial interest of Equity Office consist of 750,000,000 common shares, par value $.01 per share, and 100,000,000 preferred shares, par value $.01 per share, of which 8,000,000 shares are designated as 8.98% series A cumulative redeemable preferred shares, 7,000,000 shares are designated as 5.25% series B convertible, cumulative preferred shares and 4,600,000 shares are designated as 8 5/8% series C cumulative redeemable preferred shares of beneficial interest. The following

94

Table of Contents

table sets forth the issued and outstanding Equity Office common shares and series A, B and C preferred shares as of May 21, 2001:

| Class or Series of Shares | Issued and Outstanding |
|---|---|
| Common shares | 309,815,068 |
| Series A preferred shares | 7,994,000 |
| Series B preferred shares | 5,990,000 |
| Series C preferred shares | 4,562,000 |

Under the Equity Office declaration of trust, the Equity Office board of trustees has the authority to issue authorized but unissued common shares and, subject to the rights of holders of any class or series of preferred shares, preferred shares in one or more classes or series, without shareholder approval. The Equity Office board of trustees also is authorized to reclassify authorized but unissued common shares into preferred shares, and authorized but unissued preferred shares into common shares, without shareholder approval, subject to the rights of holders of any class or series of preferred shares. Absent an express provision to the contrary in the terms of any class or series of authorized shares, under the Equity Office declaration of trust, the Equity Office board of trustees also has the power to divide or combine the outstanding shares of any class or series, without shareholder approval.

Under Maryland law applicable to Maryland REITs, a shareholder is not personally liable for the obligations of Equity Office solely as a result of his or her status as a shareholder. The Equity Office declaration of trust provides that no shareholder will be liable for any debt or obligation of Equity Office by reason of being a shareholder nor will any shareholder face any personal liability in tort, contract or otherwise to any person that relates to the property or affairs of Equity Office by reason of being a shareholder.

The Equity Office bylaws further provide that Equity Office will indemnify each present or former shareholder against any claim or liability to which the shareholder may become subject by reason of being or having been a shareholder and that Equity Office will reimburse each shareholder for all reasonable expenses incurred by him or her relating to any such claim or liability. However, with respect to tort claims, contractual claims where shareholder liability is not so negated, claims for taxes and certain statutory liability, the shareholders may, in some jurisdictions, be personally liable to the extent that such claims are not satisfied by Equity Office.

Inasmuch as Equity Office carries public liability insurance which it considers adequate, any risk of personal liability to shareholders is limited to situations in which Equity Office's assets plus its insurance coverage would be insufficient to satisfy the claims against Equity Office and its shareholders.

### Common Shares

All Equity Office common shares outstanding are duly authorized, validly issued, fully paid and nonassessable.

Subject to the preferential rights of any other shares of beneficial interest and to the provisions of the Equity Office declaration of trust regarding ownership limitations and restrictions on transfers of shares of beneficial interest, holders of Equity Office common shares are entitled to receive distributions if, as and when authorized and declared by the Equity Office board of trustees out of assets legally available therefor and to share ratably in the assets of Equity Office legally available for distribution to its shareholders in the event of its liquidation, dissolution or winding–up after payment of, or adequate provision for, all known debts and liability of Equity Office.

Subject to the provisions of the Equity Office declaration of trust regarding ownership limitations and restrictions on transfer of shares of beneficial interest, each outstanding Equity Office common share entitles the holder to one vote on all matters submitted to a vote of shareholders, including the election of trustees. Except as provided with respect to any other class or series of shares of beneficial interest, the holders of the Equity Office common shares possess the exclusive voting power.

Table of Contents

There is no cumulative voting in the election of trustees, which means that the holders of a majority of the outstanding common shares can elect all of the trustees then standing for election and the holders of the remaining shares of beneficial interest, except as provided with respect to any other class or series of shares of beneficial interest, will not be able to elect any trustees.

