sum sufficient for the payment thereof set apart for such payments on series E preferred shares for all past distribution periods and the then current distribution period.

In addition, unless full cumulative distributions on series E preferred shares have been or contemporaneously are declared and paid or declared and a sum sufficient for the payment thereof set apart for payment for all past dividend periods and the then current dividend period:

- no distributions other than in Equity Office common shares or other shares of beneficial interest ranking junior to series E preferred shares as to distributions and amounts upon liquidation may be declared or paid or set aside for payment or other distribution may be declared or made upon the

99

---

Table of Contents

Equity Office common shares, series A preferred shares, series B preferred shares, series C preferred shares, series F preferred shares and series H preferred shares or any other shares of beneficial interest of Equity Office ranking junior to or on a parity with series E preferred shares as to distributions or upon liquidation; and

- no Equity Office common shares, series A preferred shares, series B preferred shares, series C preferred shares, series F preferred shares and series H preferred shares or any other shares of beneficial interest of Equity Office ranking junior to or on a parity with series E preferred shares as to distributions or amounts upon liquidation may be redeemed, purchased or otherwise acquired for any consideration (or any moneys be paid to or made available for a sinking fund for the redemption of any such shares of beneficial interest) by Equity Office, except by conversion into or exchange for other shares of beneficial interest of Equity Office ranking junior to series E preferred shares as to distributions and amounts upon liquidation.

Upon any voluntary or involuntary liquidation, dissolution or winding up of Equity Office, the Equity Office series E preferred shares, when issued, will be entitled to a liquidation preference of $25.00 per share, plus accrued and unpaid distributions to the date of payment, before any distribution or payment to the Equity Office common shares or any other class or series of shares of beneficial interest of Equity Office ranking junior to the Equity Office series E preferred shares as to liquidation rights.

If upon any voluntary or involuntary liquidation, dissolution or winding up of Equity Office, the assets of Equity Office are insufficient to make full payments to holders of Equity Office series E preferred shares and other preferred shares ranking on a parity with the Equity Office series E preferred shares, then holders of Equity Office series E preferred shares and such other preferred shares will share ratably in any distribution of assets in proportion to the full liquidating distributions to which they would otherwise be respectively entitled. After payment of the full amount of the liquidating distributions to which they are entitled, the holders of Equity Office series E preferred shares will not be entitled to any further participation in any distribution of assets by Equity Office.

### *Series F Preferred Shares to be Issued in the Merger*

The Equity Office series F preferred shares to be issued in the merger will rank senior to the Equity Office common shares and on a parity with the Equity Office series A, B, C, E and H preferred shares with respect to the payment of distributions and amounts upon liquidation, dissolution or winding up of Equity Office.

Distributions on the Equity Office series F preferred shares, when issued, will cumulate and will be payable quarterly, when, as and if declared by the Equity Office board of trustees, on the last day of January, April, July and October of each year. The rate of distributions for the series F preferred shares will be $1.96875 per annum per share.

The Equity Office series F preferred shares will not be convertible into Equity Office common shares and will not be entitled to the benefit of any sinking fund.

The Equity Office series F preferred shares, when issued, will be redeemable by Equity Office after October 10, 2002 at a price of $25.00 per Equity Office series F preferred share, plus accumulated and unpaid distributions to the redemption date. The redemption price of series F preferred shares, other than the portion consisting of accrued and unpaid distributions, will be payable solely out of proceeds from the sale of other shares of beneficial interest of Equity Office, including any rights, warrants or options to purchase any shares of beneficial interest but excluding debt securities convertible into or exchangeable for shares of beneficial interest. In addition, Equity Office may acquire any excess series F preferred shares that are transferred to it under the articles supplementary for the series F preferred shares because they were owned or acquired by a shareholder in violation of applicable ownership limits.

The Equity Office series F preferred shares will have the same limitations on the payment of distributions on junior and parity shares and the same liquidation rights as the Equity Office series E preferred shares.

100

Table of Contents

### *Series H Preferred Shares to be Issued in the Merger*

The new Equity Office series H preferred shares to be issued in the merger will rank senior to the Equity Office common shares and on a parity with the Equity Office series A, B, C, E and F preferred shares with respect to the payment of distributions and amounts upon liquidation, dissolution or winding up of Equity Office. Distributions on the Equity Office series H preferred shares will cumulate and will be payable quarterly, when, as and if declared by the Equity Office board of trustees, on the last day of March, June, September and December of each year. The rate of distributions for the series H preferred shares will be $2.00 per annum per share.

The Equity Office series H preferred shares will not be convertible into Equity Office common shares and will not be entitled to the benefit of any sinking fund.

The Equity Office series H preferred shares will be redeemable by Equity Office after June 4, 2003 at a price of $25.00 per Equity Office series H preferred share, plus accumulated and unpaid distributions to the redemption date. The redemption price of series H preferred shares, other than the portion consisting of accrued and unpaid distributions, will be payable solely out of proceeds from the sale of other shares of beneficial interest of Equity Office, including any rights, warrants or options to purchase any shares of beneficial interest but excluding debt securities convertible into or exchangeable for shares of beneficial interest. In addition, Equity Office may acquire any excess series H preferred shares that are transferred to it under the articles supplementary for the series H preferred shares because they were owned or acquired by a shareholder in violation of applicable ownership limits.

The Equity Office series H preferred shares will have the same limitations on the payment of distributions on junior and parity preferred shares and the same liquidation rights as the Equity Office series E and F preferred shares.

### *Voting Rights of Equity Office Series E, F and H Preferred Shares*

Holders of Equity Office series E, F and H preferred shares will not have any voting rights, except as set forth below or as otherwise required by law.

Under the articles supplementary establishing these series of preferred shares, if six quarterly distributions, whether or not consecutive, payable on any of these series of preferred shares or other parity preferred shares are in arrears, the number of trustees on the Equity Office board of trustees will be increased by two, and the holders of the series E, F and H preferred shares, voting together as a class, with the holders of other series of parity preferred shares entitled to such voting rights, which are referred to as "voting preferred shares," will have the right to elect two additional trustees to serve on the Equity Office board of trustees until the distributions have been paid in full or set aside for payment. The term of office of all trustees so elected will terminate with the termination of such voting rights.

The approval of a majority of the outstanding series E, F and H preferred shares and all other series of voting preferred shares similarly affected and having such voting rights, voting as a single class is required to:

• enter into a share exchange that affects series E, F or H preferred shares, or consolidate with or merge Equity Office with or into any other entity, unless in each such case each series E, F or H preferred share remains outstanding without a material adverse change to its terms and rights or is converted into or exchanged for preferred shares of the surviving entity having preferences, conversion and other rights, voting powers, restrictions, limitations as to distributions, qualifications and terms or conditions of redemption thereof identical to those of the series E, F or H preferred shares, as applicable, or

• authorize, reclassify, create, or increase the authorized amount of any class of shares of beneficial interest having rights senior to series E, F or H preferred shares with respect to the payment of distributions or amounts upon liquidation, dissolution or winding up of the affairs of Equity Office.

However, Equity Office may create additional classes of parity preferred shares and shares of beneficial interest ranking junior to series E, F and H preferred shares as to distributions or amounts upon liquidation, dissolution or winding up of the affairs of Equity Office, increase the authorized number of

Table of Contents

parity preferred shares and junior shares and issue additional series of parity preferred shares and junior shares without the consent of any holder of series E, F or H preferred shares.

The approval of two–thirds of the outstanding series E, F and H preferred shares and all other series of voting preferred shares similarly affected and having such voting rights, voting as a single class, is required in order to amend the articles supplementary for the series E, F or H preferred shares or Equity Office's declaration of trust to affect materially and adversely the rights, preferences or voting power of the holders of series E, F or H preferred shares or any voting preferred shares.

**REIT Ownership Limitations and Transfer Restrictions Applicable to Equity Office Common Shares and Series A, B and C Preferred Shares**

For Equity Office to qualify as a REIT under the Internal Revenue Code, no more than 50% in value of its outstanding shares of beneficial interest may be owned, actually or constructively, by five or fewer "individuals," which, as defined in the Internal Revenue Code for this purpose, includes certain entities. In addition, if Equity Office, or an actual or constructive owner of 10% or more of the shares of Equity Office, owns, actually or constructively, 10% or more of a tenant of Equity Office, then the rent received by Equity Office from that "related party tenant" will not be qualifying income for purposes of determining whether Equity Office meets the requirements for qualification as a REIT under the Internal Revenue Code unless the tenant is a taxable REIT subsidiary and specified requirements are met. A REIT's shares also must be beneficially owned by 100 or more persons.

As a means of addressing these requirements, Article VII of the Equity Office declaration of trust provides that, with several exceptions, no person may own, or be deemed to own directly and/or by virtue of the attribution provisions of the Internal Revenue Code, more than 9.9%, in value or number of shares, whichever is more restrictive, of the issued and outstanding shares of any class or series of shares. Under the Equity Office declaration of trust, the Equity Office board of trustees may increase the ownership limit with respect to any class or series of shares. After giving effect to this increase, however, five beneficial owners of common shares may not beneficially own in the aggregate more than 49.5% of the outstanding common shares. In addition, the Equity Office board of trustees is required to waive or modify the ownership limit with respect to one or more persons who would not be treated as "individuals" under the Internal Revenue Code if such person submits to the Equity Office board of trustees specified information that demonstrates, to the reasonable satisfaction of the Equity Office board of trustees, that such ownership would not jeopardize Equity Office's status as a REIT under the Internal Revenue Code. The Equity Office declaration of trust further prohibits any person from transferring any Equity Office common or preferred shares if the transfer would result in shares of beneficial interest of Equity Office being owned by fewer than 100 persons or otherwise would cause Equity Office not to qualify as a REIT.

With respect to the Equity Office series B preferred shares, the ownership limit in the declaration of trust means the greater of (a) 9.9% of the series B preferred shares, in value or number, whichever is more restrictive, or (b) such number of series B preferred shares such that five persons who are considered individuals pursuant to Section 542 of the Internal Revenue Code, as modified by Section 856(h)(3) of the Internal Revenue Code, taking into account all excepted holders within the meaning of the declaration of trust, could not beneficially own, in the aggregate, more than 49.5% of the value of the outstanding shares of beneficial interest of Equity Office.

If any transfer of shares or any other event would otherwise result in any person violating the ownership limits, then the declaration of trust provides that (a) the transfer will be void and of no force or effect with respect to the prohibited transferee with respect to that number of shares that exceeds the ownership limits and (b) the prohibited transferee would not acquire any right or interest in the shares. The shares transferred in violation of the ownership limit instead would be transferred automatically to a charitable trust, the beneficiary of which would be a qualified charitable organization selected by Equity Office.

The trustee of the charitable trust would be required to sell the shares transferred in violation of the ownership limit to a person or entity who could own the shares without violating the ownership limit, and to distribute to the prohibited transferee an amount equal to the lesser of the price paid by such person for the shares transferred in violation of the ownership limit or the sales proceeds received by the charitable

Table of Contents

trust for the shares. In the case of a transfer for no consideration, such as a gift, the charitable trustee would be required to sell the shares to a qualified person or entity and distribute to the prohibited transferee an amount equal to the lesser of the fair market value of the shares as of the date of the prohibited transfer or the sales proceeds received by the charitable trust.

Under its declaration of trust, Equity Office, or its designee, would have the right to purchase the shares from the charitable trust at a price per share equal to the lesser of (a) the price per share in the transaction that resulted in the transfer of the shares to the charitable trust, or, in the case of a devise or gift, the market price at the time of such devise or gift, and (b) the market price of such shares on the date Equity Office, or its designee, were to agree to purchase the shares. Any proceeds derived from the sale of the shares in excess of the amount distributed to the prohibited transferee under these provisions would be distributed to the beneficiary of the charitable trust.

The charitable trustee will have the sole right to vote the shares that it holds, and any distributions paid on shares held by the charitable trustee would be paid to the beneficiary of the charitable trust.

If the transfer to the charitable trust of the shares that were transferred in violation of the ownership limit is not automatically effective for any reason, then the transfer that resulted in the violation of the ownership limit would be void.

All persons or entities who own, directly or by virtue of the attribution provisions of the Internal Revenue Code, more than 5%, or such other percentage between 1/2 of 1% and 5% as provided in applicable rules and regulations under the Internal Revenue Code, of the lesser of the number or value of the outstanding Equity Office shares must give a written notice to Equity Office by January 30 of each year stating the name and address of such owner, the number of Equity Office shares owned and a description of the manner in which such Equity Office shares are held. In addition, a holder of record of Equity Office shares to whom the foregoing requirement applies who holds his Equity Office shares as nominee for another person or entity which is

required to include in gross income the dividends received on such shares must also give notice of the name and address of such person or entity and the number of Equity Office shares of such person or entity with respect to which such holder of record is nominee. In addition, each record, beneficial and constructive holder of Equity Office shares is required, upon demand of Equity Office, to disclose to Equity Office in writing any information with respect to the direct, indirect and constructive ownership of Equity Office shares as the Equity Office board of trustees deems necessary to comply with the provisions of the Internal Revenue Code applicable to REITs, to comply with the requirements of any taxing authority or governmental agency or to determine any such compliance.

The Equity Office declaration of trust contains an additional limitation on the ownership by non–U.S. persons of Equity Office common and preferred shares, other than preferred shares issued and outstanding as of June 19, 2000, and common shares into which such preferred shares may be converted. This limitation restricts the direct or indirect acquisition or ownership of Equity Office shares if, as a result of the acquisition or ownership, non–U.S. persons would own directly or indirectly 43% or more of the fair market value of the issued and outstanding Equity Office shares. If any transfers of Equity Office shares occur that would result in non–U.S. persons owning directly or indirectly 43% or more of the fair market value of the issued and outstanding Equity Office shares as described above, then the number of shares that would cause a non–U.S. person to violate this restriction are automatically transferred to a charitable trust, or if transfer to a charitable trust would not be effective to prevent violation of this restriction, then the transfer of shares will be void.

As part of the merger, the Equity Office declaration of trust will be amended to allow for the exemption of series of preferred shares issued in any merger from ownership limitations or restrictions on transfer under specified circumstances. See "Approval of Amendments to Equity Office's Declaration of Trust" beginning on page 93.

The foregoing restrictions on ownership and transferability would not apply if the Equity Office board of trustees were to determine that it is no longer in the best interests of Equity Office to attempt to qualify, or to continue to qualify, as a REIT under the Internal Revenue Code.

103

Table of Contents

## REIT Ownership Limitations and Transfer Restrictions Applicable to Equity Office Series E, F and H Preferred Shares

Instead of being governed by the foregoing restrictions, the Equity Office series E, F and H preferred shares will have ownership limitations and transfer restrictions identical to those contained in the articles supplementary for the corresponding Spieker series B, C and E preferred stock.

Under the articles supplementary for the Equity Office series E, F and H preferred shares, no holder of series E, F and H preferred shares may own more than 9.9% of the value of the outstanding Equity Office common shares and preferred shares. If the issuance or transfer of series E, F and H preferred shares to any person would cause that person to exceed the ownership limit (unless a waiver of the Equity Office board of trustees has been obtained), would cause Equity Office to be beneficially owned by fewer than 100 persons or would cause Equity Office to become "closely held" under Section 856(h) of the Internal Revenue Code, the issuance or transfer will be null and void and the intended transferee will acquire no rights to the shares.

Series E, F and H preferred shares involved in a transfer or change in capital structure that results in a person owning in excess of the ownership limit (unless a waiver of the Equity Office board of trustees has been obtained) or would cause Equity Office to become "closely held" within the meaning of Section 856(h) of the Internal Revenue Code will automatically be exchanged for excess preferred shares of the same series as the shares intended to be transferred. All excess preferred shares will be transferred, without action by the shareholder, to Equity Office as trustee of a trust for the exclusive benefit of the transferee or transferees to whom the excess preferred shares are ultimately transferred.

While the excess preferred shares are held in trust, they will not be entitled to vote, they will not be considered for purposes of any shareholder vote or the determination of a quorum for a shareholder vote and they will not be entitled to participate in any distributions made by Equity Office or upon liquidation. Equity Office has the right, for a period of 90 days during the time the excess preferred shares are held by Equity Office in trust, to purchase all or any portion of the excess preferred shares from the intended transferee at the lesser of the price paid for the shares by the intended transferee and the closing market price for the shares on the date Equity Office exercises its option to purchase.

All certificates representing series E, F and H preferred shares will bear a legend referring to the restrictions described above.

All holders of series E, F and H preferred shares who own of record more than 5% of the outstanding Equity Office common shares and preferred shares, or 1% if there are more than 200 but fewer than 2,000 shareholders or one–half of 1% if there are 200 or less shareholders of record, must file an affidavit with Equity Office containing the information specified in the articles supplementary for the class or series of shares owned by the filing holder within 30 days after January 1 of each year. In addition, each series E, F and H preferred shareholder will upon demand be required to disclose to Equity Office in writing information with respect to the direct, indirect and constructive ownership of shares as the Equity Office board of trustees deems necessary to determine Equity Office's status as a REIT and to ensure compliance with the ownership limit.

**Possible Redesignation of Equity Office Preferred Shares to be Issued in the Merger**

The merger agreement, as amended, permits Equity Office to redesignate the series of preferred shares to be issued in the merger and the partnership merger to enable Equity Office to issue consecutively–numbered series of preferred shares. For example, the amended merger agreement permits Equity Office:

- to redesignate as "series D preferred shares" its series E preferred shares to be issued in the merger in exchange for issued and outstanding Spieker series B preferred shares;

- to redesignate as "series E preferred shares" its series F preferred shares to be issued in the merger in exchange for issued and outstanding Spieker series C preferred shares; and

104

Table of Contents

- to redesignate as "series F preferred shares" its series H preferred shares to be issued in the merger in exchange for issued and outstanding Spieker series E preferred shares.

The redesignation of preferred shares under the amended merger agreement is subject to the repurchase of the Spieker series D preferred units immediately prior to the partnership merger. Apart from redesignating the Equity Office preferred shares to be issued in the merger and eliminating references within the articles supplementary for each series of Equity Office preferred shares to be issued in the merger to series of Equity Office preferred shares that will not be issued in the merger, the articles supplementary for the redesignated Equity Office series D, E and F preferred shares will otherwise be substantially in the form set forth as exhibits to the registration statement of which this document is a part.

**Transfer Agent and Registrar**

The transfer agent and registrar for the Equity Office common and preferred shares is EquiServe LP.

**Anti–Takeover Considerations**

Maryland law and the Equity Office declaration of trust and bylaws contain a number of provisions that may have the effect of discouraging transactions that involve an actual or threatened change of control of Equity Office. See "Comparison of Shareholder Rights" beginning on page 106. These provisions include:

- *Classified board of trustees and size of board fixed with range* — The board of trustees of Equity Office is divided into three classes with staggered terms of office. The total number of trustees is fixed by a majority vote of the board of trustees within a range of a minimum of nine and a maximum of 15 (to be increased to 16 as part of the merger). These provisions may make it more difficult for a third party to gain control of the board of trustees of Equity Office. At least two annual meetings of Equity Office, instead of one, generally would be required to effect a change in a majority of the board of trustees, and the number of trustees cannot be increased above the maximum number of trustees specified in the declaration of trust without board and shareholder approvals.

- *Removal of trustees* — Under the Equity Office declaration of trust, subject to the rights of one or more classes or series of preferred shares to elect one or more trustees, a trustee may be removed at any time, but only with cause, at a meeting of the shareholders by the affirmative vote of the holders of not less than a majority of the shares then outstanding and entitled to vote generally in the election of trustees.

- *Unsolicited Takeover Provisions of Maryland Law* — Maryland law provides protection for Maryland real estate investment trusts against unsolicited takeovers by protecting the board of trustees with regard to actions taken in a takeover context. Maryland law also allows publicly held Maryland real estate investment trusts to elect to be governed by all or any part of Maryland law provisions relating to extraordinary actions and unsolicited takeovers.

- *Call of Special Meetings of Shareholders* — The Equity Office bylaws provide that special meetings of shareholders may be called only by the chairman of the board, the president, one–third of the trustees or by the holders of shares entitled to cast not less than a majority of all the votes entitled to be cast at the meeting. This provision limits the ability of shareholders to call special meetings.

- *Advance Notice Provisions for Shareholder Nominations and Shareholder New Business Proposals* — The Equity Office bylaws require advance written notice for shareholders to nominate a trustee or bring other business before a meeting of shareholders. This provision limits the ability of shareholders to make nominations for trustees or introduce other proposals that are not timely received for consideration at a meeting.

105

Table of Contents

• *Two-thirds Shareholder Vote Required to Approve Some Amendments to the Declaration of Trust* — Some amendments to the declaration of trust must first be declared advisable by the board of trustees and thereafter must be approved by shareholders by the affirmative vote of not less than two-thirds of all votes entitled to be cast. These vote requirements may make amendments to the Equity Office declaration of trust that shareholders believe desirable more difficult to effect.

• *Exclusive Authority of Board to Amend Bylaws, Except for Specified Amendments* — The Equity Office bylaws provide that the power to amend, repeal or adopt new bylaws is vested exclusively with the board of trustees, except that any amendments by the board of trustees to the bylaw provisions relating to meetings of shareholders, the minimum and maximum number of trustees, and the requirement that at least two-thirds of the trustees must be persons who are not executive officers of Equity Office or persons affiliated with Mr. Zell or his affiliates are subject to the approval of shareholders by vote of a majority of the votes cast. These provisions may make more difficult bylaw amendments that shareholders may believe are desirable.

• *Business Combination with Interested Shareholders* — The Maryland Business Combination Act provides that, unless exempted, a Maryland real estate investment trust may not engage in business combinations, including mergers, dispositions of 10% or more of its assets, issuances of shares and other specified transactions, with an "interested shareholder" or its affiliates, for five years after the most recent date on which the interested shareholder became an interested shareholder and thereafter unless specified criteria are met. The Equity Office board of trustees has elected by resolution to exempt from the provisions of the Maryland Business Combination Act any business combination with any person. However, this resolution, by its terms, may be altered or repealed at any time, in whole or in part, by the board of trustees.

• *Other Constituencies* — Maryland law expressly codifies the authority of a Maryland real estate investment trust to include in its charter a provision that allows the board of trustees to consider the effect of a potential acquisition of control on shareholders, employees, suppliers, customers, creditors and communities in which offices or other establishments of the trust are located. The Equity Office declaration of trust does not include a provision of this type. Maryland law also provides, however, that the inclusion or omission of this type of provision in the declaration of trust of a Maryland real estate investment trust does not create an inference concerning factors that may be considered by the board of trustees regarding a potential acquisition of control. This law may allow the board of trustees to reject an acquisition proposal even though the proposal was in the best interests of Equity Office shareholders.

## COMPARISON OF SHAREHOLDER RIGHTS

The following comparison of the rights of Equity Office shareholders and Spieker stockholders summarizes the material differences but is not intended to list all of the differences. As a Maryland real estate investment trust, Equity Office is subject to the Maryland REIT Law. The Maryland REIT Law covers many of the same matters covered by the Maryland General Corporation Law, including limitation of liabilities of trustees and officers, indemnification of trustees and officers, classification of the board, classification of shares, amendment of the declaration of trust, mergers of a Maryland real estate investment trust with other entities and dissenters' rights. There are some corporate governance matters that are addressed in the Maryland General Corporation Law, however, that are not dealt with in the Maryland REIT Law. It is the general practice of Maryland real estate investment trusts to address some of these matters through provisions in the declaration of trust or bylaws. As a Maryland corporation, Spieker is subject to the Maryland General Corporation Law.

The following discussion should be read together with the declaration of trust and bylaws of Equity Office, the charter and bylaws of Spieker and applicable Maryland law. The declaration of trust and bylaws of Equity Office and the charter and bylaws of Spieker are incorporated by reference in this joint proxy statement/prospectus, and will be sent to holders of Equity Office common shares and Spieker common and preferred stock upon request. See "Where You Can Find More Information" beginning on page 124.

106

Table of Contents

## Authorized Shares

*Equity Office.* The authorized shares of beneficial interest of Equity Office consist of 750,000,000 common shares, $.01 par value per share, and 100,000,000 preferred shares, $.01 par value per share, of which 8,000,000 shares are designated as 8.98% series A cumulative redeemable preferred shares, 7,000,000 shares are designated as 5.25% series B convertible cumulative preferred shares and 4,600,000 shares are designated as 8 5/8% series C cumulative redeemable preferred shares.

Under the Equity Office declaration of trust, the Equity Office board of trustees has the authority to issue authorized but unissued common shares or preferred shares in one or more classes or series without shareholder approval. The Equity Office board of trustees also is authorized to reclassify authorized but unissued common shares into preferred shares, and authorized but unissued preferred shares into common shares, without shareholder approval.

Subject to an express provision to the contrary in the terms of any class or series of authorized shares, under the Equity Office declaration of trust the board of trustees also has the power to divide or combine the outstanding shares of any class or series, without shareholder approval.

Notwithstanding the foregoing, under the articles supplementary establishing the outstanding series A, B and C preferred shares of Equity Office, the board of trustees may not authorize, create or increase the authorized amount of any class or series of shares ranking before the outstanding series A, B and C preferred shares with respect to the payment of distributions or upon liquidation, without the approval of holders of two–thirds of the outstanding shares of these series of preferred shares voting together as a single class.

At May 21, 2001, there were issued and outstanding 309,815,068 Equity Office common shares, 7,994,000 Equity Office series A preferred shares, 5,990,000 Equity Office series B preferred shares and 4,562,900 Equity Office series C preferred shares.

