(a)  "Environmental Law" shall mean all applicable Laws, including any plans, other criteria, or guidelines promulgated pursuant to such Laws, relating to noise control, or the protection of human health, safety and natural resources, animal health or welfare or the environment, including, without limitation, Laws relating to the use, manufacturing, production, generation, installation, recycling, reuse, sale, storage, handling, transport, treatment, release, threatened release or disposal of any Hazardous Materials (including

A–18

---

Table of Contents

the Comprehensive Environmental Response, Compensation, and Liability Act, as amended, 42 U.S.C. ss 9601 et seq. ("CERCLA")). "Hazardous Materials" shall mean substances, wastes, radiation or materials (whether solids, liquids or gases) (i) which are hazardous, toxic, infectious, explosive, radioactive, carcinogenic, or mutagenic, (ii) which are listed, regulated or defined under any Environmental Law, and shall include "hazardous wastes," "hazardous substances," "hazardous materials," "pollutants," "contaminants," "toxic substances," "radioactive materials" or "solid wastes," (iii) the presence of which on property cause or threaten to cause a nuisance pursuant to applicable statutory or common law upon the property or to adjacent properties, (iv) which contain without limitation polychlorinated biphenyls (PCBs), asbestos or asbestos–containing materials, lead–based paints, urea–formaldehyde foam insulation, or petroleum or petroleum products (including, without limitation, crude oil or any fraction thereof) or (v) which pose a hazard to human health, safety, natural resources, industrial hygiene, or the environment, or an impediment to working conditions. "Release" shall have the meaning set forth in Section 101 of CERCLA, without regard to the exclusions set forth therein.

(b)  Except as disclosed in the Spieker SEC Documents,

(i)  none of Spieker, any of the Spieker Subsidiaries or Spieker TRS or, to Spieker's Knowledge, any other Person has caused or permitted the presence of any Hazardous Materials at, on or under any of the Spieker Properties and none of Spieker, any of the Spieker Subsidiaries or Spieker TRS has any Knowledge of the presence of any Hazardous Materials at, on or under any of the Spieker Properties, in each of the foregoing cases, such that the presence of such Hazardous Materials (including the presence of asbestos in any buildings or improvements at the Spieker Properties) would, individually or in the aggregate, reasonably be expected to have a Spieker Material Adverse Effect;

(ii)  (y) there have been no Releases of Hazardous Materials at, on, under or from (A) the Spieker Properties or (B) any real property previously owned, operated or leased by Spieker, the Spieker Subsidiaries, or Spieker TRS (the "Former Spieker Properties") during the period of such ownership, operation or tenancy, and (z) none of Spieker, any of the Spieker Subsidiaries or Spieker TRS has any Knowledge of any Releases of Hazardous Materials having occurred or presently occurring at, on, under or from the Spieker Properties or the Former Spieker Properties, which Releases described in changes (y) and (z) would, individually or in the aggregate, reasonably be expected to have a Spieker Material Adverse Effect;

(iii)  (y) Spieker, the Spieker Subsidiaries and Spieker TRS have not failed to comply with any Environmental Law, and (z) none of Spieker, any of the Spieker Subsidiaries or Spieker TRS has any liability under the Environmental Laws, except in each of cases (y) and (z) to the extent that any such failure to comply or any such liability, individually or in the aggregate, would not reasonably be expected to have a Spieker Material Adverse Effect; and

(iv)  Spieker, the Spieker Subsidiaries and Spieker TRS have been duly issued, and currently have and will maintain through the Closing Date, all permits, licenses, certificates and approvals required under any Environmental Law (collectively, the "Environmental Permits") necessary to operate their businesses as currently operated except where the failure to obtain and maintain such Environmental Permit would not, individually or in the aggregate, reasonably be expected to have a Spieker Material Adverse Effect. Spieker, the Spieker Subsidiaries and Spieker TRS have timely filed applications for all Environmental Permits. All of the Environmental Permits are transferable and none require consent, notification or other action to remain in full force and effect following consummation of the transactions contemplated hereby.

(c)  Spieker has previously delivered or made available to Equity Office complete copies of all material information, documents and reports, including, without limitation, environmental investigations and testing or analysis that are in the possession or control of any of Spieker, the Spieker Subsidiaries and Spieker TRS and which relate to compliance with Environmental Laws by any of them or to the past or current environmental condition of the Spieker Properties.

A–19

---

Table of Contents

2.11  *Related Party Transactions.* Set forth in *Schedule 2.11* to the Spieker Disclosure Letter is a list of all material arrangements, agreements and contracts entered into by Spieker, any Spieker Subsidiary and Spieker TRS which are in effect and which are with (a) any investment banker or financial advisor, in each case, relating to any obligation to make, or which could result in the making of, any payment (except pursuant to indemnification obligations), (b) any Person who is an officer, director or Affiliate (as defined herein) of Spieker or any Spieker Subsidiary or Spieker TRS, any relative of any of the foregoing or any entity of which any of the foregoing is an Affiliate or (c) any Person who acquired Spieker Common Stock, Spieker OP Units or any series of Spieker Preferred OP Units or Spieker Preferred Stock in a private placement. Such documents, copies of all of which have previously been delivered or made available to Equity Office, are listed in *Schedule 2.11* to the Spieker Disclosure Letter. As used in this Agreement, the term "Affiliate" shall have the same meaning as such term is defined in Rule 405

promulgated under the Securities Act.

2.12 *Employee Benefits*. As used herein, the term "Employee Plan" includes any pension, retirement, savings, disability, medical, dental, health, life, death benefit, group insurance, profit sharing, deferred compensation, stock option, bonus, incentive, vacation pay, tuition reimbursement, severance pay, or other employee benefit plan, trust, agreement, contract, agreement, policy or commitment (including, without limitation, any pension plan, as defined in Section 3(2) of the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder ("ERISA") ("Pension Plan"), and any welfare plan as defined in Section 3(1) of ERISA ("Welfare Plan")), whether any of the foregoing is funded, insured or self–funded, written or oral, (i) sponsored or maintained by Spieker, any Spieker Subsidiary or Spieker TRS (each, a "Controlled Group Member") and covering any Controlled Group Member's active or former employees (or their beneficiaries), (ii) to which any Controlled Group Member is a party or by which any Controlled Group Member (or any of the rights, properties or assets thereof) is bound or (iii) with respect to which any current Controlled Group Member may otherwise have any material liability (whether or not such Controlled Group Member still maintains such Employee Plan). Each Employee Plan is listed on *Schedule 2.12* to the Spieker Disclosure Letter. Except as disclosed in *Schedule 2.12* to the Spieker Disclosure Letter, with respect to the Employee Plans:

(a)  No Controlled Group Member has any continuing liability under any Welfare Plan which provides for continuing benefits or coverage for any participant or any beneficiary of a participant after such participant's termination of employment, except as may be required by Section 4980B of the Code or Section 601 (et seq.) of ERISA, or under any applicable state law, and at the expense of the participant or the beneficiary of the participant.

(b)  Each Employee Plan complies in all material respects with the applicable requirements of ERISA and any other applicable law governing such Employee Plan, and, to the Knowledge of Spieker, each Employee Plan has at all times been properly administered in all material respects in accordance with all such requirements of law, and in accordance with its terms and the terms of any applicable collective bargaining agreement to the extent consistent with all such requirements of law. Each Pension Plan which is intended to be qualified is qualified under Section 401(a) of the Code, has received a favorable determination letter from the IRS stating that such Plan meets the requirements of Section 401(a) of the Code and that the trust associated with such Plan is tax–exempt under Section 501(a) of the Code and, to the Knowledge of Spieker, no event has occurred which would jeopardize the qualified status of any such plan or the tax exempt status of any such trust under Sections 401(a) and Section 501(a) of the Code, respectively. No lawsuits, claims (other than routine claims for benefits) or formal complaints to, or by, any Person or governmental entity have been filed, are pending or, to the Knowledge of Spieker, threatened with respect to any Employee Plan and, to the Knowledge of Spieker, there is no fact or contemplated event which would reasonably be expected to give rise to any such lawsuit, claim (other than routine claims for benefits) or complaint with respect to any Pension Plan. Without limiting the foregoing, the following are true with respect to each Employee Plan:

(i)  all Controlled Group Members have complied in all material respects with the reporting and disclosure requirements of ERISA, the Code, or both, with respect to each Employee Plan and no Controlled Group Member has incurred any material liability in connection with such reporting or disclosure;

A–20

---

Table of Contents

(ii)  all contributions and payments with respect to Employee Plans that are required to be made by a Controlled Group Member with respect to periods ending on or before the Closing Date (including periods from the first day of the current plan or policy year to the Closing Date) have been, or will be, made or accrued before the Closing Date in accordance with the appropriate plan document, actuarial report, collective bargaining agreements or insurance contracts or arrangements or as otherwise required by ERISA or the Code; and

(iii)  with respect to each such Employee Plan, to the extent applicable, Spieker has delivered to or has made available to Equity Office true and complete copies of (A) plan documents, or any and all other documents that establish the existence of the plan, trust, arrangement, contract, policy or commitment and all amendments thereto, (B) the most recent determination letter, if any, received from the IRS, (C) the three most recent Form 5500 Annual Reports (and all schedules and reports relating thereto) and actuarial reports and (D) all related trust agreements, insurance contract or other funding agreements that implement each such Employee Plan.

(c)  With respect to each Employee Plan, to the Knowledge of Spieker, there has not occurred, and no Person is contractually bound to enter into, any "prohibited transaction" within the meaning of Section 4975(c) of the Code or Section 406 of ERISA, which transaction is not exempt under Section 4975(d) of the Code or Section 408 of ERISA and which could subject Spieker or any Controlled Group Member to material liability.

(d)  No Controlled Group Member has maintained or been obligated to contribute to any Employee Plan subject to Code Section 412 or Title IV of ERISA. No Employee Plan subject to Code Section 412 or Title IV of ERISA has been terminated.

(e)  With respect to each Pension Plan maintained by any Controlled Group Member, such Plan provides the Plan Sponsor the authority to amend or terminate the Plan at any time, subject to applicable requirements of ERISA and the Code.

2.13 *Employee Policies*. The employee handbooks of Spieker, the Spieker Subsidiaries and Spieker TRS currently in effect have been delivered to Equity Office and fairly and accurately summarize in all material respects all material employee policies, vacation policies and payroll policies.

2.14 *Taxes.*

(a) Each of Spieker, the Spieker Subsidiaries and Spieker TRS (A) has filed all Tax returns and reports required to be filed by it (after giving effect to any filing extension properly granted by a Governmental Entity having authority to do so) and all such returns and reports are accurate and complete in all material respects, (B) has paid (or Spieker has paid on its behalf) all Taxes (as defined herein) shown on such returns and reports as required to be paid by it, and (C) has complied in all material respects with all applicable laws, rules and regulations relating to the payment and withholding of Taxes (including, without limitation, withholding of Taxes pursuant to Sections 1441, 1442, 1445, 1446, 3121, and 3402 of the Code or similar provisions under any foreign laws) and has, within the time period prescribed by law, withheld and paid over to the proper governmental entities all amounts required to be so withheld and paid over under applicable laws and regulations, except, with respect to all of the foregoing, where the failure to file such tax returns and reports or failure to pay such Taxes or failure to comply with such withholding requirements would not reasonably be expected to have a Spieker Material Adverse Effect. The most recent audited financial statements contained in the Spieker SEC Documents reflect an adequate reserve for all material Taxes payable by Spieker, the Spieker Subsidiaries and Spieker TRS for all taxable periods and portions thereof through the date of such financial statements. Since the Spieker Financial Statement Date, Spieker has incurred no liability for Taxes under Sections 857(b), 860(c) or 4981 of the Code, including without limitation any Tax arising from a prohibited transaction described in Section 857(b)(6) of the Code, and none of Spieker, any Spieker Subsidiary or Spieker TRS has incurred any material liability for Taxes other than in the ordinary course of business. No event has occurred, and no condition or circumstance exists, which presents a material risk that any material Tax described in the preceding sentences will be imposed upon Spieker, any Spieker Subsidiary, or Spieker TRS. None of Spieker, any Spieker Subsidiary or Spieker TRS is

A–21

Table of Contents

the subject of any audit, examination, or other proceeding in respect of federal income Taxes, and to Spieker's Knowledge, no audit, examination or other proceeding in respect of federal income Taxes involving any of Spieker, any Spieker Subsidiary, or Spieker TRS is being considered by any Tax authority. To the Knowledge of Spieker, no deficiencies for any Taxes have been proposed, asserted or assessed against Spieker, any Spieker Subsidiary or Spieker TRS, and no requests for waivers of the time to assess any such Taxes are pending. As used in this Agreement, "Taxes" shall include all taxes, charges, fees, levies and other assessments, including, without limitation, income, gross receipts, excise, property, sales, withholding (including, without limitation, dividend withholding and withholding required pursuant to Sections 1445 and 1446 of the Code), social security, occupation, use, service, license, payroll, franchise, transfer and recording taxes, fees and charges, including estimated taxes, imposed by the United States or any taxing authority (domestic or foreign), whether computed on a separate, consolidated, unitary, combined or any other basis, and any interest, fines, penalties or additional amounts attributable to, or imposed upon, or with respect to any such taxes, charges, fees, levies or other assessments.

(b) Spieker (i) for all taxable years for which the Internal Revenue Service could assert a tax liability, has been subject to taxation as a real estate investment trust (a "REIT") within the meaning of Section 856 of the Code and has satisfied all requirements to qualify as a REIT for all such years, (ii) has operated since December 31, 2000 to the date of this representation, and intends to continue to operate, in such a manner as to qualify as a REIT for the taxable year ending on the earlier of December 31, 2001 or the Closing Date and, if later, for the taxable year of Spieker ending on the Closing Date, and (iii) has not taken or omitted to take any action which would reasonably be expected to result in a challenge to its status as a REIT and, to Spieker's Knowledge, no such challenge is pending or threatened. Each Spieker Subsidiary which is a partnership, joint venture or limited liability company (i) has been since its formation and continues to be treated for federal income tax purposes as a partnership or as an entity that is disregarded for federal income tax purposes and not as a corporation or an association taxable as a corporation and (ii) has not since the later of its formation or the acquisition by Spieker of a direct or indirect interest therein, owned any assets (including, without limitation, securities) that would cause Spieker to violate Section 856(c)(4) of the Code. Spieker Partnership is not a publicly traded partnership within the meaning of Section 7704(b) of the Code that is taxable as a corporation pursuant to Section 7704(a) of the Code. Each Spieker Subsidiary which is a corporation has been since its formation a qualified REIT subsidiary under Section 856(i) of the Code. Neither Spieker nor any Spieker Subsidiary holds any asset (x) the disposition of which would be subject to rules similar to Section 1374 of the Code as a result of an election under IRS Notice 88–19 or Temporary Treas. Reg. §1.337(d)–5T or (y) which is subject to a consent filed pursuant to Section 341(f) of the Code and the regulations thereunder.

(c) To Spieker's knowledge, as of the date hereof, Spieker is a "domestically–controlled" REIT within the meaning of Section 897(h) of the Code.

2.15 *No Payments to Employees, Officers or Directors.* Schedule 2.15 to the Spieker Disclosure Letter contains a true and complete list of all arrangements, agreements or plans pursuant to which cash and non–cash payments which will become payable to each employee, officer or director of Spieker, any Spieker Subsidiary or Spieker TRS as a result of the Merger or a termination of service subsequent to the consummation of the Merger. Except as described in *Schedule 2.15* to the Spieker Disclosure Letter, or as otherwise provided for in this Agreement, there is no employment or severance contract, or other agreement requiring payments, cancellation of indebtedness or other obligation to be made on a change of control or otherwise as a result of the consummation of any of the transactions contemplated by this Agreement or as a result of a termination of service subsequent to the consummation of any of the transactions contemplated by this Agreement, with respect to any employee, officer or director of Spieker, any Spieker Subsidiary or Spieker TRS. Except as described in *Schedule 2.15* of the Spieker Disclosure Letter, there is no agreement or arrangement with any employee, officer or other service provider under which Spieker, any Spieker Subsidiary or any Spieker TRS has agreed to pay any tax that might be owed under Section 4999 of the Code with respect to payments to such individuals.

2.16 *Broker; Schedule of Fees and Expenses*. No broker, investment banker, financial advisor or other Person, other than Goldman, Sachs & Co. the fees and expenses of which are described in the engagement

A–22

Table of Contents

letter dated February 16, 2001, between Goldman, Sachs & Co. and Spieker, a true, correct and complete copy of which has previously been given to Equity Office, is entitled to any broker's, finder's, financial advisor's or other similar fee or commission in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of Spieker or any Spieker Subsidiary.

2.17 *Compliance with Laws*. None of Spieker, any Spieker Subsidiary or Spieker TRS has violated or failed to comply with any statute, law, ordinance, regulation, rule, judgment, decree or order of any Governmental Entity applicable to its business, properties or operations, except in each case to the extent that such violation or failure would not reasonably be expected to have a Spieker Material Adverse Effect.

2.18 *Contracts; Debt Instruments*.

(a) None of Spieker, any Spieker Subsidiary or Spieker TRS has received a written notice that it is in violation of or in default under (nor to the Knowledge of Spieker does there exist any condition which upon the passage of time or the giving of notice or both would cause such a violation of or default under) any material loan or credit agreement, note, bond, mortgage, indenture, lease, permit, concession, franchise, license or any other material contract, agreement, arrangement or understanding, to which it is a party or by which it or any of its properties or assets is bound, nor to the Knowledge of Spieker does such a violation or default exist, except in each case to the extent that such violation or default, individually or in the aggregate, would not reasonably be expected to have a Spieker Material Adverse Effect.

(b) Except for any of the following expressly identified in the Spieker SEC Documents, *Schedule 2.18(b)* to the Spieker Disclosure Letter sets forth a list of each material loan or credit agreement, note, bond, mortgage, indenture and any other agreement or instrument pursuant to which any Indebtedness (as defined herein) of Spieker, the Spieker Subsidiaries and Spieker TRS, other than Indebtedness payable to Spieker, a Spieker Subsidiary or the Spieker TRS, is outstanding or may be incurred. For purposes of this Section 2.18, "Indebtedness" shall mean (i) indebtedness for borrowed money, whether secured or unsecured, (ii) obligations under conditional sale or other title retention agreements relating to property purchased by such Person, (iii) capitalized lease obligations, (iv) obligations under interest rate cap, swap, collar or similar transaction or currency hedging transactions (valued at the termination value thereof) and (v) guarantees of any such indebtedness of any other Person.

(c) To the extent not set forth in response to the requirements of Section 2.18(b), *Schedule 2.18(c)* to the Spieker Disclosure Letter sets forth each interest rate cap, interest rate collar, interest rate swap, currency hedging transaction, and any other agreement relating to a similar transaction to which Spieker, any Spieker Subsidiary or Spieker TRS is a party or an obligor with respect thereto.

(d) Except as set forth in *Schedule 2.18(d)* of the Spieker Disclosure Letter, none of Spieker, any Spieker Subsidiary or Spieker TRS is a party to any agreement which would restrict any of them from prepaying any of their Indebtedness without penalty or premium at any time or which requires any of them to maintain any amount of Indebtedness with respect to any of the Spieker Properties.

(e) None of Spieker, any Spieker Subsidiary or Spieker TRS is a party to any agreement relating to the management of any Spieker Property by any Person other than Spieker, a Spieker Subsidiary or Spieker TRS.

(f) None of Spieker, any Spieker Subsidiary or Spieker TRS is a party to any agreement pursuant to which Spieker, any Spieker Subsidiary or Spieker TRS manages or provides services with respect to any real properties other than Spieker Properties, except for the agreements listed in *Schedule 2.18(f)* to the Spieker Disclosure Letter.

(g) Spieker has delivered to Equity Office prior to the date of this Agreement a true and complete capital budget for the year 2001 relating to budgeted capital improvements and development. *Schedule 2.18(g)* to the Spieker Disclosure Letter lists all material agreements entered into by Spieker, each of the Spieker Subsidiaries and Spieker TRS relating to the development or construction of, or additions or expansions to, any Spieker Real Properties (or any properties with respect to which Spieker has executed as of the date of this Agreement a purchase agreement or other similar agreement) which are currently in effect and under which Spieker or any of the Spieker Subsidiaries or Spieker TRS currently has, or expects to incur,

A–23

Table of Contents

an obligation in excess of $250,000 in the aggregate in the future. True, correct and complete copies of such agreements have previously been delivered or made available to Equity Office.

(h) *Schedule 2.18(h)* to the Spieker Disclosure Letter lists all agreements entered into by Spieker, any Spieker Subsidiary or Spieker TRS providing for the sale of, or option to sell, any Spieker Properties or the purchase of, or option to purchase, by

Spieker, any Spieker Subsidiary or Spieker TRS, on the one hand, or the other party thereto, on the other hand, any real estate not yet consummated as of the date hereof.

(i) Except as set forth in *Schedule 2.18(i)* to the Spieker Disclosure Letter, none of Spieker, any Spieker Subsidiary or Spieker TRS has any material continuing contractual liability (A) for indemnification or otherwise under any agreement relating to the sale of real estate previously owned, whether directly or indirectly, by Spieker, any Spieker Subsidiary or Spieker TRS or (B) to pay any additional purchase price for any of the Spieker Properties.

(j) Except as set forth in *Schedule 2.18(j)* to the Spieker Disclosure Letter, none of Spieker, any Spieker Subsidiary or Spieker TRS has entered into or is subject, directly or indirectly, to any "Tax Protection Agreements." As used herein, a Tax Protection Agreement is an agreement, oral or written, (A) that has as one of its purposes to permit a Person to take the position that such Person could defer federal taxable income that otherwise might have been recognized upon a transfer of property to the Spieker Partnership or any other Spieker Subsidiary that is treated as a partnership for federal income tax purposes, and that (i) prohibits or restricts in any manner the disposition of any assets of Spieker, any Spieker Subsidiary or Spieker TRS, (ii) requires that Spieker, any Spieker Subsidiary or Spieker TRS maintain, put in place, or replace, indebtedness, whether or not secured by one or more of the Spieker Properties, or (iii) requires that Spieker, any Spieker Subsidiary or Spieker TRS offer to any Person at any time the opportunity to guarantee or otherwise assume, directly or indirectly (including, without limitation, through a "deficit restoration obligation," guarantee (including, without limitation, a "bottom" guarantee), indemnification agreement or other similar arrangement), the risk of loss for federal income tax purposes for indebtedness or other liabilities of Spieker, any Spieker Subsidiary or Spieker TRS, (B) that specifies or relates to a method of taking into account book–tax disparities under Section 704(c) of the Code with respect to one or more assets of Spieker or a Spieker Subsidiary, or (C) that requires a particular method for allocating one or more liabilities of Spieker or any Spieker Subsidiary under Section 752 of the Code. None of Spieker, any Spieker Subsidiary or Spieker TRS is in violation of or in default under any Tax Protection Agreement.

2.19 *Opinion of Financial Advisor.* Spieker has received the written opinion of Goldman, Sachs & Co., Spieker's financial advisor, to the effect that the proposed consideration to be received by the holders of Spieker Common Stock pursuant to the Merger is fair to such holders from a financial point of view.

2.20 *State Takeover Statutes.* Spieker has taken all action necessary to exempt the transactions contemplated by this Agreement between Equity Office and Spieker and its Affiliates from the operation of any "fair price," "moratorium," "control share acquisition" or any other anti–takeover statute or similar statute enacted under the laws of the state or federal laws of the United States or similar statute or regulation (a "Takeover Statute").

2.21 *Stockholder Rights Plan.* The Board of Directors of Spieker has resolved to, and Spieker promptly after execution of this Agreement shall, take all action necessary to render the rights (the "Spieker Rights") issued pursuant to the terms of that certain Stockholder Protection Rights Agreement, dated as of September 10, 1998, between Spieker and The Bank of New York, as rights agent (the "Spieker Rights Agreement"), inapplicable to the Mergers, this Agreement, and the other transactions contemplated hereby.

2.22 *Investment Company Act of 1940.* None of Spieker, any Spieker Subsidiary or Spieker TRS is, or at the Effective Time will be, required to be registered under the Investment Company Act of 1940, as amended (the "1940 Act").

2.23 *Definition of "Knowledge of Spieker".* As used in this Agreement, the phrase "Knowledge of Spieker" (or words of similar import) means the actual knowledge of those individuals identified in *Schedule 2.23* to the Spieker Disclosure Letter.

A–24

**Table of Contents**

2.24 *Required Stockholder Approvals and Partner Approvals.* The affirmative vote of the holders of at least a majority of the Spieker Common Stock and the Spieker Series A Preferred Stock outstanding and entitled to vote and voting together as a single class are the only votes of the holders of any class or series of Spieker capital stock necessary or required under this Agreement or under applicable law to approve the Merger and this Agreement. The approval of Spieker and the affirmative vote of at least a majority of each class of Spieker limited partner interests, voting in accordance with the Spieker Partnership Agreement, and the affirmative vote of the outstanding Spieker Series D Preferred OP Units, as set forth in *Schedule 2.24* to the Spieker Disclosure Letter, are the only vote of the holders of any class or series of Spieker Partnership's partnership interests necessary or required under this Agreement or under applicable law to approve this Agreement, the Merger, the withdrawal of Spieker as general partner and the Partnership Merger (including, without limitation, termination of the Spieker Partnership Agreement).

