# Exhibit I

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

---------------------------------------------------------------x
:
EOP OPERATING LIMITED PARTNERSHIP and     :
BLACKHAWK PARENT LLC,                     :
                                          :
                            Petitioners,  :
                                          :
        -against-                         :
                                          :         07CH 19272
WARREN E. SPIEKER, JR., DENNIS E.         :
SINGLETON, JOHN K. FRENCH, BRUCE E.       :
HOSFORD, BLAKE FAMILY TRUST, GREGG R.     :  Case No.: 07 CH
DAUGHERTY, JOHN G. DAVENPORT, JAMES       :
C. EDDY, JOHN A. FOSTER, DONALD S.        :
JEFFERSON, VINCENT D. MULROY, RICHARD     :
L. ROMNEY, PETER H. SCHNUGG, JILL T.      :
SCHNUGG, JOHN B. SOUTHER, JR., CRAIG G.   :
VOUGHT, and JOEL BENOLIEL,                :
                                          :
                            Respondents.  :
                                          :
---------------------------------------------------------------x

**PETITION
FOR AN ORDER COMPELLING ARBITRATION**

Petitioners EOP Operating Limited Partnership ("EOP") and Blackhawk Parent LLC ("Blackhawk Parent") (collectively, "Petitioners"), as and for their petition for an order compelling arbitration pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-2, allege as follows:

**NATURE OF THE PETITION**

1.      With this Petition, Petitioners seek to compel Respondents to arbitrate — and thereby put to rest — the meritless claim that Respondents' self-inflicted tax liabilities somehow trigger an indemnification obligation by Petitioners.

2.      In 2001, EOP acquired Spieker Properties, L.P. for in excess of $7 billion. Pursuant to that transaction, Respondents became limited partners of EOP. In a tax protection

agreement ("TPA") entered into in connection with that transaction, EOP agreed not to "directly or indirectly sell, exchange, or otherwise dispose of" certain identified properties (the "Protected Properties") and further agreed to pay certain taxes incurred as a result of any such disposition.

3. The TPA contains the following provision requiring arbitration of this dispute:

> If the Partnership has breached or violated the covenant set forth in Paragraph 2(a) [of the TPA] (or a Sale Restriction Partner asserts that the Partnership has breached or violated the covenant set forth in Paragraph 2(a)), the General Partner and the Sale Restriction Partner agree to negotiate in good faith to resolve any disagreements regarding any such breach or violation and the amount of damages, if any, payable to such Sale Restriction Partner under Paragraph 2(c) [of the TPA]. If any such disagreement cannot be resolved by the General Partner and such Sale Restriction Partner within sixty (60) days after such breach, the General Partner and the Sale Restriction Partner shall jointly retain a nationally recognized independent public accounting firm to act as an arbitrator to resolve as expeditiously as possible all points of any such disagreement.

(Third Amended and Restated Agreement of Limited Partnership of EOP Operating Limited Partnership at Exhibit E-9 § 2(d) ("EOP Partnership Agreement") (Ex. B).)

4. In November 2006, affiliates of The Blackstone Group ("Blackstone") and Equity Office Properties Trust ("EOPT"), the general partner of EOP, announced that they had entered into an agreement whereby Blackstone would acquire EOPT (the "Blackstone Transaction").

5. In early January 2007, Petitioners provided Respondents with a Confidential Election Memorandum explaining that Respondents, as limited partners in EOP, could exchange their limited partnership units for cash consideration or remain limited partners in EOP. In late January 2007, certain of the Respondents wrote to Petitioners claiming that if they chose to receive cash consideration in connection with the Blackstone Transaction, then Petitioners would have to indemnify them under the TPA for taxes incurred as a result of such

cash payments. Petitioners explained in a letter dated January 30, 2007 that no such indemnification obligations existed because the Blackstone Transaction did not involve the direct or indirect sale, exchange or disposition of any of the Protected Properties under the TPA. The transaction closed on February 9, 2007. It is undisputed that EOP owned all of the Protected Properties before and after the closing.