Holders of Equity Office common shares have no preferences, conversion, sinking fund, redemption rights or preemptive rights to subscribe for any securities of Equity Office. Subject to the exchange provisions of the declaration of trust regarding ownership limitations and restrictions on transfer, Equity Office common shares have equal distribution, liquidation, voting and other rights.

The Equity Office declaration of trust permits the termination of the existence of Equity Office if approved by the affirmative vote of the holders of not less two−thirds of the votes entitled to be cast on the matter. In addition, the Equity Office board of trustees may terminate the status of Equity Office as a REIT under the Internal Revenue Code at any time, without a vote of the holders of Equity Office common or preferred shares.

## Preferred Shares

The Equity Office declaration of trust authorizes the Equity Office board of trustees to issue 100,000,000 preferred shares, to classify any unissued preferred shares and to reclassify any previously classified but unissued preferred shares of any series from time to time, in one or more series, as authorized by the Equity Office board of trustees. The Equity Office board of trustees also is authorized to reclassify authorized but unissued common shares into preferred shares, and authorized but unissued preferred shares into common shares, without shareholder approval.

### Series A Preferred Shares

The Equity Office series A preferred shares rank senior to the Equity Office common shares and on a parity with the Equity Office series B and series C preferred shares with respect to payment of distributions and distributions of assets upon liquidation, dissolution or winding up of Equity Office.

Holders of the Equity Office series A preferred shares are entitled to receive, when and as authorized by Equity Office, cumulative cash distributions at the rate of 8.98% of the $25.00 liquidation preference per annum, which is equivalent to a fixed annual amount of $2.245 per share. These distributions are cumulative and are payable quarterly in arrears on or before March 15, June 15, September 15 and December 15 of each year.

The Equity Office series A preferred shares are not convertible and are not entitled to the benefit of any sinking fund.

On and after June 15, 2002, Equity Office, at its option, may redeem the series A preferred shares, in whole or from time to time in part, for cash at a redemption price of $25.00 per share, plus all accumulated and unpaid distributions to the date fixed for redemption. However, the redemption price, other than the portion consisting of accrued and unpaid distributions, is payable only out of the sale proceeds of other shares of beneficial interest of Equity Office. In addition, Equity Office may acquire any series A preferred shares that have been transferred to a charitable beneficiary under Article VII of the declaration of trust of Equity Office because they were owned or acquired by a shareholder in violation of the applicable ownership limits.

### Series B Preferred Shares

The Equity Office series B preferred shares rank senior to the Equity Office common shares and on a parity with the Equity Office series A preferred shares and the Equity Office series C preferred shares with respect to the payment of distributions and amounts upon liquidation, dissolution or winding up of Equity Office.

Table of Contents

Distributions on the Equity Office series B preferred shares are cumulative and are payable quarterly, when, as and if declared by the Equity Office board of trustees, on or about February 15, May 15, August 15 and November 15 of each year, at the rate of 5.25% of the $50.00 liquidation preference per annum, which is equivalent to $2.625 per annum per share.

The Equity Office series B preferred shares are convertible at any time, at the option of the holder, unless previously redeemed, into Equity Office common shares at a conversion price of $35.70 per Equity Office common share, which is equivalent to a conversion rate of 1.40056 common shares for each Equity Office series B preferred share, and which may be adjusted in specified circumstances.

The Equity Office series B preferred shares are not entitled to the benefit of any sinking fund.

On and after February 15, 2003, the Equity Office series B preferred shares will be redeemable by Equity Office, in whole or from time to time in part, at the option of Equity Office, for that number of Equity Office common shares as are issuable at the conversion price. Equity Office may exercise the redemption right only if for 20 trading days within any period of 30 consecutive trading days, the closing price of the Equity Office common shares on the NYSE exceeds $41.055 per share, which may be adjusted in specified circumstances.