Before completion of the merger, Equity Office will file articles supplementary to its declaration of trust to provide for the designation of the preferred shares to be issued in the merger, of which 4,250,000 will be classified as series E preferred shares, 6,000,000 will be classified as series F preferred shares and 4,000,000 will be classified as series H preferred shares. Equity Office also will provide for the designation of a corresponding number of excess preferred shares for each newly established series of preferred shares. The Equity Office series E, F and H preferred shares issued in the merger will have preferences, conversion and other rights, voting powers, restrictions, limitations as to dividends, qualifications and terms or conditions of redemption identical to those of the shares of the corresponding series of Spieker preferred stock.

*Spieker.* The authorized shares of capital stock of Spieker consist of 1,000,000,000 shares of capital stock, par value $.0001 per share, of which 649,000,000 are classified as Spieker common stock, 2,000,000 are classified as class B common stock, par value $.0001 per share, 1,500,000 are classified as class C common stock, par value $.0001 per share, 1,000,000 are classified as series A preferred stock, par value $.0001 per share, 5,000,000 are classified as series B preferred stock, par value $.0001 per share, 6,000,000 are classified as series C preferred stock, par value $.0001 per share, 1,500,000 are classified as series D preferred stock, par value $.0001 per share, 4,000,000 are classified as series E preferred stock, par value $.0001 per share, and 330,000,000 are classified as excess stock.

Subject to limitations prescribed by Maryland law and the Spieker charter, the Spieker board of directors is authorized to reclassify any unissued portion of the authorized shares of capital stock into other classes or series of common stock or preferred stock. The Spieker board may also establish the number of shares in each class or series, fix the designation and any preferences, conversion and other rights, voting powers, restrictions, limitations as to dividends, qualifications and terms and conditions of redemption.

Except as described above, the articles supplementary establishing the outstanding series B, C and E preferred stock of Spieker do not permit the Spieker board of directors to authorize, reclassify, create or increase the authorized amount of any class of stock having rights senior to those series of preferred stock

107

---

Table of Contents

with respect to the payment of dividends or amounts upon liquidation, dissolution or winding up of the affairs of Spieker without the approval of holders of a majority of the outstanding shares of those series of preferred stock, each voting together as a single class.

At May 21, 2001, there were issued and outstanding 67,395,001 shares of Spieker common stock, 4,250,000 shares of series B preferred stock, 6,000,000 shares of series C preferred stock, 4,000,000 shares of series E preferred stock, no shares of class B common stock, no shares of series A preferred stock and no shares of excess stock.

## Voting Rights

*Equity Office.* Each holder of Equity Office common shares is entitled to one vote per share and to the same and identical voting rights as other holders of Equity Office common shares. Holders of Equity Office common shares do not have cumulative voting rights. Except as provided in articles supplementary establishing a series of Equity Office preferred shares or required by law, holders of Equity Office preferred shares do not have any voting rights. For a description of the voting rights of holders of outstanding series A, B and C preferred shares, see "Description of Equity Office Shares of Beneficial Interest — Preferred Shares — Voting Rights of Series A, B and C Preferred Shares" on page 98.

*Spieker.* Each holder of Spieker common stock is entitled to one vote per share and to the same and identical voting rights as other holders of Spieker common stock. Holders of Spieker common stock do not have cumulative voting rights. Except as provided by law or in the articles supplementary establishing the series of Spieker preferred stock, holders of Spieker series B, C and E preferred stock do not have voting rights.

## Classification of the Board

*Equity Office.* The Maryland REIT Law permits a Maryland real estate investment trust's board of trustees to be divided into up to three classes with staggered terms of office. The Equity Office declaration of trust divides the Equity Office board of trustees into three classes, with classes being elected to three–year terms on a rotating basis.

*Spieker.* The Maryland General Corporation Law permits a Maryland corporation to divide its board of directors into classes with staggered terms of office so long as the term of office of at least one class expires each year. Spieker's board of directors is divided into three classes, with classes being elected to three-year terms on a rotating basis.

**Number of Trustees/ Directors; Removal of Trustees/ Directors; Vacancies**

*Equity Office.* The Equity Office declaration of trust currently provides for a minimum of nine and a maximum of 15 trustees, with the number of trustees within this range established by a majority vote of the board of trustees as provided in the Equity Office bylaws. As part of the merger, the Equity Office declaration of trust will be amended to, among other things, increase the maximum number of trustees from 15 to 16. Under the Equity Office bylaws, except during the period in which a vacancy exists, at least two-thirds of the Equity Office trustees must be persons who are not executive officers of Equity Office or persons affiliated with Samuel Zell or his affiliates.

Under the Equity Office declaration of trust, subject to the rights of one or more classes or series of preferred shares to elect one or more trustees, a trustee may be removed at any time, but only with cause, at a meeting of the shareholders by the affirmative vote of the holders of not less than a majority of the shares then outstanding and entitled to vote generally in the election of trustees.

Under the Equity Office declaration of trust, subject to the rights of holders of any class or series of preferred shares, each vacancy on the board of trustees, including a vacancy resulting from an increase in the number of trustees, may be filled only by the affirmative vote of a majority of the remaining trustees in office, even if the remaining trustees do not constitute a quorum. Any trustee elected to fill a vacancy will

108

---

Table of Contents

hold office for the remainder of the full term of the class of trustees in which the vacancy occurred and until a successor is elected and qualifies.

The holders of the outstanding shares of series A, B and C preferred shares of Equity Office are entitled, voting together as a single class, to elect a total of two trustees to the Equity Office board of trustees at any time distributions on the preferred shares were in arrears for six or more quarterly periods, whether or not consecutive.

*Spieker.* Spieker's charter provides that the number of directors shall be three members which may be increased or decreased by at least a majority of the board of directors pursuant to Spieker's bylaws. Spieker's bylaws provide that two-thirds of the entire board of directors may alter the number of directors set by Spieker's charter. The minimum number of directors permitted under Spieker's charter and bylaws is three and the maximum is 25. The current size of Spieker's board of directors is seven. Spieker's charter provides that directors may be removed from office at any time, but only for cause and then only by the affirmative vote of 80% of the combined voting power of all classes of shares of capital stock entitled to vote in the election for directors. Spieker's bylaws provide that cause, for these purposes, is defined as:

• Conviction of a felony;

• Declaration of unsound mind by order of a court;

• Gross dereliction of duty;

• Conviction of any act involving moral turpitude; or

• Commission of an act that constitutes intentional misconduct or a knowing violation of law if the action in either event results both in an improper substantial personal benefit to the director and in a material injury to Spieker.

Subject to the rights of the holders of any series of stock separately entitled to elect one or more directors, vacancies on Spieker's board which result from the removal of a director may be filled by the vote of Spieker stockholders. Subject to the rights of the holders of any series of stock separately entitled to elect one or more directors, a majority of remaining directors, whether or not constituting a quorum, may fill a vacancy on the Spieker board of directors resulting from any cause except an increase in the number of directors. A majority of the entire board of directors may fill a vacancy on the Spieker board resulting from an increase in the number of directors. A director elected by the stockholders to fill a vacancy which results from the removal of a director serves for the balance of the term of the removed director and a director elected by the board of directors to fill a vacancy serves until the next annual meeting of stockholders and until a successor is elected and qualifies.

If six quarterly dividends, whether or not consecutive, payable on shares of series B, C, D and E preferred stock are in arrears, whether or not earned or declared, the number of directors then constituting the board of directors will be increased by two, and the holders of shares of series B, C, D and E preferred stock, voting together as a class, will have the right to elect two additional directors at any annual meeting of the stockholders or a properly called meeting of the holders of series B, C, D and E preferred stock until all of the dividends have been declared and paid or set aside for payment. The term of office of all directors so elected shall be terminated with the termination of such voting rights.

**Limitation of Trustee/ Director and Officer Liability**

*Equity Office.* Under Maryland law, the declaration of trust of a Maryland real estate investment trust may include a provision expanding or limiting the liability of its trustees and officers to the trust or its shareholders for money damages but may not include a provision which restricts or limits the liability of its trustees or officers to the trust or its shareholders to the extent that:

- it is proved that the person actually received an improper benefit or profit in money, property or services, for the amount of the benefit or profit in money, property or services actually received; or

109

Table of Contents

- a judgment or other final adjudication adverse to the person is entered in a proceeding based on a finding that the person's action, or failure to act, was the result of active and deliberate dishonesty and was material to the cause of action adjudicated in the proceeding.

The Equity Office declaration of trust provides that, to the maximum extent that Maryland law permits, no trustee or officer of Equity Office shall be liable to Equity Office or to any shareholder for money damages.

*Spieker.* Maryland law permits a corporation to include in its charter any provision expanding or limiting the liability of its directors and officers to the corporation or its stockholders for money damages, subject to the same limitations described above for a Maryland real estate investment trust. Spieker's charter provides that to the fullest extent permitted by Maryland law, no director or officer shall be personally liable to Spieker or its stockholders for money damages.

**Indemnification**

*Equity Office.* Maryland law generally permits a Maryland real estate investment trust to indemnify any person made a party to any threatened, pending or completed action, suit or proceeding by reason of the fact that the person is or was a trustee, officer, employee or agent of the trust or any predecessor entity, or is or was serving at the request of the trust or predecessor entity as a director, officer, partner, trustee, employee or agent of another corporation, partnership, joint venture, trust, other enterprise or employee benefit plan, unless it is established that:

- the act or omission was material to the matter giving rise to the proceeding and either was committed in bad faith or was the result of active and deliberate dishonesty;

- the person actually received an improper personal benefit in money, property or services; or

- in the case of any criminal proceeding, the person had reasonable cause to believe that the act or omission was unlawful.

Under Maryland law, indemnity may be provided against judgments, penalties, fines, settlements and reasonable expenses actually incurred by the person in connection with the proceeding. The indemnification may be provided, however, only if authorized for a specific proceeding after a determination has been made that indemnification is permissible in the circumstances because the person met the applicable standard of conduct. This determination is required to be made:

- by the board of trustees by a majority vote of a quorum consisting of trustees not, at the time, parties to the proceeding;

- if a quorum cannot be obtained, then by a majority vote of a committee of the board consisting solely of two or more trustees not, at the time, parties to the proceeding;

- by special legal counsel; or

- by the shareholders.

If the proceeding is one by or in the right of the trust, indemnification may not be provided as to any proceeding in which the person is found liable to the trust.

A Maryland real estate investment trust may pay, before final disposition, the expenses, including attorneys' fees, incurred by a trustee, officer, employee or agent in defending a proceeding. Under Maryland law, expenses may be advanced to a trustee or officer when the trustee or officer gives an undertaking to the trust to repay the amounts advanced if it is ultimately determined that he or she is not entitled to indemnification. Maryland law does not require that the undertaking be secured and the undertaking may be accepted without reference to the financial ability of the trustee or officer to repay the advance. A Maryland trust is required to indemnify any trustee who has been successful, on the merits or otherwise, in defense of a proceeding for reasonable expenses. The determination as to reasonableness of expenses is required to be made in the same manner as required for indemnification.

110

Table of Contents

Under the Maryland REIT Law, the indemnification and advancement of expenses provided by statute are not exclusive of any other rights to which a person seeking indemnification or advancement of expenses may be entitled under any bylaw, agreement, vote of shareholders, vote of trustees or otherwise.

Under the Equity Office bylaws, Equity Office is required to indemnify and advance expenses to present and former trustees and officers, and may indemnify employees and agents, of Equity Office and its predecessors. The Equity Office bylaws also provide for mandatory indemnification and advancement of expenses to present and former shareholders of Equity Office or its predecessors made a party to a proceeding by reason of their status.

The limited partnership agreement of EOP Partnership also provides for indemnification of Equity Office and its officers and trustees to the same extent that indemnification is provided to officers and trustees of Equity Office in its declaration of trust, and limits the liability of Equity Office and its officers and trustees to EOP Partnership and its respective partners to the same extent that the Equity Office declaration of trust limits the liability of the officers and trustees of Equity Office to Equity Office and its shareholders.

*Spieker.* The Maryland General Corporation Law allows corporations such as Spieker to indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit or proceeding, whether civil, criminal, administrative or investigative, by reason of the fact that he or she is or was a director, officer, employee or agent of the corporation or is or was serving at the request of the corporation as a director, officer, employee, partner, trustee, or agent of another foreign or domestic corporation, partnership, joint venture, trust, other enterprise, on the same terms and subject to the same limitations as described above for a Maryland real estate investment trust.

The Spieker charter provides that Spieker shall provide any indemnification permitted by Maryland law and shall indemnify:

• Directors and officers, whether serving Spieker or at its request any other entity, to the full extent required or permitted by Maryland law, including the advance of expenses under the procedures and to the full extent permitted by law; and

• Employees and agents, whether serving Spieker or at its request any other entity, to the extent authorized by the Spieker board of directors or the bylaws and permitted by law.

**Duties of Trustees and Directors**

*Equity Office and Spieker.* Maryland law provides protection for Maryland corporations and Maryland real estate investment trusts against unsolicited takeovers by protecting the board of directors or board of trustees with regard to actions taken in a takeover context. Maryland law provides that the duties of directors and trustees will not require them to:

• accept, recommend, or respond to any proposal by a person seeking to acquire control;

• authorize the real estate investment trust to redeem any rights under, modify, or render inapplicable a shareholder rights plan;

• make a determination under the Maryland Business Combination Statute or the Control Share Acquisition Statute, as described below;

• elect to be subject to any or all of the "elective provisions" described below; or

• act or fail to act solely because of:

— the effect the act or failure to act may have on an acquisition or potential acquisition of control; or

— the amount or type of consideration that may be offered or paid to shareholders in an acquisition.

111

Table of Contents

Maryland law also establishes a presumption that the act of a director or trustee satisfies the required standard of care. In the case of a Maryland corporation, a director must perform his or her duties in good faith, in a manner that is in the best interests of the corporation and with the care of an ordinarily prudent person under similar circumstances. In the case of a Maryland real estate investment trust, the standard of care is not explicitly addressed in the statute. In addition, an act of a director or trustee relating to or affecting an acquisition or a potential acquisition of control is not subject under Maryland law to a higher duty or greater scrutiny than is applied to any other act of a director or trustee. This provision creates a Maryland rule which is less exacting than case law in many other jurisdictions which (a) imposes an enhanced level of scrutiny when a board implements anti–takeover measures in a change of control context, and (b) shifts the burden of proof to directors to show that the defensive mechanism adopted by a board is reasonable in relation to the threat posed.

Maryland law also provides that the duty of a trustee is only enforceable by the trust or in the right of the trust. A shareholder suit to enforce the duty of a trustee, therefore, can only be brought derivatively.

**Maryland Elective Provisions**

*Equity Office and Spieker.* Maryland legislation enacted in 1999 allows publicly held Maryland corporations and Maryland real estate investment trusts to elect to be governed by all or any part of Maryland law provisions relating to extraordinary actions and unsolicited takeovers. The election to be governed by one or more of these provisions can be made by a Maryland real estate investment trust in its declaration of trust or bylaws or by resolution adopted by the board of trustees so long as the trust or corporation has at least three trustees or directors, as applicable, who, at the time of electing to be subject to the provisions are not:

• officers or employees of the trust or corporation;

• persons seeking to acquire control of the trust or corporation;

• directors, officers, affiliates or associates of any person seeking to acquire control; or

• nominated or designated as trustees or directors by a person seeking to acquire control.

Articles supplementary must be filed with the Maryland State Department of Assessments and Taxation if a Maryland corporation or real estate investment trust elects to be subject to any or all of the provisions by board resolution or bylaw amendment. Shareholder approval is not required for the filing of articles supplementary.

The Maryland legislation provides that a corporation or real estate investment trust can elect to be subject to all or any portion of the following provisions, notwithstanding any contrary provisions contained in the trust's existing declaration of trust or bylaws:

• Classified Board: The corporation or real estate investment trust may divide its board into three classes which, to the extent possible, will have the same number of directors or trustees, as applicable, the terms of which will expire at the third annual meeting of shareholders after the election of each such class;

• Two-Thirds Shareholder Vote to Remove Trustees or Directors Only for Cause: The shareholders may remove any trustee or director, as applicable, only by the affirmative vote of at least two-thirds of all the votes entitled to be cast by the shareholders generally in the election of directors, but a trustee or director may not be removed without cause;

• Size of Board Fixed by Vote of Board: The number of directors or trustees, as applicable, will be fixed only by resolution of the board;

• Board Vacancies Filled by the Board for the Remaining Term: Vacancies that result from an increase in the size of the board, or the death, resignation, or removal of a trustee or director, may be filled only by the affirmative vote of a majority of the remaining trustees or directors even if they do not constitute a quorum. Trustees or directors elected to fill vacancies shall hold office for the

112

---

Table of Contents

remainder of the full term of the class of trustees or directors in which the vacancy occurred, as opposed to until the next annual meeting of shareholders, and until a successor is elected and qualifies; and

• Shareholder Calls of Special Meetings: Special meetings of shareholders shall be called by the secretary of the corporation or real estate investment trust only upon the written request of shareholders entitled to cast at least a majority of all votes entitled to be cast at the meeting.

In response to the 1999 legislation, Equity Office elected to be governed by the provisions of the Maryland code relating to the filling of board vacancies for the remainder of the term as described above. However, even before the 1999 legislation, the Equity Office declaration of trust and/or bylaws, as applicable, already provided for a classified board, that the number of trustees was to be determined by a resolution of the board, subject to a minimum and maximum number, and that the secretary of Equity Office must call a special meeting of shareholders only upon the written request of the holders of a majority of the outstanding securities entitled to vote.

Spieker has not elected to be governed by the specific provisions of the 1999 legislation. However, Spieker's charter and/or bylaws, as applicable, already provide for a classified board, that the number of directors is to be determined by a resolution of the board, subject to a minimum and maximum number, and that the secretary of Spieker must call a special meeting of stockholders only upon the written request of the holders of a majority of the outstanding securities entitled to vote.

**Call of Special Meetings of Shareholders**

*Equity Office.* The Equity Office bylaws provide that special meetings of shareholders may be called by the chairman of the board, the president or one-third of the trustees. Special meetings of shareholders also may be called by the holders of shares entitled to cast not less than a majority of all the votes entitled to be cast at a special meeting of shareholders.

*Spieker.* Spieker's bylaws provide that special meetings of the stockholders may be called by the chairman of the board, the president or a majority of the board and by the secretary upon the written request of stockholders holding at least a majority of all votes entitled to be cast at the meeting.

## Shareholder Action by Written Consent

*Equity Office.* The Equity Office bylaws permit any action required or permitted to be taken at a meeting of shareholders to be taken without a meeting if a consent in writing, setting forth the action to be taken, is signed by shareholders entitled to cast a sufficient number of votes to approve the matter.

*Spieker.* Spieker's bylaws also allow any action required or allowed to be taken at a stockholder's meeting to be taken without a meeting if there is a unanimous written consent which sets forth the action and is signed by each stockholder entitled to vote on the matter and a written waiver of any right to dissent is signed by each stockholder entitled to notice of the meeting but not entitled to vote at it.

## Advance Notice Provisions for Shareholder Nominations and Shareholder New Business Proposals

*Equity Office.* The Equity Office bylaws require advance written notice for shareholders to nominate a trustee or bring other business before a meeting of shareholders.

For an annual meeting, a shareholder must deliver notice to the secretary of Equity Office not later than the close of business on the 60th day nor earlier than the close of business on the 90th day before the first anniversary of the preceding year's annual meeting. However, if the date of the annual meeting is advanced by more than 30 days or delayed by more than 60 days from the applicable anniversary date of the prior year's annual meeting, or the meeting is a special meeting of shareholders at which trustees will be elected, notice by the shareholder must be given not earlier than the close of business on the 90th day before the meeting and not later than the close of business on the later of the 60th day before the meeting

113

---

Table of Contents

or the tenth day following the day on which public announcement of the date of the meeting is first made by Equity Office.

The Equity Office bylaws contain detailed requirements for the contents of shareholder notices of trustee nominations and new business.

*Spieker.* The Spieker bylaws require advance written notice for shareholders to nominate a director or bring other business before a meeting of stockholders.

For an annual meeting, a shareholder must deliver notice to the secretary of Spieker not less than 60 days nor more than 90 days before the first anniversary of the preceding year's annual meting. However, if the date of the annual meeting is advanced by more than 30 days or delayed by more than 60 days from the anniversary date, notice by the stockholder must be delivered not earlier than the 90th day before the annual meeting and not later than the close of business on the later of the 60th day before the annual meeting or the tenth day following the day on which public announcement of the date of the annual meeting is first made. In the case of a special meeting of stockholders called for the purpose of electing directors, notice must be given not later than the close of business on the 10th day following the day on which notice of the date of the special meeting was mailed or public disclosure of the date of the special meeting was made, whichever occurs first.

The Spieker bylaws contain detailed requirements for the contents of stockholder notices of director nominations and new business.

## Amendment of the Equity Office Declaration of Trust and Spieker Charter

*Equity Office.* Under Maryland law and the Equity Office declaration of trust, the trustees, by a two−thirds vote, may at any time amend the declaration of trust solely to enable Equity Office to qualify as a REIT under the Internal Revenue Code or as a real estate investment trust under Maryland law, without action by Equity Office shareholders. The Equity Office board of trustees also may amend the declaration of trust to set the terms of one or more series of preferred shares without action by holders of Equity Office common shares. Other amendments to the declaration of trust must first be declared advisable by the board of trustees and thereafter must be approved by shareholders by the affirmative vote of not less than two−thirds of all votes entitled to be cast, or, in the case of amendments to the declaration of trust in connection with mergers and other specified business combinations or that involve an increase or decrease in the number of authorized common shares or preferred shares, not less than a majority of all votes entitled to be cast.

Under the articles supplementary for the series A, B and C preferred shares of Equity Office, the approval of holders of each preferred series by a two−thirds class vote would be required for:

•

the authorization, creation or increase in the authorized or issued amount of any class or series of Equity Office shares ranking before the outstanding preferred series as to distributions or upon liquidation; or

- any amendment, alteration or repeal of provisions of the declaration of trust, whether by merger, consolidation, or otherwise, so as to materially and adversely affect any right, preferences, privileges or voting power of the outstanding series of preferred shares.

*Spieker.* General amendments to Spieker's charter are governed by the provisions of the Maryland General Corporation Law. Spieker's charter expressly provides, however, that Spieker's board of directors may determine the rights, preferences, privileges, designations and other characteristics of classes and series of Spieker's stock. Under the Maryland General Corporation Law, general amendments to Spieker's charter require Spieker's board of directors to adopt a resolution which sets forth the proposed amendment, declare that it is advisable and direct that the proposed amendment be submitted for consideration at either an annual or special meeting of the stockholders entitled to vote to approve the amendment.

114

---

Table of Contents

Spieker's charter requires that any proposed amendment to the charter will become effective only upon the affirmative vote of the holders of not less than a majority of all votes entitled to be cast on the matter. However, any amendment to, repeal of or adoption of any provision inconsistent with those provisions of the charter relating to:

- the number, the selection and the removal of members of the board of directors;

- the board's review of business combination transactions;

- shareholder proposals; or

- the amendment of the charter,

will be effective only if it is adopted upon the affirmative vote of not less than 80% of the aggregate votes entitled to be cast on the proposed amendment.

The Maryland General Corporation Law provides holders of classes or series of Spieker's preferred stock a right to vote as a class or series on amendments to Spieker's charter, regardless of limitations on the voting rights of the class or series, if the amendment would alter or change any preference or relative or other right given to the class or series.

## Amendment of the Bylaws

*Equity Office.* The Equity Office bylaws provide that the power to amend, repeal or adopt new bylaws is vested exclusively with the board of trustees, except that any amendments by the board of trustees to the bylaw provisions relating to meetings of shareholders, the minimum and maximum number of trustees, and the requirement that at least two–thirds of the trustees must be persons who are not executive officers of Equity Office or persons affiliated with Mr. Zell or his affiliates are subject to the approval of shareholders by vote of a majority of the votes cast.

*Spieker.* The bylaws provide that amendments to the bylaws may be adopted either by holders of record of not less than 80% of votes entitled to be cast by the outstanding shares of Spieker capital stock generally in the election of directors or by a vote of two–thirds of Spieker's board.

## Mergers, Consolidations and Sales of Assets

*Equity Office.* Under the Maryland REIT Law, a merger involving a Maryland real estate investment trust generally requires approval by the affirmative vote of not less than two–thirds of all votes entitled to be cast on the matter, unless the declaration of trust specifies a greater or lesser percentage, but not less than a majority of all votes entitled to be cast. No shareholder approval is required for 90% owned subsidiary mergers or by shareholders of a Maryland successor trust if the merger does not reclassify or change the outstanding shares or otherwise amend the declaration of trust and the number of shares to be issued in the merger is not more than 20% of the number of its shares of the same class or series outstanding immediately before the merger is completed. The Equity Office declaration of trust specifies that the affirmative vote of shareholders of not less than a majority of all votes entitled to be cast is required to approve mergers for which a shareholder vote is required under Maryland law.

The Maryland REIT Law does not address the requirements for the approval by shareholders of a consolidation or sale of all or substantially all of the assets of a real estate investment trust. However, the Equity Office declaration of trust requires that a majority of the Equity Office shares entitled to vote on the matter must approve a consolidation of Equity Office into one or more other entities or the sale of all or substantially all of the assets of Equity Office outside the ordinary course of business. Under the Equity Office declaration of trust, the mortgage, pledge or other creation of a security interest in any or all of the assets of Equity Office, whether or not in the ordinary course of business, as well as the sale of all or substantially all of the assets of Equity Office to a majority owned subsidiary or as a distribution to shareholders, is not deemed to be a sale requiring shareholder approval.