ARTICLE 3

REPRESENTATIONS AND WARRANTIES OF EQUITY OFFICE AND

EOP PARTNERSHIP

Except as specifically set forth in the Equity Office SEC Documents (as defined herein) or in the schedule delivered to Spieker prior to the execution hereof and identified by the President or an Executive Vice President of Equity Office as the disclosure letter to this Agreement (the "Equity Office Disclosure Letter"), Equity Office and EOP Partnership represent and warrant to Spieker and Spieker Partnership as follows:

3.1 *Organization, Standing and Power of Equity Office.* Equity Office is a real estate investment trust duly organized, validly existing and in good standing under the laws of Maryland. Equity Office has all requisite power and authority to own, operate, lease and encumber its properties and carry on its business as now being conducted. Equity Office is duly qualified or licensed to do business as a foreign trust and is in good standing in each jurisdiction in which the nature of its business or the ownership or leasing of its properties makes such qualification or licensing necessary, other than in such jurisdictions where the failure to be so qualified or licensed, individually or in the aggregate, would not reasonably be expected to have an Equity Office Material Adverse Effect (as defined herein). As used in this Agreement, an "Equity Office Material Adverse Effect" means any circumstance, event, occurrence, change or effect that is materially adverse to the business, properties, assets (tangible or intangible), financial condition or results of operations of Equity Office, EOP Partnership and the Subsidiaries of Equity Office (collectively, "Equity Office Subsidiaries"), taken as a whole, except, in each case, as a result of (i) changes in general economic conditions nationally or regionally, (ii) changes affecting the real estate industry generally which do not affect Equity Office or EOP Partnership, as the case may be, materially disproportionately relative to other participants in the real estate industry similarly situated, or (iii) in and of itself and without the occurrence of any other Equity Office Material Adverse Effect, changes in the trading prices of Equity Office Common Shares or any series of Equity Office Preferred Shares. Equity Office has delivered to Spieker complete and correct copies of the Equity Office Declaration of Trust and the Equity Office Bylaws, as amended or supplemented to the date of this Agreement.

3.2 *Equity Office Subsidiaries.*

(a) *Schedule 3.2(a)* to the Equity Office Disclosure Letter sets forth (i) each Equity Office Subsidiary and each entity in which Equity Office or EOP Partnership holds non–voting equity securities (but no voting equity securities) (collectively, the "Equity Office Non–controlled Subsidiaries"), (ii) the ownership interest therein of Equity Office, (iii) if not directly or indirectly wholly owned by Equity Office, the identity and ownership interest of each of the other owners of such Equity Office Subsidiary, (iv) each office property and other commercial property owned by such Equity Office Subsidiary, and (v) if not wholly owned by such Equity Office Subsidiary, the identity and ownership interest of each of the other owners of such property.

(b) Except as set forth in *Schedule 3.2(b)* to the Equity Office Disclosure Letter, (i) all the outstanding shares of capital stock owned by Equity Office, an Equity Office Subsidiary or Equity Office TRS of each

A–25

---

**Table of Contents**

Equity Office Subsidiary and each Equity Office Non–controlled Subsidiary that is a corporation have been duly authorized, validly issued and are (A) fully paid and nonassessable and not subject to preemptive or similar rights and (B) owned free and clear of all Liens and (ii) all equity interests in each Equity Office Subsidiary that is a partnership, joint venture, limited liability company or trust which are owned by Equity Office, by another Equity Office Subsidiary or by Equity Office and another Equity Office Subsidiary are owned free and clear of all Liens. Each Equity Office Subsidiary that is a corporation is duly incorporated, validly existing and in good standing under the laws of its jurisdiction of incorporation and has the requisite corporate power and authority to own, operate, lease and encumber its properties and carry on its business as now being conducted, and each Equity Office Subsidiary that is a partnership, limited liability company or trust is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization and has the requisite power and authority to own, operate, lease and encumber its properties and carry on its business as now being conducted. Each Equity Office Subsidiary is duly qualified or licensed to do business and is in good standing in each jurisdiction in which the nature of its business or the ownership or leasing of its properties makes such qualification or licensing necessary, other than in such jurisdictions where the failure to be so qualified or licensed, individually or in the aggregate, would not reasonably be expected to have an Equity Office Material Adverse Effect. Complete and correct copies of the Articles of Incorporation, Bylaws, organization documents and partnership, joint venture and operating agreements of each Equity Office Subsidiary, as amended to the date of this Agreement, have been previously delivered or made available to Spieker. No effective amendment has been made to the EOP Partnership Agreement since December 22, 2000 (except to admit substituted limited partners following transfers of Equity Office OP Units).

3.3 *Capital Structure.*

(a) The authorized shares of beneficial interest of Equity Office consist of 750,000,000 Equity Office Common Shares, 307,728,060 of which were issued and outstanding as of January 31, 2001, and 100,000,000 preferred shares of beneficial interest, 8,000,000 of which are designated as 8.98% Series A Cumulative Redeemable Preferred Shares ("Equity Office Series A Preferred Shares"), 7,000,000 of which are designated as 5.25% Series B Convertible, Cumulative Preferred Shares ("Equity Office Series B Preferred Shares") and 4,600,000 of which are designated as 8?% Series C Cumulative Redeemable Preferred Shares ("Equity Office Series C Preferred Shares," and, together with the Equity Office Series A Preferred Shares and the Equity Office Series B Preferred Shares, the "Equity Office Existing Preferred Shares"). As of January 31, 2001, 7,994,000 Equity Office Series A Preferred Shares were issued and outstanding, 6,000,000 Equity Office Series B Preferred Shares were issued and outstanding and 4,562,900 Equity Office Series C Preferred Shares were issued and outstanding.

(b) Set forth in *Schedule 3.3(b)* to the Equity Office Disclosure Letter is a true and complete list of the following: (i) each qualified or nonqualified option to purchase Equity Office's shares of beneficial interest granted under the Employee Share Option and Restricted Share Plan or any other formal or informal arrangement (collectively, the "Equity Office Options"); and (ii) except for the Equity Office Series B Preferred Shares and the Senior Exchangeable Notes due November 15, 2008 of EOP Partnership (the "Equity Office Exchangeable Notes"), all other warrants or other rights to acquire Equity Office's shares of beneficial interest, all share appreciation rights, phantom shares, dividend equivalents, performance units and performance shares which are outstanding on the date of this Agreement. *Schedule 3.3(b)* to the Equity Office Disclosure Letter sets forth the Equity

Office Options granted to Equity Office's Chief Executive Officer and four other most highly compensated officers, the date of each grant, the status of each Equity Office Option as qualified or nonqualified under Section 422 of the Code, the number of Equity Office Common Shares subject to each Equity Office Option, the number and type of Equity Office's Common Shares subject to Equity Office Options that are currently exercisable, the exercise price per share, and the number and type of such shares subject to share appreciation rights. On the date of this Agreement, except as set forth in this Section 3.3 or excepted therefrom or as set forth in *Schedule 3.3(b)* or *3.3(d)* to the Equity Office Disclosure Letter, no shares of beneficial interest of Equity Office were outstanding or reserved for issuance (except for Equity Office Common Shares reserved for issuance upon redemption of Equity Office OP Units and upon exchange of the Equity Office Exchangeable Notes).

A–26

Table of Contents

(c) All outstanding shares of beneficial interest of Equity Office are duly authorized, validly issued, fully paid and nonassessable and not subject to preemptive or similar rights under law or the Equity Office Declaration of Trust or Equity Office Bylaws, or any contract or instrument to which Equity Office is a party or by which it is bound. Except for the Equity Office Exchangeable Notes, there are no bonds, debentures, notes or other indebtedness of Equity Office having the right to vote (or convertible into, or exchangeable for, securities having the right to vote) on any matters on which shareholders of Equity Office may vote.

(d) Except (i) as set forth in this Section 3.3 or in *Schedule 3.3(b)* or *3.3(d)* to the Equity Office Disclosure Letter, (ii) Equity Office Common Shares issuable, and reserved for issuance, upon conversion of the Equity Office Series B Preferred Shares, (iii) 9,558,824 Equity Office Common Shares issuable, and reserved for issuance, upon exchange of the Equity Office Exchangeable Notes and (iv) Equity Office OP Units, which may be redeemed for Equity Office Common Shares, as of the date of this Agreement, there are no outstanding securities, options, warrants, calls, rights, commitments, agreements, arrangements or undertakings of any kind to which Equity Office or any Equity Office Subsidiary is a party or by which such entity is bound, obligating Equity Office or any Equity Office Subsidiary to issue, deliver or sell, or cause to be issued, delivered or sold, additional shares of beneficial interest, voting securities or other ownership interests of Equity Office or any Equity Office Subsidiary or obligating Equity Office or any Equity Office Subsidiary to issue, grant, extend or enter into any such security, option, warrant, call, right, commitment, agreement, arrangement or undertaking (other than to Equity Office or an Equity Office Subsidiary).

(e) As of January 31, 2001, 349,245,178 Equity Office OP Units, 7,994,000 8.98% Series A Cumulative Redeemable Preferred Units ("Equity Office Series A Preferred OP Units"), 6,000,000 5.25% Series B Convertible, Cumulative Preferred Units ("Equity Office Series B Preferred OP Units") and 4,562,900 8 5/8% Series C Cumulative Redeemable Preferred Units ("Equity Office Series C Preferred OP Units," and, together with the Equity Office Series A Preferred OP Units and the Equity Office Series B Preferred OP Units, the "Equity Office Existing Preferred OP Units") are validly issued and outstanding, fully paid and nonassessable and not subject to preemptive or similar rights under law or the EOP Partnership Agreement, or any contract or instrument to which Equity Office or EOP Partnership is a party or by which either is bound, of which 307,728,060 Equity Office OP Units and all of the Equity Office Existing Preferred OP Units are owned by Equity Office and Equity Office Subsidiaries. *Schedule 3.3(e)* to the Equity Office Disclosure Letter sets forth the name of each holder of Equity Office OP Units and the number of Equity Office OP Units owned by each such holder as of January 31, 2001. Except as set forth in the EOP Partnership Agreement or as contemplated by this Agreement, the Equity Office OP Units and Equity Office Existing Preferred OP Units are not subject to any restrictions imposed by EOP Partnership on the transfer, assignment, pledge, distribution, encumbrance or other disposition thereof (either voluntarily or involuntarily and with or without consideration) or on the exercise of the voting rights thereof provided in the EOP Partnership Agreement. Except as set forth in this Section 3.3 or in *Schedule 3.3(d)* to the Equity Office Disclosure Letter, EOP Partnership has not issued or granted and is not a party to any outstanding commitments of any kind relating to, or any presently effective agreements or understandings with respect to, interests in EOP Partnership, whether issued or unissued, or securities convertible or exchangeable into interests in EOP Partnership.

(f) All dividends on Equity Office Common Shares and Equity Office Existing Preferred Shares and all distributions on Equity Office OP Units and Equity Office Existing Preferred OP Units, which have been declared prior to the date of this Agreement have been paid in full, except that (i) the dividends payable on Equity Office Common Shares (along with the corresponding distributions payable on Equity Office OP Units) which were declared on February 13, 2001 and are payable on April 16, 2001 have not yet been paid, (ii) the dividends payable on Equity Office Series A Preferred Shares (along with the corresponding distributions payable on Equity Office Series A Preferred OP Units) which were declared on November 1, 2000 and are payable on March 15, 2001 have not yet been paid, and (iii) the dividends payable on Equity Office Series C Preferred Shares (along with the corresponding distributions payable on Equity Office Series C Preferred OP Units) which were declared on November 1, 2000 and are payable on March 15, 2001 have not yet been paid.

(g) The Equity Office Common Shares and the Equity Office Preferred Shares to be issued by Equity Office, and the Equity Office OP Units to be issued by the EOP Partnership, pursuant to this Agreement have

A–27

Table of Contents

been duly authorized for issuance, and upon issuance will be duly and validly issued, fully paid and nonassessable. The Equity Office Preferred OP Units to be issued by EOP Partnership pursuant to this Agreement will be different series of the same class of limited partnership interests as the Equity Office Existing Preferred OP Units and will represent units of Limited Partnership Interest (as defined in the EOP Partnership Agreement) in EOP Partnership.

3.4 *Other Interests.* Except for interests in the Equity Office Subsidiaries, Equity Office Non–Controlled Subsidiaries and certain other entities as set forth in *Schedule 3.2(a), 3.2(b)* or *3.4* to the Equity Office Disclosure Letter (the "Equity Office Other Interests"), neither Equity Office nor any of its Subsidiaries owns directly or indirectly any interest or investment (whether equity or debt) in any corporation, partnership, joint venture, business, trust or other entity (other than investments in short–term investment securities). With respect to the Equity Office Other Interests, Equity Office, EOP Partnership, an Equity Office Subsidiary or an Equity Office Non–Controlled Subsidiary is a partner or shareholder in good standing, and owns such interests free and clear of all Liens. Neither Equity Office nor any of the Equity Office Subsidiaries is in material breach of any agreement, document or contract which is of a material nature governing its rights in or to the Equity Office Other Interests, all of which agreements, documents and contracts are (a) listed in *Schedule 3.4* to the Equity Office Disclosure Letter (or disclosed in the Equity Office SEC Documents (as defined herein)), (b) unmodified except as described therein and (c) to the Knowledge of Equity Office (as defined herein), in full force and effect. To the Knowledge of Equity Office and except as set forth in *Schedule 3.4* to the Equity Office Disclosure Letter, the other parties to any such agreement, document or contract which is of a material nature are not in breach of any of their respective obligations under such agreements, documents or contracts.

3.5 *Authority; Noncontravention; Consents.*

(a) Equity Office has the requisite power and authority to enter into this Agreement and, subject to the requisite shareholder approval of the Merger and the Proposed Equity Office Charter Amendments (as defined herein) (the "Equity Office Shareholder Approvals" and, together with the Spieker Stockholder Approvals, the "Shareholder Approvals"), to consummate the transactions contemplated by this Agreement to which Equity Office is a party. The execution and delivery of this Agreement by Equity Office and the consummation by Equity Office of the transactions contemplated by this Agreement to which Equity Office is a party have been duly authorized by all necessary action on the part of Equity Office, except for and subject to the Equity Office Shareholder Approvals and the requisite approval, if any is required, of the partners of EOP Partnership. This Agreement has been duly executed and delivered by Equity Office and constitutes a valid and binding obligation of Equity Office, enforceable against Equity Office in accordance with and subject to its terms, subject to applicable bankruptcy, insolvency, moratorium or other similar laws relating to creditors' rights and general principles of equity.

(b) EOP Partnership has the requisite partnership power and, subject to the requisite partner approval of the Partnership Merger (if any), authority to enter into this Agreement and to consummate the transactions contemplated by this Agreement to which EOP Partnership is a party. The execution and delivery of this Agreement by EOP Partnership and the consummation by EOP Partnership of the transactions contemplated by this Agreement to which EOP Partnership is a party have been duly authorized by all necessary action on the part of EOP Partnership, except for and subject to the Equity Office Partner Approvals. This Agreement has been duly executed and delivered by EOP Partnership and constitutes a valid and binding obligation of EOP Partnership, enforceable against EOP Partnership in accordance with and subject to its terms, subject to applicable bankruptcy, insolvency, moratorium or other similar laws relating to creditors' rights and general principles of equity.

(c) Except as set forth in *Schedule 3.5(c)(1)* to the Equity Office Disclosure Letter and subject to receipt of the Equity Office Shareholder Approvals and the Equity Office Partner Approvals, the execution and delivery of this Agreement by Equity Office and EOP Partnership do not, and the consummation of the transactions contemplated by this Agreement to which Equity Office or EOP Partnership is a party and compliance by Equity Office or EOP Partnership with the provisions of this Agreement will not, conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a

A–28

Table of Contents

right of termination, cancellation or acceleration of any material obligation or to loss of a material benefit under, or result in the creation of any Lien upon any of the properties or assets of Equity Office or any Equity Office Subsidiary under, (i) the Equity Office Declaration of Trust or the Equity Office Bylaws or the comparable charter or organizational documents or partnership, operating or similar agreement (as the case may be) of any other Equity Office Subsidiary, each as amended or supplemented to the date of this Agreement, (ii) any loan or credit agreement, note, bond, mortgage, indenture, reciprocal easement agreement, lease or other agreement, instrument, permit, concession, franchise or license applicable to Equity Office or any Equity Office Subsidiary or their respective properties or assets or (iii) subject to the governmental filings and other matters referred to in the following sentence, any Laws applicable to Equity Office or any Equity Office Subsidiary or their respective properties or assets, other than, in the case of clause (ii) or (iii), any such conflicts, violations, defaults, rights, loss or Liens that individually or in the aggregate would not reasonably be expected to (x) have an Equity Office Material Adverse Effect or (y) prevent or materially impair the ability of Equity Office to perform any of its obligations hereunder or prevent or materially threaten or impede the consummation of the transactions contemplated by this Agreement. No consent, approval, order or authorization of, or registration, declaration or filing with, any Governmental Entity is required by or with respect to Equity Office or any Equity Office Subsidiary in connection with the execution and delivery of this Agreement by Equity Office and EOP Partnership or the consummation by Equity Office or any Equity Office Subsidiary of any of the transactions contemplated by this Agreement, except for (i) the filing with the SEC of (x) the Form S–4 (as defined herein) and (y) such reports and filings under the Securities Act and under Sections 13(a) and 13(d) of the Exchange Act as may be required in connection with this Agreement and the transactions contemplated by this Agreement, (ii) the filing and acceptance for record of the Articles of Merger by the

Department, (iii) the filing of the Delaware Certificate of Merger with the Office of the Secretary of State of the State of Delaware, (iv) the filing of the California Certificate of Merger with the Office of the Secretary of State of the State of California, (v) such filings as may be required in connection with the payment of any transfer and gains taxes and (vi) such other consents, approvals, orders, authorizations, registrations, declarations and filings (A) as are set forth in *Schedule 3.5(c)(2)* to the Equity Office Disclosure Letter or (B) as may be required under (w) the HSR Act, (x) federal, state or local environmental laws or (y) the "blue sky" laws of various states, to the extent applicable, or (C) which, if not obtained or made, would not prevent or delay in any material respect the consummation of any of the transactions contemplated by this Agreement or otherwise prevent Equity Office from performing its obligations under this Agreement in any material respect or reasonably be expected to have, individually or in the aggregate, an Equity Office Material Adverse Effect.

3.6 *SEC Documents; Financial Statements; Undisclosed Liabilities.* Equity Office and EOP Partnership have filed all reports, schedules, forms, statements and other documents required to be filed with the SEC since December 31, 1997 through the date hereof (the "Equity Office SEC Documents"). All of the Equity Office SEC Documents (other than preliminary material), as of their respective filing dates, complied in all material respects with all applicable requirements of the Securities Act and the Exchange Act and, in each case, the rules and regulations promulgated thereunder applicable to such Equity Office SEC Documents. None of the Equity Office SEC Documents at the time of filing contained, nor will any report, schedule, form, statement or other document filed by Equity Office or EOP Partnership after the date hereof and prior to the Effective Time contain, any untrue statement of a material fact or omitted to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading. The consolidated financial statements of Equity Office and the Equity Office Subsidiaries included in the Equity Office SEC Documents complied, or will comply, as to form in all material respects with applicable accounting requirements and the published rules and regulations of the SEC with respect thereto, have been or will be prepared in accordance with GAAP (except, in the case of unaudited statements, as permitted by the applicable rules and regulations of the SEC) applied on a consistent basis during the periods involved (except as may be indicated in the notes thereto) and fairly presented, or will fairly present, in all material respects in accordance with the applicable requirements of GAAP and the applicable rules and regulations of the SEC, the consolidated financial position of Equity Office and the Equity Office Subsidiaries, taken as a whole, as of the dates thereof and the consolidated results of operations and cash flows for the periods then ended (except, in the case of unaudited statements, as permitted by Form 10-Q

A-29

Table of Contents

under the Exchange Act). Except for liabilities and obligations set forth in the Equity Office SEC Documents or in *Schedule 3.6* to the Equity Office Disclosure Letter, neither Equity Office nor any Equity Office Subsidiary has any liabilities or obligations of any nature (whether accrued, absolute, contingent or otherwise) required by GAAP to be set forth on a consolidated balance sheet of Equity Office or in the notes thereto and which, individually or in the aggregate, would reasonably be expected to have an Equity Office Material Adverse Effect.

3.7 *Absence of Certain Changes or Events.* Except as disclosed in the Equity Office SEC Documents or in *Schedule 3.7* to the Equity Office Disclosure Letter, since December 31, 1999 (the "Equity Office Financial Statement Date"), Equity Office and the Equity Office Subsidiaries have conducted their business only in the ordinary course (taking into account prior practices, including the acquisition of properties and issuance of securities) and there has not been (a) any circumstance, event, occurrence, change or effect that has had an Equity Office Material Adverse Effect, nor has there been any circumstance, event, occurrence, change or effect that with the passage of time would reasonably be expected to result in an Equity Office Material Adverse Effect, (b) except for regular quarterly distributions not in excess of $0.45 per Equity Office Common Share or Equity Office OP Unit or the stated distribution rate for each Equity Office Existing Preferred Share or Equity Office Existing Preferred OP Unit, subject to changes pursuant to Section 5.10 and to any Corresponding Equity Office Dividends and Distributions paid pursuant to Section 1.13(d)(ii) or rounding adjustments as necessary and with customary record and payment dates, any authorization, declaration, setting aside or payment of any dividend or other distribution (whether in cash, shares or property) with respect to Equity Office Common Shares, Equity Office OP Units, Equity Office Existing Preferred Shares or Equity Office Existing Preferred OP Units, (c) any split, combination or reclassification of any of Equity Office's shares of beneficial interest, (d) any damage, destruction or loss, whether or not covered by insurance, that has had or would reasonably be expected to have an Equity Office Material Adverse Effect or (e) any change made prior to the date of this Agreement in accounting methods, principles or practices by Equity Office or any Equity Office Subsidiary materially affecting its assets, liabilities or business, except insofar as may have been disclosed in the Equity Office SEC Documents or required by a change in GAAP.

3.8 *Litigation.* Except as disclosed in the Equity Office SEC Documents or in *Schedule 3.8* to the Equity Office Disclosure Letter, and other than personal injury and other routine tort litigation arising from the ordinary course of operations of Equity Office and the Equity Office Subsidiaries (a) which are covered by insurance, subject to a reasonable deductible or retention limit or (b) for which all material costs and liabilities arising therefrom are reimbursable pursuant to common area maintenance or similar agreements, there is no suit, action or proceeding pending (in which service of process has been received by an employee of Equity Office or an Equity Office Subsidiary) or, to the Knowledge of Equity Office (as defined herein), threatened in writing against or affecting Equity Office or any Equity Office Subsidiary that, individually or in the aggregate, would reasonably be expected to (i) have an Equity Office Material Adverse Effect or (ii) prevent or materially impair the ability of Equity Office to perform any of its obligations hereunder or prevent or materially threaten or impair the consummation of any of the transactions contemplated by this Agreement, nor is there any judgment, decree, injunction, rule or order of any Governmental Entity or arbitrator outstanding against Equity Office or any Equity Office Subsidiary having, or which, insofar as reasonably can be foreseen, in the future would have, any such effect.

3.9 *Properties.*

(a) Except as set forth in *Schedule 3.9(a)* to the Equity Office Disclosure Letter, Equity Office or one of the Equity Office Subsidiaries owns fee simple title to each of the real properties listed in the Equity Office SEC Filings as owned by it (the "Equity Office Properties"), except where the failure to own such title would not have an Equity Office Material Adverse Effect.

(b) The Equity Office Properties are not subject to any Encumbrances or Property Restrictions which reasonably could be expected to cause an Equity Office Material Adverse Effect.

(c) Valid policies of title insurance (or fully paid and enforceable commitments therefor) have been issued insuring Equity Office's or the applicable Equity Office Subsidiary's fee simple title or leasehold estate, as the case may be, to the Equity Office Properties in amounts which are, except in the case of San Felipe

A–30

**Table of Contents**

Plaza, approximately equal to the purchase price thereof paid by Equity Office or the applicable Equity Office Subsidiaries therefor, except where the failure to obtain such title insurance would not reasonably be expected to have an Equity Office Material Adverse Effect.

(d) Equity Office has no Knowledge (i) that it has failed to obtain a certificate, permit or license from any governmental authority having jurisdiction over any of the Equity Office Properties where such failure would reasonably be expected to have an Equity Office Material Adverse Effect or of any pending threat of modification or cancellation of any of the same which would reasonably be expected to have an Equity Office Material Adverse Effect, (ii) of any written notice of any violation of any federal, state or municipal law, ordinance, order, rule, regulation or requirement affecting any of the Equity Office Properties issued by any governmental authorities which would reasonably be expected to have an Equity Office Material Adverse Effect or (iii) of any structural defects relating to Equity Office Properties, Equity Office Properties whose building systems are not in working order, physical damage to any Equity Office Property for which there is not insurance in effect covering the cost of the restoration and the lost revenue (subject to a reasonable deduction or retention limit), except such structural defects, building systems not in working order and physical damage, which, in the aggregate, would not reasonably be expected to have an Equity Office Material Adverse Effect.