6. In connection with the closing, Respondents chose to receive cash consideration of more than $400 million rather than remain limited partners in EOP. Thus, any tax liability owed by Respondents is the direct result of Respondents' decision to redeem their interests for cash consideration rather than rolling over their partnership interests, which would not have resulted in any tax liabilities for Respondents. Put differently, any taxes incurred by Respondents are a result of gain realized on the voluntary sale of their interests in EOP as distinguished from a sale of the Protected Properties.

7. Nonetheless, Respondents allege that they are entitled to tax reimbursement in addition to the $400 million they received, despite that EOP survived the Blackstone Transaction and that immediately before and immediately after the Blackstone Transaction EOP owned the Protected Properties. Respondents' underlying claim is entirely without merit because Respondents' alleged tax liabilities were self-inflicted and in no way trigger any indemnification obligation by Petitioners.

8. In the months that followed the closing, Respondents persisted in their disingenuous interpretation of the TPA. Because the TPA calls for arbitration of all claims, without regard to their merits or lack thereof, the parties began communicating concerning the selection of an arbitrator and other procedural issues associated with the anticipated arbitration. The TPA specifically provides that the parties "shall jointly retain" the arbitrator. As required by

the TPA, Petitioners provided Respondents with a list of accounting firms as candidates to serve as arbitrator. Respondents, however, have refused to provide Petitioners with the list of potential arbitrators required by the TPA.

9. Those discussions were active and ongoing when Respondents violated the agreement to arbitrate set forth in the TPA by filing a preemptive and premature Petition on June 8, 2007 in California federal court, seeking to litigate certain issues related to the selection of an arbitrator and the place of arbitration in order to gain some perceived strategic advantage regarding certain aspects of the arbitration. If Respondents would have continued in good-faith discussions concerning the selection of a mutually acceptable arbitrator, the parties could have selected an arbitrator by now and, if necessary, the arbitrator could have determined the location of the arbitration. Petitioners have moved to dismiss that lawsuit because, among other reasons, the federal court in which Respondents filed suit lacks subject matter jurisdiction over the dispute: the Respondents and Petitioners are not diverse and there is no basis for federal question jurisdiction.

10. Petitioners move to compel Respondents to arbitrate their claim arising under the TPA in accordance with the arbitration provisions contained therein. Specifically, Petitioners request that the Court order Respondents to provide the requisite list of potential arbitrators and to negotiate in good faith so that the parties may jointly retain a nationally recognized independent public accounting firm to act as an arbitrator of their dispute.

## PARTIES

11. Petitioner EOP is a Delaware limited partnership headquartered in Chicago, Illinois.

12. Petitioner Blackhawk Parent is a Delaware limited liability company, headquartered in New York, with offices in Chicago, Illinois.

13. Respondent Warren E. Spieker, Jr. is a resident of Menlo Park, California and a former limited partner of EOP. Spieker is a former trustee of EOP's general partner, EOPT.

14. Respondent Dennis E. Singleton is a resident of Menlo Park, California and a former limited partner of EOP.

15. Respondent John K. French is a resident of Woodside, California and a former limited partner of EOP.

16. Respondent Bruce E. Hosford is a resident of Seattle, Washington and a former limited partner of EOP.

17. Respondent Blake Family Trust is a living trust organized under the laws of the State of California and a former limited partner of EOP.

18. Respondent Gregg R. Daugherty is a resident of Clyde Hill, Washington and a former limited partner of EOP.

19. Respondent John G. Davenport is a resident of Newport Beach, California and a former limited partner of EOP.

20. Respondent James C. Eddy is a resident of Portland, Oregon and a former limited partner of EOP.

21. Respondent John A. Foster is a resident of Atherton, California and a former limited partner of EOP. Foster is a former trustee of EOP's general partner, EOPT.

22. Respondent Donald S. Jefferson is a resident of Medina, Washington and a former limited partner of EOP.

23. Respondent Vincent D. Mulroy is a resident of Ross, California and a former limited partner of EOP.

24. Respondent Richard L. Romney is a resident of Rancho Santa Fe, California and a former limited partner of EOP.

25. Respondents Peter H. Schnugg and Jill T. Schnugg are residents of Alamo, California and former limited partners of EOP.