On and after February 15, 2003, the Equity Office series B preferred shares may be redeemed at the option of Equity Office for cash, in whole or from time to time in part, initially at $51.1667 per Equity Office series B preferred share and thereafter at prices declining to $50.00 per Equity Office series B preferred share on and after February 15, 2007, plus in each case accumulated and unpaid distributions, if any, to the redemption date. Equity Office may not exercise its cash redemption right unless the redemption price, other than the portion consisting of accumulated and unpaid distributions, for the exercise of the cash redemption right is paid solely out of the sale proceeds of other shares of beneficial interest of Equity Office. In addition, Equity Office may acquire any series B preferred shares that have been transferred to a charitable beneficiary under Article VII of the declaration of trust of Equity Office because they were owned or acquired by a shareholder in violation of the applicable ownership limits.

The Equity Office series B preferred shares are subject to mandatory redemption on February 15, 2008 at a price of $50.00 per Equity Office series B preferred share, plus accumulated and unpaid distributions to the redemption date.

### Series C Preferred Shares

The Equity Office series C preferred shares rank senior to the common shares and on a parity with the Equity Office series A preferred shares and the Equity Office series B preferred shares with respect to payment of distributions and distributions of assets upon liquidation, dissolution or winding up of Equity Office.

Holders of the Equity Office series C preferred shares are entitled to receive, when and as authorized by Equity Office, cumulative cash distributions at the rate of 8 5/8% of the liquidation preference per annum, which is equivalent to $2.15625 per Equity Office series C preferred share per year. These distributions are cumulative and are payable quarterly in arrears on March 15, June 15, September 15 and December 15 of each year.

The Equity Office series C preferred shares are not convertible and are not entitled to the benefit of any sinking fund.

On or after December 8, 2003, Equity Office, at its option, may redeem the Equity Office series C preferred shares, in whole or in part, at any time or from time to time, at a redemption price of $25.00 per share, plus all accumulated and unpaid distributions to the date of redemption. However, the redemption price of the Equity Office series C preferred shares, other than any portion thereof consisting of accumulated and unpaid distributions, may be paid only from sale proceeds of other equity securities of Equity Office. In addition, Equity Office may acquire any series C preferred shares that have been

97

---

Table of Contents

transferred to a charitable beneficiary under Article VII of the declaration of trust of Equity Office because they were owned or acquired by a shareholder in violation of the applicable ownership limits.

### Liquidation Rights of Series A, B and C Preferred Shares

Upon any voluntary or involuntary liquidation, dissolution or winding up of Equity Office, the Equity Office series A and C preferred shares are entitled to a liquidation preference of $25.00 per share and the series B preferred shares are entitled to a liquidation preference of $50.00 per share plus, in each case, any accumulated and unpaid distributions to the date of payment, before any distribution of assets is made to holders of common shares and any other class or series of shares of Equity Office ranking junior to the Equity Office series A, B and C preferred shares as to liquidation rights. If upon any voluntary or involuntary liquidation, dissolution or winding up of Equity Office, the assets of Equity Office are insufficient to make such full payments to holders of Equity Office series A, B and C preferred shares and other preferred shares ranking on a parity with the Equity Office series A, B and C preferred shares, then holders of Equity Office series A, B and C preferred shares and parity preferred shares will share ratably in any distribution of assets in proportion to the full liquidating distributions to which they would otherwise be respectively entitled. After payment of the full amount of the liquidating distributions to which they are entitled, the holders of Equity Office series A, B and C preferred shares will not be entitled to any further participation in any distribution of assets by Equity Office.

### Voting Rights of Series A, B and C Preferred Shares

Holders of Equity Office series A, B and C preferred shares do not have any voting rights, except as set forth below or as otherwise required by law.