Table of Contents

*Spieker.* Under the Maryland General Corporation Law, Spieker may approve a consolidation, merger, share exchange or transfer of assets by adopting a resolution that declares the proposed transaction is advisable on substantially the terms and conditions set forth in the resolution and directing that the proposed transaction be submitted for consideration at either an annual or special meeting of the stockholders. Notice which states that a purpose of the meeting will be to act on the proposed consolidation, merger, share exchange or transfer of assets must be provided to each stockholder entitled to vote on the proposed transaction and to each stockholder not entitled to vote on the proposed transaction, except the stockholders of a successor in a merger if the merger does not alter the contract rights of their stock as expressly provided in the charter.

Under the Maryland General Corporation Law, a proposed merger ordinarily requires the approval of stockholders by the affirmative vote of two–thirds of all the votes entitled to vote on the proposed merger. However, as permitted by the Maryland General Corporation Law, Spieker's charter provides that any proposed action requiring, under Maryland law, the affirmative vote of more than a majority of all the votes entitled to vote on the proposed action shall be valid and effective if authorized under the charter by the affirmative vote of a majority of the total number of votes entitled to vote on the proposed action, except as otherwise provided in the charter. Spieker's charter does not contain a provision requiring the affirmative vote of more than a majority of all votes entitled to vote on any proposed merger.

Approval of a merger by Spieker's stockholder's is not required if: (a) the merger does not reclassify or change the terms of any class or series of stock that is outstanding immediately before the merger becomes effective or otherwise amend its charter and (b) the number of shares of its stock of such class or series outstanding immediately after the effective time of the merger does not increase by more than 20% of the number of its shares of the class or series of stock that is outstanding immediately before the merger becomes effective, or there is no stock outstanding or subscribed for and entitled to be voted on the merger.

Spieker's charter provides that the board of directors will, in connection with the exercise of its business judgement involving a business combination or any actual or proposed transaction which would or may involve a change in control of Spieker, in determining what is in the best interests of the Spieker stockholders, give due consideration to all relevant factors, including, but not limited to:

• all economic effect, both immediate and long–term, upon the Spieker stockholders including the effect of not participating in the transaction;

• the social and economic effect on the employees, customers of, and others dealing with Spieker and on the communities in which Spieker operates or is located;

• whether the proposal is acceptable based on the historical and current operating results or financial condition of Spieker;

• the reputation and business practices of the offeror and its management and affiliates as they would affect the employees of Spieker;

• the future value of the stock or any other securities of Spieker;

• any antitrust or other legal and regulatory issues that are raised by the proposed transaction; and

• the business and financial condition and earnings prospects of the acquiring person or entity, including, but not limited to, debt service and other existing financial obligations, financial obligations to be incurred in connection with the acquisition, and other likely financial obligations of the acquiring person or entity.

If, after considering all the relevant factors, the board determines that the proposed business combination or actual or proposed transaction which may involve a change in control of Spieker should be rejected by the Spieker stockholders, the board may take any lawful action to defeat the transaction, including but not limited to advising shareholders not to approve the proposed transaction, instituting

Table of Contents

litigation against the party making the proposal and obtaining a more favorable offer from another individual or entity.

**Dissolution of Equity Office or Spieker; Termination of REIT Status**

*Equity Office.* The Equity Office declaration of trust permits the termination of the existence of Equity Office if approved by the affirmative vote of the holders of not less two–thirds of the outstanding Equity Office shares entitled to vote on the matter. In addition, the board of trustees may terminate the status of Equity Office as a REIT under the Internal Revenue Code for any taxable year without a vote of the holders of Equity Office common or preferred shares.

*Spieker.* Under the Maryland General Corporation Law, Spieker may be dissolved if its board of directors adopts a resolution which declares that dissolution is advisable and directs that the proposed dissolution be submitted for consideration at either an annual or special meeting of the stockholders. Notice which states that a purpose of the meeting will be to act on the proposed dissolution must be given to each stockholder entitled to vote on the proposed dissolution. To be effective, the proposed dissolution must be approved by the stockholders by the affirmative vote of two–thirds of all the votes entitled to be cast.

## Business Combinations with Interested Shareholders

*Equity Office and Spieker.* The Maryland Business Combination Act provides that, unless exempted, a Maryland real estate investment trust or corporation may not engage in business combinations, including mergers, dispositions of 10% or more of its assets, issuances of shares and other specified transactions, with an "interested shareholder" or its affiliates, for five years after the most recent date on which the interested shareholder became an interested shareholder. Thereafter, unless specified "price criteria" and other standards are met or an exemption is available, a business combination with an interested shareholder or its affiliates must be recommended by the board of trustees and approved by (a) at least 80% of the outstanding voting shares and (b) at least two–thirds of the outstanding voting shares, other than voting shares held by the interested shareholder or any of its affiliates. Under the statute, an "interested shareholder" generally is defined to mean a person or group which owns beneficially, directly or indirectly, 10% or more of the outstanding voting shares of the real estate investment trust. These requirements do not apply to a business combination with an interested shareholder or its affiliates if approved by the board of trustees before the time the interested shareholder first became an interested shareholder.

The Equity Office board of trustees has elected by resolution to exempt from the provisions of the Maryland Business Combination Act any business combination with any person. However, this resolution, by its terms, may be altered or repealed at any time, in whole or in part, by the board of trustees. The Spieker board of directors has elected by resolution to exempt from the provisions of the Maryland Business Combination Act the proposed merger.

## Control Share Acquisitions

*Equity Office and Spieker.* The Maryland Control Share Acquisition Act provides that shares of a Maryland real estate investment trust or corporation that are acquired in a "control share acquisition," which is defined as the acquisition of shares comprising one–fifth, one–third or a majority of all voting shares, have no voting rights except:

- if approved by shareholders by the affirmative vote of two–thirds of all the votes entitled to be cast on the matter, excluding all "interested shares;" or

- if the acquisition of the shares has been approved or exempted at any time before the acquisition of the shares.

The Maryland Control Share Acquisition Act is applicable to a publicly traded Maryland real estate investment trust or corporation unless its charter or bylaws specifically provides that it shall be inapplicable.

117

Table of Contents

The Equity Office bylaws provide that the Maryland Control Share Act shall not apply to any acquisition by any person of shares of Equity Office. Any amendment to this provision by the board of trustees would require the approval of shareholders by a vote of a majority of the votes cast. See "— Amendment of the Bylaws" on page 115. Neither Spieker's bylaws nor its charter contain such an opt–out provision.

## Other Constituencies

*Equity Office and Spieker.* Maryland law expressly codifies the authority of Maryland real estate investment trusts and Maryland corporations to include in their charters a provision that allows the board of trustees or board of directors to consider the effect of a potential acquisition of control on shareholders, employees, suppliers, customers, creditors and communities in which offices or other establishments of the trust are located. The Equity Office declaration of trust does not include a provision of this type. Maryland law also provides, however, that the inclusion or omission of this type of provision in the declaration of trust of a Maryland real estate investment trust allowing the board of trustees to consider the effect of a potential acquisition of control on the foregoing constituencies does not create an inference concerning factors that may be considered by the board of trustees regarding a potential acquisition of control. As described above in "— Mergers, Consolidations and Sales of Assets — Spieker" beginning on page 116, Spieker's charter includes a provision allowing the board of directors to consider other constituencies in their consideration of a merger proposal.

## Dissenters' Rights

*Equity Office and Spieker.* Maryland law applicable to Maryland real estate investment trusts provides dissenters' rights for any shareholder who objects to a merger to the same extent as a Maryland corporation's stockholders would enjoy dissenters' rights. Therefore, shareholders of both Equity Office and Spieker have the same statutory dissenters' rights. A shareholder has the

right to demand and receive payment of the fair value of his or her shares, unless:

- the shares are listed on a national securities exchange or are designated as a national market security on the interdealer quotation system of the National Association of Securities Dealers, Inc. on the record date for determining shareholders entitled to vote on the merger; or

- the shares are those of a successor entity, as long as the merger does not alter the contract rights of the shares as expressly provided by the declaration of trust and the shares are converted in whole or in part in the merger into stock, including preferred stock, of the successor entity or cash, scrip, or other rights or interests arising out of the treatment of fractional shares.

**Distributions**

*Equity Office.* The Equity Office declaration of trust provides that the trustees will endeavor to declare and pay distributions as necessary for Equity Office to qualify as a REIT under the Internal Revenue Code. However, shareholders do not have any right to a distribution unless and until authorized and declared by the Equity Office board of trustees. Distributions may not be paid on the Equity Office common shares unless all accrued but unpaid distributions on each outstanding series of preferred shares of Equity Office have been declared and paid or set apart for payment. Payments of distributions by Equity Office are not limited by any rules concerning the capital or surplus of Equity Office or the par value of the Equity Office shares.

*Spieker.* The Maryland General Corporation Law provides that the board of directors may not make a distribution of money or property to its stockholders if the distribution would prevent the corporation from paying its debts as they became due in the ordinary course of business or, unless and to the extent specifically allowed by the corporation's charter, if after the distribution, the corporation's total assets would be less than the sum of its total liabilities plus the amount that would be needed, if the corporation were to be dissolved at the time of the distribution, to satisfy the preferential rights to distributions upon

118

Table of Contents

dissolution of the corporation's shareholders whose rights upon dissolution are superior to those receiving the distribution.

**Shareholder Rights Plans**

*Equity Office.* Equity Office has not adopted a shareholder rights plan.

*Spieker.* On September 9, 1998, Spieker adopted a shareholder rights plan. On that date, the Spieker board of directors declared a dividend payable on September 30, 1998 of one right for each outstanding share of Spieker common stock held of record at the close of business on September 30, 1998. Shares of Spieker common stock issued thereafter and prior to the separation time, as described below, will have an attached right. The Spieker board of directors adopted the Rights Agreement for the purpose of protecting stockholders against attempts to acquire control of Spieker by means of a hostile tender offer made at less than a full and fair price and other takeover tactics that can be used to deprive stockholders of the ability to get a full and fair price for all of their shares.

The separation time will occur upon the earlier of:

- 10 days following the date any entity commences a tender or exchange offer which, if completed, would result in that entity becoming an acquiring person, as described below.

- 10 days following a public announcement that an entity has become an acquiring person.

An acquiring person is any person or entity which beneficially owns 15% or more of the Spieker common stock, with some exceptions. The Spieker board of directors may shorten or lengthen the 10–day time period by resolution before the expiration of the 10–day period, in which case the separation time will be the date determined by the Spieker board of directors. If a tender offer or exchange offer is cancelled or terminated before the separation time without the purchase or exchange of any shares of Spieker common stock, the offer will be deemed not to have been made.

Until the separation time, Spieker common stock certificates will evidence the rights, and the rights will be transferred with and only with the Spieker common stock. After the separation time, the rights agent will mail separate rights certificates to holders of Spieker common stock, and the rights may trade separately.

The rights will become exercisable one business day following the separation time. In that event, each right, other than rights beneficially owned by the acquiring person, shall entitle the holder to purchase for an exercise price of $140 a number of shares of Spieker common stock having a market value of $280.

The Spieker board of directors may also elect, at any time after the separation time and before the acquiring person becomes the beneficial owner of 50% of the Spieker common stock, to exchange each outstanding right for one share of Spieker common stock or one one–hundredth of a share of Spieker participating preferred stock. The Spieker board of directors may, at its option, at any time before the separation time, redeem all of the outstanding rights at a price of $.01 per right. Immediately upon the action of the Spieker board of directors electing to redeem the rights, without any further action and without any notice, the right to exercise the rights will terminate and each right will thereafter represent only the right to receive the redemption price in cash.

The rights will expire on the earliest of (1) the close of business on September 30, 2008, (2) the date on which the rights are redeemed, (3) the date the Spieker board of directors elects to exchange the rights for Spieker common stock or Spieker participating preferred stock or (4) the date of Spieker's merger into another corporation pursuant to an agreement entered into before the public announcement that a person has become an acquiring person.

The exercise price and the number of rights outstanding, or in some circumstances the securities purchasable upon exercise of the rights, are subject to adjustment from time to time to prevent dilution in the event of a stock split or the distribution of any securities or assets in respect of, instead of or in exchange for Spieker common stock.

119

---

Table of Contents

If at any time following the date of the public announcement that a person has become an acquiring person, either Spieker is acquired in a merger or other business combination in which it is not the surviving corporation or 50% or more of Spieker's assets, cash flow or earning power is sold or transferred, then each holder of a right would be entitled to receive, upon exercise, common stock of the acquiring company having a value equal to two times the exercise price of the right.

The Spieker shareholder rights plan will terminate immediately before the merger but will otherwise remain in full force and effect until such time.

## REIT Ownership Limitations

*Equity Office.* For Equity Office to qualify as a REIT under the Internal Revenue Code, no more than 50% in value of its outstanding shares of beneficial interest may be owned, actually or constructively, by five or fewer "individuals," which, as defined in the Internal Revenue Code for this purpose, includes some entities. In addition, if Equity Office, or an actual or constructive owner of 10% or more of the shares of Equity Office, owns, actually or constructively, 10% or more of a tenant of Equity Office, then the rent received by Equity Office from that "related party tenant" will not be qualifying income for purposes of determining whether Equity Office meets the requirements for qualification as a REIT under the Internal Revenue Code unless the tenant is a taxable REIT subsidiary and specified requirements are met. A REIT's shares also must be beneficially owned by 100 or more persons.

As a means of addressing these requirements, Article VII of the Equity Office declaration of trust provides that, subject to exceptions, no person may own, or be deemed to own directly and/or by virtue of the attribution provisions of the Internal Revenue Code, more than 9.9%, in value or number of shares, whichever is more restrictive, of the issued and outstanding shares of any class or series of shares. Under the Equity Office declaration of trust, the board of trustees may increase the ownership limit with respect to any class or series of shares. After giving effect to this increase, however, five beneficial owners of common shares may not beneficially own in the aggregate more than 49.5% of the outstanding common shares. In addition, the Equity Office board of trustees is required to waive or modify the ownership limit with respect to one or more persons who would not be treated as "individuals" under the Internal Revenue Code if such person submits to the Equity Office board of trustees specified information that demonstrates, to the reasonable satisfaction of the board of trustees, that such ownership would not jeopardize Equity Office's status as a REIT under the Internal Revenue Code. The Equity Office declaration of trust further prohibits any person from transferring any Equity Office common or preferred shares if the transfer would result in shares of beneficial interest of Equity Office being owned by fewer than 100 persons or otherwise would cause Equity Office not to qualify as a REIT.

If any transfer of shares or any other event would otherwise result in any person violating the ownership limits, then the declaration of trust provides that (a) the transfer will be void and of no force or effect with respect to the prohibited transferee with respect to that number of shares that exceeds the ownership limits and (b) the prohibited transferee would not acquire any right or interest in the shares. The shares transferred in violation of the ownership limit instead would be transferred automatically to a charitable trust, the beneficiary of which would be a qualified charitable organization selected by Equity Office.

The trustee of the charitable trust would be required to sell the shares transferred in violation of the ownership limit to a person or entity who could own the shares without violating the ownership limit, and to distribute to the prohibited transferee an amount equal to the lesser of the price paid by such person for the shares transferred in violation of the ownership limit or the sales proceeds received by the charitable trust for the shares. In the case of a transfer for no consideration, such as a gift, the charitable trustee would be required to sell the shares to a qualified person or entity and distribute to the prohibited transferee an amount equal to the lesser of the fair market value of the shares as of the date of the prohibited transfer or the sales proceeds received by the charitable trust.

Under its declaration of trust, Equity Office, or its designee, would have the right to purchase the shares from the charitable trust at a price per share equal to the lesser of (a) the price per share in the

120

---

Table of Contents

transaction that resulted in the transfer of the shares to the charitable trust, or, in the case of a devise or gift, the market price at the time of such devise or gift, and (b) the market price of such shares on the date Equity Office, or its designee, were to agree to

purchase the shares. Any proceeds derived from the sale of the shares in excess of the amount distributed to the prohibited transferee under these provisions would be distributed to the beneficiary of the charitable trust.

The charitable trustee will have the sole right to vote the shares that it holds, and any distributions paid on shares held by the charitable trustee would be paid to the beneficiary of the charitable trust.

If the transfer to the charitable trust of the shares that were transferred in violation of the ownership limit is not automatically effective for any reason, then the transfer that resulted in the violation of the ownership limit would be void.

All persons or entities who own, directly or by virtue of the attribution provisions of the Internal Revenue Code, more than 5%, or such other percentage between 1/2 of 1% and 5% as provided in applicable rules and regulations under the Internal Revenue Code, of the lesser of the number or value of the outstanding Equity Office shares must give a written notice to Equity Office by January 30 of each year stating the name and address of such owner, the number of Equity Office shares owned and a description of the manner in which such Equity Office shares are held. In addition, a holder of record of Equity Office shares subject to the foregoing requirement who holds its Equity Office shares as nominee for another person or entity which is required to include in gross income the dividends received on such shares must also give notice of the name and address of such person or entity and the number of Equity Office shares of such person or entity with respect to which such holder of record is nominee. In addition, each record, beneficial and constructive holder of Equity Office shares is required, upon demand of Equity Office, to disclose to Equity Office in writing any information with respect to the direct, indirect and constructive ownership of Equity Office shares as the Equity Office board of trustees deems necessary to comply with the provisions of the Internal Revenue Code applicable to REITs, to comply with the requirements of any taxing authority or governmental agency or to determine any such compliance.

The Equity Office declaration of trust contains an additional limitation on the ownership by non–U.S. persons of Equity Office common and preferred shares, other than preferred shares issued and outstanding as of June 19, 2000, and the common shares into which such preferred shares may be converted. This limitation restricts the direct or indirect acquisition or ownership of Equity Office shares if, as a result of the acquisition or ownership, non–U.S. persons would own directly or indirectly 43% or more of the fair market value of the issued and outstanding Equity Office shares. If any transfers of Equity Office shares occur that would result in non–U.S. persons owning directly or indirectly 43% or more of the fair market value of the issued and outstanding Equity Office shares as described above, then the number of shares that would cause a non–U.S. person to violate this restriction are automatically transferred to a charitable trust, or if transfer to a charitable trust would not be effective to prevent violation of this restriction, then the transfer of shares will be void.

As part of the merger, the Equity Office declaration of trust will be amended to allow for the board to exempt one or more series of preferred stock issued in connection with their issuance in a business combination from these ownership limitations and restrictions on transfer under specified circumstances. See "Approval of Amendments to Equity Office's Declaration of Trust" beginning on page 93.

The foregoing restrictions on ownership and transferability would not apply if the Equity Office board of trustees were to determine that it is no longer in the best interests of Equity Office to attempt to qualify, or to continue to qualify, as a REIT under the Internal Revenue Code.

For a description of the ownership limitations and transfer restrictions that will apply to the Equity Office series E, F and H preferred shares, see "Description of Equity Office Shares of Beneficial Interest — REIT Ownership Limitations and Transfer Restrictions Applicable to Equity Office Series E, F and H Preferred Shares" on page 104.

*Spieker.* To enable Spieker to continue to qualify as a REIT, Spieker's charter restricts the ownership of shares of common stock and preferred stock. Spieker's charter provides that, subject to

121

Table of Contents

exceptions specified in the charter, no stockholder may own more than 9.9% of the value of the outstanding common stock and preferred stock. Spieker's board may waive this ownership limit in some limited situations if the Board receives a ruling of the Internal Revenue Service or an opinion of counsel to the effect that such ownership will not jeopardize Spieker's status as a REIT for federal income tax purposes. As a condition to such waiver, the board may require representations and undertakings from the applicant with respect to preserving the REIT status of Spieker. The ownership limit will not apply if the board and the stockholders of Spieker determine that it is no longer in the best interests of Spieker to attempt to qualify, or to continue to qualify, as a REIT. If the issuance or transfer of shares of common stock or preferred stock to any person would cause such person to exceed the ownership limit (unless a waiver of the board has been obtained) would cause Spieker to be beneficially owned by fewer than 100 persons or cause Spieker to become "closely held" under Section 856(h) of the Internal Revenue Code, such issuance or transfer shall be null and void and the intended transferee will acquire no rights to such shares.

Spieker's charter also provides that shares involved in a transfer or change in capital structure that results in a person owning in excess of the ownership limit, unless a waiver of the board has been obtained, or would cause Spieker to become "closely held" within the meaning of Section 856(h) of the Internal Revenue Code will automatically be exchanged for excess stock. All excess stock will be transferred, without action by the stockholder, to Spieker as trustee of a trust for the exclusive benefit of the transferee or transferees to whom the excess stock is ultimately transferred. While the excess stock is held in trust, it will not be entitled to vote, it will not be considered for purposes of any stockholder vote or the determination of a quorum for such vote and

it will not be entitled to participate in any distributions made by Spieker, except upon liquidation. Spieker would have the right, for a period of 90 days during the time the excess stock is held by Spieker in trust, to purchase all or any portion of the excess stock from the intended transferee at the lesser of the price paid for the stock by the intended transferee and the closing market price for the stock on the date Spieker exercises its option to purchase.

The ownership limit provision in Spieker's charter will not be automatically removed even if the REIT provisions of the Internal Revenue Code are changed so as to no longer contain any ownership concentration limitation or if the ownership concentration limitation is increased. Except as otherwise described above, any change in the ownership limit would require an amendment to the charter. An amendment to the charter increasing the ownership limit requires the affirmative vote of holders owning a majority of the total number of shares of all classes of stock outstanding and entitled to vote on the amendment.

All certificates representing shares of common stock and preferred stock bear a legend referring to the restrictions described above.

All persons who own of record more than 5% of the outstanding common stock and preferred stock (or 1% if there are more than 200 but fewer than 2,000 shareholders or one–half of 1% if there are 200 or less shareholders of record) must file an affidavit with Spieker containing the information specified in Spieker's charter within 30 days after January 1 of each year. In addition, each shareholder will upon demand be required to disclose to Spieker in writing such information with respect to the direct, indirect and constructive ownership of shares as the Spieker board deems necessary to determine Spieker's status as a REIT and to ensure compliance with the ownership limit.

## LEGAL MATTERS

The validity of the Equity Office common and preferred shares offered by this joint proxy statement/ prospectus will be passed upon for Equity Office by Hogan & Hartson L.L.P., Washington, D.C. and New York, New York.

The qualification of the merger as a reorganization under section 368(a) of the Internal Revenue Code and the qualification of Equity Office as a REIT for federal income tax purposes will be passed upon for Equity Office by Hogan & Hartson L.L.P., Washington, D.C. and New York, New York.

122

Table of Contents

The qualification of the merger as a reorganization under section 368(a) of the Internal Revenue Code will be passed upon for Spieker by Sullivan & Cromwell, New York, New York. The qualification of Spieker as a REIT for federal income tax purposes will be passed upon for Spieker by Morrison & Foerster LLP, San Francisco, California, special tax counsel for Spieker.

## EXPERTS

Ernst & Young LLP, independent auditors, have audited the Equity Office consolidated financial statements and schedule included in its Annual Report on Form 10–K, as amended, for the year ended December 31, 2000, as set forth in their report, which is incorporated by reference in this joint proxy statement/ prospectus and elsewhere in the registration statement. The Equity Office financial statements and schedule are incorporated by reference in reliance on Ernst & Young LLP's report, given on their authority as experts in accounting and auditing.

The audited financial statements and schedule of Spieker incorporated by reference in this prospectus and elsewhere in the registration statement to the extent and for the periods indicated in their report have been audited by Arthur Andersen LLP, independent public accountants, and are included herein in reliance upon the authority of said firm as experts in accounting and auditing in giving said report.

## SHAREHOLDER PROPOSALS

Shareholder proposals intended to be presented at the 2002 annual meeting of Equity Office shareholders must have been received by the Secretary of Equity Office no later than December 17, 2001, to be considered for inclusion in its proxy statement relating to the 2002 meeting.

To be considered for inclusion in the proxy statement relating to the Equity Office 2002 meeting, shareholder proposals submitted outside the Rule 14a–8 processes must have been received by the Secretary of Equity Office no earlier than February 21, 2002 and no later than March 25, 2002 to be presented at the 2002 annual meeting of shareholders, and discretionary authority may be used if untimely submitted.

Due to the proposed merger, Spieker does not currently expect to hold a 2001 annual meeting of stockholders because Spieker will be merged with and into Equity Office and it will cease to exist as a separate legal entity. If the merger is not completed and an annual meeting is held, to be eligible for inclusion in Spieker's proxy statement and form of proxy relating to that meeting, proposals of stockholders intended to be presented at the meeting must be received by Spieker within a reasonable period of time after Spieker announces publicly the date of the meeting and before Spieker mails its proxy statement to stockholders in

connection with the meeting.

## OTHER MATTERS

As of the date of this joint proxy statement/ prospectus, neither the board of trustees of Equity Office nor the board of directors of Spieker knows of any matters that will be presented for consideration at either special meeting other than those described in this joint proxy statement/ prospectus. If any other matters properly come before either of the special meetings or any adjournments or postponements of either of the special meetings, and are voted upon, the enclosed proxies will confer discretionary authority on the individuals named as proxies to vote the shares represented by those proxies as to any other matters. Those individuals named in the Equity Office proxies intend to vote or not vote consistent with the recommendation of the management of Equity Office. Those individuals named as proxies in the Spieker proxies intend to vote or not vote consistent with the recommendation of the management of Spieker.