(e) Except as set forth in *Schedule 3.9(e)* to the Equity Office Disclosure Letter, neither Equity Office nor any of the Equity Office Subsidiaries has received any written or published notice to the effect that (i) any condemnation or involuntary rezoning proceedings are pending or threatened with respect to any of the Equity Office Properties or (ii) any zoning, building or similar law, code, ordinance, order or regulation is or will be violated by the continued maintenance, operation or use of any buildings or other improvements on any of the Equity Office Properties or by the continued maintenance, operation or use of the parking areas, other than such notices which, in the aggregate, would not reasonably be expected to have an Equity Office Material Adverse Effect.

(f) Except as set forth in *Schedule 3.9(f)* to the Equity Office Disclosure Letter, (i) all work to be performed, payments to be made and actions to be taken by Equity Office or the Equity Office Subsidiaries prior to the date hereof pursuant to any agreement entered into with a governmental body or authority in connection with a site approval, zoning reclassification or similar action relating to any Equity Office Properties (*e.g.*, Local Improvement District, Road Improvement District, Environmental Mitigation), have been performed, paid or taken, as the case may be, and (ii) Equity Office has no Knowledge of any planned or proposed work, payments or actions that may be required after the date hereof pursuant to such agreements, in each of cases (i) and (ii) except where the failure to do so would, in the aggregate, not reasonably be expected to have an Equity Office Material Adverse Effect.

(g) The rent roll previously provided by Equity Office to Spieker (the "Equity Office Rent Roll") lists each Equity Office Space Lease (as defined herein) in effect as of the respective dates indicated in the Equity Office Rent Roll and, except for omissions or discrepancies that, either individually or in the aggregate, would not reasonably be expected to have an Equity Office Material Adverse Effect, all information set forth in the Equity Office Rent Roll is true, correct, and complete as of the date thereof. "Equity Office Space Lease" means each lease or other right of occupancy affecting or relating to a property in which EOP Partnership (or an entity in which it directly or indirectly has an interest) is the landlord, either pursuant to the terms of the lease agreement or as successor to any prior landlord, but excluding any ground lease. Equity Office has made available to Spieker true, correct and complete copies of all Equity Office Space Leases, including all amendments, modifications, supplements, renewals, extensions and guarantees related thereto, as of the date hereof. Except as set forth in a delinquency report made available to Spieker, neither Equity Office nor any Equity Office Subsidiary, on the one hand, nor, to the Knowledge of Equity Office or EOP Partnership, any other party, on the other hand, is in monetary default under any Equity Office Space Lease, except for such defaults that would not reasonably be expected to have an Equity Office Material Adverse Effect.

(h) *Schedule 3.9(h)* contains a true and complete list, by type of insurance, carrier, coverages (including limits) and term, of all material policies of casualty, liability and other types of insurance (except title insurance) carried by Equity Office or any Equity Office Subsidiary. All such policies are in full force and

A–31

Table of Contents

effect and neither Equity Office nor any Equity Office Subsidiary has received from any insurance company notice of any material defects or deficiencies affecting the insurability of Equity Office or any Equity Office Subsidiary or any of their respective assets thereunder.

3.10 *Environmental Matters.*

Except as disclosed in the Equity Office SEC Documents,

(i) none of Equity Office, any of the Equity Office Subsidiaries or, to Equity Office's Knowledge, any other Person has caused or permitted the presence of any Hazardous Materials at, on or under any of the Equity Office Properties, such that the presence of such Hazardous Materials (including the presence of asbestos in any buildings or improvements at the Equity Office Properties) would, individually or in the aggregate, reasonably be expected to have an Equity Office Material Adverse Effect;

(ii) except in accordance with the Environmental Permits, there have been no Releases of Hazardous Materials at, on, under or from (A) the Equity Office Properties, or (B) any real property formerly owned, operated or leased by Equity Office or the Equity Office Subsidiaries during the period of such ownership, operation or tenancy, which would, individually or in the aggregate, reasonably be expected to have an Equity Office Material Adverse Effect;

(iii) (y) Equity Office and the Equity Office Subsidiaries have not failed to comply in any material respect with all Environmental Laws, and (z) neither Equity Office nor any of the Equity Office Subsidiaries has any liability under the Environmental Laws, except in each of cases (y) and (z) to the extent such failure to comply or any such liability, individually or in the aggregate, would not reasonably be expected to have an Equity Office Material Adverse Effect; and

(iv) Equity Office and the Equity Office Subsidiaries have been duly issued, and currently have and will maintain through the Closing Date, all Environmental Permits except where the failure to obtain and maintain such Environmental Permits would not, individually or in the aggregate, reasonably be expected to have an Equity Office Material Adverse Effect. Equity Office and the Equity Office Subsidiaries have timely filed applications for all Environmental Permits.

3.11 *Taxes.*

(a) Each of Equity Office and the Equity Office Subsidiaries (i) has filed all Tax returns and reports required to be filed by it (after giving effect to any filing extension properly granted by a Governmental Entity having authority to do so), and all such returns and reports are accurate and complete in all material respects, (ii) has paid (or Equity Office has paid on its behalf) all Taxes shown on such returns and reports as required to be paid by it and (iii) has complied in all material respects with all applicable laws, rules and regulations relating to the payment and withholding of Taxes (including, without limitation, withholding of Taxes pursuant to Sections 1441, 1442, 1445, 1446, 3121, and 3402 of the Code or similar provisions under any foreign laws) and has, within the time period prescribed by law, withheld and paid over to the proper governmental entities all amounts required to be so withheld and paid over under applicable laws and regulations, except, with respect to all of the foregoing, where the failure to file such tax returns or reports or failure to pay such Taxes or failure to comply with such requirements would not reasonably be expected to have an Equity Office Material Adverse Effect. The most recent audited financial statements contained in the Equity Office SEC Documents reflect an adequate reserve for all material Taxes payable by Equity Office and the Equity Office Subsidiaries for all taxable periods and portions thereof through the date of such financial statements. Since the Equity Office Financial Statement Date, Equity Office has incurred no liability for Taxes under Sections 857(b), 860(c) or 4981 of the Code, including without limitation any Tax arising from a prohibited transaction described in Section 857(b)(6) of the Code, and neither Equity Office nor any Equity Office Subsidiary has incurred any material liability for Taxes other than in the ordinary course of business. No event has occurred, and no condition or circumstance exists, which presents a material risk that any material Tax described in the preceding sentence will be imposed upon Equity Office or any Equity Office Subsidiary. Neither Equity Office nor any Equity Office Subsidiary is the subject of any audit, examination, or other proceeding in respect of federal income Taxes, and to Equity Office's Knowledge, no audit, examination or other proceeding in respect of federal income Taxes involving any of Equity Office or any Equity Office

Table of Contents

Subsidiary is being considered by any Tax authority. To the Knowledge of Equity Office, no deficiencies for any Taxes have been proposed, asserted or assessed against Equity Office or any of the Equity Office Subsidiaries, and no requests for waivers of the time to assess any such Taxes are pending.

(b) Equity Office (i) for all taxable years commencing with 1997, which was the first year of its operations, through December 31, 2000, has been subject to taxation as a REIT within the meaning of Section 856 of the Code and has qualified as a REIT for all such years, (ii) has operated since December 31, 2000 to the date of this representation, and intends to continue to operate, in such a manner as to qualify as a REIT for the taxable year that includes the Closing Date and (iii) has not taken or omitted to take any action which would reasonably be expected to result in a challenge to its status as a REIT and, to Equity Office's Knowledge, no such challenge is pending or threatened. Each Equity Office Subsidiary which is a partnership, joint venture or limited liability company either (A)(i) has been treated since its formation and continues to be treated for federal income tax purposes either as a partnership or as an entity that is disregarded for federal income tax purposes and not as a corporation or as an association taxable as a corporation and (ii) has not since the later of its formation or the acquisition by Equity Office of a direct or indirect interest therein, owned any assets (including, without limitation, securities) that would cause

Equity Office to violate Section 856(c)(4) of the Code or (B)(i) met the conditions set forth in clause (A)(i) and (A)(ii) as of December 31, 2000 and (ii) as of March 31, 2001, will be treated for federal income tax purposes as a corporation and will qualify as a taxable REIT Subsidiary under Section 856(l) of the Code. EOP Partnership is not a publicly traded partnership within the meaning of Section 7704(b) of the Code that is taxable as a corporation pursuant to Section 7704(a) of the Code. Each Equity Office Subsidiary which is a corporation (1) has been since its formation a qualified REIT subsidiary under Section 856(i) of the Code or (2) as of March 31, 2001 will qualify as a taxable REIT subsidiary under Section 856(1) of the Code. Except as set forth in *Schedule 3.11* to the Equity Office Disclosure Letter, neither Equity Office nor any Equity Office Subsidiary holds any asset (x) the disposition of which would be subject to rules similar to Section 1374 of the Code as a result of an election under IRS Notice 88–19 or Temporary Treas. Reg. §1.337(d)–5T or (y) which is subject to a consent filed pursuant to Section 341(f) of the Code and the regulations thereunder.

(c) To Equity Office's knowledge, as of the date hereof, Equity Office is a "domestically–controlled REIT" within the meaning of Section 897(h)(4)(B) of the Code.

3.12 *Brokers; Schedule of Fees and Expenses.* No broker, investment banker, financial advisor or other Person, other than Morgan Stanley & Co. Incorporated, the fees and expenses of which will be paid by Equity Office and are described in the engagement letter dated February 16, 2001, between Morgan Stanley & Co. Incorporated and Equity Office, a true, correct and complete copy of which has previously been given to Spieker, is entitled to any broker's, finder's, financial advisor's or other similar fee or commission in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of Equity Office or any Equity Office Subsidiary.

3.13 *Compliance with Laws.* Neither Equity Office nor any of the Equity Office Subsidiaries has violated or failed to comply with any statute, law, ordinance, regulation, rule, judgment, decree or order of any Governmental Entity applicable to its business, properties or operations, except in each case to the extent that such violation or failure would not reasonably be expected to have an Equity Office Material Adverse Effect.

3.14 *Contracts; Debt Instruments.* Neither Equity Office nor any Equity Office Subsidiary has received a written notice that Equity Office or any Equity Office Subsidiary is in violation of or in default under (nor to the Knowledge of Equity Office does there exist any condition which upon the passage of time or the giving of notice or both would cause such a violation of or default under) any material loan or credit agreement, note, bond, mortgage, indenture, lease, permit, concession, franchise, license or any other material contract, agreement, arrangement or understanding, to which it is a party or by which it or any of its properties or assets is bound, nor to the Knowledge of Equity Office does such a violation or default exist, except to the extent such violation or default, individually or in the aggregate, would not reasonably be expected to have an Equity Office Material Adverse Effect, except as set forth in the Equity Office SEC Documents or in *Schedule 3.14* to the Equity Office Disclosure Letter.

A–33

---

**Table of Contents**

3.15 *Opinion of Financial Advisor.* Equity Office has received the opinion of Morgan Stanley & Co. Incorporated, Equity Office's financial advisor, to the effect that the consideration to be paid by Equity Office in connection with the Merger is fair, from a financial point of view, to Equity Office.

3.16 *State Takeover Statutes.* Equity Office has taken all action necessary to exempt the transactions contemplated by this Agreement between Equity Office and Spieker and its Affiliates from the operation of Takeover Statutes.

3.17 *Investment Company Act of 1940.* Neither Equity Office nor any of the Equity Office Subsidiaries is, or at the Effective Time will be, required to be registered under the 1940 Act.

3.18 *Definition of "Knowledge of Equity Office".* As used in this Agreement, the phrase "Knowledge of Equity Office" (or words of similar import) means the actual knowledge of those individuals identified in *Schedule 3.18* to the Equity Office Disclosure Letter.

3.19 *Required Shareholder Approvals and Partner Approvals.* The affirmative vote of the holders of not less than a majority of all votes entitled to be cast by holders of Equity Office Common Shares, and the affirmative vote of the partners of EOP Partnership holding at least a majority of the outstanding Partnership Units (as defined in the EOP Partnership Agreement) (including Partnership Units held by Equity Office), are the only votes of the holders of any class or series of Equity Office capital shares or EOP Partnership limited partners necessary or required under this Agreement or under applicable law to approve the Merger, this Agreement and the Proposed Equity Office Charter Amendments. The approval of the Partnership Merger by Equity Office is the only vote necessary or required under this Agreement or under applicable law to approve the Partnership Merger under the EOP Partnership Agreement.

ARTICLE 4

COVENANTS

4.1 *Conduct of Spieker's and Spieker Partnership's Business Pending Merger.* During the period from the date of this Agreement to the Effective Times, except as consented to in writing by Equity Office or as contemplated in this Agreement, Spieker and Spieker Partnership shall, and shall cause (or, in the case of Spieker Subsidiaries and Spieker TRS that Spieker or Spieker Partnership do not control, shall use commercially reasonable efforts to cause) each of the Spieker Subsidiaries and

Spieker TRS to:

(a) conduct its business only in the usual, regular and ordinary course and in substantially the same manner as heretofore conducted, except for such changes as are expressly required by this Agreement;

(b) use commercially reasonable efforts to preserve intact its business organizations and goodwill and, provided it does not require additional compensation, keep available the services of its officers and employees;

(c) confer on a regular basis with one or more representatives of Equity Office to report operational matters of materiality and, subject to Section 4.3, any proposals to engage in material transactions;

(d) promptly notify Equity Office of the occurrence or existence of any circumstance, event, occurrence, change or effect that has had or would reasonably be expected to have a Spieker Material Adverse Effect;

(e) promptly deliver to Equity Office true and correct copies of any report, statement, schedule or other document filed with the SEC subsequent to the date of this Agreement;

(f) maintain its books and records in accordance with GAAP consistently applied and not change in any material manner any of its methods, principles or practices of accounting in effect at the Spieker Financial Statement Date, except as may be required by the SEC, applicable law or GAAP;

(g) duly and timely file all reports, tax returns and other documents required to be filed with federal, state, local and other authorities, subject to extensions permitted by law, provided Spieker notifies Equity Office that it is availing itself of such extensions and provided such extensions do not adversely affect Spieker's status as a qualified REIT under the Code;

A–34

Table of Contents

(h) maintain in full force and effect insurance coverage substantially similar to insurance coverage maintained on the date hereof;

(i) not make or rescind any express or deemed election relative to Taxes (unless such election or rescission is required by law or necessary (1) to preserve Spieker's status as a REIT, or (2) to qualify or preserve the status of any Spieker Subsidiary as a partnership for federal income tax purposes, as a qualified REIT subsidiary under Section 856(i) of the Code, or as a taxable REIT subsidiary under Section 856(l) of the Code, as the case may be (in which event Spieker or the applicable Spieker Subsidiary shall not fail to make such election in a timely manner);

(j) not (A) acquire, enter into any option to acquire, or exercise an option or other right or election or enter into any other commitment or contractual obligation (each, a "Commitment") for the acquisition of any real property or, except as permitted in a property capital budget approved in writing by Equity Office, other transaction (other than Commitments referred to in *Schedule 4.1(j)* to the Spieker Disclosure Letter) involving in excess of $100,000, encumber assets or commence construction of, or enter into any Commitment to develop or construct other real estate projects, except in the ordinary course of its office property business, including leasing activities pursuant to Equity Office–approved guidelines identified as the guidelines by Equity Office and Spieker as of the date hereof (the "Lease Guidelines"), (B) incur or enter into any Commitment to incur additional indebtedness (secured or unsecured) except for working capital under its revolving line(s) of credit and Commitments for indebtedness for the purposes and not in excess of the amounts described on *Schedule 4.1(j)* to the Spieker Disclosure Letter or (C) modify, amend or terminate, or enter into any Commitment to modify, amend or terminate, any indebtedness (secured or unsecured) in existence as of the date hereof;

(k) not amend the Spieker Articles or the Spieker Bylaws, or the articles or certificate of incorporation, bylaws, code of regulations, partnership agreement, operating agreement or joint venture agreement or comparable charter or organization document of any Spieker Subsidiary or Spieker TRS;

(l) not classify or re–classify any unissued shares of capital stock; make no change in the number of shares of capital stock, membership interests or units of limited partnership interest issued and outstanding, other than pursuant to (i) the exercise of options disclosed in *Schedule 2.3* to the Spieker Disclosure Letter, (ii) the conversion of the Spieker Class A Preferred Shares if required by their terms, (iii) the redemption of Spieker OP Units under the Spieker Partnership Agreement solely for shares of Spieker Common Stock unless, and only to the extent that, such redemption solely for shares of Spieker Common Stock would reasonably be expected to cause Spieker not to qualify as a REIT for federal income tax purposes, or (v) the conversion of Spieker Series D OP Units under the Spieker Partnership Agreement solely into Spieker Series D Preferred Shares;

(m) grant no options or other right or commitment relating to its shares of capital stock, membership interests or units of limited partnership interest or any security convertible into its shares of capital stock, membership interests or units of limited partnership interest, or any security the value of which is measured by shares of beneficial interest, or any security subordinated to the claim of its general creditors and not amend or waive any rights under any of the Spieker Stock Options or Spieker Stock Rights;

(n) except as provided in Section 5.10 and in connection with the use of Spieker Common Stock to pay the exercise price or tax withholding in connection with equity–based employee benefit plans by the participants therein, not (i) authorize, declare, set aside or pay any dividend or make any other distribution or payment with respect to any Spieker Common Stock, Spieker Preferred Stock, Spieker OP Unit or Spieker Preferred OP Unit or (ii) directly or indirectly redeem, purchase or otherwise acquire any shares of capital stock, membership interests or units of partnership interest or any option, warrant or right to acquire, or security convertible into, shares of capital stock, membership interests or units of partnership interest of Spieker or any Spieker Subsidiary, except for (A) deemed transfers of Spieker excess shares required under Article Ninth of the Spieker Articles in order to preserve the status of Spieker as a REIT under the Code, (B) redemptions of Spieker OP Units, whether or not outstanding on the date of this Agreement, under the Spieker Partnership Agreement in which solely Spieker Common

A–35

Table of Contents

Stock is utilized, and (C) redemption of the Spieker Series A Preferred Stock, which Spieker shall call for redemption and (except to the extent converted into Spieker Common Stock pursuant to the terms thereof) redeem promptly after the date hereof;

(o) not sell, lease, mortgage, subject to Lien (or, in the case of an involuntary Lien, fail to have such Lien removed within 30 days of the creation thereof) or otherwise dispose of any of the Spieker Properties, except in connection with a transaction that is permitted by Section 4.1(j), that is made in the ordinary course of business and is the subject of a binding contract in existence on the date of this Agreement and disclosed in *Schedule 2.18* to the Spieker Disclosure Letter or in connection with a transaction that is permitted by the Lease Guidelines;

(p) not sell, lease, mortgage, subject to Lien or otherwise dispose of any of its personal property or intangible property, except in the ordinary course of business and is not material, individually or in the aggregate;

(q) not make any loans, advances or capital contributions to, or investments in, any other Person, other than loans, advances and capital contributions to Spieker Subsidiaries or Spieker TRS in existence on the date hereof and ordinary course expense advances to employees and except in connection with a transaction permitted by Section 4.1(j), and not enter into any new, or amend or supplement any existing, contract, lease or other agreement with Spieker TRS;

(r) not pay, discharge or satisfy any claims, liabilities or obligations (absolute, accrued, asserted or unasserted, contingent or otherwise), other than the payment, discharge or satisfaction, in the ordinary course of business consistent with past practice or in accordance with their terms, of liabilities reflected or reserved against in, or contemplated by, the most recent consolidated financial statements (or the notes thereto) furnished to Equity Office or incurred in the ordinary course of business consistent with past practice;

(s) not guarantee the indebtedness of another Person, enter into any "keep well" or other agreement to maintain any financial statement condition of another Person or enter into any arrangement having the economic effect of any of the foregoing;

(t) not enter into any Commitment with any officer, director or Affiliate of Spieker or any of the Spieker Subsidiaries or Spieker TRS or any material Commitment with any consultant;

(u) not increase any compensation or enter into or amend any employment, severance or other arrangement with any of its officers, directors or employees earning more than $50,000 per annum, other than as required by any contract or Plan or in accordance with waivers by employees of benefits under such agreements or in accordance with Section 5.8(f);

(v) not adopt any new employee benefit plan or amend any existing plans or rights;

(w) not settle any stockholder derivative or class action claims arising out of or in connection with any of the transactions contemplated by this Agreement;

(x) not change the ownership of any of its Subsidiaries or Spieker TRS, except changes which arise as a result of the acquisition of Spieker OP Units in exchange for Spieker Common Stock pursuant to exercise of the Spieker OP Unit redemption right under Section 8.6 of the Spieker Partnership Agreement;

(y) not accept a promissory note in payment of the exercise price payable under any option to purchase shares of Spieker Common Stock;

(z) not enter into any Tax Protection Agreement;

(aa) not settle or compromise any material federal, state, local or foreign tax liability; and

(bb) not authorize, recommend, propose or announce an intention to do any of the foregoing prohibited actions, or enter into any contract, agreement, commitment or arrangement to do any of the foregoing prohibited actions.

A–36

Table of Contents

4.2 *Conduct of Equity Office's and EOP Partnership's Business Pending Merger.* During the period from the date of this Agreement to the Effective Times, except as consented to in writing by Spieker or as expressly contemplated in this Agreement, Equity Office and EOP Partnership shall, and shall cause (or, in the case of Spieker Subsidiaries that Spieker or Spieker Partnership do not control, shall use commercially reasonable efforts to cause) each of the Equity Office Subsidiaries to:

(a) use commercially reasonable efforts to preserve intact its business organizations and goodwill and keep available the services of its officers and employees;

(b) confer on a regular basis with one or more representatives of Spieker to report operational matters of materiality which would reasonably be expected to have an Equity Office Material Adverse Effect;

(c) promptly notify Spieker of the occurrence or existence of any circumstance, event, occurrence, change or effect that has had or would reasonably be expected to have an Equity Office Material Adverse Effect;

(d) promptly deliver to Spieker true and correct copies of any report, statement, schedule or other document filed with the SEC subsequent to the date of this Agreement;

(e) maintain its books and records in accordance with GAAP consistently applied and not change in any material manner any of its methods, principles or practices of accounting in effect at the Equity Office Financial Statement Date, except as may be required by the SEC, applicable law or GAAP;

(f) duly and timely file all reports, tax returns and other documents required to be filed with federal, state, local and other authorities, subject to extensions permitted by law, provided such extensions do not adversely affect Equity Office's status as a qualified REIT under the Code;

(g) not make or rescind any express or deemed election relative to Taxes (unless such election or rescission is required by law or necessary (1) to preserve Equity Office's status as a REIT, or (2) to qualify or preserve the status of any Equity Office Subsidiary as a partnership for federal income tax purposes, as a qualified REIT subsidiary under Section 856(i) of the Code, or as a taxable REIT subsidiary under Section 856(l) of the Code, as the case may be, in which event Equity Office or the applicable Equity Office Subsidiary shall not fail to make such election in a timely manner);

(h) not amend the Equity Office Declaration of Trust, the Equity Office Bylaws or the EOP Partnership Agreement (except for the Proposed Equity Office Charter Amendments (as defined herein) and the amendment to the EOP Partnership Agreement described in Section 5.4), except to the extent necessary to reflect the admission of additional limited partners and other amendments in connection therewith that can be made by Equity Office without a vote of limited partners and that will not, individually or in the aggregate, materially adversely affect the rights or obligations of holders of Equity Office OP Units; as used herein, "Proposed Equity Office Charter Amendments" means the proposed amendments to the Equity Office Declaration of Trust, substantially in the form attached hereto as *Exhibits I*, which has been approved by the Board of Trustees of Equity Office and will be submitted to a vote of the shareholders of Equity Office;

(i) not (A) enter into or agree to effect any merger, acquisition, consolidation, reorganization, or other business combination with any third party in which Equity Office is not the surviving party thereto or (B) enter into or agree to effect any merger, acquisition, exchange offer or other business combination with a third party in which Equity Office is the surviving party that would result in the issuance of equity securities representing in excess of 25% of the outstanding Equity Office Common Shares on the date any such business combination is entered into or agreed to unless, in either such case, such business combination is approved by Spieker, which approval shall not be unreasonably withheld or delayed, or the business combination agreement provides that the required vote of Equity Office shareholders for approval of such business combination is no less than the affirmative vote of holders of Equity Office Common Shares representing more than 50% of the sum (x) the number of Equity Office Common Shares outstanding at the time of each approval plus (y) 50,000,000;

A–37

Table of Contents

(j) except as provided in Section 5.10 hereof and in connection with the use of Equity Office Common Shares to pay the exercise price or tax withholding in connection with equity–based employee benefit plans by the participants therein, not (i) authorize, declare, set aside or pay any dividend or make any other distribution or payment with respect to any Equity Office Common Shares or Equity Office OP Units or (ii) directly or indirectly redeem, purchase or otherwise acquire any shares of capital stock, membership interests or units of partnership interest or any option, warrant or right to acquire, or security convertible into, shares of capital stock, membership interests, or units of partnership interest of Equity Office or any Equity Office Subsidiary, except for (A) redemptions of Equity Office Common Shares required under Section 7.3.6 of the Equity Office Declaration of Trust in order to preserve the status of Equity Office as a REIT under the Code, and (B) redemptions of Equity Office OP Units, whether or not outstanding on the date of this Agreement, under the EOP Partnership Agreement in which Equity Office Common Shares are utilized; and

(k) not authorize, recommend, propose or announce an intention to do any of the foregoing prohibited actions, or enter into any contract, agreement, commitment or arrangement to do any of the foregoing prohibited actions.