26. Respondent John B. Souther, Jr. is a resident of Bend, Oregon and a former limited partner of EOP.

27. Respondent Craig G. Vought is a resident of Atherton, California and a former limited partner of EOP. Vought is a former trustee of EOP's general partner, EOPT.

28. Respondent Joel Benoliel is a resident of Kirkland, Washington and a former limited partner of EOP.

### JURISDICTION, VENUE AND GOVERNING LAW

29. This Court has subject matter jurisdiction over this action pursuant to Sections 1 and 2 of the FAA, 9 U.S.C. §§ 1-2, because it is a court of competent general jurisdiction entitled to enforce the laws of the United States.

30. This Court has personal jurisdiction over each of the Respondents pursuant to 735 ILCS 5/2-209 because, among other things, this dispute arises from Respondents' transaction of business within this State and from the making or performance of a contract substantially connected to this State. Respondents were limited partners in EOP, which is headquartered in this State and has its principal place of business in this State. EOP derives a substantial portion of its revenues from business conducted and assets located in this State. Accordingly, Respondents derive significant revenue from this State, and received quarterly dividends between 2001 and 2006 from revenues generated in this State. Such quarterly revenues were administered in this State. Additionally, Respondents had frequent and regular

correspondence with EOP in this State. Finally, the EOP Partnership Agreement, which provides the basis for Respondents' underlying claim and this Petition, was executed in this State.

31. Venue in the Circuit Court of Cook County, Illinois is proper under 735 ILCS 5/2-101 because a substantial portion of the events giving rise to the transactions out of which this cause of action arises occurred in Cook County, Illinois.

32. The FAA applies to any agreement to arbitrate a dispute arising out of a "contract evidencing a transaction involving commerce." 9 U.S.C. § 2.

33. This dispute arises out of the multi-billion dollar merger of EOPT and Spieker Properties, two real estate companies based in Illinois and California, respectively, with combined holdings in 24 states and the District of Columbia. The economic activity in question here is interstate in character, thus the FAA applies.

34. This Court has jurisdiction to apply the FAA to enforce arbitration agreements with a tie to interstate commerce, such as the TPA.

## THE NATURE OF THE PARTIES' DISPUTE

### A. The Spieker Transaction

35. In December 2000, Respondent Craig Vought, then the Co-Chief Executive Officer of Spieker Properties, Inc. ("Spieker Properties"), contacted Timothy Callahan, then the Chief Executive Officer of EOPT, headquartered in Chicago, to suggest that the two meet. (June 6, 2001 EOPT S-4A, as amended, at 36-39 (Ex. A) ("Spieker Proxy").)

36. Pursuant to that conversation, on December 21, 2000, Vought met Callahan in Chicago to discuss a possible merger of their companies and the concurrent merger of their respective operating partnerships, EOP and Spieker Properties L.P.

37. On January 2, 2001, Spieker Properties and EOPT entered into a confidentiality agreement and the companies began due diligence. On January 25, 2001, members of the senior management of Spieker Properties met with members of the senior management of EOPT to exchange information on the structure of their respective organizations and discuss management and personnel issues.

38. Also during January 2001 and the first week of February 2001, Vought and Respondent John Foster, then the other Co-Chief Executive Officer of Spieker Properties had various telephone conversations with Callahan concerning the combination of their two businesses.

39. Subsequently, on behalf of Spieker Properties and Spieker Properties, L.P., Vought traveled to Chicago and, on February 7, 2001, met with Callahan and other EOPT executives in Chicago. At that meeting, Callahan presented a proposal for a merger of Spieker Properties with EOPT (the "Spieker Transaction"), including a proposed price and other terms.

40. On February 9, 2001, Callahan telephoned Vought to discuss EOPT's proposal.

41. That same day, the Spieker Properties board, which included Respondent Warren E. Spieker, Jr., then the Spieker Properties Chairman of the Board, Respondent John French, and Respondent Dennis Singleton, authorized Spieker's management, which included Vought and Foster, to move forward with a transaction with EOPT.