Under the articles supplementary establishing the Equity Office series A, B and C preferred shares, the Equity Office board of trustees may not authorize, create or increase the authorized amount of any class or series of shares ranking before the outstanding Equity Office series A, B and C preferred shares with respect to the payment of distributions or upon liquidation, dissolution or

winding up of Equity Office, or reclassify any authorized shares into any such shares or create, authorize or issue any obligation or security convertible into or evidencing the right to purchase any such shares, without the approval of holders of at least two–thirds of the outstanding Equity Office series A, B and C preferred shares voting separately as classes. A two–thirds separate class vote also would be required for any amendment, alteration or repeal of provisions of the declaration of trust, whether by merger, consolidation or otherwise, that would materially and adversely affect any right, preference, privilege or voting power of the Equity Office series A, B and C preferred shares, with several specified exceptions set forth in the declaration of trust.

The holders of the outstanding Equity Office series A, B and C preferred shares also are entitled, voting together as a single class with all other equity securities with like voting rights, to elect a total of two trustees to the Equity Office board of trustees at any time distributions on the preferred shares are in arrears for six or more quarterly periods.

## Power to Issue Additional Common Shares and Preferred Shares

Equity Office believes that the power of its board of trustees to issue additional authorized but unissued common shares or preferred shares and to classify or reclassify unissued common shares or preferred shares and thereafter to cause Equity Office to issue such classified or reclassified shares of beneficial interest provides Equity Office with increased flexibility in structuring possible future financings and acquisitions and in meeting other needs which may arise. The additional classes or series, as well as the common shares, generally will be available for future issuance without further action by Equity Office's shareholders, unless such action is required by applicable law or the rules of the NYSE. Although the Equity Office board of trustees has no present intention of doing so, it could authorize Equity Office to issue a class or series that could, depending upon the terms of such class or series, delay, defer or prevent

98

Table of Contents

a transaction or a change in control of Equity Office that might involve a premium price for holders of common shares or otherwise be in their best interest.

## New Series E, F and H Preferred Shares

The Equity Office series E, F and H preferred shares to be established before or simultaneously with the merger will have preferences, conversion and other rights, voting powers, restrictions, limitations as to dividends, qualifications and terms or conditions of redemption identical to those of the shares of the corresponding series of Spieker preferred stock.

The following table sets forth the authorized, issued and outstanding Equity Office series E, F and H preferred shares upon completion of the merger:

| Class or Series of Shares | Authorized | Issued and Outstanding |
|---|---|---|
| Series E preferred shares | 4,250,000 | 4,250,000 |
| Series F preferred shares | 6,000,000 | 6,000,000 |
| Series H preferred shares | 4,000,000 | 4,000,000 |

### Series E Preferred Shares to be Issued in the Merger

The Equity Office series E preferred shares to be issued in the merger will rank senior to the Equity Office common shares and on a parity with the Equity Office series A, B, C, F and H preferred shares with respect to the payment of distributions and amounts upon liquidation, dissolution or winding up of Equity Office.

Distributions on the Equity Office series E preferred shares, when issued, will cumulate and will be payable quarterly, when, as and if declared by the Equity Office board of trustees, on the last day of March, June, September and December of each year. The rate of distributions for the series E preferred shares will be $2.3625 per annum per share.

The Equity Office series E preferred shares will not be convertible into Equity Office common shares and will not be entitled to the benefit of any sinking fund.

The Equity Office series E preferred shares will be redeemable by Equity Office at a price of $25.00 per Equity Office series E preferred share, plus accumulated and unpaid distributions to the redemption date. The redemption price of series E preferred shares, other than the portion consisting of accrued and unpaid distributions, will be payable solely out of proceeds from the sale of other shares of beneficial interest of Equity Office, including any rights, warrants or options to purchase any shares of beneficial interest but excluding debt securities convertible into or exchangeable for shares of beneficial interest. In addition, Equity Office may acquire any excess series E preferred shares that are transferred to it under the articles supplementary for the series E preferred shares because they were owned or acquired by a shareholder in violation of applicable ownership limits.

If any series E preferred shares are outstanding, no distributions may be declared or paid or set apart for payment on any class or series of shares of beneficial interest of Equity Office ranking, as to distributions, on a parity with or junior to series E preferred shares for any period unless full cumulative distributions have been or contemporaneously are declared and paid or declared and a