123

Table of Contents

## WHERE YOU CAN FIND MORE INFORMATION

Equity Office has filed with the SEC a registration statement on Form S–4, as amended (333–57526), of which this joint proxy statement/ prospectus forms a part. The registration statement registers the distribution to Spieker common stockholders of the Equity Office common shares to be issued in connection with the merger. The registration statement, including the attached exhibits and schedules, contains additional relevant information about Equity Office common shares. The rules and regulations of the SEC allow us to omit some information included in the registration statement from this joint proxy statement/ prospectus. In addition, Equity Office and Spieker file reports, proxy statements and other information with the SEC under the Securities Exchange Act of 1934. You may read and copy any of this information at the following locations of the SEC:

| | | |
|---|---|---|
| Public Reference Room | New York Regional Office | Chicago Regional Office |
| 450 Fifth Street, N.W. | 7 World Trade Center | Citicorp Center |
| Room 1024 | Suite 1300 | 500 West Madison Street |
| Washington, D.C. 20549 | New York, NY 10048 | Suite 1400 |
| | | Chicago, IL 60661–2511 |

You may obtain information on the operation of the SEC's Public Reference Room by calling the SEC at 1–800–SEC–0330.

The SEC also maintains an Internet web site that contains reports, proxy statements and other information regarding issuers, including Equity Office and Spieker, who file electronically with the SEC. The address of that site is http://www.sec.gov. Reports, proxy statements and other information concerning Equity Office and Spieker may also be inspected at the offices of the New York Stock Exchange, which are located at 20 Broad Street, New York, New York 10005.

The SEC allows Equity Office and Spieker to "incorporate by reference" information in this document, which means that the companies can disclose important information to you by referring you to another document filed separately with the SEC. The information incorporated by reference is considered to be a part of this joint proxy statement/ prospectus, except for any information that is superseded by information included directly in this document.

The documents listed below that Equity Office and Spieker have previously filed with the SEC are considered to be a part of this joint proxy statement/ prospectus. They contain important business and financial information about the companies that is not included in or delivered with this document.

Equity Office SEC Filings (File No. 1–13115):

| | |
|---|---|
| 2000 Annual Report on Form 10–K | Filed on March 23, 2001 |
| Amendment to Form 10–K on Form 10–K/A | Filed on June 6, 2001 |
| Quarterly Report on Form 10–Q for the quarter ended March 31, 2001 | Filed on May 15, 2001 |
| Amendment to Quarterly Report on Form 10–Q for the quarter ended March 31, 2001 on Form 10–Q/A | Filed on June 6, 2001 |
| Current Reports on Form 8–K | Filed on March 23, 2001 and March 9, 2001 |
| Registration Statement on Form 8–A | Filed on June 19, 1997, setting forth the description of Equity Office common shares, including any amendments or reports filed for the purpose of updating such description |

124

Table of Contents

Spieker SEC Filings (File No. 1–12528):

| | |
|---|---|
| 2000 Annual Report on Form 10–K | Filed on March 23, 2001 |
| Amendment to Form 10–K on Form 10–K/A | Filed on June 6, 2001 |
| Quarterly Report on Form 10–Q for the quarter ended March 31, 2001 | Filed on May 15, 2001 |
| Current Reports on Form 8–K | Filed on March 9, 2001 and June 4, 2001 |
| Registration Statement on Form 8–A | Filed on November 3, 1993, setting forth the description of the Spieker common stock, including any amendments or reports filed for the purpose of updating such description |

Equity Office and Spieker incorporate by reference additional documents that either company may file with the SEC between the date of this joint proxy statement/ prospectus and the date of each company's special meeting. These include periodic reports, such as Annual Reports on Form 10–K, Quarterly Reports on Form 10–Q and Current Reports on Form 8–K, as well as proxy materials.

Equity Office has supplied all information contained or incorporated by reference in this joint proxy statement/prospectus relating to Equity Office, as well as all pro forma financial information, and Spieker has supplied all information contained or incorporated by reference in this joint proxy statement/ prospectus relating to Spieker. This document constitutes the prospectus of Equity Office and a joint proxy statement of Spieker and Equity Office.

## WHAT INFORMATION YOU SHOULD RELY ON

**No person has been authorized to give any information or to make any representation that differs from, or adds to, the information discussed in this joint proxy statement/ prospectus or in the annexes attached hereto which are specifically incorporated by reference. Therefore, if anyone gives you different or additional information, you should not rely on it.**

**This document is dated June 6, 2001. The information contained in this joint proxy statement/ prospectus speaks only as of its date unless the information specifically indicates that another date applies. This joint proxy statement/ prospectus does not constitute an offer to exchange or sell, or a solicitation of an offer to exchange or purchase, Equity Office common shares or Spieker common stock or to ask for proxies, to or from any person to whom it is unlawful to direct these activities.**

125

---

Table of Contents

## EQUITY OFFICE PROPERTIES TRUST

### PRO FORMA CONDENSED COMBINED FINANCIAL STATEMENTS

**As of and for the three months ended March 31, 2001
and for the year ended December 31, 2000
(Unaudited)**

The accompanying Unaudited Pro Forma Condensed Combined Balance Sheet as of March 31, 2001 is presented as if the proposed merger of Equity Office Properties Trust and Spieker Properties, Inc. had occurred on March 31, 2001. The accompanying Unaudited Pro Forma Condensed Combined Statements of Operations for the three months ended March 31, 2001 and for the year ended December 31, 2000 reflect the proposed merger of Equity Office Properties Trust and Spieker Properties, Inc. as if the merger had occurred on January 1, 2000.

In the opinion of management, all significant adjustments necessary to reflect the effects of the merger have been made.

F–1

---

Table of Contents

## EQUITY OFFICE PROPERTIES TRUST

### PRO FORMA CONDENSED COMBINED BALANCE SHEET

**MARCH 31, 2001 (Unaudited)
(Dollars in thousands)**

| | Equity Office Properties Trust Historical | Spieker Properties, Inc. Historical | Merger Adjustments(A) | Equity Office Properties Trust Pro Forma |
|---|---|---|---|---|
| **ASSETS:** | | | | |
| Investment in real estate, net | $ 16,612,557 | $ 4,360,358 | $2,821,918 (B) | $ 23,794,833 |
| Cash and cash equivalents | 37,610 | 37,034 | — (C) | 74,644 |
| Rent and other receivables | 306,835 | 51,425 | (41,245)(D) | 317,015 |
| Escrow deposits and restricted cash | 45,131 | | | 45,131 |
| Investment in unconsolidated joint ventures | 1,135,205 | 18,098 | (1,938)(E) | 1,151,365 |
| Prepaid expenses and other assets, net | 585,960 | 147,871 | (73,930)(F) | 659,901 |
| **Total Assets** | $ 18,723,298 | $ 4,614,786 | $2,704,805 | $ 26,042,889 |
| **LIABILITIES, MINORITY INTERESTS, REDEEMABLE COMMON SHARES AND SHAREHOLDERS' EQUITY:** | | | | |
| Mortgage debt, net | $ 2,784,255 | $ 51,785 | $ — | $ 2,836,040 |
| Unsecured notes, net | 5,836,404 | 1,936,500 | (18,500)(G) | 7,754,404 |
| Lines of credit | 37,500 | 94,632 | 1,186,573 (H) | 1,318,705 |
| Distribution payable | 160,679 | 55,178 | — | 215,857 |
| Other liabilities | 596,574 | 210,101 | — | 806,675 |
| **Total Liabilities** | 9,415,412 | 2,348,196 | 1,168,073 | 12,931,681 |
| Commitments and contingencies | | | | |
| Minority Interests | | | | |
| EOP Partnership | 995,943 | 288,603 | 202,389 (I) | 1,486,935 |
| Partially owned properties | 198,280 | — | | 198,280 |
| **Total Minority Interests** | 1,194,223 | 288,603 | 202,389 | 1,685,215 |
| **Redeemable Common Shares** | 54,122 | — | | 54,122 |
| Shareholders' Equity: | | | | |
| Preferred shares | 613,423 | 368,373 | (12,123)(J) | 969,673(J) |
| Common shares | 3,073 | 6 | 1,005 (K) | 4,084 |
| Additional paid in capital | 7,443,045 | 1,609,608 | 1,345,461 (L) | 10,398,114 |
| **Total Shareholders' Equity** | 8,059,541 | 1,977,987 | 1,334,343 | 11,371,871 |
| **Total Liabilities, Minority Interests, Redeemable Common Shares and Shareholders' Equity** | $ 18,723,298 | $ 4,614,786 | $2,704,805 | $ 26,042,889 |

F–2

Table of Contents

# EQUITY OFFICE PROPERTIES TRUST

## PRO FORMA CONDENSED COMBINED STATEMENT OF OPERATIONS

### FOR THE THREE MONTHS ENDED MARCH 31, 2001 (Unaudited)
#### (Dollars in thousands, except per share data)

| | Equity Office Properties Trust Historical | Spieker Properties, Inc. Historical | Merger Adjustments(A) | Equity Office Properties Trust Pro Forma |
|---|---|---|---|---|
| **Revenues:** | | | | |
| Rental | $ 509,135 | $ 158,348 | $ 4,601 (M) | $ 672,084 |
| Tenant reimbursements | 97,321 | 48,978 | — | 146,299 |
| Parking | 30,590 | — | — | 30,590 |
| Other | 13,163 | 1,792 | — | 14,955 |
| Fee income | 2,172 | 322 | — | 2,494 |
| Interest/dividends | 10,835 | 958 | — | 11,793 |
| Total revenues | 663,216 | 210,398 | 4,601 | 878,215 |
| **Expenses:** | | | | |
| Interest: | | | | |
| Expense incurred | 157,940 | 33,395 | 18,724 (N) | 210,059 |

| | | | | |
|---|---:|---:|---:|---:|
| Amortization of deferred financing costs | 1,326 | 746 | (746)(O) | 1,326 |
| Depreciation | 114,566 | 30,333 | 14,110 (P) | 159,009 |
| Amortization | 9,082 | 3,857 | (3,857)(Q) | 9,082 |
| Real estate taxes | 76,662 | 12,889 | — | 89,551 |
| Insurance | 3,307 | 1,784 | — | 5,091 |
| Repairs and maintenance | 65,600 | 17,094 | — | 82,694 |
| Property operating | 69,022 | 22,990 | — | 92,012 |
| Ground rent | 3,081 | — | — | 3,081 |
| General and administrative | 25,639 | 7,639 | —     (R) | 33,278 |
| Total expenses | 526,225 | 130,727 | 28,231 | 685,183 |
| Income before allocation to minority interests, income from investment in unconsolidated joint ventures, net gain on sales of real estate and cumulative effect of a change in accounting principle | 136,991 | 79,671 | (23,630) | 193,032 |
| Minority Interests: | | | | |
| EOP Partnership | (16,282) | (12,116) | 2,360 (S) | (26,038) |
| Partially owned properties | (3,253) | — | — | (3,253) |
| Income from investment in unconsolidated joint ventures | 15,426 | — | — | 15,426 |
| Net gain on sales of real estate | — | 20,516 | — | 20,516 |
| Net income from continuing operations | 132,882 | 88,071 | (21,270) | 199,683 |
| Preferred distributions | (10,884) | (8,317) | 854 (T) | (18,347) |
| Net income from continuing operations before cumulative effect of a change in accounting principle available for common shares | $ 121,998 | $ 79,754 | $ (20,416) | $ 181,336 |
| Net income from continuing operations before cumulative effect of a change in accounting principle per weighted average common share outstanding — basic | $ 0.40 | | | $ 0.44 (U) |
| Weighted average common shares outstanding — basic | 306,971,084 | | | 408,581,209 |
| Net income from continuing operations before cumulative effect of a change in accounting principle per weighted average common share and common share equivalent outstanding — diluted | $ 0.39 | | | $ 0.44 (U) |
| Weighted average common shares and common share equivalents outstanding — diluted | 351,400,853 | | | 470,172,726 |

F-3

---

Table of Contents

## EQUITY OFFICE PROPERTIES TRUST

## PRO FORMA CONDENSED COMBINED STATEMENT OF OPERATIONS

### FOR THE YEAR ENDED DECEMBER 31, 2000 (Unaudited)
(Dollars in thousands, except per share data)

| | Equity Office Properties Trust Historical | Spieker Properties, Inc. Historical | Merger Adjustments(A) | Equity Office Properties Trust Pro Forma |
|---|---:|---:|---:|---:|
| Revenues: | | | | |
| Rental | $ 1,732,799 | $ 556,330 | $ 4,966 (M) | $ 2,294,095 |
| Tenant reimbursements | 324,193 | 188,169 | — | 512,362 |
| Parking | 112,107 | — | — | 112,107 |
| Other | 48,047 | 3,839 | — | 51,886 |
| Fee income | 10,931 | 1,535 | — | 12,466 |
| Interest/dividends | 36,166 | 3,963 | — | 40,129 |
| Total revenues | 2,264,243 | 753,836 | 4,966 | 3,023,045 |
| Expenses: | | | | |

| | | | | |
|---|---:|---:|---:|---:|
| Interest: | | | | |
| Expense incurred | 525,787 | 130,773 | 74,895 (N) | 731,455 |
| Amortization of deferred financing costs | 9,746 | 2,267 | (2,267)(O) | 9,746 |
| Depreciation | 399,768 | 123,027 | 56,438 (P) | 579,233 |
| Amortization | 26,903 | 14,789 | (14,789)(Q) | 26,903 |
| Real estate taxes | 268,305 | 51,533 | — | 319,838 |
| Insurance | 12,214 | 5,666 | — | 17,880 |
| Repairs and maintenance | 234,986 | 65,618 | — | 300,604 |
| Property operating | 238,490 | 91,478 | — | 329,968 |
| Ground rent | 10,012 | — | — | 10,012 |
| General and administrative | 91,415 | 28,822 | — (R) | 120,237 |
| Total expenses | 1,817,626 | 513,973 | 114,277 | 2,445,876 |
| | | | | |
| Income before allocation to minority interests, income from investment in unconsolidated joint ventures, net gain on real estate and extraordinary items | 446,617 | 239,863 | (109,311) | 577,169 |
| Minority Interests: | | | | |
| EOP Partnership | (59,376) | (46,450) | 12,140 (S) | (93,686) |
| Partially owned properties | (6,843) | — | — | (6,843) |
| Income from investment in unconsolidated joint ventures | 56,251 | — | — | 56,251 |
| Net gain on sales of real estate | 36,013 | 140,051 | — | 176,064 |
| | | | | |
| Net income from continuing operations | 472,662 | 333,464 | (97,171) | 708,955 |
| Put option settlement | (2,576) | — | — | (2,576) |
| Preferred distributions, net | (43,348) | (33,269) | 3,415 (T) | (73,202) |
| | | | | |
| Net income from continuing operations before extraordinary items available for common shares | $ 426,738 | $ 300,195 | $ (93,756) | $ 633,177 |
| | | | | |
| Net income from continuing operations before extraordinary items per weighted average common share outstanding — basic | $ 1.54 | | | $ 1.67 (U) |
| | | | | |
| Weighted average common shares outstanding — basic | 277,186,733 | | | 378,765,944 |
| | | | | |
| Net income from continuing operations before extraordinary items per weighted average common share and common share equivalent outstanding — diluted | $ 1.53 | | | $ 1.66 (U) |
| | | | | |
| Weighted average common shares and common share equivalents outstanding — diluted | 318,997,407 | | | 437,738,366 |

F—4

---

Table of Contents

**EQUITY OFFICE PROPERTIES TRUST**

**NOTES TO PRO FORMA CONDENSED COMBINED FINANCIAL STATEMENTS**

**MARCH 31, 2001 (Unaudited)**
**(Dollars in thousands, except per share data)**

(A)  Represents adjustments to record the merger between Equity Office and Spieker based upon the assumed purchase price of $7.3 billion assuming a market value of $29.2945 per share of Equity Office's common shares. The calculation of the merger acquisition cost is as follows:

| | |
|---|---:|
| Issuance of 100.5 million Equity Office common shares based on a 1.49586 exchange ratio in exchange for 67.2 million shares of Spieker common stock (see Note I) | $2,944,326 |
| Issuance of 17.2 million EOP Partnership redeemable units based on a 1.94462 exchange ratio in exchange for 8.8 million units of Spieker Partnership (see Note I) | 502,746 |
| Payment of $13.50 per share of Spieker common stock outstanding | 907,072 |
| Issuance of 4,250,000 9.45% series E preferred shares of Equity Office in exchange for 4,250,000 shares of 9.45% series B preferred stock of Spieker | 106,250 |
| Issuance of 6,000,000 7.875% series F preferred shares of Equity Office in exchange for 6,000,000 shares of 7.875% series C preferred stock of Spieker | 150,000 |
| Issuance of 4,000,000 8.0% series H preferred shares of Equity Office in exchange for 4,000,000 shares of 8.00% series E preferred stock of Spieker | 100,000 |

| | |
|---|---:|
| Assumption of Spieker's total liabilities | 2,348,196 |
| Adjustment to Spieker's unsecured notes to reflect fair value (see Note G) | (18,500) |
| Assumed borrowing by Spieker to redeem the Spieker Partnership series D preferred units prior to the merger | 69,750 |
| Payment to Spieker stock option holders to redeem 5,630,879 stock options at $58.50 each less the weighted average exercise price of $34.78 per option plus an additional $2.2 million for employer's share of social security tax on the redemption amounts (assumes all option holders accept the cash tender offer) | 135,821 |
| Merger costs (see calculation below) | 73,930 |
| Total merger acquisition cost | $7,319,591 |

The following is a calculation of estimated merger costs:

| | |
|---|---:|
| Employee termination costs | $40,955 |
| Investment advisory fees | 15,000 |
| Transfer taxes | 5,000 |
| Legal, accounting and other fees | 12,975 |
| Total merger costs | $73,930 |

(B)   Represents the estimated increase over Spieker's investment in real estate based upon the merger acquisition cost to reflect the allocation to other tangible assets of Spieker being acquired:

| | |
|---|---:|
| Merger acquisition cost (see Note A) | $7,319,591 |
| Less basis of Spieker's net assets acquired: | |
| Investment in real estate, net | 4,360,358 |
| Cash and cash equivalents | 37,034 |
| Rents and other receivables (excluding $41.2 million of deferred rents receivable) | 10,180 |
| Investment in unconsolidated joint ventures (excluding $1.9 million relating to Spieker Northwest, Inc. (see Note E)) | 16,160 |
| Prepaid expenses and other assets (excluding $73.9 million of deferred leasing and financing costs (see Note F)) | 73,941 |
| Subtotal | 4,497,673 |
| Adjustment to record fair value of Spieker's investment in real estate, net | $2,821,918 |

F–5

---

Table of Contents

## EQUITY OFFICE PROPERTIES TRUST

### NOTES TO PRO FORMA CONDENSED COMBINED FINANCIAL STATEMENTS — (Continued)

(C)   There was no change in cash and cash equivalents as a result of the following transactions:

| | |
|---|---:|
| Anticipated borrowings on a bridge loan credit facility and the current line of credit to finance the cash portion of the merger consideration, the redemption of all outstanding Spieker stock options, the redemption of all Spieker Partnership series D preferred units and the merger costs (see Note H) | $1,186,573 |
| Less cash portion of merger consideration, the redemption of all outstanding Spieker stock options, the redemption of all Spieker Partnership series D preferred units and the merger costs (see Note A) | (1,186,573) |
| Net adjustment to cash and cash equivalents | $ — |

(D)   Represents the elimination of Spieker's deferred rent receivable of $41.2 million, which arose from the historical straight lining of rental revenue.

(E)   Adjustment to consolidate Spieker Northwest, Inc. as a result of the acquisition of 100% of its voting stock and 5% of its non–voting capital stock by Equity Office Properties Management Corp., a wholly owned subsidiary of EOP Partnership, for approximately $0.2 million. In addition to third party management contracts, which are expected to terminate at the closing of the mergers, Spieker Northwest, Inc. owns 85,114 square feet of office and industrial property, which had total revenues of $0.9 million for the year ended December 31, 2000 and $0.3 million for the three months ended March 31, 2001. The $0.2 million purchase price for Spieker Northwest, Inc. is included in the total merger cost of $73.9 million and has been allocated to investment in real estate, net (See Note A). The $1.9 million adjustment represents Spieker's historical equity investment in Spieker Northwest, Inc. The adjustment to the pro forma balance sheet as a result of the acquisition of Spieker Northwest,

Inc. is as follows:

| | |
|---|---:|
| Investment in real estate, net (see Note B) | $2,140 |
| Investment in unconsolidated joint ventures | $(1,938) |
| Lines of credit (see Notes A and C) | $(202) |

(F)  Represents an adjustment to write−off Spieker's deferred financing and leasing costs of $73.9 million, which were not assigned any value in the allocation of the merger acquisition cost.

(G)  To adjust Spieker's unsecured notes to fair value.

(H)  To reflect borrowings on existing and additional credit facilities to finance the cash portion of the merger consideration, the redemption of all outstanding Spieker stock options, the redemption of all Spieker Partnership series D preferred units and the merger costs as follows:

| | |
|---|---:|
| Cash portion of merger consideration (see Note A) | $907,072 |
| Payment to Spieker stock option holders to redeem all outstanding Spieker stock options (see Note A) | 135,821 |
| Merger costs (see Note A) | 73,930 |
| Redemption of all Spieker Partnership series D preferred units prior to the merger (see Note A) | 69,750 |
| Borrowings on credit facilities | $1,186,573 |

EOP Partnership has received executed commitments from various lenders for the entire $1.0 billion principal amount of a bridge loan credit facility to be entered into before the closing of the merger, bearing interest at LIBOR plus 80 basis points, subject to EOP Partnership's credit rating, and maturing in 364 days from date of funding of the bridge facility. EOP Partnership will need to refinance the bridge facility prior to its maturity. Equity Office will guarantee any outstanding obligation under the bridge loan credit facility. EOP Partnership and Equity Office have agreed, jointly and severally, to pay a commitment fee of 20 basis points, or $2.0 million, if the bridge facility is not refinanced within 120 days from the date

Table of Contents

### EQUITY OFFICE PROPERTIES TRUST

### NOTES TO PRO FORMA CONDENSED COMBINED FINANCIAL STATEMENTS — (Continued)

of funding. See Note N. The current line of credit bears interest at LIBOR plus 60 basis points plus an annual facility fee of 20 basis points and matures in June 2003.

(I)  To adjust common minority interests in EOP Partnership to reflect the merger as follows:

| | |
|---|---:|
| Equity Office historical common shareholders' equity, minority interests in EOP Partnership and redeemable common stock | $8,496,183 |
| Spieker historical common shareholders' equity and minority interests in Spieker Partnership | 1,898,217 |
| Pro forma adjustments to common shareholders' equity | 1,548,855 |
| Total | 11,943,255 |
| Minority interests ownership percentage of EOP Partnership after the merger as of March 31, 2001 (see below) | 12.45% |
| Minority interest ownership of EOP Partnership after the merger | 1,486,935 |
| Less historical minority interest ownership of EOP Partnership prior to the merger | (995,943) |
| Less historical minority interest ownership of Spieker Partnership prior to the merger | (288,603) |
| Adjustment to minority interest ownership of EOP Partnership to reflect the merger | $202,389 |

The 12.45% minority interest of EOP Partnership as of March 31, 2001 is calculated as follows:

| | Shares | Units | Shares and Units |
|---|---:|---:|---:|
| Shares of Spieker common stock and Spieker Partnership units outstanding at March 31, 2001 | 65,971,027 | 8,825,245 | 74,796,272 |
| Add conversion of Spieker series A preferred stock to Spieker common stock | 1,219,512 | — | 1,219,512 |

| | | | |
|---|--:|--:|--:|
| Total Spieker common stock and Spieker Partnership units outstanding at March 31, 2001 | 67,190,539 | 8,825,245 | 76,015,784 |
| Conversion rate to Equity Office common shares and EOP Partnership units | 1.49586 | 1.94462 | |
| Equity Office common shares and EOP Partnership redeemable units to be issued in the partnership merger on March 31, 2001 | 100,507,640 | 17,161,748 | 117,669,388 |
| Equity Office common shares, redeemable common shares and EOP Partnership redeemable units outstanding at March 31, 2001(1) | 309,016,219 | 41,056,246 | 350,072,465 |
| Equity Office common shares, redeemable common shares and EOP Partnership redeemable units outstanding after the merger on March 31, 2001 | 409,523,859 | 58,217,994 | 467,741,853 |
| Minority interests ownership percentage of EOP Partnership as of March 31, 2001 | 12.45% | | |
| Equity Office ownership percentage of EOP Partnership as of March 31, 2001 | 87.55% | | |

(1)  Equity Office has approximately 1.7 million common shares outstanding that are redeemable at $31.50 per share. Equity Office is not subject to any sinking fund requirements pertaining to these redeemable shares.