4.3 *No Solicitation.*

(a) On and after the date hereof and prior to the Effective Time of the Merger, Spieker agrees, for itself and in its capacity as the sole general partner of the Spieker Partnership, that:

(i) none of it, Spieker Partnership, any Spieker Subsidiary or Spieker TRS shall invite, initiate, solicit or encourage, directly or indirectly, any inquiries, proposals, discussions or negotiations or the making or implementation of any proposal or offer (including, without limitation, any proposal or offer to its stockholders) with respect to any direct or indirect (A) merger, consolidation, business combination, reorganization, recapitalization, liquidation, dissolution or similar transaction, (B) sale, acquisition, tender offer, exchange offer (or the filing of a registration statement under the Securities Act in connection with such an exchange offer), share exchange or other transaction or series of related transactions that, if consummated, would result in the issuance of securities representing, or the sale, exchange or transfer of, 15% or more of the outstanding voting equity securities of Spieker or outstanding partnership interests of Spieker Partnership (including, without limitation, partnership interests and units), except an underwritten public offering of Spieker Common Stock for cash, or (C) sale, lease, exchange, mortgage, pledge, transfer or other disposition ("Transfer") of any assets of Spieker or Spieker Partnership in one or a series of related transactions that, if consummated, would result in the Transfer of more than 30% of the assets of Spieker or Spieker Partnership, other than the Mergers (any such proposal or offer being hereinafter referred to as an "Acquisition Proposal"), or engage in any discussions or negotiations with or provide any confidential or non–public information or data to, or afford access to properties, books or records to, any Person relating to, or that may reasonably be expected to lead to, an Acquisition Proposal, or enter into any letter of intent, agreement in principle or agreement relating to an Acquisition Proposal, or propose publicly to agree to do any of the foregoing, or otherwise facilitate any effort or attempt to make or implement an Acquisition Proposal (including, without limitation, by amending or granting any waiver under, the Spieker Rights Agreement);

(ii) none of it, Spieker Partnership, any Spieker Subsidiary or Spieker TRS will permit any officer, director, employee, affiliate, agent, investment banker, financial advisor, attorney, accountant, broker, finder, consultant or other agent or representative of Spieker, Spieker Partnership, any Spieker Subsidiary or Spieker TRS (each, a "Spieker Representative") to engage in any of the activities described in Section 4.3(a)(i);

(iii) (A) it, Spieker Partnership, the Spieker Subsidiaries and Spieker TRS will immediately cease and cause to be terminated any existing activities, discussions or negotiations with any Persons conducted heretofore with respect to any of the foregoing (including, without limitation, any Acquisition Proposal) and will take commercially reasonable actions to inform each Spieker Representative, and each of the Persons referred to in Section 4.3(b), of the obligations undertaken in this Section 4.3 and to cause each Spieker Representative to comply with such obligations, and (B) it shall promptly request each Person, if any, that has executed a confidentiality agreement within the twenty–four months prior to the date hereof

---

in connection with its consideration of any Acquisition Proposal to return or destroy all confidential information heretofore furnished to such Person by or on behalf of it, Spieker Partnership, the Spieker Subsidiaries and Spieker TRS; and

(iv) it will (A) notify Equity Office promptly (but in any event within 24 hours), orally and in writing, if Spieker, Spieker Partnership, any Spieker Subsidiary, Spieker TRS or any Spieker Representative after receipt of (1) an Acquisition Proposal or any amendment or change in any previously received Acquisition Proposal, (2) any request for confidential or nonpublic information or data relating to, or for access to the properties, books or records of, Spieker, Spieker Partnership, any Spieker Subsidiary or Spieker TRS by any Person that has made, or to such party's knowledge may be considering making, an Acquisition Proposal, or (3) any oral or written expression that any such activities, discussions or negotiations are sought to be initiated or continued with it, and, as applicable, include in such notice the identity of the Person making such Acquisition Proposal, indication or request, the material terms of such Acquisition Proposal, indication or request and, if in writing, shall promptly deliver to Equity Office copies of any proposals, indications of interest, indication or request along with all other related documentation and correspondence; and (B) will keep Equity Office informed of the status and material terms of (including all changes to the status or material terms of) any such Acquisition Proposal, indication or request.

(b) Notwithstanding Section 4.3(a), the Board of Directors of Spieker (including with respect to Spieker's capacity as the sole general partner of Spieker Partnership) shall not be prohibited from furnishing information to or entering into discussions or negotiations with, any Person that makes a bona fide written Acquisition Proposal to the Board of Directors of Spieker after the date hereof which was not invited, initiated, solicited or encouraged, directly or indirectly, by Spieker, Spieker Partnership, any Spieker Subsidiary, Spieker TRS or any Spieker Representative on or after the date hereof, if, and only to the extent that (i) a majority of the Board of Directors of Spieker determines in good faith, after consultation with its financial advisors of nationally recognized reputation and outside legal counsel, that such Acquisition Proposal is reasonably likely to result in a Superior Acquisition Proposal, (ii) each of Spieker and Spieker Partnership complies with all of its obligations under this Agreement, (iii) prior to furnishing such information to, or entering into discussions or negotiations with, such Person, Spieker provides written notice to Equity Office to the effect that it is furnishing information to, or entering into discussions with such Person and (iv) Spieker enters into a confidentiality agreement with such Person the material terms of which are (without regard to the terms of such Acquisition Proposal) in all material respects no less favorable to Spieker, and no less restrictive to the Person making

such Acquisition Proposal, than those contained in the Confidentiality Agreement, dated January 2, 2001, between Spieker and Equity Office (the "Confidentiality Agreement").

(c)  Notwithstanding anything to the contrary set forth in Section 4.3(a) or 4.3(b), in the event that an Acquisition Proposal constitutes a Superior Acquisition Proposal (as defined herein), nothing contained in this Section 4.3 shall prohibit the Board of Directors of Spieker from withdrawing, modifying, amending or qualifying its recommendation of this Agreement and the Merger as required under Section 5.1(d) hereof and recommending such Superior Acquisition Proposal to its stockholders: (i) if but only if, Spieker: (A) complies fully with this Section 4.3 and (B) provides Equity Office with at least three (3) business days' prior written notice of its intent to withdraw, modify, amend or qualify its recommendation of this Agreement or the Merger, (ii) if, in the event that during such three (3) business days Equity Office makes a counter proposal to such Superior Acquisition Proposal (any such counter proposal being referred to in this Agreement as the "Equity Office Counter Proposal"), Spieker's Board of Directors in good faith, taking into account the advice of its outside financial advisors of nationally recognized reputation, determines (A) that the Equity Office Counter Proposal is not at least as favorable to Spieker's stockholders as the Superior Acquisition Proposal, from a financial point of view, and (B) the Equity Office Counter Proposal is not at least as favorable generally to Spieker's stockholders (taking into account all financial and strategic considerations and other relevant factors, including relevant legal, financial, regulatory and other aspects of such proposals, and the conditions, prospects and time required for completion of such proposal), and (iii) Spieker shall have terminated this Agreement in accordance with Section 7.1(h).

A−39

Table of Contents

(d)  For all purposes of this Agreement, "Superior Acquisition Proposal" means a bona fide written proposal made by a third party to acquire, directly or indirectly, Spieker and/or Spieker Partnership pursuant to a tender or exchange offer, merger, share exchange, consolidation or sale of all or substantially all of the assets of Spieker, Spieker Partnership, and the Spieker Subsidiaries or otherwise (i) on terms which a majority of the Board of Directors of Spieker determines in good faith, (A) after consultation with Spieker's financial advisors of nationally recognized reputation, are superior, from a financial point of view, to Spieker's stockholders to those provided for in the Merger and (B) to be more favorable generally to Spieker's stockholders (taking into account all financial and strategic considerations and other relevant factors, including relevant legal, financial, regulatory and other aspects of such proposals, and the conditions, prospects and time required for completion of such proposal), (ii) for which financing, to the extent required, in the reasonable judgment of the Board of Directors is capable of being obtained and (iii) which the Board of Directors of Spieker determines in good faith is reasonably capable of being consummated.

(e)  Any disclosure that the Board of Directors of Spieker may be compelled to make with respect to the receipt of an Acquisition Proposal in order to comply with its duties to shareholders imposed by applicable law or Rule 14d−9 or 14e−2 of the Exchange Act will not constitute a violation of this Section 4.3.

(f)  Nothing in this Section 4.3 shall (i) permit Spieker to terminate this Agreement (except as expressly provided in Article 7) or (ii) affect any other obligations of Spieker under this Agreement.

4.4  *Affiliates.* Prior to the Effective Time of the Merger, Spieker shall cause to be prepared and delivered to Equity Office a list (reasonably satisfactory to counsel for Equity Office) identifying all Persons who, at the time of the Spieker Stockholders Meeting and the Equity Office Shareholders Meeting, may be deemed to be "affiliates" of Spieker or Spieker Partnership as that term is used in paragraphs (c) and (d) of Rule 145 under the Securities Act (the "Rule 145 Affiliates"). Spieker shall use its commercially reasonable efforts to cause each Person who is identified as a Rule 145 Affiliate in such list to deliver to Equity Office on or prior to the Effective Time a written agreement, in the form previously approved by the parties hereto, that such Rule 145 Affiliate will not sell, pledge, transfer or otherwise dispose of any Equity Office Common Shares, Equity Office OP Units or Equity Office Preferred OP Units issued to such Rule 145 Affiliate pursuant to the Merger, except pursuant to an effective registration statement under the Securities Act or in compliance with paragraph (d) of Rule 145 or as otherwise permitted by the Securities Act. Equity Office shall be entitled to place legends as specified in such written agreements on the certificates representing any Equity Office Common Shares to be received pursuant to the terms of this Agreement by such Rule 145 Affiliates who have executed such agreements and to issue appropriate stop transfer instructions to the transfer agent for the Equity Office Common Shares, Equity Office OP Units and Equity Office Preferred OP Units issued to such Rule 145 Affiliates, consistent with the terms of such agreements. Each of Equity Office and EOP Partnership shall timely file the reports required to be filed by it under the Exchange Act and the rules and regulations adopted by the SEC thereunder, and it will take such further action as any Rule 145 Affiliate of Spieker or Equity Office may reasonably request, all to the extent required from time to time to enable such Rule 145 Affiliate to sell shares of beneficial interest of Equity Office received by such Rule 145 Affiliate in the Merger without registration under the Securities Act pursuant to (i) Rule 145(d)(1) under the Securities Act, as such rule may be amended from to time, or (ii) any successor rule or regulation hereafter adopted by the SEC.

4.5  *Other Actions.* Each of Spieker and Spieker Partnership, on the one hand, and Equity Office and EOP Partnership, on the other hand, shall not take, and shall use commercially reasonable efforts to cause their respective Subsidiaries not to take, any action that would result in (i) any of the representations and warranties of such party (without giving effect to any "knowledge" qualification) set forth in this Agreement that are qualified as to materiality becoming untrue, (ii) any of such representations and warranties (without giving effect to any "knowledge" qualification) that are not so qualified becoming untrue in any material respect or (iii) except as expressly required by Section 4.3, any of the conditions to the Merger set forth in Article 6 not being satisfied.

A−40

Table of Contents

ARTICLE 5

ADDITIONAL COVENANTS

5.1 *Preparation of the Form S−4 and the Proxy Statement; Spieker Stockholders Meeting, Spieker Unitholders Consent Solicitation and Equity Office Shareholders Meeting.*

(a) As promptly as practicable after execution of this Agreement, (i) each of Spieker and Equity Office shall prepare and file with the SEC (with appropriate requests for confidential treatment, unless the parties hereto otherwise agree) under the Exchange Act, one or more joint proxy statements/prospectuses, forms of proxies and information statements (such joint proxy statement(s)/prospectus(es) and information statements together with any amendments to supplements thereto, the "Joint Proxy Statement") relating to the stockholder meeting of Spieker and the shareholder meeting of Equity Office, the vote of the stockholders of Spieker with respect to the Merger and the shareholders of Equity Office with respect to the Merger, and the consent, if any, of partners of Spieker Partnership and EOP Partnership in connection with any required Partner Approvals and (ii) in connection with the clearance by the SEC of the Joint Proxy Statement, Equity Office and Spieker, if applicable, shall prepare and file with the SEC under the Securities Act one or more registration statements on Form S−4 (such registration statements, together with any amendments or supplements thereto, the "Form S−4"), in which the Joint Proxy Statement will be included, as one or more prospectuses in connection with the registration under the Securities Act of the Equity Office Common Shares, Equity Office Preferred Shares, Equity Office OP Units and Equity Office Preferred OP Units to be distributed to the holders of Spieker Common Stock, Spieker Preferred Shares, Spieker OP Units and Spieker Preferred OP Units in the Mergers. The respective parties will cause the Proxy Statement and the Form S−4 to comply as to form in all material respects with the applicable provisions of the Securities Act, the Exchange Act and the rules and regulations thereunder. Each of Spieker, Spieker Partnership, Equity Office and EOP Partnership shall furnish all information about itself and its business and operations and all necessary financial information to the other as the other may reasonably request in connection with the preparation of the Joint Proxy Statement and the Form S−4. Each of Equity Office and Spieker, if applicable, shall use its commercially reasonable efforts, and Spieker will cooperate with Equity Office, to have the Form S−4 declared effective by the SEC as promptly as practicable (including clearing the Proxy Statement with the SEC). Each of Spieker and Spieker Partnership, on the one hand, and Equity Office and EOP Partnership, on the other hand, agree promptly to correct any information provided by it for use in the Joint Proxy Statement and the Form S−4 if and to the extent that such information shall have become false or misleading in any material respect, and each of the parties hereto further agrees to take all steps necessary to amend or supplement the Joint Proxy Statement and the Form S−4 and to cause the Joint Proxy Statement and the Form S−4 as amended or supplemented to be filed with the SEC and to be disseminated to their respective stockholders and shareholders and partners, in each case as and to the extent required by applicable federal and state securities laws. Each of Spieker, Spieker Partnership, Equity Office and EOP Partnership agrees that the information provided by it for inclusion in the Joint Proxy Statement or the Form S−4 and each amendment or supplement thereto, at the time of mailing thereof and at the time of the respective meetings of stockholders and shareholders of Spieker and Equity Office and at the time of the respective taking of consents, if any, of partners of Spieker Partnership and EOP Partnership, will not include an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading. Equity Office will advise and deliver copies (if any) to Spieker, promptly after it receives notice thereof, of any request by the SEC for amendment of the Joint Proxy Statement or the Form S−4 or comments thereon and responses thereto or requests by the SEC for additional information (regardless of whether such requests relate to Equity Office or EOP Partnership, on the one hand, and Spieker or Spieker Partnership, on the other hand), and Equity Office shall promptly notify Spieker, and Spieker shall promptly notify Equity Office, if applicable, of (i) the time when the Form S−4 has become effective, (ii) the filing of any supplement or amendment thereto, (iii) the issuance of any stop order, and (iv) the suspension of the qualification of registration

A−41

Table of Contents

of the Equity Office Common Shares, Equity Office Preferred Shares, Equity Office OP Units and Equity Office Preferred OP Units issuable in connection with the Mergers.

(b) Each of Spieker, Spieker Partnership, Equity Office and EOP Partnership shall use its commercially reasonable efforts to timely mail the joint proxy statement/prospectus contained in the Form S−4 to its stockholders or shareholders. It shall be a condition to the mailing of the joint proxy statement/prospectus that (i) Equity Office and EOP Partnership shall have received a "comfort" letter from Arthur Andersen LLP, independent public accountants for Spieker and Spieker Partnership, of the kind contemplated by the Statement of Auditing Standards with respect to Letters to Underwriters promulgated by the American Institute of Certified Public Accountants (the "AICPA Statement"), dated as of the date on which the Form S−4 shall become effective and as of the Effective Time, addressed to Equity Office and EOP Partnership, in form and substance reasonably satisfactory to Equity Office and EOP Partnership, concerning the procedures undertaken by Arthur Andersen LLP with respect to the financial statements and information of Spieker, Spieker Partnership and their subsidiaries and Spieker TRS contained in the Form S−4 and the other matters contemplated by the AICPA Statement and otherwise customary in scope and substance for letters delivered by independent public accountants in connection with transactions such as those contemplated by this Agreement and (ii) Spieker shall have received a "comfort" letter from Ernst & Young LLP, independent public accountants for Equity Office and EOP Partnership, of the kind contemplated by the AICPA Statement, dated as of the date on which the Form S−4 shall become effective and as of the Effective Time, addressed to Spieker and Spieker Partnership, in form and substance reasonably satisfactory to Spieker, concerning the procedures undertaken by Ernst &

Young LLP with respect to the financial statements and information of Equity Office, EOP Partnership and their subsidiaries contained in the Form S–4 and the other matters contemplated by the AICPA Statement and otherwise customary in scope and substance for letters delivered by independent public accountants in connection with transactions such as those contemplated by this Agreement. Each of Spieker and Spieker Partnership also shall use commercially reasonable efforts to cause (i) the counsel to render the opinion described in clause (i) of Section 6.2(d) to have delivered an opinion, which opinion shall be filed as an exhibit to the Form S–4, as to the federal income tax matters described in clause (i) of Section 6.2(d), and (ii) Sullivan & Cromwell or other counsel reasonably satisfactory to Equity Office to have delivered an opinion, which opinion shall be filed as an exhibit to the Form S–4, as to the federal income tax matters described in clause (ii) of Section 6.2(d) and Section 6.3(e) and such other federal income tax matters as are required to be addressed in the Form S–4 and the Joint Proxy Statement under the applicable rules of the SEC. Each of Equity Office and EOP Partnership shall use commercially reasonable efforts to cause Hogan & Hartson L.L.P. or other counsel reasonably satisfactory to Spieker to have delivered an opinion, which opinion shall be filed with the SEC as an exhibit to the Form S–4, as to the federal income tax matters described in clause (iii) of Section 6.2(d), Section 6.2(e) and Section 6.3(d). Such opinions shall contain customary exceptions, assumptions and qualifications and be based upon customary representations.

(c) Equity Office will duly call and give notice of and, as soon as practicable following the date of this Agreement (but in no event sooner than 20 business days following the date the Joint Proxy Statement is mailed to the shareholders of Equity Office), convene and hold a meeting of its shareholders (the "Equity Office Shareholders Meeting") for the purpose of obtaining the Equity Office Shareholder Approvals. Equity Office shall, through its Board of Trustees, recommend to its shareholders approval of this Agreement, the Merger and the transactions contemplated by this Agreement.

(d) Spieker will duly call and give notice of and, as soon as practicable following the date of this Agreement (but in no event sooner than 20 business days following the date the Joint Proxy Statement is mailed to the stockholders of Spieker), convene and hold a meeting of its stockholders (the "Spieker Stockholders Meeting") for the purpose of obtaining the Spieker Stockholder Approvals. Spieker shall, through its Board of Directors, recommend to its stockholders approval of this Agreement, the Merger and the transactions contemplated by this Agreement and include such recommendation in the Proxy Statement; *provided, however,* that prior to the Spieker Stockholders Meeting, such recommendation

A–42

---

Table of Contents

may be withdrawn, modified, amended or qualified if and only to the extent permitted by Section 4.3(c) hereof.

(e) Equity Office and Spieker shall use their commercially reasonable efforts to convene their respective shareholder and stockholder meetings on the same day, which day, subject to the provisions of Sections 5.1(c), 5.1(d) and 5.3, shall be a day not later than 60 days after the date the Joint Proxy Statement is mailed.

(f) If on the date for the Equity Office Shareholders Meeting and Spieker Stockholders Meeting established pursuant to Section 5.1(e) of this Agreement, either Equity Office or Spieker has not received duly executed proxies for a sufficient number of votes to approve the Merger, then both parties shall recommend the adjournment of their respective shareholders and stockholders meetings until one or more dates not later than the date 10 days after the originally scheduled date of the shareholders meetings.

(g) Spieker shall request written consents for approval by the limited partners of Spieker Partnership of each of the matters described in the definition of Spieker Partner Approvals. Spieker shall vote in favor of or consent to, as applicable, each of the matters described in the definition of Spieker Partner Approvals, to the extent approval thereof is required by the Spieker Partnership Agreement. Spieker shall recommend to the limited partners of Spieker Partnership that they approve such matters. Spieker shall execute its written consent to each of the matters described in the definition of Spieker Partner Approvals, on the 20th business day after mailing of the Joint Proxy Statement to holders of the Spieker OP Units and Spieker Preferred OP Units and immediately thereafter Spieker Partnership shall mail to each holder of a Spieker OP Unit and each Spieker Preferred OP Unit a notice of the approval of the Partnership Merger in accordance with Section 15679.3 of the CRULPA. Equity Office shall request written consents, if any is required, by the limited partners of EOP Partnership of each of the matters described in the definition of Equity Office Partner Approvals. Equity Office shall vote, if any is required, in favor of such matters and recommend to the limited partners of EOP Partnership that they approve such matters.

(h) Spieker shall not exercise any dissenters or other similar rights with respect to any of its Spieker OP Units or Spieker Preferred OP Units, including, without limitation, any rights under Section 15679.2 of the CRULPA.

5.2 *Access to Information; Confidentiality.* Subject to the requirements of confidentiality agreements with third parties in existence on the date hereof, each of the parties shall, and shall cause each of its Subsidiaries (and, in the case of Spieker, Spieker TRS) to, afford to the other parties and to the officers, employees, accountants, counsel, financial advisors and other representatives of such other parties, reasonable access during normal business hours prior to the Effective Time to all their respective properties, books, contracts, commitments, personnel and records and, during such period, each of the parties shall, and shall cause each of its Subsidiaries (and, in the case of Spieker, Spieker TRS) to, furnish promptly to the other parties (a) a copy of each report, schedule, registration statement and other document filed by it during such period pursuant to the requirements of federal or state securities laws and (b) all other information concerning its business, properties and personnel as such other party may reasonably request. Each of the parties shall, and shall cause its Subsidiaries (and in the case of Spieker, Spieker TRS) to, use commercially reasonable efforts to cause its officers, employees, accountants, counsel, financial advisors and other representatives and affiliates to, hold any nonpublic information in confidence in accordance with the Confidentiality Agreement, which shall

remain in full force and effect pursuant to the terms thereof, notwithstanding the execution and delivery of this Agreement or the termination hereof.

5.3 *Commercially Reasonable Efforts; Notification.*

(a)  Subject to the terms and conditions herein provided, each of the parties shall: (i) use commercially reasonable efforts to cooperate with one another in (A) determining which filings are required to be made prior to the Effective Time with, and which consents, approvals, permits or authorizations are required to be obtained prior to the Effective Time from, governmental or regulatory authorities of the United States, the

A–43

<hr>

Table of Contents

several states and foreign jurisdictions and any third parties in connection with the execution and delivery of this Agreement, and the consummation of the transactions contemplated hereby, including, without limitation, any filing under the HSR Act, and (B) timely making all such filings and timely seeking all such consents, approvals, permits and authorizations; (ii) use commercially reasonable efforts (other than the payment of money which is not contractually required to be paid) to obtain in writing any consents required from third parties to effectuate the Mergers, such consents to be in form reasonably satisfactory to each of the parties; and (iii) use commercially reasonable efforts to take, or cause to be taken, all other action and do, or cause to be done, all other things necessary, proper or appropriate to consummate and make effective the transactions contemplated by this Agreement. If at any time after the Effective Time any further action is necessary or desirable to carry out the purpose of this Agreement, each party shall take all such necessary action.

(b)  Spieker and Spieker Partnership shall use commercially reasonable efforts to obtain from Arthur Andersen LLP access to all work papers relating to audits of Spieker and Spieker Partnership performed by Arthur Andersen LLP, and the continued cooperation of Arthur Andersen LLP with regard to the preparation of consolidated financial statements for the Surviving Trust.

(c)  Spieker and Spieker Partnership shall give prompt notice to Equity Office and EOP Partnership, and Equity Office and EOP Partnership shall give prompt notice to Spieker and Spieker Partnership, (i) if any representation or warranty made by it contained in this Agreement that is qualified as to materiality becomes untrue or inaccurate in any respect or any such representation or warranty that is not so qualified becomes untrue or inaccurate in any material respect or (ii) of the failure by it to comply with or satisfy in any material respect any covenant, condition or agreement to be complied with or satisfied by it under this Agreement; *provided, however,* that no such notification shall affect the representations, warranties, covenants or agreements of the parties or the conditions to the obligations of the parties under this Agreement.

5.4 *Tax Matters.*

(a)  Each of Equity Office and Spieker shall use its commercially reasonable efforts before and after the Effective Time to cause the Merger to qualify as a reorganization under the provisions of Sections 368(a) of the Code and to obtain the opinions of counsel referred to in Sections 6.2(e) and 6.3(e).

(b)  In connection with the Partnership Merger, EOP Partnership shall adopt an amendment to the EOP Partnership Agreement substantially in the form set forth as *Exhibit K* hereto addressing certain federal income tax matters affecting the holders of Spieker OP Units who will receive Equity Office OP Units in the Partnership Merger.