42. Between February 9 and 12, 2001, the companies continued to discuss by telephone the structure of a merger. On February 12, 2001, Samuel Zell, then Chairman of EOPT, called Respondent Spieker to discuss the Spieker Transaction.

43. Beginning on February 20, 2001, representatives from Spieker Properties, EOPT, Goldman Sachs (financial advisor to Spieker Properties), Morgan Stanley (financial advisor to EOPT), Sullivan & Cromwell (legal counsel to Spieker Properties) and Hogan & Hartson LLP (legal counsel to EOPT) met in Hogan & Hartson's New York offices to negotiate a merger agreement and other related agreements.

44. On February 22, 2001, Spieker Properties and EOPT executed the merger agreement negotiated in New York (the "Spieker Merger Agreement").

45. On July 2, 2001, pursuant to the Spieker Merger Agreement, Spieker Properties merged into EOPT. Each company's operating partnership — Spieker Properties L.P. and EOP — also merged, with EOP surviving the merger. EOP acquired the properties previously held by Spieker Properties L.P., and Respondents became limited partners of EOP.

**B.    The EOP Partnership Agreement and the TPA**

46. On July 2, 2001, in connection with the consummation of the Spieker Transaction, the partners of EOP, including Respondents, entered the EOP Partnership Agreement. (Ex. B.) The EOP Partnership Agreement is governed by Delaware law.

47. Stanley M. Stevens, then EOPT's Executive Vice President, Chief Legal Counsel and Secretary, signed the EOP Partnership Agreement on behalf of the EOP limited partners, including all Respondents, in Chicago, Illinois.

48. As part of the EOP Partnership Agreement, EOP agreed not to "directly or indirectly sell, exchange, or otherwise dispose of" the Protected Properties formerly owned by Spieker Properties. This agreement was set forth in the TPA, which was included as part of a separate exhibit to the EOP Partnership Agreement. These properties were specifically listed as Schedule 2 to Exhibit E-9 of the EOP Partnership Agreement. Under the TPA, EOP also agreed

that if the Protected Properties were directly or indirectly sold, exchanged, or otherwise disposed of and Respondents incurred certain tax liabilities as a result, EOP would indemnify Respondents for those tax liabilities.

49. The TPA requires that if Respondents and EOP disagree over whether Respondents are entitled to any reimbursement for any alleged tax liability, Respondents and Petitioners are "to negotiate in good faith to resolve any disagreements regarding any such breach or violation and the amount of damages, if any . . . " The TPA further provides that, if, after 60 days, the parties' disagreement cannot be resolved, Respondents and Petitioners "shall jointly retain a nationally recognized independent public accounting firm to act as an arbitrator to resolve as expeditiously as possible all points of any such disagreement . . . ."

50. The TPA was negotiated in New York, New York, and executed in Chicago, Illinois.

C.  **EOP, Its General Partner, And Its Limited Partners**

51. EOP is a Delaware limited partnership with its headquarters in Chicago, Illinois.

52. The EOP Partnership Agreement provides that EOP's principal office is in Chicago, Illinois. (Ex. B § 2.3.)

53. During all relevant periods, EOPT, a Maryland Real Estate Investment Trust with its principal place of business in Chicago, Illinois, was EOP's general partner until EOPT was acquired by affiliates of Blackstone in February 2007.

54. In connection with the Spieker Transaction, Respondents Spieker, Vought, and Foster became members of the Chicago-based EOPT board of trustees.

55. EOPT board meetings attended by Spieker, Vought, and Foster by telephone or in person occurred in Chicago, Illinois.

56. During all relevant time periods, EOP's books and records were kept at EOP's headquarters in Chicago, Illinois, and remain so.

D. **The Blackstone Transaction**

57. On November 19, 2006, affiliates of Blackstone and EOPT entered into an agreement (the "Blackstone Merger Agreement") whereby Blackstone agreed to acquire all of the common shares of EOPT. (December 29, 2006 EOPT Proxy, as amended, at 35 (Ex. C) ("EOPT Proxy").)