Table of Contents

## EQUITY OFFICE PROPERTIES TRUST

### NOTES TO PRO FORMA CONDENSED COMBINED FINANCIAL STATEMENTS — (Continued)

(J)  To record the issuance of Equity Office preferred shares in exchange for Spieker preferred shares:

| | |
|---|--:|
| Issuance of Equity Office series E preferred shares | $106,250 |
| Issuance of Equity Office series F preferred shares | 150,000 |
| Issuance of Equity Office series H preferred shares | 100,000 |
| Total Equity Office preferred shares | 356,250 |
| Spieker series A preferred shares | 23,949 |
| Spieker series B preferred shares | 102,064 |
| Spieker series C preferred shares | 145,959 |
| Spieker series E preferred shares | 96,401 |
| Total Spieker preferred shares outstanding prior to the merger | 368,373 |
| Total adjustment to preferred shares | $(12,123) |

Listed below is a summary of Equity Office's preferred shares that will be outstanding after the merger. The preferred shareholders are entitled to receive, when and as authorized by Equity Office, cumulative preferential cash distributions. Equity Office may redeem the preferred shares at certain dates in whole or in part at a cash redemption price equal to the redemption preference plus all accrued unpaid dividends to the date fixed for redemption.

| Series | Annual Distribution Rate | Liquidation Preference per Share | Current Balance Outstanding | Quarterly Distribution Amount per Share | Distribution Frequency | Equity Office's Voluntary Redemption Date(2) | Maturity Date |
|---|---|---|---|---|---|---|---|
| A | 8.98% | $ 25.00 | $ 199,850 | $ 0.56125 | Quarterly | on or after 6/15/2002 | Perpetual |
| B(1) | 5.25% | $ 50.00 | $ 300,000 | $ 0.65625 | Quarterly | 2/15/2003 through 2/15/08 | 2/15/08 |
| C | 8.625% | $ 25.00 | $ 114,073 | $0.5390625 | Quarterly | on or after 12/8/2003 | Perpetual |
| E | 9.45% | $ 25.00 | $ 106,250 | $ 0.590625 | Quarterly | anytime at Equity Office's option | Perpetual |
| F | 7.875% | $ 25.00 | $ 150,000 | $0.4921875 | Quarterly | on or after 10/10/02 | Perpetual |
| H | 8.0% | $ 25.00 | $ 100,000 | $ 0.50 | Quarterly | on or after 6/4/03 | Perpetual |

(1)  The Series B Preferred Shares are convertible at any time by the holder into Common Shares at a conversion price of $35.70 per share. These shares are non–callable for five years with a mandatory call on February 15, 2008.

(2)  Equity Office is not subject to any sinking fund requirements pertaining to these preferred shares.

(K)  To record the par value of 100.5 million Equity Office common shares issued to Spieker common stockholders.

Table of Contents

## EQUITY OFFICE PROPERTIES TRUST

### NOTES TO PRO FORMA CONDENSED COMBINED FINANCIAL STATEMENTS — (Continued)

(L)  To reflect the net increase in additional paid in capital associated with the merger as follows:

| | |
|---|---|
| Issuance of 100.5 million Equity Office common shares based on a 1.49586 conversion ratio in exchange for 67.2 million shares of Spieker common stock (see Note I) | $ 2,944,326 |
| Issuance of 17.2 million EOP Partnership units based on a 1.94462 exchange rate in exchange for 8.8 million units of Spieker Partnership (see Note I) | 502,746 |
| Less par value of Equity Office common shares issued to Spieker common stockholders (see Note K) | (1,005) |
| Adjustment to minority interests in EOP Partnership (see Note I) | (202,389) |
| Less historical minority interests in the ownership of Spieker Partnership | (288,603) |
| Less Spieker's historical additional paid in capital | (1,609,614) |
| Net increase in paid in capital | $ 1,345,461 |

(M)  To reflect the adjustment for the straight-line effect of scheduled rent increases.

(N)  To reflect the additional interest expense incurred from borrowing on a bridge loan credit facility and the current line of credit to finance the cash portion of the merger consideration, the redemption of all outstanding Spieker stock options, the redemption of all Spieker Partnership series D preferred units and the merger costs and amortization of the mark-to-market adjustment for the unsecured notes:

| | |
|---|---|
| Borrowing from bridge loan credit facility | $ 1,000,000 |
| Borrowing from current line of credit | 186,573 |
| Cash portion of merger consideration, the redemption of all outstanding Spieker stock options, the redemption of all Spieker Partnership series D preferred units and the merger costs (see Note H) | 1,186,573 |
| Effective interest rate | 6.31% |
| Additional annual interest expense | 74,873 |
| Amortization of $18.5 million mark-to-market adjustment (see Note G) | 22 |
| Adjustment to annual interest expense | $   74,895 |
| Adjustment to quarterly interest expense | $   18,724 |

The current line of credit bears interest at LIBOR plus 60 basis points plus an annual facility fee of 20 basis points and matures in June 2003. As of March 31, 2001, the available borrowing capacity on this facility was approximately $962 million. EOP Partnership has received executed commitments from various lenders for the entire $1.0 billion principal amount of a bridge loan credit facility to be entered into before the closing of the merger, bearing interest at LIBOR plus 80 basis points, subject to EOP Partnership's credit rating, and maturing in 364 days from date of funding of the bridge facility. The effective interest rate of 6.31% represents the LIBOR rate as of March 31, 2001, plus 80 basis points, which is the effective rate on the current line of credit as well as the bridge loan credit facility. EOP Partnership will need to refinance the bridge facility prior to maturity of the bridge facility. Equity Office will guarantee any outstanding obligation under the bridge loan credit facility. EOP Partnership and Equity Office have agreed, jointly and severally, to pay a commitment fee of 20 basis points, or $2.0 million, if the bridge facility is not refinanced within 120 days from the date of funding. EOP Partnership anticipates incurring higher interest costs on the replacement indebtedness due to higher interest costs of longer-term debt.

Table of Contents

## EQUITY OFFICE PROPERTIES TRUST

### NOTES TO PRO FORMA CONDENSED COMBINED FINANCIAL STATEMENTS — (Continued)

Since the interest rate on the bridge loan credit facility and the current line of credit is based on a spread over LIBOR, the rates will periodically change. If the interest rate on the additional credit facility increases or decreases by 12.5 basis points, the following adjustment would be made to interest expense:

| | |
|---|---|
| Adjustment to annual interest expense if interest rate increases 12.5 basis points | $ 1,483 |

| | |
|---|---|
| Adjustment to annual interest expense if interest rate decreases 12.5 basis points | $(1,483) |
| Adjustment to quarterly interest expense if interest rate increases 12.5 basis points | $ 371 |
| Adjustment to quarterly interest expense if interest rate decreases 12.5 basis points | $ (371) |

(O) To reverse Spieker's historical amortization of deferred financing costs due to the write–off of deferred financing costs as a result of the merger (see Note F).

(P) To reflect additional depreciation expense related to the adjustment to the investment in real estate as follows:

| | |
|---|---|
| Adjustment to investment in real estate (see Note B) | $2,821,918 |
| Portion allocated to building and improvements | 80% |
| Adjustment to the depreciable basis of Spieker's investment in real estate, net | $2,257,534 |
| Additional annual depreciation expense based on an estimated useful life of 40 years | $56,438 |
| Additional quarterly depreciation expense based on an estimated useful life of 40 years | $14,110 |

(Q) To reverse Spieker's historical amortization of deferred lease commissions due to the write–off of deferred lease commissions as a result of the merger (see Note F).

(R) Management has estimated that there will be a reduction of general and administrative expenses as a result of the merger of approximately 50% to 60% on a pro forma basis. The general and administrative expense savings have not been included in the pro forma condensed combined statements of operations. There can be no assurance that Equity Office will be successful in realizing such anticipated cost savings.

(S) To adjust the minority interest income allocation to EOP Partnership for the three months ended March 31, 2001 to 12.56% and for the year ended December 31, 2000 to 12.89% as if the merger had occurred on January 1, 2000, and the Equity Office common shares and EOP Partnership units to be issued in the merger were issued on January 1, 2000. The minority interest income allocation to EOP Partnership for each period is calculated based on the weighted average number of EOP Partnership units outstanding during the period divided by the sum of the weighted average number of Equity Office common shares and EOP Partnership units outstanding during the period. Issuance of additional common shares and units changes the ownership interests of both the minority interests and Equity Office.

(T) Adjustment to eliminate the dividend on the Spieker series A preferred stock which was converted into shares of Spieker common stock on April 6, 2001.

F–10

---

Table of Contents

**EQUITY OFFICE PROPERTIES TRUST**

**NOTES TO PRO FORMA CONDENSED COMBINED FINANCIAL STATEMENTS — (Continued)**

(U) The following table sets forth the computation of basic earnings per common share and diluted earnings per common share and common share equivalent:

| | For the three months ended March 31, 2001 | | For the year ended December 31, 2000 | |
|---|---|---|---|---|
| | Historical | Pro Forma | Historical | Pro Forma |
| **Numerator** | | | | |
| Net income from continuing operations before gain on sales of real estate | $ 121,998 | $ 160,820 | $392,198 | $ 457,113 |
| Gain on sales of real estate (excluding allocation to minority interests in partially owned properties of $1,473 for the year ended December 31, 2000) | — | 20,516 | 34,540 | 176,064 |
| | 121,998 | 181,336 | 426,738 | 633,177 |

| | | | | |
|---|---|---|---|---|
| Numerator for basic earnings per share — net income from continuing operations available for common shares | | | | |
| Minority interest in EOP Partnership | 16,282 | 26,038 | 59,376 | 93,686 |
| Numerator for diluted earnings per share — net income from continuing operations available for common shares and common share equivalents | $ 138,280 | $ 207,374 | $486,114 | $ 726,863 |

**Denominator**

| | | | | |
|---|---|---|---|---|
| Denominator for basic earnings per common share — weighted average common shares outstanding | 306,971,084 | 408,581,209 | 277,186,733 | 378,765,944 |
| Denominator for diluted earnings per common share and common share equivalent — weighted average common shares and common share equivalents outstanding | 351,400,853 | 470,172,726 | 318,997,407 | 437,738,366 |

**Basic earnings available for common shares per weighted average common share:**

| | | | | |
|---|---|---|---|---|
| Net income from continuing operations before gain on sales of real estate, net of minority interests | $.40 | $.40 | $1.43 | $1.27 |
| Gain on sales of real estate, net of minority interests | — | .04 | .11 | .40 |
| Net income from continuing operations | $.40 | $.44 | $1.54 | $1.67 |

**Diluted earnings available for common shares and common share equivalents per weighted average common share and common share equivalent:**

| | | | | |
|---|---|---|---|---|
| Net income from continuing operations before gain on sales of real estate | $.39 | $.40 | $1.42 | $1.26 |
| Gain on sales of real estate | — | .04 | .11 | .40 |
| Net income from continuing operations | $.39 | $.44 | $1.53 | $1.66 |

F—11

Table of Contents

ANNEX A

**AGREEMENT AND PLAN OF MERGER**

**DATED AS OF FEBRUARY 22, 2001, AS AMENDED**

Table of Contents

**AGREEMENT AND PLAN OF MERGER**

among

**EQUITY OFFICE PROPERTIES TRUST,**

**EOP OPERATING LIMITED PARTNERSHIP,**

**SPIEKER PROPERTIES, INC.**

and

**SPIEKER PROPERTIES, L.P.**

**Dated as of February 22, 2001**

# TABLE OF CONTENTS

## ARTICLE 1

### THE MERGERS

|  |  | Page |
|---|---|---|
| 1.1 | The Partnership Merger | A–2 |
| 1.2 | The Merger | A–2 |
| 1.3 | Closing | A–2 |
| 1.4 | Effective Time | A–3 |
| 1.5 | Effect of Partnership Merger on Agreement of Limited Partnership | A–3 |
| 1.6 | Effect of Merger on Declaration of Trust and Bylaws | A–3 |
| 1.7 | Trustees of Equity Office | A–3 |
| 1.8 | Effect on Capital Stock | A–3 |
| 1.9 | Effect on Partnership Interests | A–4 |
| 1.10 | Partnership Merger Consideration; Merger Consideration | A–4 |
| 1.11 | Partner Approval | A–6 |
| 1.12 | Appraisal or Dissenters Rights | A–7 |
| 1.13 | Exchange of Certificates; Pre–Closing Dividends; Fractional Shares | A–7 |

## ARTICLE 2

### REPRESENTATIONS AND WARRANTIES OF SPIEKER AND SPIEKER PARTNERSHIP

|  |  |  |
|---|---|---|
| 2.1 | Organization, Standing and Power | A–11 |
| 2.2 | Spieker Subsidiaries | A–11 |
| 2.3 | Capital Structure | A–12 |
| 2.4 | Other Interests | A–14 |
| 2.5 | Authority; Noncontravention; Consents | A–14 |
| 2.6 | SEC Documents; Financial Statements; Undisclosed Liabilities | A–15 |
| 2.7 | Absence of Certain Changes or Events | A–16 |
| 2.8 | Litigation | A–16 |
| 2.9 | Properties | A–17 |
| 2.10 | Environmental Matters | A–18 |
| 2.11 | Related Party Transactions | A–20 |
| 2.12 | Employee Benefits | A–20 |
| 2.13 | Employee Policies | A–21 |
| 2.14 | Taxes | A–21 |
| 2.15 | No Payments to Employees, Officers or Directors | A–22 |
| 2.16 | Broker; Schedule of Fees and Expenses | A–22 |
| 2.17 | Compliance with Laws | A–23 |
| 2.18 | Contracts; Debt Instruments | A–23 |
| 2.19 | Opinion of Financial Advisor | A–24 |
| 2.20 | State Takeover Statutes | A–24 |
| 2.21 | Stockholder Rights Plan | A–24 |
| 2.22 | Investment Company Act of 1940 | A–24 |
| 2.23 | Definition of Knowledge of Spieker | A–24 |
| 2.24 | Required Stockholder Approvals and Partner Approvals | A–25 |

i

## ARTICLE 3

### REPRESENTATIONS AND WARRANTIES OF EQUITY OFFICE AND EOP PARTNERSHIP

|  |  | Page |
|---|---|---|
| 3.1 | Organization, Standing and Power of Equity Office | A–25 |
| 3.2 | Equity Office Subsidiaries | A–25 |
| 3.3 | Capital Structure | A–26 |
| 3.4 | Other Interests | A–28 |
| 3.5 | Authority; Noncontravention; Consents | A–28 |
| 3.6 | SEC Documents; Financial Statements; Undisclosed Liabilities | A–29 |
| 3.7 | Absence of Certain Changes or Events | A–30 |
| 3.8 | Litigation | A–30 |
| 3.9 | Properties | A–30 |
| 3.10 | Environmental Matters | A–32 |
| 3.11 | Taxes | A–32 |
| 3.12 | Brokers; Schedule of Fees and Expenses | A–33 |
| 3.13 | Compliance with Laws | A–33 |
| 3.14 | Contracts; Debt Instruments | A–33 |
| 3.15 | Opinion of Financial Advisor | A–34 |
| 3.16 | State Takeover Statutes | A–34 |
| 3.17 | Investment Company Act of 1940 | A–34 |
| 3.18 | Definition of Knowledge of Equity Office | A–34 |
| 3.19 | Required Shareholder Approvals and Partner Approvals | A–34 |

## ARTICLE 4

COVENANTS

| | | | |
|---|---|---|---|
| 4.1 | Conduct of Spieker's and Spieker Partnership's Business Pending Merger | A–34 |
| 4.2 | Conduct of Equity Office's and EOP Partnership's Business Pending Merger | A–37 |
| 4.3 | No Solicitation | A–38 |
| 4.4 | Affiliates | A–40 |
| 4.5 | Other Actions | A–40 |

ARTICLE 5
ADDITIONAL COVENANTS

| | | |
|---|---|---|
| 5.1 | Preparation of the Form S–4 and the Proxy Statement; Spieker Stockholders Meeting, Spieker Unitholders Consent Solicitation and Equity Office Shareholders Meeting | A–41 |
| 5.2 | Access to Information; Confidentiality | A–43 |
| 5.3 | Commercially Reasonable Efforts; Notification | A–43 |
| 5.4 | Tax Matters | A–44 |
| 5.5 | Public Announcements | A–44 |
| 5.6 | Listing | A–44 |
| 5.7 | Transfer and Gains Taxes | A–44 |
| 5.8 | Benefit Plans and Other Employee Arrangements | A–45 |
| 5.9 | Indemnification | A–46 |
| 5.10 | Declaration of Dividends and Distributions | A–48 |
| 5.11 | Transfer of Spieker TRS | A–49 |
| 5.12 | Notices | A–49 |
| 5.13 | Resignations | A–49 |
| 5.14 | Assumption of Existing Tax Protection Agreements | A–50 |
| 5.15 | EOP Partnership Agreement | A–50 |
| 5.16 | Registration Rights Agreements | A–50 |

ii

## Table of Contents

**Page**

ARTICLE 6
CONDITIONS

| | | |
|---|---|---|
| 6.1 | Conditions to Each Party's Obligation to Effect the Mergers | A–50 |
| 6.2 | Conditions to Obligations of Equity Office and EOP Partnership | A–50 |
| 6.3 | Conditions to Obligations of Spieker and Spieker Partnership | A–52 |

ARTICLE 7
TERMINATION, AMENDMENT AND WAIVER

| | | |
|---|---|---|
| 7.1 | Termination | A–53 |
| 7.2 | Certain Fees and Expenses | A–54 |
| 7.3 | Effect of Termination | A–56 |
| 7.4 | Amendment | A–56 |
| 7.5 | Extension; Waiver | A–56 |

ARTICLE 8
GENERAL PROVISIONS

| | | |
|---|---|---|
| 8.1 | Nonsurvival of Representations and Warranties | A–57 |
| 8.2 | Notices | A–57 |
| 8.3 | Interpretation | A–57 |
| 8.4 | Counterparts | A–58 |
| 8.5 | Entire Agreement; No Third–Party Beneficiaries | A–58 |
| 8.6 | Governing Law | A–58 |
| 8.7 | Assignment | A–58 |
| 8.8 | Enforcement | A–58 |
| 8.9 | Severability | A–58 |
| 8.10 | Exculpation | A–58 |
| 8.11 | Joint and Several Obligations | A–58 |

iii

## Table of Contents

### EXHIBITS

| | | |
|---|---|---|
| Exhibit A | — | Form of Delaware Certificate of Merger |
| Exhibit B | — | Form of California Certificate of Merger |
| Exhibit C | — | Form of Maryland Articles of Merger |
| Exhibit D | — | Form of Articles Supplementary Designating Equity Office Series E Preferred Shares |
| Exhibit E | — | Form of Articles Supplementary Designating Equity Office Series F Preferred Shares |
| Exhibit F | — | Form of Articles Supplementary Designating Equity Office Series G Preferred Shares |
| Exhibit G | — | Form of Articles Supplementary Designating Equity Office Series H Preferred Shares |
| Exhibit H | — | Form of Amendment to EOP Partnership Agreement Creating Equity Office Preferred OP Units |
| Exhibit I | — | Form of Proposed Equity Office Charter Amendments |
| Exhibit J | — | Form of Nonsolicitation Agreement |
| Exhibit K | — | Form of Amendment to EOP Partnership Agreement Addressing Certain Federal Income Tax Matters |

Table of Contents

**Index of Defined Terms**

| | |
|---|---|
| Acquisition Proposal | 4.3(a)(i) |
| Additional Corresponding Equity Office Dividends and Distributions | 5.10 |
| Affiliate | 2.11 |
| Agreement | Preamble |
| AICPA Statement | 5.1(b) |
| Articles of Merger | E |
| Base Amount | 7.2 |
| Break–Up Expenses | 7.2 |
| Break–Up Fee | 7.2 |
| Break–Up Fee Tax Opinion | 7.2 |
| California Certificate of Merger | D |
| Cash Amount Per Share | 1.10(b)(i) |
| CERCLA | 2.10(a) |
| Certificate | 1.10(b)(vii) |
| Closing | 1.3 |
| Closing Date | 1.3 |
| Code | F |
| Commitment | 4.1(j) |
| Confidentiality Agreement | 4.3(b) |
| Controlled Group Member | 2.12 |
| Corresponding Equity Office Dividends and Distributions | 1.13(d)(ii) |
| CRULPA | 1.1(a) |
| Delaware Certificate of Merger | C |
| Department | 1.4 |
| DRULPA | 1.1(a) |
| Effective Time | 1.4 |
| Effective Times | 1.4 |
| Employee Plan | 2.12 |
| Encumbrances | 2.9(a) |
| Environmental Law | 2.10(a) |
| Environmental Mitigation | 2.9(d) |
| Environmental Permits | 2.10(b)(iv) |
| EOP Partnership | Preamble |
| EOP Partnership Agreement | 1.5 |
| Equity Office | Preamble |
| Equity Office Bylaws | 1.6 |
| Equity Office Common Shares | 1.10(b)(i) |
| Equity Office Counter Proposal | 4.3(c) |
| Equity Office Declaration of Trust | 1.6 |
| Equity Office Disclosure Letter | Art. 3 |
| Equity Office Exchangeable Notes | 3.3(b) |
| Equity Office Existing Preferred OP Units | 3.3(e) |
| Equity Office Existing Preferred Shares | 3.3(a) |
| Equity Office Financial Statement Date | 3.7 |
| Equity Office Material Adverse Effect | 3.1 |
| Equity Office Non–controlled Subsidiaries | 3.2(a) |
| Equity Office Options | 3.3(b) |
| Equity Office OP Units | 1.10(a)(i) |
| Equity Office Other Interests | 3.4 |
| Equity Office Partner Approvals | 1.11 |
| Equity Office Preferred OP Units | 1.10(a)(vi) |

v

Table of Contents

| | |
|---|---|
| Equity Office Preferred Shares | 1.10(b)(vi) |
| Equity Office Properties | 3.9(a) |
| Equity Office Rent Roll | 3.9(g) |
| Equity Office SEC Documents | 3.6 |
| Equity Office Series A Preferred OP Unit | 3.3(e) |
| Equity Office Series B Preferred OP Unit | 3.3(e) |
| Equity Office Series C Preferred OP Unit | 3.3(e) |
| Equity Office Series D Preferred OP Unit | 1.10(a)(ii) |
| Equity Office Series E Preferred OP Unit | 1.10(a)(iii) |
| Equity Office Series F Preferred OP Unit | 1.10(a)(iv) |
| Equity Office Series G Preferred OP Unit | 1.10(a)(v) |
| Equity Office Series H Preferred OP Unit | 1.10(a)(vi) |
| Equity Office Series A Preferred Shares | 3.3(a) |
| Equity Office Series B Preferred Shares | 3.3(a) |
| Equity Office Series C Preferred Shares | 3.3(a) |
| Equity Office Series D Preferred Share | 1.10(b)(ii) |
| Equity Office Series E Preferred Share | 1.10(b)(iii) |

| | |
|---|---|
| Equity Office Series F Preferred Share | 1.10(b)(iv) |
| Equity Office Series G Preferred Share | 1.10(b)(v) |
| Equity Office Series H Preferred Share | 1.10(b)(vi) |
| Equity Office Shareholder Approvals | 3.5(a) |
| Equity Office Shareholders Meeting | 5.1(c) |
| Equity Office Space Lease | 3.9(g) |
| Equity Office Subsidiaries | 3.1 |
| Equity Office TRS | I |
| ERISA | 2.12 |
| Exchange Act | 2.6 |
| Exchange Agent | 1.13(a) |
| Exchange Fund | 1.13(b) |
| Final Spieker Dividend | 1.13(d)(i) |
| Final Spieker Partnership Distribution | 1.13(d)(ii) |
| Form S–4 | 5.1(a) |
| Former Spieker Properties | 2.10(b)(ii) |
| GAAP | 2.6 |
| Governmental Entity | 2.5(c) |
| Hazardous Materials | 2.10(a) |
| HSR Act | 2.5(c) |
| Indebtedness | 2.18(b) |
| Indemnification Parties | 5.9(b) |
| Indemnified Parties | 5.9(a) |
| Indemnifying Parties | 5.9(a) |
| Joint Proxy Statement | 5.1(a) |
| Knowledge of Spieker | 2.23 |
| Knowledge of Equity Office | 3.18 |
| Laws | 2.5(c) |
| Lease Guidelines | 4.1(j) |
| Liens | 2.2(b) |
| Maximum Amount | 7.2 |
| Merger | A |
| Merger Consideration | 1.10(b) |
| Mergers | B |
| NYSE | 5.6 |
| Partner Approvals | 1.11 |

## Table of Contents

| | |
|---|---|
| Partnership Merger | B |
| Partnership Merger Consideration | 1.10(a) |
| Payor | 7.2 |
| Pension Plan | 2.12 |
| Permitted Title Exceptions | 2.9(a) |
| Person | 2.2(a) |
| Property Restrictions | 2.9(a) |
| Proposed Equity Office Charter Amendments | 4.2(h) |
| Qualifying Income | 7.2 |
| Recipient | 7.2 |
| REIT | 2.14(b) |
| REIT Requirements | 7.2 |
| Release | 2.10(a) |
| Rule 145 Affiliates | 4.4 |
| SEC | 2.5(c) |
| Securities Act | 2.3(g) |
| Shareholder Approvals | 3.5(a) |
| Spieker | Preamble |
| Spieker Acquisition Agreement | 7.2 |
| Spieker Articles | 2.1 |
| Spieker Bylaws | 2.1 |
| Spieker Class B Common Stock | 2.3(a) |
| Spieker Class C Common Stock | 2.3(a) |
| Spieker Common Stock | 1.10(b)(i) |
| Spieker Disclosure Letter | Art. 2 |
| Spieker Financial Statement Date | 2.7 |
| Spieker Material Adverse Effect | 2.1 |
| Spieker OP Units | 1.10(a)(i) |
| Spieker Other Interests | 2.4 |
| Spieker Partner Approvals | 1.11 |
| Spieker Partnership | Preamble |
| Spieker Partnership Agreement | 1.5 |
| Spieker Preferred OP Units | 1.10(a)(vi) |
| Spieker Preferred Stock | 1.10(b)(vi) |
| Spieker Properties | 2.9(a) |
| Spieker Recent SEC Documents | 2.6 |
| Spieker Rent Roll | 2.9(e) |
| Spieker Representative | 4.3(a)(ii) |
| Spieker Rights | 2.21 |
| Spieker Rights Agreement | 2.21 |
| Spieker SEC Documents | 2.6 |

| | |
|---|---|
| Spieker Series A Preferred OP Unit | 1.10(a)(ii) |
| Spieker Series B Preferred OP Unit | 1.10(a)(iii) |
| Spieker Series C Preferred OP Unit | 1.10(a)(iv) |
| Spieker Series D Preferred OP Unit | 1.10(a)(v) |
| Spieker Series E Preferred OP Unit | 1.10(a)(vi) |
| Spieker Series A Preferred Share | 1.10(b)(ii) |
| Spieker Series B Preferred Share | 1.10(b)(iii) |
| Spieker Series C Preferred Share | 1.10(b)(iv) |
| Spieker Series D Preferred Share | 1.10(b)(v) |
| Spieker Series E Preferred Share | 1.10(b)(vi) |
| Spieker Space Lease | 2.9(e) |
| Spieker Stockholder Approvals | 2.5(a) |

vii

**Table of Contents**

| | |
|---|---|
| Spieker Stockholders Meeting | 5.1(d) |
| Spieker Stock Options | 2.3(b) |
| Spieker Stock Rights | 2.3(b) |
| Spieker Subsidiaries | 2.2(a) |
| Spieker TRS | I |
| Spieker Voting Agreement | J |
| Stock Amount Per Share | 1.10(b)(i) |
| Stock Purchase Agreement | I |
| Subsidiary | 2.2(a) |
| Substituted Option | 5.8(c) |
| Superior Acquisition Proposal | 4.3(d) |
| Surviving Partnership | 1.1(a) |
| Surviving Trust | 1.2 |
| Takeover Statute | 2.20 |
| Taxes | 2.14(a) |
| Tax Protection Agreements | 2.18(j) |
| Third Party Provisions | 8.5 |
| Title 3 | 1.2 |
| Title 8 | 1.2 |
| Transfer | 4.3(a)(i) |
| Transfer and Gains Taxes | 5.7 |
| Welfare Plan | 2.12 |
| 1940 Act | 2.22 |

viii

**Table of Contents**

# AGREEMENT AND PLAN OF MERGER

THIS AGREEMENT AND PLAN OF MERGER (this "Agreement"), dated as of February 22, 2001, by and among EQUITY OFFICE PROPERTIES TRUST, a Maryland real estate investment trust ("Equity Office"), EOP OPERATING LIMITED PARTNERSHIP, a Delaware limited partnership ("EOP Partnership"), SPIEKER PROPERTIES, INC., a Maryland corporation ("Spieker"), and SPIEKER PROPERTIES, L.P., a California limited partnership ("Spieker Partnership").