5.5 *Public Announcements.* The initial press release to be issued with respect to the transactions contemplated by this Agreement will be in the form agreed to by the parties prior to the execution of this Agreement. Spieker will consult with Equity Office before issuing, and provide Equity Office the opportunity to review and comment upon, any material press release or other written public statement, including, without limitation, any press release or other written public statement which addresses in any manner the transactions contemplated by this Agreement, and shall not issue any such press release or make any such written public statement prior to such consultation, except as may be required by applicable law, court process or by obligations pursuant to any listing agreement with any national securities exchange.

5.6 *Listing.* Equity Office shall use commercially reasonable efforts to cause the Equity Office Common Shares, Equity Office Series E Preferred Shares, Equity Office Series F Preferred Shares and Equity Office Series H Preferred Shares to be issued in the Merger, the Equity Office Common Shares reserved for issuance upon redemption of Equity Office OP Units issued in the Partnership Merger, the Equity Office Common Shares reserved for issuance upon conversion of Equity Office Series D Preferred Shares (if any), and the Equity Office Series G Preferred Shares reserved for issuance upon conversion of Equity Office Series G Preferred OP Units issued in the Partnership Merger, in each case, to be approved for listing on the New York Stock Exchange (the "NYSE"), subject to official notice of issuance, prior to the Effective Time.

5.7 *Transfer and Gains Taxes.* Each party shall cooperate in the preparation, execution and filing of all returns, questionnaires, applications or other documents regarding any real property transfer or gains, sales,

A–44

<hr>

Table of Contents

use, transfer, value added stock transfer and stamp taxes, any transfer, recording, registration and other fees and any similar taxes which become payable in connection with the transactions contemplated by this Agreement (together with any related interests, penalties or additions to tax, "Transfer and Gains Taxes"). From and after the Effective Time, Equity Office shall pay or cause EOP Partnership, as appropriate, to pay or cause to be paid, without deduction or withholding from any amounts payable to the holders of Equity Office Common Shares or Equity Office OP Units, as applicable, all Transfer and Gains Taxes (which term shall not in any event be construed to include for these purposes any Tax imposed under the Code).

5.8  *Benefit Plans and Other Employee Arrangements.*

(a)  *Benefit Plans.* After the Effective Time, all employees of Spieker who are employed by the Surviving Trust shall be eligible to participate in the same manner as other similarly situated employees of the Surviving Trust who were formerly employees of Equity Office in any "employee benefit plan," as defined in Section 3(3) of ERISA, sponsored or maintained by the Surviving Trust after the Effective Time or, if Equity Office determines it is not practicable for such employees to do so immediately after the Effective Time, then such employees shall continue to be eligible to participate in an "employee benefit plan", as defined in Section 3(3) of ERISA, of Spieker which is continued by the Surviving Trust until such time as Equity Office determines it is practicable to include them in its "employee benefit plans" for similarly situated employees of the Surviving Trust as contemplated above. With respect to each such employee benefit plan, service with Spieker or any Spieker Subsidiary (as applicable) and the predecessor of any of them shall be included for purposes of determining eligibility to participate, vesting (if applicable) and determination of the level of entitlement to, benefits under such employee benefit plan. Equity Office shall, or shall cause the Surviving Trust and its Subsidiaries to, (i) waive all limitations as to preexisting conditions, exclusions and waiting periods with respect to participation and coverage requirements applicable to all employees of Spieker who are employed by the Surviving Trust under any welfare plan that such employees may be eligible to participate in after the Effective Time, other than limitations or waiting periods that are already in effect with respect to such employees and that have not been satisfied as of the Effective Time under any welfare plan maintained for such employees immediately prior to the Effective Time, and (ii) provide each such employee of Spieker who is employed by the Surviving Trust with credit for any co–payments and deductibles paid prior to the Effective Time in satisfying any applicable deductible or out–of–pocket requirements under any welfare plans that such employees are eligible to participate in after the Effective Time.

(b)  *Stock Option and Restricted Stock Plans.* The stock option plans or programs of Spieker and the restricted stock plans or programs of Spieker shall be discontinued as of the Effective Time.

(c)  *Spieker Stock Options.* Immediately prior to the date on which the Spieker stockholders approve the Merger, each outstanding Spieker Stock Option shall, effective as of such time, become fully vested and exercisable to the extent not already so vested and exercisable and, to the extent not otherwise provided in the applicable option agreement as permitted by applicable law, each such Spieker Stock Option shall be automatically converted at the Effective Time into an option (a "Substituted Option") to purchase a number of shares of Equity Office Common Shares equal to the number of shares of Spieker Common Stock that could have been purchased (assuming full vesting) under such Spieker Stock Option multiplied by 1.94462 (rounded down to the nearest whole number of shares of Spieker Common Stock) at an exercise price per share of Equity Office Common Shares equal to the per–share option exercise price specified in the Spieker Stock Option divided by 1.94462 (rounded up to the nearest whole cent). Such Substituted Option shall otherwise be subject to the same terms and conditions as such Spieker Stock Option. For purposes of expiration and otherwise, the date of grant of the Substituted Option shall be the date on which the corresponding Spieker Stock Option was granted. As soon as practicable after the date hereof and subject to applicable law, Equity Office shall offer to purchase, subject to consummation of the Mergers, all Spieker Stock Options outstanding on the date hereof from the holders thereof for an amount in cash in respect thereof equal to the product of (i) the excess, if any, of (A) $58.50 over (B) the exercise price of such Spieker Stock Option and (ii) the number of shares of Spieker Common Stock subject thereto. If the holder of any such Spieker Stock Option tenders such option prior to 11:59 p.m., Pacific Time, on the 20th business day after the purchase offer is made to the holders thereof, then within three business days after the Effective Time, Equity Office shall, subject to reduction for required withholding taxes, pay to each such tendering former holder of

A–45

Table of Contents

Spieker Stock Options the purchase price thereof. As promptly as reasonably practicable after the Effective Time, Equity Office shall issue to each holder of an outstanding Spieker Stock Option a document evidencing the foregoing assumption by Equity Office. In respect of each Spieker Stock Option assumed by Equity Office, but not tendered for cash, and converted into a Substituted Option, and the Equity Office Common Shares underlying such Substituted Option, Equity Office shall, as soon as practicable after the Effective Time, file and keep current a Registration Statement on Form S–8 or other appropriate registration statement for as long as Substituted Options remain outstanding.

(d)  *Restricted Stock.* All unvested shares of restricted stock of Spieker set forth in Schedule 5.8(d) of the Spieker Disclosure Letter shall, by virtue of this Agreement and without further action of Spieker, Equity Office or the holder of such shares of restricted stock, to the extent required in the plan, agreement or instrument pursuant to which such shares of restricted stock were granted, vest and become free of all restrictions immediately prior to the date on which the Spieker shareholders approve the Merger and shall be converted into the Merger Consideration upon the Effective Time pursuant to Section 1.10.

(e)  *Withholding.* To the extent required by applicable law, Spieker shall require each employee who exercises a Spieker Stock Option or who receives Spieker Common Stock pursuant to any existing commitment to pay to Spieker in cash or Spieker Common Stock an amount sufficient to satisfy in full Spieker's obligation to withhold Taxes incurred by reason of such exercise

or issuance (unless and to the extent such withholding is satisfied pursuant to the provision regarding withholding in Section 1.13(c)).

(f) *Special Severance Policy.* Equity Office acknowledges that the transactions contemplated by this Agreement shall be deemed a "Change in Control" for purposes of the Special Severance Policy, and that severance payments shall be made in accordance with the Special Severance Policy to any participant who becomes entitled to such payments on account of a termination of employment occurring on or after the Effective Date, unless such termination is for Cause or is a voluntary resignation without Good Reason in accordance with the terms of the Special Severance Policy. As of the Effective Time, there shall not be any additional employees or other service providers thereafter designated for participation in the Special Severance Policy.

(g) *Bonus Plans.* From and after the Effective Time, Equity Office or EOP Partnership shall pay, if earned, development bonuses to employees identified on *Schedule 5.8(g)* of the Spieker Disclosure Letter up to the aggregate amount set forth on *Schedule 5.8(g)* of the Spieker Disclosure Letter. Equity Office or EOP Partnership also shall assume the obligations of Spieker to pay annual bonuses to Spieker employees not covered by the Special Severance Policy and such bonuses shall be payable to such employees who are terminated by Equity Office (unless terminated for inadequate performance) before January 1, 2002. Such bonuses shall be payable to the extent accrued for the year 2001 through the date of termination and shall be calculated based on actual bonuses paid in 2000 (assuming such bonuses reflected a full year of employment).

5.9 *Indemnification.*

(a) From and after the Effective Time, Equity Office and EOP Partnership (collectively, the "Indemnifying Parties") shall provide exculpation and indemnification for each individual who is now or has been at any time prior to the date hereof or who becomes prior to the Effective Time of the Merger, an officer or director of Spieker or any Spieker Subsidiary (the "Indemnified Parties") which is the same as the exculpation and indemnification provided to the Indemnified Parties by Spieker and the Spieker Subsidiaries immediately prior to the Effective Time of the Merger in its charter, Bylaws or in its partnership, operating or similar agreement, as in effect on the date hereof.

(b) In addition to the rights provided in Section 5.9(a) above, in the event of any threatened or actual claim, action, suit, proceeding or investigation, whether civil, criminal or administrative, including, without limitation, any action by or on behalf of any or all security holders of Spieker or Equity Office, or any Spieker Subsidiary or Equity Office Subsidiary, or by or in the right of Spieker or Equity Office, or any Spieker Subsidiary or Equity Office Subsidiary, or any claim, action, suit, proceeding or investigation in which any individual who is now, or has been, at any time prior to the date hereof, or who becomes prior to the Effective Time of the Merger, an officer, employee or director of Spieker or any Spieker Subsidiary (the "Indemnifica- '

A–46

Table of Contents

tion Parties") is, or is threatened to be, made a party based in whole or in part on, or arising in whole or in part out of, or pertaining to (i) the fact that he is or was an officer, employee or director of Spieker or any of the Spieker Subsidiaries or any action or omission by such individual in his capacity as a director, or (ii) this Agreement or the transactions contemplated by this Agreement, whether in any case asserted or arising before or after the Effective Time of the Merger, the Indemnifying Parties shall, from and after the Effective Time of the Merger, indemnify and hold harmless, as and to the full extent permitted by applicable law, each Indemnification Party against any losses, claims, liabilities, expenses (including reasonable attorneys' fees and expenses), judgments, fines and amounts paid in settlement in accordance herewith in connection with any such threatened or actual claim, action, suit, proceeding or investigation. Any Indemnification Party proposing to assert the right to be indemnified under this Section 5.9(b) shall, promptly after receipt of notice of commencement of any action against such Indemnification Party in respect of which a claim is to be made under this Section 5.9(b) against the Indemnifying Parties, notify the Indemnifying Parties of the commencement of such action, enclosing a copy of all papers served; *provided, however,* that the failure to provide such notice shall not affect the obligations of the Indemnifying Parties except to the extent such failure to notify materially prejudices the Indemnifying Parties' ability to defend such claim, action, suit, proceeding or investigation; and *provided further, however,* that, in the case of any action pending at the Effective Time of the Merger, notification pursuant to this Section 5.9(b) shall be received by Equity Office prior to such Effective Time. If any such action is brought against any of the Indemnification Parties and such Indemnification Parties notify the Indemnifying Parties of its commencement, the Indemnifying Parties will be entitled to participate in and, to the extent that they elect by delivering written notice to such Indemnification Parties promptly after receiving notice of the commencement of the action from the Indemnification Parties, to assume the defense of the action and after notice from the Indemnifying Parties to the Indemnification Parties of their election to assume the defense, the Indemnifying Parties will not be liable to the Indemnification Parties for any legal or other expenses except as provided below. If the Indemnifying Parties assume the defense, the Indemnifying Parties shall have the right to settle such action without the consent of the Indemnification Parties; *provided, however,* that the Indemnifying Parties shall be required to obtain such consent (which consent shall not be unreasonably withheld) if the settlement includes any admission of wrongdoing on the part of the Indemnification Parties or any decree or restriction on the Indemnification Parties; *provided further, however,* that no Indemnifying Parties, in the defense of any such action shall, except with the consent of the Indemnification Parties (which consent shall not be unreasonably withheld), consent to entry of any judgment or enter into any settlement that does not include as an unconditional term thereof the giving by the claimant or plaintiff to such Indemnification Parties of a release from all liability with respect to such action. The Indemnification Parties will have the right to employ their own counsel in any such action, but the fees, expenses and other charges of such counsel will be at the expense of such Indemnification Parties unless (i) the employment of counsel by the Indemnification Parties has been authorized in writing by the Indemnifying Parties, (ii) the Indemnification Parties have reasonably concluded (based on written advice of counsel to the Indemnification Parties) that there may be legal

defenses available to them that are different from or in addition to and inconsistent with those available to the Indemnifying Parties, (iii) a conflict or potential conflict exists (based on written advice of counsel to the Indemnification Parties) between the Indemnification Parties and the Indemnifying Parties (in which case the Indemnifying Parties will not have the right to direct the defense of such action on behalf of the Indemnification Parties) or (iv) the Indemnifying Parties have not in fact employed counsel to assume the defense of such action within a reasonable time after receiving notice of the commencement of the action from the Indemnification Parties, in each of which cases the reasonable fees, disbursements and other charges of counsel will be at the expense of the Indemnifying Parties and shall promptly be paid by each Indemnifying Party as they become due and payable in advance of the final disposition of the claim, action, suit, proceeding or investigation to the fullest extent and in the manner permitted by law; *provided, however,* that in no event shall any contingent fee arrangement be considered reasonable. Notwithstanding the foregoing, the Indemnifying Parties shall not be obligated to advance any expenses or costs prior to receipt of an undertaking by or on behalf of the Indemnification Party to repay any expenses advanced if it shall ultimately be determined that the Indemnification Party is not entitled to be indemnified against such expense. It is understood that the Indemnifying Parties shall not, in connection with any proceeding or related proceedings in the same jurisdiction, be liable for the reasonable fees, disbursements and other charges of more than one separate firm

A–47

Table of Contents

admitted to practice in such jurisdiction at any one time for all such Indemnification Parties unless (a) the employment of more than one counsel has been authorized in writing by the Indemnifying Parties, (b) any of the Indemnification Parties have reasonably concluded (based on written advice of counsel to the Indemnification Parties) that there may be legal defenses available to them that are different from or in addition to and inconsistent with those available to other Indemnification Parties or (c) a conflict or potential conflict exists (based on written advice of counsel to the Indemnification Parties) between any of the Indemnification Parties and the other Indemnification Parties, in each case of which the Indemnifying Parties shall be obligated to pay the reasonable fees and expenses of such additional counsel or counsels. Notwithstanding anything to the contrary set forth in this Agreement, the Indemnifying Parties (i) shall not be liable for any settlement effected without their prior written consent and (ii) shall not have any obligation hereunder to any Indemnification Party to the extent that a court of competent jurisdiction shall determine in a final and non–appealable order that such indemnification is prohibited by applicable law. In the event of a final and non–appealable determination by a court that any payment of expenses is prohibited by applicable law, the Indemnification Parties shall promptly refund to the Indemnifying Parties the amount of all such expenses theretofore advanced pursuant hereto.

(c) At or prior to the Effective Time of the Merger, Equity Office shall purchase directors' and officers' liability insurance covering acts or omissions occurring prior to the Effective Time of the Merger for a period of six years with respect to those individuals who are currently covered by Spieker's directors' and officers' liability insurance policy on terms with respect to such coverage and amount no less favorable to Spieker's directors and officers currently covered by such insurance than those of such policy in effect on the date hereof.

(d) This Section 5.9 is intended for the irrevocable benefit of, and to grant third–party rights to, the Indemnified Parties, the Indemnification Parties and their successors, assigns and heirs and shall be binding on all successors and assigns of Equity Office and EOP Partnership. Each of the Indemnified Parties and the Indemnification Parties shall be entitled to enforce the covenants contained in this Section 5.9 and Equity Office and EOP Partnership acknowledge and agree that each Indemnified Party and Indemnification Party would suffer irreparable harm and that no adequate remedy at law exists for a breach of such covenants and such Indemnified Party or such Indemnification Party shall be entitled to injunctive relief and specific performance in the event of any breach of any provision in this Section 5.9.

(e) If Equity Office or EOP Partnership or any of its respective successors or assigns (i) consolidates with or merges into any other Person and shall not be the continuing or surviving corporation or entity of such consolidation or merger or (ii) transfers all or substantially all of its properties and assets to any Person, then, and in each such case the successors and assigns of such entity shall assume the obligations set forth in this Section 5.9, which obligations are expressly intended to be for the irrevocable benefit of, and shall be enforceable by, each director and officer covered hereby.

5.10 *Declaration of Dividends and Distributions.* From and after the date of this Agreement, neither Spieker nor Equity Office shall make any dividend or distribution to its respective stockholders or shareholders without the prior written consent of the other party; *provided, however,* the written consent of the other party shall not be required for the authorization and payment of (a) distributions at their respective stated dividend or distribution rates with respect to Equity Office Existing Preferred Shares or any series of Spieker Preferred Stock, (b) quarterly distributions with respect to the Spieker Common Stock of $0.70 per share for the quarter ending March 31, 2001 and each quarter thereafter, subject to increase as set forth below and (c) quarterly distributions with respect to the Equity Office Common Shares of up to $0.45 per share for the quarter ending March 31, 2001 and for each quarter thereafter; *provided, however,* the record date for each distribution with respect to the Spieker Common Stock shall be the same date as the record date for the quarterly distribution for the Equity Office Common Shares, as provided to Spieker by notice not less than twenty (20) business days prior to the record date for any quarterly Equity Office distribution. Within 30 days of the date of this Agreement, Spieker shall prepare and present to Equity Office a financial plan showing in reasonable detail the expected management of its operations, including any asset dispositions, and its estimated taxable income (including allowable deductions attributable to payments required to be made by Spieker prior to the Effective Time under the Spieker special severance policy and allowable deductions

A–48

Table of Contents

attributable to the vesting of restricted stock of Spieker set forth on *Schedule 5.8(d)* prior to the Effective Time) in a manner that results in no required Final Spieker Dividend in order for Spieker, at the Effective Time of the Merger, to satisfy the requirement of the Section 857(a)(1) for the short taxable year of Spieker ending at such time (and to avoid the payment of any tax with respect to any undistributed income or gain for such year). Such plan shall include the projected required quarterly dividends per share of Spieker Common Stock necessary to ensure that no Final Spieker Dividend is required to be paid, which quarterly dividends shall be not less than $0.70 per share nor result in a "return of capital" per share of Spieker Common Stock that exceeds one percent (1%) of the projected dividends per share. Upon the approval by Equity Office of such plan, which approval shall not be unreasonably withheld, Spieker shall be entitled to increase the quarterly dividend per share of Spieker Common Stock to the amount shown in such plan, as approved by Equity Office. From and after the date of this Agreement, Spieker Partnership shall not make any distribution to the holders of Spieker OP Units except a distribution per Spieker OP Unit in the same amount as a dividend per share of Spieker Common Stock permitted pursuant to this Section 5.10, with the same record and payment dates as such dividend on the Spieker Common Stock. If Spieker increases any quarterly dividend per share of Spieker Common Stock to an amount in excess of $0.70 per share in accordance with this Section 5.10, Equity Office shall be entitled to declare a dividend per share payable to holders of Equity Office Common Shares (and EOP Partnership shall declare a distribution per unit payable to holders of Equity Office OP Units if a dividend has been declared on the Equity Office Common Shares), the record dates for which shall be the close of the business on the last business day prior to the Effective Time, in an amount per Equity Office Common Share and Equity Office OP Unit equal to the quotient obtained by dividing (x) the aggregate amount of quarterly dividends per share of Spieker Common Stock declared or paid by Spieker in excess of $0.70 per share per quarter in accordance with this Section 5.10 by (y) 1.94462 (the "Additional Corresponding Equity Office Dividends and Distributions"). If, and to the extent, the terms of any series of Equity Office Preferred Shares or Equity Office Preferred OP Units require the payment of a dividend or distribution by reason of the payment of the Additional Corresponding Equity Office Dividends and Distributions, Equity Office and EOP Partnership shall declare and pay any such required dividends and distributions. The Additional Corresponding Equity Office Dividends and Distributions (and any dividends payable to holders of Equity Office Preferred Shares and distributions payable to holders of Equity Office Preferred OP Units) shall be paid on the last business day immediately preceding the Closing Date. The foregoing restrictions shall not apply, however, (i) to Equity Office to the extent a distribution (or an increase in a distribution) by Equity Office is necessary for Equity Office to maintain REIT status, avoid the incurrence of any taxes under Section 857 of the Code, avoid the imposition of any excise taxes under Section 4981 of the Code, or avoid the need to make one or more extraordinary or disproportionately larger distributions to meet any of the three preceding objectives (or to any corresponding distributions or increases in distributions paid by EOP Partnership), (ii) to Equity Office and EOP Partnership with respect to any Corresponding Equity Office Dividends and Distributions, or (iii) to Spieker and Spieker Partnership with respect to any Final Spieker Dividends and Final Spieker Partnership Distributions.

5.11 *Transfer of Spieker TRS.* At the Closing and pursuant to the Stock Purchase Agreement, each of the holders of voting capital stock of Spieker TRS (other than Spieker Partnership, to the extent it owns any such voting capital stock) shall transfer to Equity Office TRS Sub or such Person or Persons as Equity Office TRS Sub shall designate by written notice delivered to them prior to the Closing, or shall authorize a merger that will result in such a transfer of all of the shares of Spieker TRS which are not owned by Spieker Partnership, for an aggregate consideration in an amount equal to the purchase price per share set forth in the Stock Purchase Agreement multiplied by the number of outstanding shares of voting capital stock of Spieker TRS. Equity Office shall use commercially reasonable efforts to cause Equity Office TRS Sub to perform its obligations under the Stock Purchase Agreement.

5.12 *Notices.* Equity Office shall provide such notice to its preferred shareholders of the Merger as is required under Maryland law or the Equity Office Declaration of Trust.

5.13 *Resignations.* On the Closing Date, Spieker shall cause the directors and officers of Spieker and of each of the Spieker Subsidiaries to submit their resignations from such positions, effective as of the Effective Time of the Merger.

A–49

Table of Contents

5.14 *Assumption of Existing Tax Protection Agreements.* Effective as of the Effective Time of the Partnership Merger, Equity Office and EOP Partnership shall assume the obligations of Spieker, Spieker Partnership and/or the applicable Spieker Subsidiary, as the case may be, under the Tax Protection Agreements as described in *Schedule 2.18(j)* to the Spieker Disclosure Letter. Immediately prior to the Effective Time of the Partnership Merger, Equity Office and EOP Partnership shall enter into agreements with Spieker and Spieker Partnership, for the benefit of and enforceable by the individuals and entities who are intended to be protected by the provisions of the Tax Protection Agreements, confirming such assumption effective as of the Effective Time of the Partnership Merger.

5.15 *EOP Partnership Agreement.* At the Closing, EOP Partnership shall assume and perform any obligations that Spieker Partnership or any Spieker Subsidiary has immediately prior to the Effective Time to issue securities in accordance with the terms of any partnership or other agreement to which Spieker Partnership or such Spieker Subsidiary is a party and that are described on *Schedule 5.15,* in the same manner and to the same extent that Spieker Partnership or such Spieker Subsidiary would be required to perform such obligation if no Merger had been consummated.

5.16 *Registration Rights Agreements.* At the Closing, Spieker shall assign and Equity Office shall assume by appropriate instrument the Registration Rights Agreements described on *Schedule 5.16* to the Spieker Disclosure Letter.

ARTICLE 6

CONDITIONS

6.1 *Conditions to Each Party's Obligation to Effect the Mergers.* The obligations of each party to effect the Mergers and to consummate the other transactions contemplated by this Agreement to occur on the Closing Date shall be subject to the fulfillment at or prior to the Closing Date of the following conditions:

(a) *Shareholder and Partner Approvals.* The Spieker Stockholder Approvals, the Equity Office Shareholder Approvals and the Partner Approvals shall have been obtained.

(b) *HSR Act.* The waiting period (and any extension thereof) applicable to the Partnership Merger, the Merger or the transactions contemplated by the Stock Purchase Agreement under the HSR Act, if applicable to the Partnership Merger, the Merger or the transactions contemplated by the Stock Purchase Agreement, shall have expired or been terminated.

(c) *Listing of Shares.* The NYSE shall have approved for listing the Equity Office Common Shares, Equity Office Series E Preferred Shares, Equity Office Series F Preferred Shares and Equity Office Series H Preferred Shares to be issued in the Merger, the Equity Office Common Shares reserved for issuance upon redemption of Equity Office OP Units issued in the Partnership Merger, the Equity Office Common Shares reserved for issuance upon conversion of Equity Office Series D Preferred Shares (if any), and the Equity Office Series G Preferred Shares reserved for issuance upon conversion of Equity Office Series G Preferred OP Units issued in the Partnership Merger, in each case, to be approved for listing on the NYSE, subject to official notice of issuance, prior to the Effective Time.

(d) *Form S-4.* The Form S-4 shall have become effective under the Securities Act and shall not be the subject of any stop order or proceedings by the SEC seeking a stop order.

(e) *No Injunctions or Restraints.* No temporary restraining order, preliminary or permanent injunction or other order issued by any court of competent jurisdiction or other legal restraint or prohibition preventing the consummation of the Mergers or any of the other transactions contemplated hereby shall be in effect.