58. The Blackstone Merger Agreement contemplated that immediately prior to the merger of EOPT and Blackstone: (i) Blackhawk Acquisition, L.P., an affiliate of Blackstone, would merge into EOP; (ii) Blackhawk Parent, also an affiliate of Blackstone, would become EOP's general partner; and (iii) EOP would survive the transaction. The Blackstone Merger Agreement also provided that, upon the holder's election, each outstanding unit of partnership interest in EOP would be rolled over as units in the surviving partnership on a one-for-one basis. Accordingly, the Blackstone Merger Agreement was specifically structured to offer EOP limited partners such as Respondents the opportunity to avoid incurring taxes through the election to take units in the surviving entity, *i.e.*, the Blackstone Transaction itself was not a taxable event for Respondents. Instead, all of the taxes incurred by Respondents are a result of their decision to redeem their interests for cash.

59. On January 23, 2007, prior to the closing of the Blackstone Transaction, Respondent Spieker wrote to EOP in Chicago to address whether the Blackstone Transaction "triggered" any obligation of EOP under the TPA. (Initial Letters from Respondents (Ex. I).) Similar letters were sent by each of Respondents to EOP in Chicago.

60. While EOP and Blackstone understood that certain limited partners might choose to take cash as part of the Blackstone Transaction, EOP had no indemnification obligation to EOP limited partners under the TPA because Blackhawk Acquisition L.P. would be merged into EOP, and EOP would survive the merger. Petitioners advised the Respondents of this before the Blackstone Transaction closed and even before the shareholders voted in favor of the Blackstone Transaction. (January 30, 2007 letters from Blackhawk Parent to Respondents (Ex. D).) Petitioners explained that the Blackstone Transaction did not constitute a direct or indirect sale, exchange or other disposition of any of the Protected Properties. Indeed, the Blackstone Merger Agreement contemplated that the Protected Properties would continue to be owned by EOP after February 9, 2007.

61. On February 9, 2007, the Blackstone Transaction closed as contemplated by the Blackstone Merger Agreement and the EOP limited partners, who made the requisite election, continued to be limited partners in EOP.

E. **Respondents' Election To Take Cash Consideration**

62. Before the Blackstone Transaction closed, Respondents were sent election form packages to enable them to indicate whether they wished to remain EOP limited partners or exchange their partnership interests for cash consideration.

63. The election form package stated that questions concerning the Blackstone Transaction should be directed to EOPT representative Elizabeth P. Coronelli in Chicago, Illinois.

64. Respondents elected not to remain limited partners in EOP, but rather chose to receive cash for each of their EOP partnership units.

65. On or about February 9, 2007, Respondents received in excess of $400 million in cash for their EOP units.

66. Although deciding to liquidate their interests in EOP, Respondents sought to avoid paying the tax obligations that arose from that decision.

67. During January and February 2007, Respondents sent letters to EOP in Chicago, Illinois and to Blackhawk Parent in New York, New York requesting indemnification under the TPA.

F. **The Continuing Arbitration Discussions**

68. When it became clear that Respondents were persisting in their unmeritorious claim that they were entitled to indemnification notwithstanding it was their decision to take cash rather than remain limited partners in EOP, the parties recognized that this dispute was subject to arbitration under the TPA. On May 10, 2007, counsel for Petitioners wrote to counsel for Respondents stating that the parties should begin to discuss the procedures for the anticipated arbitration and identifying certain issues to be addressed in connection with the arbitration, including: selecting an arbitrator, including exchanging lists of nationally recognized independent public accounting firms that could act as arbitrator; discussing the procedures to be employed if the parties could not agree on a nationally recognized independent public accounting firm; deciding the arbitration rules and procedures that would govern the arbitration; and deciding the place of the arbitration. (May 10, 2007 Letter from Angiolillo to Steinberg (Ex. E).) Counsel for Petitioners proposed that the parties exchange lists of potential arbitrators early the following week; that if the parties could not agree on an arbitrator, then the International Institute for Conflict Prevention and Resolution ("CPR") could chose the arbitrator;

that the arbitration proceeding be governed by the CPR Rules; and that the place of arbitration be New York, New York (where the TPA was negotiated).