*R E C I T A L S :*

A. The Board of Trustees of Equity Office and the Board of Directors of Spieker deem it advisable and in the best interests of their respective shareholders, upon the terms and subject to the conditions contained herein, that Spieker shall merge with and into Equity Office (the "Merger").

B. Equity Office, as the sole general partner of EOP Partnership, and Spieker, as the sole general partner of Spieker Partnership, deem it advisable and in the best interests of their respective limited partners, subject to the conditions and other provisions contained herein, that, immediately prior to the Merger, Spieker Partnership shall merge with and into EOP Partnership (or such other entity as provided in Section 1.1(a)), with the holders of partnership interests in Spieker Partnership at the time of the Partnership Merger receiving in any event units of limited partnership interest in EOP Partnership, as set forth herein (the "Partnership Merger" and, together with the Merger, the "Mergers").

C. Upon the terms and subject to the conditions set forth herein, immediately prior to the Merger, EOP Partnership and Spieker Partnership shall execute a Certificate of Merger (the "Delaware Certificate of Merger") in substantially the form attached hereto as *Exhibit A* and shall file such Delaware Certificate of Merger in accordance with Delaware law to effectuate the Partnership Merger.

D. Upon the terms and subject to the conditions set forth herein, immediately prior to the Merger, EOP Partnership and Spieker Partnership shall execute a Certificate of Merger (the "California Certificate of Merger") in substantially the form attached hereto as *Exhibit B* and shall file such California Certificate of Merger in accordance with California law to effectuate the Partnership Merger.

E. Upon the terms and subject to the conditions set forth herein, immediately following the effectiveness of the Partnership Merger, Equity Office and Spieker shall execute Articles of Merger (the "Articles of Merger") in substantially the form attached hereto as *Exhibit C* and shall file such Articles of Merger in accordance with Maryland law to effectuate the Merger.

F. For federal income tax purposes, it is intended that the Merger shall qualify as a reorganization under Section 368(a) of the Internal Revenue Code of 1986, as amended (the "Code"), and that this Agreement shall constitute a plan of reorganization under Section 368(a) of the Code.

G. For federal income tax purposes, it is intended that the Partnership Merger, regardless of form, be treated as a contribution by Spieker Partnership of all of its assets to EOP Partnership in exchange for partnership interests in EOP Partnership, as provided for herein, under Section 721 of the Code, and a distribution of such partnership interests by Spieker Partnership to its partners under Section 731 of the Code.

H. Equity Office, EOP Partnership, Spieker and Spieker Partnership desire to make certain representations, warranties, covenants and agreements in connection with the Mergers.

I. Concurrently with the execution of this Agreement and as an inducement to Equity Office and EOP Partnership to enter into this Agreement, Messrs. Warren E. Spieker, Jr., John K. French and Dennis E. Singleton, as owners of voting capital stock of Spieker Northwest, Inc., a California corporation ("Spieker TRS"), have entered into a Stock Purchase Agreement, dated as of the date hereof, relating to the voting capital stock of Spieker TRS (the "Stock Purchase Agreement"), providing for the sale of their shares of outstanding voting capital stock of Spieker TRS to Equity Office Properties Management Corp. ("Equity Office TRS") or its assigns.

A-1

**Table of Contents**

J. As an inducement to Equity Office to enter into this Agreement, certain executive officers of Spieker have entered into a voting agreement (each, a "Spieker Voting Agreement"), pursuant to which such person has agreed, among other things, to vote his shares of Spieker Common Stock and Spieker OP Units (as defined herein) to approve this Agreement, the respective Mergers and any other matter which requires his vote in connection with the transactions contemplated by this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual representations, warranties, covenants and agreements contained herein, the parties hereto hereby agree as follows:

ARTICLE 1

THE MERGERS

1.1 *The Partnership Merger.*

(a) Upon the terms and subject to the conditions of this Agreement, and in accordance with Title 6, Chapter 17 of the Delaware Code Annotated, as amended (the "DRULPA"), and Title 2, Chapter 3, Article 7.5 of the California Corporations Code, as amended (the "CRULPA"), immediately prior to the consummation of the Merger, Spieker Partnership shall be merged with and into EOP Partnership with EOP Partnership as the surviving limited partnership (or, at EOP Partnership's option, with a limited liability company owned entirely, directly and/or indirectly, by EOP Partnership, or a limited partnership owned entirely, directly and/or indirectly, by EOP Partnership, as determined by Equity Office and EOP Partnership), with the entity designated by EOP Partnership being the surviving limited partnership or limited liability company, as applicable, provided that the alternative structure does not materially adversely affect any class or series of partnership interests in Spieker Partnership) (the "Surviving Partnership"), and with the holders of partnership interests in Spieker Partnership receiving in any event units of partnership interest in EOP Partnership, as set forth in Section 1.10(a).

(b) Pursuant to Treasury Regulation § 1.708-1(c)(3), EOP Partnership and Spieker Partnership intend that the Partnership Merger be treated as an "assets over" form of merger, with the consequences set forth in Treasury Regulation § 1.708-1(c)(3)(i). In addition, if and to the extent that any transaction entered into pursuant to this Agreement or otherwise deemed undertaken in connection with the transactions contemplated by this Agreement is treated for federal income tax purposes as a direct or indirect transfer of cash from EOP Partnership to a holder of Spieker OP Units or Spieker Preferred OP Units that would be characterized as a sale for federal income tax purposes, pursuant to Treasury Regulation § 1.708-1(c)(4) such sale shall be treated by all parties as a sale by the former holder of Spieker OP Units or Spieker Preferred OP Units receiving (or deemed to receive) such cash of Spieker OP Units or Spieker Preferred OP Units to EOP Partnership and as a direct purchase by EOP Partnership of such Spieker OP Units or Spieker Preferred OP Units from such former holder of Spieker OP Units or Spieker Preferred OP Units immediately prior to the Partnership Merger (and not as a transfer of cash from EOP Partnership to Spieker Partnership as part of the Partnership Merger). Each holder of Spieker OP Units or Spieker Preferred OP Units who receives, directly or indirectly, any cash in connection with the Partnership Merger shall be deemed, by such holder's act of receiving and accepting such cash, to have agreed to the characterization of such transaction set forth in the immediately preceding sentence for purposes of Treasury Regulation § 1.708-1(c)(4).

1.2 *The Merger.* Upon the terms and subject to the conditions set forth in this Agreement, and in accordance with Title 3 of the Corporations and Associations Article of the Annotated Code of Maryland, as amended ("Title 3"), and Title 8 of the Corporations and Associations Article of the Annotated Code of Maryland, as amended ("Title 8"), Spieker shall be merged with

and into Equity Office, with Equity Office surviving as a real estate investment trust (the "Surviving Trust").

1.3 *Closing.* The closing of the Mergers (the "Closing") will take place commencing at 9:00 a.m., local time, on the date to be specified by the parties, which (subject to satisfaction or waiver of the conditions set forth in Article 6) shall be no later than the third business day after satisfaction or waiver of the conditions set forth in Section 6.1 (the "Closing Date"), at the offices of Hogan & Hartson L.L.P., 885 Third Avenue, New York, NY 10022, unless another date or place is agreed to in writing by the parties.

A−2

Table of Contents

1.4 *Effective Time.* As soon as practicable on the Closing Date, (i) EOP Partnership and Spieker Partnership shall execute and file the Delaware Certificate of Merger, executed in accordance with the DRULPA, with the Office of the Secretary of State of the State of Delaware, and the California Certificate of Merger, executed in accordance with the CRULPA, with the Office of the Secretary of State of the State of California and (ii) Equity Office and Spieker shall then execute and file the Articles of Merger, executed in accordance with Title 3 and Title 8, with the State Department of Assessments and Taxation of Maryland (the "Department"), and shall make all other filings and recordings required, with respect to the Partnership Merger, under the DRULPA and the CRULPA or, with respect to the Merger, under Title 3 and Title 8. The Mergers shall become effective (each an "Effective Time" and collectively the "Effective Times") at such times as Equity Office and Spieker shall agree should be specified in the Delaware Certificate of Merger, the California Certificate of Merger and the Articles of Merger (not to exceed thirty (30) days after the Articles of Merger are accepted for record by the Department). Unless otherwise agreed, the parties shall cause the Effective Times to occur on the Closing Date, with not less than one hour between the Effective Time of the Partnership Merger and the Effective Time of the Merger.

1.5 *Effect of Partnership Merger on Agreements of Limited Partnership.* The Second Amended and Restated Agreement of Limited Partnership, as amended (including the amendment made pursuant to Section 1.9), of EOP Partnership, as in effect as of the Effective Time of the Partnership Merger (the "EOP Partnership Agreement"), shall continue in full force and effect after the Partnership Merger until further amended in accordance with applicable Delaware law. The Second Amended and Restated Agreement of Limited Partnership, as amended, of Spieker Partnership, as in effect immediately prior to the Effective Time of the Partnership Merger (the "Spieker Partnership Agreement"), shall terminate at the Effective Time of the Partnership Merger.

1.6 *Effect of Merger on Declaration of Trust and Bylaws.* The Articles of Amendment and Restatement of Declaration of Trust, as amended (including the amendments made pursuant to Section 1.8) of Equity Office (the "Equity Office Declaration of Trust") and the Bylaws, as amended, of Equity Office (the "Equity Office Bylaws"), as in effect as of the Effective Time of the Merger, and if approved by the Equity Office shareholders, as amended by the Proposed Equity Office Charter Amendments (as defined herein), shall continue in full force and effect after the Merger until further amended in accordance with applicable Maryland law and the terms thereof.

1.7 *Trustees of Equity Office.* The trustees of Equity Office following the Merger shall consist of the trustees of Equity Office immediately prior to the Effective Time of the Merger, who shall continue to serve for the balance of their unexpired terms or their earlier death, resignation or removal, together with Mr. Warren E. Spieker, Jr., Craig G. Vought and John A. Foster, each of whom shall, no later than the third business day after the Effective Time of the Merger, become a trustee. Mr. Spieker's term shall expire in 2004. Prior to the initial filing of the Form S−4 with the SEC, Spieker shall notify Equity Office in writing as to whether (a) Mr. Vought's term shall expire in 2003 and Mr. Foster's term shall expire in 2002 or (b) Mr. Vought's term shall expire in 2002 and Mr. Foster's term shall expire in 2003. Following their election as trustees, such individuals shall serve for their designated terms, subject to their earlier death, resignation or removal.

1.8 *Effect on Capital Stock.* The effect of the Merger on the shares of capital stock of Spieker shall be as provided in the Articles of Merger and in Section 1.10. The Merger shall not change the shares of beneficial interest of Equity Office outstanding immediately prior to the Merger. Prior to or as of the Effective Time, the Equity Office Declaration of Trust shall be amended, in accordance with Title 8 and the terms of the Equity Office Declaration of Trust, as follows:

(i) by the adoption by the Equity Office Board of Trustees of the articles supplementary substantially in the form set forth on *Exhibit D* to provide for the creation of the Equity Office Series E Preferred Shares (as defined herein) and the Equity Office Series E Preferred Excess Shares (as defined herein);

(ii) by the adoption by the Equity Office Board of Trustees of the articles supplementary substantially in the form set forth on *Exhibit E* to provide for the creation of the Equity Office Series F

A−3

Table of Contents

Preferred Shares (as defined herein) and the Equity Office Series F Preferred Excess Shares (as defined herein);

(iii) by the adoption by the Equity Office Board of Trustees of the articles supplementary substantially in the form set forth on *Exhibit F* to provide for the creation of the Equity Office Series G Preferred Shares (as defined herein) and the Equity Office Series G Preferred Excess Shares (as defined herein); and

(iv) by the adoption by the Equity Office Board of Trustees of the articles supplementary substantially in the form set forth on *Exhibit G* to provide for the creation of the Equity Office Series H Preferred Shares (as defined herein) and the Equity Office Series H Preferred Excess Shares (as defined herein).

1.9 *Effect on Partnership Interests.* The effect of the Partnership Merger on the partnership interests of Spieker Partnership shall be as provided in the Delaware Certificate of Merger and in Section 1.10. The Partnership Merger shall not change the partnership interests of Spieker Partnership outstanding immediately prior to the Merger. Prior to or as of the Effective Time, the EOP Partnership Agreement shall be amended, in accordance with the DRULPA and the terms of the EOP Partnership Agreement, by the adoption by Equity Office, in its capacity as the general partner of EOP Partnership, of an amendment substantially in the form set forth on *Exhibit H* in order to provide for the creation of (i) if necessary, the Equity Office Series D Preferred OP Units (as defined herein), (ii) the Equity Office Series E Preferred OP Units (as defined herein), (iii) the Equity Office Series F Preferred OP Units (as defined herein), (iv) the Equity Office Series G Preferred OP Units (as defined herein) and (v) the Equity Office Series H Preferred OP Units (as defined herein).

1.10 *Partnership Merger Consideration; Merger Consideration.*

(a) *Partnership Merger Consideration.* The consideration to be paid to holders of Partnership Units (as defined in the Spieker Partnership Agreement) and Partnership Interests (as defined in the Spieker Partnership Agreement) of Spieker Partnership in the Partnership Merger (collectively, the "Partnership Merger Consideration") is as follows:

(i) Each Partnership Unit (as defined in the Spieker Partnership Agreement) of Spieker Partnership, excluding all Partnership Units allocated to the Spieker Preferred OP Units (as defined herein) ("Spieker OP Units"), outstanding immediately prior to the Effective Time of the Partnership Merger shall be exchanged for 1.94462 Class A Units (as defined in the EOP Partnership Agreement) of EOP Partnership ("Equity Office OP Units"). The holders of the Equity Office OP Units issued in the Partnership Merger (other than Spieker and Spieker Subsidiaries (as defined herein)) shall be entitled to redeem such Equity Office OP Units immediately following the consummation of the Partnership Merger (and thereafter) pursuant to the terms of the EOP Partnership Agreement, except that for purposes of the exchange provisions thereof such Equity Office OP Units shall be deemed to have been issued as of the date the related Spieker OP Units were issued by Spieker Partnership (or if earlier, one year prior to the Effective Time of the Partnership Merger), and shall be entitled to the same rights and privileges as the holders of Equity Office OP Units outstanding on the date hereof.

(ii) The Series A Preferred Interest (as defined in the Spieker Partnership Agreement) of Spieker Partnership ("Spieker Series A Preferred OP Unit") outstanding immediately prior to the Effective Time of the Partnership Merger, if any, shall be exchanged for 1,000,000 Series D Preferred Units (as defined in the EOP Partnership Agreement), designated a Series D Preferred Unit, of EOP Partnership (each, an "Equity Office Series D Preferred OP Unit").

(iii) The Series B Cumulative Redeemable Preferred Interest (as defined in the Spieker Partnership Agreement) of Spieker Partnership ("Spieker Series B Preferred OP Unit") outstanding immediately prior to the Effective Time of the Partnership Merger shall be exchanged for 4,250,000 Series E Preferred Units (as defined in the EOP Partnership Agreement), designated a Series E Preferred Unit, of EOP Partnership (each, an "Equity Office Series E Preferred OP Unit").

A–4

Table of Contents

(iv) The Series C Cumulative Redeemable Preferred Interest (as defined in the Spieker Partnership Agreement) of Spieker Partnership ("Spieker Series C Preferred OP Unit") outstanding immediately prior to the Effective Time of the Partnership Merger shall be exchanged for 6,000,000 Series F Preferred Units (as defined in the EOP Partnership Agreement), designated a Series F Preferred Unit, of EOP Partnership (each, an "Equity Office Series F Preferred OP Unit").

(v) Each Series D Preferred Unit (as defined in the Spieker Partnership Agreement) of Spieker Partnership ("Spieker Series D Preferred OP Unit") outstanding immediately prior to the Effective Time of the Partnership Merger shall be exchanged for one Series G Preferred Unit (as defined in the EOP Partnership Agreement), designated a Series G Preferred Unit, of EOP Partnership ("Equity Office Series G Preferred OP Unit").

(vi) The Series E Cumulative Redeemable Preferred Interest (as defined in the Spieker Partnership Agreement) of Spieker Partnership ("Spieker Series E Preferred OP Unit") outstanding immediately prior to the Effective Time of the Partnership Merger shall be exchanged for 4,000,000 Series H Preferred Units (as defined in the EOP Partnership Agreement), designated a Series H Preferred Unit, of EOP Partnership (each, an "Equity Office Series H Preferred OP Unit").

As used herein, (i) "Spieker Preferred OP Units" means, collectively, Spieker Series A Preferred OP Units, Spieker Series B Preferred OP Units, Spieker Series C Preferred OP Units, Spieker Series D Preferred OP Units and Spieker Series E Preferred OP Units and (ii) "Equity Office Preferred OP Units" means, collectively, Equity Office Series D Preferred OP Units, Equity Office Series E Preferred OP Units, Equity Office Series F Preferred OP Units, Equity Office Series G Preferred OP Units and Equity Office Series H Preferred OP Units.

(b) *Merger Consideration.* The consideration to be paid to holders of capital stock of Spieker in the Merger (collectively, the "Merger Consideration") is as follows:

(i) Each share of Common Stock, par value $.0001 per share, of Spieker ("Spieker Common Stock") issued and outstanding immediately prior to the Effective Time of the Merger, together with the associated Spieker Right (as defined herein), shall be converted into the right to receive (a) an amount of cash computed as set forth in subparagraph (A) below (the "Cash Amount Per Share"), without interest, and (b) a number of validly issued, fully paid and nonassessable common shares of beneficial interest, $.01 par value per share, of Equity Office ("Equity Office Common Shares") computed as set forth in subparagraph (B) below (the "Stock Amount Per Share"), as follows:

(A) The Cash Amount Per Share shall be an amount of cash, without interest, equal to $13.50.

(B) The Stock Amount Per Share shall be 1.49586 Equity Office Common Shares.

(ii) Each share of Series A Preferred Stock (par value $.0001 per share), liquidation preference $25.00 per share, of Spieker ("Spieker Series A Preferred Share") issued and outstanding immediately prior to the Effective Time of the Merger, if any, shall be converted into the right to receive one Series D preferred share of beneficial interest, $0.01 par value per share, liquidation preference $25.00 per share, of Equity Office ("Equity Office Series D Preferred Share");

(iii) Each share of Series B Cumulative Redeemable Preferred Stock (par value $.0001 per share), liquidation preference $25.00 per share, of Spieker ("Spieker Series B Preferred Share") issued and outstanding immediately prior to the Effective Time of the Merger shall be converted into the right to receive one Series E preferred share of beneficial interest, $0.01 par value per share, liquidation preference $25.00 per share, of Equity Office ("Equity Office Series E Preferred Share"). The Equity Office Series E Preferred Shares shall have preferences, conversion and other rights, voting powers, restrictions, limitations as to dividends, qualifications and terms or conditions of redemption thereof identical to that of the Spieker Series B Preferred Shares outstanding on the date hereof;

(iv) Each share of Series C Cumulative Redeemable Preferred Stock (par value $.0001 per share), liquidation preference $25.00 per share, of Spieker ("Spieker Series C Preferred Share") issued and outstanding immediately prior to the Effective Time of the Merger shall be converted into the right to

A–5

---

Table of Contents

receive one Series F preferred share of beneficial interest, $0.01 par value per share, liquidation preference $25.00 per share, of Equity Office ("Equity Office Series F Preferred Share"). The Equity Office Series F Preferred Shares shall have preferences, conversion and other rights, voting powers, restrictions, limitations as to dividends, qualifications and terms or conditions of redemption thereof identical to that of the Spieker Series C Preferred Shares outstanding on the date hereof;

(v) Each share of Series D Cumulative Redeemable Preferred Stock (par value $.0001 per share), liquidation preference $50.00 per share, of Spieker ("Spieker Series D Preferred Shares") issued and outstanding immediately prior to the Effective Time of the Merger shall be converted into the right to receive one Series G preferred share of beneficial interest, $0.01 par value per share, liquidation preference $50.00 per share, of Equity Office ("Equity Office Series G Preferred Share"). The Equity Office Series G Preferred Shares shall have preferences, conversion and other rights, voting powers, restrictions, limitations as to dividends, qualifications and terms or conditions of redemption thereof identical to that of the Spieker Series D Preferred Shares outstanding on the date hereof;

(vi) Each share of Series E Cumulative Redeemable Preferred Stock (par value $.0001 per share), liquidation preference $25.00 per share, of Spieker ("Spieker Series E Preferred Share") issued and outstanding immediately prior to the Effective Time of the Merger shall be converted into the right to receive one Series H preferred share of beneficial interest, $0.01 par value per share, liquidation preference $25.00 per share, of Equity Office ("Equity Office Series H Preferred Share"). The Equity Office Series H Preferred Shares shall have preferences, conversion and other rights, voting powers, restrictions, limitations as to dividends, qualifications and terms or conditions of redemption thereof identical to that of the Spieker Series E Preferred Shares outstanding on the date hereof. As used herein, (i) "Spieker Preferred Stock" means, collectively, Spieker Series A Preferred Shares, Spieker Series B Preferred Shares, Spieker Series C Preferred Shares, Spieker Series D Preferred Shares and Spieker Series E Preferred Shares and (ii) "Equity Office Preferred Shares" means, collectively, Equity Office Series D Preferred Shares, Equity Office Series E Preferred Shares, Equity Office Series F Preferred Shares, Equity Office Series G Preferred Shares and Equity Office Series H Preferred Shares;

(vii) All shares of Spieker Common Stock, together with the associated Spieker Right, when so converted as provided in Section 1.10(b)(i), and all shares of Spieker Preferred Stock, when so converted as provided in Sections 1.10(b)(ii)–(vi), shall no longer be outstanding and shall automatically be cancelled and retired and shall cease to exist, and each holder of a certificate (a "Certificate") theretofore representing any such shares shall cease to have any rights with respect thereto, except the right to receive, upon the surrender of such Certificate in accordance with Section 1.13(c), as applicable, (A) any dividends and other distributions in accordance with Section 1.13(d), (B) certificates representing the Equity Office Common Shares into which such shares of Spieker Common Stock are converted pursuant to Section 1.10(b)(i), (C) cash, without interest, into which such shares of Spieker Common Stock are converted pursuant to Section 1.10(b)(i), (D) certificates representing the Equity Office Series D Preferred Shares into which Spieker Series A Preferred Shares are converted pursuant to Section 1.10(b)(ii), if any, (E) certificates representing the Equity Office Series E Preferred Shares into which Spieker Series B Preferred Shares are converted pursuant to Section 1.10(b)(iii), (F) certificates representing the Equity Office Series F Preferred Shares into which Spieker Series C Preferred Shares are converted pursuant to Section 1.10(b)(iv), (G) certificates representing the Equity Office Series G Preferred Shares into which Spieker Series D Preferred Shares are

converted pursuant to Section 1.10(b)(v), (H) certificates representing the Equity Office Series H Preferred Shares into which Spieker Series E Preferred Shares are converted pursuant to Section 1.10(b)(vi), and (I) any cash, without interest, in lieu of fractional Equity Office Common Shares to be issued or paid in consideration for Spieker Common Stock upon the surrender of such Certificate in accordance with Sections 1.13(c) and 1.13(g).