(f) *Blue Sky Laws.* Equity Office and EOP Partnership shall have received all state securities or "blue sky" permits and other authorizations necessary to issue the Equity Office Common Shares and Equity Office OP Units issuable in the Mergers.

6.2 *Conditions to Obligations of Equity Office and EOP Partnership.* The obligations of Equity Office and EOP Partnership to effect the Mergers and to consummate the other transactions contemplated to occur

A-50

Table of Contents

on the Closing Date are further subject to the following conditions, any one or more of which may be waived by Equity Office:

(a) *Representations and Warranties.* Each of the representations and warranties of Spieker and Spieker Partnership set forth in this Agreement, disregarding all qualifications and exceptions contained therein relating to materiality or Spieker Material Adverse Effect, shall be true and correct as of the date of this Agreement and as of the Closing Date as though made on and as of the Closing Date (except to the extent that such representations and warranties are expressly limited by their terms to another date, in which case such representations and warranties shall be true and correct as of such other date), except where the failure of such representations and warranties to be true and correct would not, individually or in the aggregate, reasonably be expected to have a Spieker Material Adverse Effect; and Equity Office shall have received a certificate (which certificate may be qualified by "knowledge" to the same extent as the representations and warranties of Spieker and Spieker Partnership contained herein are so qualified) signed on behalf of Spieker by the chief executive officer or the chief financial officer of Spieker, in such capacity, to such effect.

(b) *Performance of Obligations of Spieker and Spieker Partnership.* Spieker and Spieker Partnership shall have performed in all material respects all obligations required to be performed by them under this Agreement at or prior to the Effective Time, and Equity Office shall have received a certificate signed on behalf of Spieker by the chief executive officer or the chief operating officer of Spieker, in such capacity, to such effect.

(c) *Material Adverse Effect.* Since the date of this Agreement, there shall have been no Spieker Material Adverse Effect and Equity Office shall have received a certificate of the chief executive officer or chief operating officer of Spieker, in such capacity, certifying to such effect.

(d) *Tax Opinions Relating to REIT Status and Partnership Status.* Equity Office shall have received (i) an opinion of counsel to Spieker reasonably satisfactory to Equity Office, dated as of the Closing Date, to the effect that, commencing with its taxable year ended December 31, 1993 through and including the end of its taxable year ended December 31, 1999, (x) Spieker was organized and operated in conformity with the requirements for qualification as a REIT under the Code, and (y) Spieker Partnership was during and since October 15, 1993, through the end of its taxable year ended December 31, 1999, treated for federal income tax purposes as a partnership and not as a corporation or association taxable as a corporation (with customary exceptions, assumptions and qualifications and based upon customary representations); (ii) an opinion of Sullivan & Cromwell or other counsel to Spieker reasonably satisfactory to Equity Office, dated as of the Closing Date, to the effect that, commencing with its taxable year ended December 31, 2000, (x) Spieker was organized and has operated in conformity with the requirements for qualification as a REIT under the Code, and (y) Spieker Partnership has been during and since January 1, 2000, and continues

to be, treated for federal income tax purposes as a partnership and not as a corporation or association taxable as a corporation (with customary exceptions, assumptions and qualifications and based upon customary representations and upon the opinion of counsel rendering the opinion described in clause (i) if such counsel is not the same counsel), and (iii) an opinion of Hogan & Hartson L.L.P. or other counsel to Equity Office reasonably satisfactory to Spieker, dated as of the Closing Date, to the effect that, commencing with its taxable year ended December 31, 1997, Equity Office was organized and has operated in conformity with the requirements for qualification as a REIT under the Code and that, after giving effect to the Merger, Equity Office's proposed method of operation will enable it to continue to meet the requirements for qualification and taxation as a REIT under the Code (with customary exceptions, assumptions and qualifications and based upon customary representations and based upon and subject to the opinions of counsel to Spieker described in clauses (i) and (ii) above).

(e) *Tax Opinion Relating to the Mergers.* Equity Office shall have received an opinion dated the Closing Date from Hogan & Hartson L.L.P. or other counsel reasonably satisfactory to Equity Office, based upon customary certificates and letters, which letters and certificates are to be in a form to be agreed upon by the parties and dated the Closing Date, to the effect that (i) the Merger will qualify as a reorganization under the provisions of Section 368(a) of the Code and (ii) the Partnership Merger will not result in the recognition

A–51

---

**Table of Contents**

of taxable gain or loss at the time of the Partnership Merger to a holder of Spieker OP Units or Spieker Preferred OP Units, as applicable, (A) who is a "U.S. person" (as defined for purposes of Sections 897 and 1445 of the Code; (B) who does not exercise its redemption right with respect to Equity Office OP Units or Equity Office Preferred OP Units, as applicable, under the EOP Partnership Agreement on a date sooner than the date two years after the Effective Date for the Partnership Merger; (C) who does not receive a cash distribution in connection with the Partnership Merger (or a deemed cash distribution resulting from relief or a deemed relief from liabilities, including as a result of the prepayment of indebtedness of Spieker Partnership in connection with or following the Partnership Merger) in excess of such holder's adjusted basis in its Spieker OP Units or its Spieker Preferred OP Units, as applicable, at the time of the Partnership Merger; (D) who is not required to recognize gain by reason of the application of Section 707(a) of the Code and the Treasury Regulations thereunder to the Partnership Merger, with the result that the Partnership Merger is treated as part of a "disguised sale" by reason of any transactions undertaken by Spieker Partnership prior to or in connection with the Partnership Merger or any debt of Spieker Partnership that is assumed or repaid in connection with the Partnership Merger; and (E) whose "at risk" amount does not fall below zero as a result of the Mergers.

(f) *Opinion Relating to Roll–Up Rules.* Equity Office shall have received an opinion of Sullivan & Cromwell or other counsel to Spieker reasonably satisfactory to Equity Office, dated as of the Closing Date, to the effect that the Partnership Merger is not subject to the requirements of (a) Subpart 900 of Regulation S–K, as amended, as promulgated by the SEC, (b) Rule 2810(a)(10) promulgated by the National Association of Securities Dealers or (c) Sections 25014.5 through 25014.7 of Title 4, Division 1 of the California Corporate Securities Law, as amended.

(g) *"Comfort" Letter.* Equity Office and EOP Partnership shall have received a "comfort" letter from Arthur Andersen LLP, as described in Section 5.1(b).

(h) *Shares of Spieker TRS.* All of the voting shares of Spieker TRS (other than any such shares owned by Spieker Partnership) shall have been transferred to Equity Office TRS Sub, or its designees or assigns, in accordance with the Stock Purchase Agreement.

(i) *Nonsolicitation Agreements.* Each of Warren E. Spieker, Jr., John A. Foster and Craig G. Vought shall have entered into nonsolicitation agreements substantially in the forms set forth on *Exhibit J*.

6.3 *Conditions to Obligations of Spieker and Spieker Partnership.* The obligations of Spieker and Spieker Partnership to effect the Mergers and to consummate the other transactions contemplated to occur on the Closing Date is further subject to the following conditions, any one or more of which may be waived by Spieker:

(a) *Representations and Warranties.* Each of the representations and warranties of Equity Office and EOP Partnership set forth in this Agreement, disregarding all qualifications and exceptions contained therein relating to materiality or Equity Office Material Adverse Effect, shall be true and correct as of the date of this Agreement and as of the Closing Date as though made on and as of the Closing Date (except to the extent that such representations and warranties are expressly limited by their terms to another date, in which case such representations and warranties shall be true and correct as of such other date), except where the failure of such representations and warranties to be true and correct would not, individually or in the aggregate, reasonably be expected to have a Equity Office Material Adverse Effect; and Spieker shall have received a certificate (which certificate may be qualified by "knowledge" to the same extent as the representations and warranties of Equity Office and EOP Partnership contained herein are so qualified) signed on behalf of Equity Office by the chief executive officer or the chief financial officer of Equity Office, in such capacity, to such effect.

(b) *Performance of Obligations of Equity Office and EOP Partnership.* Equity Office and EOP Partnership shall have performed in all material respects all obligations required to be performed by it under this Agreement at or prior to the Effective Time, and Spieker shall have received a certificate of Equity Office signed on behalf of Equity Office by a duly authorized executive officer of Equity Office, in such capacity, to such effect.

A–52

Table of Contents

(c) *Material Adverse Effect.* Since the date of this Agreement, there shall have been no Equity Office Material Adverse Effect and Spieker shall have received a certificate of a duly authorized executive officer of Equity Office, in such capacity, certifying to such effect.

(d) *Tax Opinions Relating to REIT Status and Partnership Status.* Spieker shall have received the opinion of Hogan & Hartson L.L.P. or other counsel to Equity Office reasonably satisfactory to Spieker, dated as of the Closing Date, that, commencing with its taxable year ended December 31, 1997, (i) Equity Office was organized and has operated in conformity with the requirements for qualification as a REIT under the Code and that, after giving effect to the Merger, Equity Office's proposed method of operation will enable it to continue to meet the requirements for qualification and taxation as a REIT under the Code (with customary exceptions, assumptions and qualifications and based upon customary representations and based upon and subject to the opinions of counsel to Spieker described in Section 6.2(d) of this Agreement), and (ii) EOP Partnership has been during and since 1997, and continues to be, treated for federal income tax purposes as a partnership and not as a corporation or association taxable as a corporation (with customary exceptions, assumptions and qualifications and based upon customary representations).

(e) *Tax Opinion Relating to the Mergers.* Spieker shall have received an opinion dated the Closing Date from Sullivan & Cromwell or other counsel reasonably satisfactory to Spieker, based upon customary certificates and letters, which letters and certificates are to be in a form to be agreed upon by the parties and dated the Closing Date, to the effect that (i) the Merger will qualify as a reorganization under the provisions of Section 368(a) of the Code and (ii) the Partnership Merger will not result in the recognition of taxable gain or loss at the time of the Partnership Merger to a holder of Spieker OP Units or Spieker Preferred OP Units, as applicable, (A) who is a "U.S. person" (as defined for purposes of Sections 897 and 1445 of the Code; (B) who does not exercise its redemption right with respect to Equity Office OP Units or Equity Office Preferred OP Units, as applicable, under the EOP Partnership Agreement on a date sooner than the date two years after the Effective Date for the Partnership Merger; (C) who does not receive a cash distribution in connection with the Partnership Merger (or a deemed cash distribution resulting from relief or a deemed relief from liabilities, including as a result of the prepayment of indebtedness of Spieker Partnership in connection with the Partnership Merger) in excess of such holder's adjusted basis in its Spieker OP Units or its Spieker Preferred OP Units, as applicable, at the time of the Partnership Merger; (D) who is not required to recognize gain by reason of the application of Section 707(a) of the Code and the Treasury Regulations thereunder to the Partnership Merger, with the result that the Partnership Merger is treated as part of a "disguised sale" by reason of any transactions undertaken by Spieker Partnership prior to or in connection with the Partnership Merger or any debt of Spieker Partnership that is assumed or repaid in connection with the Partnership Merger; and (E) whose "at risk" amount does not fall below zero as a result of the Mergers.

(f) *"Comfort" Letter.* Spieker and Spieker Partnership shall have received a "comfort" letter from Ernst & Young LLP, as described in Section 5.1(b).

ARTICLE 7

TERMINATION, AMENDMENT AND WAIVER

7.1 *Termination.* This Agreement may be terminated at any time prior to the Effective Time of the Partnership Merger, whether such action occurs before or after any of the Spieker Stockholder Approvals, the Equity Office Shareholder Approvals or either of the Spieker Partner Approvals are obtained:

(a) by mutual written consent duly authorized by the Board of Trustees of Equity Office and the Board of Directors of Spieker;

(b) by Equity Office, (i) upon a breach of or failure to perform any covenant, obligation or agreement on the part of Spieker or Spieker Partnership set forth in this Agreement, or (ii) upon a breach of or in the event that any representation or warranty of Spieker or Spieker Partnership is or shall have become untrue, in either case such that the conditions set forth in Section 6.2(a) or Section 6.2(b),

A–53

Table of Contents

as the case may be, would be incapable of being satisfied by December 31, 2001 (or as otherwise extended);

(c) by Spieker, (i) upon a breach of or failure to perform any covenant, obligation or agreement on the part of Equity Office or EOP Partnership set forth in this Agreement, or (ii) upon a breach of or in the event that any representation or warranty of Equity Office or EOP Partnership is or shall have become untrue, in either case such that the conditions set forth in Section 6.3(a) or Section 6.3(b), as the case may be, would be incapable of being satisfied by December 31, 2001 (or as otherwise extended);

(d) by either Equity Office or Spieker, if any judgment, injunction, order, decree or action by any Governmental Entity of competent authority preventing the consummation of either of the Mergers shall have become final and non–appealable;

(e) by either Equity Office or Spieker, if the Mergers shall not have been consummated before December 31, 2001; *provided, however,* that a party may not terminate pursuant to this clause (e) if the terminating party shall have breached in any material respect its obligations under this Agreement in any manner that shall have caused either of the Mergers not to have been consummated by such date;

(f) by either Equity Office or Spieker (unless Spieker or Spieker Partnership is in breach in any material respect of its obligations under Section 5.1) if, upon a vote at a duly held Spieker Stockholders Meeting or any adjournment thereof, the Spieker Stockholder Approvals shall not have been obtained as contemplated by Section 5.1, if the Spieker Partner Approvals have not been obtained as contemplated by Section 5.1 or if it is determined by Equity Office that the Spieker Partner Approvals cannot be obtained;

(g) by either Spieker or Equity Office (unless Equity Office or EOP Partnership is in breach in any material respect of its obligations under Section 5.1) if, upon a vote at a duly held Equity Office Shareholders Meeting or any adjournment thereof, the Equity Office Shareholder Approvals shall not have been obtained as contemplated by Section 5.1 or if the Equity Office Partner Approvals have not been obtained as contemplated by Section 5.1;

(h) by Spieker (i) if the Board of Directors of Spieker shall have withdrawn, modified, amended or qualified in any manner adverse to Equity Office its approval or recommendation of either of the Merger or this Agreement in connection with, or approved or recommended, any Superior Acquisition Proposal, or, (ii) in order to enter into a binding written agreement with respect to a Superior Acquisition Proposal, provided that, in each case, Spieker shall have complied with the terms of Section 4.3 and, prior to terminating pursuant to this Section 7.1(h), has paid to EOP Partnership the Break–Up Fee (as defined herein) as provided by Section 7.2 hereof; and

(i) by Equity Office, if (1) the Board of Directors of Spieker shall have failed to recommend or withdrawn, modified, amended or qualified, or proposed publicly not to recommend or to withdraw, modify, amend or qualify, in any manner adverse to Equity Office its approval or recommendation of either of the Mergers or this Agreement or approved or recommended any Superior Acquisition Proposal, (2) following the announcement or receipt of an Acquisition Proposal, Spieker shall have failed to call the Spieker Stockholders Meeting in accordance with Section 5.1(a) or failed to prepare and mail to its stockholders the Joint Proxy Statement in accordance with Section 5.1(a) or 5.1(b), or (3) the Board of Directors of Spieker or any committee thereof shall have resolved to do any of the foregoing.

7.2  *Certain Fees and Expenses.* If this Agreement shall be terminated (i) pursuant to Section 7.1(h), 7.1(i)(1) or 7.1(i)(3), then Spieker and Spieker Partnership theretofore or thereupon shall pay to EOP Partnership a fee equal to the Break–Up Fee (as defined herein), and (ii) pursuant to Section 7.1(b) or 7.1(f), then Spieker and Spieker Partnership shall pay to EOP Partnership (provided that Spieker was not entitled to terminate this Agreement pursuant to Section 7.1(c) at the time of such termination) an amount equal to the Break–Up Expenses (as defined herein). If this Agreement shall be terminated pursuant to Section 7.1(c) or 7.1(g), then Equity Office and EOP Partnership shall pay to Spieker Partnership (provided that Equity Office was not entitled to terminate this Agreement pursuant to Section 7.1(b) at the time of such termination) an amount equal to the Break–Up Expenses. If this Agreement shall be terminated pursuant to

A–54

Table of Contents

Section 7.1(b), 7.1(d) (if primarily resulting from any action or inaction of Spieker, Spieker Partnership or any Spieker Subsidiary or Spieker TRS), 7.1(e), 7.1(f), 7.1(i)(2) and prior to the time of such termination an Acquisition Proposal has been received by Spieker or Spieker Partnership, and either prior to the termination of this Agreement or within twelve (12) months thereafter, Spieker or Spieker Partnership enters into any written agreement to consummate a transaction or series of transactions which, had such agreement been proposed or negotiated during the term of this Agreement, would have constituted an Acquisition Proposal pursuant to Section 4.3 (each, a "Spieker Acquisition Agreement"), which is subsequently consummated (whether or not any Spieker Acquisition Agreement relates to the same Acquisition Proposal which had been received at the time of the termination of this Agreement), then Spieker and Spieker Partnership shall pay the Break–Up Fee to EOP Partnership.

The payment of the Break–Up Fee shall be compensation for the loss suffered by Equity Office and EOP Partnership as a result of the failure of the Mergers to be consummated (including, without limitation, opportunity costs and out–of–pocket costs and expenses) and to avoid the difficulty of determining damages under the circumstances. The Break–Up Fee shall be paid by Spieker and Spieker Partnership to EOP Partnership, or the Break–Up Expenses shall be paid by Spieker and Spieker Partnership to EOP Partnership or EOP Partnership to Spieker Partnership (as applicable), in immediately available funds within two (2) business days after the date the event giving rise to the obligation to make such payment occurred (except as otherwise provided in Section 7.1(h) or 7.1(i)). Spieker acknowledges that the agreements contained in this Section 7.2 are integral parts of this Agreement; accordingly, if Spieker and Spieker Partnership fail to promptly pay the Break–Up Fee or Break–Up Expenses due pursuant to this Section 7.2 and, in order to obtain payment, Equity Office commences a suit which results in a judgment against Spieker or Spieker Partnership for any amounts owed pursuant to this Section 7.2, Spieker and Spieker Partnership shall pay to Equity Office its costs and expenses (including attorneys' fees and expenses) in connection with such suit, together with interest on the amount owed at the rate on six–month U.S. Treasury obligations in effect on the date such payment was required to be made plus 300 basis points.

As used in this Agreement, "Break–Up Fee" shall be an amount equal to the lesser of (i) $160,000,000 less Break–Up Expenses paid or payable under this Section 7.2 (the "Base Amount") and (ii) the sum of (A) the maximum amount that can be

paid to EOP Partnership without causing Equity Office to fail to meet the requirements of Sections 856(c)(2) and (3) of the Code determined as if the payment of such amount did not constitute income described in Sections 856(c)(2)(A)–(H) and 856(c)(3)(A)–(I) of the Code ("Qualifying Income"), as determined by independent accountants to Equity Office, and (B) in the event Equity Office receives a letter from outside counsel (the "Break–Up Fee Tax Opinion") indicating that Equity Office has received a ruling from the IRS holding that EOP Partnership's receipt of the Base Amount would either constitute Qualifying Income or would be excluded from gross income of Equity Office within the meaning of Sections 856(c)(2) and (3) of the Code (the "REIT Requirements") or that the receipt by EOP Partnership of the remaining balance of the Base Amount following the receipt of and pursuant to such ruling would not be deemed constructively received prior thereto, the Base Amount less the amount payable under clause (A) above. Spieker's and Spieker Partnership's obligation to pay any unpaid portion of the Break–Up Fee shall terminate three years from the date of this Agreement. In the event that EOP Partnership is not able to receive the full Base Amount, Spieker and Spieker Partnership shall place the unpaid amount in escrow and shall not release any portion thereof to EOP Partnership unless and until Spieker receives one or both of the following: (i) a letter from Equity Office's independent accountants indicating the maximum amount that can be paid at that time to EOP Partnership without causing Equity Office to fail to meet the REIT Requirements or (ii) a Break–Up Fee Tax Opinion, in either of which events Spieker and Spieker Partnership shall pay to EOP Partnership the unpaid Base Amount or, if less and either there is no Break–up Fee Tax Opinion or the ruling described in the Break–Up Fee Tax Opinion does not hold that the Base Amount either would constitute Qualifying Income or would be excluded from gross income for purposes of the REIT Requirements, the maximum amount stated in the letter referred to in (i) above. Subject to satisfaction of the conditions set forth in the immediately preceding sentence, there is no limitation on the number of distributions that can be made from the escrow prior to the third anniversary of the date of this Agreement.

A–55

Table of Contents

The "Break–Up Expenses" payable to EOP Partnership or Spieker Partnership, as the case may be (the "Recipient"), shall be an amount equal to the lesser of (i) $7,500,000 or (ii) the Recipient's out–of–pocket expenses incurred in connection with this Agreement and the transactions contemplated hereby (including, without limitation, all attorneys', accountants' and investment bankers' fees and expenses). If the Break–Up Expenses payable to the Recipient exceed the maximum amount that can be paid to the Recipient without causing the Recipient to fail to meet the requirements of Sections 856(c)(2) and (3) of the Code determined as if the payment of such amount did not constitute Qualifying Income, as determined by independent accountants to the Recipient (the "Maximum Amount"), the amount initially payable to the Recipient shall be limited to the Maximum Amount. If, however, within the three–year period commencing on the date of this Agreement, the Recipient receives a Break–Up Fee Tax Opinion indicating that it has received a ruling from the IRS holding that the Recipient's receipt of the Break–Up Expenses would either constitute Qualifying Income or would be excluded from gross income of the Recipient within the meaning of the REIT Requirements or that receipt by the Recipient of the balance of the Break–Up Expenses above the Maximum Amount following the receipt of and pursuant to such ruling would not be deemed constructively received prior thereto, the Recipient shall be entitled to a letter payable to it the full amount of the Break–Up Expenses. The obligation of Equity Office and EOP Partnership or Spieker and Spieker Partnership, as applicable ("Payor"), to pay any unpaid portion of the Break–Up Expenses shall terminate three years from the date of this Agreement. In the event that the Recipient is not able to receive the full Break–Up Expenses, the Payor shall place the unpaid amount in escrow and shall not release any portion thereof to the Recipient unless and until the Payor receives either one or both of the following: (i) a letter from the independent accountants of Equity Office or Spieker, as the case may be, indicating the maximum amount that can be paid at that time to the Recipient without causing it to fail to meet the REIT Requirements or (ii) a Break–Up Expense Tax Opinion, in either of which events the Payor shall pay to the Recipient the unpaid Break–Up Expenses or, if less and there is no Break–Up Expense Tax Opinion or the ruling described in the Break–Up Expense Tax Opinion does not hold that the Base Amount either would constitute Qualifying Income or would be excluded from gross income for purposes of the REIT Requirements, the maximum amount stated in the letter referred to in (i) above. Subject to satisfaction of the conditions set forth in the immediately preceding sentence, there is no limitation on the number of distributions that can be made from the escrow prior to the third anniversary of the date of this Agreement.

7.3 *Effect of Termination.* In the event of termination of this Agreement by either Spieker or Equity Office as provided in Section 7.1, this Agreement shall forthwith become void and have no effect, without any liability or obligation on the part of Equity Office, EOP Partnership, Spieker or Spieker Partnership, other than the last sentence of Section 5.2, Section 7.2, this Section 7.3 and Article 8, and except to the extent that such termination results from a material breach by any party of any of its representations, warranties, covenants or agreements set forth in this Agreement.

7.4 *Amendment.* This Agreement may be amended by the parties in writing by action of the respective Board of Trustees or Board of Directors of Equity Office and Spieker at any time before or after any Shareholder Approvals are obtained and prior to the filing of the Articles of Merger with the Department; *provided, however,* that, after the Shareholder Approvals and Partner Approvals are obtained, no such amendment, modification or supplement shall be made which by law requires the further approval of shareholders or partners without obtaining such further approval. The parties agree to amend this Agreement in the manner provided in the immediately preceding sentence to the extent required to (a) continue the status of each party as a REIT or (b) preserve the Merger as a reorganization under Section 368(a) of the Code.

7.5 *Extension; Waiver.* At any time prior to the Effective Time, the parties may (a) extend the time for the performance of any of the obligations or other acts of the other party, (b) waive any inaccuracies in the representations and warranties of the other party contained in this Agreement or in any document delivered pursuant to this Agreement or (c) subject to the proviso of Section 7.4, waive compliance with any of the agreements or conditions of the other party contained in this Agreement. Any agreement on the part of a party to any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of

A–56

**Table of Contents**

such party. The failure of any party to this Agreement to assert any of its rights under this Agreement or otherwise shall not constitute a waiver of those rights.

ARTICLE 8

GENERAL PROVISIONS

8.1 *Nonsurvival of Representations and Warranties*. None of the representations and warranties in this Agreement or in any instrument delivered pursuant to this Agreement confirming the representations and warranties in this Agreement shall survive the Effective Time. This Section 8.1 shall not limit any covenant or agreement of the parties which by its terms contemplates performance after the Effective Time.