69.  By letter dated May 14, 2007, Respondents' counsel indicated that they would be ready to exchange lists of nationally recognized independent public accounting firms by early the following week (though, to date, they have never provided any such list). (*See* May 14, 2007 Letter from Steinberg to Angiolillo (Ex. F).) Respondents' counsel also stated that they believed it was "premature" to discuss the question of which organization might assist the parties in selecting an arbitrator (but then filed a Petition to Compel Arbitration in the District Court of the Northern District of California less than a month later). Respondents' counsel also stated that they were considering the suggestion of Petitioners' counsel to use the CPR Rules, but never provided any further response on this topic. Respondents' counsel said that they thought California would be a more appropriate forum for arbitration, but also stated that they would "consider any reasons you may offer for preferring New York."

70.  On May 23, 2007, Petitioners' counsel spoke with Respondents' counsel by telephone. Petitioners' counsel advised Respondents' counsel that Petitioners were amenable to using any of the "big four" accounting firms — Deloitte Touche Tohmatsu, Ernst & Young, KPMG, and PricewaterhouseCoopers — to arbitrate Respondents' claims. (May 31, 2007 Letter from Gluckow to Edgar (Ex. H).) Respondents' counsel was not prepared to provide Respondents' list at that time.

71.  On May 25, 2007, Respondents' counsel wrote to Petitioners' counsel proposing that the parties exchange information concerning "which nationally recognized public accounting firms meet the definition of 'independent' under" Respondents' interpretation of the TPA. (May 25, 2007 Letter from Edgar to Gluckow (Ex. G).)

72. On May 31, 2007, Petitioners' counsel wrote to Respondents' counsel noting that Petitioners had already proposed four potential arbitrators and that Respondents had not provided their list to Petitioners. (May 31, 2007 Letter from Gluckow to Edgar (Ex. H).) Petitioners' counsel also explained that once Respondents provided Petitioners with their list, the parties would be in a position to "discuss which of the proposed candidates might be mutually acceptable to the parties."

73. Petitioners were awaiting a response to their May 31, 2007 letter when Respondents filed their Petition in the District Court of the Northern District of California on June 8, 2007, breaching the parties' agreement to arbitrate all points of disagreement and seeking to subvert the arbitration and obtain some perceived strategic advantage.

### COUNT I – TO COMPEL ARBITRATION

74. Petitioners incorporate the allegations of paragraphs 1 through 73 as the allegations of paragraph 74.

75. The TPA provides that the parties "shall jointly retain a nationally recognized independent public accounting firm to act as an arbitrator to resolve as expeditiously as possible all points" of their disagreement.

76. Respondents have refused to abide by the TPA, derailing the process to which they agreed and resorting to a court without jurisdiction over the subject matter of the dispute rather than simply proffering their own list of potential arbitrators and reaching an agreement with Petitioners on an arbitrator.

77. This Court's intervention is required to enforce the parties' arbitration agreement by compelling Respondents to tender a list of proposed arbitrators and to meet and confer in good faith with Petitioners to bring the matter to arbitration.

## **RELIEF REQUESTED**

WHEREFORE, Petitioners respectfully request that the Court:

    A.    Enter an order compelling Respondents to provide Petitioners with a list of nationally recognized independent public accounting firms that could act as arbitrator;

    B.    Enter an order compelling Respondents to negotiate in good faith with Petitioners for thirty days so that the parties can jointly retain a nationally recognized independent public accounting firm to act as arbitrator and, failing that, directing the parties to participate in proceedings before the International Institute for Conflict Prevention and Resolution or the American Arbitration Association or another similar arbitral institution to appoint an arbitrator;

    C.    Retain jurisdiction to enforce any order entered by the arbitrator; and

    D.    Grant any such other relief as the Court shall deem just and appropriate.

Dated: July 20, 2007              Respectfully submitted,

                                    Wildman, Harrold, Allen & Dixon LLP

                                    By: _____
                                            One of the Attorneys for Plaintiffs

Michael Dockterman  
Anders C. Wick  
WILDMAN, HARROLD, ALLEN & DIXON LLP  
225 West Wacker Drive  
Chicago, IL 60606-1229  
(Tel.) 312-201-2000  
(Fax) 312-201-2555  
Firm No. 10535