1.11 *Partner Approval.* Spieker shall seek the requisite approval of the partners of Spieker Partnership of this Agreement, the Merger, the withdrawal of Spieker as general partner and the Partnership Merger to the extent required by the Spieker Partnership Agreement or applicable law to effectuate the transactions contemplated by this Agreement (collectively, the "Spieker Partner Approvals"). Equity Office shall seek the

A–6

Table of Contents

requisite approval of the partners of EOP Partnership of the Merger and the Partnership Merger to the extent required by the EOP Partnership Agreement or applicable law to effectuate the transactions contemplated by this Agreement (collectively, the "Equity Office Partner Approvals," and together with the Spieker Partner Approvals, the "Partner Approvals").

1.12 *Appraisal or Dissenters Rights.* The holders of Spieker Common Stock, Spieker Preferred Stock (other than the Spieker Series A Preferred Shares), Equity Office Common Shares, Equity Office Existing Preferred Shares, Equity Office OP Units or Equity Office Existing Preferred Shares are not entitled under applicable law to appraisal, dissenters or similar rights as a result of the Mergers. Pursuant to Section 3–202 of the Maryland General Corporation Law, the holders of Spieker Series A Preferred Shares are entitled to dissenter's rights in accordance with the Maryland General Corporation Law. Pursuant to Section 15679.2 of the CRULPA, the holders of Spieker OP Units and Spieker Preferred OP Units are entitled to dissenters rights in accordance with the CRULPA but not otherwise.

1.13 *Exchange of Certificates; Pre–Closing Dividends; Fractional Shares.*

(a) *Exchange Agent.* Prior to the Effective Time, Equity Office shall appoint Equiserve LLC as the exchange agent, or another bank or trust company reasonably acceptable to Spieker, to act as exchange agent (the "Exchange Agent") for the exchange of the Merger Consideration upon surrender of certificates representing issued and outstanding shares of Spieker Common Stock and each series of Spieker Preferred Stock.

(b) *Equity Office to Provide Merger Consideration; Spieker to Provide Funds for Final Spieker Dividend.* Equity Office shall provide to the Exchange Agent on or before the Effective Time of the Merger, for the benefit of the holders of Spieker Common Stock and each series of Spieker Preferred Stock, the Merger Consideration issuable in exchange for the issued and outstanding Spieker Common Stock and each series of Spieker Preferred Stock pursuant to Section 1.10, together with any cash required to make payments in lieu of any fractional shares pursuant to Section 1.13(g) (the "Exchange Fund"). The Exchange Agent (or other depository acting for the benefit of the Exchange Agent) shall invest any cash included in the Exchange Fund as directed by Equity Office, on a daily basis. Any interest or other income resulting from such investments shall be paid to Equity Office. Spieker shall provide to the Exchange Agent not later than one business day prior to the Effective Time of the Merger, for the benefit of the holders of Spieker Common Stock and each series of Spieker Preferred Stock, cash payable in respect of any dividends required pursuant to Section 1.13(d)(i). Such cash shall be invested in accordance with written directions delivered by Spieker to the Exchange Agent or other depository not later than one business day prior to the Effective Time of the Merger, with any interest or other income earned on such investments to be paid to Equity Office as the successor to Spieker in the Merger.

(c) *Exchange Procedure.* Equity Office shall use commercially reasonable efforts to cause the Exchange Agent, no later than the fifth business day after the Closing Date, to mail to each holder of record of a Certificate or Certificates which immediately prior to the Effective Time represented outstanding shares of Spieker Common Stock or any series of Spieker Preferred Stock whose shares were converted into the right to receive the Merger Consideration pursuant to Section 1.10(b), (i) a letter of transmittal (which shall specify that delivery shall be effected, and risk of loss and title to the Certificates shall pass, only upon delivery of the Certificates to the Exchange Agent and shall be in a form and have such other provisions as Equity Office may reasonably specify) and (ii) instructions for use in effecting the surrender of the Certificates in exchange for the Merger Consideration together with any dividends or distributions to which such holder is entitled pursuant to Section 1.13(d) and cash, if any, payable in lieu of fractional shares pursuant to Section 1.13(g). Upon surrender of a Certificate for cancellation to the Exchange Agent, together with such letter of transmittal, duly executed, and such other documents as may reasonably be required by the Exchange Agent, (i) the holder of such Certificate shall be entitled to receive in exchange therefor the Merger Consideration into which the shares of Spieker Common Stock or a series of Spieker Preferred Stock, as applicable, theretofore represented by such Certificate shall have been converted pursuant to Section 1.10(b), together with any dividends or other distributions to which such holder is entitled pursuant to Section 1.13(d) and cash, if any, payable in lieu of fractional shares pursuant to Section 1.13(g), (ii) Equity Office shall use

A–7

Table of Contents

commercially reasonable efforts to cause the Exchange Agent to mail (or make available for collection by hand if so elected by the surrendering holder) such amount to such holder within five business days after receipt thereof, and (iii) the Certificate so surrendered shall forthwith be canceled. In the event of a transfer of ownership of shares of Spieker Common Stock or any series

of Spieker Preferred Stock which is not registered in the transfer records of Spieker, payment may be made to a Person other than the Person in whose name the Certificate so surrendered is registered if such Certificate shall be properly endorsed or otherwise be in proper form for transfer and the Person requesting such payment either shall pay any transfer or other taxes required by reason of such payment being made to a Person other than the registered holder of such Certificate or establish to the satisfaction of Equity Office that such tax or taxes have been paid or are not applicable. Until surrendered as contemplated by this Section 1.13, each Certificate shall be deemed at any time after the Effective Time to represent only the right to receive upon such surrender the Merger Consideration, without interest, into which the shares of Spieker Common Stock or any series of Spieker Preferred Stock heretofore represented by such Certificate shall have been converted pursuant to Section 1.10, and any dividends or other distributions to which such holder is entitled pursuant to Section 1.13(d) and any cash payable in lieu of fractional shares pursuant to Section 1.13(g). No interest will be paid or will accrue on the Merger Consideration upon the surrender of any Certificate or on any cash payable pursuant to Section 1.13(d) or Section 1.13(g). Equity Office or the Exchange Agent, as applicable, shall be entitled, in its sole and absolute discretion, to deduct and withhold from the cash, Equity Office Common Shares or Equity Office Preferred Shares (as defined herein), or any combination thereof, that otherwise is payable pursuant to this Agreement to any holder of shares of Spieker Common Stock or any series of Spieker Preferred Stock such amounts as Equity Office or the Exchange Agent is required to deduct and withhold with respect to the making of such payment under the Code or under any provision of state, local or foreign tax law. For this purpose, any Equity Office Common Shares or Equity Office Preferred Shares deducted and withheld by Equity Office shall be valued at the last trading price of the Equity Office Common Shares or the Equity Office Preferred Shares, as applicable, on the New York Stock Exchange on the Effective Date of the Merger (or in the event that a series of Equity Office Preferred Shares does not trade on the New York Stock Exchange, at the liquidation preference (excluding unpaid dividends) per Equity Office Preferred Share). To the extent that amounts are so withheld by Equity Office or the Exchange Agent, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the holder of the shares of Spieker Common Stock or a series of Spieker Preferred Stock, as applicable, in respect of which such deduction and withholding was made by Equity Office or the Exchange Agent.

(d) *Record Dates for Final Dividends; Distributions with Respect to Unexchanged Shares.*

(i) If and to the extent necessary for Spieker to satisfy the requirements of Section 857(a)(1) of the Code for the taxable year of Spieker ending at the Effective Time of the Merger (and to avoid the payment of any tax with respect to undistributed income or gain), Spieker shall declare a dividend (the "Final Spieker Dividend") to holders of shares of Spieker Common Stock and each series of Spieker Preferred Stock, if and to the extent required by the terms thereof, the record date for which shall be the close of business on the last business day prior to the Effective Time of the Merger, in an amount equal to the minimum dividend sufficient to permit Spieker to satisfy such requirements. Any dividends payable hereunder to holders of Spieker Common Stock and, if applicable, each series of Spieker Preferred Stock shall be paid on the last business day immediately preceding the Closing Date. In the event that Spieker is required to declare a Final Spieker Dividend with respect to the Spieker Common Stock, Spieker Partnership shall simultaneously declare a distribution (the "Final Spieker Partnership Distribution") to holders of Spieker OP Units in an amount per unit equal to the Final Spieker Dividend payable per share of Spieker Common Stock, together with any distributions required to be paid to holders of Spieker Preferred OP Units by reason of the payment of either the Final Spieker Dividend or the Final Spieker Partnership Distribution with respect to Spieker OP Units, the record date for which shall be the close of business on the last business day prior to the Effective Time of the Partnership Merger. The distribution payable hereunder to holders of Spieker OP Units and, if applicable, Spieker Preferred OP Units, shall be paid on the last business day immediately preceding the Closing Date.

A–8

Table of Contents

(ii) If Spieker determines that it is necessary to declare the Final Spieker Dividend, Spieker shall notify Equity Office at least 20 days prior to the date for the Spieker Stockholders Meeting, and Equity Office shall be entitled to declare a dividend per share payable to holders of shares of Equity Office Common Shares (in which event EOP Partnership shall declare a distribution per unit payable to holders of Equity Office OP Units if a distribution has been declared on the Equity Office Common Shares), the record dates for which shall be the close of business on the last business day prior to the Effective Time, in an amount per Equity Office Common Share (and Equity Office OP Unit) equal to the quotient obtained by dividing (x) the Final Spieker Dividend paid by Spieker with respect to each share of Spieker Common Stock by (y) 1.94462 (the "Corresponding Equity Office Dividends and Distributions"). If, and to the extent, the terms of any series of Equity Office Preferred Shares or Equity Office Preferred OP Units require the payment of a dividend or distribution by reason of the payment of the Corresponding Equity Office Dividends and Distributions, Equity Office and EOP Partnership shall declare and pay any such required dividends and distributions. The Corresponding Equity Office Dividends and Distributions (and any dividends payable to holders of Equity Office Preferred Shares and distributions payable to holders of Equity Office Preferred OP Units) shall be in addition to any Additional Corresponding Equity Office Dividends and Distributions (and any dividends payable to holders of Equity Office Preferred Shares and distributions payable to holders of Equity Office Preferred OP Units) payable pursuant to Section 5.10.

(iii) No dividends or other distributions with respect to Equity Office Common Shares or any series of Equity Office Preferred Shares with a record date after the Effective Time shall be paid to the holder of any unsurrendered Certificate with respect to the Equity Office Common Shares or such series of Equity Office Preferred Shares represented thereby, and no cash payment in lieu of fractional shares shall be paid to any such holder pursuant to Section 1.13(g), in each case until the surrender of such Certificate in accordance with this Section 1.13. Subject to the effect of applicable escheat laws, following surrender of any such Certificate (A) with respect to Certificates that represent the right to receive Equity Office Common Shares, there shall be paid to the holder of such Certificate, without interest, (i) at the time of such surrender, the amount of any cash payable pursuant to Section 1.10 and/or in lieu of any fractional Equity Office Common Shares to which such holder

is entitled pursuant to Section 1.13(g) and (ii) (x) at the time of such surrender the amount of dividends or other distributions with a record date after the Effective Time theretofore paid with respect to such whole Equity Office Common Shares, without interest, and (y) at the appropriate payment date, the amount of dividends or other distributions with a record date after the Effective Time but prior to such surrender and with a payment date subsequent to such surrender payable with respect to such whole Equity Office Common Shares and (B) with respect to Certificates that represent the right to receive any series of Equity Office Preferred Shares, there shall be paid to the holder of such Certificate, without interest, (x) at the time of such surrender the amount of dividends or other distributions with a record date after the Effective Time theretofore paid with respect to such Equity Office Preferred Shares and (y) at the appropriate payment date, the amount of dividends or other distributions with a record date after the Effective Time but prior to such surrender and with a payment date subsequent to such surrender payable with respect to such Equity Office Preferred Shares.

(e) *No Further Ownership Rights in Spieker Common Stock and Spieker Preferred Stock.* All Merger Consideration paid upon the surrender of Certificates in accordance with the terms of this Section 1.13 (including any cash paid pursuant to Section 1.13(g)) shall be deemed to have been paid in full satisfaction of all rights pertaining to the Spieker Common Stock and each series of Spieker Preferred Stock, as applicable, theretofore represented by such Certificates; *provided, however,* that Spieker shall transfer to the Exchange Agent cash sufficient to pay any dividends or make any other distributions with a record date prior to the Effective Time which may have been declared or made by Spieker on such Spieker Common Stock or any such series of Spieker Preferred Stock in accordance with the terms of this Agreement or prior to the date of this Agreement and which remain unpaid at the Effective Time and have not been paid prior to such surrender, and there shall be no further registration of transfers on the stock transfer books of Spieker of the Spieker Common Stock or any series of Spieker Preferred Stock which were outstanding immediately prior to

A-9

---

Table of Contents

the Effective Time. If, after the Effective Time, Certificates are presented to Equity Office for any reason, they shall be canceled and exchanged as provided in this Section 1.13.

(f) *No Liability.* None of Spieker, Equity Office or the Exchange Agent shall be liable to any Person in respect of any Merger Consideration or dividends delivered to a public official pursuant to any applicable abandoned property, escheat or similar law. Any portion of the Exchange Fund delivered to the Exchange Agent pursuant to this Agreement that remains unclaimed for 12 months after the Effective Time shall be redelivered by the Exchange Agent to Equity Office, upon demand, and any holders of Certificates who have not theretofore complied with Section 1.13(c) shall thereafter look only to Equity Office for delivery of the Merger Consideration, any cash payable in lieu of fractional shares pursuant to Section 1.13(g) and any unpaid dividends, subject to applicable escheat and other similar laws.

(g) *No Fractional Shares; No Fractional Equity Office OP Units*

(i) No certificates or scrip representing fractional Equity Office Common Shares shall be issued upon the surrender for exchange of Certificates, and such fractional share interests will not entitle the owner thereof to vote, to receive dividends or to any other rights of a shareholder of Equity Office.

(ii) No fractional Equity Office Common Shares shall be issued pursuant to this Agreement. In lieu of the issuance of any fractional Equity Office Common Shares pursuant to this Agreement, each holder of Spieker Common Stock shall be paid an amount in cash (without interest), rounded to the nearest cent (with .5 of a cent rounded up), determined by multiplying (i) the average closing price of one Equity Office Common Share on the New York Stock Exchange on the five trading days immediately preceding the Closing Date by (ii) the fraction of an Equity Office Common Share which such holder would otherwise be entitled to receive under this Section 1.13.

(iii) No fractional Equity Office OP Units shall be issued pursuant to this Agreement. In lieu of the issuance of any fractional Equity Office OP Units pursuant to this Agreement, each holder of Spieker OP Units who would receive, based on the exchange ratio specified in Section 1.10(a)(i), a number of Equity Office OP Units that is not a whole number shall receive instead a number of Equity Office OP Units that is equal to the whole number that is nearest to the number of Equity Office OP Units that otherwise would be paid to such holder of Spieker OP Units based on Section 1.10(a)(i) (with .5 of a Spieker OP Unit rounded up).

(h) *Lost Certificates.* If any Certificate shall have been lost, stolen or destroyed, upon the making of an affidavit of that fact by the Person claiming such Certificate to be lost, stolen or destroyed and, if required by Equity Office or the Exchange Agent, the posting by such Person of a bond in such reasonable amount as Equity Office or the Exchange Agent reasonably may direct (but consistent with the practices Equity Office applies to its own shareholders) as indemnity against any claim that may be made against them with respect to such Certificate, the Exchange Agent will issue in exchange for such lost, stolen or destroyed Certificate the cash, Equity Office Common Shares or Equity Office Preferred Shares to which the holders thereof are entitled pursuant to Section 1.10, any cash payable pursuant to Section 1.13(g) to which the holders thereof are entitled and any dividends or other distributions to which the holders thereof are entitled pursuant to Section 1.13(d).

(i) *Applicability to Partnership Merger.* Except for the provisions relating to the Exchange Agent, certificates, the exchange procedure and fractional Equity Office Common Shares, (which shall not be applicable), all other provisions of this Section 1.13 shall apply to Spieker Partnership, EOP Partnership, the Spieker OP Units and the Spieker OP Preferred Units with respect to the Partnership Merger.

## ARTICLE 2

### REPRESENTATIONS AND WARRANTIES OF SPIEKER AND SPIEKER PARTNERSHIP

Except as specifically set forth in the Spieker SEC Documents (as defined herein) or in the schedule delivered to Equity Office prior to the execution hereof and identified by either co–Chief Executive Officer of

A–10

Table of Contents

Spieker as the disclosure letter to this Agreement (the "Spieker Disclosure Letter"), Spieker and Spieker Partnership represent and warrant to Equity Office and EOP Partnership as follows:

2.1 *Organization, Standing and Power.* Spieker is a corporation duly incorporated, validly existing and in good standing under the laws of Maryland. Spieker has all requisite corporate power and authority to own, operate, lease and encumber its properties and carry on its business as now being conducted. The Articles of Incorporation, as amended and supplemented, of Spieker (the "Spieker Articles") are in effect, and no dissolution, revocation or forfeiture proceedings regarding Spieker have been commenced. Spieker is duly qualified or licensed to do business as a foreign corporation and is in good standing in each jurisdiction in which the nature of its business or the ownership or leasing of its properties makes such qualification or licensing necessary, other than in such jurisdictions where the failure to be so qualified or licensed, individually or in the aggregate, would not reasonably be expected to have a Spieker Material Adverse Effect (as defined herein). As used in this Agreement, a "Spieker Material Adverse Effect" means any circumstance, event, occurrence, change or effect that is materially adverse to the business, properties, assets (tangible or intangible), financial condition or results of operations of Spieker, Spieker Partnership and the Spieker Subsidiaries (as defined herein), taken as a whole, except, in each case, as a result of (i) changes in general economic conditions nationally or regionally, (ii) changes affecting the real estate industry generally which do not affect Spieker or Spieker Partnership, as the case may be, materially disproportionately relative to other participants in the real estate industry similarly situated, or (iii) in and of itself and without the occurrence of any other Spieker Material Adverse Effect, changes in the trading prices of Spieker Common Stock or any series of Spieker Preferred Stock. Spieker has delivered to Equity Office complete and correct copies of the Spieker Articles and the Amended and Restated Bylaws of Spieker (the "Spieker Bylaws"), in each case, as amended or supplemented to the date of this Agreement.

2.2 *Spieker Subsidiaries.*

(a) *Schedule 2.2* to the Spieker Disclosure Letter sets forth (i) each Subsidiary (as defined herein) of Spieker (the "Spieker Subsidiaries") and Spieker TRS (which Spieker TRS constitutes the only entity in which Spieker owns a non–voting equity interest and has no right to control except as set forth in Schedule 2.4 of the Spieker Disclosure Letter), (ii) the ownership interest therein of Spieker, (iii) if not directly or indirectly wholly owned by Spieker, the identity and ownership interest of each of the other owners of such Spieker Subsidiary or Spieker TRS, as applicable, (iv) each office property and other commercial property owned by such Spieker Subsidiary or Spieker TRS, as applicable, and (v) if not wholly owned by such Spieker Subsidiary or Spieker TRS, as applicable, the identity and ownership interest of each of the other owners of such property. As used in this Agreement, "Subsidiary" of any Person (as defined herein) means any corporation, partnership, limited liability company, joint venture, trust or other legal entity of which such Person owns (either directly or through or together with another Subsidiary of such Person) either (i) a general partner, managing member or other similar interest, or (ii)(A) 10% or more of the voting power of the voting capital stock or other voting equity interests, or (B) 10% or more of the outstanding voting capital stock or other voting equity interests of such corporation, partnership, limited liability company, joint venture or other legal entity. As used herein, "Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization or other entity. *Schedule 2.2* of the Spieker Disclosure Letter sets forth a true and complete list of the equity securities owned by Spieker, any Spieker Subsidiary or Spieker TRS, in any corporation, partnership, limited liability company, joint venture or other legal entity, excluding Spieker Subsidiaries and Spieker TRS.

(b) Except as set forth in *Schedule 2.2* to the Spieker Disclosure Letter, (i) all of the outstanding shares of capital stock owned by Spieker, or Spieker Subsidiary or Spieker TRS of each Spieker Subsidiary and Spieker TRS that is a corporation have been duly authorized, validly issued and are (A) fully paid and nonassessable and not subject to preemptive or similar rights, and (B) owned free and clear of all pledges, claims, liens, charges, encumbrances and security interests of any kind or nature whatsoever (collectively, "Liens") and (ii) all equity interests in each Spieker Subsidiary that is a partnership, joint venture, limited liability company or trust which are owned by Spieker, by another Spieker Subsidiary or Spieker TRS or by Spieker and another Spieker Subsidiary or Spieker TRS are owned free and clear of all Liens other than pledges, if any, contained in organizational documents of such Spieker Subsidiary and given to secure

A–11

Table of Contents

performance thereunder. Each Spieker Subsidiary and Spieker TRS that is a corporation is duly incorporated, validly existing and in good standing under the laws of its jurisdiction of incorporation and has the requisite corporate power and authority to own, operate, lease and encumber its properties and carry on its business as now being conducted, and each Spieker Subsidiary that is a partnership, limited liability company or trust is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization and has the requisite power and authority to own, operate, lease and encumber its properties and carry

on its business as now being conducted. Each Spieker Subsidiary and Spieker TRS is duly qualified or licensed to do business and is in good standing in each jurisdiction in which the nature of its business or the ownership or leasing of its properties makes such qualification or licensing necessary, other than in such jurisdictions where the failure to be so qualified or licensed, individually or in the aggregate, would not reasonably be expected to have a Spieker Material Adverse Effect. Complete and correct copies of the articles of incorporation, bylaws, organization documents and partnership, joint venture and operating agreements of each Spieker Subsidiary and Spieker TRS, as amended to the date of this Agreement, have been previously delivered or made available to Equity Office. No effective amendment has been made to the Spieker Partnership Agreement since February 28, 2000.

2.3  *Capital Structure.*

(a)  The authorized shares of capital stock of Spieker consist of 1,000,000,000 shares of capital stock, par value $.0001 per share, 649,000,000 of which are classified as Spieker Common Stock, 2,000,000 of which are classified as Class B Common Stock (par value $.0001 per share) of Spieker ("Spieker Class B Common Stock"), 1,500,000 of which are classified as Class C Common Stock (par value $.0001 per share) of Spieker ("Spieker Class C Common Stock"), 1,000,000 of which are classified as Series A Preferred Shares, 5,000,000 of which are classified as Series B Preferred Shares, 6,000,000 of which are classified as Series C Preferred Shares, 1,500,000 of which are classified as Series D Preferred Shares, 4,000,000 of which are classified as Series E Preferred Shares and 330,000,000 of which are classified as Excess Stock. 65,923,946 shares of Spieker Common Stock are issued and outstanding on the date of this Agreement; no shares of Spieker Class B Common Stock are issued and outstanding on the date of this Agreement; no shares of Spieker Class C Common Stock are issued and outstanding on the date of this Agreement; 1,000,000 Spieker Series A Preferred Shares are issued and outstanding on the date of this Agreement; 4,250,000 Spieker Series B Preferred Shares are issued and outstanding on the date of this Agreement; 6,000,000 Spieker Series C Preferred Shares are issued and outstanding on the date of this Agreement; no shares of Spieker Series D Preferred Shares are issued and outstanding on the date of this Agreement; 4,000,000 Spieker Series E Preferred Shares are issued and outstanding on the date of this Agreement. 6,500,000 shares of Spieker Participating Preferred Stock (par value $.0001 per share) have been reserved for issuance pursuant to the Spieker Rights Plan and none are outstanding.

(b)  Set forth in *Schedule 2.3(b)* to the Spieker Disclosure Letter is a true and complete list of the following: (i) each qualified or nonqualified option to purchase shares of Spieker Common Stock or Spieker OP Units granted under Spieker's Amended and Restated 1993 Directors' Stock Option Plan, Spieker's Amended and Restated 1993 Stock Incentive Plan, Spieker Partnership's Employee Stock Incentive Pool or any other formal or informal arrangement (collectively, the "Spieker Stock Options"); and (ii) except for the Spieker Rights, the Spieker Series A Preferred Shares and the Spieker OP Units, all other warrants or other rights to acquire Spieker Common Stock, all stock appreciation rights, restricted stock, dividend equivalents, deferred compensation accounts, restricted stock unit awards and other awards which are outstanding on the date of this Agreement ("Spieker Stock Rights"). *Schedule 2.3(b)* to the Spieker Disclosure Letter sets forth for each Spieker Stock Option and Spieker Stock Right (other than Spieker OP Units and Spieker Series A Preferred Shares) the name of the grantee, the date of the grant, the type of grant, the status of the option grants as qualified or nonqualified under Section 422 of the Code, the number of shares of Spieker Common Stock subject to each option or other award, the number and type of shares subject to options or awards that are currently exercisable, the exercise price per share, and the number and type of such shares subject to stock appreciation rights. On the date of this Agreement, except as set forth in this Section 2.3 or excepted therefrom or as set forth in *Schedule 2.3(b)* to the Spieker Disclosure Letter, no shares of Spieker Common Stock were outstanding or reserved for issuance.