8.2 *Notices*. All notices, requests, claims, demands and other communications under this Agreement shall be in writing and shall be delivered personally, sent by overnight courier (providing proof of delivery) to the parties or sent by telecopy (providing confirmation of transmission) at the following addresses or telecopy numbers (or at such other address or telecopy number for a party as shall be specified by like notice):

    (a)  if to Equity Office or EOP Partnership, to:

> Equity Office Properties Trust
> Two North Riverside Plaza
> Suite 2100
> Chicago, IL 60606
> Attention:  Timothy H. Callahan, President
>            Stanley M. Stevens, Chief Legal Counsel
> Fax No.:  (312) 466–4020

with a copy (which shall not constitute notice) to:

> Hogan & Hartson L.L.P.
> 555 Thirteenth Street, N.W.
> Washington, D.C. 20004–1109
> Attention:  J. Warren Gorrell, Jr.
>            George P. Barsness
> Fax No.:  (202) 637–5910

    (b)  if to Spieker or Spieker Partnership, to:

> Spieker Properties, Inc.
> 2180 Sand Hill Road
> Suite 200
> Menlo Park, CA 94025
> Attention:  Craig Vought, Co–Chief Executive Officer
>            Sara Reynolds Steppe, Senior Vice
>            President, General Counsel
> Fax No.:  (650) 233–3838

with a copy (which shall not constitute notice) to:

> Sullivan & Cromwell
> 1888 Century Park East
> Los Angeles, CA 90067–1725
> Attention: Alison S. Ressler
> Fax No.: (310) 712–8800

All notices shall be deemed given only when actually received.

8.3 *Interpretation*. When a reference is made in this Agreement to a Section, such reference shall be to a Section of this Agreement unless otherwise indicated. The table of contents and headings contained in this

A–57

Table of Contents

Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation."

8.4 *Counterparts.* This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other party.

8.5 *Entire Agreement; No Third–Party Beneficiaries.* This Agreement, the Spieker Disclosure Letter, the Equity Office Disclosure Letter, the Confidentiality Agreement, the Voting Agreements and the other agreements entered into in connection with the Mergers (a) constitute the entire agreement and supersede all prior agreements and understandings, both written and oral between the parties with respect to the subject matter of this Agreement and (b) except as provided in Section 5.9 ("Third Party Provisions"), are not intended to confer upon any Person other than the parties hereto any rights or remedies.

8.6 *Governing Law.* THE PARTNERSHIP MERGER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATES OF DELAWARE AND CALIFORNIA, AS APPLICABLE, REGARDLESS OF THE LAWS THAT MIGHT OTHERWISE GOVERN UNDER APPLICABLE PRINCIPLES OF CONFLICT OF LAWS THEREOF. EXCEPT AS PROVIDED IN THE IMMEDIATELY PRECEDING SENTENCE, THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF MARYLAND, REGARDLESS OF THE LAWS THAT MIGHT OTHERWISE GOVERN UNDER APPLICABLE PRINCIPLES OF CONFLICT OF LAWS THEREOF.

8.7 *Assignment.* Neither this Agreement nor any of the rights, interests or obligations under this Agreement shall be assigned or delegated, in whole or in part, by operation of law or otherwise by any of the parties without the prior written consent of the other parties. Subject to the preceding sentence, this Agreement will be binding upon, inure to the benefit of, and be enforceable by, the parties and their respective successors and assigns.

8.8 *Enforcement.* The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in any federal court located in Maryland or in any state court located in Maryland this being in addition to any other remedy to which they are entitled at law or in equity. In addition, each of the parties hereto (a) consents to submit itself (without making such submission exclusive) to the personal jurisdiction of any federal court located in Maryland or any state court located in Maryland in the event any dispute arises out of this Agreement or any of the transactions contemplated by this Agreement and (b) agrees that it will not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court.

8.9 *Severability.* Any term or provision of this Agreement which is invalid or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Agreement or affecting the validity or enforceability of any of the terms or provisions of this Agreement in any other jurisdiction. If any provision of this Agreement is so broad as to be unenforceable, the provision shall be interpreted to be only so broad as is enforceable.

8.10 *Exculpation.* This Agreement shall not impose any personal liability on any shareholder, trustee, trust manager, officer, employee or agent of Equity Office or Spieker, and all Persons shall look solely to the property of Equity Office or Spieker for the payment of any claim hereunder or for the performance of this Agreement.

8.11 *Joint and Several Obligations.* In each case where both Spieker and Spicker Partnership, on the one hand, or Equity Office and EOP Partnership, on the other hand, are obligated to perform the same obligation hereunder, such obligation shall be joint and several.

A–58

Table of Contents

IN WITNESS WHEREOF, Equity Office, EOP Partnership, Spieker and Spieker Partnership have caused this Agreement to be signed by their respective officers (or general partners) thereunto duly authorized all as of the date first written above.

EQUITY OFFICE PROPERTIES TRUST

By: _____ /s/ TIMOTHY H. CALLAHAN

Name: Timothy H. Callahan
Title:   President and Chief Executive Officer

EOP OPERATING LIMITED PARTNERSHIP

By:  Equity Office Properties Trust,
its sole general partner

| By: | /s/ TIMOTHY H. CALLAHAN |
|---|---|

Name: Timothy H. Callahan
Title:    President and Chief Executive Officer

SPIEKER PROPERTIES, INC.

| By: | /s/ WARREN E. SPIEKER, JR. |
|---|---|

Name: Warren E. Spieker, Jr.
Title:    Chairman of the Board

SPIEKER PROPERTIES, L.P.

By:  Spieker Properties, Inc.,
its sole general partner

| By: | /s/ WARREN E. SPIEKER, JR. |
|---|---|

Name: Warren E. Spieker, Jr.
Title:    Chairman of the Board

A–59

Table of Contents

## FIRST AMENDMENT TO AGREEMENT AND PLAN OF MERGER

THIS FIRST AMENDMENT TO AGREEMENT AND PLAN OF MERGER (this "First Amendment") is entered into as of May 25, 2001 by and among EQUITY OFFICE PROPERTIES TRUST, a Maryland real estate investment trust ("Equity Office"), EOP OPERATING LIMITED PARTNERSHIP, a Delaware limited partnership ("EOP Partnership"), SPIEKER PROPERTIES, INC., a Maryland corporation ("Spieker"), and SPIEKER PROPERTIES, L.P., a California limited partnership ("Spieker Partnership"), for the purpose of amending the Agreement and Plan of Merger, dated as of February 22, 2001, entered into by and among Equity Office, EOP Partnership, Spieker and Spieker Partnership (the "Merger Agreement"). All capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Merger Agreement.

WHEREAS, the parties hereto desire to amend certain provisions of the Merger Agreement as provided herein;

NOW, THEREFORE, in consideration of the premises and the mutual covenants set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

**Section 1.  Clarification of NYSE Listing Requirements.**

(a) Section 5.6 of the Merger Agreement is deleted and replaced with the following:

5.6 *Listing.* Equity Office shall use commercially reasonable efforts to cause the Equity Office Common Shares, Equity Office Series E Preferred Shares, Equity Office Series F Preferred Shares and Equity Office Series H Preferred Shares to be issued in the Merger and the Equity Office Common Shares reserved for issuance upon redemption of Equity Office OP Units issued in the Partnership Merger, in each case, to be approved for listing on the New York Stock Exchange (the "NYSE"), subject to official notice of issuance, prior to the Effective Time.

(b) Section 6.1(c) of the Merger Agreement is deleted and replaced with the following:

(c) *Listing of Shares.* The NYSE shall have approved for listing the Equity Office Common Shares, Equity Office Series E Preferred Shares, Equity Office Series F Preferred Shares and Equity Office Series H Preferred Shares to be issued in the Merger and the Equity Office Common Shares reserved for issuance upon redemption of Equity Office OP Units issued in the Partnership Merger, in each case, subject to official notice of issuance, prior to the Effective Time.

**Section 2.  Spieker Stock Options.**

The fourth and fifth sentences of Section 5.8(c) of the Merger Agreement hereby are amended in their entirety to read as set forth below:

As soon as practicable after Spieker mails the Joint Proxy Statement to its shareholders and subject to applicable law, EOP Partnership shall offer to purchase, subject to consummation of the Mergers, each Spieker Stock Option outstanding on the date hereof from the holders thereof for an amount in cash in respect thereof equal to the product of (i) the excess, if any, of (A) $58.50 over (B) the exercise price of such Spieker Stock Option and (ii) the number of shares of Spieker Common Stock subject to such Spieker Stock Option at such exercise price. Subject to the terms and conditions of the offer to purchase, if the holder of any such Spieker Stock Option tenders such option prior to 5:00 p.m., New York City time, on the later of (x) the 20th business day after the mailing of the offer to purchase and (y) the 2nd business day after the Effective Time, then promptly after the expiration of the

offer period, EOP Partnership shall, subject to reduction for required withholding taxes, pay to each such tendering former holder of Spieker Stock Options the purchase price thereof.

---

Table of Contents

**Section 3.    Possible Redesignation of Equity Office Preferred Shares and EOP Partnership Preferred Units to be issued in the Mergers.**

A new Section 8.12 is added to the Merger Agreement as follows:

8.12 *Redesignation of Equity Office Preferred Shares and EOP Partnership Preferred Units to be issued in the Mergers.* On April 6, 2001, all of the issued and outstanding Spieker Series A Preferred Shares were converted, at the election of the holders thereof, into 1,219,512 shares of Spieker Common Stock and all of the issued and outstanding Spieker Series A Preferred OP Units were converted into 1,219,512 Spieker OP Units. Pursuant to the terms of a Consent and Purchase Agreement, dated as of May 7, 2001 (the "Consent and Purchase Agreement"), by and among Spieker Partnership, Belair Real Estate Corporation ("Belair") and Belcrest Realty Corporation ("Belcrest", and together with Belair, the "Series D Holders"), the Series D Holders (a) consented to the principal terms of the Partnership Merger and (b) agreed to the repurchase by Spieker Partnership of all Spieker Series D Preferred OP Units held by the Series D Holders on the Closing Date immediately prior to the Partnership Merger, at a purchase price of $46.50 per Spieker Partnership Series D Preferred OP Unit plus any accrued but unpaid distributions, without interest. Therefore, (a) no Equity Office Series D Preferred Shares will be issued in the Merger in exchange for Spieker Series A Preferred Shares and no Equity Office Series D Preferred OP Units will be issued in the Partnership Merger in exchange for Spieker Series A Preferred Units, and (b) subject to completion of such repurchase, no Equity Office Series G Preferred Shares will be issued or reserved for issuance in the Merger in exchange for Spieker Series D Preferred Shares and no Equity Office Series G Preferred OP Units will be issued in the Partnership Merger in exchange for Spieker Series D Preferred OP Units. In order to enable Equity Office and EOP Partnership to issue Equity Office preferred shares and EOP Partnership preferred units of limited partnership interest in consecutively–lettered series and subject to completion of the repurchase of the Series D Preferred OP Units by Spieker Partnership as contemplated by the Consent and Purchase Agreement, notwithstanding any provision of this Agreement to the contrary (a) Equity Office shall have the authority to redesignate as (i) Equity Office "Series D Cumulative Redeemable Preferred Shares (par value $.01 per share)," the Equity Office Series E Preferred Shares to be issued in the Merger in exchange for issued and outstanding Spieker Series B Preferred Shares, (ii) Equity Office "Series E Cumulative Redeemable Preferred Shares (par value $.01 per share)," the Equity Office Series F Preferred Shares to be issued in the Merger in exchange for issued and outstanding Spieker Series C Preferred Shares and (iii) Equity Office "Series F Cumulative Redeemable Preferred Shares (par value $.01 per share)," the Equity Office Series H Preferred Shares to be issued in the Merger in exchange for issued and outstanding Spieker Series E Preferred Shares; and (b) EOP Partnership shall have the authority to redesignate as (i) EOP Partnership "Series D Cumulative Redeemable Preferred Units," the EOP Partnership Series E Preferred OP Units to be issued in the Partnership Merger in exchange for issued and outstanding Spieker Series B Preferred OP Units, (ii) EOP Partnership "Series E Cumulative Preferred Units," the EOP Partnership Series F Preferred OP Units to be issued in the Partnership Merger in exchange for issued and outstanding Spieker Series C Preferred OP Units and (iii) EOP Partnership "Series F Cumulative Preferred Units," the EOP Partnership Series H Preferred OP Units to be issued in the Partnership Merger in exchange for issued and outstanding Spieker Series E Preferred OP Units. Apart from redesignating the Equity Office preferred shares and EOP Partnership preferred units to be issued in the Merger and the Partnership Merger as indicated above and eliminating references within the articles supplementary for each series of Equity Office preferred shares and in each newly created series of EOP Partnership preferred units to be issued in the Merger and the Partnership Merger, as the case may be, to series of Equity Office preferred shares or EOP Partnership preferred units that will not be issued in the Merger and the Partnership Merger, respectively, the articles supplementary for the redesignated Equity Office series D, E and F preferred shares shall otherwise be substantially in the form set forth on *Exhibits D, E and G,* respectively, and the amendments to the EOP Partnership Agreement to provide for the creation of the redesignated EOP Partnership series D, E and F preferred units shall otherwise be substantially in the form set forth on *Exhibit H.*

A–2

---

Table of Contents

**Section 4.    Index of Defined Terms.**

The Index of Defined Terms contained in the Merger Agreement is amended by adding the following entries:

|  |  |
|---|---|
| Belair | Section 8.12 |
| Belcrest | Section 8.12 |
| Consent and Purchase Agreement | Section 8.12 |
| Series D Holders | Section 8.12 |

**Section 5.    Construction of Merger Agreement.**

The Merger Agreement shall be read together and shall have the same force and effect as if the provisions of the Merger Agreement and this First Amendment were contained in one document; and, in the event of conflict, this First Amendment shall control without regard to whether any provision of the Merger Agreement is specifically named in this First Amendment. Except

as expressly amended by this First Amendment, the Merger Agreement shall remain in full force and effect in accordance with its terms.

**Section 6. Counterparts.**

This First Amendment may be executed in any number of counterparts and by the parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

A-3

Table of Contents

IN WITNESS WHEREOF, Equity Office, EOP Partnership, Spieker and Spieker Partnership have caused this First Amendment to be signed by their respective officers (or general partners) thereunto duly authorized all as of the date first written above.

**EQUITY OFFICE PROPERTIES TRUST**

By: /s/ STANLEY M. STEVENS

Name: Stanley M. Stevens
Title:    Executive Vice President, Chief
Legal Counsel and Secretary

**EOP OPERATING LIMITED PARTNERSHIP**

By:  Equity Office Properties Trust,
its sole general partner

By:    /s/ STANLEY M. STEVENS

Name: Stanley M. Stevens
Title:        Executive Vice President,
Chief Legal Counsel and
Secretary

**SPIEKER PROPERTIES, INC.**

By: /s/ CRAIG G. VOUGHT

Name: Craig G. Vought
Title:  Co-Chief Executive Officer

**SPIEKER PROPERTIES, L.P.**

By:  Spieker Properties, Inc.,
its sole general partner

By:    /s/ CRAIG G. VOUGHT

Name: Craig G. Vought
Title:  Co-Chief Executive Officer

A-4

Table of Contents

**ANNEX B**

*MORGAN STANLEY DEAN WITTER*

1585 BROADWAY
NEW YORK, NEW YORK 10036
(212) 761-4000

February 22, 2001

Board of Trustees

Equity Office Properties Trust
Two North Riverside Plaza, Suite 2100
Chicago, IL 60606

Members of the Board:

We understand that Spieker Properties, Inc. (the "Target" or the "Company"), Spieker Properties, L.P. (the "Target Partnership"), Equity Office Properties Trust (the "Buyer") and Equity Office Properties Limited Partnership (the "Buyer Partnership") propose to enter into the Agreement and Plan of Merger, dated as of February 22, 2001 (the "Merger Agreement"), which provides, among other things, for the merger (the "Merger") of Target with and into Buyer, and immediately prior to the Merger, the merger of Target Partnership with and into Buyer Partnership. Pursuant to the Merger, as set forth in the Merger Agreement, (i) each outstanding share of common stock, par value $.0001 per share (the "Company Common Stock") of Target, together with the associated rights issued pursuant to the terms of that certain Stockholder Protection Rights Agreement, dated as of September 10, 1998, between Target and the Bank of New York, as rights agent, other than shares held in treasury or held by the Buyer or any affiliate of the Buyer, will be converted into the right to receive $13.50 per share in cash and 1.49586 common shares of beneficial interest, $.01 par value per share, of Equity Office Properties Trust (the "Buyer's Common Shares"), and (ii) Spieker Properties Preferred Stock (as defined in the Merger Agreement) will be converted into Equity Office Properties Preferred Shares (as defined in the Merger Agreement). The terms and conditions of the Merger are more fully set forth in the Merger Agreement.

You have asked for our opinion as to whether the consideration to be paid by the Buyer pursuant to the Merger Agreement is fair from a financial point of view to the Buyer.

For purposes of the opinion set forth herein, we have:

(i)    reviewed certain publicly available financial statements and other business and financial information of the Company and the Buyer, respectively;

(ii)   reviewed certain internal financial statements and other financial and operating data concerning the Company and the Buyer, respectively;

(iii)  analyzed certain internal financial forecasts prepared by the managements of the Company and the Buyer, respectively;

(iv)   reviewed information relating to certain strategic, financial and operational benefits anticipated from the Merger, prepared by the managements of the Company and the Buyer, respectively;

(v)    discussed the past and current operations and financial condition and the prospects of the Buyer, including information relating to certain strategic, financial and operational benefits anticipated from the Merger, with senior executives of the Buyer;

(vi)   reviewed the pro forma impact of the Merger on the Buyer's funds from operations per share, cash flow, consolidated capitalization and financial ratios;

(vii)  reviewed the reported prices and trading activity for the Company Common Stock and the Buyer's Common Shares, respectively;

B-1

---

Table of Contents

*MORGAN STANLEY DEAN WITTER*

Board of Trustees
Equity Office Properties Trust
February 22, 2001
Page 2

(viii) compared the financial performance of the Company and the Buyer and the prices and trading activity of the Company Common Stock and the Buyer's Common Shares with that of certain other publicly– traded companies comparable with the Company and the Buyer, respectively, and their securities;

(ix)   reviewed the financial terms, to the extent publicly available, of certain comparable acquisition transactions;

(x)    participated in discussions and negotiations among representatives of the Company and the Buyer and their financial and legal advisors;

(xi)   reviewed the Merger Agreement and certain related documents; and

(xii)   considered such other factors and performed such other analyses as we have deemed appropriate.

We have assumed and relied upon without independent verification the accuracy and completeness in all material respects of the information supplied or otherwise made available to us by the Company and the Buyer for the purposes of this opinion. With respect to the internal financial forecasts, including information relating to certain strategic, financial and operational benefits anticipated from the Merger, we have assumed that they have been reasonably prepared on bases reflecting the best currently available estimates and judgments of the future financial performance of the Company and the Buyer. In addition, we have assumed that the Merger will be consummated in accordance with the terms set forth in the Merger Agreement. We have not made any independent valuation or appraisal of the assets or liabilities of the Company, nor have we been furnished with any such appraisals. Our opinion is necessarily based on financial, economic, market and other conditions as in effect on, and the information made available to us as of, the date hereof.

We have acted as financial advisor to the Board of Trustees of the Buyer in connection with this transaction and will receive a fee for our services, including a transaction fee that is contingent upon the consummation of the Merger. In the past, Morgan Stanley & Co. Incorporated and its affiliates have provided financial advisory and financing services for the Buyer and the Company and have received fees for the rendering of these services. In the ordinary course of business, Morgan Stanley may from time to time trade in the debt and equity securities or senior loans of the Buyer. In addition, asset management affiliates of Morgan Stanley beneficially own, in the aggregate, approximately 2.0% of the Buyer's Common Shares. Furthermore, Morgan Stanley is financial advisor to and affiliates of Morgan Stanley are shareholders of Constellation Real Technologies LLC, a private company in which both the Buyer and the Company are shareholders.

It is understood that this letter is for the information of the Board of Trustees of the Buyer and may not be used for any other purpose without our prior written consent, except that a copy of our written opinion may be included in its entirety in any filing that the Buyer is required to file with the Securities and Exchange Commission in connection with the Merger. In addition, this opinion does not in any manner address the prices at which the Buyer's Common Shares will trade following the consummation of the Merger, and Morgan Stanley expresses no opinion or recommendation as to how the shareholders of the Company and the Buyer should vote at the shareholders' meetings held in connection with the Merger.

B-2

Table of Contents

*MORGAN STANLEY DEAN WITTER*

Board of Trustees
Equity Office Properties Trust
February 22, 2001
Page 3

Based upon and subject to the foregoing, we are of the opinion on the date hereof that the consideration to be paid by the Buyer pursuant to the Merger Agreement is fair from a financial point of view to the Buyer.

Very truly yours,

MORGAN STANLEY & CO. INCORPORATED

By:

J.E. Hoke Slaughter
Managing Director

B-3

Table of Contents

Goldman, Sachs & Co.  85 Broad Street  New York, New York 10004
Tel: 212-902-1000

**ANNEX C**

Goldman, Sachs & Co.   85 Broad Street   New York, New York 10004
Tel: 212-902-1000

**PERSONAL AND CONFIDENTIAL**

February 22, 2001

Board of Directors

Spieker Properties, Inc.
2180 Sand Hill Road
Menlo Park, CA 94025

Gentlemen:

      You have requested our opinion as to the fairness from a financial point of view to the holders of the outstanding shares of Common Stock, par value $0.0001 per share (the "Spieker Common Stock"), of Spieker Properties, Inc. ("Spieker" or the "Company") of the Consideration (as defined below) to be received for each share of Spieker Common Stock pursuant to the Agreement and Plan of Merger, dated as of February 22, 2001 (the "Agreement"), by and among the Company, Spieker Properties, L.P., an affiliate of the Company ("Spieker Partnership"), Equity Office Properties Trust ("EOP"), and EOP Operating Limited Partnership, an affiliate of EOP ("EOP Partnership"). Pursuant to the Agreement, the Company will be merged with and into EOP (the "Merger") and each outstanding share of Spieker Common Stock will be converted into the right to receive (a) $13.50 in cash (the "Cash Consideration") and (b) 1.49586 common shares of beneficial interest, par value $0.01 per share (the "EOP Common Stock"), of EOP (the "Stock Consideration" and, together with the Cash Consideration, the "Consideration") as more fully set forth in the Agreement.

      We note that also pursuant to the Agreement, Spieker Partnership will be merged with and into EOP Partnership (the "Partnership Merger") and each partnership unit (other than preferred partnership units) of Spieker Partnership ("Spieker OP Unit") will be exchanged for 1.94462 Class A units of EOP Partnership. We further note that, pursuant to the Limited Partnership Agreement of Spieker Partnership, holders of Spieker OP Units have the right, exercisable prior to the Partnership Merger, to convert their Spieker OP Units into shares of Spieker Common Stock and thereby receive the Consideration provided for in the Merger for shares of Spieker Common Stock. In rendering this opinion, we are not opining on the consideration to be received by holders of Spieker OP Units in the Partnership Merger or to the differential treatment afforded to the holders of Spieker OP Units in comparison to the Consideration to be received by the holders of shares of Spieker Common Stock in the Merger.

      Goldman, Sachs & Co., as part of its investment banking business, is continually engaged in the valuation of businesses and their securities in connection with mergers and acquisitions, negotiated underwritings, competitive biddings, secondary distributions of listed and unlisted securities, private placements and valuations for estate, corporate and other purposes. We are familiar with the Company having provided certain investment banking services to the Company from time to time, including having acted as (i) lead–managing underwriter of a public offering of $150 million aggregate principal amount of 6.75% Notes due 2008 of Spieker Partnership in January 1998, (ii) lead–managing underwriter of a public offering of four million Series D Cumulative Redeemable Preferred Shares of Spieker in June 1998, (iii) lead–managing underwriter of a public offering of $200 million aggregate principal amount of 7.25% Notes due 2009 of Spieker Partnership in May 1999, (iv) lead–managing underwriter of a public offering of $200 million aggregate principal amount of 6.80% Notes due 2004 of Spieker Partnership in May 1999, (v) lead–managing underwriter of a public offering of $200 million aggregate principal amount of 7.65% Notes due 2010 of Spieker Partnership in December 2000, and (vi) its financial advisor in connection with the Agreement. We also have provided certain investment banking services to EOP from time to time, including having acted as (i) co–managing underwriter of a public offering of $300 million aggregate principal amount of 6.763% Notes due 2007 of EOP Partnership in June 1998, (ii) lead–managing underwriter of a public offering of 4,765,423 shares of EOP Common Stock in October 1998, (iii) co–managing underwriter of a public offering of

C–1

---

Table of Contents

Board of Directors
Spieker Properties, Inc.
February 22, 2001
Page Three

$500 million aggregate principal amount of 6.8% Notes due 2009 of EOP Partnership in January 1999, (iv) co–managing underwriter of a public offering of $300 million aggregate principal amount of 6.5% Notes due 2004 of EOP Partnership in January 1999, (v) co–managing underwriter of a public offering of $200 million aggregate principal amount of 6.375% Notes due 2002 of EOP Partnership in January 1999, (vi) co–managing underwriter of a public offering of $500 million aggregate principal amount of 8.375% Notes due 2006 of EOP Partnership in March 2000, and (vii) co–lead–managing underwriter of a public offering of $400 million aggregate principal amount of 7.375% Notes due 2003 of EOP Partnership in November 2000. Goldman, Sachs & Co. provides a full range of financial advisory and securities services and, in the course of its normal trading activities, may from time to time effect transactions and hold positions in securities, including derivative securities, of the Company or EOP for its own account and for the accounts of customers. As of the date hereof, Goldman, Sachs & Co. holds a net long position of 2,661,085 shares of EOP Common Stock. Goldman, Sachs & Co. may provide investment banking services to EOP and its subsidiaries in the future.