A–12

Table of Contents

(c)  All outstanding shares of Spieker Common Stock are duly authorized, validly issued, fully paid and nonassessable and not subject to preemptive or similar rights under law or the Spieker Articles or Spieker Bylaws, or any contract or instrument to which Spieker is a party or by which it is bound. There are no bonds, debentures, notes or other indebtedness of Spieker having the right to vote (or convertible into, or exchangeable or exercisable for, securities having the right to vote) on any matters on which shareholders of Spieker may vote.

(d)  Other than (i) as set forth in this Section 2.3 or in *Schedule 2.3(b)* to the Spieker Disclosure Letter, (ii) Spieker OP Units, which may be converted into shares of Spieker Common Stock at a rate of one share of Spieker Common Stock for each Spieker OP Unit or, under the circumstances described in Article XI and Exhibit C of the Spieker Partnership Agreement, into cash, shares of Spieker Common Stock or a combination of cash and shares of Spieker Common Stock, (iii) 1,500,000 Spieker Series D Preferred Shares issuable, and reserved for issuance, upon the conversion of Spieker Series D Preferred OP Units, and (iv) 1,219,512 shares of Spieker Common Stock issuable, and reserved for issuance, upon the conversion of the Spieker Series A Preferred Shares, as of the date of this Agreement, there are no outstanding securities, options, warrants, calls, rights, commitments, agreements, arrangements or undertakings of any kind to which Spieker or any Spieker Subsidiary or Spieker TRS is a party or by which such entity is bound, obligating Spieker or any Spieker Subsidiary or Spieker TRS to issue, deliver or sell, or cause to be issued, delivered or sold, additional shares of capital stock, voting securities or other ownership interests of Spieker or any Spieker Subsidiary or Spieker TRS or obligating Spieker or any Spieker Subsidiary or Spieker TRS to issue, grant, extend or enter into any such security, option, warrant, call, right, commitment, agreement, arrangement or undertaking (other than to Spieker or a Spieker Subsidiary or Spieker TRS).

(e)  As of the date of this Agreement, (i) 75,749,191 Spieker OP Units (including for purposes of this Section 2.3(e) the Spieker Series A Preferred Unit representing 1,000,000 Spieker OP Units) are validly issued and outstanding, fully paid and nonassessable and not subject to preemptive or similar rights under law or the Spieker Partnership Agreement, or any contract or instrument to which Spieker or Spieker Partnership is a party or by which either is bound, of which 66,923,946 Spieker OP Units

(including for purposes of this Section 2.3(e) the Spieker Series A Preferred Unit representing 1,000,000 Spieker OP Units) are owned by Spieker, (ii) the Spieker Series A Preferred OP Unit (which represents 1,000,000 Spieker OP Units) is validly issued and outstanding, fully paid and nonassessable and not subject to preemptive or similar rights, and is owned by Spieker, (iii) the Spieker Series B Preferred OP Unit is validly issued and outstanding, fully paid and nonassessable and not subject to preemptive or similar rights and is owned by Spieker, (iv) the Spieker Series C Preferred OP Unit is validly issued and outstanding, fully paid and nonassessable and not subject to preemptive or similar rights, and is owned by Spieker, (v) 1,500,000 Spieker Series D Preferred OP Units are validly issued and outstanding, fully paid and nonassessable and not subject to preemptive or similar rights, none of which are owned by Spieker and (vi) the Spieker Series E Preferred OP Unit is validly issued and outstanding, fully paid and nonassessable and not subject to preemptive or similar rights, and is owned by Spieker. *Schedule 2.3(e)* to the Spieker Disclosure Letter sets forth the name of each holder of Spieker OP Units and the number of Spieker OP Units owned by each such holder as of the date of this Agreement. Except as provided in the Spieker Partnership Agreement or as contemplated by this Agreement, the Spieker OP Units are not subject to any restrictions imposed by Spieker Partnership on the transfer, assignment, pledge, distribution, encumbrance or other disposition thereof (either voluntarily or involuntarily and with or without consideration) or on the exercise of the voting rights thereof provided in the Spieker Partnership Agreement. Except as provided in the Spieker Partnership Agreement, Spieker Partnership has not issued or granted and is not a party to any outstanding commitments of any kind relating to, or any presently effective agreements or understandings with respect to, the issuance or sale of interests in Spieker Partnership, whether issued or unissued, or securities convertible into or exchangeable or exercisable for interests in Spieker Partnership.

(f) All dividends on Spieker Common Stock and each series of Spieker Preferred Stock and all distributions on Spieker OP Units and Spieker Preferred OP Units, which have been declared prior to the date of this Agreement, have been paid in full.

A–13

Table of Contents

(g) Set forth on *Schedule 2.3(g)* to the Spieker Disclosure Letter is a list of each registration rights agreement or other agreement between Spieker and/or Spieker Partnership, on the one hand, and one or more other parties, on the other hand, which sets forth the rights of any such other party or parties to cause the registration of any securities of Spieker and/or Spieker Partnership pursuant to the Securities Act of 1933, as amended (the "Securities Act").

2.4 *Other Interests.* Except for interests in the Spieker Subsidiaries, Spieker TRS and certain other entities as set forth in *Schedule 2.4* to the Spieker Disclosure Letter (the "Spieker Other Interests"), none of Spieker, Spieker Partnership, any Spieker Subsidiary or Spieker TRS owns directly or indirectly any interest or investment (whether equity or debt) in any corporation, partnership, joint venture, business, trust, limited liability company or other entity (other than investments in short–term investment securities). With respect to the Spieker Other Interests, Spieker Partnership is a partner, member or shareholder in good standing, and owns such interests free and clear of all Liens. None of Spieker, Spieker Partnership, any Spieker Subsidiary or Spieker TRS is in material breach of any agreement, document or contract which is of a material nature governing its rights in or to the Spieker Other Interests, all of which agreements, documents and contracts are (a) listed in Schedule 2.4 to the Spieker Disclosure Letter, (b) unmodified except as described therein and (c) to the Knowledge of Spieker (as defined herein), in full force and effect. To the Knowledge of Spieker, the other parties to any such agreement, document or contract which is of a material nature are not in material breach of any of their respective obligations under such agreements, documents or contracts.

2.5 *Authority; Noncontravention; Consents.*

(a) Spieker has the requisite corporate power and authority to enter into this Agreement and, subject to the requisite Spieker stockholder approval of the Merger and any other matters reasonably and timely requested by any other party to effectuate the transactions contemplated by this Agreement (collectively, the "Spieker Stockholder Approvals") and the Spieker Partner Approvals (as defined herein), to consummate the transactions contemplated by this Agreement to which Spieker is a party. The execution and delivery of this Agreement by Spieker and the consummation by Spieker of the transactions contemplated by this Agreement to which Spieker is a party have been duly authorized by all necessary action on the part of Spieker, except for and subject to the Spieker Stockholder Approvals and the Spieker Partner Approvals. This Agreement has been duly executed and delivered by Spieker and constitutes a valid and binding obligation of Spieker, enforceable against Spieker in accordance with and subject to its terms, subject to applicable bankruptcy, insolvency, moratorium or other similar laws relating to creditors' rights and general principles of equity.

(b) Spieker Partnership has the requisite partnership power and authority to enter into this Agreement and, subject to the requisite Spieker Partner Approvals, to consummate the transactions contemplated by this Agreement to which Spieker Partnership is a party. The execution and delivery of this Agreement by Spieker Partnership and the consummation by Spieker Partnership of the transactions contemplated by this Agreement to which Spieker Partnership is a party have been duly authorized by all necessary action on the part of Spieker Partnership, except for and subject to the Spieker Stockholder Approvals and the Spieker Partner Approvals. This Agreement has been duly executed and delivered by Spieker Partnership and constitutes a valid and binding obligation of Spieker Partnership, enforceable against Spieker Partnership in accordance with and subject to its terms, subject to applicable bankruptcy, insolvency, moratorium or other similar laws relating to creditors' rights and general principles of equity.

(c) Except as set forth in *Schedule 2.5(c)(1)* to the Spieker Disclosure Letter and subject to receipt of the Spieker Stockholder Approvals and the Spieker Partner Approvals, the execution and delivery of this Agreement by Spieker do not, and the consummation of the transactions contemplated by this Agreement to which Spieker is a party and compliance by Spieker with the provisions of this Agreement will not, conflict with, or result in any violation of, or default (with or without notice or lapse of

time, or both) under, or give rise to a right of termination, cancellation or acceleration of any material obligation or to material loss of a benefit under, or result in the creation of any Lien upon any of the properties or assets of Spieker or any Spieker Subsidiary under, (i) the Spieker Articles or Spieker Bylaws or the comparable charter or organizational documents or partnership, operating, or similar agreement (as the case may be) of any Spieker Subsidiary or Spieker TRS, each as amended or supplemented, (ii) any loan or credit agreement, note, bond,

A–14

**Table of Contents**

mortgage, indenture, merger or other acquisition agreement, reciprocal easement agreement, lease or other agreement, instrument, permit, concession, franchise or license applicable to Spieker or any Spieker Subsidiary or Spieker TRS or their respective properties or assets or (iii) subject to the governmental filings and other matters referred to in the following sentence, any judgment, order, decree, statute, law, ordinance, rule or regulation (collectively, "Laws") applicable to Spieker or any Spieker Subsidiary or Spieker TRS, or their respective properties or assets, other than, in the case of clause (ii) or (iii), any such conflicts, violations, defaults, rights, loss or Liens that individually or in the aggregate would not reasonably be expected to (x) have a Spieker Material Adverse Effect or (y) prevent or materially impair the ability of Spieker to perform any of its obligations hereunder or prevent or materially threaten or impede the consummation of the transactions contemplated by this Agreement. No consent, approval, order or authorization of, or registration, declaration or filing with, any federal, state or local government or any court, administrative or regulatory agency or commission or other governmental authority or agency, domestic or foreign (a "Governmental Entity"), is required by or with respect to Spieker or any Spieker Subsidiary or Spieker TRS in connection with the execution and delivery of this Agreement by Spieker and Spieker Partnership or the consummation by Spieker or any Spieker Subsidiary of the transactions contemplated by this Agreement, except for (i) the filing with the Securities and Exchange Commission (the "SEC") of (x) the Joint Proxy Statement (as defined herein), and (y) such reports and filings under the Securities Act and Section 13(a) of the Exchange Act as may be required in connection with this Agreement and the transactions contemplated by this Agreement, (ii) the filing and acceptance for record of the Articles of Merger by the Department, (iii) the filing of the Delaware Certificate of Merger with the Office of the Secretary of State of the State of Delaware, (iv) the filing of the California Certificate of Merger with the Secretary of State of the State of California and (v) such other consents, approvals, orders, authorizations, registrations, declarations and filings (A) as are set forth in *Schedule 2.5(c)(2)* to the Spieker Disclosure Letter, (B) as may be required under (w) the Hart–Scott–Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act"), (x) laws requiring transfer, recordation or gains tax filings, (y) federal, state or local environmental laws or (z) the "blue sky" laws of various states, to the extent applicable, or (C) which, if not obtained or made, would not prevent or delay in any material respect the consummation of any of the transactions contemplated by this Agreement or otherwise prevent Spieker from performing its obligations under this Agreement in any material respect or reasonably be expected to have, individually or in the aggregate, a Spieker Material Adverse Effect.

    2.6 *SEC Documents; Financial Statements; Undisclosed Liabilities.* Spieker and Spieker Partnership have filed all reports, schedules, forms, statements and other documents required to be filed with the SEC since December 31, 1997 through the date hereof (collectively, including all exhibits thereto and any registration statement filed since such date, the "Spieker SEC Documents"). All of the Spieker SEC Documents (other than preliminary material), as of their respective filing dates, complied in all material respects with all applicable requirements of the Securities Act and the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and, in each case, the rules and regulations promulgated thereunder applicable to such Spieker SEC Documents. None of the Spieker SEC Documents at the time of filing contained, nor will any report, schedule, form, statement or other document filed by Spieker or Spieker Partnership after the date hereof and prior to the Effective Time contain, any untrue statement of a material fact or omitted to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading. The consolidated financial statements of Spieker included in the Spieker SEC Documents or of Spieker Partnership included in the Spieker SEC Documents complied, or will comply, as to form in all material respects with applicable accounting requirements and the published rules and regulations of the SEC with respect thereto, have been or will be prepared in accordance with generally accepted accounting principles ("GAAP") (except, in the case of unaudited statements, as permitted by the applicable rules and regulations of the SEC) applied on a consistent basis during the periods involved (except as may be indicated in the notes thereto) and fairly presented, or will fairly present, in all material respects in accordance with the applicable requirements of GAAP and the applicable rules and regulations of the SEC, the consolidated financial position of Spieker and its Subsidiaries or Spieker Partnership and its Subsidiaries, as the case may be, in each case, taken as a whole, as of the dates thereof and the consolidated results of operations and cash flows for the periods then ended (except, in the case of unaudited statements, as permitted by Form 10–Q under the

A–15

**Table of Contents**

Exchange Act). Except as set forth in *Schedule 2.6(b)* to the Spieker Disclosure Letter, Spieker has no Subsidiaries which are not consolidated for accounting purposes. Except for liabilities and obligations set forth in the Spieker SEC Documents or in *Schedule 2.6(c)* to the Spieker Disclosure Letter, none of Spieker, any Spieker Subsidiary or Spieker TRS has any liabilities or obligations of any nature (whether accrued, absolute, contingent or otherwise) required by GAAP to be set forth on a consolidated balance sheet of Spieker or in the notes thereto and which, individually or in the aggregate, would reasonably be expected to have a Spieker Material Adverse Effect.

    2.7 *Absence of Certain Changes or Events.* Except as disclosed in the Spieker SEC Documents or in *Schedule 2.7* to the Spieker Disclosure Letter, since December 31, 1999 (the "Spieker Financial Statement Date"), Spieker, its Subsidiaries and

Spieker TRS have conducted their business only in the ordinary course (taking into account prior practices, including the acquisition and disposition of properties and issuance of securities) and there has not been (a) any circumstance, event, occurrence, change or effect that has had a Spieker Material Adverse Effect, nor has there been any circumstance, event, occurrence, change or effect that with the passage of time would reasonably be expected to result in a Spieker Material Adverse Effect, (b) except for regular quarterly distributions not in excess of $0.70 per share of Spieker Common Stock or Spieker OP Unit (subject to changes pursuant to Section 5.10 and to any Final Spieker Dividend payable pursuant to Section 1.13(d)(i)), $0.8536584 per share of Spieker Series A Preferred Shares, of $0.590625 per share of Spieker Series B Preferred Shares, $0.4921875 per share of Spieker Series C Preferred Shares or of $0.50 per share of Spieker Series E Preferred Shares (or, in each case, with respect to the period commencing on the date hereof and ending on the Closing Date, distributions as necessary to maintain REIT (as defined herein) status), in each case with customary record and payment dates, any authorization, declaration, setting aside or payment of any dividend or other distribution (whether in cash, stock or property) with respect to the Spieker Common Stock, the Spieker OP Units or any series of the Spieker Preferred OP Units or the Spieker Preferred Stock, (c) any split, combination or reclassification of the Spieker Common Stock, the Spieker OP Units or any series of the Spieker Preferred OP Units or the Spieker Preferred Stock or any issuance or the authorization of any issuance of any other securities in respect of, in lieu of or in substitution for, or giving the right to acquire by exchange or exercise, shares of stock of Spieker or partnership interests in Spieker Partnership or any issuance of an ownership interest in, any Spieker Subsidiary or Spieker TRS, (d) any damage, destruction or loss, whether or not covered by insurance, that has had or would reasonably be expected to have a Spieker Material Adverse Effect, (e) any change in accounting methods, principles or practices by Spieker or any of its Subsidiaries, Spieker Partnership or any of its Subsidiaries or Spieker TRS materially affecting its assets, liabilities or business, except insofar as may have been disclosed in Spieker SEC Documents or required by a change in GAAP, or (f) any amendment in any material respect of any employment, consulting, severance, retention or any other agreement between Spieker and any officer or director of Spieker.

2.8 *Litigation.* Except as disclosed in the Spieker SEC Documents or in *Schedule 2.8* to the Spieker Disclosure Letter, and other than personal injury and other routine tort litigation arising from the ordinary course of operations of Spieker, the Spieker Subsidiaries and Spieker TRS (a) which are covered by insurance, subject to a reasonable deductible or retention limit or (b) for which all material costs and liabilities arising therefrom are reimbursable pursuant to common area maintenance or similar agreements, there is no suit, action or proceeding pending (in which service of process has been received by an employee of Spieker, a Spieker Subsidiary or the Spieker TRS) or, to the Knowledge of Spieker (as hereinafter defined), threatened in writing against or affecting Spieker, or any Spieker Subsidiary or Spieker TRS that, individually or in the aggregate, would reasonably be expected to (i) have a Spieker Material Adverse Effect or (ii) prevent or materially impair the ability of Spieker to perform any of its obligations hereunder or prevent or materially threaten or impair the consummation of any of the transactions contemplated by this Agreement, nor is there any judgment, decree, injunction, rule or order of any court or Governmental Entity or arbitrator outstanding against Spieker, any Spieker Subsidiary or Spieker TRS having, or which, insofar as reasonably can be foreseen, in the future would have, any such effect. Notwithstanding the foregoing, (y) *Schedule 2.8* to the Spieker Disclosure Letter sets forth each and every material uninsured claim, equal employment opportunity claim and claim relating to sexual harassment and/or discrimination pending or, to the Knowledge of Spieker, threatened as of the date hereof, in each case with a brief summary of such claim or threatened

A–16

**Table of Contents**

claim, and (z) no claim has been made under any directors' and officers' liability insurance policy maintained at any time by Spieker, any of the Spieker Subsidiaries or Spieker TRS.

2.9 *Properties.*

(a) Except as provided in *Schedule 2.2* or *Schedule 2.9(a)* to the Spieker Disclosure Letter, Spieker or the Spieker Subsidiary or Spieker TRS set forth on *Schedule 2.2* to the Spieker Disclosure Letter owns fee simple title to or holds a leasehold interest in each of the real estate properties identified in *Schedule 2.2* to the Spieker Disclosure Letter (the "Spieker Properties"), which are all of the real estate properties owned or leased by them, in each case (except for the Permitted Title Exceptions (as defined herein)) free and clear of liens, mortgages or deeds of trust, claims against title, charges which are liens, security interests or other encumbrances on title ("Encumbrances"). *Schedule 2.2* to the Spieker Disclosure Letter further identifies which of the Spieker Properties are owned in fee simple by Spieker or the Spieker Subsidiary or Spieker TRS and which of the Spieker Properties are subject to a ground lease. Except as set forth in *Schedule 2.2* to the Spieker Disclosure Letter, no other Person has any ownership interest in any of the Spieker Properties and any such ownership interest so scheduled does not materially interfere with the present use of, any of the Spieker Properties subject thereto or affected thereby. Except as set forth in *Schedule 2.9(a)* to the Spieker Disclosure Letter, none of the Spieker Properties is subject to any restriction on the sale or other disposition thereof or on the financing or release of financing thereon. The Spieker Properties are not subject to any rights of way, agreements, laws, ordinances and regulations affecting building use or occupancy, or reservations of an interest in title (collectively, "Property Restrictions") or Encumbrances, except for the following (collectively, the "Permitted Title Exceptions") (i) Property Restrictions and Encumbrances set forth in the Spieker Disclosure Letter, (ii) Property Restrictions imposed or promulgated by law or any governmental body or authority with respect to real property, including zoning regulations, which do not materially adversely affect the current use of any Spieker Property, (iii) Property Restrictions and Encumbrances disclosed on existing title reports or policies or existing surveys or subsequently granted by Spieker or the Spieker Subsidiary or Spieker TRS, which Property Restrictions and Encumbrances, in any event, do not materially interfere with the present use of any of the Spieker Properties subject thereto or affected thereby and (iv) liens for real estate taxes not yet due and payable, mechanics', carriers', workmen's, repairmen's liens and other Encumbrances and Property Restrictions, if any, which, individually or in the aggregate, do not materially detract from the value of or materially interfere with the present use of any of the Spieker Properties subject thereto or

affected thereby. *Schedule 2.9(a)* to the Spieker Disclosure Letter lists each of the Spieker Properties which are under development as of the date of this Agreement and describes the status of such development as of the date hereof.

(b) Except as provided in *Schedule 2.2* or *Schedule 2.9(b)* to the Spieker Disclosure Letter, valid policies of title insurance (or fully paid and enforceable commitments therefor) have been issued insuring the applicable Spieker Subsidiary's or Spieker TRS's (as the case may be) fee simple title or leasehold estate, as the case may be, to the Spieker Properties owned by it in amounts approximately equal to the purchase price therefor paid by such Spieker Subsidiary or Spieker TRS, subject only to the Permitted Title Exceptions and the matters disclosed in the Spieker Disclosure Letter. Such policies are, at the date hereof, in full force and effect. No material claim has been made against any such policy.

(c) Except as provided in *Schedule 2.9(c)* to the Spieker Disclosure Letter, Spieker has no Knowledge (i) that, any certificate, permit or license from any governmental authority having jurisdiction over any of the Spieker Properties or any agreement, easement or other right which is necessary to permit the lawful use and operation of the buildings and improvements on any of the Spieker Properties or which is necessary to permit the lawful use and operation of all driveways, roads and other means of egress and ingress to and from any of the Spieker Properties has not been obtained and is not in full force and effect, or of any pending threat of modification or cancellation of any of the same, the absence of which would reasonably be expected to have a material adverse effect on such Spieker Property, (ii) of any written notice of any violation of any federal, state or municipal law, ordinance, order, regulation or requirement affecting any of the Spieker Properties issued by any governmental authority which would reasonably be expected to have a material adverse effect on such Spieker Property, (iii) of any structural defects relating to any Spieker Property which would reasonably be expected to have a material adverse effect on such Spieker Property, (iv) of any Spieker Property whose

A-17

Table of Contents

building systems are not in working order so as to have a material adverse effect on such Spieker Property, or (v) of any physical damage to any Spieker Property which would reasonably be expected to have a material adverse effect on such Spieker Property for which there is not insurance in effect covering the cost of the restoration and the loss of revenue (subject to a reasonable deduction or retention limit).

(d) Except as set forth in *Schedule 2.9(d)* to the Spieker Disclosure Letter, none of Spieker, any Spieker Subsidiary or Spieker TRS has received any written or published notice to the effect that (i) any condemnation or involuntary rezoning proceedings are pending or threatened with respect to any of the Spieker Properties or (ii) any zoning, building or similar law, code, ordinance, order or regulation is or will be violated by the continued maintenance, operation or use of any buildings or other improvements on any of the Spieker Properties or by the continued maintenance, operation or use of the parking areas which would reasonably be expected to have a material adverse effect on such Spieker Property. Except as set forth in *Schedule 2.9(d)* to the Spieker Disclosure Letter, (i) all work required to be performed, payments required to be made and actions required to be taken prior to the date hereof pursuant to any agreement entered into with a governmental body or authority in connection with a site approval, zoning reclassification or other similar action relating to any Spieker Properties (*e.g.*, Local Improvement District, Road Improvement District, Environmental Mitigation (as defined herein)) have been performed, paid or taken, as the case may be, and (ii) Spieker has no Knowledge of any planned or proposed work, payments or actions that may be required after the date hereof pursuant to such agreements, in each of case (i) and (ii) except as set forth in development or operating budgets for such Spieker Properties delivered to Equity Office and EOP Partnership prior to the date hereof and other than those which would not reasonably be expected to have a Spieker Material Adverse Effect. As used in this Agreement, "Environmental Mitigation" means investigation, clean-up, removal action, remedial action, restoration, repair, response action, corrective action, monitoring, sampling and analysis, installation, reclamation, closure or post-closure in response to any actual or suspected environmental condition or Hazardous Materials.

(e) The rent rolls previously provided by Spieker to Equity Office (the "Spieker Rent Roll") list each Spieker Space Lease (as defined herein) in effect as of the dates set forth therein, none of which are earlier than December 31, 2000, and, except for omissions or discrepancies that, either individually or in the aggregate, would not reasonably be expected to have a Spieker Material Adverse Effect, all information set forth in the Spieker Rent Roll is true, correct and complete as of the date thereof. "Spieker Space Lease" means each lease or other right of occupancy affecting or relating to a property in which Spieker Partnership (or an entity in which it directly or indirectly has an interest) is the landlord, either pursuant to the terms of the lease agreement or as successor to any prior landlord, but excluding any ground lease. Spieker has made available to Equity Office true, correct and complete copies of all Spieker Space Leases, including all amendments, modifications, supplements, renewals, extensions and guarantees related thereto, as of the date hereof. Except as set forth in a delinquency report made available to Equity Office, none of Spieker, any Spieker Subsidiary or Spieker TRS, on the one hand, nor, to the knowledge of Spieker or Spieker Partnership, any other party, on the other hand, is in monetary default under any Spieker Space Lease, except for such defaults that would not reasonably be expected to have a Spieker Material Adverse Effect.

(f) *Schedule 2.9(f)* contains a true and complete list, by type of insurance, carrier, coverages (including limits) and term, of all material policies of casualty, liability and other types of insurance (except title insurance) carried by Spieker or any Spieker Subsidiary. All such policies are in full force and effect and neither Spieker nor any Spieker Subsidiary has received from any insurance company notice of any material defects or deficiencies affecting the insurability of Spieker or any Spieker Subsidiary or any of their respective assets thereunder.

2.10 *Environmental Matters.*