      In connection with this opinion, we have reviewed, among other things, the Agreement; Annual Reports to Stockholders and Annual Reports on Form 10–K of the Company and EOP for the three years ended December 31, 1999; a draft of the audited financial statements for the Company for the year ended December 31, 2000; certain interim reports to stockholders and Quarterly Reports on Form 10–Q of the Company and EOP; certain other communications from the Company and EOP to their respective stockholders; certain internal financial analyses and forecasts for the Company prepared by its management (the "Company Forecasts"); certain internal financial analyses and forecasts for EOP prepared by its management; and certain cost savings and operating synergies projected by the managements of the Company and EOP to result from the transactions contemplated by the

Agreement. We also have held discussions with members of the senior managements of the Company and EOP regarding their assessment of the strategic rationale for, and the potential benefits of, the transactions contemplated by the Agreement and the past and current business operations, financial condition and future prospects of their respective companies. In addition, we have reviewed the reported price and trading activity for the Spieker Common Stock and the EOP Common Stock, compared certain financial and stock market information for the Company and EOP with similar information for certain other companies the securities of which are publicly traded, reviewed the financial terms of certain recent business combinations in the real estate industry specifically and other industries generally and performed such other studies and analyses as we considered appropriate.

We have relied upon the accuracy and completeness of all of the financial and other information discussed with or reviewed by us and have assumed such accuracy and completeness for purposes of rendering this opinion. In addition, we have not made an independent evaluation or appraisal of the assets and liabilities of the Company or EOP or any of their subsidiaries and we have not been furnished with any such evaluation or appraisal. With your consent, we have taken into account the views of the Company's management of the risks and uncertainties relating to the Company's ability to achieve the Company Forecasts in the amounts and time periods contemplated thereby. We were not requested to solicit, and did not solicit, interest from other parties with respect to an acquisition of, or other business combination with, the Company. Our advisory services and the opinion expressed herein are provided for the information and assistance of the Board of Directors of the Company in connection with its consideration of the transactions contemplated by the Agreement and such opinion does not constitute a recommendation as to how any holder of Spieker Common Stock should vote with respect to such transactions.

Based upon and subject to the foregoing and based upon such other matters as we consider relevant, it is our opinion that, as of the date hereof, the Consideration to be received by the holders of Spieker Common Stock is fair from a financial point of view to such holders.

Very truly yours,

C–2

---

Table of Contents

Board of Directors
Spieker Properties, Inc.
February 22, 2001
Page Three

*Goldman, Sachs & Co.*

GOLDMAN, SACHS & CO.

C–3

---

Table of Contents

**ANNEX D**

**AMENDMENTS TO EQUITY OFFICE DECLARATION OF TRUST AS PART OF THE MERGER**

**1. Amendment to Section 5.2**

The first sentence of Section 5.2 of the Declaration of Trust of Equity Office, as amended, is amended in its entirety to read as follows:

The number of Trustees (hereinafter the "Trustees") shall initially be three, shall be increased to nine within 90 days following closing of the Trust's initial public offering of Shares (as hereinafter defined), and shall not thereafter be decreased, but may be increased to a maximum of sixteen pursuant to the Bylaws of the Trust.

**2. Amendment to Add New Section 7.2.10**

A new Section 7.2.10 is added to Article VII of the Declaration of Trust of Equity Office, as amended, to read in its entirety as follows:

Section 7.2.10. *Exemption for Certain Preferred Shares.* Notwithstanding any provision of this Article VII (or any successor provision), in connection with the issuance of Preferred Shares by the Trust in connection with a Business Combination (as defined in Section 8.4), the Board may exempt by Board resolution one or more series of Preferred Shares (an "Exempted Preferred Series") from all or any portion of the provisions of this Article VII, including, without limitation, the restrictions or limitations on ownership and transfer contained in Section 7.2.1(a) and Section 7.3, *provided* that either condition (a), (b) or (c) below has been met:

(a) the Board, in its sole and absolute discretion, shall have determined that assuming that all shares of such Exempted Preferred Series are Beneficially Owned by one Non−U.S. Person who is considered an individual pursuant to Section 542 of the Code as modified by Section 856(h)(3) of the Code, it is not reasonably likely that:

(1) five Persons who are considered individuals pursuant to Section 542 of the Code as modified by Section 856(h)(3) of the Code (taking into account all of the Excepted Holders) would Beneficially Own more than 49.5% of the value of the outstanding Shares;

(2) the Shares would be beneficially owned by less than 100 Persons; and

(3) the fair market value of the Shares owned directly and indirectly by Non−U.S. Persons for purposes of Section 897(h)(4)(B) of the Code would comprise forty−three (43%) percent or more of the fair market value of the issued and outstanding Shares; or

(b) the Board shall have established restrictions or limitations on Beneficial Ownership and transfer of the Exempted Preferred Series and remedies for breach thereof that vary from those contained in this Article VII and that, in the sole and absolute discretion of the Board, ensure that it is reasonably likely that:

(1) no five Persons who are considered individuals pursuant to Section 542 of the Code as modified by Section 856(h)(3) of the Code (taking into account all of the Excepted Holders) would Beneficially Own more than 50% of the value of the outstanding Shares;

(2) the Shares would be beneficially owned by at least 100 Persons; and

(3) the fair market value of the Shares owned directly and indirectly by Non−U.S. Persons for purposes of Section 897(h)(4)(B) of the Code would comprise less than forty−three percent (43%) of the fair market value of the issued and outstanding Shares; or

(c) a combination of conditions (a) or (b) above shall have been met, provided that (1) at least one of condition (a)(1) or condition (b)(1) shall have been met; (2) at least one of condition (a)(2) or condition (b)(2) shall have been met; and (3) at least one of condition (a)(3) or condition (b)(3) shall have been met.

D−1

---

Table of Contents

## PART II

## INFORMATION NOT REQUIRED IN PROSPECTUS

**Item 20.** *Indemnification of Trustees and Officers*

The Maryland REIT Law permits a Maryland REIT to include in its declaration of trust a provision limiting the liability of its trustees and officers to the REIT and its shareholders for money damages, except with respect to liability resulting from (1) an actual receipt of an improper benefit or profit in money, property or services, to the extent of the amount of the benefit or profit in money, property or services actually received or (2) a judgment or other final adjudication adverse to the trustee or officer entered in a proceeding based on a finding that the trustee's or officer's action or failure to act was material to the cause of action adjudicated in the proceeding and was the result of active and deliberate dishonesty. The Equity Office declaration of trust contains such a provision.

The Maryland REIT Law permits a Maryland REIT to indemnify and advance expenses to its trustees and officers to the same extent as permitted for directors and officers of a Maryland corporation under the Maryland General Corporation Law. In the case of directors and officers of a Maryland corporation, the Maryland General Corporation Law permits a Maryland corporation to indemnify present and former directors and officers (including any such person who, while serving in that capacity, is or was serving at the request of the corporation as a director, officer, partner, trustee, employee or agent of a foreign or domestic corporation, partnership, joint venture, trust, other enterprise or employee benefit plan) against judgments, penalties, fines, settlements and reasonable expenses actually incurred by them in connection with any proceeding to which they may be made a party by reason of such service, unless it is established that either: (1) the act or omission of the director or officer was material to the matter giving rise to the proceeding and either (x) was committed in bad faith or (y) was the result of active and deliberate dishonesty; (2) the director or officer actually received an improper personal benefit in money, property or services; or (3) in the case of any criminal proceeding, the director or officer had reasonable cause to believe that the act or omission was unlawful.

Under the Maryland General Corporation Law, a Maryland corporation may not, however, indemnify a director or advance expenses for a proceeding brought by the direct or against the corporation, except (x) for a proceeding to enforce indemnification under the Maryland General Corporation Law or (y) if the charter or bylaws of the corporation, a resolution of the board of directors of the corporation or an agreement approved by the board of directors of the corporation to which the corporation is a party expressly so provide. Also, in the case of a proceeding by or in the right of the corporation, the corporation may not indemnify in the case of a judgment of liability on the basis that a personal benefit was improperly received. In either situation described in this paragraph, a court may order indemnification only for expenses.

As a condition to advancing expenses, a Maryland corporation must first receive (1) a written affirmation by the director or officer of his or her good faith belief that he or she has met the standard of conduct necessary for indemnification and (2) a written undertaking by the director or officer or on his or her behalf to repay the amount paid or reimbursed by the Maryland corporation if it shall ultimately be determined that the standard of conduct was not met.

Under the Maryland General Corporation Law, a determination of entitlement to indemnification must by made by (1) the board of directors by a majority vote of a quorum consisting of directors not, at the time, parties to the proceeding, or, if such a quorum cannot be obtained, then by a majority vote of a committee of the board consisting solely of two or more directors not, at the time, parties to such proceeding and who were fully designated to act in the matter by a majority vote of the full board in which the designated directors who are parties may participate; (2) special legal counsel selected by the board for a committee of the board by vote, or, if the requisite quorum of the full board cannot be obtained and the committee cannot be established, by a majority vote of the full board in which directors who are parties may participate; or (3) stockholders.

II–1

---

**Table of Contents**

The Equity Office declaration of trust provides that Equity Office has the power, to the maximum extent permitted by Maryland law, to obligate itself to indemnify, and to pay or reimburse reasonable expenses in advance of final disposition of a proceeding to, (1) any individual who is a present or former trustee or officer of Equity Office or (2) any individual who, while a trustee or officer of Equity Office and at the request of Equity Office, serves or has served as a director, officer, partner, trustee, employee or agent of another corporation, partnership, joint venture, trust, employee benefit plan or any other enterprise and who is made a party to the proceeding by reason of his or her status as a trustee or former trustee or officer of Equity Office. The Equity Office bylaws provide that, to the maximum extent permitted by Maryland law, Equity Office shall indemnify such persons. In addition, under the Equity Office bylaws, Equity Office is obligated to, without requiring a preliminary determination of the ultimate entitlement to indemnification, pay or reimburse, in advance of final disposition of a proceeding, reasonable expenses incurred by such persons under circumstances permitted by Maryland law. Under the Equity Office declaration of trust and bylaws, Equity Office also may, with the approval of its board of trustees, provide indemnification or payment or reimbursement of expenses to any present or former trustee or officer who served a predecessor of Equity Office.

In addition, Mr. Dobrowski, a trustee of Equity Office, is indemnified by General Motors Investment Management Corporation and is covered by an insurance policy maintained by General Motors Corporation, of which General Motors Investment Management Corporation is a subsidiary, in connection with serving on the Equity Office board of trustees.

The partnership agreement of EOP Partnership also provides for indemnification of Equity Office and its trustees and officers to the same extent that indemnification is provided to trustees and officers of Equity Office in its declaration of trust and bylaws, and limits the liability of Equity Office and its trustees and officers to EOP Partnership and its respective partners to the same extent that the Equity Office declaration of trust limits the liability of trustees and officers of Equity Office to Equity Office and its shareholders.

Equity Office has entered into indemnification agreements with some of its trustees and executive officers to provide them with indemnification to the full extent permitted by Maryland law and the declaration of trust and bylaws of Equity Office.

Equity Office has obtained an insurance policy to provide liability coverage for its trustees and officers.

Insofar as indemnification for liabilities arising under the Securities Act may be permitted to trustees, officers or persons controlling Equity Office under the foregoing provisions, Equity Office has been informed that in the opinion of the SEC such indemnification is against public policy as expressed in the Act and is therefore unenforceable.

**Item 21.  *Exhibits and Financial Statement Schedules***

**(a)  Exhibits**

| Exhibit No. | Exhibit Description |
|---|---|
| 2.1 | Agreement and Plan of Merger, dated as of February 22, 2001, as amended, by and among Equity Office, EOP Partnership, Spieker and Spieker Partnership, which is included in this Registration Statement as Annex A to the joint proxy statement/prospectus. The Form of Proposed Equity Office Charter Amendments, which is Exhibit I to the Merger Agreement, is included in this Registration Statement as Annex D to the joint proxy statement/prospectus. Exhibits D–H and K to the Merger Agreement are incorporated herein by reference to Exhibit 2.1 to Equity Office's Current Report on Form 8–K, as filed with the SEC on March 9, 2001. The registrant agrees to furnish supplementally a copy of Exhibits A–C and J to the Merger Agreement to the SEC upon request. |

II–2

---

**Table of Contents**

| Exhibit No. | Exhibit Description |
|---|---|

| 4.1 | Form of Articles Supplementary Designating Equity Office Series E Preferred Shares (attached as Exhibit D to the Merger Agreement, which is incorporated herein by reference to Exhibit 2.1 to Equity Office's Current Report on Form 8–K, as filed with the SEC on March 9, 2001) |
| 4.2 | Form of Articles Supplementary Designating Equity Office Series F Preferred Shares (attached as Exhibit E to the Merger Agreement, which is incorporated herein by reference to Exhibit 2.1 to Equity Office's Current Report on Form 8–K, as filed with the SEC on March 9, 2001) |
| 4.3 | Form of Articles Supplementary Designating Equity Office Series G Preferred Shares (attached as Exhibit G to the Merger Agreement, which is incorporated herein by reference to Exhibit 2.1 to Equity Office's Current Report on Form 8–K, as filed with the SEC on March 9, 2001) |
| 5.1 | Opinion of Hogan & Hartson L.L.P. regarding the legality of common shares and preferred shares being registered |
| 8.1 | Opinion of Hogan & Hartson L.L.P. regarding the qualification of the merger as a reorganization for federal income tax purposes and related federal income tax consequences |
| 8.2 | Opinion of Hogan & Hartson L.L.P. regarding the qualification of Equity Office as a real estate investment trust and EOP Partnership as a partnership for federal income tax purposes |
| 8.3 | Opinion of Sullivan & Cromwell regarding the qualification of the merger as a reorganization for federal income tax purposes and related federal income tax consequences |
| 8.4 | Opinion of Morrison & Foerster LLP regarding the qualification of Spieker as a real estate investment trust and Spieker Partnership as a partnership for federal income tax purposes |
| 10.1 | Commitment Letter for Bridge Facility, dated May 11, 2001 |
| 10.2† | Fee Letter for Bridge Facility, dated May 11, 2001 |
| 10.3 | First Amendment to Revolving Credit Agreement, dated as of May 18, 2001 |
| 12.1† | Ratio of earnings to combined fixed charges and preferred share dividends of Equity Office |
| 12.2† | Ratio of earnings to combined fixed charges and preferred share dividends of Spieker |
| 23.1 | Consent of Ernst & Young LLP (Equity Office) |
| 23.2 | Consent of Arthur Andersen LLP (Spieker) |
| 23.3 | Consent of Hogan & Hartson L.L.P. (included in Exhibit 5.1) |
| 23.4 | Consent of Hogan & Hartson L.L.P. (included in Exhibits 8.1 and Exhibit 8.2) |
| 23.5 | Consent of Sullivan & Cromwell (included in Exhibit 8.3) |
| 23.6 | Consent of Morrison & Foerster LLP (included in Exhibit 8.4) |
| 23.7† | Consent of Morgan Stanley & Co. Incorporated |
| 23.8 | Consent of Goldman, Sachs & Co. |
| 24.1† | Power of attorney (included on signature page) |
| 99.1 | Equity Office — Form of Proxy |
| 99.2 | Spieker — Form of Proxy |
| 99.3† | Consent of Warren E. Spieker, Jr. to be named as a trustee |
| 99.4† | Consent of Craig G. Vought to be named as a trustee |
| 99.5† | Consent of John A. Foster to be named as a trustee |

† Previously filed.

II–3

Table of Contents

### (b) Financial Statement Schedule

The following financial statement schedule was filed with the Equity Office Annual Report on Form 10–K/A for the year ended December 31, 2000 (File no. 1–13115), filed with the SEC on June 6, 2001, and is incorporated herein by reference:

### Schedule III — Real Estate and Accumulated Depreciation

Schedules not listed above have been omitted because they are inapplicable or the information required to be set forth therein is contained, or incorporated by reference, in the consolidated final statements of Equity Office or notes thereto.

### (c) Reports, Opinions or Appraisals

The opinion of Morgan Stanley & Co. Incorporated is attached as Annex B to this joint proxy statement/prospectus. The opinion of Goldman, Sachs & Co. is attached as Annex C to this joint proxy statement/prospectus.

## Item 22. *Undertakings*

The Registrant hereby undertakes:

(1) To file, during any period in which offers or sales are being made, a post–effective amendment to this registration statement:

(i) to include any prospectus required by Section 10(a)(3) of the Securities Act of 1933;

(ii) to reflect in the prospectus any facts or events arising after the effective date of the registration statement (or the most recent post–effective amendment thereof) which, individually or in the aggregate, represent a fundamental change in the information set forth in the registration statement. Notwithstanding the foregoing, any increase or decrease in volume of securities offered (if the total dollar value of securities offered would not exceed that which was registered) and any deviation from the low or high end of the estimated maximum offering range may be reflected in the form of prospectus filed with the Commission pursuant to rule 424(b) if, in the aggregate, the changes in volume and price represent no more than a 20 percent change in the maximum aggregate offering price set forth in the "Calculation of Registration Fee" table in the effective registration statement; and

(iii) to include any material information with respect to the plan of distribution not previously disclosed in the registration statement or any material change to such information in the registration statement.

(2) That, for the purpose of determining any liability under the Securities Act of 1933, each such post–effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial *bona fide* offering thereof.

(3) To remove from registration by means of a post–effective amendment any of the securities being registered which remain unsold at the termination of the offering.

(4) That, for the purpose of determining any liability under the Securities Act of 1933, each filing of the registrant's annual report pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (and, where applicable, each filing of an employee benefit plan's annual report pursuant to Section 15(d) of the Securities Exchange Act of 1934) that is incorporated by reference in the registration statement shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial *bona fide* offering thereof.

II–4

**Table of Contents**

(5) That prior to any public reoffering of the securities registered hereunder through use of a prospectus which is a part of this registration statement, by any person or party who is deemed to be an underwriter within the meaning of Rule 145(c), the issuer undertakes that such reoffering prospectus will contain the information called for by the applicable registration form with respect to reofferings by persons who may be deemed underwriters, in addition to the information called for by the other items of the applicable form.

(6) That every prospectus: (i) that is filed pursuant to paragraph (5) immediately preceding, or (ii) that purports to meet the requirements of Section 10(a)(3) of the Act and is used in connection with an offering of securities subject to Rule 415, will be filed as a part of an amendment to the registration statement and will not be used until such amendment is effective, and that, for purposes of determining any liability under the Securities Act of 1933, each such post–effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial *bona fide* offering thereof.

(7) Insofar as indemnification for liabilities arising under the Securities Act of 1933 may be permitted to trustees, officers and controlling persons of the registrant pursuant to the foregoing provisions, or otherwise, the registrant has been advised that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the registrant of expenses incurred or paid by a trustee, officer or controlling person of the registrant in the successful defense of any action, suit or proceeding) is asserted by such trustee, officer or controlling person in connection with the securities being registered, the registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Act and will be governed by the final adjudication of such issue.

(8) To respond to requests for information that is incorporated by reference into the prospectus pursuant to Item 4, 10(b), 11, or 13 of this form, within one business day of receipt of such request, and to send the incorporated documents by first class mail or other equally prompt means. This includes information contained in documents filed subsequent to the effective date of the registration statement through the date of responding to the request.

(9) To supply by means of a post–effective amendment all information concerning a transaction, and the company being acquired involved therein, that was not the subject of and included in the registration statement when it became effective.

II–5

**Table of Contents**

## SIGNATURES

Pursuant to the requirements of the Securities Act, the registrant has duly caused this registration statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Chicago, State of Illinois on June 6, 2001.

EQUITY OFFICE PROPERTIES TRUST

By:                          /s/ STANLEY M. STEVENS

Stanley M. Stevens
Executive Vice President,
Chief Legal Counsel and Secretary

Pursuant to the requirements of the Securities Act of 1933, this registration statement has been signed by the following persons in the capacities indicated as of the 6th day of June, 2001.

| Signature | Title |
|---|---|
| * <br> Timothy H. Callahan | President, Chief Executive Officer and Trustee (principal executive officer) |
| * <br> Richard D. Kincaid | Executive Vice President — Chief Financial Officer (principal financial officer) |
| * <br> Stephen M. Briggs | Senior Vice President — Chief Accounting Officer (principal accounting officer) |
| * <br> Samuel Zell | Chairman of the Board of Trustees |
| * <br> Sheli Z. Rosenberg | Trustee |
| * <br> Thomas E. Dobrowski | Trustee |
| * <br> James D. Harper, Jr. | Trustee |
| * <br> Jerry M. Reinsdorf | Trustee |
| * <br> William M. Goodyear | Trustee |
| * <br> David K. McKown | Trustee |
| * <br> Edwin N. Sidman | Trustee |

II–6

## Table of Contents

| Signature | Title |
|---|---|
| * <br> D. J. André de Bock | Trustee |
| * <br> William Wilson III | Trustee |
| * <br> John S. Moody | Trustee |
| * <br> Jan H.W.R. van der Vlist | Trustee |

* Pursuant to Power of Attorney
By: /s/ STANLEY M. STEVENS

Stanley M. Stevens
Attorney–in–Fact

II–7

## Table of Contents

### EXHIBIT INDEX

| Exhibit No. | Exhibit Description |
|---|---|

| 2.1 | Agreement and Plan of Merger, dated as of February 22, 2001, as amended, by and among Equity Office, EOP Partnership, Spieker and Spieker Partnership, which is included in this Registration Statement as Annex A to the joint proxy statement/ prospectus. The Form of Proposed Equity Office Charter Amendments, which is Exhibit I to the Merger Agreement, is included in this Registration Statement as Annex D to the joint proxy statement/prospectus. Exhibits D–H and K to the Merger Agreement are incorporated herein by reference to Exhibit 2.1 to Equity Office's Current Report on Form 8–K, as filed with the SEC on March 9, 2001. The registrant agrees to furnish supplementally a copy of Exhibits A–C and J to the Merger Agreement to the SEC upon request. |
| 4.1 | Form of Articles Supplementary Designating Equity Office Series E Preferred Shares (attached as Exhibit D to the Merger Agreement, which is incorporated herein by reference to Exhibit 2.1 to Equity Office's Current Report on Form 8–K, as filed with the SEC on March 9, 2001) |
| 4.2 | Form of Articles Supplementary Designating Equity Office Series F Preferred Shares (attached as Exhibit E to the Merger Agreement, which is incorporated herein by reference to Exhibit 2.1 to Equity Office's Current Report on Form 8–K, as filed with the SEC on March 9, 2001) |
| 4.3 | Form of Articles Supplementary Designating Equity Office Series H Preferred Shares (attached as Exhibit G to the Merger Agreement, which is incorporated herein by reference to Exhibit 2.1 to Equity Office's Current Report on Form 8–K, as filed with the SEC on March 9, 2001) |
| 5.1 | Opinion of Hogan & Hartson L.L.P. regarding the legality of common shares and preferred shares being registered |
| 8.1 | Opinion of Hogan & Hartson L.L.P. regarding the qualification of the merger as a reorganization for federal income tax purposes and related federal income tax consequences |
| 8.2 | Opinion of Hogan & Hartson L.L.P. regarding the qualification of Equity Office as a real estate investment trust and EOP Partnership as a partnership for federal income tax purposes |
| 8.3 | Opinion of Sullivan & Cromwell regarding the qualification of the merger as a reorganization for federal income tax purposes and related federal income tax consequences |
| 8.4 | Opinion of Morrison & Foerster LLP regarding the qualification of Spieker as a real estate investment trust and Spieker Partnership as a partnership for federal income tax purposes |
| 10.1 | Commitment Letter for Bridge Facility, dated May 11, 2001 |
| 10.2† | Fee Letter for Bridge Facility, dated May 11, 2001 |
| 10.3 | First Amendment to Revolving Credit Agreement, dated as of May 18, 2001 |
| 12.1† | Ratio of earnings to combined fixed charges and preferred distributions of Equity Office |

## Table of Contents

| Exhibit No. | Exhibit Description |
| --- | --- |
| 12.2† | Computation of ratio of earnings to combined fixed charges and preferred dividends of Spieker |
| 23.1 | Consent of Ernst & Young LLP (Equity Office) |
| 23.2 | Consent of Arthur Andersen LLP (Spieker) |
| 23.3 | Consent of Hogan & Hartson L.L.P. (included in Exhibit 5.1) |
| 23.4 | Consent of Hogan & Hartson L.L.P. (included in Exhibits 8.1 and Exhibit 8.2) |
| 23.5 | Consent of Sullivan & Cromwell (included in Exhibit 8.3) |
| 23.6 | Consent of Morrison & Foerster LLP (included in Exhibit 8.4) |
| 23.7† | Consent of Morgan Stanley & Co. Incorporated |
| 23.8 | Consent of Goldman, Sachs & Co. |
| 24.1† | Power of attorney |
| 99.1 | Equity Office — Form of Proxy |
| 99.2 | Spieker — Form of Proxy |
| 99.3† | Consent of Warren E. Spieker, Jr. to be named as a trustee |
| 99.4† | Consent of Craig G. Vought to be named as a trustee |
| 99.5† | Consent of John A. Foster to be named as a trustee |

† Previously filed.